**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SCOTT BISHINS and DARSHAN
HASTHANTRA, Individually and on Behalf
of All Others Similarly Situated,

                Plaintiff,

      v.

CLEANSPARK, INC., ZACHARY
BRADFORD, and S. MATTHEW SCHULTZ,

                Defendants.

Case No. 1:21-cv-00511-LAP

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**

Jay S. Auslander
Michael Van Riper
Wilk Auslander LLP
825 Eighth Avenue, Suite 2900
New York, NY 10019
Tel: 212-981-2300

*Attorneys for Defendants CleanSpark, Inc.,*
*Zachary Bradford, and S. Matthew Schultz*

TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ......................................................................................1

   A. THE PARTIES................................................................................................2

   B. BACKGROUND ............................................................................................2

       1. The FE1 Timeline ...............................................................................3

       2. The Culper Report................................................................................3

   C. THE PAST: ALLEGED NON-DISCLOSURE OF EXISTING FACTS
      REGARDING ATL ACQUISITION ...........................................................4

       1. Previous Owner's Bankruptcy .............................................................4

       2. Marathon Retreats From Its Acquisition of ATL ...................................4

       3. Blue Chip Accounting, LLC Performs a Diligence Audit ......................5

   D. THE FUTURE: TIMING ESTIMATES FOR EXPANSION OF ATL'S
      BITCOIN MINING OPERATIONS...............................................................5

   E. CLEANSPARK'S CLEAR AND MEANINGFUL CAUTIONARY LANGUAGE ..........6

POINT I: PLEADING REQUIREMENTS ARE RIGOROUS .....................................6

   A. Plaintiffs Must State a Plausible Claim Under Rule 8 .................................6

   B. Plaintiffs Must Plead Fraud With Specificity .............................................7

       1. Rule 9(b) Requires
          Particularity ........................................................................................7

       2. PSLRA Requires Even More Specificity................................................7

          a. Alleged Misstatements and Omissions .................................7

          b. Scienter ...............................................................................8

             (1) Motive and Opportunity...................................................9

             (2) Conscious Misbehavior and Recklessness..........................9

POINT II: PLAINTIFFS FAIL TO STATE A SECTION 10(b) CLAIM....................10

   A. Elements of 10(b) Claim...........................................................................10

   B. Plaintiffs Fail to Plead Misstatements And Scienter....................................10

       1. Estimates ...........................................................................................11

          a. Contemporaneous Falsity Is Required...............................11

          b. The Estimates Are Not Material
             Misstatements or Omissions ...............................................12

        c.   Plaintiffs Fail to Allege Scienter ................................................................14

    2.   Statements Regarding ATL Due Diligence ...........................................................15

        a.   ATL Analysis Date ..............................................................................15

        b.   Bankruptcy of Virtual Citadel............................................................16

        c.   Competitor's Decision Not to Buy ATL..............................................16

    3.   Blue Chip Audit       .....................................................................................18

    4.   The Culper Reports and Employee Questions About Them.................................18

    5.   Safe Harbor Applies   .......................................................................................19

C.  Plaintiffs' Reliance Allegations Are Defective...................................................................19

D.  Plaintiffs Fail to Plead Loss Causation ..............................................................................19

POINT III: PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM....................................20

CONCLUSION..............................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014) .............................................................. 20

*Affiliated Ute*,
  406 U.S. 128 (1972) ..................................................................................... 19

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S.Ct. 1937 (2009) ............................................................. 7

*Ashland Inc. v. Morgan Stanley & Co.*,
  652 F.3d 333 (2d Cir. 2011) ........................................................................... 7

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ........................................................................... 21

*Cavello Bay Reinsurance Ltd. v. Shubinn Stein*,
  986 F.3d 161 (2d Cir. 2021) ........................................................................... 7

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ....................................................................... 8, 9

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ........................................................................... 8

*In re Eros Int'l Secs. Litig*,
  2017 WL 6405846 .......................................................................... 8, 10, 12, 16

*Finger v. Pearson PLC*,
  2019 WL 10632904 (S.D.N.Y. Sept. 16, 2019) .................................... passim

*Gamm v. Sanderson Farms, Inc.*,
  944 F.3d 455 (2d Cir. 2019) ..................................................................... 8, 18

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000) ........................................................................... 9

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258, 134 S. Ct. 2398 (2014) ..................................................... 10, 19

*Harris v. AmTrust Fin. Servs., Inc.*,
  135 F. Supp. 3d 155 (S.D.N.Y. 2015) ............................................................ 7

iii

*In re AT&T/DirecTV Now Sec. Litig.*,
 480 F. Supp.3d 507  (S.D.N.Y. Aug. 18, 2020) .............................................. 12, 13, 16

*In re Bear Stearns Cos, Inc. Sec., Derivative, & ERISA Litig.*,
 995 F. Supp. 2d 291 (S.D.N.Y. 2014) ............................................................. 7

*In re Bristol-Myers Squibb Sec. Litig.*,
 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................................ 12

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ....................................................... 12, 14

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
 163 F.3d 102 (2d Cir. 1998) .................................................................... 11, 13

*In re Longtop Fin. Tech. Ltd. Sec. Litig.*,
 910 F Supp. 2d 561 (S.D.N.Y. 2012) .................................................................. 18, 19

*In re Lululemon Sec. Litig.*,
 14 F. Supp. 3d 553 (S.D.N.Y. 2014) .................................................................. 9, 14, 15

*In re Omnicom Grp. Inc. Sec. Litig.*,
 597 F.3d 501 (2d Cir. 2010) ........................................................................ 20

*In re Puda Coal Sec. Inc., Litig.*,
 30 F. Supp. 3d 230 (S.D.N.Y. 2014) .................................................................. 9, 15, 18

*In re Skechers USA, Inc. Sec. Litig.*,
 444 F. Supp. 3d 498 (S.D.N.Y. 2020) ............................................................. 11, 13, 17

*Kalnit v. Eichler*,
 264 F.3d 131 (2d Cir. 2001) .................................................................. 8, 11, 15

*Lau v. Opera Ltd.*,
 527 F. Supp. 3d 537 (S.D.N.Y. 2021) ......................................................... 20

*Lehmann v. Ohr Pharm. Inc.*,
 No. 18 CIV. 1284 (LAP), 2019 WL 4572765 (S.D.N.Y. Sept. 20, 2019) ............ passim

*Lipow v. Netl UEPS Techs., Inc.*,
 131 F. Supp. 3d 144 (S.D.N.Y. 2015) ................................................................ 16, 17

*Martin v. Quartermain*,
 732 F. App'x 37 (2d Cir. 2018) .......................................................... 12, 13

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000) ................................................................... 9, 12

*Sharette v. Credit Suisse Int'l,*
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) ............................................................................ 7

*South Cherry St., LLC v. Hennessee Group LLC,*
    573 F.3d 98 (2d Cir. 2009) ............................................................................................ 9

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
    551 U.S. 308, 127 S. Ct. 2499 (2007) .............................................................. 8, 16, 17

*Tongue v. Sanofi,*
    816 F.3d 199 (2d Cir. 2016) ............................................................................. 7, 12, 17

*Waggoner v. Barclays PLC,*
    875 F.3d 79 (2d Cir. 2017) ................................................................................... 19, 20

*Woolgar v. Kingstone Companies, Inc.,*
    477 F. Supp. 3d 193 (S.D.N.Y. 2020) ........................................................................ 13

## Statutes

15 U.S.C. § 78u-4 .................................................................................................... passim

v

## PRELIMINARY STATEMENT

First, an anonymous short seller called Culper Research issued an inflammatory, self-serving "report" deriding Defendant CleanSpark, Inc.'s ("CleanSpark") acquisition of ATL Data Centers LLC ("ATL") and its data center and bitcoin mining facility. A few days later, this action followed.

Like the short-seller reports it leans on, this action has no merit. Plaintiffs go to great lengths to attempt to squeeze securities fraud claims out of benign, true statements: they allege that vague estimates of future timing were unreasonable and that accurate statements about due diligence omitted "facts" that are clearly immaterial. In short, Plaintiffs come nowhere near satisfying the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act.

The claim Plaintiffs assert under Exchange Act Section 10(b) and Rule 10b-5 (together, the "10(b)(5) Claim") lacks at least three of the necessary elements of such a claim. They identify no material misrepresentation or omission whatsoever. Their allegations do not even approach the very strong inference of "recklessness" that they would have to establish under their chosen theory of scienter. They fail to allege loss causation as well, relying on "corrective disclosures" that are not corrective disclosures and a fraud-on-the-market theory of reliance that undercuts their loss causation allegations. And their reliance allegations are defective as well, because several of the allegedly misleading statements occurred after Plaintiffs purchased their shares.

Finally, because Plaintiffs fail to allege the elements of their primary 10(b)(5) Claim, their "control person liability" claim under Section 20(a) of the Exchange Act fails as a matter of law.

## STATEMENT OF FACTS

On December 10, 2020, CleanSpark, Inc. ("CleanSpark"), a provider of innovative and efficient microgrid controls (Amended Complaint ¶ 2) ("AC"), announced its acquisition of ATL

Data Centers LLC ("ATL") and ATL's principal asset, a data center and bitcoin mining facility in College Park, Georgia (the "ATL Facility"). (AC ¶¶ 3, 61).

## A.     The Parties

Defendant CleanSpark is a bitcoin miner, and "an industrial one at that." (*Id*. ¶ 27). Defendant Zachary Bradford ("Bradford") is CleanSpark's CEO and President. (*Id*. ¶ 22). Defendant S. Matthew Schultz is CleanSpark's Executive Chairman and a Director. (*Id*. ¶ 23). Lead Plaintiff Darshan Hasthantra purchased his shares of CleanSpark between December 31, 2020 and March 5, 2021. (AC Ex.1). Plaintiff Scott Bishins bought CleanSpark shares on January 8, 2021 and sold all of them on January 14, 2021. (Certification to Compl., ECF No. 1).

## B.     Background

CleanSpark's acquisition of ATL has undeniably succeeded, driving a 400% increase in year-over-year revenue and a *seventeen fold* increase in net quarterly revenue, with record net income. (*See* CleanSpark, Inc., *Form 10-K 2021*, at pp. 35, 39, F-6 (filed Dec. 14, 2021)); (CleanSpark, Inc., *Form 10-Q 2022 Q1*, at p. F-2 (filed Feb. 9, 2022)) (Exs. A and B to the accompanying Declaration of Michael Van Riper). Plaintiffs nevertheless allege that Defendants made material misstatements and omissions regarding CleanSpark's acquisition of ATL and its anticipated expansion of mining operations throughout the Class Period (December 10, 2020 through August 16, 2021, inclusive) (AC ¶ 1) (*but see* AC ¶ 34 ("The Class Period starts on December 20, 2020.").

In "support," Plaintiffs cite the wild ravings of a short seller, the anonymous collective known as Culper Research ("Culper") (*Id*. ¶¶ 45-54; 101-04) and the post-hoc musings of a holdover from the failed team that managed ATL before CleanSpark acquired it, Former Employee 1, who departed in June 2021 ("FE1") (*Id*. ¶¶ 67-79).

2

### 1.   The FE1 Timeline

In FE1's opinion, a set of physical and legal conditions at the ATL mining facility made Bradford's timing estimates concerning completion of capacity expansion unreasonable. (*Id*. ¶¶ 76-77, 80).  Yet neither FE1 nor Plaintiffs claim that she or anyone else conveyed those conditions to Bradford, nor that Bradford considered those conditions and agreed that they made his anticipated timeline unreasonable.  Rather, the Complaint alleges only that sometime in "January or February 2021" Bradford "tasked FE1 with" preparing a "detailed timeline and construction plan" (the "FE1 Timeline"). (*Id*. ¶ 75).

Tellingly, the Amended Complaint also leaves the actual details of FE1's "detailed" plan to the reader's imagination. Beyond allegations that the FE1 Timeline "contemplated a completion date in October 2021," (*Id*.) Plaintiffs allege nothing of the FE1 Timeline's contents.

### 2.   The Culper Report

Culper is an admitted short-seller, which inclines it towards trashing its targets in order to depress their share price and cover Culper's short positions.[1] (AC ¶ 45 and Ex. 2 at 1-2).  On January 14, 2021, Culper issued a report (the "First Culper Report") titled "Cleanspark (CLSK): Back to the Trash Can" (*Id*.), in which Culper maligns Defendants at length. The Report especially derides CleanSpark's acquisition of ATL, opining on the bankruptcy of ATL's predecessors (*id*. at 2, 4-6); and postulating (wrongly) that if competing miner Marathon Patent Group ("Marathon") could not make ATL work, neither could CleanSpark. (*Id*. at 6).  The First Culper Report also

---

[1] Indeed, in unrelated litigation, Culper has conceded the "obvious bias" arising from its desire to "benefit from declines in [the target's] share price." (*See* Defs.' Mem. in Supp. Mot. Dismiss 1, 8, *LifeMD, Inc., et al. v. LaMarco, Culper Research, et al.* (W.D. Pa.) ("*LifeMD*"), ECF No. 19 (Van Riper Decl. Ex. C)). Culper aptly describes its own work product as "replete with language of conjecture," (*Id*. 10), "speculative" (*Id*.), and "biased opinion." (Defs. Reply Mem. in Supp. Mot. Dismiss 8, *LifeMD*, ECF No. 24 (Van Riper Decl. Ex. D)).

relies on already public information:  As the Complaint concedes, the fact of Virtual Citadel's bankruptcy, ATL's acquisition of the data center in the bankruptcy, and Marathon's decision to walk away from ATL were all matters of public record in court filings and press releases. (*Id*. ¶¶ 57-58, 61 n. 16, 47, and 48 n. 10).  So, too, were the corporate records and websites Culper reviewed in order to spin its yarn about CleanSpark investors "paying Porsche 911 prices for what amounts to a broken-down Toyota Corolla [i.e., ATL]."  (AC Ex. 2 at 2).

This action commenced almost immediately thereafter, on January 20, 2021, with an original complaint that did little more than overlay legal boilerplate over a near-verbatim quotation of the First Culper Report. (ECF No. 1). On June 18, 2021, Culper issued a second report (the "Second Culper Report," and, together with the First Culper Report, the "Culper Reports"), claiming that it could not reconcile CleanSpark's reported costs and expenses for its mining operations with ATL's utility bills. (AC ¶¶ 101-03 and Ex. 3).

## C.     The Past: Alleged Non-Disclosure of Existing Facts Regarding ATL Acquisition

Plaintiffs claim CleanSpark should have "disclosed" three categories of alleged facts when it announced its acquisition of ATL on December 10, 2020:

### 1.     Previous Owner's Bankruptcy

The ATL Facility was previously owned by Virtual Citadel, Inc. ("Virtual Citadel"), an entity that went into receivership in November 2019 and bankruptcy in February 2020 after the death of its founder.  (AC ¶¶ 56-58).  Virtual Citadel's management team incorporated ATL on April 13, 2020 (*Id*. ¶ 61); ATL acquired the data center on or about June 5, 2020 (*Id*.); and CleanSpark announced its agreement to acquire ATL on December 10, 2020.  (*Id*. ¶ 3).

### 2.     Marathon Retreats From Its Acquisition of ATL

Virtual Citadel's team, however, marketed the data center under the name "FastBlock Mining" ("FastBlock"). (*Id*. ¶¶ 6, 62-63). It was under that name, FastBlock, that Marathon, a

4

bitcoin miner and CleanSpark competitor, announced its own fleeting bid to acquire the data center on August 26, 2020. (*Id*. ¶ 63(a)). Marathon withdrew that bid on September 17, 2020, stating in a press release that the expiration of a subsidized power rate agreement a full *three years* in the future made the project economically infeasible—for Marathon (not CleanSpark). (*Id*. ¶ 45, 47).

### 3.    Blue Chip Accounting, LLC Performs a Diligence Audit

FE1 alleges that Blue Chip Accounting, LLC ("Blue Chip"), which Bradford co-founded, conducted two due diligence audits of ATL for CleanSpark. (*Id*. ¶ 73). To be sure, she is mistaken, but in any event Plaintiffs ignore that CleanSpark has long disclosed its and Bradford's relationship with Blue Chip as a related party transaction and disclosed that Blue Chip provides bookkeeping, accounting, and administrative support assistance to CleanSpark. (CleanSpark, Inc., *Form 10 Q 2020 Q3*, at p. F-22 (filed Aug. 4, 2020) (Van Riper Decl. Ex. E)).

## D.    The Future: Time Estimates For Expansion of ATL's Mining Operations

Upon acquiring ATL, CleanSpark immediately made plans to expand the mining capacity at the ATL Facility. (AC ¶¶ 3-4, 35). In press releases and statements at investor conferences, Bradford made forward-looking predictions of the dates on which CleanSpark expected it would meet certain target benchmarks for power capacity (as expressed in megawatts) and total processing power (as expressed in petahashes or exahashes), adjusting the expected dates where appropriate.[2] Relying heavily on FE1, Plaintiffs claim these were unreasonable. (*Id*. ¶ 80).

---

[2] The alleged statements are: (i) a 12/10/20 press release stating, "[i]t is expected that this expansion will begin promptly and be completed in April 2021." (AC ¶ 118); (ii) at a 12/10/20 virtual conference for investors, Bradford allegedly, in answer to an investor question, stated, "[O]ur expansion from 20 to 50 should happen over the next, call it three, three and a half months. So we expect it to be complete by the end of April…." (*Id*. ¶ 120); (iii) a 12/31/20 press release that does not include any estimated date for capacity expansion completion, and states, "We are working diligently to expand the data center capacity allowing us to further increase these initial estimates [regarding revenue], but the Company's guidance will remain somewhat conservative until the expansion has been completed and we have sufficient date to forecast a firm outlook." (*Id*. ¶ 122); (iv) a 1/5/21 press release that does not include any estimated date for capacity

## E.    CleanSpark's Clear and Meaningful Cautionary Language

The statements Plaintiffs cite identify themselves as forward-looking statements and incorporate CleanSpark's existing SEC reports.  These are replete with meaningful cautionary language, including warnings that CleanSpark expected to incur losses and that its success depended on the successful integration of acquisitions (specifically including ATL), its management of contract suppliers, its ability to withstand the impact of future growth on operations and systems, and the continued availability of favorable utility rate structures and government subsidies.  (CleanSpark, Inc., *Press Release, CleanSpark Agrees to Acquire Bitcoin Miner ATL Data Center* 5, Dec. 10, 2020 (Van Riper Decl. Ex. F)); (CleanSpark, Inc., *Form 10-K 2019*, at pp. 11, 13-14, filed December 16, 2019 (Van Riper Decl. Ex. G)).

## POINT I: PLEADING REQUIREMENTS ARE RIGOROUS

Strict pleading requirements apply to the securities fraud claims Plaintiffs assert.

## A.    Plaintiffs Must State a Plausible Claim Under Rule 8

Under FRCP 8, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009)). While a court on a Rule 12(b)(6) motion "'must accept as true all of the [factual] allegations contained in the complaint,'" it need not accept "'a legal conclusion couched as a factual

---

expansion completion, and states, "We will continue to provide periodic updates as we make additional progress on our expansion plans…." (*Id*. ¶ 124); (v) a 2/12/21 press release stating that the increase in capacity "is expected to be complete by mid-year 2021" (*Id*. ¶ 126)); (v) at a 2/18/21 virtual conference, Bradford allegedly stated that "we expect" the capacity expansion to be complete "by midsummer" (*Id*. ¶ 128); (vi) a 3/2/21 press release stating, "[w]e … expect" to reach expanded capacity "this summer" (*Id*. ¶ 130); (vii) a 3/26/21 press release stating, "as previously announced, [CleanSpark] intends to reach" expanded capacity "by end of summer, 2021." (*Id*. ¶ 132); (viii) a 4/15/21 press release containing the same statement. (*Id*. ¶ 134); (iv) a 5/6/21 press release stating, "The capacity increase is underway and is expected to be complete by summer 2021." (*Id*. ¶ 136).

6

allegation.'" *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 168 (S.D.N.Y. 2015) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).

The Court may consider documents the complaint attaches or incorporates, *see Cavello Bay Reinsurance Ltd. v. Shubinn Stein*, 986 F.3d 161, 165 (2d Cir. 2021), as well as SEC filings, *see Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016), and matters appropriate for "judicial notice." *Sharette v. Credit Suisse Int'l,* 127 F. Supp. 3d 60, 75 (S.D.N.Y. 2015).

**B.       Plaintiffs Must Plead Fraud With Specificity**

Securities fraud claims are subject to "the heightened pleading requirements" of both FRCP 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2) ("PSLRA"). *See*, *e.g.*, *Lehmann v. Ohr Pharm. Inc.*, No. 18 CIV. 1284 (LAP), 2019 WL 4572765, at *2 (S.D.N.Y. Sept. 20, 2019) (Preska, *J.*), *aff'd and remanded*, 830 F. App'x 349 (2d Cir. 2020)

### 1.       Rule 9(b) Requires Particularity

Plaintiffs alleging fraud must "state with particularity the circumstances constituting fraud," FRCP 9(b), by "(1) specify[ing] the statements that the [claimant] contends were fraudulent, (2) identify[ing] the speaker, (3) stat[ing] where and when the statements were made, and (4) explain[ing] why the statements were fraudulent." *In re Eros Int'l Secs. Litig.*, 2017 WL6405846, at *4 (S.D.N.Y. Sept. 22, 2017).  "General, conclusory, or speculative allegations, unsupported by specific facts, are legally insufficient," *In re Bear Stearns Cos, Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 299 (S.D.N.Y. 2014), as are "hindsight-driven allegations." *See Finger v. Pearson PLC*, 2019 WL 10632904, at *14 (S.D.N.Y. Sept. 16, 2019).

### 2.       PSLRA Requires Even More Specificity

#### a.       Alleged Misstatements and Omissions

The "heightened pleading requirements" of the PSLRA also apply to securities fraud claims.  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d

7

187, 196 (2d Cir. 2009). "The PSLRA *builds on* Rule 9's particularity requirement," *Employees'*

*Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (emphasis

added), requiring plaintiffs asserting Exchange Act claims to "specify each statement alleged to

have been misleading, the reason or reasons why the statement is misleading, and, if an allegation

regarding the statement or omission is made on information and belief the complaint shall state

with particularity all facts on which that belief is based." 15 U.S.C. § 78u-4(b)(1).

As with FRCP 9(b), "[c]onclusory and hindsight-driven allegations" do not satisfy the

PSLRA's pleading requirements. *Finger*, 2019 WL 10632904, at *14.

### b.    Scienter

In addition, the PSLRA requires securities fraud plaintiffs to "plead scienter" – "intent[] to

deceive, manipulate, or defraud" – "with particularity."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d

Cir. 2001); *Eros,* 2017 WL 6405846, at *3-4. Thus, securities fraud plaintiffs "must with respect

to each act or omission … state with particularity facts giving rise to a *strong* inference that the

defendant acted with the required state of mind." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455,

462 (2d Cir. 2019) (emphasis added).

In determining whether the plaintiff has satisfied that standard, "a court *must* consider

plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the

plaintiff." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–24, 127 S. Ct. 2499, 2509–

10 (2007) (emphasis added). The alleged facts must give rise to "an inference of scienter *at least*

*as likely* as any plausible opposing inference." *Finger*, 2019 WL 10632904, at *12.

"[F]raud by hindsight" is not sufficient. *E.g.*, *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.

2000). Further, where plaintiffs claim that "defendants had access to contrary facts, they [the

plaintiffs] must specifically identify the reports or statements containing this information." *Id.*

Finally, where the alleged facts do not "'indicat[e] a clear duty to disclose, plaintiff's scienter

8

allegations do not provide *strong* evidence of conscious misbehavior or recklessness.'" *Finger*, 2019 WL 10632904, at \*13 (quoting *Kalnit*, 264 F.3d at 144).

To allege facts giving rise to a "strong inference" of scienter, the plaintiff must either "(1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 247 (S.D.N.Y. 2014), *aff'd sub nom. Querub v. Hong Kong*, 649 Fed. Appx. 55 (2d Cir. 2016).

### (1)    Motive and Opportunity

The "motive and opportunity" route to scienter may not rest on general allegations that defendants were attempting to maximize corporate profit or their own compensation, however. *See, e.g., ECA, Loc. 134 IBEW*, 553 F.3d at 198; *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000).

### (2)    Conscious Misbehavior and Recklessness

And the pleading requirements for the other route to scienter, "conscious misbehavior or recklessness," are demanding as well. "Conscious misbehavior generally consists of deliberate, illegal behavior." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 573 (S.D.N.Y. 2014), *aff'd*, 604 Fed. Appx. 62 (2d Cir. 2015). Recklessness is "'a state of mind approximating actual intent, and not merely a heightened form of negligence.'" *Lehmann*, 2019 WL 4572765, at \*6 (quoting *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009)). Pleading recklessness "requires allegations that a defendant's conduct was *highly unreasonable* and constitutes *an extreme departure from the standards of ordinary care* to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (internal quotation marks omitted and emphasis added). *See also Finger,* 2019 WL 10632904, at \*13.

Moreover, where scienter is based on "conscious misbehavior or recklessness," the

9

inference must be even "stronger" than where it is based on "motive and opportunity." *E.g., Finger*, 2019 WL 10632904, at *12.

### POINT II: PLAINTIFFS FAIL TO STATE A SECTION 10(b) CLAIM

Plaintiffs assert a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5").

**A.    Elements of 10(b) Claim**

The elements of a claim under Section 10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267, 134 S. Ct. 2398, 2407 (2014) ("*Halliburton II*").

An omission generally is actionable only where there is "a duty to disclose the omitted facts.'" *Eros*, 2017 WL 6405846, at *6. There is no such duty "simply because an investor might find the information relevant or of interest." *Id.* Moreover, an omission gives rise to liability "'only when an issuer's failure to include a material fact has rendered a published statement misleading.'" *Id.* at 9. "The key question" is "'whether defendants' representations, taken together and in context, would have misle[d] a reasonable investor,' not whether it is susceptible to any interpretation that could generate misleading impressions when read in isolation." *In re Skechers USA, Inc. Sec. Litig.,* 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020).

Here, as set forth below, Plaintiffs fail to allege at least four necessary elements of their 10(b) Claim: material misstatements or omissions; scienter; reliance; and loss causation.

**B.    Plaintiffs Fail to Plead Misstatements And Scienter**

Plaintiffs purport to allege misstatements or omissions appearing in press releases, investor calls, and SEC filings. These fall into two categories: (i) statements estimating the future date of

completion of expansion of the power supply at the ATL Facility (the "Estimates"); and (ii) statements regarding the acquisition of ATL. Plaintiffs claim the latter falsely stated that early-stage analysis of "ATL" began in February 2021 and did not "disclose" (a) that ATL's assets previously belonged to a bankrupt entity, Virtual Citadel; (b) that a competitor, Marathon, had considered acquiring ATL but then declined to do so; and (c) that Blue Chip, co-founded by Bradford, conducted the audit of ATL during CleanSpark's due diligence.

As set forth below, however, "[t]he challenged statements were neither false nor misleading," *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998). Further, the alleged statements all fall within the PSLRA's safe harbor. Accordingly, none of them is actionable.

In addition, Plaintiffs do not allege any facts even approaching a "strong" inference that Defendants made the alleged statements with any intent "to deceive, manipulate, or defraud," thus failing to plead scienter. *E.g., Kalnit*, 264 F.3d at 138.

### 1. Estimates

#### a. Contemporaneous Falsity Is Required

A statement is not actionable under Exchange Act Section 10(b) or Rule 10b-5 unless it is "contemporaneously false: A statement believed to be true when made, but later shown to be false, is insufficient." *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *7 (S.D.N.Y. Mar. 30, 2021) (Preska, J.) (internal quotation marks omitted).

Predictions and estimates are statements of opinion, not fact. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004) (Preska, *J.*); *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018). Where an alleged statement is "a false opinion…the scienter and misrepresentation requirements of § 10(b) collapse together because a material misstatement of opinion is by its nature a false statement, not about the objective word, but about the defendant's

11

own belief." *Lehmann*, 2019 WL 4572765, at *6 (internal quotation marks omitted).

"[E]xpressions of optimism, opinions, predictions, and projections about the future" cannot form the basis for a Section 10(b) or Rule 10b-5 claim unless "'the speaker did not hold the belief she professed,'" "supplied … untrue" "supporting fact[s]," or "omit[ted] information whose omission makes the statement misleading to a reasonable investor." *Tongue*, 816 F.3d at 210; *see also In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp.3d 507, 523  (S.D.N.Y. Aug. 18, 2020) (internal quotation marks omitted) (holding that "[g]eneric, indefinite statements of corporate optimism" are not actionable and acknowledging that "reasonable investors" do not rely on these). There is no requirement that corporate leaders "'take a gloomy, fearful or defeatist view of the future.'" *AT&T/DirecTV*, 480 F. Supp. 3d at 523.

Merely alleging "that the opinion was wrong or that the defendant failed to reveal its basis for the opinion" is not enough to state a claim. *Finger*, 2019 WL 10632903, at *9. And issuers need not "disclose a piece of information merely because it cuts against their projections." *Tongue*, 816 F.3d at 214. Nor is puffery actionable, including "'[s]tatements containing simple economic projections, [and] expressions of optimism.'" *Lehmann,* 2019 WL 4572765, at *4 (quoting *Novak*, 216 F.3d at 315). Finally, "disclaimers" are relevant. *See Eros*, 2017 WL 6405846, at *8 (no misrepresentation given conclusory allegations and disclaimers).

### b.    The Estimates Are Not Material Misstatements or Omissions

As a preliminary matter, the Estimates – which consist of general statements that "we expect" or "intend" to complete capacity expansion by vaguely referenced times, such as "end of summer, 2021" (AC ¶ 97) -- are not actionable because they are puffery, "too general to cause a reasonable investor to rely upon them." *Skechers USA,* 444 F. Supp. 3d at 517.

Even putting that aside, the Estimates are not actionable: at most, they predict when the ATL facility expansion will be complete and therefore are opinions as a matter of law. *See, e.g.*,

12

*Martin*, 732 F. App'x at 40. The cautionary and informal language surrounding them, such as "we expect" (AC ¶¶ 120, 128) and "call it three, three and a half months" (AC ¶ 120), underscores this. *See In re Int'l Bus. Machines,* 163 F.3d at 108 (investor reliance on projections as "long-term guarantees" would not be reasonable in light of "sufficient cautionary language to indicate that they were only short-term predictions."); *Finger*, 2019 WL 10632904, at *8 ("forward-looking projections were not phrased as assurances" where defendant did not "guarantee" projections and instead "used broad, optimistic language" such as "it 'expect[ed]'").

Plaintiffs nowhere allege that Bradford did not believe the Estimates were correct when he provided them or that he gave "supporting fact[s]" for them that "were untrue." *Lehmann*, 2019 WL 4572765, at *3. Moreover, Plaintiffs do not even "allege[] that Defendants reviewed any contemporaneous information that should have undermined the optimism in their strategies." *AT&T/DirecTV*, 480 F. Supp. 3d at 531. While Plaintiffs point to the FE1 Timeline, according to Plaintiffs' allegations, several of the Estimates took place *before* FE1 even provided the timeline. (*E.g.*, AC ¶¶ 118-28). And even with respect to Estimates that took place after FE1 allegedly provided the Timeline, Plaintiffs cannot rely on the FE1 Timeline because they fail to "specifically identify" the report, as FRCP 9(b) and the PSLRA require. *Novak*, 216 F.3d at 30; *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 221-22 (S.D.N.Y. 2020) ("Without approximate dates as to when the CWs had – or raised – certain concerns, their allegations do not plead contemporaneous falsity.").

Further, while the Complaint alleges that various "undisclosed factors," such as the need for certain permits or contracts, rendered Defendants' Estimates "unrealistic" or "lacking any reasonable basis" or of "extremely low" likelihood (AC ¶¶ 119(d); ¶ 129), Plaintiffs notably do not allege which of these Defendants were aware of when the Estimates were made, or at any other

13

time thereafter. Despite conclusorily alleging that FE1's Timeline was a "detailed" plan, the Complaint is devoid of details concerning the Report. *See In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 637007, at \*3 (S.D.N.Y. July 9, 2020) ("There can be no actionable omission under the securities laws if the defendants never had the purportedly omitted information in the first place."); *Finger*, 2019 WL 10632904, at \*13-14 ("no details as to what Defendants knew, and when they knew it, that would have made their statements knowingly false")

Nor did Defendants have any obligation to disclose every fact "cutting the other way," *see Lehmann*, 2019 WL 4572765, at \*3, such as the was minor alleged discrepancy between the "October 2021" estimate set forth in the FE1 Timeline and the "summer 2021" or "end of summer 2021" (AC 134) Estimates that occurred after delivery of the FE1 Timeline.

Thus, Plaintiffs have no basis for claiming anything in the FE1 Timeline rendered the Estimates false when made. *See, e.g., LuLuLemon,* 14 F. Supp. 3d at 573. Given that the Complaint is devoid of allegations that the Estimates were "contemporaneously false," they cannot be actionable. *See, e.g., Diebold Nixdorf,* 2021 WL 1226627.

### c.    Plaintiffs Fail to Allege Scienter

Plaintiffs' 10(b) Claim also fails with respect to the Estimates because they do not allege "with particularity" – or at all – that in making these Estimates Defendants intended to "deceive, manipulate, or defraud." *Kalnit*, 264 F.3d at 138. Plaintiffs do not even purport to identify any "motive" by Defendants to defraud. *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 247 (S.D.N.Y. 2014), *aff'd sub nom. Querub v. Hong Kong*, 649 Fed. Appx. 55 (2d Cir. 2016). As a result, Plaintiffs bear the burden of alleging especially strong "circumstantial evidence of conscious misbehavior or recklessness." *E.g., Finger*, 2019 WL 10632904, at \*12. Here, where plaintiffs allege reckless predictions, "the falsity and scienter [pleading] requirements are essentially combined," *Lululemon*, 14 F. Supp. 3d at 574, and so the Amended Complaint fails for

14

the same reasons set forth above.

Tellingly, there is not a single instance in which Plaintiffs allege that Defendants *knew* they purportedly had "no reasonable basis" for the Estimates. *See* AC ¶¶ 80; 131(b). Further, scienter is lacking given that there is a more compelling, competing interpretation of Plaintiffs' allegations: that Bradford believed his Estimates and nothing in the FE1 Timeline – which was prepared by a since-departed managerial holdover of Virtual Citadel, CleanSpark's failed predecessor at the ATL Facility (AC ¶¶ 68-69)– persuaded Defendants that October 2021 was the correct estimate. *See Finger*, 2019 WL 10632904, at *14 (concluding that inference of "misplaced optimism" was "more compelling" than inference of recklessness based on the facts alleged).

## 2.    Statements Regarding ATL Due Diligence

CleanSpark's alleged statements regarding its due diligence concerning the ATL acquisition likewise reflect no actionable misstatement or omission and no scienter.

### a.    ATL Analysis Date

Plaintiffs half-heartedly point to a statement in a December 10, 2020 press release in which Bradford, almost immediately after referring to "the ATL complex," said: "We began early-stage analysis of ATL: in February 2020 to evaluate expanding *the facility's* energy capacity and reducing energy costs." (AC ¶¶ 118). Plaintiffs claim this statement "could not be true" because the company ATL did not exist in February 2020. (AC ¶ 119(a))). But the statement at issue is neither false nor misleading: it obviously refers to the ATL data facility, not the corporate entity, an interpretation the Amended Complaint itself immediately concedes.  (AC 119(b))

Nor do Plaintiffs' allegations establish the very strong inference of scienter that the law requires. *See, e.g.*, *In re AT&T/DirecTV*, 480 F. Supp.3d 507, 523 (S.D.N.Y. Aug. 18, 2020) (allegations based on recklessness require "an even stronger showing of intent"). A more compelling nonculpable explanation than intent to defraud, *see*, *e.g.*, *Tellabs, Inc. v. Makor Issues*

15

*& Rts., Ltd.*, 551 U.S. 308, 322–24, 127 S. Ct. 2499, 2509–10, 168 L. Ed. 2d 179 (2007), is readily available, as set forth above: "ATL" referred to the ATL Facility.

### b.    Bankruptcy of Virtual Citadel

Plaintiffs' effort to demonstrate a material omission concerning the bankruptcy of the previous owner of ATL, Virtual Citadel, also fails because CleanSpark had no duty whatsoever to disclose the bankruptcy of this unrelated entity.  Nor do Plaintiffs specify what "material risks about the quality and profitability of the underlying business" CleanSpark purportedly omitted by not discussing Virtual Citadel's bankruptcy following the "sudden[]" death of its owner (AC ¶ 56, 119). This comes nowhere near satisfying FRCP 9(b) and the PSLRA requirements.

Moreover, to the extent that Plaintiffs imply that not discussing the Virtual Citadel bankruptcy somehow conceals a risk that acquisition of ATL could threaten CleanSpark's financial health, that is inherently speculative and therefore cannot form the basis of a Section 10(b) or Rule 10b-5 claim. *See*, *e.g.*, *Lipow v. Netl UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170-71 (S.D.N.Y. 2015). (Also, Plaintiffs' implication is wrong: CleanSpark has flourished.) Further, CleanSpark's many disclaimers and cautionary language in its securities filings amply disclose the risks of its business (*see* Van Riper Decl. at ¶ _ and Ex. G), yet more evidence there was no actionable misstatement or omission here.  *See Eros*, 2017 WL 6405846, at *8.

Finally, Plaintiffs' allegations concerning "omission" of Virtual Citadel fail to state a claim because Plaintiffs do not even purport to allege that Defendants made the relevant statements with intent to defraud. And, certainly, a much more compelling inference exists: that Defendants (correctly) did not believe Virtual Citadel's bankruptcy was relevant to CleanSpark's success with the ATL acquisition nor that the acquisition would fail. *See, e.g., Tellabs*, 551 U.S. at 322-24.

### c.    Competitor's Decision Not to Buy ATL

Plaintiffs also strain to find liability in Schultz's unremarkable alleged statement that

16

"recent, significant investments into Bitcoin by such respected companies as Square, PayPal, and MicroStrategy further validate our due diligence conclusions surrounding this acquisition." (AC ¶ 119(c).) Plaintiffs do not claim this was false, but they assert that not mentioning Marathon's decision not to complete the transaction was a material omission worthy of 10(b) liability. (*Id*.) It isn't. First, this general, optimistic statement is not actionable because it is "puffery." *See Skechers*, 444 F. Supp. 3d at 498; *Lehmann*, 2019 WL 4572765 at 4.

Second, "Defendants cannot be held liable for failing to disclose what would have been pure speculation." *Lipow v. Netl UEPS Techs., Inc.*131 F. Supp. 3d 144, 170-71 (S.D.N.Y. 2015). The impact of Marathon's reported reason for withdrawing its bid – the expiration of a subsidized power rate agreement a full three years in the future that meant the project was economically infeasible *for Marathon* – on CleanSpark's acquisition is purely speculative. Moreover, Plaintiffs themselves openly speculate about what the "real" reason for Marathon's withdrawal was. (AC ¶ 71). As a matter of law, Defendants simply had no duty to "disclose" this alleged fact given the speculative nature of any impact. *See Lipow*, 131 F. Supp. 3d at 170.

Third, even assuming for the sake of argument that Marathon's decision not to go forward with the transaction somehow cut against CleanSpark's decision to acquire ATL, Defendants had no obligation to disclose every fact that might cut against their decision. *See, e.g., Tongue*, 816 F.3d at 214.

Finally, Schultz's alleged statement cannot form the basis for 10(b) liability because Plaintiffs' allegations give rise to no "strong" inference of "conscious misbehavior or recklessness," *see Finger*, 2019 WL 10632904, at *13 -- or indeed any at all. In addition, Bradford cannot be liable for this statement because he was not the alleged maker or disseminator of it and, conversely, Schultz cannot be liable for any of the other statements for the same reason. *See in re*

17

*Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 247 (S.D.N.Y. 2014), aff'd sub nom. *Querub v. Hong Kong*, 649 Fed. Appx. 55 (2d Cir. 2016).

### 3.    Blue Chip Audit

Plaintiffs also take issue with a "statement concerning the depth and rigor of Defendants' due diligence with respect to this acquisition" due to the use of "Blue Chip Accounting," co-founded by Bradford, to conduct the audit (AC ¶ 119(e)). But under Rule 9(b) and the PSLRA, a plaintiff must plead the basis its contention that a statement is fraudulent. *See Gamm*, 944 F.3d at 463. Plaintiffs provide no such facts: they do not allege what, if anything, they claim was wrong with the audit and therefore have "not met the burden of explaining what rendered the statement[] materially false or misleading." *Id.* Plaintiffs' allegations of scienter are likewise deficient: they proffer no facts demonstrating "conscious misbehavior" or "recklessness" – let alone facts giving rise to the strong inference required here. *See*, *e.g., Finger*, 2019 WL 10632904, at *13.

### 4.    The Culper Reports and Employee Questions About Them

Plaintiffs' attempt to shore up scienter allegations by pointing to the anonymous Culper Reports' derogatory statements concerning CleanSpark's ATL acquisition (AC ¶¶ 141-45) and to CleanSpark's supposed refusal to answer employee questions about the "reports" (AC ¶ 146-48) fails. "[S]hort sellers operate by speculating that the price of a security will decrease." *In re Longtop Fin. Tech. Ltd. Sec. Litig.*, 910 F Supp. 2d 561, 577-78 (S.D.N.Y. 2012). They therefore "have an obvious motive to exaggerate the infirmities of the securities in which they speculate." *Id.* And that motive is on full display in the Culper Reports, which ask such slanted questions as "why has the Company not disclosed this potentially devastating risk?" (AC ¶ 51). A much more compelling interpretation of Plaintiffs' allegations exists: that, having *already been named* as Defendants in a federal action that essentially mirrored the outrageous claims in the Culper Reports, Defendants were responsible and careful in their responses to short-seller Culper and to

18

employee questions about it.

### 5.    Safe Harbor Applies

In addition, Plaintiffs fail to allege any actionable statement whatsoever because all of the alleged misstatements and omissions set forth in the Complaint fall within the PSLRA's safe harbor, 15 U.S.C. § 78u-5(c) -- contrary to Plaintiffs' conclusory, preemptive allegations (AC ¶ 167). CleanSpark's press releases and reports are full of meaningful cautionary language and identification of forward-looking statements. (*See* Van Riper Decl. ¶ _ and Ex. G.)

### C.    Plaintiffs' Reliance Allegations Are Defective

First, contrary to Plaintiffs' conclusory allegations, they cannot have relied on any alleged "fraudulent" statements that took place after March 5, 2021 under the "fraud-on-the-market" presumption because neither of them purchased shares after that date, according to their own certifications.  (AC Ex.1); (Certification to Compl., ECF No. 1).  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268, 134 S. Ct. 2398, 2408, 189 L. Ed. 2d 339 (2014).

Second, Plaintiffs' attempt to plead reliance based on *Affiliated Ute*, 406 U.S. 128 (1972) (AC ¶ 40) is misplaced because that applies only where the case primarily involves "failure to disclose" rather than affirmative misrepresentations. *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017). Here, (i) Plaintiffs rely on several alleged affirmative misstatements, including the Estimates and the reference to "early-stage analysis" of ATL and (ii) the alleged omissions are not "pure omissions" but rather "positive statements" whose "only [alleged] omission is the truth that the statement [allegedly] misrepresents," *e.g.*, *id.* at 96.

### D.    Plaintiffs Fail to Plead Loss Causation

Plaintiffs rely in part on "corrective disclosures" to plead loss causation. (AC ¶¶ 151-52 (alleging that Defendants' purported misstatements inflated the price of CleanSpark's stock and that subsequent corrective disclosures caused the stock price to fall)). "Already-public information

cannot constitute a corrective disclosure for purposes of alleging loss causation." *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537 (S.D.N.Y. 2021). Thus, "[a] negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom Grp. Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).

Here, Plaintiffs fail to plead any corrective disclosure.  Contrary to AC ¶ 54, the anonymous First Culper Report is not a corrective disclosure given that it is based on publicly available information, such as securities filings. *See, e.g., Omnicom*, 597 F.3d at 511. While the anonymous Second Culper Report attaches utility bills, those are merely further support for the same allegations already made in the First Culper Report.  In addition, the Culper Reports cannot be corrective disclosures with respect to the Blue Chip Audit because they do not discuss it at all and because CleanSpark had already disclosed its and Bradford's Blue Chip's relationship with Bradford and CleanSpark.

Nor can any of the Estimates be corrective disclosures, as Plaintiffs claim (AC ¶¶80-83), because "none disclose[s] the allegedly omitted facts upon which Plaintiffs based their fraud claim," *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 208 (D. Conn. 2014), such as the FE1 Timeline or the "conditions" that Plaintiffs claim made the dates in the Estimates "unlikely."

### POINT III: PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM

Where plaintiffs fail "to state a primary violation under Section 10(b), they cannot establish control person liability under § 20(a)." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007). Plaintiffs' failure to state a claim under Section 10(b) and Rule 10b-5 for the reasons set forth above therefore requires dismissal of their Section 20(a) claim as well. *See id.*

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' action in its entirety with prejudice.

/s/Jay S. Auslander
Jay S. Auslander
Michael Van Riper
Wilk Auslander LLP
825 Eighth Avenue, Suite 2900
New York, NY 10019
Tel: 212-981-2300

*Attorneys for Defendants CleanSpark, Inc.,
Zachary Bradford, and S. Matthew Schultz*

Dated:  April 28, 2022

21