# EXHIBIT C

Declaration of Michael Van Riper In Support of Defendants' Motion to Dismiss
*Hasthantra, et al. v. CleanSpark, Inc., et al.*, No. 20-cv-00511 (LAP)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LIFEMD, INC., JUSTIN SCHREIBER and STEFAN GALLUPPI | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION |
| | : | |
| CHRISTIAN MATTHEW LAMARCO, | : | NO.  2:21-cv-00640-WSS |
| CULPER RESEARCH and JOHN/JANE DOES 2-10 | : | |
| | : | |
| Defendants. | : | |
| | : | Electronically Filed |
| | : | |

**DEFENDANTS CHRISTIAN MATTHEW LAMARCO
AND CULPER RESEARCH'S MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

**TABLE OF CONTENTS**

**Page**

STATEMENT OF FACTS ............................................................................................ 3

ARGUMENT ............................................................................................................. 6

I.     Plaintiffs Failed to Plead Actionable Defamation Or Trade Libel. ..................... 6

   A.   The Challenged Statements are Statements Opinion Are Not Actionable Under The New York Constitution, Which Affords Greater Protection To Such Statements Than The First Amendment. ................................................................... 6

      1.   The Article's Context Signaled To The Reader it Was Opinion ................................... 8

      2.   The Specific Challenged Statements Are Protected Opinion Because They Disclosed The Sources On Which the Opinions Were Based. .................................... 11

   B.   Plaintiffs, Public Figures, Failed To Plead Actual Malice............................................... 17

   C.   Plaintiffs Fail To Plead Special Damages........................................................................ 19

II.    Plaintiffs' Demand For A Permanent Injunction Is Not A Standalone Cause of Action And, In Any Event, Is A Request For an Unconstitutional Prior Restraint............ 20

CONCLUSION................................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*600 W. 115th St. Corp. v. Von Gutfeld*,
  80 N.Y.2d 130, 139 (1992))............................................................................................7

*Alabama v. U.S. Army Corps. of Engineers*,
  424 F.3d 1117 (11th Cir. 2005) ...................................................................................20

*Alexander v. United States*,
  509 U.S. 544 (1993)......................................................................................................20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................................18

*Bellavia Blatt & Crossett, P.C. v. Kel & Parnters LLC*,
  151 F. Supp. 3d 287 (E.D.N.Y. 2015), *aff'd* 670 Fed. App'x 731 (2d Cir.
  2016) ...........................................................................................................................8, 10

*Biro v. Conde Nast*,
  807 F.3d 541 (2d Cir. 2015).....................................................................................17, 18

*Biro v. Conde Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd* 807 F.3d 541 (2d Cir. 2015) ...............18

*Brian v Richardson*,
  87 N.Y.2d 46 (1995) ...................................................................................................7, 10

*Dillon v. City of New York*,
  261 A.D.2d 34 (1st Dep't 1999) ....................................................................................6

*Drug Research Corp. v. Curtis Pub. Co.*,
  *7 N.Y.2d 435 (1960)* ...................................................................................................19

*Egiazaryan v. Zalmayev*,
  880 F. Supp. 2d 494 (S.D.N.Y. 2012).......................................................................8, 18

*Eros Intern. PLC v. Mangrove Partners*,
  2019 WL 1129196 (N.Y. Sup. Mar. 8, 2019), *aff'd*, 191 A.D.3d 465 (1st Dep't
  2021) ..............................................................................................................................8

*Farb v. Baldwin Union Free School District*,
  2006 WL 8439500 (E.D.N.Y. Mar. 3, 2006)................................................................6

*Franklin Prescriptions, Inc. v. The New York Times Co.*,
   267 F. Supp. 2d 425 (E.D. Pa. 2003) ...................................................................6

*Gross v. New York Times Co.*,
   82 N.Y.2d 146 (1993) ...........................................................................................7

*Hengjun Chao v. Mount Sinai Hosp.*,
   476 Fed. App'x 892 (2d Cir. 2012)......................................................................11

*Immuno AG. v Moor-Jankowski*,
   77 N.Y.2d 235, 254 (1991) ...................................................................................7

*Kasavana v. Vela*,
   172 A.D.3d 1042, 100 N.Y.S.3d 82 ......................................................................6

*Kirby v. Wildenstein*,
   784 F. Supp. 1112 (S.D.N.Y. 1992)......................................................................19

*McAnany v. Angel Records, Inc.*,
   216 F. Supp. 2d 335 (S.D.N.Y. 2002)...................................................................20

*McCullough v. Advest, Inc.*,
   754 Fed. App'x 109 (3d Cir. 2018)........................................................................5

*MiMedx Grp., Inc. v. Sparrow Fund Mgt. LP*,
   2018 WL 847014 (S.D.N.Y. 2018)..........................................................16, 17, 18

*Mzamane v. Winfrey*,
   693 F. Supp. 2d 442 (E.D. Pa. 2010) ....................................................................6

*Nanoviricides v. Seeking Alpha*,
   2014 WL 2930753 (N.Y. Sup. June 26, 2014) ....................................................11

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
   813 F. Supp. 2d 489 (S.D.N.Y. 2011)...................................................................19

*Reliance Ins. Co. v. Barron's*,
   442 F. Supp. 1341 (S.D.N.Y. 1977)......................................................................17

*Ronnie Van Zant, Inc. v. Cleopatra Recs., Inc.*,
   906 F.3d 253 (2d Cir. 2018)..................................................................................20

*Sabratek Corp. v. Keyser*,
   2000 WL 423529 (S.D.N.Y. Apr. 19, 2000 )..........................................................9

*Sandals Resorts Int'l Ltd. v. Google*,
   86 A.D.3d 32 (1st Dep't 2011) .............................................................................10

iii

*Silvercorp Metals Inc. v. Anthion Mgmt. LLC*,
   959 N.Y.S.2d 92 (N.Y. Sup. Aug. 16, 2012) ..............................................................8, 9

*Solmetex, LLC. v. Dental Recycling of N. Am., Inc.*,
   2017 WL 2840282 (S.D.N.Y. June 26, 2017) ...............................................................19

*Steinhilber v. Alphonse*,
   68 N.Y.2d 283 (1986) ..........................................................................................7, 8, 11

*Thai v. Cayre Grp., Ltd.*,
   726 F. Supp. 2d 323 (S.D.N.Y. 2010)...........................................................................19

*Thompson v. JPMorgan Chase Bank, N.A.*,
   563 Fed. Appx. 440 (6th Cir. 2014)..............................................................................20

*Trepel v. Hodgins*,
   183 A.D.3d 429 (1st Dep't 2020) .................................................................................18

*United States v. Bell*,
   414 F.3d 474 (3d Cir. 2005)..........................................................................................20

*Winklevoss v. Steinberg*,
   170 A.D.3d 618 (2019) ..................................................................................................17

*Yangtze River Port and Logistics Ltd. v. Hindenburg Research*,
   2020 WL 905770 (N.Y. Sup. Feb. 25, 2020).............................................................9, 11

**Other Authorities**

69 Fed. Reg. 48,008, at 48,009 (Aug. 6, 2004) No. 34-50103 ...........................................3

Plaintiffs—LifeMD, Inc., a publicly-traded company, and Justin Schreiber and Stefan Galluppi (two LifeMD executives)—have brought this lawsuit in an attempt to quiet any and all critical opinions about LifeMD, its business model, and its executives. Their targets are Defendants Culper Research and Christian Matthew Lamarco (collectively, "**Culper**"). Culper Research published an article on the Internet on April 14, 2021 (the "**Article**"), in which it expressed its negative opinions about LifeMD based upon well-documented and clearly cited sources, sources that were either linked to or embedded within the Article itself. Rather than focusing on addressing the concerns in the Article—or focusing on why LifeMD's share price had been in regular, substantial decline for months *before* the Article was published—Plaintiffs brought this suit to try to quash Culper's voice and trample on Culper's Constitutionally protected freedom to voice its opinions. Indeed, Plaintiffs here ask this Court *preemptively* to stop all unflattering speech about them. The Article may have been critical, but that does not make it defamatory, and Plaintiffs' claims—including their request to *permanently enjoin* Culper's speech—must be dismissed in their entirety.

Plaintiffs' Complaint is without merit because the Article contains constitutionally protected opinion. A review of the whole Article in context—which the relevant law requires—makes clear that the Article expresses Culper's opinions. Culper discloses in the very first sentence that it is a short-seller of LifeMD, making clear that it has an obvious bias that the reader should consider. The Article includes at the very beginning conspicuous disclaimers that it contains opinions based upon research conducted. It also includes language that makes clear that the conclusions are opinion (*i.e.*, "we think" and "we believe"). These signals permeate the subsequent text. Moreover, the Article was published on the Internet, on Culper's personal blog. Most importantly, Culper fully disclosed in the Article the sources on which it based its opinions—often

consisting of Plaintiffs' own SEC filings and press statements—through hyperlinks and embedded tables. Plaintiffs do not—and cannot—dispute the truth of these disclosed facts; they just do not like the opinions Culper reached. But that does not matter. Readers were fully equipped with all the information necessary to make their own determinations about the opinions in the Article, rendering the statements Constitutionally-protected opinion and defeating the defamation and trade libel claims as a matter of law.

In any event, the defamation and trade libel claims fail on the separate independent grounds that Plaintiffs—public figures for purposes of this defamation action—failed to plead that Culper made its statements with knowledge of falsity. Indeed, any such allegation would be refuted by the citations throughout the Article supporting the opinions Culper reached. The Complaint also fails to make anything more than conclusory and vague allegations about special damages.

Plaintiffs' request for a permanent injunction—while a remedy, not a cause of action—must be dismissed because, as the United States Supreme Court recognizes, it is a "classic example of a prior restraint" and is therefore a violation of the First Amendment.

Finally, the Complaint ignores the inconvenient truth that LifeMD's share price had been declining steadily for months—long before Culper published a word about LifeMD. Indeed, in the two months prior to publication of the Article, the price dropped nearly 60%—a drop more substantial by orders of magnitude than anything the share price experienced in the wake of the Article's publication. Instead of confronting this truth, Plaintiffs baldly and implausibly argue that Culper is somehow responsible for the share price decline that LifeMD suffered from February 2021—simply because that is when, according to Plaintiffs (though falsely), Culper began its LifeMD short position. Setting aside that the Complaint contains not a shred of plausible evidence that Culper began a short position in February, it is an untenable stretch of logic to assign Culper

the blame for losses LifeMD sustained months before the alleged defamatory statements at issue in this case saw the light of day.  Essentially, Plaintiffs seek to hold Culper—*on behalf of all market participants, including short sellers*—liable for LifeMD's alleged losses.[1]  Ultimately, this is a Complaint that seeks to silence free speech and restrict protected market participation activity.  There is no more ludicrous proposition.

For these reasons, as set forth more fully herein, the Complaint should be dismissed in its entirety against the Culper Defendants.

## STATEMENT OF FACTS[2]

LifeMD is a self-described "leading telehealth company" that trades on the New York Stock Exchange under the symbol "LFMD."  (Compl. ¶¶ 10, 16.)  LifeMD is incorporated in Delaware with its principal offices in New York. (*Id.* ¶ 10.)  LifeMD offers various "subscription-based proprietary telehealth products and services" catering to different demographics, including RexMD (a men's telehealth platform).  (*Id.* ¶ 17.)  Plaintiff  Schreiber is LifeMD's Chairman and CEO and Plaintiff Galluppi is LifeMD's Chief Technology Officer.  (*Id.* ¶¶ 11, 12.)

Defendant Culper Research is an independent stock research firm that conducts investigative investment analysis and disseminates its reports on the Internet via its personal blog, www.culperresearch.com. (*Id.* ¶ 14.)  Lamarco is an employee of Culper Research.  (*Id.* ¶ 24.)

On April 14, 2021, Culper published the Article, an Internet piece about LifeMD entitled "LifeMD, Inc.:  Redwood Redux at RexMD," which appeared on the Culper Research blog.  (*Id.* ¶¶ 32, 33.)  Some of its content was also shared—not by Culper—on Seeking Alpha, an investor-

---

[1] Broadside attacks on short selling, including Plaintiffs' unfounded premise that short sellers alone pushed the stock price down, have no legal support.  Indeed, the Securities and Exchange Commission has recognized that short selling "provides the market with at least two important benefits:  market liquidity and pricing efficiency."  Short Sales, Exchange Act Release No. 34-50103, 69 Fed. Reg. 48,008, at 48,009 (Aug. 6, 2004).

[2] This Statement of Facts is drawn from the Complaint and, unless otherwise indicated as contradicted by the publicly-available information, the allegations are taken as true for purposes of this Motion only.

sharing website devoted to publishing investment opinion about public companies. (*Id.* ¶ 33.) The Article addressed various items of concern to LifeMD investors, such as physician licensing discrepancies associated with LifeMD's platforms, the LifeMD business model, and LifeMD's executives' prior involvement with Redwood Scientific Technologies, Inc., which was sued by the FTC. (Compl. Ex. 1.) The Article was preceded by a lengthy disclaimer explaining that it contains opinions and that it was presenting information "as is," without any warranty and which was accurate "to the best of [Culper's] ability and belief." (*Id.* at 1.) Finally, Culper Research made clear in the very first sentence of the Article that it was a short seller of LifeMD stock. (*Id.* at 2.)

LifeMD's stock had been experiencing steady decline long before Culper published the Article. As the below graph demonstrates, the share price peaked at $33.02 on February 10, 2021, then dropping in value (then recovering slightly and dropping again) and closing at $11.84—a nearly ***60% drop*** from the peak—by April 13. 2021. All of this activity occurred before the allegedly defamatory statements were published.



*See* LifeMD, Inc. Market Summary, Google Search, (last visited Jul 6, 2021).[3]

This nearly 60% decline preceded—and therefore had nothing to do with—the publication of the Article.[4]  Instead, over the course of this these two months (from mid-February to mid-April 2021), LifeMD changed its corporate name, reported fourth quarter 2020 results, and filed annual report Form 10-K with the SEC.[5]  Indeed, when LifeMD published its fourth quarter results after market hours on March 29, 2021, LFMD stock fell from an $18.87 closing price, to close at $15.98 the following day, a decline of 15%.  *See* LifeMD, Inc. Common Stock (LFMD) Historical Data, Nasdaq (2021), https://www.nasdaq.com/market-activity/stocks/lfmd/historical (last visited Jul 6, 2021); SEC, Lifemd, Inc. Form 10-K Annual Report (March 30, 2021), https://sec.report/Document/0001493152-21-007194/ (last visited July 8, 2021).  The shares tumbled another 26% over the following 2 weeks to close at $11.84 on April 13, 2021, for a total loss of 37%.  *See* LifeMD, Inc. Common Stock (LFMD) Historical Data, Nasdaq (2021), https://www.nasdaq.com/market-activity/stocks/lfmd/historical (last visited Jul 6, 2021).

---

[3]Lifemd, Inc. Market Summary, Google Search,
https://www.google.com/search?q=lifemd+stock&source=hp&ei=i0jnYP3mM9TYgSx4YHQCA&iflsig=AINFCbYAAAAAYOdWmV6cfwXi85FtE6_e_nEndDlYT4R&oq=lifemd+stock&gs_lcp=Cgdnd3Mtd2l6EAMyCwguEMcBEK8BEJMCMgIIADICCAAyAggAMgIIADICCAAyAggAMgIIADICCAAyBQgAEMkDOg4ILhCxAxDHARCjAhCTAjoFCAAQsQM6CAguELEDEIMBOggILhDHARCjAjoICAAQsQMQgwE6CwguELEDEMcBEKMCOgIILjoICC4QxwEQrwE6BQguELEDOgsIABCxAxCDARCxAxCDARCLAzoICC4QsQMQiwM6DgguELEDEMcBEK8BEIsDOgoILhDHARCvARAKOgQIABAKUKgKWMgTYPQUaABwAHgAgAFPiAHABZIBAjEymAEAoAEBqgEHZ3dzLXdpergBAg&sclient=gwswiz&ved=0ahUKEwi92N_VkdTxAhVUrJ4KHbFwAIoQ4dUDCAw&uact=5#spf=1625770128533 (last visited July 6, 2021).
[4] The Court may take judicial notice of public records and consider them in resolving motions to dismiss. *McCullough v. Advest, Inc.,* 754 Fed. App'x 109, 110-11 (3d Cir. 2018).
[5] *See* Conversion Labs to Become Life MD™ with Launch of New Concierge Telehealth Services, Intrado Globe Newswire (2021), https://www.globenewswire.com/fr/news-release/2021/02/12/2174951/0/en/Conversion-Labs-to-Become-Life-MD-with-Launch-of-New-Concierge-Telehealth-Services.html (last visited July 5, 2021); LifeMD Reports Q4 2020 Revenue up 227% to Record $12.9 Million, Full Year up 199% to Record $37.3 Million, SEC.gov, https://www.sec.gov/Archives/edgar/data/948320/000149315221007652/ex99-1.htm (last visited July 8, 2021); SEC, LifeMD, Inc. Form 10-K Annual Report (March 30, 2021), https://sec.report/Document/0001493152-21-007194/ (last visited July 8, 2021).

The day the Article was published, April 14, 2021, the share price dropped from $11.84 to $9.00—less than $3.00 per share and significantly less than prior declines. *Id.* By June 8, 2021, the share price for LifeMD had bounced back to $15.85 a share. *Id.*[6]

Despite the recovery of LifeMD's share price, Plaintiffs brought this suit against Culper for defamation and trade libel, seeking to permanently enjoin all analysis critical of LifeMD and its executives. For the reasons set forth herein, the Complaint should be dismissed in its entirety.

## ARGUMENT

I.    **Plaintiffs Failed to Plead Actionable Defamation Or Trade Libel.**

   A.    **The Challenged Statements are Statements Opinion Are Not Actionable Under The New York Constitution[7], Which Affords Greater Protection To Such Statements Than The First Amendment.[8]**

Under New York law, a defamation plaintiff must plead: (1) a false statement that is (2) published to a third party (3) without privilege or authorization and that (4) plaintiff is caused harm or constitute defamation per se. *See Dillon v. City of New York*, 261 A.D.2d 34, 38 (1st Dep't 1999). But "[i]t is now beyond dispute that expressions of opinion are cloaked with the absolute privilege of speech protected by the First Amendment and 'false or not, libelous or not, are constitutionally protected and may not be subject of private damage actions.'" *Farb v. Baldwin*

---

[6] Plaintiffs' allegation that LifeMD's share price "continues to plummet" (Compl. ¶ 78) is flatly contradicted by the publicly-available evidence showing that the share price of LifeMD has recovered.

[7] Because a claim for defamation per se also requires a false statement of fact (not an opinion), the opinion defense applies to the extent Plaintiffs plead a claim for defamation per se. *Kasavana v. Vela,* 172 A.D.3d 1042, 1044, 100 N.Y.S.3d 82.

[8] Where, as here, the defamatory statements were published on the Internet and therefore made available to all states at once, "the state of plaintiff's domicile generally has the greatest concern in vindicating plaintiff's good name and providing compensation for harm caused by the defamatory publication." *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 472-73 (E.D. Pa. 2010); *Franklin Prescriptions, Inc. v. The New York Times Co.*, 267 F. Supp. 2d 425, 432–33 (E.D. Pa. 2003). Plaintiff LifeMD is has its principal place of business in New York, it trades its common stock in New York, and the two individual plaintiffs are alleged to have been targeted in connection with their roles at LifeMD, a New York company. As such, the state with the most signification relationship with the dispute is New York and New York law applies.

6

*Union Free School District*, 2006 WL 8439500, at \*8 (E.D.N.Y. Mar. 3, 2006); *see also Brian v Richardson*, 87 N.Y.2d 46, 51 (1995) (defamation claim can only succeed if "'it is premised on published assertions of fact,' rather than assertions of opinion"). Thus, "[a]n expression of pure opinion is not actionable …, no matter how vituperative or unreasonable it may be." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986).  The New York Constitution affords even greater protection to statement of opinion than the First Amendment.  *Gross v. New York Times Co.*, 82 N.Y.2d 146, 152 (1993) (quoting *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 139 (1992)).

"[I]n distinguishing between actionable factual assertions and nonactionable opinion, the courts must consider the content of the communication as a whole, as well as its tone and apparent purpose."  *Brian,* 87 N.Y.2d at 51 (citing *Immuno AG. v Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991)).  " Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff.'" *Id.*

Whether particular words constitute nonactionable opinion is a question of law for the Court's determination.  *Steinhilber*, 68 N.Y.2d at 290.  New York courts consider the following factors in determining whether a statement constitutes protected opinion: (1) whether the specific language has a precise meaning that is readily understood;  (2) whether the statements are capable of being proven true or false; and (3) whether the context in which the statement appears signals to readers or listeners that the statement is likely to be opinion, not fact.  *Brian*, 87 N.Y.2d at 51; *see also Steinhilber*, 68 N.Y.2d at 290.

Under New York law, a "pure opinion" is "a statement of opinion which is accompanied by a recitation of the facts upon which it is based," and "[a]n opinion not accompanied by such a

factual recitation may, nevertheless be 'pure opinion' if it does not imply that it is based upon undisclosed facts." *Steinhilber,* 68 N.Y.2d at 289.  A "mixed opinion," on the other hand, "implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it," and may be actionable.  *Id.*

### 1.    The Article's Context Signaled To The Reader it Was Opinion

A review of the entire Article—*i.e.*, the context of the challenged statements—makes clear that the challenged statements were protected opinion.  Most strikingly, the Article discloses, in the very first sentence, that the author is short LifeMD stock and would therefore benefit from declines in LifeMD's share price.  (Compl. Ex. 1 at 2.)  Where an author reveals a short position, "[s]uch motive, as noted in [New York appellate precedential cases], indicates to the reader that the author is expressing his opinion." *Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 959 N.Y.S.2d 92, at *9 (N.Y. Sup. Aug. 16, 2012) ("[T]hat [the author] disclosed its short position, namely to the particular group of addressees who would appreciate the significance of a short-position, is sufficient to indicate to these particular readers that [the author] was not disinterested"); *Bellavia Blatt & Crossett, P.C. v. Kel & Parnters LLC*, 151 F. Supp. 3d 287, 296 (E.D.N.Y. 2015) ("where circumstances surrounding an allegedly defamatory statement indicate that the person making the statement has a special interest in the matter, courts have routinely held that a reasonable observer would understand such a statement to be one of opinion, rather than fact"), *aff'd* 670 Fed. App'x 731 (2d Cir. 2016) (affirming "for substantially the same reasons" as set forth by district court); *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 507 (S.D.N.Y. 2012) (noting where the article describes the author's position it was "signaling that he was not a disinterested observer"); *Eros Intern. PLC v. Mangrove Partners,* 2019 WL 1129196, at *8 (N.Y. Sup. Mar. 8, 2019) (recognizing, where short position is disclosed, "[c]ourts have traditionally viewed an author's

announced self-interest as evidence that the author's statements likely constitute opinions, not facts"), *aff'd*, 191 A.D.3d 465 (1st Dep't 2021).

Indeed, even before the reader reaches the Article, it first confronts a thorough disclaimer posted by Culper, which states:

> ***To the best of our ability and belief***, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the securities covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. ***However, such information is presented "as is," without warranty of any kind – whether express or implied. Culper makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use.*** … ***All expressions of opinion are subject to change without notice.***

(Compl. Ex. 1 at 1 (emphasis added).)  New York courts have held that similar disclaimer language clarifies that a report's content is protected opinion.  *See, e.g.*, *Sabratek Corp. v. Keyser*, 2000 WL 423529, at *7 (S.D.N.Y. Apr. 19, 2000 ) (finding same language in disclaimer of article provided context to be understood as "expressions of opinion"); *Eros Int'l*, 191 A.D.3d at 465 (same); *Yangtze River Port and Logistics Ltd. v. Hindenburg Research*, 2020 WL 905770, at *7 (N.Y. Sup. Feb. 25, 2020) (same).

Moreover, the disclaimer makes clear the Article "may contain forward-looking statements, estimates, projections, and opinions … ." (Compl. Ex. 1 at 1.)  It further notes that "[s]uch statements, estimates, projections and opinions may prove to be substantially inaccurate and are inherently subject to significant risks and uncertainties beyond Culper's control."  (*Id.*)  When confronted with these clear disclaimers, a reasonable reader would understand that the content of the Article was Culper's opinion.  *See, e.g., Silvercorp Metals*, 959 N.Y.S.2d 92 at n.5 (finding disclaimer stating the report contained the author's opinion dispositive in holding that challenged statements were "claims to be investigated rather than assertions of fact").

9

The Article is also replete with language of conjecture.  The Article opens with the following statement, setting the tone for the subsequent content:  "… we ***think*** that LifeMD is a cash-burning charade which runs afoul of numerous FTC regulations and ***could*** suffer the same fate as Redwood Scientific … ."  (Compl. Ex. 1 at 2 (emphasis added).)  This speculative language pervades the remainder of the article:  "apparently," "we think" (and "we don't think"), "we find," "we believe," "we estimate," "we question," "in our view," and "lead us to believe."  (Compl. Ex. 1.)  These words of conjecture appear ***over 50 times*** in the article.  There is even a table that sets forth "Culper Research ***Views*** on LifeMD."  (*Id.* at 5.)  The reader is bombarded with indications the Article is conveying opinion, not facts.  *Brian*, 87 N.Y.2d at 53 ("given the use of the words 'apparently,' 'rumored,' and 'reportedly' …, a reasonable reader would understand the statements made about the plaintiffs as mere allegations to be investigated rather than as facts"); *see also Bellavia Blatt & Crossett*, 151 F. Supp. 3d at 293  ("There are certain rhetorical 'indicators' that the writer or speaker is expressing an opinion, like 'appeared to be,' 'might well be,' 'could well happen,' and 'should be' which signal presumptions and predictions rather than facts.").

Finally, "[i]n addition to considering the immediate context in which the disputed words appear, the courts are required to take into consideration the larger context in which the statements were published, including the nature of the particular forum." *Brian*, 87 N.Y.2d at 51.  The forum on which the Article appeared—Culper's personal investment analysis blog—signal to a reader that the content is opinion.  New York case law recognizes that "readers give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts," and that this "observation … is equally valid for … blogs." *Sandals Resorts Int'l Ltd. v. Google*, 86 A.D.3d 32, 44 (1st Dep't 2011); *Bellavia Blatt & Crossett*, 151 F. Supp. 3d at 295 ("New York courts have consistently protected statements made in online forums as statements of

10

opinion rather than fact").[9]  Indeed, the Internet publication at issue here—an investment analysis by a disclosed short seller—is even more likely to be understood to be conveying the author's opinion.  New York courts "frequently determine that investment analysis … constitutes the author's opinion." *Yangtze River Port and Logistics*, 2020 WL 905770, at *7 (citing *MiMedx Grp., Inc. v. Sparrow Fund Mgt. LP*, 2018 WL 847014, *8 (S.D.N.Y. 2018) and other cases where New York courts found investment analysis pieces to be nonactionable opinion).

**2.      The Specific Challenged Statements Are Protected Opinion Because They Disclosed The Sources On Which the Opinions Were Based.**

In any event, none of the enumerated statements Plaintiffs challenge are actionable defamation.  Each of the challenged statements is a statement of opinion that fully discloses—indeed, often hyperlinks to—the source on which it is based.  As such, the statements are pure opinion afforded full protection under the New York and federal Constitutions.  *Steinhilber,* 68 N.Y.2d at 289.[10]

- *Statements regarding LifeMD's "auto-shipping/auto-billing scheme"*

Over the course of three pages, the Article explains why Culper believes LifeMD is engaged in auto-shipping and auto-billing and either links to or pastes in the sources for these opinions:  (i) Schreiber's ***own statements*** on LifeMD's March 29, 2021 earnings call, boasting that

---

[9]  The Complaint suggests that the Article was published on Seeking Alpha (Compl. ¶ 33), but it was not.  Instead, Seeking Alpha chose to publish a few bullet points that it derived from the Article.  In any event, courts have singled out the Seeking Alpha platform—whose tagline is "Read. Decide. Invest."— noting that this particular Internet forum "clearly gives the impression that the website is designed to give people a place to express their opinions and for the reader to then form his or her own assumptions based on the posted articles." *Nanoviricides v. Seeking Alpha*, 2014 WL 2930753, at *6 (N.Y. Sup. June 26, 2014) (noting that "readers are likely to give less credence to the articles found on [Seeking Alpha] and view the assertions in the articles, like the one herein at issue, with some skepticism and to treat its contents as opinion rather than fact.").

[10] For all of these same reasons, as fully set forth herein, LifeMD's trade libel claim fails alongside its defamation claim—statements of opinion cannot support trade libel.  *See, e.g., Hengjun Chao v. Mount Sinai Hosp.*, 476 Fed. App'x 892, 895 (2d Cir. 2012) (holding "district court correctly dismissed [plaintiff's] other tort claims as duplicative of his defamation claim" where "the factual allegations underlying [those] ... claims [were] virtually identical to the facts underlying his defamation claim" and "the harms that [plaintiff] contend[ed] he suffered as a result of the[ ] other torts ... all flow[ed] from the effect on his reputation caused by defendants' allegedly defamatory statements").

the recurring revenue model is "truly recurring basis every month.  It's auto-shipped, auto-charged" (*see* https://seekingalpha.com/article/4416693-lifemd-inc-lfmd-ceo-justin-schreiber-on-q4-2020-results-earnings-call-transcript); (ii) LifeMD's ***own statements*** in its public filings that its subscriptions provide "recurring revenue" (*see* LifeMD Reports Q4 2020 Revenue up 227% to Record $12.9 Million, Full Year up 199% to Record $37.3 Million, SEC.gov, https://www.sec.gov/Archives/edgar/data/948320/000149315221007652/ex99-1.htm (last visited Jul 5, 2021); (iii) links to—as well as embedded tables of—customer reviews which complain of auto-shipping, automatic, recurring credit card charges, and "money back guarantees" that were not honored, which reviews appeared on consumer feedback sites including sitejabber.com and trustpilot.com.  (Compl. Ex. 1 at 11-12.)  Tellingly, Plaintiffs do not allege that these facts were not disclosed, or that these facts on which the opinion was based are false.

- ***Statements concerning LifeMD's apparent use of unlicensed doctors***

The Article supports its opinions regarding LifeMD's "apparent" reliance on unlicensed doctors by highlighting a particular doctor who was listed on the RexMD platform as being a "licensed physician in Florida," whose license was in fact suspended by Florida, and suspended, revoked, or restricted by other states and the Drug Enforcement Administration ("DEA").  As support, the Article links to (and embeds in the Article) a medical credential verification website, the DEA's findings of fact on this physician, as well as various state websites setting forth their own suspensions.  (Compl. Ex. 1 at 6-7.)  Plaintiffs do not dispute these underlying facts, or even the Article's statement that this physician was suspended in several states, including Florida. Indeed, Plaintiffs allege that when they learned of this physician's background (years ***after*** he was first reprimanded and even suspended by various state medical authorities) they removed him from

their physician network (*id.* ¶¶ 58-59), reinforcing the Article's opinion that it was problematic for this doctor to have been listed as part of the RexMD network in the first instance.

Moreover, based on the disclosed—and, importantly, **undisputed**—facts that RexMD had partnered with a doctor who did not have a current valid medical license and would therefore have committed a felony had he prescribed a controlled substance in that state (*id.* Ex. 1 at 6-7), the Article reaches the opinion that LifeMD might have been exposed to—in the DEA's own words— "felony distribution of controlled substances." (*Id.* at 2, 7.) That the Article points out this possibility that LifeMD created for itself by allowing an unlicensed doctor to be listed as part of the RexMD network is not controversial, and certainly not defamatory.

The Article also points out that another doctor who LifeMD claimed to be a "licensed physician in California" was not in fact licensed in California—with links to California's medical board as support. (*Id.* pp. 7-8.) Plaintiffs' Complaint again **concedes** the truth of these statements—*i.e.*, that Plaintiffs themselves falsely claimed a doctor to be licensed in California— and notes that LifeMD made changes in response. (Compl. ¶¶ 62-63.) While Plaintiffs go on to explain that this doctor never wrote a prescription in California, this is irrelevant to the Article's statement that LifeMD made false claims about doctors' licensing, which it clearly did.

- ***Statements regarding the LifeMD executives' involvement in Redwood Scientific***

The Article sets forth the following disclosed facts in support of the opinion regarding LifeMD executives' corporate/ownership roles at Redwood Scientific: Schreiber was Redwood Scientific's Resident Agent and Incorporator in Puerto Rico (with links to Puerto Rico's corporate registry and embedded table in Article); a Redwood Scientific shareholder entity holding over 200,000 shares of Redwood Scientific common stock had an address at the same Puerto Rico address as Schreiber (link to Redwood's Form S-1), and that shareholder entity's manager worked

13

at a different company that Schreiber founded and headed (links to LinkedIn profiles); Redwood Scientifics' Form S-1 (linked and embedded) showed that LifeMD former CFO Dagnery was the investor behind 802 Investments LLC, which held over 160,000 shares of Redwood Scientific common stock in 2016; and Redwood Scientifics' Form S-1 (linked and embedded) showed that LifeMD former CFO Kalkstein was the investor behind Generous Limestones LLC, which in 2016 held over 50,000 shares of Redwood Scientific common stock. (Compl. Ex. 1 at 16-19.)  LifeMD's own SEC filings  (linked and embedded) noted Galluppi's Redwood Scientific role "overs[eeing] the information technology infrastructure, ranging from customer services software to CRM systems"  and other "instrumental" contributions.  (*Id.* at 5, embedding 2016 Form 10-K .)

Again, importantly, Plaintiffs do not dispute these underlying facts.  Indeed, Plaintiffs *concede* that Galluppi was Redwood's CTO (though Plaintiffs self-servingly attempt to call this C-suite position a "nominal" title).  (Compl. ¶ 50.)  Instead, they allege only that Schreiber "held only a passive investment and non-controlling interest in the company" (*Id*. ¶ 49)—which, even if true, does not contradict the Article's statements about Schreiber's significant share ownership or his being listed as resident agent and incorporator on Redwood's founding documents.  Moreover, Plaintiffs argue that Galluppi held no equity in Redwood (*id*. ¶ 50), but, critically, the Article never states otherwise.  Finally, Plaintiffs do not dispute that Schreiber and Galluppi's former roles at Redwood Scientific were not disclosed in their executive biographies.

Plaintiffs do not dispute that Redwood Scientific was involved in fraud investigated by the FTC—or that that the disclosed facts reveal that LifeMD current and former executives had both executive titles and substantial ownership positions in Redwood Scientific.  But Plaintiffs then argue that it is somehow defamatory for Culper to convey an opinion that these executives had any involvement with Redwood in connection with the fraud.  Plaintiffs argue that this *opinion* is

14

unfounded because the FTC did not sue Schreiber or Galluppi or discuss them in one of their filings seeking liability against *other* defendants. (Compl. ¶¶ 51-53.) But the Article nowhere states that the FTC sued Schreiber and Galluppi. Indeed, there could be any number of reasons the FTC did not pursue claims against Schreiber or Galluppi. It would not be surprising for there to be limited evidence regarding Schreiber or Galluppi in the FTC's case against *other* defendants. Plaintiffs' reliance on the FTC's case against those *other* defendants is therefore misguided. In any event, the disclosed facts on which Culper based its opinion—*i.e.*, that Redwood Scientific was charged with fraud and Schreiber and Galluppi's were both involved at Redwood Scientific—are not disputed, and they are presented to the reader so the reader can reach its own conclusions. That Plaintiffs are unhappy with the opinion Culper reached based on these disclosed facts—and without suggestion of any additional, undisclosed facts—is not grounds for a defamation claim.

- ***Statements regarding LifeMD's payment of 900,000 shares to Schreiber***

The Article links to LifeMD's Form 10-K, which plainly states that Schreiber is the owner of JLS Ventures, which received 900,000 shares of stock (worth $432,000) for a 3-year extension of a 2017 "Services Agreement" to provide "operational management services. " (Compl. Ex. 1 at 12, 16.) The Form 10-K also states that in 2018 and 2019, JLS Ventures was paid $172,500 and $374,000, respectively, for "credit card processing services." (*Id.*) Based on these disclosed facts in the linked Form 10-K, the Article states that Schreiber received these shares for credit card processing services. (*Id.*) As the Article links to the 10-K and the facts on which the statement was based, the reader was free to make its own conclusions and the statement is protected opinion.

- ***Statements regarding the launch of Veritas MD Telehealth Platform***

The Article's discussion of the Veritas MD Telehealth Platform centers on a press release about the platform's launch that Culper cautioned was "filled with hot air"—hyperbolic language

15

that New York courts do not consider defamatory.  *See, e.g., MiMedx Grp.*, 2018 WL 847014, at *7.  Moreover, the Article discloses all of the facts supporting this clear opinion:  that no "Veritas MD" Telehealth platform was available for consumer use (based on Culper's personal search); and that LifeMD only had four employees in technology/software roles and substantially less R&D spend than other telemedicine platforms (link to LinkedIn and disclosure of these other spend amounts).  (Compl. Ex. 1 at 8.)  Plaintiffs do not dispute these disclosed facts.  Instead, they make a ***different*** point—i.e., that LifeMD is not a consumer-facing application.   (Compl. ¶ 67.)[11] Interestingly, that is not how LifeMD described Veritas MD in their December 11, 2020 press release.[12]  In any event, that point—true or not—is unrelated to the opinion reached in the Article. Plaintiffs' disagreement with Culper's opinion based on fully disclosed facts does not constitute actionable defamation.

- ***Statements regarding payments made to LifeMD insiders***

Plaintiffs' challenge to the Article's statements about payments LifeMD has made to its insiders completely misrepresents the text of the Article.  The Article states simply that insiders have been "enriched" and then details—from LifeMD's own 10-K—that payments have been made to BV Global Fulfillment, a company owned by Schreiber's father.  (Compl. Ex. 1 at 15.) Plaintiffs, in response, do not dispute that these payments are made or Schreiber's relation to BV Global Fulfillment.  Instead, Plaintiffs attempt to justify the amount of the payments.  But, again,

---

[11] In any event, Plaintiffs plead in their own Complaint that LifeMD "offer[s]" "direct-to-patient product[s] and service[s]."  (Compl. ¶ 16.)

[12] *See* Conversion Labs Launches Veritas MD™ Telehealth Platform, Delivering Greater Access to Growing Portfolio of Industry-Leading, Direct-to-Consumer Pharmacy and Wellness Brands, Intrado Globe Newswire (Dec. 11, 2021), https://www.globenewswire.com/news-release/2020/12/11/2143772/6480/en/Conversion-Labs-Launches-Veritas-MD-Telehealth-Platform-Delivering-Greater-Access-to-Growing-Portfolio-of-Industry-Leading-Direct-to-Consumer-Pharmacy-and-Wellness-Brands.html (last visited Jul 5, 2021) (touting the "state-of-the-art telemedicine technology that forms the foundation of Veritas MD revolutioniz[ing] the way people gain access to medical care").

16

these protestations do not undermine the statements in the Article that—justifiably or not—LifeMD insiders are "enriched."

- ***"LifeMD is a cash-burning direct marketing response business. The core driver of Rex MD … is a paid search and web marketing operation which only incinerates more shareholder cash over time."***

The Article's statements about LifeMD and RexMD's business models (direct marketing response and paid search, respectively), mirror how Plaintiffs themselves talk about these businesses. *See, e.g.,* SEC, Lifemd, Inc. Form 10-K Annual Report (March 30, 2021), https://sec.report/Document/0001493152-21-007194/ (last visited July 8, 2021). Moreover, statements such as "cash-burning" are loose, hyperbolic language that New York courts do not recognize as actionable defamation. *See, e.g., MiMedx Grp. Inc.*, 2018 WL 847014, at *7.

## B.    Plaintiffs, Public Figures, Failed To Plead Actual Malice.

LifeMD, a publicly-traded company that files publicly-available reports with the SEC, is a 'public figure" for purposes of a defamation claim. *MiMedx Grp. Inc.,* 2018 WL 4735717, at *8 n.5; *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1348 (S.D.N.Y. 1977).[13]    As such, Plaintiffs are required to plead "actual malice"—*i.e.*, that Culper acted with "knowledge that the statements were false or with reckless disregard of their falsity." *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015).    The burden on Plaintiffs is high: "[a]ctual malice, even by way of recklessness, is

---

[13] The individual plaintiffs are also "limited purpose public figures" under New York law because they voluntarily injected themselves into the public in relation to the subject matter of this defamation suit—*i.e.*, the financial condition and future prospects of LifeMD. *Winklevoss v. Steinberg,* 170 A.D.3d 618, 619 (2019)*.* Moreover, the individual plaintiffs invited public attention to their views on LifeMD to sway public opinion. *Id.* Both individual plaintiffs have participated in public investor earnings calls, video interviews, and press releases regarding LifeMD's finances, platform, and prospects. *See* LifeMD, Inc. (LFMD) CEO Justin Schreiber on Q4 2020 Results - Earnings Call Transcript, SeekingAlpha 2021), https://seekingalpha.com/article/4416693-lifemd-inc-lfmd-ceo-justin-schreiber-on-q4-2020-results-earnings-call-transcript (last visited Jun 28, 2021); LifeMD, Inc., LifeMD Launches NavaMD™ Adding Direct-to-Patient Clinical Skincare Services to its Portfolio of Personalized Telehealth Brands GlobeNewswire News Room (2021), https://www.globenewswire.com/en/news-release/2021/04/07/2205885/6480/en/LifeMD-Launches-NavaMD-Adding-Direct-to-Patient-Clinical-Skincare-Services-to-its-Portfolio-of-Personalized-Telehealth-Brands.html (last visited Jun 28, 2021); LilaMax Media, Conversion Labs (OTCQB: CVLB) | CEO Justin Schreiber | Innovators with Jane King YouTube (2019), https://www.youtube.com/watch?v=5k_4EBnZ1Ek&amp;t=8s (last visited Jun 28, 2021).

therefore a difficult standard to meet, and quite purposefully so: as the Supreme Court has repeatedly noted, 'the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 276 (S.D.N.Y. 2013), *aff'd* 807 F.3d 541 (2d Cir. 2015). And where, as here, the claims are brought in federal court, "a public-figure plaintiff must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." *Biro*, 807 F.3d at 546 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Biro*, 963 F. Supp. 2d at 278 ("Not only is "[p]roving actual malice [ ] a heavy burden, but, in the era of *Iqbal* and *Twombly* pleading actual malice is a more onerous task as well.").

Plaintiffs here fail to meet that high burden. The Complaint makes no plausible allegations that Culper **knew** that it was making false statements about the Plaintiffs. Nor could it—the Article fully disclosed all the sources on which the opinions in the Article were based, undermining any suggestion of intent. Ultimately, Plaintiffs' "actual malice" argument boils down to a motive argument—*i.e.*, Culper must have intentionally made false statements so that it could benefit financially from its short positions. (Compl. ¶¶ 81, 109.) But under New York law, allegations of pecuniary gain cannot satisfy the stringent "actual malice" element required to state a defamation claim. *See, e.g., MiMedx Grp. Inc.*, 2018 WL 4735717, at *12 (holding, on a motion to dismiss, that purported financial motives alone do not support a finding of actual malice); *Egiazaryan*, 880 F. Supp. 2d at 501 ("the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term").[14]

---

[14] For this same reason, the trade libel claim must be dismissed. *See Trepel v. Hodgins*, 183 A.D.3d 429, (1st Dep't 2020). Nor does the Complaint allege that the statements were made out of "spite or ill will" to satisfy the "common

18

### C.    Plaintiffs Fail To Plead Special Damages

Finally, Plaintiffs' defamation and trade libel claims must be dismissed because Plaintiffs failed to adequately plead special damages. *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 330 (S.D.N.Y. 2010).[15]    Plaintiffs allege damages only in the most cursory terms: to reputation, "relationships with its equity investors, sell-side analysts, debt investors, banks, auditors, lawyers, customers and suppliers," as well as "substantial expenses."    (Compl. ¶¶ 110-12.)    However, special damages are "limited to losses having pecuniary or economic value, and must be fully and accurately stated, with sufficient particularity to identify actual losses." *Kirby v. Wildenstein*, 784 F. Supp. 1112, 1116 (S.D.N.Y. 1992).    In addition, "special damages must be the 'natural and immediate consequence of the disparaging statements' to be recoverable.'" *Id*.

Here, Plaintiffs' recitation of alleged damages lacks any specificity, let alone itemization. Even complaints that do provide a damages amount—but not a specific itemization—are found not to constitute special damages. *See, e.g., Kirby*, 784 F. Supp. at 1116, 1118 ( "vague allegation" that plaintiff sustained $250,000 in damages, without specifying losses or identifying any person acting on defamatory statements, "clearly inadequate" to plead special damages); *see also Drug Research Corp. v. Curtis Pub. Co.*, 7 N.Y.2d 435, 441 (1960) (allegation of damages of $5 million insufficient as special damages because "[s]uch round figures, with no attempt at itemization, must be deemed to be a representation of general damages").    Nor have Plaintiffs alleged that it is the allegedly defamatory statements in the Article—as opposed to the myriad other factors that led to

---

law malice" standard. *Solmetex, LLC. v. Dental Recycling of N. Am., Inc.*, 2017 WL 2840282, at *6 (S.D.N.Y. June 26, 2017).  To the contrary—Plaintiffs allege that Culper was motivated purely out of self-interest in driving down the share price as a short seller. (Compl. ¶ 35.)

[15] LifeMD fails to plausibly allege that the challenged statements are defamation per se, excusing the pleading of special damages.  Where the plaintiff is a corporation, pleading defamation per se requires a showing that the statement injured "its overall business reputation or its credit standing." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489 n. 23 (S.D.N.Y. 2011).  Indeed, LifeMD's share price had been in steady decline for two months prior to the publication of the challenged statements.

the near-60% drop in LifeMD's share price prior to the Article's publication—that led to its alleged damages.  Critically—LifeMD's stock price now trades at an even higher price than it did prior to the publication of the Article, undermining any allegation of damages suffered.[16]

## II.    Plaintiffs' Demand For A Permanent Injunction Is Not A Standalone Cause of Action And, In Any Event, Is A Request For an Unconstitutional Prior Restraint.

It is well settled that an injunction is a remedy, not a cause of action.  *See, e.g.*, *Alabama v. U.S. Army Corps. of Engineers,* 424 F.3d 1117, 1127 (11th Cir. 2005) ("any motion or suit for either a preliminary or permanent injunction must be based upon a cause of action"); *Thompson v. JPMorgan Chase Bank, N.A.*, 563 Fed. Appx. 440, 442 n.1, (6th Cir. 2014) ("injunctive relief is not a cause of action, it is a remedy"); *McAnany v. Angel Records, Inc.*, 216 F. Supp. 2d 335, 338 (S.D.N.Y. 2002).

Nor could Plaintiffs properly plead entitlement to a permanent injunction here.  The United States Supreme Court has found permanent injunctions of speech "classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (collecting cases showing "[t]his understanding [that a permanent injunction] constitutes a prior restraint"); *see also United States v. Bell*, 414 F.3d 474, 478 (3d Cir. 2005) (permanent injunctions "are 'classic examples of prior restraints' on speech, and prior restraints are generally presumed unconstitutional"); *Ronnie Van Zant, Inc. v. Cleopatra Recs., Inc.*, 906 F.3d 253, 257 (2d Cir. 2018).

## CONCLUSION

For the reasons set forth herein, Defendants, Culper Research and Christian Lamarco, respectfully request that the Court dismiss the Complaint in its entirety, with prejudice.

---

[16] Plaintiffs ask the Court to make the leap of logic that the very existence of short sellers caused the months-long decline in LifeMD's share price, and that (even were this true) it should somehow hold **Culper** responsible for an entire market of short sellers as early as February 2021 (even though Plaintiffs present no plausible evidence that Culper was a short seller as of that date).  These baseless allegations fall far short of the plausibility pleading threshold.

20

Respectfully submitted,

COZEN O'CONNOR


BY:    /s/ Michael de Leeuw

Michael de Leeuw  (admitted pro hac vice)
Tamar Wise (admitted pro hac vice)
Rachel J. Wenger (Pa. I.D. 325647)
COZEN O'CONNOR
One Oxford Centre
301 Grant Street, 41st Floor
Pittsburgh, PA  15219
Telephone: 412.620.6500
Attorneys for Christian Matthew Lamarco
and Culper Research

21