**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SCOTT BISHINS and DARSHAN HASTHANTRA, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>CLEANSPARK, INC., ZACHARY BRADFORD, and S. MATTHEW SCHULTZ,<br><br>     Defendants. | Civil Action No. 1:21-cv-00511-LAP |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ...................................................................................1

II.     STATEMENT OF FACTS .......................................................................................1

III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION ...........5

IV.     THE COMPLAINT PLEADS MATERIAL MISSTATEMENTS AND OMISSIONS .....5

        A.      Standards For Pleading Material Falsity .................................................................5

        B.      Defendants' Statements Concerning ATL's Corporate History And CleanSpark's
                Due Diligence Process Were Materially False And Misleading ...........................6

                1.      Bradford's Misidentification Of ATL As The Subject Of Defendants'
                        Original Diligence Efforts Materially Misled Investors .............................6

                2.      Schultz's Market Comparison Statement Was Materially Misleading .....10

                3.      Bradford's Due Diligence Statement Was Materially Misleading ............12

        C.      Defendants' Statements Concerning The Completion Timeline For The ATL
                Expansion Project Were Materially False And Misleading ..................................13

                1.      Defendants' Estimates Were Not Puffery ..................................................15

                2.      Defendants' Estimates Are Actionable Opinions ......................................16

        D.      The PSLRA Safe Harbor Does Not Protect Defendants' Statements ...................17

                1.      The Safe Harbor Does Not Protect Present Or Historical Statements .......17

                2.      The Safe Harbor Does Not Protect Material Omissions ...........................18

                3.      The Statements Lacked "Meaningful" Cautionary Language ...................19

                4.      Defendants Had Actual Knowledge Of The Facts That Rendered The
                        Timeline Estimates Misleading ................................................................20

V.      THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER .....................20

        A.      Standards For Pleading Scienter ..........................................................................20

        B.      The Complaint Pleads A Strong Inference Of Scienter Regarding Defendants'
                Statements About ATL's History And CleanSpark's Due Diligence ...................21

        C.      The Complaint Pleads A Strong Inference Of Scienter Regarding Defendants'
                Timeline Estimates For The ATL Expansion Project ...........................................23

D.      The Complaint Pleads A Strong Inference Of Corporate Scienter..........................25

VI.      THE COMPLAINT PLEADS RELIANCE ......................................................................25

VII.      THE COMPLAINT PLEADS LOSS CAUSATION .........................................................26

VIII.      CONCLUSION .........................................................................................................28

**TABLE OF AUTHORITIES**

**CASES**

*Affiliated Ute Citizens of Utah v. U.S.*,
406 U.S. 128 (1972) ............................................................................................26

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) ..............................................................20

*Ashcraft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................................5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..............................................................................................5

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012) ...............................................................15

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ...........................................................................5, 26

*Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ...................................................18

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ..................................................18

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020) ...............................................................28

*Cromer Fin. Ltd. v. Berger*,
205 F.R.D. 113 (S.D.N.Y. 2001) .......................................................................25

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................................26

*Emps.' Ret. Sys. of Gov't of Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015) .................................................................................5

*Epstein v. World Acceptance Corp.*,
203 F. Supp. 3d 655 (D.S.C. 2016) ...................................................................27

*Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019) .................................................................25

*Fogarazzo v. Lehman Bros.*,
232 F.R.D. 176 (S.D.N.Y. 2005)...................................................................26

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018)...........................................................19

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)...............................................................6, 7, 12

*Halliburton v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ......................................................................................26

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019)...........................................................21

*In re Atlas Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)...........................................................24

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F.Supp.3d 65(S.D.N.Y. 2017)................................................................25

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ..............................................27

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006)..............................................................19

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
251 F. Supp. 3d 596 (S.D.N.Y. 2017).............................................................6

*In re NovaGold Res. Inc. Sec. Litig.*,
629 F. Supp. 2d 272 (S.D.N.Y. 2009)...........................................................15

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)..........................................................................27

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)...........................................................11

*In re Regeneron Pharm. Inc. Sec. Litig.*,
2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ...................................................18

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)...........................................18, 25

*In re Silvercorp Metals, Inc. Sec. Litig.*,
  26 F. Supp. 3d 266 (S.D.N.Y. 2014) ..................................................................23

*In re Skechers USA, Inc. Securities Litigation*,
  444 F. Supp. 3d 498 (S.D.N.Y. 2020) ...............................................................15

*In re Symbol Techs., Inc. Sec. Litig.*,
  2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ..............................................16, 25

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..........................................................26, 27

*In re VEON Ltd. Sec. Litig.*,
  2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) ..................................................25

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) ...............................................................27

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ...............................................................................18

*In re Winstar Commc'ns*,
  2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .....................................................27

*In re: Petrobras Sec. Litig.*,
  150 F. Supp. 3d 337 (S.D.N.Y. 2015) ...............................................................27

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013) ...............................................................................11

*Lipow v. Net1 UEPS Techs., Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015) .................................................................8

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..........................................................................................5, 24

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014) ...........................................................................8, 10

*Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008) ................................................................................22

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ...............................................................................20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ...................................................................................16

*Ontario Tchrs.' Pension Plan Bd. v. Teva Pharms. Indus. Ltd.*,
    432 F. Supp. 3d 131 (D. Conn. 2019) ..........................................................11

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) ........................................................................11

*Patel v. L-3 Communications Holdings Inc.*,
    2016 WL 1629325 n.38 (S.D.N.Y. Apr. 21, 2016) ......................................25

*Rudani v. Ideanomics, Inc.*,
    2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020) .............................................21

*S.E.C. v. Carriba Air, Inc.*,
    681 F.2d 1318 (11th Cir. 1982) .....................................................................7

*S.E.C. v. Merchant Cap., LLC*,
    483 F.3d 747 (11th Cir. 2007) ..................................................................7, 22

*S.E.C. v. Weintraub*,
    2011 WL 6935280 (S.D. Fla. Dec. 30, 2011) ................................................7

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) ............................................................26

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ...................................................................19, 20

*Stevelman v. Alias Research, Inc.*,
    2000 WL 888385 (D. Conn. June 22, 2000) ................................................26

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) .............................................................................5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .........................................................................20, 21, 24

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) .........................................................................16

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
    985 F.2d 1190 (2d Cir. 1993) .........................................................................7

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)........................................................................................26

*Wilson v. LSB Indus., Inc.*,
   2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) .........................................14, 16, 17, 18

## **STATUTES**

15 U.S.C. §78u-4 .................................................................................................5, 20

15 U.S.C. §78u-5 ......................................................................................................20

154 U.S.C. §78j .........................................................................................................5

## **RULES**

Fed. R. Civ. P. 15(a)(2) ............................................................................................28

## **REGULATIONS**

17 C.F.R. §240.10b-5 .................................................................................................5

# GLOSSARY OF DEFINED TERMS

| Term | Definition |
|---|---|
| 2019 10-K | Cleanspark's Form 10-K for the fiscal year ending September 30, 2019 filed with the SEC on December 16, 2019. |
| 2020 10-K | Cleanspark's Form 10-K for the fiscal year ending September 30, 2020 filed with the SEC on December 17, 2020. |
| 2021 10-K | Cleanspark's Form 10-K for the fiscal year ending September 30, 2021 filed with the SEC on December 14, 2021. |
| ATL | ATL Data Centers, Inc. which was acquired by CleanSpark in December 2020. ATL was ultimately an alter ego of Schucman, Fastblock and Block Data. |
| Bitcoin | When "Bitcoin" is capitalized it refers to the Bitcoin network, which was created in 2009 and is the world's largest and most popular form of cryptocurrency. The lowercase "bitcoin" refers to the units of the cryptocurrency. |
| Block Data | Block Data Processing Corp. Block Data is an alter ego of Schucman, ATL, and Fastblock and ATL and was declared the successful bidder for the assets of Virtual Citadel by the bankruptcy court. |
| Bradford | Defendant Zachary Bradford was CleanSpark's Chief Executive Officer ("CEO") and President since October 2019. Bradford served as CleanSpark's Chief Financial Officer ("CFO") from 2014 through October 2019. |
| CleanSpark | Defendant CleanSpark, Inc. that has its principal executive offices located in Woods Cross, Utah and its common stock trades on the NASDAQ exchange under the symbol "CLSK." The Company was incorporated in Nevada in October 1987 as SmartData Corporation ("SmartData") and it began trading publicly in January 1988. |
| Coinmint | Coinmint LLC which is the company that agreed to house and power certain of CleanBlok's cryptocurrency mining equipment in its facilities, and to use commercially reasonable efforts to mine Bitcoin through an agreed upon third-party provider on behalf of CleanBlok. |
| Company | Defendant CleanSpark, Inc. |
| Complaint | Plaintiff's amended class action complaint (Dkt. No. 36) |
| Culper Report | Culper Research, *Cleanspark Inc. (CLSK) - Back to the Trashcan*, Jan. 14, 2021 (Dkt. No. 36-2) |
| EH/s | Exa hash per second. |
| Fastblock | Bitcoin mining company seemingly owned by Bernando Schucman. "Fastblock Data Centers" and "Fastblock Mining" seem to be synonymous companies. |
| FE1 | Former Employee 1 |
| FE2 | Former Employee 2 |
| Hash | A measure of computing power. The computing power of bitcoin mining equipment is often evaluated my measuring the number of calculations, or "hashes," per second. A "terahash" is one trillion hashes. One "petahash" is equivalent to one thousand terahashes, and one "exahash" is equivalent to 1000 petahashes. |

| | |
|---|---|
| Hash rate | The number of hashes per second that can be executed by a machine or group of machines. |
| Linkh Decl. or Declaration | Declaration of Gregory B. Linkh in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss |
| Marathon | Marathon Patent Group which sought to purchase FastBlock Mining (an alter ego of ATL) in August 2020, but withdrew the offer in September 2020 after due diligence revealed problems with FastBlock. |
| Microgrid | A local, decentralized, energy grid with control capability, which means it can disconnect from the traditional grid and operate autonomously. |
| MTD | Defendants' memorandum in support of their motion to dismiss (Dkt No. 45) |
| MW | Megawatts, or measure of electrical output. |
| PH/s | Peta hash per second. |
| PR | Press release |
| PSLRA | Private Securities Litigation Reform Act |
| Schultz | Defendant C. Matthew Schultz was CleanSpark's Chairman of the Board since October 2019 and as Director since March 2014. Schultz was CleanSpark's CEO from 2014 through October 2019 and has served as Executive Chairman since October 2020. |
| Schucman | Bernardo Schucman, the owner of Block Data, who was listed an organizer of ATL in its Articles of Organization, and was identified as a seller of ATL to CleanSpark in the Agreement and Plan of Merger. |
| Van Riper Decl. or Declaration | Declaration of Michael Van Riper (Dkt. No. 46) |
| Virtual Citadel | A Bitcoin mining business whose assets were ultimately conveyed to ATL. |

## I. PRELIMINARY STATEMENT

This securities fraud class action centers on CleanSpark's acquisition of ATL, a Bitcoin mining company.[1] At the time of the acquisition, Defendants made a set of misrepresentations concerning the origins of ATL and Defendants' due diligence. Throughout the Class Period, Defendants made a second set of misrepresentations concerning the timeline and status of a project to expand the power capacity at the ATL facility. As the truth came to light and the concealed risks materialized, CleanSpark's stock price sank and investors suffered massive losses.

Defendants' motion to dismiss raises several challenges to the adequacy of the Complaint's allegations. As detailed herein, none of Defendants' arguments meaningfully grapples with the facts alleged in the Complaint, and none of them supports dismissal. The motion should be denied.

## II. STATEMENT OF FACTS

Prior to the Class Period, CleanSpark stated it was an energy company providing advanced software and controls technology, including microgrids. ¶25. During the Class Period, CleanSpark pivoted its business model to focus on Bitcoin mining. ¶26. This pivot centered around CleanSpark's acquisition of ATL, which was announced on December 10, 2020. ¶3. ATL's business consisted of two segments: a traditional data center and a Bitcoin mining operation. *Id.* Defendants stated that by leveraging CleanSpark's microgrid technologies and trade secrets, CleanSpark could maximize energy savings, expand power capacity, and improve the resiliency of ATL's existing Bitcoin mining facility. *Id.* Following this announcement (and several follow-up statements touting the acquisition), CleanSpark's stock price steadily climbed throughout

---

[1] Capitalized terms not defined herein are defined in the Glossary. *See supra* at viii-ix. Unless otherwise indicated, (i) citations in the form of "¶__" refer to the Amended Class Action Complaint (the "Complaint") (Dkt No. 36), (ii) "MTD" refers to Defendants' memorandum in support of their motion to dismiss (Dkt No. 45), (iii) all emphasis has been added, and (iv) all internal citations, quotation marks, and alterations have been removed.

December and January, reaching a high of $42.60 per share on January 8, 2021. ¶¶40-44, 162.

Defendants, however, failed to disclose a number of material facts about ATL that adversely affected its value and materially increased the risks of the transaction, which were soon revealed to the market when Culper Research issued a report on January 14, 2021. ¶45. Among other things, Culper claimed that the business now called ATL was nothing more than the rebranded assets of a defunct company called Virtual Citadel, Inc., which had gone through bankruptcy in early 2020. ¶49. Culper also claimed that public Bitcoin mining company Marathon Patent Group had just a few months earlier made an effort to acquire the same business (then branded under the name of Fastblock, rather than ATL) but pulled out of the deal after discovering adverse information during due diligence. ¶¶45-48. Following the release of the Culper Report, CleanSpark's stock price declined by roughly 9% on January 14 and an another 13% on January 15, closing at $31.15 per share on January 15, 2021. ¶52.

CleanSpark did not confirm or deny any specific allegations made by Culper, but contested the report with the conclusory statement that Culper had made "false accusations against CleanSpark and its officers." ¶53. Plaintiffs' research, however, has confirmed Culper's key allegations. For example, while Defendant Bradford[2] claimed that Defendants "began early-stage analysis of ATL in February 2020" (¶118), ATL did not exist in February 2020. ¶61. It was not formed until April 13, 2020. *Id.* Block Data—a company controlled by Bradford's personal friend Bernardo Schucman—was declared the successful bidder for the assets of Virtual Citadel by the bankruptcy court on April 28, 2020, and those assets were later transferred to ATL. ¶59.[3]

---

[2] Defendant Bradford is CleanSpark's CEO and President. ¶22. Defendant Schultz is the Executive Chairman of CleanSpark's Board of Directors. ¶23.

[3] Prior to Virtual Citadel's bankruptcy, a receiver was appointed to oversee that entity in November 2019 following an action by one of the company's creditors and one of its directors. ¶57.

Schucman formed a number of different shell companies to market these assets to potential buyers, including Block Data, ATL, and Fastblock. ¶¶60-66.[4]

While the Culper Report revealed some of the undisclosed facts about ATL to the market, there were additional adverse facts that remained undisclosed and continued to artificially prop up CleanSpark's stock price. When Defendants first announced the ATL acquisition in December 2020, they stated that the "first phase" of improving the ATL facility, before applying CleanSpark's microgrid technologies to improve efficiency, would involve expanding the power capacity at the facility from 20 megawatts to 50 megawatts. ¶118. Defendants stated that they had contracted with the local municipality for this power expansion and expected the project to "begin promptly and be completed in April 2021." *Id.* This estimate, at the time it was issued, lacked any basis in fact. At the time, Defendants had not prepared any detailed timeline for the project, no architectural or engineering drawings had been completed, no general contractor had been hired, and the process of seeking construction permits had not been started. ¶¶75-78, 119(d).

According to a former employee ("FE1") who managed the ATL facility, she informed Defendants in January or February 2021 that their publicly-stated project timeline was wildly off target, and that an aggressive project schedule, assuming no delays, would entail a completion date of October 2021. ¶¶11, 75. Defendants, however, refused to accept this reality. Instead of modifying the public timeline to reflect a realistic estimate for project completion, Defendants issued a series of incremental revisions to soften the blow to investor expectations. On February 12, 2021, Defendants adjusted the public estimate for project completion to "mid-year 2021." ¶126. On February 18, 2021, they further revised the estimate to "midsummer." ¶128. Throughout

---

[4] According to a former business associate of Schucman in Brazil, all of these entities were alter egos of Schucman that he used in a scheme to defraud his business partners and breach his fiduciary duties to them. ¶63(l).

March, April and May, Defendants stated that they expected the expansion project would be completed by "this summer" or the "end of summer, 2021." ¶¶130, 132, 134, 136.

During this timeframe, however, the project continued to fall further and further behind the schedule that FE1 had already said would take at least until October 2021. ¶78. As late as May 6, 2021, when Defendants repeated that they expected the project to be completed by the "summer," Defendants still had not started the process of applying for construction permits. ¶¶136-37.

Eventually, CleanSpark was forced to adopt alternative, less profitable means to expand its mining capacity so that its mining equipment would not stand idle while the expansion project was ongoing. On July 14, 2021, CleanSpark announced that it had entered into a contract with a third party called Coinmint to house and power CleanSpark's Bitcoin mining equipment. ¶¶106-08. On August 10, 2021, CleanSpark announced that it acquired a second data center in Norcross, Georgia to expand the power available for the Company's Bitcoin mining operations. ¶109. These steps were necessary so that CleanSpark could come closer to hitting its targeted hash rate projections for mining capacity during the delay of the power capacity expansion at the ATL facility.

On August 17, 2021, Defendants admitted that the expansion of the power capacity at the ATL facility to 50 MW would not be completed until "this fall." ¶111. On this news, CleanSpark's stock price declined by roughly 15%, closing at $11.65 per share on August 17, 2021. ¶112.

After the end of the Class Period, Defendants admitted to further delays. On December 14, 2021, Defendants acknowledged that CleanSpark still had not completed the expansion at the ATL facility or achieved 50 MW of capacity. ¶¶113-17. Bradford stated that he expected an additional 23 MW would be coming online at the ATL facility in the "next couple of weeks." ¶116.[5]

---

[5] In an investor presentation filed with the SEC on March 25, 2022, Defendants stated that as of February 28, 2022, the ATL facility had a power capacity of 47 MW, still shy of the 50 MW that Defendants originally stated they expected to be completed by April 2021. *See* Linkh Decl., Ex. 1

**III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION**

On a motion to dismiss a court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). While the pleading of scienter is subject to a "strong inference" standard, 15 U.S.C. § 78u-4(b)(2), every other element of a securities fraud claim is subject to the "plausibility" standard of *Twombly* and *Iqbal*.[6] *See Blanford*, 794 F.3d at 304; *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014).

To state a claim under §10(b) and Rule 10b-5(b), a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants contest falsity, scienter, reliance, and loss causation. As detailed *infra*, the Complaint sufficiently alleges each of the requisite elements of its claims.

**IV.    THE COMPLAINT PLEADS MATERIAL MISSTATEMENTS AND OMISSIONS**

**A.    Standards For Pleading Material Falsity**

Under Section 10(b) of the Exchange Act, defendants are liable for material misstatements or omissions.[7] An omission is actionable if "a corporate statement … would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). Under the PSLRA and Rule 9(b), a plaintiff adequately pleads falsity if he or she "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). Whether a statement is false or misleading

---

at 7, 13, 15.

[6] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcraft v. Iqbal*, 556 U.S. 662, 678 (2009).

[7] 154 U.S.C. §78j; 17 C.F.R. §240.10b-5.

"is generally a question reserved for the trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017). Disputes concerning falsity cannot be decided on a motion to dismiss, "unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that *reasonable minds could not differ* on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *Id.*[8]

**B.** **Defendants' Statements Concerning ATL's Corporate History And CleanSpark's Due Diligence Process Were Materially False And Misleading**

**1.** **Bradford's Misidentification Of ATL As The Subject Of Defendants' Original Diligence Efforts Materially Misled Investors**

In CleanSpark's press release announcing the acquisition, Defendant Bradford stated that "[w]e ***began early-stage analysis of ATL in February 2020*** to evaluate expanding the facility's energy capacity and reducing energy costs." ¶118. This statement is plainly false. ATL did not exist in February 2020, ¶61, and this statement misleadingly suggested that the company Defendants analyzed in February 2020 was the same company that CleanSpark later purchased in December 2020. The misstatement served to conceal material information about ATL's origins and recent history, including (1) that ATL was formed out of the ashes of the Virtual Citadel bankruptcy, (2) that ATL was just one of several shell companies formed by Bernardo Schucman to market the same set of assets, and (3) that Marathon had attempted to acquire the ATL assets under the name of "Fastblock" in August 2020 but withdrew its bid in September 2020. These facts materially increased the risks of the acquisition, including the risk that ATL would not be able to rapidly and profitably expand its Bitcoin mining operations.

Courts have held that a defendant's failure to disclose a bankruptcy may constitute a

---

[8] The same rule applies to materiality. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (complaint cannot be dismissed on materiality grounds unless the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance").

material omission under the securities laws, because of the obvious risks such events pose to investors. *See, e.g.*, *S.E.C. v. Merchant Cap., LLC*, 483 F.3d 747, 770 (11th Cir. 2007) ("a failure to disclose the bankruptcy of a similar predecessor company is a material omission") (citing *S.E.C. v. Carriba Air, Inc.*, 681 F.2d 1318, 1323-24 (11th Cir. 1982)); *S.E.C. v. Weintraub*, 2011 WL 6935280, at *5 (S.D. Fla. Dec. 30, 2011) ("Courts have repeatedly found the failure to disclose bankruptcies … to be material omissions in securities fraud enforcement actions.").

Defendants contend that it was "***obvious***[]" that Bradford's reference to "ATL" meant "the ATL data facility, not the corporate entity." MTD 15. This assertion is belied by the fact that the press release defined "ATL" to mean "ATL Data Centers, LLC"—*i.e.*, the corporation. ¶118. In any event, investors had no idea that this entity had only recently been rebranded as ATL, and only a short time earlier was known as Virtual Citadel and in bankruptcy.[9] It was only after the Culper Report that the link between ATL and Virtual Citadel became "obvious" to the market.

Defendants assert that "the fact of Virtual Citadel's bankruptcy" and "ATL's acquisition of the data center in the bankruptcy" were "matters of public record" based on court filings in the Virtual Citadel bankruptcy. MTD 4. However, CleanSpark's investors had no reason to know that ATL was related to Virtual Citadel and therefore had no reason to inspect Virtual Citadel's bankruptcy filings. A "buried" disclosure in Virtual Citadel's bankruptcy filings cannot suffice to counteract the misleading nature of Defendants' statements. *See United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) ("buried" information is not sufficient to constitute adequate disclosure, even when that information is actually sent to shareholders).[10]

---

[9] The corporate filings of ATL make no mention of Virtual Citadel or Block Data, which are not in the lineal history of ATL. ¶65. ATL's website—which was created only two days before the CleanSpark acquisition—likewise made no mention of Virtual Citadel or Block Data. ¶¶49, 65.

[10] To the extent that Defendants are raising a "truth-on-the-market" defense, such a defense is not appropriate for resolution on a motion to dismiss. *See Ganino*, 228 F.3d at 167 ("The truth-on-the-

Next, Defendants argue that they had no duty to disclose the bankruptcy of Virtual Citadel. MTD 16. Defendants, however, had a duty not to issue materially misleading statements. Once Defendants inaccurately stated that they "began early-stage analysis *of ATL* in February 2020," they had a duty to reveal the ***entire*** truth: *i.e.*, that the entity Defendants analyzed in February 2020 was Virtual Citadel, not ATL; that ATL was formed later; and that ATL acquired its bitcoin mining business from the failed Virtual Citadel. *See Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

Defendants argue that they had no duty to disclose the financial risks arising from the Virtual Citadel bankruptcy because such risks are "inherently speculative." MTD 16 (citing *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170-71 (S.D.N.Y. 2015). Once again, Defendants misapprehend Plaintiffs' theory of falsity. The Complaint does not allege that Defendants had a duty to speculate on future risks that the Virtual Citadel bankruptcy might pose to ATL. The Complaint alleges that Defendants had a duty to disclose the historical facts necessary to correct Bradford's objective misstatement that Defendants had investigated ATL in February 2020.[11]

For the same reason, Defendants' argument that CleanSpark's "many disclaimers and cautionary language … amply disclose the risks of its business" (MTD 16) is unavailing. The

---

market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.").

[11] *Lipow* is inapposite. In that case, the court held that defendants did not have a duty to disclose the speculative risk of regulatory scrutiny or that a contract might be invalidated due to undisclosed facts about the bidding process. The plaintiffs, however, did not allege that the defendant misstated any facts about the bidding process, and alleged only that because defendants touted the benefits of the contract, they were required to disclose the corresponding risks. 131 F. Supp. 3d at 169-71. Those facts are not similar to those here, where Defendants affirmatively misstated that they had initiated their diligence on one company, which did not exist at the time, when they actually had initiated their diligence on a different company, which was in bankruptcy.

challenged statement here is not a forward-looking statement but a misstatement of historical fact. In any event, Defendants do not cite any cautionary language that discloses the applicable facts concerning ATL's corporate history or warns investors of the specific risks arising from those facts.

Finally, Defendants argue that the ultimate implication of Plaintiffs' allegations—that ATL's bankruptcy and the other undisclosed facts negatively affected ATL's value—is wrong, because, according to Defendants, "CleanSpark has flourished" (MTD 16) and its acquisition of ATL has "undeniably succeeded." MTD 2. The market, however, clearly has made a different assessment of CleanSpark's supposed success. As just one illustration, on December 9, 2020, the day before CleanSpark announced the acquisition of ATL, CleanSpark's stock price closed at $13.09 per share. ¶40.[12] Today, CleanSpark's stock price closed at $4.53. While a portion of the price decline over this roughly 18 month period is attributable to a dilutive stock issuance (which was itself caused by the need to raise new capital to finance the ATL expansion, *see, e.g.*, ¶¶95-96), that dilution does not explain all or most of the decline. CleanSpark's market cap as of today is about $187 million, roughly 35% lower than its market cap of $286 million on December 9, 2020. *See* Linkh Decl., Ex. 2. This means that the market's assessment of Clean Spark's value today is materially lower than the market's assessment of CleanSpark's value before the ATL acquisition.[13]

---

[12] Following Defendants' various statements touting the acquisition, CleanSpark's stock price climbed to a Class Period high of $42.60, before tumbling to $31.15 after the release of the Culper Report. ¶¶44, 52, 162. Following the final alleged corrective disclosure, CleanSpark's stock price dropped to $11.65. ¶112.

[13] Defendants base their conclusion that the ATL acquisition was a success on the year-over-year increase in revenue for FY 2021 and a "record net income" of $14.5 million in Q1 2022. MTD 2. This ignores that much of the revenue generated during this period was due to the use of a third-party services agreement with Coinmint and the acquisition of a second data center while the ATL expansion was ongoing, which made the bitcoin mining operations less profitable than originally

### 2. Schultz's Market Comparison Statement Was Materially Misleading

The second challenged statement is Defendant Schultz's statement that "recent, significant investments into Bitcoin by such respected companies as Square, PayPal, and MicroStrategy further validate our due diligence conclusions surrounding this acquisition." ¶118. Schultz's attempt to "validate" the reasoning of Defendants' decision to acquire ATL by referring to recent investments into Bitcoin by other major companies was materially misleading because it failed to disclose a much more relevant comparable: Marathon's offer (and withdrawal of offer) to acquire Fastblock, which was just a different brand name for the same assets that comprised ATL.

Schultz's statement cannot be viewed in isolation; it must be viewed in tandem with Bradford's statement, which misidentified the target of Defendants' initial diligence and concealed the fact that Virtual Citadel, ATL, Block Data, and Fastblock were different shells for housing the same business. *See Jinkosolar*, 761 F.3d at 250-51 ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context."). Taken together, Schultz's and Bradford's statements disguised the history of ATL and created a materially misleading impression about the nature of Defendants' diligence and relevant comparables for evaluating the benefits and risks of the acquisition.[14]

Defendants argue that they cannot be held liable for failing to disclose speculation about

_____

anticipated. *See, e.g.*, ¶¶106-09. Since the ATL acquisition, CleanSpark has recorded greater net losses than profits, including a $16.7 million net loss in Q3 2021, a $5.4 million net loss in Q4 2021, and $0.2 million net loss in Q2 2022. *See* Linkh Decl., Ex. 3 citing Exs. 4-10 (post-acquisition results).

[14] Defendants insist that Schultz's and Bradford's statements should be evaluated separately, claiming that each individual is responsible only for his own statements. MTD 17. Both statements, however, were contained in the same press release, which was jointly prepared and authorized by both individuals for the purpose of convincing the market that the acquisition was a positive for CleanSpark. In any event, CleanSpark is liable for both statements, and the scienter of both individuals is imputable to CleanSpark for the purposes of corporate scienter. *See infra* at Sec. V.D.

the reasons Marathon withdrew its bid. MTD 17. Again, this misunderstands Plaintiffs' theory of falsity. Plaintiffs do not allege that Defendants should have speculated about the reasons Marathon withdrew its bid. Plaintiffs allege that it was misleading for Defendants to favorably compare their decision to acquire ATL to other Bitcoin investments made by other companies while in the same press release misidentifying the initial diligence target as ATL. In effect, Defendants prevented investors from making the appropriate comparisons themselves and drawing their own conclusions by (1) hiding the fact that ATL and Fastblock were basically the same company branded under two different shells and (2) affirmatively misstating the facts about ATL's history.

For the same reason, Defendants' argument that Schultz's statement constitutes puffery fails. MTD 17. A statement that may otherwise be puffery can become an actionable misstatement if the context in which the statement was made renders it materially misleading. *See, e.g.*, *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) ("Whether a representation is 'mere puffery' depends, in part, on the context in which it is made.").[15] Even if Schultz's market comparison might be considered puffery as a stand-alone statement, its presence in the press release, along with Bradford's misidentification statement, rendered it actionable deception.

Finally, Defendants suggest that their failure to disclose Marathon's aborted bid to acquire Fastblock was not material. MTD 17. The Complaint pleads multiple facts supporting an inference of materiality, including the sharp price decline when Culper revealed the connection between ATL and Fastblock.[16] *See* ¶¶7, 45-52 & n.9. Among other things, the press release Marathon issued

---

[15] *See also Ontario Tchrs.' Pension Plan Bd. v. Teva Pharms. Indus. Ltd.*, 432 F. Supp. 3d 131, 166-67 (D. Conn. 2019) ("Puffery … depends on the context …. ***[I]n context with the defendants' other actionable statements and omissions***, those challenged statements are not those which were 'too general' to mislead a reasonable investor.").

[16] *See, e.g.*, *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 155 (2d Cir. 2013) (stock drop "tends to establish materiality"); *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) (4% drop in response to corrective disclosure suggested investors viewed the undisclosed information as material).

when it withdrew its offer suggested that Fastblock's subsidized power rate was set to expire in 2024, that Marathon believed that a long investment time horizon was necessary for the operation to become economically viable, and that material risks existed with respect to expansion of Fastblock's Bitcoin mining operation. ¶¶47-48.[17] These are not minor "fact[s] that might cut against [Defendants'] decision" (MTD 17), but highly material facts that were relevant to the market's valuation of ATL. At a minimum, the omitted information was not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance," *Ganino*, 228 F.3d at 162, which is all that Plaintiffs must show at this stage.

### 3. Bradford's Due Diligence Statement Was Materially Misleading

The third challenged statement was Bradford's representation that Defendants conducted an "in-depth examination of the profitability under the existing structure" and that, based on this diligence, Defendants concluded that the ATL acquisition would allow CleanSpark to "to obtain a significant and rapid return on our investment while further validating our energy technologies." ¶118. This statement was misleading because it failed to disclose the Virtual Citadel bankruptcy, which undercut the likelihood that that CleanSpark would be able to obtain "a significant and rapid return" on its investment. The statement was also misleading because it failed to disclose that that the audit into ATL had been conducted by Blue Chip Accounting, an accounting firm at which Bradford is a partner. ¶¶22, 73, 119(e). That no audit was performed by an independent accounting firm, and that the purchase of ATL was made from Bradford's personal friend (¶70), undermines Bradford's representation concerning the rigor and quality of Defendants' due diligence process.

---

[17] Defendants argue that the fact that the project may have been economically infeasible for Marathon does not necessarily mean that it would be economically infeasible for CleanSpark. MTD 5. Maybe so. Nevertheless, the fact that another major company—one with a substantially higher market cap than CleanSpark—decided to pass on the project after kicking the tires spoke to the risks involved and was material information. Defendants concealed that information by misleading the market about ATL's origins and history.

C. **Defendants' Statements Concerning The Completion Timeline For The ATL Expansion Project Were Materially False And Misleading**

Defendants' second set of materially false and misleading statements concerned the timeline for CleanSpark's plan to expand the power at the ATL facility from 20 MW to 50 MW (and related statements concerning expansion in hash rate capacity).[18] In the December 10, 2020 press release announcing the ATL acquisition, Defendants stated that "[i]t is expected that this expansion will begin promptly and be completed *in April 2021*." ¶118.[19] Defendants modified the estimate on February 12, 2021, stating that "*[t]he capacity increase is underway and is expected to be complete by mid-year 2021*." ¶126. Defendants again revised the estimate on February 18, 2021, stating that "Now we expect everything to be online … *by midsummer*." ¶128. For the remainder of the Class Period, Defendants stated that they expected the expansion project would be completed by "this summer" or the "end of summer, 2021."[20]

These statements were materially false and misleading based on conditions that existed at the time the statements were made. As discussed *infra* at Section V.C., the Complaint pleads specific facts giving rise to a strong inference that Defendants had actual knowledge of those conditions when they made the challenged statements. For example, on December 10, 2020, when Defendants issued their initial anticipated project completion date of April 2021, Defendants had not prepared a detailed timeline for project completion, and no detailed architectural or engineering

---

[18] *See* ¶¶118, 120, 124, 126, 128, 130, 132, 134, 136.

[19] *See also* ¶120 (December 10, 2020 virtual conference) (Bradford stated that "our expansion from 20 to 50 should happen over the next, call it three, three and a half months. So we expect it to be complete *by the end of April*.").

[20] *See* ¶130 (3/2/2021 PR) (stating that expansion of hash rate from 1 to 1.3 EH/s was expected "this summer" and suggesting that addition of 30 MW would be completed within same timeframe); ¶132 (3/26/2021 PR) (stating that expansion of hash rate from 1 to 1.3 EH/s was expected "by the end of summer, 2021"); ¶134 (4/15/2021 PR) (same); ¶136 (5/6/2021 PR) ("The capacity increase is underway and is expected to be complete by summer 2021.").

drawings for the facility expansion project had been completed. ¶76. No contract with a general contractor had been executed, no contract for the build-out of the mining units had been executed, and CleanSpark and ATL had not even started the process of applying for construction permits. *Id.* In light of these factors, Defendants' projection that the expansion would be completed by the end of April 2020 was, at best, nothing more than a spitball estimate, lacking any reasonable basis, and is thus actionable. *See, e.g.*, *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at \*1 (S.D.N.Y. Mar. 2, 2017) ("Plaintiff has plausibly alleged that defendants' cost and schedule estimates were misleading because the projections omitted the fact that LSB had not performed a meaningful inquiry into the engineering necessary to complete the ammonia plant project.").[21]

By the end of February 2021, FE1 was asked by Bradford to prepare a detailed project timeline and construction plan and she presented one to him. ¶75. That plan contemplated a completion date of October 2021. FE1 told Bradford that her plan was very aggressive and assumed there would be no delays or weather issues. *Id.* Bradford told her that this plan was unacceptable because he had already publicly stated that he would have the facility up and running in four months. Bradford told FE1 to rework the plan, but FE1 responded that that was infeasible. *Id.* Soon thereafter, Bradford cut FE1 out of the planning process. *Id.* While CleanSpark did incrementally push back its public estimates during the Class Period, the facts pled in the Complaint raise a strong inference that these estimates always lacked a reasonable basis. Even by

---

[21] Similarly, when Defendants publicly revised their estimate on February 12, 2021 to a new expected completion date of "mid-year 2021," all of the conditions that rendered the December 10, 2020 estimate misleading still existed. Defendants still had not prepared a detailed project timeline, and there were still no completed architectural or engineering drawings. Defendants still had not executed a contract with a general contractor or a contract for the build-out of the mining units. Defendants still had not started the process of applying for construction permits. Even worse, the February 12, 2021 update stated that the "[t]he capacity increase is underway." ¶126. In light of this representation, investors had even greater reason to believe that the new estimate was based on a detailed project timeline and that meaningful progress had been made.

May 6, 2021, the last date during the Class Period on which Defendants provided an estimate, Defendants continued to maintain that the project would be completed by the summer 2021. ¶99. By that time, there had only been further delays that rendered FE1's original projection of October 2021 unattainable. ¶78. Ultimately, the project was not completed until 2022.

### 1. Defendants' Estimates Were Not Puffery

Defendants argue that their estimates for the completion of the ATL power expansion project are puffery because they were not sufficiently specific to be relied upon by investors. MTD 12. Courts "must exercise great caution" when considering a puffery defense at the "motion to dismiss stage" because "materiality determinations entail delicate, fact-intensive assessments that are more properly left to the jury." *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012).[22]

Statements similar to those in this case have been held actionable. *See, e.g.*, *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301-02 (S.D.N.Y. 2009) ("Cost estimates, a forecast that the Project will be commercially viable, or *a comment that the Project's budget and construction schedule are unchanged are too specific to be considered mere puffery*."). In *NovaGold*, the challenged statements included comments like "construction is progressing on schedule" and "[f]ull construction to begin as early as possible in the spring."[23] In *LSB*, the actionable estimates

---

[22] The only case cited by Defendants in support of their claim that their estimates were puffery, *In re Skechers USA, Inc. Securities Litigation*, 444 F. Supp. 3d 498 (S.D.N.Y. 2020) (cited by MTD at 12), did not involve a construction schedule or any other timeline estimate. In *Skechers*, the statements that the court found to be puffery "simply state[d] that, during the remainder of the respective year, management intends to focus on … continuing to manage the Company's expenses to be in line with expected sales levels." 444 F. Supp. 3d at 517. The court held that these statements "do not suggest that management had any set target ratio" between expenses and sales and were "too general to generate any concrete form of expectation that management would … achieve any specific outcome." *Id.* Those facts bear no resemblance to this case.

[23] Linkh Decl., Ex. 11 (Opposition to Motion to Dismiss in *In re NovaGold Res. Inc. Sec. Litig.*, Case No. 08-cv-07041-DLC (S.D.N.Y filed on Feb. 13, 2009), Dkt. No. 68 at A-2).

included a statement that the expected completion date of an ammonia plant was the "fourth quarter of 2015" and that the expected start-up date of the plant was the "first quarter of 2016."[24] These statements are no more specific than Defendants' statements here that the project would be completed "in April 2021" or "by mid-year 2021" or "by summer 2021."[25]

Further supporting the materiality of Defendants' timeline estimates are economic factors that are unique to the Bitcoin industry. The creator of Bitcoin put a hard cap of 21 million on the supply of bitcoins. ¶32. The number of new bitcoins awarded each year decreases, and as the scarcity of bitcoins increases, the difficulty in mining increases. *Id.* This puts a premium on obtaining more bitcoins ***now*** as opposed to later. Any delay in ATL's ability to quickly ramp up production diminishes the entire value proposition of the acquisition. As Defendant Bradford has stated on more than one occasion, "[i]n the Bitcoin mining industry, time is money." ¶33.

### 2. Defendants' Estimates Are Actionable Opinions

Defendants argue that their estimates are inactionable opinions. Opinions are actionable, however, if (1) the speaker did not actually hold the stated belief at the time the statement was made or (2) the speaker omitted material facts "whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194-95 (2015).[26]

---

[24] Linkh Decl., Ex. 12 (Corrected Second Amended Class Action Complaint in *Wilson v. LSB Indus., Inc.*, Case No. 1:15-cv-07614-RA (S.D.N.Y. filed on Apr. 5, 2017), Dkt. No. 69 at ¶¶136, 137(f)-(g), 140, 146(d), 148, 157, 158(c), 161, 166(c), 170, 174, 175(b), 177).

[25] That an estimate is presented as a range does not make that estimate immaterial puffery. *See, e.g.*, *In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *7 (E.D.N.Y. Dec. 5, 2013) ("[C]ontrary to Defendants' contention, the alleged revenue projections do not constitute inactionable puffery because the projections provided specific ranges for future revenues.").

[26] *Accord Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) ("[O]pinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor.").

In this case, the omitted facts rendered Defendants' estimates materially misleading to a reasonable person. A reasonable person would have expected that an estimate for a major construction project issued by a public company would have had a more rigorous degree of preparation and analysis built into its estimate. *See LSB*, 2017 WL 7052046, at *2 (defendants' cost and schedule estimates for ammonia plant construction project were misleading opinion statements because the facts supported an inference that defendants "did not do much analysis at all, at least not the analysis a reasonable investor would expect in this context" and that defendants "omitted material information about the level of engineering work that lay behind" their estimates).

The inference that Defendants omitted material information that rendered their estimates misleading becomes even stronger as the Class Period moved forward. Once Defendants updated the schedule in February 2021 and announced that the "[t]he capacity increase is underway," a reasonable investor would have had even greater reason to believe that the new estimate was grounded on a detailed project timeline and completed architectural and engineering drawings (and, indeed, that construction permits had already been applied for, if not already approved). Similarly, FE1's testimony provides further support for the unreasonableness of the opinions. The omitted facts were not minor details "that might cut against" Defendants' estimates (MTD 17), but highly material facts that seriously undermined the accuracy and foundation of Defendants' opinions. Defendants' failure to disclose these facts rendered their estimates materially misleading opinion statements under applicable law.

**D.**     **The PSLRA Safe Harbor Does Not Protect Defendants' Statements**

**1.**     **The Safe Harbor Does Not Protect Present Or Historical Statements**

Defendants assert that "all of the alleged misstatements and omissions set forth in the Complaint fall within the PSLRA's safe harbor." MTD 19. Not so. The challenged statements concerning ATL's corporate history and CleanSpark's due diligence process discussed in Section

IV.B, *infra*, are statements of historical fact, not forward-looking statements. *E.g.*, ¶118 ("We began early-stage analysis of ATL in February 2020 …."). "Representations of historical or current fact do not qualify for the PSLRA's safe harbor." *In re Regeneron Pharm. Inc. Sec. Litig.*, 2005 WL 225288, at *13 (S.D.N.Y. Feb. 1, 2005).

With respect to Defendants' timeline estimates for the power expansion project, those statements are forward-looking, but some include representations of present or historical fact. "[I]t is well recognized that even when an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of ***present fact***, the safe harbor provision of the PSLRA does not apply." *Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018).[27] For example, the February 12, 2021 press release stated, "***The capacity increase is underway*** and is expected to be complete by mid-year 2021." ¶126. That statement was a misrepresentation of ***present fact*** in that no drawings had been completed, no applications for construction permits had been submitted, and no general contractor had been hired.[28]

### 2. The Safe Harbor Does Not Protect Material Omissions

Defendants' timeline estimates are not protected by the safe harbor for another reason. "The safe harbor … does not protect material omissions." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016). This is true, "regardless of whether the statements thereby rendered misleading were forward-looking." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013).[29] The gravamen of Plaintiffs' allegations with

---

[27] *See also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) ("[A] statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements. … The safe-harbor provision does not protect … present representations ….").

[28] *See also* ¶136 (5/6/2021 PR) ("The capacity increase ***is underway*** ….").

[29] *See also LSB*, 2017 WL 7052046, at *3 (safe harbor did not apply where plaintiff alleged "a material omission based on defendants' failure to disclose that no detailed engineering analysis

respect to Defendants' timeline estimates is that these statements omitted material facts that rendered those statements materially misleading. *See* Sec. IV.C.2, *supra*. Accordingly, the safe harbor does not apply to these statements.

### 3. The Statements Lacked "Meaningful" Cautionary Language

"To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010). "To be meaningful, cautionary language must precisely address the substance of the specific statement or omission that is challenged." *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006).

While Defendants assert that "CleanSpark's press releases and reports are full of meaningful cautionary language" (MTD 19), they do not point the Court to any specific risk factors or cautionary language and instead refer generally to CleanSpark's 2019 10-K. *Id.* The 2019 10-K was filed before the ATL acquisition, and, as such, it has no specific risk factors related to the ATL acquisition. The December 10, 2020 press release does include some cautionary language related to ATL, but that language is entirely boilerplate.[30] Moreover, CleanSpark's 2020 10-K (which Defendants did not include with the Van Riper Declaration) includes a series of specific risk factors related to ATL, but those factors concern general industry and regulatory risks relating to blockchain and cryptocurrency, the taxation of digital assets, and cybersecurity risks. Nothing is

---

had been performed" to support their estimates); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) ("[C]ourts in the Second Circuit have consistently held that the PSLRA safe harbor provision does not protect material omissions.").

[30] *See* Van Riper Decl., Ex. F at 6 ("Actual results may differ … due to the risk and uncertainties inherent in our business, including, without limitation: the successful integration of ATL into CleanSpark, the closing of the transaction, the fitness of our energy software and solutions for this particular application or market ….")

mentioned—in either the 2020 10-K or in CleanSpark's other SEC filings and press releases—about specific risks relating to the completion of the power capacity expansion project at the ATL facility. *See* Linkh Decl., Ex. 4. Nor are there warnings about the specific factors that rendered the estimates misleading, such as the lack of completed architectural and engineering drawings.

### 4. Defendants Had Actual Knowledge Of The Facts That Rendered The Timeline Estimates Misleading

Finally, the safe harbor does not apply because Defendants had actual knowledge of facts that rendered their statements misleading. 15 U.S.C. §78u–5(c)(1)(B). In this context, actual knowledge that a statement is misleading means that "defendants (1) did not genuinely believe the … statement, (2) actually knew that they had no reasonable basis for making the statement, or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement." *Slayton*, 604 F.3d at 775. As detailed *infra*, the facts alleged in the Complaint support a strong inference that Defendants had actual knowledge of facts tending to seriously undermine their estimates and that they actually knew they had no reasonable basis for making those estimates.

## V. THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER

### A. Standards For Pleading Scienter

To plead scienter, a plaintiffs must allege facts that give rise to a "strong inference" that the defendants acted with "the required state of mind." 15 U.S.C. §78u–4(b)(2). A plaintiff may satisfy this standard "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

Scienter is adequately alleged if the facts give rise to an inference that Defendants intentionally or recklessly misled the public which is at least as compelling as an inference that Defendants acted non-culpably. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "When the competing inferences rest in equipoise, the tie goes to the plaintiff." *Akerman*

*v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009). The proper inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S at 322-23.

### B. The Complaint Pleads A Strong Inference Of Scienter Regarding Defendants' Statements About ATL's History And CleanSpark's Due Diligence

The well-pleaded facts of the Complaint raise a strong inference that Defendants had actual knowledge of the omitted facts that rendered Defendants' statements misleading: (1) that ATL did not exist at the time Defendants began to consider acquiring the assets of the bankrupt Virtual Citadel, (2) that ATL was formed later to act as a shell company to convey those assets to a buyer, (3) that Schucman tried selling those same assets to Marathon under the name of Fastblock, and (4) that CleanSpark moved in to purchase ATL after the Marathon deal fell apart.

If Defendants initiated their "early-stage analysis" in February 2020, they must have known these facts, because ATL did not exist at that time and Schucman had not yet acquired the Virtual Citadel assets out of bankruptcy. Schucman told FE1 that he and Bradford had a pre-existing friendship (¶70), supporting a strong inference that Bradford knew about the Virtual Citadel bankruptcy and the various corporate shells that Schucman used to shop its assets to potential buyers. Defendants also represented that they had engaged in rigorous due diligence into ATL,[31] which further strengthens the inference of scienter. *See, e.g.*, *Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, at *7 (S.D.N.Y. Sept. 25, 2020) (imputing knowledge of target companies' financial data to CEO and Chairman of acquiring company because data was made available during due diligence); *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings*, 422 F. Supp. 3d 821, 851-52 (S.D.N.Y. 2019) ("unfettered access" to data and "level of due diligence

---

[31] *See* ¶118 (Bradford stated Defendants conducted "an in-depth examination of the profitability under the existing energy structure" and Schultz touted Defendants' "due diligence conclusions").

performed" supported inference of scienter).

Defendants assert that when Bradford referred to CleanSpark's "early-stage analysis of ATL," he was not referring to ATL the company, and instead was referring to the data facility ATL later purchased. MTD 15-16. Regardless, Defendants failed to disclose Virtual Citadel's bankruptcy, Marathon's offer to buy Fastblock, and, most importantly, the information necessary to discover the relationship between these entities. "Knowingly omitting material information is probative … of scienter." *Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 87 (1st Cir. 2008). At a minimum, Bradford's false reference to "ATL" was severely reckless in light of these material non-disclosures.

Defendants contend that the history behind ATL is not material. Objectively, however, "a failure to disclose the bankruptcy of a similar predecessor company is a material omission." *Merchant Cap.*, 483 F.3d at 770. That omission becomes even more material when management of the predecessor entity shops its assets to multiple potential acquirers under different brand names, a public company announces an offer to buy the company, and then the public company walks away from the deal. Subjectively, the totality of Defendants' actions suggest a deliberate effort to conceal ATL's history.[32]

Defendants' response to the Culper Report further strengthens the inference of scienter. In CleanSpark's January 21, 2021 press release, Defendants stated that the Culper Report made "false accusations against CleanSpark and its officers," but did not identify which accusations it was claiming were false. ¶53. Defendants also did not respond to the questions posed by Culper in its January 15 tweet, including: "Were Fastblock's abandoned assets simply rebranded as ATL?"

---

[32] For example, ATL's website was registered two days before the CleanSpark acquisition, and that website makes no mention of Virtual Citadel or Fastblock. As Culper concluded, "this hasty rebranding was an attempt to dissociate ATL from its checkered history." ¶50.

¶¶51-53. Tellingly, Defendants did not rebut the substance of the Culper Report's accusations at the time, but now claim that the information was already known by the public and immaterial.

Internally, Defendants responded to the Culper Report by shutting down attempts by employees to obtain information about the substance of Culper's allegations. ¶¶146-49. According to FE2, CleanSpark's Director of Strategic Partnerships from April 2019 to May 2021, CleanSpark's senior management created a "firewall" and refused to provide employees with information on how to respond to shareholder inquiries about the allegations. ¶¶147-48. Defendants argue that they were just being "responsible and careful" in their responses to Culper and CleanSpark's employees (MTD 18-19), but their silence and refusal to clarify the true facts support an inference of conscious wrongdoing. *See, e.g.*, *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014) (defendant's "non-denial" of allegations raised in public reporting about the defendant's and company's conduct "provide a strong inference of scienter").

### C. The Complaint Pleads A Strong Inference Of Scienter Regarding Defendants' Timeline Estimates For The ATL Expansion Project

The facts alleged in the Complaint also support a strong inference that Defendants had actual knowledge of facts that rendered their timeline estimates materially misleading. Bradford asked FE1 to prepare him a detailed project timeline in January or February 2021. ¶75. This supports an inference that prior to January 2021, Defendants had no detailed project timeline. Further, as of December 2020, when Defendants issued the initial estimate, and as of February 2021, Defendants had no completed architectural or engineering drawings for the project, no contract with a general contractor, and no contract for a build-out of the mining units. ¶76. Taken together, these facts raise a strong inference that the initial estimate of project completion by April 2021 lacked any reasonable basis and was issued with actual knowledge of the facts that rendered the estimate misleading.

By the time that FE1 provided the detailed project timeline to Bradford in January or February 2021 showing a completion date of October 2021 under the most aggressive assumptions, the inference of scienter moves from strong to overwhelming. When FE1 told Bradford about this estimate, he threw a fit and told her that this schedule was unacceptable because he had promised shareholders the facility would be up and running within four months. ¶75. FE1 responded that there was no way to meet Bradford's desired timeline. *Id.*

Defendants argue that the most compelling inference is that Bradford and FE1 had a good faith difference of opinion. MTD 15. Given the totality of the facts, discussed above, the much more compelling inference is that Bradford simply refused to accept reality and preferred to incrementally push back the public estimates rather than make a clean admission of the extent to which the initial estimates were wrong.[33] Defendants continued to tell the public that the project would be completed by the end of the summer even as late as May 6, 2021, despite the fact that Defendants still had not started the process of applying for construction permits and there had been further delays that had not been anticipated at the time that FE1 provided the completion estimate of October 2021. ¶¶78, 99. Ultimately, the project was not completed until sometime in 2022. The contemporaneous facts demonstrate that the failure to meet the timeline was not misplaced optimism but a deliberate refusal to acknowledge the facts.[34]

The inference of scienter is also bolstered by the core operations doctrine.[35] After acquiring

---

[33] Defendants argue they had no motive to lie, but such a motive is not necessary to plead securities fraud. *See Tellabs*, 551 U.S. at 325; *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011).

[34] Multiple observers, including Schucman, a lawyer who assisted with the acquisition, and an outside financial consultant, all expressed to FE1 that they thought Bradford was jumping the gun with his public announcements about the schedule. ¶79.

[35] *See In re Atlas Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004) ("knowledge of the falsity of a company's ... statements can be imputed to key officers who should have known of facts relating to the core operations of their company."). While courts generally hold that the core operations doctrine does not itself establish scienter, when a misrepresentation

ATL, CleanSpark changed its strategic focus to Bitcoin mining. As such, the ATL expansion project was integral to the success of the Company, and the Court may infer that Defendants were highly focused on the status and progress of that project.

### D.     The Complaint Pleads A Strong Inference Of Corporate Scienter

The scienter of both Defendants Bradford and Schultz may be imputed to CleanSpark. Moreover, for purposes of corporate scienter, the individual whose intent is imputed to the corporation need not be the same individual who made the false or misleading statement. *See, e.g.*, *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at \*10 (S.D.N.Y. Sept. 19, 2017) ("[T]he person whose state of mind is imputed to the corporate defendant need not also be the person who made the material misstatements at issue.").[36]

## VI.     THE COMPLAINT PLEADS RELIANCE

Defendants argue that Plaintiffs cannot have relied on any statements made after March 5, 2021 because "neither of them purchased shares after that date." MTD 19. This confuses the question of reliance with standing. A plaintiff may represent a class of investors for a class period that extends beyond that individual's last purchase date.[37] Defendants do not cite a single case

---

concerns a company's core operations, that fact does strengthen the inference of scienter. *See, e.g.*, *Salix*, 2016 WL 1629341, at \*16 ("the fact that the alleged fraud concerned Salix's core operations … buttress[es] the allegations of scienter discussed above"); *Okla. Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16 (S.D.N.Y. 2019) (similar).

[36] *Accord Patel v. L-3 Communications Holdings Inc.*, 2016 WL 1629325, at \*15 n.38 (S.D.N.Y. Apr. 21, 2016) (same) (collecting cases); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F.Supp.3d 65, 90 (S.D.N.Y. 2017) ("the individual making an alleged misstatement and the one with scienter do not have to be one and the same").

[37] *See, e.g.*, *In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at \*16 (E.D.N.Y. Dec. 5, 2013) (rejecting, on motion to dismiss, defendants' argument that plaintiff "lacks standing to sue on certain alleged misrepresentations made either both before or after Lead Plaintiff purchased stock in Symbol" because "Lead Plaintiff is not required to have standing to assert all claims on behalf of the potential class members"); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 125 (S.D.N.Y. 2001) (rejecting, at class certification, defendant's argument that proposed class representatives "cannot represent those that invested in the Fund after the dates on which these

holding, or even suggesting, otherwise. *Halliburton v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) says nothing about the purported rule Defendants ask this Court to adopt.

Defendants next argue that Plaintiffs cannot rely on a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) because this case is based primarily on affirmative misstatements rather than omissions. MTD 19.[38] Defendants are wrong. Plaintiffs' allegations are based primarily on omissions. *See supra* at Sec. IV.B.-D. In any event, this is not an issue for a motion to dismiss. The only case Defendants cite on this issue, *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), addressed the issue at class certification. Plaintiffs also plead the fraud-on-the-market doctrine as an independent basis for the presumption of reliance. ¶¶159-65.

## VII.   THE COMPLAINT PLEADS LOSS CAUSATION

"[C]ourts in this District have historically evaluated loss causation under the notice pleading standard of Rule 8." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 80 (S.D.N.Y. 2015). A "short and plain statement" that provides notice of a "causal connection" between the misrepresentation and the loss is sufficient. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). This causal connection can be pled by alleging (i) a corrective disclosure or (ii) "the loss was foreseeable and caused by a materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr.*, 750 F.3d at 232-33 (2d Cir. 2014). "[L]oss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008).

---

two representatives made their last investments"); *Stevelman v. Alias Research, Inc.*, 2000 WL 888385, at *7 (D. Conn. June 22, 2000) (similar).

[38] Even if the Court were to find that Plaintiffs' claims were a combination of misstatements and omissions, the presumption would still apply. *Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005) ("where plaintiffs' claims are based on a combination of omissions and misstatements, courts in this Circuit" nonetheless "have acknowledged the applicability of the *Affiliated Ute* presumption.").

Defendants argue that the first Culper Report cannot be a corrective disclosure because it is based on publicly available information. MTD 20 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511-12 (2d Cir. 2010)). However, the notion that "any third party's analysis of a company's already-public financial information cannot contribute new information to the marketplace …. is incorrect." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7-8 (S.D.N.Y. Mar. 23, 2020) (collecting cases).[39]

*Omnicom* does not hold otherwise. In that case, decided at summary judgment, the Second Circuit held that a Wall Street Journal article did not constitute a corrective disclosure because the underlying accounting issue had been widely reported in the press a year earlier and the article provided no new facts about the accounting. 597 F.3d at 511-12. Here, by contrast, the first Culper Report uncovered information that was not discussed in the press like the accounting issue in *Omnicom* (including information buried in the bankruptcy filings of a company investors had no reason to know was connected to ATL) and then synthesized that information in a way that partially revealed the previously-unrecognized fraud.[40]

Defendants' argument concerning the second Culper Report is even weaker. MTD 20. Defendants acknowledge that this report was based in part on utility bills that were not readily available to investors. Culper used that information to support its allegations that CleanSpark was

---

[39] *See also In re Winstar Commc'ns*, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006) (loss causation may be based on stock drop following short seller report, even when its findings are "not attributed to any non-public information" and "derived from an analysis of" published financials"); *Take-Two*, 551 F. Supp. 2d at 283 (loss causation may be based on "third-party analyses of a company's financials, which contradict representations made by defendants").

[40] Multiple courts have cautioned against an expansive reading of *Omnicom*. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 559 (S.D.N.Y. 2011) (*Omnicom* not to be read "broadly"); *In re: Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 343-44 (S.D.N.Y. 2015) (*Omnicom* "concerned a motion for summary judgment" and provides no basis for defendants to "challenge the novelty and accuracy of plaintiffs' alleged news" at the pleading stage); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 674-75 (D.S.C. 2016) (similar).

understating the costs of its Bitcoin mining operations. MTD 20; *see* ¶102-03. This was new information not previously revealed to the market.

Defendants argue that CleanSpark's revised estimates cannot constitute corrective disclosures because they did not disclose the omitted facts upon which Plaintiffs base their fraud claims.[41] MTD 20. The revised estimates, however, do support a pleading of loss causation based on materialization of the risk. *See, e.g.*, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 477 F. Supp. 3d 123, 138 (S.D.N.Y. 2020) (plaintiff adequately alleged that "lower-than-expected income projections … reflected a partial materialization" of concealed risk).[42]

## VIII.  CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.[43] In the event the Court grants all or part of Defendants' motion, Plaintiffs request an opportunity to re-plead. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

Dated:  June 27, 2021

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By:*/s/ Gregory B. Linkh*
Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

-and-

---

[41] The Complaint bases its pleading of loss causation, in part, on the revised estimates disclosed in CleanSpark's 2/12/2021 press release and 8/17/2021 press release. *See* ¶¶88-89, 110-12, 152.

[42] Defendants do not challenge the Complaint's pleading of loss causation in connection with CleanSpark's 3/15/2021 announcement of a dilutive stock offering, ¶¶95-96, 152, which also suffices under a materialization of the risk theory.

[43] Defendants' only argument concerning the Complaint's Section 20(a) claims is their contention that it fails to plead a primary violation under Section 10(b). MTD 20. Because the Complaint adequately pleads Section 10(b) claims, it also adequately pleads Section 20(a) claims.

Robert V. Prongay (*pro hac vice*)
Christopher R. Fallon (*pro hac vice* pending)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz (*pro hac vice*)
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Lead Plaintiff Darshan*
*Hasthantra and Plaintiff Scott Bishins*

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. June 27, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 27, 2022, at New York, New York.

*/s/ Gregory B. Linkh*_____
Gregory B. Linkh