UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SCOTT BISHINS, et al.,

                Plaintiffs,

-against-

CLEANSPARK, INC., et al.,

                Defendants.

21 CV 511 (LAP)
OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

    Before the Court is Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 7(b), 9(b), 12(b)(1), and 12(b)(6).[1] Plaintiffs oppose the motion.[2] For the reasons below, the motion to dismiss is DENIED.

## I.  **Background**

    Plaintiffs filed this class action "on behalf of persons and entities that purchased or otherwise acquired CleanSpark securities between December 10, 2020, to August 16, 2021" (the "Class Period"). (Dkt. no. 36 at 7.)[3] Plaintiffs allege that

---

[1] (See Notice of Motion to Dismiss with Prejudice by All Defendants ("Def. MTD"), dated April 28, 2022 [dkt. no. 44]; see also Defendants' Memorandum of Law in Support of Motion to Dismiss ("Def. Br."), dated April 28, 2022 [dkt. no. 45]; Defendants' Reply in Further Support of Motion to Dismiss ("Def. Reply"), dated August 11, 2022 [dkt. no. 56].)

[2] (See Plaintiffs' Opposition to Defendants' Motion to Dismiss Amended Complaint ("Pl. Opp."), dated June 27, 2022 [dkt. no. 52].)

[3] (Amended Class Action Complaint for Violations of the Federal Securities Laws ("AC"), dated February 28, 2022. All citations in this section are to the AC unless (footnote continued)

during the Class Period, Defendants shifted CleanSpark's business model from alternative energy and software to mining Bitcoin. Plaintiffs further allege that in executing this shift, Defendants fraudulently omitted material information and misled investors, making Defendants liable to investors for the drop in CleanSpark's stock price that occurred during the Class Period.

Plaintiffs base many of their claims of undisclosed facts on the account of a former CleanSpark employee that Plaintiffs identify as Former Employee 1 ("FE1"). FE1 became the General Manager of Virtual Citadel during its receivership and remained General Manager of the business through its transition to ATL, up until the end of June 2021. (Id. at 35.) FE1 managed ATL's books and "oversaw all the projects that affected the entire company." (Id.)

A. **The ATL Acquisition**

On October 6, 2020, CleanSpark publicly offered more than four million shares of its common stock. CleanSpark's intentions for the proceeds from this sale included "strategic mergers and acquisitions," though CleanSpark wrote at the time that it had "no present commitments or agreements to enter into any such mergers or acquisitions." (Id. at 15-16.)

On December 10, 2020, the start of the Class Period,

---

(continued) otherwise stated.)

CleanSpark issued a press release announcing that it had acquired ATL Data Centers, Inc. ("ATL"), a Bitcoin mining company. (Dkt. no. 46-6, "Dec. 10 PR.") The Dec. 10 PR said that CleanSpark planned to expand the power in its new facility from twenty megawatts to fifty megawatts and that the expansion would be complete in April 2021. (AC at 18). In addition, CleanSpark wrote that it expected it could "reduce the cost of energy to below $0.0285 per kw/h" using CleanSpark's technology. (Id. at 19.)

Defendant Zachary Bradford ("Bradford") has been CleanSpark's CEO and President since October 2019. (Id. at 12.) Bradford was quoted in the Dec. 10 PR as saying that CleanSpark "began early-stage analysis of ATL in February 2020 to evaluate expanding the facility's energy capacity and reducing energy costs. After an in-depth examination of the profitability under the existing energy structure, it was apparent that it was a perfect fit to deploy the aforementioned strategy." (Dec. 10 PR at 3-4.) Defendant Matthew Schultz ("Schultz") has served as the Chairman of CleanSpark's Board of Directors since October 2019. (AC at 12.) Schultz was quoted in the Dec. 10 PR as saying "[t]he recent, significant investments into Bitcoin by such respected companies as Square, PayPal, and MicroStrategy further validate our due diligence conclusions surrounding this acquisition." (Dec. 10 PR at 4.) CleanSpark's stock price rose $2.30 (17.6%) the day of the ATL acquisition announcement. (AC

at 21.)

Through the end of December 2020, CleanSpark issued several positive projections regarding the Bitcoin business. On December 17, 2020, CleanSpark's financial report for fiscal year ("FY") 2020 projected that it expected to earn a minimum of $8 million in revenue through its Bitcoin mining activities. (Id.) On December 31, 2020, CleanSpark wrote in a letter to shareholders that it expected to make at least $10 million from its Bitcoin mining activities in FY 2021. (Id.) On January 5, 2021, CleanSpark wrote that it anticipated completing the near-term expansion "within the coming weeks." (Id. at 22.) Between December 9, 2020, the day before the ATL acquisition announcement, and January 7, 2021, CleanSpark's stock price more than tripled from $13.09 to $40.39. (Id.)

Following the announcement of the ATL acquisition, CleanSpark purchased millions of dollars of new Bitcoin mining equipment, without having space to store the new equipment in ATL's existing facility. (Id. at 40.) The December 22, 2020 press release announcing the equipment purchase stated

> As we work towards the implementation of the facility power system upgrade, our focus is on maximizing the total Bitcoin output by immediately adding ASICs. In the Bitcoin mining industry, time is money . . .. Many mining companies, both publicly traded and privately held, have stated plans to expand capacity in six to nine months, however we have focused on sourcing units for immediate deployment.

(Id. at 41.) Between March 2, 2021, and August 10, 2021,

CleanSpark made nine additional announcements regarding its acquiring new Bitcoin mining equipment. (Id. at 41-42.)

B. **ATL's Corporate History**

On January 14, 2021, a short seller called Culper Research published a report on CleanSpark's acquisition of ATL. (Dkt. no. 36-2, "Jan. Culper Rep.") Culper wrote that in August 2020, a Bitcoin mining company called Marathon Patent Group ("Marathon") had announced its intent to purchase ATL, then known as Fastblock Mining, before withdrawing the offer by September 2020. (AC at 23). In a press release explaining the withdrawal, Marathon wrote that ATL's subsidized power rate would expire in three years, making it impossible for Marathon to reach the seven-to-ten-year window it would need to make the acquisition "economically feasible." (Id.)

FE1 stated that she believed Marathon had additional reasons for revoking its offer to buy ATL, including the fact that ATL's previous owner had allowed the data center's certifications to lapse. (Id. at 36.) FE1 estimated that it would take nearly $100,000 and six to eight months to reinstate the certifications. (Id.) FE1 also asserted that ATL's Bitcoin mining facility was in poor condition at the time of the CleanSpark acquisition. (Id. at 37.) FE1 alleged that the only way to access the Bitcoin mining facility was by way of stairs that were not OSHA-compliant. (Id.) FE1 stated that employees would dig trenches on ATL's property without setting up

5

appropriate safety barriers around the trenches and that there
were nine to eleven transformers on the property that similarly
lacked protective barriers. (Id.) FE1 identified an occasion in
March or April 2021 when an employee was nearly electrocuted.
(Id.)

FE1 said that during CleanSpark's due diligence process,
FE1 provided CleanSpark extensive financial reports and full
access to ATL's books. (Id. at 36). FE1 alleged that she
personally provided information regarding the data center
certification lapses to Bradford and that FE1 knew Bradford had
reviewed the information because FE1 received comments from
Bradford on some of the materials she provided. (Id. at 36-37.)
FE1 also stated that ATL's previous owner, Bernardo Schucman
("Schucman"), told FE1 that he had been "friends with Bradford
for a while." (Id. at 36.) FE1 said that CleanSpark conducted
two audits of ATL and that the audits were done by Blue Chip
Accounting, LLC ("Blue Chip"). (Id. at 37). Bradford co-founded
Blue Chip and remains a senior executive at the accounting firm.
(Id.)

Culper also asserted that Fastblock and ATL were simply
names attached to the assets of Virtual Citadel, a company that
initiated bankruptcy proceedings on the death of its founder.
(Id. at 24.) Culper wrote that while CleanSpark said its due
diligence into ATL began in February 2020, ATL was not formed as
a corporate entity until April 13, 2020, and ATL's website was

not registered until December 8, 2020. (Id. at 24.)

The day Culper published its report and the day after, CleanSpark's stock price fell 20.8% from $39.34 to $31.15. (Id. at 25.) On January 21, 2021, CleanSpark issued a press release that asserted Culper's report made "false accusations against CleanSpark and its officers" without specifying which accusations in the report were false. (Id. at 25-26.)

On June 18, 2021, Culper released a follow-up report that alleged CleanSpark was understating the costs of its Bitcoin mining operation. (Id. at 46; dkt. no. 36-3, "June Culper Rep.") Specifically, Culper compared CleanSpark's stated costs for the first quarter ("Q1") of 2021 ($611,863) with ATL's power bills for Q1 ($693,144.70) – "a greater sum than the entire segment costs, not to mention rent expenses, employee expenses, and any additional expenses." (Id. at 46.) The day the report was released and the day after, CleanSpark's stock price fell 13.6% from $19.85 to $17.16. (Id. at 47.)

## C. **Estimated Completion Date for the ATL Expansion**

FE1 alleged that Bradford's estimate of an April 2021 completion date for the ATL expansion was "not grounded in reality." (Id. at 38.) FE1 stated that at Bradford's request, FE1 prepared a construction plan for the ATL expansion that she considered to be the "most aggressive plan that could realistically be implemented." (Id. at 37.) Assuming no delays or weather issues, FE1 estimated that the earliest date the ATL

expansion could be completed was October 2021. (Id. at 38)

FE1 presented her plan, its assumptions, and its conclusions to Bradford in January or February 2021. (Id.) FE1 alleged that Bradford said her construction plan unacceptable because he had already stated publicly that the expansion would be complete by April 2021 and that Bradford told FE1 to rework the plan to meet that timeline. (Id.) FE1 stated she told Bradford that his timeline was not possible. (Id.) FE1 alleged that within weeks of that conversation, she had been cut out of the planning process for the expansion project. (Id.)

To substantiate her claim that Bradford's timeline was unreasonable, FE1 stated that as of February 2021, CleanSpark "did not have construction permits, did not have a contract with a general contractor, and did not have a contract for the build of the mining container units." (Id.) FE1 alleged that the "the architectural drawings and engineering plans were not completed until March 2021 at the earliest." (Id.) FE1 also pointed to a Georgia law that required a deforestation plan, which was not completed until March 2021, and a City of College Park requirement for a noise study, which was not completed until May 2021. (Id. at 38-39.) FE1 asserted that ATL did not begin applying for construction permits until June 2021, and by the time she left ATL, the expected completion date for the project was later that the October 2021 date she had originally proposed. (Id. at 39.)

8

Through 2021, CleanSpark made incremental revisions to the expected completion date for the ATL expansion project. On February 12, 2021, CleanSpark stated the expected completion date was mid-year 2021 rather than April 2021 (id. at 42); on February 18, 2021, Bradford said it was "mid-summer" (id. at 43); on March 26, 2021, CleanSpark said "end of summer, 2021" (id. at 45); and on August 17, 2021, CleanSpark announced that the ATL expansion was expected to be completed in fall 2021 (id. at 50). On December 14, 2021, Bradford stated on an earnings call that CleanSpark had forty megawatts operating, still short of the fifty-megawatt expansion that Defendants had told investors CleanSpark would achieve. (Id. at 51-52.)

Amid the date revisions, there were other troubling signs regarding the expansion project. On March 15, 2021, CleanSpark announced a public offering of common stock, which FE1 said was necessary to fund the ATL expansion project. (Id. at 44.) The next day, CleanSpark's stock fell $6.66 from $29.34 to $22.68 (22.7%). (Id.) On July 14, 2021, CleanSpark issued a press release announcing a partnership with a company called Coinmint, LLC ("Coinmint") whereby Coinmint agreed to house, power, and operate some of CleanSpark's Bitcoin mining equipment. (Id. at 47.) The press release further stated "The 30MW energy expansion of our wholly-owned facilities is progressing and will be finalized in the coming months to bring our Atlanta facilities to 50MW of total capacity." (Id. at 48-49.) The copy of the

agreement that CleanSpark made available to the public redacted key provisions and made it impossible to know how much the agreement cost CleanSpark. (Id. at 49.)

## II.  Legal Standards

### A. Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss, a complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Palin v. N.Y. Times Co., 940 F.3d 804, 810 (2d Cir. 2019) (citation omitted). If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." Twombly, 550 U.S. at 570. "The court accepts as true all well-pleaded factual allegations in the complaint, [and] draws all reasonable inferences in favor of the nonmoving party." Gamm v. Sanderson Farms, Inc., 944 F.3d 455, 462 (2d Cir. 2019) (quotation marks and citation omitted). However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678.

**B.** **Fed. R. Civ. P. 9(b) & the Private Securities Litigation Reform Act ("PSLRA") 15 U.S.C. § 78u-4(b)**

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015) (quoting ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009)). Rule 9(b) requires that a complaint "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (citing Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)). "The PSLRA builds on Rule 9's particularity requirement, dictating the pleading standard for claims brought under the Exchange Act." Blanford, 794 F.3d at 304.

"Under the PSLRA, the complaint must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading,' and 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" ECA, 553 F.3d at 196 (quoting the PSLRA). "Therefore, '[w]hile we normally draw reasonable inferences in the non-movant's favor on a motion

11

to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." Id. (quoting Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir.2008)).

## C. **Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5**

For claims of securities fraud under Section 10(b) and Rule 10b-5 promulgated thereunder, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Gamm, 944 F.3d at 463.

## D. **Section 20(a) of the Securities Exchange Act of 1934**

"To state a claim of control person liability under § 20(a), 'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (quoting ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007)).

### III. <u>Discussion</u>

Defendants assert deficiencies in Plaintiffs' pleadings regarding the following elements of their Section 10(b) claim: 1) misstatement or omission of material fact; 2) scienter; 3) reliance; and 4) loss causation.

### A. <u>Misstatements or Omissions of Material Fact</u>

#### i. <u>Legal Standard</u>

To support a claim of securities fraud, an alleged statement or omission must be false or misleading and the stated or omitted fact must be material. See <u>Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.</u>, 433 F. Supp. 3d 515, 531 (S.D.N.Y. 2020). "'The test for whether a statement is materially misleading under Section 10(b)' is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" <u>In re Vivendi, S.A. Sec. Litig.</u>, 838 F.3d 223, 250 (2d Cir. 2016) (quoting <u>Rombach</u>, 355 F.3d at 172 n.7).

#### 1. <u>False or Misleading</u>

A statement of fact is actionably false under the securities laws if the statement was "false at the time it was made. . .. A statement believed to be true when made, but later shown to be false, is insufficient." <u>In re Lululemon Sec. Litig.</u>, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (citing <u>San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris</u>

Cos., Inc., 75 F.3d 801, 812–13 (2d Cir.1996)); see also Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("fraud by hindsight" is not actionable). "Falsity is a failure to be truthful—it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made." C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG, 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013) (citing San Leandro, 75 F.3d at 813). Plaintiffs must do more than allege a statement is false, "they must demonstrate with specificity why that is so." Rombach, 355 F.3d at 174.

A statement of belief or opinion is actionably false if "(1) the speaker does not hold the belief professed; (2) the facts supplied in support of the belief professed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable investor." Martin v. Quartermain, 732 Fed. App'x 37, 40 (2d Cir. 2018) (quoting Tongue v. Sanofi, 816 F.3d 199, 210 (2d Cir. 2016)) (internal quotation marks and alterations omitted). However, "a sincere statement of pure opinion is not an untrue statement of material fact, regardless [of] whether an investor can ultimately prove the belief wrong." Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 186 (2015) (quotation marks omitted).

"[A]n omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." Stratte-McClure v. Morgan Stanley, 776 F.3d 94,

14

101 (2d Cir. 2015). "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011). "[A]bsent an underlying duty to disclose, companies may remain silent '[e]ven with respect to information that a reasonable investor might consider material.'" Finger v. Pearson PLC, No. 17-cv-1422, 2019 WL 10632904, at *8 (S.D.N.Y. 2019) (quoting Matrixx Initiatives, 563 U.S. at 44-45). "Such a duty may arise when there is a corporate insider trad[ing] on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading." Stratte-McClure, 776 F.3d at 101 (quotation marks and citations omitted). "[T]he lack of an independent duty is not [necessarily] a defense to Rule 10b-5 liability because upon choosing to speak, one must speak truthfully about material issues." Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002) ("Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete."). "This inquiry, unlike other duty-to-disclose scenarios, merges with the question of whether the omitted fact is material." Constr. Laborers, 433 F. Supp. 3d at 531 (citing In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)).

2. __Material__

"An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." Singh v. Cigna Corp., 918 F.3d 57, 63 (2d Cir. 2019) (quotation marks and citation omitted). "When contingent or speculative future events are at issue, the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001) (quotation marks and citations omitted).

"Because materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, 'a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" ECA, 553 F.3d at 197 (quoting Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000)). However, "Courts have been 'careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information.'" Lululemon, 14. F. Supp. 3d at 572 (quoting Matrixx, 563 U.S. at 38).

"Certain categories of statements are immaterial as a

matter of law, such as 'puffery,' opinions, and forward-looking statements accompanied by adequate cautionary language." Barilli v. Sky Solar Holdings, Ltd., 389 F. Supp. 3d 232, 250 (S.D.N.Y. 2019). "Puffery encompasses statements that are too general to cause a reasonable investor to rely upon them," In re Vivendi, 838 F.3d at 245 (cleaned up), such "as a company's statements of hope, opinion, or belief about its future performance or general market conditions." Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc., 412 F. Supp. 3d 353, 363 (S.D.N.Y. 2019), aff'd, 826 F. App'x 111 (2d Cir. 2020); see also Novak, 14 F. Supp. 3d at 315 ("statements containing simple economic projections, expressions of optimism, and other puffery are insufficient"); In re AT&T/DirecTV Now Sec. Litig., 480 F. Supp. 3d 507, 523 (S.D.N.Y. 2020) (collecting cases).

Forward-looking statements fall under the PSLRA's safe harbor provision when accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). To fall within the safe harbor provision, "defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." Slayton v. Am. Exp. Co., 604 F.3d 758, 772 (2d Cir. 2010). "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent

materials — including the cautionary language — to determine if
a reasonable investor could have been misled into thinking that
the risk that materialized and resulted in his loss did not
actually exist.'" In re Delcath Sys., Inc. Sec. Litig., 36 F.
Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting Halperin v. eBanker
USA.com, Inc., 295 F.3d 352, 359 (2d Cir. 2002)). "'[C]autionary
language [that] did not expressly warn of or did not directly
relate to the risk that brought about plaintiffs' loss' is
insufficient." Gregory v. ProNAi Therapeutics, Inc., 297 F.
Supp. 3d 372, 398 (S.D.N.Y. 2018) (quoting Halperin, 295 F.3d at
359).

    ii. **Analysis**

      1. **Bradford's Statement on February 2020 ATL Analysis**

The first statement at issue is Bradford's statement in the
Dec. 10 PR saying that CleanSpark's analysis of the ATL
acquisition began in February 2020 ("Feb. 2020 Analysis
Statement". Plaintiffs assert that this statement was false
because ATL was not formed until April 13, 2020. (AC at 54-55.)
Plaintiffs further argue that if Bradford meant to reference the
assets of Virtual Citadel that were later conveyed to ATL, it
was materially misleading to fail to disclose Virtual Citadel's
receivership and bankruptcy because these facts suggested that
CleanSpark's acquisition was in financial distress. (Id. at 55.)
Defendants respond that CleanSpark had no duty to disclose
Virtual Citadel's bankruptcy. (Def. Br. at 22.) Defendants say

it is "inherently speculative" that failing to disclose Virtual Citadel's bankruptcy concealed the threat that the ATL acquisition posed to CleanSpark's finances and argue that such speculative claims cannot form the basis of a 10b-5 claim. (Id., citing Lipow v. Netl UEPS Techs., Inc., 131 F. Supp. 3d 144, 170-71 (S.D.N.Y. 2015).)

Whether Bradford's Feb. 2020 Analysis Statement gives rise to liability under Section 10(b) turns on whether the Court finds that the statement created a duty to disclose Virtual Citadel's bankruptcy. "Such a duty may arise when there is . . . a corporate statement that would otherwise be inaccurate, incomplete, or misleading." Stratte-McClure, 776 F.3d at 101 (quotation marks and citations omitted). "This inquiry, unlike other duty-to-disclose scenarios, merges with the question of whether the omitted fact is material." Constr. Laborers, 433 F. Supp. 3d at 531 (citing In re Time Warner, 9 F.3d at 267). "An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." Singh, 918 F.3d at 63 (quotation marks omitted). "[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Ganino, 228 F.3d at 162.

Plaintiffs have alleged that the Feb. 2020 Analysis Statement implied ATL existed in February 2020 when ATL did not exist as a corporate entity until April 2020. Plaintiffs have also alleged that Defendants omitted all information about the corporate history of ATL's assets, including the Virtual Citadel bankruptcy and the attempts to sell the assets to Marathon under the name Fastblock Mining. Reasonable minds could differ on whether these facts would be important to a reasonable investor following CleanSpark's acquisition of ATL. Thus, Plaintiffs have alleged sufficient facts to meet the material omission element here.

Defendants separately argue the disclaimers and cautionary language CleanSpark included in its securities filings disclosed the risks of its business and work against Plaintiffs' allegations of misstatements and omissions. (Def. Br. at 22.) Defendants' argument fails because the PSLRA's safe harbor standard applies to "forward-looking statements." Bradford's statement concerns the historical facts of CleanSpark's pre-acquisition analysis of ATL, not forward-looking projections.

### 2. Schultz's Market Comparison Statement

The second statement at issue is Schultz's statement in the Dec. 10 PR saying that "recent, significant investments into Bitcoin by such respected companies as Square, PayPal, and MicroStrategy further validate our due diligence conclusions surrounding this acquisition" ("Market Comparison Statement").

(AC at 55.) Defendants assert that this statement is inactionable puffery. (Def. Br. at 23, citing <u>In re Skechers USA, Inc. Sec. Litig.</u>, 444 F. Supp. 3d 498 (S.D.N.Y. 2020); <u>Lehmann v. Ohr Pharm. Inc.</u>, No. 18 CIV. 1284 (LAP), 2019 WL 4572765 (S.D.N.Y. Sept. 20, 2019).) As discussed above, statements classified as puffery are "immaterial as a matter of law." <u>Barilli</u>, 389 F. Supp. 3d at 250. "Puffery encompasses statements that are too general to cause a reasonable investor to rely upon them," <u>In re Vivendi</u>, 838 F.3d at 245 (cleaned up), such "as a company's statements of hope, opinion, or belief about its future performance or general market conditions," <u>Skechers</u>, 412 F. Supp. 3d at 363.

Despite Defendants' contentions, Schultz's Market Comparison Statement does not meet the definition of inactionable puffery – it is too specific and too grounded in the present. Schultz said that Bitcoin investments by specific companies (Square, PayPal, MicroStrategy) validated CleanSpark's due diligence conclusions regarding the ATL acquisition. However, Schultz omitted any information regarding Marathon's withdrawn offer to buy ATL, a much more relevant market comparison with greater implications for the quality of CleanSpark's due diligence conclusions. Schultz's statement is not merely a statement of hope, opinion, or belief about future performance or market conditions but, rather, a statement on the strength of CleanSpark's past due diligence regarding the

acquisition at issue. For these reasons, Schultz's statement is not inactionable puffery.

Defendants also argue that even if Marathon's withdrawn offer cut against CleanSpark's decision to acquire ATL, Defendants had "no obligation to disclose every fact that might cut against their decision." (Def. Br. at 23, citing Tongue, 816 F.3d at 199.) By contrast, Plaintiffs claim Schultz's Market Comparison Statement was materially misleading because the context demanded Defendants disclose Marathon's withdrawn offer to buy ATL (then known as Fastblock Mining). (Pl. Opp. at 20, citing Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245, 250-51 (2d Cir. 2014) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context.").)

As discussed above, whether an omission is materially misleading turns on whether the Defendants had a duty to disclose, which can arise when there is "a corporate statement that would otherwise be inaccurate, incomplete, or misleading." Stratte-McClure, 776 F.3d at 101 (quotation marks and citations omitted). That inquiry in turn depends on whether the omitted fact is material (i.e., whether there is a "substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." Singh, 918 F.3d at 63 (quotation marks omitted)). Here, Schultz said

Bitcoin investments by large market players such as Square and PayPal validated CleanSpark's due diligence conclusions regarding the ATL acquisition. In the context of CleanSpark's identifying relevant market comparisons for its ATL acquisition, it seems clear that a reasonable person would consider Marathon's withdrawn offer an important fact in deciding whether to trade CleanSpark stock.

It is a close question whether Schultz's Market Comparison Statement is materially misleading. However, the Court is mindful of the Court of Appeals' instruction that district courts must weigh potentially fraudulent statements together and in context rather than in isolation. See In re Vivendi, 838 F.3d at 250 (quoting Rombach, 355 F.3d at 172 n.7). Schultz's Market Comparison Statement appeared in the same press release as Bradford's Feb. 2020 Analysis Statement. Taking these statements together reinforces the conclusion that Schultz's failure to disclose Marathon's withdrawn offer was a material omission giving rise to liability under Section 10(b).

### 3. Estimates of Completion Date for ATL Expansion

The third set of statements at issue[4] are those in which

---

[4] Plaintiffs also take issue with statements regarding CleanSpark's due diligence, conducted by Blue Chip Accounting. Plaintiffs argue that Defendants omitted the material facts that Virtual Citadel had gone bankrupt, and that Bradford is a partner at Blue Chip. (Pl. Opp. at 22: "That no audit was performed by an independent accounting firm, and that the purchase of ATL was made from Bradford's (footnote continued)

CleanSpark and its officers discussed the estimated completion
date of the ATL Expansion project (the "Estimates"). The
Defendants assert that the Estimates are not actionable because
they are puffery or because they are opinion. (Def. Br. at 18-
19.) Defendants' puffery argument fails because the Estimates
are not "too general to cause a reasonable investor to rely upon
them," In re Vivendi, 838 F.3d at 245 (cleaned up). They are
specific estimates of the completion date of a major asset
expansion in the company's core business.

A statement of belief or opinion is actionably false if
"the speaker 'omits information' that 'makes the statement
misleading to a reasonable investor.'" Martin, 732 Fed. App'x at
40 (quoting Tongue, 816 F.3d at 210). If a statement "omits
material facts about the issuer's inquiry into or knowledge
concerning a statement of opinion, and if those facts conflict
with what a reasonable investor would take from the statement
itself," then the statement can give rise to liability under the

_____

(continued) personal friend (¶70), undermines Bradford's
representation concerning the rigor and quality of Defendants'
due diligence process.") Defendants cite to Van Riper Decl., Ex.
E (dkt. no. 46-5), a Form 10-Q filed in Q3 of FY 2020, to argue
that CleanSpark had disclosed Bradford's relationship with Blue
Chip and that Blue Chip provides accounting assistance to
CleanSpark. (Id. at 30.) The Court finds that the due diligence
statements did not create a duty to disclose the Virtual Citadel
bankruptcy. Further, due to Defendants' disclosures, the Court
finds that Plaintiffs have failed to allege material omissions
regarding these statements.

securities laws. Omnicare, 575 U.S. at 189. However, "a sincere statement of pure opinion is not an untrue statement of material fact, regardless [of] whether an investor can ultimately prove the belief wrong." Id. at 186 (quotation marks omitted).

Here, Defendants are alleged to have omitted information that made the Estimates misleading to reasonable investors. Plaintiffs allege that FE1 delivered a report to Bradford in January or February 2021 that concluded October 2021 was the earliest possible completion date for the ATL expansion. (AC at 38.) Plaintiffs further allege a series of facts that suggest Bradford had not done the investigation a reasonable investor would expect of a corporate officer before making such a specific estimate. As late as February 2021, CleanSpark had not secured construction permits or a general contractor. (AC at 38.) Despite Bradford's having received FE1's report, on March 26, 2021, CleanSpark said it expected to complete the expansion by end of summer, 2021. (Id. at 45). Given FE1's report and the alleged lack of investigation on the part of CleanSpark's officers, Plaintiffs have alleged sufficient facts to make the Estimates actionable under Section 10(b). See Wilson v. LSB Indus., Inc., 2017 WL 7052046, at *1 (S.D.N.Y. 2017) (citing Omnicare, 575 U.S. at 188) ("Plaintiff has plausibly alleged that defendants' cost and schedule estimates were misleading because the projections omitted the fact that LSB had not performed a meaningful inquiry into the engineering necessary to

complete the ammonia plant project.").

Defendants assert that the Estimates fall within the PSLRA's safe harbor. (Def. Br. at 25.) The Court disagrees. The Estimates are best characterized as material omissions, which the PSLRA's safe harbor does not protect. See Galestan v. OneMain Holdings, Inc., 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018). Even if the Court were to characterize the Estimates as misstatements, the Estimates would still fail to qualify for the safe harbor because they were not accompanied by meaningful cautionary language.

"To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials — including the cautionary language — to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" In re Delcath Sys., 36 F. Supp. 3d at 333 (quoting Halperin, 295 F.3d at 359). Cautionary language must expressly warn of or directly relate to the risk that brought about Plaintiffs' loss, see Gregory, 297 F. Supp. 3d at 398, it must convey substantive information, and it must not be boilerplate, Slayton, 604 F.3d at 772.

The cautionary language Defendants point to is the language

in their FY 2019 10-K filing.[5] This language does not discuss the
Defendants' ATL Expansion Estimates – indeed, it could not
discuss the Estimates because the language predates the ATL
acquisition. The language does not address the undisclosed risk
that Defendants' failure to plan for and execute the expansion
would result in delaying the completion of the project by nearly
a year.[6] Additionally, the cautionary language that accompanied

---

[5] (See Def. Br. at 25; Van Riper Decl., Ex. G. [Dkt. no. 46-7.]
The "Risk Factors" language includes two sections on
acquisitions. The following is a representative excerpt:

> We may seek additional opportunities to expand our product
> offerings or the markets we serve by acquiring other
> companies, product lines, technologies and personnel.
> Acquisitions involve numerous risks, including the following:
>
> - difficulties integrating the operations, technologies,
>   products, and personnel of an acquired company or being
>   subjected to liability for the target's pre-acquisition
>   activities or operations as a successor in interest;
> - diversion of management's attention from normal daily
>   operations of the business;
> - potential difficulties completing projects associated with
>   in-process research and development;
> - difficulties entering markets in which we have no or
>   limited prior experience, especially when competitors in
>   such markets have stronger market positions;
> - initial dependence on unfamiliar supply chains or
>   relatively small supply partners;
> - insufficient revenues to offset increased expenses
>   associated with acquisitions;
> - the potential loss of key employees of the acquired
>   companies; and
> - the potential for recording goodwill and intangible assets
>   that later can be subject to impairment.

[Dkt. no. 46-7 at 22-23.])

[6] (See Pl. Opp. at 14 n.5 ("In an investor presentation filed
with the SEC on March 25, 2022, Defendants stated that as of
February 28, 2022, the ATL facility had a (footnote continued)

the statements in the Dec. 10 PR is boilerplate.[7]

**B. <u>Scienter</u>**

**i. <u>Legal Standard</u>**

Claims under Section 10(b) and Rule 10b-5 must allege "that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 319 (2007) (quotation marks and citation omitted). A court must decide "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." <u>Id.</u> at 323. The PSLRA mandates that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Under that standard, "[a] complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Tellabs</u>, 551 U.S. at 324.

―――――――――――――

(continued) power capacity of 47 MW, still shy of the 50 MW that Defendants originally stated they expected to be completed by April 2021.").)

[7] (<u>See</u> Van Riper Decl., Ex. F at 6 [dkt. no. 46-6] ("Actual results may differ . . . due to the risk and uncertainties inherent in our business, including, without limitation: the successful integration of ATL into CleanSpark, the closing of the transaction, the fitness of our energy software and solutions for this particular application or market . . ..").)

For an individual, "the scienter requirement is met where the complaint alleges facts showing either: 1) a motive and opportunity to commit the fraud; or 2) strong circumstantial evidence of conscious misbehavior or recklessness." Blanford, 794 F.3d at 306 (quotation marks and citation omitted). "[I]f Plaintiffs cannot make the 'motive' showing, then . . . the strength of the circumstantial allegations must be correspondingly greater." ECA, 553 F.3d at 198-99 (cleaned up). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'" Blandford, 794 F.3d at 306 (citing ECA, 553 F.3d at 199 and Novak, 216 F.3d at 311). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Novak, 216 F.3d at 309 (citation omitted).

For corporations, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 195 (2d Cir. 2008).

ii. **Analysis**

1. **Omission of ATL's Corporate History**

Plaintiffs claim that Bradford's Feb. 2020 Analysis Statement and Schultz's Market Comparison Statement were reckless given Defendants' failure to disclose Virtual Citadel's bankruptcy, Marathon's offer to buy Fastblock, and the relationship between Virtual Citadel, Fastblock, and ATL. Defendants write that Plaintiffs' allegations do not establish the strong inference of scienter required under the PSLRA, asserting that Plaintiffs "do not even purport to allege that Defendants made the relevant statements with intent to defraud." (Def. Br. at 22.)

Plaintiffs have pled that Defendants acted with recklessness. Plaintiffs alleged that Defendants "knew facts or had access to information suggesting that their public statements were not accurate," Blandford, 794 F.3d at 306; namely, the omitted facts regarding ATL's corporate history. Plaintiffs specifically identified the reports or statements containing the information. Plaintiffs allege that Defendants must have known these omitted facts because, if Defendants initiated their analysis of ATL in February 2020 as they say they did, then at the time, the assets that would become ATL were still part of Virtual Citadel and had not yet been sold through the bankruptcy proceedings. (Pl. Opp. at 31.) Additionally, Bernardo Schucman—the owner who purchased ATL's

assets out of the Virtual Citadel bankruptcy, tried to sell the
assets to Marathon and then successfully sold the assets to
CleanSpark under the ATL name—told FE1 that he had a preexisting
friendship with Bradford, bolstering the inference that Bradford
knew these facts. (AC at 36; Pl. Opp. at 31.) Finally,
Plaintiffs allege that during CleanSpark's due diligence
process, FE1 provided CleanSpark extensive financial reports and
full access to ATL's books. (AC at 36). Given these allegations,
Plaintiffs have met the strong inference of scienter required
under the PSLRA.

### 2. <u>Estimates of Completion Date for the ATL Expansion</u>

Regarding the scienter of the Estimates, Defendants write
that "where plaintiffs allege reckless predictions, 'the falsity
and scienter [pleading] requirements are essentially combined."
(Def. Br. at 20, citing <u>In re Lululemon</u>, 14 F. Supp. 3d at 574.)
Defendants assert that Plaintiffs fail the scienter requirement
for the same reasons they fail the falsity requirement: the
Estimates are either puffery or opinion. (Def. Br. at 20-21.)
Defendants further argue that scienter is lacking because

> there is a more compelling, competing interpretation of
> Plaintiffs' allegations: that Bradford believed his
> Estimates and nothing in the FE1 Timeline - which was
> prepared by a since-departed managerial holdover of
> Virtual Citadel, CleanSpark's failed predecessor at the
> ATL Facility (AC ¶¶68-69) - persuaded Defendants that
> October 2021 was the correct estimate.

(Def. Br. at 21 (citing <u>Finger</u>, 2019 WL 10632904 at *14.)
Plaintiffs answer that "the much more compelling inference is

that Bradford simply refused to accept reality and preferred to incrementally push back the public estimates rather than make a clean admission of the extent to which the initial estimates were wrong." (Pl. Opp. at 34.)

Following the falsity analysis above, the Plaintiffs have pled sufficient facts to meet the scienter element regarding the Estimates. Given the alleged facts, including Bradford's statement to FE1 that her construction plan was "was unacceptable because he had already publicly stated that he was going to have a new facility up and running in four months," (AC at 38), the Court finds Plaintiffs' inference of scienter to be "cogent and at least as compelling" at Defendants' opposing inference, Tellabs, 551 U.S. at 324.

### C. **Reliance**

#### i.  **Legal Standard**

"The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—e.g., purchasing common stock—based on that specific misrepresentation." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 810 (2011) ("Halliburton I"). Failing that, a plaintiff can invoke two presumptions of reliance: the Affiliated Ute Citizens of Utah v. United States presumption, 406 U.S. 128 (1972), or the Basic Inc. v. Levinson presumption, 485 U.S. 224 (1988), based on the "fraud-on-the-market" theory.

See Waggoner v. Barclays PLC, 875 F.3d 79, 93-94 (2d Cir. 2017)

The Affiliated Ute presumption applies "in cases involving primarily omissions, rather than affirmative misstatements, because proving reliance in such cases is, in many situations, virtually impossible." Id. at 93. The Second Circuit has found this presumption does not apply in cases where the allegations principally concern misrepresentations rather than omissions. See id. at 96; see generally Wilson v. Comtech Telecommunications Corp., 648 F.2d 88 (2d Cir. 1981) and Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc., 412 F.3d 103 (2d Cir. 2005). "The Affiliated Ute presumption does not apply to earlier misrepresentations made more misleading by subsequent omissions, or to what has been described as 'half-truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents." Id. (citations omitted).

Under the Basic presumption,

> a plaintiff must make the following showings to demonstrate that the presumption of reliance applies in a given case: (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed.

Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 268 (2014) ("Halliburton II") (citations omitted).

### ii. **Analysis**

Attempting to counter Plaintiffs' Basic presumption pleading, Defendants assert that Plaintiffs cannot have relied on any of the alleged statements that took place after March 5, 2021, because neither of the named plaintiffs purchased shares after that date. (Def. Br. at 25.) Even if this is true, Defendants' argument would not deny Plaintiffs' Basic presumption for any statements Defendants made before March 5, 2021. Therefore, Plaintiffs would at least have plausibly pleaded the reliance element for the earlier statements.

Plaintiffs separately plead an Affiliated Ute presumption. Defendants argue that the presumption is not applicable here because this case concerns allegations of affirmative misrepresentations. (Id.) Defendants assert that the "the alleged omissions are not 'pure omissions' but rather 'positive statements' whose 'only [alleged] omission is the truth that the statement [allegedly] misrepresents.'" (Id., quoting Waggoner, 875 F.3d at 96.) As discussed above, the Court views the allegations in this case as primarily concerning omissions rather than misstatements. Therefore, Plaintiffs may properly invoke the Affiliated Ute presumption.

D. **Loss Causation**

   i. **Legal Standard**

"To allege loss causation under Section 10(b) and Rule 10b-5, the plaintiffs must provide in the complaint 'notice of what the relevant economic loss might be and what the causal connection might be between that loss and the misrepresentation.'" Lau v. Opera Ltd., 527 F. Supp. 3d 537, 559 (S.D.N.Y. 2021) (quoting Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005)). Plaintiffs must plead "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement," ATSI, 493 F.3d at 107 (citation omitted), or "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005).

The second method is called a "corrective disclosure": "To show loss causation, a corrective disclosure must 'purport[ ] to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint.'" Lau, 527 F. Supp. 3d at 559. (quoting In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 511 (2d Cir. 2010)). Other courts have cautioned that Omnicom concerned a motion for summary judgment and emphasized the notice pleading standard at the motion to dismiss stage. See, e.g., In re Petrobras Sec. Litig., 150 F. Supp. 3d 337, 343 (S.D.N.Y. 2015). "[L]oss causation may be premised on partial

revelations that do not uncover the complete extent of the falsity of specific prior statements." In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008).

> ii. **Analysis**

Defendants assert that Plaintiffs failed to plead corrective disclosure because the first Culper Report was based on publicly available information and the Estimates did not disclose the allegedly omitted facts upon which Plaintiffs based their fraud claim. (Def. Br. at 26.) Plaintiffs respond that "the notion that 'any third party's analysis of a company's already-public financial information cannot contribute new information to the marketplace . . . is incorrect.'" (Pl. Opp. at 37, citing In re Chicago Bridge & Iron Co. N.V. Sec. Litig., 2020 WL 1329354, at *7-8 (S.D.N.Y. Mar. 23, 2020) (collecting cases); see also In re Winstar Commc'ns, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006) (loss causation may be based on stock drop following short seller report, even when its findings are "not attributed to any non-public information" and "derived from an analysis of" published financials); Take-Two, 551 F. Supp. 2d at 283 (loss causation may be based on "third-party analyses of a company's financials, which contradict representations made by defendants").) Further, Plaintiffs attempt to distinguish Omnicom's facts on the ground that the underlying accounting issue in Omnicom had been widely reported in the press, whereas

the information in the first Culper Report had been buried in the bankruptcy filings of an unrelated company. (Pl. Opp. at 37.)

The case law supports Plaintiffs' ability to plead the Culper Report as a corrective disclosure. Plaintiffs gathered several precedents holding that third party analyses of previously public information could be sufficient to plead loss causation. See, e.g., Chicago Bridge, 2020 WL 1329354, at *7-8; Winstar Commc'ns, 2006 WL 473885, at *15; Take-Two, 551 F. Supp. 2d at 283. Defendants built their argument against loss causation almost entirely on Omnicom's holding against already-public information and Culper's identity as a short seller. As discussed above, it is not clear that district courts should apply Omnicom at the motion to dismiss stage. Because the Court finds Plaintiffs' view of the case law to be more compelling, the Court finds that Plaintiffs have sufficiently pled the Culper Report as a corrective disclosure.

Finally, Plaintiffs assert that their allegations regarding the Estimates support a pleading of loss causation based on materialization of the risk. (Pl. Opp. at 38, citing City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc., 477 F. Supp. 3d 123, 138 (S.D.N.Y. 2020) (plaintiff adequately alleged that "lower than-expected income projections . . . reflected a partial materialization" of concealed risk).) Defendants respond that the AC contained "no such allegation let

alone the 'identif[ication of] a particular risk that was

allegedly concealed by the defendant's actions and which then

materialized to cause a market loss' – as would be required to

alleged loss causation via materialization of risk." (Def. Reply

at 24, quoting In re AOL Time Warner, Inc. Sec. Litig., 503 F.

Supp. 2d 666, 678 (S.D.N.Y. 2007).) However, the relevant

language does appear in the AC on page 72, ¶ 152:

> As detailed in ¶¶6-7, 12, 45-52, 88-89, 96-96, 101-05,
> 110-12, supra, the truth regarding the undisclosed
> adverse conditions at ATL and CleanSpark's projections
> concerning the ATL expansion project was partially
> revealed, and/or the concealed risks materialized, on or
> about: January 4-5, 2021; February 12, 2021; March 15-
> 16, 2021; June 18-21, 2021; and August 16-17, 2021. As
> a direct result of these partial disclosures, the price
> of CleanSpark's stock declined significantly,
> precipitously, thereby damaging investors as the
> artificial inflation in CleanSpark's stock price was
> removed.

Because this language alleges a materialization of the risk, and

the larger complaint identifies the risk that the longer

expansion project timeline posed to investors, Plaintiffs have

sufficiently pled loss causation for the Estimates as a

materialization of the risk.

### E. Section 20(a) Claims

Plaintiffs have properly pled a primary violation by the

controlled person, CleanSpark; Bradford and Schultz's control of

CleanSpark by dint of their executive management roles within

CleanSpark; and Bradford and Schultz's culpable participation in

CleanSpark's fraud through their statements. As a result,

Plaintiffs' Section 20(a) claims against Bradford and Schultz are sufficient.

## IV.  <u>Conclusion</u>

For the reasons above, Defendants' motion to dismiss is <u>DENIED</u>. Counsel shall confer and inform the Court by letter no later than January 12 how they propose to proceed. The Clerk of the Court shall close the open motion. (Dkt. no. 44.)

<u>**SO ORDERED.**</u>

Dated:   January 5, 2023 New
         York, New York

LORETTA A. PRESKA
Senior United States District Judge

39