**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARSHAN HASTHANTRA, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. 1:21-cv-00511-LAP |
| Plaintiff, | |
| v. | |
| CLEANSPARK, INC., ZACHARY BRADFORD, and S. MATTHEW SCHULTZ, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND & SUMMARY OF ALLEGATIONS ...................................... 2

PROCEDURAL HISTORY & THE PROPOSED CLASS REPRESENTATIVES .............. 5

ARGUMENT .................................................................................................................... 6

    I.    Applicable Standards Favor Class Certification ...................................................... 6

    II.    The Class Satisfies The Requirements Of Rule 23(a) ............................................. 7

        A.    The Class Satisfies Rule 23(a)(1): Numerosity ......................................... 7

        B.    The Class Satisfies Rule 23(a)(2): Commonality ...................................... 8

        C.    Plaintiff Satisfies Rule 23(a)(3): Typicality ............................................. 9

        D.    Plaintiff Satisfies Rule 23(a)(4): Adequacy ............................................. 10

    III.    The Requirements Of Rule 23(b)(3), Predominance And Superiority, Are Met ...................................................................................................................... 11

        A.    Common Questions Of Law And Fact Predominate ................................. 11

            1.    Plaintiff Is Entitled To A Presumption Of Reliance Under *Basic* ................................................................................... 12

                (a)    CleanSpark Traded On The Nasdaq ................................. 13

                (b)    Market Efficiency Factors ................................................ 13

                (c)    The *Cammer* Factors Demonstrate Market Efficiency .......................................................................... 14

                      (i)    CleanSpark Stock Had A High Weekly Trading Volume ...................................................... 14

                      (ii)    CleanSpark Was Followed By Financial Analysts And News Media ................................. 15

                      (iii)    CleanSpark Stock Had Numerous Market Makers ................................................................. 16

                      (iv)    CleanSpark Was Eligible To File Form S-3s ........ 17

(v) The Price Of CleanSpark's Stock Reacted To New, Company-Specific Information During The Class Period ....................................... 17

(d) The *Unger*/*Krogman* Factors Further Support Efficiency ......................................................... 20

2. The *Affiliated Ute* Presumption Of Reliance Applies ................... 21

3. Potential Individual Questions Of Damages Do Not Predominate ................................................................................ 23

B. A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of This Action ..................................... 24

**CONCLUSION** ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

**Statutes and Rules**

Fed. R. Civ. P. 23 ................................................................................................ 1, 6, 7

Securities Exchange Act of 1934, Section 10(b) ........................................................ 1, 10

Securities Exchange Act of 1934, Section 20(a) ................................................. 1, 9, 10

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) .................................................................. 2, 12, 21, 22

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) .................................................................. 6, 11, 12

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013) .................................................................. 6, 12, 13

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .................................................................. 12, 13

*Billhofer v. Flamel Techs., S.A.*,
   281 F.R.D. 150 (S.D.N.Y. 2012) ................................................................ 21

*Brown v. Kelly*,
   609 F.3d 467 (2d Cir. 2010) ................................................................ 12

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ........................................... 14, 15, 17, 18

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)") ................................................................ 24

*Dodona I, LLC v. Goldman, Sachs & Co.*,
   296 F.R.D. 261 (S.D.N.Y. 2014) ................................................................ 6

*Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"),
   563 U.S. 804 (2011) ................................................................ 6, 12

*Fogarazzo v. Lehman Bros.*,
    232 F.R.D. 176 (S.D.N.Y. 2005) ................................................................ 23

*Forsta AP-Fonden v. St. Jude Med., Inc.*,
    312 F.R.D. 511 (D. Minn. 2015) ....................................................................... 18

*Gary Plastic Packaging Corp. v. Merrill Lynch*,
    903 F.2d 176 (2d Cir. 1990) ............................................................................... 6

*Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*,
    573 U.S. 258 (2014) ......................................................................................... 12

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
    338 F.R.D. 205 (S.D.N.Y. 2021) ...................................................................... 22

*In re Aphria, Inc. Sec. Litig.*,
    342 F.R.D. 199 (S.D.N.Y. 2022) ................................................................*passim*

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (S.D.N.Y. 2016) .................................................................. 12, 23

*In re Beacon Assoc. Litig.*,
    282 F.R.D. 315 (S.D.N.Y. 2012) ...................................................................... 23

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) ........................................................................ 25

*In re Dynex Capital, Inc. Sec. Litig.*,
    2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ...................................................... 22

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 428 (S.D.N.Y. 2013) ............................................................... 22

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ............................................................................... 10

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015) .................................................. 23

*In re Initial Public Offering Sec. Litig.*,
    260 F.R.D. 81 (S.D.N.Y. 2009) ........................................................................ 16

*In re Interpublic Sec. Litig.*,
    2003 WL 22509414 (S.D.N.Y. Nov. 6, 2003) .................................................. 25

*In re JPMorgan Chase & Co. Sec. Litig.*,
    2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015) ................................................ 18

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ........................................................ 10

*In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*,
   2013 WL 396117 (D.N.J. Jan. 30, 2013) ............................................................... 24

*In re NII Holdings, Inc.* Sec. Litig.,
   311 F.R.D. 401 (E.D. Va. 2015) ............................................................................ 18

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) .............................................................................. 8

*In re Petrobras Secs.*,
   862 F.3d 250 (2d Cir. 2017)............................................................................ *passim*

*In re Pfizer Inc. Sec. Litig.*,
   282 F.R.D. 38 (S.D.N.Y. 2012) ............................................................................. 12

*In re Retek Inc. Sec. Litig.*,
   236 F.R.D. 431 (D. Minn. 2006)............................................................................ 18

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) .......................................................................... 6, 22

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   2017 WL 2062985 (S.D.N.Y. May 15, 2017) ......................................................... 7

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) .................................................................. 8, 15, 16

*In re Xcelera.com Sec. Litig.*,
   430 F.3d 503 (1st Cir. 2005)................................................................................... 15

*In re XL Fleet Corp. Sec. Litig.*,
   2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)............................................................ 5

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ............................................................... 14, 20, 21

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
   967 F.2d 742 (2d Cir. 1992).................................................................................... 22

*Malriat v. Quantumscape Corp.*,
   2022 WL 17974629 (N.D. Cal. Dec. 19, 2022)...................................................... 18

v

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014).................................................................... 14, 15, 16, 21

*Pearlstein v. BlackBerry Ltd.*,
    2021 WL 253452 (S.D.N.Y. Jan 26, 2021) ..................................................................... 7, 11

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) ............................................................................................ 8

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)................................................................................................. 9

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) .............................................................................. 12, 13, 18

*Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*,
    2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004) ..................................................................... 9

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008)............................................................................................... 14

*Todd v. STAAR Surgical Co.*,
    2017 WL 821662 (C.D. Cal. Jan. 5, 2017) ....................................................................... 15

*Trinidad v. Breakaway Courier Sys., Inc.*,
    2007 WL 103073 (S.D.N.Y. Jan. 12, 2007) ....................................................................... 9

*Unger v. Amedisys*,
    401 F.3d 316 (5th Cir. 2005) ....................................................................................... 20, 21

*Vida Longevity Fund, LP v. Lincoln Life & Annuity Co. of New York*,
    2022 WL 986071 (S.D.N.Y. Mar. 31, 2022) ...................................................................... 7

*Villella v. Chem. And Mining Co. of Chile, Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2021) ........................................................................................... 9

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) ................................................................................. 23, 24

## Other Authorities

Brad A. Barber, Paul A. Griffin, and Baruch Lev, THE FRAUD-ON-THE-MARKET THEORY AND
    THE INDICATORS OF COMMON STOCKS' EFFICIENCY, 19 J. Corp. L. 285, 302, 310-11 (1994). 16

Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988).......... 17

Plaintiff Darshan Hasthantra respectfully submits this memorandum in support of his motion for class certification pursuant to Federal Rule of Civil Procedure 23, seeking (i) certification of this case as a class action; (ii) the appointment of Plaintiff as Class Representative; and (iii) the appointment of Glancy Prongay & Murray LLP ("GPM") as Class Counsel.

## PRELIMINARY STATEMENT

This action asserts claims on behalf of a putative class of investors pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, against Defendants.[1] Now, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of the following "Class":

> All persons and entities that purchased or otherwise acquired the publicly-traded securities of CleanSpark, Inc. between December 10, 2020 and August 16, 2021, both dates inclusive.[2]

The Second Circuit favors class actions in securities fraud cases, and class certification is indeed appropriate here. The proposed Class satisfies each of the requirements of certification under Fed. R. Civ. P. 23 – numerosity, commonality, typicality, and adequacy – as well as the requirement of ascertainability. Further, this action also satisfies Rule 23(b)(3)'s requirements of predominance and superiority. Not only are the questions of the falsity of Defendants' statements and their mental state in making those statements common to all Class members, the Class is

---

[1] Defendants include CleanSpark, Inc., Zachary Bradford (CleanSpark's CEO), and S. Matthew Schultz (Chairman of CleanSpark's Board of Directors).

[2] Excluded from the Class are: (i) Defendants; (ii) current and former officers, employees, and directors of CleanSpark; (iii) blood relatives and household members of any person excluded under (i) or (ii); and (iv) any entities affiliated with, controlled by, or more than 10% owned by, any person excluded under (i) through (iii); and (v) the legal representatives, heirs, successors, or assigns of any person or entity excluded under (i) through (iv).

entitled to a presumption of reliance based on the "fraud-on-the-market" doctrine because CleanSpark's securities traded in an efficient market. *See* Section III.A.1; Declaration of Dr. Zahn Bozanic (the "Bozanic Report"), at ¶¶ 19-20, 24.[3] In addition, the Class is entitled to a presumption of reliance pursuant to the Supreme Court's ruling in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) based on Defendants' having concealed material information from investors. Thus, any potential individual questions of reliance do not predominate over common issues in this case. Nor do potential individual issues of damages predominate over common issues, and the calculation of damages is susceptible to a Class-wide methodology. *See* Bozanic Report at ¶¶ 75-91. Finally, a class action is a superior means of litigating Class members' claims as it is manageable and provides redress to investors who would otherwise be unable to pursue individual claims.

## FACTUAL BACKGROUND & SUMMARY OF ALLEGATIONS

This securities fraud case is about CleanSpark's acquisition of ATL Data Centers ("ATL") and the timeline Defendants told investors they would complete their expansion of ATL's property at 2380 Godby Road, College Park GA (the "Godby Road Facility"), which would allow CleanSpark to increase revenues through greater production capacity for Bitcoin. Throughout the December 10, 2020 through August 16, 2021 Class Period, in an effort to maintain the Company's inflated share price following the acquisition of ATL, Defendants aggressively touted CleanSpark's business prospects. However, Defendants knowingly withheld material information from investors concerning: (i) the history of ATL, including the Virtual Citadel bankruptcy and

---

[3] The Bozanic Report is filed herewith as Exhibit 1 to the Declaration of Gregory B. Linkh ("Linkh Decl."), submitted herewith.

the failed attempt to sell its assets to Marathon; and (ii) the timeline for completion of additional power capacity and miners to be installed at the Godby Road Facility (the "Expansion Project").

Prior to the Class Period, CleanSpark stated it was an energy company providing advanced software and controls technology. Dkt. 36 ("Amended Complaint"), ¶ 25. The Class Period begins on December 10, 2020 when CleanSpark announced its acquisition of ATL (the "Acquisition") and the related pivot of its business model to focus on Bitcoin mining. *Id*, at ¶¶ 3, 26. The key physical assets acquired by CleanSpark in the Acquisition were the Godby Road Facility and Bitcoin miners and associated technology located therein. *Id*., at ¶ 61. ATL had also entered into an agreement with the City of College Park ("CoCP") in September 2020 to provide power to the Godby Road Facility at a rate of $0.0285 per KwH through the end of 2023 (the "Power Agreement"). *Id*., at ¶¶ 47, 71.

Defendants made three sets of misrepresentations in the December 10, 2020 press release and subsequent investor call announcing the Acquisition. First, Defendants stated that the Expansion Project was expected to be completed by April 2021 which omitted the fact that, there was no reasonable basis in fact for the Expansion Project to be completed in that time frame. *Id*., at ¶¶ 35, 39. Second, the press release stated that "[t]he recent, significant investments into Bitcoin by such respected companies as Square, PayPal, and MicroStrategy further validate our due diligence conclusions surrounding this acquisition" which was misleading because Defendants failed to disclosed that Marathon terminated its proposed acquisition. *Id*. Third, the press release stated that CleanSpark "began early-stage analysis of ATL in February 2020 to evaluate expanding [the Godby Road Facility's] energy capacity and reducing energy costs. After an in-depth examination of the profitability under the existing energy structure, it was apparent that it was a perfect fit to deploy the aforementioned strategy." *Id*. This statement was technically false, as

"ATL" was not formed until April 2020, and thus omitted the material fact that ATL was rebranded from the bankrupt Virtual Citadel. *Id*. Nonetheless, on December 10, 2020, CleanSpark's stock price closed at $15.39 per share, an increase of $2.30, or 7.6%, over the closing price of $13.09 per share on December 9, 2020.

On January 14, 2021, Culper Research ("Culper") published a report (the "Culper Report"), which disclosed that Marathon's prospective acquisition of ATL failed due to the previously undisclosed 2023 expiration of the Power Agreement and that ATL was the rebranded Virtual Citadel, which had entered into bankruptcy proceedings in February 2020. *Id*., at ¶¶ 45-49. The following day, on January 15, 2021, Culper published a Tweet stating that CleanSpark had declined to respond to its report and that Culper had emailed a series of questions to CleanSpark Chairman Matthew Schultz, and the Tweet repeated those questions, seeking public answers. *Id*., at ¶ 51. Following the issuance of the Culper Report, the Company's stock price fell $3.63, or 9%, to close at $35.71 per share on January 14, 2021, thereby damaging investors. The stock continued to decline the next trading session by $4.56, or 13%, to close at $31.15 per share on January 15, 2021. ¶ 52.

On February 12, 2021, Defendants adjusted the public estimate for the completion of the Expansion Project from April 2021 (as per the December 10, 2020 statements) to "mid-year 2021." *Id*., at ¶ 126. On that news, CleanSpark's stock price fell $1.04, or 3.6%, to close at $28.23 per share. *Id*., at ¶ 89. Defendants continued to revise this timeline to "mid-summer 2021" on February 18, 2021, to "this summer" on March 2, 2021, to "end of summer, 2021" on March 26, 2021, and to "by summer 2021" on May 6, 2021. *Id*., at ¶¶ 88, 91, 93, 97, 98, and 99. These completion dates also had no factual basis. On August 17, 2021, Defendants admitted that the expansion of the power capacity at the ATL facility to 50 MW would not be completed until "this fall." *Id*., at ¶ 111.

4

On this news, CleanSpark's stock price declined by roughly 15%, closing at $11.65 per share on August 17, 2021. *Id*., at ¶ 112.

## PROCEDURAL HISTORY & THE PROPOSED CLASS REPRESENTATIVES

This action was commenced by Scott Bishins, with his counsel GPM, on January 20, 2021. *See* Dkt No. 1. On December 2, 2021, the Court appointed Darshan Hasthantra as Lead Plaintiff ("Plaintiff"), and appointed GPM as Lead Counsel. *See* Dkt No. 30. On February 28, 2022, GPM filed the operative amended complaint on behalf of Lead Plaintiff Darshan Hasthantra, and additional named plaintiff Scott Bishins. *See* Dkt No. 36 ("Amended Complaint"). On January 31, 2021, Mr. Bishins sought to withdraw from the case (Dkt. No. 76), which was so ordered the next day. Dkt. No. 77. The instant motion seeks appointment of Plaintiff as Class Representative, and seeks appointment of GPM as Class Counsel.

After briefing, on January 5, 2023, the Court denied Defendants' motion to dismiss the Amended Complaint. *See Bishins v. CleanSpark Inc.*, 2023 WL 112558 (S.D.N.Y. Jan. 5, 2023).

In the two years following the Court's denial of Defendants' motion to dismiss, the parties have conducted significant fact discovery. Plaintiff obtained almost 70,000 pages of documents from Defendants, as well as hundreds more from third parties. Five depositions have been taken thus far, including those of (1) CleanSpark CEO Zach Bradford, (2) Plaintiff Darshan Hasthantra, (3) key third-party witness Lisa DeKalb, the General Manager of the Godby Road Facility during most of the Class Period, (4) key third-party witness Bernardo Schucman, who sold ATL to CleanSpark and subsequently became CleanSpark Senior Vice President of Mining, and (5) Kent Shelley, CleanSpark Operations Manager. In addition, Plaintiffs have scheduled the deposition of Chairman, Matt Schultz for February 27, 2025. See Linkh Decl. at ¶ 6. The evidence produced in

discovery strongly supports Plaintiff's claims, and confirms key allegations relied on by the Court in denying Defendants' motion to dismiss.[4]

## ARGUMENT

### I.       Applicable Standards Favor Class Certification

The Supreme Court has long recognized that securities fraud claims are particularly well suited for class treatment. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (noting that predominance of common issues "is a test readily met in certain cases alleging . . . securities fraud"). Indeed, the Supreme Court continues to favor class certification in securities fraud cases. *See Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 812-13 (2011) (vacating appellate court denial of class certification); *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 464-67 (2013) (affirming class certification).

Courts within the Second Circuit have likewise overwhelmingly found that, in securities fraud actions, class treatment is an appropriate way to vindicate investors' rights. Moreover, "[i]n light of the importance of the class action device in securities fraud suits, [the Rule 23] factors are to be construed liberally." *Gary Plastic Packaging Corp. v. Merrill Lynch*, 903 F.2d 176, 179 (2d Cir. 1990); *accord Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 266 (S.D.N.Y. 2014) ("The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this that involve alleged manipulation of public markets, to maximize the benefits to the public provided by class actions.").[5]

---

[4] A detailed analysis of the evidence obtained in discovery will be provided at trial (and if summary judgment motions are filed, at that time as well), and is beyond the scope of the present motion. Discovery has only strengthened Plaintiff's belief in the merits of his claims.

[5] *See also In re Allergan PLC Sec. Litig.,* 2021 WL 4077942, at *5 (S.D.N.Y. Sept. 8, 2021) ("the requirements of Rule 23 must be construed liberally"); *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013) ("Generally, claims alleging violations of Section 10(b) of the Exchange Act are especially amenable to class certification.") (cleaned up); *In re Virtus Inv.*

**II.     The Class Satisfies The Requirements Of Rule 23(a)**

Rule 23(a) of the Federal Rules of Civil Procedure establishes four requisite elements for class certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The proposed Class meets each of these requirements.[6]

**A.     The Class Satisfies Rule 23(a)(1): Numerosity**

Rule 23(a)(1) is satisfied when a class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Second Circuit, numerosity is presumed when a class consists of 40 members or more. *Vida Longevity Fund, LP v. Lincoln Life & Annuity Co. of New York*, 2022 WL 986071, at *3 (S.D.N.Y. Mar. 31, 2022). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *7 (S.D.N.Y. Jan 26, 2021) (internal quotation marks omitted).

---

*Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) (same).

[6] In addition, in order to evaluate Rule 23(a)'s requirements, the Second Circuit imposes an implied requirement that the Class is ascertainable. *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 203-04 (S.D.N.Y. 2022). "This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *In re Petrobras Secs.*, 862 F.3d 250, 269 (2d Cir. 2017). Ascertainability is readily established in securities fraud cases because "securities purchases identified by subject matter, timing, and location [] are clearly objective." *Aphria*, 342 F.R.D. at 205 (quoting *In re Petrobras*, 862 F.3d at 269). The proposed Class is ascertainable because CleanSpark's securities traded on the Nasdaq, the Class Period is clearly defined, and the identity of Class members can be readily determined from documents including the books and records maintained by CleanSpark and its transfer agents.

During the Class Period, CleanSpark common stock was actively traded on the Nasdaq, with an average of 30.3 million shares outstanding and approximately 93% of the Company's Common Stock was held and freely tradeable by outside investors in CleanSpark's public float during the Class Period. Bozanic Report ¶¶ 67, 74. The average weekly trading volume was approximately 41.9% of all outstanding CleanSpark stock. *Id.* ¶ 30. Thus, there are likely thousands of Class Members at the very least. The numerosity requirement is met.

### B.    The Class Satisfies Rule 23(a)(2): Commonality

Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In securities class actions, this requirement has been characterized as a "low hurdle" that is met "when plaintiffs allege that class members have been injured by similar material misrepresentations and omissions." *Aphria*, 342 F.R.D. at 204 (internal quotation marks omitted).[7] "Even a single common legal or factual question will suffice." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009).

Plaintiff's claims readily meet this standard as the allegations in the Amended Complaint raise numerous questions common to the Class. These questions include, *inter alia*, whether:

(a)    Defendants concealed material facts about CleanSpark's business, including but not limited to the Virtual Citadel bankruptcy and the failed attempt to sell its assets to Marathon, the expiring Power Agreement, and the lack of reasonable basis for the Expansion Project completion dates;

(b)    Defendants engaged in a scheme to defraud investors;

---

[7] *Accord In re Winstar Commc'ns Sec. Litig.,* 290 F.R.D. 437, 443 (S.D.N.Y. 2013) (same); *see also Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011) ("[C]ourts in this Circuit have held that the . . . commonality requirement is plainly satisfied where the alleged misrepresentations . . . relate to all the investors, as the existence and materiality of such misrepresentations obviously present important common issues.") (cleaned up).

(c)     Defendants acted with scienter;

(d)     the prices of the CleanSpark's securities were artificially inflated during the Class Period because of the Defendants' conduct as alleged in the Amended Complaint;

(e)     Defendants' conduct caused Class members to suffer damages;

(f)     Defendants were "controlling persons" of CleanSpark within the meaning of §20(a) of the Exchange Act; and

(g)     Defendants are liable to the Class for violations of the federal securities laws.

Because all Class members' claims depend on the answers to these common questions, commonality is established.

### C.     Plaintiff Satisfies Rule 23(a)(3): Typicality

Rule 23(a)(3) is satisfied when the claims of the representative parties are "typical" of those of the class. Fed. R. Civ. P. 23(a)(3). As with commonality, the test for typicality "is not demanding." *Villella v. Chem. and Mining Co. of Chile, Inc.*, 333 F.R.D. 39, 55 (S.D.N.Y. 2019) (internal citation omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). For this reason, typicality "'should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members.'" *Trinidad v. Breakaway Courier Sys., Inc.*, 2007 WL 103073, at *6 (S.D.N.Y. Jan. 12, 2007) (internal citation omitted).[8]

Here, Plaintiff's claims are typical of the proposed Class as they arise out of the same

---

[8] *See also Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*, 2004 WL 2997957, at *4 (S.D.N.Y. Dec. 27, 2004) ("When inquiring into the typicality requirement under Rule 23(a)(3), the focus must be on the defendants' behavior and not that of the plaintiffs.").

course of conduct, i.e., that Defendants artificially inflated the prices of CleanSpark's publicly-traded securities through material omissions concerning the ATL acquisition, including the Virtual Citadel bankruptcy and the failed acquisition by Marathon due to the expiring Power Agreement, and the lack of a reasonable basis for the Expansion Project completion date.[9] All of Plaintiff's claims—i.e., the alleged violations of Sections 10(b) and 20(a) of the Exchange Act—will be proven by the same evidence on a class-wide basis. Therefore, the typicality requirement is satisfied.

### D.       Plaintiff Satisfies Rule 23(a)(4): Adequacy

The final requirement of Rule 23(a) is that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "In assessing this requirement, courts make two principal inquiries: 'whether (1) plaintiff's interests are antagonistic to the interest of other members of the class; and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation'." *Aphria*, 342 F.R.D. at 204-05 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)). Both prongs are satisfied here.

Plaintiff's interests are aligned entirely with those of the class. Plaintiff's claims are predicated on the same wrongful conduct that gives rise to the claims of the Class. Plaintiff has suffered sizable financial losses. *See* Dkt Nos. 13-2, 13-3. And Plaintiff has demonstrated a commitment to vigorously prosecute this action on behalf of absent Class members, including by producing documents in discovery, sitting for a deposition, and supervising and monitoring the

---

[9] As courts consistently recognize, trivial "[f]actual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009); *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 456 (S.D. Ohio 2009) ("[i]ndividual differences regarding the purchasing and selling of stock during the proposed class period [do] not destroy the typicality requirement") (internal citation omitted).

progress of the litigation. *See generally* Declaration of Darshan Hasthantra (Linkh Decl. Ex. 2). Furthermore, Plaintiff understands that by seeking appointment as Class Representative he has a fiduciary duty to act in the best interests of the entire Class of CleanSpark investors, and he is committed to continue to actively participate in the case, and to seek a recovery that is fair and beneficial to the Class. *See id.*

"Moreover, as is always the case, in securities fraud class actions the best measure of whether a plaintiff will adequately represent the interests of a class is whether his lawyers are equipped to handle the matter." *BlackBerry*, 2021 WL 253453, at *13. Plaintiff retained counsel who "are qualified, experienced and able to conduct the litigation." *Aphria*, 342 F.R.D. at 204-05 (internal citation omitted). GPM has extensive experience in the field of securities litigation,[10] and its vigorous pursuit of the Class's interests has already been demonstrated in its advancement of the Class's claims before this Court. *See* Linkh Decl. Ex. 3 (Firm résumé of GPM). For these reasons, and because Lead Counsel have devoted substantial time and resources to the litigation, and will continue to do so (*see* Linkh Decl. ¶ 5), GPM also satisfies the considerations of Rule 23(g) and should be appointed Class Counsel.

## III.    The Requirements Of Rule 23(b)(3), Predominance And Superiority, Are Met

### A.    Common Questions Of Law And Fact Predominate

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "[T]he predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over

---

[10] For more than 30 years, GPM has successfully prosecuted class action cases and complex litigation in federal and state courts throughout the country, and has recovered billions of dollars for investors, consumers, and entities injured by corporate wrongdoing.

11

those issues that are subject only to individualized proof." *Brown v. Kelly*, 609 F.3d 467, 483 (2d

Cir. 2010) (citation omitted). "Predominance is a test readily met in certain cases . . . alleging

securities fraud." *Amchem*, 521 U.S. at 625.

In cases under §10(b) of the Exchange Act and SEC Rule 10b-5, the elements of falsity,

materiality, scienter, and loss causation are subject to class-wide proof.[11] Therefore, "[w]hether

common questions of law or fact predominate in a securities fraud action often turns on the element

of reliance." *See Halliburton I*, 563 U.S. at 810. In this case, reliance may be presumed on a class-

wide basis pursuant to (a) the fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485

U.S. 224 (1988), and (b) the presumption of reliance applicable to omission claims under *Affiliated*

*Ute*.[12] Each presumption is independently sufficient for class certification, and both apply here.

### 1.    Plaintiff Is Entitled To A Presumption Of Reliance Under *Basic*

Pursuant to the *Basic* fraud-on-the-market doctrine, a proposed class representative may:

> satisfy the reliance element of the Rule 10b–5 cause of action by invoking a
> presumption that a public, material misrepresentation will distort the price of stock
> traded in an efficient market, and that anyone who purchases the stock at the market
> price may be considered to have done so in reliance on the misrepresentation.

*Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 283-84 (2014). To

invoke this presumption, a plaintiff must show: "(1) that the alleged misrepresentations were

---

[11] *See, e.g., Amgen*, 568 U.S. at 459 (materiality "is a question common to all members of the class"); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) (all elements of a Section 10(b) claim, "other than reliance in cases that are not premised on fraud-on-the-market, are subject to class wide proof in securities litigation").

[12] *See generally Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 (S.D.N.Y. 2016) ("The predominance requirement is typically met in securities fraud class actions by plaintiffs' invocation of one of two presumptions developed by the Supreme Court . . . . the '*Basic* presumption' of reliance in fraudulent misrepresentation cases, and the '*Affiliated Ute* presumption' of reliance in fraudulent omission cases."); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 101 (S.D.N.Y. 2016) (similar).

publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* at 268.

Plaintiff here readily makes the required showing. First, Defendants' statements were clearly publicly known, because they were made in CleanSpark's SEC filings, press releases, and earnings calls. Second, the issues relating to Defendants' fraud (e.g., CleanSpark's acquisition of ATL and the timeline to complete the expansion project) would clearly be significant to a reasonable investor. In any event, while Plaintiff must ultimately prove materiality at trial, such "proof is not a prerequisite to class certification." *Amgen*, 568 U.S. at 459. Third, Plaintiff purchased CleanSpark common stock during the Class Period, prior to the corrective disclosures. Fourth, as discussed in detail below, the preponderance of the evidence establishes that CleanSpark's common stock traded in an efficient market, and Plaintiff is therefore entitled to a presumption of reliance under *Basic*.

### (a)    CleanSpark Traded On The Nasdaq

CleanSpark's stock trades on the Nasdaq. Courts in this district have held on multiple occasions that a stock's listing on the Nasdaq creates a presumption that the market for the stock is efficient. *Strougo*, 312 F.R.D. at 318 (It would require "unusual circumstances" for a security that trades on the Nasdaq to not trade efficiently); *see Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,* 310 F.R.D. 69, 81 (S.D.N.Y. 2015) (even courts "reluctant to conclude that a stock was traded efficiently solely because it was traded on the NYSE or NASDAQ" usually "agree that such listing is a good indicator of efficiency.").

### (b)    Market Efficiency Factors

Neither the Supreme Court nor the Second Circuit has adopted a formal test for market efficiency. *Petrobras*, 862 F.3d at 276. District courts in this Circuit and elsewhere, however,

13

routinely consider the non-exhaustive factors derived from *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), in determining whether a security trades in an efficient market: (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases. *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (citing *Cammer*, 711 F. Supp. 1264 at 1285-87); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008) ("The *Cammer* factors have been routinely applied by district courts considering the efficiency of equity markets."); *Petrobras*, 862 F.3d at 276 (affirming finding of market efficiency pursuant to *Cammer* factors). The *Cammer* factors, however, are not exclusive and "are meant to be an analytical tool to assist in the evaluation of market efficiency, not a rigid checklist." *McIntire*, 38 F. Supp. 3d at 432.[13] Courts may consider other factors that tend to indicate market efficiency, including (6) a high market capitalization, (7) a large float, and (8) a narrow bid-ask spread. *See Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001); *Petrobras*, 862 F.3d at 276 (acknowledging these "three additional" factors comprised part of the efficiency analysis).

An analysis of each of the *Cammer* and *Krogman* factors, evaluated both individually and collectively, shows that CleanSpark's common stock traded in an efficient market.

### (c)    The *Cammer* Factors Demonstrate Market Efficiency

#### (i)    CleanSpark Stock Had A High Weekly Trading Volume

During the Class Period, the average weekly trading volume was 41.9% of CleanSpark's

---

[13] *See also Carpenters*, 310 F.R.D. at 83 ("While the Second Circuit endorsed the use of the *Cammer* factors in *Bombardier*, it has not required their use or held that any one of them is dispositive.").

common stock outstanding. Bozanic Report ¶ 30. That turnover rate is far in excess of the 2% threshold set by *Cammer* as giving rise to a "strong presumption" of market efficiency. *See Cammer*, 711 F. Supp. at 1286.

> **(ii)    CleanSpark Was Followed By Financial Analysts And News Media**

The presence of analyst coverage on a security "supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." *Winstar*, 290 F.R.D. at 446. This factor is measured alternatively by the number of analysts covering the company or security, or by the number of analyst reports published about the company or security, during the relevant period.[14] Courts also consider the extent of analyst coverage in connection with related factors, including the amount of news coverage on a company and the degree of institutional ownership.[15]

Here, at least ten firms published reports on CleanSpark, including H.C. Wainwright and Water Tower Research. Bozanic Report ¶ 34. Further, on January 14, 2021, Culper Research published research reports about the Company. ¶ 15. Empirical research demonstrates that coverage by just one or two analysts strengthens the presumption of efficiency for a publicly traded

---

[14] *Compare, e.g., id*. ("the number of securities analysts") with *McIntire,* 38 F. Supp. 3d at 431("the existence of a significant number of analyst reports").

[15] *See e.g., In re Xcelera.com Sec. Litig.,* 430 F.3d 503, 514-15 (1st Cir. 2005) (affirming district court's determination of market efficiency, where only one analyst followed the company's stock and issued only one report during a 16 month class period, but information about the company was widely distributed through other sources, including news articles, press releases, and SEC filings, and institutional investors invested in the stock); *Todd v. STAAR Surgical Co*., 2017 WL 821662, at *7 (C.D. Cal. Jan. 5, 2017) (ownership of company's stock by major institutions bolstered determination that efficiency was indicated by second *Cammer* factor).

stock.[16] In this case, the level of analyst coverage is well in line with the level of coverage found by other courts to support a finding of efficiency.

In addition to the analyst reports issued during the Class Period, information about CleanSpark was disseminated to the market through a variety of other means, including buy-side analysis by major institutions,[17] and over 400 news stories, press releases, and SEC filings featuring CleanSpark appearing in financial publications and newswires, including *Dow Jones Newswires, GlobeNewswire, PR Newswire, Reuters,* and *Business Wire*. Bozanic Report ¶ 37. These facts further support the conclusion that CleanSpark's financial performance was "closely watched by investment professionals," whose views were rapidly incorporated into the stock price. *Winstar*, 290 F.R.D. at 446.

### (iii)    CleanSpark Stock Had Numerous Market Makers

The third *Cammer* factor concerns whether there are a sufficient number of market makers and/or arbitrageurs to facilitate the efficiency of the market. *See McIntire*, 38 F. Supp. 3d at 431-32. Courts have found the fact that a security trades on the Nasdaq is itself sufficient to satisfy this factor.[18] But even setting that aside, during the Class Period, there were at least 73 market makers for CleanSpark stock. Bozanic Report ¶ 41. That number more than exceeds the ten market makers

---

[16] Brad A. Barber, Paul A. Griffin, and Baruch Lev, THE FRAUD-ON-THE-MARKET THEORY AND THE INDICATORS OF COMMON STOCKS' EFFICIENCY, 19 J. Corp. L. 285, 302, 310-11 (1994).

[17] Between 69 and 115 institutional investors owned CleanSpark stock during the Class Period. Bozanic Report ¶ 42. This implies that significant buy-side analysis was likely available to institutional investors and bolsters the conclusion that CleanSpark's stock traded in an efficient market.

[18] *See In re Initial Public Offering Sec. Litig*., 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (trading on the Nasdaq "provides the necessary evidence to satisfy this factor"); *In re DVI, Inc. Sec. Litig*., 639 F.3d 623, 634 (3d Cir.2011) ("[T]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency.").

the *Cammer* court found to justify a substantial presumption of efficiency.[19]

### (iv)    CleanSpark Was Eligible To File Form S-3s

Eligibility for S-3 registration with the SEC is an indicator of market efficiency because it is associated with characteristics that correlate with efficiency, including size, transparency, and the availability of relevant financial information. *See Cammer*, 711 F. Supp. at 1284-85. In order to be eligible for an S-3 registration, a company must be "seasoned," i.e., it must have filed Exchange Act reports with the SEC for twelve months, and it must meet a certain minimum threshold for public float. *See Cammer*, 711 F. Supp. at 1284-85. Shortly before the Class Period began, on September 23, 2020, CleanSpark filed an S-3 registration.[20] It did so again during the Class Period on March 15, 2021.[21] This *Cammer* factor weighs in favor of finding market efficiency. *See* Bozanic Report ¶ 45.

### (v)    The Price Of CleanSpark's Stock Reacted To New, Company-Specific Information During The Class Period

The fifth *Cammer* factor examines whether empirical evidence demonstrates "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. This factor often receives special attention from courts, because empirical evidence of this kind provides direct evidence of market

---

[19] See *Cammer*, 711 F. Supp. at 1283 n.30 (noting stock at issue had eleven market makers); *see also id.* at 1293 ("'Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.'") (quoting Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988)).

[20] https://www.sec.gov/Archives/edgar/data/827876/000166357720000333/clsk_s3.htm(last checked January 10, 2025)

[21] https://www.sec.gov/Archives/edgar/data/827876/000110465921036264/tm219449-1_s3asr.htm (last checked January 10, 2025)

efficiency, whereas the other *Cammer* factors examine indirect evidence of market efficiency. *See Petrobras*, 862 F.3d at 276-79. This factor, however, is also one of the most fraught, as it often involves dueling expert reports and event studies, in which "methodological constraints limit their utility." *Id*. at 278. For these reasons, multiple courts have found markets to be efficient even in the absence of convincing empirical evidence, especially where, as here, (i) the plaintiff's showing as to the other *Cammer* factors is strong,[22] and (ii) the defendants have not proffered any direct evidence of their own to demonstrate that the market is not efficient.[23] *See Malriat v. QuantumScape Corp*., 2022 WL 17974629, at *13 (N.D. Cal. Dec. 19, 2022) (noting that courts have held that "plaintiffs may prove market efficiency without satisfying the cause and- effect factor, which suggests that even if this factor undisputedly favored defendants, plaintiffs still may be entitled to the fraud on the market presumption") (collecting cases, quotations omitted).

---

[22] *See also Aphria*, 342 F.R.D. at 206 ("Importantly, when determining whether a plaintiff has proven market efficiency, a district court should not 'view direct and indirect evidence as distinct requirements and should, instead, conduct a holistic analysis based on the totality of the evidence presented ... the burden to prove market efficiency is not an onerous one.'") (citing *Petrobras*, 862 F.3d at 277-278); *Strougo*, 312 F.R.D at 319-23 & n.85 (noting that the court had previously decided that the fifth *Cammer* factor was not necessary to establish efficiency and "in the interim additional courts have reached the same conclusion"); *Forsta AP-Fonden v. St. Jude Med., Inc*., 312 F.R.D. 511, 520 (D. Minn. 2015) ("A plaintiff's shortfall on the fifth *Cammer* factor alone does not outweigh, as here, showings on many other relevant factors."); *In re NII Holdings, Inc*. *Sec. Litig*., 311 F.R.D. 401, 413 (E.D. Va. 2015) ("even if the fifth *Cammer* factor were considered weak, the evidence offered in support of the other *Cammer* factors as well as the non-*Cammer* factors is more than sufficient to demonstrate by a preponderance of the evidence that the stocks and bonds at issue traded in an efficient market"); *In re Retek Inc. Sec. Litig*., 236 F.R.D. 431, 437 (D. Minn. 2006) ("empirical evidence is not necessary to demonstrate market efficiency").

[23] *See, e.g., In re JPMorgan Chase & Co. Sec. Litig.,* 2015 WL 10433433, at *6 (S.D.N.Y. Sept. 29, 2015) ("As Defendants' expert offers no opinion on market efficiency through an event study of his own, the fifth *Cammer* factor can only weigh against Defendants or be neutral."); *Carpenters*, 310 F.R.D. at 82-86 & n.97 (holding that the fifth *Cammer* factor "is not dispositive," particularly where defendants "chose not to submit their own event study," and collecting cases where "courts have found market efficiency in the absence of an event study or where the event study was not definitive").

In order to assess the fifth *Cammer* factor, Dr. Bozanic conducted two tests: (1) an event study and (2) a cause-and-effect analysis. *See* Bozanic Report, at ¶¶ 46-64. Dr. Bozanic concluded that "the Company's Common Stock traded in an efficient market during the Class Period." *Id.* at ¶ 64.

First, Dr. Bozanic performed an event study investigating whether the market for CleanSpark stock was efficient, specifically with respect to allegation-related information that was released to the market during the Class Period. *See id*, at ¶¶ 46-56. An event study can measure how much a firm's security price rises or falls in response to new information. *See id*, at ¶ 48. An event study first calculates the difference between the actual return on an individual security and the return predicted by the market model. *See id*, at ¶ 50. If this difference over an event period is deemed to be statistically significant, it indicates that the security price movement was likely caused by firm-specific information and therefore cannot be attributed to market and/or industry factors, or to random volatility alone, thereby providing empirical evidence of market efficiency. *See id*. Specifically, Dr. Bozanic's event study encompassed the Class Period (December 10, 2020 to August 16, 2021, inclusive), plus one year before and after the Class Period (Analysis Period = December 10, 2019 to August 16, 2022, inclusive). *See id*, at ¶ 52. Dr. Bozanic then constructed a market model, based on an overall stock market index, and an industry index compared of peer companies in CleanSpark's industry. *See id*, at ¶¶ 53. Dr. Bozanic then used statistical methods to compare the expected movement in CleanSpark's stock price based on the market model, to the observed historical price changes in CleanSpark's stock price on those dates. *See id*, at ¶¶ 55-56. Dr. Bozanic concluded that CleanSpark's stock price reaction to the company-specific news supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period supporting a finding of market efficiency. *See id,* at ¶ 47.

19

Second, Dr. Bozanic performed a cause-and-effect analysis to compare CleanSpark's stock price reaction on earnings announcements during the Class Period. *See id.* at ¶59. Dr. Bozanic then performed statistical analyses to compare CleanSpark's stock price reaction on "News Days" to CleanSpark's stock price reaction on "No News Days." *See id.* at ¶ 61. Dr. Bozanic found that News Days caused statistically significant price movements at six times the rate No News Days did. *See id.* at ¶¶ 62-63. Dr. Bozanic concluded that the difference in frequency for statistically significant CleanSpark stock price reactions between high and low information days was statistically significant at the 95% confidence level, thereby demonstrating a "clear cause-and-effect relationship between new company-specific information and CleanSpark's Common Stock price movements," which "supports the conclusion that the Company's Common Stock traded in an efficient market during the Class Period." *See id.* at ¶ 64.

### (d)    The *Unger*/*Krogman* Factors Further Support Efficiency

Courts have also considered three other factors identified in *Unger v. Amedisys, Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) and *Krogman*, 202 F.R.D. at 478: (1) the company's market capitalization; (2) the stock's float; and (3) the typical bid-ask spread.

Market capitalization, which is the total value of a company's outstanding shares, is equal to the number of shares outstanding multiplied by the price per share. During the Class Period, the aggregate market value of CleanSpark's common stock averaged $625.4 million, placing it between the 25th and 50th percentiles of all companies listed on either the NASDAQ and the NYSE from 2016-2018. Bozanic Report ¶ 67. CleanSpark's market capitalization was sufficiently large to attract analyst and news coverage, and gain the attention of a large number of investors, all of which further promotes market efficiency. *See id*, at ¶¶ 66-67.

A stock's float is the number of shares outstanding, less shares held by insiders and affiliated corporate entities, which is generally the number of shares available for trading by

20

outside investors in the open market. During the Class Period, there were between 21.8 and 35.6 million shares outstanding of CleanSpark's common stock, and 5.02% to 7.01% was held by CleanSpark insiders. Bozanic Report ¶ 74. As a result, approximately 93% of the Company's Common Stock was held and freely tradeable by outside investors during the Class Period. *Id*. Under *Krogman*, such a large public float helps support a finding of an efficient market. *See id*.; *McIntire*, 38 F. Supp. 3d at 433 (finding that even a public float of only 31 to 43 percent supported a finding of an efficient market).

The final *Unger/Krogman* factor is the bid-ask spread, which is the difference between the price at which market makers are offering to buy or sell the security. Bozanic Report ¶ 69. A narrow bid-ask spread implies that there is a large number of investors willing to buy or sell a security, thus the cost of executing a trade is lower, all else equal. *See id*. Here, the average bid-ask spread for CleanSpark common stock during the Class Period was 0.35%. *See id.* at ¶ 70. This factor thus supports market efficiency. *See id.* at ¶ 72; *McIntire*, 38 F. Supp. 3d at 433 (finding that a bid-ask spread of 0.27% supported a finding of an efficient market).

In sum, the three *Unger/Krogman* factors strongly weigh in favor of finding that CleanSpark's stock traded in an efficient market. *See, e.g., Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) ("[S]ubstantial market capitalization with a narrow bid-ask spread, and a large public float . . . strongly indicate . . . an efficient market such that the *Basic* presumption is appropriate.").

### 2.    The *Affiliated Ute* Presumption Of Reliance Applies

In addition to the fraud-on-the-market presumption under *Basic*, a presumption of reliance independently arises here under *Affiliated Ute*. The Supreme Court has instructed that in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153. Instead, "[a]ll that is necessary is that the facts withheld

be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131. Courts within the Second Circuit have thus consistently held that reliance is presumed under *Affiliated Ute* where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992) (citing *Affiliated Ute*, 406 U.S. at 154); *see, e.g.*, *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 216 (S.D.N.Y. 2021) (applying *Affiliated Ute* to grant class certification).[24]

Reliance here may be presumed because Plaintiff's claims are primarily based on Defendants' material omissions, i.e., important information that Defendants consciously chose to hide in order to mislead investors and to inflate CleanSpark's stock price. For example, the heart of Defendants' fraud lies in their decision to ***conceal*** from investors material facts about the ATL acquisition, including the Virtual Citadel bankruptcy and the failed acquisition by Marathon due to the expiring Power Agreement, as well as the lack of a reasonable basis for the Expansion Project completion date.[25]

Because the claims at issue here focus primarily on what Defendants *did not* say, Plaintiff is entitled the *Affiliated Ute* presumption of reliance. *See, e.g.*, *In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215, at *7 (S.D.N.Y. Mar. 7, 2011) (applying *Affiliated Ute* presumption since "the

---

[24] The *Affiliated Ute* presumption is rooted in the reality that "as a practical matter [reliance on an omission] is impossible to prove." *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013). This is because "[w]hen a defendant's fraud consists primarily of omissions, requiring a plaintiff to show a speculative set of facts, i.e., how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff." *In re Smith Barney*, 290 F.R.D. at 47.

[25] Indeed, commenting on the Amended Complaint's allegations concerning the falsity of CleanSpark's projections to complete the expansion project, the Court aptly noted that "Bradford had not done the investigation a reasonable investor would expect of a corporate officer before making such a specific estimate." *See CleanSpark*, 2023 WL 112558, at *9 .

heart of the alleged deception is rooted not in statements, but in the fact that specific information about the quality of the collateral was withheld, and that information would have been important to a reasonable investor."); *Fogarazzao v. Lehman Bros, Inc.*, 232 F.R.D. 176, 185-86 (S.D.N.Y. 2005) (applying *Affiliated Ute* to grant class certification).

### 3.    Potential Individual Questions Of Damages Do Not Predominate

Courts routinely find that damages in securities cases present common questions because they can be calculated by measuring the price impact of company-specific information alleged to be a corrective disclosure on a class-wide basis. *See Barrick Gold*, 314 F.R.D. at 106 (finding that damages issues did not defeat predominance because calculation of damages called for the application of a damages model across the entire class); *Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014) (fact that class members who purchased and sold at different times would be entitled to different recoveries does not defeat predominance because "[p]laintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis."); *In re Beacon Assoc. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012) (common issues predominate even though calculation of each class member's damages will be somewhat individualized).[26]

Here, damages can be readily calculated on a class-wide basis in this action using the same kind of generally accepted event study methodology. Bozanic Report ¶ 91. Using such an event study, the artificial inflation caused by Defendants' material omissions can be measured on a class-wide basis by analyzing the change in the stock price caused by a corrective disclosure. *See id.* at

---

[26] *In re Goldman Sachs Grp., Inc. Sec. Litig.,* 2015 WL 5613150, at *8 (S.D.N.Y. Sept. 24, 2015) ("[A]t the class certification stage, Plaintiffs must only show that their damages model 'actually measure[s] damages that result from the class's asserted theory of injury.'") (internal citation omitted) (emphasis in original) (vacated and remanded on other grounds by *Arkansas Teachers Retirement System v. Goldman Sachs Group, Inc.*, 879 F.3d 474 (2d Cir. 2018)).

¶ 79. Once the daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity in the security can be used to mechanically apply common calculations to arrive at the Class member's damages. *See id.* at ¶¶ 77-79, 85. Because this methodology is entirely consistent with the class-wide theory of liability and allows for measurement of damages on a class-wide basis, common issues predominate. *See Wallace*, 302 F.R.D. at 318 ("Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability, thus meeting the requirements of *Comcast Corp. v. Behrend*, [569 U.S. 27 (2013)]").[27]

**B.     A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of This Action**

Under Rule 23(b)(3), "[s]uperiority is established when 'a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 241 F.R.D. 435, 449 (S.D.N.Y. 2007) (*quoting Amchem*, 521 U.S. at 615). Superiority is typically found in cases in which each individual class member's interest in the litigation is less than the anticipated cost of litigating individually. *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 99 (S.D.N.Y. 2010). The following factors are relevant to the superiority assessment:

> A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and D) the likely

---

[27] Plaintiff's showing above that their § 10(b) claims are entitled to a presumption of reliance applies equally to Plaintiff's control person claims under § 20(a), and so predominance is satisfied as to these claims as well. *In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, 2013 WL 396117, at *13 (D.N.J. Jan. 30, 2013) (finding that the same predominance analysis applies to § 20(a) claims as for Rule 10b-5 violations).

difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors all weigh in favor of class certification in this case.

There is no indication that members of the proposed Class would prefer to prosecute their claims individually, and Lead Counsel are unaware of any other case involving the same claims. The fraud here, like "[m]ost violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 10 (S.D.N.Y. 1999).[28] Finally, securities class actions like this one generally raise no unusual manageability issues. "[F]ailure to certify an action under Rule 23(b) (3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *In re Petrobras Sec.*, 862 F.3d at 268 (internal citation omitted). Thus, a class action is the superior method for the efficient adjudication of the Class's claims.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant his motion in its entirety, certify this case as a class action, appoint Plaintiff as Class Representative, and appoint GPM as Class Counsel.

---

[28] The litigation of separate actions "would be wasteful, and potentially result in delay and an inefficient expenditure of judicial resources." *In re Interpublic Sec. Litig.*, 2003 WL 22509414, at *4 (S.D.N.Y. Nov. 6, 2003). It would also "risk disparate results among those seeking redress." *Id.* Moreover, Plaintiff does not foresee any management difficulties.

Dated: January 10, 2025

By: */s/ Gregory B. Linkh*
**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone:(212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

Christopher Fallon (*admitted pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**LAW OFFICES OF FRANK CRUZ**
Frank Cruz (*admitted pro hac vice*)
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Lead Attorneys for Lead Plaintiff Darshan Hasthantra and the putative Class*

26

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On January 10, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 10, 2025.


*s/ Gregory B. Linkh*
Gregory B. Linkh