**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARSHAN HASTHANTRA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>     v.<br><br>CLEANSPARK, INC., ZACHARY BRADFORD, and S. MATTHEW SCHULTZ,<br><br>Defendants. | **Case No. 1:21-cv-00511-LAP** |

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

PROCEDURAL HISTORY................................................................................................. 2

STATEMENT OF FACTS .................................................................................................. 3

   I.   THE PARTIES........................................................................................................ 3

   II.   CLEANSPARK ANNOUNCES ATL ACQUISITION ........................................ 4

      A.   Discovery Has Eviscerated Plaintiff's Allegations of ATL Misstatements............... 4

          1.   FE1 Discredits Plaintiff's Allegations on ATL Expansion Estimates ............... 4

          2.   Remaining Alleged Omissions Are Irrelevant or Discredited ........................... 7

   III.   THE "DISCLOSURES" ........................................................................................ 8

      A.   The Culper Report ................................................................................................. 9

ARGUMENT ...................................................................................................................... 9

   I.   Standing Issues Preclude Class Certification........................................................ 9

      A.   Plaintiff Fails to Prove He Has Article III Standing ............................................. 9

          1.   Establishing Standing Is Plaintiff's Burden ......................................... 9

          2.   Plaintiff Does Not Satisfy His Burden ................................................ 10

      B.   Proposed Class Includes Those Who Lack Article III Standing ............................ 12

   II.   Plaintiff Bears Burden of Proving Rule 23 Compliance ...................................... 13

      A.   Rigorous Analysis Required Regarding Rule 23(a) Compliance ........................... 13

      B.   An "Even More Demanding" Standard Applies to Rule 23(b)(3) Compliance........ 14

   III.   Plaintiff Fails to Establish Typicality Under Rule 23(a). ..................................... 14

      A.   Unique Defenses Destroy Typicality .................................................................... 14

      B.   Plaintiff Is Vulnerable to Unique Reliance Defenses ........................................... 15

          1.   Plaintiff Continued to Buy Stock While This Lawsuit Was Pending............... 16

          2.   Plaintiff Cannot Show Reliance on Statements After March 5, 2021 .............. 18

      C.   Plaintiff Is Subject to Unique Defenses Regarding Damages/Loss Causation......... 19

      D.   These Unique Defenses Threaten to Become Litigation's Focus ........................... 19

   IV.   PLAINTIFF FAILS TO ESTABLISH PREDOMINANCE ................................... 20

      A.   Individual Reliance Questions Will Predominate .................................................. 20

          1.   Discovery Shows *Affiliated Ute* Prerequisite Not Met ..................................... 21

          2.   Neither Presumption Applies to Post-January 20, 2021 Purchasers ................. 22

          3.   *Basic* Presumption Does Not Apply to Statements Made After Purchases.................................................................................................. 22

B.    Individual Causation, Injury, and Damages Issues Will Predominate ...................... 22

CONCLUSION ................................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Adkins v. Morgan Stanley*,
  307 F.R.D. 119 (S.D.N.Y. 2015) ................................................................................ 14

*Affiliated Ute Citizens of Utah v. U.S.*,
  406 U.S. 128 (1972) .................................................................................................. 16

*Allen v. City of New York*,
  2023 WL 171402 (S.D.N.Y. Jan. 12, 2023) .............................................................. 13

*Allen v. Koenigsmann*,
  2023 WL 2731733 (S.D.N.Y. Mar. 31, 2023) ........................................................... 13

*Arkansas Teachers Retirement Sys. v. Goldman Sachs Group, Inc.*,
  879 F.3d 474 (2d Cir. 2018) ..................................................................................... 21

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000) ....................................................................................... 17

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .................................................................................................. 16

*Bowling v. Johnson & Johnson*,
  2019 WL 1760162 (S.D.N.Y. Apr. 22, 2019) ........................................................... 15

*Calvo v. City of New York*,
  2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017) ..................................................... 10, 12

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ..................................................................................... 20

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .......................................................................................... 14, 22, 25

*Dakus v. Koninklijke Luchtvaart Maatschappij, N.V.*,
  2023 WL 5935694 (S.D.N.Y. Sept. 12, 2023) ............................................................ 9

*DeMarco v. Robertson Stephens Inc.*,
  318 F. Supp. 2d 110 (S.D.N.Y. 2004) ...................................................................... 24

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ................................................................................... 9, 12

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) .................................................................................................. 12

*Eagle Equity Funds, LLC v. Centrais Electricas Brasileiras S/A – Eletrobras*,
  2021 WL 371449 (S.D.N.Y. Feb. 3, 2021) ............................................. 11, 16, 17, 18

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ........................................................................................16, 20, 21

*Forte v. U.S. Pension Comm.*,
  2016 WL 5922653 (S.D.N.Y. Sept. 30, 2016)........................................................................ 11

*GAMCO Inv'rs, Inc. v. Vivendi, S.A.*,
  917 F. Supp. 2d 246 (S.D.N.Y. 2013) ................................................................................. 22

*GAMCO Inv'rs, Inc. v. Vivendi, S.A.*,
  927 F. Supp. 2d 88 (S.D.N.Y. 2013) ................................................................................... 16

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement Sys.*,
  594 U.S. 113 (2021)............................................................................................................. 16

*Goodman v. Genworth Fin. Wealth Mgt., Inc.*,
  300 F.R.D. 90 (E.D.N.Y. 2014)........................................................................................... 21

*Gruber v. Gilbertson*,
  692 F. Supp. 3d 303 (S.D.N.Y. 2023) ................................................................................. 17

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)......................................................................................................*passim*

*In re Digital Music Antitrust Litig.*,
  321 F.R.D. 64 (S.D.N.Y. 2017) .....................................................................................*passim*

*In re IMAX Sec. Litig.*,
  272 F.R.D. 138 (S.D.N.Y. 2010) ................................................................................... 15, 20

*In re Initial Pub. Offerings Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006) ................................................................................................. 16

*In re Pfizer Inc. Sec. Litig.*,
  282 F.R.D. 38 (S.D.N.Y. 2012) .......................................................................................... 18

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) ............................................................................................... 13

*In re Vivendi Universal, S.A. Sec. Litig.*,
  183 F. Supp. 3d 458 (S.D.N.Y. 2016) ................................................................................. 18

*Indiana Pub. Retirement Sys. v. AAC Holdings, Inc.*,
  2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023)................................................................... 25

*Kely v. Elec. Arts, Inc.*,
  71 F. Supp. 3d 1061 (N.D. Cal. 2014) ................................................................................ 19

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).............................................................................................................. 10

*Packer v. Yampol*,
  630 F. Supp. 1237 (S.D.N.Y. 1986) .................................................................................... 11

*Passman v. Peloton Interactive, Inc.*,
  671 F. Supp. 3d 417 (S.D.N.Y. 2023) ................................................................................. 23

*Rocco v. Nam Tai Elecs., Inc.*,
  245 F.R.D. 131 (S.D.N.Y. 2007) ............................................................................... 16, 17, 20

*Ross v. AXA Equit. Life Ins. Co.*,
115 F. Supp. 3d 424 (S.D.N.Y. 2015) ................................................................................... 12

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .............................................................................................................. 10, 12

*Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*,
412 F.3d 103 (2d Cir. 2005) ................................................................................................. 22

*Steginsky v. Xcelera, Inc.*,
2015 WL 1036985 (D. Conn. Mar. 10, 2015) ...................................................................... 21

*Strubel v. Comenity Bank*,
842 F.3d 181 (2d Cir. 2016) ................................................................................................. 10, 11

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .............................................................................................................. 10

*Trinidad v. Breakaway Courier Sys., Inc.*,
2007 WL 103073 (S.D.N.Y. Jan. 12, 2007) ........................................................................ 15

*Tschoe v. Monarch Recovery Mgt., Inc.*,
2024 WL 1251278 (S.D.N.Y. Mar. 22, 2024) ...................................................................... 10

*Villella v. Chem. & Min. Co. of Chile Inc.*,
2018 WL 2958361 (S.D.N.Y. June 13, 2018) ...................................................................... 16

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017) ................................................................................................... 17

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .............................................................................................................. 14

*Wilamowsky v. Take-Two Interactive Software, Inc.*,
818 F. Supp. 2d 744 (S.D.N.Y. 2011) .................................................................................. 12

*Woodhams v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*,
2024 WL 1216595 (S.D.N.Y. Mar. 21, 2024) ...................................................................... 15, 20

**Statutes**

15 U.S.C. § 78u-4(e) .................................................................................................................... 20

Article III of the United States Constitution ............................................................................... 1

**Rules**

Federal Rule of Civil Procedure 23 ............................................................................................. 1, 10, 13

Rule 23(a) .................................................................................................................................... 13, 14, 15

Rule 23(a)(3) ............................................................................................................................... 1, 16

Rule 23(b) .................................................................................................................................... 1, 14

Rule 23(b)(3) ............................................................................................................................... 14, 20, 21

**INTRODUCTION**

As the party seeking class certification, Plaintiff[1] bears the burden of demonstrating – with supporting evidence – that class treatment is warranted. He does not satisfy this burden.

In fact, Plaintiff's barebones motion does not even grapple with the fundamental question of whether he has standing under Article III of the United States Constitution. He provides no evidence that he has sold shares at a loss, nor of any other concrete harm. That mandates denial of his class certification motion, as we show below in Section I(A). Class certification is also inappropriate because the overbroad class definition Plaintiff proffers captures stock purchasers who lack standing, as set forth in Section I(B).

If the Court does not deny Plaintiff's motion based on the above standing issues, however, the Court should nevertheless deny it because Plaintiff fails to satisfy the class certification requirements set forth in Federal Rule of Civil Procedure ("Rule" or "FRCP") 23. First, as we show in Section III, Plaintiff cannot establish that he is typical of the putative class under Rule 23(a)(3) because he is subject to unique defenses regarding necessary elements of his claims. For example, Plaintiff is uniquely ill-suited to invoke rebuttable presumptions of reliance on Defendants' alleged statements given his decision to continue purchasing CleanSpark shares soon before filing a motion to be appointed lead plaintiff in this very securities fraud litigation against CleanSpark. Further, his own damages model fails to calculate any damages to him.

Second, Plaintiff fails to demonstrate that common issues will predominate over individual questions, as Rule 23(b) requires. As we show in Section IV(A), Plaintiff fails to demonstrate a common method of proving reliance, in part due to discovery that disproves the allegations that

---

[1] "Plaintiff" or "Hasthantra" refers to plaintiff Darshan Hasthantra. "Defendants" refers to, collectively, CleanSpark, Inc. ("CleanSpark"), Zachary Bradford ("Bradford"), and S. Matthew Schultz ("Schultz").

1

saved his claims at the motion to dismiss stage. Moreover, as we show in Section IV(B), predominance is lacking because Plaintiff does not satisfy his obligation to provide a damages model capable of calculating class-wide damages consistent with his "artificial inflation" theory of liability. To the contrary, the proposed model is riddled with flaws that Plaintiff's own expert admitted in deposition testimony.

## PROCEDURAL HISTORY

This action began on or about January 20, 2021, just days after the January 14, 2021 short-seller "report" from which it sprang. (*See* Complaint dated January 20, 2021 (the "Original Complaint" or "OC") (ECF 1); OC ¶ 3. The Original Complaint alleged a putative class period of approximately two weeks, from December 31, 2020 through January 14, 2021 (the "Original Class Period"). (OC ¶ 1).

On March 22, 2021, Hasthantra appeared in this case, filing a motion to be appointed lead plaintiff ("LP Mot.") that the Court granted on December 2, 2021. (ECF 30).

On February 28, 2022, Hasthantra and former named plaintiff Scott Bishins ("Bishins") filed an amended complaint (the "Complaint" or "AC") (ECF 36), which alleges an expanded putative class period of December 10, 2020 through August 16, 2021 (the "Class Period"). (AC ¶ 1).

On January 5, 2023, the Court denied Defendants' motion to dismiss this action. (ECF 60) (the "MTD Op.").

On January 31, 2024, Bishins voluntarily withdrew from the case. (ECF 77).

On January 10, 2025, Hasthantra moved for class certification and appointment as class representative, as well as appointment of his counsel as class counsel.[2] (ECF 90). The putative class period set forth in his Motion is December 10, 2020 through August 16, 2021. (Mot. at 1).

**STATEMENT OF FACTS[3]**

**I.      THE PARTIES**

Defendant CleanSpark is an industrial bitcoin miner. (AC ¶ 27). Defendant Bradford is CleanSpark's CEO and President. (*Id*. ¶ 22). Defendant Schultz is CleanSpark's Executive Chairman and a Director. (*Id.* ¶ 23).

Sole remaining named Plaintiff Hasthantra is a CleanSpark shareholder (*Id.* ¶ 19), who "purchased publicly-traded shares of CleanSpark, Inc. common stock during the Class Period." (Affidavit of Hasthantra dated January 8, 2025,[4] ¶ 5) (ECF 91-2) ("Hasthantra Aff."). In previous filings, Plaintiff has averred that he purchased CleanSpark securities on various dates between December 31, 2020 and March 5, 2021. *See* Amended Certification dated February 28, 2022 ("AC Cert.") (ECF 36-1).

At his July 19, 2024 deposition, Plaintiff revealed the reasons for his purchases of CleanSpark stock, and they have *nothing* to do with the statements by Defendants on which this case purports to be based. Rather, Hasthantra testified that he bought CleanSpark's stock because of bitcoin FOMO:[5] "[t]he stock used to go up, and up, and up, and up actually, so there is something

---

[2] The brief in support of Plaintiff's motion is referred to as the "Motion" or "Mot."

[3] Defendants strongly dispute Plaintiff's rendition of the facts underlying this matter and cite Complaint allegations solely for purposes of this Motion.

[4] Plaintiff titles this document "[Proposed] Order Granting Plaintiff's Motion For Class Certification."

[5] Indeed, Hasthantra testified that he bought CleanSpark's stock for no reason other than that:

> online, internet bitcoin was one of the top performing industries at that time. I really missed out on investing with bitcoin when it was $500. I had [sic] opportunity, but I really missed out, so I did not want to miss out again one more time. That's why -- but I could not afford to buy bitcoin

called fear of missing out, so I was just buying more and more and more because I thought it will go up in the sky like a rocket ship." (Hasthantra Tr. at 66:15-20).

## II.   CLEANSPARK ANNOUNCES ATL ACQUISITION

On December 10, 2020, CleanSpark announced its acquisition of ATL Data Centers LLC ("ATL") and ATL's principal asset, a data center and bitcoin mining facility in College Park, Georgia (the "ATL Facility"). (AC ¶¶ 3, 61). Upon acquiring ATL, CleanSpark immediately made plans to expand the mining capacity at the ATL Facility. (*Id*. ¶¶ 3-4, 35).

CleanSpark's acquisition of ATL has undeniably succeeded, driving a 400% increase in year-over-year revenue and a seventeen-fold increase in net quarterly revenue, with record net income.  (*See* CleanSpark, Inc., *Form 10-K 2021*, at pp. 35, 39, F-6 (filed Dec. 14, 2021)); (CleanSpark, Inc., *Form 10-Q 2022 Q1*, at p. F-2 (filed Feb. 9, 2022)) (Exs. A and B to the accompanying Declaration of David J. Partida) (the "Decl.").

### A.   Discovery Has Eviscerated Plaintiff's Allegations of ATL Misstatements

### 1.   FE1 Discredits Plaintiff's Allegations on ATL Expansion Estimates

Defendants made estimates (the "Expansion Estimates"), beginning on December 10, 2020, regarding the timeline for completion of a "planned expansion of the power capacity" at the ATL Facility. (AC¶ 80). Plaintiff claims these were unreasonable. Key to Plaintiff's position is a report that FE1 supposedly provided to Defendants (the "FE1 Report") "in January or February 2021" (AC¶¶ 11, 75), which purportedly advised Defendants "that their publicly-stated project timeline was wildly off target and that an aggressive project schedule, assuming no delays, would entail a completion date of October 2021." (AC¶ 11).

---

at that point of time. That's why I took a route to invest in bitcoin indirectly through CleanSpark having known that this will be a very good long-term performer.

Confidential Transcript of the July 19, 2024 Deposition of Lead Plaintiff, Darshan Hasthantra ("Hasthantra Tr.") at 53:16-54:3 (attached as **Exhibit E**).

In fact, "FE1," who departed CleanSpark in June 2021 (Transcript of Lisa DeKalb Deposition dated July 10, 2024 ("FE1 Tr."), is the lynchpin of Plaintiff's case: Plaintiff cites FE1 as the basis for allegations throughout the Complaint. *See, e.g.*, AC ¶¶ 70-79; *see also* MTD Op. at 2 ("Plaintiffs based many of their claims of undisclosed facts on the account of" FE1). Moreover, the allegations Plaintiff attributed to FE1 were critical to the Court's denial of Defendants' dismissal motion. *See*, *e.g.*, MTD Op. at 25 ("*Given FE1's report* and the alleged lack of investigation on the part of CleanSpark's officers, Plaintiffs have alleged sufficient facts to make the Estimates actionable under Section 10(b).") (emphasis added); MTD Op. at 25 (holding that allegations of material omissions regarding the Expansion Estimates were adequate, based largely on allegations that "*FE1 delivered a report to Bradford in January or February 2021* that concluded October 2021 was the earliest possible completion date for the ATL expansion" and that "[a]s late as February 2021, CleanSpark had not secured construction permits or a general contractor").

**FE1 has discredited Plaintiff's allegations in sworn deposition testimony**, however:[6]

FE1 testified that she "do[es] not agree with" the allegations the Complaint attributes to her "account" (FE1 Tr.,146-7). She also conveyed the troubling genesis of this case, testifying that she spoke to Plaintiff's counsel's investigator, who represented himself "as working for a law firm," with the "understanding that legal issues were something that I had to comply with." (FE1 Tr., 164:24-165:4). That investigator did not review any documents with FE1, nor disclose that a pleading attributing alleged material facts to her would be filed. (FE1 Tr., 72-73, 76).

Nor did FE1 speak with Plaintiff's counsel or review drafts any pleading; in fact, she was

---

[6] Plaintiff's unsupported assertion that "[t]he evidence produced in discovery strongly supports Plaintiff's claims" (Mot. at 5-6) notably ignores this.

unaware of the OC's and Complaint's existence until well after their filing. (FE1 Tr., 146:13-19).

In addition, FE1 testified that she did not provide the FE1 Report to Bradford (or any Defendant) until March 3, 2021 (FE1 Tr., 107:19-108:8, 195:6-23, and 202:2-18), which is well *after* the critical "January or February 2021" date alleged in the Complaint. (AC ¶ 75).

And FE1 vigorously denied the allegation that she had ever "informed" Defendants that their estimated expansion "timeline was wildly off target" or that an "aggressive project schedule" would yield an October 2021 completion date: she testified that the relevant Complaint paragraph (AC¶ 11) is "*not accurate because it is not a statement I made.*" (FE1 Tr., 143-144) (emphasis added). And she felt so strongly that she went on to *ask to voluntarily interject* that:

> [t]his paragraph [11] appears to be quoting or relaying information from me, and that is not correct. … [t]he gist of that is -- it must be generated from information they garnered other places and compiled into that paragraph, and it makes it appear that all of the information in that paragraph is related to comments I made, and that is not accurate. (LDK Depo at 144:4-15).

Moreover, FE1's testimony undercuts Plaintiff's heavy reliance on the FE1 Report – *e.g.*, his allegation that it reflects "known facts" that Defendants "consistently ignored" (AC¶ 81) – by admitting, among other things, that the FE1 Report was untrustworthy and that she was not qualified to be making the kind of timeline projections Plaintiff attributes to her. (FE1 Tr., 66; 92:9-95:22, 107:8-119:24, and Exhibits 44-45). Further, documentary evidence shows that FE1 essentially told Bradford *not* to rely on the FE1 Report due to its flaws: in the email dated March 3, 2021, attaching the FE1 Report, FE1 called it "a rush job" with "variables missing," and cautioned Bradford that it might contain incorrect "delivery timetables," "assumptions," and "errors or omissions." (FE1 Tr., 107:8-18 and Exhibits 44-45).

Also contrary to Plaintiff's allegations (AC¶ 95), FE1 denied telling Plaintiff's legal team that CleanSpark "needed" its March 15, 2021 $200-million public offering to complete the ATL project; the Court in the MTD Op. relied on this now-disproven statement as a "troubling sign[]

6

regarding the expansion project."[7] (MTD Op. at 9).

### 2.    Remaining Alleged Omissions Are Irrelevant or Discredited

Plaintiff also alleges that Defendants should have "disclosed," when CleanSpark announced its acquisition of ATL on December 10, 2020: (1) Bradford's relationship with Blue Chip Accounting, LLC ("Blue Chip") (*id.* ¶ 73). CleanSpark has long disclosed this, however, and the Court has ruled that "Plaintiffs have failed to allege material omissions" on this topic due to those disclosures. MTD Op. at 24 n.4. (2) The November 2019 receivership and February 2020 bankruptcy of the ATL Facility's previous owner, Virtual Citadel, Inc. ("Virtual Citadel"), after its founder's death. (AC ¶¶ 56-58). The Court has found, however, "that the due diligence statements did not create a duty to disclose the Virtual Citadel bankruptcy" and that "due to Defendants' disclosures … Plaintiffs have failed to allege material omissions regarding these statements." (MTD Op. at 24).[8] (3) A fleeting bid by bitcoin miner/CleanSpark competitor Marathon Patent Group ("Marathon"), and its subsequent withdrawal of that bid on September 17, 2020, for acquisition of the ATL Facility (AC ¶¶ 45, 47, 63(a)), which at that time was being marketed by Virtual Citadel's team under the name "FastBlock Mining" ("FastBlock"). (*Id.* ¶¶ 6, 62-63). But FE1 has denounced the allegations regarding Marathon, on which the Court relied in finding materiality for purposes of Defendants' dismissal motion. *E.g.*, MTD Op. at 30-31 ("Bernardo Schucman – the owner who purchased ATL's assets out of the Virtual Citadel

---

[7] *See* FE1 Tr., 160:23 – 161:25. To the contrary, FE1 testified that she "was not" "involved in providing any projections to investors," and that she never spoke to the plaintiffs' counsel's investigator "about any of the finances in terms of overall success of the bitcoin mining business after CleanSpark acquired it [or] about their financial performance" because "I would not have been privy to that, so I don't know what I would have had to say about it." (FE1 Tr., 163).

[8] Elsewhere, the Court states: "Plaintiffs have alleged that the Feb. 2020 Analysis Statement implied ATL existed in February 2020 when ATL did not exist as a corporate entity until April 2020. Plaintiffs have also alleged that Defendants omitted all information about the corporate history of ATL's assets, including the Virtual Citadel bankruptcy and the attempts to sell the assets to Marathon under the name Fastblock Mining. Reasonable minds could differ on whether these facts would be important to a reasonable investor following CleanSpark's acquisition of ATL. Thus, Plaintiffs have alleged sufficient facts to meet the material omission element here." (MTD Order at 20).

bankruptcy, tried to sell the assets to Marathon and then successfully sold the assets to CleanSpark under the ATL -- *told FE1 that he had a preexisting friendship with Bradford, bolstering the inference that Bradford knew these facts*.") (emphasis added). For example, FE1 testified that she did not have any idea about the nature of Schucman's and Bradford's relationship (FE1 Tr., *e.g.*, 109:6-10, 150:12-21) and extensively testified that the ATL Facility's name changes had absolutely nothing to do with the acquisition (FE1 Tr., 125:22-128:3). Also, during her deposition FE1 denied knowledge of the reasons Marathon decided not to purchase ATL's assets[9] -- a stark contradiction of allegations attributed to FE1 (AC ¶ 71).

Plaintiff also alleges that the December 10, 2020 Press Release refers to "early-stage analysis of ATL," which is "technically false" (Mot. at 3) given that the ATL corporate entity was not formed until April 2020. (AC ¶ 37).

## III.    THE "DISCLOSURES"

The Complaint alleges several "partial disclosures" of the above alleged misrepresentations and omissions (e.g., AC ¶ 10), but abandons all but four in the Motion (Bozanic Rep. ¶15 n.11; Mot. at 4-5): (i) the "Culper Report" "published" on January 14, 2021 (AC ¶ 45); (ii) CleanSpark's Tweet on January 15, 2021 (AC ¶51); (iii) CleanSpark's February 12, 2021 press release announcing financial results for the fiscal quarter ending on December 31, 2020 (AC ¶88); and (iv) CleanSpark's August 17, 2021 press release announcing financial results for the fiscal quarter ending on June 30, 2021 (AC ¶ 110).

---

[9] FE1 testified that while she had heard of Marathon, she "did not have any direct dealings with them" and that she is "not privy to any other detail" about why Marathon did not purchase ATL other than "I believe it had to do with the power contract." (FE1 Tr., 124:4-20).

A.    **The Culper Report**

The Culper Report – a January 14, 2021 "report" by admitted short seller Culper Research ("Culper") (AC ¶ 45), titled "Cleanspark (CLSK): Back to the Trash Can" (AC Ex. 2) – is at the heart of this action. The Original Complaint, filed just six days after its issuance, did little more than regurgitate its contents and overlay them with legal boilerplate. (ECF 1). And it permeates the amended Complaint as well. (*E.g.*, AC §D).

The Culper Report mostly maligns Defendants about topics unrelated to ATL, as well as the bankruptcy of ATL's predecessors (AC Ex. 2 at 2, 4-6); and postulating (wrongly) that if competing miner Marathon could not make ATL work, neither could CleanSpark. (*Id*. at 6) all based on *public information*. (AC ¶¶ 57-58, 61 n. 16, 47, and 48 n. 10). *See also* AC Ex. 2 at 2.

On June 18, 2021, Culper issued a second report, which Plaintiff has abandoned.

**ARGUMENT**

**I.    STANDING ISSUES PRECLUDE CLASS CERTIFICATION**

A.    **Plaintiff Fails to Prove He Has Article III Standing**

1.    **Establishing Standing Is Plaintiff's Burden**

"The filing of suit as a class action does not relax" the "jurisdictional requirement" of Article III standing. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263-64 (2d Cir. 2006). The named plaintiff must individually have standing; that putative class members do is not enough. *Dakus v. Koninklijke Luchtvaart Maatschappij, N.V.*, 2023 WL 5935694, at *3 (S.D.N.Y. Sept. 12, 2023) (internal quotation marks omitted) (in putative class action, "the relevant legal entity for determining whether Article III standing is proper is the named plaintiff(s), not the proposed class"); *Tschoe v. Monarch Recovery Mgt., Inc.*, 2024 WL 1251278, at *2 (S.D.N.Y. Mar. 22, 2024) ("Absent proof of Article III standing [by named plaintiffs], this Court lacks subject matter jurisdiction."). Accordingly, the Court should turn to analyzing class certification under Federal

Rule of Civil Procedure ("Rule" or "FRCP") 23 only *after* it "first mak[es] its standing determination." *Konig v. TransUnion, LLC*, 223 WL 3002396, at *6 (S.D.N.Y. Apr. 19, 2023).

At this stage, Plaintiff must establish his Article III standing by a preponderance of the evidence. *See*, *e.g.*, *Calvo v. City of New York*, 2017 WL 4231431, at *3 (S.D.N.Y. Sept. 21, 2017) ("at class certification, Plaintiff[] must prove standing by a preponderance of the evidence"). This requires showing, among other things, a "concrete, particularized, and actual or imminent" injury "caused by the defendant." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). That injury may not be "'conjectural or hypothetical,'" *Strubel v. Comenity Bank*, 842 F.3d 181, 188 (2d Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)); it "'must actually exist.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)).

### 2.    Plaintiff Does Not Satisfy His Burden

Here, Plaintiff proffers no evidence, let alone a preponderance of it, establishing that he has Article III standing. In fact, the Motion ignores the issue; at most, Plaintiff claims he is an adequate class representative because he purportedly "has suffered sizable financial losses." (Mot. at 10). But the two documents he cites in support do not demonstrate any concrete financial loss. The first (ECF 13-2) is the January 29, 2021 "Sworn Certification of Plaintiff" filed in support of his motion for lead plaintiff appointment, which lists his purchases of CleanSpark securities between December 30, 2020 and January 12, 2021, without addressing any of his later purchases (*see* AC Cert.). The second (ECF 13-3), a document titled "Loss Chart" that Plaintiff also submitted with his lead plaintiff motion, purports to calculate a $28,244.04 loss with respect to those same purchases while acknowledging that Plaintiff had not sold the shares it references;[10] Plaintiff recently confirmed in

---

[10] Plaintiff submitted this document in support of his motion to be appointed lead plaintiff.

deposition testimony that he continues to hold his CleanSpark shares, years after their purchase. Hasthantra Tr. at 24:14-15.

Further, the Complaint's allegation that Plaintiff and others purchased shares at "artificially inflated" prices (AC¶ 140; *see also* Bozanic Rep. ¶17) does not establish concrete harm to Plaintiff. *See, e.g., Eagle Equity Funds, LLC v. Centrais Electricas Brasileiras S/A – Eletrobras*, 2021 WL 371449, at *4 (S.D.N.Y. Feb. 3, 2021) (plaintiffs failed to allege cognizable injury based on "falsely inflated" securities). Rather, "stock must be purchased at an inflated price *and sold at a loss* for an economic injury to occur." *Forte v. U.S. Pension Comm.*, 2016 WL 5922653, at *8 (S.D.N.Y. Sept. 30, 2016) (internal quotation marks omitted and emphasis added). Here, however, Plaintiff does not show that he sold his shares at a loss nor provide evidence of any other concrete financial harm.[11] *Cf. Packer v. Yampol*, 630 F. Supp. 1237, 1240 (S.D.N.Y. 1986) (plaintiffs who allegedly purchased stock at artificially inflated prices did not "allege[] how this inflation of the price has damaged them," for example by "alleg[ing] that because the price of the stock was artificially inflated, the return on their investment has been less than it would have been if the price had not been inflated"). To the extent Plaintiff speculates he would experience financial loss if he were to sell his shares in the future, that is insufficient not only because it is conjecture, *see Strubel*, 842 F.3d at 188, but also because Plaintiff makes no showing that such hypothetical loss would be "fairly traceable" to the alleged misstatements – another Article III standing prerequisite, *see, e.g.*, *Spokeo*, 578 U.S. at 338 – given the now more than four years that have passed since Plaintiff's purchases: "[T]he longer the time between the purchase and sale … the more likely that other factors caused the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005).

---

[11] While the Court appointed Plaintiff to be lead plaintiff based in part on the purported losses set forth in his "Loss Chart" (ECF 30 at 3, 10), at this stage Plaintiff is required to demonstrate standing by a preponderance of the evidence. *See* above at 10.

Given Plaintiff's failure to demonstrate that he personally has Article III standing, the Court must deny his motion. *See*, *e.g.*, *Ross v. AXA Equit. Life Ins. Co.*, 115 F. Supp. 3d 424, 432 (S.D.N.Y. 2015) ("'[E]ven named plaintiffs who represent a class must allege and show that they personally have been injured…."), *aff'd*, 680 Fed. Appx. 41 (2d Cir. 2017).

### B.       Proposed Class Includes Those Who Lack Article III Standing

In addition, the Court should deny class certification because the broad class Plaintiff proposes would include many who lack Article III standing: "[I]n this Circuit, a class cannot be certified if any person captured within that definition lacks Article III standing." *Calvo v. City of New York*, 2017 WL 4231431, at *3 (S.D.N.Y. Sept. 21, 2017) (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006)).

Here, Plaintiff defines the putative class as consisting of anyone who purchased or acquired publicly traded CleanSpark securities during the more than eight months "between December 10, 2020 and August 16, 2021, both dates inclusive," except for certain narrow categories of shareholders such as Defendants and CleanSpark officers, employees, and directors. (Mot. at 1, n.2). Thus, the Proposed Class would capture categories of purchaser/acquirors who suffered no injury, such as: (i) those who sold *before* the first alleged disclosure of purported misrepresentations on January 14, 2021 and thus *before* any of the supposedly corresponding stock price declines that Plaintiff alleges (*e.g.*, AC ¶52); and (ii) short-sellers who *profited* from the alleged stock price declines. *See Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 753 (S.D.N.Y. 2011) ("where … a company concealed *negative* information about its economic condition, a short seller who sold at artificially inflated prices and covered after the corrective disclosure would actually *profit*").

12

## II.    PLAINTIFF BEARS BURDEN OF PROVING RULE 23 COMPLIANCE

Even without the above standing defects, the Court should deny class certification because Plaintiff fails to demonstrate compliance with the prerequisites set forth in Rule 23, as detailed below in Sections III and IV.

Although Plaintiff ignores it (Mot. at I), "[t]he party seeking class certification bears the burden of satisfying Rule 23's prerequisites by a preponderance of the evidence." *Allen v. Koenigsmann*, 2023 WL 2731733, at *3 (S.D.N.Y. Mar. 31, 2023) (Preska, J.). Pleading compliance with Rule 23 is not enough: the plaintiff "must actually *prove*" it. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).

Therefore, before certifying a class, "a district court must make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, must resolve material factual disputes relevant to each Rule 23 requirement, and must find that each requirement is established by at least a preponderance of the evidence." *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 86 (S.D.N.Y. 2017) (Preska, J.) (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013)). The Court is free to review "affidavits, documents, or testimony." *Allen v. City of New York*, 2023 WL 171402, at *2 (S.D.N.Y. Jan. 12, 2023) (internal quotation marks and omitted).

### A.    Rigorous Analysis Required Regarding Rule 23(a) Compliance

Rule 23(a) sets forth "four requirements – numerosity, commonality, typicality, and adequate representation"[12] – which "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). The

---

[12] In addition, "[p]laintiffs must satisfy the implied requirement of 'ascertainability,'" which requires that the class be "defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Digital Music*, 321 F.R.D. at 86, 89 (internal quotation marks omitted).

absence of *any* of these requirements is fatal to class certification. *See*, *e.g.*, *Digital Music*, 321 F.R.D. at 72. And courts must engage in "rigorous analysis" regarding Rule 23(a) compliance, including "prob[ing] behind the pleadings" where appropriate. *Comcast Corp. v. Behrend*, 569 U.S. 33 (internal quotation marks omitted).

> **B.**     **An "Even More Demanding" Standard Applies to Rule 23(b)(3) Compliance**

Even if they satisfy every Rule 23(a) requirement, however, putative class action plaintiffs must clear another hurdle: "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Wal-Mart Stores*, 564 U.S. at 345-6. *See also Digital Music*, 321 F.R.D. at 85 ("If the Rule 23(a) criteria are satisfied, an action may be maintained as a class action only if it also qualified under at least one of the categories provided in Rule 23(b).").

Here, Plaintiff asserts predominance under Rule 23(b)(3), *see* Mot. at 11-12, which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also*, *e.g.*, *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 135-6 (S.D.N.Y. 2015), *aff'd*, 656 Fed. Appx 555 (2d Cir. 2016).

Courts "take a close look" at predominance, whose "criterion is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34 (internal quotation marks omitted).

## III.    PLAINTIFF FAILS TO ESTABLISH TYPICALITY UNDER RULE 23(A).

> **A.**     **Unique Defenses Destroy Typicality**

A putative class representative cannot obtain class certification without "show[ing], by a preponderance of the evidence, that [his] claims are typical of the claims of the class, and that [he]

is 'not subject to any unique defenses which threaten to become the focus of the litigation.'"[13] *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010). And Plaintiff's refusal to acknowledge this requirement in his Motion[14] does not erase it.

Where a defendant identifies unique defenses in opposition to class certification, the question "is not whether Plaintiffs could prevail at trial," but rather "whether unique defenses will unacceptably detract from the focus of the litigation to the detriment of absent class members." *Woodhams v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 2024 WL 1216595, at *10-11 (S.D.N.Y. Mar. 21, 2024). Thus, in analyzing typicality, the "Court need not resolve whether a unique defense would ultimately succeed on the merits; rather, certification must be refused if the Court is confronted with a sufficiently clear showing of the defense's applicability to the representative plaintiff." *Bowling v. Johnson & Johnson*, 2019 WL 1760162, at *4 (S.D.N.Y. Apr. 22, 2019)) (internal quotation marks omitted). Where unique defenses are "meritorious enough to require [plaintiffs] to devote considerable time to rebut them," class certification is inappropriate. *Woodhams*, 2024 WL 1216595, at *10-11 (internal quotation marks omitted).

## B.    Plaintiff Is Vulnerable to Unique Reliance Defenses

A defendant may "challeng[] a putative class representative's reliance on typicality grounds." *Villella v. Chem. & Min. Co. of Chile Inc.,* 2018 WL 2958361, at *6 (S.D.N.Y. June 13, 2018). Plaintiff's particular circumstances subject him to unique, meritorious defenses concerning

---

[13] In addition, "class certification is inappropriate not only where Proposed Class Representatives are subject to unique defenses … but also proposed class members." *Digital Music*, 321 F.R.D. at 87.

[14] Plaintiff seems intent on distracting from this requirement, citing *Trinidad v. Breakaway Courier Sys., Inc*., 2007 WL 103073, at *6 (S.D.N.Y. Jan. 12, 2007) for the proposition that "typicality 'should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members.'". (Mot. at 9). *Trinidad* did not involve a named plaintiff subject to unique defenses, however.

reliance, an "essential element" of his Section 10(b) claim. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). Those preclude him from using the rebuttable *Basic*[15] and *Affiliated Ute*[16] presumptions (Mot. at 12-13, 21-24) to satisfy the reliance element,[17] as set forth below.

### 1.    Plaintiff Continued to Buy Stock While This Lawsuit Was Pending

Plaintiff "'has the burden of pleading and proving *reasonable* reliance.'" *Eagle Equity Funds,* 2021 WL 371449, at \*4 (emphasis added). And "a section 10(b) claimant 'must allege and prove' that the claimant traded 'in ignorance of the fact that the price was affected by the alleged manipulation." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006), *decision clarified on denial of reh. sub nom., In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007). A plaintiff who "did not rely on the integrity of a stock's market price in trading in that security" may not rely on the *Basic* presumption. *Villella v. Chem. & Min. Co. of Chile Inc.*, 2018 WL 2958361, at \*6 (S.D.N.Y. June 13, 2018). And "a named plaintiff who is subject to an arguable defense of non-reliance on the market has been held subject to a unique defense, and therefore, atypical of the class under Rule 23(a)(3)." *Rocco v. Nam Tai Elecs., Inc.,* 245 F.R.D. 131, 136 (S.D.N.Y. 2007). Similarly, the *Affiliated Ute* presumption is rebutted where a defendant shows "by a preponderance of the evidence that disclosure of th[e] [withheld] information would not have altered the plaintiff's investment decision, or that through minimal diligence the investor could have uncovered the truth." *Gruber v. Gilbertson*, 692 F. Supp. 3d 303, 311 (S.D.N.Y. 2023). *See also Waggoner v. Barclays PLC*, 875 F.3d 79, 102 (2d Cir. 2017) ("the *Affiliated Ute* presumption

---

[15] This presumption, also known as the "fraud on the market" presumption (MTD Op. at 32), was "endorsed by the Court in *Basic Inc. v. Levinson*, 485 U.S. 224" *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement Sys.*, 594 U.S. 113 (2021).

[16] This refers to *Affiliated Ute Citizens of Utah v. U.S.* 406 U.S. 128 (1972).

[17] In his Motion, Plaintiff does not contend that he *directly* relied on any misrepresentation or omission by Defendant, *see, e.g., GAMCO Inv'rs, Inc. v. Vivendi, S.A.*, 927 F. Supp. 88, 97-98 (S.D.N.Y. 2013), *aff'd sub nom. GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214 (2d Cir. 2016); nor could he. Plaintiff has admitted that he purchased his shares due to "FOMO," not in reliance on any statement by Defendants. *See* above at 3-4.

is rebutted if a defendant proves 'by a preponderance of the evidence that the plaintiff did not rely on the omission [at issue] in making' his investment decision").

Here, Plaintiff is uniquely vulnerable to an argument that he did *not* rely on market price integrity, nor on Defendants' alleged omissions, because he continued to increase his CleanSpark holdings up until March 5, 2021 -- which is not just well after the issuance of the January 14, 2021 Culper Report and the January 20, 2021 commencement of this lawsuit but only *seventeen days before Plaintiff filed a motion in this very lawsuit seeking to be appointed lead plaintiff*.

Courts in this jurisdiction have held that a putative class representative who "increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative." *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (internal quotation marks omitted). *See also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (affirming denial of motion to intervene as class representative by party that "bought Rickel stock after the value had drastically declined amidst reports of financial difficulty"). And courts have refused to apply reliance presumptions to plaintiffs who purchase securities even after disclosure of the alleged fraud. *See Eagle Equity Funds, LLC v. Centrais Eletricas Brasileiras S/A/ - Eletrobras*, 2021 WL 371449, at *4 (S.D.N.Y. Feb. 3, 2021) (in case where plaintiffs had spent years challenging the defendants' position in Brazilian courts and thus "affirmatively *disbelieved* the statements at issue," *Basic* presumption had "no application"); *In re Vivendi Universal, S.A. Sec. Litig.*, 183 F. Supp. 3d 458, 466 (S.D.N.Y. 2016) ("a plaintiff who buys or sells stock with knowledge that the stock price was tainted by fraud is not entitled to the [*Basic*] presumption.").

While the law is mixed – some courts do not treat post-disclosure purchases as automatically disqualifying plaintiffs from invoking reliance presumptions with respect to

purchases that *pre-date* the alleged disclosure, *see, e.g., In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 46 (S.D.N.Y. 2012) ("[N]umerous courts have held [that] the fact that a putative class representative purchased additional shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not [the representative] relied on the integrity of the market … before the information at issue was corrected or changed") -- the bulk of the Class Period here *post-dates* the commencement of this lawsuit (and the Culper Report). Moreover, Plaintiff's circumstances are distinct: Plaintiff continued to buy shares despite the pendency of this very securities fraud lawsuit which, even before amendment, quoted the same Culper Report that remains central to Plaintiff's claims, including Culper's accusations of "fabricated" statements in the same December 10, 2020 press release at issue in the amended Complaint (OC ¶ 19; *e.g.*, ¶¶AC 45, 118) and Culper's postulations regarding Virtual Citadel's relationship to ATL and Marathon's withdrawn bid. (OC ¶ 19, e.g., AC ¶¶ 49-50, 63). Plaintiff's willingness to participate in the action as a lead plaintiff further suggests that he purchased despite "affirmatively disbeliev[ing]" CleanSpark's alleged statements. *Eagle Equity*, 2021 WL 371449, at *4.

**2.    Plaintiff Cannot Show Reliance on Statements After March 5, 2021**

In addition, Plaintiff is subject to another significant, unique defense: he cannot prove that he relied on any of the alleged misstatements that took place *after* his last transaction of CleanSpark securities on March 5, 2021, such as the alleged statements on March 26, 2021, April 15, 2021, and May 6, 2021 that Plaintiff alleges were "materially false and misleading" (AC ¶100). *See Halliburton*, 573 U.S. at 278 (one of the prerequisites to *Basic* presumption[18] is that "plaintiff traded the stock between when the misrepresentations were made and when the truth was

---

[18] The *Affiliated Ute* presumption does not apply for all of the reasons set forth above at 16-17 and below at 21-22.

18

revealed"); *Kely v. Elec. Arts, Inc.*, 71 F. Supp. 3d 1061, 1069-70 (N.D. Cal. 2014) ("Because lead plaintiffs cannot plead Section 10(b) reliance as to the five purported misstatements that post-date their EA stock purchase, those statements are inactionable as a matter of law.").

### C.    Plaintiff Is Subject to Unique Defenses Regarding Damages/Loss Causation

Here, Plaintiff is subject to unique defenses regarding economic damage and loss causation not only for the reasons set forth in Section I(A) but also because the very damages model Plaintiff submits in support of his Motion (*see generally* "Expert Report of Zahn Bozanic, Ph.D.," dated January 10, 2025 ("Bozanic Rep." (ECF 91-1)) fails to calculate any damages to him. That model depends upon *the date of sale*: In particular, Dr. Bozanic urges application of an "'out-of-pocket' method of calculating damages," which "calculates investor damages formulaically as the artificial inflation in the stock price at the time of an investor purchase minus the artificial inflation in the stock price *at the time of an investor sale*." Bozanic Rep. ¶ 77 (emphasis added).  Indeed, "sale information for the Class member's trades (including transaction dates and quantity of shares traded" is a formula "input[]" under this model. *Id.* ¶ 78. But that input is not available in Plaintiff's case: he has not sold his shares. Nor does the 90-day lookback period in Private Securities Litigation Reform Act of 1995 ("PSLRA"), which Dr. Bozanic indicates is relevant "[i]f shares are not sold prior to the full revelation of the fraud," support any finding of injury to Plaintiff here. As Dr. Bozanic acknowledges, that is merely a "cap on damages" Bozanic Rep. ¶ 77; it does not create them. *See* 15 U.S.C. § 78u-4(e) ("Limitation on damages").

### D.    These Unique Defenses Threaten to Become Litigation's Focus

The above unique defenses "threaten to become the focus of the litigation,"[19] *IMAX Sec. Litig.*, 272 F.R.D. at 147: Plaintiff's failure to prove the elements of reliance, economic loss, or

---

[19] Plaintiff's vulnerability to these key unique defenses likewise renders him an inadequate class representative under Rule 23(a)(4). *See Woodhams*, 2024 WL 1216595, at \*12 ("[t]he Court concludes that Plaintiffs would have to devote

loss causation would be fatal to both his claims in this action.[20] And, for all the reasons above, the unique defenses to which Plaintiff is subject are, at the very least, "meritorious enough to require [Plaintiff] to devote considerable time to rebut" them, rendering him atypical of the putative class. *Woodhams*, 2024 WL 1216595, at *10-11.

## IV.    PLAINTIFF FAILS TO ESTABLISH PREDOMINANCE

Plaintiff's failure to prove compliance with Rule 23(a) by itself mandates denial of his Motion for class certification. *See, e.g., Woodhams*, 2024 WL 1216595, at *12.  Even if the Court reaches Rule 23(b), however, it should deny the Motion because Plaintiff fails to show that common questions of law or fact predominate. *See* FRCP 23(b)(3); *Halliburton*, 573 U.S. at 276 (plaintiffs have "the burden of proving…that this [predominance] requirement is met"). In particular, this action would require individualized determinations of (i) reliance and (ii) damages that would overwhelm common issues, as set forth below.

### A.    Individual Reliance Questions Will Predominate

"Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton*, 563 U.S. at 810. *See also Arkansas Teachers Retirement Sys. v. Goldman Sachs Group, Inc.*, 879 F.3d 474, 482 (2d Cir. 2018). Thus, in a securities fraud case asserting violation of Section 10(b) – such as this one – the "plaintiff seeking

---

substantial attention to overcoming their damaging deposition testimony and addressing concerns regarding their credibility on material facts….Taken together, these issues render Plaintiffs inadequate class representatives"); *Rocco*, 245 F.R.D. at 135 ("As to the class representative specifically, where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation, certification for the class is improper because he or she can no longer act in the best interest of the class.") (internal quotation marks omitted).

[20]"The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton*, 563 U.S. 804, 809-10 (internal quotation marks omitted). And a claim under Section 20(a) of the Securities Exchange Act of 1934 requires, among other things, "a primary violation by the controlled person." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted).

20

class certification under Rule 23(b)(3) must demonstrate a common method of proving reliance," *Goodman v. Genworth Fin. Wealth Mgt., Inc.*, 300 F.R.D. 90, 102-3 (E.D.N.Y. 2014), *i.e.*, either the *Basic* or *Affiliated Ute* reliance presumptions. Without either of those, reliance would have to be proven individually "so common issues would not predominate over individual ones, as required by Rule 23(b)(3)." *Steginsky v. Xcelera, Inc.*, 2015 WL 1036985, at \*9 (D. Conn. Mar. 10, 2015), *aff'd*, 658 Fed. Appx. 5 (2d Cir. 2016).

Here, Plaintiff fails to demonstrate a common method of proving reliance: neither the *Affiliated Ute* nor the *Basic* presumption applies class-wide, for the reasons below.

### 1.    Discovery Shows *Affiliated Ute* Prerequisite Not Met

Plaintiff's allegations that FE1 sent her "report" to Defendants in January or February 2021 was key to the Court's holding that this case is "primarily" based on omissions and that the *Affiliated Ute* presumption therefore applies.[21] (MTD Op. at 2, 34). But discovery has disproven those allegations, revealing that (i) FE1 did not send any report whatsoever until March 3, 2021, which was after several of the Expansion Estimates on which Plaintiffs base their claims (*e.g.*, AC ¶¶ 90, 91, 93) and (ii) FE1 herself cautioned *against* reliance on the report. *See above* at 7. Discovery has likewise disproved Plaintiff's allegations of the remaining supposed omissions, which pertain to the Virtual Citadel bankruptcy and Marathon's withdrawal of its bid for the ATL Facility (Mot. at 2-3). See above at 7-8. Thus, this case is not primarily based on omissions, and the *Affiliated Ute* presumption therefore does not apply. *See, e.g., Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005).

---

[21] It is well-established that where a plaintiff's claims "do not *primarily* concern omissions," the *Affiliated Ute* presumption does not apply. *Goodman v. Genworth Fin. Wealth Mgt., Inc.*, 300 F.R.D. 90, 105-6 (E.D.N.Y. 2014).

**2.      Neither Presumption Applies to Post-January 20, 2021 Purchasers**

As set forth above at 12-13, the proposed class includes those who purchased CleanSpark shares during a period that extends until almost seven months after this very action began. OC ¶3. The pendency of this securities fraud lawsuit, on the heels of the Culper Report, is "a disclosure so forceful that it becomes unreasonable for an investor, or the market, to continue to be [allegedly] misled by" Defendants' alleged misstatements in this action. *GAMCO Inv'rs, Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 261-62 (S.D.N.Y. 2013) (internal quotation marks omitted). Thus, purchasers who purchased after January 20, 2021 are not entitled to invoke the *Basic* or *Affiliated Ute* presumptions. *See* above at e.g., 2, 17.

**3.      *Basic* Presumption Does Not Apply to Statements Made After Purchases**

In addition, for the same reasons above at 18-19, putative class members will be unable to invoke the *Basic* presumption to show reliance on statements that post-date their purchases.

**B.      Individual Causation, Injury, and Damages Issues Will Predominate**

"[I]t is incumbent upon Plaintiffs, not Defendants, to 'present a damages model that can be used on a classwide basis based on common proof.'" *Digital Music*, 321 F.R.D. at 92 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35). Further, that model "must be consistent with [the plaintiff's] liability case…." *Comcast*, 569 U.S. at 35 (internal quotation marks omitted). Thus, where putative class plaintiffs "fail[] to propose a model capable of measuring the damages attributable to their theory of liability," they "have not carried their burden of establishing that causation, injury, and damages are common issues susceptible to common proof." *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 452-53 (S.D.N.Y. 2023).

Plaintiff has not carried his burden. Here, Plaintiff's liability theory rests on "artificial inflation": Plaintiff claims that "damages can be readily calculated on a class-wide basis in this

22

action using" Dr. Bozanic's "event study methodology," under which "the artificial inflation caused by Defendants' material omissions can be measured on a class-wide basis by analyzing the change in the stock price caused by a corrective disclosure." (Mot. at 23; *see also* AC ¶138). For the reasons below, however, Dr. Bozanic's model is unable to measure damages class-wide in a manner consistent with Plaintiff's liability theory – as he essentially admitted during his recent deposition:

The premise of Plaintiff's theory is that alleged misstatements on or about December 10, 2020 artificially inflated the price of CleanSpark's stock and subsequent alleged misstatements maintained that inflation; according to Plaintiff, he and other putative class members were then damaged when each alleged corrective disclosure caused a decline in stock price. (AC ¶¶1-14). But Dr. Bozanic's analysis does not support the front-end or back-end price impact that Plaintiff alleges: First, Dr. Bozanic did not find *a statistically significant price increase* caused by the alleged December 10, 2020 misstatements (153:4-24), contrary to Plaintiff's allegations. (AC ¶ 40).

Second, Dr. Bozanic found no statistically significant price decline on *three of the four* alleged partial disclosure dates (Bozanic Rep. Ex. 6), including the January 14, 2021 Culper Report "publication" date -- thus undercutting Plaintiff's allegations that he and the putative class were damaged by stock price declines on those dates. (*E.g.*, AC ¶ 7). Dr. Bozanic also admitted as much in his deposition. *See* Bozanic Tr. 147:17- 158:6 (1/14/21, 1/15/21, and 2/12/21 drops not statistically significant); 175:4-11 (1/14/21 drop not statistically significant); 157:12-21 (1/15/21 drop not statistically significant); 157:22-158:6: (2/12/21 drop not statistically significant).

As for the fourth and final partial disclosure date – August 17, 2021, the only alleged disclosure date on which Dr. Bozanic found a statistically significant price decline (Bozanic Rep.,

23

Ex. 6) – Dr. Bozanic has identified no method that would determine the impact of confounding information[22] incorporated into the stock price on the same day as the alleged corrective disclosure. *See* Bozanic Rep. ¶91; Bozanic Tr. at 174:9 – 22 (*e.g.*, event study is "not distinguishing between individual elements of information that arrive throughout the day"). That is, Dr. Bozanic's model does not explain how to distinguish a stock price drop attributable to Defendant's alleged statement that the ATL expansion would be completed in the fall of 2021 (AC ¶ 111) from a stock price drop attributable to CleanSpark's earnings report, which occurred on the same date. *See* Bozanic Tr. at 179:4-15 ("This would be very tricky to disentangle with an event study. You would have to support – you'd have to show the result to say that the price moved; you would also have to concede that there were multiple elements of information arriving at the market at the same time. **And then beyond that, the event study does not tell you which piece of information was moving the market.**") (emphasis added).

Indeed, Dr. Bozanic repeatedly characterized carving out such information as "tricky," *e.g.,* Bozanic Tr. 177:3-179:20. In Dr. Bozanic's own words, "[F]rom a statistical perspective, it's difficult to disentangle whether information, element A versus B versus C, say that came out at 10:00 a.m., which, if the stock price did move, which was the element of information that was relied upon such that the price did move." *Id.* at 177:18-24.

Moreover, contemporaneous securities analyst reports do not even *mention* the "corrected" ATL Expansion date, and no analysts attributed the price decline on August 17 to the corrective information, contradicting Plaintiff's crucial allegation that the ATL Expansion date disclosure caused CleanSpark's stock price to decline (AC ¶12). (Partida Aff. Exs. F, G, and H).

---

[22] "It is not enough to claim that the price was artificially inflated when plaintiffs purchased the stock, because if some event not related to the misrepresentation caused the loss, then there is no § 10(b) liability." *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 123 (S.D.N.Y. 2004).

Finally, while the Complaint makes conclusory allegations regarding materialization of risk, which Dr. Bozanic acknowledges (Bozanic Rep. ¶ 15), Dr. Bozanic does not even purport to explain in his Report what the materialized risk was, much less how that would be factored into his damages model; his deposition testimony likewise fails to do so (Bozanic Tr. at 167-179). *See Indiana Pub. Retirement Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at \*24-5 (M.D. Tenn. Feb. 24, 2023) (denying class certification where plaintiff's expert "provided no explanation as to how the risk of AAC's deceptive marketing claims will be factored into Plaintiff's damages model—that is, how [plaintiff's expert] expects to show that the risk affected AAC's stock price at the time the risk was concealed or after it was materialized").

Far from proffering a class-wide damages model consistent with Plaintiff's liability theory, as Plaintiff was required to do to establish that common damages issues predominate, *see Digital Music*, 321 F.R.D. at 92, *Comcast*, 569 U.S. at 35, Plaintiff has made "clear that individual issues related to damage calculations would overwhelm questions common to the class." *Digital Music*, 321 F.R.D. at 93.

**CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's Motion.


DATED:   March 14, 2025
         New York, New York

                                             Respectfully submitted,


                                             /s/  Jay S. Auslander
                                             Jay S. Auslander
                                             Aari Itzkowitz
                                             David J. Partida
                                             Wilk Auslander LLP
                                             Worldwide Plaza
                                             825 Eighth Avenue,  Suite 2900
                                             New York, NY 10036
                                             Tel: (212) 981-2338

                                             *Attorneys for Defendants CleanSpark, Inc.,*
                                             *Zachary Bradford, and S. Matthew Schultz*

26