**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SCOTT BISHINS and DARSHAN HASTHANTRA, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    v.<br><br>CLEANSPARK, INC., ZACHARY BRADFORD, and S. MATTHEW SCHULTZ,<br><br>        Defendants. | Case No. 1:21-cv-00511-LAP<br><br>**DECLARATION OF DAVID J. PARTIDA** |

DAVID J. PARTIDA hereby declares as follows:

1.      I am a member of the bar of this Court and an associate with the law firm of Wilk Auslander LLP, counsel to Defendants CleanSpark, Inc. ("CleanSpark"), Zachary Bradford, and S. Matthew Schultz (collectively, "Defendants") in the above-captioned matter.

2.      I make this Declaration on personal knowledge, for the purpose of providing the Court with documents relied upon by Defendants in support of Defendants' Opposition to Plaintiff's Motion for Class Certification filed concurrently herewith, dated March 14, 2025.

3.      Attached hereto as **Exhibit A** is a true and correct copy, excepting the exhibits thereto, of CleanSpark's annual report for the fiscal year ending September 30, 2021, filed with the Securities and Exchange Commission ("SEC") on Form 10-K on December 14, 2021.

4.      Attached hereto as **Exhibit B** is a true and correct copy, excepting the exhibits thereto, of CleanSpark's quarterly report for the quarter ending December 31, 2021, filed with the SEC on Form 10-Q on February 9, 2022

1

2

5.      Attached hereto as **Exhibit C** is a true and correct copy of the excerpts of the Confidential Transcript of the July 10, 2024 Deposition of Lisa DeKalb, and exhibits, cited in Defendants' opposition being filed concurrently herewith.

6.      Attached hereto as **Exhibit D** is a true and correct copy of the excerpts of the Confidential Transcript of the February 27, 2025 Deposition of Zahn Bozanic, Ph.D., cited in Defendants' opposition being filed concurrently herewith.

7.      Attached hereto as **Exhibit E** is a true and correct copy of the excerpts of the Confidential Transcript of the July 19, 2024 Deposition of Lead Plaintiff, Darshan Hasthantra, cited in Defendants' opposition being filed concurrently herewith.

8.      Attached hereto as **Exhibit F** is a true and correct copy of H.C. Wainwright&Co.'s Earnings Update with F3Q21 Results Update, dated August 18, 2021.

9.      Attached hereto as **Exhibit G** is a true and correct copy of CleanSpark, Inc.'s 3Q21 Update of Revenue Growth, dated August 19, 2021.

10.     Attached hereto as **Exhibit H** is a true and correct copy of CleanSpark, Inc.'s Fireside Chat Invitation for the WTR Fireside Chat Series, dated August 20, 2021.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on March 14, 2025, New York, New York.

Respectfully submitted,

*/s/ David J. Partida*
David J. Partida

2

**EXHIBIT A**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended **September 30, 2021**

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number**: 001-39187**

# CleanSpark, Inc.

(Exact name of registrant as specified in its charter)

| **Nevada** | **87-0449945** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| **2370 Corporate Circle, Suite 160** | |
| **Henderson, Nevada** | **89074** |
| (Address of principal executive offices) | (Zip Code) |

Registrants telephone number, including area code: **(702) 941-8047**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.001 per share** | **CLSK** | **The Nasdaq Stock Market LLC** |

Securities registered pursuant to Section 12(g) of the Act: **N/A**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [X] No [ ]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes [ ] No [X]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes [X] No [ ]

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes [X] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of large accelerated filer, accelerated filer, smaller reporting company, and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| ☒ Large accelerated Filer | ☐ Accelerated Filer |
|---|---|
| ☐ Non-accelerated Filer | ☐ Smaller reporting company |
| | ☐ Emerging growth company |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. **[ ]**

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes [ ] No [X]

The aggregate market value of the common stock held by non-affiliates as of March 31, 2021 (the last business day of the registrants most recently completed

second fiscal quarter), was approximately $702,832,610 based on the per share closing price as of March 31, 2021 quoted on the Nasdaq Capital Market for the registrant's common stock, which was $23.89.

As of December 14, 2021, there were 41,447,776 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain portions of the registrant's definitive proxy statement to be delivered to its shareholders in connection with the registrant's 2022 Annual Meeting of Shareholders are incorporated by reference into Part III of this Annual Report on Form 10-K. Such definitive proxy statement will be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**CLEANSPARK, INC.**
**TABLE OF CONTENTS**
**Form 10-K for the Fiscal Year Ended**
**September 30, 2021**

Page

PART I

| | | |
|---|---|---|
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 32 |
| Item 2. | Properties | 32 |
| Item 3. | Legal Proceedings | 33 |
| Item 4. | Mine Safety Disclosures | 33 |

PART II

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 34 |
| Item 6. | [Reserved] | 34 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 35 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 42 |
| Item 8. | Financial Statements and Supplementary Data | 42 |
| Item 9. | Changes In and Disagreements With Accountants on Accounting and Financial Disclosure | 43 |
| Item 9A. | Controls and Procedures | 43 |
| Item 9B. | Other Information | 45 |

PART III

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 45 |
| Item 11. | Executive Compensation | 45 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 45 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 45 |
| Item 14. | Principal Accountant Fees and Services | 45 |

PART IV

| | | |
|---|---|---|
| Item 15. | Exhibit and Financial Statement Schedules | 46 |

## FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains certain statements that are, or may be deemed to be, forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act") and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These forward-looking statements may include terminology such as "aim," "anticipate," "assume," "believe," "contemplate," "continue," "could," "due," "estimate," "expect," "goal," "intend," "may," "objective," "plan," "predict," "potential," "positioned," "seek," "should," "target," "will," "would," and other similar expressions that are predictions of or indicate future events and future trends, or the negative of these terms or comparable terminations. These forward-looking statements include, but are not limited to, statements regarding future operating results, potential risks pertaining to these future operating results, future plans or prospects, anticipated benefits of proposed (or future) acquisitions, dispositions and new facilities, growth, the capabilities and capacities of business operations, any financial or other guidance, expected capital expenditures and all statements that are not based on historical fact, but rather reflect our current expectations concerning future results and events. These forward-looking statements are based on management's current expectations, estimates, forecasts, and projections about our business and the industry in which we operate, as well as the economy, trends and other future conditions, and are subject to significant risks and uncertainties, and are subject to changes based on various factors, some of which are beyond our control. Therefore, we can give no assurance that the results implied by these forward-looking statements will be realized. Furthermore, the inclusion of forward-looking information should not be regarded as a representation by the Company or any other person that future events, plans or expectations contemplated by the Company will be achieved. The following important factors, among others, could affect future results and events, causing those results and events to differ materially from those expressed or implied in our forward-looking statements:

- our ability to achieve profitability, and to maintain profitability, in the future;

- high volatility in the value attributable to our business;

- the rapidly changing regulatory and legal environment in which we operate, may lead to unknown future challenges to operating our business or which may subject our business to added costs and/or uncertainty regarding the ability to operate;

- our ability to keep pace with technology changes and competitive conditions;

- our ability to execute on our business strategy; and

- other risks and uncertainties related to our business plan and business strategy.

For a further list and description of various risks, factors and uncertainties that could cause future results or events to differ materially from those expressed or implied in our forward-looking statements, see the Risk Factors and Management's Discussion and Analysis of Financial Condition and Results of Operations sections contained in this document, and any subsequent reports on Form 10-Q and Form 8-K, and other filings we make with the Securities and Exchange Commission ("SEC"). Given these risks and uncertainties, the reader should not place undue reliance on these forward-looking statements.

All forward-looking statements included in this Annual Report on Form 10-K are made only as of the date of this Annual Report on Form 10-K, and we do not undertake any obligation to publicly update or correct any forward-looking statements to reflect events or circumstances that subsequently occur, or of which we hereafter become aware. You should read this document completely and with the understanding that our actual future results or events may be materially different from what we expect. All forward-looking statements attributable to us are expressly qualified by these cautionary statements.

Information regarding market and industry statistics contained in this report is included based on information available to us that we believe is accurate. It is generally based on industry and other publications that are not produced for purposes of securities filings or economic analysis. Forecasts and other forward-looking information obtained from these sources are subject to the same qualifications and the additional uncertainties accompanying any estimates of future market size, revenue and market acceptance of products and services. We do not undertake any obligation to publicly update any forward-looking statements. As a result, investors should not place undue reliance on these forward-looking statements.

3

PART I

**Item 1. Business**

As used in this Annual Report on Form 10-K, the terms "we," "us," "our," the "Company," "CleanSpark, Inc." and "CleanSpark" mean CleanSpark, Inc. and its consolidated subsidiaries, unless otherwise indicated.

**Overview**

CleanSpark, Inc. is a leading bitcoin mining and diversified energy company incorporated in Nevada, whose common stock is listed on the Nasdaq Capital Market. We sustainably mine bitcoin; we also provide advanced energy technology solutions to commercial and residential customers to solve modern energy challenges. The Company, through itself and its wholly owned subsidiaries, has operated in the digital currency mining sector since December 2020, and in the alternative energy sector since March 2014.

We are currently working with industry leaders and other advisors in developing a long-term sustainability and clean energy plan. We are also using all available clean and renewable energy resources that we currently have reasonable access to in all of our bitcoin mining locations in order to further support our sustainability efforts.

**Lines of Business**

*Digital Currency Mining Segment*

Through our wholly owned subsidiaries, ATL Data Centers LLC ("ATL") and CleanBlok, Inc. ("CleanBlok"), we mine bitcoin. We entered the bitcoin mining industry through our acquisition of ATL in December 2020. We acquired a second data center in August 2021 and have had a co-location agreement with New York-based Coinmint in place since July 2021. Bitcoin mining has now become our principal revenue generating business activity. We currently intend to continue to acquire additional facilities, equipment and infrastructure capacity to continue to expand our bitcoin mining operations.

Bitcoin was introduced in 2008 with the goal of serving as a digital means of exchanging and storing value. Bitcoin is a form of digital currency that depends upon a consensus-based network and a public ledger called a "blockchain," which contains a record of every bitcoin transaction ever processed. The bitcoin network is the first decentralized peer-to-peer payment network, powered by users participating in the consensus protocol, with no central authority or middlemen, that has wide network participation. The authenticity of each bitcoin transaction is protected through digital signatures that correspond with addresses of users that send and receive bitcoin. Users have full control over remitting bitcoin from their own sending addresses. All transactions on the bitcoin blockchain are transparent, allowing those running the appropriate software to confirm the validity of each transaction. To be recorded on the blockchain, each bitcoin transaction is validated through a proof-of-work consensus method, which entails solving complex mathematical problems to validate transactions and post them on the blockchain. This process is called mining. Miners are rewarded with bitcoins, both in the form of newly-created bitcoins and fees in bitcoin, for successfully solving the mathematical problems and providing computing power to the network.

Factors such as access to computer processing capacity, interconnectivity, electricity cost, environmental factors (such as cooling capacity) and location play important roles in mining. As of the date of this filing, our mining units are currently capable of producing over 1.3 exahash/s ("EH") in hash rate capacity. In cryptocurrency mining, "hash rate" is a measure of the processing capacity and speed by which a mining computer mines and processes transactions on the bitcoin network. Our activities in this area are complemented by our energy background and planning is underway to deploy our portfolio of energy technologies to advance our bitcoin mining business, with the goal of maximizing energy savings, increasing total power capacity, providing resilient electricity, and reducing greenhouse gas emissions. We are expanding our bitcoin mining business with the goal of reaching 2.0 EH/s in hashrate capacity at or near the end of December 31, 2021. We expect to exceed 3 EH/s in capacity by mid-to-late 2022. Hash rate capacity is one of the most important metrics for evaluating bitcoin mining companies.

We obtain bitcoin as a result of our mining operations; while we retain a significant portion of the bitcoin, we have sold, and intend to sell bitcoin from time to time, to support our operations and strategic growth. We do not currently plan to engage in regular trading of bitcoin (other than as necessary to convert our bitcoin to U.S. dollars) or to engage in hedging activities related to our holding of bitcoin; however, our decisions to hold or sell bitcoin at any given time may be impacted by the bitcoin market, which has been historically characterized by significant volatility. Currently, we do not use a formula or specific methodology to determine whether or when we will sell bitcoin that we hold, or the number of bitcoins we will sell. Rather, decisions to hold or sell bitcoins are currently determined by analyzing forecasts and monitoring the market in real time.

4

Through our recently formed wholly owned subsidiaries, CSRE Properties, LLC, CSRE Property Management Company LLC, and CSRE Properties Norcross, LLC, we maintain real property holdings for ATL and CleanBlok.

*Energy Segment*

We provide energy solutions through our wholly-owned subsidiaries CleanSpark, LLC, CleanSpark Critical Power Systems, Inc., GridFabric, LLC, and Solar Watt Solutions, Inc. These solutions consist of engineering, design and software solutions, custom hardware solutions, Open Automated Demand response ("OpenADR"), solar, energy storage for microgrid and distributed energy systems to military, commercial and residential customers in Southern California and through the world.

Our solutions are supported by our proprietary suite of software platforms (collectively, the "Platforms") that include microgrid energy modeling, energy market communications and energy management solutions as summarized below:

- **mPulse and mVoult:** Patented, proprietary controls platforms that enable integration and optimization of multiple energy sources.
- **Canvas:** Middleware used by grid operators and aggregators to administrate load shifting programs.
- **Plaid:** Middleware used by controls and IoT (internet-of-things) product companies to participate in load shifting programs.
- **mVSO:** Energy modeling software for internal microgrid design .

The Platforms were developed to enable the designing, building, and operating of distributed energy systems and microgrids which efficiently manage energy assets. These strategies are generally targeted to achieve resiliency and economic optimization.

We also own patented gasification energy technologies. Our technology converts organic material into synthesis gas, which can be used as fuel for a variety of applications and as feedstock for the generation of DME (Di-Methyl Ether). As previously disclosed, we currently plan to continue to focus on our other offerings.

*Other business activities*

Through p2kLabs, Inc., we provide design, software development, and other technology-based consulting services. The services provided are generally hourly or fixed-fee project-based arrangements.

Through ATL, we also provide traditional data center services, such as providing customers with rack space, power and equipment, and offer several cloud services including virtual services, virtual storage, and data backup services.

**Markets, Geography and Major Customers**

*Digital Currency Mining Segment*

Bitcoin is a global store and exchange of value used by people across the world as an asset and to conduct daily transactions. Mining bitcoin supports the global bitcoin blockchain and the millions of people that depend on it for economic security and other benefits. Strictly speaking, there is no customer market for mining bitcoin but we consider our mining pool operators as customers because they compensate us for providing processing power to the mining pool (see Item 1A. Risk Factors for more information on our mining pool operators). We own and operate our own facilities and do not lease mining space to other mining companies or private individuals that mine. Our wholly-owned mining operations are located in the State of Georgia in the United States. We also have a relationship with a facility located in New York State that hosts a portion of our miners.

*Energy Segment*

Around the world, an aging energy infrastructure is becoming unstable and unreliable due to increases in loads and limited new, large-scale generation facilities. This inherent instability is compounded by the push to integrate a growing number and variety of renewable but intermittent energy generation assets and advanced technologies into outdated electrical grid systems. Defense installations, industrial complexes, communities, campuses and other aggregators across the world are turning to microgrids as a means to decrease their reliance on the grid, reduce utility costs, utilize cleaner power, and enhance energy security.

The Company's products and services predominantly serve the energy markets throughout the Americas in the residential, commercial, and industrial sectors. Federal, state and local governmental bodies provide incentives to owners and system integrators of solar energy systems to promote renewable energy in the form of rebates, tax credits, and other similar incentives. These incentives help to catalyze customer acceptance of renewable energy systems as an alternative to utility-provided power. Over the most recent year, our energy business operated extensively in California's residential energy markets by participating in the state's Self-Generation Incentive Program ("SGIP").

For the years ended September 30, 2021 and 2020, respectively, 61.2% and 64.8% of our total energy revenues were associated primarily with three customers. A loss or decline in business with these customers could have an adverse impact on our business, financial condition, and results of operations.

We provide our hardware products under manufacturing and distribution agreements. We provide our software and services at customer locations and from our office located in Carlsbad, California.

**Working Capital Items**

*Digital Currency Mining Segment*

The bitcoin mining industry is highly competitive and dependent on specialized mining machines that have few manufacturers. Machine purchases require large down payments and miner deliveries often arrive many months after initial orders are placed.

At the time the Company acquired ATL in December 2020, the Company had approximately 3,471 bitcoin mining units with application-specific integrated circuits ("ASICs") in operation, which produced approximately 190 petahash/s. Since acquiring ATL, the Company has expanded its operations and purchased additional ASICs. The Company now has 12,900 ASICs (as of the date of this filing) in daily operation, which are producing approximately 1.3 EH/s. In addition to the ASICs in operation, the Company has also entered into futures contracts, pursuant to which it has pre-paid significant down payments to acquire additional mining machines. The majority of miners we operate and expect to operate once received are the latest generation Antminers manufactured by Bitmain, including the S19, S19-Pro, and S19j-Pro. We believe that Bitmain's miners are the most efficient and productive miners currently on the market, though that may change as new manufacturers enter the market.

In addition to our currently deployed fleet of approximately 12,900 latest-generation miners (as of the date of this filing), we have purchased an additional 26,830 miners that are slated for delivery over the next 12 months. With the full deployment of these miners, our total fleet will consist of approximately 38,610 miners.

*Energy Segment*

We currently possess a significant amount of inventory, however, our short-term demand currently exceeds our current inventory levels. We are actively working with our current suppliers to satisfy our short-term and anticipated long-term needs. Due to current supply chain dynamics worldwide constraining our ability to secure certain inventory, these constraints have resulting in a significant customer backlog.

**Distribution, Marketing and Strategic Relationships**

*Digital Currency Mining Segment*

We have developed strategic relationships with well-established companies in key areas including traditional and renewable energy, infrastructure, and bitcoin mining equipment procurement.

6

Coinmint

In addition to operating our own mining facilities, we may engage with third-parties to operate mining equipment on behalf of the Company. On July 8, 2021, CleanBlok entered into a services agreement with Coinmint, LLC ("Coinmint"). Pursuant to the agreement, Coinmint has agreed to house and power certain of our cryptocurrency mining equipment in its facilities, and to use commercially reasonable efforts to mine bitcoin on our behalf. All bitcoin mining services performed by Coinmint are conducted using mining equipment owned by the Company. As of the date of this filing, we have received and deployed approximately 6,700 total miners pursuant to the co-location mining services agreement at Coinmint's facility in New York.

Pursuant to the agreement, as consideration for the services, we pay Coinmint certain services fees, which are based on the operating costs incurred by Coinmint in performing the services, and a variable fee calculated based on the profitability of the bitcoin mined during the relevant payment period, subject to uptime performance commitments. The agreement has an initial term of one year, after which it will renew automatically for three-month periods until terminated in accordance with the terms of the agreement.

*Energy Segment*

We have developed strategic relationships with well-established companies in key areas including distribution and manufacturing. We sell our products worldwide, with a primary focus on Southern California and the Americas, through our direct product sales force, and partner networks.

**Materials and Suppliers**

*Digital Currency Mining Segment*

We engage in high efficiency bitcoin mining by using ASICs. These specialized computers, often called mining rigs, have few manufacturers. A majority of the machines we purchased this year were manufactured by Bitmain, a Chinese company and the preeminent manufacturer of bitcoin mining rigs.

In addition to ASICS, mining equipment includes networking equipment, power cords, racking, other specialized storage, transformers, and energy. We rely on utility providers for our power needs. These utilities buy into local energy mixes to source power. We make every effort to establish our facilities in locations serviced by utilities that generate a substantial portion of their energy from clean and renewable sources. We supplement the energy mix provided by our partners with the purchase of renewable energy credits because the precise ratio of renewable energy in local energy mixes is not within our control. We also intend to generate a portion of our own power through renewable solar energy by installing our microgrid solutions at our mining centers.

Historically, we have been able to manage our supply chains effectively, but global supply chains are highly constrained, and we are experiencing substantial increases in shipping costs and unprecedented logistical delays as we make efforts to ensure timely delivery of equipment. There can be no certainty that we will not be affected in the future, and we believe that there is significant risk that equipment supply chains will be affected in 2022. Inflationary pressures may also impact our fiscal year 2022.

*Energy Segment*

Although most components essential to our energy business are generally available from multiple sources, we believe there are component suppliers and manufacturing vendors whose loss to us could have an adverse effect on our business and financial condition. The Company also currently engages a contract manufacturer, whereby they exclusively manufacture parallel switchgear, automatic transfer switches and related control and circuit protective equipment for us. The Company sources energy storage devices (batteries) from a variety of vendors based on availability, cost, and quality. If we fail to maintain or expand our relationships with our suppliers and manufacturers, or if one or more that we rely upon to meet anticipated demand reduces or ceases production, it may be difficult to quickly identify and qualify alternatives on acceptable terms. In addition, equipment prices may increase in the coming years, or not decrease at the rates we historically have experienced, due to tariffs or other factors.

In 2021, we experienced periodic supply chain constraints around certain inventory items, most notably battery energy supply systems. Global supply chains are highly constrained, and unprecedented logistical delays have the potential to impact our abilities timely delivery of equipment. There can be no certainty that we will not be affected in the future, and we believe that there is significant risk that equipment supply chains will be affected in 2022. Inflationary pressures may also impact our fiscal year 2022.

**Environmental Issues**

*Digital Currency Mining and Energy Segments*

No significant pollution or other types of hazardous emission result from the Company's direct operations and it is not anticipated that our operations will be materially affected by federal, state or local provisions concerning environmental controls. Our costs of complying with environmental, health and safety requirements have not been material. Starting in the fourth calendar quarter of 2021, we began to voluntarily purchase renewable energy credits to offset a significant portion of our energy usage that is derived from non-renewable sources. The Company has also engaged market professionals to enhance and build a comprehensive environmental, social and governance ("ESG") strategy.

We do not believe that existing or pending climate change legislation, regulation, or international treaties or accords are reasonably likely to have a material effect in the foreseeable future on our business or markets that we serve, nor on our results of operations, capital expenditures or financial position. We continue to monitor emerging developments in this area.

**Competition**

*Digital Currency Mining Segment*

Bitcoin mining is a global activity. During our most recent fiscal year, a majority of bitcoin mining occurred in China. After China banned bitcoin mining in May 2021, the center of mining moved to North America. Although bitcoin mining by its nature is not a directly competitive business, all miners compete for bitcoin rewards; based on this, we define competitors as other bitcoin miners. Our competitors include large, publicly-listed mining companies, large private mining companies, and, in some cases, independent, individual miners who pool resources. We believe our principal competitive factors include our energy technology background, a combination of owned, operated, and co-located miners and facilities, our strategic use of the bitcoin we mine to fund growth, and our commitment to sustainable business practices, including sourcing renewable energy. Within North America, our major competitors include:

1) Marathon Digital Holdings
2) Riot Blockchain, Inc.
3) Greenidge Generation Holdings
4) Bit Digital, Inc.
5) Hut 8 Mining Corp.
6) Hive Blockchain Technologies
7) Compute North
8) Core Scientific
9) Bitfarms LTD.

In addition to the foregoing, we compete with other companies that focus all or a portion of their activities on mining activities at scale. We face significant competition in certain operational aspects of our business, including, but not limited to, the acquisition of new miners, obtaining the lowest cost of electricity, obtaining clean energy sources, obtaining access to energy sites with reliable sources of power, and evaluating new technology developments in the industry.

*Energy Segment*

The markets we address in our energy operations are characterized by the presence of both new start-ups and well-established product providers. This industry is capital intensive and highly competitive. The ability to compete effectively is determined by product features, scalability, relative price, lifetime operating cost, product durability and reliability, safety, ease of integration, customer support, design innovation, marketing and distribution capability, service and support and corporate reputation.

We offer turnkey energy solutions which include system design, installation and grid integration. Our Platforms are capable of interoperating with the local utility grid to help users optimize power for their homes or businesses. Our solutions are vendor agnostic. Our solutions are ideal for commercial, industrial, mining, defense, campus and community users, both small and large, with an aim to deliver power at or below the customers cost of utility power. These attributes contribute to our ability to compete with larger, more established competitors. Our major competitors include:

1) Schneider Electric
2) Siemens
3) Spirae
4) Ageto Energy
5) PowerSecure
6) ABB
7) Homer
8) Tesla

**Intellectual Property**

*Digital Currency Mining Segment*

We do not currently own any patents in connection with our existing and planned digital currency mining related operations. We do rely, and expect to continue relying, upon trade secrets, trademarks, service marks, trade names, copyrights and other intellectual property rights.

*Energy Segment*

In relation to our microgrid business, we own the following patent: Patent No. 9,941,696 B2 "Establishing Communication and Power Sharing Links Between Components of a Distributed Energy System," awarded April 10, 2018, which addresses our engineering and data-analytics technologies, processes and procedures. The patent covers our ability to receive data from a plurality of sources within a microgrid, which is then analyzed to forecast power needs across the microgrid, or a combination of multiple 'fractal' microgrids, and then determining whether or when to share power with the requesting module.

In relation to our legacy gasifier business, we own the following patents: Patent No. 9,359,567 "Gasification Method Using Feedstock Comprising Gaseous Fuels;" Patent No. 8,518,133 "Parallel Path, Downdraft Gasifier Apparatus and Method;" Patent No. 8,105,401 "Parallel Path, Downdraft Gasifier Apparatus and Method;" Patent No. 8,347,829 "Electrolytic Reactor and Related Methods for Supplementing the Air Intake of an Internal Combustion Engine." Another patent, "Parallel Path Downdraft Gasifier Apparatus and Method, US 9,890, 340 B2," awarded February 13, 2018, further enhanced our patent portfolio surrounding our proprietary gasification and waste-to-energy technologies. Our patents begin to expire between 2028 and 2035.

**Government Regulation**

*Digital Currency Mining and Energy Segments*

We are subject to federal, state and local laws and regulations governing environmental quality and pollution control. It is anticipated that, absent the occurrence of an extraordinary event, compliance with existing federal, state and local laws, rules and regulations concerning the protection of the environment and human health will not have a material effect upon us, our capital expenditures, or earnings. We cannot predict the effects of any additional regulation or legislation, enforcement policies thereunder and claims for damages for injuries to property, employees, other persons and the environment resulting from our

operations. Our operations are subject to environmental regulation by state and federal authorities including the Environmental Protection Agency ("EPA"). This regulation has not increased the cost of planning, designing and operating to date. Although we believe that compliance with environmental regulations will not have a material adverse effect on our operations or results of these operations, there can be no assurance that significant costs and liabilities, including criminal or civil penalties, will not be incurred. Moreover, it is possible that other developments, including stricter environmental laws and regulations, and claims for damages for injuries to property or persons resulting from our activities could result in substantial costs and liabilities.

In the conduct of our activities, our operations will be subject to the requirements of the federal Occupational Safety and Health Act ("OSHA") and comparable state statutes. The OSHA hazard communication standard, the EPA community right-to-know regulations under Title III of the federal Superfund Amendment and Reauthorization Act and similar state statutes require us to organize information about hazardous materials used, released or produced in our operations. Certain of this information must be provided to employees, state and local governmental authorities and local citizens. We are also subject to the requirements and reporting set forth in OSHA workplace standards.

Blockchain technologies and digital currencies, including bitcoin, are increasingly becoming subject to governmental regulation, both in the U.S. and internationally. Blockchain technologies and cryptocurrency are under review with a number of U.S. governmental agencies, including, without limitation, the SEC, the Commodity Futures Trading Commission, the Federal Trade Commission and the Financial Crimes Enforcement Network of the U.S. Department of the Treasury. State and local regulations also may apply to our digital currency mining. Other governmental or quasi-governmental regulatory bodies have shown an interest in regulating or investigating companies engaged in digital currency related business. For instance, the Cyber-Digital Task Force of the U.S. Department of Justice (the "DOJ") published a report entitled "Cryptocurrency: An Enforcement Framework" in October 2020. This report provides a comprehensive overview of the possible threats and enforcement challenges the DOJ views as associated with the use and prevalence of digital currencies, amongst other things. Further, in early March 2021, the SEC chairperson nominee expressed an intent to focus on investor protection issues raised by cryptocurrencies.

Presently, we do not believe any U.S. or State regulatory body has taken any action or position adverse to our digital currency mining activities; however, future changes to existing regulations or entirely new regulations may affect our business in ways it is not presently possible for us to predict with any reasonable degree of reliability.

In addition, regulators and the media have expressed concerns related to the potential environmental impacts of bitcoin mining, and its energy-intensive nature in particular. We are not materially impacted by any current regulations targeted toward the digital currency mining industry.

Other than the above regulations and maintaining our good standing in the states in which we operate, complying with applicable local business licensing requirements, complying with all state and federal tax requirements, preparing our periodic reports under the Securities Exchange Act of 1934, as amended, and complying with other applicable securities laws, rules, and regulations, we do not believe that existing governmental regulations will have a material effect on our operations. Certain governmental and quasi-governmental bodies are considering additional regulations in the bitcoin mining and energy industries; it is not currently known whether any such regulations would have a material impact on our businesses. We do not currently require the approval of any governmental agency or affiliated program for our operations.

In the future we may become subject to new laws and/or regulations, such as further regulation by the SEC and other agencies, which may affect our digital currency mining and other activities. For additional discussion regarding our belief about the potential risks existing and future regulation pose to our business, see the Section entitled "Risk Factors," below.

**Product Development**

*Digital Currency Mining and Energy Segments*

Because the distributed energy and related software industry is still in a relatively early state of adoption, our ability to compete successfully is heavily dependent upon our ability to ensure a continual and timely flow of competitive products, services, and technologies to the marketplace. We continue to enhance our existing products in order to drive further commercialization. We may also expand the range of our product offerings and intellectual property through licensing and/or acquisition of third-party business and technology.

Bitcoin mining by its nature has no products.

10

**Human Capital Resources; Employees; Personnel**

*Digital Currency Mining and Energy Segments*

We believe that our future success depends, in part, on our ability to continue to attract, hire, and retain qualified personnel. As of December 1, 2021, we had 87 staff members, 86 of which were full time. Employees participate in equity incentive plans and receive generous compensation in the form of salary and benefits. We continually seek to hire and retain talented professionals, although the competition for such personnel in our segments is significant. None of our employees are represented by a labor union, and we have never experienced a work stoppage.

**Company Websites**

We maintain a corporate website at: www.cleanspark.com and informational websites for our subsidiaries at www.cleanblok.com, www.gridfabric.io, and www.p2klabs.com.

The contents of these websites are not incorporated in, or otherwise to be regarded as part of, this Annual Report.

We file reports with the SEC, which are available on our website free of charge. These reports include annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, Section 16 filings on Form 3, Form 4, and Form 5, and other related filings, each of which is provided on our website as soon as reasonably practical after we electronically file such materials with or furnish them to the SEC. In addition, the SEC maintains a website (www.sec.gov) that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC, including the Company.

**Item 1A. Risk Factors**

*We are subject to various risks that may materially harm our business, prospects, financial condition and results of operations. An investment in our common stock is speculative and involves a high degree of risk. In evaluating an investment in shares of our common stock, you should carefully consider the risks described below, together with the other information included in this Annual Report.*

*The risks described below are not the only risks we face. If any of the events described in the following risk factors actually occurs, or if additional risks and uncertainties later materialize, that are not presently known to us or that we currently deem immaterial, then our business, prospects, results of operations and financial condition could be materially adversely affected. In that event, the trading price of our common stock could decline, and you may lose all or part of your investment in our shares. The risks discussed below include forward-looking statements, and our actual results may differ substantially from those discussed in these forward-looking statements.*

**Risk Factors Summary**

*Below is a summary of the principal factors that make an investment in our common stock speculative or risky. This summary does not address all of the risks that we face. Additional discussion of the risks summarized in this risk factor summary, and other risks that we face, can be found below and should be carefully considered, together with other information included in this Annual Report.*

- risks arising from pandemics, epidemics or an outbreak of diseases, such as the recent outbreak of the COVID-19 pandemic;
- supply chain and shipping disruptions have resulted in shipping delays, a significant increase in lead times and shipping costs, and could increase product costs and result in lost sales and bitcoin production;
- our limited operating history and history of operating losses and negative cash flow;
- volatile and unpredictable cycles in the emerging and evolving industries in which we operate;
- competition in the markets in which we operate;
- our reliance on intellectual property rights to protect our technology;
- our ability to manage our suppliers and contract manufacturers;

11

- our relationships with certain key customers;
- our limited experience selling our distributed energy focus products and solutions for use in residential markets;
- the concentration of our solar energy business in Southern California;
- potential product defect or liability suits, or any recall of our products;
- our reliance on our management team, and any failure by management to properly manage growth;
- future strategic acquisitions and other arrangements that we engage in, which could disrupt our business, cause dilution to our stockholders, reduce our financial resources and harm our operating results;
- our substantial dependency on utility rate structures and government incentive programs that encourage the use of alternative energy sources;
- our need for financing in the future to sustain and expand our operations and any inability to obtain such financing on acceptable terms, or at all;
- potential changes in laws and regulations applicable to digital currencies, or interpretations thereof, including, without limitation, banking regulations and securities regulations and regulations governing mining activities, both in the U.S. and in other countries;
- the uncertain impact of geopolitical and economic events on the demand for bitcoin;
- our exposure to pricing risk and volatility associated with the value of bitcoin because we do not hedge our investment in bitcoin;
- the development and acceptance of competing blockchain platforms or technologies;
- challenges of scaling bitcoin, which, if not overcome, may lead to high fees or slow transaction settlement times;
- the reward for successfully solving a block will halve in the future and its value may not adjust to compensate us for the reduction in the rewards we receive from our mining efforts;
- potential actions of malicious actors or botnets;
- our reliance on a third-party mining pool service provider for our mining revenue payouts;
- loss, theft or restriction on access to bitcoins and other digital assets we hold;
- the loss or destruction of private keys required to access our bitcoins and potential data loss relating to our bitcoins;
- the irreversibility of incorrect or fraudulent bitcoin transactions;
- forks in the bitcoin network;
- the open-source structure of the bitcoin network protocol and any failure to properly monitor and upgrade the protocol;
- the possibility that banks and financial institutions may not provide services to businesses that engage in cryptocurrency-related activities;
- potential exposure to specifically designated nationals or blocked persons as a result of our interactions with the bitcoin network;
- the relative novelty and lack of regulation of the digital asset exchanges on which cryptocurrencies, including bitcoin, trade;
- inadequate sources of recovery if our digital assets are lost, stolen or destroyed;
- the lack of limitations of FDIC or SIPC protections for the assets we hold;
- the possible failure to comply with internal control over financial reporting requirements under Section 404 of the Sarbanes-Oxley Act of 2002;
- the limited rights of legal recourse available to us following any loss of our bitcoins;
- the possibility that a cryptocurrency other than bitcoin could be more desirable to the digital asset user base;
- the possibility that our mining costs may exceed our mining revenues;
- damage of the properties included in our mining operation and inability to get adequate insurance coverage for same;
- our need for significant electrical power to support our mining operations;
- competition from other methods of investing in cryptocurrencies;
- the possibility that operators of bitcoins mining operations may immediately sell bitcoin rewards earned by mining in the market, thereby constraining the growth of the price of bitcoin;
- risks related to technological obsolescence, the vulnerability of the global supply chain for cryptocurrency hardware disruption, and difficulty in obtaining new hardware;
- the possible transition of bitcoin mining algorithms to proof of stake validation;
- potential Internet disruptions;

12

- the limited precedent for financial accounting of digital assets, and the possibility of future accounting requirements for transactions involving digital assets;
- future developments regarding the treatment of digital assets for U.S. federal income and applicable state, local and non-U.S. tax purposes;
- the price of our common stock may be volatile and could fluctuate widely in price;
- any future issuance of preferred stock may adversely affect holders of our common stock, as shares of preferred stock may have additional rights, preferences and privileges as compared to the common stock;
- we have not, and do not intend to, pay dividends on shares of our common stock;
- if securities or industry analysts do not publish or do not continue to publish research or reports about our business, or if they issue an adverse or misleading opinion regarding our stock, our stock price and trading volume could decline; and
- Provisions in the Nevada Revised Statutes and our Bylaws could make it very difficult for an investor to bring any legal actions against our directors or officers for violations of their fiduciary duties or could require us to pay any amounts incurred by our directors or officers in any such actions.

**Risks Related to Our Business**

*Our business has been, and in the future may be, subject to risks arising from pandemic, epidemic, or an outbreak of diseases, such as the outbreak of the COVID-19 pandemic.*

On March 11, 2020, the World Health Organization declared the COVID-19 outbreak to be a pandemic. Since then, COVID-19 has spread across the globe and is impacting worldwide economic activity, including through quarantines, travel bans and restrictions, shelter-in-place orders, shutdowns of businesses, reductions in business activity, supply chain interruptions and overall economic and financial market instability. These measures have impacted, and may further impact, our workforce and operations, as well as the operations of our customers, our partners and our vendors and suppliers. Our critical business operations, including our headquarters, and many of our key suppliers, are located in regions which have been and continue to be impacted by COVID-19. Our customers and suppliers worldwide have also been affected by COVID-19 and may continue to experience material impacts well beyond the end of the pandemic.

Specifically, the manufacture of components of our products, the final assembly of our products, and other critical operations are concentrated in certain geographic locations that have been impacted by COVID-19 and in which local governments continue to take measures to try to contain the pandemic. There is considerable uncertainty regarding the impact of such measures and potential future measures, including restrictions on manufacturing facilities, on our support operations or workforce, or on our customers, partners, vendors and suppliers. Such measures, as well as restrictions on or disruptions of transportation, such as reduced availability or increased cost of air transport, port closures, and increased border controls or closures, could limit our capacity to meet customer demand and have a material adverse effect on our financial condition and results of operations.

The COVID-19 pandemic and other factors have adversely affected our supply chain, consistent with its effect across many industries, including creating shipping and logistics challenges and placing significant limits on component supplies. These effects on our supply chain have resulted in delayed product availability in our energy business, especially when combined with the demand for our products, and have adversely impacted, and may continue to adversely impact, our ability to meet our energy product demand, result in additional costs, or may otherwise adversely impact our business and results of operations. They have also significantly increased the costs of shipping miners, related components and infrastructure. We expect these impacts, including delayed product availability, to continue for as long as the global supply chain is experiencing these challenges.

The spread of COVID-19 has also caused us to modify our business practices as we comply with state-mandated requirements for safety in the workplace to ensure the health, safety, and welling-being of our employees. While the company has implemented a Vaccination and Testing Policy, we still maintain other measures including personal protective equipment, social distancing, cleanliness of our facilities, and daily monitoring of the health of employees in our facilities, as well as modifying our policies on employee travel and the cancellation of physical participation in meetings,

events, and conferences. We may take further actions in response to the pandemic as may be required by government authorities or that we may determine are in the best interests of our employees, customers, partners, and suppliers. However, we have not developed a specific and comprehensive contingency plan designed to address the challenges and risks presented by the COVID-19 pandemic and, even if and when we do develop such a plan, there can be no assurance that such plan will be effective in mitigating the potential adverse effects on our business, financial condition, and results of operations.

In addition, while the extent and duration of the COVID-19 pandemic on the global economy and our business in particular are difficult to assess or predict, the pandemic has resulted in, and may continue to result in, significant disruption of global financial markets, which may reduce our ability to access capital or our customers' ability to pay us for past or future purchases, which could negatively affect our working capital and liquidity. A recession or financial market correction resulting from the lack of containment and spread of COVID-19 could impact overall spending, adversely affecting demand for our products and services, our business, and the value of our common stock.

The ultimate impact of the COVID-19 pandemic or a similar health epidemic is highly uncertain and subject to change. The extent of the impact of the COVID-19 pandemic on our operational and financial performance, including our ability to execute our business strategies and initiatives in the expected time frame, will depend on future developments, including, but not limited to, the duration and continued spread of the pandemic, its severity, further related restrictions on travel, any reopening plans, the effectiveness of actions taken in the United States and other countries to contain and treat the disease, including, without limitation, the effectiveness and timing of vaccination initiatives in the United States and worldwide and the duration, timing, and severity of the impact on customer spending, including any recession resulting from the pandemic, all of which are uncertain and cannot be predicted. An extended period of global supply chain and economic disruption as a result of the COVID-19 pandemic, even after the pandemic subsides, could have a materially adverse impact on our business, results of operations, access to sources of capital and financial condition, though the full extent and duration of any such impact is also uncertain.

***Supply chain and shipping disruptions have resulted in shipping delays, a significant increase in shipping costs, and could increase product costs and result in lost sales, which may have a material adverse effect on our business, operating results and financial condition.***

Supply chain disruptions, resulting from factors such as the COVID-19 pandemic, labor supply and shipping container shortages, have impacted, and may continue to impact, us and our third-party manufacturers and suppliers. These disruptions have resulted in longer lead times and increased product costs and shipping expenses, including with respect to the delivery of miners that we have purchased. While we have taken steps to minimize the impact of these increased costs by working closely with our suppliers and customers, there can be no assurances that unforeseen events impacting the supply chain will not have a material adverse effect on us in the future. Additionally, the impacts supply chain disruptions have on our third-party manufacturers and suppliers are not within our control. It is not currently possible to predict how long it will take for these supply chain disruptions to cease. Prolonged supply chain disruptions impacting us and our third-party manufacturers and suppliers could interrupt product manufacturing, increased lead times, increased product costs and result in lost sales and bitcoin production, result in a delay in the delivery of miners that we have purchased, and continue to increase shipping costs associated with the delivery of our purchased miners, which may have a material adverse effect on our business, operating results and financial condition.

***We have a limited operating history and a history of operating losses and negative cash flow, and we may never achieve consistent profitability.***

Our limited operating history, including our recent entry into the digital currency mining business, makes it difficult to evaluate our business and predict our future results of operations. Although we have achieved profitable quarters in the past, to date, we have not maintained consistent profitability from period to period, and no assurances can be made that we will achieve consistent profitability in the near future, if ever. From the Company's inception through September 30, 2021, we sustained $138,392,118 in cumulative net losses, and we had a net loss for the fiscal year ended September 30, 2021 of $21,812,010. We have generated these losses as we attempt to implement our business plan, including expanding our existing products and customer base. We will not achieve consistent profitability unless and until we can develop a substantial and stable revenue base.

14

***Our future success is difficult to predict because we operate in emerging and evolving industries that are subject to volatile and unpredictable cycles.***

The renewable energy, bitcoin mining, microgrid and related industries are emerging and evolving, which may lead to period-to-period variability in our operating results and may make it difficult to evaluate our future prospects. Our energy products and services are based on unique technology that we believe offers significant advantages to our customers, but the markets we serve are in a relatively early stage of development and it is uncertain how rapidly they will develop. It is also uncertain whether our energy products will achieve high levels of demand and acceptance as these markets grow. If companies and customers in the industries we serve do not perceive or value the benefits of our technologies and products, or if they are unwilling to adopt our products as alternatives to traditional power solutions, the market for our products and services may not develop or may develop more slowly than we expect, which could significantly and adversely impact our operating results.

As a supplier to the renewable energy, microgrid and related industries, we may be subject to business cycles, the timing, length, and volatility of which may be difficult to predict. The cyclical nature of our business may be driven by sudden changes in customers' manufacturing capacity requirements and spending, which depend in part on capacity utilization, demand for customers' products, inventory levels relative to demand and access to affordable capital. These changes may affect the timing and amounts of customers' purchases and investments in technology, and affect our orders, net sales, operating expenses, and net income. In addition, we may not be able to respond adequately or quickly to any declines in demand by reducing our costs. To meet rapidly changing demand in each of the industries we serve, we must effectively manage our resources and production capacity. During periods of decreasing demand for our products, we must be able to appropriately align our cost structure with prevailing market conditions, effectively manage our supply chain, and motivate and retain key employees. During periods of increasing demand for our products, we must have sufficient inventory to fulfill customer orders, effectively manage our supply chain, and attract, retain, and motivate a sufficient number of qualified individuals. If we are not able to timely and appropriately adapt to changes in our business environment or to accurately assess where we are positioned within a business cycle, our business, financial condition, or results of operations may be materially and adversely affected.

***The markets in which we participate are highly competitive, and we may be unable to successfully compete.***

We compete in the highly competitive market for renewable energy products and microgrid technology and associated services, as well as in certain operational aspects of our digital currency mining business, including, but not limited to, the acquisition of new miners, obtaining the lowest cost of electricity, obtaining clean energy sources, obtaining access to energy sites with reliable sources of power, and evaluating new technology developments in the industry. Evolving industry standards, rapid price changes and product obsolescence impact the market and its various participants, including us. Our competitors include many domestic and foreign companies, many of which have substantially greater financial, marketing, personnel and other resources than we do, which may cause us to be at a competitive disadvantage. Our current competitors or new market entrants could introduce new or enhanced technologies, products or services with features that render our technologies, products or services obsolete, less competitive or less marketable. The success of our energy business will be dependent upon our ability to develop products that are superior to existing products and products introduced in the future, and which are cost effective. In addition, we may be required to continually enhance any products that are developed as well as introduce new products that keep pace with technological change and address the increasingly sophisticated needs of the marketplace. Even if our current technologies prove to be commercially feasible, there is extensive research and development being conducted on alternative energy sources that may render our technologies and protocols obsolete or otherwise non-competitive. The success of our digital currency mining business will be further dependent upon our ability to purchase additional miners, adapt to changes in technology in the industry, and to obtain sufficient energy at reasonable prices, amongst other things.

We may also be unable to keep pace with the technological demands of the marketplace or successfully develop products that will succeed in the marketplace. Since many of our competitors are larger, well-established companies that have substantially greater financial, technical, manufacturing, marketing, distribution and other resources than us, we are at an inherent competitive disadvantage. We may not have the capital resources available to undertake the research that may be necessary to upgrade our equipment or develop new devices to meet the efficiencies of changing technologies. Our inability to adapt to technological change could have a materially adverse effect on our results of operations.

***We rely on a variety of intellectual property rights to protect our technology, and enforcing those rights could disrupt our business operation and divert resources that could ultimately harm our future prospects.***

We rely on a combination of trade secrets, confidentiality agreements and procedures and patents to protect our proprietary technologies.

Our business primarily relies upon trade secret laws and contractual restrictions, such as confidentiality agreements and work-for-hire provisions, to protect our technology, know-how and other proprietary information. It may be cost prohibitive for us to seek to enforce such rights through the legal-enforcement mechanisms available to us, and, in any case, such laws and contractual restrictions may not provide meaningful protection to us against the possible unauthorized use, misappropriation or disclosure of such trade secrets.

In relation to our microgrid business, we also own patents that protect our ability to receive data from a plurality of sources within a microgrid, which is then analyzed to forecast power needs across the microgrid, or a combination of multiple 'fractal' microgrids, and then determine whether or when to share power with the requesting module. The claims contained in those and any other patents we own may not provide adequate protection for our products and technology. In the absence of patent protection, our competitors may attempt to copy our products or gain access to our trade secrets and know-how. In addition, the laws of foreign countries may not protect our proprietary rights to our technology to the same extent as the laws of the U.S.

In addition, our ongoing expansion of our business, including, in particular, through the development of products, may result in claims of intellectual property infringement, regardless of merit. If an infringement claim or other dispute arises concerning our technology, we could become involved in litigation that might involve substantial cost. Litigation could divert substantial management attention away from our operations and into efforts to enforce our patents, protect our trade secrets or know-how or determine the scope of the proprietary rights of others. If a proceeding resulted in adverse findings, we could be subject to significant liabilities to third parties, and we might also be required to seek licenses from third parties to manufacture or sell our products. Our ability to manufacture and sell our products may also be adversely affected by other unforeseen factors relating to any such proceeding or its outcome.

***A significant part of our success will depend on our ability to manage our suppliers and contract manufacturers, and any failure to do so could materially and adversely affect our results of operations and relations with our customers.***

We rely upon a limited number of suppliers to provide the components necessary to build our energy products and contract manufacturers to procure components and assemble our products. In addition, we rely on a limited number of suppliers for the purchase and delivery of our miners to support our digital currency mining operations. There can be no assurance that such key suppliers and contract manufacturers will provide components, products or miners in a timely and cost-efficient manner or otherwise meet our needs and expectations. Any disruption in such key suppliers' or contract manufacturers could delay our ability to provide our products to our customers or to expand our digital currency mining operations. Our ability to manage such relationships and timely replace suppliers and contract manufacturers, if necessary, is critical to our success. Our failure to timely replace our contract manufacturers and suppliers, should that become necessary, could materially and adversely affect our results of operations and relations with our customers. For example, we depend on Bitmain for the majority of our mining rigs and Pioneer Custom Electrical Products Corp. as a sole source contract manufacturer of our switchgear product lines, and any change in their ability to manufacture and deliver these products could have a significant impact on our results of operations.

***Our success is dependent upon our relationships with certain key customers.***

In the past, we have derived a significant portion of our revenues from a relatively limited number of customers. Our dependence on a limited number of customers may continue in the future. The loss of any one of our major customers or decrease in demand by those customers could have a material adverse effect on our business, our results of operations and our cash flows.

16

*We have limited experience selling our distributed energy focused products and solutions for use in residential markets, and our increased efforts in this regard may not be as successful as we expect or at all.*

As a result of our recent acquisition of Solar Watt, we now are providing solar and alternative energy solutions for homeowners, as well as commercial businesses, and have developed a proprietary platform to enable integration and optimization of solar, energy storage and back-up solutions for residential applications. Historically, however, our products and solutions have been primarily sold into commercial and governmental markets. We have limited experience pursuing the residential markets, and there are unique challenges associated with sales to homeowners and others in the residential market. There can be no assurance that we will be successful in growing profitably (or at all) sales of our residential market focused products and solutions or otherwise achieving success in our efforts in this regard. Further, the success of these efforts will depend on part on expansion of homeowner use of solar energy. To date, solar energy has only achieved limited market acceptance (particularly in regions outside of Southern California, in which regions we intend to expand our services and capabilities), and its continued market acceptance and growth may depend on continued support in the form of performance-based incentives, rebates, tax credits and other incentives from federal, state, local and foreign governments. Additionally, there can be no assurance that we will be able to successfully develop our planned proprietary platform to enable integration and optimization of solar, energy storage and back-up generators for residential applications.

*Our solar energy business is concentrated in Southern California, putting us at risk of region-specific disruptions.*

Our solar energy customer base is currently concentrated in Southern California, and we expect many of our future solar energy installations to be in California, which could further concentrate our solar energy customer base and operational infrastructure. Accordingly, our business and results of operations are particularly susceptible to adverse economic, regulatory, political, weather and other conditions in California, including the impacts of the COVID-19 pandemic and any legislative changes related to grid operations.

*If we are the subject of future product defect or liability suits, or our products are subject to a recall, our business and our reputation could be adversely affected.*

In the course of our planned operations, we may become subject to legal actions based on a claim that our energy products are defective in workmanship or have caused personal or other injuries. We may also be subject to lawsuits and other claims in the future if our products malfunction, including, for example, if any of our solar service offerings (such as our racking systems, photovoltaic modules, batteries, inverters, or other products) causes injuries. Because solar energy systems and many of our other current and anticipated products are electricity-producing devices, it is possible that customers or their property could be injured or damaged by our products, whether due to product malfunctions, defects, improper installation or other causes. Further, since our products are used in systems that are made up of components sourced from third party manufacturers, we may be subject to product liability claims even if our products do not malfunction. Additionally, any of our products could be subject to recalls due to product malfunctions or defects.

The successful assertion of product liability claims against us could result in potentially significant monetary damages that could require us to make significant payments, as well as subject us to adverse publicity, damage our reputation and competitive position and adversely affect sales of our systems and other products. We rely on third-party manufacturing warranties, warranties provided by our manufacturing partners and our general liability insurance to cover product liability claims and have not obtained separate product liability insurance. Such warranties and insurance coverage may not be adequate to cover all potential claims. Moreover, even if such warranties and insurance coverage are sufficient, any successful claim could significantly harm our business, reputation, financial condition and results of operations. In addition, product liability claims, injuries, defects or other problems experienced by other companies in the industries in which we operate could lead to unfavorable market conditions for the industry as a whole, and may have an adverse effect on our ability to attract customers and thereby have an adverse effect our growth and financial performance.

17

***We rely heavily on our management team, whose continued service and performance is critical to our future success. Any failure by management to properly manage growth, including hiring and retaining competent and skilled management and other personnel, could have a material adverse effect on our business, operating results, and financial condition.***

We currently have four executive officers — our Chief Executive Officer and President, Zachary Bradford, our Chief Financial Officer, Lori Love, our Chief Revenue Officer, Amer Tadayon, and S. Matthew Schulz, our Executive Chairman — who are responsible for our management functions and are responsible for strategic development, financing and other critical functions. Some of the members of our management team and our board of directors may not have prior experience in the energy or cryptocurrency mining industries. This lack of experience may impair our management teams' and directors' ability to evaluate and make well-informed decisions involving our current operations and any future projects we may undertake in the industries in which we operate. Such impairment and lack of experience could adversely affect our business, financial condition and future operations.

Our future success depends significantly on the continued service and performance of our existing management team. The departure, death, disability or other extended loss of services of any member of our management team, particularly with little or no notice, could cause delays on projects, frustrate our growth prospects and could have an adverse impact on our client and industry relationships, our project exploration and development programs, other aspects of our business and our financial condition, results of operations, cash flow and prospects.

Our success, growth prospects, and ability to capitalize on market opportunities also depend to a significant extent on our ability to identify, hire, motivate and retain qualified managerial personnel, including additional senior members of management. Our growth may be constrained by resource limitations as competitors and customers compete for increasingly scarce human capital resources. The demand for trained software engineers, electrical engineers, professionals familiar with cryptocurrency mining and other skilled workers is currently high. Our competitors may be able to offer a work environment with higher compensation or more opportunities than we can. Any new personnel we hire may not be or become as productive as we expect, as we may face challenges in adequately or appropriately integrating them into our workforce and culture. If we are unable to attract and retain a sufficient number of skilled personnel, our ability to successfully implement our business plan, grow our company and maintain or expand our product offerings may be adversely affected, and the costs of doing so may increase, which may adversely impact our business, financial condition and results of operations.

Our expansion could also place significant demands on our management, operations, systems, accounting, internal controls and financial resources. If we experience difficulties in any of these areas, we may not be able to expand our business successfully or effectively manage our growth. Any failure by management to manage growth and to respond to changes in our business could have a material adverse effect on our business, financial condition and results of operations.

***We have engaged in, and in the future may engage in, strategic acquisitions and other arrangements that could disrupt our business, cause dilution to our stockholders, reduce our financial resources and harm our operating results.***

We have previously engaged in strategic transactions, including acquisitions of companies, product lines, technologies and personnel, such as our recent acquisitions of ATL in December 2020 and Solar Watt in February 2021, and, as part of our growth strategy, in the future, we may seek additional opportunities to expand our product offerings or the markets we serve by pursuing strategic transactions. Our ability to grow through future acquisitions will depend on the availability of, and our ability to identify, suitable acquisition and investment opportunities at an acceptable cost, our ability to compete effectively to attract those opportunities and the availability of financing to complete acquisitions. Future acquisitions may require us to issue common stock that would dilute our current stockholders' percentage ownership, assume or otherwise be subject to liabilities of an acquired company, record goodwill and non-amortizable intangible assets that will be subject to impairment testing on a regular basis and potential periodic impairment charges,

18

incur amortization expenses related to certain intangible assets, incur large acquisition and integration costs, immediate write-offs, and restructuring and other related expenses, and become subject to litigation. The benefits of an acquisition may also take considerable time to develop, and we cannot be certain that any particular acquisition will produce the intended benefits in a timely manner or to the extent anticipated or at all. We may experience difficulties integrating the operations, technologies, products, and personnel of an acquired company or be subjected to liability for the target's pre-acquisition activities or operations as a successor in interest. Such integration may divert management's attention from normal daily operations of our business. Future acquisitions may also expose us to potential risks, including risks associated with entering markets in which we have no or limited prior experience (such as our acquisition of our ATL subsidiary, in light of its cryptocurrency mining operations), especially when competitors in such markets have stronger market positions, the possibility of insufficient revenues to offset the expenses we incur in connection with an acquisition and potential loss of, or harm to, our relationships with employees, customers, consumers and suppliers as a result of integration of new businesses.

***Our energy business is substantially dependent on utility rate structures and government incentive programs that encourage the use of alternative energy sources. The reduction or elimination of government subsidies and economic incentives for energy-related technologies would harm our business.***

We believe that near-term growth of energy-related technologies, including power conversion and solar energy technology, relies partly on the availability and size of government and economic incentives and grants (including, but not limited to, the U.S. Investment Tax Credit and various state and local incentive programs). These incentive programs could be challenged by utility companies, or for other reasons found to be unconstitutional, or could be reduced or discontinued for other reasons, all of which are outside of our control. The reduction, elimination, or expiration of government subsidies and economic incentives could harm our business.

A combination of utility rate structures and government subsidies that encourage the use of alternative energy sources is a primary driver of demand for our energy products. For example, public utilities are often allowed to collect demand charges on commercial and industrial customers in addition to traditional usage charges. In addition, the federal government and many states encourage the use of alternative energy sources through a combination of direct subsidies and tariff incentives such as net metering for users that use alternative energy sources such as solar power. California also encourages alternative energy technology through its Self-Generation Incentive Program, or SGIP, which offers rebates for businesses and consumers who adopt certain new technologies. Other states have similar incentives and mandates which encourage the adoption of alternative energy sources. Notwithstanding the adoption of other incentive programs, we expect that California will be the most significant market for the sale of our energy products in the near term. Should California or another state in which we derive a substantial portion of our product revenues in the future change its utility rate structure or eliminate or significantly reduce its incentive programs, demand for our products could be substantially affected, which would adversely affect our business prospects, financial condition and operating results.

***In the future, we may require additional financing to sustain and expand our operations, and we may not be able to obtain financing on acceptable terms, or at all, which would have a material adverse effect on our business, financial condition, results of operations, cash flow and prospects.***

Our ability to operate profitably and to grow our business is dependent upon, among other things, generating sufficient revenue from our operations and, when and if needed, obtaining financing. If we are unable to generate sufficient revenues to operate and/or expand our business, we will be required to raise additional capital to fund operating deficits (if applicable) and growth of our business, pursue our business plans and to finance our operating activities, including through equity or debt financings, which may not be available to us on favorable terms, or at all.

To the extent that we raise additional capital through the sale of equity or convertible debt securities, stockholder ownership interest in the Company may be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect rights as a stockholder. Debt and equity financings, if available, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as redeeming our shares of common stock, making investments, incurring additional debt, making capital expenditures or declaring dividends.

19

*We maintain our cash at financial institutions, which at times, exceed federally insured limits.*

The majority of our cash is held in accounts at U.S. banking institutions that we believe are of high quality. Cash held in non-interest-bearing and interest-bearing operating accounts may exceed the Federal Deposit Insurance Corporation insurance limits. If such banking institutions were to fail, we could lose all or a portion of those amounts held in excess of such insurance limitations.

*If we fail to comply with Section 404 of the Sarbanes-Oxley Act of 2002, the market may have reduced confidence in our reported financial information.*

We must continue to document, test, monitor and enhance our internal control over financial reporting in order to satisfy the requirements of Section 404 of the Sarbanes-Oxley Act of 2002. We will continue to perform the documentation and evaluations needed to comply with Section 404. If during this process our management identifies one or more material weaknesses in our internal control over financial reporting, we will be unable to assert that our internal controls are effective, which may cause market participants to have reduced confidence in our reported financial condition.

**Risks Related to Our Cryptocurrency Mining Operations**

Through our acquisition of ATL in December 2020, we expanded our business to include bitcoin mining, and we are actively trying to grow our bitcoin mining infrastructure, equipment and capacity. Bitcoin mining is a significant portion of our business and revenues and is expected to continue to be the source of a majority of our revenues in the future. Our bitcoin mining activities, both now and in the future, may subject us to inherent risks, including the risks described below and elsewhere in this Annual Report.

*If regulatory changes or interpretations of our activities require our registration as a money services business (an "MSB") under the regulations promulgated by the Financial Crimes Enforcement Network ("FinCEN") under the authority of the U.S. Bank Secrecy Act (the "BSA"), or otherwise under state laws, we may incur significant compliance costs, which could be substantial or cost-prohibitive. If we become subject to these regulations, our costs in complying with them may have a material adverse effect on our business and the results of our operations.*

To the extent our bitcoin mining activities cause us to be deemed an MSB under the regulations promulgated by FinCEN under the authority of the BSA, we may be required to comply with FinCEN regulations, including those that would mandate us to implement anti-money laundering programs, make certain reports to FinCEN and maintain certain records.

To the extent that our cryptocurrency activities cause us to be deemed a "money transmitter" (an "MT") or be given an equivalent designation, under state law in any state in which we operate, we may be required to seek a license or otherwise register with a state regulator and comply with state regulations that may include the implementation of anti-money laundering programs, maintenance of certain records and other operational requirements. Currently, the New York State Department of Financial Services maintains a comprehensive "BitLicense" framework for businesses that conduct "virtual currency business activity." In July 2020, Louisiana enacted the Virtual Currency Businesses Act, becoming the second state after New York to enact a stand-alone virtual currency law. We will continue to monitor for developments in state-level legislation, guidance or regulations applicable to us.

Such additional federal or state regulatory obligations in the United States or obligations that could arise under the regulatory frameworks of other countries may cause us to incur significant expenses, possibly affecting its business and financial condition in a material and adverse manner. Furthermore, we and our service providers may not be capable of complying with certain federal or state regulatory obligations applicable to MSBs and MTs or similar obligations in other countries. If we are deemed to be subject to such additional regulatory and registration or licensing requirements, we may be required to substantially alter our bitcoin mining activities and possibly cease engaging in such activities. Any such action may adversely affect our business operations and financial condition and an investment in our company.

*Current regulation regarding the exchange of bitcoins under the CEA by the CFTC is unclear; to the extent we become subject to regulation by the CFTC in connection with our exchange of bitcoin, we may incur additional compliance costs, which may be significant.*

The Commodity Exchange Act, as amended (the "CEA"), does not currently impose any direct obligations on us related to the mining or exchange of bitcoins. Generally, the Commodity Futures Trading Commission ("CFTC"), the federal agency that administers the CEA, regards bitcoin and other cryptocurrencies as commodities. This position has been supported by decisions of federal courts.

However, the CEA imposes requirements relative to certain transactions involving bitcoin and other digital assets that constitute a contract of sale of a commodity for future delivery (or an option on such a contract), a swap, or a transaction involving margin, financing or leverage that does not result in actual delivery of the commodity within 28 days to persons not defined as "eligible contract participants" or "eligible commercial entities" under the CEA (e.g., retail persons). Changes in the CEA or the regulations promulgated by the CFTC thereunder, as well as interpretations thereof and official promulgations by the CFTC, may impact the classification of bitcoins and, therefore, may subject them to additional regulatory oversight by the agency. Although to date the CFTC has not enacted regulations governing non-derivative or non-financed, margined or leveraged transactions in bitcoin, it has authority to commence enforcement actions against persons who violate certain prohibitions under the CEA related to transactions in any contract of sale of any commodity, including bitcoin, in interstate commerce (e.g., manipulation and engaging in certain deceptive practices).

We cannot be certain as to how future regulatory developments will impact the treatment of bitcoins under the law. Any requirements imposed by the CFTC related to our mining activities or our transactions in bitcoin could cause us to incur additional extraordinary, non-recurring expenses, thereby materially and adversely impacting an investment in the Company. In addition, changes in the classification of bitcoins could subject us, as a result of our bitcoin mining operations, to additional regulatory oversight by the agency. Although to date the CFTC has not enacted regulations governing non-derivative or non-financed, margined or leveraged transactions in bitcoin, it has authority to commence enforcement actions against persons who violate certain prohibitions under the CEA related to transactions in any contract of sale of any commodity, including bitcoin, in interstate commerce (e.g., manipulation and engaging in certain deceptive practices).

Moreover, if our mining activities or transactions in bitcoin were deemed by the CFTC to constitute a collective investment in derivatives for our shareholders, we may be required to register as a commodity pool operator with the CFTC through the National Futures Association. Such additional registrations may result in extraordinary, non-recurring expenses, thereby materially and adversely impacting an investment in the Company. If we determine not to comply with such additional regulatory and registration requirements, we may seek to cease certain of our operations. Any such action may adversely affect an investment in the Company.

While no provision of the CEA, or CFTC rules, orders or rulings (except as noted herein) appears to be currently applicable to our business, this is subject to change.

***If the SEC or another regulatory body considers bitcoin or any other cryptocurrency that we may mine in the future to be a security under U.S. securities laws, we may be required to comply with significant SEC registration and/or other requirements.***

In general, novel or unique assets such as bitcoin and other digital assets may be classified as securities if they meet the definition of investment contracts under U.S. law. In recent years, the offer and sale of digital assets other than bitcoin, most notably Kik Interactive Inc.'s Kin tokens and Telegram Group Inc.'s TON tokens, have been deemed to be investment contracts by the SEC. While we believe that bitcoin is unlikely to be considered an investment contract, and thus a security under the investment contract definition, we cannot provide any assurances that digital assets that we mine or otherwise acquire or hold for our own account, including bitcoin, will never be classified as securities under U.S. law.

To the extent that any digital asset we have already mined or will mine is deemed a security, we may be obligated to comply with registration and/or other requirements by the SEC. This would cause us to incur significant, non-recurring expenses, thereby materially and adversely impacting an investment in the Company.

21

***If regulations or interpretations change and regulation of bitcoin under the U.S. securities laws or otherwise is promulgated, we may be classified as an investment company.***

Current and future legislation and the SEC's rulemaking and other regulatory developments, including interpretations released by a regulatory authority, may impact the manner in which bitcoin is treated for classification and clearing purposes. The SEC's July 25, 2017 Report expressed its view that digital assets may be securities depending on the facts and circumstances. As of the date of this Annual Report, we are not aware of any rules that have been proposed to regulate bitcoin as a security, and SEC staff have publicly suggested that bitcoin is not a security for purposes of the Investment Company Act of 1940, as amended (the "1940 Act"), because current purchasers of bitcoin are not relying on the essential managerial and entrepreneurial efforts of others to produce a profit. We cannot be certain, however, as to how future regulatory developments will impact the treatment of bitcoin under the law.

For example, in the event that the bitcoin (or, in the future, any digital assets) held by us, whether as a result of our cryptocurrency mining business or otherwise (including by acquisition), are determined to constitute securities under the U.S. securities laws and such assets exceed 40% of our total assets, exclusive of cash, we would inadvertently become an investment company under the 1940 Act. Classification as an investment company under the 1940 Act requires registration with the SEC. If an investment company fails to register, it would have to stop doing almost all business, and its contracts would become voidable. Registration is time-consuming and restrictive and may require a restructuring of our operations, and we would be very constrained in the kind of business we could engage in as a registered investment company. Further, we would become subject to substantial regulation concerning management, operations, transactions with affiliated persons and portfolio composition, and would need to file reports under the 1940 Act. The cost of compliance with the 1940 Act and any other regulations applicable to our crypto mining business would result in our incurring substantial additional expenses, and the failure to properly register with the SEC or otherwise if required would have a materially adverse impact to conduct our operations.

***It may be illegal now, or in the future, to mine, acquire, own, hold, sell or use bitcoin or other cryptocurrencies, participate in blockchains or utilize similar cryptocurrency assets in one or more countries, the ruling of which could adversely affect us.***

Although currently cryptocurrencies generally are not regulated or are lightly regulated in most countries, several countries, such as China, India and Russia, may continue taking regulatory actions in the future that could severely restrict the right to mine, acquire, own, hold, sell or use these cryptocurrency assets or to exchange for local currency. For example, in China and Russia (India is currently proposing new legislation), it is illegal to accept payment in bitcoin and other cryptocurrencies for consumer transactions and banking institutions are barred from accepting deposits of cryptocurrencies. In addition, in March 2021, the governmental authorities for the Chinese province of Inner Mongolia banned bitcoin mining in the province due to the industry's intense electrical power demands and its negative environmental impacts. If other countries, including the U.S., implement similar restrictions, such restrictions may adversely affect us. Such circumstances could have a material adverse effect on us, which could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account, and thus harm investors.

***There are several new and existing competitors in our industry that are purchasing mining equipment at scale, which may cause delays or difficulty in us obtaining new miners.***

Many of the competitors in our industry have also been purchasing mining equipment at scale, which has caused a world-wide shortage of mining equipment and extended the corresponding delivery schedules for new miner purchases. There are no assurances that Bitmain, or any other manufacturers, will be able to keep pace with the surge in demand for mining equipment. It is uncertain how manufacturers will respond to this increased global demand and whether they can deliver on the schedules promised to all of their customers. In the event Bitmain or other manufacturers, are not able to keep pace with demand, we may not be able to purchase additional miners in sufficient quantities, on the delivery schedules that meet our business needs, or at favorable prices.

*The impact of geopolitical and economic events on the demand for bitcoin is uncertain.*

Geopolitical crises may trigger large-scale purchases of bitcoin, which could rapidly increase their prices. This may, however, also increase the likelihood of a subsequent price swing in the opposite direction as crisis-driven purchasing behavior dissipates, ultimately decreasing the value of bitcoins or any other digital asset in our possession. Such risks are similar to the risks of purchasing commodities in generally uncertain times, such as the risk of purchasing, holding or selling gold.

Alternatively, global crises and economic downturns may discourage investment in bitcoin and digital assets in general as investors shift their investments towards less volatile asset classes. Such events could have a material adverse effect on our business, prospects or operations and potentially the value of bitcoin we mine or otherwise acquire or hold for our own account.

*The value of bitcoin may be subject to pricing risk and has historically been subject to wide swings. Because we do not currently hedge our investment in bitcoin and do not intend to for the foreseeable future, we may be directly exposed to bitcoin's price volatility and surrounding risks.*

While bitcoin prices are determined primarily using data from various exchanges, over-the-counter markets and derivative platforms, they have historically been volatile and are impacted by a variety of factors. Such factors include, but are not limited to, the worldwide growth in the adoption and use of bitcoins, the maintenance and development of the software protocol of the bitcoin network, changes in consumer demographics and public tastes, fraudulent or illegitimate actors, real or perceived scarcity, and political, economic, regulatory or other conditions. Furthermore, pricing may be the result of, and may continue to result in, speculation regarding future appreciation in the value of bitcoin, or our share price, making prices more volatile or creating "bubble" type risks.

Currently, we do not use a formula or specific methodology to determine whether or when we will sell bitcoin that we hold, or the number of bitcoins we will sell. Rather, decisions to hold or sell bitcoins are currently determined by analyzing forecasts and monitoring the market in real time. Such decisions, however well-informed, may result in untimely sales and even losses, adversely affecting an investment in us. At this time, we do not anticipate engaging in any hedging activities related to our holding of bitcoin; this could expose us to substantial decreases in the price of bitcoin.

*The development and acceptance of competing blockchain platforms or technologies may cause consumers to use alternative distributed ledgers or other alternatives.*

The development and acceptance of competing blockchain platforms or technologies may cause consumers to abandon bitcoin. As we exclusively mine, and expect to exclusively mine bitcoin, we could face difficulty adapting to emergent digital ledgers, blockchains, or alternatives thereto. This could prevent us from realizing the anticipated profits from our investments. Such circumstances could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin we mine or otherwise acquire or hold for our own account and harm investors.

*Bitcoin faces significant challenges with scaling which, if not overcome, may lead to high fees or slow transaction settlement times.*

Bitcoin is presently limited with respect to how many transactions can occur per second. Developers and contributors in the bitcoin ecosystem debate potential solutions to increasing the average number of transactions per second that networks can handle. Some have implemented mechanisms or are researching ways to increase scale, such as increasing the allowable sizes of blocks, and therefore the number of transactions per block, which would increase the number of transactions that could occur per second. However, it is uncertain how long those mechanisms being explored to increase the scale of settlement of bitcoin transactions will take to become effective, if at all. Any failure to improve bitcoin settlement times could materially affect the price of bitcoin and, as a result, adversely affect an investment in us.

***Bitcoin is subject to halving; the reward for successfully solving a block will halve several times in the future and its value may not adjust to compensate us for the reduction in the rewards we receive from our mining efforts.***

Halving is a process designed to control the overall supply and reduce the risk of inflation in cryptocurrencies using a Proof-of-Work consensus algorithm. In an event referred to as bitcoin "halving," the bitcoin reward for mining any block is cut in half. For example, the mining reward for bitcoin declined from 12.5 to 6.25 bitcoin on May 11, 2020. This process is scheduled to occur once every 210,000 blocks, or roughly four years, until the total amount of bitcoin rewards issued reaches 21 million, which is expected to occur around 2140. Once 21 million bitcoin are generated, the network will stop producing more. Currently, there are more than 18 million bitcoin in circulation. While bitcoin prices have had a history of price fluctuations around halving events, there is no guarantee that the price change will be favorable or would compensate for the reduction in mining reward. If a corresponding and proportionate increase in the price of bitcoin does not follow these anticipated halving events, the revenue from our mining operations would decrease, and we may not have an adequate incentive to continue mining and may cease mining operations altogether, which may adversely affect an investment in us.

Furthermore, such reductions in bitcoin rewards for uncovering blocks may result in a reduction in the aggregate hash rate of the bitcoin network as the incentive for miners decreases. Miners ceasing operations would reduce the collective processing power on the network, which would adversely affect the confirmation process for transactions and make the bitcoin network more vulnerable to malicious actors or botnets obtaining control in excess of 50 % of the processing power active on the blockchain. Such events may adversely affect our activities and an investment in us.

***If a malicious actor or botnet obtains control of more than 50% of the processing power on the bitcoin network, such actor or botnet could manipulate the network to adversely affect us, which would adversely affect an investment in us.***

If a malicious actor or botnet, a collection of computers controlled by networked software coordinating the actions of the computers, obtains over 50% of the processing power dedicated to mining bitcoin, such actor may be able to construct fraudulent blocks or prevent certain transactions from completing in a timely manner, or at all. The malicious actor or botnet could control, exclude or modify the order of transactions, though it could not generate new units or transactions using such control. The malicious actor could also "double-spend," or spend the same bitcoin in more than one transaction, or it could prevent transactions from being validated. In certain instances, reversing any fraudulent or malicious changes made to the bitcoin blockchain may not be possible.

Although there are no known reports of malicious activity or control of blockchains achieved through controlling over 50% of the processing power on the bitcoin network, it is believed that certain mining pools may have exceeded, and could exceed, the 50% threshold on the bitcoin network. This possibility creates a greater risk that a single mining pool could exert authority over the validation of bitcoin transactions. To the extent that the bitcoin ecosystem, and the administrators of mining pools, do not have adequate controls and responses in place, the risk of a malicious actor obtaining control of the processing power may increase. If such an event were to occur, it could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin we mine or otherwise acquire or hold for our own account and harm investors.

***Our reliance on a third-party mining pool service provider for our mining revenue payouts may adversely affect an investment in us.***

We currently rely on Foundry Digital and Antpool ("pools" or "Cryptocurrency Customers"), open access mining pools that support cryptocurrencies including bitcoin, to receive our mining rewards and fees from the network. Our pools have the sole discretion to modify the terms of our agreement at any time, and, therefore, our future rights and relationship with our pools may change. In general, mining pools allow miners to combine their computing and processing power, increasing their chances of solving a block and getting paid by the bitcoin network. The rewards, distributed proportionally to our contribution to the pool's overall mining power, are distributed by the pool operator. Should our pools' operator systems suffer downtime due to a cyber-attack, software malfunction or other similar issues, it will negatively impact our ability to mine and receive revenue. Furthermore, while we receive daily reports from our pools detailing the total processing power provided to the pools and the proportion of that total processing power, we provided to determine the distribution of

24

rewards to us, we are dependent on the accuracy of our pool's record keeping. Therefore, we have little means of recourse against our pools' operators if we determine the proportion of the reward paid out to us by the mining pool operator is incorrect, other than leaving the pools. If we are unable to consistently obtain accurate proportionate rewards from our pools, we may experience reduced rewards for our efforts, which would have an adverse effect on our business and operations.

***Bitcoins and other digital assets we mine or hold for our own account may be subject to loss, theft or restriction on access.***

There is a risk that some or all of our bitcoins could be lost or stolen. Bitcoins are stored in and accessed by cryptocurrency sites commonly referred to as "wallets." A hot wallet refers to any cryptocurrency wallet that is connected to the Internet. Generally, hot wallets are easier to set up and access than wallets in cold storage, but they are also more susceptible to hackers and other technical vulnerabilities. Cold storage refers to any cryptocurrency wallet that is not connected to the Internet. Cold storage is generally more secure than hot storage, but is not ideal for quick or regular transactions. When we keep our bitcoin in cold storage, we may experience lag time in our ability to respond to market fluctuations in the price of our cryptocurrency assets.

We currently mine bitcoin by contributing to and benefiting from our pools' processing power. Our share of bitcoins mined from our pools are initially received by us in wallets we control, which are maintained by Coinbase Inc., a U.S. based digital assets exchange. We maintain the majority of our bitcoin in cold storage with a minority allocation kept in hot wallets for working capital purposes. Bitcoins we mine or hold for our own account may be subject to loss, theft or restriction on access. Hackers or malicious actors may launch attacks to steal, compromise or secure bitcoins, such as by attacking the bitcoin network source code, exchange miners, third-party platforms (including Coinbase), cold and hot storage locations or software, or by other means. We may be in control and possession of substantial holdings of bitcoin, and as we increase in size, we may become a more appealing target of hackers, malware, cyber-attacks or other security threats. Any of these events may adversely affect our operations and, consequently, our investments and profitability.

***The loss or destruction of private keys required to access our bitcoins may be irreversible. Our loss of access to our private keys or our experience of a data loss relating to our bitcoins could adversely affect an investment in us.***

Bitcoins may only be controlled by the possessor of both the unique public and private keys relating to the local or online digital wallet in which they are held. We publish the public key relating to digital wallets in use when we verify the receipt or transfers of bitcoins to and from our wallets and disseminate such information into the network on an anonymous basis, but we safeguard the private keys relating to such digital wallets. Digital asset exchanges, such as Coinbase, where we hold our bitcoin, engage in similar practices. To the extent such private keys are lost, destroyed or otherwise compromised, we will be unable to access our bitcoins and such private keys may not be capable of being restored by any network. Any loss of private keys relating to digital wallets used to store our bitcoins whether by us or digital asset exchanges where we hold our bitcoin, could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin we mine or otherwise acquire or hold for our own account.

***Incorrect or fraudulent bitcoin transactions may be irreversible.***

Bitcoin transactions are irreversible and stolen or incorrectly transferred bitcoins may thus be irretrievable. While we exchange our bitcoins directly for U.S. dollars on Coinbase and do not presently use, or expect to use, our bitcoins for any other transactions, any incorrectly executed or fraudulent cryptocurrency transactions may still adversely affect our investments and assets.

***Forks in the bitcoin network may occur in the future, which may affect the value of bitcoins held by us.***

A small group of contributors can propose refinements or improvements to the bitcoin network's source code that alter the protocols and software that govern the bitcoin network and the properties of bitcoin, including the irreversibility of transactions and limitations on the mining of new bitcoin. This is known as a "fork." In the event a developer or group of developers proposes modifications to the bitcoin network that are not accepted by a majority of miners and users, but that is nonetheless accepted by a substantial plurality of miners and users, two or more competing and incompatible blockchain implementations could result. This is known as a "hard fork."

The value of bitcoin after the creation of a fork is subject to many factors, including, but not limited to, the value of the fork product, market reaction to the creation of the fork product, and the occurrence of forks in the future. As such, existing forks, such as Bitcoin Cash and Bitcoin Gold, and future forks may have a negative effect on bitcoin's value and may adversely affect an investment in us.

***The open-source structure of the bitcoin network protocol means that the contributors to the protocol are generally not directly compensated for their contributions in maintaining and developing the protocol. A failure to properly monitor and upgrade the protocol could damage the bitcoin network and an investment in us.***

As an open-source project, bitcoin does not generate revenues for its contributors, and contributors are generally not compensated for maintaining and updating the bitcoin network protocol. The lack of guaranteed financial incentives for contributors to maintain or develop the bitcoin network and the lack of guaranteed resources to adequately address emerging issues with the bitcoin network may reduce incentives to address the issues adequately or in a timely manner. To the extent that contributors may fail to adequately update and maintain the bitcoin network protocol, it could have a material adverse effect on our business, prospects, or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account.

***Banks and financial institutions may not provide banking services, or may cut off services, to businesses that engage in cryptocurrency-related activities.***

A number of companies that engage in bitcoin and/or other cryptocurrency-related activities have been unable to find banks or financial institutions that are willing to provide them with bank accounts and other services. Similarly, a number of companies and individuals or businesses associated with cryptocurrencies may have had and may continue to have their existing bank accounts closed or services discontinued with financial institutions. To the extent that such events may happen to us, they could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account.

***Our interactions with the bitcoin network may expose us to SDN or blocked persons or cause us to violate provisions of law that did not contemplate distributed ledger technology.***

The Office of Financial Assets Control ("OFAC") of the US Department of Treasury requires us to comply with its sanction program and not conduct business with persons named on its specially designated nationals ("SDN") list. However, because of the pseudonymous nature of blockchain transactions, we may inadvertently and without our knowledge engage in transactions with persons named on OFAC's SDN list. We also may not be adequately capable of determining the ultimate identity of the persons with whom we transact.

***The digital asset exchanges on which cryptocurrencies, including bitcoin, trade are relatively new and largely unregulated, and thus may be exposed to fraud and failure. Such failures may result in a reduction in the price of bitcoin and other cryptocurrencies and can adversely affect an investment in us.***

Digital asset exchanges on which cryptocurrencies trade are relatively new and, in most cases, largely unregulated. Many digital exchanges do not provide the public with significant information regarding their ownership structure, management teams, corporate practices or regulatory compliance. As a result, the marketplace may lose confidence in, or may experience problems relating to, cryptocurrency exchanges, including prominent exchanges handling a significant portion of the volume of digital asset trading.

A lack of stability in the digital asset exchange market and the closure or temporary shutdown of digital asset exchanges due to fraud, business failure, hackers or malware, or government-mandated regulation may reduce confidence in digital asset networks and result in greater volatility in cryptocurrency values. These potential consequences of a digital asset exchange's failure could adversely affect an investment in us.

26

***We may not have adequate sources of recovery if our digital assets are lost, stolen or destroyed.***

We rely on Coinbase to facilitate the custody of our bitcoins. If our bitcoins are lost, stolen or destroyed under circumstances rendering a party, including Coinbase, liable to us, the responsible party may not have the financial resources sufficient to satisfy our claim. For example, as to a particular event of loss, the only source of recovery for us might be limited, to the extent identifiable, to other responsible third parties (e.g., a thief or terrorist), any of which may not have the financial resources (including liability insurance coverage) to satisfy a valid claim of ours.

***Bitcoins held by us are not subject to FDIC or SIPC protections.***

We do not hold our bitcoins with a banking institution or a member of the Federal Deposit Insurance Corporation ("FDIC") or the Securities Investor Protection Corporation ("SIPC"), and, therefore, our bitcoins are not subject to the protections enjoyed by depositors with FDIC or SIPC member institutions. As a result, we may suffer a loss with respect to our bitcoins that is not covered by insurance, and we may not be able to recover any of our carried value in these bitcoins if they are lost or stolen or suffer significant and sustained reduction in conversion spot price. If we are not otherwise able to recover damages from a malicious actor in connection with these losses, our business and results of operations may suffer, which may have a material negative impact on our stock price.

***The limited rights of legal recourse available to us expose us and our investors to the risk of loss of our bitcoins for which no person is liable.***

At this time, there is no specifically enumerated U.S. or foreign governmental, regulatory, investigative or prosecutorial authority or mechanism through which to bring an action or complaint regarding missing or stolen cryptocurrency. To the extent that we are unable to recover our losses from such action, error or theft, such events could have a material adverse effect on our business, prospects or operations of and potentially the value of any bitcoin we mine or otherwise acquire or hold for our own account.

***The sale of our bitcoins to pay for expenses at a time of low bitcoin prices could adversely affect an investment in us.***

We may sell our bitcoins to pay for expenses on an as-needed basis, irrespective of then-current prices. Consequently, we may sell our bitcoins at a time when bitcoin prices are low, which could adversely affect an investment in us. At this time, we do not mitigate against the potential for decreasing price by engaging in hedging activities related to our bitcoin holdings. See the above risk factor entitled, "The value of bitcoin may be subject to pricing risk and has historically been subject to wide swings. Because we do not currently hedge our investment in bitcoin and do not intend to for the foreseeable future, we may be directly exposed to bitcoin's price volatility and surrounding risks".

***Demand for bitcoin is driven, in part, by its status as a prominent and secure cryptocurrency. It is possible that a cryptocurrency other than bitcoin could have features that make it more desirable to a material portion of the digital asset user base, resulting in a reduction in demand for bitcoins.***

Bitcoin holds a "first-to-market" advantage over other cryptocurrencies. This first-to-market advantage is driven in large part by having the largest user base and, more importantly, the largest combined mining power in use. Nonetheless, another form of cryptocurrency could become materially popular due to either a perceived or exposed shortcoming of the bitcoin network or a perceived advantage of another form of digital currency. If another form of digital currency obtains significant market share, this could reduce the interest in, and value of, bitcoin and the profitability of our bitcoin operations.

***Our mining costs may be in excess of our mining revenues, which could seriously harm our business and adversely impact an investment in us.***

Mining operations are costly and our expenses may increase in the future. Increases in mining expenses may not be offset by corresponding increases in revenue. Our expenses may become greater than we anticipate, and our investments to make our business more cost-efficient may not succeed. Increases in our costs without corresponding increases in our revenue would adversely affect our profitability and could seriously harm our business and an investment in us.

27

*The properties included in our mining operation may experience damages, including damages that are not covered by insurance.*

Our current mining locations and any future sites we establish will be subject to a variety of risks relating to physical condition and operation, including but not limited to:

- construction or repair defects or other structural or building damage; any noncompliance with or liabilities under applicable environmental, health or safety regulations or requirements or building permit requirements;
- any damage resulting from natural disasters, such as hurricanes, earthquakes, fires, floods and windstorms; and
- claims by employees and others for injuries sustained at our properties.

Although our mining sites are equipped with standard security measures normally associated with a traditional data center, our mining sites could still be rendered inoperable, temporarily or permanently, as a result of a fire or other natural disaster or by a terrorist or other events outside of our control. The measures we take to prevent and insure against these risks may not be sufficient or effective.

*We are subject to risks associated with our need for significant electrical power.*

The operation of a bitcoin mining facility can require massive amounts of electrical power. Any mining site we currently operate or establish in the future can only be successful if we can continue to obtain sufficient electrical power for that site on a cost-effective basis. To the extent that we establish multiple sites, there may be significant competition for suitable locations, and government regulators may potentially restrict the ability of electricity suppliers to provide electricity to mining operations in times of electricity shortage or may otherwise potentially restrict or prohibit the provision or electricity to mining operations.

Additionally, our facilities could be adversely affected by a power outage. Although we maintain limited backup power at certain sites, it would not be feasible to run miners on back-up power generators in the event of a government restriction on electricity or a power outage. To the extent we are unable to receive adequate power supply and are forced to reduce or cease our operations due to the availability or cost of electrical power, our business would be adversely affected.

*Our operations and profitability may be adversely affected by competition from other methods of investing in cryptocurrencies.*

We compete with other users and/or companies that are mining cryptocurrencies and other potential financial vehicles, including securities backed by or linked to cryptocurrencies. Market and financial conditions, and other conditions beyond our control, may make it more attractive to invest in other financial vehicles, or to invest in cryptocurrencies directly, which could limit the market for our shares and reduce their liquidity. The emergence of other financial vehicles and exchange-traded funds have increased scrutiny on cryptocurrencies, and such scrutiny could be applicable to us and impact our ability to successfully establish or maintain a public market for our securities. Such circumstances could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin we mine or otherwise acquire or hold for our own account, and harm investors.

*To the extent that the profit margins of bitcoin mining operations are not high, operators of bitcoin mining operations are more likely to immediately sell bitcoin rewards earned by mining in the market, thereby constraining the growth of the price of bitcoin.*

28

Bitcoin mining operations have evolved from individual users mining with computer processors, graphics processing units and first-generation ASIC servers. Currently, new processing power is predominantly added by incorporated and unincorporated professionalized mining operations. Professionalized mining operations may use proprietary hardware or sophisticated ASIC machines acquired from ASIC manufacturers. They require the investment of significant capital for the acquisition of this specialized hardware, the leasing of operating space (often in data centers or warehousing facilities), incurring of electricity costs and the employment of technicians to operate the mining farms. As a result, professionalized mining operations are of a greater scale than those prior and have more defined and regular expenses and liabilities. These regular expenses and liabilities require professionalized mining operations to maintain profit margins on the sale of bitcoin. To the extent the price of bitcoin declines and such profit margin decreases, professionalized miners will be pressured to immediately sell bitcoin earned from mining operations, whereas it is believed that smaller, individual operations in past years were more likely to hold newly mined bitcoin for lengthier periods. The immediate selling of newly mined bitcoin greatly increases the trading volume of bitcoin, creating downward pressure on the market price of bitcoin.

*There are risks related to technological obsolescence, the vulnerability of the global supply chain for cryptocurrency hardware disruption, and difficulty in obtaining new hardware which may have a negative effect on our business.*

Our mining operations can only be successful and ultimately profitable if the costs, including hardware and electricity costs, associated with mining bitcoin are lower than the price of a single bitcoin. As our mining facility operates, our miners experience ordinary wear and tear, and may also face more significant malfunctions caused by a number of extraneous factors beyond our control. The degradation of our miners will require us to, over time, replace those miners which are no longer functional. Additionally, as the technology evolves, we may be required to acquire newer models of miners to remain competitive in the market. This upgrading process requires substantial capital investment, and we may face challenges in doing so on a timely and cost-effective basis.

Further, the global supply of miners is unpredictable and presently heavily dependent on manufacturers based in China, which was severely affected by the emergence of the COVID-19 coronavirus global pandemic. We currently utilize several types of ASIC miners as part of our mining operation, including Bitmain Antminers, Avalon miners and MicroBT WhatsMiners, which are all produced in China, Malaysia, and Indonesia. Geopolitical matters, including the U.S. relationship with China, may impact our ability to import ASIC miners. As a result, we may not be able to obtain adequate replacement parts for our existing miners or obtain additional miners from manufacturers on a timely basis. Such events could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin we mine or otherwise acquire or hold for our own account, and harm investors.

*There is a possibility of bitcoin mining algorithms transitioning to proof of stake validation and other mining related risks, which could make us less competitive and ultimately adversely affect our business and an investment in us.*

Proof of stake is an alternative method in validating cryptocurrency transactions. Should the bitcoin mining algorithm shift from a proof of work validation method to a proof of stake method, mining would require less energy and may render any company that maintains advantages in the current climate (for example, from lower priced electricity, processing, real estate, or hosting) less competitive. As a result of our efforts to optimize and improve the efficiency of our bitcoin mining operations, we may be exposed to the risk in the future of losing the benefit of our capital investments and the competitive advantage we hope to gain and may be negatively impacted if a switch to proof of stake validation were to occur. Such events could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin we mine or otherwise acquire or hold for our own account.

*We may face risks of Internet disruptions, which could have an adverse effect on not only the price of bitcoin but our ability to mine bitcoin.*

A disruption of the Internet may adversely affect the mining and use of cryptocurrencies, including bitcoin. Generally, cryptocurrencies and our business of mining bitcoin is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt bitcoin's network operations until the disruption is resolved and have an adverse effect on the price of bitcoin and our ability to mine bitcoin.

29

*Since there has been limited precedent set for financial accounting of digital assets, including bitcoin, it is unclear how we will be required to account for transactions involving digital assets.*

Because there has been limited precedent set for the financial accounting of cryptocurrencies and related revenue recognition and no official guidance has yet been provided by the Financial Accounting Standards Board or the SEC, it is unclear how companies may in the future be required to account for cryptocurrency transactions and assets and related revenue recognition. A change in regulatory or financial accounting standards or interpretation by the SEC could result in changes in our accounting treatment and the necessity to restate our financial statements. Such a restatement could adversely impact the accounting for the bitcoins we hold and bitcoin transactions and, more generally, negatively impact our business, prospects, financial condition and results of operations.

*Future developments regarding the treatment of digital assets for U.S. federal income and applicable state, local and non-U.S. tax purposes could adversely impact our business.*

Due to the new and evolving nature of digital assets and the absence of comprehensive legal guidance with respect to digital assets and related transactions, many significant aspects of the U.S. federal income and applicable state, local and non-U.S. tax treatment of transactions involving digital assets, such as the purchase and sale of bitcoin and the receipt of staking rewards and other digital asset incentives and rewards products, are uncertain, and it is unclear what guidance may be issued in the future with respect to the tax treatment of digital assets and related transactions.

Current IRS guidance indicates that for U.S. federal income tax purposes digital assets such as bitcoins should be treated and taxed as property, and that transactions involving the payment of bitcoins for goods and services should be treated in effect as barter transactions. The IRS has also released guidance to the effect that, under certain circumstances, hard forks of digital currencies are taxable events giving rise to taxable income and guidance with respect to the determination of the tax basis of digital currency. However, current IRS guidance does not address other significant aspects of the U.S. federal income tax treatment of digital assets and related transactions. Moreover, although current IRS guidance addresses the treatment of certain forks, there continues to be uncertainty with respect to the timing and amount of income inclusions for various crypto asset transactions, including, but not limited to, staking rewards and other crypto asset incentives and rewards products. While current IRS guidance creates a potential tax reporting requirement for any circumstance where the ownership of a bitcoin passes from one person to another, it preserves the right to apply capital gains treatment to those transactions, which is generally favorable for investors in bitcoin.

There can be no assurance that the IRS will not alter its existing position with respect to digital assets in the future or that other state, local and non-U.S. taxing authorities or courts will follow the approach of the IRS with respect to the treatment of digital assets such as bitcoins for income tax and sales tax purposes. Any such alteration of existing guidance or issuance of new or different guidance may have negative consequences including the imposition of a greater tax burden on investors in bitcoin or imposing a greater cost on the acquisition and disposition of bitcoin, generally; in either case potentially having a negative effect on the trading price of bitcoin or otherwise negatively impacting our business. In addition, future technological and operational developments that may arise with respect to digital currencies may increase the uncertainty with respect to the treatment of digital currencies for U.S. federal income and applicable state, local and non-U.S. tax purposes.

**Risks Related to Our Securities**

*The price of our common stock may be volatile and could fluctuate widely, which could result in substantial losses for investors.*

The market price of our common stock is likely to be highly volatile and could fluctuate widely in response to various factors, many of which are beyond our control, including, without limitation:

- technological innovations or new products and services by us or our competitors;
- government regulation of our products and services;
- the establishment of partnerships with other technology companies;
- intellectual property disputes;
- additions or departures of key personnel;
- sales of our common stock;
- our ability to integrate operations, technology, products and services;
- our ability to execute our business plan;
- operating results below expectations;
- loss of any strategic relationship;
- industry developments;
- economic and other external factors; and
- period-to-period fluctuations in our financial results.

In addition, the securities markets have from time to time experienced significant price and volume fluctuations that are unrelated to the operating performance of particular companies. These market fluctuations may also materially and adversely affect the market price of our common stock.

***We have the right to designate and issue additional shares of preferred stock. If we were to designate and/or issue additional preferred stock, it is likely to have rights, preferences and privileges that may adversely affect the common stock.***

We are authorized to issue 10,000,000 shares of blank-check Preferred Stock, with such rights, preferences and privileges as may be determined from time to time by our Board of Directors. Our Board of Directors is empowered, without stockholder approval, to issue Preferred Stock in one or more series, and to fix for any series the dividend rights, dissolution or liquidation preferences, redemption prices, conversion rights, voting rights, and other rights, preferences and privileges for the Preferred Stock. Currently, 2,000,000 shares are designated as Series A Preferred Stock, of which 1,750,000 shares are outstanding, the features of which are discussed elsewhere in this Annual Report.

The issuance of shares of Preferred Stock, depending on the rights, preferences and privileges attributable to the Preferred Stock, could reduce the voting rights and powers of the common stock and the portion of our assets allocated for distribution to common stockholders in a liquidation event, and could also result in dilution in the book value per share of the common stock. The preferred stock could also be utilized, under certain circumstances, as a method for raising additional capital or discouraging, delaying or preventing a change in control of the Company, to the detriment of the investors in the common stock offered hereby. We cannot assure that we will not, under certain circumstances, issue shares of our Preferred Stock.

***We have not paid dividends on shares of our common stock in the past and have no immediate plans to pay do so in the future.***

We have not paid, and do not plan to pay, any cash dividends with respect to our common stock in the immediate future. We plan to reinvest all of our earnings, to the extent we have earnings, in order to market our products and to cover operating costs and to otherwise become and remain competitive. We cannot assure stockholders that we would, at any time, generate sufficient surplus cash that would be available for distribution to the holders of our common stock as a dividend. Therefore, stockholders should not expect to receive cash dividends on our common stock.

***If securities or industry analysts do not publish or do not continue to publish research or reports about our business, or if they issue an adverse or misleading opinion regarding our stock, our stock price and trading volume could decline.***

Table of Contents

The trading market for our common stock is influenced by the research and reports that industry or securities analysts publish about us or our business. If any of the analysts who cover us now or in the future issue an adverse opinion regarding our stock, our stock price would likely decline. If one or more of these analysts ceases coverage of our company or fail to publish reports on us regularly, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline.

***Provisions in the Nevada Revised Statutes and our Bylaws could make it very difficult for an investor to bring any legal actions against our directors or officers for violations of their fiduciary duties or could require us to pay any amounts incurred by our directors or officers in any such actions.***

Members of our Board of Directors and our officers will have no liability for breaches of their fiduciary duty of care as a director or officer, except in limited circumstances, pursuant to provisions in the Nevada Revised Statutes and our Bylaws as authorized by the Nevada Revised Statutes. Specifically, Section 78.138 of the Nevada Revised Statutes provides that a director or officer is not individually liable to the company or its shareholders or creditors for any damages as a result of any act or failure to act in his or her capacity as a director or officer unless it is proven that (1) the directors or officers act or failure to act constituted a breach of his or her fiduciary duties as a director or officer and (2) his or her breach of those duties involved intentional misconduct, fraud or a knowing violation of law. This provision is intended to afford directors and officers protection against and to limit their potential liability for monetary damages resulting from suits alleging a breach of the duty of care by a director or officer.

Accordingly, stockholders may be unable to prevail in a legal action against our directors or officers even if they have breached their fiduciary duty of care. In addition, our Bylaws allow us to indemnify our directors and officers from and against any and all costs, charges and expenses resulting from their acting in such capacities with us. This means that if one were able to enforce an action against our directors or officers, in all likelihood, we would be required to pay any expenses they incurred in defending the lawsuit and any judgment or settlement they otherwise would be required to pay. Accordingly, our indemnification obligations could divert needed financial resources and may adversely affect our business, financial condition, results of operations and cash flows, and adversely affect prevailing market prices for our common stock.

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties**

On August 6, 2021, the Company, through its wholly owned subsidiary CSRE Properties Norcross, LLC, closed on the purchase of real property located at 5295 Brook Hollow Parkway, Norcross, Georgia, 30071 (the "Norcross Property"). The total purchase price was $6,550,000 and the seller conveyed fee simple title by limited warranty deed. The Norcross Property consists of an office building of approximately 86,000 square feet on approximately 7 acres of land. The Norcross Property is utilized by CleanBlok to conduct cryptocurrency mining activities.

On May 20, 2021, the Company, through its wholly owned subsidiary ATL, closed on the purchase of real property located at 2380 Godby Road, College Park, Georgia, 30349 (the "Godby Road Property"), which it had been leasing prior to the purchase. The total purchase price was $4,711,799 and the seller conveyed fee simple title by limited warranty deed. The Godby Road Property consists of an office/warehouse building of approximately 41,387 square feet on approximately 6 acres of land. The Godby Road Property is utilized by ATL and CleanBlok to conduct cryptocurrency mining activities.

On June 15, 2021, the Company entered into a lease for warehouse and office space at 2042 Corte Del Nogal, Suite C, Carlsbad, California, 92011. The 5-year lease is for an approximately 12,704 square foot industrial unit and part of a larger 47,744 square foot multi-tenant industrial flex building and requires monthly base rent payments of $11,307. The leased property is utilized by our energy segment.

On August 26, 2021, the Company entered into a lease for office space at 2370 Corporate Circle, Suite 160, Henderson, Nevada, 89074. The 65-month lease is for 4,552 rentable square feet an initial base rent of $10,925 and increases 3% each year. The Corporate Circle space will be utilized as the CleanSpark corporate and executive headquarters. Until the Corporate Circle location is move-in ready, we sublease offices located at 8475 S. Eastern Ave., Suite 200, Las Vegas, Nevada. We are currently on a year-to-year lease agreement that calls for us to make payments of $1,525 per month.

We also have an office located at 1185 S. 1800 W, Suite 3, Woods Cross Utah 84087. We are currently on a year-to-year lease agreement that calls for us to make payments of $2,300 per month. This property is utilized by corporate employees.

The Company believes its existing facilities and equipment are in good operating condition and are suitable for the conduct of its business.

**Item 3. Legal Proceedings**

We are subject to litigation, claims, investigations and audits arising from time to time in the ordinary course of our business.

For a description of our material pending legal proceedings, please see footnote 15 pertaining to commitments and contingencies included elsewhere in this Annual Report.

**Item 4. Mine Safety Disclosures**

Not applicable.

<div align="center">33</div>

**PART II**

**Item 5. Market for Registrants Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our common stock, par value $0.001 per share, is listed on The Nasdaq Capital Market under the ticker symbol "CLSK."

**Holders of Our Common Stock**

As of December 14, 2021, we had 185 registered holders of record of our common stock, with others in street name.

The holders of our common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. Holders of our common stock have no preemptive rights and no right to convert their common stock into any other securities. There are no redemption or sinking fund provisions applicable to our common stock.

**Dividends**

There are no restrictions in our articles of incorporation or bylaws that prevent us from declaring dividends. The Nevada Revised Statutes, however, do prohibit us from declaring dividends where after giving effect to the distribution of the dividend:

1.    we would not be able to pay our debts as they become due in the usual course of business, or;

2.    our total assets would be less than the sum of our total liabilities plus the amount that would be needed to satisfy the rights of shareholders who have preferential rights superior to those receiving the distribution.

We have never declared any dividends on shares of our common stock, and we do not plan to declare any dividends in the foreseeable future.

**Recent Sales of Unregistered Securities; Use of Proceeds from Registered Securities**

As of December 10, 2021, we issued an aggregate of 8,404 unregistered shares of our common stock to the Sellers of Gridfabric in accordance with the Membership Interest Purchase Agreement entered into on August 31, 2020, based upon the achievement of certain milestones. The shares had an aggregate value of $150,000.

The shares of common stock were issued in a transaction not involving a public offering in reliance upon an exemption from registration provided by Section 4(a)(2) of the Securities Act, and/or Regulation D promulgated thereunder.

During the fiscal year ended September 30, 2021, there were no other unregistered sales of our securities that were not reported in a Current Report on Form 8-K or our Quarterly Reports on Form 10-Q.

**Repurchases**

The Company has not made any repurchases of shares or other units of any class of the Company's equity securities during the fourth quarter of the fiscal year covered by this Annual Report.

**Item 6. [Reserved]**

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Forward-Looking Statements**

*The following discussion of our financial condition and results of operations for the years ended September 30, 2021 and 2020 should be read in conjunction with our consolidated financial statements and the notes to those statements that are included elsewhere in this Annual Report on Form 10-K. Our discussion includes forward-looking statements based upon current expectations that involve risks and uncertainties, such as our plans, objectives, expectations and intentions. Actual results and the timing of events could differ materially from those anticipated in these forward-looking statements as a result of a number of factors. We use words such as anticipate, estimate, plan, project, continuing, ongoing, expect, believe, intend, may, will, should, could, and similar expressions to identify forward-looking statements.*

**Results of Operations for the Year Ended September 30, 2021 and 2020**

*Revenues*

We earned $49,438,115 in revenues during the year ended September 30, 2021, as compared with $10,028,701 in revenues for the year ended September 30, 2020.

For the year ended September 30, 2021, our revenue was derived from cryptocurrency mining revenues, the sale of equipment, solar panels, batteries, design, engineering, and services revenue. Income from our mining segment is a result of bitcoin mining activities in the United States. Income from our Energy segment is the result of contracts to sell switchgear equipment, perform engineering design, and provide software for distributed energy and microgrid systems. For the year ended September 30, 2021, we also generated services revenue from p2kLabs. We hope to generate more significant revenue from customers through the sale and licensing of our Software platforms and services in the future. However, we are unable to estimate with any degree of certainty the amount of future revenues, from existing or future software contracts. Also, we do not anticipate earning significant revenues from our Gasifier business until such time that we have fully developed our technology and are able to market our products.

*Costs and Expenses*

We had costs and expenses of $78,015,168 for the year ended September 30, 2021, as compared with $25,171,817 for the year ended September 30, 2020.

Our cost of revenues were $13,964,711 for the year ended September 30, 2021, as compared with cost of revenues of $7,907,849 for the year ended September 30, 2020.

Our cost of revenues in 2021 was mainly the result of mining energy costs, hosting fees, contract manufacturing expenses, and hardware materials. Our cost of revenues in 2020 was mainly the result of contract manufacturing expenses and hardware materials.

Mining expenses incurred during the year ended September 30, 2021 is $4,889,996. It consisted mainly of energy costs and hosting fees paid to Coinmint.

Contract manufacturing expenses decreased to $3,926,060  for the year ended September 30, 2021, from $6,704,075  for the year ended 2020. Our manufacturing expense consisted of the cost of contract manufacturing of switchgear equipment.

35

Hardware material purchases increased to $3,205,547 for the year ended September 30, 2021, from $824,665 in hardware expenses for the year ended September 30, 2020. Our materials expense for the years ended September 30, 2021 and 2020 consisted mainly of the cost of energy storage and solar panels.

Professional fees increased to $8,272,966 for the year ended September 30, 2021 from $6,521,016 for the same period ended September 30, 2020. Our professional fees expenses for the year ended September 30, 2021 consisted mainly of legal fees of $4,570,216, accounting and tax fees of $1,070,174 consulting fees of $818,741, investor relations and external marketing consulting fees of $959,717, director fees of $177,084, recruitment and conference fees of $251,183, subcontract fees of $185,980 and audit and review fees of $214,100.

Our professional fees expenses for the year ended September 30, 2020 consisted mainly of consulting fees of $607,392 paid to management of the Company, stock-based compensation for consulting of $2,265,194, sales consulting of $278,547, legal fees of $1,472,421, investor relations and external marketing consulting of $725,347, director fees of $442,000, consulting for software and engineering of $82,031, accounting and tax fees of $186,969 and audit and review fees of $135,060.

Payroll expenses increased to $25,355,684 for the year ended September 30, 2021 from $6,813,641 for the same period ended September 30, 2020. Our payroll expenses for the year ended September 30, 2021 consisted mainly of salary and wages expense of $17,624,078 and employee and officer stock-based compensation and related bonuses of $7,731,605. Our payroll expenses for the year ended September 30, 2020 consisted mainly of salary and wages expense of $4,293,559 and employee and officer stock-based compensation of $2,520,083.

General and administrative fees increased to $5,291,652 for the year ended September 30, 2021 from $1,093,062 for the same period ended September 30, 2020. Our general and administrative expenses for the year ended September 30, 2021 consisted mainly of marketing related expenses of $1,488,933, travel expenses of $367,632, rent expenses of $445,944, insurance expenses of $720,053, dues and subscriptions of $1,129,963, repairs and maintenance of $174,192, supplies of $134,163, utilities of $184,232 and bad debt expense of $246,453. Our general and administrative expenses for the year ended September 30, 2020 consisted mainly of travel expenses of $82,407, rent expenses of $117,223, insurance expenses of $232,043, dues and subscriptions of $362,887, marketing related expenses of $153,091, and bad debt expense of $36,924.

Depreciation and amortization expense increased to $12,244,368 for the year ended September 30, 2021, from $2,836,249 for the same period ended September 30, 2020.

Impairment expenses were recorded for the year ended September 30, 2021 for $12,885,776, and no impairment expenses were recorded for the same period ended September 30, 2020. Impairment expense for the year ended September 30, 2021 consisted primarily of bitcoin impairment of $6,608,076, goodwill impairment of $5,723,388 and software impairment of $554,322, which represents a write down of our GridFabric product line of $250,000 and our mVSO platform of $304,322.

*Other Income/Expenses*

We had net other income of $6,765,043 for the year ended September 30, 2021, compared with other expenses of $8,203,027 for the year ended September 30, 2020. Other income for the year ended September 30, 2021 consisted mainly of other income of $544,778, change in fair value of contingent consideration of $84,198, gains on derivative assets of $2,790,387, realized gains on the sale of digital currency of $3,104,378, realized gains on the sale of equity securities of $179,046, interest income of $221,488 and interest expense of $154,079. Our other income/expenses for the year ended September 30, 2020 consisted mainly of other income of $20,000, unrealized gains on equity security and derivative security of $116,868 and $2,115,269 respectively, interest income of $308,804, and interest expense of $10,758,750.

*Net Loss*

Net loss for the year ended September 30, 2021 was $21,812,010 compared to net loss of $23,346,143 for the year ended September 30, 2020.

**Non-GAAP Measures**

Adjusted EBITDA and Adjusted EPS is not a measurement of financial performance under generally accepted accounting principles in the United States, or GAAP. Because of varying available valuation methodologies, subjective assumptions and the variety of equity instruments that can impact a company's non-cash operating expenses, CleanSpark management believes that providing a non-GAAP financial measure that excludes non-cash and non-recurring expenses allows for meaningful comparisons between the Company's core business operating results and those of other companies, as well as providing the Company with an important tool for financial and operational decision making and for evaluating its own core business operating results over different periods of time.

The Company's adjusted EBITDA measure may not provide information that is directly comparable to that provided by other companies in its industry, as other companies in its industry may calculate non-GAAP financial results differently, particularly related to non-recurring, unusual items. The Company's adjusted EBITDA is not a measurement of financial performance under GAAP and should not be considered as an alternative to operating income or as an indication of operating performance or any other measure of performance derived in accordance with GAAP. Our management does not consider adjusted EBITDA to be a substitute for, or superior to, the information provided by GAAP financial results.

We are providing supplemental financial measures for (i) non-GAAP adjusted earnings before interest, taxes, depreciation and amortization, or ("adjusted EBITDA") that excludes the impact of interest, taxes, depreciation, amortization, our share-based compensation expense, and impairment of assets, unrealized gains/losses on securities, certain financing costs, other non-cash items, certain non-recurring expenses, and impacts related to discontinued operations; and (ii) non-GAAP adjusted EBITDA and non-GAAP earnings per share that excludes the impact of interest, taxes, depreciation, amortization, our share-based compensation expense, and impairment of assets, unrealized gains/losses on securities, certain financing costs, other non-cash items, and impacts related to discontinued operations. These supplemental financial measures are not measurements of financial performance under generally accepted accounting principles in the United States ("GAAP") and, as a result, these supplemental financial measures may not be comparable to similarly titled measures of other companies. Management uses these non-GAAP financial measures internally to help understand, manage, and evaluate our business performance and to help make operating decisions.

We believe that these non-GAAP financial measures are also useful to investors and analysts in comparing our performance across reporting periods on a consistent basis. The first supplemental financial measure excludes (i) impacts of interest, taxes, and depreciation; (ii) significant non-cash expenses such as our share-based compensation expense, unrealized gains/losses on securities, certain financing costs, other non-cash items that we believe are not reflective of our general business performance, and for which the accounting requires management judgment, and the resulting expenses could vary significantly in comparison to other companies; (iii) significant impairment losses related to long-lived and digital assets, which include our bitcoin for which the accounting requires significant estimates and judgment, and the resulting expenses could vary significantly in comparison to other companies; and (iv) and impacts related to discontinued operations that would not be applicable to our future business activities.

Non-GAAP financial measures are subject to material limitations as they are not in accordance with, or a substitute for, measurements prepared in accordance with GAAP. For example, we expect that share-based compensation expense, which is excluded from the first two non-GAAP financial measures, will continue to be a significant recurring expense over the coming years and is an important part of the compensation provided to certain employees, officers, and directors.

We have also excluded impairment losses on assets, including impairments of our digital currency our non-GAAP financial measures, which may continue to occur in future periods as a result of our continued holdings of significant amounts of bitcoin. Our non-GAAP financial measures are not meant to be considered in isolation and should be read only in conjunction with our Consolidated Financial Statements, which have been prepared in accordance with GAAP. We rely primarily on such Consolidated Financial Statements to understand, manage, and evaluate our business performance and use the non-GAAP financial measures only supplementally.

The following is a reconciliation of our non-GAAP adjusted EBITDA to the most directly comparable financial measure stated in accordance with GAAP, which excludes the impact of (i) interest, taxes, depreciation, amortization; (ii) our share-based compensation expense; (iii) impairment expense; (iv) unrealized gains/losses on securities; (v) and (vi) impacts related to discontinued operations, to its most directly comparable GAAP measures for the periods indicated:

| | Years Ended September 30, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Reconciliation of non-GAAP adjusted EBITDA** | | |
| Net Loss: | $ (21,812,010) | $ (23,346,143) |
| Interest and taxes | (67,409) | 10,449,946 |
| Depreciation and amortization | 12,244,368 | 2,836,249 |
| Share-based compensation expense | 8,546,712 | 2,053,232 |
| Digital asset impairment losses | 6,608,076 | — |
| Energy & other goodwill impairment losses | 6,277,710 | — |
| Unrealized (gains)/losses of securities and derivatives | (2,785,234) | (2,232,137) |
| Discontinued operations | — | — |
| non-GAAP adjusted EBITDA | 9,012,213 | (10,238,853) |

The following is a reconciliation of our non-GAAP adjusted EBITDA earnings per share, in each case excluding the impact of (i) interest, taxes, depreciation, amortization; (ii) our share-based compensation expense; (iii) impairment expense; (iv) unrealized gains/losses on securities; (v) certain financing costs and other non-cash items; (vi) certain non-recurring expenses; and (vii) impacts related to discontinued operations:

| **Reconciliation of non-GAAP adjusted EBITDA per share:** | | |
| --- | --- | --- |
| Non-GAAP adjusted EBITDA | $ 9,012,213 | $(10,238,853) |
| Interest and taxes (per diluted share) | — | 1.09 |
| Depreciation and amortization (per share) | 0.42 | 0.30 |
| Share-based compensation expense | 0.29 | 0.21 |
| Digital asset impairment losses (per share) | 0.22 | — |
| Energy & other goodwill impairment losses | 0.21 | — |
| Unrealized (gains)/losses of securities and derivatives (per share) | (0.09) | (0.23) |
| Discontinued operations | — | — |
| Non-GAAP EBITDA per share | $ 0.31 | $ (1.07) |

38

The following is a reconciliation of fair market value of our digital currency holdings to the current carrying value at September 30, 2021. We did not hold any digital currency as of September 30, 2020:

| | Carrying Value (1) | Fair Market Value (2) |
|---|---|---|
| Number of Bitcoins held | $ 627 | $ 627 |
| Value per coin (1) (2) | 37,645 | 43,929 |
| Total | $23,603,415 | $27,543,483 |

(1) Value per coin is the average book value per coin determined by the number of coins held as of the balance sheet date divided by the carrying value.
(2) Value per coin is the quoted market price as of the balance sheet date.

**Liquidity and Capital Resources**

For the year ended September 30, 2021, our primary sources of liquidity came from existing cash and proceeds from share offerings. On March 18, 2021, the Company consummated a fully underwritten public offering of shares of its common stock, which resulted in net proceeds to the Company of approximately $187,200,000. On June 3, 2021, the Company entered into an At the Market Offering Agreement (the "ATM") with H.C. Wainwright & Co., LLC ("HCW"), pursuant to which it may, from time to time, offer and sell up to an aggregate of $500,000,000 of shares of its common stock to or through HCW. During the fiscal year ended September 30, 2021, the Company issued an aggregate of 3,443,379 shares of the Company's common stock under the ATM for net proceeds of $46.4 million. The shares were sold pursuant to a prospectus dated March 15, 2021 and a prospectus supplement dated June 3, 2021 filed with the SEC. Based on our current plans and business conditions, we believe that existing cash, cash generated from operations and our ATM will be sufficient to satisfy our anticipated cash requirements until we reach profitability, and we are not aware of any trends or demands, commitments, events or uncertainties that are reasonably likely to result in a decrease in liquidity of our assets. However, our future capital requirements will depend on many factors including our growth rate, the timing and extent of spending to support development efforts, the expansion of our sales and marketing, the timing of new product introductions and the continuing market acceptance of our products and services. If cash generated from operations is insufficient to satisfy our capital requirements, we may open a revolving line of credit with a bank, or we may have to sell additional equity or debt securities or obtain credit facilities. In the event such financing is needed in the future, there can be no assurance that such financing will be available to us, or, if available, that it will be in amounts and on terms acceptable to us. If cash flows from operations became insufficient to continue operations at the current level, and if no additional financing was obtained, our business, operating results and financial condition would be adversely affected.

As of September 30, 2021, we had total current assets of $57,726,321, consisting of cash, accounts receivable, inventory, digital currency, investments, prepaid expenses and other current assets, and total assets in the amount of $317,473,121. Our total current liabilities as of September 30, 2021 were $10,063,022. We had a working capital surplus of $47,663,299 as of September 30, 2021.

Operating activities used $35,429,342 in cash for the year ended September 30, 2021, as compared with $6,642,734 for the same period ended September 30, 2020. Our net loss of $21,812,010 was the main component of our negative operating cash flow for the year ended September 30, 2021, offset mainly by stock-based compensation of $8,546,712, impairment expense of $12,885,786 and depreciation and amortization of $12,244,368. Our net loss of $23,346,143 was the main component of our negative operating cash flow for the year ended September 30, 2020, offset mainly by amortization of debt discount of $9,010,547, depreciation and amortization of $2,672,331, shares issued as interest of $2,050,000, amortization of capitalized software of $163,918 and stock-based compensation of $2,053,232.

Cash flows used by investing activities during the year ended September 30, 2021 was $217,714,926, as compared with $2,383,623 for the year ended September 30, 2020. Our acquisitions of Solar watt Solutions for  $1,000,136, purchase of fixed assets of $139,234,948, and deposits on mining equipment of $87,959,910 were the main components of our negative investing cash flow for the year ended September 30, 2021. The negative cash flow from investing activities is offset by sale of digital currencies of $11,443,132, acquisition of ATL  Data Center, net of cash received of $45,783 and sale of equity securities of $373,121.

For the year ended September 30, 2020, our investment in the capitalized software of $84,924, acquisition of P2K Labs of $1,141,990, acquisition of Grid Fabric of $371,812, purchase of fixed assets of $34,897, and investment in equity and debt security of $750,000 were the main components of our negative investing cash flow.

Cash flows provided by financing activities during the year ended September 30, 2021 amounted to $268,058,393, as compared with $4,313,702 for the year ended September 30, 2020. Our positive cash flows from financing activities for the year ended September 30, 2021 consisted of $270,656,118 in proceeds from offerings, $3,750,932 in proceeds from the exercise of warrants  and options offset by repayments of $5,882,553 on promissory notes and $288,602 in finance leases. Our positive cash flows from financing activities for the year ended September 30, 2020 consisted of $4,000,000 in proceeds from the sale of common stock, $531,169 in proceeds from promissory notes offset by repayments of $217,467 on promissory notes.

**Contractual Obligations**

The Company has purchase commitments for approximately $203.6 million related to purchase of miners as of September 30, 2021, and the Company has paid $144.7 million towards these commitments as of the end of this period.

The Company has purchase commitments for infrastructure assets and other mining equipment of approximately $6,512,000 as of September 30, 2021 and the Company has paid $4,576,000 towards these commitments during this period.

The following table sets forth certain information concerning our obligations to make contractual future payments towards our agreements as of September 30, 2021:

| | 2022 | 2023 | 2024 | 2025 | 2026 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| **Recorded contractual obligations:** | | | | | | | |
| Operating lease obligations | $316,908 | $324,948 | $333,234 | $341,767 | $299,039 | $50,659 | $1,666,555 |
| Finance Lease obligations | 449,431 | 321,887 | 142,428 | 12,320 | 1,853 | — | 927,919 |
| Miner equipment | 58,930,880 | | | | | | 58,930,880 |
| Infrastructure assets | 1,936,000 | | | | | | 1,936,000 |
| Total | $61,633,219 | $646,835 | $475,662 | $354,087 | $300,892 | $50,659 | $63,461,354 |

Contingent consideration

GridFabric: On August 31, 2020, the Company acquired GridFabric, LLC. Pursuant to the terms of the purchase agreement, additional shares of the Company's common stock valued at up to $750,000 were issuable if GridFabric achieves certain revenue and product release milestones. On September 30, 2021, the contingent consideration was re-measured to $500,000.

Subsequent to September 30, 2021, the Company settled all contingent consideration due to GridFabric resulting in the issuance of 8,404 shares of Company common stock valued at $150,000.

Solar Watt Solutions: On February 24, 2021, the Company acquired Solar Watt Solutions, Inc. Pursuant to the terms of the purchase agreement, additional cash consideration of up to $2,500,000 and up to 310,018 shares of the Company's common stock may be payable if Solar Watt Solutions achieves certain revenue milestones. As of September 30 2021, none of the contingent consideration had been earned.

**Known Trends or Uncertainties**

Although we have not seen any significant reduction in revenues to date, we have seen some consolidation in our industry during economic downturns. These consolidations have not had a negative effect on our total sales; however, should consolidations and downsizing in the industry continue to occur, those events could adversely impact our revenues and earnings going forward.

As discussed in the Risk Factors section of this Annual Report on Form 10-K, the world has been affected due to the COVID-19 pandemic. Until the pandemic has passed, there remains uncertainty as to the effect of COVID-19 on our business in both the short and long-term.

We believe that the need for improved productivity in the research and development activities directed toward developing new products and/or software will continue to result in increasing adoption of energy solution tools such as those we produce. New product and/or software developments in the energy business segment could result in increased revenues and earnings if they are accepted by our markets; however, there can be no assurances that new products and/or software will result in significant improvements to revenues or earnings. For competitive reasons, we do not disclose all of our new product development activities.

Our continued quest for acquisitions could result in a significant change to revenues and earnings if one or more such acquisitions are completed.

The potential for growth in new markets is uncertain. We will continue to explore these opportunities until such time as we either generate sales or determine that resources would be more efficiently used elsewhere.

**Inflation**

We have not been affected materially by inflation during the periods presented, and no material effect is expected in the near future.

**Recently Issued Accounting Pronouncements**

In October 2021, the FASB issued ASU 2021-08, Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers, which requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with ASC 606, Revenue from Contracts with Customers, as if it had originated the contracts. Under the current business combinations guidance, such assets and liabilities are recognized by the acquirer at fair value on the acquisition date. This new guidance is effective for the Company for its fiscal year beginning February 1, 2023 and interim periods within that fiscal year, and early adoption is permitted. The Company is evaluating its potential impact but does not expect the new standard to have a material impact on the Company's results of operations or cash flows.

In March 2020, the FASB issued ASU 2020-04, Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting and issued subsequent amendments to the initial guidance (collectively, "Topic 848"). Topic 848 became effective immediately and expires on December 21, 2022. Topic 848 allows eligible contracts that are modified to be accounted for as a continuation of those contracts, permits companies to preserve their hedging accounting during the transition period and enables companies to make a one-time election to transfer or sell held-to-maturity debt securities that are affected by rate reform. Topic 848 provides optional expedients and exceptions for contracts, hedging relationships and other transactions that reference the London Inter-Bank Offered Rate ("LIBOR") or another reference rate expected to be discontinued because of reference rate reform if certain criteria are met. The adoption of ASU 2020-04 is not expected to have a material impact on the Company's financial statements or disclosures.

The Company adopted ASU 2016-13, Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments on October 1, 2020 ("ASU 2016-13"). ASU 2016-13 requires entities to use a new forward-looking "expected loss" model that reflects expected credit losses, including credit losses related to trade receivables, and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates, which generally will result in the earlier recognition of allowances for losses. As the Company was a Smaller Reporting Company at the time of issuance of the ASU, the Company expects to adopt the ASU effective October 1, 2023, including the interim periods within the fiscal year. In August 2020, the FASB issued ASU2020-06, "Debt - Debt with Conversion and Other Options (subtopic 470-20) and Derivatives and Hedging - Contracts in Entity's Own Equity (subtopic 815-40)," which reduces the number of accounting models in ASC 470-20 that require separate accounting for embedded conversion features. As a result, a convertible debt instrument will be accounted for as a single liability measured at its amortized cost as long as no other features require bifurcation and recognition as derivatives. By removing those separation models, the effective interest rate of convertible debt instruments will be closer to the coupon interest rate. Further, the diluted net income per share calculation for convertible instruments will require the Company to use the if-converted method. The treasury stock method should no longer be used to calculate diluted net income per share for convertible instruments. The amendment will be effective for the Company with annual periods beginning January 1, 2022 and early adoption is permitted. The adoption of ASU 2020-06 is not expected to have a material impact on the Company's financial statements or disclosures.

In August 2020, the FASB issued Account Standard Update ("ASU") 2020-06, "Debt - Debt with Conversion and Other Options (subtopic 470-20) and Derivatives and Hedging - Contracts in Entity's Own Equity (subtopic 815-40)," which reduces the number of accounting models in ASC 470-20 that require separate accounting for embedded conversion features. As a result, a convertible debt instrument will be accounted for as a single liability measured at its amortized cost as long as no other features require bifurcation and recognition as derivatives. By removing those separation models, the effective interest rate of convertible debt instruments will be closer to the coupon interest rate. Further, the diluted net income per share calculation for convertible instruments will require the Company to use the if-converted method. The treasury stock method should no longer be used to calculate diluted net income per share for convertible instruments. The amendment will be effective for the Company with annual periods beginning January 1, 2022 and early adoption is permitted. The adoption of ASU 2020-06 is not expected to have a material impact on the Company's financial statements or disclosures.

The Company has evaluated all other recent accounting pronouncements and believes that none of them will have a material effect on the Company's financial position, results of operations or cash flows.

**Critical Accounting Policies**

In December 2001, the SEC requested that all registrants list their most critical accounting policies in the Management Discussion and Analysis. The SEC indicated that a critical accounting policy is one which is both important to the portrayal of a Company's financial condition and results, and requires managements most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain.

Our accounting policies are discussed in detail in the footnotes to our financial statements included in this Annual Report on Form 10-K for the year ended September 30, 2021 however we consider our critical accounting policies to be those related to revenue recognition, long-lived assets, accounts receivable, fair value of financial instruments, cash and cash equivalents, digital currency and stock-based compensation.

Our significant estimates include estimates used to review the Company's goodwill and digital currency impairment, intangible assets acquired, impairments and estimations of long-lived assets, revenue recognition on percentage of completion type contracts, revenue recognition from digital currency mining, valuation of derivative assets and liabilities, available-for-sale investments, allowances for uncollectible accounts, valuation of digital currencies, valuation of contingent consideration, warranty, and the valuations of share based awards. The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable in the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions including, but not limited to, the ultimate impact that COVID-19 may have on the Company's operations.

**Off Balance Sheet Arrangements**

As of September 30, 2021, there were no off-balance sheet arrangements.

41

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

As a first time large accelerated filer, we are not required to provide the information required by this Item until the first quarter after the fiscal year in which it is first determined that we have become a large accelerated filer.

**Item 8. Financial Statements and Supplementary Data**

Index to Financial Statements Required by Article 8 of Regulation S-X:


Audited Consolidated Financial Statements:

F-1      Reports of Independent Registered Public Accounting Firm
F-5      Consolidated Balance Sheets as of September 30, 2021 and 2020;
F-6      Consolidated Statements of Operations and Comprehensive Loss for the years ended September 30, 2021 and 2020;
F-7      Consolidated Statements of Stockholders' Equity for the years ended September 30, 2021 and 2020
F-8      Consolidated Statements of Cash Flows for the years ended September 30, 2021 and 2020;
F-9      Notes to Consolidated Financial Statements

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and Board of Directors of
CleanSpark, Inc.

### *Opinion on the Financial Statements*

We have audited the accompanying consolidated balance sheets of CleanSpark, Inc. and its subsidiaries (collectively, the "Company") as of September 30, 2021 and 2020, and the related consolidated statements of operations and comprehensive loss, stockholders' equity, and cash flows for each of the two years in the period ended September 30, 2021, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of September 30, 2021 and 2020, and the results of their operations and their cash flows for each of the two years in the period ended September 30, 2021, in conformity with accounting principles generally accepted in the United States of America.

We also have audited the Company's internal control over financial reporting as of September 30, 2021, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated December 14, 2021 expressed an adverse opinion.

### *Basis for Opinion*

The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's financial statements and an opinion on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the financial statements included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that responds to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinion.

### *Critical Audit Matters*

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Evaluation of the Accounting for and Disclosure of Digital Currency Held*

As disclosed in Note 2 to the consolidated financial statements, the Company's digital currency held as of September 30, 2021, which mainly consist of Bitcoin, are accounted for as indefinite-lived intangible assets, and have been included in current assets on the consolidated balance sheet. The Company's digital currency as of September 30, 2021 amounted to approximately $23,603,000. We identified the accounting for and disclosure of the digital currency held as a critical audit matter because, currently, no specific definitive guidance exists for the accounting for and disclosure of digital currencies held in accordance with accounting principles generally accepted in the United States ("GAAP"). The Company's management has exercised significant judgment in their determination of how existing GAAP should be applied to the accounting for its digital currency held, the associated financial statement presentation and accompanying footnote disclosures.

The primary procedures we performed to address this critical audit matter included the following:
- Evaluated management's rationale for the application of Accounting Standards Codification ("ASC") 350 to account for its digital currency held and examined management's processes for determining the amount of impairment expense recognized;
- Evaluated management's rationale for the inclusion of digital currency as a current asset on the balance sheet;
- Independently and directly confirmed the balance and ownership of digital currency that is in the custody of a third party;
- Evaluated management's disclosures of its digital currency activities in the financial statement footnotes; and
- Examined supporting sale and cash receipt evidence for digital currency sales, including management's processes for calculating any gains or losses on sales of its digital currency.

*Evaluation of the Accounting for and Disclosure of Digital Currency Mining Revenue Recognized*

As disclosed in Note 2, the Company recognizes revenue in accordance with ASC 606, Revenue from Contracts with Customers. The Company provides computing power to the mining pools and in exchange for providing such computing power, the Company is entitled to a fractional share of the fixed cryptocurrency award the pool operator receives for successfully adding a block to the blockchain, plus a fractional share of the transaction fees attached to that block. The Company's fractional share is based on the proportion of computing power the Company contributed to the mining pool operator to the total computing power contributed by all mining pool participants in solving the current algorithm. During the year ended September 30, 2021, the Company recognized net digital currency mining revenue of approximately $38,846,000. We identified the accounting for and disclosure of digital currency mining revenue recognized as a critical audit matter because, currently, no specific definitive guidance exists for the accounting for and disclosure of digital currency mining revenue recognized in accordance with GAAP. The Company's management has exercised significant judgment in their determination of how existing GAAP should be applied to the accounting for and disclosure of digital currency mining revenue recognized.

The primary procedures we performed to address this critical audit matter included the following:
- Performed a site visitation of the facility where the Company's mining hardware is located. The visitation included an observation of the physical and environmental controls and mining equipment inventory observation procedures;
- Evaluated management's rationale for the application of ASC 606 to account for digital currency awards earned;
- Evaluated management's disclosures of its digital currency activities in the financial statement footnotes;
- Evaluated and tested management's rationale and supporting documentation associated with the valuation of digital currency awards earned;
- Independently confirmed certain financial data and wallet records directly with the mining pools;
- Compared the Company's wallet records of digital currency mining compensation received to publicly available blockchain records; and
- Undertook an analytical review of total digital currency mining revenue expected to be recognized by the Company by assessing the total hash power contributed onto the network by the Company against total block rewards and transaction fees issued over the year.

*/s/ MaloneBailey, LLP*
www.malonebailey.com
We have served as the Company's auditor since 2018.
Houston, Texas
December 14, 2021

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and Board of Directors of
CleanSpark, Inc.

***Opinion on Internal Control Over Financial Reporting***

We have audited the internal control over financial reporting of CleanSpark, Inc. and its subsidiaries (collectively, the "Company") as of September 30, 2021 based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). In our opinion, because of the effect of the material weaknesses described below on the achievement of the objectives of the control criteria, the Company did not maintain effective internal control over financial reporting as of September 30, 2021, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by COSO.

We do not express an opinion or any other form of assurance on management's statements referring to any corrective actions taken by the Company after the date of management's assessment.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements of the Company as of September 30, 2021 and 2020 and for the years then ended and our report dated December 14, 2021 expressed an unqualified opinion on those financial statements.

The Company acquired ATL Data Centers LLC and Solar Watt Solutions, Inc. (collectively, the "Acquired Businesses") during the year ended September 30, 2021, and management excluded from its assessment of the effectiveness of the Company's internal control over financial reporting as of September 30, 2021, the Acquired Businesses' internal control over financial reporting associated with total assets of $267.3 million (of which $27.3 million represents goodwill and intangibles included within the scope of the assessment), and total revenues of $43.2 million included in the consolidated financial statements of the Company as of and for the year ended September 30, 2021. Our audit of internal control over financial reporting of the Company also excluded an evaluation of the internal control over financial reporting of the Acquired Businesses.

***Basis for Opinion***

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the Management's Report on Internal Control over Financial Reporting ("Management's Report"). Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment: (1) the Company did not adequately implement or properly maintain controls over its financial close and reporting process, its process over the recording of energy and other services revenue and its process over the accounting and valuation of certain aspects of business combinations involving significant estimates and (2) the Company did not adequately design and maintain effective general information technology controls over third-party information systems and applications that are relevant to the preparation of the Company's financial statements. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2021 consolidated financial statements, and this report does not affect our report on those financial statements.

***Definition and Limitations of Internal Control Over Financial Reporting***

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States of America, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*/s/ MaloneBailey, LLP*
www.malonebailey.com
We have served as the Company's auditor since 2018.
Houston, Texas
December 14, 2021

F-4

**CLEANSPARK, INC.**
**CONSOLIDATED BALANCE SHEETS**

| | September 30, 2021 | September 30, 2020 |
|---|---:|---:|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents, including restricted cash | $ 18,040,327 | $ 3,126,202 |
| Accounts receivable, net | 2,619,957 | 859,791 |
| Contract assets | — | 4,103 |
| Inventory | 2,672,744 | 247,500 |
| Prepaid expense and other current assets | 5,129,047 | 938,993 |
| Digital currency | 23,603,210 | — |
| Derivative investment asset | 4,905,656 | 2,115,269 |
| Investment equity security | 260,772 | 460,000 |
| Investment debt security, AFS, at fair value | 494,608 | 500,000 |
| Total current assets | 57,726,321 | 8,251,858 |
| | | |
| Property and equipment, net | 137,592,871 | 117,994 |
| Operating lease right of use asset | 1,488,240 | 40,711 |
| Capitalized software, net | 503,685 | 976,203 |
| Intangible assets, net | 12,277,360 | 7,049,656 |
| Deposits on mining equipment | 87,959,910 | — |
| Other long-term asset | 875,536 | — |
| Goodwill | 19,049,198 | 5,903,641 |
| | | |
| Total assets | 317,473,121 | 22,340,063 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Accounts payable and accrued liabilities | 7,975,263 | 4,527,037 |
| Contract liabilities | 296,964 | 64,198 |
| Operating lease liability | 256,195 | 41,294 |
| Finance lease liability | 413,798 | — |
| Acquisition liability | 300,000 | — |
| Contingent consideration | 820,802 | 750,000 |
| Total current liabilities | 10,063,022 | 5,382,529 |
| | | |
| **Long-term liabilities** | | |
| Loans payable | — | 531,169 |
| Operating lease liability, net of current portion | 1,235,325 | — |
| Finance lease liability, net of current portion | 458,308 | — |
| Total liabilities | 11,756,655 | 5,913,698 |
| | | |
| **Stockholders' equity** | | |
| Common stock; $0.001 par value; 100,000,000 shares authorized; 37,395,945 and 17,390,979 shares issued and outstanding as of September 30, 2021 and September 30, 2020, respectively | 37,394 | 17,391 |
| Preferred stock; $0.001 par value; 10,000,000 shares authorized; Series A shares; 2,000,000 authorized; 1,750,000 and 1,750,000 issued and outstanding as of September 30, 2021 and September 30, 2020 respectively | 1,750 | 1,750 |
| Additional paid-in capital | 444,074,832 | 132,809,830 |
| Accumulated other comprehensive loss | (5,392) | — |
| Accumulated deficit | (138,392,118) | (116,402,606) |
| Total stockholders' equity | 305,716,466 | 16,426,365 |
| | | |
| Total liabilities and stockholders' equity | 317,473,121 | 22,340,063 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

**CLEANSPARK, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**

| | September 30, 2021 | September 30, 2020 |
|---|---|---|
| Revenues, net | | |
| Digital currency mining revenue, net | 38,846,633 | — |
| Energy hardware, software and services revenue | 9,002,636 | 9,018,023 |
| Other services revenue | 1,588,846 | 1,010,678 |
| Total revenues, net | 49,438,115 | 10,028,701 |
| | | |
| Costs and expenses | | |
| Cost of revenues (exclusive of depreciation and amortization shown below) | 13,964,711 | 7,907,849 |
| Professional fees | 8,272,967 | 6,521,016 |
| Payroll expenses | 25,355,684 | 6,813,641 |
| General and administrative expenses | 5,291,652 | 1,093,062 |
| Impairment of goodwill | 5,723,388 | — |
| Other impairment expense (related to Intangible Assets) | 7,162,398 | — |
| Depreciation and amortization | 12,244,368 | 2,836,249 |
| Total costs and expenses | 78,015,168 | 25,171,817 |
| | | |
| Loss from operations | (28,577,053) | (15,143,116) |
| | | |
| Other income/(expense) | | |
| Other income | 544,778 | 20,000 |
| Change in fair value of contingent consideration | 84,198 | — |
| Realized gain on sale of digital currency | 3,104,378 | — |
| Realized gain on sale of equity securities | 179,046 | — |
| Unrealized gain (loss) on equity security | (5,153) | 116,868 |
| Unrealized gain on derivative security | 2,790,387 | 2,115,269 |
| Interest income | 221,488 | 308,804 |
| Interest expense | (154,079) | (10,758,750) |
| Loss on disposal of assets | — | (5,218) |
| Total other income (expense) | 6,765,043 | (8,203,027) |
| | | |
| Loss before income tax (expense) or benefit | (21,812,010) | (23,346,143) |
| Income tax (expense) or benefit | — | — |
| Net loss | (21,812,010) | (23,346,143) |
| | | |
| Other comprehensive loss | (5,392) | — |
| Total comprehensive loss | (21,817,402) | (23,346,143) |
| | | |
| Preferred stock dividends | 177,502 | — |
| | | |
| Total comprehensive loss attributable to common shareholders | (21,994,904) | (23,346,143) |
| | | |
| Loss per common share - basic and diluted | (0.75) | (2.44) |
| | | |
| Weighted average common shares outstanding - basic and diluted | 29,441,364 | 9,550,626 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

**CLEANSPARK, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

### For the Year Ended September 30, 2021

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance, September 30, 2020 | 1,750,000 | 1,750 | 17,390,979 | 17,391 | 132,809,830 | — | (116,402,606) | 16,426,365 |
| Shares issued for services | — | — | 631,765 | 631 | 5,923,300 | — | — | 5,923,931 |
| Exercise of options and warrants | — | — | 389,745 | 389 | 3,750,542 | — | — | 3,750,931 |
| Shares returned for settlement of debt | — | — | (15,000) | (15) | 15 | — | — | — |
| Shares issued for business acquisition | — | — | 976,828 | 996 | 15,783,376 | — | — | 15,784,372 |
| Shares in Escrow for business acquisition | — | — | 1,119,160 | 1,100 | 10,580,786 | — | — | 10,581,886 |
| Options and warrants issued for services | — | — | — | — | 5,480,426 | — | — | 5,480,426 |
| Shares issued under underwritten offering, net of offering costs | — | — | 16,978,734 | 16,978 | 270,639,140 | — | — | 270,656,118 |
| Shares returned in relation to business acquisition | — | — | (76,266) | (76) | (892,583) | — | — | (892,659) |
| Preferred stock dividends | — | — | — | — | — | — | (177,502) | (177,502) |
| Net loss | — | — | — | — | — | — | (21,812,010) | (21,812,010) |
| Other comprehensive loss | — | — | — | — | — | (5,392) | — | (5,392) |
| Balance, September 30, 2021 | 1,750,000 | 1,750 | 37,395,945 | 37,394 | 444,074,832 | (5,392) | (138,392,118) | 305,716,466 |

### For the Year Ended September 30, 2020

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance, September 30, 2019 | 1,000,000 | $ 1,000 | 4,679,018 | $ 4,679 | $ 111,936,125 | $ — | $ (93,056,463) | $ 18,885,341 |
| Shares issued for services | 750,000 | 750 | 50,381 | 50 | 139,800 | — | — | 140,600 |
| Options and warrants issued for services | — | — | — | — | 1,912,632 | — | — | 1,912,632 |
| Shares issued upon conversion of debt and accrued interest | — | — | 11,330,978 | 11,331 | 14,038,669 | — | — | 14,050,000 |
| Rounding shares issued for stock split | — | — | 793 | 1 | (1) | — | — | — |
| Shares returned and cancelled | — | — | (30,000) | (30) | 30 | — | — | — |
| Options issued for business acquisition | — | — | — | — | 88,935 | — | — | 88,935 |
| Shares issued for business acquisition | — | — | 122,126 | 122 | 694,878 | — | — | 695,000 |
| Shares issued upon exercise of warrants | — | — | 6,913 | 7 | (7) | — | — | — |
| Shares issued under registered direct offering | — | — | 1,230,770 | 1,231 | 3,998,769 | — | — | 4,000,000 |
| Net loss | — | — | — | — | — | — | (23,346,143) | (23,346,143) |
| Other comprehensive loss | — | — | — | — | — | — | — | — |
| Balance, September 30, 2020 | 1,750,000 | 1,750 | 17,390,979 | 17,391 | 132,809,830 | — | (116,402,606) | 16,426,365 |

The accompanying notes are an integral part of these consolidated financial statements.

F-7

**CLEANSPARK, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | For the Year Ended | |
| --- | --- | --- |
| | September 30, 2021 | September 30, 2020 |
| Cash Flows from Operating Activities | | |
| Net loss | (21,812,010) | (23,346,143) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Stock based compensation including expenses in lieu of commission to brokers | 8,546,712 | 2,053,232 |
| Impairment expense on digital currency | 6,608,076 | — |
| Unrealized gain on equity security | 5,153 | (116,868) |
| Digital currency issued for services | 296,592 | — |
| Realized gain on sale of equity security | (179,046) | — |
| Realized gain on digital currency | (3,104,378) | — |
| Depreciation and amortization | 12,244,368 | 2,836,249 |
| Provision for bad debts | 246,453 | 27,456 |
| Gain on derivative asset | (2,790,387) | (2,115,269) |
| Gain on forgiveness of debt | (531,169) | — |
| Change in fair value of contingent consideration | (84,198) | |
| Amortization of debt discount | — | 9,010,547 |
| Shares issued as interest | — | 2,050,000 |
| Loss on asset disposal | — | (5,218) |
| Impairment expense on capitalized software | 554,322 | — |
| Impairment of Goodwill | 5,723,388 | — |
| Noncash lease expense | 321,758 | 44,569 |
| Changes in operating assets and liabilities | | |
| Decrease (increase) in prepaid expenses and other current assets | (3,216,288) | 275,452 |
| Decrease in contract assets | 4,103 | 52,974 |
| Decrease in contract liabilities, net | 146,128 | (435,203) |
| (Increase) in accounts receivable | (2,011,250) | (21,664) |
| Increase in accounts payable and accrued liabilities | 5,006,403 | 3,415,168 |
| (Increase) in digital currency | (38,846,633) | — |
| (Decrease) in lease liability | (319,061) | (43,986) |
| Increase in inventory | (2,238,378) | (247,500) |
| (Decrease) in due to related parties | — | (86,966) |
| Net cash used in operating activities | (35,429,342) | (6,642,734) |
| | | |
| Cash Flows from investing | | |
| Increase in deposits on mining equipment | (89,260,010) | — |
| Proceeds from sale of digital currencies | 11,443,132 | — |
| Proceeds from sale of equity securities | 373,121 | — |
| Investment in infrastructure development | (81,868) | — |
| Purchase of property and equipment | (139,234,948) | (34,897) |
| Acquisition of ATL Data Center, net of cash received | 45,783 | — |
| Acquisition of p2KLabs, net of cash received | — | (1,141,990) |
| Acquisition of Solar Watt Solutions | (1,000,136) | — |
| Cash consideration for acquisition of GridFabric, net of cash acquired | — | (371,812) |
| Investment in capitalized software | — | (84,924) |
| Investment in debt and equity securities | — | (750,000) |
| Net cash used in investing activities | (217,714,926) | (2,383,623) |
| | | |
| Cash Flows from Financing Activities | | |
| Payments on promissory notes | (5,882,553) | (217,467) |
| Proceeds from promissory notes | — | 531,169 |
| Payments on finance leases | (288,602) | — |
| Proceeds from exercise of options and warrants | 3,750,932 | — |
| Proceeds from offerings, net | 270,656,118 | 4,000,000 |
| Dividend paid | (177,502) | — |
| | | |
| Net cash provided by financing activities | 268,058,393 | 4,313,702 |
| | | |
| Net increase (decrease) in Cash | 14,914,125 | (4,712,655) |
| | | |
| Cash and cash equivalents, including restricted cash, beginning of period | 3,126,202 | 7,838,857 |
| | | |
| Cash and cash equivalents, including restricted cash, end of period | 18,040,327 | 3,126,202 |

| | | |
|---|---:|---:|
| Supplemental disclosure of cash flow information | | |
| Cash paid for interest | 156,204 | 14,162 |
| Cash paid for tax | — | — |
| | | |
| Non-cash investing and financing transactions | | |
| Day one recognition of right of use asset and liability | 1,543,719 | 85,280 |
| Remeasurement of right of use asset and liability due to lease modification | 695,551 | — |
| Shares and options issued for business acquisition | 25,473,675 | 783,935 |
| Options issued for services | 953,125 | 1,912,632 |
| Shares issued for services | 1,904,521 | 139,850 |
| Shares issued for conversion of debt and accrued interest | — | 14,050,000 |
| Cashless exercise of warrants | 74 | 7 |
| Shares issued as collateral returned to treasury | 15 | 30 |

The accompanying notes are an integral part of these consolidated financial statements.

F-8

**CLEANSPARK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

1.  ORGANIZATION AND LINE OF BUSINESS

<u>Organization</u>

The Company – CleanSpark, Inc. ("CleanSpark," "we," "our," "Company") was incorporated in the state of Nevada on October 15, 1987 as SmartData Corporation. In October 2016, the Company changed its name to CleanSpark, Inc.

CleanSpark, Inc. is a bitcoin mining and diversified energy company incorporated in Nevada. The Company sustainably mines bitcoin and provides advanced energy technology solutions to commercial and residential customers to solve modern energy challenges. The Company, through itself and its wholly owned subsidiaries, has operated in the digital currency mining sector since December 2020, and in the alternative energy sector since March 2014.

CleanSpark, Inc. aims to develop a long-term sustainability and clean energy plan to support its bitcoin mining operations.

**Lines of Business**

*Digital Currency Mining Segment*

Through our wholly owned subsidiaries, ATL Data Centers LLC ("ATL") and CleanBlok, Inc. ("CleanBlok"), the Company mines bitcoin. The Company entered the bitcoin mining industry through our acquisition of ATL in December 2020. It acquired a second data center in August 2021 and have had a co-location agreement with New York-based Coinmint in place since July 2021. Bitcoin mining has now become the Company's principal revenue generating business activity. We currently intend to acquire additional facilities, equipment and infrastructure capacity to continue to expand our bitcoin mining operations.

Through our subsidiaries CSRE Properties Norcross, LLC and CSRE Property Management Company, LLC and CSRE Properties, LLC, we maintain real property holdings for ATL Data Centers LLC and CleanBlok Inc.

*Energy Segment*

The Company provides energy solutions through our wholly owned subsidiaries CleanSpark, LLC, CleanSpark Critical Power Systems, Inc., GridFabric, LLC, and Solar Watt Solutions, Inc. These solutions consist of engineering, design and software solutions, custom hardware solutions, Open Automated Demand response ("OpenADR"), solar, energy storage for microgrid and distributed energy systems to military, commercial and residential customers in Southern California and throughout the world.

The Company's solutions are supported by a proprietary suite of software solutions that include microgrid energy modeling, energy market communications and energy management solutions.

*Other business activities*

Through our wholly owned subsidiary p2kLabs, Inc., we provide design, software development, and other technology-based consulting services. The services provided are generally hourly or fixed-fee project-based arrangements.

Through ATL, we also provide traditional data center services, such as providing customers with rack space, power and equipment, and offer several cloud services including virtual services, virtual storage, and data backup services.

F-9

2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Basis of Presentation and Liquidity

The accompanying audited financial statements of the Company have been prepared by the Management in accordance with accounting principles generally accepted in the United States of America and the rules of the Securities and Exchange Commission and have been filed with the SEC on December 14, 2021 ("Form 10-K").

As shown in the accompanying audited consolidated financial statements, the Company incurred a net loss of $21,812,010 and $23,346,143 during the years ended September 30, 2021 and September 30, 2020, respectively. While the Company has experienced negative cash flows from operations, the Company has sufficient capital to support its ongoing operations from cash flows provided from operational activities, including potential sale of digital currency, and has access to additional capital through the registered sale of equity securities pursuant to a registration statement on Form S-3. In addition, the Company is continuing to grow its business segments through which it expects to grow its working capital base. As of September 30, 2021 and September 30, 2020, the Company had working capital of $47,663,299 and $2,869,329, respectively.

Principles of Consolidation

The accompanying audited consolidated financial statements include the accounts of CleanSpark, Inc., and its wholly owned operating subsidiaries, CleanSpark, LLC, CleanSpark II, LLC, CleanSpark Critical Power Systems Inc., p2kLabs, Inc, GridFabric, LLC, ATL Data Centers LLC, CleanBlok, Inc., CSRE Properties, LLC, Solar Watt Solutions, Inc, CSRE Properties Norcross, LLC and CSRE Property Management Company, LLC. All intercompany transactions have been eliminated upon consolidation of these entities.

Going Concern

The accompanying consolidated financial statements of the Company have been prepared assuming the Company will continue as a going concern. The going concern basis of presentation assumes that the Company will continue in operation one year after the date these financial statements are issued and will be able to realize its assets and discharge its liabilities and commitments in the normal course of business. The evaluation of going concern under the accounting guidance requires significant judgment which involves the Company to consider that it has historically incurred losses in recent years as it has prepared to grow its business through acquisition opportunities. The Company must also consider its current liquidity as well as future market and economic conditions that may be deemed outside the control of the Company as it relates to obtaining financing and generating future profits. As of September 30, 2021, the Company had approximately $18 million of available cash on-hand and Bitcoin with a fair market value of $27.5 million. In determining whether there is substantial doubt about the Company's ability to continue as a going concern, the Company may consider the effects of any mitigating plans for additional sources of financing. The Company identified additional financing sources it believes are currently available to fund its operations and drive future growth that include (i) the ability to access capital using the at-the-market ("ATM") equity offering program available to the Company whereby the Company may sell additional shares of its common stock (discussed in Note 11 – Stockholders' Equity), and (ii) the ability to raise additional financing from other sources. (Refer to Note 11 for further details)

Use of estimates

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities as of the date of the consolidated financial statements, and the reported amounts of revenues and expenses during the reporting period. Significant estimates include estimates used to review the Company's goodwill and digital currency impairment, intangible assets acquired, impairments and estimations of long-lived assets, revenue recognition on percentage of completion type contracts, revenue recognition from digital currency mining, valuation of derivative assets and liabilities, available-for-sale investments, allowances for uncollectible accounts, valuation of digital currencies, valuation of contingent consideration, warranty, and the valuations of share based awards.  The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable in the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions including, but not limited to, the ultimate impact that COVID-19 may have on the Company's operations.

F-10

Revenue Recognition

We recognize revenue in accordance with generally accepted accounting principles as outlined in the Financial Accounting Standard Board's ("FASB") Accounting Standards Codification ("ASC") 606, Revenue From Contracts with Customers, which requires that five steps be followed in evaluating revenue recognition: (i) identify the contract with the customer; (ii) identity the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price; and (v) recognize revenue when or as the entity satisfied a performance obligation.

Our accounting policy on revenue recognition by type of revenue is provided below.

### Revenues from digital currency mining

The Company has entered in digital asset mining pools to provide computing power to the mining pools. The contracts are terminable at any time by either party and the Company's enforceable right to compensation only begins when the Company starts providing computing power to the mining pool operator. In exchange for providing computing power, the Company is entitled to a fractional share of the fixed cryptocurrency award the mining pool operator receives (*less* net digital asset transaction fees to the mining pool operator), for successfully adding a block to the blockchain, , plus a fractional share of the transaction fees attached to that block.. The Company's fractional share is based on the proportion of computing power the Company contributed to the mining pool operator to the total computing power contributed by all mining pool participants in solving the current algorithm. The transaction consideration the Company receives is noncash consideration, in the form of digital currency, which the Company measures at fair value on the date received which is not materially different than the fair value at contract inception or time the Company has earned the award from the mining pools. The consideration is dependent on the number of digital assets mined on any given day. Fair value of the digital currency award received is determined using the spot price of the related digital currency on the date earned.

There is currently no definitive guidance under GAAP or alternative accounting framework for the accounting for digital currencies recognized as revenue or held, and management has exercised significant judgment in determining the appropriate accounting treatment. In the event authoritative guidance is enacted by the FASB, the Company may be required to change its policies, which could have an effect on the Company's consolidated financial position and results from operations. The total revenue recognized from digital currency mining for the years ended September 30, 2021 and September 30, 2020 is $38,846,633 and $0, respectively.

### Engineering & Construction Contracts and Service Contracts

The Company recognizes engineering and construction contract revenue over time, as performance obligations are satisfied, due to the continuous transfer of control to the customer. Engineering and construction contracts are generally accounted for as a single unit of account (a single performance obligation) and are not segmented between types of services. The Company recognizes revenue based primarily on contract cost incurred to date compared to total estimated contract cost (an input method). The input method is the most faithful depiction of the Company's performance because it directly measures the value of the services transferred to the customer. Customer-furnished materials, labor and equipment and, in certain cases, subcontractor materials, labor and equipment, are included in revenue and cost of revenue when management believes that the company is acting as a principal rather than as an agent (i.e., the company integrates the materials, labor and equipment into the deliverables promised to the customer). Customer-furnished materials are only included in revenue and cost when the contract includes construction activity and the Company has visibility into the amount the customer is paying for the materials or there is a reasonable basis for estimating the amount. The Company recognizes revenue, but not profit, on certain uninstalled materials that are not specifically produced, fabricated, or constructed for a project. Revenue on these uninstalled materials is recognized when the cost is incurred (when control is transferred). Changes to total estimated contract cost or losses, if any, are recognized in the period in which they are determined as assessed at the contract level. Pre-contract costs are expensed as incurred unless they are expected to be recovered from the client. Project mobilization costs are generally charged to project costs as incurred when they are an integrated part of the performance obligation being transferred to the client. Customer payments on engineering and construction contracts are typically due within 30 to 45 days of billing, depending on the contract.

The Company recognizes energy (solar panel and battery) installation contract revenue for residential customers at a point in time upon completion of the installation. The revenues associated with energy installations for commercial customers are recognized over a period of time as noted in the engineering and construction contract revenue disclosure above.

F-11

For service contracts (including maintenance contracts) in which the Company has the right to consideration from the customer in an amount that corresponds directly with the value to the customer of the Company's performance completed to date, revenue is recognized when services are performed and contractually billable. Service contracts that include multiple performance obligations are segmented between types of services.

For contracts with multiple performance obligations, the Company allocates the transaction price to each performance obligation using an estimate of the stand-alone selling price of each distinct service in the contract. Revenue recognized on service contracts that have not been billed to clients is classified as a current asset under contract assets on the Consolidated Balance Sheets. Amounts billed to clients in excess of revenue recognized on service contracts to date are classified as a current liability under contract liabilities. Customer payments on service contracts are typically due within 30 days of billing, depending on the contract.

The total revenue recognized from sale of residential battery, residential solar and commercial solar for the years ended September 30, 2021 and September 30, 2020 is $3,727,335 and $0, respectively.

***Revenues from Sale of Equipment***

*Performance Obligations Satisfied at a point in time.*

We recognize revenue on agreements for equipment we sell on a standardized basis to the market at a point in time. We recognize revenue at the point in time that the customer obtains control of the good, which is generally upon shipment or when the customer has physical possession of the product depending on contract terms. We use proof of delivery for certain large equipment with more complex logistics, whereas the delivery of other equipment is estimated based on historical averages of in-transit periods (i.e., time between shipment and delivery). Generally, shipping costs are included in the price of equipment unless the customer requests a non-standard shipment. In situations where an alternative shipment arrangement has been made, the Company recognizes the shipping revenue upon customer receipt of the shipment.

In situations where arrangements include customer acceptance provisions based on seller or customer-specified objective criteria, we recognize revenue when we have concluded that the customer has control of the goods and that acceptance is likely to occur. We generally do not provide for anticipated losses on point in time transactions prior to transferring control of the equipment to the customer.

Our billing terms for these point in time equipment contracts vary and generally coincide with shipment to the customer; however, within certain businesses, we receive progress payments from customers for large equipment purchases, which is generally to reserve production slots with our manufacturing partners, which are recorded as contract liabilities.

Due to the customized nature of the equipment, the Company does not allow for customer returns.

*Service Performance obligations satisfied over time.*

We enter into long-term product service agreements with our customers primarily within our microgrid segment. These agreements require us to provide preventative maintenance, and standby support services that include certain levels of assurance regarding system performance throughout the contract periods, these contracts will generally range from 1 to 10 years. We account for items that are integral to the maintenance of the equipment as part of our service-related performance obligation, unless the customer has a substantive right to make a separate purchasing decision (e.g., equipment upgrade). Contract modifications that extend or revise contract terms are not uncommon and generally result in our recognizing the impact of the revised terms prospectively over the remaining life of the modified contract (i.e., effectively like a new contract). Revenues are recognized for these arrangements on a straight-line basis consistent with the nature, timing and extent of our services, which primarily relate to routine maintenance and as needed product repairs. Our billing terms for these contracts vary, but we generally invoice periodically as services are provided.

Contract assets represent revenue recognized in excess of amounts billed and include unbilled receivables (typically for cost reimbursable contracts) of $0 and contract work in progress (typically for fixed-price contracts) of $0 and $4,103 as of September 30, 2021 and September 30, 2020, respectively. Unbilled receivables, which represent an unconditional right to payment subject only to the passage of time, are reclassified to accounts receivable when they are billed under the terms of the contract. There are no advances that are payments on account of contract assets that have been deducted from contract assets as of September 30, 2021 and September 30, 2020. Contract liabilities mostly represent customer deposits. The Company recorded $296,964 and $64,198 in contract liabilities as of September 30, 2021 and September 30, 2020, respectively.

The total revenue recognized from sale of switchgear for the years ended September 30, 2021 and September 30, 2020 is $4,448,726 and $7,505,761 respectively.

### Revenues from software

The Company derives its software revenue from both subscription fees from customers for access to its energy software offerings and software license sales and support services. Revenues from software licenses are generally recognized upfront when the software is made available to the customer and revenues from the related support is generally recognized ratably over the contract term. The Company's policy is to exclude sales and other indirect taxes when measuring the transaction price of its subscription agreements.

The Company's subscription agreements generally have monthly or annual contractual terms. Revenue is recognized ratably over the related contractual term beginning on the date that the platform is made available to a customer. Access to the platform represents a series of distinct services as the Company continually provides access to, and fulfills its obligation to the end customer over the subscription term. The series of distinct services represents a single performance obligation that is satisfied over time.

The total revenue recognized from design, software development and other technology-based consulting services for the years ended September 30, 2021 and September 30, 2020 is $1,676,505 and $2,431,419, respectively.

### Revenues from design, software development and other technology-based consulting services

For service contracts performed under Master Services Agreements ("MSA") and accompanying Statement(s) of Work ("SOW"), revenue is recognized based on the performance obligation(s) outlined in the SOW which is typically hours worked or specific deliverable milestones. In the case of a milestone-based SOW, the Company recognizes revenues as each deliverable is signed off by the customer.

The total revenue recognized from design, software development and other technology-based consulting services for the years ended September 30, 2021 and September 30, 2020 is $1,676,505 and $2,431,419, respectively.

### Revenues from data center services

The Company provides data services such as providing its customers with rack space, power and equipment, and cloud services such as virtual services, virtual storage, and data backup services, generally based on monthly services provided at a defined price included in the contracts. The performance obligations are the services provided to a customer for the month based on the contract. The transaction price is the price agreed with the customer for the monthly services provided and the revenues are recognized monthly based on the services rendered for the month.

The total revenue recognized from data center services for the years ended September 30, 2021 and September 30, 2020 is $554,345 and $0, respectively.

### Variable Consideration

The nature of the Company's contracts gives rise to several types of variable consideration, including claims and unpriced change orders; awards and incentive fees; and liquidated damages and penalties. The Company recognizes revenue for

F-13

variable consideration when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur. The Company estimates the amount of revenue to be recognized on variable consideration using the expected value (i.e., the sum of a probability-weighted amount) or the most likely amount method, whichever is expected to better predict the amount. Factors considered in determining whether revenue associated with claims (including change orders in dispute and unapproved change orders in regard to both scope and price) should be recognized include the following: (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. If the requirements for recognizing revenue for claims or unapproved change orders are met, revenue is recorded only when the costs associated with the claims or unapproved change orders have been incurred. Back charges to suppliers or subcontractors are recognized as a reduction of cost when it is determined that recovery of such cost is probable and the amounts can be reliably estimated. Disputed back charges are recognized when the same requirements described above for claims accounting have been satisfied.

The Company generally provides limited warranties for work performed under its engineering and construction contracts. The warranty periods typically extend for a limited duration following substantial completion of the Company's work on a project. Historically, warranty claims have not resulted in material costs incurred.

*Practical Expedients*

If the Company has a right to consideration from a customer in an amount that corresponds directly with the value of the Company's performance completed to date (a service contract in which the company bills a fixed amount for each hour of service provided), the Company recognizes revenue in the amount to which it has a right to invoice for services performed.

The Company does not adjust the contract price for the effects of a significant financing component if the Company expects, at contract inception, that the period between when the company transfers a service to a customer and when the customer pays for that service will be one year or less.

The Company has made an accounting policy election to exclude from the measurement of the transaction price all taxes assessed by governmental authorities that are collected by the Company from its customers (use taxes, value added taxes, some excise taxes).

For the year ended September 30, 2021 and 2020, the Company reported revenues of $49,438,115 and $10,028,701, respectively.

Cost of Revenues

The Company includes the following in cost of revenues: energy costs, materials costs, manufacturing and logistics costs, freight costs, inventory write-downs, hosting services costs. The recognition of cost of revenue for our energy segment is dependent upon the revenue stream that it pertains to, refer below:

1. Products Delivered at a Point in Time. Cost of revenue from these products is recognized when the Company transfers control of the product to the customer, which is generally upon shipment.
2. Products Delivered Over Time. Cost of revenue from these products is recognized over the related service period.

Cash and cash equivalents including restricted cash

Cash and cash equivalents include cash and amounts due from banks and restricted cash. The Company's restricted cash represents amounts held in trust for certain construction projects. The following table sets forth a reconciliation of cash, cash equivalents, and restricted cash reported in the consolidated balance sheets that agrees to the total of those amounts as presented in the consolidated statements of cash flows.

|  | September 30, 2021 | September 30, 2020 |
|---|---|---|
| Cash and cash equivalents, excluding restricted cash | $14,571,198 | $3,126,202 |
| Restricted cash – construction escrow account | 3,469,129 | — |
| Cash and cash equivalents per consolidated Balance Sheet | $18,040,327 | $3,126,202 |

Accounts receivable
Accounts receivable is comprised of uncollateralized customer obligations due under normal trade terms. They are initially recorded at the invoiced amount upon the sale of goods or services to customers, and do not bear interest. The Company performs ongoing credit evaluation of its customers and management closely monitors outstanding receivables based on factors surrounding the credit risk of specific customers, historical trends, and other information. The carrying amount of accounts receivable is reviewed periodically for collectability. If management determines that collection is unlikely, an allowance that reflects management's best estimate of the amounts that will not be collected is recorded.

Accounts receivable, net consists of the following:

|  | September 30, 2021 | September 30, 2020 |
|---|---|---|
| Accounts Receivable, gross | $ 2,891,784 | $ 902,146 |
| Other receivables | 421,681 | — |
| Retainage receivable | — | 615 |
| Provision for doubtful allowances | (693,508) | (42,970) |
| Total Accounts Receivable, net | $ 2,619,957 | $ 859,791 |

Inventory
Inventory is stated at the lower cost or net realizable value with cost being measured on a first-in, first-out basis. For solar panel and battery installations, the Company transfers component parts from inventories to cost of goods sold once installation is complete. The Company periodically reviews inventories for unusable and obsolete items based on assumptions about future demand and market conditions. Based on this evaluation, provisions are made to write inventories down to their net realizable value. There were no write-downs of inventory as of September 30, 2021 and 2020, respectively. The composition of inventory for the years ended as of September 30, 2021 and 2020 are as follows:

|  | September 30, 2021 | September 30, 2020 |
|---|---|---|
| Batteries and solar panels | $1,819,398 | $  — |
| Supplies and other | 853,346 | 247,500 |
| **Total inventory** | **$2,672,744** | **$ 247,500** |

The Company has presented inventory amounting to $247,500 separate from Prepaid and other current assets to Inventory as of September 30, 2020.

Prepaid expense and other current assets
The Company records a prepaid expense for costs paid but not yet incurred. Those expected to be incurred within one year are recognized and shown as a short-term pre-paid expense. Any costs expected to be incurred outside of one year would be considered other long term assets.

Other current assets are assets that consist of deposits and interest receivable. Deposits and interest we expect to receive within one year are shown as short-term. Those we expect to receive outside of one year are shown as other long term assets.

Investment securities
Investment securities include debt securities and equity securities. Debt securities are classified as available for sale ("AFS") and are reported as an asset in the Consolidated Balance Sheets at their estimated fair value. As the fair values of AFS debt securities change, the changes are reported net of income tax as an element of OCI, except for other-than-temporarily-impaired securities. When AFS debt securities are sold, the unrealized gains or losses are reclassified from OCI to non-interest income. Securities classified as AFS are securities that the Company intends to hold for an indefinite period of time, but not necessarily to maturity. Any decision to sell a security classified as AFS would be based on various factors, including significant movements in interest rates, changes in the maturity mix of the Company's assets and liabilities, liquidity needs, decline in credit quality, and regulatory capital considerations.

Interest income is recognized based on the coupon rate and increased by accretion of discounts earned or decreased by the amortization of premiums paid over the contractual life of the security.

F-15

For individual debt securities where the Company either intends to sell the security or more likely than not will not recover all of its amortized cost, OTTI (other than temporary impairment) is recognized in earnings equal to the entire difference between the security's cost basis and its fair value at the balance sheet date. For individual debt securities for which a credit loss has been recognized in earnings, interest accruals and amortization and accretion of premiums and discounts are suspended when the credit loss is recognized. Interest received after accruals have been suspended is recognized in income on a cash basis.

The Company holds investments in both publicly held and privately held equity securities. However, as described in Note 1, the Company is primarily doing business of in the digital currency mining sector and alternative energy sector, and not in the business of investing in securities.

Privately held equity securities are recorded at cost and adjusted for observable transactions for same or similar investments of the issuer (referred to as the measurement alternative) or impairment. All gains and losses on privately held equity securities, realized or unrealized, are recorded through gains or losses on equity securities on the consolidated statement of operations and comprehensive loss.

Publicly held equity securities are based on fair value accounting with unrealized gains or losses resulting from changes in fair value reflected as unrealized gains or losses on equity securities in our consolidated statements of operations and comprehensive loss.

Concentration Risk

At times throughout the year, the Company may maintain cash balances in certain bank accounts in excess of FDIC limits. The cash balance, in excess of the FDIC limits was $17,790,327 and $2,876,202 for periods ended September 30, 2021 and September 30, 2020, respectively. The accounts offered by custodians of the Company's bitcoin are not insured by the FDIC. The fair market value of bitcoin held in accounts covered by FDIC limits was $27,554,031 and $0 for the periods ended September 30, 2021 and 2020, respectively. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk in these accounts.

The Company has certain customers and vendors who individually represented 10% or more of the Company's revenue or capital expenditures. (see Note 16 for details)

Leases

In accordance with ASC 842, the Company assesses whether an arrangement contains a lease at contract inception. When an arrangement contains a lease, the Company categorize leases with contractual terms longer than twelve months as either operating or finance. Finance leases are generally those leases that allow us to substantially utilize or pay for the entire asset over its estimated life. Assets acquired under finance leases are recorded in "Fixed Assets, net." All other leases are categorized as operating leases.

The Company records right-of use ("ROU") assets and lease obligations for its finance and operating leases, which are initially recognized based on the discounted future lease payments over the term of the lease. As the rate implicit in the Company's leases is not easily determinable, the Company's applicable incremental borrowing rate is used in calculating the present value of the sum of the lease payments.

Lease term is defined as the non-cancelable period of the lease plus any options to extend or terminate the lease when it is reasonably certain that the Company will exercise the option. The Company has elected not to recognize ROU asset and lease obligations for its short-term leases, which are defined as leases with an initial term of 12 months or less.

Some leases include multiple year renewal options. The Company's decision to exercise these renewal options is based on an assessment of its current business needs and market factors at the time of the renewal. Currently, the Company has no leases for which the option to renew is reasonably certain and therefore, options to renew were not factored into the calculation of its right of use asset and lease liability as of September 30, 2021.

For all classes of underlying assets, the Company has elected to not separate lease from non-lease components.

Warranty Liability

The Company establishes warranty liability reserves to provide for estimated future expenses as a result of installation and product defects, product recalls and litigation incidental to the Company's business. Liability estimates are determined based on management's judgment, considering such factors as historical experience, the likely current cost of corrective action, manufacturers and subcontractors participation in sharing the cost of corrective action, consultations with third party experts such as engineers, and discussions with the Company's general counsel and outside counsel retained to handle specific product liability cases. The Company's manufacturers and service providers currently provide substantial warranties between ten to twenty-five years with full reimbursement to replace and install replacement parts. While it is probable that the Company will incur costs associated with future warranty claims, the Company cannot reasonably estimate the loss of future warranty claims. Thus, the loss on warranty claims will be charged to the income of the period in which the loss can be reasonably estimated and shall not be charged retroactively to an earlier period, in accordance with the provisions of ASC 450. There were no warranty costs and associated liabilities as of September 30, 2021 and September 30, 2020.

Stock -based compensation

The Company follows the guidelines in FASB Codification Topic ASC 718-10 Compensation-Stock Compensation, which requires companies to measure the cost of employee and non-employee services received in exchange for an award of an equity instrument based on the grant-date fair value of the award. Stock-based compensation expense for stock options is recognized on a straight-line basis over the requisite service period. The Company may issue compensatory shares for services including, but not limited to, executive, management, accounting, operations, corporate communication, financial and administrative consulting services. The Company determines the grant date fair value of the options using the Black-Scholes option-pricing model. For discussion of accounting for RSUs, please refer Note 13 – Stock-Based Compensation.

Earnings (loss) per share

The Company reports earnings (loss) per share in accordance with FASB ASC 260-10 "Earnings Per Share," which provides for calculation of "basic" and "diluted" earnings per share. Basic earnings per share includes no dilution and is computed by dividing net income or loss available to common stockholders by the weighted average common shares outstanding during the period. Diluted earnings per share reflect the potential dilution of securities that could share in the earnings of an entity. The calculation of diluted net loss per share gives effect to common stock equivalents; however, potential common shares are excluded if their effect is anti-dilutive. As of September 30, 2021 and 2020, there were 2,173,578 shares and 1,577,013 shares, respectively, issuable upon exercise of outstanding options warrants and restricted stock units, as well as 5,250,000 shares issuable upon preferred stock conversions, that were excluded from the current and prior period calculations of diluted net loss per share as their inclusion would have been anti-dilutive to the Company's net loss.

Property and equipment

In accordance with the Financial Accounting Standards Board ASC 360-10, "Property, Plant and Equipment" the carrying value of property and equipment, and other long-lived assets is reviewed on a regular basis for the existence of facts or circumstances that may suggest impairment. The Company recognizes impairment when the sum of the expected undiscounted future cash flows is less than the carrying amount of the asset. Impairment losses, if any, are measured as the excess of the carrying amount of the asset over its estimated fair value. During the year ended September 30, 2021 and September 30, 2020 the Company did not record an impairment expense. Property and equipment are stated at cost less accumulated depreciation. Construction in progress is the construction or development of assets that has not yet been placed in service for its intended use. Depreciation for machinery and equipment, mining equipment, buildings, furniture and fixtures and leasehold improvements commences once they are ready for its intended use. Land is not depreciated.

Depreciation is calculated on a straight-line basis over the estimated useful life of the asset as follows:

|  | Useful life (years) |
|---|---|
| Building | 30 |
| Machinery and equipment | 1 - 10 |
| Mining equipment | 3 – 15 |
| Leasehold improvements | Shorter of estimated lease term or 5 years |
| Furniture and fixtures | 1 - 5 |

F-17

Business combinations, Intangible Assets and Goodwill

The Company accounts for business combinations under the acquisition method of accounting in accordance with ASC 805, Business Combinations, where the total purchase price is allocated to the identified assets acquired and liabilities assumed based on their estimated fair values. The purchase price is allocated using the information currently available, and may be adjusted, up to one year from acquisition date, after obtaining more information regarding, among other things, asset valuations, liabilities assumed and revisions to preliminary estimates. The difference between the purchase price, including any contingent consideration, and the fair value of net assets acquired is recorded as goodwill. Contingent consideration transferred is initially recognized at fair value. Contingent consideration classified as a liability or an asset is remeasured to fair value each period until settlement, with changes recognized in profit or loss. Contingent consideration classified as equity is not remeasured. Acquisition-related costs are recognized separately from the acquisition and are expensed as incurred.

The Company reviews its indefinite lived intangibles and goodwill for impairment annually or whenever events or circumstances indicate that the carrying amount of the asset exceeds its fair value and may not be recoverable. In accordance with its policies, the Company performed an assessment of indefinite lived intangibles and goodwill as of the year end September 30, 2021. (See Note 6 for impairment related to indefinite lived intangibles and goodwill).

2021 Goodwill Impairment analysis

In completing the 2021 annual goodwill impairment analysis, the Company elected to perform both qualitative and quantitative assessments for our goodwill. The assessments involve comparing the carrying value of the entity, including goodwill, to its estimated fair value. In accordance with ASU 2017-04, a goodwill impairment charge is recorded for the amount by which the carrying value unit exceeds the fair value of the reporting unit. In determining the fair value for which the quantitative assessment was performed, the Company obtained an independent evaluation of goodwill. The independent evaluation agency has utilized the income approach to test for goodwill impairment. The income approach is a valuation technique under which we estimate future cash flows using the financial forecast from the perspective of an unrelated market participant. Using historical trending and internal forecasting techniques, revenue is projected and applied to fixed and variable cost experience rates to arrive at the future cash flows. A terminal value was then applied to the projected cash flow stream. Future estimated cash flows were discounted to their present value to calculate the estimated fair value. The discount rate used was the value-weighted average of our estimated cost of capital derived using both known and estimated customary market metrics. In determining the estimated fair value, several factors were estimated, including projected operating results, growth rates, economic conditions, anticipated future cash flows and the discount rate.

The assessment indicated that impairment of goodwill was necessary. Based on the assessment for impairment, the Company reported an impairment expense of goodwill of $5,723,388 for the year ended September 30, 2021. There was no impairment expense for the year ended September 30, 2020.

The following table reflects segment wise goodwill activity for the years ended September 30, 2021 and 2020, respectively:

| | Digital | Energy | Others | Total |
|---|---|---|---|---|
| **Goodwill- October 1, 2019** | $ — | $ 4,919,858 | $ — | $ 4,919,858 |
| New Acquisitions | — | 6,395 | 977,388 | 983,783 |
| Impairment | — | — | — | — |
| **Goodwill- September 30, 2020** | — | 4,926,253 | 977,388 | 5,903,641 |
| New Acquisitions | 12,048,419 | 6,820,526 | — | 18,868,945 |
| Impairment | — | (4,746,000) | (977,388) | (5,723,388) |
| **Goodwill- September 30, 2021** | $12,048,419 | $ 7,000,779 | $ — | $19,049,198 |

F-18

The Company amortizes intangible assets with finite lives over their estimated useful lives, which range between two and twenty years as follows:

| | Useful life (years) |
|---|---|
| Patents | 13-20 |
| Websites | 3 |
| Customer list and non-compete agreement | 2-4 |
| Design assets | 2 |
| Trademarks | 14 |
| Engineering trade secrets | 1-7 |
| Software | 4-7 |
| Strategic contract | 5 |
| Infrastructure asset | 15 |
| Capitalized software | 7 |

Digital Currency

Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are classified as indefinite-lived intangible assets in accordance with ASC 350, Intangibles — Goodwill and Other, and are accounted for in connection with the Company's revenue recognition policy detailed above and in Footnote 2 – Significant Accounting Policies. An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Quantitative impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the digital currency at the time its fair value is being measured in accordance with ASC 820, Fair Value Measurement. Quoted prices are obtained from the principal market. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted as per ASC 350, Intangibles – Goodwill and Other.

Digital currencies earned by the Company through its mining activities are included within operating activities on the accompanying consolidated statements of cash flows. The sales of digital currencies are included within investing activities in the accompanying consolidated statements of cash flows and any realized gains or losses from such sales are included in other income (expense) in the consolidated statements of operations and comprehensive loss. The Company accounts for its gains or losses in accordance with the first in first out ("FIFO") method of accounting.

The following table presents the activities of the digital currencies for the year ended September 30, 2021:

| | Amount ($) |
|---|---|
| **Balance as on September 30, 2019** | — |
| Additions to digital currencies | — |
| Sale of digital currencies | — |
| **Balance as on September 30, 2020** | — |
| Additions of digital currencies | 38,846,633 |
| Sale of digital currencies | (11,443,132) |
| Realized gain on sale of digital currencies | 3,104,378 |
| Digital currencies issued for services | (296,593) |
| Impairment loss | (6,608,076) |
| **Balance as on September 30, 2021** | **23,603,210** |

Software Development Costs

The Company capitalizes software development costs under guidance of ASC 985-20 Costs of Software to be Sold, Leased or Marketed for our mPulse, Canvas & Plaid platforms and under ASC 350-40 Internal Use Software. Software development costs include payments made to independent software developers under development agreements, as well as direct costs incurred for internally developed products. Software development costs are capitalized once the technological feasibility of a product is established and such costs are determined to be recoverable. Technological feasibility of a product requires both technical

design documentation and infrastructure design documentation, or the completed and tested product design and a working model. Significant management judgments and estimates are utilized in the assessment of when technological feasibility is established, and the evaluation is performed on a product-by-product basis. For products where proven technology exists, this may occur early in the development cycle. Prior to a product's release, if and when we believe capitalized costs are not recoverable, we expense the amounts as part of "Product development." Capitalized costs for products that are cancelled or are expected to be abandoned are charged to "Product development" in the period of cancellation.

Commencing upon a product's release, capitalized software development costs are amortized to "Cost of revenues software amortization" based on the ratio of current revenues to total projected revenues for the specific product, generally resulting in an amortization period of seven years for our current product offerings. In recognition of the uncertainties involved in estimating future revenue, amortization will never be less than straight-line amortization of the products remaining estimated economic life.

We evaluate the future recoverability of capitalized software development costs on a quarterly basis. For products that have been released in prior periods, the primary evaluation criterion is the actual performance of the software platform to which the costs relate. For products that are scheduled to be released in future periods, recoverability is evaluated based on the expected performance of the specific products to which the costs relate. Criteria used to evaluate expected product performance include: historical performance of comparable products developed with comparable technology; market performance of comparable software; orders for the product prior to its release; pending contracts and general market conditions.

Significant management judgments and estimates are utilized in assessing the recoverability of capitalized costs. In evaluating the recoverability of capitalized costs, the assessment of expected product performance utilizes forecasted sales amounts and estimates of additional costs to be incurred. If revised forecasted or actual product sales are less than the originally forecasted amounts utilized in the initial recoverability analysis, the net realizable value may be lower than originally estimated in any given quarter, which could result in an impairment charge. Material differences may result in the amount and timing of expenses for any period if matters resolve in a manner that is inconsistent with management's expectations. If an impairment occurs the reduced amount of the capitalized software costs that have been written down to the net realizable value at the close of each annual fiscal period will be considered the cost for subsequent accounting purposes.

Fair Value Measurement of financial instruments, derivative asset and contingent consideration

The carrying value of cash, accounts payable and accrued expenses, and debt approximate their fair values because of the short-term nature of these instruments. Management believes the Company is not exposed to significant interest or credit risks arising from these financial instruments.

Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value maximize the use of observable inputs and minimize the use of unobservable inputs. The Company utilizes a fair value hierarchy based on three levels of inputs, of which the first two are considered observable and the last unobservable.

Level 1    Quoted prices in active markets for identical assets or liabilities. These are typically obtained from real-time quotes for transactions in active exchange markets involving identical assets.

Level 2    Quoted prices for similar assets and liabilities in active markets; quoted prices included for identical or similar assets and liabilities that are not active; and model-derived valuations in which all significant inputs and significant value drivers are observable in active markets. These are typically obtained from readily-available pricing sources for comparable instruments.

Level 3    Unobservable inputs, where there is little or no market activity for the asset or liability. These inputs reflect the reporting entity's own beliefs about the assumptions that market participants would use in pricing the asset or liability, based on the best information available in the circumstances.

F-20

The following table presents the Company's financial instruments that are measured and recorded at fair value on the Company's balance sheets on a recurring basis, and their level within the fair value hierarchy as of September 30, 2021 and September 30, 2020:

**September 30, 2021:**

| | Amount ($) | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| Derivative asset | 4,905,656 | — | — | 4,905,656 |
| Investment in equity security | 10,772 | 10,772 | — | — |
| Investment in debt security | 494,608 | — | — | 494,608 |
| Contingent cash consideration | 820,802 | — | — | 820,802 |
| Total | 6,231,838 | 10,772 | — | 6,221,066 |

**September 30, 2020:**

| | Amount ($) | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| Derivative asset | 2,115,269 | — | — | 2,115,269 |
| Investment in equity security | 210,000 | 210,000 | — | — |
| Investment in debt security | 500,000 | — | — | 500,000 |
| Contingent cash consideration | 750,000 | — | — | 750,000 |
| Total | 3,575,269 | 210,000 | — | 3,365,269 |

Income taxes

The Company's calculation of its tax liabilities involves dealing with uncertainties in the application of complex tax laws and regulations in various taxing jurisdictions. The Company recognizes tax liabilities for uncertain tax positions based on management's estimate of whether it is more likely than not that additional taxes will be required. The Company had no uncertain tax positions as of September 30, 2021 and 2020.

Deferred income taxes are recognized in the consolidated financial statements for the tax consequences in future years of differences between the tax basis of assets and liabilities and their financial reporting amounts based on enacted tax laws and statutory tax rates. Temporary differences arise from net operating losses, differences in depreciation methods of archived images, and property and equipment, stock-based and other compensation, and other accrued expenses. A valuation allowance is established when it is determined that it is more likely than not that some or all of the deferred tax assets will not be realized.

The application of tax laws and regulations is subject to legal and factual interpretation, judgment and uncertainty. Tax laws and regulations themselves are subject to change as a result of changes in fiscal policy, changes in legislation, the evolution of regulations and court rulings. Therefore, the actual liability for U.S., or the various state jurisdictions, may be materially different from managements estimates, which could result in the need to record additional tax liabilities or potentially reverse previously recorded tax liabilities. Interest and penalties are included in tax expense.

The Company includes interest and penalties arising from the underpayment of income taxes in the statements of operation in the provision for income taxes. As of September 30, 2021 and 2020, the Company had no accrued interest or penalties related to uncertain tax positions.

Reclassifications

Certain prior year amounts have been reclassified for consistency with the current year presentation. These reclassifications had no effect on the reported results of operations or net assets of the Company and are as follows:

- The Company has reclassified interest receivable on investment in debt securities from Accounts Receivable to Prepaid expense and other current assets amounting to $399,863 and $187,562 as of September 30, 2021 and 2020, respectively.
- The revenue presentation is updated to remain consistent with the business segments of the Company. In 2020, revenues were categorized into hardware and software related sales. In 2021, the Company has realigned its focus and accordingly revenue is reported based upon business segments of digital currency mining, energy and others.
- Product development expense for the year ended September 30, 2020 has been reclassified to be included in depreciation and amortization expense.

F-21

Commitments and contingencies

The Company is subject to the possibility of various loss contingencies and loss recoveries, such as legal proceedings and claims arising out of its business. The Company considers the likelihood of loss or impairment of an asset, or the incurrence of a liability, as well as the Company's ability to reasonably estimate the amount of loss, in determining loss contingencies. An estimated loss contingency is accrued when it is probable that an asset has been impaired or a liability has been incurred and the amount of loss can be reasonably estimated. The Company regularly evaluates current information available with its external and internal counsel to determine whether an accrual is required, an accrual should be adjusted or a range of possible loss should be disclosed.

Segment Reporting

Operating segments are defined as components of an enterprise for which separate financial information is available and evaluated regularly by the chief operating decision maker, or decision-making group, in deciding the method to allocate resources and assess performance. To better align with the Company's strategic objectives, the Company optimized its reportable segments down to two, (1) Digital Currency Mining Segment and (2) Energy Segment; by eliminating the digital agency segment. Results associated with that component are now being reported under other revenue and eliminations.

Recently issued accounting pronouncements

In October 2021, the FASB issued ASU 2021-08, Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers, which requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with ASC 606, Revenue from Contracts with Customers, as if it had originated the contracts. Under the current business combinations guidance, such assets and liabilities are recognized by the acquirer at fair value on the acquisition date. This new guidance is effective for the Company for its fiscal year beginning February 1, 2023 and interim periods within that fiscal year, and early adoption is permitted. The Company is evaluating its potential impact but does not expect the new standard to have a material impact on the Company's results of operations or cash flows.

In March 2020, the FASB issued ASU 2020-04, Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting and issued subsequent amendments to the initial guidance (collectively, "Topic 848"). Topic 848 became effective immediately and expires on December 21, 2022. Topic 848 allows eligible contracts that are modified to be accounted for as a continuation of those contracts, permits companies to preserve their hedging accounting during the transition period and enables companies to make a one-time election to transfer or sell held-to-maturity debt securities that are affected by rate reform. Topic 848 provides optional expedients and exceptions for contracts, hedging relationships and other transactions that reference the London Inter-Bank Offered Rate ("LIBOR") or another reference rate expected to be discontinued because of reference rate reform if certain criteria are met. The adoption of ASU 2020-04 is not expected to have a material impact on the Company's financial statements or disclosures.

The Company adopted ASU 2016-13, Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments on October 1, 2020 ("ASU 2016-13"). ASU 2016-13 requires entities to use a new forward-looking "expected loss" model that reflects expected credit losses, including credit losses related to trade receivables, and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates, which generally will result in the earlier recognition of allowances for losses. As the Company was a Smaller Reporting Company at the time of issuance of the ASU, the Company expects to adopt the ASU effective October 1, 2023, including the interim periods within the fiscal year. In August 2020, the FASB issued ASU2020-06, "Debt - Debt with Conversion and Other Options (subtopic 470-20) and Derivatives and Hedging - Contracts in Entity's Own Equity (subtopic 815-40)," which reduces the number of accounting models in ASC 470-20 that require separate accounting for embedded conversion features. As a result, a convertible debt instrument will be accounted for as a single liability measured at its amortized cost as long as no other features require bifurcation and recognition as derivatives. By removing those separation models, the effective interest rate of convertible debt instruments will be closer to the coupon interest rate. Further, the diluted net income per share calculation for convertible instruments will require the Company to use the if-converted method. The treasury stock method should no longer be used to calculate diluted net income per share for convertible instruments. The amendment will be effective for the Company with annual periods beginning January 1, 2022 and early adoption is permitted. The adoption of ASU 2020-06 is not expected to have a material impact on the Company's financial statements or disclosures.

F-22

In August 2020, the FASB issued Account Standard Update ("ASU") 2020-06, "Debt - Debt with Conversion and Other Options (subtopic 470-20) and Derivatives and Hedging - Contracts in Entity's Own Equity (subtopic 815-40)," which reduces the number of accounting models in ASC 470-20 that require separate accounting for embedded conversion features. As a result, a convertible debt instrument will be accounted for as a single liability measured at its amortized cost as long as no other features require bifurcation and recognition as derivatives. By removing those separation models, the effective interest rate of convertible debt instruments will be closer to the coupon interest rate. Further, the diluted net income per share calculation for convertible instruments will require the Company to use the if-converted method. The treasury stock method should no longer be used to calculate diluted net income per share for convertible instruments. The amendment will be effective for the Company with annual periods beginning January 1, 2022 and early adoption is permitted. The adoption of ASU 2020-06 is not expected to have a material impact on the Company's financial statements or disclosures.

3. ACQUISITIONS

SOLAR WATT SOLUTIONS, INC.

On February 23, 2021, the Company entered into an Agreement and Plan of Merger (the "SWS Merger Agreement") with Solar Watt Solutions, Inc. ("SWS") and its owners (the "Sellers"). The Company accounted for the acquisition of SWS as an acquisition of a business under ASC 805 – Business Combination.

At the closing on February 24, 2021, SWS became a wholly owned subsidiary of the Company. In exchange, the Company issued (i) 477,703 shares of restricted common stock with a deemed value of $15,640,000 calculated based on the five-day average price to the Sellers, of which (a) 167,685 shares with a deemed value of $5,490,000 would be fully earned on closing, and (b) an additional 310,018 shares with a deemed fair value of $10,150,000 were issued to an escrow agent and only earned by Sellers, subject to holdback pending Sellers' satisfaction of certain future milestones with all such shares subject to a lock up of no less than 180 days and a leak out of no more than 10% of average daily trading value of the prior 30 days for a period of 36 months following the closing, and (ii) up to $3,850,000 in cash to the Sellers, minus the Sellers' debt, minus the difference between the Actual Amount and Expected Amount consisting of: (A) $1,350,000 (no changes post acquisition date) in cash payable on a pro rata basis to Sellers at closing, less payment of $500,000 (no changes post acquisition date) to settle Sellers' debt at closing, which includes (I) $200,000 (no changes post acquisition date) in cash was held back by the Company to satisfy potential damages from indemnification claims and any amounts owed pursuant to post-closing adjustments, (II) an additional $100,000 (no changes post acquisition date) in cash was held back by the Company to satisfy any amounts owed pursuant to post-closing adjustments, and (B) up to $2,500,000 (fair valued at $155,000 at acquisition date) in cash held back by the Company and only payable pro rata to Sellers upon meeting certain future milestones and subject to satisfaction of any amounts owing rom SWS to the Company resulting from damages required to be indemnified under the SWS Merger Agreement.

The Company determined the fair value of the consideration given to the sellers of SWS in connection with the transaction in accordance with ASC 820 was as follows:

| Consideration: | Fair Value |
|---|---|
| Cash | $ 1,350,000 |
| Contingent consideration | 155,000 |
| 310,018 shares of common stock as contingent equity consideration | $ 533,002 |
| 167,685 shares of common stock | 4,649,905 |
| Total Consideration | $ 6,687,907 |

| Purchase Price Allocation | Preliminary Allocation at Acquisition Date | | Adjustments to Fair Value | | Final Allocation at Acquisition Date | |
|---|---|---|---|---|---|---|
| Customer List | $ | 5,122,733 | $ | (4,932,733) | $ | 190,000 |
| Goodwill | | 1,642,409 | | 5,178,126 | | 6,820,535 |
| Other Assets and Liabilities assumed, net | | (77,235) | | (245,393) | | (322,628) |
| Total | $ | 6,687,907 | $ | — | $ | 6,687,907 |

The goodwill recorded as result of the acquisition represents the strategic benefits of growing the Company's service portfolio and the expected revenue growth from increased market penetration. Acquired goodwill is not deductible for income tax purposes. The total purchase price was allocated to identifiable assets deemed acquired, and liabilities assumed, based on their estimated fair values.

In connection with the preparation of our financial statements, the Company determined that the accounting treatment of the contingent consideration as reported in the March 31, 2021 and June 30, 2021 consolidated financial statements needed to be revised. Specifically, the contingent cash consideration liability recorded at acquisition date of $2,500,000 should be adjusted to $155,000 due to probability of non-satisfaction of future milestones. As a result, the contingent cash consideration liability recorded at acquisition date of $2,500,000 was adjusted to $155,000 due to probability of non-satisfaction of future milestones. The Company also estimated that based upon the milestones, only 19,221 contingent shares will be earned out of the 310,018 total contingent shares, and as a result, the Company adjusted the contingent stock consideration to $533,002. The Company assessed the materiality of these adjustments and determined that these were not material to previously issued financial statements for the quarters ended March 31, 2021 and June 30, 2021.

The immaterial impacts of these adjustments for the quarters ended March 31, 2021 and June 30, 2021 are as follows:

**Condensed Consolidated Balance Sheet (unaudited)**

| | March 31, 2021 | | | June 30, 2021 | | |
|---|---|---|---|---|---|---|
| | As Reported ($) | Change ($) | As Revised ($) | As Reported ($) | Change ($) | As Revised ($) |
| Goodwill | 32,034,559 | (10,408,798) | 21,625,761 | 31,797,564 | (10,408,798) | 21,388,766 |
| Total assets | 292,612,596 | (10,408,798) | 282,203,798 | 297,488,821 | (10,408,798) | 287,080,023 |
| Contingent consideration - Current | 2,416,667 | (1,319,751) | 1,096,916 | 650,000 | (855) | 649,145 |
| Total current liabilities | 7,340,445 | (1,319,751) | 6,020,694 | 11,910,017 | (855) | 11,909,162 |
| Contingent consideration - Non Current | 833,333 | (833,333) | - | 2,600,000 | (2,000,000) | 600,000 |
| Total Liabilities | 8,892,137 | (2,153,084) | 6,739,053 | 15,693,207 | (2,000,855) | 13,692,352 |
| Additional paid-in capital | 400,032,436 | (8,063,798) | 391,968,638 | 414,783,896 | (8,063,798) | 406,720,098 |
| Total Stockholders' equity | 283,720,459 | (8,255,714) | 275,464,745 | 281,795,614 | (8,407,943) | 273,387,671 |
| Total Liabilities and Stockholders' equity | 292,612,596 | (10,408,798) | 282,203,798 | 297,488,821 | (10,408,798) | 287,080,023 |

**Condensed Consolidated Statement of operations (unaudited)**

| | For the Three Months Ended March 31, 2021 | | | For the Three Months Ended June 30, 2021 | | |
|---|---|---|---|---|---|---|
| | As Reported ($) | Change ($) | As Revised ($) | As Reported ($) | Change ($) | As Revised ($) |
| Change in fair value of contingent consideration | — | (191,916) | (191,916) | — | (152,229) | (152,229) |
| Total other income (expense) | 9,897,012 | (191,916) | 9,705,096 | (2,058,948) | (152,229) | (2,211,177) |
| Net Income/(loss) | 7,400,040 | (191,916) | 7,208,124 | (16,677,127) | (152,229) | (16,829,356) |
| Net Income (loss) attributable to the Company's common shareholders | 7,222,535 | (191,916) | 7,030,619 | (16,677,127) | (152,229) | (16,829,356) |

The amortization period for customer list is estimated to be 1.5 years. The Company estimated the fair value of the identified customer list using a discounted cash flow model. These fair value measurements were based on significant inputs not observable in the market and thus represent a Level 3 measurement. Key assumptions include the level and timing of expected incremental future cash flows over its remaining useful life, and discount rates the Company believe to be consistent with the inherent risks associated with customer list, which is 14%. The Company believes the level and timing of expected future cash flows appropriately reflects market participant assumptions.

The contingent cash consideration was re-measured to $320,802 at September 30, 2021. The company estimates the total contingent cash consideration to be between $320,000 and $550,000 based on the range of possible outcomes. In addition, the Company estimates the total stock consideration to be between $1,100,000 and $1,900,000 based on the range of possible outcomes.

Net sales and net loss of this business included in the Company's consolidated results of operations in fiscal year 2021 were approximately $3,806,007 and $811,727, respectively.

ATL DATA CENTERS, LLC

On December 9, 2020, the Company entered into an Agreement and Plan of Merger (the "ATL Merger") with ATL Data Centers LLC ("ATL") and its members. The Company accounted for the acquisition of ATL as an acquisition of a business under ASC 805 – Business Combination.

At the closing, ATL became a wholly owned subsidiary of the Company. In exchange, the Company issued 1,618,285 shares of restricted common stock to the selling members of ATL, of which: (i) 642,309 shares were fully earned on closing, and (ii) an additional 975,976 shares were issued and held in escrow, subject to holdback pending satisfaction of certain indemnification claims and future milestones, with all such shares subject to a lock up of no less than 180 days and a leak out of no more than 10% of the average daily trading value of the prior 30 days.

The Company determined the fair value of the consideration given to the sellers of SWS in connection with the transaction in accordance with ASC 820 was as follows:

| | Preliminary Allocation at | Adjustments to | Final Allocation at Acquisition |
|---|---|---|---|

| Consideration | Acquisition Date Fair Value | | | Date | |
|---|---|---|---|---|---|
| 642,309 shares of common stock | $ | 8,407,826 | — | $ | 8,407,826 |
| 975,976 shares of common stock – held in escrow | | 12,775,525 | — | | 12,775,525 |
| Total Consideration | $ | 21,183,351 | — | $ | 21,183,351 |

Of the 975,976 shares held in escrow, 515,724 shares were released to the selling members of ATL and 68,194 shares were returned to the Company and canceled due to nonsatisfaction of certain indemnification claims during the year ended September 30, 2021. The remaining 392,058 shares held in escrow consist of 72,989 shares subject to holdback pending satisfaction of further indemnification claims and 319,069 shares subject to satisfaction of future milestones.

In connection with the return of the 68,194 shares held in escrow that were cancelled due to the non-satisfaction of certain indemnification claims, total consideration and the related goodwill, decreased by $892,659 during the year ended September 30, 2021.

The consideration remitted in connection with the ATL Merger is subject to adjustment based on post-closing adjustments to closing cash, indebtedness, and transaction expenses of ATL within 90 days of closing. The Company also assumed approximately $6.9 million in debts of ATL at closing. As part of the transaction costs, the Company issued 41,708 shares of common stock for an aggregate value of $545,916 to the broker which were expensed upon issuance of the shares.

| Purchase Price Allocation | Preliminary Allocation at Acquisition Date | | Adjustments to Fair Value | | Final Allocation at Acquisition Date | |
|---|---|---|---|---|---|---|
| Strategic Contract | $ | 7,457,970 | $ | 2,342,000 | $ | 9,799,970 |
| Goodwill | | 14,205,245 | | (1,264,167) | | 12,941,078 |
| Other Assets and Liabilities assumed, net | | (479,864) | | (1,077,833) | | (1,557,697) |
| Total | $ | 21,183,351 | $ | — | $ | 21,183,351 |

The Company made measurement period adjustments, primarily to strategic contract and goodwill, to better reflect the facts and circumstances that existed at the acquisition date.

The goodwill recorded as a result of the acquisition represents the strategic benefits of growing the Company's service portfolio and the expected revenue growth from increased mcarket penetration. Acquired goodwill is not deductible for income tax purposes. The total purchase price was allocated to identifiable assets deemed acquired, and liabilities assumed, based on their estimated fair values.

The strategic contract relates to supply of a critical input to our digital currency mining business. The other assets and liabilities assumed include $5.67 million of digital currency mining equipment and $5.475 million of notes payable related to this equipment, which was settled by the Company during the year ended September 30, 2021. In connection with the acquisition, the Company had acquired an operating lease related to a rental building, which had a purchase option associated with the lease agreement. The Company exercised the purchase option to buy the property in May 2021 and, as a result, terminated the lease.

The amortization period for strategic contracts is estimated to be 5 years. The Company estimated the fair value of the identified strategic contract using a discounted cash flow model. These fair value measurements were based on significant inputs not observable in the market and thus represent a Level 3 measurement. Key assumptions include the level and timing of expected future cash flows, conditions and demands over its remaining useful life, and discount rates the Company believe to be consistent with the inherent risks associated with strategic contract, which is 6.4%. The Company believe the level and timing of expected future cash flows appropriately reflects market participant assumptions.

Net sales and net income of this business included in CleanSpark's consolidated results of operations in fiscal year 2021 were approximately $30,234,683 and $14,449,160, respectively.

P2K LABS, INC.

On January 31, 2020, the Company, entered into an Agreement with p2k, and its sole stockholder, Amer Tadayon (the "Seller"), whereby the Company purchased all of the issued and outstanding shares of p2k in exchange for an aggregate adjusted purchase price of cash and equity of $1,688,935. The transaction closed simultaneously upon the execution of the Agreement by the parties on January 31, 2020.

As a result of the transaction, p2k became a wholly owned subsidiary of the Company. Pursuant to the terms of the Agreement, the purchase price was as follows:

a) $1,039,500 in cash was paid to the Seller;

b) 31,183 restricted shares of the Company's common stock, valued at $145,000, were issued to the Seller (the "Shares"). The Shares are subject to certain lock-up and leakout provisions whereby the Seller may sell an amount of Shares equal to ten percent (10%) of the daily dollar trading volume of the Company's common stock on its principal market for the prior 30 days (the "Leak-Out Terms");

c) $115,500 in cash was paid to an independent third-party escrow where such cash is subject to offset for adjustments to the purchase price and indemnification purposes;

d) 64,516 restricted shares of the Company's common stock, valued at $300,000, were issued to an independent third-party escrow agent (the "Holdback Shares") and will be released to the Seller upon achievement of certain revenue milestones. During the year ended September 30, 2021, 56,444 restricted shares of the Company's common stock were released to the Seller and the balance of 8,072 shares of the Company's common stock were returned and cancelled. The Holdback Shares are subject to the Leak-Out Terms.

The Shares and Holdback Shares were deemed to have a fair market value of $4.65 per share, which was the closing price of the Company's common stock on January 31, 2020; and

e) 26,950 common stock options that were deemed to have a fair market value of $88,935 on the date of the closing of the transaction.

The Company accounted for the acquisition of p2k as an acquisition of a business under ASC 805 – Business Combinations.

The Company determined the fair value of the consideration given to the Seller in connection with the transaction in accordance with ASC 820 – Fair Value Measurement was as follows:

| Cash Consideration ($): | |
| --- | --- |
| Cash | 1,155,000 |
| 95,699 shares of common stock | 445,000 |
| 26,950 common stock options | 88,935 |
| Total Consideration | 1,688,935 |

The total purchase price of the Company's acquisition of p2k was allocated to identifiable assets deemed acquired, and liabilities assumed, based on their estimated fair values as indicated below.

| Purchase Price Allocation ($): | |
| --- | --- |
| Customer list | 710,000 |
| Design and other assets | 123,000 |
| Goodwill | 977,388 |
| Other assets and liabilities assumed, net | (121,453) |
| Total | 1,688,935 |

Net sales and net loss of this business included in the Company's consolidated results of operations in fiscal year 2021 were approximately $1,241,641 and $1,201,753, respectively.

GRIDFABRIC, LLC

On August 31, 2020, the Company entered into a Membership Interest Purchase Agreement (the "Agreement") with GridFabric, and its sole member, Dupont Hale Holdings, LLC (the "Seller"), whereby the Company purchased all of the issued and outstanding membership units of GridFabric from the Seller (the "Transaction") in exchange for an aggregate purchase price of cash and stock of up to $1,400,000 (the "Purchase Price"). The Transaction closed simultaneously with execution on August 31, 2020. As a result of the Transaction, GridFabric, became a wholly owned subsidiary of the Company.

Pursuant to the terms of the Agreement, the Purchase Price was as follows:
1. $360,000 in cash was paid to the Seller at closing;
2. $400,000 in cash was delivered to an independent third-party escrow agent where such cash is subject to offset for adjustments to the Purchase Price and indemnification purposes for a period of 12 months;

3.  26,427 restricted shares of the Company's common stock, valued at $250,000, were issued to the Seller. The shares issued are subject to certain leak-out provisions whereby the Seller may sell an amount of shares equal to no more than ten percent (10%) of the daily dollar trading volume of the Company's common stock on its principal market for the prior 30 days (the "Leak-Out Terms"); and

4.  additional shares of the Company's common stock, valued at up to $750,000, will be issuable to Seller if GridFabric achieves certain revenue and product release milestones related to the future performance of GridFabric (the "Earn-out Shares"). The Earn-Out Shares are also subject to the Leak-Out Terms.

The Shares were issued at a fair market value of $9.46 per share. The Earn-Out Shares are accounted for as contingent consideration and the number of shares to be issued will be determined based on the closing price of the Company's common stock on the date such milestone event occurs.

The Agreement contains standard representations, warranties, covenants, indemnification and other terms customary in similar transactions.

In connection with the transaction, the Company also entered into employment relationships and non-compete agreements with GridFabric's key employees for a period of 36 months and plans to issue future equity compensation to said employees, subject to approval of the Company's board of directors.

The Company accounted for the acquisition of GridFabric as an acquisition of a business under ASC 805 – Business Combinations.

The Company determined the fair value of the consideration given to the Seller in connection with the Transaction in accordance with ASC 820 – Fair Value Measurement was as follows:

| Consideration: | Fair Value ($) |
|---|---|
| Cash | 400,000 |
| 26,427 shares of common stock | 250,000 |
| Contingent consideration - common stock issuable upon achievement of milestone(s) | 750,000 |
| Total Consideration | 1,400,000 |

During the year ended September 30, 2021, the Company reassessed the contingent consideration due to GridFabric to $500,000.

A change in the fair value of the contingent consideration of $250,000 is included in change in fair value of contingent consideration  in Consolidated Statement of Consolidated Operations and Comprehensive Loss.

The total purchase price of the Company's acquisition of GridFabric was allocated to identifiable assets deemed acquired, and liabilities assumed, based on their estimated fair values as indicated below.

| Purchase Price Allocation: | |
|---|---|
| Software | $ 1,120,000 |
| Customer list | 60,000 |
| Non-compete | 190,000 |
| Goodwill | 26,395 |
| Net Assets | 3,605 |
| Total | $ 1,400,000 |

Net sales and operating loss of this business included in the Company's consolidated results of operations in fiscal year 2021 were approximately $299,606 and $794,805, respectively.

The following is the unaudited pro forma information assuming the acquisition of GridFabric, p2k Labs, ATL, and SWS occurred on October 1, 2019:

|  | September 30, 2021 | September 30, 2020 |
|---|---|---|
| Net sales | $ 35,581,937 | $ 25,627,704 |
| Net income (loss) | 12,848,264 | (47,333,110) |
| Net profit / (loss) per common share – basic and diluted | $ 0.43 | $ (4.04) |
| Weighted average common shares outstanding – basic and diluted | $ 29,939,290 | $ 11,701,937 |

The unaudited pro forma consolidated financial results have been prepared for illustrative purposes only and do not purport to be indicative of the results of operations that would have actually resulted had the acquisition occurred on the first day of the earliest period presented, or of future results of the consolidated entities. The unaudited pro forma consolidated financial information does not reflect any operating efficiencies and cost savings that may be realized from the integration of the acquisition. All transactions that would be considered inter-company transactions for proforma purposes have been eliminated.

4.  INVESTMENTS

As of September 30, 2021 and September 30, 2020, the Company had total investments of $5,661,036 and $3,075,269 that comprise of the following:

International Land Alliance, Inc.
On November 5, 2019, the Company entered in a binding Memorandum of Understanding (the "MOU") with International Land Alliance, Inc. ("ILAL"), a Wyoming corporation, to lay a foundational framework where the Company will deploy its energy solutions products and services to ILAL, its energy projects, and its customers.

In connection with the MOU, and to support the power and energy needs of ILALs development and construction of certain projects, the Company entered into a Securities Purchase Agreement ("SPA"), dated as of November 6, 2019, with ILAL.

- Investment in Debt Securities (Preferred Stock) and related Embedded Derivative Asset

Pursuant to the terms of the SPA with ILAL, the Company purchased 1,000 shares of Series B Preferred Stock of ILAL (the "Preferred Stock") an aggregate purchase price of $500,000 (the "Stock Transaction"), less certain expenses and fees. The Series B Preferred Stock accrue cumulative in-kind accruals at a rate of 12% per annum and were redeemable on August 6, 2020. The Preferred Stock can be converted into common stock at a variable rate (refer the discussion on embedded derivative assets below). This variable conversion ratio will increase by 10% with the occurrence of certain events. Since the investments were not redeemed on August 6, 2020, they are now redeemable at the Company`s option in cash or into common stock, based on the conversion ratio. The Preferred Stock is recorded as an AFS debt security and is reported at its estimated fair value as of September 30, 2021. Any change in the fair values of AFS debt securities are reported net of income tax as an element of Other Comprehensive income.

The Company accrued interest on our available-for-sale debt securities totaling $399,863 and $187,562, as of September 30, 2021 and 2020, respectively, presented as prepaid expense and other current assets on the Consolidated Balance Sheets. The fair value of investment in Debt Securities is $494,608 and $500,000 as of September 30, 2021 and 2020. The Company has presented loss on fair value of preferred stock amounting to $5,392 for the year ended September 30, 2021 as part of other comprehensive loss in the Consolidated Statement of Operations and Comprehensive Loss. There was an immaterial loss or gain on the fair value of preferred stock for the year ended September 30, 2020.

The Company has deemed this variable conversion feature of ILAL preferred stock as an embedded derivative instrument in accordance with ASC Topic No. 815. This topic requires the Company to account for the conversion feature on its balance sheet at fair value and account for changes in fair value as a derivative gain or loss. Unrealized gain or loss on fair valuation of this embedded feature is recognized as an income in Consolidated statements of Operations and Comprehensive Loss.

Total fair value of investment in Derivative assets as of September 30, 2021 and 2020 is $4,905,656 and $2,115,269. The Company fair values the debt security as a straight debt instrument based on liquidation value and accrued interest to date. The fair value of the derivative asset is based on the difference in the fair value of the debt security determined as a straight debt instrument and the fair value of the debt security if converted as of the reporting date.

- Commitment shares - Common stock of ILAL

Pursuant to the terms of the SPA with ILAL, the Company also received 350,000 shares (commitment shares) of ILALs common stock. The commitment shares were fully earned at the time of execution of the agreement. During the year ended September 30, 2021, out of 350,000 commitment shares, the Company sold 334,611 shares at various prices and fair valued the remaining 15,389 shares at the closing stock price of ILAL as of September 30, 2021. Realized gain on sale of shares and the unrealized loss on fair value of the remaining shares amounted to $179,046 and $5,153, respectively

Total fair value of investment in equity securities as on September 30, 2021 and 2020 is $10,772 and $210,000, respectively.

- Investment in Equity Securities- LawClerk

In February 2020, the Company made a $250,000 strategic relationship investment in LawClerk for 200,000 Series A Preferred Shares of LawClerk. This investment is recorded on a cost basis and adjusted for observable transactions for same or similar investments of the issuer (referred to as the measurement alternative) or impairment. The Company annually performs impairment analysis on this investment and there were no impairments required for the years ended September 30, 2021 and 2020.

Total value of this investment as of September 30, 2021 and 2020 is $250,000, respectively.

Refer the table below for a reconciliation of carrying value of all investments for the year ended September 30, 2021 and 2020:

| | ILAL Debt Securities | ILAL Derivative asset | ILAL Equity Securities | Law Clerk Equity Securities |
|---|---|---|---|---|
| **Balance as of October 1, 2019** | $ - | $ - | $ - | $ - |
| Purchased during the year | 500,000 | - | 93,132 | 250,000 |
| Unrealized gain on fair value recognized in income | - | 2,115,269 | 116,868 | - |
| **Balance as of September 30, 2020** | **500,000** | **2,115,269** | **210,000** | **250,000** |
| Shares sold during the year | - | - | (373,121) | - |
| Realized gain on fair value recognized income | - | - | 179,046 | - |
| Unrealized gain (loss) recognized in net income | - | 2,790,387 | (5,153) | - |
| Unrealized loss on fair value recognized in other comprehensive loss | (5,392) | - | - | - |
| **Balance as of September 30, 2021** | $ **494,608** | $ **4,905,656** | $ **10,772** | $ **250,000** |

F-29

5.   INTANGIBLE ASSETS

Intangible assets consist of the following as of September 30, 2021 and September 30, 2020:

| | September 30, 2021 | | |
| | Intangible assets | Accumulated amortization | Total |
|---|---|---|---|
| Patents | $ 74,112 | $ 28,329 | $ 45,783 |
| Websites | 8,115 | 8,115 | — |
| Customer list and non-compete agreement | 6,892,024 | 4,940,456 | 1,951,568 |
| Design assets | 123,000 | 123,000 | — |
| Trademarks | 5,928 | 2,236 | 3,692 |
| Engineering trade secrets | 4,370,269 | 2,943,173 | 1,427,096 |
| Software | 870,000 | 325,519 | 544,481 |
| Strategic Contract | 9,799,970 | 1,577,098 | 8,222,872 |
| Infrastructure asset | 81,868 | — | 81,868 |
| mPulse software | 741,846 | 238,161 | 503,685 |
| Total | $ 22,967,132 | $ 10,186,087 | $ 12,781,045 |

| | September 30, 2020 | | |
| | Intangible assets | Accumulated amortization | Total |
|---|---|---|---|
| Patents | $ 74,112 | $ 24,471 | $ 49,641 |
| Websites | 8,115 | 8,115 | — |
| Customer list and non-compete agreement | 6,702,024 | 2,923,592 | 3,778,432 |
| Design assets | 123,000 | 41,000 | 82,000 |
| Trademarks | 5,928 | 1,805 | 4,123 |
| Engineering trade secrets | 4,370,269 | 2,331,858 | 2,038,411 |
| Software | 1,120,000 | 22,951 | 1,097,049 |
| mVSO software | 437,135 | 132,813 | 304,322 |
| mPulse software | 741,846 | 69,965 | 671,881 |
| Total | $ 13,582,429 | $ 5,556,570 | $ 8,025,859 |

Amortization expense for the years ended September 30, 2021 and 2020 was $4,848,179 and $2,767,345, respectively.

During the year ended September 30, 2021, the Company recorded an impairment of $554,322 related to write-off of software. There was no impairment during the year ended September 30, 2020.

The strategic contract relates to supply of a critical input to our digital currency mining business at significantly low prices compared to market. During the year September 30, 2021, the initial allocation of $7,457,970 was adjusted by $2,342,000. The strategic contract is now carried at $9,799,970 net of accumulated amortization of $1,577,098.

The Company expects to record amortization expense of intangible assets over the next 5 years and thereafter as follows:

| Year | September 30, 2021 |
|---|---|
| 2022 | $ 4,494,533 |
| 2023 | 2,884,225 |
| 2024 | 2,471,413 |
| 2025 | 1,975,742 |
| 2026 | 398,644 |
| Thereafter | 556,488 |
| | $ 12,781,045 |

F-30

6. IMPAIRMENT

During the year ended September 30, 2021, the Company has incurred the following impairment loss on goodwill, digital currency and software. The Company did not incur any impairment loss for the year ended September 30, 2020.

| | Amount ($) |
|---|---|
| Impairment of digital currency | 6,608,076 |
| Impairment of goodwill | 5,723,388 |
| Impairment of software | 554,322 |
| **Total impairment loss** | 12,885,786 |

For impairment relating to digital currency and goodwill, refer to Digital Currency and Business combinations, Intangible Assets and Goodwill. (See Note 2)

7. PROPERTY AND EQUIPMENT

Property and equipment consist of the following as of September 30, 2021 and September 30, 2020:

| | September 30, 2021 | September 30, 2020 |
|---|---|---|
| Mining equipment | $123,147,843 | — |
| Land and building | 11,048,299 | — |
| Machinery and equipment | 376,163 | 193,042 |
| Leasehold improvements | 72,577 | 17,965 |
| Furniture and fixtures | 107,660 | 82,547 |
| Construction in progress | 10,498,311 | — |
| Total | 145,250,853 | 293,554 |
| Less: accumulated depreciation | (7,657,982) | (175,560) |
| Property and equipment, net | $137,592,871 | $ 117,994 |

Depreciation expense for the years ended September 30, 2021 and 2020 was $7,396,189 and $68,904, respectively. During the year ended September 30, 2020, the Company disposed of $48,898 of property and equipment resulting in a loss on disposal of $5,218. There was no disposal made during the year ended September 30, 2021.

The Company has purchased mining equipment for approximately $123.15 million during the year ended September 30, 2021. This primarily consisted of miners of $120.4 million with the remaining consisting of ancillary mining equipment.

College Park Data Center: On May 19, 2021, the Company exercised its purchase option on the ATL lease agreement to purchase property for $4.4 million in College Park, Georgia. The property contains approximately six acres of land and includes approximately 41,000 square feet of office and warehouse space. ATL utilizes, and intends to continue utilizing, this space for cryptocurrency mining activities.

*Construction in progress:* The Company is expanding its facility in Atlanta, a build out adjacent to the ATL data center mentioned above.

Norcross Data Center*:* On August 6, 2021, CSRE Properties Norcross, LLC, the Company's wholly owned subsidiary, purchased certain real property located in Norcross, Georgia for $6,550,000 plus transaction and settlement costs. The property consists of approximately seven acres of land and includes an approximately 87,000 square foot office building. The Company intends to utilize this office space to conduct certain of its cryptocurrency mining activities.

The Company has purchase commitments for approximately $144.04 million related to purchase of miners as of September 30, 2021, and the Company has paid $85.11 million towards these commitments as of the end of this period. As of September 30, 2021, the remaining commitment for future payments was $58.93 million.

As of September 30, 2021, the Company has outstanding deposits worth $87.9 million to premier suppliers and manufacturers for securing our purchases of mining equipment.

8.  LOANS

Long-term loans as of September 30, 2021 and 2020 consist of the following:

| | September 30, 2021 | September 30, 2020 |
|---|---|---|
| Promissory notes | $ — | $ 531,169 |
| Total | $ — | $ 531,169 |

Promissory Notes

On May 7, 2020, the Company applied for a loan from Celtic Bank Corporation, as lender, pursuant to the Paycheck Protection Program of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), as administered by the U.S. Small Business Administration (the "SBA"). On May 15, 2020, the loan was approved, and the Company received the proceeds from the loan in the amount of $531,169 (the "PPP Loan"). The Company applied for and received loan forgiveness from the SBA on March 23, 2021. The entire principal balance and interest charges were forgiven. The gain on loan forgiveness of $531,169 is included in other income in the consolidated statements of operations and comprehensive loss for the year ended September 30, 2021.

9.  LEASES

On October 1, 2019, the Company adopted the amendments to ASC 842, Leases, which requires lessees to recognize lease assets and liabilities arising from operating leases on the balance sheet. The Company adopted the new lease guidance using the modified retrospective approach and elected the transition option issued under ASU 2018-11, Leases (Topic 842) Targeted Improvements, allowing entities to continue to apply the legacy guidance in ASC 840, Leases, to prior periods, including disclosure requirements.

The Company's operating leases are office spaces and finance leases primarily in relation to the equipment used at its data center.

The Company's lease costs recognized in the Consolidated Statements of Income and Comprehensive Loss consist of the following:

| | 2021 | 2020 |
|---|---|---|
| Operating lease cost [1] | $ 340,440 | $ 117,223 |
| Finance lease cost: | | |
| Amortization of right-of-use assets | 303,292 | — |
| Interest on lease obligations | $ 42,992 | $ — |

(1) Included in general and administrative expenses

Other lease information is as follows:

| | Fiscal Years Ended September 30, | |
|---|---|---|
| | 2021 | 2020 |
| Cash paid for amounts included in measurement of lease obligations: | | |
| Operating cash flows from operating leases | $ 319,061 | $ 43,986 |
| Financing cash flows from finance leases | 288,602 | — |

Operating cash flows from finance leases is $42,992 for the year ended September 30, 2021.

| | 2021 | 2020 |
|---|---|---|
| Weighted-average remaining lease term - operating leases | 5 years | 0.4 years |
| Weighted-average remaining lease term - finance leases | 3.2 years | — |
| Weighted-average discount rate - operating leases | 4.5% | 10% |
| Weighted-average discount rate - finance leases | 5.5% | — |

F-32

The following is a schedule of the Company's lease liabilities by contractual maturity as of September 30, 2021:

| Fiscal Year | Operating Leases | | Finance Leases | |
|---|---|---|---|---|
| 2022 | $ | 316,908 | $ | 449,431 |
| 2023 | | 324,948 | | 321,887 |
| 2024 | | 333,234 | | 142,428 |
| 2025 | | 341,767 | | 12,320 |
| 2026 | | 299,039 | | 1,853 |
| Thereafter | | 50,659 | | — |
| Total undiscounted lease obligations | | 1,666,555 | | 927,919 |
| Less imputed interest | | (175,035) | | (55,813) |
| Total presnet value of lease liabilities | $ | 1,491,520 | $ | 872,106 |
| Less: Current portion of lease obligations | $ | 256,195 | $ | 413,798 |
| Total lease obligations, net of current portion | $ | 1,235,325 | $ | 458,308 |

## 10.  RELATED PARTY TRANSACTIONS

*Zachary Bradford Chief Executive Officer, Director and Former Chief Financial Officer*

During the years ended September 30, 2021 and 2020, the Company paid Blue Chip Accounting, LLC ("Blue Chip") $183,075 and $131,248, respectively, for accounting, tax, administrative services and reimbursement for office supplies. Blue Chip is 50% beneficially owned by Mr. Bradford. None of the services were associated with work performed by Mr. Bradford. The services consisted of preparing and filing tax returns, bookkeeping, accounting and administrative support assistance. The Company also sub-leases office space from Blue Chip. During the years ended September 30, 2021 and 2020, $18,300 and $14,725, respectively, was paid to Blue Chip for rent.

*Bryan Huber – Former Officer and Director*

On August 28, 2018, the Company executed an agreement with Zero Positive, LLC an entity controlled by Mr. Huber. In accordance with the agreement with Zero Positive, LLC, Mr. Huber earned $125,154 during the year ended September 30, 2020.

On March 12, 2020, the Agreement was terminated upon the execution of a separation agreement. All amounts owed from all agreements totaling, $90,000, were paid in full.

On September 28, 2018, in connection with the consulting agreement executed with Zero Positive, LLC, the Company issued warrants to purchase 90,000 shares of common stock at an exercise price of $8.00 per share to Zero Positive. The warrants were valued at $2,607,096 using the Black Scholes option pricing model based upon the following assumptions: term of 10 years, risk free interest rate of 3.05%, a dividend yield of 0% and volatility rate of 191%. The warrants vest as follows: 30,000 vested immediately, the balance vest evenly on the last day of each month over forty-two months beginning August 31, 2018. As of September 30, 2020, 62,857 warrants had vested, and the Company recorded an expense of $1,158,709 during the year ended September 30, 2020.

There were no transactions during the year ended September 30, 2021.

*Matthew Schultz- Executive Chairman of the Board and Former Chief Executive Officer*

The Company had a consulting agreement with Matthew Schultz, for management services. Mr. Schultz, for management services. Mr. Schultz received $1,086,200 as compensation for his services as chairman of the board during the year ended September 30, 2020. The agreement was terminated at the conclusion of fiscal year ending September 30, 2020 when Mr. Schultz's position was changed from Chairman to Executive Chairman and he accepted the associated employment agreement.

The Company additionally entered into an agreement on November 15, 2019 with an organization to provide general investor relations and consulting services that Mr. Schultz is affiliated with. The Company paid the organization $49,500 in fees plus $176,000 in expense reimbursements for the year ended September 30, 2020. The agreement was terminated in March 2020.

11.   STOCKHOLDERS' EQUITY

Overview

The Company's authorized capital stock consists of 100,000,000 shares of common stock and 10,000,000 shares of preferred stock, par value $0.001 per share. As of September 30, 2021, there were 37,395,945 shares of common stock issued and outstanding and 1,750,000 shares of preferred stock issued and outstanding. As of September 30, 2020, there were 17,390,979 shares of common stock issued and outstanding and 1,750,000 shares of preferred stock issued and outstanding.

On December 5, 2019, the Board of Directors approved a reverse stock split of the Company's common stock, par value $0.001 per share. On December 10, 2019, Financial Industry Regulatory Authority ("FINRA") approved the 1:10 reverse stock split of the Company's common stock. The reverse stock split took effect on December 11, 2019. Unless otherwise noted, impacted amounts and share information in the consolidated financial statements and notes thereto as of and for the fiscal year ended September 30, 2020, have been adjusted for the stock split as if such stock split occurred on the first day of the first period presented. There is no impact of this transaction in the year ended September 30, 2021.

Amendment to Articles of Incorporation

On October 4, 2019, pursuant to Article IV of our Articles of Incorporation, our Board of Directors voted to increase the number of shares of preferred stock designated as Series A Preferred Stock from one million (1,000,000) shares to two million (2,000,000) shares, par value $0.001 per share.

Under the Certificate of Designation for the Series A Preferred Stock, holders of shares of Series A Preferred Stock  are entitled to quarterly dividends on 2% of our earnings before interest, taxes and amortization. The dividends are payable in cash or common stock. The company paid $177,502 in preferred stock dividends during the year ended September 30, 2021. The holders will also have a liquidation preference on the stated value of $0.02 per share plus any accumulated but unpaid dividends. The holders are further entitled to have us redeem their Series A Preferred Stock for three shares of common stock in the event of a change of control and they are entitled to vote together with the holders of our common stock on all matters submitted to shareholders at a rate of forty-five (45) votes for each share held.

The rights of the holders of Series A Preferred Stock are defined in the relevant Amendment to the Certificate of Designation filed with the Nevada Secretary of State on October 9, 2019.

On October 2, 2020, the Company filed a Certificate of Amendment to its Articles of Incorporation with the Nevada Secretary of State to increase its authorized shares of common stock to 35,000,000.

On March 16, 2021, the Company filed a Certificate of Amendment to its Articles of Incorporation with the Nevada Secretary of State to increase its authorized shares of common stock to 50,000,000.

On September 17, 2021, the Company filed its First Amended and Restated Articles of Incorporation (the "Amended and Restated Articles") with the Secretary of State of the State of Nevada, which Amended and Restated Articles became effective upon filing. The Amended and Restated Articles were previously approved by the Company's Board, subject to stockholder approval, on July 16, 2021, and were approved by the Company's stockholders at the Company's Annual Meeting and, among other things, increased the Company's authorized shares of common stock to 100,000,000.

Common Stock issuances for the year ended September 30, 2021

The Company issued 4,444,445 shares of the Company's common stock in connection with its underwritten equity offering at a price of $9.00 per share for net proceeds of approximately $37.05 million.

The Company issued 9,090,910 shares of the Company's common stock in connection with its underwritten public equity offering at a price of $22.00 per share for net proceeds of approximately $187.2 million.

The Company issued 236,000 shares of common stock as settlement of accrued bonus compensation related to the year ended September 30, 2020. The fair value of these shares was approximately $1.9 million and was fully expensed for in the prior year. The Company issued 327,725 shares of common stock for the current year related to bonus compensation. The fair value of these shares is approximately $3.07 million.

The Company issued 1,618,285 shares of common stock in relation to the acquisition of ATL, which includes 809,142 shares held in escrow. The Company issued 477,703 shares of common stock in relation to the acquisition of SWS, which includes 310,000 shares held in escrow. (See Note 3 for additional details)

F-34

The Company issued 57,045 shares of common stock for services rendered for a total fair value of approximately $815,000 which has been fully expensed during the year ended September 30, 2021.

The Company issued 389,745 shares of common stock in relation to the exercise of stock options and warrants. (See Notes 12 and 13 for additional details)

The Company issued 15,577 restricted stock units to certain SWS employees as part of the transaction to incentivize the employees for retention purposes. These restricted stock units vest over a period of one year. As of September 30, 2021, 4,582 of the restricted stock units had been forfeited. (See Note 13 for additional details)

On June 3, 2021, the Company entered into an At The Market Offering Agreement ("ATM") with H.C. Wainwright & Co., LLC, to create an at-the-market equity program under which the Company may, from time to time, offer and sell shares of its common stock having an aggregate gross offering price of up to $500,000,000 to or through H.C. Wainwright & Co., LLC. During the year ended September 30, 2021, the Company issued 3,443,379 shares of the Company's common stock under the ATM for net proceeds of $46.4 million. The shares were sold pursuant to a prospectus dated March 15, 2021 and a prospectus supplement dated June 3, 2021 filed with the SEC.

Common stock returned during the year ended September 30, 2021

As a result of an adjustment of holdback shares to actual milestones earned in relation to the p2k acquisition, 8,072 shares were returned and cancelled. (See Note 3 for additional details)

As a result of an adjustment of holdback shares pursuant to Article II and Schedule A of that certain Agreement and Plan of ATL Merger in connection with the acquisition of ATL, 68,194 shares were returned and cancelled. (See Note 3 for additional details)

15,000 shares, held in escrow as collateral, were returned from a lender on September 30, 2021.

Common Stock issuances during the year ended September 30, 2020

The Company issued 1,964,313 shares of common stock in accordance with the terms of the convertible debt agreement due to the decrease in stock price.

The Company issued 22,000 shares of common stock for services rendered to independent consultants at a fair value of $54,000.

The Company issued 793 shares of common stock as a result of rounding related to the reverse stock split.

The Company issued 95,699 shares of common stock in relation to the acquisition of p2k.

In relation to the Securities Purchase Agreement dated December 31, 2018, the Company issued 1,125,000 shares of common stock for the conversion of $1,250,000 in principal and $437,500 in interest at an effective conversion price of $1.50 per share.

In relation to the Securities Purchase Agreement dated April 17, 2019, the Company issued 8,241,665 shares of common stock for the conversion of $10,750,000 in principal and $1,612,500 in interest as a conversion premium at an effective conversion price of $1.50 per share.

The Company issued 28,381 shares of common stock as board and executive compensation at a fair value of $71,600.

The Company issued 1,230,770 shares of common stock as a result of a registered direct offering resulting in total consideration of $4,000,000.

The Company issued 6,913 shares of common stock as a result of a cashless exercise of 15,000 common stock warrants.

The Company issued 26,427 shares of common stock in relation to the acquisition of GridFabric

Common stock returned during the year ended September 30, 2020

As a result of a note payoff on December 5, 2019, 5,000 shares common stock were returned to treasury and cancelled on January 13, 2020.

As a result of the cancellation of an investor relations services contract, 25,000 shares were returned to treasury and cancelled on February 10, 2020.

Series A Preferred Stock issuances during the year ended September 30, 2020

On October 4, 2019, the Company authorized the issuance of a total of seven hundred and fifty thousand (750,000) shares of its designated Series A Preferred Stock to members of its board of directors for services rendered. A fair value of $0.02 per share was determined by the Company. Director fees of $15,000 was recorded as a result of the stock issued.

12.  STOCK WARRANTS

The following is a summary of stock warrant activity during the years ended September 30, 2021 and September 30, 2020.

| | Number of Warrant Shares | Weighted Average Exercise Price ($) |
|---|---|---|
| Balance, September 30, 2019 | 1,314,065 | $    21.70 |
| Warrants granted | — | — |
| Warrants expired | — | — |
| Warrants canceled | — | — |
| Warrants exercised | (15,000) | 8.00 |
| Balance, September 30, 2020 | 1,299,065 | 21.78 |
| Warrants granted | — | — |
| Warrants expired | (432,721) | 15.00 |
| Warrants canceled | — | — |
| Warrants exercised | (250,790) | 11.77 |
| Balance, September 30, 2021 | 615,554 | 30.72 |

As of September 30, 2021, the outstanding warrants have a weighted average remaining term of 0.71 years and an intrinsic value of $389,243.

During the year ended September 30, 2021, a total of 173,990 shares of the Company's common stock were issued in connection with the exercise of common stock warrants at exercise prices ranging from $3.36 and $20.00, for total consideration of $2,883,623.

On September 30, 2021, a total of 74,437 shares of the Company's common stock were issued in connection with the cashless exercise of 76,800 common stock warrants at exercise prices ranging from $0.83 to $3.67.

As of September 30, 2021, there are warrants exercisable to purchase 609,840 shares of common stock in the Company and 5,714 unvested warrants outstanding that cannot be exercised until vesting conditions are met. 418,834 of the warrants require a cash investment to exercise as follows: 2,500 required a cash investment of $8.00 per share. 103,000 require a cash investment of $25.00 per share, 200,000 require a cash investment of $35.00 per share, 10,000 require a cash investment of $40.00 per share, 60,000 require a cash investment of $50.00 per share, 38,334 require a cash investment of $75.00 per share and 5,000 require a cash investment of $100.00 per share. 196,720 of the outstanding warrants contain provisions allowing a cashless exercise at their respective exercise prices.

Warrant activity for the year ended September 30, 2020

On September 25, 2020, a total of 6,913 shares of the Company's common stock were issued in connection with the cashless exercise of 15,000 common stock warrants at an exercise price of $8.00.

13.  STOCK-BASED COMPENSATION

The Company sponsors a stock-based incentive compensation plan known as the 2017 Incentive Plan (the "Plan"), which was established by the Board of Directors of the Company on June 19, 2017. On October 7, 2020, the Company executed a first amendment to the Plan to increase its share pool from 300,000 to 1,500,000 shares of common stock.

On September 15, 2021, the shareholders approved and the Company executed a second amendment to (i) increase the number of shares of common stock authorized for issuance under the Plan by an additional 2,000,000 shares, resulting in an aggregate of 3,500,000 shares of common stock authorized for issuance under the Plan, and (ii) revise Section 19 of the Plan to more closely align with the provisions of Section 422 of the Internal Revenue Code of 1986, as amended, and Section 17.2 of the Plan.

As of September 30, 2021, there were 1,225,351 shares available for issuance under the Plan.

The Plan allows the Company to grant incentive stock options, non-qualified stock options, stock appreciation rights, or restricted stock units. The incentive stock options are exercisable for up to ten years, at an option price per share not less than the fair market value on the date the option is granted. The incentive stock options are limited to persons who are full-time employees of the Company at the date of the grant of the option. The option vesting schedule for options granted is determined by the Board of Directors at the time of the grant. The Plan provides for accelerated vesting of unvested options if there is a change in control, as defined in the Plan.

Non-qualified options may be granted to any person, including, but not limited to, employees, independent agents, consultants and attorneys, who the Company's Board believes have contributed, or will contribute, to the success of the Company. Non-qualified options may be issued at option prices of less than fair market value on the date of grant and may be exercisable for up to ten years from date of grant. As of September 30, 2021, no non-qualified options were granted to any person.

The Company recognized $3,868,927 and $3,608,885 for the years ended September 30, 2021 and September 30, 2020, respectively, in stock-based compensation under the stock-based incentive compensation plan.

**STOCK OPTIONS**

The following is a summary of stock option activity during the year ended September 30, 2021:

| | Number of Option Shares | Weighted Average Exercise Price ($) |
|---|---|---|
| Balance, September 30, 2019 | 81,254 | 11.82 |
| Options granted | 233,233 | 5.28 |
| Options expired | (25,692) | 8.71 |
| Options canceled | (10,847) | 19.04 |
| Options exercised | — | — |
| Balance, September 30, 2020 | 277,948 | 6.34 |
| Options granted | 1,469,250 | 19.32 |
| Options expired | (12,975) | 10.53 |
| Options canceled | (45,876) | 16.31 |
| Options exercised | (141,318) | 6.14 |
| Balance, September 30, 2021 | 1,547,029 | 18.35 |

As of September 30, 2021, there are options exercisable to purchase 525,646 shares of common stock in the Company and 1,028,383 unvested options outstanding that cannot be exercised until vesting conditions are met. As of September 30, 2021, the outstanding options have a weighted average remaining term of 4.03 years and an intrinsic value of $1,579,336.

F-37

Option activity for the year ended September 30, 2021

During the year ended September 30, 2021, a total of 141,318 shares of the Company's common stock were issued in connection with the exercise of 141,318 common stock options at exercise prices ranging from $4.65 to $24.40, for a total consideration of $867,308.

During the year ended September 30, 2021, the Company granted 1,469,250 options with a total fair value of $21,582,485 to purchase shares of common stock to employees. The Company offset $953,125 of stock compensation expense against bonuses accrued during the prior year and recognized $7,731,606 during the year. The shares were granted at quoted market prices ranging from $7.55 to $34.67 and were valued at issuance using the Black Scholes model.

The Black-Scholes model utilized the following inputs to value the options granted during year ended September 30, 2021:

| Fair value assumptions Options: | September 30, 2021 |
|---|---|
| Risk free interest rate | 0.10-0.41% |
| Expected term (years) | 1.5-5.25 |
| Expected volatility | 140% to 239% |
| Expected dividends | 0% |

As of September 30, 2021, the Company expects to recognize $16,434,789 of stock-based compensation for the non-vested outstanding options over a weighted-average period of 2.47 years.

Option activity for the year ended September 30, 2020

During the year ended September 30, 2020, the Company issued 233,233 options to purchase shares of common stock to employees, the options were granted with exercise prices equal to the then current quoted market prices ranging from $4.50 to $8.50. The options were valued at issuance using the Black Scholes model and stock compensation expense of $716,740 was recorded as a result of the issuances.

The Black-Scholes model utilized the following inputs to value the options granted during year ended September 30, 2020:

| Fair value assumptions Options: | September 30, 2020 |
|---|---|
| Risk free interest rate | 0.85 to 1.73% |
| Expected term (years) | 3-5 |
| Expected volatility | 124% to 209% |
| Expected dividends | 0% |

**RESTRICTED STOCK UNITS**

The Company grants RSUs that contain either a) service conditions, or b) performance conditions, or c) market performance conditions. RSUs containing service conditions vest monthly or annually. RSUs containing performance conditions generally vest over 1 year, and the number of shares earned depends on the achievement of predetermined Company metrics.

When the criteria for vesting is met, the Company recognizes the expense equal to the total fair value of the common stock price on the grant date. All of the RSUs issued prior to September 30, 2021 were either vested or forfeited and cancelled.

The following table summarizes the performance-based restricted stock units at the maximum award amounts based upon the respective performance share agreements. Actual shares that will vest depend on the attainment of the performance-based criteria.

| | Number of Shares | Weighted Average Grant-Date Fair Value Per Share | | Aggregate Intrinsic Value | |
|---|---|---|---|---|---|
| Outstanding at September 30, 2020 | — | | — | | — |
| Granted | 579,302 | $ | 10.53 | $ | 1,669,711 |
| Vested | (558,475) | $ | 10.03 | $ | 1,651,231 |
| Forfeited | (9,832) | $ | 17.98 | $ | 18,480 |
| Outstanding at September 30, 2021 | 10,995 | $ | 27.73 | | — |

As of September 30, 2021, the Company had $123,216 unrecognized compensation cost related to restricted stock unit awards that will be recognized over a weighted average period of 0.4 years.

The Company recognized stock-based compensation expenses related to restricted stock units, of $3,862,679 for fiscal 2021. The Company recognized $1,904,520 in stock-based compensation expense for restricted stock units issued in 2021 related to 2020 bonuses.

14.  INCOME TAXES

The Company provides for income taxes under FASB ASC 740, Accounting for Income Taxes. FASB ASC 740 requires the use of an asset and liability approach in accounting for income taxes. Deferred tax assets and liabilities are recorded based on the differences between the financial statement and tax bases of assets and liabilities and the tax rates in effect currently.

FASB ASC 740 requires the reduction of deferred tax assets by a valuation allowance, if, based on the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized. In the Company's opinion, it is uncertain whether they will generate sufficient taxable income in the future to fully utilize the net deferred tax asset. Accordingly, a valuation allowance equal to the deferred tax asset has been recorded. The total deferred tax asset is approximately $38.8 million as of September 30, 2021 which is calculated by multiplying a 21% estimated tax rate by the cumulative net operating loss ("NOL") of approximately $184.6 million.

Due to the enactment of the Tax Reform Act of 2017, we have calculated our deferred tax assets using an estimated corporate tax rate of 21%. U.S. Tax codes and laws may be subject to further reform or adjustment which may have a material impact to the Company's deferred tax assets and liabilities.

The significant components of the Company's deferred tax assets and liabilities as of September 30, 2021 and 2020 are as follows:

| As of September 30, | 2021 | 2020 |
|---|---|---|
| Cumulative tax net operating losses (in millions) | $  184.6 | $   52.5 |
| Deferred tax asset (in millions) | $   38.8 | $   11.0 |
| Valuation allowance (in millions) | (38.8) | (11.0) |
| Current taxes payable | — | — |
| Income tax expense | $   — | $   — |

As of September 30, 2021, and 2020, the Company had gross federal net operating loss carryforwards of approximately $184.6 million and $52.5 million, respectively.

The Company plans to file its U.S. federal return for the year ended September 30, 2021 upon the issuance of this filing. Upon filing of the tax return for the year ended September 30, 2021 the actual deferred tax asset and associated valuation allowance available to the Company may differ from managements estimates. The tax years 2015-2019 remained open to examination for federal income tax purposes by the major tax jurisdictions to which the Company is subject. No tax returns are currently under examination by any tax authorities.

15.  COMMITMENTS AND CONTINGENCIES

The Company has purchase commitments that are cancellable of approximately $144.04 million related to purchase of miners as of September 30, 2021, and the Company has paid $85.11 million towards these commitments as of the end of this period. As of September 30, 2021, the remaining commitment for future payments was $58.93 million.

The Company has purchase commitments for infrastructure assets and other mining equipment of approximately $6,512,000 as of September 30, 2021 and the Company has paid $4,576,000 towards these commitments as of end of this period.

The following table sets forth certain information concerning our obligations to make contractual future payments towards our agreements as of September 30, 2021:

| | 2022 | 2023 | 2024 | 2025 | 2026 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| **Recorded contractual obligations:** | | | | | | | |
| Operating lease obligations | $316,908 | $324,948 | $333,234 | $341,767 | $299,039 | $50,659 | $1,666,555 |
| Finance Lease obligations | 449,431 | 321,887 | 142,428 | 12,320 | 1,853 | — | 927,919 |
| Miner equipment | 58,930,880 | | | | | | 58,930,880 |
| Infrastructure assets | 1,936,000 | | | | | | 1,936,000 |
| Total | $61,633,219 | $646,835 | $475,662 | $354,087 | $300,892 | $50,659 | $63,461,354 |

Contingent consideration

GridFabric: On August 31, 2020, the Company acquired GridFabric, LLC. Pursuant to the terms of the purchase agreement, additional shares of the Company's common stock valued at up to $750,000 were issuable if GridFabric achieves certain revenue and product release milestones. On September 30, 2021, the contingent consideration was re-measured to $500,000.

Subsequent to September 30, 2021, the Company settled all contingent consideration due to GridFabric resulting in a payment of 8,404 shares of common stock valued at $150,000.

Solar Watt Solutions: On February 24, 2021, the Company acquired Solar Watt Solutions, Inc. Pursuant to the terms of the purchase agreement, additional cash consideration of up to $2,500,000 (fair valued at $155,000 at acquisition date) in cash held back by the Company and only payable pro rata to Sellers upon meeting certain future milestones and subject to satisfaction of any amounts owing from SWS to the Company resulting from damages required to be indemnified under the SWS Merger Agreement. The contingent cash consideration was re-measured to $320,802 at September 30, 2021.

F-40

Legal contingencies

From time to time we may be subject to litigation. Risks associated with legal liability are difficult to assess and quantify, and their existence and magnitude can remain unknown for significant periods of time. We have acquired liability insurance to reduce such risk exposure to the Company. Despite the measures taken, such policies may not cover future litigation, or the damages claimed may exceed our coverage which could result in contingent liabilities.

**Bishins v. CleanSpark, Inc. et al.**

On January 20, 2021, Scott Bishins ("Bishins"), individually, and on behalf of all others similarly situated (together, the "Class"), filed a class action complaint (the "Class Complaint") in the United States District Court for the Southern District of New York against the Company, its Chief Executive Officer, Zachary Bradford ("Bradford"), and its Chief Financial Officer, Lori Love ("Love") (the "Class Action"). The Class Complaint alleges that, between December 31, 2020 and January 14, 2021, the Company, Bradford, and Love "failed to disclose to investors: (1) that the Company had overstated its customer and contract figures; (2) that several of the Company's recent acquisitions involved undisclosed related party transactions; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis." (the "Class Allegations"). The Class Complaint seeks: (a) certification of the Class, (b) an award of compensatory damages to the Class, and (c) an award of reasonable costs and expenses incurred by the Class in the litigation. To date, no class has been certified in the Class Action. Currently, there is a pending motion to appoint lead class plaintiff, at which point dispositive motions may be filed.

Although the ultimate outcome of the Class Action cannot be determined with certainty, the Company stands behind all of its prior statements and disclosures and believes that the claims raised in the Class Complaint are entirely without merit. The Company intends to both defend itself vigorously against these claims and to vigorously prosecute any counterclaims.

Notwithstanding the Class Allegations' lack of merit, however, the Class Action may distract the Company and cost the Company's management time, effort and expense to defend against the claims made in the Class Complaint. Notwithstanding the Company's belief that the Company and its management have complied with all of their obligations under applicable securities regulations, no assurance can be given as to the outcome of the Class Action, and in the event the Company does not prevail in such action, the Company, its business, financial condition and results of operations would be materially and adversely affected.

**Ciceri, derivatively on behalf of CleanSpark, Inc., v. Bradford, Love, Schultz, Beynon, McNeill, and Wood (consolidated with Perna, derivatively on behalf of CleanSpark, Inc., v. Bradford, Love, Schultz, Beynon, McNeill, and Wood)**

On May 26, 2021, Andrea Ciceri ("Ciceri"), derivatively on behalf of CleanSpark, Inc., filed a verified shareholder derivative action (the "Ciceri Derivative Action") in the United States District Court in the District of Nevada against Chief Executive Officer, Zachary Bradford ("Bradford"), Chief Financial Officer, Lori Love ("Love") and Directors Matthew Schultz, Roger Beynon, Larry McNeill and Tom Wood (Bradford, Love and Directors collectively referred to as "Defendants.") On June 22, 2021, Mark Perna ("Perna") filed a verified shareholder derivative action (the "Perna Derivative Action") in the same Court against the same Defendants making substantially similar allegations. On June 29, 2021, the court consolidated the Ciceri Derivative Action with the Perna Derivative Action in accordance with a stipulation among the parties (the consolidated case referred to as the "Derivative Action"). The Derivative Action alleges that Defendants: (1) made materially false and misleading public statements about the Company's business and prospects; (2) did not maintain adequate internal controls; and (3) did not disclose several related party transactions benefitting insiders, questionable uses of corporate assets, and excessive compensation. The claims asserted against all Defendants include breach of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. A claim for contribution under Sections 10(b) and 21D of the Securities and Exchange Act is asserted against only Bradford and Love. The Derivative Action seeks declaratory relief, monetary damages, and imposition of adequate corporate governance and internal controls. Plaintiffs were given the opportunity to submit an Amended Complaint by November 25, 2021, but elected not to. Defendants' Motion to Dismiss will be due by January 20, 2022.

Although the ultimate outcome of the Derivative Action cannot be determined with certainty, the Company stands behind all of its prior statements and disclosures, and believes that the claims raised in that case are entirely without merit. The Company intends to both defend itself vigorously against these claims and to vigorously prosecute any counterclaims.

Notwithstanding the Derivative Action's lack of merit, however, it may distract the Company and cost the Company's management time, effort and expense to defend against the claims. Notwithstanding the Company's belief that the Company and its management have complied with all of their obligations under applicable securities regulations, no assurance can be given as to the outcome of the Derivative Action, and in the event the Company does not prevail in such action, the Company, its business, financial condition and results of operations would be materially and adversely affected.

16.  MAJOR CUSTOMERS AND VENDORS

*Digital Currency Mining Segment*

For the year ended September 30, 2021, the digital currency mining business had the following customers that represented more than 10% of revenue. For these purposes customers are defined as the Company's mining pool operators.

| | September 30, 2021 |
|---|---|
| Mining Pool Operator A | 55.72% |
| Mining Pool Operator B | 44.28% |

For the year ended September 30, 2021, the Company had the following significant suppliers of mining equipment.

| | September 30, 2021 |
|---|---|
| Vendor A | 49.9% |
| Vendor B | 37.4% |
| Vendor C | 2.8% |

*Energy Segment*

For the years ended September 30, 2021 and September 2020, the energy business had the following customers that represented more than 10% of revenue.

| | September 30, 2021 | September 30, 2020 |
|---|---|---|
| Customer A | 48.88% | 58.31% |
| Customer B | 12.36% | 0% |
| Customer C | 0% | 11.56% |

For the years ended September 30, 2021 and 2020, the Company had the following suppliers that represented more than 10% of direct material costs.

| | September 30, 2021 | September 30, 2020 |
|---|---|---|
| Vendor A | 32.2% | 85.55% |
| Vendor B | 23.4% | 0% |

F-42

17. SEGMENT REPORTING

We disclose segment information that is consistent with the way in which management operates and views the business. Our operating structure contains two reportable segments: Digital Currency and Energy. The Company measures the results of its segments using, among other measures, each segment's sales and operating income, which includes certain corporate overhead allocations.

**Digital Currency.** This segment consists of operation related to Bitcoin mining. The Company provides computing power through ATL Data Centers LLC and CleanBlok Inc. to the mining pools. This segment also includes operation related to maintenance of real property holdings for company purposes through CSRE properties Norcross LLC and CSRE properties LLC. This segment revenue represents fractional share of the fixed cryptocurrency award received from the mining pool operator in exchange of computing power.

**Energy.** This segment provides services, equipment, and software to the energy industry. This segment includes revenue from providing engineering and construction services, selling equipment such as residential battery, residential solar, commercial solar and non-customized equipment and providing access to its energy software offerings and software license sales and support services.

**Corporate and Other.** This includes revenue from providing design, software development, and other technology-based consulting services through p2k Labs and data center services through ATL Data Center.

We allocate expenses related to corporate activities to the segments, and corporate overhead to CleanSpark Inc. Corporate Items and eliminations consist of corporate overhead and other items not allocated to any of the Company's segments as in the table below. Intersegment transactions, which were at market price, are included in the "Other revenue and eliminations" and "Corporate items and eliminations" in the table below.

| | September 30, 2021 | September 30, 2020 |
|---|---|---|
| Revenue | | |
| Energy | $ 9,002,636 | $ 9,018,023 |
| Digital Currency Mining | 38,846,633 | — |
| **Total segment revenues** | **47,849,269** | **9,018,023** |
| Other revenue and eliminations | 1,588,846 | 1,010,678 |
| **Consolidated Revenues** | **49,438,115** | **10,028,701** |
| **Profit** | | |
| Energy | (8,111,138) | (13,554,515) |
| Digital Currency Mining | 23,198,270 | — |
| **Total segment profit/(loss)** | **15,087,132** | **(13,554,515)** |
| | | |
| Corporate items and eliminations (including depreciation and amortization) | (36,899,142) | (9,791,628) |
| **Net loss** | **$ (21,812,010)** | **$ (23,346,143)** |

For details on major customers of Digital currency and Energy segment, see Note 16.

A summary of segment assets is as follows:

| | September 30, 2021 | September 30, 2020 |
|---|---|---|
| Digital Currency Mining | $ 270,995,942 | $ — |
| Energy | $ 17,507,314 | $13,621,190 |
| Other and Corporate assets | $ 28,969,865 | $ 8,718,873 |
| **Total** | **$ 317,473,121** | **$22,340,063** |

The Company has its geographic operations only in United States.

Total additions in long-lived assets during the years ended September 30, 2021 and 2020:

| | September 30,2021 | | | September 30,2020 | | |
|---|---|---|---|---|---|---|
| | Digital Currency | Energy | Corporate | Digital Currency | Energy | Corporate |
| Property Plant and Equipment | $144,743,498 | $ 212,178 | $ 972 | $ — | $ 28,937 | $ 18,108 |
| Intangibles | 9,881,838 | 190,000 | — | — | 1,381,633 | 833,000 |
| Capitalized software | — | — | — | — | 84,924 | — |
| **Total** | **$154,625,336** | **$ 402,178** | **$ 972** | **$ —** | **$1,495,494** | **$ 851,108** |

## 18. SUBSEQUENT EVENTS

We have evaluated events occurring between the end of the most recent fiscal year and the date the financial statements were issued through December 14, 2021. There were no material subsequent events except as disclosed below:

*Georgia Power Agreement*
Effective October 1, 2021, the Company entered into certain agreements with Georgia Power Company ("Georgia Power"), for electrical services to the Company's facilities in Norcross, Georgia. The agreements have an initial term of five years, during which time the power utilized by the Company will be billed under the Georgia Power Real Time Pricing ("RTP") rate, where a portion of the usage is priced hourly and another portion is billed at a conventional rate.

In addition, the Company agreed to pay Georgia Power a one-time fee of approximately $2.0 million to install additional power equipment on the property.

*Mining Equipment Purchase Agreements*
On October 6 and October 14, 2021, the Company entered into agreements that are cancellable with a mining equipment supplier to purchase an aggregate of 6,750 mining servers. As compensation for the mining equipment, the Company agreed to pay the supplier up to an aggregate amount of approximately $49.5 million, of which, approximately $28.6 was paid upon execution of the agreements, with the remainder to be paid in monthly installments through June 2022. The Company currently expects to receive the mining equipment in nine equal monthly shipments from November 2021 through July 2022 and plans to use the mining equipment to expand its digital currency mining activities through its wholly owned subsidiaries.

In November 2021, the Company entered into a new purchase agreement that is cancellable for a total of 2,597 mining machines with an aggregate purchase price of approximately $26.5 million.

*Immersion Cooling System Purchase*
On December 1, 2021, the Company entered into an agreement to purchase an immersion cooling system and related equipment with a purchase price of approximately $9.6 million.

The Company issued 4,017,652 shares under its At the Market financing instrument resulting in proceeds of approximately $68 million.

The Company issued 25,775 shares as a result of stock option exercises resulting in proceeds of $189,677.

On November 23, 2021, the Company settled all contingent consideration due to GridFabric resulting in the issuance of 8,404 shares of Company common stock valued at $150,000.

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES**

In connection with the preparation of this Annual Report on Form 10-K, our management conducted an assessment of the effectiveness of our internal controls over financial reporting as of the end of the period covered by this report (under the supervision and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"). Based on that assessment, our CEO and CFO have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) under the Exchange Act) were not effective due to material weaknesses in internal control over financial reporting, as described below. Management's assessment of the effectiveness of our disclosure controls and procedures is expressed at a level of reasonable assurance because management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives.

**MANAGEMENTS REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) and 15d-15(f) of the Exchange Act. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP and includes those policies and procedures that (1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect our transactions; (2) provide reasonable assurance that our transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and that our receipts and expenditures are being made only in accordance with appropriate authorizations; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness for future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. No evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.

Under the supervision of and with the participation of our management, we assessed the effectiveness of our internal control over financial reporting as of September 30, 2021, using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework (2013). We excluded from our assessment the internal control over financial reporting of ATL Data Centers LLC and Solar Watt Solutions, Inc. with total assets of $267.3 million (of which $27.3 million represents goodwill and intangibles included within the scope of the assessment), and total revenues of $43.2 million included in the consolidated financial statements of the Company as of and for the year ended September 30, 2021.As part of our assessment of the effectiveness of our internal control over financial reporting as of September 30, 2021, management identified the following material weaknesses: (1) the Company did not adequately implement or properly maintain controls over its financial close and reporting process, its process over the recording of energy and other services revenue and its process over the accounting and valuation of certain aspects of business combinations involving significant estimates and (2) the Company did not adequately design and maintain effective general information technology controls over third-party information systems and applications that are relevant to the preparation of the Company's financial statements:

- *Financial Close and Reporting:* Controls over financial statement reviews, specific to the appropriate reconciliation of certain balance sheet accounts, were not operating effectively.
  - *Recording of Revenues for certain non-principal revenue generating subsidiaries:* Controls over the recording and processing of revenue for certain non-principal revenue generating entities, specifically, p2kLabs, Inc, GridFabric, LLC and CleanSpark, LLC, lack the level of precision necessary to ensure the completeness and accuracy of revenue recorded.

  - *Business Combinations:* Controls designed to properly consider and evaluate certain aspects of our business combinations and related reporting units did not operate effectively to identify all necessary adjustments made to the purchase price during the valuation process and the related goodwill balances recorded. This includes controls around business combination accounting, specifically as it relates to the valuation of contingent consideration as part of the purchase price underlying the business combinations, as well as the identification of reporting units.

43

- *Information and Technology Controls:* Certain individual control deficiencies related to information technology ("IT") general controls and report reviews aggregate into a material weakness, as follows:

  - Certain process-level and IT-dependent controls over user access to IT programs and applications, specifically utilized for hosting services and file storage, were not effective.

  - Controls relating to the evaluation of service organization controls reports were not performed over certain third-party service providers to cover the entire fiscal year.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis

These material weaknesses did not result in any identified material misstatements to the financial statements, and there were no changes to previously released financial results. Based on these material weaknesses, management concluded that at September 30, 2021, internal control over financial reporting was not effective.

Our independent registered public accounting firm, MaloneBailey, LLP has issued an adverse audit report on the effectiveness of internal control over financial reporting as of September 30, 2021, which appears on page F-2.

Following identification of the material weaknesses and prior to filing this Annual Report on Form 10-K, we completed substantive procedures for the year ended September 30, 2021. Based on these procedures, management believes that our consolidated financial statements included in this Form 10-K have been prepared in accordance with U.S. GAAP. Our CEO and CFO has certified that, based on their knowledge, the financial statements, and other financial information included in this Form 10-K, fairly present in all material respects the financial condition, results of operations and cash flows of CleanSpark as of, and for, the periods presented in this Form 10-K. MaloneBailey, LLP has issued an unqualified opinion on our financial statements, which appears on page F-1.

**REMEDIATION**
Management has been implementing and continues to implement measures designed to ensure that control deficiencies contributing to the material weakness are remediated, such that these controls are designed, implemented, and operating effectively. The remediation actions include the following:
- additional qualified staff were appointed during the year-ended September 30, 2021 and subsequent to year-end to ensure appropriate reviews occur
- the implementation of additional monitoring of controls to improve documentation of internal control procedures
- expanding the management and governance over IT system controls; and
- implementing enhanced process controls around internal user access management including provisioning, removal, and periodic review

We believe that these actions will remediate the material weaknesses, once management has performed its assessment of our internal controls over financial reporting including the remedial measures described above. The weaknesses will not be considered remediated, however, until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. We expect that the remediation of these material weaknesses will be completed prior to the end of fiscal year 2022.

**CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING**
Except for the material weaknesses identified during the quarter, as of September 30, 2021, and except for the remedial measures described above, there have been no other changes in our internal control over financial reporting (as defined in Rules 13a-15(f) or 15d-15(f) of the Exchange Act) that occurred during the fourth quarter of fiscal year 2021 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**INHERENT LIMITATIONS ON INTERNAL CONTROLS**

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness for future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. No evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.

**Item 9B. Other Information**

None.

## PART III

**Item 10 – Directors, Executive Officers, and Corporate Governance**

Information required by Item 10 is incorporated by reference from the Company's definitive proxy statement, to be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year covered by this Annual Report.

**Item 11 – Executive Compensation**

The information required by Item 11 is incorporated by reference from the Company's definitive proxy statement, to be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year covered by this Annual Report.

**Item 12 – Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by Item 12 is incorporated by reference from the Company's definitive proxy statement, to be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year covered by this Annual Report.

**Item 13 – Certain Relationships and Related Transactions, and Director Independence**

The information required by Item 13 is incorporated by reference from the Company's definitive proxy statement, to be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year covered by this Annual Report.

**Item 14 – Principal Accounting Fees and Services**

The information required by Item 14 is incorporated by reference from the Company's definitive proxy statement, to be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year covered by this Annual Report.

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

*(a)*

1.    Financial Statements. The consolidated financial statements are included in Part II, Item 8 of this Annual Report on Form 10-K beginning on page F-2.

2.    Financial Statement Schedules. Schedules are not submitted because they are not applicable or not required under Regulation S-X or because the required information is included in the financial statements or notes thereto.

3.    Exhibits required to be filed by Item 601 of Regulation S-K. The information called for by this Item is incorporated by reference from the Index to Exhibits included in this Annual Report on Form 10-K.

| Exhibit Number | Exhibit Description | Form | File No. | Exhibit Filing Date | Filing Date | Filed Herewith |
|---|---|---|---|---|---|---|
| 2.1 | Agreement and Plan of Merger by and between the Company and Pioneer Critical Power, Inc., dated January 22, 2019 | 8-K | 000-53498 | 2.1 | January 24, 2019 | |
| 2.2 | Stock Purchase Agreement by and between p2klabs, Inc., Amer Tadayon and the Company, dated January 31, 2020 | 8-K | 001-39187 | 2.1 | February 6, 2020 | |
| 2.3 † | Agreement and Plan of Merger, dated as of December 9, 2020, by and among CleanSpark, Inc., ATL Data Centers LLC, CLSK Merger Sub, LLC and the Sellers | 8-K | 001-39187 | 2.1 | December 10, 2020 | |
| 3.1 | Articles of Incorporation, dated October 9, 1987 | 10-12G | 000-53498 | 3.1 | November 17, 2008 | |
| 3.2 | Amendment to Articles of Incorporation, dated October 9, 1987 | 10-12G | 000-53498 | 3.1A | November 17, 2008 | |
| 3.3 | Bylaws, dated October 15, 1987 | 10-12G | 000-53498 | 3.2 | November 17, 2008 | |
| 3.4 | Amended Bylaws, dated February 5, 2013 | 8-K | 000-53498 | 3.1 | February 12, 2013 | |
| 3.5 | Certificate of Change, dated February 26, 2013 | 8-K | 000-53498 | 3.1 | February 26, 2013 | |
| 3.6 | Article of Merger, dated November 14, 2021 | 8-K | 000-53498 | 3.1 | December 1, 2014 | |
| 3.7 | Certificate of Amendment, dated April 15, 2015 | 8-K | 000-53498 | 3.1 | April 16, 2015 | |

46

| 3.8 | Certificate of Designation, dated April 15, 2015 | 8-K | 000-53498 | 3.2 | April 16, 2015 | |
| 3.9 | Certificate of Change, dated May 6, 2015 | 8-K | 000-53498 | 3.1 | May 13, 2015 | |
| 3.10 | Article of Merger, dated October 31, 2016 | 8-K | 000-53498 | 3.1 | November 14, 2016 | |
| 3.11 | Certificate of Designation, dated April 16, 2019 | 8-K | 000-53498 | 3.1 | April 18, 2019 | |
| 3.12 | Certificate of Amendment to Articles of Incorporation, dated August 9, 2019 | DEF 14C | 000-53498 | Appendix A | July 12, 2019 | |
| 3.13 | Amendment to Certificate of Designation, dated October 9, 2019 | 8-K | 000-53498 | 3.1 | October 9, 2019 | |
| 3.14 | Certificate of Change, dated December 4, 2019 | 8-K | 000-53498 | 3.1 | December 10, 2019 | |
| 3.15 | Certificate of Withdrawal of Series B Preferred Stock Certificate of Designation, dated March 10, 2020 | 8-K | 001-39187 | 3.1 | March 10, 2020 | |
| 3.16 | Certificate of Amendment to Articles of Incorporation of CleanSpark, Inc., dated October 2, 2020 | DEF 14C | 000-53498 | Appendix A | July 28, 2020 | |
| 3.17 | Certificate of Amendment to Articles of Incorporation of CleanSpark, Inc., dated March 16, 2021. | 8-K | 001-39187 | 3.1 | March 18, 2021 | |
| 3.18 | First Amended and Restated Articles of Incorporation of CleanSpark, Inc., dated September 17, 2021 | 8-K | 001-39187 | 3.1 | September 17, 2021 | |
| 3.19 | First Amended and Restated Bylaws of CleanSpark, Inc., 2017 Incentive Plan, dated September 17, 2021 | 8-K | 001-39187 | 3.2 | September 17, 2021 | |
| 4.1 | Form of Senior Secured Redeemable Convertible Debenture, dated December 31, 2018 issued to the Investor | 8-K | 000-53498 | 4.1 | December 31, 2018 | |
| 4.2 | Form of Common Stock Purchase Warrant, dated December 31, 2018, issued to the Investor | 8-K | 000-53498 | 4.2 | December 31, 2018 | |
| 4.3 | Form of Senior Secured Redeemable Convertible Promissory Note, dated April 17, 2019, issued to the Investor | 8-K | 000-53498 | 4.1 | April 18, 2019 | |

| 4.4 | Form of Common Stock Purchase Warrant, dated December 31, 2018, issued to the Investor | 8-K | 000-53498 | 4.2 | April 18, 2019 | |
| 10.1+ | CleanSpark, Inc. 2017 Equity Incentive Plan | S-8 | 333-218831 | 10.12 | June 19, 2017 | |
| 10.2 | Form of Securities Purchase Agreement, dated December 31, 2018, between CleanSpark Inc. and the Investor | 8-K | 000-53498 | 10.1 | December 31, 2018 | |
| 10.3 | Form of IP Security Agreement, dated December 31, 2018, between CleanSpark, Inc. and the Investor | 8-K | 000-53498 | 10.2 | December 31, 2018 | |
| 10.4 | Non-Competition and Non-Solicitation Agreement, dated January 22, 2019 | 8-K | 000-53498 | 10.2 | January 24, 2019 | |
| 10.5 | Indemnity Agreement, dated January 22, 2019 | 8-K | 000-53498 | 10.3 | January 24, 2019 | |
| 10.6 | Contract Manufacturing Agreement, dated January 22, 2019 | 8-K | 000-53498 | 10.4 | January 24, 2019 | |
| 10.7 | Form of Purchase Agreement, dated April 17, 2019, between the Company and the Investor | 8-K | 000-53498 | 10.1 | April 18, 2019 | |
| 10.8 | IP Security Agreement dated April 17, 2019 | 8-K | 000-53498 | 10.3 | April 18, 2019 | |
| 10.9† | Memorandum of Understanding, dated as of November 5, 2019 | 8-K | 000-53498 | 10.1 | November 12, 2019 | |
| 10.10 | Securities Purchase Agreement, dated as of November 6, 2019 | 8-K | 000-53498 | 10.2 | November 12, 2019 | |
| 10.11 | Escrow Agreement, dated January 31, 2020 | 8-K | 001-39187 | 10.1 | February 6, 2020 | |
| 10.12 | Amendment to Transaction Documents, dated as of March 10, 2020 | 8-K | 001-39187 | 10.1 | March 10, 2020 | |
| 10.13 | Second Amendment to Transaction Documents, dated as of March 13, 2020 | 8-K | 001-39187 | 10.1 | March 16, 2020 | |
| 10.14 | Joint Venture Agreement, dated as of April 6, 2020 | 10-Q | 001-39187 | 10.1 | August 4, 2020 | |
| 10.15 | Third Amendment to Transaction Documents, dated as of May 1, 2020 | 8-K | 001-39187 | 10.1 | May 6, 2020 | |
| 10.16 | Promissory Note, dated as of May 7, 2020 | 8-K | 001-39187 | 10.1 | May 20, 2020 | |
| 10.17+ | First Amendment to CleanSpark, Inc. 2017 Equity Incentive Plan, dated as of October 7, 2020 | DEF 14C | 000-53498 | Appendix B | July 28, 2020 | |

48

| 10.18 | Form of Securities Purchase Agreement, dated July 20, 2020 | 8-K | 001-39187 | 10.1 | July 21, 2020 | |
| 10.19 | Exclusive Partner Agreement, by and between the Company and Sunshine Energy Corp., dated August 6, 2020 | 8-K | 001-39187 | 10.1 | August 7, 2020 | |
| 10.20 | Membership Interest Purchase Agreement, dated as of August 31, 2010, by and between the Company, GridFabric, LLC and its sole member, DuPont Hale Holdings, LLC | 8-K | 001-39187 | 10.1 | September 1, 2020 | |
| 10.21+ | Employment Agreement, entered into by and between CleanSpark, Inc. and Zachary K. Bradford, dated October 26, 2020 | 8-K | 001-39187 | 10.1 | October 28, 2020 | |
| 10.22+ | Employment Agreement, entered into by and between CleanSpark, Inc. and Lori Love, dated October 26, 2020 | 8-K | 001-39187 | 10.2 | October 28, 2020 | |
| 10.23+ | Employment Agreement, entered into by and between CleanSpark, Inc. and Amanda Kabak, dated October 26, 2020 | 8-K | 001-39187 | 10.3 | October 28, 2020 | |
| 10.24+ | Amended and Restated Employment Agreement, entered into by and between CleanSpark, Inc. and Amer Tadayon, dated October 26, 2020 | 8-K | 001-39187 | 10.4 | October 28, 2020 | |
| 10.25+ | Employment Agreement, entered into by and between CleanSpark, Inc. and S. Matthew Schultz, dated October 26, 2020 | 8-K | 001-39187 | 10.5 | October 28, 2020 | |
| 10.26† | Agreement and Plan of Merger, dated as of February 23, 2021, by and among CleanSpark, Inc., CLSK SWS Merger Sub, Inc., Solar Watt Solutions, Inc., and the Sellers. | 8-K | 001-39187 | 10.1 | February 24, 2021 | |
| 10.27 | Non-Fixed Price Sales and Purchase Agreement between CleanSpark, Inc. and Bitmain Technologies Limited, dated April 14, 2021 | 10-Q | 001-39187 | 10.1 | May 6, 2021 | |

49

| 10.28 | Form of Hardware Purchase & Sales Agreement | 10-Q | 001-39187 | 10.2 | May 6, 2021 | |
| 10.29 | Form of Future Sales Agreement | 10-Q | 001-39187 | 10.3 | May 6, 2021 | |
| 10.30 | Form of Agreement for Sale of Equipment | 10-Q | 001-39187 | 10.4 | May 6, 2021 | |
| 10.31+ | Amendment to Employment Agreement by and between CleanSpark, Inc. and Zachary K. Bradford, dated April 16, 2021 | 10-Q | 001-39187 | 10.5 | May 6, 2021 | |
| 10.32+ | Amendment to Employment Agreement by and between CleanSpark, Inc. and Lori Love, dated April 16, 2021 | 10-Q | 001-39187 | 10.6 | May 6, 2021 | |
| 10.33+ | Amendment to Employment Agreement by and between CleanSpark, Inc. and S. Matthew Schultz, dated April 16, 2021 | 10-Q | 001-39187 | 10.7 | May 6, 2021 | |
| 10.34 | At the Market Offering Agreement, dated June 3, 2021, between CleanSpark, Inc. and H.C. Wainwright & Co., LLC | 8-K | 001-39187 | 10.1 | June 3, 2021 | |
| 10.35+ | Amendment to Amended and Restated Employment Agreement by and between CleanSpark, Inc. and Amer Tadayon, dated June 9, 2021 | 8-K | 001-39187 | 10.1 | June 15, 2021 | |
| 10.36 | Lease, by and between ATL Data Centers LLC and Arkhos Property Group Holdings, LLC dated June 5, 2020 | 10-Q | 001-39187 | 10.9 | August 16, 2021 | |
| 10.37† | Coinmint Collection Mining Services Agreement, by and between CleanBlok, Inc. and Coinmint, LLC date July 8, 2021 | 10-Q | 001-39187 | 10.11 | August 16, 2021 | |
| 10.38 | Purchase Agreement, by and between CSRE Properties, LLC and MDRE-Norcross, LLC | 10-Q | 001-39187 | 10.12 | August 16, 2021 | |
| 10.39+ | Second Amendment to CleanSpark, Inc. 2017 Incentive Plan, dated September 17, 2021 | 8-K | 001-39187 | 10.1 | September 17, 2021 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 10.40† | Electrical Services Agreement between CleanBlok, Inc. and Georgia Power Company, dated October 1, 2021 | | | | | X |
| 10.41 | Form of Future Sales and Purchase Agreement | | | | | X |
| 10.42 | Lease Agreement, by and between CleanSpark, Inc. and ANC Corporate Center & Paseo Verde, LLC, dated August 26, 2021 | | | | | X |
| 21.1 | List of Subsidiaries | | | | | X |
| 23.1 | Consent of MaloneBailey | | | | | X |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a)/15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 31.2 | Certification of Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a)/15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 101 INS* | Inline XBLR Instance Document | | | | | |
| 101 SCH* | Inline XBLR Taxonomy Extension Schema Document | | | | | |
| 101 CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document | | | | | |
| 101 LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document | | | | | |
| 101 PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document | | | | | |
| 101 DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document | | | | | |
| 104* | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101 attachments) | | | | | |

* These certifications are being furnished solely to accompany this quarterly report pursuant to 18 U.S.C. Section

1350, and are not being filed for purposes of Section 18 of the Securities Exchange Act of 1934 and are not to be incorporated by reference into any filing of the Registrant, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

** The XBRL related information in Exhibit 101 shall not be deemed "filed" for purposes of Section 18 of the

Securities Exchange Act of 1934, as amended, or otherwise subject to liability of that section and shall not be incorporated by reference into any filing or other document pursuant to the Securities Act of 1933, as amended, except as shall be expressly set forth by specific reference in such filing or document.

+ Indicates management contract or compensatory plan.

†Portions of this exhibit have been redacted in compliance with Item 601(b)(10) of Regulation S-K.

51

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**CLEANSPARK, INC.**

By:     /s/ Zachary Bradford
        Zachary Bradford
        Chief Executive Officer, Principal Executive Officer and Director
        December 14, 2021

By:     /s/ Lori Love
        Lori Love
        Chief Financial Officer, Principal Financial Officer, Principal Accounting Officer
        December 14, 2021

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

By:     /s/ Zachary Bradford
        Zachary Bradford
        Chief Executive Officer, Principal Executive Officer and Director
        December 14, 2021

By:     /s/ Lori Love
        Lori Love
        Chief Financial Officer, Principal Financial Officer, Principal Accounting Officer
        December 14, 2021

By:     /s/ S. Matthew Schultz
        S. Matthew Schultz
        Executive Chairman and Chairman of the Board
        December 14, 2021

By:     /s/ Larry McNeill
        Larry McNeill
        Director
        December 14, 2021

By:     /s/ Roger Beynon
        Roger Beynon
        Director
        December 14, 2021

By:     /s/ Dr. Thomas Wood
        Dr. Thomas Wood
        Director
        December 14,2021

52

CERTAIN INFORMATION, IDENTIFIED BY [*****], HAS BEEN EXCLUDED FROM THE EXHIBIT BECAUSE IT IS BOTH (I) NOT MATERIAL, AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO THE COMPANY IF PUBLICLY DISCLOSED

**Georgia Power**

Account Manager: [*****]
Account Number: [*****]

# CONTRACT FOR ELECTRIC SERVICE

**THIS CONTRACT** for electric service is entered into this 24th day of September, 2021, ("Effective Date") between Georgia Power Company ("Company") and CLEANBLOK INC. ("Customer").

**IN CONSIDERATION** of the mutual agreements hereinafter contained, IT IS AGREED:

1.    Scope. Company will supply electric service to Customer, and Customer will purchase, receive and pay Company for such service in accordance with this Contract.

2.    Rules, Regulations and Rates. Georgia state law and the rules, regulations and applicable rate schedules of Company as may be filed with and regulated by the Georgia Public Service Commission govern this service and are incorporated herein by reference. Such laws, rules, regulations and rate schedules are subject to change during the term of this contract as provided by law. Copies of current rules, regulations and applicable rate schedules are available from Company upon request and may be attached to this Contract.

3.    Term. The term of this Contract shall be [*****] from the commencement of electric service under this Contract. The Contract shall continue in effect thereafter until terminated by either party providing written notice to the other in accordance with the rules, regulations and applicable rate schedules.

4.    Service. The characteristics of the service to be furnished under this Contract are as follows:

a.        Premise location: 5295 BROOK HOLLOW PKWY NORCROSS, GA 30071
b.        Frequency: Approximately [*****]
c.        Voltage and Phase: [*****]
d.        Delivery Point: N/A
e.        Rate Schedule(s):RTP-HA/PLL
          *(for RTP Attach Terms and Conditions and CBL Agreement)*
f.        Service level: ☐ Transmission ☒ Primary ☐ Secondary ☐ TOU-FCR
g.        Rate Rider(s): OP
h.        Commencement of electric service not later than: 9/24/2021
i.        Contract Capacity: N/A
j.        Minimum billing demand: [*****]

5.    Additional Provisions. Additional terms and conditions relating to the provision of service to the premises identified in paragraph 4 herein may be attached hereto. Such attached terms and conditions shall be controlling over any conflicting terms set forth herein. The following such terms and conditions are attached hereto and incorporated by reference:

☒        Build-Up Terms and Conditions (In excess of a two month build-up period. The term designated on this contract shall be extended by the build-up period.)
☐        Demand Plus Energy Credit Terms and Conditions
☒        Meter-Totalization Terms and Conditions
☐        Modernization Rider Terms and Conditions
☒        CBL Agreement and Real Time Pricing Terms and Conditions (RTP-DA and RTP-HA)

CERTAIN INFORMATION, IDENTIFIED BY [ ****** ], HAS BEEN EXCLUDED FROM THE EXHIBIT BECAUSE IT IS BOTH (I) NOT MATERIAL, AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO THE COMPANY IF PUBLICLY DISCLOSED

6.      <u>Payment</u>. During the term of this Contract, Customer will pay monthly charges calculated in accordance with the applicable rules, regulations and rate schedules.

7.      <u>Equipment</u>. Customer, at its expense, shall maintain and operate its equipment so that it does not cause unacceptable voltage fluctuations, unacceptable harmonic current usage, overload, or other disturbances on Company's electrical and communications systems, or affect the safe, economical and reliable operation of Company's electric system. Customer, at its expense, shall immediately correct any such unacceptable use of electric power, including the provision of suitable apparatus to prevent or cure such effects where necessary. The specifications of unacceptable voltage fluctuations and unacceptable harmonic current usage are outlined in the current copy of the Southern Company Power Quality Policy, which is available upon request.

8.      <u>Limitation of Liability</u>. Company does not guarantee that service will be free from, and Company shall not be liable for, interruptions, surges, voltage fluctuations or disturbances. Company shall have no liability for any loss or damage from any loss of service, or delay in providing service.

9.      <u>Assignment of Contract</u>. Customer may not assign this Contract without written consent of Company. Such consent shall not be unreasonably withheld.

10.     <u>Remedies</u>. In the event of default by either party, the non-defaulting party may pursue any and all judicial and administrative remedies and relief available.

11.     <u>Non-waiver</u>. The parties agree that this Contract does not preclude the Company from collecting any additional costs as directed or authorized by a legislative body, administrative body, or court having jurisdiction over such issues.

12.     <u>Miscellaneous</u>. A waiver of one or more defaults by either party shall not be deemed a waiver of any other or subsequent default by such party. This Contract, upon becoming effective, shall cancel and supersede any previously existing agreement covering supply by Company to Customer of electric energy to the premise identified in this contract. This document, those documents incorporated by reference and any attachments constitute the entire agreement between the parties. No modification of this Contract, except as provided in paragraph 2 above, shall be binding unless it is in writing and accepted by Customer and Company. This Contract shall be governed by the laws of the State of Georgia.

13.     <u>Prior Agreements</u>. This Contract for Electric Service, upon becoming effective, shall cancel and supersede any previously existing Contracts for Electric Service or other agreement covering service to this premise.

        **IN WITNESS WHEREOF**, the parties hereto have caused this Contract to be executed by their duly authorized representatives, as of the Effective Date hereof.

**CLEANBLOK INC. GEORGIA POWER COMPANY**

Signature: <u>/s/ Zachary Bradford</u>
Signature: <u>/s/ Kyle Leach</u>

Print Name: <u>Zachary Bradford</u>
Title: <u>VP Pricing; Planning</u>

Title: <u>CEO</u>

Date: <u>9/29/2021</u>

2

CERTAIN INFORMATION, IDENTIFIED BY [*****], HAS BEEN EXCLUDED FROM THE EXHIBIT BECAUSE IT IS BOTH (I) NOT MATERIAL, AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO THE COMPANY IF PUBLICLY DISCLOSED

# INITIAL CUSTOMER BASELINE LOAD (CBL) AGREEMENT
## For New Accounts RTP-HA

The customer, **CLEANBLOK INC.**, Account Number: [*****], has agreed that the following information will constitute the basis for their CBL:

CBL Rate: [*****] Rider: [*****] Level [*****]
CBL Type: [*****] Minimum Billing Demand: [*****] Contract Capacity: [*****]

| Initial Month: Initial Year: | Est. Final Total Peak kW** | Est. Final Total kWh** | CBL Peak kW** | CBL kWh** | CBL Billing Demand** (On-Peak/Econ for TOU) |
|---|---|---|---|---|---|
| January | [*****] | [*****] | [*****] | [*****] | [*****] |
| February | [*****] | [*****] | [*****] | [*****] | [*****] |
| March | [*****] | [*****] | [*****] | [*****] | [*****] |
| April | [*****] | [*****] | [*****] | [*****] | [*****] |
| May | [*****] | [*****] | [*****] | [*****] | [*****] |
| June | [*****] | [*****] | [*****] | [*****] | [*****] |
| July | [*****] | [*****] | [*****] | [*****] | [*****] |
| August | [*****] | [*****] | [*****] | [*****] | [*****] |
| September | [*****] | [*****] | [*****] | [*****] | [*****] |
| October | [*****] | [*****] | [*****] | [*****] | [*****] |
| November | [*****] | [*****] | [*****] | [*****] | [*****] |
| December | [*****] | [*****] | [*****] | [*****] | [*****] |
| **Peak/Total** | [*****] | [*****] | [*****] | [*****] | [*****] |

\* 2 Point CBL Not Available to School or TOU Type Rates
\*\*Data is based on Calendar Month ½ hourly data and may differ from billing data due to the type CBL selected by the customer, the billing cycle and from mapping the CBL into future years for billing.

**CBL Information:**

The Customer shall pay an Administrative Charge of $ [*****] per

month. Final CBL is [*****]% of the total loadshape and is based upon:

☒ Actual/Estimated Interval/Billing Data from calendar year: 2012 which was developed from:

    ☒ Template       ☐ Interval Data

☐ Footprint (Load shape based on a previously demonstrated CBL level for the same customer using similar facilities in terms of basic design and energy requirements and any equipment used to achieve demonstration level).

☒ Demonstration (required if not a Footprint or if under [*****]% of Final Total Commercial Loadshape or [*****]% of Final Total Industrial Loadshape).

    Demonstration Level: [*****] (Based on highest summer demand in CBL)

**Special Term/Conditions (see also Real Time Pricing Terms and Conditions):**

[*****]


**Georgia Power Company Client Manager:** [*****]


| |
|---|
| **Customer Location: 5295 BROOK HOLLOW PKWY NORCROSS, GA 30071** |
| **Signature:** /s/ Zachary Bradford |
| **Title:** CEO |
| **Date:** 9/29/21 |

3

CERTAIN INFORMATION, IDENTIFIED BY [ **** ], HAS BEEN EXCLUDED FROM THE EXHIBIT BECAUSE IT IS BOTH (I) NOT MATERIAL, AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO THE COMPANY IF PUBLICLY DISCLOSED

## REAL TIME PRICING TERMS AND CONDITIONS

1.  <u>Customer Baseline Load.</u> The Company and the Customer have mutually agreed to an initial Customer Baseline Load ("CBL") for the stated premise location – see Initial Customer Baseline Load (CBL) Agreement. The Customer agrees to provide, on an annual basis, pertinent operating information (including holidays and plant shut downs) as necessary or desirable to formulate subsequent CBLs for such premises. CBL revisions based on load removal will be allowed after a customer is billed on RTP for one year.

2.  <u>Corrective Load Modifications.</u> Georgia Power reserves the right to make minor load modifications for the purpose of establishing the appropriate load shape for the customer.

3.  <u>Confidentiality of Information</u>. The Customer will use its best efforts to protect hourly price as proprietary information, and neither the Customer nor its employees, agents or independent contractors will copy, transfer in any way, communicate, disclose, or disseminate proprietary price information contained therein to any third party.

4.  <u>Customer Demonstration.</u> Customer may be required to demonstrate the ability to respond to high RTP prices by curtailing load down to the "Approximate CBL Demonstration kW level" for two specified hours. Customer will be given four attempts to achieve such demonstration.

5.  <u>Effective Date.</u> Georgia Power will exercise its best efforts, but cannot guarantee, that billing under the RTP tariff will begin on the desired month specified by the Customer. The provisions of these Real Time Pricing Terms and Conditions shall become effective from the first billing date under the RTP tariff. These Real Time Pricing Terms and Conditions shall terminate automatically upon the withdrawal, expiration or other termination of the RTP tariff.

6.  <u>Rate Terms.</u> After the Customer has taken RTP service for a period of one year, the Customer may request and obtain a change in the rate provided that such premise location will continue taking electric service from Company for a total of five years from the initial billing date under this Contract. The Customer's contracted CBL level is supported by the revenues generated from a combination of embedded load on the specific standard bill tariff previously identified and the remaining load at the specific RTP tariff. If the Customer requests a change in the base tariff associated with the standard bill portion that collects lower embedded revenues, or a change to the RTP tariff, a new profitability analysis will be required. Based on the results of the new analysis, a contribution may be required by the Customer or the CBL level may be increased. Contracts will renew annually after expiration of the initial rate term. The Company may remove the Customer's premises from the RTP tariff if the Customer ceases to qualify for the rate or in the event of an uncured material breach of these Real Time Pricing Terms and Conditions.

7.  <u>Rules, Regulations and Rates</u>. Georgia state law and the rules, regulations and applicable rate schedules of Company as may be filed with and regulated by the Georgia Public Service Commission govern this service and are incorporated herein by reference. Such laws, rules, regulations and applicable rate schedules are subject to change during the term of this Contract as provided by law. Copies of current rules, regulations and applicable rate schedules are available from Company upon request and may be attached to this Contract.

8.  <u>Assignment of Contract</u>. Customer may not assign this Contract without the written consent of Company. Such consent shall not be unreasonably withheld.

Customer Initials: <u>/s/ ZB</u>

Note: "Minimum Billing Demand" is the lowest kW from CBL Billing Demand column "Contract Capacity"
is the transformer sizing for the service point

CERTAIN INFORMATION, IDENTIFIED BY [*****], HAS BEEN EXCLUDED FROM THE EXHIBIT BECAUSE IT IS BOTH (I) NOT MATERIAL, AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO THE COMPANY IF PUBLICLY DISCLOSED

## INITIAL CUSTOMER BASELINE LOAD (CBL) AGREEMENT
### For New Accounts RTP-DA

### CLEANBLOK INC, New Account
5295 BROOK HOLLOW PKWY NORCROSS, GA 30071

### CBL Information for Year 1
### CBL will be [*****]

| Initial Month: Initial Year: | Est. Final Total Peak kW** | Est. Final Total kWh** | CBL Peak kW** | CBL kWh** | CBL Billing Demand** (On-Peak/Econ for TOU) |
|---|---|---|---|---|---|
| January | | [*****] | [*****] | [*****] | [*****] |
| February | [*****] | [*****] | [*****] | [*****] | [*****] |
| March | [*****] | [*****] | [*****] | [*****] | [*****] |
| April | [*****] | [*****] | [*****] | [*****] | [*****] |
| May | [*****] | [*****] | [*****] | [*****] | [*****] |
| June | [*****] | [*****] | [*****] | [*****] | [*****] |
| July | [*****] | [*****] | [*****] | [*****] | [*****] |
| August | [*****] | [*****] | [*****] | [*****] | [*****] |
| September | [*****] | [*****] | [*****] | [*****] | [*****] |
| October | [*****] | [*****] | [*****] | [*****] | [*****] |
| November | [*****] | [*****] | [*****] | [*****] | [*****] |
| December | [*****] | [*****] | [*****] | [*****] | [*****] |
| **Peak/Total** | [*****] | [*****] | [*****] | [*****] | |

5

CERTAIN INFORMATION, IDENTIFIED BY [*****], HAS BEEN EXCLUDED FROM THE EXHIBIT BECAUSE IT IS BOTH (I) NOT MATERIAL, AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO THE COMPANY IF PUBLICLY DISCLOSED

CERTAIN INFORMATION, IDENTIFIED BY [ *****], HAS BEEN EXCLUDED FROM THE EXHIBIT BECAUSE IT IS BOTH (I) NOT MATERIAL, AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO THE COMPANY IF PUBLICLY DISCLOSED



**Account Manager:** [*****]

**Account Number:** [*****]

**Customer Name:** CleanBlok Inc.

# METER TOTALIZATION TERMS AND CONDITIONS

1.  The Premises identified in the electric service contract(s) include all the account addresses listed in paragraph five of these Meter Totalization Terms and Conditions. Electric service at such account addresses shall be combined such that all electric usage is recorded through a single meter registration. All buildings, structures, or facilities, and the land on which they stand, are owned by Customer and are located on the same or contiguous tracts of land.

2.   The meter totalization described in these Meter Totalization Terms and Conditions will be accomplished through the following metering arrangement to be installed by the Company: <u>Remote Totalization</u>.

3. Customer agrees to pay for the following:
    a.  the costs of modifying the existing meter(s) or installing new meter(s) (as appropriate),
    b.  the costs of relocating distribution facilities necessary to accommodate the single-metering arrangement,
    c.  the cost of any additional facilities,
    d.  the unrecovered cost of serving the existing facilities under the current metering arrangement.
    e.  the remote totalization translator charges, pursuant to the Company's Excess Facilities Charge Agreement. Any additional telephone lines necessary for the meter totalization arrangement shall be provided by Customer unless Customer requests that such lines be provided by Company. In the event Company provides additional phone lines for the meter totalization arrangement, Customer shall pay Company the costs of such additional lines pursuant to the Company's Excess Facilities Charge Agreement.

The total amount of these items above will be paid: (CHECK METHOD(S) OF PAYMENT.)

☒      According to the terms of Company's Excess Facilities Charge Agreement.

         Customer agrees to raise CBL to meet financial requirements or to compensate the Company for costs associated
☐      with meter totalization.

4.   In the event that all or part of the Customer's facilities located at any of the account addresses listed in paragraph five are sold, the Customer agrees to notify the Company and to pay all costs associated with separating the Customer's facilities sold from this meter-totalized arrangement. Should Customer sell all of its facilities to a single new owner and new owner agrees to the meter totalization arrangement, the meter totalization arrangement shall continue for the new owner.

5. Account Addresses (or descriptive identifier) to be totalized:

(a)  5295 Brook Hollow Pkwy - Primary Meter 1

(b)  5295 Brook Hollow Pkwy - Primary Meter 2

(c)

(d)

**Customer Signature: /s/ Zachary Bradford**          **Date: 9/29/21**

---

*Revision 4;* August 31, 2018                                                                                                  Page 1 of 1

CERTAIN INFORMATION, IDENTIFIED BY [*****], HAS BEEN EXCLUDED FROM THE EXHIBIT BECAUSE IT IS BOTH (I) NOT MATERIAL, AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO THE COMPANY IF PUBLICLY DISCLOSED



| Account Manager: | [*****] |
| Account Number: | [*****] |
| Premise Address: | **5295 Brook Hollow Pkwy** **Norcross, GA 30071** |

# EXCESS FACILITIES CHARGE AGREEMENT
# STANDARD OFFER

This Excess Facilities Charge Standard Agreement ("Agreement") is entered into this 24th day of **September**, **2021** (the "Effective Date") between **Georgia Power Company** ("Company") and **CleanBlok Inc.** ("Customer").

The Customer has requested that the Company install the excess facilities described below (the "Excess Facilities") on the Customer's premises described below (the Premises). The Excess Facilities shall augment the Company's standard system on the Premises. Subject to the terms and conditions contained herein, the Company agrees to install its Excess Facilities on the Premises.

### **Description of Excess Facilities:**

[*****]

### **Location of Premises:**

5295 Brook Hollow Pkwy Norcross, GA 30071

1.    To compensate the Company for the cost of installing its capital Excess Facilities on the Premises, the Customer shall pay Excess Facilities Installation Charges to the Company in the amount of:

☒  (i) a one time Excess Facilities Installation Charge of $[*****]

☐  (ii) monthly installments each in the amount of $_____, for a fixed period of_____months

All such payments shall include additional amounts as may be necessary to pay any applicable taxes. As security for the monthly installments of the Excess Facilities Charge, the Customer shall deliver to the Company a security deposit of $ n/a (not to exceed the sum of three monthly installments).

2.    To compensate the Company for the allocated cost of operating and maintaining its Excess Facilities at the Premises, the Customer shall pay Excess Facilities Ongoing Charges to the Company in the amount of:

☐  (i) a one time prepaid Excess Facilities Charge of $[*****]

☐  (ii) monthly installments, each in the amount of $n/a, for an initial period of twelve (12) months

All such payments shall include additional amounts as may be necessary to pay any applicable taxes. If all or any portion of the Excess Facilities Ongoing Charge is to be paid monthly, the Customer's obligations to make such payments shall automatically renew from year to year for successive twelve (12) month periods, until thirty (30) days after written notice from either party hereto of its intent to terminate this Agreement. As security for the monthly installments of the Excess Facilities Ongoing Charge, the Customer shall deliver to the Company a security deposit of $ n/a (not to exceed the sum of three monthly installments).

3.    Additional Terms and Provisions.

The Customer shall provide access to the Company at reasonable times to allow the Company to perform such work and to remove the Excess Facilities upon termination of this Agreement.

The Customer shall not increase load (e.g., building or equipment additions) without first notifying the Company. If the Customer's planned load increase would require extensions or modifications of the Excess Facilities, the Company shall prepare a plan and estimate of the costs of such extensions or modifications. Implementation of such extensions or modifications may require modification of this Agreement.

CERTAIN INFORMATION, IDENTIFIED BY [ *****], HAS BEEN EXCLUDED FROM THE EXHIBIT BECAUSE IT IS BOTH (I) NOT MATERIAL, AND (II) WOULD LIKELY CAUSE COMPETITIVE HARM TO THE COMPANY IF PUBLICLY DISCLOSED

The Customer shall not tamper with, move, or adjust any part of the Excess Facilities or allow anyone else on the Premises, other than authorized Company representatives, to do the same without prior Company approval. The Customer shall be responsible for the acts of those persons on the Premises who are not authorized Company personnel, agents or subcontractors. The Customer shall not place any future buildings or hazardous obstructions within twenty-five (25) feet of the Company's substations or lines without prior written approval of the Company.

The Company shall not be liable for consequential damages resulting from outages of electric current, including but not limited to damages to equipment or loss of product or profits. The Customer accepts the risk that there may be periodic interruptions of electric service, which interruptions shall not constitute a breach of this Agreement by the Company or give rise to any claim or set-off by the Customer against the Company.

The Customer's obligation to pay all of the payments due hereunder is absolute and unconditional, and the Customer shall not be entitled to, and hereby waives the right to claim, any abatement, reduction, set-off, counterclaim, defense, interruption, deferment, recoupment or deduction with respect to any payments due hereunder, unless an unreasonable interruption occurs as a result of the company's negligence or willful misconduct. Receivables covered under this agreement unpaid after 21 days after the bill date are subject to a late payment charge.

The Customer is in default of this agreement if the Premises are or become the subject of a foreclosure proceeding, or if the Customer (a) fails to pay within 30 days from the due date of its monthly bill; (b) fails to perform in accordance with any provision of this Agreement; (c) is or becomes insolvent or unable to pay its obligations as they become due; or (d) is or becomes the subject of a petition in a bankruptcy or a petition for a receivership. Also, upon default, the Company may exercise any one or more of its available remedies at law or equity, including, without limitation, (i) installing meters in multiple locations between Company owned and Customer owned electric equipment; (ii) changing the service rate to one that will compensate the Company for all amounts owing under this Agreement; and (iii) removing the Excess Facilities. Partial exercise or non - exercise of any of the Company's rights or remedies shall not constitute a waiver of any other right or remedy unless such waiver is expressed in writing.

This Agreement is not a sale or transfer of any interest in the Excess Facilities. The Company is and shall remain the sole owner of the Excess Facilities, and shall replace or cause the Excess Facilities to be replaced at no additional cost to the customer if the Excess Facilities are defective or do not perform to the specifications provided. The Customer shall not have any interest or rights in the Excess Facilities.

In the event of early termination of this Agreement, the Customer shall be responsible for removal costs in an amount determined by the Company.

This Agreement will be in force on the Effective Date of this Agreement or at the time the Excess Facilities become functional, whichever occurs first, and shall continue until all amounts owing to the Company hereunder have been paid in full or the Company has removed the Excess Facilities, whichever occurs later. This Agreement may be modified only in writing signed by the parties hereto, and may not be modified by an oral agreement. The Customer agrees to provide such additional information of documentation as the Company requests in connection with this Agreement including further evidence of its authority to enter into this agreement.

This Agreement shall be binding upon the successors and assigns of the parties hereto. The Customer may not assign its rights and obligations hereunder without the Company's prior written consent which shall not be unreasonably withheld. The Company may assign its rights and obligations hereunder, or any portion thereof, to any other person or entity without the consent of the Customer.

**CUSTOMER: CLEANBLOK INC.**        **GEORGIA POWER COMPANY**

Signature: /s/ Zachary Bradford        Signature: /s/ Kyle Leach

Print Name: Zachary Bradford        Title: VP Pricing; Planning

Title: CEO

Date: 9/29/21

**FUTURES SALES AND PURCHASE AGREEMENT BETWEEN**

**_____**
**("_____")**

**AND**

**CleanSpark, Inc.**
**("Purchaser")**

# Contents

| | | |
|---|---|---|
| 1. | Definitions and Interpretations | 3 |
| 2. | Sales of Product(s) | 5 |
| 3. | Prices and Terms of Payment | 6 |
| 4. | Shipping of Product(s) | 7 |
| 5. | Warranty | 8 |
| 6. | Representations and Warranties | 10 |
| 7. | Indemnification and Limitation of Liability | 12 |
| 8. | Distribution | 13 |
| 9. | Intellectual Property Rights | 13 |
| 10. | Confidentiality and Communications | 14 |
| 11. | Term of this Agreement | 14 |
| 12. | Contact Information | 14 |
| 13. | Compliance with Laws and Regulations | 15 |
| 14. | Force Majeure | 16 |
| 15. | Entire Agreement and Amendment | 16 |
| 16. | Assignment | 16 |
| 17. | Severability | 17 |
| 18. | Personal Data | 17 |
| 19. | Governing Law and Dispute Resolution | 17 |
| 20. | Waiver | 18 |
| 21. | Counterparts and Electronic Signatures | 18 |
| 22. | Further Assurance | 18 |
| 23. | Third Party Rights | 18 |
| 24. | Liquidated Damages Not Penalty | 18 |
| | Cleanspark, Inc. | 20 |

This futures sale and purchase agreement (this "Agreement") is made on _____ by and between _____, a _____ ("_____"), with its registered office at _____, and Cleanspark, Inc., a Nevada Corporation (the "Purchaser"), with its principal place of business at 1885 S. 1800 W., Suite 3, Woods Cross, UT 84087.

_____ and the Purchaser shall hereinafter collectively be referred to as the "Parties", and individually as a "Party".

Whereas:

1.    Purchaser fully understands the market risks, the price-setting principles and the market fluctuations relating to the Products sold under this Agreement.
2.    _____ purchases the Products from Bitmain, a supplier of cryptocurrency mining hardware and other equipment, either directly or through a reseller, as the case may be.
3.    The Purchaser is willing to purchase and _____ is willing to supply cryptocurrency mining hardware and other equipment in accordance with the terms and conditions of this Agreement.

The Parties hereto agree as follows:

## 1.    Definitions and Interpretations

The following terms, as used herein, have the following meanings:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person; "Person" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality); and "Control" means the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the members or shareholders of such Person or power to control the composition of a majority of the board of directors of such Person. The terms "Controlled" and "Controlling" have meanings correlative to the foregoing.

3

"Applicable Law" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or international law, and which creates or purports to create any requirement or rule that may affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

"Bank Account" means the bank account information that _____ specifies in its invoices.

"Bitmain" means Bitmain Technologies Limited (Company number: 2024301), with its registered office at Unit A1 of Unit A, 11th Floor, Success Commercial Building, 245-251 Hennessy Road, Hong Kong.

"Margin Fee" means the aggregate margins payable by the Purchaser to _____ as set out in Appendix A of this Agreement.

"Force Majeure" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

"Intellectual Property Rights" means any and all intellectual property rights, including but not limited to those concerning inventions, patents, utility models, registered designs and models, engineering or production materials, drawings, trademarks, service marks, domain names, applications for any of the foregoing (and the rights to apply for any of the foregoing), proprietary or business sensitive information and/or technical know-how, copyright, authorship, whether registered or not, and any neighbor rights.

"Product(s)" means the merchandise that _____ will provide to the Purchaser in accordance with this Agreement.

"Total Purchase Price" means the aggregate purchase price payable by the Purchaser as set out in Appendix A of this Agreement.

"Upfront Fee" means the irrevocable and non-refundable upfront fee payable by the Purchaser as set out in Appendix A of this Agreement.

4

"Warranty Period" means the period of time that the Product(s) are covered by the warranty granted by Bitmain or its Affiliates in accordance with its relevant service policy.


"Warranty Start Date" means the date on which the Product(s) are delivered to the carrier. Interpretations:

i)      Words importing the singular include the plural and vice versa where the context so requires.

ii)     The headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement.

iii)    References to Clauses and Appendix(es) are references to Clauses and Appendix(es) of this Agreement.

iv)     Unless specifically stated otherwise, all references to days shall mean calendar days.

v)      Any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force.

vi)     The word "including" shall be deemed to be followed by the words "without limitation".


## 2.  Sales of Product(s)

_____ will provide the Product(s) set forth in Appendix A (attached hereto as part of this Agreement) to the Purchaser in accordance with provisions of Clause 2, Clause 3, Clause 4 and Appendix A of this Agreement, and the Purchaser shall make payment in accordance with the terms specified in this Agreement.

2.1.    Both Parties agree that the Product(s) shall be sold in accordance with the following steps:

(i)      The Purchaser shall make payments to _____ in accordance with Appendix B of this Agreement.

(ii)     Upon receipt of each payment from the Purchaser, _____ will provide a payment receipt to the Purchaser.

(iii)    _____ will send a shipping confirmation to the Purchaser after it has delivered the Product(s) to the carrier.


2.2.    If Bitmain or its reseller postpones, modifies or cancels the shipping schedule of any batch of Products, _____ may similarly postpone, modify or cancel the shipping schedule of any such batch of Products to the Purchaser without the Purchaser's prior consent. For the avoidance of doubt, to the extent Bitmain or its reseller cancels any batch of Product(s) or portion thereof, _____ shall refund in full any payments with respect to such batch or portion, free of any interest, subject to the non-refundable Upfront Fee set forth in Appendix A of this Agreement.

2.3.    There shall be no further upfront fees required for any future Purchase Orders or for any batches or portions of product defined herein.

2.4.    For the avoidance of doubt, the Purchaser is entitled to resell the Products to the Purchaser's customers, including as packaged or bundled with other products.

## 3.    Prices and Terms of Payment

3.1    The Total Purchase Price (inclusive of any sales and use tax payable), the Margin Fee, the Upfront Fee shall be paid in accordance with the payment schedule set forth in Appendix B of this Agreement.

3.2    The payment date shall be the date as evidenced in the remittance copy of such payment. Interest shall not be charged when the respective amounts have been received by _____ in full according to the agreed payment schedule. Different clients may have different payment schedules. No interest shall be charged on the remaining amount.

3.3    In the event that the Purchaser fails to fully settle the respective percentage of the Total Purchase Price with respect to any batch of Products before the applicable prescribed deadline in accordance with Appendix B of this Agreement and fails to make a written request to _____ no less than five (5) business days prior to such prescribed deadline and obtain _____'s written consent, _____ shall be entitled to request the Purchaser to pay a reasonable liquidated damage (not a penalty) of 20% of the purchase price of such batch of Products ("Liquidated Damages") within sixty (60) days. In the event that the Purchaser fails to pay the Liquidated Damages after the expiration of the time limit, _____ shall be entitled to terminate this Agreement with respect to such batch of Products, or resell such batch of Products to other customers. If there are any remaining balance of the Purchaser after deducting the Liquidated Damage, such remaining balance shall be refunded to the Purchaser free of any interest. If the Purchaser requests to continue to make payment after previous delay, while _____ has not terminated this Agreement, _____ shall be entitled to reject the payment temporarily and request the Purchaser to pay the Liquidated Damages. Afterwards, the Parties shall negotiate the settlement separately. If the Purchaser fails to pay the down payment on a timely basis and Bitmain has arranged production or procurement, _____ shall be entitled to request the Purchaser to be responsible for the loss related to such production or procurement and the liability of the Purchaser shall be no less than 20% of the Total Purchase Price. For the avoidance of doubt, termination or modification of this Agreement with respect to any particular batch of Product(s) shall not, in any way, vary, limit or extend the Parties' rights and obligations in respect of other batches under this Agreement.

6

3.4   The Total Purchase Price set forth in this Agreement is merely an estimate of the price and not the actual price. The actual price will be determined one month before the current batch is shipped and with reference to the market circumstances, provided that the actual price shall not be higher than the estimated price.

3.5   The Parties shall confirm the corresponding batch of the Product(s) of each payment before such payment is made by the Purchaser. This confirmation shall be used to determine matters where different arrangements are applicable to different batches, such as the defaults of the Purchaser.

3.6   Before the delivery date, _____ shall be entitled to request the Purchaser to sign a Purchase Order ("PO") by sending a written notice to the Purchaser, and the Purchaser shall reasonably cooperate to sign such PO and pay the price of the remaining batch(s) of Products to _____ as specified in this Agreement. If the Purchaser refuses to sign a PO as required by Bitmain, Bitmain shall be entitled to request the Purchaser to perform his rights and obligations refer in this Agreement. The terms of this Agreement shall apply to any future PO. To the extent that the terms of a PO conflict with this Agreement, the terms of PO shall control.

3.7   If _____ breaches the terms of this Agreement solely and directly as a result of events or occurrences beyond the reasonable control of _____ (including breach by _____'s supplier of its agreement with _____), then the Purchaser shall not be entitled to any Purchaser Liquidated Damages or other indemnity or other payments from _____, provided that the Purchaser shall be entitled to a full refund of its advance payments.

3.8   The Parties understand and agree that the applicable prices of the Product(s) are inclusive of applicable bank transaction, and insurance, but are exclusive of any and all logistics costs, applicable taxes, import/export duties, taxes and fees and governmental charges. The Purchaser shall pay or reimburse _____ for all taxes levied on or assessed against the amounts payable hereunder upon receipt of documentation thereof, except for any tax on _____ income derived from this Agreement. If any payment is subject to tax withholding, the Purchaser shall pay such additional amounts as necessary, to ensure that _____ receives the full amount it would have received had payment not been subject to such tax withholding.

## 4.   Shipping of Product(s)

4.1.   _____ shall deliver the Products in accordance with the shipping schedule set forth in Appendix A to the place of delivery designated by the Purchaser. For the avoidance of doubt, the Products shall be fully insured such that it could adequately cover any losses of Product(s), personal injury, property damage, other damage or liability caused by the Product(s) or the transportation of the Product(s) either to the Purchaser or any third party, or theft of the Product(s) during transportation to the

7

Purchaser. If the Purchaser seeks to make claims against the applicable insurer with respect to the delivery of the Products, _____ shall make such claims against such insurer and reasonably cooperate with the Purchaser in connection therewith, including at the Purchaser's request granting the Purchaser a right of subrogation against such insurer.

4.2.    Subject to the limitations stated in Appendix A, the terms of delivery of the Product(s) shall be DAP USA (Delivered at Place in the USA according to Incoterms 2010) to the place of delivery designated by the Purchaser. Once the Product(s) have been shipped and are available for unloading at the place of delivery designated by the Purchaser, _____ shall have fulfilled its obligation to supply the Product(s) to the Purchaser, and the title and risk of loss or damage to the Product(s) shall pass to the Purchaser.

**4.3.**    There are _____(__) batches of Products under this Agreement and each batch shall constitute independent legal obligations of and shall be performed separately by the Parties. The delay of a particular batch shall not constitute waiver of the payment obligation of the Purchaser in respect of other batches. Neither party shall be entitled to terminate this Agreement solely on the ground of delay of delivery of a single batch of Products.

4.4.    Logistics costs shall be borne by the Purchaser, which must be paid to _____ before _____ arranges for shipping of the Products.

## 5.    Warranty

5.1.    The Warranty Period shall start on the Warranty Start Date and end on the 365th day after the Warranty Start Date. During the Warranty Period, the Purchaser's sole and exclusive remedy, and _____'s entire liability, will be to have Bitmain repair or replace (subject to Bitmain's option) the defective part/component of the Product(s) or the defective Product(s) at no charge to the Purchaser.

5.2.    The Parties acknowledge and agree that the warranty provided by Bitmain as stated in the preceding paragraph does not apply to the following:

(i)        normal wear and tear;

(ii)       damage resulting from accident, abuse, misuse, neglect, improper handling or improper installation;

(iii)      damage or loss of the Product(s) caused by undue physical or electrical stress, including but not limited to moisture, corrosive environments, high voltage surges, extreme temperatures, shipping, or abnormal working conditions;

8

(iv)     damage or loss of the Product(s) caused by acts of nature including, but not limited to, floods, storms, fires, and earthquakes;

(v)     failure of the Purchaser to use the Product(s) in accordance with the manual, specifications, operation descriptions or operation conditions provided by Bitmain or _____ in writing;

(vi)     alterations by persons other than Bitmain or _____, associated partners or authorized service facilities;

(vii)     Product(s), on which the original software has been replaced or modified by persons other than Bitmain or _____, associated partners or authorized service facilities;

(viii)     counterfeit products;

(ix)     damage or loss of data due to interoperability with current and/or future versions of operating system, software and/or hardware;

(x)     damage or loss of data caused by improper usage and behavior which is not recommended and/or permitted in the product documentation;

(xi)     failure of the Product(s) caused by usage of products not supplied by Bitmain or _____;

(xii)     the non-operation of the Product(s) during the replacement/maintenance period or caused by other reasons;

(xiii)     confiscation, seizure, search or other actions taken by government agencies such as customs; and

(xiv)     hash boards or chips are burnt.

In case the warranty is voided, the Purchaser may request Bitmain to provide it repair services, and the Purchaser shall bear all related expenses and costs.

5.3.    Notwithstanding anything to the contrary herein, the Purchaser acknowledges and agrees that the Product(s) provided by _____ do not guarantee any cryptocurrency mining time and, _____ shall not be liable for any cryptocurrency mining time loss or cryptocurrency mining revenue loss that are caused by downtime of any part/component of the Product(s). _____ does not warrant that the Product(s) will meet the Purchaser's requirements or the Product(s) will be uninterrupted or error free. To the extent permitted by laws, except as provided in Clause 6 of this Agreement, _____ makes no warranties to the Purchaser with respect to the Product(s), and no warranties of any kind, whether written, oral, express, implied or statutory, including warranties of merchantability, fitness for a particular purpose or non-infringement or arising from course of dealing or usage in trade shall apply.

5.4.     In the event of any ambiguity or discrepancy between this Clause 5 of this Agreement and Bitmain's After-sales Service Policy from time to time, it is intended that the After-sales Service Policy shall prevail and the Parties shall comply with and give effect to the After-sales Service Policy.

9

**6.   Representations and Warranties**

6A. _____ makes the following representations and warranties to the Purchaser:

**6.1.**   This Agreement is the legal, valid, binding obligations of _____, enforceable against it in accordance with its terms;

6.2.    It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement;

6.3.    All corporate action on its part and on the part of each of its officers and directors necessary for the authorization, execution and delivery of this Agreement and the performance of its obligations hereunder has been taken;

6.4.   All authorizations required or desirable:

(i)      to enable it lawfully to enter into, exercise its rights under and comply with its obligations under this Agreement;
(ii)     to ensure that those obligations are legal, valid, binding and enforceable; and
(iii)    to make this Agreement admissible in evidence in its jurisdiction of incorporation, have been or will have been by the time, obtained or effected and are, or will be by the appropriate time, in full force and effect.

6.5.   It is not aware of any circumstances which will likely lead to:

(i)      any authorization obtained or effected not remaining in full force and effect;
(ii)     any authorization not being obtained, renewed or effected when required or desirable; or
(iii)    any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or would have a material adverse effect.

6.6.    Neither the execution and delivery of this Agreement nor the performance of the obligations contemplated hereby will:

(i)       conflict with or result in any violation of or constitute a breach of any of the terms or provisions of or result in the acceleration of any obligation under, or constitute a default under any provision of any material contract or any other obligation to which _____ is a party or under which _____ is subject or bound,
(ii)     violate any judgment, order, injunction, decree or award of any governmental authority, against, or affecting or binding upon, _____ or upon the assets, property or business of _____, or

10

(iii)    constitute a violation by _____ of any Applicable Law of any jurisdiction as such law relates to _____ or to the property or business of _____.

6.7.    (a) It is not the target of economic sanctions administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or Singapore ("Sanctions"), including by being listed on the Specially Designated Nationals and Blocked Persons (SDN) List maintained by OFAC or any other Sanctions list maintained by one of the foregoing governmental authorities, directly or indirectly owned or controlled by one or more SDNs or other Persons included on any other Sanctions list, or located, organized or resident in a country or territory that is the target of Sanctions, and (b) the sale of the Product(s) will not violate any Sanctions or import and export control related laws and regulations.

6B. The Purchaser makes the following representations and warranties to _____:


6.8.    It has the full power and authority to own its assets and carry on its businesses.

6.9.    This Agreement is the legal, valid, binding obligations of the Purchaser, enforceable against it in accordance with its terms;

6.10.    It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

6.11.    The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:

(i)    any Applicable Law;
(ii)    its constitutional documents; or
(iii)    any agreement or instrument binding upon it or any of its assets.


6.12.    All authorizations required or desirable:

(i)    to enable it lawfully to enter into, exercise its rights under and comply with its obligations under this Agreement;
(ii)    to ensure that those obligations are legal, valid, binding and enforceable; and
(iii)    to make this Agreement admissible in evidence in its jurisdiction of incorporation, have been or will have been by the time, obtained or effected and are, or will be by the appropriate time, in full force and effect.


6.13.    It is not aware of any circumstances which will lead to:

(i)    any authorization obtained or effected not remaining in full force and effect;
(ii)    any authorization not being obtained, renewed or effected when required or desirable; or

11

(iii)  any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or could reasonably be expected to have a material adverse effect.

6.14.  It is not the target of economic sanctions administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or Singapore ("Sanctions"), including by being listed on the Specially Designated Nationals and Blocked Persons (SDN) List maintained by OFAC or any other Sanctions list maintained by one of the foregoing governmental authorities, directly or indirectly owned or controlled by one or more SDNs or other Persons included on any other Sanctions list, or located, organized or resident in a country or territory that is the target of Sanctions, and (b) the purchase of the Product(s) will not violate any Sanctions or import and export control related laws and regulations.

6.15.  All information supplied by either Party is and shall be true and correct, and the information does not contain and will not contain any statement that is false or misleading.

**7.  Indemnification and Limitation of Liability**

7.1.  Each Party shall, during the term of this Agreement and at any time thereafter, indemnify and save the other Party and/or its Affiliates harmless from and against any and all damages, suits, claims, judgments, liabilities, losses, fees, costs or expenses of any kind, including reasonable legal fees, whatsoever arising out of or incidental to (a) the Products pursuant to this Agreement, (b) a breach of this Agreement or (c) such first Party's willful misconduct or gross negligence.

7.2.  Notwithstanding anything to the contrary herein, each Party and its Affiliates shall under no circumstances, be liable to the other Party and its Affiliates for any consequential loss, or loss of goodwill, business, anticipated profits, revenue, contract, or business opportunity arising out of or in connection with this Agreement, and each Party hereby waives any claim it may at any time have against the other Party and its Affiliates in respect of any such damages. In addition, _____ shall not be responsible for any direct, specific, incidental, accidental or indirect loss arising from the use of the Product(s), including but not limited to the loss of commercial profits. The foregoing limitation of liability shall apply whether in an action at law, including but not limited to contract, strict liability, negligence, willful misconduct or other tortious action, or an action in equity.

7.3.  (a) _____ and its Affiliates' cumulative aggregate liability pursuant to this Agreement, whether arising from tort, breach of contract or any other cause of action,

12

shall be limited to and not exceed the amount of one hundred percent (100%) of the payment actually made by the Purchaser to _____ under this Agreement (the "Indemnity Cap"); and (b) the Purchaser and its Affiliates' cumulative aggregate liability pursuant to this Agreement, whether arising from tort, breach of contract or any other cause of action, shall be limited to and not exceed the amount of one hundred percent (100%) of the Indemnity Cap.

7.4.    The Product(s) are not designed, manufactured or intended for use in hazardous or critical environments or in activities requiring emergency or fail-safe operation, such as the operation of nuclear facilities, aircraft navigation or communication systems or in any other applications or activities in which failure of the Product(s) may pose the risk of environmental harm or physical injury or death to humans. _____ specifically disclaims any express or implied warranty of fitness for any of the above described application and any such use shall be at the Purchaser's sole risk.

7.5.    The above limitations and exclusions shall apply (1) notwithstanding failure of essential purpose of any exclusive or limited remedy; and (2) whether or not the indemnifying Party has been advised of the possibility of such damages. This Clause allocates the risks under this Agreement and the pricing herein reflects this allocation of risk and the above limitations.


## 8.   Distribution

8.1.    This Agreement does not constitute a distributor agreement between _____ and the Purchaser. Therefore, the Purchaser is not an authorized distributor of _____.

8.2.    The Purchaser shall in no event claim or imply to a third party that it is an authorized distributor of _____ or any similar terms, or perform any act that will cause it to be construed as an authorized distributor of _____. As between the Purchaser and _____, the Purchaser shall be exclusively and fully responsible for complying with the Applicable Laws regarding repackaging the Product(s) for the Purchaser's redistribution needs, and shall be solely liable for any and all liabilities or costs directly incurred or incidental to such redistribution.


## 9.   Intellectual Property Rights

9.1.    The Parties agree that the Intellectual Property Rights in any way contained in the Product(s), made, conceived or developed by Bitmain and/or its Affiliates for the Product(s) under this Agreement and/or, achieved, derived from, related to, connected with the provision of the Product(s) by Bitmain and/or acquired by Bitmain from any other person in performance of this Agreement shall be the exclusive property of Bitmain and/or its Affiliates.

9.2.    Notwithstanding anything to the contrary herein, all Intellectual Property Rights in

13

the Product(s) shall remain the exclusive property of Bitmain and/or its licensors. Except for licenses explicitly identified in Bitmain's shipping confirmation or in this Clause 9.2, no rights or licenses are expressly granted, or implied, whether by estoppel or otherwise, in respect of any Intellectual Property Rights of Bitmain and/or its Affiliates or any Intellectual Property residing in the Product(s) provided to the Purchaser, including in any documentation or any data furnished by Bitmain. _____ grants a non-exclusive, royalty-free and irrevocable sublicense of Bitmain and/or its Affiliates' Intellectual Property Rights to solely use the Product(s) for their ordinary function, and subject to the Clauses set forth herein. The Purchaser shall in no event knowingly violate the Intellectual Property Rights of Bitmain and/or its licensors.

9.3.   The Purchaser shall not illegally use or infringe the Intellectual Property Rights of the Product in any other measure. Otherwise, _____ shall have the right to request the Purchaser to take immediate remedial measures and assume full responsibilities, including but not limited to ceasing the infringement immediately, eliminating the impact, and compensating _____ and/or its suppliers for all losses arising out of the infringement, etc.

9.4.   The Purchaser shall not use any technical means to disassemble, mapping or analyze the Products that the Purchaser obtains publicly to retrieve relevant technical information of the Products and use it for commercial purposes. Otherwise, The Purchaser shall be liable for losses caused to _____ in accordance with Clause 9.3.

## 10.  Confidentiality and Communications

**10.1.** All information concerning this Agreement and matters pertaining to or derived from the provision of Product(s) pursuant to this Agreement between the Parties, whether in oral or written form, or in the form of drawings, computer programs or other, as well as all data derived therefrom ("Confidential Information"), shall be deemed to be confidential and, as such, may not be divulged to any unauthorized person. The Purchaser undertakes and agrees to take all reasonable and practicable steps to ensure and protect the confidentiality of the Confidential Information which cannot be passed, sold, traded, published or disclosed to any unauthorized person.

## 11.  Term of this Agreement

11.1.   The Parties agree that, unless this Agreement specifies otherwise, no Party shall terminate this Agreement in advance.

11.2.   This Agreement shall be effective upon signing of this Agreement and shall remain effective up to and until the delivery of the last batch of Products.

## 12.  Contact Information

All communications in relation to this Agreement shall be made to the following contact(s):

_____'s business contact:

Name: _____

Phone: _____

Email: _____ **Purchaser's business contact:** Name:

Zach Bradford, CEO Phone: _____

Email: _____

## 13.  Compliance with Laws and Regulations

13.1.  The Purchaser acknowledges and agrees that the Product(s) in this Agreement are subject to export control laws and regulations, including but not limited to the Export Administration Regulations ("EAR") of the United States. Without limiting the foregoing, the Purchaser shall not knowingly export, re-export, or transfer, directly or indirectly, any Product(s) subject to this Agreement without receiving the proper licenses or license exceptions from all applicable governmental authorities, including but not limited to the U.S. Department of Commerce Bureau of Industry and Security. With respect to any export transactions under this Agreement, the Purchaser and _____ will reasonably cooperate to promote compliance with all applicable export laws and regulations. _____ agrees to provide the Purchaser with accurate and complete information regarding the Products that is reasonably necessary for Purchaser to comply with applicable export laws, including all applicable Export Control Classification Numbers (ECCNs), information regarding eligibility of the Products for license exceptions, and any other information reasonably requested by Purchaser from time to time for the purposes of export. _____ further agrees to promptly inform Purchaser of any changes to such information, including as a result of changes to the applicable export laws or regulations.

15

13.2.  The Purchaser undertakes that it will not take any action under this Agreement or use the Product(s) in a way that will be a breach of any applicable anti-money laundering laws, anti-corruption laws, and/or counter-terrorist financing laws.

## 14.  Force Majeure

**To the extent that a Party is fully or partially delayed, prevented or hindered by an event of Force Majeure from performing any obligation under this Agreement (other than an obligation to make payment), subject to the exercise of reasonable diligence by the affected Party, the failure to perform shall be excused by the occurrence of such event of Force Majeure. A Party claiming that its performance is excused by an event of Force Majeure shall, promptly after the occurrence of such event of Force Majeure, notify the other Party of the nature, date of inception and expected duration of such event of Force Majeure and the extent to which the Party expects that the event will delay, prevent or hinder the Party from performing its obligations under this Agreement. The notifying Party shall thereafter use its best effort to eliminate such event of Force Majeure and mitigate its effects.**

**14.1.** The affected Party shall use reasonable diligence to remove the event of Force Majeure, and shall keep the other Party informed of all significant developments.

**14.2.** Except in the case of an event of Force Majeure, neither party may terminate this Agreement prior to its expiry date.

14.3.  The Parties agree that, except for the prohibition of production and sale of Super Computing Server by the local government for Bitmain, other related government actions shall not be deemed as Force Majeure.

## 15.  Entire Agreement and Amendment

This Agreement, along with executed POs as contemplated herein, constitutes the entire agreement of the Parties hereto and can only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties.

## 16.  Assignment

16.1.  _____ may assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party, with Purchaser's consent, which Purchaser shall not unreasonably withhold. The Purchaser may not assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part without _____'s prior written consent, which _____ shall unreasonably withhold.

16

16.2.  This Agreement shall be binding upon and inure to the benefit of each Party to this Agreement and its successors in title and permitted assigns.

## 17.  Severability

To the extent possible, if any provision of this Agreement is held to be illegal, invalid or unenforceable in whole or in part by a court, the provision shall apply with whatever deletion or modification is necessary so that such provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties. The remaining provisions of this Agreement shall not be affected and shall remain in full force and effect.

## 18.  Personal Data

18.1.  Depending on the nature of the Purchaser's interaction with _____, some examples of personal data which _____ may collect from the Purchaser include the Purchaser's name and identification information, contact information such as the Purchaser's address, email address and telephone number, nationality, gender, date of birth, and financial information such as bank account information.

18.2.  _____ generally does not collect the Purchaser's personal data unless (a) it is provided to _____ voluntarily by the Purchaser directly or via a third party who has been duly authorized by the Purchaser to disclose the Purchaser's personal data to _____ (the Purchaser's "authorized representative") after (i) the Purchaser (or the Purchaser's authorized representative) has been notified of the purposes for which the data is collected, and (ii) the Purchaser (or the Purchaser's authorized representative) has provided written consent to the collection and usage of the Purchaser's personal data for those purposes, or (b) collection and use of personal data without consent is permitted or required by related laws. _____ shall seek the Purchaser's consent before collecting any additional personal data and before using the Purchaser's personal data for a purpose which has not been notified to the Purchaser (except where permitted or authorized by law).

## 19.  Governing Law and Dispute Resolution

19.1.  This Agreement shall be solely governed by and construed in accordance with the laws of the Commonwealth of Massachusetts without regard to its conflicts of laws principles.

19.2.    Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration to be administered by JAMS pursuant to its Comprehensive Arbitration Rules (the "Comprehensive Rules"), and in accordance with the Expedited Procedures in those Rules, except to the extent modified by the

provisions of this Section 19.2; provided, however, that any party may seek provisional or ancillary remedies, such as preliminary injunctive relief, from a court having jurisdiction, before, during or after the pendency of any arbitration proceeding. The arbitration shall be before a three-arbitrator panel unless the parties agree to a single arbitrator. Within 15 days after the commencement of arbitration, each party shall select one person to act as arbitrator, and the two so selected shall select a third arbitrator within 30 days of the commencement of the arbitration. If a party does not select an arbitrator within the allotted time, or if the arbitrators selected by the parties are unable or fail to agree upon the third arbitrator within the allotted time, the arbitrator shall be designated by JAMS. All arbitrators shall serve as neutral, independent and impartial arbitrators. All such arbitrations shall be held in the Commonwealth of Massachusetts or such other location as the parties may mutually agree, and the arbitrator(s) shall apply the law of the Commonwealth of Massachusetts to the dispute exclusive of conflict or choice of law rules.

## 20. Waiver

Failure by either Party to enforce at any time any provision of this Agreement, or to exercise any election of options provided herein shall not constitute a waiver of such provision or option, nor affect the validity of this Agreement or any part hereof, or the right of the waiving Party to thereafter enforce each and every such provision or option.

## 21. Counterparts and Electronic Signatures

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, will be deemed to constitute one and the same agreement. The facsimile, email or other electronically delivered signatures of the Parties shall be deemed to constitute original signatures, and facsimile or electronic copies hereof shall be deemed to constitute duplicate originals.

## 22. Further Assurance

Each Party undertakes to the other Party to execute or procure to be executed all such documents and to do or procure to be done all such other acts and things as may be reasonable and necessary to give all Parties the full benefit of this Agreement.

## 23. Third Party Rights

A person who is not a Party to this Agreement has no right under the Contracts (Rights of Third Parties) Ordinance (Chapter 623 of the Laws of Hong Kong) to enforce or to enjoy the benefit of any term of this Agreement.

## 24. Liquidated Damages Not Penalty

It is expressly agreed that any liquidated damages payable under this Agreement do not constitute a penalty and that the Parties, having negotiated in good faith for such specific liquidated damages and having agreed that the amount of such liquidated damages is reasonable in light of the anticipated harm caused by the breach related thereto and the difficulties of proof of loss and inconvenience or nonfeasibility of obtaining any adequate remedy, are estopped from contesting the validity or enforceability of such liquidated damages.

(*The rest part of the page is intentionally left in blank*)

18

Each Party represents and warrants that its signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary corporate or other appropriate action to execute this Agreement.


Signed for and on behalf of _____


_____

Signature _____
Name _____
Title _____


Signed for and on behalf of the Purchaser


***CleanSpark, Inc.***

Signature _____
Name _____
Title _____

19

**APPENDIX A**

1.  Products:

1.1. The information (including but not limited to the quantity, rated hashrate, estimated unit price ("**Unit Price**"), estimated total price for one item ("**Total Price (One Item)**"), total price for all the items ("**Total Purchase Price**") of Products to be purchased by the Purchaser from _____ is as follows ("**Products**"):

1.1.1    Product Type

| Type | Details |
|---|---|
| Product Name | |
| Rated hashrate / unit | |
| Rated power / unit | |
| J/T@25℃ environment temperature | |
| Description | |

20

1.1.2   The estimated delivery schedule, reference quantity, total rated hashrate, unit price and total price are as follows:

| Batch | Shipping Schedule | Reference Quantity | Total Rated Hashrate (T) | Estimated Price(US D$/T) | Estimated Unit Price (US$) | Estimated Total Price (US$) | Estimated Margin Fee (US$) |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |

21

1.1.3    Total price of the Products listed above:

Total Purchase Price (exclusive of tax, Upfront Fee and margin fee): US$_____
Margin Fee (tax exclusive): US $ _____

1.1.4    _____ shall arrange for shipping of the Product(s) to the place of delivery designated by the Purchaser within seven (7) business days of receipt of Product(s) from its supplier.

1.2. Both Parties confirm and agree that, if and to the extent that _____'s supplier does not provide Product(s) with sufficient hashrate to _____, _____ may adjust the total quantity based on the total hashrate provided that the total hashrate of the Product(s) actually delivered to the Purchaser shall not be less than the total rated hashrate agreed in Article 1.1 of this Appendix A. _____ makes no representation that the quantity of the actually delivered Products shall be the same as the quantity set forth in Article 1.1. of this Appendix A.

1.3. In the event that Bitmain publishes any new type of products with less J/T value and suspends the production of the type of the Products as agreed in this Agreement, _____ shall be entitled to release itself from any future obligation to deliver any subsequent Products by 10-day prior notice to the Purchaser and continue to deliver new types of Products to the Purchaser, the total rated hashrate of which shall be no less than such subsequent Products cancelled under this Agreement and the price of which shall be adjusted in accordance with the J/T value. In the event that the Purchaser explicitly refuses to accept new types of Products, the Purchaser is entitled to request for a refund of the remaining balance of the purchase price already paid by the Purchaser together with an interest at 0.0333% per day on such balance for the period from the next day following the payment date of such balance to the date immediately prior to the date of request of refund. If the Purchaser accepts the new types of Products delivered by Bitmain, _____ shall be obliged to deliver such new types of Products to fulfill its obligations under this Agreement. The Purchaser may request to lower the actual total hashrate of the Products delivered but shall not request to increase the actual total hashrate to the level exceeding the total rated hashrate as set out in this Agreement. After Bitmain publishes new types of Products and if Bitmain has not suspended the production of the types of Products under this Agreement, _____ shall continue to delivery such agreed types of Products in accordance with this Agreement and the Purchaser shall not terminate this Agreement or refuse to accept the Products on the grounds that Bitmain has published new type(s) of Products.

2.    Cargo insurance coverage limitations

22

The cargo insurance coverage provided by _____ is subject to the following limitations and exceptions:

Exclusions:

- loss damage or expense attributable to willful misconduct of the assured
- ordinary leakage, ordinary loss in weight or volume, or ordinary wear and tear of the subject-matter insured
- loss damage or expense caused by insufficiency or unsuitability of packing or preparation of the subject-matter insured (for the purpose of this Clause, "packing" shall be deemed to include stowage in a container or liftvan but only when such stowage is carried out prior to attachment of this insurance or by the assured or their servants)
- loss damage or expense caused by inherent vice or nature of the subject-matter insured
- loss damage or expense proximately caused by delay, even though the delay be caused by a risk insured against (except expenses payable)
- loss damage or expense arising from insolvency or financial default of the owners managers charterers or operators of the vessel
- loss, damage, or expense arising from the use of any weapon of war employing atomic or nuclear fission, and/or fusion or other like reaction or radioactive force or matter.
- Loss, damage or expense arising from unseaworthiness of vessel or craft, unfitness of vessel craft conveyance container or liftvan for the safe carriage of the subject- matter insured, where the Assured or their servants are privy to such unseaworthiness or unfitness, at the time the subject-matter insured is loaded therein.
- The underwriters waive any breach of the implied warranties of seaworthiness of the ship and fitness of the ship to carry the subject-matter insured to destination, unless the Assured or their servants are privy to such unseaworthiness or unfitness.
- Loss, damage or expense caused by (1) war, civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power, (2) capture, seizure, arrest, restraint or detainment (piracy excepted), and the consequences thereof or any attempt threat, (3) derelict mines, torpedoes, bombs, or other derelict weapons of war.
- Loss, damage, or expense caused by strikers, locked-out workmen, or persons taking part in labor disturbances, riots or civil commotion, resulting from strikes,

23

lock-outs, labor disturbances, riots or civil commotions, caused by any terrorist or any person acting from a political motive.

3. The payment shall be arranged by the Purchaser as set forth in Appendix B.

4. At any time prior to the delivery, _____ is entitled to, by written notice, request the Purchaser to enter into a separate purchase agreement with _____, and the Purchaser, if so requested, shall cooperate with _____ to enter into such purchase agreement and shall pay the outstanding price for the Products in accordance with the terms and conditions of this Agreement, failing which _____ is entitled to request the Purchaser to continue to perform its obligations under this Agreement.

5. The Purchaser shall pay US$ _____ as down payment to _____ upon the signing of this Agreement, with the remaining being settled in accordance with the payment schedule set forth in this Agreement.

6. The Purchaser shall pay US$ _____ as Upfront Fee to _____ upon the signing of this Agreement, which is irrevocable and non-refundable.

7. Without prejudice to the above, the unit price and the Total Purchase Price of the Product(s) and any amount paid by the Purchaser shall be all denominated in USD. Where the Parties agree that the payments shall be made in cryptocurrencies, the exchange rate between the USD and the cryptocurrency selected shall be determined and calculated as follows: The real time exchange rate between the USD and the cryptocurrency displayed on the Bitmain's website upon payment shall apply. The exchange rate between the USD and the cryptocurrency shall be fixed according to this provision. In any circumstance, the Purchaser shall not ask for any refund due to the change of exchange rate.

24

**APPENDIX B**

| Due Date | Amount (USD) | Concept |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

25

**LEASE AGREEMENT BETWEEN**

**ANC CORPORATE CENTER & PASEO VERDE, LLC,**

**AS LANDLORD, AND**

**CLEANSPARK, INC.,**

**AS TENANT**

**DATED AUGUST 26, 2021**

**2370 CORPORATE CIRCLE**
**HENDERSON, NEVADA**

## BASIC LEASE INFORMATION

| | |
|---|---|
| Lease Date: | August 26, 2021 |
| Landlord: | **ANC CORPORATE CENTER & PASEO VERDE, LLC**, a Delaware limited liability company |
| Tenant: | **CLEANSPARK, INC.**, a Nevada corporation |
| Premises: | Suite No. 160, containing approximately 4,552 rentable square feet and approximately 3,923 usable square feet, in the office building commonly known as Green Valley Corporate Center (the "**Building**"), and whose street address is 2370 Corporate Circle, Henderson, Nevada.  The Premises are outlined on the plan attached to the Lease as Exhibit A.  The land on which the Building is located (the "**Land**") is described on Exhibit B.  The term "**Project**" shall collectively refer to the Building, the Land and the driveways, parking facilities, and similar improvements and easements associated with the foregoing or the operation thereof.  Tenant's rights to use parking spaces at the Project are set forth in Exhibit G hereto. |
| Term: | Sixty-five (65) full calendar months, plus any partial month from the Commencement Date to the end of the month in which the Commencement Date falls, starting on the Commencement Date and ending at 5:00 p.m. local time on the last day of the sixty-fifth (65th) full calendar month following the Commencement Date, subject to adjustment and earlier termination as provided in the Lease.  Tenant shall have an option to renew the Term as set forth in Exhibit H hereto. |
| Commencement Date: | The earlier of (a) the date on which Tenant occupies any portion of the Premises and begins conducting business therein, or (b) ninety (90) days after the date on which Landlord tenders possession of the Premises to Tenant (provided, that if Landlord is unable to deliver possession of the Premises to Tenant by such date, then, as provided in Section 3 of the Lease, Tenant shall accept possession of the Premises on the date Landlord tenders possession thereof to Tenant, which date will then be the "Commencement Date") or (c) upon completion of Tenant's Improvements within ninety days (90) pursuant to Exhibit D. |

Base Rent

Base Rent shall be the following amounts for the following periods of time:

| Lease Month | Monthly Base Rent |
|:---:|:---:|
| 1 – 12 | $10,924.80 |
| 13 – 24 | $11,252.54 |
| 25 – 36 | $11,590.12 |
| 37 – 48 | $11,937.82 |
| 49 – 60 | $12,295.96 |
| 61 – 65 | $12,664.84 |

As used herein, the term "**Lease Month**" means each calendar month during the Term (and if the Commencement Date does not occur on the first day of a calendar month, the period from the Commencement Date to the first day of the next calendar month shall be included in the first Lease Month for purposes of determining the duration of the Term and the monthly Base Rent rate applicable for such partial month).

| | |
|---|---|
| Base Rent Abatement: | Notwithstanding the section above titled "Base Rent", provided that no Event of Default exists, Tenant shall be entitled to an abatement of Base Rent otherwise due for Lease Months 2, 3, 13, 14 and 25, such that the effective Base Rent rate for such Lease Months shall be zero dollars ($0.00).).   Notwithstanding such abatement of Base Rent (a) all other sums due under this Lease, including Additional Rent, shall be payable as provided in this Lease, and (b) any increases in Base Rent set forth in this Lease shall occur on the dates scheduled therefor. The abatement of Base Rent provided for in this paragraph is conditioned upon Tenant's full and timely performance of all of its obligations under this Lease.  If at any time during the Term an Event of Default by Tenant occurs, then the abatement of Base Rent provided for in this paragraph shall immediately become void, and Tenant shall promptly pay to Landlord, in addition to all other amounts due to Landlord under this Lease, the full amount of all Base Rent herein abated. |
| Security Deposit: | $12,664.84. |
| Rent: | Base Rent, Tenant's share of Additional Rent, and all other sums that Tenant may owe to Landlord or otherwise be required to pay under the Lease. |
| Initial Rent Payment: | Upon execution of this Lease and in addition to the Security Deposit, Tenant shall pay to Landlord the amount of $10,924.80, which amount shall be applied against Tenant's first due monthly payments of Base Rent due under this Lease. |
| Permitted Use: | General office use. |
| Tenant's Proportionate Share: | 6.5773% with regard to the Building, which is the percentage obtained by dividing (a) the number of  rentable square feet in the Premises as stated above by (b) the 69,208 rentable square feet in the Building.  Landlord and Tenant stipulate that the number of rentable square feet in the Premises and in the Building set forth above is conclusive and shall be binding upon them. |
| Base Year: | Calendar year 2022 (grossed up as provided in Section 4(b)(4) of the Lease). |

Initial Liability Insurance Amount:   $3,000,000 (including umbrella coverage as set forth in Section 11 of the Lease).

Tenant's Address:

| Prior to Commencement Date: | Following Commencement Date: |
|---|---|
| CleanSpark, Inc. | CleanSpark, Inc. |
| 8475 S. Eastern Ave., Suite 200 | 2370 Corporate Circle, Suite 160 |
| Las Vegas, NV 89123 | Henderson, NV 89074 |
| Attention: Compliance Department | Attention: Compliance Department |
| Telephone: 203-252-9882 or 702-292-2994 | Telephone: 203-252-9882 or 702-292-2994 |
| Email: compliance@cleanspark.com | Email: compliance@cleanspark.com |

Landlord's Address:

For all Notices:
ANC Corporate Center & Paseo Verde, LLC
c/o JMA Ventures, LLC
460 Bush Street
San Francisco, CA 94108
Attention: Paul Faries
Telephone:
Email:

2

The foregoing Basic Lease Information is incorporated into and made a part of the Lease identified above. If any conflict exists between any Basic Lease Information and the Lease, then the Lease shall control.

**LANDLORD**:                                          ANC CORPORATE CENTER & PASEO VERDE, LLC, a Delaware limited liability company


By: /s/ Paul Faries
Name: Paul Faries
Title: Authorized Signatory



**TENANT**:                                            CLEANSPARK, INC., a Nevada corporation


By: /s/ Zachary Bradford
Name: Zachary Bradford
Title: CEO

3

**TABLE OF CONTENTS**

Page No.

| | | | |
|---|---|---|---|
| 1. | | Definitions and Basic Provisions. | 1 |
| 2. | | Lease Grant. | 1 |
| 3. | | Tender of Possession. | 1 |
| 4. | | Rent. | 1 |
| | (a) | Payment.. | 1 |
| | (b) | Operating Costs. | 2 |
| 5. | | Delinquent Payment; Handling Charges. | 4 |
| 6. | | Security Deposit. | 4 |
| 7. | | Landlord's Obligations. | 4 |
| | (a) | Services. | 4 |
| | (b) | Excess Utility Use | 5 |
| | (c) | Restoration of Services; Abatement | 5 |
| | (d) | Access | 5 |
| 8. | | Improvements; Alterations; Repairs; Maintenance. | 5 |
| | (a) | Improvements; Alterations. | 5 |
| | (b) | Repairs; Maintenance. | 5 |
| | (c) | Performance of Work. | 6 |
| | (d) | Mechanic's Liens. | 6 |
| | (e) | N.R.S. Sections 108.2403 and 108.2407. | 7 |
| 9. | | Use. | 7 |
| 10. | | Assignment and Subletting. | 7 |
| | (a) | Transfers. | 7 |
| | (b) | Consent Standards. | 7 |
| | (c) | Request for Consent. | 7 |
| | (d) | Conditions to Consent. | 8 |
| | (e) | Attornment by Subtenants | 8 |
| | (f) | Cancellation. | 8 |
| | (g) | Additional Compensation. | 8 |
| | (h) | Permitted Transfers. | 8 |
| 11. | | Insurance; Waivers; Subrogation; Indemnity. | 9 |
| | (a) | Tenant's Insurance. | 9 |
| | (b) | Landlord's Insurance. | 11 |
| | (c) | No Subrogation; Waiver of Property Claims. | 12 |
| | (d) | Indemnity | 12 |
| 12. | | Subordination; Attornment; Notice to Landlord's Mortgagee. | 12 |
| | (a) | Subordination | 12 |
| | (b) | Attornment | 13 |
| | (c) | Notice to Landlord's Mortgagee | 13 |
| | (d) | Landlord's Mortgagee's Protection Provisions. | 13 |
| 13. | | Rules and Regulations. | 13 |
| 14. | | Condemnation. | 13 |

(a)   Total Taking                                                                      13
(b)   Partial Taking - Tenant's Rights                                                  13
(c)   Partial Taking - Landlord's Rights                                                13
(d)   Temporary Taking                                                                  14
(e)   Award                                                                             14
15.   Fire or Other Casualty.                                                           14
(a)   Repair Estimate                                                                   14
(b)   Tenant's Rights                                                                   14
(c)   Landlord's Rights                                                                 14
(d)   Repair Obligation                                                                 14
(e)   Waiver of Statutory Provisions                                                    15
(f)   Abatement of Rent                                                                 15
16.   Personal Property Taxes.                                                          15
17.   Events of Default.                                                                15
(a)   Payment Default                                                                   15
(b)   Abandonment                                                                       15
(c)   Estoppel                                                                          15
(d)   Insurance                                                                         15
(e)   Mechanic's Liens                                                                  15
(f)   Other Defaults                                                                    15
(g)   Insolvency                                                                        16
18.   Remedies.                                                                         16
(a)   Termination of Lease                                                              16
(b)   Enforcement of Lease                                                              16
(c)   Sublessees of Tenant                                                              17
(d)   Efforts to Relet                                                                  17
(e)   Suspension of Services                                                            17
19.   Payment by Tenant; Non-Waiver; Cumulative Remedies.                               17
(a)   Payment by Tenant                                                                 17
(b)   No Waiver                                                                         17
(c)   Cumulative Remedies                                                               18
(d)   Continuing Liability of Tenant                                                    18
20.   Intentionally Omitted.                                                            18
21.   Surrender of Premises.                                                            18
22.   Holding Over.                                                                     18
23.   Certain Rights Reserved by Landlord.                                              18
(a)   Building Operations                                                               19
(b)   Security                                                                          19
(c)   Prospective Purchasers and Lenders                                                19
(d)   Prospective Tenants                                                               19
24.   Substitution Space.                                                               19
25.   Miscellaneous.                                                                    19
(a)   Landlord Transfer                                                                 19
(b)   Landlord's Liability                                                              19
(c)   Force Majeure                                                                     19
(d)   Brokerage.                                                                        20

|     |       |                                      |     |
|-----|-------|--------------------------------------|-----|
|     | (e)   | Estoppel Certificates                | 20  |
|     | (f)   | Notices                              | 20  |
|     | (g)   | Separability                         | 20  |
|     | (h)   | Amendments; Binding Effect           | 20  |
|     | (i)   | Quiet Enjoyment                      | 20  |
|     | (j)   | No Merger                            | 21  |
|     | (k)   | No Offer                             | 21  |
|     | (l)   | Entire Agreement                     | 21  |
|     | (m)   | Waiver of Jury Trial                 | 21  |
|     | (n)   | Governing Law                        | 21  |
|     | (o)   | Recording                            | 21  |
|     | (p)   | Water or Mold Notification           | 21  |
|     | (q)   | Joint and Several Liability          | 21  |
|     | (r)   | Financial Reports                    | 21  |
|     | (s)   | Landlord's Fees                      | 22  |
|     | (t)   | Attorneys' Fees                      | 22  |
|     | (u)   | Telecommunications                   | 22  |
|     | (v)   | Confidentiality                      | 22  |
|     | (w)   | Authority                            | 22  |
|     | (x)   | Hazardous Materials                  | 22  |
|     | (y)   | List of Exhibits                     | 23  |
|     | (z)   | Prohibited Persons and Transactions  | 23  |
|     | (aa)  | ERISA.                               | 23  |
| 26. |       | Intentionally Omitted.               | 23  |
| 27. |       | Directory Sign; Suite-Entry Sign     | 23  |
| 28. |       | Counterparts.                        | 23  |

6

**LIST OF DEFINED TERMS**

|  | Page No. |
|---|---|
| Additional Rent | 2 |
| Affiliate | 1 |
| Association | 3 |
| Base Rent | i |
| Base Rent Abatement | ii |
| Base Year | ii |
| Basic Lease Information | 1 |
| Building | i |
| Building's Structure | 1 |
| Building's Systems | 1 |
| Casualty | 14 |
| Commencement Date | i |
| Damage Notice | 14 |
| Declaration | 3 |
| Default Rate | 4 |
| Disabilities Acts | 7 |
| ERISA | 23 |
| Estimated Delivery Date | 1 |
| Event of Default | 15 |
| Fair Market Rental Rate | H-1 |
| GAAP | 9 |
| Hazardous Materials | 22 |
| HVAC | 4 |
| including | 1 |
| Initial Liability Insurance Amount | ii |
| Land | i |
| Landlord's Mortgagee | 12 |
| Law | 1 |
| Laws | 1 |
| Lease | 1 |
| Lease Month | ii |
| Loss | 12 |
| Mortgage | 12 |
| NRS | 14 |
| OFAC | 23 |
| Operating Costs | 2 |
| Operating Costs Statement | 3 |
| Parking Area | G-1 |
| Permitted Transfer | 8 |
| Permitted Transferee | 8 |
| Permitted Use | ii |
| Premises | i |
| Primary Lease | 12 |
| Project | i |
| Rent | ii |
| Repair Period | 14 |
| Security Deposit | ii |
| Taking | 13 |
| Tangible Net Worth | 9 |
| Taxes | 3 |
| Telecommunications Services | 22 |
| Tenant | 1 |
| Tenant Party | 1 |
| Tenant's Off-Premises Equipment | 1 |
| Tenant's Proportionate Share | ii |
| Term | i |
| Transfer | 7 |

7

# LEASE

This Lease Agreement (this "**Lease**") is entered into as of August 26, 2021, between **ANC CORPORATE CENTER & PASEO VERDE, LLC**, a Delaware limited liability company ("**Landlord**"), and **CLEANSPARK, INC.**, a Nevada corporation ("**Tenant**").

1.    **Definitions and Basic Provisions** The definitions and basic provisions set forth in the Basic Lease Information (the "**Basic Lease Information**") executed by Landlord and Tenant contemporaneously herewith are incorporated herein by reference for all purposes. Additionally, the following terms shall have the following meanings when used in this Lease: "**Affiliate**" means any person or entity which, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the party in question; "**Building's Structure**" means the Building's exterior walls, roof, elevator shafts, footings, foundations, structural portions of load-bearing walls, structural floors and subfloors, and structural columns and beams; "**Building's Systems**" means the Building's HVAC, life-safety, plumbing, electrical, and mechanical systems; "**including**" means including, without limitation; "**Laws**" means all federal, state, and local laws, ordinances, rules and regulations, all court orders, governmental directives, and governmental orders and all interpretations of the foregoing, and all restrictive covenants affecting the Project, and "**Law**" means any of the foregoing; "**Tenant's Off-Premises Equipment**" means any of Tenant's equipment or other property that may be located on or about the Project (other than inside the Premises); and "**Tenant Party**" means any of the following persons: Tenant; any assignees claiming by, through, or under Tenant; any subtenants claiming by, through, or under Tenant; and any of their respective agents, contractors, employees, licensees, guests and invitees.

2.    **Lease Grant.** Subject to the terms of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises.

3.    **Tender of Possession.** Landlord and Tenant presently anticipate that possession of the Premises will be tendered to Tenant in the condition required by this Lease within one (1) business day after the execution and delivery of this Lease by Landlord and Tenant (the "**Estimated Delivery Date**"). If Landlord is unable to tender possession of the Premises in such condition to Tenant by the Estimated Delivery Date, then (a) the validity of this Lease shall not be affected or impaired thereby, (b) Landlord shall not be in default hereunder or be liable for damages therefor, and (c) Tenant shall accept possession of the Premises when Landlord tenders possession thereof to Tenant. By occupying the Premises, Tenant shall be deemed to have accepted the Premises in their condition as of the date of such occupancy, subject to the performance of punch-list items that remain to be performed by Landlord, if any. Prior to occupying the Premises, Tenant shall execute and deliver to Landlord a letter substantially in the form of Exhibit E hereto confirming (1) the Commencement Date and the expiration date of the initial Term, (2) that Tenant has accepted the Premises, and (3) that Landlord has performed all of its obligations with respect to the Premises (except for punch-list items specified in such letter); however, the failure of the parties to execute such letter shall not defer the Commencement Date or otherwise invalidate this Lease. Occupancy of the Premises by Tenant prior to the Commencement Date shall be subject to all of the provisions of this Lease excepting only those requiring the payment of Base Rent and Additional Rent (each as defined herein).

4.    **Rent.**

(a)    **Payment** Tenant shall timely pay to Landlord Rent, without notice, demand, deduction or set off (except as otherwise expressly provided herein), by ACH/Wire or, good and sufficient check drawn on a national banking association at Landlord's address provided for in this Lease or as otherwise specified by Landlord and shall be accompanied by all applicable state and local sales or use taxes. Rent and other monies required to be paid by Tenant hereunder shall be paid to Landlord, without deduction or offset, except as otherwise provided herein, in legal tender of the United States of America, at:

> If by wiring instructions (and ACH)
> WIRING INSTRUCTIONS
> _____
> ABA # _____
> Account # _____

8

Account name: _____

ACH INSTRUCTIONS

_____
ABA# _____
Account# _____
Account name: _____

Or by check made payable to ANC Corporate Center & Paseo Verde, LLC and delivered to:

American Nevada Realty, LLC
2360 Corporate Circle, Suite 330
Henderson, NV89074
Attention: Property Management

Landlord reserves the right to modify the foregoing payment instructions upon not less than thirty (30) days prior notice to Tenant. The obligations of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Base Rent, adjusted as herein provided, shall be payable monthly in advance. The first monthly installment of Base Rent shall be payable contemporaneously with the execution of this Lease; thereafter, Base Rent shall be payable on the first day of each month beginning on the first day of the second full calendar month of the Term. The monthly Base Rent for any partial month at the beginning of the Term shall equal the product of 1/360 of the annual Base Rent in effect during the partial month and the number of days in the partial month and shall be due on the Commencement Date. Payments of Base Rent for any fractional calendar month at the end of the Term shall be similarly prorated. Tenant shall pay Additional Rent at the same time and in the same manner as Base Rent.

(b) **Operating Costs.**

(1)    Tenant shall pay to Landlord Tenant's Proportionate Share of the amount by which Operating Costs (defined below) exceed Operating Costs for the Base Year ("**Additional Rent**"). Landlord may make a good faith estimate of the Additional Rent to be due from Tenant for any calendar year or part thereof during the Term. During each calendar year or partial calendar year of the Term (after the Base Year). Tenant shall pay to Landlord, in advance concurrently with each monthly installment of Base Rent, an amount equal to Tenant's Proportionate Share of the estimated Additional Rent for such calendar year or part thereof divided by the number of months therein. From time to time, Landlord may estimate and re-estimate the Additional Rent to be due from Tenant and deliver a copy of the estimate or re-estimate to Tenant. Thereafter, the monthly installments of Additional Rent payable by Tenant shall be appropriately adjusted in accordance with the estimations so that, by the end of the calendar year in question, Tenant shall have paid all of the Additional Rent as estimated by Landlord. Any amounts paid based on such an estimate shall be subject to adjustment as herein provided when actual Operating Costs are available for each calendar year. The term "**Operating Costs**" means all expenses and disbursements (subject to the limitations set forth below) that Landlord incurs in connection with the ownership, operation, and maintenance of the Project, determined in accordance with sound accounting principles consistently applied, including the following costs: (A)management and supervision fees in an amount not to exceed three and one half percent (3.5%) of all gross receipts (which includes all rental and other revenue) received by Landlord in connection with the ownership, operation, and management of the Building; (B) all supplies and materials used in the operation, maintenance, repair, replacement, and security of the Project; (C) costs for improvements made to the Project which, although capital in nature, are expected to reduce the normal operating costs (including all utility costs) of the Project, as amortized using a commercially reasonable interest rate over the time period reasonably estimated by Landlord to recover the costs thereof taking into consideration the anticipated cost savings, as determined by Landlord using its good faith, commercially reasonable judgment, as well as capital improvements made in order to comply with any Law hereafter promulgated by any governmental authority or any interpretation hereafter rendered with respect to any existing Law, as amortized using a commercially reasonable interest rate over the useful economic life of such improvements as determined by Landlord in its reasonable discretion; (D) cost of all utilities, except the cost of utilities reimbursable to Landlord by the Project's tenants other than pursuant to a provision similar to this Section 4(b);

9

(E) insurance expenses; (F) repairs, replacements, and general maintenance of the Project; (G) fair market rental and other costs with respect to the management office for the Building and shared tenant amenities, such as conference rooms and fitness facilities; (H) service, maintenance and management contracts with independent contractors for the operation, maintenance, management, repair, replacement, or security of the Project (including alarm service, window cleaning, and elevator maintenance); (I) all utilities and all other services provided to the Building and the Project, not separately metered to other tenants; (J) costs and assessments allocated to the Project pursuant to the Declaration, as defined below; and (K) Taxes, as defined in Section 4(c)(2) below. Notwithstanding the foregoing, Tenant's Proportionate Share of Controllable Expenses (defined below) shall not increase by more than 5% over Tenant's Proportionate Share of Controllable Expenses in the previous calendar year, including the Base Year, on a cumulative, compounded basis. However, any increases in excess Operating Costs not recovered by Landlord due to the foregoing limitation shall be carried forward into all succeeding calendar years during the Term (subject to the foregoing limitation) until fully recouped by Landlord. For example, if Controllable Expenses were $100.00 in 2021, then the total Controllable Expenses that could be included in Operating Costs in 2022 would be $105.00, for 2023 would be $110.25, for 2024 would be $115.76, and so on. The term "Controllable Expenses" means all Operating Costs excluding expenses relating to the cost of utilities, insurance, real estate taxes and assessments, healthcare reform and other expenses not within Landlord's control arising from increases in the minimum wage or other similar legal requirements.

Operating Costs shall not include costs for (i) capital improvements made to the Building, other than capital improvements described in Section 4(b)(1)(C) and except for items which are generally considered maintenance and repair items, such as painting of common areas, replacement of carpet in elevator lobbies, and the like; (ii) repair, replacements and general maintenance paid by proceeds of insurance or by Tenant or other third parties; (iii) interest, amortization or other payments on loans to Landlord; (iv) depreciation; (v) leasing commissions; (vi) legal expenses for services, other than those that benefit the Project tenants generally (e.g., tax disputes); (vii) renovating or otherwise improving space for occupants of the Project or vacant space in the Project; and (viii) federal income taxes imposed on or measured by the income of Landlord from the operation of the Project.

(2)  "**Taxes**" means taxes, assessments, and governmental charges or fees whether federal, state, county or municipal, and whether they be by taxing districts or authorities presently taxing or by others, subsequently created or otherwise, and any other taxes and assessments (including non-governmental assessments for common charges under a restrictive covenant or other private agreement that are not treated as part of Operating Costs) now or hereafter attributable to the Project (or its operation), excluding, however, penalties and interest thereon and federal and state taxes on income. For property tax purposes, Tenant waives all rights to protest or appeal the appraised value of the Premises, as well as the Project, and all rights to receive notices of re-appraisement. The Project and the Premises, and Tenant's use of Green Valley Corporate Center, the Project, and the Premises, are subject to (i) those rights, restrictions, covenants, easements, appendages, privileges, and appurtenances set forth in that certain Green Valley Corporate Center Declaration of Covenants, Conditions, Restrictions, Reservations and Easements recorded on January 25, 1996, in Book 960125, as Instrument No. 01411, in the Office of the Recorder of Clark County, Nevada, as amended pursuant to that Supplemental Declaration of Restrictive Covenants, Conditions and Restrictions recorded on December 12, 2007, in Book 20071212, as Instrument No. 00145 in the Office of the Recorder of Clark County, Nevada, and as may be further amended from time to time (the "**Declaration**"). The Declaration is enforced and implemented in part by the Green Valley Corporate Center Commercial Association (the "**Association**").

(3)  By April 1 of each calendar year, or as soon thereafter as practicable, Landlord shall furnish to Tenant a statement of Operating Costs for the previous year, in each case adjusted as provided in Section 4(b)(1) (the "**Operating Costs Statement**"). If Tenant's estimated payments of Operating Costs under this Section 4(b) for the year covered by the Operating Costs Statement exceed Tenant's Proportionate Share of such items as indicated in the Operating Costs Statement, then Landlord shall promptly credit or reimburse Tenant for such excess; likewise, if Tenant's estimated payments of Operating Costs under this Section 4(b) for such year are less than Tenant's Proportionate Share of such items as indicated in the Operating Costs Statement, then Tenant shall pay Landlord such deficiency within thirty (30) days of Notice to Tenant of such deficiency.

10

(4)   With respect to any calendar year or partial calendar year in which the Building is not occupied to the extent of 95% of the rentable area thereof, or Landlord is not supplying services to 95% of the rentable area thereof, the Operating Costs for such period which vary with the occupancy of the Building shall, for the purposes hereof, be increased to the amount which would have been incurred had the Building been occupied to the extent of 95% of the rentable area thereof and Landlord had been supplying services to 95% of the rentable area thereof.

**5.    Delinquent Payment; Handling Charges.** All past due payments required of Tenant hereunder shall bear interest from the date due until paid at the lesser of ten percent (10%) per annum or the maximum lawful rate of interest (such lesser amount is referred to herein as the "**Default Rate**"); additionally, Landlord, in addition to all other rights and remedies available to it, may charge Tenant a fee equal to five percent (5%) of the delinquent payment to reimburse Landlord for its cost and inconvenience incurred as a consequence of Tenant's delinquency. In no event, however, shall the charges permitted under this Section 5 or elsewhere in this Lease, to the extent they are considered to be interest under applicable Law, exceed the maximum lawful rate of interest. Notwithstanding the foregoing, the late fee referenced above shall not be charged with respect to the first occurrence (but not any subsequent occurrence) during any twelve (12) month period that Tenant fails to make payment when due, until five days after Landlord delivers written notice of such delinquency to Tenant.

**6.    Security Deposit.** Contemporaneously with the execution of this Lease, Tenant shall pay to Landlord the Security Deposit, which shall be held by Landlord to secure Tenant's performance of its obligations under this Lease. The Security Deposit is not an advance payment of Rent or a measure or limit of Landlord's damages upon an Event of Default (as defined herein). Landlord may, from time to time following an Event of Default and without prejudice to any other remedy, use all or a part of the Security Deposit to perform any obligation Tenant fails to perform hereunder. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. Provided that Tenant has performed all of its obligations hereunder, Landlord shall, within 30 days after the Term ends, return to Tenant the portion of the Security Deposit which was not applied to satisfy Tenant's obligations. The Security Deposit may be commingled with other funds, and no interest shall be paid thereon. If Landlord transfers its interest in the Premises and the transferee assumes Landlord's obligations under this Lease, then Landlord may assign the Security Deposit to the transferee and Landlord thereafter shall have no further liability for the return of the Security Deposit.

**7.    Landlord's Obligations.**

**(a)    Services.** Landlord shall use good faith commercially reasonable efforts to furnish to Tenant (1) water at those points of supply provided for general use of tenants of the Building; (2) heated and refrigerated air conditioning ("**HVAC**") using such HVAC units as appropriate to meet Tenant's reasonable requirements for the Premises (provided that the maintenance and repair of such HVAC units shall be Tenant's obligation pursuant to Paragraph 8(b) below)) and at such temperatures and in such amounts as are standard for comparable buildings in the vicinity of the Building; and (3) elevators for ingress and egress to the floor on which the Premises are located, in common with other tenants, provided that Landlord may reasonably limit the number of operating elevators during non-business hours and holidays. Landlord shall maintain the common areas of the Building in reasonably good order and condition, except for damage caused by a Tenant Party. If Tenant desires any of the services specified in Section 7(a)(2): (A) at any time other than between 7:00 a.m. and 6:00 p.m. on weekdays and between 9:00 a.m. and 2:00 p.m. on Saturday (in each case other than holidays), or (B) on Sunday or holidays, then such services shall be supplied to Tenant upon the written request of Tenant delivered to Landlord before 3:00 p.m. on the business day preceding such extra usage, and Tenant shall pay to Landlord the cost of such services within 30 days after Landlord has delivered to Tenant an invoice therefor. The costs incurred by Landlord in providing after-hour HVAC service to Tenant shall include costs for electricity, water, sewage, water treatment, labor, metering, filtering, and maintenance reasonably allocated by Landlord to providing such service. The current rate for overtime HVAC per hour is Sixty Dollars ($60.00). Landlord shall not be required to deliver any janitorial services or electrical current to the Premises. Tenant shall be responsible for and is hereby required to obtain such janitorial services for the Premises as are reasonably necessary to maintain the Premises in a first-class condition. In addition, the entire Premises shall, as part of the Tenant Work (as defined in Exhibit D), be separately metered for electrical usage, and Tenant shall be responsible for the electrical usage in the Premises.

<div align="center">11</div>

**(b)    Excess Utility Use**Tenant shall not install any electrical equipment requiring special wiring or requiring voltage in excess of 110 volts unless approved in advance by Landlord, which approval shall not be unreasonably withheld. Tenant shall not install any electrical equipment requiring voltage in excess of Building capacity unless approved in advance by Landlord, which approval may be withheld in Landlord's sole discretion. The use of electricity in the Premises shall not exceed the capacity of existing feeders and risers to or wiring in the Premises. Any risers or wiring required to meet Tenant's excess electrical requirements shall, upon Tenant's written request, be installed by Landlord, at Tenant's cost, if, in Landlord's judgment, the same are necessary and shall not cause permanent damage to the Building or the Premises, cause or create a dangerous or hazardous condition, entail excessive or unreasonable alterations, repairs, or expenses, or interfere with or disturb other tenants of the Building. If Tenant uses machines or equipment in the Premises which affect the temperature otherwise maintained by the air conditioning system or otherwise overload any utility, Landlord may install supplemental air conditioning units or other supplemental equipment in the Premises, and the cost thereof, including the cost of installation, operation, use, and maintenance, in each case plus an administrative fee of 15% of such cost, shall be paid by Tenant to Landlord within 30 days after Landlord has delivered to Tenant an invoice therefor.

**(c)    Restoration of Services; Abatement**Landlord shall use reasonable efforts to restore any service required of it that becomes unavailable; however, such unavailability shall not render Landlord liable for any damages caused thereby, be a constructive eviction of Tenant, constitute a breach of any implied warranty, or, except as provided in the next sentence, entitle Tenant to any abatement of Tenant's obligations hereunder. If, however, Tenant is prevented from using the Premises because of the unavailability of any such service for a period of twenty (20) consecutive business days following Landlord's receipt from Tenant of a written notice regarding such unavailability, the restoration of which is within Landlord's reasonable control, and such unavailability was not caused by a Tenant Party or a governmental directive, then Tenant shall, as its exclusive remedy be entitled to a reasonable abatement of Rent for each consecutive day (after such 20 business day period) that Tenant is so prevented from using the Premises.

**(d)    Access**Subject to the Building rules and regulations attached as Exhibit C hereto and the other provisions of this Lease (including Section 7(a) hereof), Tenant will be provided access to the Premises 24 hours per day, seven days per week, 52 weeks per year. If such access is unavailable due to force majeure or any other reason beyond Landlord's control (including construction performed by parties other than Landlord which prohibits such access), Landlord shall not be in default under this Section 7(d).

**8.    Improvements; Alterations; Repairs; Maintenance.**

**(a)    Improvements; Alterations.** Improvements to the Premises shall be installed at Tenant's expense only in accordance with plans and specifications which have been previously submitted to and approved in writing by Landlord, which approval shall be governed by the provisions set forth in this Section 8(a). No alterations or physical additions in or to the Premises may be made without Landlord's prior written consent, which shall not be unreasonably withheld or delayed; however, Landlord may withhold its consent to any alteration or addition that would adversely affect (in the reasonable discretion of Landlord) the (1) Building's Structure or the Building's Systems (including the Building's restrooms or mechanical rooms), (2) exterior appearance of the Building, (3) appearance of the Building's common areas or elevator lobby areas, or (4) provision of services to other occupants of the Building. Tenant shall not paint or install lighting or decorations, signs, window or door lettering, or advertising media of any type visible from the exterior of the Premises without the prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion. All alterations, additions, and improvements shall be constructed, maintained, and used by Tenant, at its risk and expense, in accordance with all Laws; Landlord's consent to or approval of any alterations, additions or improvements (or the plans therefor) shall not constitute a representation or warranty by Landlord, nor Landlord's acceptance, that the same comply with sound architectural and/or engineering practices or with all applicable Laws, and Tenant shall be solely responsible for ensuring all such compliance.

**(b)    Repairs; Maintenance.** Tenant shall maintain the Premises in a clean, safe, and operable condition, and shall not permit or allow to remain any waste or damage to any portion of the Premises. Additionally, Tenant, at its sole expense, shall repair, replace and maintain in good condition and in accordance with all Laws and the equipment manufacturer's suggested service programs, all portions of the Premises, Tenant's Off-

12

Premises Equipment and all areas, improvements and systems, including HVAC equipment, exclusively serving the Premises; provided however, that Landlord agrees to replace the compressors in each of the two (2) HVAC units serving the Premises, and Landlord shall warrant such HVAC units serving the Premises against defects for one (1) year following the Commencement Date. Tenant shall repair or replace, subject to Landlord's direction and supervision, any damage to the Building caused by a Tenant Party. If Tenant fails to make such repairs or replacements within 15 days after the occurrence of such damage, then Landlord may make the same at Tenant's cost. If any such damage occurs outside of the Premises, then Landlord may elect to repair such damage at Tenant's expense, rather than having Tenant repair such damage. The cost of all maintenance, repair or replacement work performed by Landlord under this Section 8 shall be paid by Tenant to Landlord within 30 days after Landlord has invoiced Tenant therefor. If Landlord elects to repair such damage pursuant to this Section 8, Tenant shall only be liable and invoiced for maintenance, repair or replacement work actually performed (and supported by documentation and receipts) and no other fees shall be assessed.

(c)    **Performance of Work.** All work described in this Section 8 shall be performed only by Landlord or by contractors and subcontractors approved in writing by Landlord. Tenant shall cause all contractors and subcontractors performing work described in this Section 8 to procure and maintain insurance coverage as set forth in Exhibit J. Tenant shall provide Landlord with the identities, mailing addresses and telephone numbers of all persons performing work or supplying materials prior to beginning such construction and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable Laws. All such work shall be performed in accordance with all Laws and in a good and workmanlike manner so as not to damage the Building (including the Premises, the Building's Structure and the Building's Systems). All such work which may affect the Building's Structure or the Building's Systems must be approved by the Building's engineer of record, at Tenant's expense and, at Landlord's election, must be performed by Landlord's usual contractor for such work. All work affecting the roof of the Building must be performed by Landlord's roofing contractor and no such work will be permitted if it would void or reduce the warranty on the roof.

(d)    **Mechanic's Liens.** All work performed, materials furnished, or obligations incurred by or at the request of a Tenant Party shall be deemed authorized and ordered by Tenant only, and Tenant shall not permit any mechanic's liens to be filed against the Premises or the Project in connection therewith. Upon completion of any such work, Tenant shall deliver to Landlord final lien waivers from all contractors, subcontractors and materialmen who performed such work. If such a lien is filed, then Tenant shall, within ten days after Landlord has delivered notice of the filing thereof to Tenant (or such earlier time period as may be necessary to prevent the forfeiture of the Premises, the Project or any interest of Landlord therein or the imposition of a civil or criminal fine with respect thereto), either (1) pay the amount of the lien and cause the lien to be released of record, or (2) diligently contest such lien and deliver to Landlord a bond or other security reasonably satisfactory to Landlord. If Tenant fails to timely take either such action, then Landlord may pay the lien claim, and any amounts so paid, including expenses and interest, shall be paid by Tenant to Landlord within ten days after Landlord has invoiced Tenant therefor. Landlord and Tenant acknowledge and agree that their relationship is and shall be solely that of "landlord-tenant" (thereby excluding a relationship of "owner-contractor," "owner-agent" or other similar relationships). Accordingly, all materialmen, contractors, artisans, mechanics, laborers and any other persons now or hereafter contracting with Tenant, any contractor or subcontractor of Tenant or any other Tenant Party for the furnishing of any labor, services, materials, supplies or equipment with respect to any portion of the Premises, at any time from the date hereof until the end of the Term, are hereby charged with notice that they look exclusively to Tenant to obtain payment for same. Nothing herein shall be deemed a consent by Landlord to any liens being placed upon the Premises, the Project or Landlord's interest therein due to any work performed by or for Tenant or deemed to give any contractor or subcontractor or materialman any right or interest in any funds held by Landlord to reimburse Tenant for any portion of the cost of such work. Tenant shall defend, indemnify and hold harmless Landlord and its agents and representatives from and against all claims, demands, causes of action, suits, judgments, damages and expenses (including attorneys' fees) in any way arising from or relating to the failure by any Tenant Party to pay for any work performed, materials furnished, or obligations incurred by or at the request of a Tenant Party. This indemnity provision shall survive termination or expiration of this Lease.

(e)    **N.R.S. Sections 108.2403 and 108.2407**.

Prior to commencing any alterations, (i) Tenant shall comply with N.R.S. Sections 108.2403 and 108.2407; and (ii) providing evidence of such compliance to Landlord.

**9.**    **Use.** Tenant shall continuously occupy and use the Premises only for the Permitted Use and shall comply with all Laws relating to the use, condition, access to, and occupancy of the Premises and will not commit waste, overload the Building's Structure or the Building's Systems or subject the Premises to use that would damage the Premises. The population density within the Premises as a whole shall at no time exceed one person for each 300 rentable square feet in the Premises. Tenant shall not conduct second or third shift operations within the Premises; however, Tenant may use the Premises after normal business hours. Notwithstanding anything in this Lease to the contrary, as between Landlord and Tenant, (a) Tenant shall bear the risk of complying with Title III of the Americans With Disabilities Act of 1990, any state laws governing handicapped access or architectural barriers, and all rules, regulations, and guidelines promulgated under such laws, as amended from time to time (the "**Disabilities Acts**") in the Premises, and (b) Landlord shall bear the risk of complying with the Disabilities Acts in the common areas of the Building, other than compliance that is necessitated by the use of the Premises for other than the Permitted Use or as a result of any alterations or additions, including any initial tenant improvement work, made by or on behalf of a Tenant Party (which risk and responsibility shall be borne by Tenant). The Premises shall not be used for any use which is disreputable, creates extraordinary fire hazards, or results in an increased rate of insurance on the Building or its contents, or for the storage of any Hazardous Materials (other than typical office supplies [e.g., photocopier toner] and then only in compliance with all Laws). Tenant shall not use any substantial portion of the Premises for a "call center," any other telemarketing use, or any credit processing use. If, because of a Tenant Party's acts or because Tenant vacates the Premises, the rate of insurance on the Building or its contents increases, then such acts shall be an Event of Default, Tenant shall pay to Landlord the amount of such increase on demand, and acceptance of such payment shall not waive any of Landlord's other rights. Tenant shall conduct its business and control each other Tenant Party so as not to create any nuisance or unreasonably interfere with other tenants or Landlord in its management of the Building.

**10.    Assignment and Subletting.**

**(a)    Transfers.** Except as provided in Section 10(h), Tenant shall not, without the prior written consent of Landlord, which consent Landlord shall not unreasonably withhold pursuant to Section 10(b) (1) assign, transfer, or encumber this Lease or any estate or interest herein, whether directly or by operation of law, (2) permit any other entity to become Tenant hereunder by merger, consolidation, or other reorganization, (3) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant so as to result in a change in the current control of Tenant, (4) sublet any portion of the Premises, (5) grant any license, concession, or other right of occupancy of any portion of the Premises, or (6) permit the use of the Premises by any parties other than Tenant (any of the events listed in Section 10(a)(1) through 10(a)(6) being a "**Transfer**").

**(b)    Consent Standards.** Landlord shall not unreasonably withhold its consent to any assignment or subletting of the Premises, provided that the proposed transferee (1) is creditworthy, (2)  will use the Premises for the Permitted Use (thus, excluding, without limitation, uses for credit processing and telemarketing) and will not use the Premises in any manner that would conflict with any exclusive use agreement or other similar agreement entered into by Landlord with any other tenant of the Building, (3) will not use the Premises, Building or Project in a manner that would materially increase the pedestrian or vehicular traffic to the Premises, Building or Project, (4) is not a governmental entity, or subdivision or agency thereof, (5) is not another occupant of the Building, and (6) is not a person or entity with whom Landlord is then, or has been within the six-month period prior to the time Tenant seeks to enter into such assignment or subletting, negotiating to lease space in the Building or any Affiliate of any such person or entity; otherwise, Landlord may withhold its consent in its sole discretion. Additionally, Landlord may withhold its consent in its sole discretion to any proposed Transfer if any Event of Default by Tenant then exists.

**(c)    Request for Consent.** If Tenant requests Landlord's consent to a Transfer, then, at least 30 business days prior to the effective date of the proposed Transfer, Tenant shall provide Landlord with a written description of all terms and conditions of the proposed Transfer, copies of the proposed documentation, and the following information about the proposed transferee: name and address; reasonably satisfactory information about its business and business history; its proposed use of the Premises; banking, financial, and other credit information; and general references sufficient to enable Landlord to determine the proposed transferee's creditworthiness and character. Concurrently with Tenant's notice of any request for consent to a Transfer, Tenant shall pay to Landlord a fee of $1,000 to defray Landlord's expenses in reviewing such request, and Tenant shall also reimburse Landlord immediately upon request for its reasonable attorneys' fees incurred in connection with considering any request for consent to a Transfer.

14

**(d)    Conditions to Consent.** If Landlord consents to a proposed Transfer, then the proposed transferee shall deliver to Landlord a written agreement whereby it expressly assumes Tenant's obligations hereunder; however, any transferee of less than all of the space in the Premises shall be liable only for obligations under this Lease that are properly allocable to the space subject to the Transfer for the period of the Transfer. No Transfer shall release Tenant from its obligations under this Lease, but rather Tenant and its transferee shall be jointly and severally liable therefor. Landlord's consent to any Transfer shall not waive Landlord's rights as to any subsequent Transfers. If an Event of Default occurs while the Premises or any part thereof are subject to a Transfer, then Landlord, in addition to its other remedies, may collect directly from such transferee all rents becoming due to Tenant and apply such rents against Rent. Tenant authorizes its transferees to make payments of rent directly to Landlord upon receipt of notice from Landlord to do so following the occurrence of an Event of Default hereunder. Tenant shall pay for the cost of any demising walls or other improvements necessitated by a proposed subletting or assignment.

**(e)    Attornment by Subtenants** Each sublease by Tenant hereunder shall be subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and each subtenant by entering into a sublease is deemed to have agreed that in the event of termination, re-entry or dispossession by Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublandlord, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not be (1) liable for any previous act or omission of Tenant under such sublease, (2) subject to any counterclaim, offset or defense that such subtenant might have against Tenant, (3) bound by any previous modification of such sublease not approved by Landlord in writing or by any rent or additional rent or advance rent which such subtenant might have paid for more than the current month to Tenant, and all such rent shall remain due and owing, notwithstanding such advance payment, (4) bound by any security or advance rental deposit made by such subtenant which is not delivered or paid over to Landlord and with respect to which such subtenant shall look solely to Tenant for refund or reimbursement, or (5) obligated to perform any work in the subleased space or to prepare it for occupancy, and in connection with such attornment, the subtenant shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such attornment. Each subtenant or licensee of Tenant shall be deemed, automatically upon and as a condition of its occupying or using the Premises or any part thereof, to have agreed to be bound by the terms and conditions set forth in this Section 10(e). The provisions of this Section 10(e) shall be self-operative, and no further instrument shall be required to give effect to this provision.

**(f)    Cancellation.** Landlord may, within 30 days after submission of Tenant's written request for Landlord's consent to an assignment or subletting, cancel this Lease as to the portion of the Premises proposed to be sublet or assigned as of the date the proposed Transfer is to be effective. If Landlord cancels this Lease as to any portion of the Premises, then this Lease shall cease for such portion of the Premises and Tenant shall pay to Landlord all Rent accrued through the cancellation date relating to the portion of the Premises covered by the proposed Transfer. Thereafter, Landlord may lease such portion of the Premises to the prospective transferee (or to any other person) without liability to Tenant.

**(g)    Additional Compensation.** While no Event of Default exists, Tenant shall pay to Landlord, immediately upon receipt thereof, fifty percent (50%) of the excess of (1) all compensation received by Tenant for a Transfer over (2) the Rent allocable to the portion of the Premises covered thereby. While an Event of Default exists, Tenant shall pay to Landlord, immediately upon receipt thereof, one hundred percent (100%) of the excess of (A) all compensation received by Tenant for a Transfer over (B) the Rent allocable to the portion of the Premises covered thereby.

**(h)    Permitted Transfers.** Notwithstanding Section 10(a), Tenant may Transfer all or part of its interest in this Lease or all or part of the Premises (a "**Permitted Transfer**") to the following types of entities (a "**Permitted Transferee**") without the written consent of Landlord:

(1)  an Affiliate of Tenant; provided that for the purposes of this Section 10(h)(i) only, the term "Affiliate" shall include a corporation that Tenant or Tenant's corporate parent owns in excess of 25% of the outstanding capital stock.

15

(2)  any corporation, limited partnership, limited liability partnership, limited liability company or other business entity in which or with which Tenant, or its corporate successors or assigns, or Tenant's corporate parent, or its corporate successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions governing merger and consolidation of business entities, so long as (A) Tenant's obligations hereunder are assumed by the entity surviving such merger or created by such consolidation; and (B) the Tangible Net Worth of the surviving or created entity is not less than the Tangible Net Worth of Tenant as of the date hereof; or

(3)  any corporation, limited partnership, limited liability partnership, limited liability company or other business entity acquiring all or substantially all of Tenant's assets if such entity's Tangible Net Worth after such acquisition is not less than the Tangible Net Worth of Tenant as of the date hereof.

Tenant shall promptly notify Landlord of any such Permitted Transfer. Tenant shall remain liable for the performance of all of the obligations of Tenant hereunder, or if Tenant no longer exists because of a merger, consolidation, or acquisition, the surviving or acquiring entity shall expressly assume in writing the obligations of Tenant hereunder. Additionally, the Permitted Transferee shall comply with all of the terms and conditions of this Lease, including the Permitted Use, and the use of the Premises by the Permitted Transferee may not violate any other agreements affecting the Premises, the Building, Landlord or other tenants of the Building. No later than 30 days after the effective date of any Permitted Transfer, Tenant agrees to furnish Landlord with (A) copies of the instrument effecting any of the foregoing Transfers, (B) documentation establishing Tenant's satisfaction of the requirements set forth above applicable to any such Transfer, and (C) evidence of insurance as required under this Lease with respect to the Permitted Transferee. The occurrence of a Permitted Transfer shall not waive Landlord's rights as to any subsequent Transfers. "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), excluding, however, from the determination of total assets all assets which would be classified as intangible assets under GAAP including goodwill, licenses, patents, trademarks, trade names, copyrights, and franchises. Any subsequent Transfer by a Permitted Transferee shall be subject to the terms of this Section 10.

11.  **Insurance; Waivers; Subrogation; Indemnity.**

(a)  **Tenant's Insurance.**(1) General Liability Insurance. Tenant shall, at all times during the Term, at its sole cost and expense, procure and maintain in full force and effect a policy or policies of commercial general liability insurance coverage assuring against loss, damage or liability for injury or death to persons and loss or damage to property occurring from any cause whatsoever in connection with the Premises or Tenant's use thereof. If the use and occupancy of the Premises include any activity or matter that is or may be excluded from coverage under a commercial general liability policy (e.g., the sale, service, or consumption of alcoholic beverages), Tenant shall obtain such endorsements to the commercial general liability policy or otherwise obtain insurance to insure all liability arising from such activity or matter in such amounts as Landlord may reasonably require). Such insurance policy shall not have a deductible in excess of Ten Thousand Dollars ($10,000.00). Such insurance shall also cover and include all signs maintained by Tenant hereunder. Tenant shall also cover contractual liability insurance that is sufficient to cover Tenant's indemnity obligations hereunder if such contractual liability insurance is not already included in Tenant's commercial general liability insurance policy.

(2)  Property Insurance.Tenant shall, at all times during the Term, at its sole cost and expense, procure and maintain in full force and effect property insurance on a special form or "all risks" policy form covering not less than one hundred percent (100%) of the current replacement value of Tenants alterations, improvements and betterments in the Premises, including without limitation, all furniture, fixtures, and personal property therein and business interruption insurance. Such insurance shall also cover and include all exterior signs maintained by Tenant hereunder and shall include coverage for plate glass

(3)  Worker's Compensation and Employer's Liability**.** Tenant shall, at its sole cost and expense, at all times during the Term, procure and maintain in full force and effect worker's compensation and employer's liability insurance in amounts not less than the statutory requirements as outlined by the State of Nevada's Business & Industry and NRS Chapters 616A and 616D, as may be amended from time to time.

16

(4)      _Automobile Insurance_. Tenant, at its sole cost and expense, shall, at all times during the Term, procure and maintain in full force and effect, automobile insurance in a commercially reasonable amount covering all automobiles owned by Tenant. Tenant's commercial general liability insurance policy required by Section 11(a)1 above, shall include an endorsement for automobiles that are not owned by Tenant, but that are used in carrying out Tenant's business.

**\*Minimum Insurance Limits:**

| | | |
|---|---|---|
| Commercial General Liability: | $1,000,000 | Each Occurrence |
| Occurrence Form Only | $2,000,000 | Aggregate (Per Project) |
| | $2,000,000 | Products / Completed Operations |
| | $1,000,000 | Advertising and Personal Injury |
| | | |
| Auto Liability: | $1,000,000 | Combined Single Limit Any Auto or Hired and Non-Owned Autos |
| | | |
| Workers Compensation: | $1,000,000 | Employers Liability Limits Statutory Coverage–State of Hire |
| | | |
| Excess/Umbrella Liability | $1,000,000 | Each Occurrence/Aggregate Excess over Commercial General Liability, Automobile Liability & Employers Liability |

The following Endorsements must be referenced on all Certificates of Insurance and copies of the endorsements must be attached:

General Liability:
- Additional Insured – CG2011 01/96 or its equivalent
- Primary and Non-Contributory Wording
- Waiver of Subrogation

Automobile Liability:
- Additional Insured
- Primary and Non-Contributory Wording
- Waiver of Subrogation

Workers' Compensation:
- Waiver of Subrogation

Excess/Umbrella Liability:
- Additional Insured
- Primary and Non-Contributory Wording
- Waiver of Subrogation

All policies must be endorsed to provide 30 days' notice of cancellation, except 10 days for non-payment of premium
\*The minimum insurance limits are the limits carried by the tenant or the minimum insurance limits contained in the lease, whichever is greater.

17

**Additional Insured:**

ANC Corporate Center & Paseo Verde, LLC and any and all of their respective parents, members, partners, subsidiaries, affiliates, employees, agents, officers and representatives, together with owner and any mortgagee from time to time of Owner's interest, must be named as an additional insured, as their interests may appear.

**Certificate Holder:**

ANC Corporate Center & Paseo Verde, LLC
c/o JMA Ventures, LLC
460 Bush Street
San Francisco, CA 94108

   (5)  Certificate of Insurance. A certificate providing evidence of insurance coverage maintained by Tenant hereunder shall be delivered to Landlord and all other additional insureds on or before the Commencement Date hereof and thereafter, as to policy renewals, within ten (10) days following any renewal of such policies. Any proposed diminution in the perils insured against, or reduction of the amount of coverage of the particular policy in question, initiated by either the insurer, or by the Tenant shall require not less than thirty (30) days' prior written notice to Landlord. All such insurance policies shall be issued by insurance carriers having an A.M. Best rating of at least A-/VIII or higher who are authorized to transact business in the State of Nevada. All deductibles and self-insured retentions must be shown on the Certificate of Insurance. If Tenant fails to comply with the foregoing insurance requirements or to deliver to Landlord the certificates or evidence of coverage required herein, Landlord, in addition to any other remedy available pursuant to this Lease or otherwise, may, but shall not be obligated to, obtain such insurance, and Tenant shall pay to Landlord on demand the premium costs thereof, plus an administrative fee of fifteen percent (15%) of such cost.

   (6)  Prohibited Sales or Activity. Tenant shall not use, occupy or permit the Premises to be used or occupied, in a manner which will make void or voidable any insurance then in force with respect thereto or the Project, or which will make it impossible to obtain casualty or other insurance with respect to the Project. Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises or any section thereof, any item, or permit any activity, which may be prohibited by the standard form of casualty or public liability insurance policy. Tenant agrees to pay any increase in premiums for insurance which may be carried by Landlord on the Premises or the Building of which it is a part, resulting from the use or activities in the Premises, whether or not Landlord has consented to the same. In determining whether increased premiums are the result of Tenant's use of the Premises, a schedule, issued by the organization making the insurance rate on the Premises, showing various components of such rate, shall be conclusive evidence of the several items and charges which make up the respective insurance rate on the Premises.

   Prohibited Use Deemed Ultra Hazardous. Tenant shall not use or occupy the Premises or any part thereof, or suffer or permit the same to be used or occupied for any business or purpose deemed ultra hazardous on account of fire or otherwise. In the event Tenant's use and/or occupancy causes any increase of premium for insurance on the Premises, the Building, the Project, or any part of any of them above the rate for the least hazardous type of occupancy legally permitted in the Premises, Tenant shall pay such additional premium on the insurance policy that may be carried by Landlord for its protection. Bills for such additional premiums shall be rendered by Landlord to Tenant at such time as Landlord may elect, and shall be due from and payable by Tenant within twenty (20) days following delivery of such additional premiums by Landlord, but such increase in the rate of insurance shall not be deemed a default under this Lease. Failure to pay amounts due hereunder shall be a breach of this Lease.

   **(b) Landlord's Insurance.** Throughout the Term of this Lease, Landlord shall maintain, as a minimum, the following insurance policies: (1) property insurance for the Building's replacement value (excluding property required to be insured by Tenant), less a commercially-reasonable deductible if Landlord so chooses, and (2) commercial general liability insurance in an amount of not less than $3,000,000 (including excess/umbrella coverage). Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary. The cost of all insurance carried by Landlord with respect to the Project shall be included in Operating Costs. The foregoing insurance policies and any other insurance carried by Landlord shall be for the sole benefit of Landlord and under Landlord's sole control, and Tenant shall have no right or claim to any proceeds thereof or any other rights thereunder.

<center>18</center>

(c)    **No Subrogation; Waiver of Property Claims.** Landlord and Tenant each waives any claim it might have against the other for any damage to or theft, destruction, loss, or loss of use of any property, to the extent the same is insured against under any insurance policy of the types described in this Section 11 that covers the Project, the Premises, Landlord's or Tenant's fixtures, personal property, leasehold improvements, or business, or is required to be insured against under the terms hereof, **regardless of whether the negligence of the other party caused such Loss (defined below)**. Additionally, Tenant waives any claim it may have against Landlord for any Loss to the extent such Loss is caused by a terrorist act. Each party shall cause its insurance carrier to endorse all applicable policies waiving the carrier's rights of recovery under subrogation or otherwise against the other party. Notwithstanding any provision in this Lease to the contrary, Landlord, its agents, employees and contractors shall not be liable to Tenant or to any party claiming by, through or under Tenant for (and Tenant hereby releases Landlord and its servants, agents, contractors, employees and invitees from any claim or responsibility for) any damage to or destruction, loss, or loss of use, or theft of any property of any Tenant Party located in or about the Project, caused by casualty, theft, fire, third parties or any other matter or cause, regardless of whether the negligence of any party caused such loss in whole or in part. Tenant acknowledges that Landlord shall not carry insurance on, and shall not be responsible for damage to, any property of any Tenant Party located in or about the Project.

(d)    **Indemnity** Subject to Section 11(c), Tenant shall defend, indemnify, and hold harmless Landlord and its representatives and agents from and against all claims, demands, liabilities, causes of action, suits, judgments, damages, and expenses (including reasonable attorneys' fees) arising from any injury to or death of any person or the damage to or theft, destruction, loss, or loss of use of, any property or inconvenience (a "**Loss**") (1) occurring in or on the Project (other than within the Premises) to the extent caused by the negligence or willful misconduct of any Tenant Party, (2) occurring in the Premises, or (3) arising out of the installation, operation, maintenance, repair or removal of any property of any Tenant Party located in or about the Project, including Tenant's Off-Premises Equipment. Subject to Section 11(c), Landlord shall defend, indemnify, and hold harmless Tenant and its agents from and against all claims, demands, liabilities, causes of action, suits, judgments, damages, and expenses (including reasonable attorneys' fees) for any Loss arising from any occurrence in or on the Building's common areas and Premises to the extent caused by the negligence or willful misconduct of Landlord or its agents. The indemnities set forth in this Lease shall survive termination or expiration of this Lease and shall not terminate or be waived, diminished or affected in any manner by any abatement or apportionment of Rent under any provision of this Lease. If any proceeding is filed for which indemnity is required hereunder, the indemnifying party agrees, upon request therefor, to defend the indemnified party in such proceeding at its sole cost utilizing counsel satisfactory to the indemnified party.

12.    **Subordination; Attornment; Notice to Landlord's Mortgagee.**

(a)    **Subordination**. This Lease shall be subordinate to any deed of trust, mortgage, or other security instrument (each, a "**Mortgage**"), or any ground lease, master lease, or primary lease (each, a "**Primary Lease**"), that now or hereafter covers all or any part of the Premises (the mortgagee under any such Mortgage, beneficiary under any such deed of trust, or the lessor under any such Primary Lease is referred to herein as a "**Landlord's Mortgagee**"). Any Landlord's Mortgagee may elect, at any time, unilaterally, to make this Lease superior to its Mortgage, Primary Lease, or other interest in the Premises by so notifying Tenant in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, in confirmation of such subordination, Tenant shall execute and return to Landlord (or such other party designated by Landlord) within ten days after written request therefor such documentation, in recordable form if required, as a Landlord's Mortgagee may reasonably request to evidence the subordination of this Lease to such Landlord's Mortgagee's Mortgage or Primary Lease (including a subordination, non-disturbance and attornment agreement) or, if the Landlord's Mortgagee so elects, the subordination of such Landlord's Mortgagee's Mortgage or Primary Lease to this Lease.

(b)    **Attornment**. Tenant shall attorn to any party succeeding to Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease, or otherwise, upon such party's request, and shall execute such agreements confirming such attornment as such party may reasonably request.

19

(c) **Notice to Landlord's Mortgagee**. Tenant shall not seek to enforce any remedy it may have for any default on the part of Landlord without first giving written notice by certified mail, return receipt requested, specifying the default in reasonable detail, to any Landlord's Mortgagee whose address has been given to Tenant, and affording such Landlord's Mortgagee a reasonable opportunity to perform Landlord's obligations hereunder.

(d) **Landlord's Mortgagee's Protection Provisions.** If Landlord's Mortgagee shall succeed to the interest of Landlord under this Lease, Landlord's Mortgagee shall not be: (1) liable for any act or omission of any prior lessor (including Landlord); (2) bound by any rent or additional rent or advance rent which Tenant might have paid for more than the current month to any prior lessor (including Landlord), and all such rent shall remain due and owing, notwithstanding such advance payment; (3) bound by any security or advance rental deposit made by Tenant which is not delivered or paid over to Landlord's Mortgagee and with respect to which Tenant shall look solely to Landlord for refund or reimbursement; (4) bound by any termination, amendment or modification of this Lease made without Landlord's Mortgagee's consent and written approval, except for those terminations, amendments and modifications permitted to be made by Landlord without Landlord's Mortgagee's consent pursuant to the terms of the loan documents between Landlord and Landlord's Mortgagee; (5) subject to the defenses which Tenant might have against any prior lessor (including Landlord); and (6) subject to the offsets which Tenant might have against any prior lessor (including Landlord) except for those offset rights which (A) are expressly provided in this Lease, (B) relate to periods of time following the acquisition of the Building by Landlord's Mortgagee, and (C) Tenant has provided written notice to Landlord's Mortgagee and provided Landlord's Mortgagee a reasonable opportunity to cure the event giving rise to such offset event. Landlord's Mortgagee shall have no liability or responsibility under or pursuant to the terms of this Lease or otherwise after it ceases to own an interest in the Project. Nothing in this Lease shall be construed to require Landlord's Mortgagee to see to the application of the proceeds of any loan, and Tenant's agreements set forth herein shall not be impaired on account of any modification of the documents evidencing and securing any loan.

13. **Rules and Regulations.** Tenant shall comply with the rules and regulations of the Project which are attached hereto as Exhibit C. Landlord may, from time to time, change such rules and regulations for the safety, care, or cleanliness of the Project and related facilities, provided that such changes are applicable to all tenants of the Project, will not unreasonably interfere with Tenant's use of the Premises and are enforced by Landlord in a non-discriminatory manner. Tenant shall be responsible for the compliance with such rules and regulations by each Tenant Party.

14. **Condemnation.**

(a) **Total Taking**. If the entire Building or Premises are taken by right of eminent domain or conveyed in lieu thereof (a "**Taking**"), this Lease shall terminate as of the date of the Taking.

(b) **Partial Taking - Tenant's Rights**. If any part of the Building becomes subject to a Taking and such Taking will prevent Tenant from conducting on a permanent basis (permanent basis shall be defined in this Section 14 as forty (40) days) its business in the Premises in a manner reasonably comparable to that conducted immediately before such Taking, then Tenant may terminate this Lease as of the date of such Taking by giving written notice to Landlord within 30 days after the Taking, and Base Rent and additional rent shall be apportioned as of the date of such Taking. If Tenant does not terminate this Lease, then Rent shall be abated on a reasonable basis as to that portion of the Premises rendered untenantable by the Taking.

(c) **Partial Taking - Landlord's Rights**. If any material portion, but less than all, of the Building becomes subject to a Taking, or if Landlord is required to pay any of the proceeds arising from a Taking to a Landlord's Mortgagee, then Landlord may terminate this Lease by delivering written notice thereof to Tenant within 30 days after such Taking, and Base Rent and additional rent shall be apportioned as of the date of such Taking. If Landlord does not so terminate this Lease, then this Lease will continue, but if any portion of the Premises has been taken, Rent shall abate as provided in the last sentence of Section 14(b). Tenant waives any and all rights it might otherwise have pursuant to Nevada Revised Statutes ("**NRS**") Section 37.115.

(d) **Temporary Taking**. If all or any portion of the Premises becomes subject to a Taking for a limited period of time, this Lease shall remain in full force and effect and Tenant shall continue to perform all of the terms, conditions and covenants of this Lease, including the payment of Base Rent and all other amounts required hereunder. If any such temporary Taking terminates prior to the expiration of the Term, Tenant shall restore the Premises as nearly as possible to the condition prior to such temporary Taking, at Tenant's sole cost and expense. Landlord shall be entitled to receive the entire award for any such temporary Taking, except that Tenant shall be entitled to receive the portion of such award which (1) compensates Tenant for its loss of use of the Premises within the Term and (2) reimburses Tenant for the reasonable out-of-pocket costs actually incurred by Tenant to restore the Premises as required by this Section.

(e)    **Award**. If any Taking occurs, then Landlord shall receive the entire award or other compensation for the Land, the Building, and other improvements taken; however, Tenant may separately pursue a claim (to the extent it will not reduce Landlord's award) against the condemnor for the value of Tenant's personal property which Tenant is entitled to remove under this Lease, moving costs and loss of business.

15.  **Fire or Other Casualty.**

(a)    **Repair Estimate**. If the Premises or the Building are damaged by fire or other casualty (a "**Casualty**"), Landlord shall, within 90 days after such Casualty, deliver to Tenant a good faith estimate (the "**Damage Notice**") of the time needed to repair the damage caused by such Casualty.

(b)    **Tenant's Rights**. If a material portion of the Premises is damaged by Casualty such that Tenant is prevented from conducting its business in the Premises in a manner reasonably comparable to that conducted immediately before such Casualty and Landlord estimates that the damage caused thereby cannot be repaired within 210 days after the commencement of repairs (the "**Repair Period**"), then Tenant may terminate this Lease by delivering written notice to Landlord of its election to terminate within thirty (30) days after the Damage Notice has been delivered to Tenant.

(c)    **Landlord's Rights**. If a Casualty damages the Premises or a material portion of the Building and (1) Landlord estimates that the damage to the Premises cannot be repaired within the Repair Period, (2) the damage to the Premises exceeds 50% of the replacement cost thereof (excluding foundations and footings), as estimated by Landlord, and such damage occurs during the last two years of the Term, (3) regardless of the extent of damage to the Premises, the damage is not fully covered by Landlord's insurance policies or Landlord makes a good faith determination that restoring the Building would be uneconomical, or (4) Landlord is required to pay any insurance proceeds arising out of the Casualty to a Landlord's Mortgagee, then Landlord may terminate this Lease by giving written notice of its election to terminate within 30 days after the Damage Notice has been delivered to Tenant.

(d)    **Repair Obligation**. If neither party elects to terminate this Lease following a Casualty, then Landlord shall, within a reasonable time after such Casualty, begin to repair the Premises and shall proceed with reasonable diligence to restore the Premises to substantially the same condition as they existed immediately before such Casualty; however, Landlord shall not be required to repair or replace any alterations or betterments within the Premises (which shall be promptly and with due diligence repaired and restored by Tenant at Tenant's sole cost and expense) or any furniture, equipment, trade fixtures or personal property of Tenant or others in the Premises or the Building, and Landlord's obligation to repair or restore the Premises shall be limited to the extent of the insurance proceeds actually received by Landlord for the Casualty in question. If this Lease is terminated under the provisions of this Section 15, Landlord shall be entitled to the full proceeds of the insurance policies providing coverage for all alterations, improvements and betterments in the Premises, unless such alterations, improvements and betterments in the Premises were paid for by Tenant and not reimbursed by Landlord (and, if Tenant has failed to maintain insurance on such items as required by this Lease, Tenant shall pay Landlord an amount equal to the proceeds Landlord would have received had Tenant maintained insurance on such items as required by this Lease).

(e)    **Waiver of Statutory Provisions**. The provisions of this Lease, including this Section 15, constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises or the Building and any statute or regulation of the State of Nevada with respect to any rights or obligations concerning damage or destruction in the absence of an express agreement between the parties, and any other statute or regulation, now or hereafter in effect, shall have no application to this Lease or any damage or destruction to all or any part of the Premises or the Building.

(f)    **Abatement of Rent**. If the Premises are damaged by Casualty, Rent for the portion of the Premises rendered untenantable by the damage shall be abated on a reasonable basis from the date of damage until the completion of Landlord's repairs (or until the date of termination of this Lease by Landlord or Tenant as provided above, as the case may be), unless a Tenant Party caused such damage, in which case, Tenant shall continue to pay Rent without abatement.

21

**16.** **Personal Property Taxes.** Tenant shall be liable for all taxes levied or assessed against personal property, furniture, or fixtures placed by Tenant in the Premises or in or on the Building or Project. If any taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property and Landlord elects to pay the same, or if the assessed value of Landlord's property is increased by inclusion of such personal property, furniture or fixtures and Landlord elects to pay the taxes based on such increase, then Tenant shall pay to Landlord, within 30 days following written request therefor, the part of such taxes for which Tenant is primarily liable hereunder; however, Landlord shall not pay such amount if Tenant notifies Landlord that it will contest the validity or amount of such taxes before Landlord makes such payment, and thereafter diligently proceeds with such contest in accordance with Law and if the non-payment thereof does not pose a threat of loss or seizure of the Project or interest of Landlord therein or impose any fee or penalty against Landlord.

**17.** **Events of Default.** Each of the following occurrences shall be an "**Event of Default**":

(a) **Payment Default**. Tenant's failure to pay Rent within five days after Landlord has delivered written notice to Tenant that the same is due (any such notice shall be in lieu of, and not in addition to, any notice required under NRS Section 40.253 or any similar or successor law); however, an Event of Default shall occur hereunder without any obligation of Landlord to give any notice if Tenant fails to pay Rent when due and, during the 12 month interval preceding such failure, Landlord has given Tenant written notice of failure to pay Rent on two or more occasions;

(b) **Abandonment**. Tenant (1) abandons or vacates the Premises or any substantial portion thereof or (2) fails to continuously operate its business in the Premises;

(c) **Estoppel**. Tenant fails to provide any estoppel certificate after Landlord's written request therefor pursuant to Section 25(e) and such failure shall continue for five (5) business days after Landlord's second written notice thereof to Tenant;

(d) **Insurance**. Tenant fails to procure, maintain and deliver to Landlord evidence of the insurance policies and coverages as required under Section 11(a);

(e) **Mechanic's Liens**. Tenant fails to pay and release of record, or diligently contest and bond around, any mechanic's lien filed against the Premises or the Project for any work performed, materials furnished, or obligation incurred by or at the request of Tenant, within the time and in the manner required by Section 8(d);

(f) **Other Defaults**. Tenant's failure to perform, comply with, or observe any other agreement or obligation of Tenant under this Lease and the continuance of such failure for a period of more than 30 days after Landlord has delivered to Tenant written notice thereof (any such notice shall be in lieu of, and not in addition to, any notice required under NRS Sections 40.251 to 40.260 or any similar or successor law). However, if Tenant's failure to comply cannot reasonably be cured within 30 days, Tenant shall be allowed additional time (not to exceed an additional 30 days) as is reasonably necessary to cure the failure so long as: (1) Tenant commences to cure the failure within the 10 day period following Landlord's initial written notice, and (2) Tenant diligently pursues a course of action that will cure the failure and bring Tenant back into compliance with this Lease.

(g) **Insolvency**. The filing of a petition by or against Tenant (the term "Tenant" shall include, for the purpose of this Section 17(g), any guarantor of Tenant's obligations hereunder) (1) in any bankruptcy or other insolvency proceeding; (2) seeking any relief under any state or federal debtor relief law; (3) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease; (4) for the reorganization or modification of Tenant's capital structure; or (5) in any assignment for the benefit of creditors proceeding; however, if such a petition is filed against Tenant, then such filing shall not be an Event of Default unless Tenant fails to have the proceedings initiated by such petition dismissed within 90 days after the filing thereof.

22

18. **Remedies.** Upon any Event of Default, Landlord may, in addition to all other rights and remedies afforded Landlord hereunder or by law or equity, take any one or more of the following actions, each and all of which shall be cumulative and non-exclusive, without notice or demand whatsoever:

(a) **Termination of Lease**. Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim or damages therefor; and Landlord may recover from Tenant the following:

(1)  The worth at the time of award of any unpaid rent which has been earned at the time of such termination; plus

(2)  The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(3)  The worth at the time of award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(4)  Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, specifically including but not limited to, brokerage commissions and advertising expenses incurred, expenses of remodeling the Premises or any portion thereof for a new tenant, whether for the same or a different use, and any special concessions made to obtain a new tenant; and

(5)  At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

The term "rent" as used in this Section 18(a) shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others. As used in Sections 18(a)(1) and 18(a)(2) above, the "worth at the time of award" shall be computed by allowing interest at the Interest Rate set forth in Section 5 of this Lease, but in no case greater than the maximum amount of such interest permitted by Law. As used in Section 18(a)(3) above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

(b) **Enforcement of Lease**. If Landlord does not elect to terminate this Lease on account of any Event of Default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all Rent as it becomes due. After the occurrence of an Event of Default, Landlord may re-enter the Premises without terminating this Lease and sublet all or any part of the Premises for Tenant's account to any person, for such term (which may be a period shorter than or beyond the remaining Term of this Lease), at such rents and on such other terms and conditions as Landlord reasonably deems advisable. Pursuant to said rights of re-entry, Landlord may remove all persons from the Premises and may, but shall not be obligated to, remove all property therefrom, and may, but shall not be obligated to, enforce any rights Landlord may have against said property or store the same in any public or private warehouse or elsewhere at the cost and for the account of Tenant or the owner or owners thereof. Tenant agrees to hold Landlord free and harmless of any liability whatsoever for the removal and/or storage of any such property, whether of Tenant or any third party whomsoever. In the event of any subletting described above, rents received by Landlord from such subletting shall be applied (i) first, to the payment of the costs of maintaining, preserving, altering and preparing the Premises for subletting, the other costs of subletting, including but not limited to brokers' commissions, attorneys' fees and expenses of removal of Tenant's personal property, trade fixtures and alterations or improvements made by or on behalf of Tenant to the Premises; (ii) second, to the payment of Rent then due and payable hereunder; (iii) third, to

23

the payment of future Rent as the same may become due and payable hereunder; (iv) fourth, the balance, if any, shall be paid to Tenant upon (but not before) expiration of the Term of this Lease. If the rents received by Landlord from such subletting, after application as provided above, are insufficient in any month to pay the Rent due and payable hereunder for such month, Tenant shall pay such deficiency to Landlord monthly upon demand.  Landlord reserves the right to bring such actions for the recovery of any deficits remaining unpaid by Tenant to Landlord hereunder as Landlord may deem advisable from time to time without being obligated to await the end of the term hereof for a final determination of Tenant's account and the commencement or maintenance of one or more actions by Landlord in this connection shall not bar Landlord from bringing any subsequent actions for further accruals pursuant to the provisions of this Section. Notwithstanding any such subletting for Tenant's account without termination, Landlord may at any time thereafter, by written notice to Tenant, elect to terminate this Lease by virtue of a previous Default.

(c)    **Sublessees of Tenant**. Whether or not Landlord elects to terminate this Lease on account of any default by Tenant, as set forth in this Section 18, Landlord shall have the right to terminate any and all subleases, licenses, concessions or other consensual arrangements for possession entered into by Tenant and affecting the Premises or may, in Landlord's sole discretion, succeed to Tenant's interest in such subleases, licenses, concessions or arrangements. In the event of Landlord's election to succeed to Tenant's interest in any such subleases, licenses, concessions or arrangements, Tenant shall, as of the date of notice by Landlord of such election, have no further right to or interest in the rent or other consideration receivable thereunder.

(d)  **Efforts to Relet**. For the purposes of this Section 18, Tenant's right to possession shall not be deemed to have been terminated by efforts of Landlord to relet the Premises, by its acts of maintenance or preservation with respect to the Premises, or by appointment of a receiver to protect Landlord's interests hereunder. The foregoing enumeration is not exhaustive, but merely illustrative of acts which may be performed by Landlord without terminating Tenant's right to possession.

(e)    **Suspension of Services**. Suspend any services required to be provided by Landlord hereunder without being liable for any claim for damages therefor.

19.  **Payment by Tenant; Non-Waiver; Cumulative Remedies.**

(a)    **Payment by Tenant**. Upon any Event of Default, Tenant shall pay to Landlord all costs incurred by Landlord (including court costs and reasonable attorneys' fees and expenses) in (1) obtaining possession of the Premises, (2) removing and storing Tenant's or any other occupant's property, (3) repairing, restoring, altering, remodeling, or otherwise putting the Premises into condition acceptable to a new tenant, (4) performing Tenant's obligations which Tenant failed to perform, and (5) enforcing, or advising Landlord of, its rights, remedies, and recourses arising out of the default. To the full extent permitted by law, Landlord and Tenant agree the federal and state courts of the state in which the Premises are located shall have exclusive jurisdiction over any matter relating to or arising from this Lease and the parties' rights and obligations under this Lease.

(b)    **No Waiver**. Landlord's acceptance of Rent following an Event of Default shall not waive Landlord's rights regarding such Event of Default. No waiver by Landlord of any violation or breach of any of the terms contained herein shall waive Landlord's rights regarding any future violation of such term. Landlord's acceptance of any partial payment of Rent shall not waive Landlord's rights with regard to the remaining portion of the Rent that is due, regardless of any endorsement or other statement on any instrument delivered in payment of Rent or any writing delivered in connection therewith; accordingly, Landlord's acceptance of a partial payment of Rent shall not constitute an accord and satisfaction of the full amount of the Rent that is due.

(c)    **Cumulative Remedies**. Any and all remedies set forth in this Lease: (1) shall be in addition to any and all other remedies Landlord may have at law or in equity, (2) shall be cumulative, and (3) may be pursued successively or concurrently as Landlord may elect. The exercise of any remedy by Landlord shall not be deemed an election of remedies or preclude Landlord from exercising any other remedies in the future. Additionally, Tenant shall defend, indemnify and hold harmless Landlord, Landlord's Mortgagee and their respective representatives and agents from and against all claims, demands, liabilities, causes of action, suits, judgments, damages and expenses (including reasonable attorneys' fees) arising from Tenant's failure to perform its obligations under this Lease.

**(d)** **Continuing Liability of Tenant**. Anything contained herein to the contrary notwithstanding, no act or conduct of Landlord, including, without limitation, exercise of any rights of re-entry described above, efforts to relet the Premises, an action in unlawful detainer or service of notice upon Tenant, or surrender of possession by Tenant pursuant to such notice or action, shall extinguish the liability of Tenant to pay Rent or other sums due hereunder, nor shall any of the foregoing serve to terminate this Lease unless Landlord notifies Tenant in writing of Landlord's election to terminate this Lease. No act or conduct of Landlord, including the acceptance of the keys to the Premises, other than a written acknowledgment of acceptance of surrender signed by Landlord, shall be deemed to be or constitute an acceptance of the surrender of the Premises by Tenant prior to the expiration of the Term. The surrender of this Lease by Tenant, voluntarily or otherwise, shall, at Landlord's option, operate as an assignment to Landlord of any and all existing subleases, or Landlord may elect to terminate any or all of such subleases by notifying the sublessees of its election within fifteen (15) days after such surrender. under this Lease.

**20.** **Intentionally Omitted.**

**21.** **Surrender of Premises.** No act by Landlord shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless it is in writing and signed by Landlord. At the expiration or termination of this Lease, Tenant shall deliver to Landlord the Premises with all improvements located therein in good repair and condition, free of Hazardous Materials placed on the Premises during the Term, broom-clean, reasonable wear and tear (and condemnation and Casualty damage not caused by Tenant, as to which Sections 14 and 15 shall control) excepted, and shall deliver to Landlord all keys to the Premises. Provided that Tenant has performed all of its obligations hereunder, Tenant may remove all unattached trade fixtures, furniture, and personal property placed in the Premises or elsewhere in the Building by Tenant (but Tenant may not remove any such item which was paid for, in whole or in part, by Landlord or any wiring or cabling unless Landlord requires such removal). Additionally, at Landlord's option, Tenant shall remove such alterations, additions, improvements, trade fixtures, personal property, equipment, wiring, conduits, cabling, and furniture (including Tenant's Off-Premises Equipment) as Landlord may request; however, Tenant shall not be required to remove any addition or improvement to the Premises or the Project if Landlord has specifically agreed in writing that the improvement or addition in question need not be removed. Tenant shall repair all damage caused by such removal. All items not so removed shall, at Landlord's option, be deemed to have been abandoned by Tenant and may be appropriated, sold, stored, destroyed, or otherwise disposed of by Landlord without notice to Tenant and without any obligation to account for such items; any such disposition shall not be considered a strict foreclosure or other exercise of Landlord's rights in respect of the security interest granted under Section 20. The provisions of this Section 21 shall survive the end of the Term.

**22.** **Holding Over.** If Tenant fails to vacate the Premises at the end of the Term, then Tenant shall be a tenant at sufferance and, in addition to all other damages and remedies to which Landlord may be entitled for such holding over, (a) Tenant shall pay, in addition to the other Rent, Base Rent equal to 150% of the Rent payable during the last month of the Term.  Tenant shall otherwise continue to be subject to all of Tenant's obligations under this Lease. The provisions of this Section 22 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law. If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including any claims made by any succeeding tenant founded upon such failure to surrender, and any lost profits to Landlord resulting therefrom.

**23.** **Certain Rights Reserved by Landlord.** Provided that the exercise of such rights does not unreasonably interfere with Tenant's occupancy of the Premises, Landlord shall have the following rights:

**(a)** **Building Operations**. To decorate and to make inspections, repairs, alterations, additions, changes, or improvements, whether structural or otherwise, in and about the Project, or any part thereof; to enter upon the Premises (after giving Tenant reasonable notice thereof, which may be oral notice, except in cases of real or apparent emergency, in which case no notice shall be required) and, during the continuance of any such work, to temporarily close doors, entryways, public space, and corridors in the Building; to interrupt or temporarily suspend Building services and facilities; to change the name of the Building; and to change the arrangement and location of entrances or passageways, doors, and doorways, corridors, elevators, stairs, restrooms, or other public parts of the Building;

25

(b)  **Security**. To take such reasonable measures as Landlord deems advisable for the security of the Building and its occupants; evacuating the Building for cause, suspected cause, or for drill purposes; temporarily denying access to the Building; and closing the Building after normal business hours and on Sundays and holidays, subject, however, to Tenant's right to enter when the Building is closed after normal business hours under such reasonable regulations as Landlord may prescribe from time to time;

(c)  **Prospective Purchasers and Lenders**. To enter the Premises at all reasonable hours to show the Premises to prospective purchasers or lenders; and

(d)  **Prospective Tenants**. At any time during the last nine (9) months of the Term (or earlier if Tenant has notified Landlord in writing that it does not desire to renew the Term) or at any time following the occurrence of an Event of Default, to enter the Premises at all reasonable hours to show the Premises to prospective tenants.

24.  **Substitution Space.** Landlord may, at Landlord's expense, relocate Tenant within the Building to space which is comparable in size, utility and condition to the Premises. If Landlord relocates Tenant, Landlord shall reimburse Tenant for Tenant's reasonable out-of-pocket expenses for moving Tenant's furniture, equipment, and supplies from the Premises to the relocation space and for reprinting Tenant's stationery of the same quality and quantity as Tenant's stationery supply on hand immediately before Landlord's notice to Tenant of the exercise of this relocation right. Upon such relocation, the relocation space shall be deemed to be the Premises and the terms of this Lease shall remain in full force and shall apply to the relocation space. No amendment or other instrument shall be necessary to effectuate the relocation contemplated by this Section; however, if requested by Landlord, Tenant shall execute an appropriate amendment document within fifteen (15) business days after Landlord's written request therefor. If Tenant fails to execute such relocation amendment within such time period, or if Tenant fails to relocate within the time period stated in Landlord's relocation notice to Tenant (or, if such relocation space is not available on the date specified in Landlord's relocation notice, as soon thereafter as the relocation space becomes available and is tendered to Tenant in the condition required by this Lease), then Landlord may terminate this Lease by notifying Tenant in writing thereof at least sixty (60) days prior to the termination date contained in Landlord's termination notice and Tenant shall have no further obligations under this Lease. Time is of the essence with respect to Tenant's obligations under this Section.

25.  **Miscellaneous.**

(a)  **Landlord Transfer**. Landlord may transfer any portion of the Project and any of its rights under this Lease. If Landlord assigns its rights under this Lease, then Landlord shall thereby be released from any further obligations hereunder arising after the date of transfer, provided that the assignee assumes in writing Landlord's obligations hereunder arising from and after the transfer date.

(b)  **Landlord's Liability**. The liability of Landlord (and its partners, shareholders or members) to Tenant (or any person or entity claiming by, through or under Tenant) for any default by Landlord under the terms of this Lease or any matter relating to or arising out of the occupancy or use of the Premises and/or other areas of the Building shall be limited to Tenant's actual direct, but not consequential, damages therefor and shall be recoverable only from the interest of Landlord in the Building, and Landlord (and its partners, shareholders or members) shall not be personally liable for any deficiency.

(c)  **Force Majeure**. Other than for Tenant's obligations under this Lease that can be performed by the payment of money (e.g., payment of Rent and maintenance of insurance), whenever a period of time is herein prescribed for action to be taken by either party hereto, such party shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, terrorist acts or activities, governmental laws, regulations, or restrictions, pandemics or any other causes of any kind whatsoever which are beyond the control of such party.

(d)  **Brokerage.** Neither Landlord nor Tenant has dealt with any broker or agent in connection with the negotiation or execution of this Lease, other than CBRE (Brad Peterson), representing Landlord, and Logic Commercial Real Estate (Amelia Henry), representing Tenant, whose commission shall be paid by Landlord pursuant to a separate written agreement. Tenant and Landlord shall each indemnify the other against all costs, expenses, attorneys' fees, liens and other liability for commissions or other compensation claimed by any other broker or agent claiming the same by, through, or under the indemnifying party.

26

    **(e)**   **Estoppel Certificates**. From time to time, Tenant shall furnish to any party designated by Landlord, within ten days after Landlord has made a request therefor, a certificate signed by Tenant confirming and containing such factual certifications and representations as to this Lease as Landlord may reasonably request. Unless otherwise required by Landlord's Mortgagee or a prospective purchaser or mortgagee of the Project, the initial form of estoppel certificate to be signed by Tenant is attached hereto as Exhibit F. If Tenant does not deliver to Landlord the certificate signed by Tenant within such required time period, Landlord, Landlord's Mortgagee and any prospective purchaser or mortgagee, may conclusively presume and rely upon the following facts: (1) this Lease is in full force and effect; (2) the terms and provisions of this Lease have not been changed except as otherwise represented by Landlord; (3) not more than one monthly installment of Base Rent and other charges have been paid in advance; (4) there are no claims against Landlord nor any defenses or rights of offset against collection of Rent or other charges; and (5) Landlord is not in default under this Lease. In such event, Tenant shall be estopped from denying the truth of the presumed facts.

    **(f)**   **Notices**. All notices and other communications given pursuant to this Lease shall be in writing and shall be (1) mailed by first class, United States Mail, postage prepaid, certified, with return receipt requested, and addressed to the parties hereto at the address specified in the Basic Lease Information, (2) hand delivered to the intended addressee, (3) sent by a nationally recognized overnight courier service, or (4) sent by email during normal business hours followed by a confirmatory letter sent in another manner permitted hereunder. All notices shall be effective upon delivery to the address of the addressee (even if such addressee refuses delivery thereof) or upon the next business day if the date of delivery is not a business day (or if an email is sent after 5:00 p.m. Las Vegas time on a business day). The parties hereto may change their addresses by giving notice thereof to the other in conformity with this provision.

    **(g)**   **Separability**. If any clause or provision of this Lease is illegal, invalid, or unenforceable under present or future laws, then the remainder of this Lease shall not be affected thereby and in lieu of such clause or provision, there shall be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid, and enforceable.

    **(h)**   **Amendments; Binding Effect**. This Lease may not be amended except by instrument in writing signed by Landlord and Tenant. No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing signed by Landlord, and no custom or practice which may evolve between the parties in the administration of the terms hereof shall waive or diminish the right of Landlord to insist upon the performance by Tenant in strict accordance with the terms hereof. The terms and conditions contained in this Lease shall inure to the benefit of and be binding upon the parties hereto, and upon their respective successors in interest and legal representatives, except as otherwise herein expressly provided. This Lease is for the sole benefit of Landlord and Tenant, and, other than Landlord's Mortgagee, no third party shall be deemed a third party beneficiary hereof.

    **(i)**   **Quiet Enjoyment**. Provided Tenant has performed all of its obligations hereunder, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord, but not otherwise, subject to the terms and conditions of this Lease.

    **(j)**   **No Merger**. There shall be no merger of the leasehold estate hereby created with the fee estate in the Premises or any part thereof if the same person acquires or holds, directly or indirectly, this Lease or any interest in this Lease and the fee estate in the leasehold Premises or any interest in such fee estate.

    **(k)**   **No Offer**. The submission of this Lease to Tenant shall not be construed as an offer, and Tenant shall not have any rights under this Lease unless Landlord executes a copy of this Lease and delivers it to Tenant.

    **(l)**   **Entire Agreement**. This Lease constitutes the entire agreement between Landlord and Tenant regarding the subject matter hereof and supersedes all oral statements and prior writings relating thereto. Except for those set forth in this Lease, no representations, warranties, or agreements have been made by Landlord or Tenant to the other with respect to this Lease or the obligations of Landlord or Tenant in connection therewith. The normal rule of construction that any ambiguities be resolved against the drafting party shall not apply to the interpretation of this Lease or any exhibits or amendments hereto.

<div align="center">27</div>

(m) <u>Waiver of Jury Trial</u>. **TO THE MAXIMUM EXTENT PERMITTED BY LAW, LANDLORD AND TENANT EACH WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LITIGATION OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE ARISING OUT OF OR WITH RESPECT TO THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.**

(n) <u>Governing Law</u>. This Lease shall be governed by and construed in accordance with the laws of the state in which the Premises are located.

(o) <u>Recording</u>. Tenant shall not record this Lease or any memorandum of this Lease without the prior written consent of Landlord, which consent may be withheld or denied in the sole and absolute discretion of Landlord, and any recordation by Tenant shall be a material breach of this Lease. Tenant grants to Landlord a power of attorney to execute and record a release releasing any such recorded instrument of record that was recorded without the prior written consent of Landlord.

(p) <u>Water or Mold Notification</u>. To the extent Tenant or its agents or employees discover any water leakage, water damage or mold in or about the Premises or Project, Tenant shall promptly notify Landlord thereof in writing.

(q) <u>Joint and Several Liability</u>. If Tenant is comprised of more than one party, each such party shall be jointly and severally liable for Tenant's obligations under this Lease. All unperformed obligations of Tenant hereunder not fully performed at the end of the Term shall survive the end of the Term, including payment obligations with respect to Rent and all obligations concerning the condition and repair of the Premises.

(r) <u>Financial Reports</u>. Within 15 days after Landlord's request, Tenant will furnish Tenant's most recent audited financial statements (including any notes to them) to Landlord, or, if no such audited statements have been prepared, such other financial statements (and notes to them) as may have been prepared by an independent certified public accountant or, failing those, Tenant's internally prepared financial statement. Tenant will discuss its financial statements with Landlord and, following the occurrence of an Event of Default hereunder, will give Landlord access to Tenant's books and records in order to enable Landlord to verify the financial statements. Landlord will not disclose any aspect of Tenant's financial statements that Tenant designates to Landlord as confidential except (1) to Landlord's Mortgagee or prospective mortgagees or purchasers of the Building, (2) in litigation between Landlord and Tenant, and/or (3) if required by court order. Tenant shall not be required to deliver the financial statements required under this Section 25(s) more than once in any 12-month period unless requested by Landlord's Mortgagee or a prospective buyer or lender of the Building or an Event of Default occurs. Notwithstanding the foregoing, the preceding obligations shall not apply so long as Tenant is a publicly-traded company. If Tenant is a publicly traded corporation, Tenant may satisfy its obligations hereunder by providing to Landlord Tenant's most recent annual and quarterly reports.

(s) <u>Landlord's Fees</u>. Whenever Tenant requests Landlord to take any action not required of it hereunder or give any consent required or permitted under this Lease, Tenant will reimburse Landlord for Landlord's reasonable, out-of-pocket costs payable to third parties and incurred by Landlord in reviewing the proposed action or consent, engineers' or architects' fees, within 30 days after Landlord's delivery to Tenant of a statement of such costs. Tenant will be obligated to make such reimbursement without regard to whether Landlord consents to any such proposed action.

(t) <u>Attorneys' Fees</u>. In the event that either Landlord or Tenant should bring suit for the possession of the Premises, for the recovery of any sum due under this Lease, or because of the breach of any provision of this Lease or for any other relief against the other, then all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party therein, shall be paid by the other party, which obligation on the part of the other party shall be deemed to have accrued on the date of the commencement of such action and shall be enforceable whether or not the action is prosecuted to judgment.

28

(u) **Telecommunications**. Tenant and its telecommunications companies, including local exchange telecommunications companies and alternative access vendor services companies, shall have no right of access to and within the Building, for the installation and operation of telecommunications systems, including voice, video, data, Internet, and any other services provided over wire, fiber optic, microwave, wireless, and any other transmission systems ("**Telecommunications Services**"), for part or all of Tenant's telecommunications within the Building and from the Building to any other location without Landlord's prior written consent, which consent shall not be unreasonably withheld. All providers of Telecommunications Services shall be required to comply with the rules and regulations of the Building, applicable Laws and Landlord's policies and practices for the Building. Tenant acknowledges that Landlord shall not be required to provide or arrange for any Telecommunications Services and that Landlord shall have no liability to any Tenant Party in connection with the installation, operation or maintenance of Telecommunications Services or any equipment or facilities relating thereto. Tenant, at its cost and for its own account, shall be solely responsible for obtaining all Telecommunications Services.

(v) **Confidentiality**. Tenant acknowledges that the terms and conditions of this Lease are to remain confidential for Landlord's benefit, and may not be disclosed by Tenant to anyone, by any manner or means, directly or indirectly, without Landlord's prior written consent; however, Tenant may disclose the terms and conditions of this Lease if required by Law, court order or SEC/NASDAQ requirements and regulations, and to its attorneys, accountants, employees and existing or prospective financial partners provided same are advised by Tenant of the confidential nature of such terms and conditions and agree to maintain the confidentiality thereof (in each case, prior to disclosure). Tenant shall be liable for any disclosures made in violation of this Section by Tenant or by any entity or individual to whom the terms of and conditions of this Lease were disclosed or made available by Tenant. The consent by Landlord to any disclosures shall not be deemed to be a waiver on the part of Landlord of any prohibition against any future disclosure.

(w) **Authority**. Tenant (if a corporation, partnership or other business entity) hereby represents and warrants to Landlord that Tenant is a duly formed and existing entity qualified to do business in the state in which the Premises are located, that Tenant has full right and authority to execute and deliver this Lease, and that each person signing on behalf of Tenant is authorized to do so. Landlord hereby represents and warrants to Tenant that Landlord is a duly formed and existing entity qualified to do business in the state in which the Premises are located, that Landlord has full right and authority to execute and deliver this Lease, and that each person signing on behalf of Landlord is authorized to do so.

(x) **Hazardous Materials**. The term "**Hazardous Materials**" means any substance, material, or waste which is now or hereafter classified or considered to be hazardous, toxic, or dangerous under any Law relating to pollution or the protection or regulation of human health, natural resources or the environment, or poses or threatens to pose a hazard to the health or safety of persons on the Premises or in the Project. Tenant shall not use, generate, store, or dispose of, or permit the use, generation, storage or disposal of Hazardous Materials on or about the Premises or the Project except in a manner and quantity necessary for the ordinary performance of Tenant's business, and then in compliance with all Laws. If Tenant breaches its obligations under this Section 25(x), Landlord may immediately take any and all action reasonably appropriate to remedy the same, including taking all appropriate action to clean up or remediate any contamination resulting from Tenant's use, generation, storage or disposal of Hazardous Materials. Notwithstanding Landlord's indemnity contained in Section 11(d), Tenant shall defend, indemnify, and hold harmless Landlord and its representatives and agents from and against any and all claims, demands, liabilities, causes of action, suits, judgments, damages and expenses (including reasonable attorneys' fees and cost of clean up and remediation) arising from Tenant's failure to comply with the provisions of this Section 25(x). This indemnity provision shall survive termination or expiration of this Lease.

(y) **List of Exhibits**. All exhibits and attachments attached hereto are incorporated herein by this reference.

Exhibit A - Outline of Premises
Exhibit B - Description of the Land
Exhibit C - Building Rules and Regulations
Exhibit D - Tenant Finish-Work
Exhibit E - Form of Confirmation of Commencement Date Letter
Exhibit F - Form of Tenant Estoppel Certificate
Exhibit G - Parking
Exhibit H - Option to Extend
Exhibit I - Intentionally Omitted
Exhibit J - Insurance coverage for work performed by contractors and subcontractors

**(z)** **Prohibited Persons and Transactions**. Tenant represents and warrants that neither Tenant nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents is, nor will they become, a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not Transfer this Lease to, contract with or otherwise engage in any dealings or transactions or be otherwise associated with such persons or entities.

**(aa) ERISA.** Tenant hereby represents, warrants and agrees that: (i) it is acting on its own behalf and that it is not an employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which is subject to Title 1 of ERISA, nor a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"; each of the foregoing hereinafter referred to collectively as a "Plan"); (ii) Tenant's assets do not constitute "plan assets" of one or more such Plans within the meaning of Department of Labor Regulation Section 2510.3-101.

26. **Intentionally Omitted.**

27. **Directory Sign; Suite-Entry Sign**. Landlord shall install and maintain (1)Tenant's name on the alphabetical directory in the main lobby of the Building in accordance with Exhibit C, and (2) a Building-standard sign with Tenant's name near the primary entryway door of the Premises; provided that all costs associated with the construction and installation of such signage shall be at Tenant's cost and expense.

28. **Counterparts.** This Lease may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Signatures to this Lease transmitted by electronic mail in "portable document format" (.pdf) form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

LANDLORD AND TENANT EXPRESSLY DISCLAIM ANY IMPLIED WARRANTY THAT THE PREMISES ARE SUITABLE FOR TENANT'S INTENDED COMMERCIAL PURPOSE, AND TENANT'S OBLIGATION TO PAY RENT HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE PREMISES OR THE PERFORMANCE BY LANDLORD OF ITS OBLIGATIONS HEREUNDER, AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, TENANT SHALL CONTINUE TO PAY THE RENT, WITHOUT ABATEMENT, DEMAND, SETOFF OR DEDUCTION, NOTWITHSTANDING ANY BREACH BY LANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER, WHETHER EXPRESS OR IMPLIED.

This Lease is executed on the respective dates set forth below, but for reference purposes, this Lease shall be dated as of the date first above written. If the execution date is left blank, this Lease shall be deemed executed as of the date first written above.

**LANDLORD**:                          ANC CORPORATE CENTER & PASEO VERDE, LLC, a Delaware limited liability company

                                        By: /s/ Paul Faries
                                        Name: Paul Faries
                                        Title: Authorized Signatory
                                        Execution Date: 8/30/2021

**TENANT**:                            CLEANSPARK, INC., a Nevada corporation

                                        By: /s/ Zachary Bradford
                                        Name: Zachary Bradford
                                        Title: CEO
                                        Execution Date: 8/30/2021

31

**EXHIBIT A**

**OUTLINE OF PREMISES**

32

**EXHIBIT B**

**DESCRIPTION OF THE LAND**

[to be provided]

33

**EXHIBIT C**

**BUILDING RULES AND REGULATIONS**

34

**EXHIBIT D**

**[structural improvements -- tenant managed construction]**

35

**EXHIBIT E**

**CONFIRMATION OF COMMENCEMENT DATE**

36

**EXHIBIT F**

**FORM OF TENANT ESTOPPEL CERTIFICATE**

37

**EXHIBIT G**

**PARKING**

38

**EXHIBIT H**

**RENEWAL OPTION**

39

**EXHIBIT I**

**<u>INTENTIONALLY OMITTED</u>**

40

**EXHIBIT J**

**RE: ACCESS AGREEMENT AND WORK PERFORMED AT 2370 CORPORATE CIRCLE, HENDERSON, NV 89074**

41

**Subsidiaries**

| Name | Jurisdiction |
| --- | --- |
| ATL Data Centers LLC | Georgia |
| CleanBlok, Inc. | Georgia |
| CleanSpark, LLC | California |
| CleanSpark II, LLC | Nevada |
| CleanSpark Critical Power Systems, Inc. | Nevada |
| Solar Watt Solutions, Inc. | California |
| GridFabric, LLC | Wisconsin |
| p2klabs, Inc. | Nevada |

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in the Registration Statements on Forms S-3 (File Nos. 333-228063 and 333-248975), S-3ASR (File No. 333-254290), and S-8 (File Nos. 333-218831, 333-249959, and 333-259917) of our report dated December 14, 2021 with respect to the audited consolidated financial statements of CleanSpark, Inc. and its subsidiaries (the "Company") (which report expresses an unqualified opinion) and the effectiveness of internal control over financial reporting (which report expresses an adverse opinion) appearing in this Annual Report on Form 10-K of the Company for the year ended September 30, 2021.

*/s/ MaloneBailey, LLP*
www.malonebailey.com
Houston, Texas
December 14, 2021

**Rule 13a-14(a)/15d-14(a) Certification of Chief Executive Officer**

I, Zachary Bradford, certify that;

1.   I have reviewed this Annual Report on Form 10-K for the year ended September 30, 2021 of CleanSpark, Inc. (the "registrant");

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: December 14, 2021

/s/ Zachary Bradford
By: Zachary Bradford
Title: Chief Executive Officer

**Rule 13a-14(a)/15d-14(a) Certification of Chief Financial Officer**

I, Lori Love, certify that;

1.   I have reviewed this Annual Report on Form 10-K for the year ended September 30, 2021 of CleanSpark, Inc. (the "registrant");

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: December 14, 2021

/s/ Lori Love
By: Lori Love
Title: Chief Financial Officer

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND
CHIEF FINANCIAL OFFICER
PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of CleanSpark, Inc. (the "Company") on Form 10-K for the year ended September 30, 2021 filed with the Securities and Exchange Commission (the "Report"), I, Zachary Bradford, Chief Executive Officer of the Company, and I, Lori Love, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the consolidated financial condition of the Company as of the dates presented and the consolidated result of operations of the Company for the periods presented.

| | |
|---|---|
| By: | /s/ Zachary Bradord |
| Name: | Zachary Bradford |
| Title: | Chief Executive Officer, |
| Date: | December 14, 2021 |

| | |
|---|---|
| By: | /s/ Lori Love |
| Name: | Lori Love |
| Title: | Chief Financial Officer |
| Date: | December 14, 2021 |

This certification has been furnished solely pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

**EXHIBIT B**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-Q

☒      Quarterly Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

For the quarterly period ended **December 31, 2021**

☐      Transition Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

For the transition period from _____ to _____

Commission File Number: **001-39187**

# CleanSpark, Inc.

(Exact name of Registrant as specified in its charter)

| **Nevada** | **87-0449945** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**2370 Corporate Circle, Suite 160**
**Henderson, NV 89074**
(Address of principal executive offices)

**(702) 989-7692**
(Registrant's telephone number, including area code)

_____
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.001 per share** | **CLSK** | **The Nasdaq Stock Market LLC** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days
☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| ☒ Large accelerated filer | ☐ Accelerated filer |
| ☐ Non-accelerated Filer | ☐ Smaller reporting company |
| | ☐ Emerging growth company |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐ No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date. 41,469,079 shares as of February 9, 2022.

TABLE OF CONTENTS

|  |  | <u>Page</u> |
|---|---|---|
| **PART I – FINANCIAL INFORMATION** | | |
| Item 1: | Financial Statements | 5 |
| Item 2: | Management's Discussion and Analysis of Financial Condition and Results of Operations | 4 |
| Item 3: | Quantitative and Qualitative Disclosures About Market Risk | 8 |
| Item 4: | Controls and Procedures | 9 |
| **PART II – OTHER INFORMATION** | | |
| Item 1: | Legal Proceedings | 11 |
| Item 1A: | Risk Factors | 11 |
| Item 2: | Unregistered Sales of Equity Securities and Use of Proceeds | 11 |
| Item 3: | Defaults Upon Senior Securities | 11 |
| Item 4: | Mine Safety Disclosures | 11 |
| Item 5: | Other Information | 11 |
| Item 6: | Exhibits | 12 |

2

**FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. We intend such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). All statements other than statements of historical facts contained in this Quarterly Report on Form 10-Q may be forward-looking statements. In some cases, you can identify forward-looking statements by terms such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "targets," "projects," "contemplates," "believes," "estimates," "forecasts," "predicts," "potential" or "continue" or the negative of these terms or other similar expressions. Forward-looking statements contained in this Quarterly Report on Form 10-Q include, but are not limited to statements regarding our future results of operations and financial position, industry and business trends, equity compensation, business strategy, plans, market growth and our objectives for future operations.

The forward-looking statements in this Quarterly Report on Form 10-Q are only predictions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our business, financial condition and results of operations. Forward-looking statements involve known and unknown risks, uncertainties and other important factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements, including, but not limited to: the success of its digital currency mining activities; the volatile and unpredictable cycles in the emerging and evolving industries in which we operate, increasing difficulty rates for bitcoin mining; bitcoin halving; new or additional governmental regulation; the anticipated delivery dates of new miners; the ability to successfully deploy new miners; the dependency on utility rate structures and government incentive programs; the successful deployment of energy solutions for residential and commercial applications; the expectations of future revenue growth may not be realized; ongoing demand for the Company's software products and related services; the impact of global pandemics (including COVID-19) on logistics and shipping and the demand for our products and services; and other risks described in the Company's prior press releases and in its filings with the Securities and Exchange Commission (SEC), including under the heading "Risk Factors" in the Company's Annual Report on Form 10-K and any subsequent filings with the SEC. The forward-looking statements in this Quarterly Report on Form 10-Q are based upon information available to us as of the date of this Quarterly Report on Form 10-Q, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

You should read this Quarterly Report on Form 10-Q and the documents that we reference in this Quarterly Report on Form 10-Q and have filed as exhibits to this Quarterly Report on Form 10-Q with the understanding that our actual future results, performance and achievements may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements. These forward-looking statements speak only as of the date of this Quarterly Report on Form 10-Q. Except as required by applicable law, we do not plan to publicly update or revise any forward-looking statements contained in this Quarterly Report on Form 10-Q, whether as a result of any new information, future events or otherwise.

As used in this Quarterly Report on Form 10-Q, unless otherwise stated or the context requires otherwise, references to "CleanSpark," the "Company," "we," "us," and "our," refer to CleanSpark, Inc. and its consolidated subsidiaries.

**GENERAL**

We may announce material business and financial information to our investors using our investor relations website at https://www.cleanspark.com/investor-relations/. We therefore encourage investors and others interested in CleanSpark to review the information that we make available on our website, in addition to following our filings with the SEC, webcasts, press releases and conference calls. Information contained on our website is not part of this Quarterly Report on Form 10-Q.

3

**WHERE YOU CAN FIND MORE INFORMATION**

All reports we file with the SEC are available for download free of charge via the Electronic Data Gathering Analysis and Retrieval (EDGAR) System on the SEC's website at www.sec.gov. We also make electronic copies of our reports available for download, free of charge, through our website at https://www.cleanspark.com/investor-relations/ as soon as reasonably practicable after filing such material with the SEC. Information contained on our website is not part of this Quarterly Report on Form 10-Q.

4

PART I - FINANCIAL INFORMATION

**Item 1. Financial Statements**

Our consolidated financial statements included in this Form 10-Q are as follows:

| | |
|---|---|
| Consolidated Balance Sheets as of December 31, 2021 (unaudited) and September 30, 2021; | F-1 |
| Consolidated Statements of Operations and Comprehensive Income (Loss) for the three months ended December 31, 2021 and 2020 (unaudited); | F-2 |
| Consolidated Statements of Stockholders' Equity for the three months ended December 31, 2021 and 2020 (unaudited); | F-3 |
| Consolidated Statements of Cash Flow for the three months ended December 31, 2021 and 2020 (unaudited); | F-4 |
| Notes to Consolidated Financial Statements (unaudited). | F-5 |

This report on Form 10-Q for the quarter ended December 31, 2021, should be read in conjunction with the Company's annual report on Form 10-K for the year ended September 30, 2021, filed with the Securities and Exchange Commission ("SEC") on December 14, 2021.

The accompanying consolidated financial statements and footnotes have been prepared in accordance with accounting principles generally accepted in the United States of America for interim financial information and the SEC instructions to Form 10-Q. In the opinion of management, all adjustments considered necessary for a fair presentation have been included. Operating results for the interim period ended December 31, 2021 are not necessarily indicative of the results that can be expected for the full year.

**CLEANSPARK, INC.**
**CONSOLIDATED BALANCE SHEETS**

| | | December 31, 2021 (Unaudited) | | September 30, 2021 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets | | | | |
| Cash and cash equivalents, including restricted cash | $ | 5,212,414 | $ | 18,040,327 |
| Accounts receivable, net | | 4,622,002 | | 2,619,957 |
| Inventory | | 1,432,110 | | 2,672,744 |
| Prepaid expense and other current assets | | 11,245,426 | | 5,129,047 |
| Digital currency | | 30,203,387 | | 23,603,210 |
| Derivative investment asset | | 5,204,505 | | 4,905,656 |
| Investment in equity security | | 250,000 | | 260,772 |
| Investment in debt security, AFS, at fair value | | 512,721 | | 494,608 |
| Total current assets | $ | 58,682,565 | $ | 57,726,321 |
| | | | | |
| Property and equipment, net | $ | 198,490,355 | $ | 137,674,739 |
| Operating lease right of use asset | | 1,421,252 | | 1,488,240 |
| Capitalized software, net | | 477,191 | | 503,685 |
| Intangible assets, net | | 10,996,442 | | 12,195,492 |
| Deposits on mining equipment | | 125,700,523 | | 87,959,910 |
| Other long-term asset | | 3,327,245 | | 875,536 |
| Goodwill | | 19,049,198 | | 19,049,198 |
| Total assets | $ | 418,144,771 | $ | 317,473,121 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities | | | | |
| Accounts payable and accrued liabilities | $ | 20,237,550 | $ | 7,975,263 |
| Contract liabilities | | 386,740 | | 296,964 |
| Operating lease liability | | 261,101 | | 256,195 |
| Finance lease liability | | 366,728 | | 413,798 |
| Acquisition liability | | 300,000 | | 300,000 |
| Contingent consideration | | 615,249 | | 820,802 |
| Dividends payable | | 314,611 | | — |
| Total current liabilities | | 22,481,979 | | 10,063,022 |
| Long-term liabilities | | | | |
| Operating lease liability, net of current portion | | 1,167,779 | | 1,235,325 |
| Finance lease liability, net of current portion | | 419,563 | | 458,308 |
| Total liabilities | $ | 24,069,321 | $ | 11,756,655 |
| | | | | |
| Stockholders' equity | | | | |
| Common stock; $0.001 par value; 100,000,000 shares authorized; 41,474,062 and 37,395,945 shares issued and outstanding as of December 31, 2021 and September 30, 2021, respectively | | 41,475 | | 37,394 |
| Preferred stock; $0.001 par value; 10,000,000 shares authorized; Series A shares; 2,000,000 authorized; 1,750,000 and 1,750,000 issued and outstanding as of December 31, 2021 and September 30, 2021, respectively | | 1,750 | | 1,750 |
| Additional paid-in capital | | 518,240,478 | | 444,074,832 |
| Accumulated other comprehensive income (loss) | | 12,721 | | (5,392) |
| Accumulated deficit | | (124,220,974) | | (138,392,118) |
| Total stockholders' equity | | 394,075,450 | | 305,716,466 |
| | | | | |
| Total liabilities and stockholders' equity | $ | 418,144,771 | $ | 317,473,121 |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

F-1

**CLEANSPARK, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME (LOSS)**
**(UNAUDITED)**

| | Three months ended | | | |
|---|---|---|---|---|
| | | December 31, | | December 31, |
| | | **2021** | | **2020** |
| Revenues, net | | | | |
| Digital currency mining revenue, net | $ | 36,974,578 | $ | 733,410 |
| Energy hardware, software and services revenue | | 3,970,210 | | 1,213,870 |
| Other services revenue | | 297,181 | | 310,290 |
| Total revenues, net | | 41,241,969 | | 2,257,570 |
| | | | | |
| Costs and expenses | | | | |
| Cost of revenues (exclusive of depreciation and amortization shown below) | | 8,797,926 | | 1,332,890 |
| Professional fees | | 3,317,819 | | 1,712,723 |
| Payroll expenses | | 8,883,047 | | 3,314,201 |
| General and administrative expenses | | 1,888,100 | | 950,139 |
| Other impairment expense (related to Digital Currency) | | 6,222,346 | | — |
| Depreciation and amortization | | 7,697,568 | | 1,117,715 |
| Total costs and expenses | | 36,806,806 | | 8,427,668 |
| | | | | |
| Income (loss) from operations | | 4,435,163 | | (6,170,098 ) |
| | | | | |
| Other income/(expense) | | | | |
| Change in fair value of contingent consideration | | 55,542 | | — |
| Realized gain on sale of digital currency | | 9,994,791 | | 49,918 |
| Realized gain on sale of equity security | | 665 | | — |
| Unrealized loss on equity security | | (1,847 ) | | (73,500 ) |
| Unrealized gain (loss) on derivative security | | 298,849 | | (1,020,494 ) |
| Interest income | | 33,471 | | 47,984 |
| Interest expense | | (52,709 ) | | (1,340 ) |
| Loss on write off and disposal of assets | | (278,170 ) | | — |
| Total other income (expense) | | 10,050,592 | | (997,432 ) |
| | | | | |
| Income (loss) before income tax (expense) or benefit | | 14,485,755 | | (7,167,530 ) |
| Income tax (expense) or benefit | | — | | — |
| Net income (loss) | $ | 14,485,755 | $ | (7,167,530 ) |
| | | | | |
| Preferred stock dividends | | 314,611 | | — |
| | | | | |
| Net income (loss) attributable to common shareholders | $ | 14,171,144 | $ | (7,167,530 ) |
| | | | | |
| Other comprehensive income | | 18,113 | | — |
| | | | | |
| Total comprehensive income (loss) attributable to common shareholders | $ | 14,189,257 | $ | (7,167,530 ) |
| | | | | |
| Income (loss) per common share - basic | $ | 0.35 | $ | (0.32 ) |
| | | | | |
| Weighted average common shares outstanding - basic | | 40,279,938 | | 22,146,992 |
| | | | | |
| Income (loss) per common share - diluted | $ | 0.35 | $ | (0.32 ) |
| | | | | |
| Weighted average common shares outstanding - diluted | | 40,485,761 | | 22,146,992 |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

F-2

**CLEANSPARK, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

**(UNAUDITED)**

**For the Three Months Ended December 31, 2021**

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance, September 30, 2021 | 1,750,000 | $ 1,750 | 37,395,945 | $ 37,394 | $ 444,074,832 | $ (5,392) | $ (138,392,118) | $ 305,716,466 |
| Options and restricted stock units issued for services | — | - | - | - | 5,749,107 | - | - | 5,749,107 |
| Shares issued for settlement of contingent consideration related to business acquisition | — | - | 8,404 | 8 | 150,003 | - | - | 150,011 |
| Exercise of options and warrants | — | - | 52,061 | 52 | 281,564 | - | - | 281,616 |
| Shares issued under equity offering, net of offering costs | — | - | 4,017,652 | 4,021 | 67,984,972 | - | - | 67,988,993 |
| Preferred dividends | — | - | - | - | - | - | (314,611) | (314,611) |
| Net income | — | - | - | - | - | - | 14,485,755 | 14,485,755 |
| Other comprehensive income | — | - | - | - | - | 18,113 | - | 18,113 |
| Balance, December 31, 2021 | 1,750,000 | $ 1,750 | 41,474,062 | $ 41,475 | $ 518,240,478 | $ 12,721 | $ (124,220,974) | $ 394,075,450 |

**For the Three Months Ended December 31, 2020**

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance, September 30, 2020 | 1,750,000 | $ 1,750 | 17,390,979 | $ 17,391 | $ 132,809,830 | $ - | $ (116,402,606) | $ 16,426,365 |
| Shares issued for services | — | - | 501,437 | 501 | 3,011,133 | - | - | 3,011,634 |
| Options and warrants issued for services | — | - | - | - | 1,339,009 | - | - | 1,339,009 |
| Shares issued for business acquisition | — | - | 1,618,285 | 1,618 | 21,181,733 | - | - | 21,183,351 |
| Exercise of options and warrants | — | - | 115,385 | 116 | 192,540 | - | - | 192,656 |
| Shares issued under underwritten offering, net of offering costs | — | - | 4,444,445 | 4,445 | 37,045,160 | - | - | 37,049,605 |
| Net Loss | — | - | - | - | - | - | (7,167,530) | (7,167,530) |
| 'Balance, December 31, 2020 | 1,750,000 | $ 1,750 | 24,070,531 | $ 24,071 | $ 195,579,405 | $ - | $ (123,570,136) | $ 72,035,090 |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

F-3

**CLEANSPARK, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOW**

**(UNAUDITED)**

| | | Three Months Ended | | |
|---|---|---|---|---|
| | | December 31, | | December 31, |
| | | **2021** | | **2020** |
| **Cash Flows from Operating Activities** | | | | |
| Net income (loss) | $ | 14,485,755 | $ | (7,167,530 ) |
| **Adjustments to reconcile net income (loss) to net cash used in operating activities:** | | | | |
| Unrealized loss on equity security | | 1,847 | | 73,500 |
| Realized gain on sale of equity security | | (665 ) | | - |
| Impairment of digital currency | | 6,222,346 | | - |
| Realized gain on sale of digital currency | | (9,994,791 ) | | (49,918 ) |
| Digital currency issued for services | | 181,658 | | - |
| Unrealized (gain) loss on derivative asset | | (298,849 ) | | 1,020,494 |
| Gain on fair valuation of contingent consideration | | (55,542 ) | | - |
| Non-cash lease expense | | 66,988 | | 11,864 |
| Stock Based Compensation | | 5,749,107 | | 4,350,643 |
| Depreciation and amortization | | 7,697,568 | | 1,117,715 |
| Loss on write-off and disposal of assets | | 278,170 | | - |
| **Changes in operating assets and liabilities** | | | | |
| Production of digital currency | | (36,974,578 ) | | (733,410 ) |
| Decrease in operating lease right of use liabilities | | (62,640 ) | | (23,740 ) |
| Decrease (increase) in contract assets, net | | - | | 3,197 |
| Increase (decrease) in contract liabilities, net | | 89,776 | | (595 ) |
| Increase (decrease) in accounts payable and accrued liabilities | | (911,848 ) | | (2,366,531 ) |
| (Increase) in prepaid expenses and other current assets | | (6,682,127 ) | | (2,329,318 ) |
| Increase in accounts receivables | | (2,002,045 ) | | (463,199 ) |
| (Increase) decrease in Inventory | | 1,240,634 | | (276,750 ) |
| **Net cash used in operating activities** | $ | **(20,969,236 )** | $ | **(6,833,578 )** |
| **Cash Flows from investing** | | | | |
| Payments on miner deposits | $ | (70,633,823 ) | $ | - |
| Purchase of fixed assets | | (21,429,893 ) | | (19,082 ) |
| Investment in infrastructure development | | (1,948,709 ) | | (2,830,560 ) |
| Proceeds from sale of digital currencies | | 33,965,188 | | 375,887 |
| Proceeds from the sale of equity securities | | 9,590 | | - |
| Cash acquired from ATL acquisition | | - | | 45,783 |
| **Net cash used in investing activities** | $ | **(60,037,647 )** | $ | **(2,427,972 )** |
| **Cash Flows from Financing Activities** | | | | |
| Payments on promissory notes | $ | - | $ | (5,475,000 ) |
| Payments on finance leases | | (91,645 ) | | - |
| Proceeds from exercise of options and warrants | | 281,616 | | 192,656 |
| Proceeds from offerings, net | | 67,988,999 | | 37,049,605 |
| **Net cash provided by financing activities** | $ | **68,178,970** | $ | **31,767,261** |
| | | | | |
| **Net increase (decrease) in cash and cash equivalents and restricted cash** | $ | **(12,827,913 )** | $ | **22,505,711** |
| | | | | |
| Cash and cash equivalents and restricted cash, beginning of period | $ | 18,040,327 | $ | 3,126,202 |
| | | | | |
| **Cash and cash equivalents and restricted cash, end of period** | $ | **5,212,414** | $ | **25,631,913** |
| **Supplemental disclosure of cash flow information** | | | | |
| Cash paid for interest | $ | 52,709 | $ | - |
| Cash paid for tax | $ | - | $ | - |
| **Non-cash investing and financing transactions** | | | | |
| Shares and options issued for business acquisition | $ | - | $ | 21,183,351 |
| Cashless exercise of options and warrants | $ | - | $ | 74 |
| Shares issued for settlement of seller agreements related to acquisition | $ | 150,011 | $ | - |
| Preferred shares dividends accrued | $ | 314,611 | $ | - |
| Reclass from fixed assets to miner deposits | $ | 279,603 | $ | - |
| Reclass from miner deposits to fixed assets | $ | 43,429,467 | $ | - |
| Reclass from AP and accrued expenses to construction in progress | $ | 2,686,665 | $ | - |
| Gross-up of accounts payable related to bills received for goods and services outstanding | $ | 10,256,654 | | |
| Changes in other comprehensive income | $ | 18,113 | $ | - |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

**CLEANSPARK, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(UNAUDITED)**

## 1.    ORGANIZATION AND LINE OF BUSINESS

Organization

The Company – CleanSpark, Inc. ("CleanSpark," "we," "our," or the "Company") was incorporated in the state of Nevada on October 15, 1987 as SmartData Corporation. In October 2016, the Company changed its name to CleanSpark, Inc.

CleanSpark, Inc. is a bitcoin mining and energy technology company. The Company sustainably mines bitcoin and provides advanced energy technology solutions to commercial and residential customers to solve modern energy challenges. The Company, through itself and its wholly owned subsidiaries, has operated in the digital currency mining sector since December 2020, and in the alternative energy sector since March 2014.

CleanSpark, Inc. aims to develop a long-term sustainability and clean energy plan to support its bitcoin mining operations. We are currently working with industry leaders and other advisors in developing a long-term sustainability and clean energy plan. We are also using all available clean and renewable energy resources that we currently have reasonable access to in all of our bitcoin mining locations in order to further support our sustainability efforts.

**Lines of Business**

*Digital Currency Mining Segment*

Through our wholly owned subsidiaries, ATL Data Centers LLC ("ATL") and CleanBlok, Inc. ("CleanBlok"), the Company mines bitcoin. The Company entered the bitcoin mining industry through our acquisition of ATL in December 2020. It acquired a second data center in August 2021 and has had a co-location agreement with New York-based Coinmint, LLC in place since July 2021. Bitcoin mining has now become the Company's principal revenue generating business activity. We currently intend to acquire additional facilities, equipment and infrastructure capacity to continue to expand our bitcoin mining operations.

Through our subsidiaries CSRE Properties Norcross, LLC, CSRE Property Management Company, LLC and CSRE Properties, LLC, we maintain real property holdings for ATL Data Centers LLC and CleanBlok Inc.

*Energy Segment*

The Company provides energy solutions through our wholly owned subsidiaries CleanSpark, LLC, CleanSpark Critical Power Systems, Inc., GridFabric, LLC, and Solar Watt Solutions, Inc. These solutions consist of engineering, design and software solutions, custom hardware solutions, Open Automated Demand response ("OpenADR"), solar, energy storage for microgrid and distributed energy systems to military, commercial and residential customers in Southern California and throughout the world.

The Company's solutions are supported by a proprietary suite of software solutions that include microgrid energy modeling, energy market communications and energy management solutions.

*Other business activities*

Through our wholly owned subsidiary p2kLabs, Inc., we provide design, software development, and other technology-based consulting services. The services provided are generally hourly or fixed-fee project-based arrangements.

Through ATL, we also provide traditional data center services, such as providing customers with rack space, power and equipment, and offer several cloud-based service solutions including virtual services, virtual storage, and data backup services.

F-5

## 2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

<u>Basis of Presentation and Principles of Consolidation</u>

The accompanying unaudited interim financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America and the rules of the Securities and Exchange Commission and should be read in conjunction with the audited financial statements and notes thereto contained in the Company's most recent annual report on Form 10-K for the year ended September 30, 2021, filed with the SEC on December 14, 2021 ("Form 10-K"). In the opinion of management, all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of financial position and the results of operations for the interim period presented in this quarterly report on Form 10-Q have been reflected herein. The results of operations for the interim period are not necessarily indicative of the results to be expected for the full year. Notes to the financial statements which would substantially duplicate the disclosures contained in the audited financial statements for the most recent fiscal period, as reported in the Form 10-K, have been omitted.

The accompanying unaudited consolidated financial statements include the accounts of CleanSpark, Inc., and its wholly owned operating subsidiaries, CleanSpark, LLC, CleanSpark II, LLC, CleanSpark Critical Power Systems Inc., p2kLabs, Inc, GridFabric, LLC, ATL Data Centers LLC, CleanBlok, Inc., CSRE Properties, LLC, Solar Watt Solutions, Inc, CSRE Properties Norcross, LLC and CSRE Property Management Company, LLC. All intercompany transactions have been eliminated upon consolidation of these entities.

<u>Liquidity</u>

As shown in the accompanying unaudited consolidated financial statements, the Company generated a net income of $14,485,755 during the three months ended December 31, 2021. While the Company has experienced negative cash flows from investing and operating activities due to its continued investments in capital expenditures, it has generated positive cash flows from financing activities. The Company has sufficient capital for ongoing operations from raising additional capital through the registered sale of equity securities pursuant to a registration statement on Form S-3. In addition, the Company is continuing to grow its business segments through which it expects to grow the working capital base. As of December 31, 2021, the Company had working capital of $36,200,586.

<u>Use of Estimates</u>

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities as of the date of the consolidated financial statements, and the reported amounts of revenues and expenses during the reporting period. Significant estimates include estimates used to review the Company's goodwill and digital currency impairment, intangible assets acquired, impairments and estimations of long-lived assets, revenue recognition on percentage of completion type contracts, revenue recognition from digital currency mining, valuation of derivative assets and liabilities, available-for-sale investments, allowances for uncollectible accounts, valuation of digital currencies, valuation of contingent consideration, warranty, and the valuations of share based awards. The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable in the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions including, but not limited to, the ultimate impact that the ongoing COVID-19 pandemic may have on the Company's operations.

<u>Revenue Recognition</u>

We recognize revenue in accordance with generally accepted accounting principles as outlined in the Financial Accounting Standard Board's ("FASB") Accounting Standards Codification ("ASC") 606, Revenue From Contracts with Customers, which requires that five steps be followed in evaluating revenue recognition: (i) identify the contract with the customer; (ii) identity the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price; and (v) recognize revenue when or as the entity satisfied a performance obligation.

Our accounting policy on revenue recognition by type of revenue is provided below.

*Revenues from digital currency mining*

The Company has entered into contracts with digital asset mining pool operators to provide computing power to the mining pools. The contracts are terminable at any time by either party and the Company's enforceable right to compensation only begins when the Company starts providing computing power to the mining pool operator. In exchange for providing computing power, the Company is entitled to a fractional share of the fixed cryptocurrency award the mining pool operator receives (*less* net digital asset transaction fees to the mining pool operator), for successfully adding a block to the blockchain, plus a fractional share of the transaction fees attached to that blockchain. The Company's fractional share is based on the proportion of computing power the Company contributed to the mining pool operator to the total computing power contributed by all mining pool participants in solving the current algorithm. The transaction consideration the Company receives is noncash consideration, in the form of digital currency, which the Company measures at fair value on the date received which is not materially different than the fair value at contract inception or time the Company has earned the award from the mining pools. Fair value of the digital currency award received is determined using the spot price of the related digital currency on the date earned.

There is currently no definitive guidance under GAAP or alternative accounting framework for the accounting for digital currencies recognized as revenue or held, and management has exercised significant judgment in determining the appropriate accounting treatment. In the event authoritative guidance is enacted by the FASB, the Company may be required to change its policies, which could have an effect on the Company's consolidated financial position and results from operations.

*Engineering & Construction Contracts and Service Contracts*

The Company recognizes engineering and construction contract revenue over time, as performance obligations are satisfied, due to the continuous transfer of control to the customer. Engineering and construction contracts are generally accounted for as a single unit of account (a single performance obligation) and are not segmented between types of services. The Company recognizes revenue based primarily on contract cost incurred to date compared to total estimated contract cost (an input method). The input method is the most faithful depiction of the Company's performance because it directly measures the value of the services transferred to the customer. Customer-furnished materials, labor and equipment and, in certain cases, subcontractor materials, labor and equipment, are included in revenue and cost of revenue when management believes that the Company is acting as a principal rather than as an agent (i.e., the Company integrates the materials, labor and equipment into the deliverables promised to the customer). Customer-furnished materials are only included in revenue and cost when the contract includes construction activity and the Company has visibility into the amount the customer is paying for the materials or there is a reasonable basis for estimating the amount. The Company recognizes revenue, but not profit, on certain uninstalled materials that are not specifically produced, fabricated, or constructed for a project. Revenue on these uninstalled materials is recognized when the cost is incurred (when control is transferred). Changes to total estimated contract cost or losses, if any, are recognized in the period in which they are determined as assessed at the contract level. Pre-contract costs are expensed as incurred unless they are expected to be recovered from the client. Project mobilization costs are generally charged to project costs as incurred when they are an integrated part of the performance obligation being transferred to the client. Customer payments on engineering and construction contracts are typically due within 30 to 45 days of billing, depending on the contract.

The Company recognizes energy (solar panel and battery) installation contract revenue for residential customers at a point in time upon completion of the installation. The revenues associated with energy installations for commercial customers are recognized over a period of time as noted in the engineering and construction contract revenue disclosure above.

For service contracts (including maintenance contracts) in which the Company has the right to consideration from the customer in an amount that corresponds directly with the value to the customer of the Company's performance completed to date, revenue is recognized when services are performed and contractually billable. Service contracts that include multiple performance obligations are segmented between types of services.

For contracts with multiple performance obligations, the Company allocates the transaction price to each performance obligation using an estimate of the stand-alone selling price of each distinct service in the contract. Revenue recognized on service contracts that have not been billed to clients is classified as a current asset under contract assets

F-7

on the Consolidated Balance Sheets. Amounts billed to clients in excess of revenue recognized on service contracts to date are classified as a current liability under contract liabilities. Customer payments on service contracts are typically due within 30 days of billing, depending on the contract.

### *Revenues from Sale of Equipment*

*Performance Obligations Satisfied at a point in time.*

We recognize revenue on agreements for equipment we sell on a standardized basis to the market at a point in time. We recognize revenue at the point in time that the customer obtains control of the good, which is generally upon shipment or when the customer has physical possession of the product depending on contract terms. We use proof of delivery for certain large equipment with more complex logistics, whereas the delivery of other equipment is estimated based on historical averages of in-transit periods (i.e., time between shipment and delivery). Generally, shipping costs are included in the price of equipment unless the customer requests a non-standard shipment. In situations where an alternative shipment arrangement has been made, the Company recognizes the shipping revenue upon customer receipt of the shipment.

In situations where arrangements include customer acceptance provisions based on seller or customer-specified objective criteria, we recognize revenue when we have concluded that the customer has control of the goods and that acceptance is likely to occur. We generally do not provide for anticipated losses on point in time transactions prior to transferring control of the equipment to the customer.

Our billing terms for these point in time equipment contracts vary and generally coincide with shipment to the customer; however, within certain businesses, we receive progress payments from customers for large equipment purchases, which is generally to reserve production slots with our manufacturing partners, which are recorded as contract liabilities.

Due to the customized nature of the equipment, the Company does not allow for customer returns.

### *Service Performance obligations satisfied over time.*

We enter into long-term product service agreements with our customers primarily within our microgrid segment. These agreements require us to provide preventative maintenance, and standby support services that include certain levels of assurance regarding system performance throughout the contract periods, and these contracts will generally range from 1 to 10 years. We account for items that are integral to the maintenance of the equipment as part of our service-related performance obligation, unless the customer has a substantive right to make a separate purchasing decision (e.g., equipment upgrade). Contract modifications that extend or revise contract terms are not uncommon and generally result in our recognizing the impact of the revised terms prospectively over the remaining life of the modified contract (i.e., effectively like a new contract). Revenues are recognized for these arrangements on a straight-line basis consistent with the nature, timing and extent of our services, which primarily relate to routine maintenance and as needed product repairs. Our billing terms for these contracts vary, but we generally invoice periodically as services are provided.

Contract assets represent revenue recognized in excess of amounts billed and include unbilled receivables (typically for cost reimbursable contracts) and contract work in progress (typically for fixed-price contracts). There were no contracts assets as of December 31, 2021 and September 30, 2021. Unbilled receivables, which represent an unconditional right to payment subject only to the passage of time, are reclassified to accounts receivable when they are billed under the terms of the contract. There are no advances that are payments on account of contract assets that have been deducted from contract assets as of December 31, 2021 and September 30, 2021. Contract liabilities mostly represent customer deposits. The Company recorded $386,740 and $296,964 in contract liabilities as of December 31, 2021 and September 30, 2021, respectively.

### *Revenues from software*

The Company derives its software revenue from both subscription fees from customers for access to its energy software offerings and software license sales and support services. Revenues from software licenses are generally

recognized upfront when the software is made available to the customer and revenues from the related support is generally recognized ratably over the contract term. The Company's policy is to exclude sales and other indirect taxes when measuring the transaction price of its subscription agreements.

The Company's subscription agreements generally have monthly or annual contractual terms. Revenue is recognized ratably over the related contractual term beginning on the date that the platform is made available to a customer. Access to the platform represents a series of distinct services as the Company continually provides access to, and fulfills its obligation to the end customer over the subscription term. The series of distinct services represents a single performance obligation that is satisfied over time.

### *Revenues from design, software development and other technology-based consulting services*

For service contracts performed under Master Services Agreements ("MSA") and accompanying Statement(s) of Work ("SOW"), revenue is recognized based on the performance obligation(s) outlined in the SOW which is typically hours worked or specific deliverable milestones. In the case of a milestone-based SOW, the Company recognizes revenues as each deliverable is signed off by the customer.

### *Revenues from data center services*

The Company provides data services such as providing its customers with rack space, power and equipment, and cloud services such as virtual services, virtual storage, and data backup services, generally based on monthly services provided at a defined price included in the contracts. The performance obligations are the services provided to a customer for the month based on the contract. The transaction price is the price agreed with the customer for the monthly services provided and the revenues are recognized monthly based on the services rendered for the month.

### *Variable Consideration*

The nature of the Company's contracts gives rise to several types of variable consideration, including claims and unpriced change orders; awards and incentive fees; and liquidated damages and penalties. The Company recognizes revenue for variable consideration when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur. The Company estimates the amount of revenue to be recognized on variable consideration using the expected value (i.e., the sum of a probability-weighted amount) or the most likely amount method, whichever is expected to better predict the amount. Factors considered in determining whether revenue associated with claims (including change orders in dispute and unapproved change orders in regard to both scope and price) should be recognized include the following: (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the Company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. If the requirements for recognizing revenue for claims or unapproved change orders are met, revenue is recorded only when the costs associated with the claims or unapproved change orders have been incurred. Back charges to suppliers or subcontractors are recognized as a reduction of cost when it is determined that recovery of such cost is probable and the amounts can be reliably estimated. Disputed back charges are recognized when the same requirements described above for claims accounting have been satisfied.

The Company generally provides limited warranties for work performed under its engineering and construction contracts. The warranty periods typically extend for a limited duration following substantial completion of the Company's work on a project. Historically, warranty claims have not resulted in material costs incurred.

### *Practical Expedients*

If the Company has a right to consideration from a customer in an amount that corresponds directly with the value of the Company's performance completed to date (a service contract in which the Company bills a fixed amount for each hour of service provided), the Company recognizes revenue in the amount to which it has a right to invoice for services performed.

The Company does not adjust the contract price for the effects of a significant financing component if the Company expects, at contract inception, that the period between when the Company transfers a service to a customer and when the customer pays for that service will be one year or less.

The Company has made an accounting policy election to exclude from the measurement of the transaction price all taxes assessed by governmental authorities that are collected by the Company from its customers (use taxes, value added taxes, some excise taxes).

Cost of Revenues

The Company includes the following in cost of revenues: energy costs, materials costs, manufacturing and logistics costs, freight costs, inventory write-downs, hosting services costs. The recognition of cost of revenue for our energy segment is dependent upon the revenue stream that it pertains to, refer below:

1.  Products Delivered at a Point in Time. Cost of revenue from these products is recognized when the Company transfers control of the product to the customer, which is generally upon shipment.

2.  Products Delivered Over Time. Cost of revenue from these products is recognized over the related service period.

Cash and cash equivalents

Cash and cash equivalents include cash and amounts due from banks and restricted cash. The Company's restricted cash represents amounts held in trust for certain construction projects. The following table sets forth a reconciliation of cash, cash equivalents, and restricted cash reported in the consolidated balance sheet that agrees to the total of those amounts as presented in the consolidated statements of cash flows.

| | December 31, 2021 | | September 30, 2021 | |
|---|---|---|---|---|
| Cash and cash equivalents, excluding restricted cash | $ | 4,104,574 | $ | 14,571,198 |
| Restricted cash - construction escrow account | $ | 1,107,840 | $ | 3,469,129 |
| Cash and cash equivalents, including restricted cash | $ | 5,212,414 | $ | 18,040,327 |

Accounts receivable

Accounts receivable is comprised of uncollateralized customer obligations due under normal trade terms. They are initially recorded at the invoiced amount upon the sale of goods or services to customers, and do not bear interest. The Company performs ongoing credit evaluation of its customers and management closely monitors outstanding receivables based on factors surrounding the credit risk of specific customers, historical trends, and other information. The carrying amount of accounts receivable is reviewed periodically for collectability. If management determines that collection is unlikely, an allowance that reflects management's best estimate of the amounts that will not be collected is recorded.

F-10

Accounts receivable, net consists of the following:

| | | December 31, | | | September 30, |
| --- | --- | --- | --- | --- | --- |
| | | **2021** | | | **2021** |
| Accounts Receivable, gross | $ | 4,776,757 | $ | | 2,891,784 |
| Other receivables | | 538,753 | | | 421,681 |
| Provision for doubtful allowances | | (693,508) | | | (693,508) |
| Total Accounts Receivable, net | $ | 4,622,002 | $ | | 2,619,957 |

Inventory

Inventory is stated at the lower of cost or net realizable value with cost being measured on a first-in, first-out basis. For solar panel and battery installations, the Company transfers component parts from inventories to cost of goods sold once installation is complete. The Company periodically reviews inventories for unusable and obsolete items based on assumptions about future demand and market conditions. Based on this evaluation, provisions are made to write inventories down to their net realizable value. There were no write-downs of inventory as of December 31, 2021 and September 30, 2021, respectively. The composition of inventory as of December 31, 2021 and September 30, 2021 are as follows:

| | December 31, | | | September 30, |
| --- | --- | --- | --- | --- |
| | **2021** | | | **2021** |
| Batteries and solar panels | 718,955 | $ | | 1,819,398 |
| Supplies and other | 713,155 | | | 853,346 |
| **Total inventory** | **1,432,110** | **$** | | **2,672,744** |

Prepaid expense and other current assets

The Company records a prepaid expense for costs paid but not yet incurred. Those expected to be incurred within one year are recognized and shown as a short-term pre-paid expense. Any costs expected to be incurred outside of one year would be considered other long-term assets.

Other current assets are assets that consist of deposits and interest receivable. Deposits and interest we expect to receive within one year are shown as short-term. Those we expect to receive outside of one year are shown as other long-term assets.

Concentration Risk

At times throughout the year, the Company may maintain cash balances in certain bank accounts in excess of FDIC limits. The cash balance, in excess of the FDIC limits was $3,812,842 and $17,790,327 for periods ended December 31, 2021 and September 30, 2021, respectively. The accounts offered by custodians of the Company's bitcoin are not insured by the FDIC. The fair market value of bitcoin held in accounts not covered by FDIC limits was $30,203,387 and $23,603,210 as of December 31, 2021 and September 30, 2021, respectively. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk in these accounts.

The Company has certain customers and vendors who individually represented 10% or more of the Company's revenue or capital expenditures. Please refer to Note 13 - Major Customers and Vendors.

Stock-based compensation

The Company follows the guidelines in FASB Codification Topic ASC 718-10 Compensation-Stock Compensation, which requires companies to measure the cost of employee and non-employee services received in exchange for an award of an equity instrument based on the grant-date fair value of the award. Stock-based compensation expense for stock options is recognized on a straight-line basis over the requisite service period. The Company may issue compensatory shares for services including, but not limited to, executive, management, accounting, operations, corporate communication, financial and administrative consulting services. The Company determines the grant date

F-11

fair value of the options using the Black-Scholes option-pricing model. For equity awards granted by the Company that are contingent upon market based conditions, the Company fair values these awards using the Monte Carlo simulation model. For discussion of accounting for restricted stock units (RSUs), please refer Note 11 – Stock-Based Compensation.

Earnings (loss) per share

The Company reports earnings (loss) per share in accordance with FASB ASC 260-10 "Earnings Per Share," which provides for calculation of "basic" and "diluted" earnings per share. Basic earnings per share includes no dilution and is computed by dividing net income or loss available to common stockholders by the weighted average common shares outstanding during the period. Diluted earnings per share reflect the potential dilution of securities that could share in the earnings of an entity. The calculation of diluted net loss per share gives effect to common stock equivalents; however, potential common shares are excluded if their effect is anti-dilutive. As of December 31, 2021, there were 152,682 shares, 51,622 shares and 1,519 shares respectively issuable in an incremental manner upon exercise of outstanding options, warrants and restricted stock units respectively. As of December 31, 2020, potential incremental shares from the exercise of equity instruments were excluded from the prior period calculation of diluted net loss per share, as their inclusion would have been anti-dilutive to the Company's net loss.

| | | For the Three Months Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2021 | | 2020 |
| **Numerator** | | | | |
| Consolidated net income (loss) attributable to common shareholders | $ | 14,171,144 | $ | (7,167,530) |
| **Denominator** | | | | |
| Weighted- average common shares outstanding, | | | | |
| basic | | 40,279,938 | | 22,146,992 |
| Dilutive impact of stock options and other | | | | |
| share-based awards | | 205,823 | | — |
| Weighted- average common shares outstanding, | | | | |
| diluted | | 40,485,761 | | 22,146,992 |
| **Net income (loss) per common share attributable** | | | | |
| Basic | $ | 0.35 | $ | (0.32) |
| Diluted | $ | 0.35 | $ | (0.32) |

Property and equipment

Property and equipment are stated at cost less accumulated depreciation. Construction in progress is the construction or development of assets that has not yet been placed in service for its intended use. Depreciation for machinery and equipment, mining equipment, buildings, furniture and fixtures and leasehold improvements commences once they are ready for its intended use. Leasehold improvements are depreciated on a straight-line basis over the shorter of their estimated useful lives or the terms of the related leases. Land is not depreciated.

Depreciation is calculated on a straight-line basis over the estimated useful life of the asset as follows:

| | Useful life (years) |
| --- | --- |
| Building | 30 |
| Machinery and equipment | 1 - 10 |
| Mining equipment | 3 – 15 |
| Infrastructure asset | Shorter of estimated lease term or 15 years |
| Leasehold improvements | Shorter of estimated lease term or 5 years |
| Furniture and fixtures | 1 - 5 |

In accordance with the Financial Accounting Standards Board ASC 360-10, "Property, Plant and Equipment" the carrying value of property and equipment, and other long-lived assets is reviewed on a regular basis for the existence

F-12

of facts or circumstances that may suggest impairment. The Company recognizes impairment when the sum of the expected undiscounted future cash flows is less than the carrying amount of the asset. Impairment losses, if any, are measured as the excess of the carrying amount of the asset over its estimated fair value. During the three months ended December 31, 2021 and December 31, 2020 the Company did not record an impairment expense.

Digital Currency

Digital currencies are included in current assets in the consolidated balance sheets. Digital currencies are recorded at cost less impairment. They are classified as indefinite-lived intangible assets in accordance with ASC 350, Intangibles — Goodwill and Other, and are accounted for in connection with the Company's revenue recognition policy detailed above and in Note 2 – Summary of Significant Accounting Policies. An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value. In testing for impairment, the Company has the option to first perform a qualitative assessment to determine whether it is more likely than not that an impairment exists. If it is determined that it is not more likely than not that an impairment exists, a quantitative impairment test is not necessary. If the Company concludes otherwise, it is required to perform a quantitative impairment test. Quantitative impairment is measured using the quoted price of the digital currency at the time its fair value is being measured in accordance with ASC 820, Fair Value Measurement. Quoted prices are obtained from the principal market. To the extent an impairment loss is recognized, the loss establishes the new cost basis of the asset. Subsequent reversal of impairment losses is not permitted as per ASC 350, Intangibles – Goodwill and Other.

Digital currencies earned by the Company through its mining activities are included within operating activities on the accompanying consolidated statements of cash flows. The sales of digital currencies are included within investing activities in the accompanying consolidated statements of cash flows and any realized gains or losses from such sales are included in other income (expense) in the consolidated statements of operations and comprehensive income (loss). The Company accounts for its gains or losses in accordance with the first in first out ("FIFO") method of accounting.

The following table presents the activities of the digital currencies for the three months ended December 31, 2021:

| | Amount ($) |
|---|---|
| **Balance as on September 30, 2021** | **23,603,210** |
| Addition of digital currencies | 36,974,578 |
| Sale of digital currencies | (33,965,188) |
| Digital currencies issued for services | (181,658) |
| Realized gain on sale of digital currencies | 9,994,791 |
| Impairment loss | (6,222,346) |
| **Balance as on December 31, 2021** | **30,203,387** |

Fair Value Measurement of financial instruments, derivative asset and contingent consideration

Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value maximize the use of observable inputs and minimize the use of unobservable inputs. The Company utilizes a fair value hierarchy based on three levels of inputs, of which the first two are considered observable and the last unobservable.

Level 1 Quoted prices in active markets for identical assets or liabilities. These are typically obtained from real-time quotes for transactions in active exchange markets involving identical assets.

Level 2 Quoted prices for similar assets and liabilities in active markets; quoted prices included for identical or similar assets and liabilities that are not active; and model-derived valuations in which all significant inputs and significant value drivers are observable in active markets. These are typically obtained from readily-available pricing sources for comparable instruments.

Level 3 Unobservable inputs, where there is little or no market activity for the asset or liability. These inputs reflect the reporting entity's own beliefs about the assumptions that market participants would use in pricing the asset or liability, based on the best information available in the circumstances.

The carrying value of cash, accounts payable and accrued expenses, and debt approximate their fair values because of the short-term nature of these instruments. Management believes the Company is not exposed to significant interest or credit risks arising from these financial instruments.

The following table presents the Company's financial instruments that are measured and recorded at fair value on the Company's balance sheets on a recurring basis, and their level within the fair value hierarchy as of December 31, 2021 and September 30, 2021:

**December 31, 2021:**

|  | Amount ($) | Level 1 ($) | Level 2 ($) | Level 3 ($) |
|---|---|---|---|---|
| Derivative asset | 5,204,505 | - | - | 5,204,505 |
| Investment in equity security | - | - | - | - |
| Investment in debt security | 512,721 | - | - | 512,721 |
| Contingent cash consideration | 615,249 | - | - | 615,249 |
| **Total** | $ 6,332,475 | - | - | 6,332,475 |

**September 30, 2021:**

|  | Amount ($) | Level 1 ($) | Level 2 ($) | Level 3 ($) |
|---|---|---|---|---|
| Derivative asset | 4,905,656 | — | — | 4,905,656 |
| Investment in equity security | 10,772 | 10,772 | — | — |
| Investment in debt security | 494,608 | — | — | 494,608 |
| Contingent cash consideration | 820,802 | — | — | 820,802 |
| **Total** | 6,231,838 | 10,772 | — | 6,221,066 |

There were no transfers between Level 1, 2 or 3 during the three months ended December 31, 2021 and 2020.

Income taxes

The Company's calculation of its tax liabilities involves dealing with uncertainties in the application of complex tax laws and regulations in various taxing jurisdictions. The Company recognizes tax liabilities for uncertain tax positions based on management's estimate of whether it is more likely than not that additional taxes will be required. The Company had no uncertain tax positions as of December 31, 2021 and September 30, 2021.

Deferred income taxes are recognized in the consolidated financial statements for the tax consequences in future years of differences between the tax basis of assets and liabilities and their financial reporting amounts based on enacted tax laws and statutory tax rates. Temporary differences arise from net operating losses, differences in depreciation methods of archived images, and property and equipment, stock-based and other compensation, and other accrued expenses. A valuation allowance is established when it is determined that it is more likely than not that some or all of the deferred tax assets will not be realized.

The application of tax laws and regulations is subject to legal and factual interpretation, judgment and uncertainty. Tax laws and regulations themselves are subject to change as a result of changes in fiscal policy, changes in legislation, the evolution of regulations and court rulings. Therefore, the actual liability for U.S., or the various state jurisdictions, may be materially different from managements estimates, which could result in the need to record additional tax liabilities or potentially reverse previously recorded tax liabilities. Interest and penalties are included in tax expense.

The Company includes interest and penalties arising from the underpayment of income taxes in the statements of operation in the provision for income taxes. As of December 31, 2021 and September 30, 2021, the Company had no accrued interest or penalties related to uncertain tax positions.

F-14

Income tax expense/(benefit) from operations for the three months ended December 31, 2021 and 2020 was $0 in each period, which resulted primarily from maintaining a full valuation allowance against the Company's deferred tax assets.

Reclassifications

Certain prior year amounts have been reclassified for consistency with the current year presentation. These reclassifications had no effect on the reported results of operations or net assets of the Company.

Segment Reporting

Operating segments are defined as components of an enterprise for which separate financial information is available and evaluated regularly by the chief operating decision maker, or decision-making group, in deciding the method to allocate resources and assess performance. The Company has two reportable segments, namely, (1) Digital Currency Mining Segment and (2) Energy Segment.

Recently issued accounting pronouncements

In October 2021, the FASB issued ASU 2021-08, Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers, which requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with ASC 606, Revenue from Contracts with Customers, as if it had originated the contracts. Under the current business combinations guidance, such assets and liabilities are recognized by the acquirer at fair value on the acquisition date. This new guidance is effective for the Company for its fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. Early adoption is permitted, including adoption in an interim period. The Company is evaluating its potential impact but does not expect the new standard to have a material impact on the Company's results of operations or cash flows.

In March 2020, the FASB issued ASU 2020-04, Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting and issued subsequent amendments to the initial guidance (collectively, "Topic 848"). Topic 848 became effective March 12, 2020 and expires on December 31, 2022. Topic 848 allows eligible contracts that are modified to be accounted for as a continuation of those contracts, permits companies to preserve their hedging accounting during the transition period and enables companies to make a one-time election to transfer or sell held-to-maturity debt securities that are affected by rate reform. Topic 848 provides optional expedients and exceptions for contracts, hedging relationships and other transactions that reference the London Inter-Bank Offered Rate ("LIBOR") or another reference rate expected to be discontinued because of reference rate reform if certain criteria are met. The adoption of ASU 2020-04 did not have a material impact on the Company's financial statements or disclosures.

In June 2016, the FASB issued ASU 2016-13, Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments on October 1, 2020 ("ASU 2016-13"). ASU 2016-13 requires entities to use a new forward-looking "expected loss" model that reflects expected credit losses, including credit losses related to trade receivables, and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates, which generally will result in the earlier recognition of allowances for losses. As the Company was a Smaller Reporting Company at the time of issuance of the ASU, the Company expects to adopt the ASU effective October 1, 2023, including the interim periods within the fiscal year. Early application of the adoption is permitted. The Company is evaluating its potential impact but does not expect the new standard to have a material impact on the Company's results of operations or cash flows.

In August 2020, the FASB issued ASU2020-06, "Debt - Debt with Conversion and Other Options (subtopic 470-20) and Derivatives and Hedging - Contracts in Entity's Own Equity (subtopic 815-40)," which reduces the number of accounting models in ASC 470-20 that require separate accounting for embedded conversion features. As a result, a convertible debt instrument will be accounted for as a single liability measured at its amortized cost as long as no other features require bifurcation and recognition as derivatives. By removing those separation models, the effective interest rate of convertible debt instruments will be closer to the coupon interest rate. Further, the diluted net income

F-15

per share calculation for convertible instruments will require the Company to use the if-converted method. The treasury stock method should no longer be used to calculate diluted net income per share for convertible instruments. The amendment will be effective for the Company for fiscal years beginning after December 15, 2021, including interim periods within those fiscal years. Early adoption is permitted, but no earlier than fiscal years beginning after December 15, 2020, including interim periods within those fiscal years. The adoption of ASU 2020-06 did not have a material impact on the Company's financial statements or disclosures.

## 3.  ACQUISITIONS

SOLAR WATT SOLUTIONS, INC.

On February 23, 2021, the Company entered into an Agreement and Plan of Merger (the "SWS Merger Agreement") with Solar Watt Solutions, Inc. ("SWS") and its owners (the "Sellers"). The Company accounted for the acquisition of SWS as an acquisition of a business under ASC 805 – Business Combination.

At the closing on February 24, 2021, SWS became a wholly owned subsidiary of the Company. In exchange, the Company issued (i) 477,703 shares of restricted common stock with a deemed value of $15,640,000 calculated based on the five-day average closing price of the Company's common stock for the trading days including and immediately preceding the closing date of $32.74 per share to the Sellers, of which (a) 167,685 shares with a deemed value of $5,490,000 would be fully earned on closing, and (b) an additional 310,018 shares with a deemed fair value of $10,150,000 were issued to an escrow agent and only earned by Sellers, subject to holdback pending Sellers' satisfaction of certain future milestones with all such shares subject to a lock up of no less than 180 days and a leak out of no more than 10% of average daily trading value of the prior 30 days for a period of 36 months following the closing, and (ii) up to $3,850,000 in cash to the Sellers, minus the Sellers' debt, minus the difference between the Actual Amount and Expected Amount consisting of: (A) $1,350,000 (no changes post acquisition date) in cash payable on a pro rata basis to Sellers at closing, less payment of $500,000 (no changes post acquisition date) to settle Sellers' debt at closing, which includes (I) $200,000 (no changes post acquisition date) in cash was held back by the Company to satisfy potential damages from indemnification claims and any amounts owed pursuant to post-closing adjustments, (II) an additional $100,000 (no changes post acquisition date) in cash was held back by the Company to satisfy any amounts owed pursuant to post-closing adjustments, and (B) up to $2,500,000 (fair valued at $155,000 at acquisition date) in cash held back by the Company and only payable pro rata to Sellers upon meeting certain future milestones and subject to satisfaction of any amounts owing from SWS to the Company resulting from damages required to be indemnified under the SWS Merger Agreement.

The Company determined the fair value of the consideration given to the sellers of SWS in connection with the transaction in accordance with ASC 820 was as follows:

| Consideration: | | Fair Value |
|---|---|---|
| Cash | $ | 1,350,000 |
| Contingent consideration | | 155,000 |
| 310,018 shares of common stock as contingent equity consideration | $ | 533,002 |
| 167,685 shares of common stock | | 4,649,905 |
| Total Consideration | $ | 6,687,907 |

| | Preliminary Allocation at Acquisition Date | | Adjustments to Fair Value | | Final Allocation at Acquisition Date |
|---|---|---|---|---|---|
| Customer List | $ | 5,122,733 | $ (4,932,733) | $ | 190,000 |
| Goodwill | | 1,642,409 | 5,178,126 | | 6,820,535 |
| Other Assets and Liabilities assumed, net | | (77,235) | (245,393) | | (322,628) |
| Total | $ | 6,687,907 | $ — | $ | 6,687,907 |

F-16

The goodwill recorded as result of the acquisition represents the strategic benefits of growing the Company's service portfolio and the expected revenue growth from increased market penetration. Acquired goodwill is not deductible for income tax purposes. The total purchase price was allocated to identifiable assets deemed acquired, and liabilities assumed, based on their estimated fair values.

The amortization period for customer list is estimated to be 1.5 years. The Company estimated the fair value of the identified customer list using a discounted cash flow model. These fair value measurements were based on significant inputs not observable in the market and thus represent a Level 3 measurement. Key assumptions include the level and timing of expected incremental future cash flows over its remaining useful life, and discount rates the Company believe to be consistent with the inherent risks associated with customer list, which is 14%. The Company believes the level and timing of expected future cash flows appropriately reflects market participant assumptions.

The contingent cash consideration was re-measured to $615,249 at December 31, 2021. See Note 15 - Subsequent Events for the final settlement with SWS.

ATL DATA CENTERS, LLC

On December 9, 2020, the Company entered into an Agreement and Plan of Merger (the "ATL Merger") with ATL Data Centers LLC ("ATL") and its members. The Company accounted for the acquisition of ATL as an acquisition
of a business under ASC 805 – Business Combination.

At the closing, ATL became a wholly owned subsidiary of the Company. In exchange, the Company issued 1,618,285 shares of restricted common stock to the selling members of ATL, of which: (i) 642,309 shares were fully earned on closing, and (ii) an additional 975,976 shares were issued and held in escrow, subject to holdback pending satisfaction of certain indemnification claims and future milestones, with all such shares subject to a lock up of no less than 180 days and a leak out of no more than 10% of the average daily trading value of the prior 30 days.

Of the 975,976 shares held in escrow, 515,724 shares were released to the selling members of ATL and 68,194 shares were returned to the Company and canceled due to nonsatisfaction of certain indemnification claims during the year ended September 30, 2021. The remaining 392,058 shares held in escrow consist of 72,989 shares subject to holdback pending satisfaction of further indemnification claims and 319,069 shares subject to satisfaction of future milestones.

In connection with the return of the 68,194 shares held in escrow that were cancelled due to the non-satisfaction of certain indemnification claims, total consideration and the related goodwill, decreased by $892,659 during the year ended September 30, 2021.

The consideration remitted in connection with the ATL Merger is subject to adjustment based on post-closing adjustments to closing cash, indebtedness, and transaction expenses of ATL within 90 days of closing. The Company also assumed approximately $6,900,000 in debts of ATL at closing. As part of the transaction costs, the Company issued 41,708 shares of common stock for an aggregate value of $545,916 to the broker which were expensed upon issuance of the shares.

| Purchase Price Allocation | Preliminary Allocation at Acquisition Date | | Adjustments to Fair Value | | Final Allocation at Acquisition Date |
|---|---|---|---|---|---|
| Strategic Contract | $ | 7,457,970 | $ | 2,342,000 | $ | 9,799,970 |
| Goodwill | | 14,205,245 | | (1,264,167) | | 12,941,078 |
| Other Assets and Liabilities assumed, net | | (479,864) | | (1,077,833) | | (1,557,697) |
| Total | $ | 21,183,351 | $ | — | $ | 21,183,351 |

The Company made measurement period adjustments, primarily to strategic contract and goodwill, to better reflect the facts and circumstances that existed at the acquisition date.

F-17

The goodwill recorded as a result of the acquisition represents the strategic benefits of growing the Company's service portfolio and the expected revenue growth from increased market penetration. Acquired goodwill is not deductible for income tax purposes. The total purchase price was allocated to identifiable assets deemed acquired, and liabilities assumed, based on their estimated fair values.

The strategic contract relates to supply of a critical input to our digital currency mining business. The other assets and liabilities assumed include $5,670,000 of digital currency mining equipment and approximately $5,475,000 of notes payable related to this equipment, which was settled by the Company during the year ended September 30, 2021. In connection with the acquisition, the Company had acquired an operating lease related to a rental building, which had a purchase option associated with the lease agreement. The Company exercised the purchase option to buy the property in May 2021 and, as a result, terminated the lease.

The amortization period for strategic contracts is estimated to be 5 years. The Company estimated the fair value of the identified strategic contract using a discounted cash flow model. These fair value measurements were based on significant inputs not observable in the market and thus represent a Level 3 measurement. Key assumptions include the level and timing of expected future cash flows, conditions and demands over its remaining useful life, and discount rates the Company believe to be consistent with the inherent risks associated with strategic contract, which is 6.4%. The Company believe the level and timing of expected future cash flows appropriately reflects market participant assumptions.

The following is the unaudited pro forma information assuming the acquisition of, ATL and SWS occurred on October 1, 2020:

|  |  | December 31, 2020 |
|---|---|---|
| Net sales | $ | 4,060,029 |
| Net income (loss) |  | (7,759,752) |
| Net profit / (loss) per common share – basic | $ | (0.35) |
| Weighted average common shares outstanding – basic |  | 22,146,992 |
| Net profit / (loss) per common share – diluted | $ | (0.35) |
| Weighted average common shares outstanding – diluted |  | 22,146,992 |

The unaudited pro forma consolidated financial results have been prepared for illustrative purposes only and do not purport to be indicative of the results of operations that would have actually resulted had the acquisition occurred on the first day of the earliest period presented, or of future results of the consolidated entities. The unaudited pro forma consolidated financial information does not reflect any operating efficiencies and cost savings that may be realized from the integration of the acquisition. All transactions that would be considered inter-company transactions for proforma purposes have been eliminated.

## 4.    INVESTMENTS

As of December 31,2021 and September 30, 2021, the Company had total investments of $5,967,226 and $5,661,036, respectively that comprise of the following:

International Land Alliance, Inc.

On November 5, 2019, the Company entered into a binding Memorandum of Understanding (the "MOU") with International Land Alliance, Inc. ("ILAL"), a Wyoming corporation, to lay a foundational framework where the Company will deploy its energy solutions products and services to ILAL, its energy projects, and its customers.

In connection with the MOU, and to support the power and energy needs of ILALs development and construction of certain projects, the Company entered into a Securities Purchase Agreement ("SPA"), dated as of November 6, 2019, with ILAL.

Pursuant to the terms of the SPA with ILAL, the Company purchased 1,000 shares of Series B Preferred Stock of ILAL (the "Preferred Stock") for an aggregate purchase price of $500,000 (the "Stock Transaction"), less certain expenses and fees. The Series B Preferred Stock accrue cumulative in-kind accruals at a rate of 12% per annum and

F-18

were redeemable on August 6, 2020. The Preferred Stock can be converted into common stock at a variable rate (refer the discussion on embedded derivative assets below). This variable conversion ratio will increase by 10% with the occurrence of certain events. Since the investments were not redeemed on August 6, 2020, they are now redeemable at the Company`s option in cash or into common stock, based on the conversion ratio. The Preferred Stock is recorded as an AFS debt security and is reported at its estimated fair value as of December 31, 2021. Any change in the fair values of AFS debt securities are reported net of income tax as an element of Other Comprehensive income.

The Company accrued interest on our available-for-sale debt securities totaling $432,219 and $399,863, as of December 31, 2021 and September 30, 2021, respectively, presented as prepaid expense and other current assets on the Consolidated Balance Sheets. The fair value of investment in Debt Securities is $512,721 and $494,608 as of December 31, 2021 and September 30, 2021, respectively. The Company has included gain on change in fair value of preferred stock amounting to $18,113 and $5,392 for the three month period ended December 31, 2021 and for the year end September 30, 2021, respectively, as part of other comprehensive loss in the Consolidated Statements of Operations and Comprehensive Income (Loss).

The Company has deemed this variable conversion feature of ILAL preferred stock as an embedded derivative instrument in accordance with ASC Topic No. 815. This topic requires the Company to account for the conversion feature on its balance sheet at fair value and account for changes in fair value as a derivative gain or loss. Unrealized gain or loss on fair valuation of this embedded feature is recognized as an income in Consolidated statements of Operations and Comprehensive Income (Loss).

Total fair value of investment in derivative assets as of December 31, 2021 and September 30, 2021, respectively was $5,204,505 and $4,905,656. The Company fair values the debt security as a straight debt instrument based on liquidation value and accrued interest to date. The fair value of the derivative asset is based on the difference in the fair value of the debt security determined as a straight debt instrument and the fair value of the debt security if converted as of the reporting date.

The following table sets forth a reconciliation of carrying value of all investments as of December 31, 2021 and September 2020:

| | ILAL Debt Securities | | ILAL Derivative Asset | | ILAL Equity Securities | | Law Clerk Equity Securities | |
|---|---|---|---|---|---|---|---|---|
| Balance as of September 30, 2021 | $ | 494,608 | $ | 4,905,656 | $ | 10,772 | $ | 250,000 |
| Shares sold during the year | | — | | — | | (9,590 ) | | — |
| Realized loss on fair value recognized income in other income/expense | | — | | — | | (1,182 ) | | — |
| Unrealized gain recognized in net income in other income/expense | | — | | 298,849 | | — | | — |
| Unrealized gain on fair value recognized in other comprehensive income | | 18,113 | | — | | — | | — |
| Balance as of December 31, 2021 | $ | 512,721 | $ | 5,204,505 | $ | — | $ | 250,000 |

F-19

5.   **INTANGIBLE ASSETS**

Intangible assets consist of the following as of December 31, 2021 and September 30, 2021:

|  | December 31, 2021 | | | | | |
|---|---|---|---|---|---|---|
|  | | Intangible assets | | Accumulated amortization | | Total |
| Patents | $ | 74,112 | $ | 29,294 | $ | 44,818 |
| Websites | | 8,115 | | 8,115 | | - |
| Customer list and non-compete agreement | | 6,892,024 | | 5,456,881 | | 1,435,143 |
| Design assets | | 123,000 | | 123,000 | | - |
| Trademarks | | 5,928 | | 2,343 | | 3,585 |
| Engineering trade secrets | | 4,370,269 | | 3,086,755 | | 1,283,514 |
| Software | | 870,000 | | 373,492 | | 496,508 |
| Strategic Contract | | 9,799,970 | | 2,067,097 | | 7,732,873 |
| mPulse software | | 741,846 | | 264,654 | | 477,192 |
| Total | $ | 22,885,264 | $ | 11,411,631 | $ | 11,473,633 |

|  | September 30, 2021 | | | | | |
|---|---|---|---|---|---|---|
|  | | Intangible assets | | Accumulated amortization | | Total |
| Patents | $ | 74,112 | $ | 28,329 | $ | 45,783 |
| Websites | | 8,115 | | 8,115 | | — |
| Customer list and non-compete agreement | | 6,892,024 | | 4,940,456 | | 1,951,568 |
| Design assets | | 123,000 | | 123,000 | | — |
| Trademarks | | 5,928 | | 2,236 | | 3,692 |
| Engineering trade secrets | | 4,370,269 | | 2,943,173 | | 1,427,096 |
| Software | | 870,000 | | 325,519 | | 544,481 |
| Strategic Contract | | 9,799,970 | | 1,577,098 | | 8,222,872 |
| mPulse software | | 741,846 | | 238,161 | | 503,685 |
| Total | $ | 22,885,264 | $ | 10,186,087 | $ | 12,699,177 |

Amortization expense for the three months ended December 31, 2021 and 2020 was $1,225,544 and $816,587, respectively.

The Company expects to record amortization expense of intangible assets over the next 5 years and thereafter as follows:

| Year | December 31, 2021 |
|---|---|
| 2022 | 3,363,558 |
| 2023 | 2,978,810 |
| 2024 | 2,565,998 |
| 2025 | 2,070,327 |
| 2026 | 493,229 |
| Thereafter | 1,710 |
| | 11,473,632 |

F-20

## 6.  PROPERTY AND EQUIPMENT

Property and equipment consist of the following:

| | December 31, | September 30, |
|---|---|---|
| | **2021** | **2021** |
| Mining equipment | 187,132,309 | 123,147,843 |
| Land and building | 11,048,299 | 11,048,299 |
| Machinery and equipment | 399,530 | 376,163 |
| Leasehold improvements | 119,796 | 72,577 |
| Furniture and fixtures | 157,629 | 107,660 |
| Infrastructure | 2,919,278 | 81,868 |
| Construction in progress | 10,710,205 | 10,498,311 |
| Total | 212,487,046 | 145,332,721 |
| Less: accumulated depreciation | (13,996,691) | (7,657,982) |
| Property and equipment, net | $     198,490,355 | $     137,674,739 |

Depreciation expense for three months ended December 31, 2021 and 2020 was $6,472,023 and $301,128, respectively. For the three months ended December 31, 2021, $411,484 of property and equipment was written-off resulting in a loss of $278,170. There were no disposals during the three months ended December 31, 2020.

The Company placed-in service mining equipment for approximately $64,741,433 during the three months ended December 31, 2021. This primarily consisted of miners of $62,634,807, with the remaining consisting of ancillary mining equipment.

*Construction in progress:* The Company is expanding its facility in Atlanta, a build out adjacent to the ATL data center mentioned above.

As of December 31, 2021, the Company has outstanding deposits worth $125,700,523 to premier suppliers and manufacturers for securing our purchases of mining equipment.

## 7.  LEASES

On October 1, 2019, the Company adopted the amendments to ASC 842, Leases, which requires lessees to recognize lease assets and liabilities arising from operating leases on the balance sheet. The Company adopted the new lease guidance using the modified retrospective approach and elected the transition option issued under ASU 2018-11, Leases (Topic 842) Targeted Improvements, allowing entities to continue to apply the legacy guidance in ASC 840, Leases, to prior periods, including disclosure requirements.

The Company's operating leases are office spaces and finance leases primarily in relation to the equipment used at its data center.

The Company's lease costs recognized during the three months ended December 31, 2021 and 2020 in the Consolidated Statements of Operations and Comprehensive Income (Loss) consist of the following:

| | December 31, | December 31, |
|---|---|---|
| | **2021** | **2020** |
| Operating lease cost [1] | $     83,237 | 117,223 |
| Finance lease cost: | | |
| Amortization of right-of-use assets | 94,815 | 21,748 |
| Interest on lease obligations | $     11,387 | 3,578 |

(1) Included in general and administrative expenses

Other lease information is as follows:

| | | December 31, 2021 | | December 31, 2020 |
|---|---|---|---|---|
| Cash paid for amounts included in measurement of lease obligations: | | | | |
| Operating cash flows from operating leases | $ | 94,262 | $ | — |
| Financing cash flows from finance leases | $ | 103,032 | $ | 23,665 |

| | December 31, 2021 | September 30, 2021 |
|---|---|---|
| Weighted-average remaining lease term - operating leases | 4.79 years | 5 years |
| Weighted-average remaining lease term - finance leases | 2.03 years | 3.2 years |
| Weighted-average discount rate - operating leases | 4.50% | 4.50% |
| Weighted-average discount rate - finance leases | 5.50% | 5.50% |

The following is a schedule of the Company's lease liabilities by contractual maturity as of December 31, 2021:

| Fiscal Year | | Operating Leases | | Finance Leases |
|---|---|---|---|---|
| 2022 | $ | 238,019 | $ | 358,855 |
| 2023 | | 324,948 | | 321,887 |
| 2024 | | 333,234 | | 142,428 |
| 2025 | | 341,767 | | 12,320 |
| 2026 | | 299,039 | | 1,853 |
| Thereafter | | 50,659 | | - |
| Gross lease liabilities | | 1,587,666 | | 837,343 |
| Less: imputed interest | | (158,786) | | (51,052) |
| Present value of lease liabilities | $ | 1,428,880 | $ | 786,291 |
| Less: Current portion of lease liabilities | | (261,101) | | (366,728) |
| Total lease liabilities, net of current portion | $ | 1,167,779 | $ | 419,563 |

## 8. RELATED PARTY TRANSACTIONS

*Zachary K. Bradford - Chief Executive Officer and Director*

During the three months ended December 31, 2021 and 2020, the Company paid Blue Chip Accounting, LLC ("Blue Chip") $47,000 and $30,000, respectively, for accounting, tax, administrative services and reimbursement for office supplies. Blue Chip is 50% beneficially owned by Mr. Bradford. None of the services were associated with work performed by Mr. Bradford. The services consisted of preparing and filing tax returns, bookkeeping, accounting and administrative support assistance. The Company also sub-leases office space from Blue Chip. During the three months ended December 31, 2021 and 2020, $4,575 and $4,575, respectively, was paid to Blue Chip for rent. The sublease and engagement for accounting services was terminated December 31, 2021.

## 9.   STOCKHOLDERS' EQUITY

Overview

The Company's authorized capital stock consists of 100,000,000 shares of common stock and 10,000,000 shares of preferred stock, par value $0.001 per share. As of December 31, 2021, there were 41,474,062 shares of common stock issued and outstanding and 1,750,000 shares of preferred stock issued and outstanding. As of September 30, 2021,

there were 37,395,945 shares of common stock issued and outstanding and 1,750,000 shares of preferred stock issued and outstanding.

Common Stock issuances during the three months ended December 31, 2021

The Company issued 52,061 common shares in relation to exercise of options.

The Company issued 8,404 common shares valued at $150,011 for settlement of contingent consideration related to business acquisition.

The Company issued 4,017,652 common shares in relation to equity raises through its At-the-Market offering facility, net of offering costs, for net proceeds of $67,988,993.

Common stock returned during the three months ended December 31, 2021

The Company did not have any common shares returned during the three months ended December 31, 2021.

10.  STOCK WARRANTS

The following is a summary of stock warrant activity during the three months ended December 31, 2021:

| | Number of Warrant Shares | Weighted Average Exercise Price ($) |
|---|---|---|
| Balance, September 30, 2021 | 615,704 | 30.72 |
| Warrants granted | — | — |
| Warrants expired | (183,334) | 40.91 |
| Warrants canceled | — | — |
| Warrants exercised | — | — |
| Balance, December 31, 2021 | 432,370 | 26.39 |

As of December 31, 2021, there are warrants exercisable to purchase 432,370 shares of common stock in the Company and there are no warrants that are unvested. As of December 31, 2021, the outstanding warrants have a weighted average remaining term of 1.86 years and an intrinsic value of $184,735.

During the three months ended December 31, 2021, there were no exercise of warrants.

11.  STOCK-BASED COMPENSATION

The Company sponsors a stock-based incentive compensation plan known as the 2017 Incentive Plan (the "Plan"), which was established by the Board of Directors of the Company on June 19, 2017. On October 7, 2020, the Company executed a first amendment to the Plan to increase its share pool from 300,000 to 1,500,000 shares of common stock.

Effective September 15, 2021, following approval by our stockholders, the Plan was amended to (i) increase the number of shares of common stock authorized for issuance under the Plan by an additional 2,000,000 shares, resulting in an aggregate of 3,500,000 shares of common stock authorized for issuance under the Plan, and (ii) revise Section 19 of the Plan to more closely align with the provisions of Section 422 of the Internal Revenue Code of 1986, as amended, and Section 17.2 of the Plan.

As of December 31, 2021, there were 211,725 shares available for issuance under the Plan.

The Plan allows the Company to grant incentive stock options, non-qualified stock options, stock appreciation rights, common stock, units of common stock, restricted stock, performance shares and performance units. Other than incentive stock options that are granted to participants who owns more than 10% of the total combined voting power of all classes of the stock of the Company or of its parent or subsidiary corporations (a "Ten Percent Stockholder"),

F-23

stock options are exercisable for up to ten years, at an option price per share not less than the fair market value on the date the option is granted. The incentive stock options are limited to persons who are regular full-time employees of the Company or Ten Percent Stockholders at the date of the grant of the option. Non-qualified stock options and the other types of awards issuable under the Plan may be granted to any person, including, but not limited to, employees, independent agents, consultants and attorneys, who the Company's Compensation Committee believes have contributed, or will contribute, to the success of the Company. The option vesting schedule for options granted is determined by the Compensation Committee at the time of the grant. The Plan provides for accelerated vesting of unvested options if there is a change in control, as defined in the Plan.

As of December 31, 2021, no non-qualified options were granted pursuant to the Plan.

The Company recognized $5,749,107 and $932,040 for the three months ended December 31, 2021 and December 31, 2020, respectively, in stock-based compensation under the stock-based incentive compensation plan.

## STOCK OPTIONS

The following is a summary of stock option activity during the three months ended December 31, 2021:

| | Number of Option Shares | Weighted Average Exercise Price ($) |
|---|---|---|
| Balance, September 30, 2021 | 1,547,029 | 18.35 |
| Options granted | 64,000 | 20.48 |
| Options expired | (487) | 35.05 |
| Options canceled | (60,494) | 19.51 |
| Options exercised | (52,061) | 5.41 |
| Balance, December 31, 2021 | 1,497,987 | 18.98 |

As of December 31, 2021, there are options exercisable to purchase 616,052 shares of common stock in the Company and 915,885 unvested options outstanding that cannot be exercised until vesting conditions are met. As of December 31, 2021, the outstanding options have a weighted average remaining term of 1.74 years and an intrinsic value of $682,294.

During the three months ended December 31, 2021, a total of 52,061 shares of the Company's common stock were issued in connection with the exercise of 52,061 common stock options at exercise prices ranging from $3.63 to $8.07, for a total consideration of $281,616. The Company also granted 64,000 options with a total fair value of $1,291,616 to purchase shares of common stock to employees.

The Black-Scholes model utilized the following inputs to value the options granted during the three months ended December 31, 2021:

| Fair value assumptions Options: | December 31, 2021 |
|---|---|
| Risk free interest rate | 1.04% |
| Expected term (years) | 5.50 |
| Expected volatility | 407% |
| Expected dividends | 0% |

As of December 31, 2021, the Company expects to recognize $14,873,047 of stock-based compensation for the non-vested outstanding options over a weighted-average period of 2.19 years.

## RESTRICTED STOCK UNITS

The Company grants RSUs that contain (a) service conditions, (b) performance conditions, or (c) market performance conditions. RSUs containing service conditions vest monthly or annually. RSUs containing performance conditions generally vest over 1 year, and the number of shares earned depends on the achievement of predetermined Company metrics.

F-24

When the criteria for vesting is met, the Company recognizes the expense equal to the total fair value of the common stock price on the grant date. All of the RSUs issued prior to September 30, 2021 were either vested or forfeited and cancelled.

The following table summarizes the performance-based restricted stock units at the maximum award amounts based upon the respective performance share agreements. Actual shares that will vest depend on the attainment of the performance-based criteria.

| | Number of Shares | | Weighted Average Fair Value Per Share | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| Outstanding at September 30, 2021 | 10,995 | $ | 27.73 | $ | 127,432 |
| Granted | 1,100,250 | | 14.70 | | 10,474,380 |
| Vested | (22,635) | | 23.44 | | 624,283 |
| Forfeited | (20,750) | | 20.48 | | 197,540 |
| Outstanding at December 31, 2021 | 1,067,860 | $ | 14.56 | $ | 10,127,922 |

During the three months ended December 31, 2021, the Company granted 870,000 RSUs that will vest based on market conditions. 60,000 of these RSUs do not have a stated service period, and therefore, is given a derived service period of 5 years. The remaining 810,000 RSUs have a stated service period of 1 year. The fair value of the market based RSUs are determined using the Monte Carlo simulation and is in the following range: $11.03 - $17.89 per unit. The risk free rate, volatility, expected term, and cost of equity of these market based RSUs are as follows: 0.14-1.26%, 111.37-172.18%, 1-5 years, and 20.00-21.00%.

As of December 31, 2021, the Company had $12,196,920 unrecognized compensation cost related to RSU awards that will be recognized over a weighted average period of 1.01 years.

## 12.   COMMITMENTS AND CONTINGENCIES

The Company has purchase commitments that are cancellable of approximately $170,000,000 related to purchase of miners as of December 31, 2021, and the Company has paid approximately $124,300,000 towards these commitments as of the end of this period. As of December 31, 2021, the remaining commitment for future payments was approximately $45,700,000.

The Company has purchase commitments for mining related equipment of approximately $4,272,333 as of December 31, 2021 and the Company has paid $1,769,930 towards these commitments as of end of this period.

The following table sets forth certain information concerning our obligations to make contractual future payments towards our agreements as of December 31, 2021:

| | | 2022 | | 2023 | | 2024 | | 2025 | | 2026 | | Thereafter | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Recorded contractual obligations:** | | | | | | | | | | | | | | |
| Operating lease obligations | $ | 238,015 | $ | 324,949 | $ | 333,234 | $ | 341,767 | $ | 299,039 | $ | 50,662 | $ | 238,019 |
| Finance Lease obligations | $ | 312,303 | $ | 321,887 | $ | 179,572 | $ | 21,728 | $ | 1,853 | | | $ | 358,855 |
| Mining equipment | $ | 45,646,618 | | | | | | | | | | | $ | 45,646,618 |
| Mining operations related equipment | $ | 2,502,403 | | | | | | | | | | | $ | 2,502,403 |
| Total | $ | 48,699,339 | $ | 646,836 | $ | 512,806 | $ | 363,495 | $ | 300,892 | $ | 50,662 | $ | 48,745,895 |

Contingent consideration

GridFabric: On August 31, 2020, the Company acquired GridFabric, LLC. Pursuant to the terms of the purchase agreement, additional shares of the Company's common stock valued at up to $750,000 were issuable if GridFabric

achieves certain revenue and product release milestones. On September 30, 2021, the contingent consideration was re-measured to $500,000.

During the three months ended December 31, 2021, the Company settled all contingent consideration due to GridFabric resulting in a payment of 8,404 shares of common stock valued at $150,000.

Solar Watt Solutions: On February 24, 2021, the Company acquired Solar Watt Solutions, Inc. Pursuant to the terms of the purchase agreement, additional cash consideration of up to $2,500,000 (fair valued at $155,000 at acquisition date) in cash held back by the Company and only payable pro rata to Sellers upon meeting certain future milestones and subject to satisfaction of any amounts owing from SWS to the Company resulting from damages required to be indemnified under the SWS Merger Agreement. The contingent cash consideration was re-measured to $615,249 at December 31, 2021.

On January 31, 2022, the Company settled all contingent consideration due to the SWS sellers, resulting in a payment of $625,000, 77,500 shares of common stock released out of escrow to the SWS sellers, and SWS sellers releasing 232,518 shares of common stock back the Company.

Legal contingencies

From time to time we may be subject to litigation arising in the ordinary course of business. The Company accrues a liability when a loss is considered probable and the amount can be reasonably estimated. When a material loss contingency is reasonably possible but not probable, the Company does not record a liability, but instead discloses the nature and the amount of the claim, and an estimate of the loss or range of loss, if such an estimate can be made. Legal fees are expensed as incurred. Based on the opinion of legal counsel and other factors, management believes that the final disposition of these existing matters will not have a material adverse effect on the business, results of operations, financial condition, or cash flows of the Company. The Company has identified certain claims as a result of which a loss may be incurred, but in the aggregate the loss is expected to be insignificant. This assessment is based on our current understanding of relevant facts and circumstances. As such, our view of these matters is subject to inherent uncertainties and may change in the future. Significant judgment is required in both the determination of probability and the determination as to whether an exposure is reasonably estimable. Actual outcomes of these legal and regulatory proceedings may materially differ from our current estimates. For other claims regarding proceedings that are in an initial phase, the Company is unable to estimate the range of possible loss, if any, but at this time believes that any loss related to such claims will not be material. Risks associated with legal liability are difficult to assess and quantify, and their existence and magnitude can remain unknown for significant periods of time. We maintain liability insurance to reduce such risk exposure to the Company. Despite the measures taken, such policies may not cover future litigation, or the damages claimed may exceed our coverage which could result in contingent liabilities.

**Bishins v. CleanSpark, Inc. et al.**

On January 20, 2021, Scott Bishins ("Bishins"), individually, and on behalf of all others similarly situated (together, the "Class"), filed a class action complaint (the "Class Complaint") in the United States District Court for the Southern District of New York against the Company, its Chief Executive Officer, Zachary Bradford ("Bradford"), and its Chief Financial Officer, Lori Love ("Love") (the "Class Action"). The Class Complaint alleges that, between December 31, 2020 and January 14, 2021, the Company, Bradford, and Love "failed to disclose to investors: (1) that the Company had overstated its customer and contract figures; (2) that several of the Company's recent acquisitions involved undisclosed related party transactions; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis." (the "Class Allegations"). The Class Complaint seeks: (a) certification of the Class, (b) an award of compensatory damages to the Class, and (c) an award of reasonable costs and expenses incurred by the Class in the litigation. To date, no class has been certified in the Class Action. On December 2, 2021, the Court appointed Darshan Hasthantra as lead Plaintiff, and Glancy, Prongay and Murray LLP as class counsel. Hasthantra now has until February 14, 2022, to file an amended complaint, and the Company is permitted to file its Motion to Dismiss by April 14, 2022.

Although the ultimate outcome of the Class Action cannot be determined with certainty, the Company stands behind all of its prior statements and disclosures and believes that the claims raised in the Class Complaint are entirely without

F-26

merit. The Company intends to both defend itself vigorously against these claims and to vigorously prosecute any counterclaims.

Notwithstanding the Class Allegations' lack of merit, however, the Class Action may distract the Company and cost the Company's management time, effort and expense to defend against the claims made in the Class Complaint. Notwithstanding the Company's belief that the Company and its management have complied with all of their obligations under applicable securities regulations, no assurance can be given as to the outcome of the Class Action, and in the event the Company does not prevail in such action, the Company, its business, financial condition and results of operations could be materially and adversely affected.

**Ciceri, derivatively on behalf of CleanSpark, Inc., v. Bradford, Love, Schultz, Beynon, McNeill, and Wood (consolidated with Perna, derivatively on behalf of CleanSpark, Inc., v. Bradford, Love, Schultz, Beynon, McNeill, and Wood)**

On May 26, 2021, Andrea Ciceri ("Ciceri"), derivatively on behalf of CleanSpark, Inc., filed a verified shareholder derivative action (the "Ciceri Derivative Action") in the United States District Court in the District of Nevada against Chief Executive Officer, Zachary Bradford ("Bradford"), Chief Financial Officer, Lori Love ("Love") and Directors Matthew Schultz, Roger Beynon, Larry McNeill and Tom Wood (Bradford, Love and Directors collectively referred to as "Defendants.") On June 22, 2021, Mark Perna ("Perna") (Ciceri, Perna, and Defendants collectively referred to as the "Parties") filed a verified shareholder derivative action (the "Perna Derivative Action") in the same Court against the same Defendants making substantially similar allegations. On June 29, 2021, the court consolidated the Ciceri Derivative Action with the Perna Derivative Action in accordance with a stipulation among the parties (the consolidated case referred to as the "Derivative Action"). The Derivative Action alleges that Defendants: (1) made materially false and misleading public statements about the Company's business and prospects; (2) did not maintain adequate internal controls; and (3) did not disclose several related party transactions benefitting insiders, questionable uses of corporate assets, and excessive compensation. The claims asserted against all Defendants include breach of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. A claim for contribution under Sections 10(b) and 21D of the Securities and Exchange Act is asserted against only Bradford and Love. The Derivative Action seeks declaratory relief, monetary damages, and imposition of adequate corporate governance and internal controls. Plaintiffs were given the opportunity to submit an Amended Complaint by November 25, 2021, but elected not to. In January 2022, the Parties agreed to stay the entirety of the case pending the outcome of the Motion to Dismiss in the Class Action. Any of the Parties may also terminate the stay on 20 days' notice.

Although the ultimate outcome of the Derivative Action cannot be determined with certainty, the Company stands behind all of its prior statements and disclosures, and believes that the claims raised in that case are entirely without merit. The Company intends to both defend itself vigorously against these claims and to vigorously prosecute any counterclaims.

Notwithstanding the Derivative Action's lack of merit, however, it may distract the Company and cost the Company's management time, effort and expense to defend against the claims. Notwithstanding the Company's belief that the Company and its management have complied with all of their obligations under applicable securities regulations, no assurance can be given as to the outcome of the Derivative Action, and in the event the Company does not prevail in such action, the Company, its business, financial condition and results of operations could be materially and adversely affected.

## 13.  MAJOR CUSTOMERS AND VENDORS

*Digital Currency Mining Segment*

For the three months ended December 31, 2021 and 2020, the digital currency mining business had the following customers that represented more than 10% of revenue. For these purposes customers are defined as the Company's mining pool operators.

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Mining Pool Operator A | 99.87% | — |
| Mining Pool Operator B | 0.13% | 100.00% |

For the three months ended December 31, 2021 and 2020, the Company had the following significant suppliers of mining equipment.

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Vendor A | 67.93% | 0.00% |
| Vendor B | 32.07% | 0.00% |

At December 31, 2020, all mining equipment the Company had was from the ATL acquisition.

*Energy Segment*

For the three months ended December 31, 2021 and 2020, the energy business had the following customers that represented more than 10% of revenue.

| Major Customer | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Customer A | 21.40% | 36.68% |
| Customer B | 11.08% | 0.00% |
| Customer C | 0.00% | 10.35% |

For the three months ended December 31, 2021 and 2020, the Company had the following suppliers that represented more than 10% of direct material costs.

| Major Vendor | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Vendor A | 10.70% | 57.82% |
| Vendor B | — | 16.30% |

## 14.  SEGMENT REPORTING

We disclose segment information that is consistent with the way in which management operates and views the business. Our operating structure contains two reportable segments: Digital Currency and Energy. The Company measures the results of its segments using, among other measures, each segment's sales and operating income, which includes certain corporate overhead allocations.

**Digital Currency:** This segment consists of operations related to Bitcoin mining. The Company provides computing power through ATL Data Centers LLC and CleanBlok Inc. to the mining pools. This segment also includes operation related to maintenance of real property holdings for company purposes through CSRE properties Norcross LLC and CSRE properties LLC. This segment revenue represents fractional share of the fixed cryptocurrency award received from the mining pool operator in exchange of computing power.

**Energy:** This segment provides services, equipment, and software to the energy industry. This segment includes revenue from providing engineering and construction services, selling equipment such as residential battery, residential solar, commercial solar and non-customized equipment and providing access to its energy software offerings and software license sales and support services.

**Other Revenue and Eliminations:** This includes revenue from providing design, software development, and other technology-based consulting services through p2k Labs and data center services through ATL Data Center. Corporate items and eliminations consist of corporate overhead and other items not allocated to any of the Company's segments

F-28

as in the table below. Intersegment transactions, which were at market price, are included in the "Other revenue and eliminations" and "Corporate items and eliminations" in the table below.

|  | | December 31, 2021 | | December 31, 2020 |
|---|---|---|---|---|
| Revenue | | | | |
| Energy | $ | 3,970,210 | $ | 1,213,870 |
| Digital Currency Mining | $ | 36,974,578 | | 733,410 |
| Total segment revenues | | 40,944,788 | | 1,947,280 |
| Other revenue and eliminations | | 297,181 | | 310,290 |
| Consolidated Revenues | | 41,241,969 | | 2,257,570 |
| Profit | | | | |
| Energy | $ | 986,240 | $ | 173,184 |
| Digital Currency Mining | | 31,332,990 | $ | 560,209 |
| Total segment profit/(loss) | | 32,319,230 | | 733,393 |
| Corporate items and eliminations (including depreciation and amortization) | $ | (17,833,475) | $ | (7,900,923) |
| Net income/(loss) | $ | 14,485,755 | $ | (7,167,530) |

For details on major customers of Digital currency and Energy segment, see Note 13.

A summary of segment assets is as follows:

|  | | December 31, 2021 | | September 30, 2021 |
|---|---|---|---|---|
| Digital Currency Mining | $ | 349,331,100 | $ | 270,995,942 |
| Energy | | 22,733,365 | | 17,507,314 |
| Other and Corporate assets | | 46,080,306 | | 28,969,865 |
| **Total** | $ | **418,144,771** | $ | **317,473,117** |

The Company operates its business only in the United States.

Total additions in long-lived assets for the three months ended December 31, 2021 and 2020:

|  | | December 31, 2021 | | | | | December 31, 2020 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | | Digital Currency | | Energy | | Corporate | | Digital Currency | | Energy | | Corporate |
| Property Plant and Equipment | $ | 67,018,388 | $ | 135,936 | $ | 0 | $ | 6,570,869 | $ | 18,109 | $ | 972 |
| Intangibles | | - | | - | | - | $ | 7,457,970 | | - | | - |
| Capitalized software | | - | | - | | - | | - | | - | | - |
| Total | $ | 67,018,388 | $ | 135,936 | $ | — | $ | 14,028,839 | $ | 18,109 | $ | 972 |

## 15.  SUBSEQUENT EVENTS

We have evaluated events occurring between the end of the most recent fiscal period and the date the financial statements were issued through February 9, 2022. There were no material subsequent events except as disclosed below:

F-29

*Solar Watt Solutions, Inc.*

On January 31, 2022, the Company entered into a Merger Satisfaction and Release Agreement (the "Merger Satisfaction Agreement") with Sellers of SWS. In consideration of fully satisfying the previously agreed milestone, the Company will pay Sellers $625,000 and release from escrow 77,500 shares of the Company's common stock. Additionally, the Sellers will agree to release back to the Company 232,518 shares of the Company's common stock held in escrow. Upon delivery of such consideration, the parties agree the milestones contained in the original merger agreement will have been fully satisfied.

<div align="center">F-30</div>

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of our financial condition and results of operations should be read together with the interim condensed consolidated financial statements and related notes included elsewhere in this Quarterly Report on Form 10-Q, as well as our audited consolidated financial statements and related notes as disclosed in our Annual Report on Form 10-K for the fiscal year ended September 30, 2021. This discussion contains forward-looking statements based upon current expectations that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under Part II, Item 1A "Risk Factors" or in other parts of this Quarterly Report on Form 10-Q, as well as those identified in the "Risk Factors" section of our Annual Report on Form 10-K for the fiscal year ended September 30, 2021. Our historical results are not necessarily indicative of the results that may be expected for any period in the future. See "Forward-Looking Statements."*

**Company Overview**

CleanSpark, Inc. is a leading bitcoin mining and diversified energy company incorporated in Nevada, whose common stock is listed on the Nasdaq Capital Market. We sustainably mine bitcoin; we also provide advanced energy technology solutions to commercial and residential customers to solve modern energy challenges. The Company, through itself and its wholly owned subsidiaries, has operated in the digital currency mining sector since December 2020, and in the alternative energy sector since March 2014.

We are currently working with industry leaders and other advisors in developing a long-term sustainability and clean energy plan. We are also using all available clean and renewable energy resources that we currently have reasonable access to in all of our bitcoin mining locations in order to further support our sustainability efforts.

**Lines of Business**

*Digital Currency Mining Segment*

Through our wholly owned subsidiaries, ATL Data Centers LLC ("ATL") and CleanBlok, Inc. ("CleanBlok"), we mine bitcoin. We entered the bitcoin mining industry through our acquisition of ATL in December 2020. We acquired a second data center in August 2021 and have had a co-location agreement with New York-based Coinmint in place since July 2021. Bitcoin mining has now become our principal revenue generating business activity. We currently intend to continue to acquire additional facilities, equipment and infrastructure capacity to continue to expand our bitcoin mining operations.

Bitcoin was introduced in 2008 with the goal of serving as a digital means of exchanging and storing value. Bitcoin is a form of digital currency that depends upon a consensus-based network and a public ledger called a "blockchain," which contains a record of every bitcoin transaction ever processed. The bitcoin network is the first decentralized peer-to-peer payment network, powered by users participating in the consensus protocol, with no central authority or middlemen, that has wide network participation. The authenticity of each bitcoin transaction is protected through digital signatures that correspond with addresses of users that send and receive bitcoin. Users have full control over remitting bitcoin from their own sending addresses. All transactions on the bitcoin blockchain are transparent, allowing those running the appropriate software to confirm the validity of each transaction. To be recorded on the blockchain, each bitcoin transaction is validated through a proof-of-work consensus method, which entails solving complex mathematical problems to validate transactions and post them on the blockchain. This process is called mining. Miners are rewarded with bitcoins, both in the form of newly-created bitcoins and fees in bitcoin, for successfully solving the mathematical problems and providing computing power to the network.

Factors such as access to computer processing capacity, interconnectivity, electricity cost, environmental factors (such as cooling capacity) and location play important roles in mining. As of the date of this filing, our mining units are currently capable of producing over 2.0 exahash per second ("EH/s") in hash rate capacity. In cryptocurrency mining, "hash rate" is a measure of the processing capacity and speed by which a mining computer mines and processes transactions on the bitcoin network. Our activities in this area are complemented by our energy background and

4

planning is underway to deploy our portfolio of energy technologies to advance our bitcoin mining business, with the goal of maximizing energy savings, increasing total power capacity, providing resilient electricity, and reducing greenhouse gas emissions. We are expanding our bitcoin mining business with the goal of reaching 4.0 EH/s in hash rate capacity at or near the end of December 31, 2022. We expect to exceed 3 EH/s in capacity at or near the end of September 31, 2022. Hash rate capacity is one of the most important metrics for evaluating bitcoin mining companies.

We obtain bitcoin as a result of our mining operations; while we retain a significant portion of the bitcoin, we have sold, and intend to sell bitcoin from time to time, to support our operations and strategic growth. We do not currently plan to engage in regular trading of bitcoin (other than as necessary to convert our bitcoin to U.S. dollars) or to engage in hedging activities related to our holding of bitcoin; however, our decisions to hold or sell bitcoin at any given time may be impacted by the bitcoin market, which has been historically characterized by significant volatility. Currently, we do not use a formula or specific methodology to determine whether or when we will sell bitcoin that we hold, or the number of bitcoins we will sell. Rather, decisions to hold or sell bitcoins are currently determined by analyzing forecasts and monitoring the market in real time.

Through our recently formed wholly owned subsidiaries, CSRE Properties, LLC, CSRE Property Management Company LLC, and CSRE Properties Norcross, LLC, we maintain real property holdings for ATL and CleanBlok.

*Energy Segment*

We provide energy solutions through our wholly-owned subsidiaries CleanSpark, LLC, CleanSpark Critical Power Systems, Inc., GridFabric, LLC, and Solar Watt Solutions, Inc. These solutions consist of engineering, design and software solutions, custom hardware solutions, Open Automated Demand response ("OpenADR"), solar, energy storage for microgrid and distributed energy systems to military, commercial and residential customers in Southern California and through the world.

Our solutions are supported by our proprietary suite of software platforms (collectively, the "Platforms") that include microgrid energy modeling, energy market communications and energy management solutions as summarized below:

- **mPulse and mVoult:** Patented, proprietary controls platforms that enable integration and optimization of multiple energy sources.

- **Canvas:** Middleware used by grid operators and aggregators to administrate load shifting programs.

- **Plaid:** Middleware used by controls and IoT (internet-of-things) product companies to participate in load shifting programs.

- **mVSO:** Energy modeling software for internal microgrid design .

The Platforms were developed to enable the designing, building, and operating of distributed energy systems and microgrids which efficiently manage energy assets. These strategies are generally targeted to achieve resiliency and economic optimization.

We also own patented gasification energy technologies. Our technology converts organic material into synthesis gas, which can be used as fuel for a variety of applications and as feedstock for the generation of DME (Di-Methyl Ether). As previously disclosed, we currently plan to continue to focus on our other offerings.

*Other business activities*

Through p2kLabs, Inc., we provide design, software development, and other technology-based consulting services. The services provided are generally hourly or fixed-fee project-based arrangements.

Through ATL, we also provide traditional data center services, such as providing customers with rack space, power and equipment, and offer several cloud services including virtual services, virtual storage, and data backup services.

**Results of operations for the three months ended December 31, 2021 and 2020**

*Revenues*

Revenues increased to $41,241,969 during the three months ended December 31, 2021, as compared with $2,257,570 in revenues for the same period ended 2020 primarily due to increase in revenues from our digital currency mining segment.

For the three months ended December 31, 2021, our revenue was derived from digital currency mining, the sale of equipment, solar panels, batteries, design, engineering, and services, and data center services. Income from our mining segment is a result of bitcoin mining activities in the United States. Income from our Energy segment is the result of contracts to sell switchgear equipment, perform engineering design, provide software for distributed energy and microgrid systems, and provide solar and battery installation.

*Costs and Expenses*

We had costs and expenses of $36,806,806 for the three months ended December 31, 2021, as compared with $8,427,668 for the three months ended December 31, 2020.

Our cost of revenues was $8,797,926 for the three months ended December 31, 2021, as compared with cost of revenues of $1,332,890 for the three months ended December 31, 2020. Our cost of revenues during the three months ended December 31, 2021 was mainly the result of mining energy costs of $1,373,711, mining hosting fees of $4,171,662, hardware material purchases of $2,280,279 and contract manufacturing expenses of $344,088. Our cost of revenues during the three months ended December 31, 2020 was mainly the result of contract manufacturing expenses of $748,214, hardware material purchase of $236,247, and mining expenses of $169,046.

Professional fees increased to $3,317,819 for the three months ended December 31, 2021 from $1,712,723 for the three months ended December 31, 2020. Our professional fees expenses for the three months ended December 31, 2021 consisted mainly of accounting and tax consulting fees of $1,548,189, audit and review fees of $498,121, subcontractor expenses of $417,989, legal fees of $290,278, recruitment fees of $222,240, and consulting fees of $155,983. Our professional fees for the three months ended December 31, 2020 consisted mainly of legal fees of $1,231,562, and investor relations and public relations consulting expense of $120,838.

Payroll expenses increased to $8,883,047 for the three months ended December 31, 2021 from $3,314,201 for the three months ended December 31, 2020. Our payroll expenses for the three months ended December 31, 2021 consisted mainly of salary and wages expense of $2,901,295, and employee and officer stock-based compensation and related bonuses of $5,749,101. Our payroll expenses for the three months ended December 31, 2020 consisted mainly of salary and wages expense of $1,726,526 and employee and officer stock-based compensation of $932,040.

General and administrative expenses increased to $1,888,100 for the three months ended December 31, 2021 from $950,139 for the three months ended December 31, 2020. Our general and administrative expenses for the three months ended December 31, 2021 consisted mainly of insurance expenses of $487,680, marketing expenses of $280,614, dues and subscriptions expense of $217,084, utilities expense of $196,125, and travel expenses of $114,489. Our general and administrative expenses for the three months ended December 31, 2020 consisted mainly of dues and subscriptions expense of $110,681 and marketing expense of $601,387.

Depreciation and amortization expense increased to $7,697,568 for the three months ended December 31, 2021, from $1,117,715 for the three months ended December 31, 2020.

Impairment expenses were recorded for the three months ended December 31, 2021 for $6,222,346, and no impairment expenses were recorded for the three months ended December 31, 2020. Impairment expense for the three months ended December 31, 2021 consisted of bitcoin impairment of $6,222,346.

6

*Other income (expenses)*

Other income increased to $10,050,592 for the three months ended December 31, 2021 compared to other expense of ($997,432) for the three months ended December 31, 2020. Our other income/(expenses) for the three months ended December 31, 2021 consisted mainly of a realized gain on sales of digital currency of $9,994,791, an unrealized loss on derivative security of $298,849, and loss on write off of assets of ($278,170). Our other expenses for the three months ended December 31, 2020 consisted mainly of an unrealized loss on derivative security of ($1,020,494).

*Net Income*

We recorded a net income of $14,485,755 for the three months ended December 31, 2021, as compared with a net loss of $7,167,530 for the three months ended December 31, 2020. The increase was due mainly to the increase in digital currency mining revenue.

**Liquidity and Capital Resources**

Our primary requirements for liquidity and capital are working capital, inventory management, capital expenditures, public company costs and general corporate needs. We expect these needs to continue as we develop and grow our business. Our principal sources of liquidity have been and are expected to be our cash and cash equivalents and digital currency inventory.

As of December 31, 2021, we had total current assets of $58,682,565, consisting of cash and cash equivalents, accounts receivable, inventory, prepaid expenses and other current assets, digital currency, investment in equity security, investment in debt security and related derivative asset, and total assets in the amount of $418,144,771. Our total current and total liabilities as of December 31, 2021 were $22,481,979 and $24,069,321 respectively. We had working capital of $36,200,586 as of December 31, 2021.

As of December 31, 2021, there were no off-balance sheet arrangements.

We believe our cash and cash equivalents on hand, together with cash we expect to generate from future operations, will be sufficient to meet our working capital and capital expenditure requirements for a period of at least twelve months from the date of this Quarterly Report on Form 10-Q. We are likely to require additional capital to respond to technological advancements, competitive dynamics or technologies, customer demands, business opportunities, challenges, acquisitions or unforeseen circumstances and in either the short-term or long-term may determine to engage in equity or debt financings or enter into credit facilities for other reasons. If we are unable to obtain adequate financing or financing on terms satisfactory to us, when we require it, our ability to continue to grow or support our business and to respond to business challenges could be significantly limited. In particular, the widespread COVID-19 pandemic, including variants, has resulted in, and may continue to result in, significant disruption of global financial markets, reducing our ability to access capital. If we are unable to raise additional funds when or on the terms desired, our business, financial condition and results of operations could be adversely affected.

*Operating Activities*

Operating activities used $(20,969,236) in cash for the three months ended December 31, 2021, as compared with using $(6,833,578) in cash for the three months ended December 31, 2020. Our net income of $14,485,755 was the main component of our negative operating cash flow for the three months ended December 31, 2021, offset mainly by realized gain on digital currency $(9,994,791). Other components of our operating cash flow are the changes in operating assets and liabilities including production of digital currency $(36,974,578), increase in prepaid expenses and other current assets $(6,682,127), increase in accounts receivables $(2,002,045), and decrease in accounts payable and accrued liabilities $(911,848). Our net loss of $(7,167,530) was the main component of our negative operating cash flow for the three months ended December 31, 2020, offset mainly by unrealized loss on derivative assets of $1,020,494, stock based compensation of $4,350,643, and depreciation and amortization of $1,117,715.

*Investing Activities*

Investing activities used $(60,037,647) during the three months ended December 31, 2021, as compared with $(2,427,972) for the three month period ended December 31, 2020. Our sale of digital currencies of $33,965,188, payments on miner deposits of $(70,633,823), purchase of fixed assets of $(21,429,893), and investment in infrastructure development of $(1,948,709) were the main components of our investing cash flow for the three months ended December 31, 2021. Our investment in infrastructure development of $(2,830,560) was the main component of our negative investing cash flow for the three months ended December 31, 2020.

*Financing Activities*

Cash flows generated from financing activities during the three months ended December 31, 2021 amounted to $68,178,970, when compared to $31,767,261 for the three months ended December 31, 2020. Our cash flows from financing activities for the three months ended December 31, 2021 consisted of proceeds from exercise of options and warrants of $281,616, and proceeds from underwritten offering of $67,988,999. Our positive cash flows from financing activities for the three months ended December 31, 2020 consisted of proceeds from exercise of options and warrants of $192,656 and proceeds from underwritten offering of $37,049,605, offset by payments on promissory notes of $(5,475,000).

**Critical Accounting Estimates**

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with generally accepted accounting principles in the United States. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, net sales and expenses. We evaluate our estimates and assumptions on an ongoing basis, and base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances, the results of which form the basis for the judgments we make about the carrying value of assets and liabilities that are not readily apparent from other sources. Because these estimates can vary depending on the situation, actual results may differ from these estimates. Making estimates and judgments about future events is inherently unpredictable and is subject to significant uncertainties, some of which are beyond our control. Should any of these estimates and assumptions change or prove to have been incorrect, it could have a material impact on our results of operations, financial position and statement of cash flows.

There have been no material changes to our critical accounting policies and estimates as compared to those disclosed in our 2021 10-K. For a description of our critical accounting policies and estimates, see Part I, Item 1, Note 2, "Summary of Significant Accounting Policies" in our notes to the consolidated financial statements in this Quarterly Report.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

The following discussion about our market risk exposure involves forward-looking statements. Actual results could differ materially from those projected in the forward-looking statements. See "Forward-Looking Statements" included elsewhere in this Quarterly Report on Form 10-Q[YI(1] .

The Company is exposed to several market risks in its normal business activities. The types of market risks the Company is exposed to are the market price of bitcoin, banking, costs of mining, and liquidity risk.

***Market Price Risk of Bitcoin.*** We acquire bitcoin from our daily operations of mining and, as of December 31, 2021, we held approximately 649.87 bitcoins. The carrying value of our bitcoins as of December 31, 2021 was $30,203,387 on our Consolidated Balance Sheet. We account for our bitcoin as indefinite-lived intangible assets, which are subject to impairment losses if the fair value of our bitcoin decreases below their carrying value at any time since their acquisition. Impairment losses cannot be recovered for any subsequent increase in fair value. For example, the market price of one bitcoin in our principal market ranged from $46,421.20 - $68,205.40 during the three months ended December 31, 2021, but the carrying value of each bitcoin we held at the end of the reporting period reflects the lowest price of one bitcoin quoted on the active exchange at any time since its acquisition. Therefore, negative swings in the market price of bitcoin could have a material impact on our earnings and on the carrying value of our digital assets.

8

Positive swings in the market price of bitcoin are not reflected in the carrying value of our digital assets and impact earnings only when the bitcoin is sold at a gain. For the three months ended December 31, 2021, we incurred an impairment loss of $6,222,346 on our bitcoin.

***Banking Risk.*** A number of companies that engage in bitcoin and/or other cryptocurrency-related activities have been unable to find banks or financial institutions that are willing to provide them with bank accounts and other services. Similarly, a number of companies and individuals or businesses associated with cryptocurrencies may have had and may continue to have their existing bank accounts closed or services discontinued with financial institutions. To the extent that such events may happen to us, they could have a material adverse effect on our business, prospects or operations and potentially the value of any bitcoin or other cryptocurrencies we mine or otherwise acquire or hold for our own account.

***Costs of Mining Risk.*** Mining operations are costly and our expenses may increase in the future. Increases in mining expenses may not be offset by corresponding increases in revenue. Our expenses may become greater than we anticipate, and our investments to make our business more cost-efficient may not succeed. Bitcoin mining operations are also subject to increased costs as a result of the periodically increasing mining difficulty rates. Increases in our costs without corresponding increases in our revenue would adversely affect our profitability and could seriously harm our business and an investment in us.

We do not believe that inflation has had a material effect on our business, financial condition or results of operations. Nonetheless, if our costs were to become subject to significant inflationary pressures, we may not be able to fully offset such higher costs through price increases. Our inability or failure to do so could harm our business, financial condition, and results of operations.

***Liquidity Risk.*** Liquidity risk arises from the general funding needs of the Company's activities and in the management of the Company's assets and liabilities.

### Item 4. Controls and Procedures

### Limitation on Effectiveness of Controls and Procedures

We maintain disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) that are designed to ensure that information required to be disclosed in our periodic and current reports that we file with the SEC is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our principal executive officer and principal financial officer, evaluated, as of the end of the period covered by this Quarterly Report on Form 10-Q, the effectiveness of our disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act). Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of December 31, 2021, our disclosure controls and procedures were not effective due to the material weakness in our internal control over financial reporting described below.

### Material Weakness and Remediation Plan

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in

management assessment: (1) The Company did not adequately implement or properly maintain controls over its financial close and reporting process and its process over the recording of energy and other services revenue and (2) the Company did not adequately design and maintain effective general information technology controls over third-party information systems and applications that are relevant to the preparation of the Company's financial statements:

- Financial Close and Reporting: Controls over financial statement reviews, specific to the appropriate reconciliation of certain balance sheet accounts, were not operating effectively.

  - Recording of Revenues for certain non-principal revenue generating subsidiaries: Controls over the recording and processing of revenue for certain non-principal revenue generating entities, specifically, p2kLabs, Inc, GridFabric, LLC and CleanSpark, LLC, lack the level of precision necessary to ensure the completeness and accuracy of revenue recorded.

- Information and Technology Controls: Certain individual control deficiencies related to information technology ("IT") general controls and report reviews aggregate into a material weakness, as follows:

  - Certain process-level and IT-dependent controls over user access to IT programs and applications, specifically utilized for hosting services and file storage, were not effective.

  - Controls relating to the evaluation of service organization controls reports were not performed over certain third-party service providers to cover the entire fiscal year.

Management has been implementing and continues to implement measures designed to ensure that control deficiencies contributing to the material weakness are remediated, such that these controls are designed, implemented, and operating effectively. The remediation actions include the following:

- additional qualified staff were appointed;

- the implementation of additional monitoring of controls to improve documentation of internal control procedures;

- expanding the management and governance over IT system controls; and

- implementing enhanced process controls around internal user access management including provisioning, removal, and periodic review.

While these actions and planned actions are subject to ongoing management evaluation and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period, we are committed to continuous improvement and will continue to diligently review our internal control over financial reporting.

**Changes in Internal Control over Financial Reporting**

Other than remediation actions related to the material weakness in our internal controls described above, there has been no change in our internal control over financial reporting (as that term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended December 31, 2021 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

10

**PART II – OTHER INFORMATION**

**Item 1. Legal Proceedings**

We are from time to time subject to various claims, lawsuits, and other legal and administrative proceedings arising in the ordinary course of business. See Note 12 - Commitments and Contingencies to our consolidated financial statements in Item 1. Part I of this Report.

**Item 1A. Risk Factors**

Please carefully consider the information set forth in this Quarterly Report on Form 10-Q and the risk factors discussed in Part I, Item I A. of our Annual Report on Form 10-K for the year ended September 30, 2021, which could materially affect our business, financial condition or future results. In evaluating our business, you should carefully consider the risk factors discussed in our Annual Report on Form 10-K, as updated by our subsequent filings under the Exchange Act. The occurrence of any of the risks discussed in such filings, or other events that we do not currently anticipate or that we currently deem immaterial, could harm our business, prospects, financial condition and results of operations. In that case, the trading price of our common stock could decline, and you may lose all or part of your investment.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

None.

**Item 3. Defaults upon Senior Securities**

None.

**Item 4. Mine Safety Disclosures**

Not applicable.

**Item 5. Other Information**

None.

**Item 6. Exhibits**

| Exhibit Number | Exhibit Description | Form | File No. | Exhibit | Filing Date | Filed/ Furnished Herewith |
|---|---|---|---|---|---|---|
| | | | **Incorporated by Reference** | | | |
| 3.1 | First Amended and Restated Articles of Incorporation of CleanSpark, Inc., dated September 17, 2021 | 8-K | 001-39187 | 3.1 | 9/17/2021 | |
| 3.2 | First Amended and Restated Bylaws of CleanSpark, Inc., dated September 17, 2021 | 8-K | 001-39187 | 3.2 | 9/17/2021 | |
| 4.1 | Form of Senior Secured Redeemable Convertible Debenture, dated December 31, 2018 issued to the Investor | 8-K | 000-53498 | 4.1 | 12/31/2018 | |
| 4.2 | Form of Common Stock Purchase Warrant, dated December 31, 2018, issued to the Investor | 8-K | 000-53498 | 4.2 | 12/31/2018 | |
| 4.3 | Form of Senior Secured Redeemable Convertible Promissory Note, dated April 17, 2019, issued to the Investor | 8-K | 000-53498 | 4.1 | 4/18/2019 | |
| 4.4 | Form of Common Stock Purchase Warrant, dated December 31, 2018, issued to the Investor | 8-K | 000-53498 | 4,2 | 4/18/2019 | |
| 10.1 | Electrical Services Agreement between CleanBlok, Inc. and Georgia Power Company, dated October 1, 2021 | 10-K | 001-39187 | 10.40 | 12/14/2021 | |
| 10.2 | Form of Future Sales and Purchase Agreement | 10-K | 001-39187 | 10.41 | 12/14/2021 | |
| 10.3 | Employment Agreement with the Chief Financial Officer dated December 15, 2021 | | | | | * |
| 31.1 | Certification of Chief Executive Officer pursuant to Rule 13a-14(a)/15d-14(a) | | | | | * |
| 31.2 | Certification of Chief Financial Officer pursuant to Rule 13a-14(a)/15d-14(a) | | | | | * |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 | | | | | ** |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 | | | | | ** |
| 101 INS | Inline XBRL Instance Document – the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document | | | | | |
| 101 SCH | Inline XBRL Taxonomy Extension Schema Document | | | | | |
| 101 CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | | | | | |
| 101 DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | | | | | |
| 101 LAB | Inline XBRL Taxonomy Extension Label Linkbase Document | | | | | |
| 101 PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | | | | | |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) | | | | | |

| * | Filed herewith. |
|---|---|
| ** | Furnished herewith. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.


Date: February 9, 2022                                          By: */s/ Zachary K. Bradford*
                                                                    Zachary K. Bradford
                                                                    Title: Chief Executive Officer
                                                                    (Principal Executive Officer)


Date: February 9, 2022                                          By: */s/Gary A. Vecchiarelli*
                                                                    Gary A. Vecchiarelli
                                                                    Title: Chief Financial Officer
                                                                    (Principal Financial and Accounting Officer)


2

**Exhibit 10.3**

# EMPLOYMENT AGREEMENT

This Employment Agreement (this "<u>Agreement</u>"), dated as of December 15, 2021 (the "<u>Effective Date</u>"), is entered into by and between CleanSpark, Inc., a Nevada corporation (the "<u>Company</u>"), and Gary Vecchiarelli (the "<u>Employee</u>"). This Agreement supersedes and replaces any previous agreements, express or implied, between the parties concerning employment terms.

## RECITALS

WHEREAS, the Employee desires to enter into this Agreement, to be effective as of the Effective Date, which sets forth the terms and conditions of the Employee's employment with the Company from and after the Effective Date;

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## AGREEMENT

1.      <u>Definitions</u>. In addition to the capitalized terms defined elsewhere herein, the following definitions shall be in effect under this Agreement:

(a)             "<u>Affiliate</u>" means, with respect to any entity, any person or entity, directly or indirectly controlling or controlled by or under direct or indirect common control with such entity.

(b)       "<u>Board</u>" means the Board of Directors of the Company.

(c)             "<u>Business</u>" means any business dealings of CleanSpark Inc. or its subsidiaries which includes, energy software and consulting and offering a platform that helps companies go from idea to market by offering services such as software engineering, design ux/ui, digital content, salesforce, and business development.

(d)             "<u>Cause</u>" means: (i) the Employee's material breach of this Agreement and such breach is not cured by the Employee within thirty (30) days after written notice from the Company; (ii) the Employee's failure to perform Employee's material duties and obligations under this Agreement (other than during any period of Disability) and such failure is not cured by the Employee within thirty (30) days after written notice from the Company; (iii) the Employee's material malfeasance or material misconduct in connection with the performance of Employee's duties hereunder; (iv) the Employee's conviction of, or pleading guilty or nolo contendere to, a felony or the equivalent thereof, any other crime having as its predicate element fraud, dishonesty, misappropriation, moral turpitude, violence or theft; or (v) committing an act of moral turpitude, whether criminal or not, which would tend to undermine the reputation of the Company.

Page 1

(e)        "Disability" means and shall be deemed to have occurred if, in the Board's reasonable discretion, after consultation with a physician selected by the Board, the Employee shall have been unable to perform the essential functions of the Employee's duties, even with reasonable accommodation if required by law, for a period of not less than one hundred twenty (120) consecutive days, or one hundred eighty (180) total days, during any twelve (12) month period. The Employee shall cooperate in submitting to medical examinations and providing medical records to the physician selected by the Board as reasonably requested by the Board in making a determination of Disability hereunder.

(f)        "Sale" means the sale by the Company of substantially all of the capital stock or assets of the Company or the following changes in control: (a) the sale of more than 50% of the Company's stock in one transaction, or (b) a change of at least 60% of the Board within a 30-day period.

3.        Employment. The Company agrees to employ the Employee, and the Employee agrees to be employed by the Company, for the period set forth in Paragraph 3, in the position and with the duties and responsibilities set forth in Exhibit 1, and upon the other terms and conditions set out in this Agreement.

4.        Term. The term of the Agreement shall commence on the Effective Date and, shall terminate as provided herein (the "Employment Term").

5.        Position and Duties.

(a)        During the Employment Term, the Employee shall serve as the Chief Financial Officer of the Company. The Employee shall serve and perform the duties outlined in Exhibit 1 and other executive, managerial or administrative duties, functions or responsibilities as are from time to time delegated to the Employee by the Company or the Board.

(b)        During the Employment Term, the Employee shall devote sufficient business time, skill, attention and effort to all facets of the business and affairs of the Company and will use Employee's efforts to discharge fully, faithfully, and efficiently the duties and responsibilities delegated and assigned to the Employee in or pursuant to this Agreement; provided, however, nothing herein shall be construed as providing that Employee may not engage in outside business activities so long as they do not materially conflict with Employee's Employment with Company. During the Employment Term, the Employee shall comply with all of Company's policies and procedures as they may be adopted, modified or amended from time to time including, but not limited to, the Code of Business Conduct and Ethics, Insider Trading Policy, and the like.

(c)        The Company considers the protection of its confidential information, proprietary materials and goodwill to be extremely important. Accordingly, the Employee will be required to sign the Company's confidentiality, non-solicitation, non-compete and assignment of inventions agreement attached as Exhibit 2 hereto (the "Confidentiality, Non-Solicitation Non-Compete and Assignment of Inventions Agreement"), as a condition of Employee's employment.

**Page 2**

5.        Compensation and Related Matters.

(a)                Base Salary. The Company shall pay the Employee a base salary at the annual rate of not less than Three Hundred Fifty Thousand Dollars (USD $350,000.00), such base salary shall be earned monthly and payable "on a salary basis" under applicable federal law ("Base Salary"). During the Employment Term, the Base Salary will be reviewed annually and is subject to adjustment at the discretion of the Board, but in no event may the Company pay the Employee a Base Salary less than that set forth above during the Employment Term. Payment of all compensation to the Employee hereunder shall be made in accordance with the terms of this Agreement and applicable Company policies in effect from time to time, including normal payroll practices, and shall be subject to all applicable withholdings and taxes.

(b)                Annual review. Employee will review Compensation as identified in Paragraphs 5(a), 5(b) and 5(c), with the Chief Executive Officer and/or Compensation Committee no less than annually and as fully defined in Exhibit 3 (as updated annually). Upon review, if Salary is less than 10% of the comparable Benchmarked Companies, the Compensation Committee will make a good faith effort to increase compensation accordingly.

(c)                Cash Bonus. The Employee shall be entitled to receive a discretionary bonus based on the annual gross margin of the Company and other benchmarks that may be identified by the CEO and ratified by the Compensation Committee (the "Bonus"). Payment of the Bonus is conditioned on compliance with applicable law, and shall be payable to the Employee (i) only if the Employee has not breached the terms of this Agreement, (ii) is performing their job duties satisfactorily, which will be deemed the case so long as the Employee has not received documented negative performance feedback, and (iii) only if the Employee continues to be employed by the Company on the date of determination of the Bonus as well as on the date of payment thereof. Any Bonus shall be paid at such time as the Company customarily pays bonuses. The bonus percentage(s) shall be determined by the CEO and ratified by the Compensation committee and as referenced in Exhibit 3 (as updated annually) but shall be no less than 30% of Base Salary.

(d)                Restricted Stock Units. Company will grant Employee Restricted Stock Units ("RSUs") as incentive compensation. The combination and vesting schedule shall be determined annually by the CEO and Compensation Committee and as referenced in Exhibit 3 (as updated annually). If the Employee is prohibited for regulatory reasons or any other reason mandated by corporate governance to dispose of any stock, options or RSU's as a means to satisfy tax obligations in any calendar year, the Company may agree in its sole discretion to pay the employee an amount equal to the tax obligations, up to a 35% tax rate, which were directly attributable to such grant of restricted stock, options or RSU's in that calendar year. In no case will the Company be obligated to pay the employee such amount for any other circumstance. If Employee's RSUs will vest during a blackout period, the Company shall withhold the number of shares of Common Stock that would otherwise be vested with Employee having a fair market value equal to the tax withholding obligations and shall make such required tax payment on behalf of Employee.

(e)                Employee Benefits and Perquisites. During the Employment Term, the Employee will be entitled to: (i) participate in the Company's long-term disability, and health

Page 3

plans ("Employee Benefits"); (ii) the perquisites and other fringe benefits that are from time to time made available by the Company generally to its employees; and (iii) such perquisites and fringe benefits that are from time to time made available by the Company to the Employee in particular, subject to any applicable terms and conditions of any specific perquisite or other fringe benefit; provided, however, that nothing contained herein shall be deemed to require the Company to adopt, maintain or provide any particular plan, program, arrangement, policy, perquisite or fringe benefit. The Employee shall be required to comply with the conditions attendant to coverage by such plans and shall comply with and be entitled to benefits only in accordance with the terms and conditions of such plans as they may be amended from time to time. The Employee agrees to cooperate and participate in any medical or physical examinations as may be required in connection with the applications for such life and/or disability insurance policies.

(e)         Expenses. The Employee shall be entitled to receive reimbursement for all reasonable and necessary business expenses incurred by the Employee in performing Employee's duties and responsibilities under this Agreement, consistent with the Company's policies or practices as may from time to time be in effect for reimbursement of expenses incurred by other Company employees. All expenses shall be reimbursed within fifteen (15) days after Employee submits an expense report and any required documentation.

(f)         Paid Time Off. The Employee shall be eligible for paid time off in accordance with the policies and practices of the Company as may from time to time be in effect for its employees which will include, at a minimum, three (3) weeks of paid vacation per calendar year. Employee will also be eligible for any other paid/unpaid time off as required by law.

(g)         Indemnification. The Company shall indemnify the Employee, to the maximum extent permitted by applicable law, against all costs, charges and expenses incurred or sustained by Employee in connection with any action, suit or proceeding to which Employee may be made a party by reason of being an officer, director, employee, contractor or agent of the Company or of any subsidiary or affiliate of the Company or any other corporation for which Employee serves as an officer, director, or employee at the Company's request.

2.      Termination of Employment.

(a)         Death. This Agreement shall terminate automatically upon the Employee's death.

(b)         Disability. The Company may terminate this Agreement at any time upon the Board's determination of the Employee's Disability pursuant to Section 1(e) above; provided, however, that such termination must occur while the Disability is in existence and before the Employee returns to work at the Company on a full time basis.

(c)         Termination by the Company for Cause. The Company may immediately terminate this Agreement for Cause after at least three-fifths (or more than 60%) of the Board determines that Cause exists.

**Page 4**

(d)          Termination by the Employee (Resignation). The Employee may terminate this Agreement for any reason, upon at least ten (10) business days advance prior written notice to the Company.

(e)          Termination by the Company Without Cause. The Company may terminate this Agreement without Cause upon ten (10) business days' advance prior written notice to Employee, or the equivalent amount in pay at the Company's discretion.

(f)          Termination or Assignment upon a Sale. This Agreement shall terminate automatically upon a Sale provided that the Employee enters into a new employment agreement with the acquiring entity as a part of the Sale. If no new employment agreement is entered into with such acquiring entity, then the Company's obligations under this Agreement shall be assigned to and assumed by such acquiring entity as provided in Paragraph 12 herein.

(g)          Notice of Termination. Any termination of the Employee's employment by the Company or the Employee (other than a termination pursuant to Paragraph 6(a)) shall be communicated by a Notice of Termination. A "Notice of Termination" is a written notice delivered in the manner set forth in Paragraph 10 hereof that must (i) indicate the specific termination provision in this Agreement relied upon, and (ii) specify the Employment Termination Date.

(h)          Employment Termination Date. The Employment Termination Date shall be as follows: (i) if the Employee's employment is terminated by Employee's death, the date of Employee's death; (ii) if the Employee's employment is terminated pursuant to any other provision of this Agreement, the date specified in the Notice of Termination (the "Employment Termination Date").

(i)          Transition Period. Upon termination of this Agreement, and for a period of thirty (30) days thereafter (the "Transition Period"), the Employee agrees to make Employee available to assist the Company with transition projects assigned to Employee by the Board. The Employee will be paid at an agreed upon hourly rate commensurate with the industry standard rate of pay for any work performed by the Employee for the Company during the Transition Period.

8.      Compensation Upon Termination of Employment.

In addition to any other compensation outlined herein, the following compensation shall be paid upon termination of employment under the following circumstances:

(a)          Death. Upon termination of this Agreement because of the Employee's death: (i) the Company shall pay the Employee's estate the accrued and unpaid portion of the Employee's Base Salary and any Bonuses earned for services provided through the Employment Termination Date (the "Compensation Payment"); (ii) the Company shall pay the Employee's estate any reimbursement for business travel and other expenses to which the Employee is entitled hereunder (the "Reimbursement"); and (iii) any unvested portion of any options, stock, RSUs or other securities of Company or any of its Affiliates granted to Employee which are subject to vesting ("Unvested Securities"), shall immediately be issued and become exercisable,

**Page 5**

regardless of the vesting or termination provisions of such Unvested Securities. For purposes of clarity, to the extent the vesting or other provisions of any Unvested Securities conflict with the terms of this Paragraph 7(a), the terms of this Paragraph 7(a) shall govern.

(d)          <u>Disability</u>. Upon termination of this Agreement by the Company due to Disability pursuant to Paragraph 6(b): (i) the Company shall pay the Employee the Compensation Payment; (ii) the Company shall pay the Employee the Reimbursement; and (iii) any Unvested Securities shall immediately be issued and become exercisable. For purposes of clarity, to the extent the vesting or other provisions of any Unvested Securities conflict with the terms of this Paragraph 7(b), the terms of this Paragraph 7(b) shall govern.

(e)          <u>Termination for Cause</u>. Upon termination of this Agreement by the Company for Cause pursuant to Paragraph 6(c), the Company shall pay the Employee: (i) the Compensation Payment; and (ii) the Reimbursement.

(f)          <u>Termination by the Employee (Resignation)</u>. Upon Termination of this Agreement by the Employee pursuant to Paragraph 6(d), the Company shall pay the Employee:
(g) the Compensation Payment; and (ii) the Reimbursement.

(h)          <u>Termination by the Company Without Cause</u>. Upon termination of this Agreement by the Company without Cause pursuant to Paragraph 6(e), except in connection with a termination in connection with a Sale: (i) the Company shall pay the Employee the Compensation Payment; (ii) the Company shall pay the Employee the Reimbursement; (iii) any Unvested Securities shall immediately be issued and become exercisable or convertible; (iv) subject to the signing by Employee of a general release of all claims against the Company in a form and manner satisfactory to the Company, and after the expiration of any revocation rights under that general release, and subject to Executive's compliance with post-termination obligations and any restrictive covenants, upon termination by the Company without Cause, the Company shall provide the Employee with severance equal to six (6) months of the Employee's Base Salary and other employment benefits plus two (2) months of Employee's Base Salary for every full year of employment with the Company ("Severance"); and (v) subject to the same terms as the Severance, the Company shall pay Employee an amount equal to 100% of the cash Bonus paid to the Employee during the prior twelve (12) months. At the election of the Company, the Severance and Bonus may be paid in equal payments over 12 months following the effective date of the termination, and shall be subject to all applicable withholdings and taxes. For purposes of clarity, to the extent the vesting or other provisions of any Unvested Securities conflict with the terms of this Paragraph 7(e), the terms of this Paragraph 7(e) shall govern.

(i)          <u>Termination upon a Sale</u>. Upon termination or assignment of this Agreement pursuant to Paragraph 6(f): (i) the Company shall pay the Employee the Compensation Payment; (ii) the Company shall pay the Employee the Reimbursement; and (iii) any Unvested Securities shall immediately be issued and become exercisable or convertible. For purposes of clarity, to the extent the vesting or other provisions of any Unvested Securities conflict with the terms of this Paragraph 7(f), the terms of this Paragraph 7(f) shall govern.

**Page 6**

(h)          No Effect on Other Benefits. The payments provided for in Paragraphs 7(a) through 7(f) do not limit the entitlement of the Employee or the Employee's estate or beneficiaries to any amounts payable pursuant to the terms of any applicable disability insurance plan, policy, or similar arrangement that is maintained by the Company for the Employee's benefit or to any death or other vested benefits to which the Employee may be entitled under any life insurance, stock ownership, stock options, RSU's, or other benefit plan or policy that is maintained by the Company for the Employee's benefit.

(i)          No Mitigation. The Employee will not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment or otherwise, nor will the amount of any payment provided for under this Agreement be reduced by any profits, income, earnings, or other benefits received by the Employee from any source other than the Company or its successor.

9.        Survival. The expiration or termination of this Agreement will not impair the rights or obligations of any party hereto that accrues hereunder prior to such expiration or termination, including, but not limited to, the Company's obligations under Paragraphs 5(g) and 7.

10.       Withholding Taxes. The Company shall withhold from any payments to be made to the Employee pursuant to this Agreement such amounts (including social security contributions and federal income taxes) as shall be required by federal, state, and local withholding tax laws.

11.       Notices. All notices, requests, demands, and other communications required or permitted to be given or made by either party shall be in writing and shall be deemed to have been duly given or made (a) when delivered personally, or (b) when deposited and sent via overnight courier, to the party for which intended at the following addresses (or at such other addresses as shall be specified by the parties by like notice, except that notices of change of address shall be effective only upon receipt):

If to the Company, at:

CleanSpark, Inc.
Attn: General Counsel
2370 Corporate Circle, Suite 160, Henderson, NV 89074 E-mail:
legal@cleanspark.com

If to the Employee, at: the Employee's then-current home address on file with the Company.

Notice so given shall, in the case of overnight courier, be deemed to be given and received on the date of actual delivery and, in the case of personal delivery, on the date of delivery.

12.       Binding Effect: No Assignment by the Employee: No Third-Party Benefit. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs,

Page 7

legal representatives, successors, and assigns. The Employee shall not have any right to pledge, hypothecate, anticipate, or in any way create a lien upon any payments or other benefits provided under this Agreement; and no benefits payable under this Agreement shall be assignable in anticipation of payment either by voluntary or involuntary acts, or by operation of law, except by will or pursuant to the laws of descent and distribution. Nothing in this Agreement, express or implied, is intended to or shall confer upon any person other than the parties, and their respective heirs, legal representatives, successors, and permitted assigns, any rights, benefits, or remedies of any nature whatsoever under or by reason of this Agreement.

3.        Assumption by Successor. Subject to Paragraph 6(f), the Company shall require any successor or assignee (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business and/or assets of the Company, by agreement in writing in form and substance reasonably satisfactory to the Employee, expressly, absolutely, and unconditionally to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession or assignment had taken place. As used in this Paragraph, "Company" shall include any successor or assignee (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all the business and/or assets of the Company that executes and delivers the agreement provided for in this Paragraph or that otherwise becomes obligated under this Agreement by operation of law.

4.        Arbitration. The parties agree that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be resolved exclusively by confidential, final and binding arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules and shall be brought and litigated in Clark County, Nevada. All disputes shall be resolved by one (1) arbitrator. The arbitrator will have the authority to award the same remedies, damages, and costs that a court could award, and will have the additional authority to award specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof (without requiring the posting of a bond or other security). The arbitrator shall issue a reasoned award explaining the decision, the reasons for the decision, and any damages or other relief awarded. The arbitrator's decision will be final and binding. The judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. This provision and any decision and award hereunder can be enforced under the Federal Arbitration Act.

5.        Governing Law and Venue. This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Nevada, without regard to conflict of laws rules or principles which might refer the governance or construction of this Agreement to the laws of another jurisdiction.

6.        Entire Agreement. This Agreement, and the Exhibits, schedules, and documents attached and referred to herein, contains the entire agreement among the parties concerning the subject matter hereof and supersedes all prior agreements and understandings, written and oral, between the parties with respect to the subject matter of this Agreement, except that all confidentiality, assignment, and non-disclosure provisions and agreements between the Employee and the Company are still in force and non-superseded.

**Page 8**

16.    Modification: Waiver. No amendment, modification or waiver of this Agreement shall be effective unless it is in writing and signed by the Employee and by a duly authorized representative of the Company (other than the Employee). Each party acknowledges and agrees that no breach of this Agreement by the other party or failure to enforce or insist on its or Employee's rights under this Agreement shall constitute a waiver or abandonment of any such rights or defenses to enforcement of such rights.

17.    Severability. If any provision of this Agreement shall be determined by a court or arbitrator to be invalid or unenforceable, the remaining provisions of this Agreement shall not be affected thereby, shall remain in full force and effect, and shall be enforceable to the fullest extent permitted by applicable law.

18.    Counterparts. This Agreement may be executed by the parties in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement. Counterparts delivered by electronic mail or facsimile shall be effective.

[*Signatures on following page.*]

**Page 9**

IN WITNESS WHEREOF, the Company and the Employee have executed this Agreement effective as of the Effective Date.

Company:

CLEANSPARK, INC.,
A Nevada Corporation

Dated: Dec 14, 2021                    By:          /s/ Zachary Bradford
                                                     Zachary Bradford, CEO

EMPLOYEE:

Dated: Dec 14, 2021                    By:          /s/ Gary A. Vecchiarelli
                                                     Gary A. Vecchiarelli

ADDRESS:
11093 Gammila Drive
Las Vegas, NV 89141

**[Signature Page to Employment Agreement]**

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO
RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Zachary Bradford, certify that;

1.  I have reviewed this Quarterly Report on Form 10-Q for the quarter ended December 31, 2021 of CleanSpark, Inc. (the "registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 9, 2022

By:  /s/ Zachary K. Bradford
     **Zachary K. Bradford**
     **Chief Executive Officer**

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO
RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Lori Love, certify that;

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended December 31, 2021 of CleanSpark, Inc. (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 9, 2022

By:    /s/ Gary A. Vecchiarelli
        **Gary A. Vecchiarelli**
        **Chief Financial Officer**

**Exhibit 32.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of CleanSpark, Inc. (the "Company") on Form 10-Q for the period ending December 31, 2021, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Zachary Bradford, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 9, 2022                                    By:  /s/ Zachary K. Bradford
                                                                **Zachary K. Bradford**
                                                                **Chief Executive Officer**

Exhibit 32.2

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of CleanSpark, Inc. (the "Company") on Form 10-Q for the period ending December 31, 2021, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Lori Love, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 9, 2021                                    By:  /s/ Gary A. Vecchiarelli
                                                              **Gary A. Vecchiarelli**
                                                              **Chief Financial Officer**

**EXHIBIT C**

Page 66

L. DeKALB - CONFIDENTIAL

A.    Correct.

Q.    What was her position at CleanSpark?

A.    I believe she was the C.F.O.

Q.    Who did you report to at CleanSpark?

A.    On paper, I reported to Zach.

Q.    In real life?

A.    Zach had almost no contact with me, so I mostly had interactions with Lori.

Q.    Anyone else?

A.    Lori hired someone else whose name I don't recall.  It might have been Max or something, and I worked with him a little bit.

Q.    Who reported to you?

A.    Everyone in the company.

Q.    When you say the company, who are you speaking about?

A.    ATL Communications.

Q.    What is ATL Communications?

A.    When the company went into bankruptcy, and then Bernardo --

Q.    Ms. DeKalb, I don't mean to cut

Page 72

L. DeKALB - CONFIDENTIAL

around when things happened; is that accurate?

A.    Yes.

Q.    Did you look at any documents before speaking to the investigator the first time?  When I say documents, I mean documents that could conceptually be relevant to what you understood the investigator to be talking about. CleanSpark.

A.    Not that I recall.

Q.    Did you talk to anyone else aside from Mr. Vaitkus?

A.    Not that I recall.

Q.    During your conversation, did you look at any e-mails or refer to any documents to provide any answers?

A.    Not that I recall.

Q.    After you spoke to the investigator the first time, did you look at any documents or go track anything down?

A.    Most likely not, but I don't actually recall.

Q.    Did you talk to anyone else?

Page 73

L. DeKALB - CONFIDENTIAL

A.    I believe I answered that question.

Q.    Indulge me.  Did you talk to anyone else?

A.    I did not.

Q.    Other than speaking to the investigator those two times and Mr. Vaitkus, you have not spoken to anyone about this lawsuit?

A.    Not that I recall.

Q.    So let me -- let me take a step back because I'm not quite sure -- I'm not quite sure you're conveying what you want me to understand because you have spoken with me about the lawsuit; isn't that true?

A.    Yes.

Q.    You've also spoken with other attorneys about this lawsuit; isn't that true?

A.    Yes, and I understood that to be knowledge you already had.

Q.    Well, that's why I want to clarify this.  So, let me just clarify.  It is my fault for not doing this at the

Page 76

L. DeKALB - CONFIDENTIAL

Q.    Did the investigator show you any documents during your conversations with him?

A.    He did not.

Q.    Did he describe any documents to you?

A.    We discussed the Culpeper documents that were on the internet.

Q.    When you refer to the Culpeper reports, I believe you are referring to reports issued by Culper Research.  There was an initial one and a second one after that.  Is that what you are referring to?

A.    Yes.

Q.    Did you read those reports?

A.    I accessed them one time, I believe, while I was still working there, but I didn't read them thoroughly.

Q.    Did you get a sense of what was contained in those documents in terms of any impression when you read them?

A.    I don't recall.  I was working eighteen sometimes twenty hours a day to keep the business going.  Honestly, that

L. DeKALB - CONFIDENTIAL

ideas to those documents?

A.     Any substantive ideas I might have been contributing might have been aesthetics or questioning him about specific technical things that I didn't understand to get clarity to help document more thoroughly.

Q.     Who created the timeline for that expansion?

A.     Based on my conversations with Don Chenault and Kent Shelley, we worked up a timeline of how long it would take to build out that proposed expansion, but I actually created the chart.

Q.     You created the chart.  Let's unpack that a little bit.

This chart timeline, let's refer to it as a timeline.  What did it look like?  Did it have dates?  Did it have specific events?  Just describe it roughly if you can.

A.     The Gantt chart is a list of all of the high level and low level details that have to go into an any project.  It

Page 93

L. DeKALB - CONFIDENTIAL

had specific steps that had to be taken. It had timelines, estimated timelines of when those steps would happen. It had dependencies on things that couldn't be done before something else had to be done.

Q. As I understand it, there were two aspects to it, tasks and sub-tasks and dates of estimated completion and then annotations --

A. Duration and dependencies.

Q. Who came up with the tasks to put in this timeline for this Gantt chart that you are referring to?

A. Kent, Don, myself. Kent Shelley, Don Chenault, and myself.

Q. Which tasks did you contribute? When you said, here's a blank chart, here's this blank Gantt chart, we need to add tasks. You said three people did that, Don Chenault, Kent Shelley, and you. I want to know what types of tasks you added to the list.

A. It was an accumulation of information about the whole process that

L. DeKALB - CONFIDENTIAL

was gathered during multiple conversations. I can't pinpoint a specific one where I said, oh, this was my idea to put down.

Q.    Who owned the timeline?

A.    I beg your pardon?

Q.    Who owned the timeline?  If we were to be sitting, say, in a meeting with Zach Bradford the C.E.O. and somebody was going to be responsible ultimately to answer for the timeline, who would that person have been?

A.    I prepared the Gantt chart and delivered it to Zach at his request.

Q.    Did you and Zach ever discuss that chart?

A.    One time at least.

Q.    What did he talk about?

A.    I'm sorry.  Ask your question. I cut you off.

Q.    What did he talk to you about on the chart?

A.    He was very upset by the length of the project.

Q.    What was the length of the

Page 95

L. DeKALB - CONFIDENTIAL
project?

A.    That it wasn't going to be completed until October.

Q.    When did you tell him this?

A.    After I sent him the Gantt chart and he called me.

Q.    Do you remember what month this might have been?

A.    I think I started working on it late January or early February, and if I recall, I sent it to him in March.  I don't remember the exact dates.

Q.    Who came up with the October completion date?

A.    Nobody came up with the October completion date.  They were a result of a number of things that had to be accomplished, the time this was going to take for them to be accomplished, and the dependencies on all of those particular tasks.

Q.    When was the first time that you recall having a conversation about CleanSpark -- about the expansion that

Page 107

L. DeKALB - CONFIDENTIAL

was a document that you were helping Kent Shelley put together, but the material content of it, the design, the planning, the engineering and all of that, that was Kent?

A.     Predominantly, yes.

MR. PARTIDA:  I'm going to show you another exhibit.  This is, again, going to be an e-mail and an attachment.  This is going to be Exhibits 44 and 45.  Let me just get these added.

(Whereupon, the aforementioned referenced documents were marked as Defendant's Exhibits 44 and 45 for identification, as of this date by the Reporter.)

Q.    Okay.  Do you see this e-mail from you to Zach Bradford, Bernardo and others?  The subject is CleanBlok dated March 3, 2021, correct?

A.    Yes.

Q.    It has an attachment CleanBlok Godbee Road build 2021.

Page 108

L. DeKALB - CONFIDENTIAL

A.    Okay.

Q.    You testified earlier that, to the best of your recollection, in or around March was when you initially sent Mr. Bradford a Gantt chart; is that correct?

A.    Correct on your Exhibit 45.

Q.    I'm going to move to Exhibit 45, which I will represent is the attachment to the e-mail I just showed you which is Exhibit 44.

I want you to look at this document here and tell me if this is the document, to the best of your recollection, that you were referring to?

A.    It appears to be.  Yes.

Q.    I'm going to go back to the cover e-mail.  I have a couple of questions, and I want you to read this briefly.

The first question is, it seems Zach Bradford and Bernardo Schucman -- I know who Mr. Bradford is, the C.E.O., and I know who Mr. Schucman is, and you testified

Page 109

L. DeKALB - CONFIDENTIAL
previously that you initially came to
Mr. Schucman shortly after starting at
Virtual Citadel in 2019.  He was a customer
and went forward after that.

Do you know if Mr. Schucman --
how well Mr. Schucman and Mr. Bradford knew
each other prior to CleanSpark's
acquisition?

A.    I do not know.

Q.    When did you meet Mr. Bradford
originally before the acquisition, the
first time you met Mr. Bradford?

A.    I don't recall if it was before
or after the close of the sale.

Q.    Fair enough.  Those are the
only two times it could be.

So, what I want to ask you here
is, first, feel free to take a minute to
read this if you would like.  I want then
to direct you to a few different points on
this page right here that is on the screen.
Take all the time you would like to read it
and then tell me when you are ready.

A.    Go ahead.

Page 110

L. DeKALB - CONFIDENTIAL

Q.    Now, let's start with the first paragraph.

Patrick Stanton from Foresite Group, who is Foresite Group?

A.    That's the company that Patrick Stanton worked for.  Patrick Stanton was the general contractor that they eventually hired.  I don't know if he was hired at that point or not.

Q.    But certainly -- evidently, discussions were happening at this point whether or not they were officially hired?

A.    Yes.

Q.    When you were going over the potential design layouts, were you contributing substantively to the design layouts, for example, I think we should use a double stack structure on footings or I think we should build a new facility.  Did you contribute those sorts of things?

A.    I did not.

Q.    What did you do at that meeting, you personally?

A.    I predominantly took notes and

Page 111

L. DeKALB - CONFIDENTIAL

talked about -- wait.  Which meeting are we talking about?  This is an e-mail.

Q.    Well, you said in the e-mail Bernardo, Kent, and I met with Patrick Stanton from Foresite Group today.

Assuming your e-mail is accurate, which I have no reason to believe it is not --

A.    Sorry.  I missed that paragraph.

Right.  That was where Kent was showing Patrick his ideas for the layout.

Q.    Okay.

Now, did you bring any ideas of your own for the layout to that meeting?

A.    I don't recall.

Q.    I would like to direct you to the fourth paragraph.  I want you to read the first sentence out loud.

A.    The result of the preliminary project plan show us container ready at the end of July.

Q.    What does container ready mean?

A.    That means the containers would

Page 112

L. DeKALB - CONFIDENTIAL

be built and in place, and then the next sentence says, This is assuming we don't have any problems with weather or contractors able to start right away, and it assumes an incredibly fast and probably unrealistic schedule for completing the various surveys and reports that have to be completed before the plan can get in front of the City of College Park.

Q.    Perfect.   In the future, I would prefer if you let me ask the questions and you give me the answers. That's how this works, but that's exactly where I was going next.   I do have a couple of more questions about that first sentence.

When you say at the end of July, you mean the end of July 2021; is that correct?   Is that the year you are talking about?

A.    Yes.

Q.    When you say that it is a probably unrealistic schedule for completing the various surveys and reports,

Page 113

L. DeKALB - CONFIDENTIAL

what made it unrealistic?

A.    Because there are too many variables over which none of us had any control.

Q.    Why does that make it unrealistic as opposed to unknown?  Do you understand the difference?  Something could be unknown and very realistic.

A.    I do.  My experience with College Park led me to believe that everything was going to take a lot longer than we would hope.

Q.    What experience?

A.    Getting a prior permit, getting other things accomplished.

Q.    That prior permit was the permit you were talking about for shelving in the data center that had nothing to do with the bitcoin mining; is that accurate?

A.    It had nothing to do directly with the bitcoin mining, but it had a lot to do with my experience of working with the city and that was relevant to this project.

L. DeKALB - CONFIDENTIAL

Q.    Just to be clear, and I didn't mean to cut you off, but just to be clear, your view is that this timeline was unrealistic because of your prior experience with CleanSpark -- with the City of College Park getting a permit for a different project unrelated to bitcoin mining?

A.    So, when I prepared the Gantt chart, I did it with the best information that I had, getting information about expected timelines from different people and trying to put that all together. Nobody ever can say this task is going to take X amount of time because there are always variables that can affect that. There is no way to put those kinds of variables into it.  All I can do is say according to the best information I have, X says this task is going to take this amount of time.  That's what I put in there.  But I can't control the weather.  I can't control other things that are going on.  I can't control all the many things that

Page 115

L. DeKALB - CONFIDENTIAL

could impact this project, so my wording that it was unrealistic was to try to help Zach understand that we couldn't commit to this timeline.  None of us could say definitively this is exactly when these things are going to happen.

Q.    Thank you for that.  Thank you for that.

But, I guess, just to be clear then, when you say unrealistic, you are simply talking about unknown.  You can't say a hundred percent this will happen. That's what you mean by unrealistic?

A.    I can't say a hundred percent that the timeline presented is going to happen in the timeframe that we have estimated.

Q.    Did you think it was impossible?

A.    I don't think anything is impossible.

Q.    That wasn't what I asked you. I asked you if you think this timeline was impossible?

Page 116

L. DeKALB - CONFIDENTIAL

A.    I don't wish to comment on what I did or didn't think.

Q.    It doesn't matter what you wish.  This is my deposition.  I'm entitled to ask a question and get an answer, so I respectfully request that you answer my question, which is, what did you think, did you think this timeline was impossible?

A.    Based on my experience project messaging the many decades that I had been working in my life, I did not think that timeline was going to be met.

Q.    In all of those decades in experience in that, can you tell me which experience had to do with bitcoin mining?

A.    My experience with life.

Q.    Basically, what you're telling me is that based on your life experience you viewed July as an impossible timeline --

A.    I did not say that.

Q.    Okay.  So, what is your view?

A.    I viewed July as an extremely aggressive and possibly unrealistic

Page 117

L. DeKALB - CONFIDENTIAL

timeline.

Q.    But possible?

A.    I don't know.  I thought it was unrealistic.

Q.    But possible?

A.    I would say that it was not likely possible.

Q.    Unlikely, but possible?

A.    I would say that it was not likely.

Q.    Again, I'll ask my question again.

Unlikely, but not impossible?

A.    I think I have answered that to the best I am able to.

MR. PARTIDA:  I object as non-responsive.  I will move on.

Q.    I want you to go to the last sentence of this and read it for the record, please.  Right before thank you.

A.    I'm sorry.  Did you want me to read that out loud?

Q.    Yes or I can read it?

A.    I humbly beg forgiveness for

L. DeKALB - CONFIDENTIAL

any errors or omissions on the preliminary project plan as this was a bit of a rush job and there are still some variables missing and I may have made assumption about delivery timetables that are incorrect.

Q.    What variables were missing?

A.    I did not have all the pieces of the project at that time.  They had not decided on a particular layout or equipment or anything that had to be purchased. There were a host of things missing from this timeline, and that would affect the delivery schedules and all of the dependencies.

Q.    When Zach got this e-mail with this project plan, if I understand your earlier testimony correctly, Mr. Bradford called you upset about this --

A.    Zach Bradford was very upset.

MR. PARTIDA:  I want to go -- bear with me a moment.

Q.    I'm going to bring up another exhibit, but before I do that, what I would

L. DeKALB - CONFIDENTIAL

ask you, Ms. DeKalb, you just represented that there were several variables after that early March e-mail on March 3 that were still being decided on and were missing from your Gantt chart that was attached to it; is that accurate?

A.    Yes.

Q.    Do you recall when, if ever, those variables were filled in, how long it took to get those missing variables?

A.    I honestly can't tell you whether they were all filled in at the time I left the company or not.

Q.    Do you recall if any were?

A.    I'm sorry?

Q.    Do you recall if any were?  For example, had a design been picked?

A.    Yes.  I believe they had settled on a design by the time I left.

Q.    What was the status of the expansion when you left?

A.    It had -- they hadn't even broken ground.

(Whereupon, the aforementioned

L. DeKALB - CONFIDENTIAL

I'm able to scribble down as I go through.

I only think I have --

Well, Marathon.  Do you know who Marathon is?

A.    Yes.

Q.    Who are they?

A.    They were a company that preceded CleanSpark in looking at purchasing ATL.

Q.    Did you deal with them?

A.    I did not have any direct dealings with them.

Q.    Do you know why they didn't follow through with the purchase?

A.    I believe it had to do with the power contract.

Q.    Anything else?

A.    I'm not privy to any other detail that I can recall.

Q.    Would it be fair to say that other than knowing who Marathon was and knowing that they considered but passed on buying your company, based on your understanding because of a power agreement,

L. DeKALB - CONFIDENTIAL
you have no knowledge about them?

A.    As I recall --

MR. PARTIDA:  Let me withdraw that.  I'm sorry.  That was confusing.

Q.    You told me everything that you know about Marathon and their involvement with ATL?

A.    One exception.  I also recall they took a look at the data center, which, at that time, we had lost a number of customers, and it was really struggling, and they considered the amount of money and effort to get that back up to be a viable enterprise to not be something they wanted to do.  That is my -- that's my takeaway from conversations that I have heard.  It is not anything that I learned directly from them.

Q.    Okay.

Now, ATL, how did that name come about?  When was ATL first a thing?  There was Broad River that was split up.  You came back to Virtual Citadel.  There

Page 126

L. DeKALB - CONFIDENTIAL

was Virtual Citadel.  Virtual Citadel went into receivership.  You mentioned earlier that you had recommended to the receiver that you would try to reach out to see if Schucman wanted to buy the whole thing, and there were conversations, you know, with Schucman about buying it, and he ultimately did.  Is that all accurate?

A.    It is accurate.  He actually financially supported the business during the bankruptcy.

Q.    When did you first hear about ATL and start using ATL instead of Virtual Citadel?

A.    Shortly before the bankruptcy was complete.

Q.    And all through the time that Marathon was considering buying the company?

A.    That was -- yes.  I guess.  We had already re-branded as ATL at that time.

Q.    And if somebody --

A.    Let me finish.

Q.    Sure.

L. DeKALB - CONFIDENTIAL

A.    When bankruptcy ended and Bernardo took over the business, he branded it as ATL.

Q.    Do you know why the name ATL was chosen?

A.    I wasn't privy to those conversations.

Q.    Did you ever understand that ATL was chosen as the name because people were embarrassed of the Virtual Citadel name and wanted to hide its bankruptcy?

A.    I have no information on that.

Q.    Did anyone ever tell you after Marathon passed on buying the company that it needed to be referred to as ATL now, and you had to change the website to be ATL, and re-branded it as ATL so nobody would know it was Virtual Citadel ever?

A.    Again, the timeline that you're talking about is not correct.  It was branded as ATL in June, and Marathon didn't come into the picture until, I don't know, fall-ish or something.  But it was already branded and the website built and

L. DeKALB - CONFIDENTIAL

everything prior to Marathon coming into the picture.

MR. PARTIDA:  I'm going to need about a five-minute break.

Greg, I think I probably have thirty minutes at the most of questioning after this and then I probably should be done.

MR. LINKH:  Okay.  We can go off the record.

THE VIDEOGRAPHER:  It is 1:50 p.m.  We are off the record.

(Whereupon, a short break was agreed upon and taken by all parties.)

THE VIDEOGRAPHER:  The time is 1:59 p.m.  We are on the record.

BY MR. PARTIDA:

Q.    Ms. DeKalb, I wanted to go back to something you testified to earlier, which was that the timeline that was originally prepared by you and -- the Gantt chart that was sent to Mr. Bradford that we have just been looking at, there was an

L. DeKALB - CONFIDENTIAL

true?

A.    Is that a question to me?

Q.    Yes.  Isn't that true that that's correct?

A.    Yes.

Q.    And this says, they were informed in January or February of 2021 that their publicly and stated October timeline was wildly off target.

Is that accurate?

A.    That is not accurate.  It is not accurate because it is not a statement I made.

Q.    Understood.

It says defendants however refused to accept this reality and instead continued to provide projections to investors that ignored the facts on the ground.

Were you involved in providing any projections to investors?

A.    I was not.

Q.    So, this --

A.    I would like to interject

Page 144

L. DeKALB - CONFIDENTIAL

something here.

Q.    Sure.

A.    This paragraph appears to be quoting or relaying information from me, and that is not correct.

Q.    Great.  Thank you.  That's what I'm trying to establish.

A.    The gist of that is -- it must be generated from information they garnered other places and compiled into that paragraph, and it makes it appear that all of the information in that paragraph is related to comments I made, and that is not accurate.

Q.    Okay.  So, understood, and I appreciate that clarification.  I will just remind you as we said earlier at the very beginning of this deposition, I do want you to give me your best answer.  I do want you to give me information that you possess.  I do not want you to speculate.  I don't want you to speculate as to why whoever wrote whatever is in the Complaint wrote is what you did or didn't say.

L. DeKALB - CONFIDENTIAL

Q.    It says, The allegations starting here in this section are principally derived from the account of a former employee who acted as the general manager of ATL both prior to and following the acquisition by CleanSpark.

A.    Yes.  It says that.

Q.    Now, I'm going to represent to you, but I will ask you first, does this sound like they are talking about you?

A.    Yes.

Q.    Were you told that anyone would be filing this Complaint based on statements you made at any point in time?

A.    No.  I was not.

Q.    Were any of these statements vetted by you?

A.    They were not.

Q.    Well, there is one difference between this Complaint and your testimony here is that one is under oath and one is not.  So, I do want to be clear because I will represent to you and plaintiffs have represented to me that you, in fact, FE1.

Page 147

L. DeKALB - CONFIDENTIAL

I want to make sure that what is being attributed to you in this Complaint is, in fact, attributable to you. It says you say a lot of things. I just want to make sure that you actually agree with these.

A.    I do not agree with these.

Q.    Well, we haven't read them yet. I appreciate you making that general statement. I suppose I would like to get into a little more detail with it, so we can just go ahead and parse that out.

So, former employee 1, FE1, that's you. You became general manager of V.C. Mining in or around June 2019, and that we covered you do agree with; is that accurate?

A.    Yes.

Q.    And you continued that role after Oken's death. That's accurate?

A.    That's correct.

Q.    Now, so we can be a little more efficient, can you read the rest of this paragraph, just 68, and tell me if there is anything in this paragraph that is

Page 150

L. DeKALB - CONFIDENTIAL

Q.    I'm sorry.  Do you see it now on 70?  I'm sorry.  Maybe it is not showing it properly.

A.    Mr. Schucman had stated his desire to have a publicly traded company is true.

Q.    Did you tell that to the investigator you spoke with?

A.    I don't recall if I did or didn't.

Q.    Did Mr. Schucman ever tell you that he and Mr. Bradford had been friends for a long time?  Did you know anything about their relationship?

A.    Mr. Schucman told me that he had known Zach Bradford.  He used friends in the way that Brazilians use friends, so I took that to mean they had some kind of relationship, but I didn't know the nature of it.

Q.    I want to look at 71, and -- when you understood Marathon -- when Marathon was coming and looking at buying the business, what did you understand them

Page 160

L. DeKALB - CONFIDENTIAL

the rest of that wordsmithing is whoever wrote this document, embellishing.

Q.    Now, I only have a couple of more paragraphs.  Maybe five more minutes here.

I want to go to paragraph 84. It says, According to FE1, immediately following CleanSpark's acquisition of ATL, Bradford began purchasing millions of dollars of new mining equipment.  FE1 stated that ATL's existing facility did not have enough room for the equipment purchased.

A.    Again, there is a lot of embellishment there.  He did start purchasing miners.  They were being delivered.  We were un-boxing them and checking them in, and there was not any space in the facility to install them.  We certainly had storage facility but not installation space.

Q.    I want to go to paragraph 95. This is a paragraph that is talking about CleanSpark announcing a $2 million

L. DeKALB - CONFIDENTIAL

fundraise.

Are you familiar with that?

A.    No.

Q.    Do you know why it was raised?

A.    I'm sorry?

Q.    Do you know why CleanSpark raised $200 million?

A.    I'm not privy to that.

Q.    Do you know what it used the $200 million for?

A.    I can't tell you specifically since I didn't manage the books for that side of the business.

Q.    At the end of the sentence, when it says, According to FE1, who we know is you, CleanSpark needed the $200 million to fund the build out at the ATL facility, that's not something you would have said?

A.    That's not something I would have a said.

Q.    And that's not something you would have known?

A.    I would not know how much they would need.

L. DeKALB - CONFIDENTIAL

Q.    Did you talk to the investigator about any of the finances in terms of overall success of the bitcoin mining business after CleanSpark acquired it about their financial performance?

A.    Not to my recollection.  I wouldn't have been privy to that, so I don't know what I would have had to say about it.  I don't recall speaking about that.

Q.    Okay.

Now, the last questions I have for you, and I will go ahead and take this off the screen, when you left CleanSpark, you signed a termination agreement, did you not?

A.    Yes.

Q.    That termination agreement was given to you, and you were given time to review it?

A.    Yes.

Q.    Did you do that?

A.    No.  Not that I recall.  I don't remember.  They just called me and

L. DeKALB - CONFIDENTIAL

told me I was terminated.

Q.    Then you received an agreement, which you ultimately --

A.    Yes.  I did.  And they gave me a month severance.  Right.

Q.    And that was the agreement.

Now, I want to ask you, there were certain things that you had to do as part of that agreement, correct, including you had to keep CleanSpark's confidential business information confidential.  Isn't that true?

A.    Yes.

Q.    In fact, that agreement prohibited you from talking to any third party or person about any CleanSpark information that you acquired that was non-public during your time there; isn't that correct?

A.    I believe so.

Q.    But you talked to these investigators about all of that, correct?

A.    The investigator represented himself as working for a law firm that was

L. DeKALB - CONFIDENTIAL

in a lawsuit, and it was my understanding that legal issues were something that I had to comply with.

Q.    So, this investigator told you that you had no choice but to talk to them?

MR. LINKH:  Objection.

A.    I'm not saying that.

Q.    Let me put it a different way.

Did you feel compelled to talk to the investigator?

A.    I felt it was my responsibility because of a lawsuit to speak.

Q.    Despite the fact that you had signed a termination agreement that prohibited you specifically from speaking about CleanSpark information to anyone, any third party, you decided to speak to an investigator for a lawyer suing the company?

A.    I felt like the legal issue -- because of the legal issue, it was my responsibility.

Q.    That was not my question.  My question was, did you do it?

L. DeKALB - CONFIDENTIAL

I want to move along. Mr. Partida previously introduced an Exhibit 44.  If you can pull that up.

A.    Yes.

Q.    Again, this is the March 3, 2021 e-mail that attaches the -- I guess, what you called the Gantt chart; is that correct?

A.    The project plan with the Grant Gantt chart.

Q.    And that's Gantt spelled G-a-n-t-t?

A.    Yes.

Q.    Prior to this -- again, I think I may have already asked it, but just to be clear, prior to this e-mail, was Mr. Bradford provided with a Gantt chart concerning -- was he provided with a Gantt chart?

A.    I don't recall that I provided him one prior to this.  I don't know if anyone else did.

Q.    I take it you testified earlier that Mr. Bradford was upset about the

Page 202

L. DeKALB - CONFIDENTIAL

Q.    This would be page 48 of 200 on this document.  It is actually page 4 of the Amended Complaint.

A.    Okay.

Q.    Do you see it says, According to a former employee who managed the ATL facility, defendants were informed in January or February of 2021 that their publicly stated project timeline was wildly off target.

Do you see this January or February 2021 reference?

A.    Yes.

Q.    Would it be more correct if it was -- if this referred to the plan that was put forth on March 3, 2021?

A.    Yes.

MR. PARTIDA:  Objection.

MR. LINKH:  If we can take five minutes, that would be great, but I don't know how much more I have.

MR. PARTIDA:  That's good with me.  I will be back at 3:50.

MR. LINKH:  Great.

**Message**

| | |
|---|---|
| **From**: | Lisa DeKalb [ldekalb@atldatacentersllc.com] |
| **Sent**: | 3/3/2021 6:13:53 PM |
| **To**: | Zach Bradford [zach@cleanspark.com]; Bernardo Schucman [bernardo@fastblockmining.com] |
| **CC**: | John Blount-Contact [john@fastblockmining.com]; Kent Shelley [kshelley@atldatacentersllc.com]; Don Chenault [dchenault@atldatacentersllc.com]; Lori Love [Lori@cleanspark.com]; Justin Daniels [jdaniels@bakerdonelson.com] |
| **Subject**: | RE: CleanBlok |
| **Attachments**: | CleanBlok Godby Road Build 2021.pdf |

Zach

Bernardo, Kent and I met with Patrick Stanton from the Foresite Group today and spent several hours going over the logistics of the project as well as several potential design layouts.  I will have Kent send you some of his ideas for the layouts.

I have put together a preliminary Project Plan (attached) trying to capture the high level milestones and events that will drive them.

There are several variables over which we will have little or no control, not the least of which is weather, but also the availability of contractors and other 3rd party personnel who will need to be hired for various deliverables.

The results of the preliminary project plan show us "container ready" at the end of July.
This is assuming we don't have any problems with weather or contractors able to start right away and it assumes an incredibly fast and probably unrealistic schedule for completing the various surveys and reports that have to be completed before the site plan can get in front of the City of College Park.

There are two milestones that we may be able to FastTrack:  The Site Plan Ready and the Permits.
1.        We can ask Foresite to pull in their site plan ready date from 4-16 to 4-9
a.        Their ability to do this is dependent on the topographical, geothermal and arboreal surveys and reports completed very quickly as well as their internal ability to turn a site plan around very quickly
2.        We can talk with Hugh Richardson and possibly others at the City of College Park to request assistance to FastTrack the permits and reduce the time frame from 6 weeks to 3 or 4 weeks
a.        I believe the City understands the importance of this project to their City budget and genuinely hope they can accommodate us.  Again it depends on a number of people available to reorganize their work load and push our requests to the top of the list.

We are working on the math for the total number of miners that the containers will be able to deploy.  A reasonable estimate is 8,000 miners.  Once we have the 8,000 deployed we can assess the power usage and may be able to add additional miners depending on how close we are to the critical power limit.

I humbly beg forgiveness for any errors or omissions on the preliminary project plan as this a bit of a rush job and there are still some variables missing and I may have made assumptions about delivery timetables that are incorrect.

Thank  you,

Lisa DeKalb
M 404-274-2341
ldekalb@atldatacentersllc.com

This electronic mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the intended recipient or the person responsible for delivering the electronic mail to the in[...] advised that you have received this electronic mail in error and that any use, dissemination, forwarding, printing, or cop[...] is strictly prohibited. If you have received this electronic mail in error, please immediately notify the sender by return m[...]

**Exhibit 44**
Lisa DeKalb

CONFIDENTIAL
CSBish0007230

**From:** Zach Bradford <zach@cleanspark.com>
**Sent:** Wednesday, March 3, 2021 10:16 AM
**To:** Bernardo Schucman <bernardo@fastblockmining.com>; Lisa DeKalb <ldekalb@atldatacentersllc.com>
**Cc:** John Blount-Contact <john@fastblockmining.com>; Kent Shelley <kshelley@atldatacentersllc.com>; Don Chenault <dchenault@atldatacentersllc.com>; Lori Love - Cleanspark <Lori@cleanspark.com>
**Subject:** RE: CleanBlok

Good morning team,

For next steps, we need to get a preliminary site plan layout to determine number of containers we can get on site and the configuration. This will allow us to determine the final order quantity, etc.

@Lisa DeKalb- Please follow-up with Foresite group, we requested a proposal on Monday and I would like them to get started ASAP.   Also please make sure they have copies of these drawings so they can quickly add them to their design.  I would also like them to give an initial indication on any pontifical permitting issues we could face using these containers, if any.

We will need to place an order for containers before permits are complete which is not without risk so we need to get as much information on permit issues prior to placing the order. (I will reach out to discuss the container order in greater detail later today.)

<u>**Project Timing:**</u>

Based on the information we have been provided, the planning & permitting process can take up to *10 weeks* from the day we start (4 weeks to create full permit ready site plans set & 6 weeks to complete the permitting process).  It is unlikely that we will be able to start any construction or clearing a trees until this process is complete.  We will need to push Foresite to see what advanced site preparation can be started prior to permits being issues.

Under that timeline, we would not be able to start construction until May 12, we should take any steps possible to move this along quicker.
- *Site plans need to be submitted for permits must be submitted no later than April 1st.*
  - The better and more complete the plans submitted the quicker the permitting process should go.
  - We need to make sure we have a comprehensive noise reduction/barrier plan included.
- After we get the plans submitted, I expect we can get the city's help to fast track permits because they will gain more revenue is we start using the power earlier.
  - I will be speaking with Hugh later today.

**Placing orders for equipment.**
- I have placed orders for mining equipment to start arriving June 15th and July 15. (see below)

| Expected Delivery date | Model | units |
|---|---|---|
| 15-Jun | S19-95 | 50.00 |
| 15-Jun | S19J-100 | 350.00 |
| 15-Jun | S19J-90 | 50.00 |
| 15-Jun | Avalon1246-85 | 1,000.00 |
| 15-Jun | Avalon1246-85 | 1,000.00 |
| 15-Jul | S19J-90 | 50.00 |
| 16-Jul | Avalon1246-85 | 1,000.00 |

- ower.
- **I plan to order only Canaan Avalon's and Bitmain S19s. I will be avoiding other models to try and make staging, installation, load balancing, etc easier.**

CONFIDENTIAL
CSBish0007231

o    If we have experienced any issues with the Avalon units please let me know ASAP.

o    There can be no guarantee that supply for these models will be available in our desired timeline, but I will do my best to provide advanced notice if we need to rely on other models/manufacturers.

•    We will want to have containers ready to accept these units upon arrival. With proper planning, and staging a wiring, etc. I'm hopeful that we can get the units installed and hashing very quickly.

•    In two weeks I plan to place additional orders, and I will schedule the delivery dates based upon adjusted timelines for deployment.

o    If we are going to be ready to receive units before June 15th I will source units for delivery in late May.

o    Currently, I expect to increase the order size for July delivery's *significantly*.  My goal would be to have all units on site by the end of July, if possible.

▪    Can I get an estimate on the number of miners the team can install in a single month? (We are going to be adding a total of ~ 9,000 new miners.)

▪    @Lisa DeKalb Please check with Hugh to get an updated schedule for when we will start seeing MW come online?

Best Regards,

Zach Bradford
CEO and President
**CleanSpark, Inc.**
Office - 702-941-7837

Important Notice: This email and any files transmitted with it are confidential to CleanSpark Inc. and its affiliates and are intended solely for the use by the individual or entity to which they are addressed. If you have received this email in error, please delete and reply to this message and let the sender know of the error.

**From:** Bernardo Schucman <bernardo@fastblockmining.com>
**Sent:** Tuesday, March 2, 2021 7:24 PM
**To:** Lisa DeKalb <ldekalb@atldatacentersllc.com>
**Cc:** Zach Bradford <zach@cleanspark.com>; John Blount-Contact <john@fastblockmining.com>; Kent Shelley <kshelley@atldatacentersllc.com>; Don Chenault <dchenault@atldatacentersllc.com>
**Subject:** Re: CleanBlok

Team ,we need to move it ASAP.
This is a top priority project that need to be kicked off.
Zach ,please advise.

Bernardo Schucman
President of the Board & CEO
Fastblock Data Centers INC
+55 48 98801-5005

Em 2 de mar. de 2021, à(s) 11:50, Lisa DeKalb <ldekalb@atldatacentersllc.com> escreveu:

Attached are drawing submitted by Tim Barber for the clean block project

CONFIDENTIAL
CSBish0007232

Lisa DeKalb
404-274-2341
ldekalb@atldatacentersllc.com

---

**From:** tim@northgeorgiadata.com <tim@northgeorgiadata.com>
**Sent:** Tuesday, March 2, 2021 11:30:58 AM
**To:** Lisa DeKalb <ldekalb@atldatacentersllc.com>
**Cc:** 'Tobias Barbir' <thecoindad@gmail.com>
**Subject:** RE: CleanSpark

Lisa,

Please see attached...

We would normally provide a fully rendered 3D REVIT model, however the proposed lead times do not allow for those renderings to be developed.

Thanks,

Tim Barbir

---

**From:** Lisa DeKalb <ldekalb@atldatacentersllc.com>
**Sent:** Tuesday, March 2, 2021 10:35 AM
**To:** Tim Barbir <tim@northgeorgiadata.com>
**Cc:** Tobias Barbir <thecoindad@gmail.com>
**Subject:** RE: CleanSpark

I look forward to seeing those drawings. Thank you!

Lisa DeKalb
M 404-274-2341
ldekalb@atldatacentersllc.com
This electronic mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the intended recipient or the person responsible for delivering the electronic mail to the intended recipient, be advised that you have received this electronic mail in error and that any use, dissemination, forwarding, printing, or copying of this electronic mail is strictly prohibited. If you have received this electronic mail in error, please immediately notify the sender by return mail.

---

**From:** Tim Barbir <tim@northgeorgiadata.com>
**Sent:** Tuesday, March 2, 2021 10:31 AM
**To:** Lisa DeKalb <ldekalb@atldatacentersllc.com>
**Cc:** Tobias Barbir <thecoindad@gmail.com>
**Subject:** RE: CleanSpark

Thank you Lisa I appreciate the clarification and the opportunity. I just wanted to let you know that we are actively working on some cat drawings to have an accurate depiction of the end product.

Thanks

Tim Barbir

Sent from BlueMail
On Mar 2, 2021, at 9:31 AM, Lisa DeKalb <ldekalb@atldatacentersllc.com> wrote:
  Thanks Tim

CONFIDENTIAL
CSBish0007233

Unless we are told otherwise the proposal and contracts will be under the name CleanBlok Inc
I'll get you a W9 later.


I have forwarded this to the CleanSpark team.


Much appreciated,


Lisa DeKalb
M 404-274-2341
ldekalb@atldatacentersllc.com

This electronic mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the intended recipient or the person responsible for delivering the electronic mail to the intended recipient, be advised that you have received this electronic mail in error and that any use, dissemination, forwarding, printing, or copying of this electronic mail is strictly prohibited. If you have received this electronic mail in error, please immediately notify the sender by return mail.

---

**From:** Timothy Barbir <tim@northgeorgiadata.com>
**Sent:** Tuesday, March 2, 2021 12:08 AM
**To:** bernardo@fastblockmining.com
**Cc:** Lisa DeKalb <ldekalb@atldatacentersllc.com>; thecoindad@gmail.com
**Subject:** CleanSpark
**Importance:** High


Team,


First and foremost thank you for the opportunity to submit a proposal. I have enjoyed working with you all in the past and humbly look forward to working together in the future. Attached is the proposal that my team has put together, please review it and reach out as soon as possible to discuss your comments, question, and next steps.


Thanks,


Tim Barbir

<Container Filter Wall.pdf>
<Container Panel Side View.pdf>
<Container Exhaust Fan Wall.pdf>

CONFIDENTIAL
CSBish0007234



| ID | | Task Mode | Task Name | Duration | Start | Finish | Predecessors | Resource Names | % Complete |
|----|--|-----------|-----------|----------|-------|--------|--------------|----------------|-----------|
| | | | **CleanBlok Godby Rd Build 2021** | | | | | | |
| 1 | | | **PROJECT INITIATION** | **8 days** | **Wed 3/3/21** | **Fri 3/12/21** | | **CleanBlok** | **0%** |
| 2 | | | Foresite Proposal Submitted | 3 days | Wed 3/3/21 | Fri 3/5/21 | | Patrick Stanton | 0% |
| 3 | | | Foresite Proposal Approved | 3 days | Mon 3/8/21 | Wed 3/10/21 | 2 | Zach Bradford | 0% |
| 4 | | | Foresite Project Initiation Confirmed | 2 days | Thu 3/11/21 | Fri 3/12/21 | 3 | Patrick Stanton | 0% |
| 5 | | | **FORESITE PROJECT PREP** | **25 days** | **Thu 3/11/21** | **Wed 4/14/21** | | **Foresite Group** | **0%** |
| 6 | | | Hire General Contractor | 2 days | Thu 3/11/21 | Fri 3/12/21 | 3 | Patrick Stanton | 0% |
| 7 | | | Schedule Topo Survey | 1 day | Mon 3/15/21 | Mon 3/15/21 | 4 | Patrick Stanton | 0% |
| 8 | | | Schedule Geothermal Survey | 1 day | Mon 3/15/21 | Mon 3/15/21 | 4 | Patrick Stanton | 0% |
| 9 | | | Schedule Arborist | 1 day | Mon 3/15/21 | Mon 3/15/21 | | Patrick Stanton | 0% |
| 10 | | | Perform Topo Survey | 4 days | Tue 3/16/21 | Fri 3/19/21 | 7 | Valentino | 0% |
| 11 | | | Complete Geothermal Survey | 3 days | Wed 3/17/21 | Fri 3/19/21 | 8 | Geothermal Surveyor | 0% |
| 12 | | | Complete Arborist Survey | 3 days | Wed 3/17/21 | Fri 3/19/21 | 9 | Arborist | 0% |
| 13 | | | Complete Project Concept | 5 days | Tue 3/16/21 | Mon 3/22/21 | 9,7,8 | Foresite Group | 0% |
| 14 | | | Approve Project Concept | 5 days | Tue 3/30/21 | Mon 4/5/21 | 13 | Zach Bradford | 0% |
| 15 | | | Complete Site Plan | 2 days | Tue 4/6/21 | Wed 4/7/21 | 14 | Patrick Stanton | 0% |
| 16 | | | Site Plan Approval | 2 days | Tue 4/13/21 | Wed 4/14/21 | 15 | Zach Bradford | 0% |
| 17 | | | **CoCP SITE PLAN APPROVAL** | **32 days** | **Thu 4/15/21** | **Fri 5/28/21** | | **Foresite Group** | **0%** |
| 18 | | | Submit Site Plan | 1 day | Thu 4/15/21 | Thu 4/15/21 | 16 | Patrick Stanton | 0% |

| | | | | | |
|--|--|--|--|--|--|
| Task | ▬▬▬ | Inactive Milestone | ◈ | Start-only | ⊏ |
| Split | ·········· | Inactive Summary | ·········· | Finish-only | ⊐ |
| Milestone | ◆ | Manual Task | ▬▬▬ | External Tasks | ▬▬▬ |
| Summary | ▭▭▭ | Duration-only | ▬▬▬ | External Milestone | ◇ |
| Project Summary | ▭▭▭ | Manual Summary Rollup | ▬▬▬ | Deadline | ⬇ |
| Inactive Task | | Manual Summary | ▭▭▭ | Critical | ▬▬▬ |
| | | | | Critical Split | ·········· |
| | | | | Progress | ▬▬▬ |
| | | | | Manual Progress | ▬▬▬ |

Project: Simple Project Plan
Date: Wed 3/3/21

**Exhibit 45**

Lisa DeKalb

TIAL
7235

**CleanBlok Godby Rd Build 2021**

| ID | (i) | Task Mode | Task Name | Duration | Start | Finish | Predecessors | Resource Names | % Complete |
|----|-----|-----------|-----------|----------|-------|--------|--------------|----------------|------------|
| 19 | | 📌 | Permits Approved | 15 days | Fri 4/16/21 | Thu 5/6/21 | 18 | CoCP Planning | 0% |
| 20 | | 📌 | City Council Approval | 1 day | Fri 5/28/21 | Fri 5/28/21 | 19 | CoCP City Council | 0% |
| 21 | | | **FORESITE BUILD** | **38 days** | **Fri 6/4/21** | **Tue 7/27/21** | | **Foresite Group** | **0%** |
| 22 | | 📌 | Clear & Grade | 15 days | Fri 6/4/21 | Thu 6/24/21 | 20 | General Contracto | 0% |
| 23 | 👤 | 📌 | Lay Conduit | 2 days | Fri 6/25/21 | Mon 6/28/21 | 22 | General Contracto | 0% |
| 24 | 👤 | 📌 | Lay Concrete Foundations | 10 days | Tue 6/29/21 | Mon 7/12/21 | 23 | General Contractor | 0% |
| 25 | 👤 | 📌 | Build Spill Containment | 5 days | Fri 6/25/21 | Thu 7/1/21 | 22 | General Contracto | 0% |
| 26 | | | Container Install Ready | 1 day | Tue 7/13/21 | Tue 7/13/21 | 22,23,24,25 | | 0% |
| 27 | 👤 | 📌 | Noise Abatement | 5 days | Wed 7/14/21 | Tue 7/20/21 | 26 | General Contracto | 0% |
| 28 | 👤 | 📌 | Landscaping | 5 days | Wed 7/14/21 | Tue 7/20/21 | 26 | General Contracto | 0% |
| 29 | 👤 | 📌 | Decking | 10 days | Wed 7/14/21 | Tue 7/27/21 | 26 | Kent Shelley | 0% |
| 30 | 👤 | | **FACILITIES BUILD** | **61 days?** | **Mon 7/12/21** | **Mon 10/4/21** | 22 | **Kent Shelley** | **0%** |
| 31 | | 📌 | Lay Conduit | 2 days | Fri 6/25/21 | Mon 6/28/21 | 22 | Kent Shelley | 0% |
| 32 | | 📌 | Connect Wire fm Transformer to Switch Gear | 2 days | Tue 6/29/21 | Wed 6/30/21 | 31 | Kent Shelley | 0% |
| 33 | | 📌 | Pull/Terminate between SW Gear/Container | 2 days | Thu 7/1/21 | Fri 7/2/21 | 32 | Kent Shelley | 0% |
| 34 | 👤 | | **ENGINEERING BUILD** | **70 days** | **Wed 3/3/21** | **Tue 6/8/21** | | **Don Chenault** | **0%** |
| 35 | 👤 | 📌 | Cabling Ordered/ Received/ Bundles | 64 days | Wed 3/3/21 | Mon 5/31/21 | | Don Chenault | 0% |
| 36 | 👤 | 📌 | Switches programmed | 64 days | Wed 3/3/21 | Mon 5/31/21 | | Don Chenault | 0% |

March 2021 timeline columns: 24 | 27 | 2 | 5 | 8 | 11 | 14 | 17 | 20 | 23 | 26 | 29

Project: Simple Project Plan
Date: Wed 3/3/21

| | | | | |
|---|---|---|---|---|
| Task | ▬▬▬ | Inactive Milestone | Start-only | Critical Split |
| Split | ·········· | Inactive Summary | Finish-only | Progress |
| Milestone | ◆ | Manual Task | External Tasks | Manual Progress |
| Summary | ⊏▬▬⊐ | Duration-only | External Milestone | |
| Project Summary | | Manual Summary Rollup | Deadline | |
| Inactive Task | | Manual Summary | Critical | |

CONFIDENTIAL
CSBish0007236

**CleanBlok Godby Rd Build 2021**

| ID | | Task Mode | Task Name | Duration | Start | Finish | Predecessors | Resource Names | % Complete |
|---|---|---|---|---|---|---|---|---|---|
| 37 | | | IP Configurations/ Assignments | 64 days | Wed 3/3/21 | Mon 5/31/21 | | Don Chenault | 0% |
| 38 | | | Network Installation | 64 days | Wed 3/3/21 | Mon 5/31/21 | | Don Chenault | 0% |
| 39 | | | All Other wiriing/configuration | 64 days | Thu 3/11/21 | Tue 6/8/21 | 32 | Don Chenault | 0% |
| 40 | | | **CONTAINER BUILD** | **126 days** | **Mon 3/1/21** | **Mon 8/23/21** | | **Tim Barbir** | **2%** |
| 41 | | | Submit Proposal | 2 days | Mon 3/1/21 | Tue 3/2/21 | | Tim Barbir | 100% |
| 42 | | | Approve Proposal | 3 days | Thu 3/4/21 | Mon 3/8/21 | 41 | Zach Bradford | 20% |
| 43 | | | Deliver 14 Containers | 61 days | Mon 3/8/21 | Mon 5/31/21 | 42 | Tim Barbir | 0% |
| 44 | | | Deliver Additional Containers Qty TBD | 60 days | Tue 6/1/21 | Mon 8/23/21 | 43 | Tim Barbir | 0% |
| 45 | | | **CoCP BUILD** | **116 days** | **Tue 2/1/22** | **Tue 7/12/22** | | **CoCP Engineering** | **0%** |
| 46 | | | 7 MW Delivered | 50 days | Tue 2/1/22 | Mon 4/11/22 | | CoCP Engineering | 0% |
| 47 | | | 15 MW Delivered | 72 days | Tue 2/1/22 | Wed 5/11/22 | | CoCP Engineering | 0% |
| 48 | | | 30 MW Delivered | 116 days | Tue 2/1/22 | Tue 7/12/22 | | CoCP Engineering | 0% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Task | | Inactive Milestone | | Start-only | | Critical Split |
| Split | | Inactive Summary | | Finish-only | | Progress |
| Milestone | ◆ | Manual Task | | External Tasks | | Manual Progress |
| Summary | | Duration-only | | External Milestone | ◈ | |
| Project Summary | | Manual Summary Rollup | | Deadline | ⬇ | |
| Inactive Task | | Manual Summary | | Critical | | |

Project: Simple Project Plan
Date: Wed 3/3/21

CONFIDENTIAL
CSBish0007237



CONFIDENTIAL
CSBish0007238



CONFIDENTIAL
CSBish0007239



CONFIDENTIAL
CSBish0007240



**CleanBlok Godby Rd Build 2021**

CONFIDENTIAL
CSBish0007241



**CleanBlok Godby Rd Build 2021**

CONFIDENTIAL
CSBish0007242



**CleanBlok Godby Rd Build 2021**

Tim Barbir

| | | | | |
|---|---|---|---|---|
| Task | | Inactive Milestone | Start-only | Critical Split |
| Split | | Inactive Summary | Finish-only | Progress |
| Milestone | ◆ | Manual Task | External Tasks | Manual Progress |
| Summary | | Duration-only | External Milestone | |
| Project Summary | | Manual Summary Rollup | Deadline | |
| Inactive Task | | Manual Summary | Critical | |

Project: Simple Project Plan
Date: Wed 3/3/21

CONFIDENTIAL
CSBish0007243



CONFIDENTIAL
CSBish0007244



CONFIDENTIAL
CSBish0007245



**CleanBlok Godby Rd Build 2021**

| | November 2021 | | | | December 2021 | | | | | | | January 2022 | | | |

CONFIDENTIAL
CSBish0007246



**CleanBlok Godby Rd Build 2021**

| Legend | | Legend | | Legend | | Legend | |
|---|---|---|---|---|---|---|---|
| Task | | Inactive Milestone | | Start-only | [ | Critical Split | |
| Split | | Inactive Summary | | Finish-only | ] | Progress | |
| Milestone | ◆ | Manual Task | | External Tasks | | Manual Progress | |
| Summary | | Duration-only | | External Milestone | ◇ | | |
| Project Summary | | Manual Summary Rollup | | Deadline | ⬇ | | |
| Inactive Task | | Manual Summary | | Critical | | | |

Project: Simple Project Plan
Date: Wed 3/3/21

CONFIDENTIAL
CSBish0007247



CONFIDENTIAL
CSBish0007248



CONFIDENTIAL
CSBish0007249



**CleanBlok Godby Rd Build 2021**

| | May 2022 | June 2022 | July 2022 |
|---|---|---|---|
| 17  20  23  26  29 | 2  5  8  11  14  17  20  23  26  29 | 1  4  7  10  13  16  19  22  25  28 | 1  4  7  10  13  16  19 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Task | | Inactive Milestone | | Start-only | | Critical Split |
| Split | | Inactive Summary | | Finish-only | | Progress |
| Milestone | ◆ | Manual Task | | External Tasks | | Manual Progress |
| Summary | | Duration-only | | External Milestone | ◈ | |
| Project Summary | | Manual Summary Rollup | | Deadline | ⬇ | |
| Inactive Task | | Manual Summary | | Critical | | |

Project: Simple Project Plan
Date: Wed 3/3/21

CONFIDENTIAL
CSBish0007250



| | | | | | | |
|---|---|---|---|---|---|---|
| Task | | Inactive Milestone | | Start-only | | Critical Split |
| Split | | Inactive Summary | | Finish-only | | Progress |
| Milestone | | Manual Task | | External Tasks | | Manual Progress |
| Summary | | Duration-only | | External Milestone | | |
| Project Summary | | Manual Summary Rollup | | Deadline | | |
| Inactive Task | | Manual Summary | | Critical | | |

Project: Simple Project Plan
Date: Wed 3/3/21

CONFIDENTIAL
CSBish0007251



**CleanBlok Godby Rd Build 2021**

| | | | | | May 2022 | | | | | | | | | | | | June 2022 | | | | | | | | | July 2022 | | | | | |
| 17 | 20 | 23 | 26 | 29 | 2 | 5 | 8 | 11 | 14 | 17 | 20 | 23 | 26 | 29 | 1 | 4 | 7 | 10 | 13 | 16 | 19 | 22 | 25 | 28 | 1 | 4 | 7 | 10 | 13 | 16 | 19 |

ngineering

CoCP Engineering

CoCP Engineering

| | | | | |
|---|---|---|---|---|
| Task | | Inactive Milestone | Start-only | Critical Split |
| Split | | Inactive Summary | Finish-only | Progress |
| Milestone | ◆ | Manual Task | External Tasks | Manual Progress |
| Summary | | Duration-only | External Milestone | |
| Project Summary | | Manual Summary Rollup | Deadline | |
| Inactive Task | | Manual Summary | Critical | |

Project: Simple Project Plan
Date: Wed 3/3/21

CONFIDENTIAL
CSBish0007252

**EXHIBIT D**

Page 147

Z. BOZANIC, PH.D.

MR. PARTIDA: So now I want to introduce -- we're on Exhibit 77. Is that correct?

MR. LINKH: I think we've -- you've introduced up to 76.

MR. PARTIDA: Yeah. Okay. So this --

THE REPORTER: This will be 77.

MR. PARTIDA: Yes. Okay. Okay. Thank you. So I'm going to send this in a sec.

Okay. Tell me when you get this file. And Exhibit 77, I'll tell you what it is, it's an Excel file that we received as part of the backup for your report.

(Exhibit 77 was marked for identification.)

THE WITNESS: Let me download this. Hold on.

MR. PARTIDA: Yeah.

THE WITNESS: Okay. I have it open.

BY MR. PARTIDA:

Q   Okay. And can you tell me what this is?

Page 148

Z. BOZANIC, PH.D.

A   This is the output from the event study.  So when we were looking at some of those prior exhibits, and you're wondering what they were in terms of the evolution through time, this is reporting some of those elements.  So, for example, you see the coefficients here that were generated from that event study.

Q   Okay.  And if I go to the far right, or to the column U; correct?

A   Mm-hmm.

Q   These are different earnings releases.  And so when I see, for example, in U7, I believe it is, that's an earnings release.  So I'm looking at this output, that's essentially what you were talking about in the earlier exhibits, one of the earnings releases you identified?

A   Mm-hmm.

Q   Okay.  Now, can you tell me what is the p-value that you calculated for December 10, 2020?

A   Give me a second.  Hold on.  Get closer to my computer.  Okay.  You said

Page 149

Z. BOZANIC, PH.D.

what now?

Q     Can you tell me what the p-value is that you calculated for December 10, 2020?

A     So I'm not seeing this in this particular output, this date.  You said December -- 12/10/2020?

Q     Mm-hmm.  Well, I'll point you to the cells I want you to look for.

A     Okay.

Q     Go down to row 255, and look at Q255.

A     Oh, we might have to share this on the screen.  Q -- where are we? -- I see row 255, December 17, 2020.  Are you looking at the same?

Q     Well, when I'm -- so here, I can share my screen.

A     Yeah, maybe.  I'm sorry.

Q     So, I'm looking at this.  I'm looking at sheet 1.  Is that correct?

A     Yes.

Q     So what I see in sheet 1 is I see on row 255.

Page 150

Z. BOZANIC, PH.D.

A    Mm-hmm.

Q    Go down there.  I see 12/10/2020 in column A --

A    Something -- let me share my screen with you -- or maybe you can share yours.  I apologize, David.

Q    Yeah, no problem.  That's why we ask these questions.  Let me see -- I'm going to switch my computers here.  So why is it not letting me share?  Oh, share.  Great.  Okay.

Can you see my screen now?

A    It's, I think, rendering.  Yeah, there we go.  If you could make the font a little larger, the bottom right, like 130, that would be wonderful.

Q    Yes, I can.  Okay.

A    Okay.

Q    All right.  I know I'm controlling it now, so tell me if you need to slow it down.  I see that some of these have not rendered yet, but it has, like, the hash values there, but.

A    You know, honestly, David, the

Z. BOZANIC, PH.D.

issue there is the column. You have to adjust the length of the column. So, if you highlight the column A, yeah, and do that. You got it. You got it. Now we're fine.

Q   Okay. Perfect. See, there we go. Good. Okay. So would I go down to row 255, here.

A   There we go. Okay.

Q   I see 12/10/2020; right? And when I go over to Q.

A   Q.

Q   Or -- sorry. Right. Do you see under Q where I've clicked on right there?

A   I do. What's the header label for column Q?

Q   Column Q, yeah, let me go up to the top. P-value.

A   Okay.

Q   That's what I'm trying to ask. So can you tell me -- I think I understand, but can you confirm that zero is statistically significant and one is not? Or what do the ones and zeros mean?

Page 152

Z. BOZANIC, PH.D.

A    So, David, again, apologies. There's some formatting mask here, changes that you could elect that would allow us to better --

Q    Sure.

A    -- opine on this particular column.  So if you can right click that column.  So highlight Q.

Q    Yep.

A    Right click.

Q    Yep.

A    Format cells.

Q    Yep.

A    Okay.  Then go to number.

Q    Mm-hmm.

A    And just click okay.

Q    Mm.

A    Okay.  So now which row are we talking, 255?

Q    Yeah.

A    Okay.  So the p-value here is 0.1.  But we need to go -- well, go back up, sorry.  Yeah.  Okay.

Q    0.1.  Right.  And so if we go

Page 153

Z. BOZANIC, PH.D.

over back here then on row 255, 12/10/2020, this is the event study model. And then if we go over here to Q for 12/10/2020, if we go here to Q, which I've highlighted, that's 0.1 for the p-value. That's correct?

A    Yes.  And some change, but that's correct.

Q    And so that's not statistically significant?

A    We would want that p-value to be below that 0.1 to be significant at the 10 percent level.

Q    But I guess I've just -- earlier you had told me that a reasonable cut off of what would be a statistically significant p-value is 0.05, and so this is 0.1 and so I guess this is not statistically significant, is what I'm trying to understand.

A    Yes, you are correct.  So in this particular row that is not statistically significant.

Q    Okay.  And then if we go here,

Page 154

Z. BOZANIC, PH.D.

right, we see in column U, which says misreps; right?

A    Mm-hmm.

Q    And let's see.  We'll go up to the very top of what U is.  Sorry, it's going to take forever unless there's a faster way people know of getting there. And it's event; right?

A    Mm-hmm.

Q    And so do you know what event occurred on December 10, 2020, that's the beginning of the class period?

A    Off the top of my head, I'd have to go back and look at the complaint, but what the sheet is saying is that that particular day reviewing the complaint was classified as a misrepresentation identified in the complaint on that date.

Q    Right.  And so my point, I guess then my question is that, just to confirm then, on December 10, 2020, a date that was identified in the complaint as having two misrepresentations and a date that's the beginning of the class period --

Page 155

Z. BOZANIC, PH.D.

A     Mm-hmm.

Q     -- is there's no statistical significant p-value.

MR. LINKH:  David, is there a question?

MR. PARTIDA:  Yes.

BY MR. PARTIDA:

Q     I'm saying, is that accurate? That's accurate that there was no statistical significance on that day?

A     Apologies.  I wasn't sure if that was a statement or a question.  I thought I already asked this one where I said this is not statistically significant.

Q     Okay.  Perfect.  And I just had to ask the information because I had to get out that it was December 10, 2020, that that was a date identified as a complaint, or a misrepresentation in the complaint.  So I understand it might not be important for you, but it is for me, so I appreciate your indulgence.

Okay.  Now, I want to go do the

Page 156

Z. BOZANIC, PH.D.

same thing if we go down just a few days and I'd like to look at January 14, 2021. Which is -- here, let me go up a little more.  Sorry, I forgot that other people are looking at this.  And I can make it even maybe a little bigger if it's helpful.

All right.  So you see where we are here?

A    I do.

Q    And A is the event date or the date, January 14, 2021.  And we go over here, just over a little more to our handy dandy column number 12; right?  And there we see that the p-value, if I understand, I know it says 0.12.  I think that's again the column size, but more accurately, if we look up here, do you see where I've highlighted?

A    I do.

Q    The p-value, if I understand, is 11.61 percent, 0.0116.  And so we see here, if we go to the right, again, to U, that it's a corrective disclosure.  Is

Page 157

Z. BOZANIC, PH.D.

that accurate?

A    I'm sorry.  Is what accurate?

Q    Is it accurate that January 14, 2021, was a corrective disclosure date identified in column U?

A    That is accurate.

Q    Okay.  And it's accurate that there's not a statistically significant p-value there.  Is that correct?

A    That is also correct.

Q    Okay.  I want to do the same thing for the next day, January 15, 2021; right?  And I want to go over here to the p-value, and it says 0.019.  But again, if we look here at the top, actually, that's really high, I guess, but 18.79 is the p-value there.  So that's not statistically significant.  Is that correct?

A    That is correct.

Q    Okay.  And then I want to go down to February 12, 2021.  Go to 98, I want to go over here to Q.  And if we look here, can you confirm that the p-value is

Page 158

Z. BOZANIC, PH.D.

42.78 percent?

A    Yes, I confirm the same.

Q    And so that's not statistically significant.  Is that correct?

A    That is correct.

Q    Now, is it also correct that you flagged in this report nine dates as alleged misrepresentation dates?  And so I can maybe help you be able to answer that question in a fair way, I was going to propose sorting the U column.

A    Sure.  I could do so on my end.

Q    Yeah.  So we could look at it like that.

A    Sure.

Q    So let's just do it.

A    Okay.  So I've sorted U as well.

Q    Oh, you sorted U?

A    I just did it now, because I was -- yeah.

Q    Oh, you can do it on your end now.

A    I have it on my end now, yeah.

Q    Okay.  Got it.  Okay.  So can

Page 167

Z. BOZANIC, PH.D.

p.m. This is the beginning of media unit number 4.

Go ahead, Counsel.

MR. PARTIDA:  All right.

BY MR. PARTIDA:

Q    Welcome back, Dr. Bozanic.  I want to turn your attention briefly, briefly, but back to your report, Exhibit 73.  And I want to direct you back to paragraph 51.

A    5-1?

Q    5-1, correct.  Mm-hmm.

A    Thank you.

Q    And I just want to -- okay. Sorry.  Are you ready for me to ask you a question?

A    Oh, let me read it.  I'm sorry. I just got there.

Q    Oh, got it.  Okay.  I'm sorry.

A    I'm up to speed.  Thank you.

Q    Okay.  Perfect.  So I just want to confirm my understanding of the event study regression analysis.  And as I understand it, that the purpose of the

Page 168

Z. BOZANIC, PH.D.

event study analysis, as stated in paragraph 51 is to "Isolate the impact of company-specific news on CleanSpark's Common Stock prices during the Class Period" and to "measure the response of the Company's common stock to announcements of company specific news."

And so my question is, that's what your events study model is designed to do?

A    So I assume that's a question. So in paragraph --

Q    My question is, is that what your event study is designed to do?  To "Isolate the impact of company-specific news on CleanSpark's Common Stock prices during the Class Period" and to "measure the response of the Company's common stock to announcements of company specific news"?

A    Right.  Yeah.  So this paragraph here is talking about specifically, as you mentioned, this is controlling for other factors to isolate that company specific

Page 169

Z. BOZANIC, PH.D.

news.  That's correct.

Q    Perfect.  Okay.  I just wanted to make sure I understood that correctly. Just so you're --

A    It's isolating the impact of that news on price.

Q    Yeah.  Okay.  I understand. Okay.

Now, I want to move to kind of talk about -- so I understand now that the event study, what it's designed to do, to isolate that company specific information, your event study was designed to do that. And I guess my question is, so with regard to a company on a given day there could be a lot of different news about it.  There could be a lot of different types of news that come out about it on the same day. Is that correct?  Is that your understanding?  A lot of news could come out, different types of news.

A    I would agree with the general sentiment that in a given day for a given firm there's a variety of news that could

Z. BOZANIC, PH.D.

be disseminated.  That's correct.

Q    Right.  So I'll give you an example, or we could take an example from here.  One of the CleanSpark's earning releases has a variety of different pieces of information about different aspects of the company on it.  Is that accurate?

A    I would say so.  Yes.

Q    Yeah.  Okay.

A    For any given average earnings announcement, I would say so.  I'm not singling out that one particular, making any statements on that particular one.  But in any average earnings announcement, you would have that.  Yeah.

Q    Right.  Which is all I'm asking is there's just whatever mix of information.  And where my question is, an event study, it takes into account specific mix of company information -- well, withdraw that.

        Can an event study, is an event study capable of isolating the impact of various different types of news about that

Z. BOZANIC, PH.D.

company?  And I'll give the earnings release as an example.  Would you be able to tell me in an event study or with your event study if a certain piece of news in that earnings report had a larger or smaller impact, or just you know that the report itself had an impact, or release had an impact?

A     So let me just go back.  So in terms of what the event study is trying to show is how when information arrives, the evolution of that information as it arrives, how does it impact stock price; right?  So I understood your question to be if you have a single -- like at first you started to say if I have multiple news events ---

Q     Right.

A     -- throughout the day versus if I have a single disclosure which contains multiple pieces of information, which one were you referring to?

Q     Oh, that's actually -- I didn't even understand that I had asked it two

Page 172

Z. BOZANIC, PH.D.

specific ways, I guess, or two different ways.  So thank you for clarifying that.

What I'm trying to understand is -- I guess I'll ask it this way.  If I understand an event study correctly that can tell me that, look, the total mix of available news, company specific, about this company, had an impact on the stock price or didn't.  But I don't understand that an event study is capable of breaking it down further than that, by saying this particular piece of information about the company had this impact, and this piece of information had that impact.  Is an event study capable of parsing it out on that level of detail?

And the reason I asked about multiple news events, and I didn't think about, you know, if you have them successively, you know, one after the other, or in, you know, a single release, but the more general question is, is an event study capable of distinguishing between the impacts of various specific

Page 173

Z. BOZANIC, PH.D.

pieces of information about a company that were all released on the same day, same event day?

A    Right.  So the confusion still remains that I have in my head, because the way that you just described that question could involve either scenario. And so let me answer with regards to the first scenario, or the second scenario that I've mentioned, which is the arrival of information throughout the day; right? So here, for the event study analysis, I'm looking at a day by day basis.  You are correct.  Okay?

And you're also correct that for a given firm, information could arrive at different intervals throughout the day. Now, this is a daily return based upon closing stock market prices being used in this analysis.  If you start to have information that comes out throughout the market at different points in the day, this is where you start to use intraday data; right?

Page 174

Z. BOZANIC, PH.D.

So this is one potential approach in terms of saying which piece of information within the day. So if it arrived at different points of time, the availability of intraday pricing data would be helpful to form a response to the particular question that you've raised.

Q   Got it. And that's all helpful because I guess I think it helps me understand the answer to my question, is that the event study you did for this report doesn't do any of that?

A   So what -- I'm not looking at intraday data for this event. That's correct. So this is using daily data at this point in time. It's not distinguishing between individual elements of information that arrive throughout the day. That's correct.

Q   Perfect. That confirms my understanding. I think I understand now.

If you were able to go about disentangling the information, trying to separate it out, as you just mentioned,

Page 175

Z. BOZANIC, PH.D.

you said it would be helpful to have intraday data; correct?

A    That's correct.

Q    And explain to me a little bit why.

A    So the idea here, and as I've said, I've not done this here, but this is one potential approach to the scenario that you mentioned is to say, how is the stock price moving through the day; right? And so instead of saying, how did it perform throughout the entire day and using a summary return for that day, you can start to look at how the price moves throughout the day.

And so as the arrival of information occurs, you look at the timestamp of the arrival of the information, then you can look at shorter intervals. So all we're doing here is decreasing the interval. Currently, the interval being used for this analysis is daily returns; right? Then you can start to see -- look at the price movement

Z. BOZANIC, PH.D.

throughout the evolution of the trading day as information arrives to the market to see how the price responds.

Q   Got it.  And how short of an intraday window would you use for an intraday event study like that?  So if, for example -- well, I'll stick with that.  How short of an intraday window would you use?

A   I'd have to look at the specific facts and circumstances of the case.  If we look to academic literature, I believe there's a variety of windows used depending upon what they're testing for.

Q   So the answer is you don't know as of this point in time, you don't know how short of an intraday window you would use?

A   The answer is I haven't formed an opinion because I haven't reviewed the facts and circumstances of -- case that's before me.

Q   Okay.  So I understand.  So that solves the scenario where you say, you

Page 177

Z. BOZANIC, PH.D.

know, there's a whole bunch of successive releases. I want to talk about the scenario where you don't. It's all in the same document.

As far as I understand, the intraday data and the intraday event study wouldn't be useful for that project; would it?

A    Correct. So in this particular case, this is the other scenario that we talked about, the first scenario where you have different elements of information coming out at the same time; right? And then disentangle the different elements, that becomes trickier.

Q    And how so?

A    So from a statistical perspective, it's difficult to disentangle whether information, element A versus B versus C, say that came out at 10:00 a.m., which, if the stock price did move, which was the element of information that was relied upon such that the price did move.

Q    So I want to go to then -- how

Z. BOZANIC, PH.D.

would you do it if you had to do it, if you had to try?

A    So as I said, it's tricky.  And so from a statistical perspective, very difficult; right?  However, what you have to do at this point -- this is beyond what we're doing here in terms of class certification stage -- but down the road, if I were to look at price impact, this is where we start to rely on the users in the market of said information to see what they relied upon.

From a statistical perspective, that is very difficult.  What you could do is say, they were, in my hypothetical, three elements of information.  And we saw at some interval that the price moved as a response to that disclosure with those three elements of information.  Now, the question becomes who paid attention to which information to support the view that element A, B versus C were the elements that were relied upon by whatever investor analyst.

Page 179

Z. BOZANIC, PH.D.

Q    So that would not be done with an event study?

A    This would be very tricky to disentangle with an event study.  You would have to support -- you'd have to show the result to say that the price moved; you would have to also concede that there were multiple elements of information arriving at the market at the same time.  And then beyond that, the event study does not tell you which piece of information was moving the market. You'd have to look for corroborating evidence.

Q    Okay.  And but that you would have to look at the actual analyst reports, which is not something you were asked to do here?

A    That is correct.

Q    Okay.  We're going to play a fun game in a minute.  Before we get to that, what I want to do is go back to -- bear with me a moment.

So are you aware of -- sorry,

**EXHIBIT E**

D. HASTHANTRA - CONFIDENTIAL

are the damages because that is not something that I can determine myself as an investor.  I have to enroll my attorneys to get help to determine the damages, so I have to discuss it with them to answer that question to you exactly.

Q.    I think you are right.  I don't think that way is going to work, so let's try it a different way.

How many CleanSpark shares do you own today?

A.    Exact number, I do not know, but approximately -- I have not sold anything since I bought.  So, all the stocks that are disclosed by me earlier, I still own them.  It was approximately around 3,600, I believe.  Approximately around that.  Exact number I have to go back and see, but it is approximately that much.

Q.    How much did you pay for those shares when you bought them?

MR. FALLON:  Is there a specific date you have in mind?

Page 53

D. HASTHANTRA - CONFIDENTIAL

A.      See, right now, the trend is AI.  Whatever is related to AI, it is doing very well actually.  The stocks are doing well.  So, those times when I bought the stocks, it was about bitcoin because bitcoin was going up significantly.  So, also, CleanSpark was an energy grid business, and they knew how to efficiently manage the energy for producing the bitcoins, for mining the bitcoins.  So, I felt that combination was great because they should know how to efficiently manage the power or energy, and at the same time, they should know how to mine the bitcoin.  And online, internet bitcoin was one of the top performing industries at that time.  I really missed out on investing with bitcoin when it was $500.  I had opportunity, but I really missed out, so I did not want to miss out again one more time.  That's why -- but I could not afford to buy bitcoin at that point of time.  That's why I took a route to invest in bitcoin indirectly through CleanSpark having known

Page 54

D. HASTHANTRA - CONFIDENTIAL

that this will be a very good long=term performer.  For short term and long term.

Q.    How often do you typically make trades?

A.    At this point of time, I'm not making any trades.  At that point of time, I used to have money in my savings, and I used to make trades at that point of time with my retirement and goal -- being the goal.  So, I used to trade regularly, but I am not -- I invested regularly.  I have not bought and sold.  I bought only and with long term in mind, with long term results in mind.  I would say regularly.  On a daily basis, multiple times a week. Regularly during the month and the year.

Q.    So, is it accurate to say that when you were purchasing stocks, you were trading to the extent that you were acquiring additional stocks that were mostly purchases of stock; is that accurate?

A.    Yes.

Q.    And the point, I guess, or what

D. HASTHANTRA - CONFIDENTIAL

Earlier you testified that around February or March, beginning in February or March, you started to find out about all these CleanSpark misstatements.

I'm asking why you continued to buy CleanSpark stock after that.

MR. FALLON:  Object to form.

A.      See, at that point of time, I did not know everything that was going on behind the scenes.  I used to just hear about the stock that they -- it is a like a (unintelligible) stock, like a (unintelligible) It will do very well. Inflated projections.  The stock used to go up, and up, and up, and up actually, so there is something called fear of missing out, so I was just buying more and more and more because I thought it will go up in the sky like a rocket ship.  So, that is why I used to buy more and more thinking that this would do great, but later on I figured out things did not go well and it was all inflated.

MR. PARTIDA:  I'm going to show

**EXHIBIT F**

**Earnings Update**
Clean Technology
**August 18, 2021**

# ✖ H.C.WAINWRIGHT&CO.

**CleanSpark, Inc. (CLSK)**
**Rating: Buy**

Amit Dayal
212-356-0517
adayal@hcwresearch.com
Sameer Joshi
212-356-0538
sj@hcwresearch.com

## Poised for Significant Ramp in Hashrate During FY2022; F3Q21 Results Update

| Stock Data | 08/17/2021 |
|---|---|
| Price | $11.65 |
| Exchange | NASDAQ |
| Price Target | $50.00 |
| 52-Week High | $42.60 |
| 52-Week Low | $6.92 |
| Enterprise Value (M) | $393 |
| Market Cap (M) | $415 |
| Shares Outstanding (M) | 35.6 |
| 3 Month Avg Volume | 1,559,307 |
| Short Interest (M) | 4.08 |

| Balance Sheet Metrics | |
|---|---|
| Cash (M) | $22.2 |
| Total Debt (M) | $0.9 |
| Total Cash/Share | $0.62 |

| EPS ($) Diluted | | | |
|---|---|---|---|
| Full Year - Sep | 2020A | 2021E | 2022E |
| 1Q | (0.40) | (0.32)A | -- |
| 2Q | (1.13) | 0.22A | -- |
| 3Q | (0.77) | (0.49)A | -- |
| 4Q | (0.14) | 0.05 | -- |
| FY | (2.44) | (0.54) | 0.37 |

| Revenue ($M) | | | |
|---|---|---|---|
| Full Year - Sep | 2020A | 2021E | 2022E |
| 1Q | 1.0 | 2.3A | -- |
| 2Q | 3.7 | 8.1A | -- |
| 3Q | 3.4 | 11.9A | -- |
| 4Q | 2.0 | 22.4 | -- |
| FY | 10.0 | 44.7 | 130.3 |



**F3Q21 results update.** On August 16, CleanSpark announced its F3Q21 results with revenues of $11.9M (246.5% YoY increase and 46.8% QoQ increase). Gross margins were 67.7% compared to 81.1% in F2Q21 and 41.0% in F1Q21, mainly supported by Bitcoin contribution. We expect to see fluctuations in gross margins during the next few quarters based on revenue mix and Bitcoin prices. Operating expenses during the quarter were $22.7M compared to $9.1M in F2Q21 and $2.7M in F3Q20. Operating expenses were affected by non-recurring executive compensation of $4.7M, stock-based compensation of $3.2M, and $3.7M of impairment expense. The company reported a net loss of $16.7M during F3Q21 or $0.49 per share, compared to a net loss of $8.6M or $0.77 per share during F3Q20. The company ended the quarter with $22.2M in cash, $10.4M in digital currency, and $125.9M in deposits on mining equipment.

**Key takeaways.** CleanSpark has revised its FY2021 outlook with expectations for revenues to range between $49M and $63M (from $47M and $60M). Energy, Services, and Bitcoin Mining segment revenues for the fiscal year are now expected to range between $9-12M, $2M, and $38-48M, respectively. We believe a greater portion of this outlook is reliant on Bitcoin price levels over the course of the year. Management indicated it is assuming price of $47,000/Bitcoin. Our revenue expectations for FY2021 are $44.7M, lower than the guided range as we are being more conservative in our view of Bitcoin prices. As of August 14, the company's overall hashrate was 820PH/s, capable of producing 6.7BTC/day. CleanSpark is in the process of adding mining capacity over the next 12-14 months, for which it has already made advance deposits. Management expects a total of 11,700 miners to be deployed by September 30, 2021, 19,900 by December 31, 2021, 25,500 by March 31, 2022, 30,000 by June 30, 2022, and 34,000 by September 30, 2022. As a result, the total hashrate installed at the end of FY2022 is expected to be 3.2-3.4EH/s, enough to produce 26-28BTC/day. We are taking a conservative stance and modeling the capacity to reach less than 10BTC/day by September 2022, mainly to hedge for: (1) any potential delays in deployment; (2) increase in difficulty rates of mining bitcoins given the increasing number of rigs being added industry-wide; and (3) uncertainty related to bitcoin prices. We may have to revise our projections upwards over the next few quarters if the company is able to maintain its mining equipment deployment schedule and bitcoin prices hold up. CleanSpark plans to hold the Bitcoins it is mining, and is exploring options on how it can generate additional yield from those holdings. Backlog in the Energy segment is around $24.5M with $9.0-12.0M of this expected to be recognized during F4Q21. The company expects improvements in the energy sector supply chain that has been challenged by tight battery supply; toward that end, CleanSpark was able to shore up a large number of batteries during June and July.

---

For definitions and the distribution of analyst ratings, analyst certifications, and other disclosures, please refer to pages 4 - 5 of this report.

August 18, 2021

**Maintain Buy.** We are estimating CleanSpark's revenues to be approximately $44.7M in FY2021 and expect these to increase to $514.3M in FY2030, at a nine-year CAGR of approximately 31.2%. We are projecting blended gross margins of 73.2% during FY2021 and expect these to range between 65.0-75.0% going forward depending on revenue mix and contribution from Bitcoin. Our operating expense estimate for FY2021 is $52.6M; we expect operating expenses to increase to $97.4M in FY2030 at a nine-year CAGR of 7.1%. We arrive at our $50 PT using a discounted cash flow (DCF) model with a discount rate of 10.3%, derived from the company's weighted average cost of capital (WACC).

**Risks.** (1) Dilution risk; (2) execution risk; (3) merger integration risk; (4) technology risk; (5) regulatory risk; (6) Bitcoin price volatility; (7) competition risk; (8) Intellectual property (IP) risk; and (9) macroeconomic risks related to COVID-19.

## Important Disclaimers

This material is confidential and intended for use by Institutional Accounts as defined in FINRA Rule 4512(c). It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply to unsubscribe@hcwresearch.com and delete it from your system; you may not copy this message or disclose its contents to anyone. The integrity and security of this message cannot be guaranteed on the Internet.

**H.C. WAINWRIGHT & CO, LLC RATING SYSTEM:** H.C. Wainwright employs a three tier rating system for evaluating both the potential return and risk associated with owning common equity shares of rated firms. The expected return of any given equity is measured on a RELATIVE basis of other companies in the same sector. The price objective is calculated to estimate the potential movements in price that a given equity could reach provided certain targets are met over a defined time horizon. Price objectives are subject to external factors including industry events and market volatility.

**RETURN ASSESSMENT**
**Market Outperform (Buy):** The common stock of the company is expected to outperform a passive index comprised of all the common stock of companies within the same sector.
**Market Perform (Neutral):** The common stock of the company is expected to mimic the performance of a passive index comprised of all the common stock of companies within the same sector.
**Market Underperform (Sell):** The common stock of the company is expected to underperform a passive index comprised of all the common stock of companies within the same sector.



Investment Banking Services include, but are not limited to, acting as a manager/co-manager in the underwriting or placement of securities, acting as financial advisor, and/or providing corporate finance or capital markets-related services to a company or one of its affiliates or subsidiaries within the past 12 months.

| Distribution of Ratings Table as of August 17, 2021 | | | | |
|---|---|---|---|---|
| | | | IB Service/Past 12 Months | |
| Ratings | Count | Percent | Count | Percent |
| Buy | 509 | 90.25% | 191 | 37.52% |
| Neutral | 50 | 8.87% | 15 | 30.00% |
| Sell | 1 | 0.18% | 0 | 0.00% |
| Under Review | 4 | 0.71% | 1 | 25.00% |

H.C. Wainwright & Co, LLC (the "Firm") is a member of FINRA and SIPC and a registered U.S. Broker-Dealer.

I, Amit Dayal and Sameer Joshi , certify that 1) all of the views expressed in this report accurately reflect my personal views about any and all subject securities or issuers discussed; and 2) no part of my compensation was, is, or will be directly or indirectly related to the specific recommendation or views expressed in this research report; and 3) neither myself nor any members of my household is an officer, director or advisory board member of these companies.

None of the research analysts or the research analyst's household has a financial interest in the securities of CleanSpark, Inc. (including, without limitation, any option, right, warrant, future, long or short position).

As of July 31, 2021 neither the Firm nor its affiliates beneficially own 1% or more of any class of common equity securities of CleanSpark, Inc..

Neither the research analyst nor the Firm knows or has reason to know of any other material conflict of interest at the time of publication of this research report.

The research analyst principally responsible for preparation of the report does not receive compensation that is based upon any specific investment banking services or transaction but is compensated based on factors including total revenue and profitability of the Firm, a substantial portion of which is derived from investment banking services.

CleanSpark, Inc.                                                                                                      August 18, 2021

The Firm or its affiliates did receive compensation from CleanSpark, Inc. for investment banking services within twelve months before, and will seek compensation from the companies mentioned in this report for investment banking services within three months following publication of the research report.

H.C. Wainwright & Co., LLC managed or co-managed a public offering of securities for CleanSpark, Inc. during the past 12 months.

The Firm does not make a market in CleanSpark, Inc. as of the date of this research report.

The securities of the company discussed in this report may be unsuitable for investors depending on their specific investment objectives and financial position. Past performance is no guarantee of future results. This report is offered for informational purposes only, and does not constitute an offer or solicitation to buy or sell any securities discussed herein in any jurisdiction where such would be prohibited. This research report is not intended to provide tax advice or to be used to provide tax advice to any person. Electronic versions of H.C. Wainwright & Co., LLC research reports are made available to all clients simultaneously. No part of this report may be reproduced in any form without the expressed permission of H.C. Wainwright & Co., LLC. Additional information available upon request.

H.C. Wainwright & Co., LLC does not provide individually tailored investment advice in research reports. This research report is not intended to provide personal investment advice and it does not take into account the specific investment objectives, financial situation and the particular needs of any specific person. Investors should seek financial advice regarding the appropriateness of investing in financial instruments and implementing investment strategies discussed or recommended in this research report.

H.C. Wainwright & Co., LLC's and its affiliates' salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies that reflect opinions that are contrary to the opinions expressed in this research report.

H.C. Wainwright & Co., LLC and its affiliates, officers, directors, and employees, excluding its analysts, will from time to time have long or short positions in, act as principal in, and buy or sell, the securities or derivatives (including options and warrants) thereof of covered companies referred to in this research report.

The information contained herein is based on sources which we believe to be reliable but is not guaranteed by us as being accurate and does not purport to be a complete statement or summary of the available data on the company, industry or security discussed in the report. All opinions and estimates included in this report constitute the analyst's judgment as of the date of this report and are subject to change without notice.

Securities and other financial instruments discussed in this research report: may lose value; are not insured by the Federal Deposit Insurance Corporation; and are subject to investment risks, including possible loss of the principal amount invested.

**EXHIBIT G**

# UPDATE NOTE

## CLEANSPARK, INC. | EQUITY RESEARCH


WATER TOWER RESEARCH

### CLEANSPARK, INC. (NASDAQ: CLSK)

3Q21 Results: +247% Revenue Growth Fueled by Bitcoin Mining; Management Raises FY21 Guidance

August 19, 2021
Shawn Severson, Mark Palmieri
ClimateTech & Sustainable Investing
sustainableinvesting@watertowerresearch.com
+1 (312) 283 7534

## KEY POINTS

- On August 16, 2021, CleanSpark reported its 3Q21 earnings results. The company delivered strong revenue growth fueled by bitcoin mining, but missed consensus estimates for the quarter. The stock traded down -15.1% post-earnings and is currently trading at ~1.9x 2022E sales.

- Consolidated revenue in the quarter was up +246.5% y/y and +46.8% q/q. Bitcoin mining grew +28.8% q/q, energy accelerated +159.6% q/q, and other revenues increased +34.0%. All-in-all, revenue saw positive momentum sequentially.

- Revenue acceleration flowed through to gross profit, which saw +13.8x growth y/y to $8.1 million, although gross margin contracted -13.4 pp q/q. Adjusted EBITDA increased +$3.4 million y/y to $2.3 million or 19.3% of revenue.

- Net income fell by -$8.1 million y/y to -$16.7 million, mainly driven by significantly higher payroll expenses related to non-recurring executive compensation. Professional fees saw an uptick from legal services to resolve outstanding litigation. D&A also increased as more equipment was used for data center and bitcoin mining applications. Marketing expenses drove higher G&A as well.

- The company ended the quarter with cash on hand of $22.2 million and $10.4 million of bitcoin (~301.4 bitcoins) on the balance sheet. Debt outstanding was $1.4 million, comprised of lease liabilities. Cash decreased from the prior quarter mainly due to increased deposits on bitcoin mining equipment and capex. Importantly, CleanSpark's hashrate capacity now exceeds 820 PH/s or 6-7 bitcoins per day.

- Management raised its FY21 revenue guidance by +$3.0 million and now expects revenue of $49-63 million. This is comprised of $38-48 million in bitcoin mining revenue, $9-12 million in energy revenue, and $2.0 million in other services revenue.

- Our prior content on CLSK can be accessed HERE.

## KEY STATISTICS

| | |
|---|---|
| **Price** | $10.72 |
| **52 Week Range** | $6.92 - $42.60 |
| **Avg. Daily Vol. (30 day)** | 1,534,811 |
| **Shares Out (MM)** | 35.6 |
| **Market Cap (MM)** | $381.5 |
| **Insiders Own %** | 8.4% |
| **Short Int. / % of float** | 4,080k / 12.4% |
| **Debt to Equity** | 0.5% |
| **Revenue TTM (MM)** | $24.2 |
| **Fiscal Year End** | September |

Source: YCharts, *As of August 19, 2021

## EARNINGS SNAPSHOT

**Financial Summary**

| ($mm, except per share) | 3Q21 | Y/Y | Q/Q |
|---|---|---|---|
| Revenue | 11.9 | 246.5% | 46.8% |
| Gross Profit | 8.1 | 1,275.2% | 22.6% |
| Gross Margin | 67.7% | 5,064 bps | (1,336) bps |
| Adj. EBITDA | 2.3 | 3.4 | 0.6 |
| Adj. EBITDA Margin | 19.3% | 5,148 bps | (110) bps |
| Net Income | (16.7) | (8.1) | (23.9) |
| Net Margin | (140.0%) | 10,873 bps | (22,891) bps |
| Diluted EPS | ($0.49) | $0.28 | ($0.71) |
| Cash | 22.2 | 20.3 | (135.1) |
| Debt | 1.4 | 0.7 | (0.2) |

**Revenue Mix**

| ($mm, except per share) | 3Q21 | Y/Y | Q/Q |
|---|---|---|---|
| Bitcoin Mining | 8.6 | n.m. | 28.8% |
| Energy | 2.9 | (7.0%) | 159.6% |
| Other Services | 0.4 | 12.5% | 34.0% |

# UPDATE NOTE

## CLEANSPARK, INC. | EQUITY RESEARCH



## COMPANY OVERVIEW

CleanSpark, Inc. (CLSK) is in the business of providing advanced software, controls, and technology solutions to solve modern energy challenges. CleanSpark has a suite of software solutions that provides end-to-end microgrid energy modeling, energy market communications, and energy management solutions. CleanSpark's offerings consist of intelligent energy monitoring and controls, intelligent microgrid design software, middleware communications protocols for the energy industry, energy system engineering, custom hardware solutions, microgrid installation and implementation services, traditional data center services, and software consulting services. The company and its subsidiaries also own and operate a fleet of bitcoin miners at its facility outside of Atlanta, Georgia. CleanSpark plans to apply its technologies with the goal of mining bitcoin at the lowest energy prices in the United States.

### The Technology

A microgrid is a decentralized group of electricity sources and loads that normally operates connected to and synchronous with the traditional wide area main grid but can also disconnect and function autonomously (as an island) as physical or economic conditions dictate. This structure enables a microgrid to integrate various sources of distributed generation, especially renewable energy sources, providing emergency power through island and connected modes. Microgrids have emerged from being typical low-voltage AC grids using diesel generators to employing a mixture of distributed energy resource (DER) systems, including small-scale power generation and storage technologies primarily using renewable energy sources. These DER systems may include biomass, combined heat and power (CHP), fuel cells, hydroelectric, solar PV, and wind power. Microgrids aggregate and optimize these DERs and represent a key component of an emerging energy cloud focused on resilience and renewable energy integration, and with the right set of control technologies, they not only provide energy at sites but also offer value upstream to the larger grid. According to Guidehouse Insights, the global market for microgrids is expected to grow at a CAGR of 28% through 2029.

### End Markets & Applications

**Software-as-a-Service (SaaS) & Controls:** CleanSpark's integrated software suite provides end-to-end microgrid energy controls and management solutions. The core product is mPulse, a proprietary platform that enables integration and optimization of multiple energy sources such as solar, batteries, and generators. Monthly reporting and cloud functionality is available for multiple tiers of mPulse. CleanSpark's software is vendor and hardware agnostic.

**Residential Microgrids:** CleanSpark is focused on the residential microgrid market with its mVoult power system. mVoult is a smart controlled microgrid for the home or small business and can be integrated with a new or existing system, including solar, wind, generators, and energy storage solutions. mVoult is highly customizable and provides resilient, back-up power in the event of a disruption from the traditional utility grid. This is an especially compelling market opportunity as high-profile grid outages have plagued homeowners and businesses in recent years.

**Bitcoin Mining:** CleanSpark entered the bitcoin mining business through its acquisition of ATL Data Centers in December 2020. The company is rapidly scaling its bitcoin operation and expects its bitcoin mining hashrate capacity to reach 2.0 EH/s by December 2021 and 3.2 EH/s by September 2022. At current difficulty rates, 3.2 EH/s would represent approximately 27-30 bitcoins per day. Management believes bitcoin mining will help the company achieve its FY21 revenue target of $49-63 million. Longer term, CleanSpark's annualized revenue from bitcoin alone could exceed $325 million, assuming the production of 25-28 bitcoins per day and a price of $35,000+ per bitcoin.

**Hardware:** CleanSpark has two main products in its hardware division: switchgear and battery systems. Both components are key parts of a distributed energy generation system or microgrid. CleanSpark sells both low-voltage and high-voltage switchgear, which are custom-designed and manufactured to customers' specifications and requirements with the capability to support all major manufacturers' generator sets. CleanSpark is also a reseller of batteries. The company views the battery reseller opportunity as a way to enhance revenue and improve profit margins in the hardware business as an add-on component that is highly synergistic with the existing product portfolio and strategy.

# UPDATE NOTE

## CLEANSPARK, INC. | EQUITY RESEARCH



## ABOUT THE ANALYSTS



**Shawn Severson**

President & Co-Founder

Head of ClimateTech &
Sustainable Investing
Research

Shawn Severson is President & Co-Founder of Water Tower Research and is a member of the Board of Managers. Prior to co-founding Water Tower Research and previously founding predecessor firm alphaDIRECT Advisors, Shawn spent over 20 years as a senior equity research analyst covering the Technology and ClimateTech sectors, including senior positions at JMP Securities, ThinkEquity, Robert W. Baird (London), and Raymond James.

Shawn started his career as an Equity Research Associate at Kemper Securities. Shawn was frequently ranked as a top research analyst, including one of the Wall Street Journal's "Best on the Street" stock pickers and a StarMine Analyst Awards Top 3 stock picker. Shawn holds a BA in Finance and Economics from Augustana College.



**Mark Palmieri**

Senior Analyst

ClimateTech & Sustainable
Investing Research

Mark Palmieri is Senior Analyst at Water Tower Research covering BioEconomy, ClimateTech & Sustainable Investing, and Industrial Technology. Prior to joining Water Tower Research, Mark spent over seven years in corporate finance and investment banking in New York City and San Francisco.

Mark spent over four years on Wall Street advising public and private issuers on equity financing alternatives including initial public offerings, follow-on equity offerings, private placements, and equity-linked financings. Mark has worked on the origination and execution of transactions raising in excess of $10 billion for small- and mid-cap clients across the alternative energy, biotechnology, internet, life sciences, and software verticals, among others. Mark holds a BA degree in Economics from New York University.

# UPDATE NOTE

## CLEANSPARK, INC. | EQUITY RESEARCH



---

<div style="background:#1a3a5c; color:white; padding:4px;">

**DISCLOSURES**

</div>

Water Tower Research ("WTR") is a professional publisher of investment research reports on public companies and, to a lesser extent, private firms ("the Companies"). WTR provides investor-focused content and digital distribution strategies designed to help companies communicate with investors.

WTR is not a registered investment adviser or a broker/dealer nor does WTR provide investment banking services. WTR operates as an exempt investment adviser under the so called "publisher's exemption" from the definition of investment adviser under Section 202(a)(11) of the Investment Advisers Act of 1940. WTR does not provide investment ratings / recommendations or price targets on the companies it reports on. Readers are advised that the research reports are published and provided solely for informational purposes and should not be construed as an offer to sell or the solicitation of an offer to buy securities or the rendering of investment advice. The information provided in this report should not be construed in any manner whatsoever as personalized advice. All users and readers of WTR's reports are cautioned to consult their own independent financial, tax and legal advisors prior to purchasing or selling securities.

Shawn Severson and Mark Palmieri, who are the writers of this report, cover the BioEconomy, ClimateTech & Sustainable Investing, Emerging Growth & Special Situations, and Industrial Technology sectors for WTR. Mr. Severson and members of his household have no personal or business-related relationship to the subject company other than providing digital content and any ancillary services WTR may offer. Mr. Palmieri and members of his household have no personal or business-related relationship to the subject company other than providing digital content and any ancillary services WTR may offer.

Unless otherwise indicated, WTR intends to provide continuing coverage of the covered companies. WTR will notify its readers through website postings or other appropriate means if WTR determines to terminate coverage of any of the companies covered.

WTR is being compensated for its research by CleanSpark, Inc. which is the subject of this report. WTR receives no more than a maximum of $10,500 per month from a given client and is required to have at least a 6-month commitment. None of the earned fees are contingent on, and WTR's client agreements are not cancellable for the content of its reports. WTR does not accept any compensation in the form of warrants or stock options or other equity instruments that could increase in value based on positive coverage in its reports.

WTR or an affiliate may seek to receive compensation for non-research services to covered companies, such as charges for presenting at sponsored investor conferences, distributing press releases, advising on investor relations and broader corporate communications and public relations strategies as well as performing certain other related services ("Ancillary Services"). The companies that WTR covers in our research are not required to purchase or use Ancillary Services that WTR or an affiliate might offer to clients.

The manner of WTR's research compensation and Ancillary Services to covered companies raise actual and perceived conflicts of interest. WTR is committed to manage those conflicts to protect its reputation and the objectivity of employees/analysts by adhering to strictly-written compliance guidelines.

In certain instances, including this report, WTR will write research covering non-clients. Readers should assume that WTR may seek to turn these non-paying companies into paying clients. Likewise, WTR may seek to transform these non-clients into paying clients of it or of its affiliate, which provides services such as presenting at sponsored investor conferences, distributing press releases, advising on investor relations and broader corporate communications and public relations strategies as well as performing certain other related services ("Ancillary Services"). The companies that WTR covers in our research are not required to purchase or use Ancillary Services of WTR or an affiliate might offer to clients.

The views and analyses included in our research reports are based on current public information that we consider to be reliable, but no representation or warranty, expressed or implied, is made as to their accuracy, completeness, timeliness,

---

# UPDATE NOTE

## CLEANSPARK, INC. | EQUITY RESEARCH



or correctness. Neither we nor our analysts, directors, officers, employees, representatives, independent contractors, agents or affiliate shall be liable for any omissions, errors or inaccuracies, regardless of cause, foreseeability or the lack of timeliness of, or any delay or interruptions in the transmission of our reports to content users. This lack of liability extends to direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, losses, lost income, lost profit or opportunity costs.

All investment information contained herein should be independently verified by the reader or user of this report. For additional information, all readers of this report are encouraged to visit WTR's website www.watertowerresearch.com.

**EXHIBIT H**

# FIRESIDE CHAT INVITATION
## CLEANSPARK, INC. | EQUITY RESEARCH



WATER
TOWER
RESEARCH

## CLEANSPARK, INC. (NASDAQ: CLSK)
WTR Fireside Chat Series: Bitcoin Mining Deep-Dive with CleanSpark CEO Zach Bradford

August 20, 2021
Shawn Severson, Mark Palmieri
ClimateTech & Sustainable Investing
sustainableinvesting@watertowerresearch.com
+1 (312) 283 7534

## KEY POINTS

- On Tuesday, August 24, 2021, at 1:30 pm EDT, we will be hosting CleanSpark CEO Zach Bradford in our Sustainable Investing Fireside Chat Series. We will be covering a deep-dive on CleanSpark's bitcoin mining operation focusing on the recent increase in hashrate capacity, the associated margin opportunity, and outlook for this business. The event is open to all investors.

- CleanSpark is in the business of providing advanced software, controls, and technology solutions to solve modern energy challenges. CleanSpark has a suite of software solutions that provides end-to-end microgrid energy modeling, energy market communications, and energy management solutions. The company and its subsidiaries also own and operate a fleet of bitcoin miners at its facility outside of Atlanta, Georgia.

- Our prior content on CLSK can be accessed HERE.

**Register for the event here.**

Water Tower Research (WTR) is an investor engagement and stakeholder communications platform powered by sector experts with significant Wall Street and industry experience. We create, deliver, and maintain the information flow required by companies to build and preserve relationships with all stakeholders and existing and potential investors. In today's world of multiple digital communications platforms, it is challenging for companies to consistently engage constructively with investors, customers, suppliers, and employees. Unified messaging and consistent communications with compelling digital content are paramount to achieving that goal. At WTR, our Wall Street veterans and digital strategies provide the foundation for realizing investor relations and communication objectives. "Research for the Other 99%™" opens the door for companies to digitally share their stories directly and engage with a broad, diverse set of investors.

## KEY STATISTICS

| | |
|---|---|
| Price | $10.72 |
| 52 Week Range | $6.92 - $42.60 |
| Avg. Daily Vol. (30 day) | 1,534,811 |
| Shares Out (MM) | 35.6 |
| Market Cap (MM) | $381.5 |
| Insiders Own % | 8.4% |
| Short Int. / % of float | 4,080k / 12.4% |
| Debt to Equity | 0.5% |
| Revenue TTM (MM) | $24.2 |
| Fiscal Year End | September |

Source: YCharts, *As of August 19, 2021

## OUR INSIGHTS

### The Opportunities

The market for microgrids is in a long-term secular growth trend, and CleanSpark is well-positioned to capitalize on this as it offers a differentiated, vendor agnostic software and hardware solution that provides significant ROI for customers. Additionally, CleanSpark is focused on scaling its bitcoin mining operation using ~100% low carbon energy and believes this business can contribute $30-40 million in revenue in FY21 and over $325 million in annualized revenue by September 2022. Currently, CleanSpark contributes ~1% of the global bitcoin capacity.

### The Obstacles

The company is a smaller player in an industry dominated by much larger, well-capitalized competitors. CleanSpark has proven its ability to compete effectively but will need to continue to expand its sales network and ensure its technology agnostic software platform evolves with the industry. On the bitcoin side of the equation, an increase in mining difficulty rates would reduce the company's bitcoin yield and associated revenue, and bitcoin price fluctuations would impact the profitability of the operation.

# FIRESIDE CHAT INVITATION
## CLEANSPARK, INC. | EQUITY RESEARCH



## COMPANY OVERVIEW

CleanSpark, Inc. (CLSK) is in the business of providing advanced software, controls, and technology solutions to solve modern energy challenges. CleanSpark has a suite of software solutions that provides end-to-end microgrid energy modeling, energy market communications, and energy management solutions. CleanSpark's offerings consist of intelligent energy monitoring and controls, intelligent microgrid design software, middleware communications protocols for the energy industry, energy system engineering, custom hardware solutions, microgrid installation and implementation services, traditional data center services, and software consulting services. The company and its subsidiaries also own and operate a fleet of bitcoin miners at its facility outside of Atlanta, Georgia. CleanSpark plans to apply its technologies with the goal of mining bitcoin at the lowest energy prices in the United States.

### The Technology

A microgrid is a decentralized group of electricity sources and loads that normally operates connected to and synchronous with the traditional wide area main grid but can also disconnect and function autonomously (as an island) as physical or economic conditions dictate. This structure enables a microgrid to integrate various sources of distributed generation, especially renewable energy sources, providing emergency power through island and connected modes. Microgrids have emerged from being typical low-voltage AC grids using diesel generators to employing a mixture of distributed energy resource (DER) systems, including small-scale power generation and storage technologies primarily using renewable energy sources. These DER systems may include biomass, combined heat and power (CHP), fuel cells, hydroelectric, solar PV, and wind power. Microgrids aggregate and optimize these DERs and represent a key component of an emerging energy cloud focused on resilience and renewable energy integration, and with the right set of control technologies, they not only provide energy at sites but also offer value upstream to the larger grid. According to Guidehouse Insights, the global market for microgrids is expected to grow at a CAGR of 28% through 2029.

### End Markets & Applications

**Software-as-a-Service (SaaS) & Controls:** CleanSpark's integrated software suite provides end-to-end microgrid energy controls and management solutions. The core product is mPulse, a proprietary platform that enables integration and optimization of multiple energy sources such as solar, batteries, and generators. Monthly reporting and cloud functionality is available for multiple tiers of mPulse. CleanSpark's software is vendor and hardware agnostic.

**Residential Microgrids:** CleanSpark is focused on the residential microgrid market with its mVoult power system. mVoult is a smart controlled microgrid for the home or small business and can be integrated with a new or existing system, including solar, wind, generators, and energy storage solutions. mVoult is highly customizable and provides resilient, back-up power in the event of a disruption from the traditional utility grid. This is an especially compelling market opportunity as high-profile grid outages have plagued homeowners and businesses in recent years.

**Bitcoin Mining:** CleanSpark entered the bitcoin mining business through its acquisition of ATL Data Centers in December 2020. The company is rapidly scaling its bitcoin operation and expects its bitcoin mining hashrate capacity to reach 2.0 EH/s by December 2021 and 3.2 EH/s by September 2022. At current difficulty rates, 3.2 EH/s would represent approximately 27-30 bitcoins per day. Management believes bitcoin mining will help the company achieve its FY21 revenue target of $49-63 million. Longer term, CleanSpark's annualized revenue from bitcoin alone could exceed $325 million, assuming the production of 25-28 bitcoins per day and a price of $35,000+ per bitcoin.

**Hardware:** CleanSpark has two main products in its hardware division: switchgear and battery systems. Both components are key parts of a distributed energy generation system or microgrid. CleanSpark sells both low-voltage and high-voltage switchgear, which are custom-designed and manufactured to customers' specifications and requirements with the capability to support all major manufacturers' generator sets. CleanSpark is also a reseller of batteries. The company views the battery reseller opportunity as a way to enhance revenue and improve profit margins in the hardware business as an add-on component that is highly synergistic with the existing product portfolio and strategy.

# FIRESIDE CHAT INVITATION

## CLEANSPARK, INC. | EQUITY RESEARCH



## ABOUT THE ANALYSTS



**Shawn Severson**

President & Co-Founder

Head of ClimateTech & Sustainable Investing Research

Shawn Severson is President & Co-Founder of Water Tower Research and is a member of the Board of Managers. Prior to co-founding Water Tower Research and previously founding predecessor firm alphaDIRECT Advisors, Shawn spent over 20 years as a senior equity research analyst covering the Technology and ClimateTech sectors, including senior positions at JMP Securities, ThinkEquity, Robert W. Baird (London), and Raymond James.

Shawn started his career as an Equity Research Associate at Kemper Securities. Shawn was frequently ranked as a top research analyst, including one of the Wall Street Journal's "Best on the Street" stock pickers and a StarMine Analyst Awards Top 3 stock picker. Shawn holds a BA in Finance and Economics from Augustana College.



**Mark Palmieri**

Senior Analyst

ClimateTech & Sustainable Investing Research

Mark Palmieri is Senior Analyst at Water Tower Research covering BioEconomy, ClimateTech & Sustainable Investing, and Industrial Technology. Prior to joining Water Tower Research, Mark spent over seven years in corporate finance and investment banking in New York City and San Francisco.

Mark spent over four years on Wall Street advising public and private issuers on equity financing alternatives including initial public offerings, follow-on equity offerings, private placements, and equity-linked financings. Mark has worked on the origination and execution of transactions raising in excess of $10 billion for small- and mid-cap clients across the alternative energy, biotechnology, internet, life sciences, and software verticals, among others. Mark holds a BA degree in Economics from New York University.

# FIRESIDE CHAT INVITATION
## CLEANSPARK, INC. | EQUITY RESEARCH



## DISCLOSURES

Water Tower Research ("WTR") is a professional publisher of investment research reports on public companies and, to a lesser extent, private firms ("the Companies"). WTR provides investor-focused content and digital distribution strategies designed to help companies communicate with investors.

WTR is not a registered investment adviser or a broker/dealer nor does WTR provide investment banking services. WTR operates as an exempt investment adviser under the so called "publisher's exemption" from the definition of investment adviser under Section 202(a)(11) of the Investment Advisers Act of 1940. WTR does not provide investment ratings / recommendations or price targets on the companies it reports on. Readers are advised that the research reports are published and provided solely for informational purposes and should not be construed as an offer to sell or the solicitation of an offer to buy securities or the rendering of investment advice. The information provided in this report should not be construed in any manner whatsoever as personalized advice. All users and readers of WTR's reports are cautioned to consult their own independent financial, tax and legal advisors prior to purchasing or selling securities.

Shawn Severson and Mark Palmieri, who are the writers of this report, cover the BioEconomy, ClimateTech & Sustainable Investing, Emerging Growth & Special Situations, and Industrial Technology sectors for WTR. Mr. Severson and members of his household have no personal or business-related relationship to the subject company other than providing digital content and any ancillary services WTR may offer. Mr. Palmieri and members of his household have no personal or business-related relationship to the subject company other than providing digital content and any ancillary services WTR may offer.

Unless otherwise indicated, WTR intends to provide continuing coverage of the covered companies. WTR will notify its readers through website postings or other appropriate means if WTR determines to terminate coverage of any of the companies covered.

WTR is being compensated for its research by CleanSpark, Inc. which is the subject of this report. WTR receives no more than a maximum of $10,500 per month from a given client and is required to have at least a 6-month commitment. None of the earned fees are contingent on, and WTR's client agreements are not cancellable for the content of its reports. WTR does not accept any compensation in the form of warrants or stock options or other equity instruments that could increase in value based on positive coverage in its reports.

WTR or an affiliate may seek to receive compensation for non-research services to covered companies, such as charges for presenting at sponsored investor conferences, distributing press releases, advising on investor relations and broader corporate communications and public relations strategies as well as performing certain other related services ("Ancillary Services"). The companies that WTR covers in our research are not required to purchase or use Ancillary Services that WTR or an affiliate might offer to clients.

The manner of WTR's research compensation and Ancillary Services to covered companies raise actual and perceived conflicts of interest. WTR is committed to manage those conflicts to protect its reputation and the objectivity of employees/analysts by adhering to strictly-written compliance guidelines.

In certain instances, including this report, WTR will write research covering non-clients. Readers should assume that WTR may seek to turn these non-paying companies into paying clients. Likewise, WTR may seek to transform these non-clients into paying clients of it or of its affiliate, which provides services such as presenting at sponsored investor conferences, distributing press releases, advising on investor relations and broader corporate communications and public relations strategies as well as performing certain other related services ("Ancillary Services"). The companies that WTR covers in our research are not required to purchase or use Ancillary Services of WTR or an affiliate might offer to clients.

The views and analyses included in our research reports are based on current public information that we consider to be reliable, but no representation or warranty, expressed or implied, is made as to their accuracy, completeness, timeliness,

**FIRESIDE CHAT INVITATION**

CLEANSPARK, INC. | EQUITY RESEARCH



---

or correctness. Neither we nor our analysts, directors, officers, employees, representatives, independent contractors, agents or affiliate shall be liable for any omissions, errors or inaccuracies, regardless of cause, foreseeability or the lack of timeliness of, or any delay or interruptions in the transmission of our reports to content users. This lack of liability extends to direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, losses, lost income, lost profit or opportunity costs.

All investment information contained herein should be independently verified by the reader or user of this report. For additional information, all readers of this report are encouraged to visit WTR's website www.watertowerresearch.com.

---