# EXHIBIT A

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

DARSHAN HASTHANTRA, *et al*.,

Plaintiff,

v.

CLEANSPARK, INC., *et al*.,

Defendants.

Case No. 1:21-cv-511 (LAP)

<u>CLASS ACTION</u>

EXPERT REPORT OF ZAHN BOZANIC, PH.D.

January 10, 2025

**Table of Contents**

I.     Scope of Report and Opinions ...................................................................1

II.    Qualifications...............................................................................................2

III.   Case Background and Alleged Fraudulent Scheme ....................................4

IV.    Bases for Opinions on Market Efficiency .................................................6

V.     **Evaluation of Market Efficiency Factors for CleanSpark Common Stock**.................8

       A.    *Cammer* Factor 1: Average Weekly Trading Volume ............................... 10

       B.    *Cammer* Factor 2: Analyst Coverage .......................................................... 11

       C.    *Cammer* Factor 3: Market Makers ............................................................... 13

       D.    *Cammer* Factor 4: SEC Form S-3 Filing Eligibility .................................. 15

       E.    *Cammer* Factor 5: Cause and Effect Relationship Between
             Company Information and Stock Prices......................................... 16

       F.    *Krogman* Factor 1: Market Capitalization .................................................. 24

       G.    *Krogman* Factor 2: Bid-Ask Spread............................................................. 25

       H.    *Krogman* Factor 3: Public Float .................................................................. 26

VI.    **Ability to Calculate Damages on a Class-Wide Basis**....................................27

       A.    Calculation of Damages for Violation of Sections 10(b) and 20(a)
             of the Exchange Act .......................................................... 27

       B.    Damages Methodology is Flexible and can Incorporate
             Alternative Findings ................................................................ 30

VII.   **Conclusion** ...................................................................................................31

## I.    Scope of Report and Opinions

1.    Plaintiff's attorneys have asked me to determine whether the market for CleanSpark Inc.'s ("CleanSpark" or the "Company") common stock ("Common Stock") was efficient during the period December 10, 2020 to August 16, 2021, inclusive (the "Class Period").

2.    Plaintiff's attorneys have also asked me to opine on whether damages for investors trading in CleanSpark's Common Stock during the Class Period can be calculated using a common methodology for all Class members that is consistent with Plaintiff's claims under (i) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, the "§10(b) claims"), and (ii) Section 20(a) of the Exchange Act.[1]

3.    Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the following opinions:

a.    The market for CleanSpark's Common Stock was efficient throughout the Class Period.

b.    The *Cammer* and *Krogman* factors accepted and applied by courts to assess market efficiency corroborate that CleanSpark's Common Stock traded in an efficient market.

c.    Though not necessary for a finding of market efficiency, the cause-and-effect relationship between new Company disclosures and resulting Common Stock price movements (which I analyze under the fifth *Cammer* factor) further shows that CleanSpark's Common Stock traded in an efficient market throughout the Class Period.

d.    Damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for Plaintiff's pending claims. In particular, the out-of-pocket damages methodology, which is used in virtually all Section 10(b) class action securities cases, is appropriate and applicable here.

---

[1] *See* Amended Class Action Complaint for Violations of the Federal Securities Laws (Doc. 36) ("Complaint") and Order, dated January 5, 2023 (Doc. 60) (the "MTD Order"). I understand Defendants to include CleanSpark, Zachary Bradford (CleanSpark's CEO), and S. Matthew Schultz (CleanSpark's Chairman).

A-1

4.    The remainder of my report is organized as follows: **Section II** describes my qualifications. **Section III** summarizes the case background. **Section IV** briefly explains the bases for the reliance requirement and the "fraud-on-the-market" theory relating to market efficiency. **Section V** presents my analyses of the market efficiency factors for the Common Stock during the Class Period. **Section VI** addresses how damages can be calculated on a class-wide basis subject to a common methodology under Section 10(b). **Section VII** summarizes my conclusions.

## II.    Qualifications

5.    I hold a Ph.D. in Business Administration from the Pennsylvania State University and am a tenured, full Professor of Accounting at Florida State University. I also hold the William Hillison Professorship of Accounting. I teach Ph.D. and Master's-level courses, present my research at universities and conferences both domestic and abroad, deliver guest lectures, participate in academic seminars, attend academic conferences, peer review academic work, organize academic conferences, and conduct research on areas related to accounting, finance, statistics, economics, and law.

6.    My research focuses on topics related to corporate disclosure, debt contracting, financial intermediaries, financial reporting misconduct, regulation, and enforcement. More specifically, my research has examined periodic corporate disclosures (*e.g.*, 10-K's, earnings press releases, etc.), earnings guidance, earnings management, earnings manipulation, financial statement irregularities, debt contracts (*e.g.*, private bank loans and public bonds), debt covenants, securitized debt, credit analysts, equity analysts, SEC comment letters, SEC requests for comment, and SEC investigations.

7.    I have been engaged in university-level teaching and academic research for over 15 years and continue to publish in peer-reviewed academic journals in accounting, economics, and finance. At the undergraduate level, I have taught courses on financial accounting, investments,

valuation, and financial statement analysis. In addition, I have taught data analytics, valuation, and financial statement analysis at the Master's level as well as academic research seminars on empirical research methods in accounting at the doctoral level. I am an Editorial Board member of several peer-reviewed journals, and am an Editor at the *International Journal of Accounting*.

8.      Before my current roles, I was a tenured, Associate Professor of Accounting and the Director of the Ph.D. Program in Accounting at Florida State University. Prior to then, I was an Assistant Professor of Accounting at the Ohio State University as well as a Research Fellow at The National Center for the Middle Market.

9.      Prior to working for Ohio State, I received my Ph.D. in Business Administration from the Pennsylvania State University. Before my graduate work at Penn State, I was employed by Wells Fargo Bank as a Financial Consultant and Product Manager. I received an M.A. from the University of Michigan and a B.A. from the University of California at Berkeley.

10.     I have published research in leading peer-reviewed journals in the fields of finance, accounting, and economics, including: *Journal of Accounting Research, Journal of Accounting and Economics*, *The Accounting Review*, *Journal of Business Finance & Accounting*, *Review of Quantitative Finance and Accounting*, and *Journal of Financial Reporting*, *inter alia*. My curriculum vitae, attached as **Appendix A**, further details my publication record. I have presented my academic research at over 50 academic institutions, as listed in my curriculum vitae. I have also received several awards and honors from my peers both nationally and globally related to my research, peer reviewing activities, and doctoral research supervision.

11.     The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $900 per hour for my work on this matter. I have been assisted in this matter by staff at Cleveland Analytics, LLC working under my direction. My

A-3

compensation is in no way contingent on the outcome of this case. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

12.     My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

### III.     Case Background and Alleged Fraudulent Scheme[2]

13.     CleanSpark is headquartered in Nevada and has bitcoin mining facilities throughout the United States.[3] The Company's common stock trades on the NASDAQ Exchange under the ticker CLSK.[4] Prior to the Class Period, CleanSpark was a provider of "advanced software and controls technology solutions to solve modern energy challenges" and "a suite of software solutions that provide end-to-end microgrid energy modeling, energy market communications and energy management solutions."[5] During the Class Period, CleanSpark pivoted to purportedly become a "leading bitcoin mining and diversified energy company" according to its 2021 10-K.[6] Reinforcing this pivot in business strategy, CleanSpark's website touts the company to be "America's Bitcoin Miner" and its CEO stated in December of 2021 that "CleanSpark is a bitcoin miner. Bitcoin mining is our primary business segment in terms of revenue. Our most efficient in terms of cost and margin and our most important in terms of maximizing value for our shareholders."[7]

---

[2] The following overview section summarizes the allegations in the Complaint as context for Plaintiff's claims. I make no findings or opinions as to these allegations, and the opinions I reach in other sections of this report regarding market efficiency and the calculation of damages are not tied to any specific allegations summarized herein.

[3] Complaint, ¶ 21; *See* https://investors.cleanspark.com.

[4] *Id.*, ¶ 21

[5] *Id.*, ¶ 25

[6] *Id.*, ¶ 26

[7] *Id.*, ¶ 27; *See* https://www.cleanspark.com/

14.     CleanSpark's pivot towards bitcoin mining began with its announcement of the acquisition of ATL Data Centers Inc. (the "ATL Facility").[8] The profitability of a bitcoin mining operation is directly related to the cost of energy used to mine bitcoin. The Complaint alleges that Defendants made materially false and misleading statements or omissions touting that the ATL Facility was supplied energy at cost advantaged rates and that CleanSpark's proprietary energy management software would further reduce its cost of energy.[9] The Complaint further alleges that Defendants made materially false and misleading statements concerning the expected timeline to expand operations to more than double the existing energy capacity at the ATL Facility, from 20 to 50 megawatts, and thus rapidly enhance CleanSpark's expected profitability.[10]

15.     The Complaint alleges that the truth regarding the ATL acquisition and CleanSpark's projections relating to the ATL expansion project was partially revealed, and/or the concealed risks materialized, on or about: January 14-15, 2021, February 12, 2021, and August 17, 2021.[11] This includes the publication of a report by Culper Research on January 14, 2021, which was followed with a Tweet by Culper Research on January 15, 2021.[12] The report and Tweet raised concerns about the ATL acquisition, as ATL had undergone several name changes, a bankruptcy, and a failed acquisition attempt by Marathon Patent Group ("Marathon").[13] Most significantly, it was revealed that Marathon pulled out of the proposed deal because the energy agreement with the municipality had too few years left to make the acquisition "economically

---

[8] *Id.*, ¶ 3.

[9] *Id.*, ¶¶ 47, 118, 130.

[10] *Id.*, ¶ 3-4, 9-12, 36, 38, 54-55, 118.

[11] Complaint, ¶¶ 6-7, 12, 88-89, 110-112, 152. I understand the Complaint alleges additional corrective disclosures which Plaintiff is no longer pursuing.

[12] *Id.*, ¶¶ 45-46; 51.

[13] *Id.*, ¶¶ 45-50.

viable."[14] The Complaint alleges that Defendants misrepresented ATL facility's operating potential by omitting material facts related to the acquisition and timeline for completing the expansion project.[15]

16. The Complaint also alleges that the relevant truth was partially revealed on February 12, 2021 when Defendants announced Q1 2021 earnings and disclosed that the ATL Facility's expansion project would not be completed until mid-year 2021 instead of April 2021.[16] The Complaint further alleges that the relevant truth was revealed on August 17, 2021 when Defendants' announced Q3 2021 earnings and disclosed that the ATL Facility's expansion project would not be completed until fall of 2021.[17] As a result of the repeated delays in expansion plans, CleanSpark paid to deploy bitcoin mining equipment at a third-party facility, and was unable to utilize the cost-advantaged energy rates at the ATL Facility and therefore unable to deliver on the expected capacity goals.[18]

17. The Complaint alleges that, as a result of Defendants' fraudulent scheme, misstatements, and omissions, investors traded CleanSpark's Common Stock at artificially inflated prices during the Class Period.[19] **Exhibit 1** graphs the closing stock price and trading volume for CleanSpark's Common Stock shares throughout the Class Period.

## IV.    Bases for Opinions on Market Efficiency

18. I understand that, with respect to their claims under §10(b), Plaintiff asserts the "fraud-on-the-market" theory of class-wide reliance, *i.e.*, that all CleanSpark shareholders relied

---

[14] *Id*., ¶¶ 47-48.

[15] *Id.*, ¶¶ 45-46; 51.

[16] *Id.*, ¶¶ 88-90.

[17] *Id.*, ¶ 110.

[18] *Id.*, ¶¶ 110-111.

[19] *Id.*, ¶¶ 138-140, 151-152.

on the alleged misrepresentations (and the fraudulent schemes and acts underlying such misstatements and omissions) through their effect on stock prices in an informationally efficient market.[20]

19.     As courts, including the Supreme Court, have explained, the "fraud-on-the-market" theory of class-wide reliance holds that investors trading securities in an informationally efficient market rely on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price. As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[21]

20.     The Supreme Court reaffirmed the availability of this theory to satisfy Section 10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[22]

---

[20] *Id.*, ¶ 159.

[21] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[22] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

21.    A market is considered informationally efficient when the market price of securities quickly responds to publicly available information.[23] In securities fraud cases, courts have endorsed the widely-cited five-factor test laid out in *Cammer v. Bloom* to evaluate whether a market is efficient for the purposes of establishing the presumption of reliance.[24] Courts also accept additional factors for evaluating market efficiency found in another widely cited opinion, *Krogman v. Sterritt*.[25]

22.    Research in accounting, economics, and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency.[26] However, as explained below, it is important to understand that an assessment of market efficiency does not hinge on any single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.[27]

## V.    Evaluation of Market Efficiency Factors for CleanSpark Common Stock

23.    I now turn to discuss the *Cammer* and *Krogman* factors and evaluate them in relation to CleanSpark's Common Stock. To do so, I compare the factors' application to

---

[23] *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005). "For purposes of establishing the fraud-on-the-market presumption of reliance, we adopt the prevailing definition of market efficiency, which provides that an efficient market is one in which the market price of the stock fully reflects all publicly available information. By 'fully reflect,' we mean that market price responds so quickly to new information that ordinary investors cannot make trading profits on the basis of such information. This is known as 'informational efficiency.' We reject a second and much broader meaning of 'fully reflect,' known as 'fundamental value efficiency,' which requires that a market respond to information not only quickly but accurately, such that the market price of a stock reflects its fundamental value."

[24] *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989).

[25] *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[26] *See, e.g.*, Villanueva, M. and Feinstein, S., 2021. Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors. *Review of Quantitative Finance and Accounting* 57.

[27] *Id.*, at 204-205.

CleanSpark's Common Stock against: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed, published academic research.

24.     As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that CleanSpark's Common Stock traded in an efficient market throughout the Class Period.

25.     One academic study that I use for comparison purposes was published by Mola, Rau, and Khorana, which I refer to as the "MRK Study."[28] In this study, the authors examined two samples of firms. The first sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[29]

26.     The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock. . . . Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[30]

---

[28] Mola, S., Rau, P., and Khorana, A., 2013. Is There Life After the Complete Loss of Analyst Coverage? *The Accounting Review* 88, at pp. 667-705.

[29] MRK Study at 678, 681-682.

[30] MRK Study at 667.

27.     The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[31] Therefore, I interpret the sample of MRK Covered firms as those eliciting high investor interest and reflect factors common to firms operating in efficient markets.

28.     Below, I compare several of CleanSpark's market efficiency factors to the samples of firms in the MRK Study to assess whether the Company's characteristics are consistent with firms operating in efficient markets.

### A.     *Cammer* Factor 1: Average Weekly Trading Volume

29.     Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security.[32] Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.[33] The first *Cammer* factor, stock trading volume, has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[34]

---

[31] MRK Study at 681 (footnotes omitted).

[32] *See, e.g.*, Bhole, B., Surana, S. and Torchio, F., 2020. Benchmarking Market Efficiency Indicators for Securities Litigation. *University of Illinois Law Review*, at pp. 101-102. (the "Bhole Study"); Thomas, R. and Cotter, J., 2000. Measuring Securities Market Efficiency in the Regulatory Setting. *Law and Contemporary Problems* 63, at p. 108; MRK Study at p. 681.

[33] *Id.*

[34] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg, §8.6).

30.     **Exhibit 2** graphs CleanSpark's common stock's weekly trading volume as a fraction of Common Stock outstanding throughout the Class Period.[35] The average weekly trading volume was 41.9% of CleanSpark's common stock outstanding over the Class Period. This level of trading volume substantially exceeds the 1% and 2% thresholds established by the *Cammer* court. As a result, CleanSpark's level of Common Stock trading volume throughout the Class Period supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

31.     Additionally, CleanSpark's Common Stock daily turnover rate of 8.5% during the Class Period placed it above the 95th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018.[36] This further supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

## B.     *Cammer* Factor 2: Analyst Coverage

32.     An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry. Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.

33.     Analyst coverage can be indicative of market efficiency since research analysts help to disseminate new important company-specific information to investors, thus impounding new information into stock prices quickly and efficiently. The *Cammer* court similarly stated:

---

[35] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[36] Bhole Study at 102. The 95th percentile of daily turnover for the 2016-2018 sample period is 2.95%. The 2016-2018 subsample time period is the most recent period reported in this study.

A-11

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[37]

34.     In **Exhibit 3** I reviewed the analyst coverage of CleanSpark over the Class Period. I identified a total of at least 41 reports issued by analysts at 10 separate firms during that period.[38] The list of analyst reports that I was able to identify includes reports by firms that conducted thorough and detailed research on CleanSpark and the industry within which it operated, such as the reports prepared by analysts at Water Tower Research, H.C. Wainwright & Co., and Plunkett Research, among others. Collectively, this is a significant degree of analyst coverage which served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

35.     This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received no analyst coverage in a given year.[39] Further, Lee and So documented that, on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[40] In other words, many firms within the category of the least amount of analyst coverage in their sample were covered by only one or two analysts. CleanSpark's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest.

---

[37] *Cammer*, 711 F. Supp. at 1286.

[38] These statistics represent a lower bound of the analyst coverage of CleanSpark because many analyst reports are provided directly to investors but are not captured by third-party data vendors.

[39] MRK Study at 668.

[40] Lee, C., and So, E., 2017. Uncovering Expected Returns: Information in Analyst Coverage Proxies. *Journal of Financial Economics* 124, at 336. (*see* Table 1, Panel B – "COV").

A-12

36. Moreover, CleanSpark's high level of analyst coverage also placed it between the 50th and 75th percentiles when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[41] The significant analyst coverage of CleanSpark during the Class Period supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

37. In addition to the analyst coverage documented above, investors could access information about CleanSpark from a variety of other sources. For example, I conducted a search of press and news articles about CleanSpark using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes *Dow Jones Newswires*, *GlobeNewswire*, *PR Newswire*, *Reuters*, *Business Wire*, and numerous other outlets. This search produced approximately 400 articles throughout the Class Period.[42]

38. As a result, the amount of analyst coverage, number of analyst research reports produced, and substantial public dissemination of news and information about CleanSpark support the conclusion that the Company's Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

### C. *Cammer* Factor 3: Market Makers

39. The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate the buying and selling of shares among investors in a company's stock during trading hours.[43] Market makers are present on major exchanges as well

---

[41] Bhole Study at 104 (50th percentile defined as 6.2 analysts; 75th percentile defined as 12.2 analysts).

[42] The articles were identified through a Factiva search of articles with CleanSpark's company tag from all available sources..

[43] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

A-13

as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[44]

40.     In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[45]

The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting.

41.     CleanSpark's Common Stock had at least 73 market makers and brokers providing similar activity over the Class Period.[46] The presence of more than 10 market makers thus supports

---

[44] Barber, B., Griffin, P., and Lev, B., 1994. The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporate Law* 19, at p. 291.

[45] *Cammer*, 711 F. Supp. at 1293; *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Cal. Dec. 22, 2016) ("The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.").

[46] *See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact . . . RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow.").

the *Cammer* Court's "substantial presumption" of the efficiency of the market for the Company's Common Stock throughout the Class Period.

42.  In addition to the presence of market makers, the presence of institutional investors can be an indicator of market efficiency. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing new information to be quickly impounded into stock prices. During the Class Period, between 69 and 115 institutions held CleanSpark's Common Stock.[47] By comparison, the MRK Study found that the MRK Sample firms had a median of only nine institutional investors while the MRK Covered firms had a median of 40 institutional investors.[48] CleanSpark's institutional ownership base greatly exceeds both of these levels. Moreover, CleanSpark's institutional ownership as a percent of shares during the Class Period placed it between the 10th and 25th percentile of NYSE and NASDAQ traded companies.[49] Thus, the significant institutional ownership base for CleanSpark's Common Stock further supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

**D.  *Cammer* Factor 4: SEC Form S-3 Filing Eligibility**

43.  The fourth *Cammer* factor is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of

---

[47] Data Source: S&P Capital IQ.

[48] MRK Study at 678 (Table 3).

[49] Bhole Study, at 106: 10th percentile defined as institutional ownership of 13.48% of shares outstanding; 25th percentile defined as 33.58%. CleanSpark institutional ownership fluctuated between 17.0% and 30.9% of shares outstanding for quarters ending within the Class Period.

shares traded and value of shares outstanding that involve the facts which imply efficiency.[50]

44.     Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has a float of at least $75 million, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[51] The rationale behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have timely access to publicly available information about the issuer.

45.     CleanSpark made all required filings with the SEC in a timely manner during the Class Period and satisfied the other Form S-3 requirements.[52] CleanSpark made Form S-3 filings with the SEC before, during, and after the Class Period.[53] As a result, this factor is consistent with the efficiency of the market for the Company's Common Stock throughout the Class Period.

### E.     *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices

46.     The fifth *Cammer* factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information. The *Cammer* court held:

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect

---

[50] *Cammer*, 711 F. Supp. at 1287.

[51] *See* SEC Form 3, available at https://www.sec.gov/files/forms-3.pdf.

[52] *See*: SEC EDGAR, CleanSpark, Inc., *available at* https://www.sec.gov/edgar/browse/?CIK=827876&owner=exclude.

[53] *See Id*.

relationship between company disclosures and resulting movements in stock price.[54]

47.     I summarize my empirical analysis below, which finds that CleanSpark's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*. I compare the behavior of CleanSpark's Common Stock on days when company-specific news is issued with its behavior on days when no such news is issued. This analysis demonstrates that CleanSpark's Common Stock price reacted rapidly to company-specific news and, thus, further supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

i.     *Event Study Methodology*

48.     To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study. Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.[55] As Professor Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.
>
> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers

---

[54] *Cammer*, 711 F. Supp. at 1291.

[55] *See* MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature* 13.

empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[56]

49. To determine whether CleanSpark's Common Stock price movements on any given date are statistically significant, I performed an event study using generally accepted economic methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices.

50. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily security price movement, which represents the component of the daily security price return that is not attributable to market-wide or industry-wide movements, but rather is attributable to company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (*i.e.*, the "abnormal return") is "statistically significant," *i.e.*, sufficiently large compared to the usual volatility in the company security price return such that simple random movement can be rejected as the cause.

51. I applied these widely used and generally accepted econometric methodologies to perform my event study here. Specifically, in order to isolate the impact of company-specific news on CleanSpark's Common Stock price during the Class Period, I performed regression analyses to measure the relationship between the Company's Common Stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in industries similar to CleanSpark. By modeling how CleanSpark's Common Stock price returns moved relative to an overall market index and an

---

[56] Fama, E., 1991. Efficient Capital Markets: II. *Journal of Finance* 46, at p. 1607.

industry index, I was also able to measure the response of the Company's common stock to announcements of company-specific news.

52.     I conducted my event study regression analysis over an Analysis Period encompassing the Class Period (December 10, 2020 to August 16, 2021, inclusive), plus one year before and after the Class Period (Analysis Period = December 10, 2019 to August 16, 2022, inclusive). For each trading day, I constructed a regression model using data from the prior six months of trading days (the "Estimation Window").[57]

53.     To study the relationship between CleanSpark's Common Stock price returns and overall market factors, I used the NASDAQ Composite Total Return Index (the "Market Index"). To study the relationship between CleanSpark's Common Stock price returns and changes in industry-wide factors that would be expected to impact all stocks in CleanSpark's industry, I used two industry indices – the S&P Software & Services Select Industry Index and the Bloomberg Bitcoin Index (the "Industry Indices") – to accommodate CleanSpark's transition from a traditional software services provider to a Bitcoin mining firm during the Class Period.

54.     I established the relationship between the daily return of CleanSpark's common stock, the daily return on the Market Index, and the daily returns on the Industry Indices over the

---

[57] I utilized an Estimation Window of 120 trading days, which is approximately six calendar months. This allowed my regression approach to adapt to the changing volatility of stock returns over time. *See, e.g.*, Mitchell, M. and Netter, J., 1994. The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission. *Business Lawyer* 49; MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature* 35, at p. 15. ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

Estimation Window.[58] As shown in **Exhibit 4**, the event study models revealed an evolving relation between the daily returns of CleanSpark's common stock and those of the overall stock market and industry indices throughout the Class Period. In other words, movements of the Market Index and the Industry Indices help explain movements in the Company's common stock prices.

55.     Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of the Company on any given date within the Class Period which controls for that day's market and industry returns. Again, in accordance with standard event-study methodology, I then subtracted this predicted return from the actual return to obtain the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

56.     Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in CleanSpark's Common Stock's price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the regression model. In other words, the standard deviation of errors provides a measure for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of CleanSpark's Common Stock after controlling for the Market Index and the Industry Indices. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period.

         *ii.*     *Cause and Effect Analysis of Comparing CleanSpark Common Stock Price Behavior on News Versus No News Days*

---

[58] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature* 35; Braun, P., Nelson, D., and Sunier, A., 1995. Good News, Bad News, Volatility, and Betas. *Journal of Finance* 50, at p. 1597.

57.     A generally-accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on news days with its behavior on other days with relatively little or no news.[59] In showing that a security's price is more volatile on news days than on no news days to a statistically significant degree indicates that the security responds promptly to news and, therefore, supports a finding of efficiency.

58.     Importantly, research has shown that in an efficient market, it is possible for a security to exhibit some large price movements despite the absence of news and, conversely, for one to observe news without large price movements.[60] For instance, a company may announce earnings that are in line with investor expectations and, while such an expected announcement is clearly important to investors, it will often not alter the total mix of information significantly enough to elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again would result in no statistically significant price movement. Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current level. Accordingly, a generally-accepted, peer-reviewed methodology accepted by numerous courts is to compare stock price behavior on a group of "news days" to stock price behavior on a group of "no news days."

---

[59] Paul Ferrillo, Frederick Dunbar, and David Tabak, 2004, The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases, *St. John's Law Review* 78, at pp. 120-21; Miguel O. Villanueva and Steven Feinstein, 2021, Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors, *Review of Quantitative Finance and Accounting* 57.

[60] *See* Boudoukh, J., Feldman, R., Kogan, S. and Richardson, M., 2019. Information, Trading, and Volatility: Evidence from Firm-Specific News. *Review of Financial Studies* 32, at p. 1004; Fair, R., 2002. Events That Shook the Market. *Journal of Business* 75, at pp. 713-714.

59.    Here, I performed such an analysis comparing the behavior of CleanSpark's Common Stock on news versus no news days. My analysis demonstrates that the price of CleanSpark's stock was statistically significantly more volatile on news days than on no news days. This result supports the conclusion that there was a "cause and effect relationship between company disclosures and resulting movements in stock price" for CleanSpark's Common Stock during the Class Period and, thus, further supports a finding of market efficiency.

60.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed CleanSpark's earnings announcements during the Class Period. These types of announcements represent a potential opportunity for the public release of new value-relevant Company information to investors.[61]

61.    As shown in **Exhibit 6**, CleanSpark issued 12 earnings announcements during the Analysis Period. I classified each day on which such earnings release was first issued as a "News Day."[62] I then compared the stock returns and trading volume of CleanSpark's Common Stock on these "News Days" versus those metrics on trading days that contained the least news during the Class Period (the "No News Days"). The No News Days provide a benchmark measurement of days in which relatively little or no new CleanSpark-specific information was provided to the market. If CleanSpark's stock prices tend to move more significantly on News Days than on No

---

[61] *See* SEC, "How to Read an 8-K," https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/how-read-8 ("The types of information required to be disclosed on Form 8-K are generally considered to be "material." That means that, in general, there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision.").

[62] If the release were issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day.

News Days, this would support a conclusion of market efficiency. As discussed below, there were 532 No News Days during the Class Period.[63]

62.     **Exhibit 6** reports the results of the event study using CleanSpark's Common Stock returns. The columns list the market impact dates, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the *t*-statistic, the *p*-value corresponding to statistical significance, and a description of the earnings announcement on each date. Overall, 3 out of 12 CleanSpark earnings announcements caused stock price movements that were statistically significant at the 95% level or better. I compare this rate with that on the No News Days in the following exhibit.

63.     **Exhibit 7** summarizes the statistical comparison of CleanSpark's Common Stock returns and trading volume following the 12 News Days versus these metrics as measured on the 532 No News Days. As shown in the **Exhibit 7**, 25% of the earnings announcements caused stock movements that were statistically significant at the 95% level. This compares to 3.9% of the No News Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at the 95% level. In other words, the rate of statistically significant News Days is more than six times greater than that of the No News Days. These results provide strong evidence of a cause-and-effect relationship between new information and CleanSpark's Common Stock price movements. Moreover, relative to the No News Days, the News Days had a higher average absolute abnormal return and greater trading volume.

64.     In summary, relative to other trading days contained in each event study's Estimation Window, News Days caused a greater proportion of statistically significant stock price

---

[63] I identified "No News Days" as days on which there were no: a) earnings announcements, b) alleged corrective disclosures, c) alleged misrepresentations, or d) *Dow Jones* news articles on Factiva tagged to CleanSpark. I ignore news articles about trading halts due to volatility or announcements related to shareholder lawsuits.

A-23

movements at the 95% level. This finding establishes a clear cause-and-effect relationship between new company-specific information and CleanSpark's Common Stock price movements. As a result, this *Cammer* Factor 5 analysis supports the conclusion that the Company's Common Stock traded in an efficient market during the Class Period.

### F.     *Krogman* Factor 1: Market Capitalization

65.     Beyond the five *Cammer* factors, I have also considered several additional factors articulated by the *Krogman* court. The first of these is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[64] Similarly, the *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[65]

66.     Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors – such as relatively small market capitalization – that indicate that their shares trade in less developed and efficient markets. The median market capitalization of the MRK Sample firms was $27.91 million.[66] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[67] This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

---

[64] *Cammer*, 711 F. Supp. at 1287.

[65] *Krogman*, 202 F.R.D. at 478.

[66] MRK Study at 678 (Table 3).

[67] MRK Study at 678 (Table 3).

67.    **Exhibit 8** reports the market capitalization of CleanSpark's Common Stock throughout the Class Period. This market capitalization averaged $625.4 million over the Class Period. The Company's Common Stock market capitalization places it between the 25th and 50th percentiles of all companies listed on either the NASDAQ and the NYSE from 2016-2018.[68] CleanSpark's Common Stock market capitalization also exceeded the MRK Sample firms on an inflation-adjusted basis.[69] CleanSpark's number of shares outstanding were approximately 30.3 million during the Class Period. CleanSpark's market capitalization, shares outstanding available for trading, and its sizeable float as discussed below, are consistent with the conclusion that the Company's Common Stock traded in an efficient market during the Class Period.

### G.    *Krogman* Factor 2: Bid-Ask Spread

68.    The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[70]

69.    The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency or as a percentage relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally efficient market. A wider bid-ask spread indicates that investors will pay more to buy and sell a given stock, and these higher

---

[68] Bhole Study at 107 (25th percentile of market capitalization defined as $167 million; 50th percentile defined as $781 million).

[69] U.S. Bureau of Labor Statistics, CPI Inflation Calculator. *See* https://www.bls.gov/data/inflation_calculator.htm.

[70] *Krogman*, 202 F.R.D. at 478.

transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

70. I analyzed the bid-ask spread of CleanSpark's common stock during the Class Period. **Exhibit 9** reports the Company's bid-ask spread as a percentage of the bid-ask midpoint.[71] This spread averaged 0.35% over the Class Period.

71. By way of comparison, the MRK Study found that MRK Sample firms had a median bid-ask spread of 4.55%, while MRK Covered firms had a median bid-ask spread of 1.69%.[72] CleanSpark's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade the Company's Common Stock at very low relative cost. Additionally, CleanSpark's average bid-ask spread over the Class Period places it between the 50th and 75th percentiles of all companies listed on NASDAQ and the NYSE from 2016-2018 (lower percentile rankings correspond to smaller bid-ask spreads).[73]

72. As a result, CleanSpark's bid-ask spread also supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

### H. *Krogman* Factor 3: Public Float

73. The *Krogman* court also considered the public float of a company in weighing market efficiency.[74] The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable

---

[71] Bloomberg daily reported "AVERAGE_BID_ASK_SPREAD_%" variable.

[72] MRK Study at 678 (Table 3).

[73] Bhole Study at 105 (50th percentile of bid-ask spread defined as 0.14%; 75th percentile defined as 0.75%).

[74] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

74. CleanSpark's Common Stock had a market capitalization averaging $625.4 million and between 21.8 and 35.6 million shares outstanding during the Class Period. Furthermore, CleanSpark insiders held roughly 5.02% to 7.01% of CleanSpark's Common Stock during the Class Period.[75] As a result, approximately 93% of the Company's Common Stock was held and freely tradeable by outside investors during the Class Period. Hence, the large degree of public float for the Company's Common Stock supports the conclusion that CleanSpark traded in an efficient market throughout the Class Period.

## VI. Ability to Calculate Damages on a Class-Wide Basis

75. I have also been asked to opine on whether per-share damages for traders of CleanSpark's Common Stock can be assessed for all Class members based upon a methodology common to all Class members and consistent with Plaintiff's theories of liability. As discussed below, damages for each of Plaintiff's claims can be calculated on a class-wide basis through a common methodology.

### A. Calculation of Damages for Violation of Sections 10(b) and 20(a) of the Exchange Act

76. For the §10(b) claims, Plaintiff alleges that the Defendants' fraudulent scheme, misstatements, and omissions artificially inflated the market price of CleanSpark's Common Stock, and caused Class members to purchase CleanSpark's Common Stock at artificially inflated prices.[76] Plaintiff also claims certain Defendants are liable as control persons under section 20(a).[77]

---

[75] Data Source: Bloomberg.

[76] Complaint, ¶¶ 138-140, 151-152.

[77] *Id.*, ¶¶ 133-134. Section 20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. 15

A-27

77.     The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act. This approach calculates investor damages formulaically as the artificial inflation in the stock price at the time of an investor purchase minus the artificial inflation in the stock price at the time of an investor sale. If shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Private Securities Litigation Reform Act of 1995 ("PSLRA").[78] This cap on damages is also applied class-wide.

78.     The claims process produces information necessary for the calculation of damages for each Class member as inputs to the formula above, including the purchase and sale information for the Class member's trades (including transaction dates and quantity of shares traded). This information is available from brokerage statements, trade blotters, and/or other documentation of securities transactions.

79.     Another input to the above formula, the quantification of artificial inflation per share, is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide as an input to the out-of-pocket formula. For example, event studies are widely employed to calculate artificial inflation. Event studies measure stock price reactions to corrective disclosures

---

U.S.C. §78t(a). Given §20(a)'s derivative nature, I understand that §20(a) damages can be calculated using the same methodology for assessing §10(b) damages.

[78] The PSLRA states: "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S. Code §78u-4 (codifying language).

which revealed the relevant truth that was concealed by alleged fraudulent schemes and misrepresentations.[79]

80.     To the extent that reliable evidence is introduced to show that a significant portion of the difference in artificial inflation between the purchase and sale of securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of CleanSpark's securities can be determined on a common, class-wide basis using various accepted methodologies. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during discovery and will be based on the specific set of facts and circumstances in a given case.

81.     A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery.

82.     One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal dollar value of stock price decline from an event study around one or more corrective disclosures.

83.     Alternatively, one can measure "constant percentage inflation," which assumes that each share price was inflated by a constant percentage amount above the correct stock price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal percentage return in stock price from an event study around one or more corrective disclosures.

---

[79] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

84.     In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculations of artificial inflation and any potential disaggregation of confounding information are based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.

85.     All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances.

**B.      Damages Methodology is Flexible and can Incorporate Alternative Findings**

86.     The damages methodology I have laid out above is flexible and able to incorporate alternative findings of fact regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period. The methodology can be modified based on alternative findings the finder of fact may determine, including, but not limited to any: (1) confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) the first actionable fraudulent conduct or misstatement.

87.     First, irrespective of what the ultimate finder of fact, *i.e.*, the jury, determines is the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information, this percentage can easily be inserted into the standard damages model that I have already described – the out-of-pocket formula. Regardless of how the jury weighs evidence, whether they find that any such disaggregation analysis I may conduct is the most appropriate, or they determine that based upon the evidence, a different amount is more appropriate, this finding can simply be incorporated into the damages calculation.

88.     Second, should the jury determine that the true economic inflation evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a class-wide basis.

89.     Third, should the jury decide that the first actionable misstatement or otherwise actionable fraudulent conduct happened at a date later than December 10, 2020, prior to such date, inflation could simply be set to zero.

90.     If the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

91.     To summarize, I have not been asked to calculate damages in this matter. Such analysis would depend on information produced in discovery and development of the case record. Based on my experience, qualifications, and understanding of the nature of the claims in this matter, I conclude that Common Stock damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

## VII.    Conclusion

92.     In conclusion, based on my analysis of the market efficiency factors considered by courts and in academia, it is my opinion that CleanSpark's Common Stock traded in an efficient market throughout the Class Period. Moreover, it is my opinion that damages in this matter under Sections 10(b) and 20(a) can be calculated on a class-wide basis utilizing a common methodology. I declare under the penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

Zahn Bozanic, Ph.D.

A-31