# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____

DARSHAN HASTHANTRA, et al.,

     Plaintiffs,

  v.                     Case No.

CLEANSPARK, INC., et al.,     1:21-cv-511 (LAP)

     Defendants.

_____

VIDEOTAPED DEPOSITION OF

ZAHN BOZANIC, PH.D.

DATE:        Thursday, February 27, 2025

TIME:        10:04 a.m.

LOCATION:    Remote Proceeding

            Tallahassee, FL 32317

REPORTED BY:  Cristina Betts

Page 2

**A P P E A R A N C E S**

ON BEHALF OF PLAINTIFFS DARSHAN HASTHANTRA, et al.:

GREGORY LINKH, ESQUIRE (by videoconference)

CHRIS FALLON, ESQUIRE (by videoconference)

Glancy Prongay & Murray LLP

230 Park Avenue, Suite 530

New York, NY 10169

glinkh@glancylaw.com

cfallon@glancylaw.com

(212) 682-5340

(888) 773-9224

ON BEHALF OF DEFENDANTS CLEANSPARK, INC., ZACHARY

BRADFORD, AND S. MATTHEW SCHULTZ:

DAVID J. PARTIDA, ESQUIRE (by videoconference)

Wilk Auslander LLP

825 8th Avenue

New York, NY 10019

dpartida@wilkauslander.com

(212) 981-2313

ALSO PRESENT:

Kevin Gallagher, Videographer - Icon Digital

Media, Inc. (by videoconference)

A P P E A R A N C E S (Cont'd)

ALSO PRESENT:

Alejandro Hoyos Suarez, Senior Manager -

Cornerstone Research (by videoconference)

Page 4

I N D E X

EXAMINATION:                                    PAGE

By Mr. Partida                              7

By Mr. Linkh                                288

E X H I B I T S

NO.              DESCRIPTION                    PAGE

Exhibit 72       Notice of Deposition of Dr.

Zahn Bozanic                13

Exhibit 73       Expert Report of Zahn

Bozanic, Ph.D. - CleanSpark   14

Exhibit 74       Expert Report of Zahn

Bozanic, Ph.D. -

Teleperformance SE            23

Exhibit 75       Expert Report of Matthew

D. Cain, Ph.D. - Dentsply

Sirona, Inc.                  63

Exhibit 76       Water Tower Research Report    96

Exhibit 77       Spreadsheet Backup Report      147

Exhibit 78       H. C. Wainwright Report        182

Exhibit 79       Culper Research Report         206

Exhibit 80       Research - Search Results      227

Page 5

Z. BOZANIC, PH.D.

THE VIDEOGRAPHER:  We are now going on the record at approximately 10:04 a.m. Today's date is February 27, 2025.  This is media unit number 1 of the video recorded deposition of Dr. Zahn Bozanic.

And my name is Kevin Gallagher; I am the videographer.  The court reporter is Cristina Betts, and she will take over from here.

THE REPORTER:  Thank you.

I am a notary authorized to take acknowledgments and administer oaths in New York.  Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded

Z. BOZANIC, PH.D.

by stenographic means; and

- shall constitute written

stipulation of such.

At this time will everyone in attendance please identify yourself for the record.

DR. BOZANIC:  Zahn Bozanic.

MR. PARTIDA:  David Partida, counsel for defendants.

MR. LINKH:  Greg Linkh from Glancy Prongay & Murray, counsel for Plaintiffs.

MR. HOYOS:  Alejandro Hoyos with Cornerstone Research for Defendants.

THE REPORTER:  Thank you.

Hearing no objection, I will now swear in the witness.

Please raise your right hand.

WHEREUPON,

ZAHN BOZANIC, PH.D., called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER:  Thank you.

Page 7

Z. BOZANIC, PH.D.

Counsel, you may proceed.

MR. PARTIDA:  All right.

EXAMINATION

BY MR. PARTIDA:

Q    Good morning, Dr. Bozanic.  My name is David Partida.  As I said, I'm counsel for the defendants here in this case, and those defendants are CleanSpark, the company, and the two individual defendants, Matthew Schultz and Zachary Bradford.  We're here today in the matter of Hasthantra vs. CleanSpark, and I just have a couple of precursor questions before we get into the mix.

First is, have you ever been deposed before?

A    I have.

Q    How many times?

A    I've been deposed twice, one in a personal matter, one in a professional matter.

Q    Okay.  What professional matter?

A    As an expert, testifying expert in a securities class action lawsuit.

Page 8

Z. BOZANIC, PH.D.

Q     And what was the name of that lawsuit?

A     This was Teleperformance SE.

Q     Okay.  So I want to cover a couple of ground rules with how a deposition works.  You've said you've been deposed before, but I just want to cover a couple of them.  So you met the court reporter, Ms. Betts, who swore you in.  She'll be recording everything that you and I and anyone else says in this deposition.  You will also be recorded on video.  The testimony that you're going to give is under oath.

And one of the most important things that I need you to do in this deposition is to make sure that you understand the question that I'm asking, and that you do your best to answer that question and only that question.  Most of the questions that I think I'm going to ask, I think are pretty clear unless I really just don't understand the issue. And hopefully, you'll be able to help me

Page 9

Z. BOZANIC, PH.D.

explain it to me, but I really do want to make sure that you understand what I'm asking.

I will ask for your expert opinion, as you are an expert, based on, you know, the report that you've given in this matter, but I don't want you to speculate about things that are outside of your knowledge. As I said, the court reporter is taking down everything that is said, so it's very important for us to speak, so no, you know, mm-hmm, no shaking your head, things like that.

The second thing is, she has to be able to take down what we say clearly, so it helps her a lot if we speak, you know, one at a time. I don't anticipate that will be a problem, but sometimes it does come up naturally when you're speaking with someone in a conversation. So just to the best we can, let's try and not speak over one another.

From time to time, your attorney, Mr. Linkh, or the attorney for

Page 10

Z. BOZANIC, PH.D.

the plaintiffs, Mr. Linkh, might object to a question that I have. The fact that he objects doesn't mean you don't have to answer the question. I'm still entitled to answer the question, unless he instructs you not to answer it.

Do you have any questions about anything that I've said so far?

A    I do not.

Q    If at any time you need a comfort break, you need a glass of water, anything like that, let me know, and I'm happy to accommodate you. The only thing that I ask is that if there is a question pending, which means I've asked a question and you haven't given your answer, that you give your answer before we take whatever break we have. Is that fair enough?

A    Fair enough.

Q    All right. Okay.

So I want to ask you just a couple of questions. Do you have anyone else in the room with you?

Page 11

Z. BOZANIC, PH.D.

A    I do not.

Q    Do you have any -- I see some sort of paper, it looks like, in the background.  Do you have any paper, notes, anything like that in front of you?

A    I have one unmarked copy of my report, if that's permissible, on my desk.

Q    You're welcome to have it.  If it helps you, I'll be looking at paper all day, so --

A    Just --

Q    Okay.  Perfect.

Do you have access -- or do you have a phone with you, like a cell phone?

A    I do, but it's tucked in my drawer.

Q    Okay.  I just ask that it be silenced pending the next question I'm going to ask you.  The way I intend to share exhibits today would be to send them via email.  So I'd like to be able to circulate an email.  I was going to use the chat function and send them.  But the first question I actually have to ask for

Page 12

Z. BOZANIC, PH.D.

that is, would you have access like to a computer or something like that where you would be able to look at the exhibit if I send it to you via email?  If not, that's not a problem.  I can use it by sharing the screen share function.  I just find typically people find it easier to be able to flip through the exhibit themselves.

A    As you wish.  I can accommodate either.

Q    Okay.  Well, then I'll send an email, and we'll test right now the first one.  So you're going to get an email from me, dpartida@wilkauslander.com, and it's going to have the subject Dr. Bozanic Depo Exhibits, and it's going to have an attachment that says Exhibit 72.  So I'm going to send that right now, and then you all can tell me if you received it.

A    Received.

MR. PARTIDA:  Okay.  So what I'd like to introduce as Exhibit 71, and if you want to go ahead and open that -- oh, 72. I'm sorry, 72.  Exhibit 72 is the February

Page 13

Z. BOZANIC, PH.D.

20th, 2025, notice of deposition of Dr. Zahn Bozanic.

(Exhibit 72 was marked for identification.)

BY MR. PARTIDA:

Q   Do you see that, Dr. Bozanic?

A   I do.

Q   And are you familiar with this document?  Have you seen it?

A   I have seen it.  I am familiar with it.

Q   Okay.  And is that the reason you're here today?

A   That is the reason I'm here today.

Q   Okay.  And you understand that everything is under oath here today?

A   I do.

MR. PARTIDA:  Okay.  So I'm going to send the next exhibit, and that exhibit that I would like to introduce is going to be Exhibit 73.  I'll send in one second.

Okay.  And I think I probably made the mistake again of saying 72 instead of

Page 14

Z. BOZANIC, PH.D.

73.  But just to be clear, the first exhibit was 72; that's the notice of deposition.  And this next exhibit is Exhibit 73, and that's the January 10th, 2025, Expert Report of Dr. Zahn Bozanic.

(Exhibit 73 was marked for identification.)

BY MR. PARTIDA:

Q    And am I pronouncing that correctly, Dr. Bozanic?

A    That's correct.  Thank you.  And I may refer to my paper copy if you're sending over my report?

Q    Absolutely.  Yep.  I just have to send it officially, and it'll be marked Exhibit 73.  And, you know, I'm looking at a paper copy too.  But at the top of the copy that you're looking at, it probably should say Document 91-9 on it at the very top in blue, or do you have the not filed copy?  I just want to make sure if you're looking at a paper copy, we're looking at the same document.

A    I'm looking at my paper copy,

Page 15

Z. BOZANIC, PH.D.

but the electronic copy does have a stamped Document 91-1.

Q    Okay.  And that's probably because once you give the report to Mr. Linkh, he puts it in the court system, and then the court system applies this stamp. But just to be clear, the very front cover page of the one you're looking at says United States District Court, Southern District of New York, and then it has the caption, Darshan Hasthantra et al., Plaintiff v. CleanSpark, Inc.  et al., Defendants, and then Case No 1:21-CV-511.

Do you see that?  Is that the document you're looking at?

A    I do, and it is.

Q    And then the very last page -- and that document includes the exhibits, the printed copy you have?

A    Let me double check the electronic version.  Let me scroll down. Okay.  It appears to be a complete representation of the report that I submitted, yes.

Page 16

Z. BOZANIC, PH.D.

Q    Okay.  Great.

Okay.  So if you can please turn to page A-1 of the report.  And do you see that?

A    I do.

Q    Okay.  And so I just want to be clear, so in paragraph 3, which is the one I'd like to go to, and we'll get into the rest of this report later, but for right now I want to focus on paragraph 3, it says "Based on my analysis to date and the evaluation of the factors described through this report, I have formed the following opinions."  And then you list four opinions, A, B, C, and D.  Is that correct?

A    That is correct.

Q    And then I want you to flip to page -- hmm, let me find it -- I think it's 31, but yeah, page A-31.  And you can tell me when you're there.

A    Almost.

Q    All right.  Can you look in paragraph 92 and tell me when you finished

Page 17

Z. BOZANIC, PH.D.

reading it?

A    Yes, I finished reading it.

Q    All right.  And then right below where you say "I declare under the penalty of perjury that the foregoing is true and correct,"  you sign the document.  Isn't that correct?

A    That is correct.

Q    Okay.  So one thing that interested me about this report when I was reading it, I was like, wow; I think I've read this before.  And so it turns out I have, maybe a couple of times.  And so my question is, how much of this report did you copy and paste from other reports?

A    This report is my report that I have reviewed, that I have written, that I have created.  Every word has been reviewed by me; every word has been approved by me.  I have edited this document; I have created this document, and so this document reflects my opinions today.

Q    That's fine.  That's not the

Page 18

Z. BOZANIC, PH.D.

question I asked you.  I asked you how much of this report did you copy and paste from other reports?  So I'd like an answer to that question.

A    Sure.  Again, what I will say is the report was written by me, reviewed by me, and every word in this paper is my opinion in terms of the matters in this case.

Q    Okay.  Again, I'm going to move to strike that answer as nonresponsive.  That's not responsive.  You repeated the same answer you just gave me, which didn't answer my question.

My question is, Dr. Bozanic, how much of this report did you copy and paste from other reports?

A    So as I said --

Q    That's an easy question.  Yes or no.  Let me strike that.  Withdraw that.

Have you copied and pasted any of the texts in this report from a different document?

A    So I've worked on several market

Page 19

Z. BOZANIC, PH.D.

efficiency reports, and so there are elements that are similar; there are elements that are unique.

Q    Okay.  That's, again, I -- I don't know how this is a difficult question, so maybe you can explain to me what's unclear about my question.  Did you select text from other reports, other expert reports, and put it into this document?

A    So I have written other reports; I've written several reports, worked on several reports, and so there are common elements to those reports.  And so those would be used again in other reports as needed.  So in terms of quantifying the amount, that's what's unclear.

Q    Sure.  And we can get into all of that because I have the red lines; right?  So we can walk through all of that, and that's fine.  But we're going to get to that after you answer my question.

And my question is, how much of this report, how much of the text in this

Page 20

Z. BOZANIC, PH.D.

report, did you cut and paste from a different document?

A    And my response is I'm not sure how much in terms of percent with respect to two different documents.  So I have not quantified that.  What I have said is there are common elements across reports.  And so to the extent possible, if I can save the client money, then I'm going to not have to reinvent the wheel.  So I don't need to reinvent the wheel every time I write a report, given the commonalities across reports with respect, for example, the Cammer and Krogman factors.

So those factors aren't changing.  Those are factors that the courts appreciate hearing an opinion about.  And so in terms of copying and pasting, yes, there would be a word Krogman that's pasted, Cammer that's pasted repeatedly.  The factors are similar across reports as well.  In terms of quantifying the amount, that's what I'm

Page 21

Z. BOZANIC, PH.D.

taking issue with, with respect to how much.

Are there elements that are common across reports?  Absolutely.

Q    Fair enough.  But I just want this to be crystal clear, so we'll just walk through it really, really slowly because you said a lot there, and it's fair.  You did take text from other reports and use it for this report.  Isn't that correct?

A    I have worked on the reports --

Q    That's a yes or no.

A    This report is a new report for this case and this matter, and it has specifics to this case and there are generalities that would be applicable to other cases.  And so to the extent needed, if I need to copy and paste a sentence that I have used in another report, that would be efficient for the client rather than retyping everything in regards to, say, Cammer or Krogman repeatedly.

Q    Listen, you write your reports

Page 22

Z. BOZANIC, PH.D.

how you write them.  I'm not the expert here.  I'm just asking you how you wrote your report.  And I'm just asking you, did you copy and paste text from other reports?

A    I believe I've already answered that question.  And so in regards to your first question, I've told you my procedure in terms of how I approach reports.  That was the first response I gave you.

Q    So the procedure is to -- okay, so let's go to -- I'm talking to a vacuum here.

All right.  Well, let's do that actually for a second.  How many previous expert reports have you prepared, you personally?

A    So as lead expert, this is my second report.

Q    This is your second report.  Okay.  And so let's flip back to -- let's see what this is -- page A-38.

A    I'm sorry.  A-30 what?

Q    A-38.

Page 23

Z. BOZANIC, PH.D.

A    38, thank you.

Q    And so tell me when you're there.

A    I'm there.

Q    Okay.  Do you see the third bold, I guess, where it says expert witness experience?

A    I do.

Q    "In re Teleperformance SE Securities Litigation"?

A    I do.

Q    Okay.  And that's your report that you prepared?

A    I did prepare a report for that case, yes.

Q    Okay.  I just sent Exhibit 74, so you can tell me when you received it.

        (Exhibit 74 was marked for
        identification.)

A    Sure.

Q    Do you have it open?

A    I'm just receiving it, just opening it, scanning through it.

Q    Okay.

Page 24

Z. BOZANIC, PH.D.

A    Okay.  I've reviewed it.

Q    And this is your report that you prepared for this case Teleperformance?

A    That is correct.

Q    You look at just the first page of that report, the first page with text on it?

A    Which page number?

Q    It would be page number 2.

A    Okay.

Q    Just take a minute to familiarize yourself with it, I guess as much as you need.  It's your report.

A    I have reviewed this page.

Q    Okay.  Now, can you go back to Exhibit 73?

A    Yes.

Q    And can you flip to page A-1 of that report?

A    I'm there.

Q    Can you familiarize yourself with that?

A    I am familiar.

Q    This would be an example of

Page 25

Z. BOZANIC, PH.D.

where you would recycle an old report that you wrote for a new report?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    You can answer.

A    I'm sorry.  Are you making a statement or asking a question?  I didn't quite hear it correctly.

Q    Sure.  My question is specific. Did you recycle the beginning of the Teleperformance report for this report?

MR. LINKH:  Same objection.

A    I'm not quite sure what you mean by recycle, but are there common elements across the reports?  Absolutely.

Q    Sure.  Okay.  Can you tell me the difference between what words are different in paragraph one of each?

A    So in regards to the companies under consideration, those are different, the focus in terms of the security is also different, the class period is also different.  So there are several elements in that first paragraph on this page that

Page 26

Z. BOZANIC, PH.D.

are different.

Q    Perfect.  And one of those differences that you pointed out was the class period.  Isn't that correct?

A    That is correct.

Q    And so the class period on page A-1 of Exhibit 73 is December 10, 2020, to August 16, 2021.  Is that accurate?

A    It appears to be so, yes.

Q    I want you to flip to -- can you flip to page A-19 of your report?

A    I can.

Q    Exhibit 73.

A    You said paragraph 52?

Q    Yes.

A    Okay.  I'm there.

Q    So if I'm understanding this, that your event study regression analysis is for an analysis period that is essentially the class period, which is December 10, 2020, to August 16, 2021, inclusive, plus a year before and a half. So that's your analysis period; correct?

A    That is correct.

Page 27

Z. BOZANIC, PH.D.

Q   And that's different than the class period; correct?

A   It does extend the class period one year before and one year after the class period dates.  That's correct.

Q   So it's different?  It's a different period; correct?

A   It extends the class period beyond the class period one year before, one year after.  Correct.

Q   So it's different?

A   It's including the class period.

Q   Why is it so hard to say it's different?  Is it two different time periods?  These are not trick questions.  So I'm trying to understand.

A   The analysis period is inclusive of the class period.  And so I'm answering your question and saying that, yes, there's the class period as defined; there's the analysis period also as defined which extends the class period.

Q   Great.  So it's different?

A   It's overlapping.  So when you

Page 28

Z. BOZANIC, PH.D.

say different --

Q    It's different?

A    -- it undermines the fact that they're overlapping.

Q    Okay.  So they're overlapping but different?

A    The dates that are used for the analysis period are different in the class period because they extend the class period out on the front and on the back.

Q    Excellent.  Okay.  So what I want to go to then is -- bear with me one moment -- I want you to go to paragraph 64 of your report.

MR. LINKH:  David, just to be clear, this is paragraph 64 of the CleanSpark report?

MR. PARTIDA:  Yes, sorry, of Exhibit 73, the CleanSpark report on page A-23.

THE WITNESS:  I'm there.

BY MR. PARTIDA:

Q    And in that you say -- or you could just read the paragraph and tell me when you finish reading it.

Page 29

Z. BOZANIC, PH.D.

A    Yes, I've finished reading it.

Q    Okay.  Now, it's not quite accurate to say that the analysis supports the conclusion that it traded in an efficient market during the class period; right?  Because when we just looked just looked at paragraph 52, your analysis period, as you testified, is different than the class period because it extends it a year before and a year after.

So what I guess I'm trying to say is that the sentence here at the end of 64 isn't really accurate because the analysis supports the conclusion that the company stock traded in an efficient market during the analysis period; right?  But that's a longer, much longer period than the class period.  Isn't that correct?

MR. LINKH:  Object to form.

A    So I appreciate going to the front end and the back end without the sausage in the middle.  So there's a reason in terms of why I chose an analysis

Page 30

Z. BOZANIC, PH.D.

period, and this goes back to power within the class period with regards to the events that are being analyzed. And so it's very common and reasonable when you have a short class period, when you have few events in that class period, there's a low power situation, statistically speaking, to extend the window to get -- create a power because you have additional events by which you can analyze.

Q    But again, my question is a little bit different than that, and we'll talk about all the middle. I'm not interested in skipping any of this, actually. But what I'm saying is that, I guess, when you say -- let's look at a different example. Okay? And then we'll get back to 64 since you want to talk about the paragraphs in the middle.

Let's go to paragraph 60. Have you read that?

A    Oh, sorry. Yeah, I'm there. Let me read it. Yes.

Page 31

Z. BOZANIC, PH.D.

Q    So it says, paragraph 60, "I analyzed CleanSpark's announcements during the class period."  But again, when we go back to paragraph 52, what I'm trying to understand here is, when I read this report, I look at paragraph 52, and I see where it says, okay, I picked an analysis period, one year before and one year after, it includes the class period, but it's clearly different because you go out of your way to say what each is.

So I'm trying to understand then why we're not talking about the analysis period, because that's what you've defined it as, the period you analyzed.  So I guess I'm trying to understand how you get from we have to analyze outside of the class period back down to, okay, everything we analyze outside of the class period says a whole bunch of stuff about what happened inside the class period.

That's what I'm trying to understand is, how the oscillation works.  How do you start with the class period,

Page 32

Z. BOZANIC, PH.D.

expand it out for purposes of your analysis, and then contract it for purposes of your conclusion?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    You can answer.  We'll get these more clear.  I'm trying to understand --

A    Sure.  Understood.  The analysis period is the period that I'm analyzing for Cammer factor five with regards to exhibit 6 and 7.  The focus obviously is on the class period, but the issue is with respect to statistical power.  And so to increase the power of the test given the short class period, I have to extend the window for analysis for statistical purposes.  But the class period -- the analysis period is inclusive of the class period.

Q    So why do you have to do that?  I guess is what I'm not understanding.  Why do you have to increase the analysis period?  Why do you have to increase it?  Or why did you increase it for this case?

Page 33

Z. BOZANIC, PH.D.

Let's just talk about it that way.  How did you decide, just walk me through that, on paragraph 52, how did you decide to come up with the analysis period?

A    So I believe I've already answered this question a few minutes ago where I said the concern; right?  And a reasonable approach to overcome the concern is lack of power.  When you have a short class period with few events under analysis, there's a power issue, statistically speaking.  So a very reasonable and objective methodology is to proceed to extend the period under analysis to include additional events adjacent to the class period to increase the power of the test.

Q    Okay.  So when you say increase the statistical power, what do you mean?

A    When you have too few events to analyze, there's an issue with the number of observations statistically speaking. To draw statistical inference, you have to have a decent number of observations to be

Page 34

Z. BOZANIC, PH.D.

able to draw that inference.  And depending upon what the analysis is, the number of observations could change; right?  So for example with respect to portfolio formation in terms of optimal diversification, the number that you typically hear about academically is 30; you need 30 firms; right?

So there are issues in terms of power where you have a larger sample size, where it can get you somewhere where you couldn't absent the ability to -- to study that phenomena because you don't have enough events to study.

Q    Got it.  So how did you pick a year before and a year after here?  How did you as an expert say, okay, I have this problem I need to solve, the one you just described, I'm going to find a solution, which you say is reasonable, how did you decide that that was the reasonable solution?  I'm trying to understand.  Just explain it to me how you get to say, okay, like if you were

Page 35

Z. BOZANIC, PH.D.

teaching me a class.  Well, you know, I come to you and I say, well, how would I do this?  How do I solve this problem?  How did you pick this solution?

MR. LINKH:  Object to the form.

A    -- question.  So I'm looking at earnings analysis.  These happen on a quarterly basis.  So if I were to go out one quarter, well, I might have one more observation in the sample depending upon the days chosen.  And so I'm looking at studying an event that happens with regularity on a quarterly basis.  And so given the length of the class period and given the few number of observations in that class period, by extending out a year, I can increase the power.

Now, if there were events that happen with greater periodicity than each quarter, then perhaps that window could be shortened.  But that wasn't the consideration in this particular case; the consideration was in looking at earnings announcements.  And so therefore, I need

Page 36

Z. BOZANIC, PH.D.

to increase the window so that I can include more earnings announcements in that analysis.

Q    Okay.  So why not go back two years?

A    So again, I'm trying to provide a reasonable and objective criteria that I can say I have a power; I want to increase the length by which I do an analysis; right?  But then you're correct.  There is some subjectivity in saying you go back one year, two year, five years.  Well, then you have a different issue; right?  Then you have other confounding events.

And so there is a point in time where the expert has to subjectively make a call and say, what is reasonable, what is objective in this case?  And that was my conclusion.

Q    And why was that your conclusion that it was reasonable and objective to extend back one year and forward one year?

A    Because I'm not cherry picking events.  All I'm saying is I need

Page 37

Z. BOZANIC, PH.D.

additional events to analyze to increase the power of my test; these happen on a quarterly basis. And so in terms of the extension of the window, one year is a very reasonable basis to extend the window, but also not include other confounding events --

Q    Okay. What was the initial -- okay.

So you said that you need to increase the statistical power. What was the statistical power calculation on the initial class period? When you discovered you had this power problem, when you ran the test initially, December 10th, 2020, to August 16, 2021, what was that power calculation?

MR. LINKH:  Objection.

A    There is no power calculation. This is my assessment reviewing the facts of the case and looking at the class period, the number of events in that class period.

Q    So I just -- so you did not

Page 38

Z. BOZANIC, PH.D.

do -- what you're saying is this report doesn't -- as part of preparing this report, you did not conduct a power calculation for the class period, December 10, 2020, to August 16, 2021?

MR. LINKH:  Object to form.

A    On the basis of my education and experience and having worked on similar cases, the issue remains the same.  This isn't a matter of needing to do a statistical test to assess the power of those three events within the class period.  It's looking at the class period and looking at saying there's only three events.  My experience, both academically as an expert, would say that's too few in terms of the number of events to analyze.  So there was no test whereby things were changed --

Q    Okay.  So just to be clear, you didn't run -- do an initial power calculation of the class period?

A    That would undermine the objectivity of my report.

Page 39

Z. BOZANIC, PH.D.

Q    So you did not do it?  Okay.

Did you run a power calculation for the analysis period?

A    As I've already said, the issue at that point -- so when you have statistical significance, then you don't have to really worry about power.  If it's statistically significant, statistically significant at that point in time, there is no power calculation need to be done ex post.

Q    So you're saying that -- you're going to have to help walk me through this again because I really -- I don't understand.  So what I'm trying to understand is you say that there's a problem that you need to increase the power.  Is that accurate for this class period?  I just want to go step by step to make sure I understand it.

For 52, we're talking only about paragraph 52, I just want to understand that.  You came up with the analysis period to solve a problem with the power

Page 40

Z. BOZANIC, PH.D.

that you needed for your statistical analysis. Is that accurate?

MR. LINKH: Object to form.

A    It is accurate insofar as what I have said. When the class period is short and there are a few events to analyze, then there is potentially a power issue given the number of events, and you can overcome the power issue by increasing the window and then you would have more events to consider, which would thus increase the power. There's not a test that's necessary.

Q    So you just know there's a power issue and then you just pick a period and you say, based on my experience, that should solve the power issue and go from there?

A    So again --

MR. LINKH: Object to form.

A    -- I have seen this method in other reports. This is a reasonable and objective method that other experts have also used in other cases where there are

Page 41

Z. BOZANIC, PH.D.

power issues because of a short class window.

Q    Dr. Bozanic, I'm not asking about a bunch of other experts or reports you may or may not have copied.  What I'm asking about is your report, and what I'm asking about is your analysis, and what I'm trying to understand quite simply is, I guess what I understand that you've testified to, which is that in your experience when you have a short class period with few events, there's a power issue and you solve that by using your experience as an expert relying on what other experts have done in other reports to expand the class period to include more events, and that solves the power problem or should?

A    Given my academic --

MR. LINKH:  Object to form.

A    Sorry.  Given my academic training and my experience, this is a reasonable method to approach this particular issue.

Page 42

Z. BOZANIC, PH.D.

Q    Okay.  And I'm just saying, though, I'm trying to understand, though, that's the issue, is it's we need a longer analysis period than the class period because the class period is short with few events, and I need to increase the power of my event analysis, and so I expanded and that's reasonable.  That's what you're testifying?  And that's fine, I just want to understand that that's what we're working with.

MR. LINKH:  Same objection.

A    I'll say it again what I've said before, which is yes, because of power issues, because of too few events within the class period, the period was extended into an analysis period to increase the power of the test.  That's correct.

Q    Okay.  Perfect.  Now I understand that part.

Now the part that I'm trying to get to, and the part that I'm trying to understand when I point you to paragraph 60, for example, if you want to flip

Z. BOZANIC, PH.D.

there, where it says "To assess the extent of a 'cause and effect relationship between company disclosures and resulting movements in stock price' I analyzed CleanSpark's earnings announcements during the class period."  Okay.

What I'm trying to understand is -- when I read the sentence I thought it should say I analyzed CleanSpark's earnings announcements during the analysis period, which I understand includes the class period but it's longer for precisely what you just testified to is the need the solve this problem you were facing.  And so I guess what I'm trying to understand is where I went wrong, why this says class period?  And that's what I'm talking about when I say, we start with this class period and you say, well, there's an issue with this class period; we got to expand it.  Okay.  I got you.  I understand that.

Then you come back and when you talk about your conclusions, you say, well, all this analysis is just about the

Page 44

Z. BOZANIC, PH.D.

class period.  So that's where I'm trying to understand is how you get back to this point by saying, okay, because I did this analysis of the analysis period which is longer, I therefore can make this conclusion about the class period.  That's what I'm trying to understand.

MR. LINKH:  Object to form.

A    Understood.  And I appreciate the confusion.  The class period is inclusive -- or the analysis period is inclusive of the class period.

Q    Right.  I get that.  What I'm saying is how does expanding the class period or the analysis period allow you to draw those conclusions taking the events from outside of the class period about the actual class period?  How do you say, okay, because I analyzed this two-year period of events, I can say this about the specific class period that's within it; right?

So to use a different example, I'm just using this as a hypothetical;

Z. BOZANIC, PH.D.

right?  I have a son.  He's two years old. If I were to say, okay, I started, you know, I can't just look at, you know, what my relationship was with my son for six months; you really got to look at the whole period he was alive.  And when I look at the whole period that he was alive, overall, you know, they had a good relationship.

How can you then say, okay, but for this specific two-month period in time where maybe we were really at odds; right? Because they overall had a good relationship during that two-month period, you know, they had a good relationship.

So again, I get that that's an objectionable question.  I'm just trying to genuinely let you know what my confusion is.  And my confusion is, I get that you analyzed the analysis period, and I get why you did it.  I don't understand how you can go and say, okay, the same is exactly true -- what's exactly true of the analysis period is true of the class

Page 46

Z. BOZANIC, PH.D.

period.  Otherwise, why would you need to expand it?

MR. LINKH:  Object to form.

A     So again, the focus is on the class period, and the class period is contained within the analysis period.  And to the extent that this is confusing, this is in regards to one factor.  So all other factors that are analyzed were restricted to the class period.  Because of the power issue for this particular factor, I had to extend the analysis.

Q     And what factor is this when you say, this factor?

A     The Cammer 5 factor.

Q     That's a pretty important factor; right?

A     It is a factor among many that the courts consider.

Q     Would you ever submit an academic article to a peer-reviewed journal where you said you found market efficiency without satisfying Cammer 5?

MR. LINKH:  Object to form.

Page 47

Z. BOZANIC, PH.D.

A    I'm sorry.  Repeat the question?

Q    Would you ever submit to a peer-reviewed academic journal a market efficiency analysis where you concluded there was an efficient market without demonstrating Cammer 5?

MR. LINKH:  Object to form.

A    I've never had to go down that path.  And so I would have to understand the facts and circumstances of whatever's going on in this article.  I mean, it's wildly hypothetical.  I don't fully understand the nature of the question in terms of what the content of the article is and what -- to do.

Q    I figured.  Okay.  So I'll just ask it more simply.  Your testimony is that you can find market efficiency absent Cammer 5?

A    My testimony is that the market is efficient on the basis of all of the factors that I've considered.

Q    My question is different.  Could you demonstrate market efficiency in this

Page 48

Z. BOZANIC, PH.D.
case without showing Cammer 5?  If I were to rip out section E, the Cammer 5 analysis, would your conclusion stay the same?

A    So I am here using the guidelines that the Cammer and Krogman courts gave us to objectively, to the best of my ability, opine on these factors without selecting or cherry picking certain factors.

Q    Right.  I'm not asking you about that.  I get your analysis has to be fulsome and you have to talk about it all.

My question is you're testifying here that, well, I know that the analysis period for this is different and we're focused on the class period, but this is just one of many factors that you would look at as if it's not important.  And I guess what I'm -- I've just never heard of a world where people say Cammer 5 is really unimportant.  And in fact, cases that you cite say the opposite.

But I guess my question is a

Page 49

Z. BOZANIC, PH.D.

little bit different.  So to be clear, my question is -- I'll ask it a different way.  In your expert opinion, how important was the Cammer 5 analysis that you performed in this report to your conclusion?

A    I do not --

MR. LINKH:  Object to form.

A    I do not weight the factors differently.  I opine on the factors and present the evidence that I find.

Q    Right.  I'm asking you though; right, how important was it for you?  You should know what's important to you in your report when you reach your conclusion.  So when you're making these conclusions, what I'm trying to figure out is how important was the Cammer 5 factor?  Was it like, oh, man, this is also great -- or I guess I'm just trying to understand how important this factor was to your analysis.

MR. LINKH:  Object to form.

A    And I believe I already

Page 50

Z. BOZANIC, PH.D.

answered.  And so, as I said before, I view all the factors equally.  I opine on all of them to the best of my abilities and objectively as possible.

Q    Okay.  So again my question is -- so if I'm understanding, then your answer is that Cammer 5 is equally important as every other factor, the three Krogman factors and the five Cammer factors?

MR. LINKH:  Object to form.

A    Is that a question?

Q    Yes, I'm asking you, is my understanding of your testimony correct that as far as your expert analysis goes, each of the five Cammer factors and each of the three Krogman factors are of equal importance?

MR. LINKH:  Object to form.

A    As I've already said, I view them on par with each other.  I don't put a differential weight.  My goal is to take what the courts give us and to apply it to the best of my ability and objectively as

Page 51

Z. BOZANIC, PH.D.

possible.

Q    Okay.  Can you go to page -- I think it's A-32.  Can you go to page A-3 of your report?

A    Yeah.

Q    In Exhibit 73.  Yeah, A-3.

A    A-3.

Q    And just tell me when you've had a chance to look at paragraph 11.

A    11, okay.

Q    It goes on to page A-4.

A    Okay.

Q    And how did the staff at Cleveland Analytics, LLC assist you in the preparation of this report?

A    So I may have directed certain analyses in regards to the creation of this report.

Q    May have or did?

A    I did.  No, sorry.  Sorry.

Q    And which analyses did you have staff perform?

A    There's no particular analysis that I had staff at Cleveland Analytics

Page 52

Z. BOZANIC, PH.D.

perform.  So it might have been in terms of the event study; it could have been other parts in terms of doing some calculations for other factors.  There's not any one particular thing that I can single out.

Q    Have you ever compared the similarities of your report with any expert reports by Dr. Matthew Cain?

A    I have not done a comparison in terms of a textual analysis, if that's what you're referring to.

Q    I'm just saying, have you ever considered how similar your reports might be to some prepared by him?

A    No.

MR. LINKH:  Objection to form.

BY MR. PARTIDA:

Q    Okay.  And do you have any professional relationship with Dr. Cain?

A    I'm not sure what you mean by professional relationship, but we work together; we support each other.

Q    And you work together, can you

Page 53

Z. BOZANIC, PH.D.

explain that more?

A    So this is -- Cleveland Analytics is Matt Cain's LLC.  So he is also an expert witness that creates reports and does depositions.  And so I'll support him on cases and vice versa as needed.

Q    Did Dr. Cain assist you with the preparation of this report in any way?

A    So I have directed Dr. Cain in different capacities to assist me with this report.

Q    How?  Can you explain?

A    So I could have said maybe insert some numbers in the draft for me, could have been maybe create this particular factor, whatever the case might have been.

Q    Okay.  Well, I'm asking you about this report which you are here to defend.  So I want to know specifically with respect to this report exactly what you asked Dr. Cain to do.  I don't want to know what you could have done; I don't

Page 54

Z. BOZANIC, PH.D.

want to know what you might have done.  I want to know what you did in connection with this report that you're here defending.

MR. LINKH:  Object to form.

A    I don't have a taxonomy of every task that was requested, but I can tell you that he did assist with the analysis. I can tell you that he did assist in terms of potentially looking over the report for typos, maybe inserting some numbers as needed and so forth.  But I don't create an exhaustive list to say, did you insert this particular number in this particular paragraph in this particular day?

Q    Okay.  So I want to break that down a little bit more.  Let's look at page 1 of the report, the table of contents, the report that you submitted in this case.

A    I am there.

Q    Okay.  Did you ask for his input with respect to your opinions on market efficiency?

Page 55

Z. BOZANIC, PH.D.

A    Did I ask for his input in regards to my opinions?  No.

Q    Yeah.

A    My opinions are my own opinions.

Q    So the answer is no?

A    With regards to the opinions. The answers are my opinions, not his, and I have not asked for his input with respect to my opinions.

Q    Perfect.

A    His input would be directing different elements of helping with the report.

Q    Okay.  Sure.  You don't have to be defensive.  I'm just asking you.

Okay.  So with regard to the evaluation of market efficiency factors for CleanSpark common stock, below that you have Cammer factor number 1, which is an analysis of the average weekly trading volume.  Is that something you would have asked him to perform analysis and connection with?

A    To some extent, perhaps, because

Page 56

Z. BOZANIC, PH.D.

I did ask him to retrieve some data.  So he would have had a hand in most all of these components because there's a data component; right?  These -- specifics, right, but in terms of different elements, I can say I did ask him to pull data, for example.

Q   Okay.  So the input data for these, to collect data for these.  Okay.

How about under Section 6, where it says "Ability to calculate damages on a class-wide basis"?  Would you have asked him for any input with regard to those sections?

A   No.

MR. LINKH:  Object to form.

Q   No?  Okay.

A   I mean, only to the extent he would have reviewed the draft.  Potentially that would be it.  So but not in terms of opinions or input.

MR. PARTIDA:  I'm going to introduce what's going to be Exhibit 75, which I'll send in a second.

Page 57

Z. BOZANIC, PH.D.

MR. LINKH:  David, if we're switching topics here, is now a good time to take a bathroom break?

MR. PARTIDA:  Oh, absolutely.  We could do that.  We aren't necessarily switching topics, but certainly we can do that.  We've been going an hour.  I appreciate you asking.

So why don't we just go off the record?

THE VIDEOGRAPHER:  Okay.

We're now going off the record at approximately 11:02 a.m.

(Off the record.)

THE VIDEOGRAPHER:  This is the beginning of media number 2.  We're going back on the record at approximately 11:16 a.m.

Go ahead, sir.

BY MR. PARTIDA:

Q    All right.  Welcome back, Dr. Bozanic.  Did you speak with anyone during the break?

A    I did.

Page 58

Z. BOZANIC, PH.D.

Q    Who?

A    Greg Linkh.

Q    All right.  Did you look at any documents?

A    I'm sorry.

Q    Did you look at any documents?

A    I did not.

Q    Anyone else?  Did you speak with anyone else?

A    I did not.

Q    I want to go back to Exhibit 74, which is the Teleperformance report.  And in this report the analysis period was identical to the class period.  Is that correct?

A    Which paragraph are you referring to, please?

Q    Sure.  So we could go back up to paragraph 1.

A    Mm-hmm.  I see it.

Q    Sufficient during -- yeah.  So that's the class period; right?  And for your event study for this report there was no different analysis period.  It was the

Page 59

Z. BOZANIC, PH.D.

same as the class period.  There was no difference.

        A      To confirm that, can you point out the other paragraph that would --

        Q      Well, I guess it's paragraph 63.

        A      Okay.  One second.

        Q      And I'm not -- I'm honestly not trying to ask a trick question.  I'm just trying to make sure.

        A      Okay.  But I'd like to refresh myself with the document.  It's been sometimes.

        Q      Of course.  Of course.  So yeah. Paragraph 63 of that.

        A      Okay.  Thank you.

        Q      So is that accurate, that the event study analysis period is identical to the class period in this case?

        A      In the Teleperformance case?

        Q      In the Teleperformance case.

        A      The report that I submitted? Yes, that's correct.

        Q      Okay.  All right.

                Now, I also had another

Page 60

Z. BOZANIC, PH.D.

question.  So you said, I want to confirm, Cleveland Analytics LLC is owned by Dr. Matt Cain?

A    This is Matt Cain's LLC, correct.

Q    Okay.  And what is your title at Cleveland Analytics LLC?

A    What is my title at Cleveland Analytics LLC?  I don't have a title at Cleveland Analytics LLC.

Q    Okay.  Are you familiar with the case San Antonio Fire and Police Pension Fund vs. Dentsply Sirona?

A    I am familiar with this case.

Q    Did you work on it?

A    I believe that that case is protected, the work product is protected in privilege, so.

Q    Okay.  Well, I can refer you to a public filing if you'd like.  But before we get there, I just want to -- so you worked on that case; you're familiar with it?

A    I'm aware of this case.

Page 61

Z. BOZANIC, PH.D.

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    Okay.  And did you perform work in connection with it?

A    Again, it's -- if you can point me to the public document, that would be fantastic.

Q    I'm asking your memory right now.  Do you remember performing work on this case?

A    Again, I believe that this work product is protected in privilege, and so it's unclear to me to what extent --

Q    I'm not asking you to disclose any privileged information.  I'm just asking, did you do work on it or not, and you haven't been instructed not to answer.

So I'm just going to ask you, did you perform work on the case?  It's a simple yes or no.  I don't understand your evasiveness.  It's making me worried, frankly.

MR. LINKH:  Object to form.

A    I am familiar with the case.

Page 62

Z. BOZANIC, PH.D.

Q    And did you perform work for that case?

A    I have assisted Matt on that case.

Q    Okay.  Thank you.  Now, I'm going to send Exhibit 75.

Well, let me ask you this, did you take any language from the expert report that was publicly filed in that case and use it in the report you filed here?

MR. LINKH:  Object to form.

A    Again, the answer that I gave before is this particular report is my report; I have reviewed it; I have edited it; I have drafted that report; I have signed my name to it, and I stand behind the opinions of that report.  I don't have that report in front of me for you to show me the differences.

Q    Right.  I'm just asking you if you recall ever taking text from a previous report and putting it in this report?

Page 63

Z. BOZANIC, PH.D.

A     Again, this is --

Q     However much, however little or much.

A     These are the same questions that we started the day with in terms of how much, and the how much is what I had issue with earlier on in the day and the same would hold here.  So in terms of how much, as I've said, across cases, there are similarities.  And as I said before, with respect to the Krogman and Cammer factors, there are similarities.

MR. PARTIDA:  All right.  I'm going to send Exhibit 75.  Exhibit 75, I will introduce the expert report of Matthew Cain dated November 15, 2024.

(Exhibit 75 was marked for identification.)

So you can tell me when you receive that document.  Please ignore the cover page that says Exhibit 15.  That's just the way the court filing comes.

Do you have it?

THE WITNESS:  Not yet.  Coming up.

Page 64

Z. BOZANIC, PH.D.

Hold on.

Okay.  I have it open.

BY MR. PARTIDA:

Q   Can you go to page 2 of that document?  Which is the --

A   Yes, I'm on page 2 of the document.

Q   And you see that expert report of Matthew Cain, November 15, 2024?

A   At the title bit -- I'm going to go back up.  Yes, I do see it.

Q   And then you see that that case is, to the left-hand side, down the top, San Antonio Fire and Police Pension Fund et al., Plaintiffs vs. Dentsply Sirona, Inc.?

A   I do.

Q   Okay.  Does this refresh your recollection as to whether or not you performed work in connection with this case?

A   Again, I believe I have assisted Matt on this case, but it's been some time.

Page 65

Z. BOZANIC, PH.D.

Q    Are you aware that there are a series of paragraphs in this report that are verbatim in the report that you just filed in this report?  I mean verbatim, and we can go look at them.  I just want to ask if you're aware of it first before we look at them.

A    I'm sorry, aware of what?

Q    Are you aware that there are a series of paragraphs in this Exhibit 75, this Dentsply expert report by Matthew Cain, that are verbatim to the paragraphs that exist in the report that you filed in this matter?  Verbatim.

And we can go look at those. I'm just asking you right now, my question is, I'll make it simple, are you, sitting here right now, aware that there are paragraphs in your expert report that you filed in this matter that are verbatim identical to paragraphs in Exhibit 75? Are you aware of that?

MR. LINKH:  Object to form.

A    So yes, I would appreciate you

Page 66

Z. BOZANIC, PH.D.

pointing out specific paragraphs, but to the extent that they exist, it would be unsurprising to me given that I help Matt and support him on cases and vice versa.

Q    Okay.  And so then why wasn't it disclosed that you had performed work in other securities class actions, or that you had assisted with preparing these expert reports on your CV?

A    It's my understanding as a lead versus support expert, there are different requirements in terms of disclosing which cases they work on.

Q    I'm asking why you chose not to disclose it.

A    And I'll repeat, as a lead expert, I know that I'm required to disclose the cases I work on.

Q    Right.  And you just testified that you worked on this case and you assisted with this case, and in fact it wouldn't surprise you that there were wholesale sections of this that are in your report.  And I'm asking why you

Page 67

Z. BOZANIC, PH.D.
wouldn't think that that should be disclosed.

MR. LINKH:  Object to form.

A    I'll repeat again.  As lead expert, I understand when I put my name on a report and publicly disseminate that, that needs to be disclosed.  As a support expert, that does not need to be disclosed.

Q    Okay.  I understand.  Yeah.

And so I guess just to give you one of the examples, you could look at paragraph 61, be an example.  So I'll let you look at, you know, 62 be an example, 63, other than the name Dentsply versus CleanSpark.

But I think you've answered my questions about this Exhibit.  What I'd like to go back to is Exhibit 74 -- or, sorry, 73.  I'd like to go back to your expert report

A    Okay.

Q    -- asked mostly.  Okay.  So I want to flip to page -- I kind of want to

Page 68

Z. BOZANIC, PH.D.

go through this in a little bit more detail now.  So I'd like to go to page, back to page 1, A-1.

A    I am at page A-1 of my report.

Q    And can you look at the opinion you express in 3C?

A    Yes.

Q    And go ahead and tell me when you've read that.

A    I've read it.

Q    I want to focus in on that first clause there, which is, I'm not sure if you've read it, which says, "Though not necessary for a finding of market efficiency, the cause and effect relationship between new company disclosures and resulting common stock price movements, which I analyze under the fifth Cammer factor, further shows that CleanSpark's common stock traded in an efficient market through the class period."

And I want to focus on the first part of that, which says "though not

Page 69

Z. BOZANIC, PH.D.

necessary for a finding of market efficiency." And I specifically would like you to explain to me the basis for that statement, though not necessary for finding a market efficiency.

MR. LINKH: Object to form.

A        Absolutely. It's my understanding that different --

MR. PARTIDA: Sorry. Can we pause for a second?

What was the -- what about the form of the question?

MR. LINKH: It's essentially asking for a legal conclusion.

MR. PARTIDA: Well, he's an expert, and this is his opinion in this report. So either it's a legal conclusion that's not his expert opinion, or it's his opinion, and I'm entitled to an answer as to his basis for it. So I want to understand the objection clearly.

MR. LINKH: Yes. Yes, he is, you know, I don't think that he necessarily needs to be an expert as to the legal

Page 70

Z. BOZANIC, PH.D.

ramifications of Cammer 5.

MR. PARTIDA:  So then it's not part of his opinion.  I'm asking -- so, okay.  Objection noted.  I disagree with it, but I'll just ask to be clear on the record, and that's what I thought I did when I asked you to look at 3C.

BY MR. PARTIDA:

Q    Is 3C your opinion?  Is that your expert opinion?  Because it says -- read it, paragraph three, "Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the following opinions."

Do you read that?

A    I have read it.

Q    All right.  And do you agree with that statement?

A    I'm waiting for you to let me answer it, and I can go ahead and proceed.

Q    No, I got to do this because there's been an objection, and I get it.  I get you can give me an answer, but I got

Page 71

Z. BOZANIC, PH.D.

to clarify this because I can't have an objection pending; right?  So what I want to clarify then is that you here sitting here today adopt that sentence of paragraph 3?  That's your opinion and you stand by it?

A    Again, you both are debating about a legal conclusion.

Q    I'm not asking you about my debate.  And we have short time here.  Like I said, these can go long.  So I prefer an answer to my question.

My question is very simple.  Do you stand behind the first sentence of paragraph 3 of this expert report or not?

A    If I could respond without getting cutting off, I'd like to give you my answer.

Q    I'm asking for a yes or no.  Do you stand behind that statement or not?  Are these your opinions or not?

A    This statement goes back to a discussion we had earlier about my weight that I apply in the factors.  It's my

Page 72

Z. BOZANIC, PH.D.

understanding that certain experts weigh these factors differentially, and some feel that only Cammer 5 is the most essential factor and it can stand alone. My view consistent with that clause that you've identified is these are on par in terms of I'm not viewing them differentially.

So this is giving a nod to that particular issue in terms of experts reliance on one factor versus the others. That's the entire meaning of the clause, not a legal opinion or legal conclusion.

Q    So thank you for all of that. And I'll just go back and keep asking the same question until I get an answer.  Do you, sitting here today, stand behind and adopt the first sentence of paragraph 3 of your report that says "Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the following opinions."

Is that a statement that you stand behind?

Page 73

Z. BOZANIC, PH.D.

A    I stand behind the statements in this --

Q    Thank you.  All right.  3-A, "The market for CleanSpark's Common Stock was efficient throughout the Class Period."

Is that your opinion?

A    It is.

Q    Do you stand behind it today?

A    I do.

Q    B, "The Cammer and Krogman factors accepted and applied by courts to assess market efficiency corroborate that CleanSpark's Common Stock traded in an efficient market."

Is that your opinion?

A    It is.

Q    Do you stand behind that opinion?

A    I do.

Q    C, "Though not necessary for a finding of market efficiency, the cause-and effect relationship between new Company disclosures and resulting Common

Page 74

Z. BOZANIC, PH.D.

Stock price movements (which I analyze under the fifth Cammer factor) further shows that CleanSpark's Common Stock traded in an efficient market throughout the Class Period."

Is that your opinion?

A   It is.

Q   Do you stand behind it?

A   I do.

Q   What is the basis in your expert opinion for your expert opinion that it's not necessary for a finding of market efficiency?  What is the basis in your expert opinion for the first statement of C, "Though not necessary for finding a market efficiency."

A   May I respond?

Q   Please.

A   I've already answered it, but let me further my answer.  So presume that Cammer 5 does not show a statistically significant cause and effect relationship. I'm still going to report this factor. I'm still going to report the analysis

Page 75

Z. BOZANIC, PH.D.

that I've done.  And I'm just reporting as objectively as possible what I find in all of the factors.  And so it could be the case that that factor does not come through, and the other factors are all weighing in favor of market efficiency. And so I'm just presenting the evidence.

But again, this harkens back to the debate that I understand that some experts feel that that's the only factor that needs to be weighed, and they ignore the other factors.  I am here to say, looking at all the factors today, that the predominance of the evidence indicates that the market was efficient for this stock.

Q    That was pretty top notch, I have to say.  My question is a lot simpler.  My question is a lot simpler; right?  My question is, you've stated that you're an expert and this is your opinion, you personally as the expert, that though not necessary for finding a market efficiency -- I get everything else you

Page 76

Z. BOZANIC, PH.D.
said; I don't need it explained again.  My question is, what is your basis, what textbook, what expert opinion have you formed, what in your training allows you to say this is my expert opinion?  I standing here, I'm telling you it's not necessary to find market efficiency, Cammer 5 isn't.  What's your basis for saying it?

        A    Frankly, with all due respect, I would appreciate the absence of tone; it would help me with the questions in terms of answering your questions.  And so I've already answered this particular question.  So I see that you've restated it.  But again, on the basis of my education and my experience, this is my understanding of how the profession views these factors.  And so I have tipped my hat with this phrase in terms of saying, I am viewing these factors on par, but I also understand that, unlike others, I am not touting one factor as the factor that we can base our decisions upon.

Page 77

Z. BOZANIC, PH.D.

I am looking at the composite factors as a set and I'm weighing on those factors and providing evidence as objectively as possible. And then the court and the jury can decide what they want to do with the individual factors. And if they find that one factor is the factor they want to focus on, that's their choice, not mine.

Q    Right, but that's not what this report says. This report says specifically the fifth Cammer factor. This doesn't say who cares about any factors? It specifically says it about this.

So I guess what I'm really trying to understand, and I guess what I'm just not getting is, where did you get the understanding?

A    I'll repeat --

MR. LINKH:  Object to form.

A    -- but this is a function of my expertise in terms of the education that I've acquired and in terms of the

Page 78

Z. BOZANIC, PH.D.
experience that I've acquired.  And so
just like with any profession, you can
learn from a book, you can learn by doing.
You learn by being engaged.

Q    So what's the experience?

A    Well -- the state in terms of my
understanding of the debate, and that's
why you see the sentence there today.

Q    So basically this sentence is,
if I'm understanding you correctly, is
just -- maybe it would help if I
understood who's they, who's the industry?
Who are you talking about when you say
it's important?  It's kind of vague.  I'm
trying to understand.

You say you have an
understanding based on your experience.
And I guess if I were to tell you, okay, I
have an understanding about this certain
type of case, I could tell you, okay,
well, here's my experience with this type
of case.  So I guess I'm just trying to
understand where the understanding came
from.

Page 79

Z. BOZANIC, PH.D.

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    So I guess I'll just ask again. It says, "Though not necessary for finding of market efficiency."  That's your opinion?  That's your expert opinion?

A    As you see the opinions listed and written on that page, I do stand by those opinions.

Q    But -- and I'll just -- the basis for that statement is your general experience and background?

A    As I've said repeatedly, yes. My education and experience had led me to that perspective.  That's correct.

Q    Okay.  All right.  Then you have D, "Damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for Plaintiffs pending claims.  In particular, the out-of-pocket damages methodology, which is used in virtually all Section 10(b) class action securities cases, is appropriate and applicable here."

Page 80

Z. BOZANIC, PH.D.

And that's your opinion and you stand behind it?

A    Yes, I do.

Q    I want to go down to paragraph 13.

A    Of my report?

Q    Yes, of your report, 73.

A    I'm there.  Let me refresh my memory.

Q    Yeah, and while you're doing that, you could look, basically, you could kind of scan just 13 through 17.  I'm going to ask you about that general background.

A    You said through 17?

Q    Yeah.

A    I have reviewed the paragraphs indicated.

Q    Okay.  So do you understand how -- sorry, we can do this, I guess, clearly.

Paragraphs 13 through 17 of the report lay out what you're understanding is of the allegations in the complaint

Page 81

Z. BOZANIC, PH.D.

generally; that's the intent of that section.  Is that fair?

A    I believe so, yes.  I was -- didn't know if you were making a statement or asking a question.

Q    Yeah, yeah.  I was trying to understand because I don't want to have to, like, walk line by line through it. But generally, it says, this is my understanding about, you know, the allegations in the case.  And so I just wanted to ask you kind of some general questions about, do you understand, like, how a Bitcoin mining company generates value?

A    Yes, I do.

Q    And how is that?

A    So this is in terms of trying to unlock Bitcoin on that distributive ledger to solve these complex algorithms.  And so the predominant costs are the machinery, right, to solve the algorithms and then energy.  And so the cheaper the machinery, the lower the energy costs, the greater

Page 82

Z. BOZANIC, PH.D.

the value that you maximize for the shareholder.

Q    Got it.  And is it possible, say, for example, you mentioned two of the inputs, power and machines, and by machines we mean Bitcoin mining machines?

A    ASICs, GPUs and the sort, yes.

Q    Yeah, okay.  And so you have those two inputs.  Now, could CleanSpark increase its Bitcoin mining capacity if it had a whole bunch of additional power but no machines?

A    So my understanding is it depends upon the capacity that you're already at; right?  So are all particular machines that are deployed being used?  And so you could conceivably have machines on site that aren't powered.

Q    Right.  I guess my question is -- I'll ask it a little clearer.  Say you're a Bitcoin mining company and you have tons of power.  Can you increase your Bitcoin mining capacity if you have no machines?

Page 83

Z. BOZANIC, PH.D.

MR. LINKH:  Object to form.

A    So if you have unlimited power but no computers to do the computations, then yes, you would not be able to increase your capacity.  I mean, it's not as simple as that.  I listed the main items; right?  But then you've got land, you've got infrastructure, you've got human resources and so forth.

Q    Yeah, you're absolutely right about that.  I just meant as a, you know, conceptually between the two main inputs you had been describing, energy and mining machines, you could have a ton of energy, but if you had no mining machines, you couldn't increase your capacity.  I understand there are other.

Okay.  Did you ever calculate how much a one-month delay in power expansion impacted CleanSpark's future cash flows?

A    So I have not been retained nor have I been asked to do any sort of DCF type of analysis.  No evaluation analysis

Page 84

Z. BOZANIC, PH.D.

in this particular report at all.

Q   Okay.

A   However, you can still refer to traditional DCF analysis in terms of the inputs to those models to show how the value of the firm will be lower depending upon how the cost of those inputs change, depending upon the timing of how the cash flows were realized.  The longer you go in the future by delaying that project, the lower the value of the firm will be, the higher the cost of energy, the lower the value of the firm will be and so forth.

In addition, the higher the riskiness in terms of the uncertainty of the outcome, the lower the firm -- the value of the firm would be.  So despite not having on that test conceptually speaking from a DCF framework, the inputs are very clear and what the impact on valuation is also very clear.

Q   Okay.  But if I understand you were not retained to do any sort of analysis, DCF analysis, at all.

Page 85

Z. BOZANIC, PH.D.

A    Correct, it doesn't undermine the hypothetical, however.

Q    Okay.  So just to be clear, DCF means discounted cash flow analysis?

A    Apologies, yes, that's correct.

Q    And so but you were not retained and there's no opinions about that expressed in your report?

A    I have not formed an opinion on how the valuation has changed.  I can speak in terms of conceptually speaking how a DCF model would work and how the inputs would impact value.

Q    I'm just trying to ask what are the parameters kind of of your report, and I understand that the valuation is outside of it.  So easy enough.

Okay.  So I want to talk about your event study, but before I do that, I actually want to go to -- do a little bit more in order.  If you go to page A-11 of your report, and you can tell me when you're there.

A    I'm there.

Page 86

Z. BOZANIC, PH.D.

Q    And I'm going to ask you to take as much time as you need to --

A    The whole page or just a paragraph?

Q    I'm sorry?

A    Take as much time as I need for the page or the paragraph?  Where are we focusing?

Q    Oh, sorry, sorry.  So page A-11 is where it starts.  What I'm going to be asking you about is the Cammer 2 factor.

A    Okay.

Q    The analyst coverage.  So if you want to review that section, which looks to be like 32 through 38, you can kind of, you know, familiarize yourself with that.

A    Thank you.  I've reviewed the indicated paragraphs.

Q    Okay.  So then I want to go to, if you could, you see there that you refer to exhibit 3 in that section?

A    Yep.

Q    Okay.  And I would ask you kindly to turn to exhibit 3.

Page 87

Z. BOZANIC, PH.D.

A    I'm there.

Q    Okay.  So I see here that there was there's a list of 41 reports issued. Is that accurate?

A    That is accurate.

Q    Okay.  Did you review each of these 41 reports?

A    I Did not review the content individually of each of the 41 reports. And putting together the reports that were available for review, any reports that would not fit the standard research report in terms of maybe it was a commentary for all sorts of other firms that had nothing to do with this firm.  So there is a filter to look at the reports to make sure that these reports would be focused on the company in question.

Q    Got it.  Okay.  Any other filters?

A    No other filters.  No, I mean, I've reviewed the reports but there's not a need to look at the individual content at this time.

Page 88

Z. BOZANIC, PH.D.

Q    Okay.  Okay.  Are you aware that, for example, Water Tower Research was hired by CleanSpark to write reports about the company?

A    I'm unaware of any conflicts of interest between the company and these particular brokerage firms.

Q    I didn't ask you about conflicts of interest.  I'm not sure why your mind is on them.  But my question was simply, are you aware that Water Tower Research was hired by CleanSpark?  I mean, CleanSpark's my client, so I'm not worried about them hiring them.  I just was wondering if you were aware.

A    So I am well familiar with analyst and credit research, and I'm also well aware of potential conflicts of interest in either industry.  And so with respect to your particular question, I was unaware that there was a relationship between CleanSpark and this particular firm.

Q    Okay.  That's really all I was

Page 89

Z. BOZANIC, PH.D.

asking. Like I said, I'm not really understanding the conflict of interest.

But in any event, now you mentioned that there's some sort of filtering you do to identify that these 41 reports contain coverage about the company in question, CleanSpark. I'm wondering if you could tell me, you know, what are the types of information you would expect to see in the analyst reports you're looking for?

A You might see a variety of information, and it depends upon the information that is also being analyzed by the analyst. And so how salient the event is, how regular this report is. So if it's a regular recurring report, or if it's a kind of a special interim report, then what -- the information that's revealed by the analyst could change.

But typically, they're talking about earnings estimates, target price estimates, talking about what's feeding into their models in terms of the

Page 90

Z. BOZANIC, PH.D.
strategy, in terms of the metrics that are being observed on the basis of the financials the firm's providing.

Q   Okay.  So for example, if we were to go to paragraph 32 of your report -- sorry; I have slow scrolling fingers.  Okay.  So if we go to 32 of your report, that second sentence of paragraph 32, it says "Analysts typically publish reports in which they assess recent company business developments, review historical financial performance, and provide forecasts of future operating performance, or make investment recommendations such as whether investors should buy, sell, or hold the company's stock."

Is that accurate?  That's the type of information that's important for these analyst reports?

A   I think the sentence is a very reasonable characterization of the process in by which analysts create these reports and what can they contain.

Page 91

Z. BOZANIC, PH.D.

Q    Cool.  So if a report didn't have that information, it really wouldn't be useful to us.  If an analyst report or a report didn't contain those things, we really wouldn't be -- it wouldn't be useful.

MR. LINKH:  Object to form.

A    I'm not quite sure I would say that.  So again, as I alluded to before, there are a variety of types of analyst reports that are revealed to the market, depending upon the type of information that's being received.  And so the content of the report would likely vary.  It's not as if there's a cookie-cutter rubber stamp where they must check the box for these elements.

Each analyst and each broker has their own license and their freedom to include what they want in that report. And depending upon the information that's arriving, they might focus on different elements in a given report versus a prior report.  But those are common elements

Page 92

Z. BOZANIC, PH.D.

that we might see.  It's not as if they are all elements we will always see.

Q    Fair enough.  But I guess -- understood and makes sense.

I guess my question is a little bit the opposite.  If you saw a report that had none of these, it wouldn't be useful, is I guess what I'm saying?  I understand that you might have one analyst that focuses really heavily on one and not on one thing at all.  But if you had a report that didn't do any of it.

MR. LINKH:  Object to form.

A    So the hypothetical, in my view, is ill-posed.  To create a report, you have to have some information in that report to disseminate whether or not it has all of the characteristics that are elucidated in that particular sentence. The mere fact of disseminating a report is also important, regardless of the information contained therein.  The fact that you disseminate that report puts additional emphasis and visibility on that

Page 93

Z. BOZANIC, PH.D.

firm.

Q    Got it.  And so if I were to go back to exhibit 3 then and understand this correctly, what exhibit 3 says is these 41 analysts reports were essentially to identify every possible report that would meet your parameters that would be talking about this company?

A    Right.  And --

MR. LINKH:  Object to form.

A    Sorry.  I apologize.  I'm responding too quickly.

So again, in terms of the filter, remember, we're relying on databases.  Databases that could be subject to error in terms of what we receive from these databases.  And so sometimes there might be a report that is double downloaded by the vendor where it's the same exact report; right?  You'd kick that out.

You might see some reports that are a little bit bizarre.  Again, something with the data vendor.  And so

Page 94

Z. BOZANIC, PH.D.

that's really what I'm looking for.  Okay?  Now, these reports, yes, we're saying there are 41 reports from 10 brokers that contributed to the overall information environment for this particular firm, which helps with market efficiency, not just only in terms of the information that's being generated and conveyed, but also the mere fact of disseminating this information is very helpful for investors.

Q    Got it.  So I understand now that basically, you know, this is intended to give us a sense of the analyst coverage that you saw, which is important for two reasons.  One, for its specific content as kind of you described in 32.  And two, by mere existence, both are important.

MR. LINKH:  Object to form.

A    I think you mischaracterized my response.  I did not say by mere existence.  What I used, the word that I used specifically was dissemination of these reports is very important for those in the market to receive this report, the

Page 95

Z. BOZANIC, PH.D.

report becomes more salient.  There's more attention on the firm.  That attention begets more attention across other capital market providers.

Q    Understood.  So do you know -- withdraw that.

Did you review any of these reports?

A    I believe I already answered the question.  Insofar as the actual content of the report, I don't go through; I take a skim of it to make sure it looks like a reasonable report to include in this particular exhibit where that particular report is available.  But I'm not diving into the details and looking for other elements to extract to opine on.  I'm looking at the availability and the dissemination of information in the market for this particular stock.

MR. PARTIDA:  So let we put -- we're on Exhibit 76; correct?

THE REPORTER:  Correct.  Well, 76 would be the next.

Page 96

Z. BOZANIC, PH.D.

MR. PARTIDA:  Yes.  Okay.  Thank you so much.

Okay.  I'm going to send Exhibit 76. And you can just tell me, everyone, when you've received it.

THE WITNESS:  I have received it.

MR. PARTIDA:  Okay.  And so this report is May 11, 2021, report by Water Towers Research.  And this was one of the reports that was identified in exhibit 3, one of the eight.

(Exhibit 76 was marked for identification.)

BY MR. PARTIDA:

Q   Now, I want you to go to the last page of that research report, and I want you to read under Disclosures the second paragraph, if you wouldn't mind, aloud, with the caveat that WTR stands for Water Tower Research.  So whenever you're ready, please read that aloud.

A   Oh, read it aloud.  Okay. Sorry --

Q   Yes, read it aloud.  Read it

Page 97

Z. BOZANIC, PH.D.

aloud, the second paragraph starting WTR.

A     Got it.

Q     And I was just caveating that that means Water Tower Research.

A     "WTR is not a registered investment adviser or a broker/dealer nor does WTR provide investment banking services.  WTR operates as an exempt investment adviser under the so-called 'publisher's exemption.' WTR does not provide investment ratings/recommendations, price targets, or earnings estimates on the companies it reports on.  Readers are advised that the research reports are published and provided solely for informational purposes and should not be construed as an offer to sell or the solicitation of an offer to buy securities or the rendering of investment advice.  All users and readers of WTR's reports are cautioned to consult their own independent financial, tax, and legal advisors prior to purchasing or selling securities."

Page 98

Z. BOZANIC, PH.D.

Q   Okay.  And were you previously aware of that disclosure?

A   As I mentioned, I've skimmed these, so that particular disclosure I had not read.

Q   Okay.  Now, I want to go back to exhibit 3.  Sorry, I want to go back to your report, Exhibit 73, and I want to go back to exhibit 3 to that report.

Now, do you know whether any of these ten contributors, whether the reports from them simply have AI-produced technical reports of stock price?

MR. LINKH:  Object to form.

A   So a screen such as looking to see whether AI was used in the creation of a report is not a screen that I have looked at.  To the extent that AI could be used in a report, that would be unsurprising given the ubiquity with which AI is being used throughout academia, throughout the corporate world, and so forth.  And so if an analyst were to choose to use some component of AI,

Page 99

Z. BOZANIC, PH.D.

whatever component that might be, that wouldn't be surprising to me.

Q    Sure.  But my question was a little bit different.  I guess my question is, do you know if any of these ten are just AI-generated reports of stock movement?  And I'll give you an example from a different context, and I can go re-ask the question, because I'm sure Greg will object.

But there are analysts' written sports articles, right, where maybe they use AI to screen a bunch of data as they're writing an article.  And then there's the little thing you get on ESPN, which says Detroit Lions beat the Chicago Bears 21-20, and then it gives you stats of three players, and it's just an auto-generated AI engine by ESPN that just spits that out.  There's no analyst coverage, nothing; it just spits out that data.

And I guess with that background in mind, my question is, are you

Z. BOZANIC, PH.D.

aware -- and I'll ask it this way, do you know if BuySellSignals research, if those seven reports comment on information about the company or they're just technical reports of stock price movement?

A    So your phrase technical reports of stock price movement, I'm not quite sure what you mean by that.  But as I said already, I have not done a screen to see if AI was used in any of these reports.

But to further your example, even in the media, AI is used to generate media news articles in tandem with the creation of those articles.  And so the general point with regards to this exhibit remains intact, which is even if AI were to be used, there is information that is being put on a report; there is information that is being distributed to the capital markets.  The greater the amount of information dissemination, the greater the salience of that information, the greater it reaches investors' attention and potentially is information

Page 101

Z. BOZANIC, PH.D.
that is actionable and tradable upon.

Q    So maybe I'm just not doing a good job. I appreciate all of that. I'm not really so much interested in, you know, you restating kind of the general analyst coverage issue. I guess I'm trying to -- I'm not asking you to defend this; I'm asking you to explain it to me. Because I'm just trying to understand when I look at this, okay, when I look at this exhibit 3 and I see Water Tower Research, does that mean, you know, okay, I look through all eight of these; they have value-relevant information?

Did you do the same with BuySellSignals, H. C. Wainwright, BTIG, Validea, ValueEngine? And so I'm just trying to understand what this is. So, for example, if I were to pull up a Validea article, would I see just CleanSpark's price moved X and nothing more, or would I see coverage? And the reason I'm asking all of this is because when I asked for the backup of these

Page 102

Z. BOZANIC, PH.D.

resources that you say you scanned through all of, I was told you only looked at 19 of the 41.

And so I'm trying to understand, okay, how do I know what's in the other 41? I get that you're telling me that there's 41 things that you identified. I've been told you only looked at 19 of them. How the hell do I know or how the heck do I know what's in the other 22? Has anyone looked at them? That's what I'm trying to figure out. So I'm just trying to understand what this exhibit tells me. So maybe this would go easier if you would try and help me understand. I'm not attacking it. I don't know what it says. So I'm trying to help understand what it says.

So with that, what I'm trying to understand is, do you have a way of knowing, or do you know, whether or not some of these reports merely have simple information such as the price moved X amount or whether or not they have more

Z. BOZANIC, PH.D.

detailed analyst coverage?  That's what I'm wondering.  And at first you had said, well, I scanned them all.  But then your counsel said, well, you only looked at 19.  So I'm just trying to understand how we know what's in the rest is what I'm trying to figure out.

MR. LINKH:  Object to form.

A       Okay.

Q       I don't know how we want to do it.

A       Should I answer or no?  I'm not sure.

Q       I guess I'm genuinely trying to understand how you know what's in these reports.  Because you said an analyst report should have certain information.  And then you say, well, I did searches through databases to find reports that have this information.  Okay.  I'm just trying to figure out how you know that if nobody's looked at them.  And fine if maybe you just said, here are the searches I ran and that's okay.  I'm just trying to

Page 104

Z. BOZANIC, PH.D.

get how we got here.

MR. LINKH:  Object to form.

A    So I'll repeat what I've said, because I've already answered this question a few times.  And so I did say that I reviewed the reports where available; right?  So I've said that certain reports were able to download and review and provide to you, and there are other reports in terms of the listing of reports that we acquired from different data vendor; right?  So this is the LSEG Refinitiv database.

And so where possible, I reviewed those reports; right?  But I did already say that there are reports that were retrieved from a listing from a database vendor.  But as I've already said already as well, in regards to those reports, the number of the reports is also essential.  An analyst, a broker, is not going to put out a white sheet of paper; right?  They're not going to be in business anymore if all they put out is

Page 105

Z. BOZANIC, PH.D.

nothing.

And so on the presumption that if they're going to put a report, there's some information in there, even if it's duplicate of information generated from AI.  The dissemination of that information, lots of academic studies show the importance of the dissemination of information, even if it's being repetitive.

Q    So yeah, I'm still at a loss because --

A    I'm happy to help clarify.  I've done my best to answer those questions --

Q    Yeah.  So --

A    -- I've answered them, I think, three times now.

Q    Yeah.  Let's just go back to paragraph 32.

A    I'm there.

Q    So there you say, if I'm understanding, you're telling us what analyst coverage is, paragraph 32.

A    32 is representing the typical

Page 106

Z. BOZANIC, PH.D.

functions of an analyst, the typical employers that they are employed by, the typical reports that they may publish, and the typical information that might be conveyed.

Q    Okay.  And I guess my question is, quite simply, to confirm that you don't specifically know which, if any -- withdraw that.

Can you identify any report of these 41 that provides that type of coverage?  Of the 19 you looked at, can you point me to one?

A    If we were --

MR. LINKH:  Object to form.

A    -- allowing me the time to review all of those reports in this deposition, then I can take a look at those reports and I can point you to the information that you requested.

Q    So it's your expert report. You're supposed to come prepared to defend it.  And you wrote it, so it's surprising. But I guess what I'm just trying to

Page 107

Z. BOZANIC, PH.D.

understand is how we know that any of these reports by these ten contributors contain any of this information.  I'm just trying to figure out how do we know that those contain it.

A    I apologize --

Q    I understand the side point about, if they just by fact of their existence, or however you want to describe it, more analyst coverage, the volume of it, all of these reports, the volume of it.  That's fine.  I get that side point. I'm trying to understand, with respect to this part on 32 that you went out to highlight, how I could go about understanding which of these reports, if any, you identified this type of coverage in.

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    Because I don't have certain of them.  So let me go back this way.  Let me break it down this way.

A    May I respond?  Because you've

Z. BOZANIC, PH.D.

said quite a bit there, and you've asked quite a bit, and you've mischaracterized my testimony to date, but I've not been allowed to respond.

Q    Sure.  Respond.  Absolutely.  Please respond.  Because again, I'm just trying to understand.

A    You started this line of questioning asking me to point you to a report that would have elements of information as summarized in paragraph 32.  My response was, please, I am happy to review those reports; I am happy to highlight said information.  Your response was that I'm not defending my report.  I am here to opine on market efficiency at the class certification stage.  I am not here to opine on the content of those particular analyst reports.  However, if you would like me to review them and put them in front of you, I would gladly do so.

Q    So what I'm trying to understand is in this report in paragraph 32, it says

Page 109

Z. BOZANIC, PH.D.

that's important.  That's why it says analyst coverage is important, so that's what I'm failing to grasp.  And I guess maybe we just --

A    Perhaps I'll make two points.

Q    My understanding, if one were to say, Cammer factor two, analyst coverage, and then it says, this is why it's important and what it does, and here's all the analyst coverage I looked at from these ten contributors in exhibit 3, but I can't tell you because I haven't looked at some of them that they do actually have that information; that that's -- and I don't have to.  I guess what I'm understanding you're saying is like, yeah, I don't know, and I -- it doesn't matter.

A    That's not what I said.  And if we fully look at the adjacent paragraphs, the next paragraph does talk about dissemination.  And that's part of the importance of these reports.  Creation and --

Q    Sure.  And I understand

Z. BOZANIC, PH.D.

dissemination is important.  I understand dissemination is important.  I'm asking about the other half of it, not dissemination.

A    And as I've responded already, a brokerage firm will quickly be out of business, or any entity that's creating these reports will quickly be out of business, if they're producing blank sheets of paper.  The presumption is that they're distributing a report because it has some content, even if duplicative.

Q    So okay, we might have to just let the record speak on it because I still, you know, I don't understand -- I'll just leave it at that.

MR. PARTIDA:  And you know what?  It's getting to be 12:15; we've been going an hour.  I could use a comfort break myself.  So do we want to take a few minutes?

THE WITNESS:  Are we taking lunch or are we taking just a break?

MR. PARTIDA:  It's up to you guys.

Page 111

Z. BOZANIC, PH.D.

I'm happy to keep going.  It's whatever you want.

THE WITNESS:  Greg, what are you thinking?  This is my normal lunchtime, so I wouldn't mind taking lunch.  But if you guys want to go a little longer and then we could have lunch at 12:45 or 1:00, I'm fine either way.  I can go another half hour or so, but at some point, it'd be good to have lunch.

MR. LINKH:  I'm thinking it might work to have lunch now.  And should we come back like maybe 12:45 or so?  Is half an hour enough for everybody?

MR. PARTIDA:  It's enough for me. I'll really defer to Dr. Bozanic, however much you need to be comfortable, 30 minutes, 45, it's up to you.  But certainly we can take lunch now.

THE WITNESS:  Sure.  I think 30 minutes --

THE VIDEOGRAPHER:  Let's go off the record and discuss it further.

We're now going off the record at

Page 112

Z. BOZANIC, PH.D.

approximately 12:15 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We're now going on the record at approximately 12:50 p.m., this is the beginning of media unit number 3.

Go ahead, Counsel.

BY MR. PARTIDA:

Q    Okay.  Welcome back, Dr. Bozanic.  Did you talk to anyone while you were on this break?

A    I did.

Q    Who?

A    Greg and Chris.

Q    Chris who?

A    Chris Fallon.

Q    Okay.  So your attorneys?

A    Yes.

Q    Or the plaintiff's attorneys. Okay.

Did you look at any documents?

A    I did not.

Q    All right.  I just have a couple of more questions about these analyst

Page 113

Z. BOZANIC, PH.D.

reports.  So if you want to go back to exhibit 3 of your report, which is Exhibit 73 in this deposition, but the page E-3 on the bottom.

A     I'm there.

Q     Okay.  Are you able to tell me which, if any, of the reports from these contributors you would expect to be able to find on the database IDIS?

A     Repeat the question?

Q     Are you familiar with the database IDIS?

A     I am.

Q     I-D-I-S?

Okay.  And can you tell me what the IDIS database is?

A     Sure.  There are actually multiple versions of this database depending upon the type of subscriber you are.  So if you're an academic subscriber, the subscription and the privileges would be a little bit different from an institutional subscriber.  And so typically this is housing and

Page 114

Z. BOZANIC, PH.D.

disseminating analyst estimates primarily with regards to earnings, though analysts can provide other estimates that are included in that database.

Q    Perfect.  So my question is, of these ten contributors, which of them would you expect to find their reports in the IDIS database?  So, for example, I'll just do it this way, would you expect to find Water Tower Research reports in the IDIS database?

A    So this is not a task that I've been charged to undertake to look at coverage across databases.  You've listed one database.  There are more databases than the IDIS database out there that are used by the capital markets.  And so depending upon the database, certain reports would exist.  IDIS does not publish reports.  Okay?

So Thompson One, for example, they do publish and they do provide these types of reports.  But again, even that's limited because of the database privileges

Page 115

Z. BOZANIC, PH.D.

and restrictions.  And so there are all sorts of exclusions and restrictions across these databases with which they're allowed to offer different elements, whether it be a full report or an analyst estimate.  But IDIS primarily focuses on earnings estimates, not reports.

MR. PARTIDA:  So Greg, when you asked how long we'll be here, and I told you it depends on the answers, there's an example.

BY MR. PARTIDA:

Q    My question is very, very simple, and I appreciate all of the education about all of the different databases and all of those things, none of which I asked about.  So I'll go ahead and ask you again, which is maybe a better way of phrasing it.

So you know, even under your example of IDIS providing estimates, not reports, my question is quite simply, which estimates or which contributors would you expect to find their reports

Z. BOZANIC, PH.D.

listed in IDIS -- their estimates listed in IDIS, not the reports -- excuse me. From which contributors would you expect their estimates to be reported in that database, that database.

A    Unfortunately, David, you've asked a more complex question than you perhaps insinuated, but the actualities of how this works in the analyst investment world are more complex than you indicate. And so in a lot of cases, you can have estimates provided to IDIS, in fact, most cases, without an accompanying report.  So analysts often provide an estimate to the database provider to be part of the consensus without providing a report.

And so as I've said, typically on IDIS, you don't see the estimates from these reports; you certainly don't see the reports.  Now, that estimate could have been in a report.  It might be generated independently of a report.

Q    Got it.  That answers my question.  Thank you.

Page 117

Z. BOZANIC, PH.D.

Okay. So the next question then I have about the reports just goes back to the initial. You mentioned that when you identified the 41 reports, there were 19 that you had and the others were unavailable. Is that --

A    So what I referred to before is there were reports that were provided to me by counsel. And then in addition to the reports provided to counsel, I looked for additional reports in databases. I did not download and review those additional reports. That's correct.

Q    Okay. And had you wanted to, could you have? Like, could you have purchased the reports? Could you have asked counsel to provide them to you? I guess my point is, was there a way for you to access those reports if you had wanted to?

A    Conceivably. I would imagine given the existence of the report in the database that for a fee it would be accessible. But as I've answered before,

Page 118

Z. BOZANIC, PH.D.

the second part of the question as in regards to not just the generation of the information, but the dissemination of the information. So this particular table is speaking to both.

Q    Yes. Understood. I'm just trying to just clarify, you know, how the decision was made on which 19 to review and whether or not the other additional reports could have been available to you should you have wanted them.

Okay. So the next thing I would like to move then is going back up to your report. We're going to get back to -- or move ahead to, I should say, page A-16. And specifically, the heading E-5, A-16.

A    Okay. I'm there on page A-16.

Q    Okay. And so, if we go back or go forward to 47, can you just take a minute to read that? And then I just have a couple of questions I want to --

A    Paragraph 47 on page 17. Okay.

Q    Yes.

A    Okay. I have read it.

Page 119

Z. BOZANIC, PH.D.

Q    Okay.  And so if we go forward to -- or if you look there, I just want to understand that so for 47, basically, what I understand you said, "I summarize my empirical analysis below, which finds that CleanSpark's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in Cammer."

And so if I understand that sentence correctly, for the Cammer 5 analysis you're undertaking an empirical analysis to measure the cause and effect relationship between the company information and stock prices.  That's the purpose of this exercise?

MR. LINKH:  Object to form.

A    I believe you just read from paragraph 47 to some extent verbatim, and so that's what the words on the page were.

Q    Right.  Right.  Exactly.  Well, but my question is, I'm just trying to understand, the Cammer 5 factor analysis it's an empirical analysis that you're

Page 120

Z. BOZANIC, PH.D.

undertaking through an event study.  Is that accurate?

A    That is accurate.

Q    And that event study is an empirical analysis of the cause and effect behavior of CleanSpark's common stock price and news about the company, that's what this is measuring?

A    I believe that is accurate. Yes.

Q    Okay.  Perfect.  I just wanted to make that that's what I understood.

So in -- there's a footnote, if you go down to footnote 79 --

A    What page is this on?

Q    79 is on page A-29.  It's a little -- it's on the very bottom there at A --

A    A-29?

Q    Mm-hmm.  A-29.  Just a few pages ahead.  And then we'll be flipping back, so I guess you could keep your thumb.

So if you look at footnote 79 and then you look at the accompanying

Page 121

Z. BOZANIC, PH.D.

text; right?

A    I can look at the footnote and the paragraph that is adjacent to.

Q    Right.

A    Yes, I've read it.

Q    Okay.  So I guess what I was -- I was confused about this footnote because it says "In this report I conducted an event study to assist with the evaluation of market efficiency."  And then it says "My event study in this report was not intended to quantify artificial inflation."

So I guess I'm trying to understand why would the response of the company's common stock price to the announcements of company specific news be different if you're assessing market efficiency than if you're calculating artificial inflation.

A    They might be different; they might not be different.  It depends upon the information that's produced in discovery after the class certification

Page 122

Z. BOZANIC, PH.D.
stage.  And so at this point the burden here is not to establish price impact; it's not to establish artificial inflation, that comes later.

Q    But I -- so that's fine.  I guess I'm just trying to understand, you said there could be differences.  What would be examples of those?  What would be an example of where it would be different if you were assessing market efficiency than if you were calculating artificial inflation?  I'm trying to understand what would be the inputs that would make it different.

A    So as I said --

Q    What would come out after class certification that would allow you then to select?

A    So there could be confounding information that is produced in discovery.  And so on the basis of that confounding information, I'd have to start to adjust the model for that confounding information.

Page 123

Z. BOZANIC, PH.D.

Q    And are you aware of confounding information in this case?

A    Again, this is not the charge; this is not the point in the case, so that usually comes out after discovery.

Q    Are you aware of any information that you would characterize as such?

A    I am not presently aware of confounding information as I'm not privileged to discovery.

Q    Okay.  And can you give me an example just so we can have it clear for the record?  And I understand it might not be -- you don't have the information in this case, but could you give me an example of what you mean when you say confounding information?

A    Did the stock price move responsive to the corrective disclosure, for example, or did it move due to some other factor, which is known as a confound?

Q    Perfect.  Thank you very much for that.

Z. BOZANIC, PH.D.

And so just so I understand, if you were to be asked, and I understand that you weren't here, but if you were to be asked to calculate artificial inflation, you would have to make changes to this model to account particularly for potential confounding information, if there were to be some?  That's what you would have to be required to deal with?

A    Again, this is all premature because I don't have the facts and circumstances in front of me.

Q    Right.

A    But as a hypothetical, what I'm saying is if additional information applies, then I might update my opinions. That's correct.

Q    Yeah, absolutely.  So and that's what I'm trying to understand is that, if I'm understanding this report correctly, it's saying, look, I've completed this empirical analysis, this event study, based on that my opinions are such; they're stated in the report about market

Page 125

Z. BOZANIC, PH.D.

efficiency.  That said, it's not a measure of artificial inflation necessarily because I don't have access to that information, which would be later.  Is that accurate?

A    I think that's a reasonable portrayal.  That's correct.

Q    Perfect.  Okay.

And then my question after that was simply, if you were to be asked to calculate artificial inflation, not that you have been, and I understand that you would have no basis or reason to be able to do so now, but if you were to be asked to do so, one of the things you might have to update that model to do is account for the existence of confounding information; that's one way your model might have to change.  Is that correct?

A    Yes, that's correct.

Q    Okay.  Now, is there anything else that you might have to change about your model other than to account for confounding information?

Page 126

Z. BOZANIC, PH.D.

A    As with the confounding information, I'm not presently aware of other elements of information.  And so right now I have no basis, no opinion in terms of how the model might change.

Q    Right.  I guess, sorry, my question is, is there any other input aside from confounding information that might have to be calculated or accounted for when you're quantifying artificial inflation?

A    Again, I have no opinions on artificial inflation.  I have not been tasked with that at this point in the case, and so I have no opinion either way.

Q    Right.  So I guess I'll leave it at that.  My question was just quite simply, if there's anything other you said, in order to calculate artificial inflation, I would have to potentially, if there existed, confounding information, account for that.

And my only question would be, is there other sort of information aside

Page 127

Z. BOZANIC, PH.D.

from confounding information that you might become aware of that you would also have to account for to calculate artificial inflation?  If you were asked to do so, I know that you haven't been.

A    Once I've had the benefit of discovery, then I can opine on that.

Q    Okay.  And now if we go back up then to the event study, which is back on page A -- well, it starts on A-15 -- or A-16, I'm sorry, but the actual event study model is referred to on page 20, which is exhibit 5.  So if you want to look there, because I want to go to exhibit 5 ultimately, but I just want to understand paragraph 56, which refers to exhibit 5 a little bit before -- or I'm sorry, Exhibit 4 first is what I want to start with.

So to clarify, let's go to bottom of page A --

A    Where did you wanted me to go? I apologize.

Q    Yeah, I did that in a bad way.

Page 128

Z. BOZANIC, PH.D.

So forget everything I said.  I'm sorry about that.

Go to the bottom of page A-19, paragraph 54.  There are two exhibits about the event study I'm going to want to look at, exhibit 4 and exhibit 5.  So what I want to look at is first you just take a minute to look at paragraph 54.

A    54, okay.

Q    And then we'll go to exhibit 4.

Okay.  So are you ready to go to exhibit 4?

A    I have it.  I need to review the paragraph.  Sorry.  I have exhibit 4 and I have the paragraph.  Give me a second to review it, please.

Q    Sure.  Yeah, yeah.

A    Wonderful.  I reviewed it. Thank you.

Q    Okay.  And what I'm understanding without getting into like too much granular detail on this is essentially what exhibit 4 is basically a visual representation of how you

Page 129

Z. BOZANIC, PH.D.

controlled for, I guess, various other impacts that could impact CleanSpark's common stock price.

So to put a finer point on it, for example, if I'm looking at the S&P software and service industry coefficient, and I look at that associated blue line, what essentially this analysis is trying to do is to say, if we would isolate CleanSpark only, it's only information relevant to it that was making it move, not more general movements in the market, these are how I would measure those general impacts.

A   Are you asking the question?

Q   My question is, is that what I'm looking at here?  A visual representation of how you measured those impacts?

A   Yeah, so what you're looking at are how the coefficients evolved through time on these particular factors that are being controlled for.  And what you said is correct insofar as you're trying to partial out information about the market

Z. BOZANIC, PH.D.

in general and the industry specifically so that you can have a focus on the stock in question with this particular event setting. And so this is showing the trend through time how the coefficients evolve throughout the period of analysis.

Q Got it. And the purpose of that, of those coefficients, are to control these outside factors you really isolate in on the company specifically?

A I'll say the purpose of those factors or variables controls the coefficients more appropriately, which are generated from the regression.

Q Okay. Fair enough.

A They're used in other computations; right? But -- just to be precise.

Q Yeah, no, I appreciate it. I value precision.

Okay. So now I want to move forward then to paragraph 56 with exhibit 5. So if you want to take a minute to familiarize yourself with both the

Page 131

Z. BOZANIC, PH.D.

paragraph and exhibit and tell me when you're ready to talk about it, that would be great.

A    Okay.

Q    Okay.  So if I'm looking at this chart, it's Rolling Event Study Regression, can you tell me what it's showing me?

A    In exhibit five in regards to paragraph 56, so this is plotting the errors coming out of the event study regression.

Q    Right.  And what does that mean?

A    So this is looking at the volatility in those errors through time. So this gets to how well the model is doing; right?  And so this is showing that you have greater errors over certain periods of time consistent with expectations then you do other periods of time.

Q    Okay.  And I want to then move forward to paragraph 61 with exhibit 6. And if you review those and tell me when

Page 132

Z. BOZANIC, PH.D.

you're ready to discuss them.

A    Okay.  I've review paragraph 61 and their associated exhibit.

Q    Okay.  Now, I want to start by talking a little bit just so I can understand what all of this means on this beautiful chart here on E-6.  And so if I'm understanding this correctly, that these 1 through 12 on the left-hand column, the far left-hand column, each correspond to what you have identified as a news day.  Is that correct?

A    So in exhibit 6, these are identifying earnings releases and yes, the earnings releases, these earnings announcement, are what I'm considering to be a news day.  That's correct.  Yeah.

Q    Okay.  Is there anything else aside from an earnings release that in your model is considered to be a news day?

A    So here in terms of true news days, we have these earnings announcements that I analyzed, these 12.

Q    Right.  And my only point is

Z. BOZANIC, PH.D.

that, or my question is, you don't deem any other day to be a news day?

MR. LINKH:  Object to form.

A    So in terms of the setup of the model with regards to the objectivity of the analysis, what I have done is looked for a routine regularly occurring event that investors expect to convey news.  And so I'm looking ex ante to say there could be other potential quote unquote news days from a colloquial sense.  But in terms of the news days with a capital N that I'm reviewing for this analysis, the attention was focused on earnings announcements.

Q    Period.  There's nothing else but earnings announcements?

MR. LINKH:  Object to form.

A    Again, in terms of the ex ante objectivity that I applied to say, I don't know what is going to turn out to be a news day until I actually run the analysis.  But in terms of a potential news day that could convey information and could move market prices, a very commonly

Page 134

Z. BOZANIC, PH.D.
occurring and analyzed corporate event are
quarterly earnings releases.

Q    Right.  I'm just quite simply
trying to understand, in your model you've
identified 12 news events and you've
identified those as earnings releases.
Those are the news events and that's what
your model is limited to?  I'm not asking
about the reasons; I'm not asking about
any of that.  I'm just asking you, if I'm
looking at this chart, reading the
information, your model says as the input
for news day, there's 12 and there are
these earnings releases.  Is that
accurate?

A    So the phrase is limited to is
what was concerning to me.  So what I'm
saying is my focus ex ante in terms of the
criteria that I set forth to estimate this
model, I'm focusing on those 12 news days.
That's correct.

Q    Is there any other piece of news
calculated for in this model than these
12?

Z. BOZANIC, PH.D.

A    What do you mean by any other piece of news?  I don't understand the question.

Q    Great.  Your model measures as news days only these 12 earnings releases. That's what it says.

A    I take issue --

Q    Or where does it say otherwise? Where does it say --

A    Where are we looking?  I'm sorry.  Can you point me to a paragraph?

Q    Okay.  What I'm trying to look for is -- let me ask it this way.  Other than the 12 earnings releases identified, is there any other input for a news day in this event study model?  These are the only 12 inputs?

A    I have selected 12 earnings releases ex ante as potential news days to include in the model.

Q    Right.  Exactly.  And that's what this model is limited to, those are the only ones that you selected for this model?  It's pretty simple yes or no, and

Z. BOZANIC, PH.D.

I think the answer is yes.  I'm struggling to understand why it's a hard question for you to answer.

A    Well --

Q    I'm not worried about the caveats of listen, I get the I selectively made these and chose earnings releases. I'm just quite simply trying to understand the model.  The model has 12 news days; correct?  And no more than that.  Is that correct?

A    May I respond?

Q    Yes.

A    Okay.

Q    It's a yes or no question.  This model has 12 news days.  Is that correct? Yes or no?

A    So this goes back to the conversation about precision where you use words that I would not necessarily use to describe what was done here.  And so I have to be careful here when you use a word that I would not use to appropriately and accurately describe the modeling that

Page 137

Z. BOZANIC, PH.D.

was done here.  And so we have some issues with regards to ex ante ex post in terms of what is done before the model is run versus what is interpreted after the model is run.  And so there is no interpretation of output ex ante.

So what I'm doing is ex ante is saying here is a regularly occurring routine event that could have the potential to convey news.  And so those 12 that you see on the page are those that were selected to include in the model.

Q    Okay.  So that's my last point. These are the only 12 that were included in that model?

A    Again, it goes back to what you mean by that.  So ex ante, yes, these are the --

Q    Okay.  Can we just -- I'm just going to go ahead and stop you there because this is an intentional, as far as I'm concerned, waste of time at this point.  I can have the court report or read back the last sentence of your answer

Z. BOZANIC, PH.D.

where you stated that these were the 12 events selected for this model.  And my question is very simple and straightforward.  It is these 12 events and only these 12 events that were selected for this model.  Isn't that the truth?

A    So I'll refer you back to the prior answer.  We can have the court report or read it if you wish, but I'll say the same thing.

MR. PARTIDA:  Please do.  Please read the last sentence of his last answer, or three answers prior, I guess now, since there's probably been a back and forth.

THE REPORTER:  Okay.  Give me one moment.

(The reporter repeated the record as requested.)

THE REPORTER:  Go ahead.

BY MR. PARTIDA:

Q    So you selected those 12 events. Did you select any others for inclusion in this model, yes or no?

Page 139

Z. BOZANIC, PH.D.

A    As noted in paragraph 61, I say there are 12 earnings announcements; I classified each day on which such earnings release was first issued as a news day.  I feel I've answered this question several times.

Q    Great.  And my answer --

A    -- is noted ex ante.

Q    I understand the difference between ex post and ex ante.  You don't understand my question, clearly, or you're just evading answering it.  I'm just quite simply trying to understand that the data in this model is limited to these 12 news days.  You've identified them, defined them as the 12 news days, this model is limited to that.  And if it's not, where is the data that was included in addition?

A    So now with the question, you've misspoke in terms of saying the data -- this is only the data that was included in this model.  There's lots of data included to estimate these models.  And so again, for the sake of precision, I

Page 140

Z. BOZANIC, PH.D.

can't answer the simple question.  You said something that's factually incorrect.

Q    Okay.  Listen, we could play the word games all you want.  I understand that you don't want to say that you selected only these 12 news days.  I get it.  And I get that there's tons of other data.  I can be absolutely precise.

There are 12 news days; correct?  In this chart on E-6, there are 12 news days?

A    On exhibit 6 there are 12 earnings releases that are being studied as possible news days, correct.

Q    And where in your report does it say that they're possible news days?  Where is that word, possible?

A    Again, I have to go back to the same response.  I am looking for a pattern ex ante.  I don't know ex post.

Q    I'm talking about how you defined it in your -- so let's go to this.  Let's look at page A-22 of your report.

All right.  So you said, first

Page 141

Z. BOZANIC, PH.D.

sentence, "As shown in Exhibit 6, CleanSpark issued 12 earnings announcements during the Analysis Period. I classified each day on which such earnings release was first issued as a 'News Day'."

Is that correct?

A    That is correct.  I already referred to the same sentence.

Q    So as defined in this model, there are 12 news days?

A    Ex ante, there are 12 news days that are defined by this model.

Q    Perfect.  And those 12 news days that you defined as news days ex ante are the 12 that are listed in E-6?

A    That is correct.

Q    Perfect.  Okay.  Now, if we look at what this shows here, when you were conducting your event study analysis you calculated, I'm understanding it, the residual and abnormal returns on these 12 days.  Is that accurate?

A    So if we're looking at exhibit

Page 142

Z. BOZANIC, PH.D.

6, you can see that there is an abnormal term percent and an abnormal term dollar amount listed.  That's correct.

Q    Okay.  And you conduct, when you run this analysis, you conduct a statistical test to determine whether or not that abnormal return is statistically significant.  Is that correct?

A    That's correct.

Q    And a way to determine if you have an abnormal return that's statistically significant is you look at the p-value.  Is that correct?

A    You may look at the p-value.

Q    Okay.  And what is the p-value?

A    So this is a level of statistical significance.  So it's showing whether or not this is happening, this occurrence, this phenomenon that we're documenting is by random chance or not.  And so it's the ability to reject that this is occurring by random chance.  That this is a pattern that's observable in the data statistically speaking that is

Z. BOZANIC, PH.D.

different than random chance.  So the lower the p-value, the greater the statistical significance and the strength of the relationship.

Q    Got it.  Now, what is the cutoff for what would be deemed statistically significant?  If I understood it, you said the lower the p-value, the more statistically significant.  What's the highest the p-value could be?

A    P-value in terms of -- it's actually the lowest, the highest, it can go up to one; right?  So the lowest would be zero.

Q    Right.  So you could have one or zero, and that's where I guess I'm trying to understand for statistical significance purposes, you said lower is better, but where's the cutoff between something that's statistically significant or not?  You as an expert, you would say, look, you get a p-value of 5 percent; you get a p-value of .05, that's statistically significant.  What is your cutoff or

Page 144

Z. BOZANIC, PH.D.

what's statistically significant?

A     A reasonable and conventionally used statistical cutoff when we're talking about p-values is .05.

Q     Okay.  That's what I understand.

And you mentioned that that's one of the things that you could do to determine whether or not -- well, one of the things you could look at, p-value, to determine whether or not there's -- the abnormal return is statistically significant.  So that's one of the things you could look at.  Is that correct?

A     That's correct.

Q     What else could you look at?

A     The adjacent column to the p-value on the left is reporting the t-statistic.  So these are two sides of the same coin.  So you can assess statistical significance using either a t-statistic or a p-value in this particular case.

Q     Is there someone else in the room with you?

Page 145

Z. BOZANIC, PH.D.

A    No, there's a window there.

Q    Oh, perfect.  Probably outside where I'd rather be.

A    My driveway, so I can see cars coming up.

Q    Nice.  I was deposing someone once, and they were in a secure facility, and all of a sudden the alarms went off.

A    Yikes.

Q    I'd never had that happen before, but -- okay.

Anyways, so we have the t-statistic, which is the adjacent column, and the p-value, and those are two different ways, as you said, different sides of the same coin that you could use to measure statistical significance?

A    Correct.

Q    Okay.  What are the -- I'm trying to ask this in a way that's -- why do you use both?  Why do you use both? What does one tell you that the other doesn't, or why are they both useful?

A    It's simply convention.

Z. BOZANIC, PH.D.

It's -- it's always convention in terms of just reporting. So even in my academic papers, we report both very commonly.

Q Okay. I understand. So they're just two different ways of looking at it. Okay.

And then just so I understand you said that the lower, you know, the number for a p-value, but typically 0.05 is a reasonable cutoff for statistical significance. I'd ask you for the same kind of analysis of the t-statistic. What's a reasonable number I should be looking for for statistical significance?

A So again, the exact number is eluding me, but I believe it's around 1.65 is the convergence in terms of the equivalence of a p-value of 0.05. But higher is better for t-statistics, absolute value.

Q Okay. So the absolute value of the t-statistic, because it can -- we want it to be higher, and for the p-value we want it to be lower.

Page 147

Z. BOZANIC, PH.D.

MR. PARTIDA:  So now I want to introduce -- we're on Exhibit 77.  Is that correct?

MR. LINKH:  I think we've -- you've introduced up to 76.

MR. PARTIDA:  Yeah.  Okay.  So this --

THE REPORTER:  This will be 77.

MR. PARTIDA:  Yes.  Okay.  Okay. Thank you.  So I'm going to send this in a sec.

Okay.  Tell me when you get this file.  And Exhibit 77, I'll tell you what it is, it's an Excel file that we received as part of the backup for your report.

(Exhibit 77 was marked for identification.)

THE WITNESS:  Let me download this. Hold on.

MR. PARTIDA:  Yeah.

THE WITNESS:  Okay.  I have it open.

BY MR. PARTIDA:

Q    Okay.  And can you tell me what this is?

Page 148

Z. BOZANIC, PH.D.

A    This is the output from the event study.  So when we were looking at some of those prior exhibits, and you're wondering what they were in terms of the evolution through time, this is reporting some of those elements.  So, for example, you see the coefficients here that were generated from that event study.

Q    Okay.  And if I go to the far right, or to the column U; correct?

A    Mm-hmm.

Q    These are different earnings releases.  And so when I see, for example, in U7, I believe it is, that's an earnings release.  So I'm looking at this output, that's essentially what you were talking about in the earlier exhibits, one of the earnings releases you identified?

A    Mm-hmm.

Q    Okay.  Now, can you tell me what is the p-value that you calculated for December 10, 2020?

A    Give me a second.  Hold on.  Get closer to my computer.  Okay.  You said

Page 149

Z. BOZANIC, PH.D.

what now?

Q    Can you tell me what the p-value is that you calculated for December 10, 2020?

A    So I'm not seeing this in this particular output, this date.  You said December -- 12/10/2020?

Q    Mm-hmm.  Well, I'll point you to the cells I want you to look for.

A    Okay.

Q    Go down to row 255, and look at Q255.

A    Oh, we might have to share this on the screen.  Q -- where are we? -- I see row 255, December 17, 2020.  Are you looking at the same?

Q    Well, when I'm -- so here, I can share my screen.

A    Yeah, maybe.  I'm sorry.

Q    So, I'm looking at this.  I'm looking at sheet 1.  Is that correct?

A    Yes.

Q    So what I see in sheet 1 is I see on row 255.

Page 150

Z. BOZANIC, PH.D.

A    Mm-hmm.

Q    Go down there.  I see 12/10/2020 in column A --

A    Something -- let me share my screen with you -- or maybe you can share yours.  I apologize, David.

Q    Yeah, no problem.  That's why we ask these questions.  Let me see -- I'm going to switch my computers here.  So why is it not letting me share?  Oh, share. Great.  Okay.

Can you see my screen now?

A    It's, I think, rendering.  Yeah, there we go.  If you could make the font a little larger, the bottom right, like 130, that would be wonderful.

Q    Yes, I can.  Okay.

A    Okay.

Q    All right.  I know I'm controlling it now, so tell me if you need to slow it down.  I see that some of these have not rendered yet, but it has, like, the hash values there, but.

A    You know, honestly, David, the

Page 151

Z. BOZANIC, PH.D.

issue there is the column. You have to adjust the length of the column. So, if you highlight the column A, yeah, and do that. You got it. You got it. Now we're fine.

Q   Okay. Perfect. See, there we go. Good. Okay. So would I go down to row 255, here.

A   There we go. Okay.

Q   I see 12/10/2020; right? And when I go over to Q.

A   Q.

Q   Or -- sorry. Right. Do you see under Q where I've clicked on right there?

A   I do. What's the header label for column Q?

Q   Column Q, yeah, let me go up to the top. P-value.

A   Okay.

Q   That's what I'm trying to ask. So can you tell me -- I think I understand, but can you confirm that zero is statistically significant and one is not? Or what do the ones and zeros mean?

Page 152

Z. BOZANIC, PH.D.

A    So, David, again, apologies. There's some formatting mask here, changes that you could elect that would allow us to better --

Q    Sure.

A    -- opine on this particular column.  So if you can right click that column.  So highlight Q.

Q    Yep.

A    Right click.

Q    Yep.

A    Format cells.

Q    Yep.

A    Okay.  Then go to number.

Q    Mm-hmm.

A    And just click okay.

Q    Mm.

A    Okay.  So now which row are we talking, 255?

Q    Yeah.

A    Okay.  So the p-value here is 0.1.  But we need to go -- well, go back up, sorry.  Yeah.  Okay.

Q    0.1.  Right.  And so if we go

Page 153

Z. BOZANIC, PH.D.

over back here then on row 255, 12/10/2020, this is the event study model. And then if we go over here to Q for 12/10/2020, if we go here to Q, which I've highlighted, that's 0.1 for the p-value. That's correct?

A    Yes.  And some change, but that's correct.

Q    And so that's not statistically significant?

A    We would want that p-value to be below that 0.1 to be significant at the 10 percent level.

Q    But I guess I've just -- earlier you had told me that a reasonable cut off of what would be a statistically significant p-value is 0.05, and so this is 0.1 and so I guess this is not statistically significant, is what I'm trying to understand.

A    Yes, you are correct.  So in this particular row that is not statistically significant.

Q    Okay.  And then if we go here,

Page 154

Z. BOZANIC, PH.D.

right, we see in column U, which says misreps; right?

A       Mm-hmm.

Q       And let's see.  We'll go up to the very top of what U is.  Sorry, it's going to take forever unless there's a faster way people know of getting there. And it's event; right?

A       Mm-hmm.

Q       And so do you know what event occurred on December 10, 2020, that's the beginning of the class period?

A       Off the top of my head, I'd have to go back and look at the complaint, but what the sheet is saying is that that particular day reviewing the complaint was classified as a misrepresentation identified in the complaint on that date.

Q       Right.  And so my point, I guess then my question is that, just to confirm then, on December 10, 2020, a date that was identified in the complaint as having two misrepresentations and a date that's the beginning of the class period --

Page 155

Z. BOZANIC, PH.D.

A     Mm-hmm.

Q     -- is there's no statistical significant p-value.

MR. LINKH:  David, is there a question?

MR. PARTIDA:  Yes.

BY MR. PARTIDA:

Q     I'm saying, is that accurate? That's accurate that there was no statistical significance on that day?

A     Apologies.  I wasn't sure if that was a statement or a question.  I thought I already asked this one where I said this is not statistically significant.

Q     Okay.  Perfect.  And I just had to ask the information because I had to get out that it was December 10, 2020, that that was a date identified as a complaint, or a misrepresentation in the complaint.  So I understand it might not be important for you, but it is for me, so I appreciate your indulgence.

Okay.  Now, I want to go do the

Page 156

Z. BOZANIC, PH.D.

same thing if we go down just a few days and I'd like to look at January 14, 2021. Which is -- here, let me go up a little more. Sorry, I forgot that other people are looking at this. And I can make it even maybe a little bigger if it's helpful.

All right. So you see where we are here?

A     I do.

Q     And A is the event date or the date, January 14, 2021. And we go over here, just over a little more to our handy dandy column number 12; right? And there we see that the p-value, if I understand, I know it says 0.12. I think that's again the column size, but more accurately, if we look up here, do you see where I've highlighted?

A     I do.

Q     The p-value, if I understand, is 11.61 percent, 0.0116. And so we see here, if we go to the right, again, to U, that it's a corrective disclosure. Is

Page 157

Z. BOZANIC, PH.D.

that accurate?

A    I'm sorry.  Is what accurate?

Q    Is it accurate that January 14, 2021, was a corrective disclosure date identified in column U?

A    That is accurate.

Q    Okay.  And it's accurate that there's not a statistically significant p-value there.  Is that correct?

A    That is also correct.

Q    Okay.  I want to do the same thing for the next day, January 15, 2021; right?  And I want to go over here to the p-value, and it says 0.019.  But again, if we look here at the top, actually, that's really high, I guess, but 18.79 is the p-value there.  So that's not statistically significant.  Is that correct?

A    That is correct.

Q    Okay.  And then I want to go down to February 12, 2021.  Go to 98, I want to go over here to Q.  And if we look here, can you confirm that the p-value is

Page 158

Z. BOZANIC, PH.D.

42.78 percent?

A    Yes, I confirm the same.

Q    And so that's not statistically significant.  Is that correct?

A    That is correct.

Q    Now, is it also correct that you flagged in this report nine dates as alleged misrepresentation dates?  And so I can maybe help you be able to answer that question in a fair way, I was going to propose sorting the U column.

A    Sure.  I could do so on my end.

Q    Yeah.  So we could look at it like that.

A    Sure.

Q    So let's just do it.

A    Okay.  So I've sorted U as well.

Q    Oh, you sorted U?

A    I just did it now, because I was -- yeah.

Q    Oh, you can do it on your end now.

A    I have it on my end now, yeah.

Q    Okay.  Got it.  Okay.  So can

Z. BOZANIC, PH.D.

you confirm -- and so as I have them that these nine rows, and I guess we could just walk through them really quick because I have them listed here.  The first one is --

A    Yeah, feel free to walk through because we're looking at different sorts.

Q    Yeah.  So the first one is row 255.  That's that December 10, 2020, date.  And if we go to column U for that, we see that there's a misrepresentation date?

A    Yes, I see the same.

Q    Right?  Okay.  And if we go down to 269, if we go down -- I'm just going to stay on the U column here -- but if we go down to row 269, we'll see again that that's the second misrep day.

A    Yes, I agree.

Q    And then if we go down to 271, right, we see the third misrep day.  Is that correct?

A    Yes, that's correct.

Q    Okay.  Then we go down to 298, and that's an earnings and a misrep day.

Page 160

Z. BOZANIC, PH.D.

Is that correct?

A     That is correct.  And I believe there's more in that cell.

Q     Let's see.  Earnings, misrep, corrective disclosure, the trifecta. Right.  Yeah.  All three of those are that day.

And let's go with 298.  That's February 12, 2021.  Okay.  I'll stay on the U column now.  And so then we go right down just slightly to cell 301, which again is a misrepresentation day.  And then we go down to 309, which is the sixth.  And then we go down to 327, which is the seventh.  And then we go down to the 340, which is the eighth.  And then we're going to go down to 356, which is the final one.  And we could look through it, but I'll represent to you that there's nine, and those are the nine that we just identified.

And so now I want you to take a minute.  I guess we could go back and I can list each one of them.  We can go look

Page 161

Z. BOZANIC, PH.D.

through the p-values for all of them. And I can tell you the numbers. But I guess what I want to confirm is that of those nine days, those nine misrepresentations, there's only one misrepresentation day with a statistically significant residual return. And that's February 18, 2021. So I'll go up there.

And I just want to show it to you. We can go through each of them however you're comfortable, but for example, we look on cell 301; right? That's February 18, 2021; correct?

A    I'm sorry. What's the question? I apologize.

Q    So row 301; correct?

A    Yes.

Q    That is the date February 18, 2021. Is that correct?

A    That is correct. Yes.

Q    Okay. And then we go over to row U, and that's a misrepresentation day that I flagged; correct?

A    That's correct.

Page 162

Z. BOZANIC, PH.D.

Q    Okay.  And then we go back to the p-value here; correct?

A    Yes.

Q    And we see what I think, if I understand, 0.0000 -- pretty statistically significant; right?

A    It is statistically significant. Yes.

Q    Okay.  But if we look at the other eight, which I'll go to now, I guess we'll just look at it in a row.  And we understand that these are all the rows that are misrepresentation dates, but we'll cover that.  I'm going to go back to the first one; right?  Which is row 255 here, and that's a two misrepresentation day; right?  Correct, under U?

A    It's a misrep day, but you said something before that.  I'm sorry.  I missed that two --

Q    Oh, I'm sorry.  I said two because I just said -- I misspoke.  It's a misrepresentation day.  We're not sure how many.  It's just flagged as a

Page 163

Z. BOZANIC, PH.D.

misrepresentation day.

A    Yes, that's correct.

Q    And that is not statistically significant.  It's 10.3 percent.  Is that correct?

A    Yes.  I believe we've established.

Q    Yeah, exactly.  So that's all I was trying to understand.  And I'm trying to ask you the question in a fair way.

Having reviewed this Excel file and looked through it, there were nine misrepresentation dates identified.  Those are on rows 255, 269, 271, 298, 301, 309, 327, 340, and 356.  Those are the nine. And my review of this showed that of those nine alleged misrepresentation dates, there was only one which was identified to be statistically significant.  And that one was February 18, 2021, which is reflected in row 301.

So I get that that's a huge mouthful, but the reason I'm explaining it that way is quite simply I want to

Page 164

Z. BOZANIC, PH.D.

understand.  Am I correct in my reading of this Excel spreadsheet that nine days were identified as misrepresentation days.  And of those nine, only one, which was February 18th, had a statistically significant p-value.

A    What are you asking again?

Q    I'm trying to ask you if that's accurate.  And the reason I said it in the long fashion is because it's your testimony; right?  So if you're going to say it's accurate, I assumed you wanted me to walk you through it.

But my point is what I'm trying to, again, ask you is, is it accurate to say that in this event study mode; -- let's just break it down piece by piece.  Is it accurate to say that in this event study model there were nine days identified as misrepresentation days?

A    Yes, that's correct.  And I do appreciate you walking me through.  I was just wondering if it was a statement or a question that you just ended up with.

Page 165

Z. BOZANIC, PH.D.

Q    Yeah, no, I'm trying to -- I can't use my own statements in court; right?  I can only use your answers to questions.  And sometimes -- I guess different witnesses, different days, sometimes I try and do the witnesses a favor so they can understand a fair question, what I'm trying to ask, and other times it doesn't work so well.  So I appreciate you trying to be precise.  But before I asked you that giant mouthful, I wanted you to understand what we were talking about.

So in any event, the simple question is we've confirmed that there were nine misrepresentations days identified.  And then my second question is that of those nine misrepresentation days, there was only one for which there was a statistically significant p value.  Is that accurate?

A    Yes, that is accurate.

Q    And that one is found in row 301, which is February 18, 2021.  And

Page 166

Z. BOZANIC, PH.D.

that --

A    I believe so.  You have to show me.

Q    Yeah.  Yeah.  Sorry.  If we look at the top here, 0.00002.  Statistically significant.  Okay.

THE WITNESS:  And David, only because the coffee is now going through me, when we're done with this line of questioning, I would appreciate taking a five-minute restroom break.

MR. PARTIDA:  We're finally getting on the same page because I was just about to suggest a break.  So I appreciate you letting me know.

Why don't we come back, if it's enough time for everyone, at two o'clock?

THE WITNESS:  That would be wonderful.  Thank you.

THE VIDEOGRAPHER:  We're now going off the record at approximately 1:53 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are now going back on the record at approximately 2:04

Page 167

Z. BOZANIC, PH.D.

p.m. This is the beginning of media unit number 4.

Go ahead, Counsel.

MR. PARTIDA:  All right.

BY MR. PARTIDA:

Q    Welcome back, Dr. Bozanic.  I want to turn your attention briefly, briefly, but back to your report, Exhibit 73.  And I want to direct you back to paragraph 51.

A    5-1?

Q    5-1, correct.  Mm-hmm.

A    Thank you.

Q    And I just want to -- okay.  Sorry.  Are you ready for me to ask you a question?

A    Oh, let me read it.  I'm sorry.  I just got there.

Q    Oh, got it.  Okay.  I'm sorry.

A    I'm up to speed.  Thank you.

Q    Okay.  Perfect.  So I just want to confirm my understanding of the event study regression analysis.  And as I understand it, that the purpose of the

Page 168

Z. BOZANIC, PH.D.
event study analysis, as stated in paragraph 51 is to "Isolate the impact of company-specific news on CleanSpark's Common Stock prices during the Class Period" and to "measure the response of the Company's common stock to announcements of company specific news."

And so my question is, that's what your events study model is designed to do?

A    So I assume that's a question. So in paragraph --

Q    My question is, is that what your event study is designed to do?  To "Isolate the impact of company-specific news on CleanSpark's Common Stock prices during the Class Period" and to "measure the response of the Company's common stock to announcements of company specific news"?

A    Right.  Yeah.  So this paragraph here is talking about specifically, as you mentioned, this is controlling for other factors to isolate that company specific

Page 169

Z. BOZANIC, PH.D.

news.  That's correct.

Q    Perfect.  Okay.  I just wanted to make sure I understood that correctly. Just so you're --

A    It's isolating the impact of that news on price.

Q    Yeah.  Okay.  I understand. Okay.

Now, I want to move to kind of talk about -- so I understand now that the event study, what it's designed to do, to isolate that company specific information, your event study was designed to do that. And I guess my question is, so with regard to a company on a given day there could be a lot of different news about it.  There could be a lot of different types of news that come out about it on the same day. Is that correct?  Is that your understanding?  A lot of news could come out, different types of news.

A    I would agree with the general sentiment that in a given day for a given firm there's a variety of news that could

Z. BOZANIC, PH.D.

be disseminated.  That's correct.

Q    Right.  So I'll give you an example, or we could take an example from here.  One of the CleanSpark's earning releases has a variety of different pieces of information about different aspects of the company on it.  Is that accurate?

A    I would say so.  Yes.

Q    Yeah.  Okay.

A    For any given average earnings announcement, I would say so.  I'm not singling out that one particular, making any statements on that particular one.  But in any average earnings announcement, you would have that.  Yeah.

Q    Right.  Which is all I'm asking is there's just whatever mix of information.  And where my question is, an event study, it takes into account specific mix of company information -- well, withdraw that.

Can an event study, is an event study capable of isolating the impact of various different types of news about that

Z. BOZANIC, PH.D.

company?  And I'll give the earnings release as an example.  Would you be able to tell me in an event study or with your event study if a certain piece of news in that earnings report had a larger or smaller impact, or just you know that the report itself had an impact, or release had an impact?

A    So let me just go back.  So in terms of what the event study is trying to show is how when information arrives, the evolution of that information as it arrives, how does it impact stock price; right?  So I understood your question to be if you have a single -- like at first you started to say if I have multiple news events ---

Q    Right.

A    -- throughout the day versus if I have a single disclosure which contains multiple pieces of information, which one were you referring to?

Q    Oh, that's actually -- I didn't even understand that I had asked it two

Z. BOZANIC, PH.D.

specific ways, I guess, or two different ways.  So thank you for clarifying that.

What I'm trying to understand is -- I guess I'll ask it this way.  If I understand an event study correctly that can tell me that, look, the total mix of available news, company specific, about this company, had an impact on the stock price or didn't.  But I don't understand that an event study is capable of breaking it down further than that, by saying this particular piece of information about the company had this impact, and this piece of information had that impact.  Is an event study capable of parsing it out on that level of detail?

And the reason I asked about multiple news events, and I didn't think about, you know, if you have them successively, you know, one after the other, or in, you know, a single release, but the more general question is, is an event study capable of distinguishing between the impacts of various specific

Page 173

Z. BOZANIC, PH.D.

pieces of information about a company that were all released on the same day, same event day?

A    Right.  So the confusion still remains that I have in my head, because the way that you just described that question could involve either scenario. And so let me answer with regards to the first scenario, or the second scenario that I've mentioned, which is the arrival of information throughout the day; right? So here, for the event study analysis, I'm looking at a day by day basis.  You are correct.  Okay?

And you're also correct that for a given firm, information could arrive at different intervals throughout the day. Now, this is a daily return based upon closing stock market prices being used in this analysis.  If you start to have information that comes out throughout the market at different points in the day, this is where you start to use intraday data; right?

Page 174

Z. BOZANIC, PH.D.

So this is one potential approach in terms of saying which piece of information within the day. So if it arrived at different points of time, the availability of intraday pricing data would be helpful to form a response to the particular question that you've raised.

Q   Got it. And that's all helpful because I guess I think it helps me understand the answer to my question, is that the event study you did for this report doesn't do any of that?

A   So what -- I'm not looking at intraday data for this event. That's correct. So this is using daily data at this point in time. It's not distinguishing between individual elements of information that arrive throughout the day. That's correct.

Q   Perfect. That confirms my understanding. I think I understand now.

If you were able to go about disentangling the information, trying to separate it out, as you just mentioned,

Page 175

Z. BOZANIC, PH.D.

you said it would be helpful to have intraday data; correct?

A    That's correct.

Q    And explain to me a little bit why.

A    So the idea here, and as I've said, I've not done this here, but this is one potential approach to the scenario that you mentioned is to say, how is the stock price moving through the day; right? And so instead of saying, how did it perform throughout the entire day and using a summary return for that day, you can start to look at how the price moves throughout the day.

And so as the arrival of information occurs, you look at the timestamp of the arrival of the information, then you can look at shorter intervals. So all we're doing here is decreasing the interval. Currently, the interval being used for this analysis is daily returns; right? Then you can start to see -- look at the price movement

Page 176

Z. BOZANIC, PH.D.

throughout the evolution of the trading day as information arrives to the market to see how the price responds.

Q    Got it.  And how short of an intraday window would you use for an intraday event study like that?  So if, for example -- well, I'll stick with that. How short of an intraday window would you use?

A    I'd have to look at the specific facts and circumstances of the case.  If we look to academic literature, I believe there's a variety of windows used depending upon what they're testing for.

Q    So the answer is you don't know as of this point in time, you don't know how short of an intraday window you would use?

A    The answer is I haven't formed an opinion because I haven't reviewed the facts and circumstances of -- case that's before me.

Q    Okay.  So I understand.  So that solves the scenario where you say, you

Page 177

Z. BOZANIC, PH.D.

know, there's a whole bunch of successive releases.  I want to talk about the scenario where you don't.  It's all in the same document.

As far as I understand, the intraday data and the intraday event study wouldn't be useful for that project; would it?

A    Correct.  So in this particular case, this is the other scenario that we talked about, the first scenario where you have different elements of information coming out at the same time; right?  And then disentangle the different elements, that becomes trickier.

Q    And how so?

A    So from a statistical perspective, it's difficult to disentangle whether information, element A versus B versus C, say that came out at 10:00 a.m., which, if the stock price did move, which was the element of information that was relied upon such that the price did move.

Q    So I want to go to then -- how

Page 178

Z. BOZANIC, PH.D.
would you do it if you had to do it, if you had to try?

A    So as I said, it's tricky.  And so from a statistical perspective, very difficult; right?  However, what you have to do at this point -- this is beyond what we're doing here in terms of class certification stage -- but down the road, if I were to look at price impact, this is where we start to rely on the users in the market of said information to see what they relied upon.

From a statistical perspective, that is very difficult.  What you could do is say, they were, in my hypothetical, three elements of information.  And we saw at some interval that the price moved as a response to that disclosure with those three elements of information.  Now, the question becomes who paid attention to which information to support the view that element A, B versus C were the elements that were relied upon by whatever investor analyst.

Z. BOZANIC, PH.D.

Q    So that would not be done with an event study?

A    This would be very tricky to disentangle with an event study.  You would have to support -- you'd have to show the result to say that the price moved; you would have to also concede that there were multiple elements of information arriving at the market at the same time.  And then beyond that, the event study does not tell you which piece of information was moving the market.  You'd have to look for corroborating evidence.

Q    Okay.  And but that you would have to look at the actual analyst reports, which is not something you were asked to do here?

A    That is correct.

Q    Okay.  We're going to play a fun game in a minute.  Before we get to that, what I want to do is go back to -- bear with me a moment.

So are you aware of -- sorry,

Page 180

Z. BOZANIC, PH.D.

I'm trying to find the page number, but I'm looking through the wrong document. So that's probably why I can't find it. Exhibit 3, this is the news reports.  Are you back there?

A    I am, so exhibit 3 now of my report.  Yes.

Q    Okay.  And are you aware of the dates of those reports?

A    I have not committed to memory the individual dates of any of these reports.  No.

Q    Well, I'm going to represent to you and, you know, counsel can double check me later, but I'm going to represent to you that -- well, let me ask you this.

Do you know if any of those reports were issued within, say, three days of any of the news days that you identified on Exhibit 6, I believe?  I guess the answer is no.  Am I understanding that, because you don't know the dates of them?

A    So typically it's the case when

Page 181

Z. BOZANIC, PH.D.

there is an earnings announcement by the firm that this is new information out in the market, and then analysts would cover that particular information release and then update their existing reports or potentially create a new report or maybe even a temporary report until they can opine more fully.

Q    Got it.  So do you know if any of these reports were issued within, say, three days of the earnings release?

A    I apologize.  I don't recall.  No.

Q    Okay.  Okay.  So now we get to then go look at, let's see, one of these earnings reports, which you'll find the exhibit.  And this report, which I'll be sending you in a second, is one of the reports we received from you.  And believe it -- okay.

I'm going to send you what I said was Exhibit 78.  So you can tell me when you received it.

//

Page 182

Z. BOZANIC, PH.D.

(Exhibit 78 was marked for identification.)

A    Will do.  This must be a large document.

Q    It's a six-page analyst report. I mean, I could --

A    It's coming.  I got it.  I got it.

Q    Okay.  I can also share my screen too.

A    Thank you.  Okay.  Should I look at it?  I haven't opened it.  Would you like me to review it or not yet?

Q    Yeah, well, I can tell you if you would like a little bit what it is, and then you can look at it --

A    Please --

Q    -- and I'll have a few specific questions about it.  But H. C. Wainwright, this report is one of the reports that was produced by your counsel as one of the backup reports that were in your possession that you looked at.

And I'll represent here, and

Z. BOZANIC, PH.D.

again, your counsel can check for the record, but I'll represent that of all the reports that were produced by your counsel as having been in your possession, this is the only report that was issued shortly after any of the news days that we've talked about, or the particular misrepresentation or corrective disclosure days.

So that's kind of -- that's what this document is.  This is the only report that you produced or was produced for you in your possession that was close in time to those.  And this one is December 11, 2020.  Do you see that at the top right-hand side?

A       One second.  I do.

Q       Yeah.  So it's December 11, 2020.  And I'll just, as we recall, the class period starts December 10, 2020; that was the first announcement.  This is the day after.  And this is that report. So if you want to take a minute to look at it, you can kind of look through it.  I

Page 184

Z. BOZANIC, PH.D.

mean, you don't have to read it word for word, but I will ask you some questions about it.

A    Sure.  Sure.  I'll skim it.  And then if the question is too detailed, I'll read it with more detail.

Okay.  I skimmed it.

Q    Okay.  Great.  So I just to make clear what I represented about this.  This December 11, 2020, report is the only of the 41 reports, the only one in your possession that we were given that is after, directly after the December 10 announcement.  So I just wanted to make sure that that was clear what that representation was.

So if you look here, you'll see under the section on the right hand side of it where it says "Bitcoin mining to be scaled immediately."  Do you see that big heading there on the right hand?

A    I do see it.

Q    So if you look at the top, it says "Bitcoin mining acquisition drives

Page 185

Z. BOZANIC, PH.D.

estimates higher," the title of the document. Then on the left side, there's a chart with stock data, on the right it says -- first like five words are "Increasing price target to $24." And then below that paragraph, you'll see another paragraph that begins "Bitcoin mining to be scaled immediately." You see that?

A    I do see that.

Q    Now do you see -- if you look at the chart on the left where it says "Revenue ($M)". And then if you see where it says 1Q, I'm just trying to direct you to a specific line in the text on the right hand side.

A    I see it.

Q    If you kind of draw your finger along and go over, starts with a line that says "during the next several quarters."

A    Oh gosh, hold on. I thought you were looking at the chart.

Q    Yeah, yeah. Well, if you -- I was looking at the chart. If you look at

Page 186

Z. BOZANIC, PH.D.

the chart where it says "Revenue ($M)" and you see where it says --

A    I am looking there.  Yes. Revenue million --

Q    Yes.  If you see where it says --

A    Yes.

Q    Yeah, and then if you see where it says 1Q and kind of draw your finger across the page, you'll run into a sentence that says "During the next several quarters, the company" --

A    Okay.  Yes, I see it.

Q    Sorry.  I guess that was a bad way of pointing you to it, but can you just read that sentence out loud?

A    I can.  If this is the one I think you have mind.  This report says "During the next several quarters, the company is planning to increase the capacity from the current 9.6MVV, operating at approximately 190PH/s" -- this is the line, anything else?

Z. BOZANIC, PH.D.

Q    Yes.  And can you read the next sentence as well?

A    I can.  "In line with this, during FY2022, we are projecting capacity to reach 49.5MVV, operating at approximately 985PH/s and generating 6.61 bitcoins per day."

Q    Great.  Other than it's 6.16, but I would have done the same thing.  So I just want to make it clear for --

A    Sorry.  It's 0.16.

Q    Yeah.  I just want to make it clear for the record.  Sorry.  Okay.  So if I'm understanding this, this particular analyst report, and I get that other than when you looked at it previously, you're just kind of looking at it now, but I read those two sentences, and would you agree that the analyst is talking about expansion of power over multiple quarters and throughout the FY2022?

MR. LINKH:  Object to form.

A    Let me re-read the sentences now that you've asked your question, please.

Page 188

Z. BOZANIC, PH.D.

So I'm reading this without the benefit of the rest of the report. It seems the two sentences are indicating an expansion of capacity with respect to the power that could be utilized to run the different GPUs and ASICs.

Q    Right. And again, this is just -- I'm not asking you to be responsible for what this analyst said or how he came up with it. I'm just -- this analyst, though, gives a timeline; he discusses the timeline -- or she, I don't -- I think it's a he -- but discusses a timeline for the expansion of that power; correct?

A    Let me revisit. Yeah. So at the top it says " Bitcoin mining to be scaled immediately," as you've already indicated. And then let me see. And then it says during the next several quarters, the company's planning to increase capacity.

Q    Right. And it's during the next several quarters; right? That's the

Z. BOZANIC, PH.D.

timeline.

A    Correct.  During fiscal year 22, and this is relative to December 2020.  So yeah.  Okay.

Q    Right.  So my question is based on this analyst report as of December 11, 2020, would you agree that this analyst is talking about an expansion timeline that involves the next several quarters?  And just to be clear, that's over a year; right?  Or I guess it doesn't have to be, but each quarter would be quarter of a year.  So during the next several quarters, and then gives a more specific projection of during FY2022.  So two years later, or the –

A    Right, but above, I mean, it's --

MR. LINKH:  Object to form.

A    It's confusing to me because above, if you go back to the major heading, "Bitcoin mining to be scaled immediately," you see the parenthetical where it says the expansion from 20 to 50

Page 190

Z. BOZANIC, PH.D.

megawatts is trying to be completed by April 2021.  So it's -- I see that there's some discussion regarding a timeline, and I appreciate the confusion and also maybe the confusion with what -- what this analyst is considering the fiscal year to be.  I'm not quite sure, but it seems like there's some sentences that might contradict each other for this particular analyst.

Q   Okay.  Got it.  And I believe it's in -- go back in your -- actually, let's just go back to your report.  Because there's a place in your report where you talk about, and I believe it's in paragraph 14.  Paragraph 14.  So if you go to page A-5 of your report.  So just tell me when you're there and when you --

A   I'm on page A-5.  Thank you.

Q   Yeah.  And when you have a chance to look at paragraph 14.

A   Fourteen, one second, please.  I read it.  Thank you.

Q   Okay.  So I want you to go to

Z. BOZANIC, PH.D.

the next page, and this is kind of just -- and read -- sorry -- if you could go back to Exhibit 78 now.

A    What's Exhibit 78?  I'll go back to my email.

Q    Oh, Exhibit 78 is the most recent exhibit, the one that has the H. C. Wainwright report from December 11th.

A    Oh, thank you, thank you.  Yes.

Q    So if you go there at the top where it says Key Takeaways.

A    Of the report?

Q    The top of page 2 of December -- that report.  So go down --

A    Yes, I see it.  I have not read it, but I see it.

Q    Okay.  So can you read the first sentence?

A    I can.  "Key Takeaways.  We do not view this acquisition as a pivot away from the company's core efforts to expand its energy analytics and software offerings."

Q    Okay.  And can you read the next

Page 192

Z. BOZANIC, PH.D.

sentence?

A    I can.  "Part of the rationale offered for this acquisition was to demonstrate and validate the suite of energy solutions the company can offer to manage a high energy intensity application, where keeping power consumption costs low can impact profitability in a significant manner."

Q    Okay.  And so I guess, you know, why I asked you to read paragraph 14 of your report and then look at this totally separate analyst report, and this analyst opinion, is to highlight, I guess, that different folks, different analysts, different experts could look at the same piece of news; right?  The December 10 announcement that you've looked at, that the plaintiffs have looked at, you've looked at through the complaint, the plaintiffs have looked at, this analyst looked at.

And in A-5, the conclusion is A-5, meaning in your report, the

Page 193

Z. BOZANIC, PH.D.

conclusion was CleanSpark started pivoting towards Bitcoin mining with the announcement of the acquisition of ATL. And this guy, H. C. Wainwright, this, you know, Mr. Dayal and Mr. Joshi came to the opposite view.

Now, leaving aside whose view is right or wrong, I'm kind of agnostic in that sense, my question is, how would we go about measuring the impact of then the pieces of information? So here, the underlying piece of information that we're talking about is the ATL data center acquisition and power expansion. That's the underlying announcement from CleanSpark.

And I guess, how do we parse out -- how would we go about doing that project to say, once we've now figured out by reviewing this analyst's report, which you said we would have to do to sort of disentangle this information, what process then would I go about to account and control for these different impacts to

Page 194

Z. BOZANIC, PH.D.

different users, what really mattered to them?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    So how would I measure that?  Do you see what I'm saying?

A    I honestly don't -- I was going to say I apologize, I don't understand the question.  If you could rephrase it more simply, I would greatly appreciate it.

Q    Yeah.  So the point is, look, earlier we testified or you testified that, you know, statistically to try and disentangle different information that came out at the same time, for example, in the December 10 announcement about the ATL acquisition, if it all comes out at the same time, with an event study it's extremely difficult as a statistical way -- or tricky, I think was the word you used -- to disentangle that information.

And then what I understood you told me that we would have to do is we would have to look at specific analyst

Page 195

Z. BOZANIC, PH.D.

reports to see what they were talking about, to see what the users of this information were focusing on. And what I'm saying is that in this report, this analyst report that you looked at as part of your report, it was released the day after the December 10 news day. And this user, this particular analyst came to the opposite conclusion that you did in your report in paragraph 14.

And the opposite conclusion I'm referring to is your report says "CleanSpark's pivot toward Bitcoin mining began with its announcement of the acquisition of ATL data centers." This analyst looking at the same news release says the exact opposite. I'm not interested in who's right or wrong with that. What I'm interested in is, how do you measure? How do we look at when we have two users who received the same information value it completely different, how do we measure for that? How do we go about disentangling that impact when we go

Page 196

Z. BOZANIC, PH.D.

to measure and parse it out?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    So I'm trying to understand --

A    Can you rephrase the question? Are you asking a question now?

Q    That is the question.  How do we measure the difference when two people look at the same piece of information and reach opposite conclusions?  How would we go about disentangling that?

A    Sure.

Q    The project that you said we would have to do by looking at the reports.  We've looked at the report now. Now what do we do with it?

MR. LINKH:  Same objection.

A    Shall I answer?

Q    Yep.

A    Okay.  So I think I've already answered this question insofar as I did say, you characterized my testimony correctly, and I did say that it would be tricky to do so.  And I said there are

Page 197

Z. BOZANIC, PH.D.

ways that we could beyond the model.  The key is the model only goes so far in terms of what it can precisely measure; right?

And so after we say that the model can't speak to the arrival of information in terms of it all occurs at the same time, which piece investors reacted to, there's a problem with the model at that point.  It can't speak to it.  This is why you have to say, as I said before, if we have a statistically significant return, then we say, okay, there was a reaction.  The next question becomes, what was reacted to?  This is more suitable for a price impact analysis, which I've not done, I've not been asked to do.  This would be down the road after we've had the benefit of discovery.

And furthermore, you have the benefit potentially of having read that entire report verbatim.  I don't have the benefit of reading that entire report. I'd like to understand the information environment better, the firm, in terms of

Page 198

Z. BOZANIC, PH.D.

what all of these reports are saying. Okay?

But then also, I think we're mincing on this word called pivot. So the analyst, his or herself is saying, at this point in time, they don't view the acquisition as a pivot away from the company's core efforts. Whether it's a pivot or not, I think this is colloquial. It's a pivot in terms of they're changing. This is what I'm saying here in my report. They've decided to change how they are generating revenues to some extent. Now, the magnitude of the extent of that change remains to be seen at that point in time at which the analyst wrote the report.

I have the benefit of hindsight insofar as saying, it's very clear. You see on the first few pages of my report, where on the company's website, in the company's end report, they come out very clearly to say that we are now a Bitcoin mining firm as of this point in time. So I agree at that point in time, maybe the

Page 199

Z. BOZANIC, PH.D.

pivot away from core wasn't as clear.  I don't say pivot away from core.  All I say is pivot.

But through the benefit of hindsight, you can see that CleanSpark does say on their website they are America's Bitcoin miner.  And the CEO even states in the 10-K, CleanSpark is a Bitcoin miner.  So at some point they did make a pivot away from core.  I'm not alleging that.  That's what the analyst is saying.  And they're entitled to their opinion.

Q    Wow.  All right.  That's a lot of information I didn't ask for, and I'm not much interested in, but I do thank you for sharing it.  Like I said several times, I'm not much interested in who's right or wrong.  I'm not much interested in whether you're right that they did pivot or they didn't.  And I agree with you.  They did pivot.  They are a Bitcoin mining company, so I appreciate you for trying to convince me of what I'm sure of,

Page 200

Z. BOZANIC, PH.D.

but that's okay.

My question was really much more simple.  And my question was simply, you said that the model loses its ability to disentangle information once you have people receiving it at the same time and forming different opinions, and that you would have to do a different sort of analysis to study it.  And my only question, all I was trying to understand is, what analysis would you do?  Because you say in your report that you're absolutely certain that this analysis could be done and you could do it.  And in order for that to be your opinion, you must have at some level considered it.

So what I'm trying to ask you is now, if we do need to go into the project of disentangling this information, because as you've testified we can't find any statistical significance for a lot of these information dates, what I'm trying to understand then is, okay, you said we have to go look at the reports.  I'm

Page 201

Z. BOZANIC, PH.D.

looking at the report, the information, which I will note, by the way, you said you haven't had the benefit of reading this.  I got it from you.

So I mean, I can't say whether or not you read documents that you provide as backup for your report.  You'll have to do that.  But that's where the basis of that was from.  This isn't like it's some document I sprung on you as a surprise. You gave me this document.  So my question is --

A    I'm just going to put for the record that I feel you've mischaracterized my testimony there in terms of this absolute certainty that you refer to.  And while yes, I do have the benefit of the document, you give me the opportunity to skim it.  And as I've also said, I've not been retained for price impact analysis at this point, which is what you're asking about.

Q    I'm just saying, I assume that you read the document you gave me.  This

Page 202

Z. BOZANIC, PH.D.

isn't some surprise new document that I gave you.

But leaving that aside, it doesn't matter.  We're looking at it now.  And my question is, and we'll go to the paragraph -- go to paragraph -- so I'm going to go to paragraph 80 of your report, 73, Exhibit 73.  So if you can tell me when you've gotten to paragraph 80 and had a chance to look at it.

A   Thank you.  One second.  8-0; right?

Q   Right.

A   Okay.

Q   Okay.  So in paragraph 80, you state that "To the extent that reliable evidence is introduced to show that a significant portion of the difference in artificial inflation between the purchase and sale of securities may be attributed to non-fraud related factors, the impact of such 'confounding information' on the price of CleanSpark's securities can be determined on a common, class-wide basis

Page 203

Z. BOZANIC, PH.D.

using various accepted methodologies."

Do you see where you say that?

A    I do.

Q    Based on your understanding of this case and your work on other securities matters, who do you think is responsible for introducing this type of evidence?

A    I don't have an opinion on who is responsible.  It's my understanding that in discovery information can come out that could be reviewed that would be perceived as potentially confounding information that ought to be, if reviewed and agreed to, ought to be included in the market because it has the potential to move the price as well that would distort the artificial inflation calculations.

Q    Correct.  But I guess my -- so just to confirm, you don't have an understanding as to which party, the defendants or the plaintiffs, is responsible for introducing that type of evidence?

Page 204

Z. BOZANIC, PH.D.

A    Well, again, it's usually coming from the defendants in the case, but I don't have an opinion as to where it arrives.  It could arrive from anywhere.

Q    Now, in paragraph 80 of your report, on that same paragraph, you also state that "The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation."

Can you show me anywhere in your report where you describe such a methodology to assess the value of that confounding information?

A    So again, the same answer as before, this is analysis that's usually done at a later stage.  And so I've not been retained to do this type of analysis.

Q    So, no?

A    At this point, no, I've not been retained to do this type of analysis that you suggest.

Q    Now, is it your understanding that the plaintiff's primary allegation in

Page 205

Z. BOZANIC, PH.D.

this case relate to the acquisition of ATL and the power expansion there?

MR. LINKH:  Object to form.

A    So it's my understanding that the ATL acquisition had certain omissions and misrepresentations that could be potentially relevant for an investor in terms of the history of those particular assets that were conveyed.  And there are other elements that I think are at issue as well.

Q    Okay.  So you mentioned -- can you give me an example of what would be confounding information in this case?

A    I'll give you an example of confounding information, whether or not it's relevant to this case remains to be seen.  But so let's say that you have some information where the relevant truth is revealed through some disclosure, but then something else happens.  There's a natural disaster that struck a plant where there is a facility that was producing something; right?  And so the market's

Page 206

Z. BOZANIC, PH.D.

going to be responding to both the arrival of the corrective information as well as potentially this natural disaster.

Q    Got it.  And so would news about a company that had nothing to do with the allegations in the complaint be confounding information?

MR. LINKH:  Objection.

A    Again, without the full benefit of the information in regards to the scenario that we're talking about, it's difficult to make an opinion one way or the other.

Q    Okay.  Just sent you an exhibit, which is exhibit 79, and while you're waiting to get it, I'll ask you a couple of questions.

(Exhibit 79 was marked for identification.)

Have you heard of a document called the Culper Report?

A    I have, but I'll pause looking for the exhibit then.  So, yes, I have heard of the document called the Culper

Page 207

Z. BOZANIC, PH.D.

Report.

Q    Okay.  Did you review it?  Were you given it?  It's not listed on your documents considered, so I just didn't know.

A    I don't believe that I received this document.  No.

Q    So when you were given the complaint, because it does say you were given the class action complaint, did that complaint have the exhibits attached to it?

A    I mean, I don't recollect.  I believe I received a copy of the complaint.  I don't think there were exhibits, to the best of my memory.

Q    Okay.  But you don't --

A    I would have to double check, honestly.

Q    Okay.  So now you can look for the exhibit, Exhibit 79.

A    It's still waiting to come through.

Q    No problem.  It's kind of --

Page 208

Z. BOZANIC, PH.D.

A    There we go.  Okay.

Q    So are you, I guess you could take a quick look through it.  I'll represent it's the Culper Report, but you should be able to tell pretty easy if you're familiar with it.

A    Yeah.

Q    The first question, I guess, is are you familiar with this document?  Do you recognize it at all?  I just want to know what I'm starting with.

A    Yeah.  So I have not received this document.  I have not reviewed this document.

Q    Okay.  So I'll give you a chance to review this more thoroughly if you would like to, but I didn't know if you were aware that, you know, for example, this document and -- well, looking at this document and taking as much time as you need to kind of look through it, would you say that it contains confounding information?

MR. LINKH:  Object to form.

Z. BOZANIC, PH.D.

A    I would say that's difficult to assess at the present moment without the benefit of reading the entirety of the report -- virtual connectivity interruption -- or information environment of the firm.  So that's a conclusion that I have not reached today.  It's an opinion I do not have today, nor do I offer in my report.

Q    Okay.  So can you please go to the second paragraph under where it says "Cleanspark (CLSK):  Back to the Trash Can"?

A    Sorry.  Yeah.  One second.

Q    This is on page 2.

A    Yeah.  Sorry.  It's rendering. One second.

Okay.  So I see the title CleanSpark Back to the Trash Can.  I am there.

Q    Yep.  Okay.  Do you see the second paragraph under that?

A    I do.

Q    All right.  And that talks about

Page 210

Z. BOZANIC, PH.D.

the Bitcoin, ATL, all of that stuff; correct?

A    I haven't read it.  Would you like me to read it?

Q    Yeah.  Sure.  Yeah.  Read that to yourself.  I don't know if you have to read it word for word.  But I mean, you can look at the bolded language.

A    I mean, it's a long report.  So I just skimmed it.  So if we're going to focus in on a single paragraph, I should probably read it before you ask questions.

Okay.  I've read it.  Thank you.

Q    Okay.  So it talks about the ATL acquisition; right?  It has complaints about that.

A    Yeah.

Q    Okay.  And then if you look at the next paragraph, right, and if you read that, the beginning of that paragraph, it has two pictures and then finishes up on the next page.  So if you could just look at that.

A    Starting with E, I can read

Page 211

Z. BOZANIC, PH.D.

that.  Okay.

Q     Yeah.

A     I have read the said paragraph. Thank you.

Q     Yeah.  And that, to me, seems to be, right, moving on to a second complaint?  I knew about this Valle Divino Mexico project.  So that's another complaint it has.  But that's, as I read this, appears to be a different complaint; correct?

A     I don't have an opinion on it. I would suppose that -- let me just look.

Q     It seems to be a different topic.

A     It does.  I don't -- I don't recall this being in the complaint.

Q     Yeah.  And if we go to the next paragraph, right, where it says "Similarly, in January 2020,"  If you'd take a minute to read that.

A     Thank you.  I've read it.  Thank you.

Q     Okay.  So that I don't -- I

Page 212

Z. BOZANIC, PH.D.

never -- I mean, except for reading it in this report, I'm not familiar with anything about this in the complaint or anything like that.  It appears to be different.  Is that what you're kind of reading it here, which seems to be different?

A    I would tend to agree.  These elements seem to be different than what I'm familiar with from the complaint.

Q    Right.

And so my question then is kind of, if we were to see -- look at this, those pieces of information based on what we could see now would seem to be what you're referring to when you're talking about confounding information.  Those would potentially be examples of that?

MR. LINKH:  Object to form.

A    Potentially.  But I haven't done a full review of the information environment by the firm for the case that you're specifying in terms of the analysis you want me to opine on.  And I just

Page 213

Z. BOZANIC, PH.D.

haven't done it.  And so I can't opine on something I haven't done.

Q    Well, I know you can't opine on it.  I'm just asking you just as you're reading this document here without saying, yes, 100 percent it is or isn't confounding information, just based on what you're seeing, it looks like it would be a candidate for confounding information.

MR. LINKH:  Object to form.

Is there a question?

BY MR. PARTIDA:

Q    My question is, isn't that the case that these could be candidates for confounding information?

MR. LINKH:  Same objection.

BY MR. PARTIDA:

Q    You can answer.

A    Oh, okay.  So I have no opinion one way or the other as of today.  Right? So I don't have the full benefit of reviewing the information environment. And so could they be confounding

Page 214

Z. BOZANIC, PH.D.

information?  Maybe.  Could they not be? I don't know just yet.  I have not formed an opinion either way.

Q    So I just want to confirm, though, they could be confounding information, according to your testimony just now.  Could they be confounding information?  Maybe.  That's what you just testified; correct?

A    I have no opinion either way. They could not be, they might be.  I don't know, I haven't done the review.  I have not --

Q    But they might be?  But they might be?

MR. LINKH:  Object to form.

A    Any piece of information could potentially be a confound depending upon the information environment we see it in.

Q    And I'm asking you about this specific information.  So for example, the paragraph that says "Similarly, in January 2020, CleanSpark signed a Memorandum of Understanding (MOU) with Shoreline Schools

Page 215

Z. BOZANIC, PH.D.

which analysts claim could lead to $2 million to $3 million in revenues."

Could that be confounding information?

MR. LINKH:  Object to form.

A    I'll refer you to my prior answer.  I have -- I have no opinion either way as of today.

Q    But could it be?  I'm not asking you for your opinion.  I'm asking --

A    That's what I'm telling you -- but I haven't done a full analysis yet to be able to opine on that.

Q    So it could be, though.  I understand that you're not sure.  You've made it very clear that you're not sure whether or not it actually is.  My question is different.  My question is, could it be?  And I think you've testified, I just want to be clear, several times, it could be, it couldn't be, I don't know, but it could be.  And I'm just trying to clarify, it could be.

A    Any piece of information has to

Page 216

Z. BOZANIC, PH.D.

be evaluated.  So any piece of information could be a confound; right?  Until I review, I can't opine one way or the other.

Q    So it could be confounding information, including, for example, this statement, "Similarly, in January 2020, CleanSpark signed a Memorandum of Understanding (MOU) with Shoreline Schools which analysts claim could lead to $2 million to $3 million in revenues."

That could be a piece of confounding information?

A    With respect to the particular information, given that I've not done a full review of the information environment, again I'll refer to my prior answer.  Maybe it will be.  Maybe it won't.  But until I've reviewed the entirety of the information that I have at my disposal and look at each element of information in isolation in the context of the other information in the environment for the firm, then I can opine.  But

Page 217

Z. BOZANIC, PH.D.

again, I just can't opine --

Q    But it could be -- I'm not asking.  Again, I'm not asking for you to render opinion.  I'm asking you, could it be?  An expert should be able to tell me whether a piece of information could or couldn't be confounding information.  And I'm asking you if this specific piece of information that I've read to you now three times in this report could be confounding information.

A    With respect to that particular piece of information, I don't know, as I testify here today.  However, what I said is any piece of information could be a potential confound, depending upon the setting and the circumstances.

Q    Including that piece?

A    Potentially, I don't know.

Q    Okay.  But potentially. That's --

A    That's what I'm trying to say.

Q    Now, I understand that as you've, I believe, testified repeatedly.

Page 218

Z. BOZANIC, PH.D.

But you haven't actually done any of that analysis; right?

A     That is correct.

Q     But if I understand paragraph 80 of your report, you're certain it could be done?

A     What I'm saying is that the methodology for calculation -- calculating damages is flexible enough to incorporate confounding information.  And so when confounding information arrives that I can analyze and try to understand the nature of information, then I can start to opine and decide about how the model should accommodate that information.

Q     And how do you analyze -- how do you render that analysis?  How would you do it here when it comes to something like the Culper Report that has a whole bunch of information in it that comes out at one time, leaving aside whether it's confounding, not confounding?  When you go to look at this piece of information that -- this document that has a lot of

Page 219

Z. BOZANIC, PH.D.

information in it, how would you go about doing that analysis?

A    Again, I form no opinion.  I speculated earlier in terms of when you talked about confounds, you asked for an example of respect to a confound.  Beyond that, I have no opinion today because I've not been retained.  The charge today is to look at the market efficiency for the stock, not to calculate price impact or damages.

Q    Right.  But I'm asking you, you do have as an opinion, as a specific opinion, unless you want to recant it, you do have an opinion in here that says you can do it.  You're certain of that.  And I'm asking if you're certain that you can do that analysis, how would you perform it?  I know you have --

A    Can you help me understand why you use the phrase certain?

Q    Okay.  So that's fine, that we can clarify.  So you're not certain you could do that analysis?  If you don't

Page 220

Z. BOZANIC, PH.D.

know --

A    I think you're putting words in my mouth at this point.  Okay.  What I've said is --

Q    That's what I'm asking.

A    -- the word that you keep repeating that I've used.  What I've said is it's possible.  What I've said is calculations are possible depending upon the information that arrives, and I will evaluate that information at that time, and then to see with my experience and education how I can best approach the analysis.

Q    So it's possible, but you don't know if it's possible here?

A    I have not been retained to do this analysis, therefore I have no opinions either way at the present moment.

MR. LINKH:  We've been going a little over an hour.  Is now a good time to take a break, or David, do you have a few more questions on this topic?

MR. PARTIDA:  I have a few more

Z. BOZANIC, PH.D.

questions.

BY MR. PARTIDA:

Q    So I want to point you back to paragraph 80.  So you say here, "To the extent that reliable evidence is introduced to show that a significant portion of the difference in artificial inflation between the purchase and sale of securities may be attributed to non-fraud related factors, the impact of such "confounding information"  on the price of CleanSpark's securities can be determined on a common, class-wide basis using various accepted methodologies."

And my question is, what is your basis for that opinion if you haven't done the analysis?  So I'm trying to understand, again, what is the basis for the opinion?  Because you've just spent a whole bunch of time telling me how you've not done the analysis, it's completely outside of this report, but you say it can be done.  So I'm just trying to understand what the basis of that is.

Page 222

Z. BOZANIC, PH.D.

A    What I have said is to the extent there exists confounding information at the appropriate time in the evolution of the case, if I am so retained, I would evaluate the information that I have at my disposal and see how I could best at that point in time determine how to model and how to control for the arrival of confounding information.

But absent the specific facts and circumstances, it's difficult to opine at this moment because I've not done that analysis.

MR. PARTIDA:  All right.  We can take a break.  Do you want to come back at 3:15?

THE WITNESS:  Sounds great.

THE VIDEOGRAPHER:  We're now going off the record at approximately 3:06 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are now going on the record at approximately 3:19 p.m., beginning of media unit number 5.

Go ahead, Counsel.

Page 223

Z. BOZANIC, PH.D.

MR. PARTIDA: Okay.

BY MR. PARTIDA:

Q    So Dr. Bozanic, when we left off we were talking about confounding information, what may or may not be confounding information. And I just want to confirm that you have not undertaken an analysis for purposes of this report of whether or not there's confounding information. Is that accurate?

A    So in terms of the potential for confounds in regards to price inflation, no, I have not taken any analysis.

Q    Now, when we spoke earlier, what I had understood is that the reason that that analysis couldn't be performed right now was that in order to do it, you would need additional information. Is that correct?

A    In part. I have not been asked to do it. So, in terms of in order to do it, what would enable me to do it would be asked by counsel, and I have not been asked at this point in the case.

Page 224

Z. BOZANIC, PH.D.

Q    Sure.  So clarifying that, sure, obviously, you'd have to be asked to do it.  I guess you could do it for fun.  Some people practice.  But I guess, you know, you'd have to be asked to do it, and then you would need more information; correct?

A    To the extent that more information is available in discovery, yes, I would review that.

Q    Okay.  But you ultimately would decide what would qualify as confounding information or not because you would be the expert conducting the analysis; correct?

A    I would weigh in to look for the arrival of other information that could distort the effect that I am analyzing.  That's correct.

Q    Right.  But you decide, ultimately, how the model works; correct?

A    I'm deciding in terms of how to structure the model in terms of accommodating for the arrival of this

Page 225

Z. BOZANIC, PH.D.

confounding information.  That's correct.

Q    Right.  And I guess my question is, the defendants don't come and tell you, hey, this is all the confounding information.  They might produce a bunch of other information, but ultimately, for purposes of your analysis that you do, you would decide what to treat as confounding versus not confounding information?  You would make that determination?

A    Wherever the information comes from, that remains to be seen, but once the information arrives to me, then I can look at it and review it.  Others might allege this is a confounder.  And so I would look at that information, whether others have alleged it to be a confounder or not, because I'm going to review all of the information that is at my disposal in the context of the entire information environment of the firm to truly understand the nature of the information arriving, confound or not.

Q    Right.  But then once you had

Page 226

Z. BOZANIC, PH.D.

all of that information, you would make the final determination for purposes of your analysis?

A     I would try to make sure, to the best of my ability and the model's ability, to try to partial out the confound.  Just like we talked about earlier with respect to market and the overall market and industry indices, trying to do what I can to parse out that information to appropriately and accurately gauge inflation.

Q     Right.  And that's what I'm trying to understand.  I just wanted to clarify that.  That would be ultimately what you as the expert would be doing with all of the information if you were asked to do it and you were given some additional information, you would be doing the analysis to determine how to account for it all in the model that you build. Is that correct?

A     That's correct.

MR. PARTIDA:  Okay.  So I want to go

Z. BOZANIC, PH.D.

to -- we're on Exhibit 80; correct?

THE REPORTER:  Yes, that's correct.

(Exhibit 80 was marked for identification.)

MR. PARTIDA:  Okay.  Thank you.

All right.  I just sent it.  And you can tell me -- and if you could tell me when you received this document.

THE WITNESS:  Will do.

MR. PARTIDA:  Have you received it or is it --

THE WITNESS:  Not yet.  No.  It must be another large file or the internet's slow.

MR. PARTIDA:  Well, knowing my offices --

THE WITNESS:  Here we go.

MR. PARTIDA:  -- it's probably the latter.

THE WITNESS:  Coming in.  Thank you.

MR. PARTIDA:  Okay.  Perfect.

THE WITNESS:  Exhibit 80 we're at? Yeah, Okay.

//

Page 228

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    Yeah.  Exhibit 80.  And this is one of the files we got of your backup. Are you familiar with this document?

A    I am not familiar with this document.  Let me review this.  What is this?

Q    I was hoping you could tell me because it was part of the backup files that we got from your counsel for your report.  It looks to me to be search results based on -- the bottom, it looks like it's from Thomson Reuters, and --

A    So this is I guess -- of Thomson Reuters.  I'm not familiar with this document.  I apologize.

Q    Okay.  So I take it that you have -- do you know who highlighted these reports?

A    Again, since I've not seen it, I'm not sure where this document came from.  I don't believe I turned this over. So this might have come directly from counsel?  I don't believe this came from

Z. BOZANIC, PH.D.

me.

Q    Definitely came from counsel. So maybe I'll talk with Greg offline about what it is.

But I guess, so my understanding is you don't know what it is; you don't know who highlighted this, and --

A    It looks like this is a listing from a search that was completed from a data vendor.  But again, this document I'm unfamiliar with.

Q    So I will tell you that I did do a little bit of sleuthing when I got this because I too wanted to know.  I'm usually interested in documents I get from my experts -- experts.  So I looked through this, and it appears that these correspond to the different 19 articles that you were given to review that we were then subsequently produced.  So I just didn't know, you know -- so since you don't know about this document, I'll go ahead and move off of it, other than to say, if you look at the column where it says date --

Page 230

Z. BOZANIC, PH.D.

A    Okay.   We're on the same Exhibit 80; right?

Q    The same exhibit, yeah.   If you go to the top, it says Selected TOC Title Collection Price Date.

A    I see it.

Q    And then you see like the first one, it says date 10 December 2021.

A    Yes.

Q    And we keep like scrolling down, and you could scroll through the whole thing, but I think it's in descending date order.

A    Okay.

Q    So the question, I guess I'm trying to understand is, if we go down -- bear with me one second here -- if we go down to August, so one of the corrective disclosure dates in this case is August 17, 2021.   Isn't that correct?

A    I believe so.   Yes.   If serving my memory is correct, yes.

Q    So it's also, if we go back --

A    I apologize, David.   Should I

Page 231

Z. BOZANIC, PH.D.

not be looking at this document again?  I thought we were focusing there.  I apologize.

Q    Oh, no, no, no.  You are looking at this document.  I'm pointing you to another document.

A    Thank you.

Q    So we're on this Exhibit 80. And what I'm trying to identify for you is to -- there was a corrective disclosure alleged in the complaint on August 17, 2021.  So I now want to refer you back to your report, and then I'm going to come back to this exhibit.  I only want to refer you back to your report to exhibit 6.

A    Okay.

Q    And do you see 8?  Do you see number 8 there?

A    Yes.

Q    And that's August 17th; correct?

A    I do.

Q    And that's an earnings release; right?

Page 232

Z. BOZANIC, PH.D.

A    That is correct.

Q    And that earnings release certainly, would contain confounding information; correct?  In addition to the corrective disclosure, that would be confounding information; correct?

A    Again, I'd have to look at the nature of the information and analyze that information, which I have not done yet so far in this case.

Q    But it could be.  And I'm not asking a trick question.  It could be if you were able to look at it?

A    We've had this debate, and so I have no opinion either way.  So can any piece of information be a confound?  Potentially, depending upon the review of the information environment.

Q    Okay.  And in order to review that information, that can't be done using an event study of the one that we have here; your event study, this event study, couldn't do that?

A    Can you please restate the

Page 233

Z. BOZANIC, PH.D.

question?  I'm sorry.

Q    If I understand your testimony from throughout the day or earlier, your event study, it would be tricky to use that event study to be able to analyze the confounding information if you were asked to analyze it?

A    So the conversation that we've had is when information all arrives at the same time.

Q    Right.

A    This is where the event study has some problems in terms of differentiating if all that information arrives at the same exact second, which information was being reacted to.  And so this is analysis for later stages of the case, potentially, when we start to look at who in the market started to analyze information, what information do they glom onto, what were they citing in terms of the reasons to change their opinions.

Q    Perfect.  Okay.  That's my understanding.

Z. BOZANIC, PH.D.

So I want you to go back to Exhibit 80 now.

A    Exhibit 80.  Okay.  I'm going there.  One second.  I'm there.

Q    Okay.  And if you look, there aren't any August analyst reports.  So --

A    I'm sorry.  Can you restate that?

Q    I'm looking between 15 and 16.

A    Okay.  Hold on.  I'm going there.  Okay.  I'm with you.

Q    Right.  And then there's no August 17 report; right?  If you keep going up and you start looking at the August reports that you'll see there.

A    I'll take your word for it that this is in chronological order, and so it would appear to be the case, I think.  Yes.  No, you're saying there are no reports in August of 2021, looking between --

Q    No, there are no reports on August 17.  If I said August 2021, I misspoke.  It's August 17 of 2021.

Page 235

Z. BOZANIC, PH.D.

A    I'm going to take your word for it, but I believe it looks to be the case that this document doesn't refer, at least in those rows that I'm looking at, to anything in regards to August 17th, 2021.

Q    Right.  So what I'm trying to understand then is -- I understand that you've not been asked to do it in this case right now.  I understand that there would have to be additional information. I'm trying to understand process-wise.  We have a whole bunch of news that was released all at the same time because it was in an earnings report, and that was released on August 17th.  That report contains a ton of information in it, whatever the earnings release contains; right?  Is that correct?

A    Well, a couple of points.  So one, I just want to clarify.  I scrolled back up on this document that we're looking at with regards to Exhibit 80, and so I'm looking at the dates.  And so there's an August 16th report and an

Page 236

Z. BOZANIC, PH.D.

August 18th report. But so in regards to the earnings release, a ton of information is concerning for me. So I don't know what a ton of information is. There's a lot of -- right?

And so again, until I've analyzed that "ton of information," I'm not quite sure what to do with it. And as I've said, I've not been retained. So I'm trying to do my best to detail the process for you. But also, I can't say today in terms of an opinion as to whether or not the questions you're asking, I formed an opinion on because that wasn't my charge from counsel today.

And so at a later date, I'm happy to answer these questions to the extent that I've done that analysis as requested by counsel. I just haven't done it. And so I keep feeling like I'm saying the same thing to you, where you're asking questions of analysis I haven't done, and I wish I could speak to them, David, but I just can't.

Page 237

Z. BOZANIC, PH.D.

Q    Right.  So I guess what you're not understanding is you do have an opinion in your report that says it can be done.  And that's important.  Because whether or not it can or can't be done is an issue that we have.  I don't think it can be done.  And I don't think that you've provided any statement in this deposition that shows it can be done.  And what I'm trying to understand is the process that you would go about doing it.

And so if you were to do the analysis -- so for example, we have a situation here where there's an earnings release, based on your testimony at the beginning of this deposition, earnings releases contain different pieces of information.  Can we agree on that basic point?

A    We can agree.

Q    Okay.  To the extent that you had to do an analysis as to whether or not any of the information in that earnings release was confounding; right, you would

Z. BOZANIC, PH.D.

have to look at analyst reports.  That's what you've testified, because it all came out at the same time.

A    That is one element that I could look at.  You could look --

Q    What else could you look at?

MR. LINKH:  Object to form.

A    Look at media articles as well.

Q    Okay.  So you'd have to look at some sort of articles because you have to understand how the users are looking at the information?

MR. LINKH:  Object to form.

A    David, once I'm presented with the information through discovery, once I am asked to do a full review of the information environment, then I can start to look to see what is the media saying? What are analysts saying?

Q    Right.

A    What information are they speaking about?  And so again, I haven't been retained to do that yet.  And so I apologize, but I just, I can't opine and

Z. BOZANIC, PH.D.

answer a question where I've not done the analysis.  And so I don't have the benefit.  I appreciate your certainty.  I don't have the benefit of that certainty just yet because I don't have the full information available to me.  So if you're able to do that, that's fantastic.  I can't yet today.

Q    Yeah, but you have stated with certainty that it's your opinion it can be done.

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    That's not your opinion?  So is that your opinion or is that not your opinion?  You stated, and I read to you in paragraph 80, where you stated with certainty it can be done.

MR. LINKH:  Again, object to form.

BY MR. PARTIDA:

Q    Great.  Let's go read it.  Let's go back to the report and let's read paragraph 80.  We'll read the sentence again.  Paragraph A-29.  And you guys can

Page 240

Z. BOZANIC, PH.D.

tell me if I've made a mistake.

It says, paragraph 80, "To the extent that reliable evidence is introduced to show that a significant portion of the difference in artificial inflation between the purchase and sale of securities may be attributed to non-fraud related factors, the impact of such "confounding information"  on the price of CleanSpark's securities can be determined."  You say it can if you're given that information; correct?

A    You are correct.  So rather than use the word certainty, I do in paragraph 80 use the word that can in the presence of information.  So I can make an assessment once given the information as to what is possible.

Q    So can --

A    And so that would likely include analyst reports; it would likely include media stories.  And so, you know, we've talked about an analyst report and what analyst reports are or not issued around

Page 241

Z. BOZANIC, PH.D.

this particular earnings release.  We haven't reviewed the media, nor have I. And so I haven't taken an individual assessment as to what stories came out, what the what the journalists were reacting to from this story.

Q    So how do you do it when there are no analysts or media reports?

A    Again, once I have reviewed the specific facts and circumstances of a case, then I can make an opinion.

Q    I'm telling you the fact.  I'm telling you to assume the fact.  Assume the fact -- assume, as a fact, that there is not a single media report or not a single analyst report released about the company that day, the day of the earnings report.

A    I would appreciate being able to respond fully before being interrupted, but I didn't honestly hear your question because I was still trying to talk.

Q    Okay.  So you could finish your previous answer.  Go ahead.

Page 242

Z. BOZANIC, PH.D.

A    I don't remember what I was talking about at that point time, so because of the interruption, I lost my train of thought.  So if you could restate your question I'll re-answer the question.

Q    Got it.  Well, I'll ask a different question because you really weren't answering my question.  So my question is quite simply, look, if you have a date where there's information like an earnings release, and on that date there are no media reports, and no analyst reports, how would you go about measuring whether or not there is confounding information in that report, in that earnings release?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    So I'm asking about -- I'll ask about a specifics earnings release. There's the earnings release on August 17th, 2021.  How would you determine whether or not there is confounding information in that specific report which

Page 243

Z. BOZANIC, PH.D.

you are familiar with?

A   I would have to undertake an analysis of the information environment of the firm as a whole.  Look at all the arrival of information around the earnings release to understand.  Now, in terms of measuring, we keep talking about measure, we've already talked about the limitations of event studies with what they can measure when you have the simultaneous arrival of different pieces of information.  And then so therefore you have to look for corroborative evidence outside of the event study.

So procedurally I've already asked -- I've already answered the question.  In terms of the specific facts and circumstances, I'll repeat the prior answer where I don't have an opinion unless I'm given the information to review and I'm given the opportunity to analyze whereby I can make an assessment.

Q   So --

A   Hypothetical upon hypothetical

Page 244

Z. BOZANIC, PH.D.

upon hypothetical, which makes answering the question very difficult.

Q    I mean, you're the one who gave the hypothetical in the report that says you can do it.  So I'm just asking you to give me the support for your hypothetical. So I don't know what you want me to do about that.  I didn't write your report.

But I guess the question -- so basically what you're telling me, what I understand your testimony is, is that your opinion really is that it's theoretically possible to account for confounding information depending on facts and circumstances.  Is that correct?

A    Depending upon the facts and circumstances, I will evaluate what I have at my disposal and then I'll make a determination.

Q    So it's theoretically possible? That's it.

A    It's not that that's it.  There is a procedure.  There is a process. There are best practices in terms of

Page 245

Z. BOZANIC, PH.D.

trying to provide corroborative evidence that I've not been asked to provide at this point in time.

Q    And how would that process -- so maybe I'll ask it this way.  If there was no other information other than the earnings report, right, is it your position that there would be no confounding information in that earnings report?

MR. LINKH:  Object to form.

A    Again, the nature of the question is difficult to answer because there's so many facts and circumstances being omitted where you're having this very much corner solution hypothetical to answer.  And I don't know until I have seen the information at my disposal, then I can make an opinion.

Q    So then how are you certain you can do it?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    How can you say this sentence

Page 246

Z. BOZANIC, PH.D.

that I can do it?  I don't understand.
I'll be frank, it sounds like double
speak.  On the one hand, you say, listen,
I can do this calculation.  And then on
the other hand, when I say, Okay. how?
You say, I can't do the calculation, I
don't have the facts and circumstances, I
have no idea.

So then I ask, okay, is your
opinion that it's only theoretically
possible that this could be done?  You
say, no, it's more than that.  And I'm
understanding how is it more than that?
Because you've just told me that you
didn't do any of the facts or research or
analysis.  So I'll go back to my same
question.  What is the basis for your
opinion that it can be done?

A    The basis for my opinion is in
the presence of information that I can
review, where I've been asked to review
the entire information environment of the
firm, I can start to opine on what
elements of information arrive when,

Page 247

Z. BOZANIC, PH.D.

whether they were simultaneous, whether they were not, and how market participants responded to those.  And then I can make that determination at that point in time when I'm so asked.  I have not made an opinion today, nor am I offering an opinion with regards to price impact.  The focus of today and the focus of my report today is on market efficiency.

Q    Right.  But I'm talking about a different part of your report.  I'm talking about the part of the report where you say you can do more than that, where you say that you can calculate this, that it can be determined on a common class-wide basis using various accepted methodologies.

And my point is either -- so my question is, if I'm understanding your testimony correctly, is it your testimony, your opinion is that it's only theoretically possible that CleanSpark's securities can be determined on a common class-wide basis?  You don't mean that

Page 248

Z. BOZANIC, PH.D.

with any certainty --

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    -- you just mean it can be done?

A    So the word, the appropriate word is can be.  So I've not said certainty.  This is a word that you keep using.  In other words --

Q    Right.

A    It's a word that you keep putting in my mouth.  So what I'm saying there is that there is a process that can be applied to try to disentangle the arrival of different forms of information. And that's what I'm telling you.  You ask for process.  I've told you the process. And so absent additional information, there's not much more that I can say.  I can't form an opinion on analysis that I've not done.

Q    It can be applied.  Great.  And again, I'm not asking you to, but you're saying that there is a process to do it. And you're saying that that process

Z. BOZANIC, PH.D.

involves looking at analyst reports and media reports.  Isn't that correct?

MR. LINKH:  Object to form.

A    In part.  I need the benefit of discovery for any other information that might be protected that could come up.

Q    Great.  In part.  And so I'm asking you, what if there is no information that's available for that date?

A    I have no opinion at the present moment.

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    I'm asking you, how does the process work in that situation?  How does the process work in a situation, okay, where you say this can be determined on a common class-wide basis.  I would have to have a lot more information.  And I'm saying in a world where there was no more information, in a world where there were no analyst reports, in a world where there were no media reports, like August 17th,

Page 250

Z. BOZANIC, PH.D.

okay?  In a world like that, how would the process work?  Does that process still work?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    When there's no other news to look at.  If there's no other news and no media reports, what process would you use?

A    Once I had the benefit of discovery, I can answer that question.  So the hypothetical is very removed from reality.

Q    So you're saying that there's no realistic situation where -- there's no situation in which you would be unable to calculate the impact of confounding information.

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    Is there any --

A    That was not what I said.  I've not said that, and it's not written in my report.

Q    Okay.  Is there a situation

Z. BOZANIC, PH.D.

then -- you said CleanSpark's securities can be.  Which situation would it not be possible?

MR. LINKH:  Object to form.

A    I have not formed an opinion either way.

Q    Well, you just formed the opinion that it's not certain that it only can be.  So that's only possible.  So if it's only possible, then you must have in your mind a situation where it's not possible.  And I'm asking you, what's that situation?

MR. LINKH:  Object to form.

A    I appreciate that.  But again, I have not formed an opinion either way at this point in time.

Q    Okay.  So then again, what is the basis for your opinion, therefore, that CleanSpark's securities can be determined on a common class-wide basis?

A    Again, there are common approaches and methodologies that can be applied to be able to quantify the level

Page 252

Z. BOZANIC, PH.D.

of artificial inflation inclusive of the presence of confounding information.  And to the extent I'm asked to do that analysis and I receive that information in discovery, then I can go ahead and proceed to do such analysis.

Q    But how is it possible that it can't -- I'm asking, is there any circumstance where it's possible that it wouldn't be able to be done after you had looked at all the facts and circumstances?

A    I have not formed an opinion today either way.

Q    You as an expert economist are sitting here telling me today that you don't have the ability to tell me whether or not, if you were to look at facts and circumstances of a case, you wouldn't be able to tell me whether or not you could measure the impact of the confounding information?

MR. LINKH:  Object to form.

A    What I said is upon the ability to review said information, then I can

Page 253

Z. BOZANIC, PH.D.

render an opinion.  Because I have not had the ability to review said information, I have not rendered an opinion.

Q    And I'm telling -- and I'm asking you to assume there is no more information.  Would you be able to do it if there was no more information?

A    And my response is I have no opinion on that particular question with the hypothetical that you so illustrated.

Q    So --

A    As formed in this report.

Q    So your opinion as stated in this report is that you are sure that, to the extent reliable evidence is introduced to show that there was confounding information, you would be able to determine it on a common class-wide basis.  That's what paragraph 80 says; correct?

MR. LINKH:  Object to form.

A    To the extent you read it verbatim, yes.  I didn't -- I didn't monitor to see whether you read it verbatim or not.  I apologize.

Page 254

Z. BOZANIC, PH.D.

Q    But you can't tell me how you would do it in this case because you haven't looked at the facts and circumstances?

A    I apologize.  I feel like I'm repeating myself.  But at the present moment, right.  And when I have the rest of the information that could be at my disposal, then I can make the appropriate determination at the time.

Q    And I'm just saying, what are the scenarios in which that situation you would say, I can't figure out; I really cannot measure whether or not there's -- I can't untangle this.

MR. LINKH:  Object to form.

A    When that scenario presents itself, then I would opine accordingly. If I find myself saying this analysis cannot be done for whatever reason after I have reviewed the facts after I've been asked to do that, then I would render the opinion.  But I don't know because I haven't done the analysis, and so I have

Page 255

Z. BOZANIC, PH.D.

no opinion to render.

Q    Perfect.  Exactly.  You keep saying that.  And again, I'm not asking you to render an opinion on it.  I get that you don't have an opinion on it.  That's obvious.

My point is, and the question that I'm trying to ask you is you say, when that situation presents itself then I'll come to the conclusion.  What hypothetical situation is in your mind?  In what situation would it not be possible?  What situation?

MR. LINKH:  Object to form.

A    You seem assured of an instance for me to come up with of a hypothetical.  And I've not gone through the permutations of all hypotheticals as to when something would or would not hold because it's wholly irrelevant until I've reviewed the information.

Q    Great.  I understand that.  Again, you're a smart guy.  I can't take other than its intentional evasion at this

Page 256

Z. BOZANIC, PH.D.

point.  But the point is, and I think you probably know as well as I do, when you testified as far as I understood it that you said when the eventuality presents itself, then I'll be able to tell you.

Well, that presupposes that there is an eventuality you're thinking about.  So you were the one who testified that you said, okay, well, after looking at the facts and circumstances when I was faced with that eventuality, then I would do it.  And I'm asking, is there any situation in the world where you would not be able to render this opinion at this point in time?

MR. LINKH:  Object to form.

A    You seem insistent that I have a hypothetical in my head that doesn't exist.  So I don't understand this line of questioning because you keep saying I have something in my head that I'm not disclosing.  Couldn't be farther from the truth.  Again, I'm not going to render an opinion without the benefit of full

Page 257

Z. BOZANIC, PH.D.
information.

Q    Right.  And I understand that. What I'm keep going back to is you do render an opinion that you say CleanSpark's -- the price of CleanSpark's securities can be determined on a common class-wide basis.  How?  You still can't tell me how.  All you can tell me is I can do it, but I can't tell you how.  Other than you said I can look at analysts or news reports.  We've looked at the day where there are none.  So I'm just asking how you could do it.

A    I already gave you an example where I can disentangle confounding information --

MR. LINKH:  Object to form.

A    -- it arrives at different parts of the day.  So there are elements, statistically speaking, where you can disentangle confounding information, that is more common.  To the extent that there's information that's confounding that arrives at the same time, then we

Page 258

Z. BOZANIC, PH.D.

have to go to corroborative evidence, as I've discussed.

Q    Correct.  And what happens when there is no corroborative evidence one way or the other?  You can't do it with that model then, can you?

MR. LINKH:  Object to form.

A    As I said, there are limitations to the event study model whereby it can't speak to certain conditions.  We've already elucidated those.  And I've already also said where I would go to speak to it.

Q    Right.

A    Now, I haven't encountered a case where there's no information whatsoever on the firm existing in the entirety of the world.  And so when I encounter that case, I will analyze it properly and then I will opine on it at that point in time.

Q    And if you did encounter that case, though, you suspect that you wouldn't be able to do it?

Page 259

Z. BOZANIC, PH.D.

MR. LINKH:  Object to form.

A    I have no suspects because I can't speak out of turn until I've done analysis.  It would be inappropriate.

Q    Well, again, how can you say that you can do it if you haven't done the analysis?  How is that a truthful statement if you sit here and say, I can do analysis, but I can't tell you that I can do it because I haven't done it?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    Those both can't be true.

MR. LINKH:  David, this is getting a little bit argumentative now.  If you can --

MR. PARTIDA:  Are you going to instruct him not to answer?

MR. LINKH:  No, I'm just pointing that out for the record.

MR. PARTIDA:  And I will point out for the record as well, you've been in depositions where witnesses are evasive and you know exactly what's happening

Page 260

Z. BOZANIC, PH.D.

here, Greg.  I'm asking very straightforward questions.  I've asked very simple, factual questions that this witness is refusing to answer on any sort of kind of proper basis.

This entire exercise has been an exercise in obstruction, and I get it. But the questions aren't being answered. There's very simple, factual questions that have been established that this gentleman is arguing with me about.  And so all I'm trying to do is make testimony that's clear on here, and I'm trying to explain the background of exactly what I'm asking.

But, you know, in terms of when I ask a specific question that says CleanSpark's securities can be determined, is that the truth?  And he says, well, no, I can't tell you because I haven't looked at it. I don't understand.

MR. LINKH:  You're asking inappropriate and, you know, inappropriate hypotheticals here, whereas this is

Page 261

Z. BOZANIC, PH.D.

common -- out of all the issues here, this is a common issue that experts always take a look at confounding information, and they determine whether or not there is, you know --

MR. PARTIDA:  So I'm going to actually ask you to stop.  I'm going to ask you to stop.  You made your objection.  I'm not going to tolerate speaking objections, and I'm certainly not going to tolerate coaching of the witness.  So you've stated your objection.  It's on the record.  Unless you're going to instruct him not to answer, then I'd prefer you to keep your objection to the stated objection and move on.

So is he going to be instructed not to answer?

MR. LINKH:  Dr. Bozanic, you're welcome to answer whatever the previous question was.

MR. PARTIDA:  Thank you.

Can you read back the question, Ms. Court Reporter?  Well, you know what?

Page 262

Z. BOZANIC, PH.D.

I'll withdraw it.  I'll withdraw it.

THE REPORTER:  Okay.

BY MR. PARTIDA:

Q    Why don't you go back to Exhibit 73, which is your report?  And can you tell me when you have it up.

A    I have the hard copy of my report in front of me.

Q    Perfect.  Can you go to paragraph -- yeah, can you go to paragraph 15?

A    I am there.  Would you like for me to read it?

Q    Well, it says there, correct, that it says, "The Complaint alleges that the truth regarding the ATL acquisition and CleanSpark's projections relating to the ATL expansion project was partially revealed, and/or the concealed risks materialized, on or about:  January 14-15, 2021, February 12, 2021, and August 17, 2021."

Is that correct?

A    Yes.  That's an accurate reading

Page 263

Z. BOZANIC, PH.D.

of that statement.

Q    What are the risks that, according to your understanding, the plaintiff alleges were concealed?

A    So the concern that I would start to highlight is with regards to the attractiveness of this acquisition and lack thereof; right?  So you had the potential for this acquisition to occur with another company that was looking to acquire these assets.  And this company chose to -- cost advantage power agreement with the municipality had a limited duration.  And in order to get the operation up to snuff, that contract would run out very quickly.  And therefore, they wouldn't be able to take advantage of those cost advantage rates.  And so that materially impacts the overall profitability of the Bitcoin mining operation.

Q    What specific risk materialized on January 14, 2021?

A    So this is in regards to the

Page 264

Z. BOZANIC, PH.D.

Culper Report and the associated tweet that followed it on the 15th.

Q    I'm asking about January 14th. And I'm asking what specific concealed risk materialized on that day?

A    So here in terms of the Culper Report on the 14th, there were several allegations in that report.

Q    And you were not familiar with the Culper Report when you did this report.  That's correct?

MR. LINKH:  Object to form.

A    That's correct.  I was just -- the complaint.

Q    Okay.  So how do you know what concealed risk materialized on that day?

A    So again, I take counsel's claims at face and then I analyze at the face of what is said on the complaint, and so I'm relying on the complaint in terms of the allegations.  And part of those allegations in regards to the quality of the assets at the facility, the ATL facility, and whether or not it be

Page 265

Z. BOZANIC, PH.D.

economically viable to do the expansion as intended, and to do so at cost advantaged rates.

Q    And what is the event, or when did that materialize on January 14 --

A    I'm sorry.  I don't understand. What do you mean when did that materialize on January 14?  The report is published on January 14, so the risks in terms of the revelation of the risk would be from that report.

Q    Now, do you agree that -- what was the materialization of the risk that happened on January 15th?  What risk, what specific risk materialized on January 15th that hadn't already materialized on January 14th?

A    I appreciate the question.  So the 14th is the report of January; the 15th is the tweet.  And so here in the tweet, one of two things would be occurring.  So one, it would be the duplication of information in that report, and then the farther reach of that

Page 266

Z. BOZANIC, PH.D.

particular tweet to other investors who might not have been privy to the report from the prior date.

Q    But I guess I'm understanding, what I'm trying to understand is, how is that a new risk materializing?  Isn't that just further dissemination?  It's not a new risk materializing.

MR. LINKH:  Object to form.

A    Correct.  I appreciate the point.  There's a nuance insofar as the investor that receives that information, that risk would have materialized for that investor upon the receipt of that information.

Q    Right.  And could I ask if you have an efficient market, isn't one of the tenants of an efficient market theory that information is instantaneously absorbed into the market?

A    Well, there are several forms of market efficiency, and that is one view.

Q    Which is the view you're espousing here in your report?

Page 267

Z. BOZANIC, PH.D.

A    So here I'm espousing informational efficiency in terms of the arrival of new information being impounded into price.  This is reflective of informational efficiency, not necessarily reflective of fundamental efficiency.

Q    And what concealed risk materialized on February 12th, 2021?

A    So let me go ahead and refresh myself with this paragraph, but I believe this is one of the earnings announcements with regards to discussing the delay.  Let me just see.  You're referring to the February 12th date; right?

Q    Yes.

A    Okay.  So the disclosure was in regards to the timing of the operation ability of the new facility, whereby it was originally slated to be completed by April of 2021.  But in this particular disclosure, they started to extend the deadline in terms of the potential completion of the facility to get it up and running.  So the farther out those

Page 268

Z. BOZANIC, PH.D.

profits to be realized, the lower the value of the firm if we can't start to get the cash flows to come in for the firm.

Q     But isn't it true, and I guess we could go back and look at the exhibit if you want to, but isn't it true that if we go back to -- this is Exhibit 78.

A     78, I'll catch up to you when we find it.  Taking a minute to render.  Hold on.  Okay.  Yes, I have Exhibit 78 back open.

Q     So even going back to the day after the December 10th acquisition announcement, this is the report that we read where it says targeted by April 2021, but then it also discloses during the next several quarters, in line with this during FY22, we are projecting capacity to reach 49.5.

If we're talking about February 12th, I guess is what concealed risk materialized?  I guess I understand that the timeline was pushed back from April 2021.  I get that.  So I get that that's

Page 269

Z. BOZANIC, PH.D.

what was announced.  I guess what I'm trying to understand is how is that a concealed risk that materialized?  Because it seems like we have a document from the day months before that discloses it.

MR. LINKH:  Object to form.

A    I'm not sure what you mean by the document months before discloses what?  Can you clarify?

Q    Oh, sorry, sorry, sorry, sorry.  Yeah, yeah, yeah.  So we have this H. C. Wainwright report dated December 11th.

A    Right.

Q    And this H. C. Wainwright report that's dated December 11th?

A    Yeah.

Q    Is two months before February 12th, 2021.  And when I just previously asked you what was the risk that materialized, or the concealed risk that materialized on February 12th, 2021, then my understanding was that you looked back at that, and they pushed the timeline back, and that that's the risk

Page 270

Z. BOZANIC, PH.D.

materialized.  Do I have it correct so far?

A    Right.  So this is part of the story.  So I got confused here is then we went to this analyst report, and so it was unclear.

Q    And so -- right.  The analyst report.  Correct.  What I'm saying about the analyst report is that we looked at sentences in this analyst report where it does disclose that the plan to increase; right?  I'm reading where it says "during the next" -- under "Bitcoin mining to be scaled immediately,"  we went kind of down to the middle of that paragraph.  It says "During the next several quarters, the company is planning to increase the capacity from the current 9.6MVV, operating at approximately 190PH/s, to 50.0MVV, operating at approximately 900-1,400PH/s.  In line with this, during FY2022, we are projecting capacity to reach 49.5MVV, operating at approximately 985PH/s and generating 6.16 bitcoins per

Page 271

Z. BOZANIC, PH.D.

day."

And the reason -- I'm trying to understand what concealed risk materialized is that I -- to me, I understand this H. C. Wainwright report to have already been disclosing the risk that the timeline might not -- the power might not be completed until FY2022.  So what I'm trying to understand is, do you agree with that?  Do you think -- because when we just previously talked about market efficiency absorbing information into the market, you know, instantaneously certain end investors might receive it at different times.

But my point is, what was concealed about the risk that materialized on February 12th?

A    Sure.  So it's my understanding, if we go back to the analyst report, that the analyst is parroting what management was saying in terms of their expectations for when the facility would be online, which it's very clear in this report.  It

Page 272

Z. BOZANIC, PH.D.

says in parentheses "targeted to be completed by April 2021." And so the materialization of the risk in terms of when truth got to -- when truth started to come onto the market was this delay is indicative, and investors would be very concerned by the delay; this is indicative of potential problems.

Now, we had the benefit of some hindsight. We had the benefit of some discovery to look and to say, it appears as if the contracts are not in place, the permits were not in place to be able to do the said expansion that was promised. And so, if we look back to the complaint, there are employees that discuss how the timeline was very unreasonable. And so to the average investor, this information is worthwhile to have because this is going to delay the realization of potential profits.

And so, as soon as the Bitcoin miners get online, as soon as they start consuming some energy, potentially revenue

Page 273

Z. BOZANIC, PH.D.

could be generated that's beneficial for investors in this stock. And so if we have to delay the massive expansion that was promised from 20 to 50 megawatts for any sort of time, this is going to reduce the value of the firm.

Q So I get all that. And a lot of that's not in the report. I'll just note, although we could walk through that and choose which, I guess you could choose which of those opinions you want to adopt unless you don't want to.

But my point is, when you say that sure, extending the timeline would be important to investors, obviously, we all agree on that. What I'm asking about is, how did that materialize on February 12th, 2021, when it was already disclosed in the January 15th tweet that we just talked about, which had to do with the timeline and the -- projects; it's already disclosed in January 14th, and it was already disclosed in this report back in December 11th, that they were projecting

Page 274

Z. BOZANIC, PH.D.

it to be done in FY 2022.

MR. LINKH:  I'm going to object --

A    Yeah, there's a lot you just said there.  But this is the first time the firm is coming up and saying, we originally said April 2021, now we're going to have to push back to the summer. And so the investor is looking at this report -- if the firm itself, if the executives of the firm are saying this, right, chances are it's going to come to fruition that there's going to be some delay.

And so, now the investor can take it at the word of the firm to say the firm now before they gave us estimates, changing the estimates, uncertainty increases, timing increases, lots of issues increase here in terms of the impact for investors in terms of their investments.

Q    So the difference is one was stated by management and one was not?

A    Well, again, the analyst report

Page 275

Z. BOZANIC, PH.D.

also indicates April 2021.  The analyst report you've identified.  The tweet is talking about the potential for issues underlying the acquisition and the potentiality that it could have on the value of the firm, or the potential impact it could have on the value of the firm.

Q    Okay.  So can you point to me the language of the February 12th disclosure that's the specific language that's the materialization of the risk?

A    I'm sorry.  Point to which language where?  What are you looking for? I apologize.

Q    You said on February 12th, 2021, there was a concealed risk that materialized.

A    Which paragraph of my report are we looking at?  Can I refer to that first?

Q    Paragraph 30 -- or sorry, paragraph 15.

A    15.  Right.  So the concealed risk -- I see that concealed risk materialized.  And so if I'm hearing you

Page 276

Z. BOZANIC, PH.D.

correctly, you're saying that the materialization of risk occurred in a different date. And so what I'm saying is that in terms of the firm speaking to the materialization of risk, that February 12th disclosure is the first instance that we see the firm, after touting the April 2021 expected timeline, saying we're going to have to push this out until the summer. That's my understanding of what the complaint says and what these earnings --

Q    Right. And that's if we go to paragraph 16; correct? That's what you're talking about?

A    I'm sorry. I was on paragraph 15. Let me go to 16.

Q    Yeah.

A    Okay. Yes, I've looked at 16.

Q    Okay. Now, are you sure that that's the first time that that information was publicly disclosed, or are you just understanding it from the complaint?

A    I'm understanding this from the

Page 277

Z. BOZANIC, PH.D.

complaint.

MR. LINKH:  Object to form.

A     So this is my understanding in terms of this particular earnings release being the disclosure of the firm to expansion delays.

Q     If the CEO of CleanSpark, Zach Bradford, had said on January 5th publicly that he did not anticipate the project, the expansion project, would be completed until mid-July, would that change your opinion as to whether or not this February 12th disclosure actually represents a materialization of that risk?

MR. LINKH:  Object to form.

A     Again, I'd have to review it. But if you're saying there was information in the public sphere that said the exact same thing that preceded this, then what you're arguing is that the risk could have materialized earlier on the basis of what the CEO had said.

Q     I'm asking, is that the case? In terms of the analysis, what I'm trying

Page 278

                    Z. BOZANIC, PH.D.

to understand is if the identical
information was disclosed earlier and that
information is redisclosed on a later
date, the later disclosure is not a
materialization of that risk because that
concealed risk would have already
materialized the first time it was
disclosed.  That's what I'm trying to
understand.

          MR. LINKH:  Object to form.

     A    I think that could be the case;
right?  But now the concern would be is
how wide-reaching are these comments?  And
so it's one thing for the CEO to publicly
say it to a few people; it's another thing
to distribute it widely through all the
press circuits and the press.  Obviously,
a press release gets distributed to a wide
swath of people.  And so that
materialization of risk, more broadly
speaking, the public market may take some
more time on the basis of the choice of
how it was disclosed.  And so an earnings
release would reach a very large swath of

Z. BOZANIC, PH.D.

investors very quickly.

Q    So if it were stated in a call following an earnings release, you'd consider that pretty broad spread, wouldn't you?

MR. LINKH:  Object to form.

A    Yeah.  An earnings call itself would be --

Q    -- throughout --

A    I'm sorry.  I missed that.  Is there a question or comment?  I'm sorry, I missed something.

Q    Go ahead.  You can finish your answer.

A    No, obviously, so if you have an earnings call after an earnings announcement, that would also be widely followed by market participants.

Q    Yeah.

THE WITNESS:  I think we're coming up on an hour.  So when we're ready with this -- when we're done with this line of questioning, a rest break would be nice.

MR. PARTIDA:  Yeah, that'll be

Page 280

Z. BOZANIC, PH.D.

perfect.  Why don't we come back at 4:25?

THE WITNESS:  About ten minutes.
That sounds great.  Thank you.

THE VIDEOGRAPHER:  We're now going
off the record at 4:15 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We're now going
back on the record at approximately 4:27
p.m., beginning of media unit number 6.

Go ahead, sir.

MR. PARTIDA:  Okay.

BY MR. PARTIDA:

Q    All right, Dr. Bozanic, I think
this is going to be pretty much.

THE WITNESS:  Was the internet slow
for you guys there for a second?
Everything froze up on my end.

MR. PARTIDA:  Oh, maybe mine did.
But --

THE WITNESS:  Okay.  Yeah, I've got
fiber optic, so there shouldn't be an
issue on my side.

MR. PARTIDA:  Yeah, I hear you now.

THE REPORTER:  -- little sketchy,

Page 281

Z. BOZANIC, PH.D.

actually.

THE WITNESS:  Okay.  Thank you.  It froze just for a minute.  I don't know if you guys saw the same, so.

MR. PARTIDA:  I did see it, but we seem to be okay now.

THE WITNESS:  I think so.

BY MR. PARTIDA:

Q    Okay.  So I want to go back to Exhibit 80.

A    80, okay.

Q    And that's this list of all these --

A    Opening it now.  Okay.  I have it open.

Q    So this is the exhibit we looked at earlier where you're not familiar with this document, but I just wanted you to have this in your mind when we go back to your report, because I want to look at exhibit 3 of your report.  So I just wanted you to have this document in your mind and we can go back to it if you need to.

Page 282

Z. BOZANIC, PH.D.

A    Thank you.

Q    So you could tell me when we're at exhibit 3.

A    I have it.  Thank you.

Q    Okay.  I see here below.  It says "Source:  Counsel, LSEG Refinitiv." Do you see that?

A    I do.

Q    Did you make this exhibit 3 or was it sent to you by somebody else and you added it to the report?

A    I made this exhibit.

Q    So what is the source of the information in it?  Where did you pull that information to -- I'm trying to understand where you got the 41, where you got these breakdown of numbers.  Because I had assumed, frankly, and this is why I wanted you to have the other document in your mind, because Thomson Reuters is Refinitiv.  This is why I was confused when -- anyways, I'm just, I had thought that this document, Exhibit No.  80, was the source of the data and information in

Page 283

Z. BOZANIC, PH.D.
exhibit number 3, but then you said you'd never seen this document.

And then I looked at exhibit 3, and I thought how would you make that without this?  And so then it said provided by counsel and Refinitiv, which is Thomson, so I had assumed that maybe counsel had just done you a favor and done the chart and send it to you.  That's why I asked.  But now that that's not the case, I want to understand where you did get the data and information to put into this exhibit 3, particularly since you don't have the reports.  So how did you make the exhibit?

A    Yes.  So I made the exhibit, excuse me, on the basis of the reports that counsel did provide.  And then by also querying the database listed for any additional reports.  And so after querying the database, additional reports were identified.

Q    And you went in and queried the database Refinitiv, and so that's why it

Page 284

Z. BOZANIC, PH.D.

says Counsel semicolon and then Refinitiv, where you went into and looked at it because counsel gave you certain of the reports, you identified additional ones through your searches, and then you made that exhibit?

A     That's correct, yeah.

Q     Okay.  Now, I understand.

A     Pardon the confusion.

Q     No, no, no.  This is why I ask these questions.

Looking through, give me one second.

A     Sure.

Q     Now, you said you went in and did the searching on Refinitiv or ran that query.  Is there a reason why that list of reports, like the list of them, wasn't included in your report?

A     I don't believe there's any reason why it would be excluded.  I don't think that I created that listing that you see somewhere from counsel.  It was just retrieving the number of reports that

Page 285

Z. BOZANIC, PH.D.

existed.  But let me just -- I don't think anything was sent over in turnover in regards to a listing similar to what you would have seen from counsel, and I think that's what you're asking.

Q    Okay.  That's what I guess I don't understand because I don't work with the interface that you do to look for these articles.  So I didn't know if it prints out like a list, here are the 97 we identified like that, or if it just gives you a number or how it works.

A    I believe that's something, Greg, we can provide at some point if requested.

Q    Okay.  We might request that. So now I understand that.  Okay.

And then the last thing, the last really, if you want to call it set, but the last question I have here is if you can go back to Exhibit 80.

A    Exhibit 80.  Yes.  Trying to get there.  Let's see here.  I am there. Thank you.

Page 286

Z. BOZANIC, PH.D.

Q    Okay.  And you know how we earlier when we discussed this, we had discussed how it looked like the date, if you look in the middle, the date's kind of in descending order, starting with 10 December 2021 and moving forward?

A    Yes.  So it goes backwards in time.

Q    Backward.  Yeah, exactly.  When you go down to 40, between 39 and 40.

A    Okay.

Q    On that document.

A    I see it.  Yes.

Q    Can you see that there's January 8, 2021, as the --

A    Which line row?  Which row number?  I'm sorry.

Q    40.

A    Okay.  Yes, I'm there.  Oh, I see it.  January 8th.  Yes.

Q    And then you just go right above that to 39, and that says --

A    Huh?

Q    You go right above row 40 to 39,

Page 287

Z. BOZANIC, PH.D.

and that says February 9, 2021?

A    I see it.

Q    Right.  Okay.  And in between that, you don't see in between those two dates, at least on this sheet, you don't see any other news report?

A    You mean analyst reports?

Q    Yeah, analyst reports listed.

A    I mean, in this listing between rows 39 and 40, the two dates that were bracketing here, February 9th, 2021 and January 8th, 2021.

Q    Okay.  But at least, and you're welcome to look through the rest of this document, but at least on this document there's nothing listed within seven days of the 14th or 15th of January?

A    Let me take a look.  So within seven days, within a week of January 14th or 15th, '21, on the presumption this is in listed accurately in reverse chronological order, I would agree with you.

MR. PARTIDA:  Okay.  I have no

Page 288

Z. BOZANIC, PH.D.

further questions.

MR. LINKH:  Dr. Bozanic, I just have one question.

EXAMINATION

BY MR. LINKH:

Q    Is there anything in your report that you would care to correct?

A    I believe there is.  So on paragraph 61, there is a reference to class period twice; that should say analysis period in paragraph 61.  And then in exhibit 7, the header -- I believe it's exhibit 7, let me just double check.

Q    So wait, let me catch up with you and then I would expect you're going to submit -- are you going to submit an amended report, or am I just going to use what's stated here on the record?

MR. PARTIDA:  Greg, what's your intention?

MR. LINKH:  Whatever you'd prefer. But since the issues are relative, you know, are errata.  We could send over an errata if you'd like.

Page 289

Z. BOZANIC, PH.D.

MR. PARTIDA:  Yeah.  The only reason I ask is because it's your report.  So I want to make sure however you want to correct it is signed off on by you, not I read this in a deposition.  So if you could send me the errata, that would be great, but I appreciate you walking through them here, so you said on paragraph 61?

THE WITNESS:  Sorry, yeah, paragraph 61, there are two references to class period that should say analysis period.

MR. PARTIDA:  Okay.

THE WITNESS:  And then in exhibit 7, the header for the exhibit, it says class period; it should also say analysis period.  That's it.

MR. PARTIDA:  You know, I really -- sorry.  It's not my line of questioning.  I apologize, Greg.

MR. LINKH:  No, that's -- no further questions.

THE VIDEOGRAPHER:  Off the record?

MR. PARTIDA:  Perfect.

Page 290

Z. BOZANIC, PH.D.

THE WITNESS:  We're off the record, I just hear that right?

THE VIDEOGRAPHER:  Should we go off the record, Counsel?

THE WITNESS:  Oh, sorry.

MR. PARTIDA:  Yes, I'm off -- yes, off the record.

THE VIDEOGRAPHER:  Okay.  Stand by.

We're now going off the record at approximately 4:37 p.m.

(Whereupon, at 4:37 p.m., the proceeding was concluded.)

**Page 291**

CERTIFICATE OF DEPOSITION OFFICER

I, CRISTINA BETTS, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

CRISTINA BETTS

Notary Public in and for the

State of New York

Page 292

**CERTIFICATE OF TRANSCRIBER**

I, H. JAMES FOY, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

**H. JAMES FOY**

Page 293

DARSHAN HASTHANTRA, et al. vs.

CLEANSPARK, INC., et al.

2/27/2025 - ZAHN BOZANIC, PH.D.

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____    _____

ZAHN BOZANIC, PH.D.                        Date

Page 294

DARSHAN HASTHANTRA, et al. vs.

CLEANSPARK, INC., et al.

2/27/2025 - ZAHN BOZANIC, PH.D.

ACKNOWLEDGEMENT OF DEPONENT

I, ZAHN BOZANIC, PH.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____

ZAHN BOZANIC, PH.D.                      Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20____.

_____

NOTARY PUBLIC

**[& - 1q]**

| & | |
|---|---|
| **&** 2:5 6:12 | |

| 0 | |
|---|---|

**0.0000** 162:6
**0.00002.** 166:6
**0.0116.** 156:23
**0.019.** 157:15
**0.05** 146:10
153:18
**0.05.** 146:19
**0.1** 153:6,13,19
**0.1.** 152:23,25
**0.12.** 156:17
**0.16.** 187:12
**05** 143:24
144:5

| 1 | |
|---|---|

**1** 5:5 16:4
24:19 26:8
54:19 55:20
58:20 68:4,4,5
132:10 149:22
149:24
**1.65** 146:17
**10** 26:8,22 38:6
79:24 94:4
148:23 149:4
153:13 154:12
154:22 155:19
159:10 183:21
184:14 192:18
194:17 195:8

199:9 230:9
286:6
**10.3** 163:5
**100** 213:7
**10019** 2:18
**10169** 2:7
**10:00** 177:21
**10:04** 1:13 5:3
**10th** 14:5 37:16
268:14
**11** 51:10,11
85:22 86:10
96:9 183:15,19
184:11 189:7
**11.61** 156:23
**11:02** 57:14
**11th** 191:9
269:13,16
273:25
**12** 132:10,24
134:6,14,21,25
135:6,15,18,19
136:10,17
137:11,15
138:2,5,6,23
139:3,15,17
140:7,10,11,13
141:3,12,13,15
141:17,23
156:15 157:23
160:10 262:22
**12/10/2020**
149:8 150:3
151:11 153:3,5

**12:15** 110:19
112:2
**12:45** 111:8,14
**12:50** 112:5
**12th** 267:9,15
268:22 269:19
269:22 271:19
273:18 275:10
275:16 276:7
277:14
**13** 4:9 80:6,13
80:23
**130** 150:16
**14** 4:11 156:3
156:13 157:4
190:17,17,22
192:12 195:11
263:24 265:6,9
265:10
**14-15** 262:21
**147** 4:19
**14th** 264:4,8
265:18,20
273:23 287:18
287:20
**15** 63:17,22
64:10 127:11
157:13 234:10
262:12 275:22
275:23 276:17
**15th** 264:3
265:15,16,21
273:20 287:18
287:21

**16** 26:9,22
37:17 38:6
118:16,17,18
127:12 234:10
276:14,17,19
**16th** 235:25
**17** 80:13,16,23
118:23 149:16
230:21 231:12
234:14,24,25
262:22
**17th** 231:22
235:6,16
242:23 249:25
**18** 161:8,14,19
163:21 165:25
**18.79** 157:17
**182** 4:20
**18th** 164:6
236:2
**19** 26:12 102:3
102:9 103:5
106:13 117:5
118:9 128:4
229:19
**190ph** 186:24
270:20
**1:00** 111:8
**1:21** 1:7 15:14
**1:53** 166:22
**1q** 185:15
186:10

**[2 - 47]**

**2**

**2**  24:10 57:17
  64:5,7 86:12
  191:14 209:16
  215:2 216:11
**2/27/2025**
  293:2 294:2
**20**  127:13
  189:25 273:5
  294:15
**2020**  26:8,22
  37:16 38:6
  148:23 149:5
  149:16 154:12
  154:22 155:19
  159:10 183:16
  183:20,21
  184:11 189:4,8
  211:21 214:24
  216:8
**2021**  26:9,22
  37:17 38:6
  96:9 156:3,13
  157:5,13,23
  160:10 161:8
  161:14,20
  163:21 165:25
  190:3 230:9,21
  231:13 234:21
  234:24,25
  235:6 242:23
  262:22,22,23
  263:24 267:9

267:21 268:16
268:25 269:19
269:22 272:3
273:19 274:7
275:2,16 276:9
286:7,16 287:2
287:12,13
**2022**  274:2
**2024**  63:17
  64:10
**2025**  1:12 5:4
  13:2 14:6
**206**  4:21
**20th**  13:2
**21**  287:21
**21-20**  99:18
**212**  2:10,20
**22**  102:11
  140:24 189:3
**227**  4:22
**23**  4:14 28:20
**230**  2:6
**24**  185:6
**255**  149:12,16
  149:25 151:9
  152:20 153:2
  159:10 162:16
  163:15
**26557**  292:13
**269**  159:15,17
  163:15
**27**  1:12 5:4
**271**  159:20
  163:15

**288**  4:4
**29**  120:17,20,21
  239:25
**298**  159:24
  160:9 163:15

**3**

**3**  16:8,11 51:4
  51:7,8 71:6,16
  72:19 73:4
  86:22,25 93:4
  93:5 96:11
  98:8,10 101:12
  109:12 112:7
  113:3,4 180:5
  180:7 215:3
  216:12 281:22
  282:4,10 283:2
  283:4,14
**30**  22:24 34:8,9
  111:18,21
  275:21
**301**  160:12
  161:13,17
  163:15,22
  165:25
**309**  160:14
  163:15
**31**  16:21,21
**32**  51:4 86:16
  90:6,8,10
  94:17 105:20
  105:24,25
  107:15 108:12

108:25
**32317**  1:15
**327**  160:15
  163:16
**33266**  291:16
**340**  160:17
  163:16
**356**  160:18
  163:16
**38**  22:23,25
  23:2 86:16
**39**  286:11,23,25
  287:11
**3:06**  222:20
**3:15**  222:17
**3:19**  222:23
**3c**  68:7 70:8,10

**4**

**4**  51:12 127:19
  128:7,11,13,15
  128:24 167:3
**40**  286:11,11,19
  286:25 287:11
**41**  87:4,8,10
  89:6 93:5 94:4
  102:4,7,8
  106:12 117:5
  184:12 282:17
**42.78**  158:2
**45**  111:19
**47**  118:20,23
  119:4,20

**[49.5. - 98]**                                                                Page 3

**49.5.** 268:20
**49.5mvv** 187:6
  270:24
**4:15** 280:6
**4:25** 280:2
**4:37** 290:11,12

**5**

**5** 46:16,24 47:7
  47:20 48:2,3
  48:22 49:5,19
  50:8 70:2 72:4
  74:22 76:9
  118:17 119:12
  119:24 127:14
  127:16,18
  128:7 130:24
  143:23 190:18
  190:20 192:24
  192:25 222:24
**5-1** 167:12,13
**50** 189:25
  273:5
**50.0mvv**
  270:21
**51** 167:11
  168:3
**511** 1:7 15:14
**52** 26:15 29:8
  31:5,7 33:4
  39:22,23
**530** 2:6
**54** 128:5,9,10

**56** 127:17
  130:23 131:11
**5th** 277:9

**6**

**6** 32:12 56:11
  131:24 132:8
  132:14 140:11
  140:13 141:2
  141:17 142:2
  180:21 231:17
  280:10
**6.16** 187:9
  270:25
**6.61** 187:7
**60** 30:22 31:2
  42:25
**61** 67:14
  131:24 132:3
  139:2 288:10
  288:12 289:10
  289:12
**62** 67:15
**63** 4:17 59:6,15
  67:16
**64** 28:14,17
  29:14 30:20
**682-5340** 2:10

**7**

**7** 4:3 32:12
  288:13,14
  289:15
**71** 12:23

**72** 4:8 12:18,24
  12:25,25 13:4
  13:25 14:3
**73** 4:10 13:23
  14:2,5,7,17
  24:17 26:8,14
  28:20 51:7
  67:21 80:8
  98:9 113:4
  167:10 202:9,9
  262:6
**74** 4:12 23:17
  23:19 58:12
  67:20
**75** 4:15 56:24
  62:7 63:15,15
  63:18 65:11,22
**76** 4:18 95:23
  95:24 96:4,13
  147:6
**77** 4:19 147:3,9
  147:14,17
**773-9224** 2:11
**78** 4:20 181:23
  182:2 191:4,5
  191:7 268:8,9
  268:11
**79** 4:21 120:15
  120:17,24
  206:16,19
  207:22

**8**

**8** 231:19,20
  286:16
**8-0** 202:12
**80** 4:22 202:8
  202:10,16
  204:6 218:5
  221:5 227:2,4
  227:23 228:3
  230:3 231:9
  234:3,4 235:23
  239:18,24
  240:3,16
  253:20 281:11
  281:12 282:24
  285:22,23
**825** 2:17
**888** 2:11
**8th** 2:17 286:21
  287:13

**9**

**9** 287:2
**9.6mvv** 186:22
  270:19
**900-1,400ph**
  270:22
**91-1** 15:3
**91-9** 14:20
**92** 16:25
**96** 4:18
**97** 285:11
**98** 157:23

**[981-2313 - actually]** Page 4

**981-2313** 2:20
**985ph** 187:7
270:25
**9th** 287:12

**a**

**a.m.** 1:13 5:3
57:14,19
177:21
**abilities** 50:4
**ability** 34:13
48:9 50:25
56:12 142:22
200:5 226:6,7
252:17,24
253:3 267:19
291:9 292:6
**able** 8:25 9:16
11:22 12:4,8
34:2 83:5
104:9 113:7,9
125:14 158:10
171:3 174:23
208:6 215:14
217:6 232:14
233:6 239:8
241:20 251:25
252:11,20
253:7,18 256:6
256:15 258:25
263:18 272:14
**abnormal**
141:23 142:2,3
142:8,12

144:12
**above** 189:18
189:22 286:22
286:25
**absence** 76:12
**absent** 5:16
34:13 47:19
222:11 248:18
**absolute**
146:21,22
201:17
**absolutely**
14:15 21:5
25:16 57:5
69:8 83:11
108:6 124:19
140:9 200:14
**absorbed**
266:20
**absorbing**
271:13
**academia**
98:22
**academic** 41:20
41:22 46:22
47:4 105:8
113:21 146:3
176:13
**academically**
34:8 38:16
**accepted** 73:13
203:2 221:15
247:17

**access** 11:14
12:2 117:20
125:4
**accessible**
117:25
**accommodate**
10:14 12:10
218:16
**accommodati...**
224:25
**accompanying**
116:14 120:25
**account** 124:7
125:17,24
126:23 127:4
170:20 193:24
226:21 244:14
**accounted**
126:10
**accurate** 26:9
29:4,14 39:19
40:3,5 59:17
87:5,6 90:19
120:3,4,10
125:6 134:16
141:24 155:9
155:10 157:2,3
157:4,7,8
164:10,13,16
164:19 165:22
165:23 170:8
223:11 262:25
291:8 292:5

**accurately**
136:25 156:18
226:13 287:22
**acknowledge...**
294:3
**acknowledg...**
5:13
**acquire** 263:12
**acquired** 77:25
78:2 104:12
**acquisition**
184:25 191:21
192:4 193:4,15
194:18 195:16
198:8 205:2,6
210:16 262:17
263:8,10
268:14 275:5
**action** 7:25
79:24 207:11
291:11,15
292:8,11
**actionable**
101:2
**actions** 66:8
**actual** 44:19
95:11 127:12
179:17
**actualities**
116:9
**actually** 11:25
22:16 30:17
85:21 109:14
113:18 133:22

143:13 157:16 171:24 190:13 215:18 218:2 261:8 277:14 281:2

**added** 282:12

**addition** 84:15 117:10 139:19 232:5

**additional** 30:11 33:16 37:2 82:12 92:25 117:12 117:14 118:10 124:16 223:19 226:20 235:11 248:18 283:21 283:22 284:5

**additionally** 5:16

**additions** 294:6

**adjacent** 33:17 109:20 121:4 144:17 145:14

**adjust** 122:23 151:3

**administer** 5:13

**adopt** 71:5 72:19 273:12

**advantage** 263:13,18,19

**advantaged** 265:3

**advice** 97:21

**advised** 97:15

**adviser** 97:7,10

**advisors** 97:24

**agnostic** 193:9

**ago** 33:7

**agree** 5:14,19 70:19 159:19 169:23 187:19 189:8 198:25 199:22 212:9 237:19,21 265:13 271:10 273:17 287:23

**agreed** 203:16

**agreement** 263:13

**ahead** 12:24 57:20 68:9 70:22 112:8 115:18 118:16 120:22 137:21 138:21 167:4 222:25 229:23 241:25 252:6 267:10 279:14 280:11

**ai** 98:13,17,19 98:22,25 99:7 99:14,20 100:11,13,17 105:7

**al** 1:4,7 2:2 15:12,13 64:16

293:1,1 294:1 294:1

**alarms** 145:9

**alejandro** 3:3 6:13

**algorithms** 81:21,23

**alive** 45:7,9

**allegation** 204:25

**allegations** 80:25 81:12 206:7 264:9,22 264:23

**allege** 225:16

**alleged** 158:9 163:18 225:18 231:12

**alleges** 262:16 263:5

**alleging** 199:12

**allow** 44:16 122:18 152:4

**allowed** 108:5 115:5

**allowing** 106:17

**allows** 76:5

**alluded** 91:10

**aloud** 96:20,22 96:23,25 97:2

**amended** 288:18

**america's** 199:8

**amount** 19:18 20:25 100:22 102:25 142:4

**analyses** 51:18 51:22

**analysis** 16:12 26:19,20,24 27:18,22 28:9 29:4,8,15,17,25 31:8,14 32:3,9 32:17,19,23 33:5,12,16 34:3 35:8 36:4 36:10 39:4,24 40:3 41:8 42:5 42:8,18 43:11 43:25 44:5,5 44:12,16 45:21 45:25 46:7,13 47:5 48:4,13 48:16 49:5,23 50:16 51:24 52:12 54:9 55:21,23 58:14 58:25 59:18 70:13 72:21 74:25 83:25,25 84:5,25,25 85:5 119:6,13 119:14,24,25 120:6 124:23 129:9 130:7

**[analysis - answered]** Page 6

133:7,14,23
141:4,21 142:6
146:13 167:24
168:2 173:13
173:21 175:23
197:16 200:10
200:12,14
201:21 204:17
204:19,22
212:24 215:13
218:3,18 219:3
219:19,25
220:15,19
221:18,22
222:14 223:9
223:14,17
224:15 225:8
226:4,21
233:18 236:19
236:23 237:14
237:23 239:3
243:4 246:17
248:20 252:5,7
254:20,25
259:5,8,10
277:25 288:12
289:13,17
**analyst** 86:14
88:18 89:11,16
89:21 90:21
91:4,11,19
92:10 94:14
98:24 99:21
101:7 103:2,17

104:22 105:24
106:2 107:11
108:20 109:3,8
109:11 112:25
114:2 115:6
116:10 178:25
179:17 182:6
187:16,20
188:10,12
189:7,8 190:7
190:11 192:14
192:14,22
194:25 195:6,9
195:17 198:6
198:17 199:12
234:7 238:2
240:22,24,25
241:17 242:13
249:2,24 270:6
270:8,10,11
271:21,22
274:25 275:2
287:8,9
**analyst's**
193:21
**analysts** 90:10
90:24 93:6
99:12 114:3
116:15 181:4
192:16 215:2
216:11 238:20
241:9 257:11
**analytics** 51:15
51:25 53:4

60:3,8,10,11
191:23
**analyze** 30:12
31:18,20 33:22
37:2 38:18
40:7 68:19
74:2 218:13,17
232:9 233:6,8
233:20 243:22
258:20 264:19
**analyzed** 30:4
31:3,16 43:5
43:10 44:20
45:21 46:10
89:15 132:24
134:2 236:8
**analyzing**
32:10 224:19
**announced**
269:2
**announcement**
132:17 170:12
170:15 181:2
183:22 184:15
192:19 193:4
193:16 194:17
195:15 268:15
279:18
**announcements**
31:3 35:25
36:3 43:6,11
121:18 132:23
133:15,17
139:3 141:4

168:8,20
267:12
**answer** 8:20
10:5,6,7,17,18
18:4,12,14,15
19:23 25:6
32:7 50:8 55:6
61:18 62:14
69:20 70:22,25
71:13,19 72:17
74:21 103:13
105:15 136:2,4
137:25 138:10
138:14 139:8
140:2 158:10
173:9 174:11
176:16,20
180:22 196:19
204:16 213:20
215:8 216:19
236:18 239:2
241:25 242:6
243:20 245:14
245:18 250:11
259:19 260:5
261:15,19,21
279:15
**answered** 22:7
33:7 50:2
67:18 74:20
76:15 95:10
104:5 105:17
117:25 139:6
196:22 243:17

**[answered - asked]**                                              Page 7

260:9
**answering**
  27:19 76:14
  139:13 242:9
  244:2
**answers** 55:8
  115:11 116:24
  138:15 165:4
**ante** 133:10,19
  134:19 135:20
  137:3,7,8,18
  139:9,11
  140:21 141:13
  141:16
**anticipate** 9:18
  277:10
**antonio** 60:13
  64:15
**anymore**
  104:25
**anyways**
  145:13 282:23
**apologies** 85:6
  152:2 155:12
**apologize** 93:12
  107:7 127:24
  150:7 161:16
  181:13 194:9
  228:17 230:25
  231:4 238:25
  253:25 254:6
  275:15 289:21
**appear** 234:19

**appears** 15:23
  26:10 211:11
  212:5 229:18
  272:12
**appended**
  294:7
**applicable** 5:23
  21:18 79:25
**application**
  192:8
**applied** 73:13
  133:20 248:14
  248:22 251:25
**applies** 15:7
  124:17
**apply** 50:24
  71:25
**appreciate**
  20:19 29:22
  44:10 57:9
  65:25 76:12
  101:4 115:15
  130:20 155:24
  164:23 165:11
  166:11,15
  190:5 194:11
  199:24 239:4
  241:20 251:16
  265:19 266:11
  289:8
**approach**
  22:10 33:9
  41:24 174:3
  175:9 220:14

**approaches**
  251:24
**appropriate**
  79:25 222:4
  248:6 254:10
**appropriately**
  130:14 136:24
  226:12
**approved**
  17:21
**approximately**
  5:3 57:14,18
  112:2,5 166:22
  166:25 186:23
  187:7 222:20
  222:23 270:20
  270:21,24
  280:9 290:11
**april** 190:3
  267:21 268:16
  268:24 272:3
  274:7 275:2
  276:8
**arguing** 260:12
  277:21
**argumentative**
  259:16
**arrival** 173:11
  175:17,19
  197:6 206:2
  222:10 224:18
  224:25 243:6
  243:12 248:15
  267:4

**arrive** 173:17
  174:19 204:5
  246:25
**arrived** 174:5
**arrives** 171:12
  171:14 176:3
  204:5 218:12
  220:11 225:14
  233:10,16
  257:19,25
**arriving** 91:23
  179:10 225:24
**article** 46:22
  47:12,15 99:15
  101:21
**articles** 99:13
  100:14,15
  229:19 238:9
  238:11 285:10
**artificial**
  121:14,21
  122:4,12 124:5
  125:3,12
  126:11,14,20
  127:5 202:20
  203:19 221:8
  240:6 252:2
**asics** 82:8
  188:7
**aside** 126:9,25
  132:20 193:8
  202:4 218:22
**asked** 10:16
  18:2,2 53:24

**[asked - aware]** Page 8

| | | | |
|---|---|---|---|
| 55:9,23 56:13 | 134:9,10,11 | **assisted** 62:4 | **attractiveness** |
| 67:24 70:8 | 164:8 170:17 | 64:23 66:9,22 | 263:8 |
| 83:24 101:25 | 188:9 196:7 | **associated** | **attributed** |
| 108:2 115:9,18 | 201:22 213:5 | 129:8 132:4 | 202:21 221:10 |
| 116:8 117:18 | 214:21 215:10 | 264:2 | 240:8 |
| 124:3,5 125:11 | 215:11 217:4,4 | **assume** 168:12 | **audio** 291:7 |
| 125:15 127:5 | 217:5,9 219:13 | 201:24 241:14 | 292:3 |
| 155:14 165:12 | 219:18 220:6 | 241:14,15 | **august** 26:9,22 |
| 171:25 172:18 | 232:13 236:14 | 253:6 | 37:17 38:6 |
| 179:19 187:25 | 236:22 242:20 | **assumed** | 230:19,21 |
| 192:12 197:17 | 244:6 248:23 | 164:13 282:19 | 231:12,22 |
| 219:6 223:21 | 249:9,16 | 283:8 | 234:7,14,16,21 |
| 223:24,25 | 251:13 252:9 | **assured** 255:16 | 234:24,24,25 |
| 224:3,6 226:18 | 253:6 255:4 | **atl** 193:4,14 | 235:6,16,25 |
| 233:7 235:9 | 256:13 257:13 | 194:17 195:16 | 236:2 242:22 |
| 238:17 243:17 | 260:2,16,23 | 205:2,6 210:2 | 249:25 262:22 |
| 245:3 246:22 | 264:4,5 273:17 | 210:15 262:17 | **auslander** 2:16 |
| 247:6 252:4 | 277:24 285:6 | 262:19 264:24 | **authorized** |
| 254:23 260:3 | **aspects** 170:7 | **attached** | 5:12 |
| 269:20 283:11 | **assess** 38:12 | 207:12 | **auto** 99:20 |
| **asking** 8:19 9:4 | 43:2 73:14 | **attachment** | **availability** |
| 22:3,4 25:8 | 90:11 144:20 | 12:18 | 95:19 174:6 |
| 41:4,7,8 48:12 | 204:14 209:3 | **attacking** | **available** 87:12 |
| 49:13 50:14 | **assessing** | 102:17 | 95:16 104:8 |
| 53:20 55:16 | 121:19 122:11 | **attendance** 6:6 | 118:11 172:8 |
| 57:9 61:9,15 | **assessment** | **attention** 95:3 | 224:10 239:7 |
| 61:17 62:22 | 37:21 240:18 | 95:3,4 100:25 | 249:10 |
| 65:17 66:15,25 | 241:5 243:23 | 133:14 167:8 | **avenue** 2:6,17 |
| 69:14 70:4 | **assets** 205:10 | 178:21 | **average** 55:21 |
| 71:10,20 72:16 | 263:12 264:24 | **attorney** 9:25 | 170:11,15 |
| 81:6 86:12 | **assist** 51:15 | 9:25 291:13 | 272:19 |
| 89:2 101:8,9 | 53:9,12 54:9 | 292:9 | **aware** 60:25 |
| 101:24 108:10 | 54:10 121:10 | **attorneys** | 65:2,7,9,10,19 |
| 110:3 129:16 | | 112:18,20 | 65:23 88:2,12 |

**[aware - believe]**                                    Page 9

88:16,19 98:3
100:2 123:2,7
123:9 126:3
127:3 179:25
180:9 208:19

**b**

**b** 4:6 16:16
73:12 79:24
177:20 178:23
**back** 22:22
24:16 28:11
29:23 30:2,20
31:5,19 36:5
36:12,23 43:23
44:3 57:18,22
58:12,19 64:12
67:20,21 68:4
71:23 72:16
75:9 93:4 98:7
98:8,10 105:19
107:23 111:14
112:10 113:2
117:3 118:14
118:15,19
120:22 127:9
127:10 136:19
137:17,25
138:9,16
140:19 152:23
153:2 154:15
160:24 162:2
162:15 166:17
166:25 167:7,9

167:10 171:10
179:23 180:6
189:22 190:13
190:14 191:4,5
209:13,20
221:4 222:16
230:24 231:13
231:15,16
234:2 235:22
239:23 246:17
257:4 261:24
262:5 268:6,8
268:11,13,24
269:23,25
271:21 272:16
273:24 274:8
280:2,9 281:10
281:20,24
285:22
**background**
11:5 79:13
80:15 99:24
260:15
**backup** 4:19
101:25 147:16
182:23 201:8
228:4,10
**backward**
286:10
**backwards**
286:8
**bad** 127:25
186:15

**banking** 97:8
**base** 76:25
**based** 9:6 16:12
40:17 70:12
72:20 78:18
124:24 173:19
189:6 203:5
212:15 213:8
228:13 237:16
**basic** 237:19
**basically** 78:10
80:12 94:13
119:4 128:24
244:11
**basis** 35:9,14
37:4,6 38:8
47:22 56:13
69:4,21 74:11
74:14 76:3,9
76:17 79:12,19
90:3 122:22
125:14 126:5
173:14 201:9
202:25 221:14
221:17,19,25
246:18,20
247:17,25
249:20 251:20
251:22 253:19
257:8 260:6
277:22 278:23
283:18
**bathroom** 57:4

**bear** 28:13
179:23 230:18
**bears** 99:18
**beat** 99:17
**beautiful** 132:8
**began** 195:15
**begets** 95:4
**beginning**
25:11 57:17
112:6 154:13
154:25 167:2
210:21 222:24
237:17 280:10
**begins** 185:8
**behalf** 2:2,13
**behavior** 120:7
**believe** 22:7
33:6 49:25
60:17 61:12
64:23 81:4
95:10 119:19
120:10 146:17
148:15 160:3
163:7 166:3
176:13 180:21
181:20 190:12
190:16 207:7
207:15 217:25
228:23,25
230:22 235:3
267:11 284:21
285:14 288:9
288:13

**beneficial**
  273:2
**benefit** 127:7
  188:2 197:19
  197:21,23
  198:18 199:5
  201:4,18
  206:10 209:4
  213:23 239:4,5
  249:5 250:10
  256:25 272:10
  272:11
**best** 8:20 9:22
  48:8 50:4,25
  105:15 207:17
  220:14 222:8
  226:6 236:11
  244:25 291:9
  292:5
**better** 115:19
  143:19 146:20
  152:5 197:25
**betts** 1:17 5:9
  8:10 291:2,17
**beyond** 27:10
  178:7 179:11
  197:2 219:7
**big** 184:21
**bigger** 156:7
**bit** 30:14 49:2
  54:18 64:11
  68:2 85:21
  92:7 93:24
  99:5 108:2,3

113:23 127:18
132:6 175:5
182:16 229:14
259:16
**bitcoin** 81:15
  81:20 82:7,11
  82:22,24
  184:20,25
  185:8 188:18
  189:23 193:3
  195:14 198:23
  199:8,10,23
  210:2 263:21
  270:14 272:23
**bitcoins** 187:8
  270:25
**bizarre** 93:24
**blank** 110:10
**blue** 14:21
  129:8
**bold** 23:7
**bolded** 210:9
**book** 78:4
**bottom** 113:5
  120:18 127:22
  128:4 150:16
  228:13
**box** 91:17
**bozanic** 1:11
  4:9,11,13 5:1,6
  6:1,8,8,20 7:1,6
  8:1 9:1 10:1
  11:1 12:1,16
  13:1,3,7 14:1,6

14:11 15:1
16:1 17:1 18:1
18:16 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1,4 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
57:23 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1

106:1 107:1
108:1 109:1
110:1 111:1,17
112:1,11 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1,7
168:1 169:1
170:1 171:1
172:1 173:1

174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
214:1 215:1
216:1 217:1
218:1 219:1
220:1 221:1
222:1 223:1,4
224:1 225:1
226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1
236:1 237:1
238:1 239:1
240:1 241:1

242:1 243:1
244:1 245:1
246:1 247:1
248:1 249:1
250:1 251:1
252:1 253:1
254:1 255:1
256:1 257:1
258:1 259:1
260:1 261:1,20
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1,14 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1,3 289:1
290:1 293:2,24
294:2,4,12
**bracketing**
  287:12
**bradford**  2:14
  7:12 277:9
**break**  10:12,19
  54:17 57:4,24
  107:24 110:20
  110:24 112:12

164:18 166:12
166:15 220:23
222:16 279:24
**breakdown**
  282:18
**breaking**
  172:11
**briefly**  167:8,9
**broad**  279:5
**broadly**  278:21
**broker**  91:19
  97:7 104:22
**brokerage**  88:8
  110:7
**brokers**  94:4
**btig**  101:17
**build**  226:22
**bunch**  31:21
  41:5 82:12
  99:14 177:2
  218:20 221:21
  225:6 235:13
**burden**  122:2
**business**  90:12
  104:25 110:8
  110:10
**buy**  90:17
  97:20
**buysellsignals**
  100:3 101:17

**c**

**c**  2:1 3:1 4:20
  16:16 73:22

74:16 101:17
177:21 178:23
182:20 191:8
193:5 269:12
269:15 271:6
**cain**  4:16 52:10
  52:21 53:9,11
  53:24 60:4
  63:17 64:10
  65:13
**cain's**  53:4 60:5
**calculate**  56:12
  83:19 124:5
  125:12 126:20
  127:4 219:11
  247:15 250:17
**calculated**
  79:19 126:10
  134:24 141:22
  148:22 149:4
**calculating**
  121:20 122:12
  204:11 218:9
**calculation**
  37:13,18,20
  38:5,23 39:3
  39:11 218:9
  246:5,7
**calculations**
  52:5 203:19
  220:10
**call**  36:18
  279:3,8,17
  285:20

**called** 6:21 97:10 198:5 206:22,25
**cammer** 20:15 20:22 21:24 32:11 46:16,24 47:7,20 48:2,3 48:7,22 49:5 49:19 50:8,10 50:17 55:20 63:12 68:20 70:2 72:4 73:12 74:3,22 76:9 77:13 86:12 109:8 119:10,12,24
**candidate** 213:10
**candidates** 213:16
**capable** 170:24 172:11,16,24
**capacities** 53:12
**capacity** 82:11 82:15,24 83:6 83:17 186:22 187:5 188:5,23 268:19 270:19 270:23
**capital** 95:4 100:21 114:18 133:13

**caption** 15:12
**care** 288:8
**careful** 136:23
**cares** 77:14
**cars** 145:5
**case** 1:6 7:9 15:14 18:10 21:16,17 23:16 24:4 32:25 35:23 36:19 37:22 48:2 53:18 54:21 59:19,20,21 60:13,15,17,23 60:25 61:11,20 61:25 62:3,5 62:11 64:13,22 64:24 66:21,22 75:5 78:21,23 81:12 123:3,5 123:16 126:16 144:23 176:12 176:22 177:11 180:25 203:6 204:3 205:2,15 205:18 212:23 213:16 222:5 223:25 230:20 232:11 233:19 234:19 235:3 235:10 241:12 252:19 254:3 258:17,20,24 277:24 278:12

283:12
**cases** 21:19 38:10 40:25 48:23 53:7 63:10 66:5,14 66:19 79:24 116:12,14
**cash** 83:22 84:9 85:5 268:4
**catch** 268:9 288:15
**cause** 43:3 68:16 73:24 74:23 119:8,14 120:6
**cautioned** 97:22
**caveat** 96:20
**caveating** 97:4
**caveats** 136:7
**cell** 11:15 160:4 160:12 161:13
**cells** 149:10 152:13
**center** 193:14
**centers** 195:16
**ceo** 199:8 277:8 277:23 278:15
**certain** 48:11 51:17 72:2 78:20 103:18 104:9 107:22 114:19 131:19 171:5 200:14

205:6 218:6 219:17,18,22 219:24 245:21 251:9 258:11 271:14 284:4
**certainly** 57:7 111:20 116:20 232:4 261:11
**certainty** 201:17 239:4,5 239:11,19 240:15 248:2,8
**certificate** 291:1 292:1
**certification** 108:18 121:25 122:18 178:9
**certified** 5:19
**certify** 291:3 292:2
**cfallon** 2:9
**chance** 51:10 142:21,23 143:2 190:22 202:11 208:16
**chances** 274:12
**change** 34:4 84:8 89:21 125:20,23 126:6 153:8 198:13,15 233:23 277:12 293:4,7,10,13 293:16,19

**changed** 38:20
85:11
**changes** 124:6
152:3 294:6
**changing** 20:18
198:11 274:18
**characteristics**
92:19
**characterizati...**
90:23
**characterize**
123:8
**characterized**
196:23
**charge** 123:4
219:9 236:15
**charged** 114:14
**chart** 131:7
132:8 134:12
140:11 185:4
185:13,23,25
186:2 283:10
**chat** 11:24
**cheaper** 81:24
**check** 15:21
91:17 180:16
183:2 207:19
288:14
**cherry** 36:24
48:10
**chicago** 99:17
**choice** 77:10
278:23

**choose** 98:25
273:11,11
**chose** 29:25
66:15 136:8
263:13
**chosen** 35:12
**chris** 2:4
112:15,16,17
**chronological**
234:18 287:23
**circuits** 278:18
**circulate** 11:23
**circumstance**
252:10
**circumstances**
47:11 124:13
176:12,22
217:18 222:12
241:11 243:19
244:16,18
245:15 246:8
252:12,19
254:5 256:11
**cite** 48:24
**citing** 233:22
**claim** 215:2
216:11
**claims** 79:21
264:19
**clarify** 71:2,4
105:14 118:8
127:21 215:24
219:24 226:16
235:21 269:10

**clarifying**
172:3 224:2
**class** 7:25
25:23 26:5,7
26:21 27:3,4,6
27:9,10,13,19
27:21,23 28:9
28:10 29:6,10
29:19 30:3,6,7
31:4,10,19,20
31:22,25 32:13
32:16,18,19
33:11,17 35:2
35:15,17 37:14
37:22,23 38:5
38:13,14,23
39:19 40:6
41:2,12,17
42:5,6,17 43:7
43:13,17,19,21
44:2,7,11,13,15
44:18,19,22
45:25 46:6,6
46:11 48:18
56:13 58:15,23
59:2,19 66:8
68:22 73:6
74:6 79:19,24
108:18 121:25
122:17 154:13
154:25 168:5
168:18 178:8
183:21 202:25
207:11 221:14

247:17,25
249:20 251:22
253:19 257:8
288:11 289:12
289:16
**classified** 139:4
141:5 154:18
**clause** 68:13
72:6,13
**cleanspark** 1:7
2:13 4:11 7:9
7:13 15:13
28:17,20 55:19
67:17 82:10
88:4,13,23
89:8 129:11
141:3 193:2,17
199:6,9 209:13
209:20 214:24
216:9 277:8
293:1 294:1
**cleanspark's**
31:3 43:6,10
68:21 73:5,15
74:4 83:21
88:14 101:22
119:7 120:7
129:3 168:4,17
170:5 195:14
202:24 221:13
240:11 247:23
251:2,21 257:6
257:6 260:18
262:18

clear 8:23 14:2 15:8 16:8 21:7 28:16 32:8 38:21 49:2 70:6 84:21,22 85:4 123:13 184:10,16 187:11,14 189:11 198:19 199:2 215:17 215:21 260:14 271:25

clearer 82:21

clearly 9:16 31:11 69:22 80:22 139:12 198:23

cleveland 51:15 51:25 53:3 60:3,8,9,11

click 152:8,11 152:17

clicked 151:15

client 20:10 21:22 88:14

close 183:14

closer 148:25

closing 173:20

clsk 209:13

coaching 261:12

coefficient 129:7

coefficients 129:21 130:6,9 130:14 148:8

coffee 166:9

coin 144:20 145:17

collect 56:10

collection 230:6

colloquial 133:12 198:10

column 132:11 132:11 144:17 145:14 148:11 150:4 151:2,3 151:4,17,18 152:8,9 154:2 156:15,18 157:6 158:12 159:11,16 160:11 229:25

come 9:20 33:5 35:3 43:23 75:5 106:23 111:14 122:17 166:17 169:19 169:21 198:22 203:12 207:23 222:16 225:4 228:24 231:14 249:7 255:11 255:17 268:4 272:6 274:12 280:2

comes 63:23 122:5 123:6 173:22 194:18 218:19,21 225:12

comfort 10:12 110:20

comfortable 111:18 161:12

coming 63:25 131:12 145:6 177:14 182:8 204:2 227:21 274:6 279:21

comment 100:4 279:12

commentary 87:14

comments 278:14

committed 180:11

common 19:14 20:8 21:5 25:15 30:5 55:19 68:18,21 73:5,15,25 74:4 79:20 91:25 119:7 120:7 121:17 129:4 168:5,7 168:17,19 202:25 221:14 247:16,24

249:20 251:22 251:23 253:19 257:7,23 261:2 261:3

commonalities 20:14

commonly 133:25 146:4

companies 25:20 97:14

company 7:10 29:16 43:4 68:17 73:25 81:15 82:22 87:19 88:5,7 89:7 90:12 93:9 100:5 119:9,15 120:8 121:18 130:11 168:4,8,16,20 168:25 169:13 169:16 170:8 170:21 171:2 172:8,9,14 173:2 186:13 186:21 192:6 199:24 206:6 241:18 263:11 263:12 270:18

company's 90:17 121:17 168:7,19 188:22 191:22 198:9,21,22

**compared** 52:8

**comparison** 52:11

**complaint** 80:25 154:15 154:17,19,23 155:21,22 192:21 206:7 207:10,11,12 207:16 211:8 211:10,11,18 212:4,11 231:12 262:16 264:15,20,21 272:16 276:12 276:24 277:2

**complaints** 210:16

**complete** 15:23 294:9

**completed** 124:22 190:2 229:10 267:20 271:9 272:3 277:11

**completely** 195:23 221:22

**completion** 267:24

**complex** 81:21 116:8,11

**component** 56:5 98:25 99:2

**components** 56:4

**composite** 77:2

**computations** 83:4 130:18

**computer** 12:3 148:25

**computers** 83:4 150:10

**concealed** 262:20 263:5 264:5,17 267:8 268:22 269:4 269:21 271:4 271:18 275:17 275:23,24 278:7

**concede** 179:8

**conceivably** 82:18 117:22

**conceptually** 83:13 84:19 85:12

**concern** 33:8 33:10 263:6 278:13

**concerned** 137:23 272:8

**concerning** 134:18 236:4

**concluded** 47:5 290:13

**conclusion** 29:5 29:15 32:4

36:20,21 44:7 48:4 49:7,17 69:15,18 71:9 72:14 192:24 193:2 195:10 195:12 209:7 255:11

**conclusions** 43:24 44:17 49:18 196:11

**conditions** 258:11

**conduct** 38:4 142:5,6

**conducted** 121:10

**conducting** 141:21 224:15

**confirm** 59:4 60:2 106:8 151:23 154:21 157:25 158:3 159:2 161:4 167:23 203:21 214:5 223:8

**confirmed** 165:16

**confirms** 174:21

**conflict** 89:3

**conflicts** 88:6,9 88:19

**confound** 123:23 214:19

216:3 217:17 219:7 225:24 226:8 232:17

**confounder** 225:16,18

**confounding** 36:15 37:8 122:20,22,24 123:2,10,18 124:8 125:18 125:25 126:2,9 126:22 127:2 202:23 203:14 204:8,15 205:15,17 206:8 208:23 212:18 213:8 213:10,17,25 214:6,8 215:4 216:6,14 217:8 217:12 218:11 218:12,23,23 221:12 222:3 222:10 223:5,7 223:10 224:13 225:2,5,9,10 232:4,7 233:7 237:25 240:10 242:15,24 244:14 245:10 250:17 252:3 252:21 253:17 257:16,22,24 261:4

**confounds** 219:6 223:13

**confused** 121:8 270:5 282:22

**confusing** 46:8 189:21

**confusion** 44:11 45:20,20 173:5 190:5,6 284:10

**connection** 54:3 55:24 61:5 64:21

**connectivity** 209:5

**consensus** 116:17

**consider** 40:12 46:20 279:5

**consideration** 25:21 35:23,24

**considered** 47:23 52:15 132:21 200:17 207:5

**considering** 132:17 190:7

**consistent** 72:6 131:20

**constitute** 6:3

**construed** 97:18

**consult** 97:22

**consuming** 272:25

**consumption** 192:9

**cont'd** 3:1

**contain** 89:7 90:25 91:5 107:4,6 232:4 237:18

**contained** 46:7 92:23

**contains** 171:21 208:23 235:17,18

**content** 47:15 87:9,24 91:14 94:16 95:11 108:19 110:13

**contents** 54:20

**context** 99:9 216:23 225:21

**contract** 32:3 263:16

**contracts** 272:13

**contradict** 190:10

**contributed** 94:5

**contributors** 98:12 107:3 109:12 113:9 114:7 115:24 116:4

**control** 130:10 193:25 222:9

**controlled** 129:2,23

**controlling** 150:21 168:24

**controls** 130:13

**convention** 145:25 146:2

**conventionally** 144:3

**convergence** 146:18

**conversation** 9:21 136:20 233:9

**convey** 133:9 133:24 137:11

**conveyed** 94:9 106:6 205:10

**convince** 199:25

**cookie** 91:16

**cool** 91:2

**copied** 18:22 41:6

**copy** 11:7 14:13,18,19,22 14:23,25 15:2 15:20 17:16 18:3,17 21:20 22:5 207:15 262:8

**copying** 20:20

**core** 191:22 198:9 199:2,3 199:11

**corner** 245:17

**cornerstone** 3:4 6:14

**corporate** 98:23 134:2

**correct** 14:12 16:17,18 17:7 17:8,9 21:12 24:5 26:5,6,24 26:25 27:3,6,8 27:11 29:20 36:11 42:19 50:15 58:16 59:23 60:6 79:16 85:2,6 95:23,24 117:14 124:18 125:8,20,21 129:24 132:13 132:18 134:22 136:11,12,17 140:10,15 141:8,9,18 142:4,9,10,14 144:14,15 145:19 147:4 148:11 149:22 153:7,9,22 157:10,11,20 157:21 158:5,6

**[correct - cv]**

158:7 159:22 159:23 160:2,3 161:14,17,20 161:21,24,25 162:3,18 163:3 163:6 164:2,22 167:13 169:2 169:20 170:2 173:15,16 174:16,20 175:3,4 177:10 179:20 188:16 189:3 203:20 210:3 211:12 214:10 218:4 223:20 224:8 224:16,20,22 225:2 226:23 226:24 227:2,3 230:21,23 231:22 232:2,5 232:7 235:19 240:13,14 244:16 249:3 253:20 258:4 262:15,24 264:12,14 266:11 270:2,9 276:14 284:8 288:8 289:5 294:8

**corrections** 294:6

**corrective** 123:20 156:25 157:5 160:6 183:9 204:10 206:3 230:20 231:11 232:6

**correctly** 14:11 25:9 78:11 93:5 119:12 124:21 132:9 169:4 172:6 196:24 247:21 276:2

**correspond** 132:12 229:18

**corroborate** 73:14

**corroborating** 179:14

**corroborative** 243:14 245:2 258:2,5

**cost** 84:8,13 263:13,19 265:3

**costs** 81:22,25 192:9

**counsel** 6:9,12 7:2,8 103:5 112:8 117:10 117:11,18 167:4 180:15 182:22 183:2,4 222:25 223:24

228:11,25 229:3 236:16 236:20 282:7 283:7,9,19 284:2,4,24 285:5 290:5 291:10,13 292:6,9

**counsel's** 264:18

**couple** 7:14 8:6 8:9 10:24 17:14 112:24 118:22 206:17 235:20

**course** 59:14,14

**court** 1:1 5:8 8:9 9:10 15:6,7 15:10 63:23 77:6 137:24 138:10 165:3 261:25

**courts** 20:19 46:20 48:8 50:24 73:13

**cover** 8:5,8 15:8 63:21 162:15 181:4

**coverage** 86:14 89:7 94:14 99:22 101:7,23 103:2 105:24 106:13 107:11 107:18 109:3,8

109:11 114:15

**create** 30:10 53:17 54:13 90:24 92:16 181:7

**created** 17:19 17:22 284:23

**creates** 53:5

**creating** 110:8

**creation** 51:18 98:17 100:15 109:23

**credit** 88:18

**cristina** 1:17 5:9 291:2,17

**criteria** 36:8 134:20

**crystal** 21:7

**culper** 4:21 206:22,25 208:5 218:20 264:2,7,11

**current** 186:22 270:19

**currently** 175:22

**cut** 20:2 153:16

**cutoff** 143:6,20 143:25 144:4 146:11

**cutter** 91:16

**cutting** 71:18

**cv** 1:7 15:14 66:10

**[d - december]** Page 18

| d | databases | 152:2 155:5 | 133:13 134:21 |
|---|---|---|---|
| **d** 4:1,16 16:16 79:18 113:15 | 93:16,16,18 103:20 114:15 114:16 115:4 115:17 117:12 | 166:8 220:23 230:25 236:24 238:15 259:15 | 135:6,20 136:10,17 139:16,17 140:7,10,12,15 |
| **daily** 173:19 174:16 175:24 | **date** 1:12 5:4 16:12 70:13 | **day** 11:11 54:16 63:6,8 132:13,18,21 | 140:17 141:12 141:13,15,16 141:24 156:2 |
| **damages** 56:12 79:18,22 218:10 219:12 | 72:21 108:4 149:7 154:19 154:22,24 155:20 156:12 | 133:3,3,22,24 134:14 135:16 139:4,5 141:5 141:7 154:17 | 161:5 164:3,4 164:20,21 165:6,17,20 |
| **dandy** 156:15 | 156:13 157:5 159:10,12 | 155:11 157:13 159:18,21,25 | 180:20,20 181:12 183:7 |
| **darshan** 1:4 2:2 15:12 293:1 294:1 | 161:19 229:25 230:6,9,13 236:17 242:11 | 160:8,13 161:6 161:23 162:18 162:19,24 | 183:10 287:17 287:20 |
| **data** 56:2,4,7,9 56:10 93:25 | 242:12 249:11 266:4 267:15 | 163:2 169:16 169:19,24 | **dcf** 83:24 84:5 84:20,25 85:4 85:13 |
| 99:14,23 104:13 139:14 | 276:4 278:5 286:4 293:24 | 171:20 173:3,4 173:12,14,14 | **deadline** 267:23 |
| 139:19,22,22 139:24 140:9 | 294:12 | 173:18,23 174:4,20 | **deal** 124:10 |
| 142:25 173:25 174:6,15,16 | **date's** 286:5 | 175:11,13,14 175:16 176:3 | **dealer** 97:7 |
| 175:3 177:7 185:4 193:14 | **dated** 63:17 269:13,16 | 183:23 187:8 195:7,8 233:4 | **debate** 71:11 75:10 78:8 232:15 |
| 195:16 229:11 282:25 283:13 | **dates** 27:6 28:8 158:8,9 162:14 | 241:18,18 257:12,20 | **debating** 71:8 |
| **database** 104:14,19 | 163:14,18 180:10,12,24 | 264:6,17 268:13 269:6 | **december** 26:8 26:22 37:16 |
| 113:10,13,17 113:19 114:5,9 | 200:23 230:20 235:24 287:6 | 271:2 294:15 | 38:5 148:23 149:4,8,16 |
| 114:12,16,17 114:19,25 | 287:11 | **dayal** 193:6 | 154:12,22 155:19 159:10 |
| 116:6,6,16 117:24 283:20 | **david** 2:15 6:9 7:7 28:16 57:2 | **days** 35:12 132:23 133:11 | 183:15,19,21 184:11,14 |
| 283:22,25 | 116:7 150:7,25 | | |

189:4,7 191:9 191:15 192:18 194:17 195:8 230:9 268:14 269:13,16 273:25 286:7

**decent** 33:25

**decide** 33:3,4 34:22 77:6 218:15 224:13 224:21 225:9

**decided** 198:13

**deciding** 224:23

**decision** 118:9

**decisions** 76:25

**declare** 17:5 294:4

**decreasing** 175:22

**deem** 133:2

**deemed** 143:7 294:6

**defend** 53:22 101:8 106:23

**defendants** 1:8 2:13 6:10,14 7:8,9,11 15:14 203:23 204:3 225:4

**defending** 54:5 108:16

**defensive** 55:16

**defer** 111:17

**defined** 27:21 27:23 31:15 139:16 140:23 141:11,14,16

**definitely** 229:3

**delay** 83:20 267:13 272:6,8 272:21 273:4 274:14

**delaying** 84:11

**delays** 277:7

**demonstrate** 47:25 192:5

**demonstrating** 47:7

**dentsply** 4:16 60:14 64:16 65:12 67:16

**depending** 34:3 35:11 84:7,9 91:13,22 113:20 114:19 176:15 214:19 217:17 220:10 232:18 244:15 244:17

**depends** 82:15 89:14 115:11 121:23

**deployed** 82:17

**depo** 12:16

**deponent** 294:3

**deposed** 7:17 7:20 8:8

**deposing** 145:7

**deposition** 1:10 4:8 5:6,25 8:7 8:13,18 13:2 14:4 106:19 113:4 237:10 237:17 289:6 291:1

**depositions** 53:6 259:24

**descending** 230:13 286:6

**describe** 107:10 136:22 136:25 204:13

**described** 16:13 34:20 70:14 72:22 94:17 119:10 173:7

**describing** 83:14

**description** 4:7

**designed** 168:10,15 169:12,14

**desk** 11:8

**despite** 84:18

**detail** 68:3 128:23 172:17 184:7 236:11

**detailed** 103:2 184:6

**details** 95:17

**determination** 225:11 226:3 244:20 247:5 254:11

**determine** 142:7,11 144:9 144:11 222:8 226:21 242:23 253:19 261:5

**determined** 202:25 221:13 240:12 247:16 247:24 249:19 251:22 257:7 260:19

**detroit** 99:17

**developments** 90:12

**difference** 25:18 59:3 139:10 196:9 202:19 221:8 240:6 274:23

**differences** 26:4 62:21 122:8

**different** 18:24 20:3,6 25:19 25:21,23,24 26:2 27:2,7,8 27:12,15,15,24

**[different - distinguishing]**

28:2,3,7,9 29:9 30:14,19 31:11 36:14 44:24 47:24 48:17 49:2,3 53:12 55:13 56:6 58:25 66:12 69:9 91:23 99:5,9 104:12 113:23 115:5 115:16 121:19 121:22,23 122:10,15 143:2 145:16 145:16 146:6 148:13 159:8 165:6,6 169:17 169:18,22 170:6,7,25 172:2 173:18 173:23 174:5 177:13,15 188:6 192:16 192:16,17 193:25 194:2 194:15 195:23 200:8,9 211:11 211:15 212:6,8 212:10 215:19 229:19 237:18 242:8 243:12 247:12 248:15 257:19 271:16 276:4

**differential** 50:23
**differentially** 72:3,9
**differentiating** 233:15
**differently** 49:11
**difficult** 19:6 177:19 178:6 178:15 194:20 206:13 209:2 222:12 244:3 245:14
**digital** 2:23 291:7 292:3
**direct** 167:10 185:15
**directed** 51:17 53:11
**directing** 55:12
**directly** 184:14 228:24
**disagree** 70:5
**disaster** 205:23 206:4
**disclose** 61:15 66:16,19 270:12
**disclosed** 66:7 67:3,8,10 273:19,23,24 276:22 278:3,9 278:24

**discloses** 268:17 269:6,9
**disclosing** 66:13 256:23 271:7
**disclosure** 98:3 98:5 123:20 156:25 157:5 160:6 171:21 178:19 183:9 205:21 230:20 231:11 232:6 267:17,22 275:11 276:7 277:6,14 278:5
**disclosures** 43:4 68:18 73:25 96:18 204:10
**discounted** 85:5
**discovered** 37:14
**discovery** 121:25 122:21 123:6,11 127:8 197:19 203:12 224:10 238:16 249:6 250:11 252:6 272:12
**discuss** 111:24 132:2 272:17
**discussed** 258:3 286:3,4

**discusses** 188:13,15
**discussing** 267:13
**discussion** 71:24 190:4
**disentangle** 177:15,19 179:5 193:23 194:15,22 200:6 248:14 257:16,22
**disentangling** 174:24 195:25 196:12 200:20
**disposal** 216:22 222:7 225:20 244:19 245:19 254:10
**disseminate** 67:7 92:18,24
**disseminated** 170:2
**disseminating** 92:21 94:10 114:2
**dissemination** 94:23 95:20 100:22 105:7,9 109:22 110:2,3 110:5 118:4 266:8
**distinguishing** 172:24 174:18

**distort** 203:18 224:19
**distribute** 278:17
**distributed** 100:20 278:19
**distributing** 110:12
**distributive** 81:20
**district** 1:1,2 15:10,11
**diversification** 34:7
**diving** 95:16
**divino** 211:8
**document** 13:10 14:20,24 15:3,16,19 17:7,22,22,23 18:24 19:11 20:3 59:12 61:7 63:21 64:6,8 177:5 180:3 182:5 183:12 185:3 201:11,12,19 201:25 202:2 206:21,25 207:8 208:10 208:14,15,20 208:21 213:6 218:25 227:9 228:5,7,17,22

229:11,23 231:2,6,7 235:4,22 269:5 269:9 281:19 281:23 282:20 282:24 283:3 286:13 287:16 287:16
**documenting** 142:21
**documents** 20:6 58:5,7 112:22 201:7 207:5 229:16
**doing** 52:4 78:4 80:11 101:3 131:18 137:8 175:21 178:8 193:19 219:3 226:17,20 237:12
**dollar** 142:3
**double** 15:21 93:20 180:15 207:19 246:3 288:14
**download** 104:9 117:13 147:19
**downloaded** 93:20
**dpartida** 2:19 12:15

**dr** 4:8 5:6 6:8 7:6 12:16 13:2 13:7 14:6,11 18:16 41:4 52:10,21 53:9 53:11,24 57:22 60:3 111:17 112:10 167:7 223:4 261:20 280:14 288:3
**draft** 53:16 56:20
**drafted** 62:17
**draw** 33:24 34:2 44:17 185:19 186:10
**drawer** 11:17
**drives** 184:25
**driveway** 145:5
**due** 76:11 123:21
**duly** 6:22 291:5
**duplicate** 105:6
**duplication** 265:24
**duplicative** 110:13
**duration** 263:15

| e |
| --- |

**e** 2:1,1 3:1,1 4:1 4:6 48:3 113:4 118:17 132:8

140:11 141:17 210:25 293:3,3 293:3
**earlier** 63:8 71:24 148:18 153:15 194:13 219:5 223:15 226:9 233:4 277:22 278:3 281:18 286:3
**earning** 170:5
**earnings** 35:8 35:24 36:3 43:6,11 89:23 97:14 114:3 115:8 132:15 132:16,16,20 132:23 133:15 133:17 134:3,7 134:15 135:6 135:15,19 136:8 139:3,4 140:14 141:3,6 148:13,15,19 159:25 160:5 170:11,15 171:2,6 181:2 181:12,17 231:24 232:3 235:15,18 236:3 237:15 237:17,24 241:2,18 242:12,17,21

242:22 243:6 245:8,10 267:12 276:12 277:5 278:24 279:4,8,17,17

**easier** 12:8 102:15

**easy** 18:20 85:18 208:6

**economically** 265:2

**economist** 252:15

**edited** 17:21 62:16

**education** 38:8 76:17 77:24 79:15 115:16 220:14

**effect** 43:3 68:16 73:24 74:23 119:8,14 120:6 224:19

**efficiency** 19:2 46:24 47:5,19 47:25 54:25 55:18 68:16 69:3,6 73:14 73:23 74:14,17 75:7,25 76:8 79:6 94:7 108:17 121:11 121:20 122:11 125:2 219:10

247:10 266:23 267:3,6,7 271:13

**efficient** 21:22 29:6,16 47:6 47:22 68:22 73:6,16 74:5 75:16 266:18 266:19

**efforts** 191:22 198:9

**eight** 96:12 101:14 162:11

**eighth** 160:17

**either** 12:11 69:18 88:20 111:9 126:16 144:21 173:8 214:4,11 215:9 220:20 232:16 247:19 251:7 251:17 252:14

**elect** 152:4

**electronic** 15:2 15:22

**element** 177:20 177:23 178:23 216:22 238:5

**elements** 19:3,4 19:15 20:8 21:4 25:15,24 55:13 56:6 91:18,24,25 92:3 95:18

108:11 115:5 126:4 148:7 174:18 177:13 177:15 178:17 178:20,23 179:9 205:11 212:10 246:25 257:20

**elucidated** 92:20 258:12

**eluding** 146:17

**email** 11:22,23 12:5,13,14 191:6

**emphasis** 92:25

**empirical** 119:6 119:13,25 120:6 124:23

**employed** 106:3 291:10 291:13 292:7,9

**employee** 291:12 292:9

**employees** 272:17

**employers** 106:3

**enable** 223:23

**encounter** 258:20,23

**encountered** 258:16

**ended** 164:25

**energy** 81:24 81:25 83:14,15 84:13 191:23 192:6,7 272:25

**engaged** 78:5

**engine** 99:20

**entire** 72:13 175:13 197:22 197:23 225:21 246:23 260:7

**entirety** 209:4 216:21 258:19

**entitled** 10:5 69:20 199:13

**entity** 110:8

**environment** 94:6 197:25 209:6 212:23 213:24 214:20 216:18,24 225:22 232:19 238:18 243:4 246:23

**equal** 50:18

**equally** 50:3,8

**equivalence** 146:19

**errata** 288:24 288:25 289:7 294:7

**error** 93:17

**errors** 131:12 131:16,19

es 291:4
espn 99:16,20
espousing
266:25 267:2
esquire 2:3,4
2:15
essential 72:5
104:22
essentially
26:21 69:14
93:6 128:24
129:9 148:17
establish 122:3
122:4
established
163:8 260:11
estimate 115:7
116:15,21
134:20 139:24
estimates 89:23
89:24 97:14
114:2,4 115:8
115:22,24
116:2,5,13,19
185:2 274:17
274:18
et 1:4,7 2:2
15:12,13 64:16
293:1,1 294:1
294:1
evading 139:13
evaluate
220:12 222:6
244:18

evaluated
216:2
evaluation
16:13 55:18
70:13 72:21
83:25 121:11
evasion 255:25
evasive 259:24
evasiveness
61:22
event 26:19
35:13 42:8
52:3 58:24
59:18 85:20
89:4,16 120:2
120:5 121:10
121:12 124:23
127:10,12
128:6 130:4
131:7,12 133:8
134:2 135:17
137:10 141:21
148:3,9 153:3
154:9,11
156:12 164:17
164:20 165:15
167:23 168:2
168:15 169:12
169:14 170:20
170:23,23
171:4,5,11
172:6,11,15,24
173:4,13
174:12,15

176:7 177:7
179:3,5,12
194:19 232:22
232:23,23
233:5,6,13
243:10,15
258:10 265:5
events 30:4,7
30:11 33:11,16
33:21 34:15
35:19 36:15,25
37:2,8,23
38:13,16,18
40:7,9,11
41:13,18 42:7
42:16 44:17,21
134:6,8 138:3
138:5,6,23
168:10 171:18
172:19
eventuality
256:5,8,12
everybody
111:15
evidence 49:12
75:8,15 77:4
179:15 202:18
203:9,25 221:6
240:4 243:14
245:2 253:16
258:2,5
evidentiary
5:24

evolution 148:6
171:13 176:2
222:5
evolve 130:6
evolved 129:21
ex 39:11 133:10
133:19 134:19
135:20 137:3,3
137:7,8,18
139:9,11,11
140:21,21
141:13,16
exact 93:21
146:16 195:18
233:16 277:19
exactly 45:24
45:24 53:23
119:22 135:22
163:9 255:3
259:25 260:15
286:10
examination
4:2 7:4 288:5
examined 6:24
example 20:15
24:25 30:19
34:5 42:25
44:24 56:8
67:14,15 82:5
88:3 90:5 99:8
100:12 101:20
114:9,22
115:12,22
122:10 123:13

123:17,21
129:6 148:7,14
161:13 170:4,4
171:3 176:8
194:16 205:14
205:16 208:19
214:22 216:7
219:7 237:14
257:15
**examples** 67:13
122:9 212:19
**excel** 147:15
163:12 164:3
**excellent** 28:12
**except** 212:2
**excluded**
284:22
**exclusions**
115:3
**excuse** 116:3
283:18
**executives**
274:11
**exempt** 97:9
**exemption**
97:11
**exercise** 119:17
260:7,8
**exhaustive**
54:14
**exhibit** 4:8,10
4:12,15,18,19
4:20,21,22
12:4,9,18,23,25

13:4,21,21,23
14:3,4,5,7,17
23:17,19 24:17
26:8,14 28:19
32:12 51:7
56:24 58:12
62:7 63:15,15
63:18,22 65:11
65:22 67:19,20
86:22,25 93:4
93:5 95:15,23
96:4,11,13
98:8,9,10
100:16 101:12
102:14 109:12
113:3,3 127:14
127:16,18,19
128:7,7,11,13
128:15,24
130:23 131:2
131:10,24
132:4,14
140:13 141:2
141:25 147:3
147:14,17
167:9 180:5,7
180:21 181:18
181:23 182:2
191:4,5,7,8
202:9 206:15
206:16,19,24
207:22,22
227:2,4,23
228:3 230:2,4

231:9,15,16
234:3,4 235:23
262:5 268:6,8
268:11 281:11
281:17,22
282:4,10,13,24
283:2,4,14,16
283:17 284:7
285:22,23
288:13,14
289:15,16
**exhibited** 119:7
**exhibits** 11:21
12:17 15:20
128:5 148:4,18
207:12,17
**exist** 65:14 66:3
114:20 256:20
**existed** 126:22
285:2
**existence** 94:18
94:22 107:10
117:23 125:18
**existing** 181:6
258:18
**exists** 222:3
**expand** 32:2
41:17 43:21
46:3 191:22
**expanded** 42:8
**expanding**
44:15
**expansion**
83:21 187:21

188:4,15 189:9
189:25 193:15
205:3 262:19
265:2 272:15
273:4 277:7,11
**expect** 89:10
113:9 114:8,10
115:25 116:4
133:9 288:16
**expectations**
131:21 271:23
**expected** 276:9
**experience** 23:8
38:9,16 40:17
41:12,15,23
76:18 78:2,6
78:18,22 79:13
79:15 220:13
**expert** 4:10,12
4:15 7:24,24
9:5,6 14:6
19:10 22:2,17
22:19 23:7
34:18 36:17
38:17 41:15
49:4 50:16
52:10 53:5
62:9 63:16
64:9 65:12,20
66:10,12,18
67:6,9,22
69:16,19,25
70:11 71:16
74:11,12,15

75:22,23 76:4 76:6 79:7 106:22 143:22 217:6 224:15 226:17 252:15

**expertise** 77:24

**experts** 40:24 41:5,16 72:2 72:11 75:11 192:17 229:17 229:17 261:3

**explain** 9:2 19:7 34:24 53:2,14 69:4 101:9 175:5 260:15

**explained** 76:2

**explaining** 163:24

**express** 68:7

**expressed** 85:9

**extend** 27:4 28:10 30:9 32:16 33:15 36:23 37:6 46:13 267:22

**extended** 42:17

**extending** 35:17 273:15

**extends** 27:9,23 29:10

**extension** 37:5

**extent** 20:9 21:19 43:2

46:8 55:25 56:19 61:14 66:3 98:19 119:20 198:14 198:15 202:17 221:6 222:3 224:9 236:19 237:22 240:4 252:4 253:16 253:22 257:23

**extract** 95:18

**extremely** 194:20

**f**

**face** 264:19,20

**faced** 256:12

**facility** 145:8 205:24 264:24 264:25 267:19 267:24 271:24

**facing** 43:15

**fact** 10:3 28:4 48:23 66:22 92:21,23 94:10 107:9 116:13 241:13,14,15 241:15

**factor** 32:11 46:9,12,14,15 46:16,18,19 49:19,22 50:9 53:18 55:20 68:20 72:5,12

74:3,24 75:5 75:11 76:24,24 77:8,9,13 86:12 109:8 119:24 123:22

**factors** 16:13 20:16,17,18,23 46:10 47:23 48:9,11,19 49:10,11 50:3 50:10,11,17,18 52:5 55:18 63:13 70:14 71:25 72:3,22 73:13 75:4,6 75:13,14 76:19 76:22 77:3,4,7 77:15 129:22 130:10,13 168:25 202:22 221:11 240:9

**facts** 37:21 47:11 124:12 176:12,22 222:11 241:11 243:18 244:15 244:17 245:15 246:8,16 252:12,18 254:4,22 256:11

**factual** 260:4 260:10

**factually** 140:3

**failing** 109:4

**fair** 10:19,21 21:6,10 81:3 92:4 130:16 158:11 163:11 165:8

**fallon** 2:4 112:17

**familiar** 13:9 13:11 24:24 60:12,15,23 61:25 88:17 113:12 208:7 208:10 212:3 212:11 228:5,6 228:16 243:2 264:10 281:18

**familiarize** 24:13,22 86:17 130:25

**fantastic** 61:8 239:8

**far** 10:9 50:16 132:11 137:22 148:10 177:6 197:3 232:11 256:4 270:3

**farther** 256:23 265:25 267:25

**fashion** 164:11

**faster** 154:8

**favor** 75:7 165:8 283:9

**february** 1:12 5:4 12:25 157:23 160:10 161:8,14,19 163:21 164:6 165:25 262:22 267:9,15 268:21 269:18 269:22 271:19 273:18 275:10 275:16 276:6 277:13 287:2 287:12

**fee** 117:24

**feeding** 89:24

**feel** 72:4 75:11 139:6 159:7 201:15 254:6

**feeling** 236:21

**fiber** 280:22

**fifth** 68:20 74:3 77:13

**figure** 49:18 102:13 103:8 103:22 107:5 254:14

**figured** 47:17 193:20

**file** 147:14,15 163:12 227:14

**filed** 14:21 62:10,11 65:5 65:14,21

**files** 228:4,10

**filing** 60:21 63:23

**filter** 87:17 93:15

**filtering** 89:6

**filters** 87:21,22

**final** 160:19 226:3

**finally** 166:13

**financial** 90:13 97:23

**financially** 291:14 292:10

**financials** 90:4

**find** 12:7,8 16:20 34:20 47:19 49:12 75:3 76:8 77:8 103:20 113:10 114:8,11 115:25 180:2,4 181:17 200:21 254:20 268:10

**finding** 68:15 69:2,6 73:23 74:13,16 75:24 79:5

**finds** 119:6

**fine** 17:25 19:22 42:10 103:23 107:13 111:9 122:6 151:6 219:23

**finer** 129:5

**finger** 185:19 186:10

**fingers** 90:8

**finish** 28:25 241:24 279:14

**finished** 16:25 17:3 29:2

**finishes** 210:22

**fire** 60:13 64:15

**firm** 84:7,12,14 84:17,18 87:16 88:24 93:2 94:6 95:3 110:7 169:25 173:17 181:3 197:25 198:24 209:7 212:23 216:25 225:22 243:5 246:24 258:18 268:3,4 273:7 274:6,10 274:11,16,17 275:7,8 276:5 276:8 277:6

**firm's** 90:4

**firms** 34:9 87:15 88:8

**first** 6:21 7:16 11:25 12:13 14:2 22:9,11 24:6,7 25:25 65:7 68:12,24 71:15 72:19

74:15 103:3 127:19 128:8 139:5 140:25 141:6 159:5,9 162:16 171:16 173:10 177:12 183:22 185:5 191:18 198:20 208:9 230:8 274:5 275:20 276:7,21 278:8

**fiscal** 189:3 190:7

**fit** 87:13

**five** 32:11 36:13 50:10,17 131:10 166:11 185:5

**fl** 1:15

**flagged** 158:8 161:24 162:25

**flexible** 218:10

**flip** 12:9 16:19 22:22 24:19 26:11,12 42:25 67:25

**flipping** 120:22

**flow** 85:5 119:9

**flows** 83:22 84:10 268:4

**focus** 16:11 25:22 32:12 46:5 68:12,24 77:9 91:23

130:3 134:19 210:12 247:9,9
**focused** 48:18 87:18 133:15
**focuses** 92:11 115:7
**focusing** 86:9 134:21 195:4 231:3
**folks** 192:16
**followed** 264:3 279:19
**following** 16:15 70:15 72:23 279:4
**follows** 6:24
**font** 150:15
**footnote** 120:14 120:15,24 121:3,8
**forecasts** 90:14
**foregoing** 17:6 291:3,4 292:4 294:5
**forever** 154:7
**forget** 128:2
**forgot** 156:5
**form** 25:4 29:21 32:5 35:6 38:7 40:4 40:21 41:21 44:9 46:4,25 47:8 49:9,24 50:12,20 52:18

54:6 56:17 61:2,24 62:13 65:24 67:4 69:7,12 77:22 79:2 83:2 91:8 92:14 93:11 94:19 98:15 103:9 104:3 106:16 107:20 119:18 133:4 133:18 174:7 187:23 189:20 194:4 196:3 205:4 208:25 212:20 213:12 214:17 215:6 219:4 238:8,14 239:13,20 242:18 245:12 245:23 248:3 248:20 249:4 249:14 250:5 250:19 251:5 251:15 252:23 253:21 254:17 255:15 256:17 257:18 258:8 259:2,12 264:13 266:10 269:7 277:3,16 278:11 279:7
**format** 152:13
**formation** 34:6

**formatting** 152:3
**formed** 16:14 70:15 72:23 76:5 85:10 176:20 214:3 236:14 251:6,8 251:17 252:13 253:13
**forming** 200:8
**forms** 248:15 266:22
**forth** 54:13 83:10 84:14 98:24 134:20 138:16
**forward** 36:23 118:20 119:2 130:23 131:24 286:7
**found** 46:23 165:24
**four** 16:16
**fourteen** 190:23
**foy** 292:2,14
**framework** 84:20
**frank** 246:3
**frankly** 61:23 76:11 282:19
**fraud** 202:22 221:10 240:8

**free** 159:7
**freedom** 91:20
**front** 11:6 15:8 28:11 29:23 62:20 108:22 124:13 262:9
**froze** 280:18 281:4
**fruition** 274:13
**full** 115:6 206:10 212:22 213:23 215:13 216:17 238:17 239:6 256:25
**fully** 47:13 109:20 181:9 241:21
**fulsome** 48:14
**fun** 179:21 224:4
**function** 11:24 12:7 77:23
**functions** 106:2
**fund** 60:14 64:15
**fundamental** 267:7
**further** 68:20 74:3,21 100:12 111:24 172:12 266:8 288:2 289:22 291:12 292:8

**[furthermore - go]**   Page 28

**furthermore** 197:20

**future** 83:21 84:11 90:14

**fy** 274:2

**fy2022** 187:5 187:22 189:16 270:23 271:9

**fy22** 268:19

**g**

**gallagher** 2:23 5:7

**game** 179:22

**games** 140:5

**gauge** 226:13

**general** 79:12 80:14 81:13 100:16 101:6 129:13,15 130:2 169:23 172:23

**generalities** 21:18

**generally** 81:2 81:10

**generate** 100:13

**generated** 94:9 99:7,20 105:6 116:22 130:15 148:9 273:2

**generates** 81:15

**generating** 187:7 198:14 270:25

**generation** 118:3

**gentleman** 260:12

**genuinely** 45:19 103:15

**getting** 71:18 77:19 110:19 128:22 154:8 166:13 259:15

**giant** 165:12

**give** 8:15 10:18 15:5 50:24 67:12 70:25 71:18 94:14 99:8 123:12,16 128:16 138:17 148:24 170:3 171:2 201:19 205:14,16 208:16 244:7 284:13

**given** 9:7 10:17 20:13 32:15 35:15,16 40:9 41:20,22 66:4 91:24 98:21 117:23 169:16 169:24,24 170:11 173:17 184:13 207:4,9

207:11 216:16 226:19 229:20 240:13,18 243:21,22 294:9

**gives** 99:18 188:12 189:15 285:12

**giving** 72:10

**gladly** 108:22

**glancy** 2:5 6:11

**glancylaw.com** 2:8,9

**glass** 10:12

**glinkh** 2:8

**glom** 233:21

**go** 12:24 16:9 22:13 24:16 28:13,14 30:22 31:4,11 35:9 36:5,12 39:20 40:18 45:23 47:9 51:3,4 57:10,20 58:12 58:19 64:5,12 65:6,16 67:20 67:21 68:2,3,9 70:22 71:12 72:16 80:5 84:10 85:21,22 86:20 90:6,8 93:3 95:12 96:16 98:7,8,9 99:9 102:15

105:19 107:16 107:23 111:7,9 111:23 112:8 113:2 115:18 118:19,20 119:2 120:15 127:9,15,21,23 128:4,11,12 137:21 138:21 140:19,23 143:14 148:10 149:12 150:3 150:15 151:8,8 151:10,12,18 152:15,23,23 152:25 153:4,5 153:25 154:5 154:15 155:25 156:2,4,13,24 157:14,22,23 157:24 159:11 159:14,15,16 159:20,24 160:9,11,14,15 160:16,18,24 160:25 161:9 161:11,22 162:2,11,15 167:4 171:10 174:23 177:25 179:23 181:16 185:20 189:22 190:13,14,18 190:25 191:4,5

**[go - guess]**                                                        Page 29

| | | | |
|---|---|---|---|
| 191:11,15 | 13:20,22 18:11 | 274:12,13 | 285:15 288:20 |
| 193:11,19,24 | 19:22 20:10 | 276:9 280:5,8 | 289:21 |
| 195:24,25 | 29:22 34:20 | 280:15 288:16 | **gregory**  2:3 |
| 196:12 200:19 | 39:14 47:12 | 288:17,18 | **ground**  8:6 |
| 200:25 202:6,7 | 56:23,24 57:8 | 290:10 | **guess**  23:7 |
| 202:8 208:2 | 57:13,17 61:19 | **good**  7:6 45:9 | 24:13 29:12 |
| 209:11 211:19 | 62:7 63:14 | 45:14,16 57:3 | 30:18 31:17 |
| 218:23 219:2 | 64:11 74:24,25 | 101:4 111:11 | 32:22 41:10 |
| 222:25 226:25 | 80:14 86:2,11 | 151:8 220:22 | 43:16 48:21,25 |
| 227:18 229:23 | 96:4 104:23,24 | **gosh**  185:22 | 49:21 59:6 |
| 230:5,17,19,24 | 105:4 110:19 | **gotten**  202:10 | 67:12 77:17,18 |
| 234:2 237:12 | 111:2,25 112:4 | **gpus**  82:8 | 78:19,23 79:4 |
| 239:22,23 | 118:14,15 | 188:7 | 80:21 82:20 |
| 241:25 242:14 | 128:6 133:21 | **granular** | 92:5,6,9 99:5 |
| 246:17 252:6 | 137:21 147:11 | 128:23 | 99:24 101:7 |
| 258:2,13 262:5 | 150:10 154:7 | **grasp**  109:4 | 103:15 106:7 |
| 262:10,11 | 158:11 159:15 | **great**  16:2 | 106:25 109:4 |
| 267:10 268:6,8 | 160:18 162:15 | 27:24 49:21 | 109:16 117:19 |
| 271:21 276:13 | 164:12 166:9 | 131:4 135:5 | 120:23 121:7 |
| 276:17 279:14 | 166:21,24 | 139:8 150:12 | 121:15 122:7 |
| 280:11 281:10 | 179:21 180:14 | 184:9 187:9 | 126:7,17 129:2 |
| 281:20,24 | 180:16 181:22 | 222:18 239:22 | 138:15 143:17 |
| 285:22 286:11 | 194:8 201:14 | 248:22 249:8 | 153:15,19 |
| 286:22,25 | 202:8 206:2 | 255:23 280:4 | 154:20 157:17 |
| 290:4 | 210:11 220:21 | 289:8 | 159:3 160:24 |
| **goal**  50:23 | 222:19,22 | **greater**  35:20 | 161:3 162:11 |
| **goes**  30:2 50:16 | 225:19 231:14 | 81:25 100:21 | 165:5 169:15 |
| 51:12 71:23 | 234:4,11,15 | 100:23,24 | 172:2,5 174:10 |
| 117:3 136:19 | 235:2 256:24 | 131:19 143:3 | 180:22 186:15 |
| 137:17 197:3 | 257:4 259:18 | **greatly**  194:11 | 189:12 192:11 |
| 286:8 | 261:7,8,10,11 | **greg**  6:11 58:3 | 192:15 193:18 |
| **going**  5:2 8:14 | 261:14,18 | 99:10 111:4 | 203:20 208:3,9 |
| 8:22 11:20,23 | 268:13 272:20 | 112:15 115:9 | 224:4,5 225:3 |
| 12:14,16,17,19 | 273:6 274:3,8 | 229:4 260:2 | 228:15 229:6 |

230:16 237:2 244:10 266:5 268:5,22,23 269:2 273:11 285:7

**guidelines** 48:7

**guy** 193:5 255:24

**guys** 110:25 111:7 239:25 280:17 281:5

**h**

**h** 4:6,20 101:17 182:20 191:8 193:5 269:12 269:15 271:6 292:2,14 293:3

**half** 26:23 110:4 111:9,14

**hand** 6:18 56:3 64:14 132:10 132:11 183:17 184:19,22 185:17 246:4,6

**handy** 156:14

**happen** 35:8,20 37:3 145:11

**happened** 31:22 265:15

**happening** 142:19 259:25

**happens** 35:13 205:22 258:4

**happy** 10:14 105:14 108:13 108:14 111:2 236:18

**hard** 27:14 136:3 262:8

**harkens** 75:9

**hash** 150:24

**hasthantra** 1:4 2:2 7:13 15:12 293:1 294:1

**hat** 76:20

**head** 9:14 154:14 173:6 256:19,22

**header** 151:16 288:13 289:16

**heading** 118:17 184:22 189:23

**hear** 25:9 34:8 241:22 280:24 290:3

**heard** 48:21 206:21,25

**hearing** 6:16 20:19 275:25

**heavily** 92:11

**heck** 102:11

**hell** 102:10

**help** 8:25 39:14 66:4 76:13 78:12 102:16 102:18 105:14 158:10 219:21

**helpful** 94:11 156:8 174:7,9 175:2

**helping** 55:13

**helps** 9:17 11:10 94:7 174:10

**hereto** 291:13 292:10 294:8

**hey** 225:5

**high** 157:17 192:7

**higher** 84:13,15 146:20,24 185:2

**highest** 143:11 143:13

**highlight** 107:16 108:15 151:4 152:9 192:15 263:7

**highlighted** 153:6 156:20 228:19 229:8

**hindsight** 198:18 199:6 272:11

**hired** 88:4,13

**hiring** 88:15

**historical** 90:13

**history** 205:9

**hmm** 9:13 16:20 58:21 120:21 148:12

148:20 149:9 150:2 152:16 154:4,10 155:2 167:13

**hold** 63:9 64:2 90:17 147:20 148:24 185:22 234:11 255:20 268:10

**honestly** 59:8 150:25 194:8 207:20 241:22

**hopefully** 8:25

**hoping** 228:9

**hour** 57:8 110:20 111:10 111:15 220:22 279:22

**housing** 113:25

**hoyos** 3:3 6:13 6:13

**huge** 163:23

**huh** 286:24

**human** 83:10

**hypothetical** 44:25 47:13 85:3 92:15 124:15 178:16 243:25,25 244:2,5,7 245:17 250:12 253:11 255:12 255:17 256:19

**hypotheticals** 255:19 260:25

**i**

**icon** 2:23
**idea** 175:7 246:9
**identical** 58:15 59:18 65:22 278:2
**identification** 13:5 14:8 23:20 63:19 96:14 147:18 182:3 206:20 227:5
**identified** 72:7 96:11 102:8 107:18 117:5 132:12 134:6,7 135:15 139:16 148:19 154:19 154:23 155:20 157:6 160:22 163:14,19 164:4,21 165:18 180:21 275:3 283:23 284:5 285:12
**identify** 6:6 89:6 93:7 106:11 231:10
**identifying** 132:15

**idis** 113:10,13 113:17 114:9 114:12,17,20 115:7,22 116:2 116:3,13,19
**ignore** 63:21 75:12
**illustrated** 253:11
**imagine** 117:22
**immediately** 184:21 185:9 188:19 189:24 270:15
**impact** 84:21 85:14 122:3 129:3 168:3,16 169:6 170:24 171:7,8,9,14 172:9,14,15 178:10 192:9 193:11 195:25 197:16 201:21 202:22 204:10 219:11 221:11 240:9 247:8 250:17 252:21 274:21 275:7
**impacted** 83:21
**impacts** 129:3 129:15,19 172:25 193:25 263:20

**importance** 50:19 105:9 109:23
**important** 8:16 9:12 46:17 48:20 49:5,14 49:15,19,22 50:9 78:15 90:20 92:22 94:15,18,24 109:2,3,10 110:2,3 155:23 237:5 273:16
**impounded** 267:4
**inappropriate** 259:5 260:24 260:24
**include** 33:16 36:3 37:7 41:17 91:21 95:14 135:21 137:13 240:21 240:22
**included** 114:5 137:15 139:19 139:23,24 203:16 284:20
**includes** 15:19 31:10 43:12
**including** 27:13 216:7 217:19
**inclusion** 138:24

**inclusive** 26:23 27:18 32:19 44:12,13 252:2
**incorporate** 218:10
**incorrect** 140:3
**increase** 32:15 32:23,24,25 33:17,19 35:18 36:2,9 37:2,12 39:18 40:12 42:7,18 82:11 82:23 83:6,17 186:21 188:22 270:12,18 274:20
**increases** 274:19,19
**increasing** 40:10 185:6
**independent** 97:23
**independently** 116:23
**indicate** 116:11
**indicated** 80:19 86:19 188:20
**indicates** 75:15 275:2
**indicating** 188:4
**indicative** 272:7,8

| | | | |
|---|---|---|---|
| **indices** 226:10 | 105:5,6,8,10 | 203:12,15 | 240:10,13,17 |
| **individual** 7:10 | 106:5,21 107:4 | 204:9,15 | 240:18 242:11 |
| 77:7 87:24 | 108:12,15 | 205:15,17,20 | 242:16,25 |
| 174:18 180:12 | 109:15 118:4,5 | 206:3,8,11 | 243:4,6,13,21 |
| 241:4 | 119:9,16 | 208:24 209:6 | 244:15 245:7 |
| **individually** | 121:24 122:21 | 212:15,18,22 | 245:10,19 |
| 87:10 | 122:23,25 | 213:8,11,17,24 | 246:21,23,25 |
| **indulgence** | 123:3,7,10,15 | 214:2,7,9,18,20 | 248:15,18 |
| 155:24 | 123:18 124:8 | 214:22 215:5 | 249:6,10,21,23 |
| **industry** 78:13 | 124:16 125:5 | 215:25 216:2,7 | 250:18 252:3,5 |
| 88:20 129:7 | 125:18,25 | 216:14,16,17 | 252:22,25 |
| 130:2 226:10 | 126:3,4,9,22,25 | 216:21,23,24 | 253:3,7,8,18 |
| **inference** 33:24 | 127:2 129:11 | 217:7,8,10,12 | 254:9 255:22 |
| 34:2 | 129:25 133:24 | 217:14,16 | 257:2,17,22,24 |
| **inflation** | 134:13 155:18 | 218:11,12,14 | 258:17 261:4 |
| 121:14,21 | 169:13 170:7 | 218:16,21,24 | 265:24 266:13 |
| 122:5,13 124:6 | 170:19,22 | 219:2 220:11 | 266:16,20 |
| 125:3,12 | 171:12,13,22 | 220:12 221:12 | 267:4 271:13 |
| 126:12,14,21 | 172:13,15 | 222:4,6,10 | 272:19 276:22 |
| 127:5 202:20 | 173:2,12,17,22 | 223:6,7,11,19 | 277:18 278:3,4 |
| 203:19 204:11 | 174:4,19,24 | 224:7,10,14,18 | 282:15,16,25 |
| 221:9 223:13 | 175:18,20 | 225:2,6,7,10,12 | 283:13 |
| 226:13 240:7 | 176:3 177:13 | 225:14,17,20 | **informational** |
| 252:2 | 177:20,23 | 225:21,23 | 97:17 267:3,6 |
| **information** | 178:12,17,20 | 226:2,12,18,20 | **infrastructure** |
| 61:16 89:10,14 | 178:22 179:10 | 232:5,7,9,10,17 | 83:9 |
| 89:15,20 90:20 | 179:13 181:3,5 | 232:19,21 | **initial** 37:10,14 |
| 91:3,13,22 | 193:12,13,23 | 233:7,10,15,17 | 38:22 117:4 |
| 92:17,23 94:5 | 194:15,22 | 233:21,21 | **initially** 37:16 |
| 94:8,11 95:20 | 195:4,23 | 235:11,17 | **input** 54:23 |
| 100:4,18,20,22 | 196:10 197:7 | 236:3,5,8 | 55:2,9,12 56:9 |
| 100:23,25 | 197:24 199:16 | 237:19,24 | 56:14,22 126:8 |
| 101:15 102:24 | 200:6,20,23 | 238:13,16,18 | 134:13 135:16 |
| 103:18,21 | 201:2 202:23 | 238:22 239:7 | |

**[inputs - items]** Page 33

inputs 82:6,10
  83:13 84:6,8
  84:20 85:14
  122:14 135:18
insert 53:16
  54:14
inserting 54:12
inside 31:22
insinuated
  116:9
insistent
  256:18
insofar 40:5
  95:11 129:24
  196:22 198:19
  266:12
instance 255:16
  276:7
instantaneous...
  266:20 271:14
institutional
  113:24
instruct 259:19
  261:14
instructed
  61:18 261:18
instructs 10:7
intact 100:17
intend 11:20
intended 5:22
  94:13 121:13
  265:3
intensity 192:7

intent 81:2
intention
  288:21
intentional
  137:22 255:25
interest 88:7,10
  88:20 89:3
interested
  17:11 30:16
  101:5 195:19
  195:20 199:17
  199:19,20
  229:16 291:14
  292:11
interface 285:9
interim 89:19
internet 280:16
internet's
  227:14
interpretation
  137:6
interpreted
  137:5
interrupted
  241:21
interruption
  209:6 242:4
interval 175:22
  175:23 178:18
intervals
  173:18 175:21
intraday
  173:24 174:6
  174:15 175:3

176:6,7,9,18
  177:7,7
introduce
  12:23 13:22
  56:23 63:16
  147:3
introduced
  147:6 202:18
  221:7 240:5
  253:16
introducing
  203:8,24
investment
  90:15 97:7,8
  97:10,12,21
  116:10
investments
  274:22
investor 178:24
  205:8 266:13
  266:15 272:19
  274:9,15
investors 90:16
  94:11 100:24
  133:9 197:8
  266:2 271:15
  272:7 273:3,16
  274:21 279:2
involve 173:8
involves 189:10
  249:2
irrelevant
  255:21

isolate 129:10
  130:11 168:3
  168:16,25
  169:13
isolating 169:6
  170:24
isolation
  216:23
issue 8:24 21:2
  32:13 33:12,22
  36:14 38:10
  39:5 40:8,10
  40:16,18 41:14
  41:25 42:4
  43:20 46:12
  63:8 72:11
  101:7 135:8
  151:2 205:11
  237:7 261:3
  280:23
issued 87:4
  139:5 141:3,6
  180:19 181:11
  183:6 240:25
issues 34:10
  41:2 42:16
  137:2 261:2
  274:20 275:4
  288:23
it'd 111:10
it'll 14:16
items 83:8

**[j - lead]** Page 34

**j**

**j** 2:15
**james** 292:2,14
**january** 14:5
156:3,13 157:4
157:13 211:21
214:23 216:8
262:21 263:24
264:4 265:6,9
265:10,15,16
265:18,20
273:20,23
277:9 286:15
286:21 287:13
287:18,20
**job** 101:4
**joshi** 193:6
**journal** 46:23
47:4
**journalists**
241:6
**july** 277:12
**jury** 77:6

**k**

**k** 199:9
**keep** 72:16
111:2 120:23
220:7 230:11
234:14 236:21
243:8 248:8,11
255:3 256:21
257:4 261:16

**keeping** 192:8
**kevin** 2:23 5:7
**key** 191:12,20
197:3
**kick** 93:21
**kind** 67:25
78:15 80:13
81:13 85:16
86:16 89:19
94:17 101:6
146:13 169:10
183:11,25
185:19 186:10
187:18 191:2
193:9 207:25
208:22 212:6
212:13 260:6
270:15 286:5
**kindly** 86:25
**knew** 211:8
**know** 9:7,13,18
10:13 14:17
19:6 35:2
40:15 45:4,4,9
45:16,19 48:16
49:15 53:22,25
54:2,3 66:18
67:15 69:24
81:5,11 83:12
86:17 89:9
94:13 95:7
98:11 99:6
100:3 101:6,13
102:6,10,11,17

102:22 103:7
103:11,16,22
106:9 107:2,5
109:18 110:16
110:18 115:21
118:8 127:6
133:21 140:21
146:9 150:20
150:25 154:8
154:11 156:17
166:16 171:7
172:20,21,22
176:16,17
177:2 180:15
180:18,23
181:10 192:11
193:6 194:14
207:6 208:12
208:18,19
210:7 213:4
214:3,13
215:23 217:14
217:20 219:20
220:2,17 224:6
228:19 229:7,8
229:15,22,22
229:22 236:4
240:23 244:8
245:18 254:24
256:3 259:25
260:17,24
261:6,25
264:16 271:14
281:4 285:10

286:2 288:24
289:19
**knowing**
102:22 227:16
**knowledge**
9:10 291:9
292:6
**known** 123:22
**krogman** 20:15
20:22 21:24
48:7 50:10,18
63:12 73:12

**l**

**label** 151:16
**lack** 33:10
263:9
**land** 83:8
**language** 62:9
210:9 275:10
275:11,14
**lap** 1:7
**large** 182:4
227:14 278:25
**larger** 34:11
150:16 171:6
**laws** 5:24
**lawsuit** 7:25
8:3
**lay** 80:24
**lead** 22:19
66:11,17 67:5
215:2 216:11

**learn**  78:4,4,5
**leave**  110:17
  126:17
**leaving**  193:8
  202:4 218:22
**led**  79:15
**ledger**  81:20
**left**  64:14
  132:10,11
  144:18 185:3
  185:13 223:4
**legal**  69:15,18
  69:25 71:9
  72:14,14 97:24
**length**  35:15
  36:10 151:3
**letting**  150:11
  166:16
**level**  142:17
  153:14 172:17
  200:17 251:25
**license**  91:20
**likely**  91:15
  240:21,22
**limitations**
  243:9 258:9
**limited**  114:25
  134:9,17
  135:23 139:15
  139:18 263:14
**line**  81:9,9
  108:9 129:8
  166:10 185:16
  185:20 186:24

187:4 256:20
268:18 270:22
279:23 286:17
289:20 293:4,7
293:10,13,16
293:19
**lines**  19:20
**linkh**  2:3 4:4
  6:11,11 9:25
  10:2 15:6 25:4
  25:13 28:16
  29:21 32:5
  35:6 37:19
  38:7 40:4,21
  41:21 42:13
  44:9 46:4,25
  47:8 49:9,24
  50:12,20 52:18
  54:6 56:17
  57:2 58:3 61:2
  61:24 62:13
  65:24 67:4
  69:7,14,23
  77:22 79:2
  83:2 91:8
  92:14 93:11
  94:19 98:15
  103:9 104:3
  106:16 107:20
  111:12 119:18
  133:4,18 147:5
  155:5 187:23
  189:20 194:4
  196:3,18 205:4

206:9 208:25
212:20 213:12
213:18 214:17
215:6 220:21
238:8,14
239:13,20
242:18 245:12
245:23 248:3
249:4,14 250:5
250:19 251:5
251:15 252:23
253:21 254:17
255:15 256:17
257:18 258:8
259:2,12,15,20
260:23 261:20
264:13 266:10
269:7 274:3
277:3,16
278:11 279:7
288:3,6,22
289:22
**lions**  99:17
**list**  16:15 54:14
  87:4 160:25
  281:13 284:18
  284:19 285:11
**listed**  79:8 83:7
  114:15 116:2,2
  141:17 142:4
  159:5 207:4
  283:20 287:9
  287:17,22

**listen**  21:25
  136:7 140:4
  246:4
**listing**  104:11
  104:18 229:9
  284:23 285:4
  287:10
**literature**
  176:13
**litigation**  23:11
**little**  30:14 49:2
  54:18 63:3
  68:2 82:21
  85:21 92:6
  93:24 99:5,16
  111:7 113:23
  120:18 127:18
  132:6 150:16
  156:4,7,14
  175:5 182:16
  220:21 229:14
  259:16 280:25
**llc**  51:15 53:4
  60:3,5,8,10,11
**llp**  2:5,16
**location**  1:14
**long**  71:12
  115:10 164:11
  210:10
**longer**  29:18,18
  42:4 43:13
  44:6 84:10
  111:7

**[look - lseg]**

**look** 12:4 16:24 24:6 30:18 31:7 45:4,6,8 48:20 51:10 54:18 58:4,7 65:6,8,16 67:13,15 68:6 70:8 80:12 87:17,24 101:11,11,13 106:19 109:20 112:22 114:14 119:3 120:24 120:25 121:3 124:22 127:15 128:7,8,9 129:8 135:13 140:24 141:19 142:13,15 143:22 144:10 144:14,16 149:10,12 154:15 156:3 156:19 157:16 157:24 158:14 160:19,25 161:13 162:10 162:12 166:5 172:7 175:15 175:18,20,25 176:11,13 178:10 179:14 179:17 181:16 182:12,17 183:24,25 184:18,24 185:12,25 190:22 192:13 192:17 194:12 194:25 195:21 196:10 200:25 202:11 207:21 208:4,22 210:9 210:19,23 211:14 212:14 216:22 218:24 219:10 224:17 225:15,17 229:25 232:8 232:14 233:19 234:6 238:2,6 238:6,7,9,10,19 242:10 243:5 243:14 250:8 252:18 257:11 261:4 268:6 272:12,16 281:21 285:9 286:5 287:15 287:19

**looked** 29:7,8 98:19 102:3,9 102:12 103:5 103:23 106:13 109:11,13 117:11 133:7 163:13 182:24 187:17 192:19 192:20,21,22 192:23 195:6 196:16 229:17 252:12 254:4 257:12 260:21 269:23 270:10 276:19 281:17 283:4 284:3 286:4

**looking** 11:10 14:17,19,23,23 14:25 15:9,16 35:7,12,24 37:22 38:14,15 54:11 75:14 77:2 89:11 94:2 95:17,19 98:16 129:6,18 129:20 131:6 131:15 133:10 134:12 135:11 140:20 141:25 146:6,15 148:3 148:16 149:17 149:21,22 156:6 159:8 173:14 174:14 180:3 185:23 185:25 186:4 187:18 195:17 196:15 201:2 202:5 206:23 208:20 231:2,5 234:10,15,21

235:5,23,24 238:12 249:2 256:10 263:11 274:9 275:14 275:20 284:13

**looks** 11:4 86:15 95:13 213:9 228:12 228:13 229:9 235:3

**loses** 200:5

**loss** 105:12

**lost** 242:4

**lot** 9:17 21:9 75:19,20 116:12 169:17 169:18,21 199:15 200:22 218:25 236:6 249:21 273:8 274:4

**lots** 105:8 139:23 274:19

**loud** 186:17

**low** 30:8 192:9

**lower** 81:25 84:7,12,13,17 143:3,9,19 146:9,25 268:2

**lowest** 143:13 143:14

**lseg** 104:13 282:7

**lunch**  110:23
111:6,8,11,13
111:20
**lunchtime**
111:5

**m**

**m**  185:14 186:2
**machinery**
81:22,24
**machines**  82:6
82:7,7,13,17,18
82:25 83:15,16
**made**  13:24
118:9 136:8
215:17 240:2
247:6 261:9
282:13 283:17
284:6 294:5
**magnitude**
198:15
**main**  83:7,13
**major**  189:22
**make**  8:18 9:3
14:22 36:17
39:21 44:6
59:10 65:18
87:17 90:15
95:13 109:6
120:13 122:14
124:6 150:15
156:6 169:4
184:9,15
187:11,13

199:11 206:13
225:11 226:2,5
240:17 241:12
243:23 244:19
245:20 247:4
254:10 260:13
282:10 283:5
283:16 289:4
**makes**  92:5
244:2
**making**  25:7
49:17 61:22
81:5 129:12
170:13
**man**  49:20
**manage**  192:7
**management**
271:22 274:24
**manager**  3:3
**manner**  5:25
192:10
**marked**  13:4
14:7,16 23:19
63:18 96:13
147:17 182:2
206:19 227:4
**market**  18:25
29:6,17 46:23
47:4,6,19,21,25
54:24 55:18
68:15,22 69:2
69:6 73:5,14
73:16,23 74:5
74:13,17 75:7

75:16,24 76:8
79:6 91:12
94:7,25 95:5
95:20 108:17
121:11,19
122:11 124:25
129:13,25
133:25 173:20
173:23 176:3
178:12 179:10
179:13 181:4
203:17 219:10
226:9,10
233:20 247:3
247:10 266:18
266:19,21,23
271:12,14
272:6 278:22
279:19
**market's**
205:25
**markets**  100:21
114:18
**mask**  152:3
**massive**  273:4
**materialization**
265:14 272:4
275:12 276:3,6
277:15 278:6
278:21
**materialize**
265:6,8 273:18
**materialized**
262:21 263:23

264:6,17
265:16,17
266:14 267:9
268:23 269:4
269:21,22
270:2 271:5,18
275:18,25
277:22 278:8
**materializing**
266:7,9
**materially**
263:20
**matt**  53:4 60:4
60:5 62:4
64:24 66:4
**matter**  7:12,21
7:22,23 9:8
21:16 38:11
65:15,21 79:18
109:18 202:5
**mattered**  194:2
**matters**  18:9
203:7
**matthew**  2:14
4:15 7:11
52:10 63:16
64:10 65:12
**maximize**  82:2
**mean**  10:4
25:14 33:20
47:12 52:22
56:19 65:5
82:7 83:6
87:22 88:13

**[mean - mm]**

100:9 101:13
123:17 131:14
135:2 137:18
151:25 182:7
184:2 189:18
201:6 207:14
210:8,10 212:2
244:4 247:25
248:5 265:8
269:8 287:8,10
**meaning**  72:13
192:25
**means**  6:2
10:16 85:5
97:5 132:7
**meant**  83:12
**measure**
119:14 125:2
129:14 145:18
168:6,18 194:6
195:21,24
196:2,9 197:4
243:8,11
252:21 254:15
**measured**
129:19
**measures**  135:5
**measuring**
120:9 193:11
242:14 243:8
**media**  2:24 5:5
57:17 100:13
100:14 112:6
167:2 222:24

238:9,19
240:23 241:3,9
241:16 242:13
249:3,25 250:9
280:10
**meet**  93:8
**megawatts**
190:2 273:5
**memorandum**
214:24 216:9
**memory**  61:9
80:10 180:11
207:17 230:23
**mentioned**  82:5
89:5 98:4
117:4 144:7
168:24 173:11
174:25 175:10
205:13
**mere**  92:21
94:10,18,21
**merely**  102:23
**met**  8:9
**method**  40:22
40:24 41:24
**methodologies**
203:2 221:15
247:18 251:24
**methodology**
33:14 79:20,22
204:14 218:9
**metrics**  90:2
**mexico**  211:9

**mid**  277:12
**middle**  29:24
30:15,21
270:16 286:5
**million**  186:5
215:3,3 216:12
216:12
**mincing**  198:5
**mind**  88:10
96:19 99:25
111:6 186:19
251:12 255:12
281:20,24
282:21
**mine**  77:10
280:19
**miner**  199:8,10
**miners**  272:24
**mining**  81:15
82:7,11,22,24
83:14,16
184:20,25
185:9 188:18
189:23 193:3
195:14 198:24
199:24 263:21
270:14
**minute**  24:12
118:21 128:9
130:24 160:24
166:11 179:22
183:24 211:22
268:10 281:4

**minutes**  33:7
110:22 111:19
111:22 280:3
**mischaracteri...**
94:20 108:3
201:15
**misrep**  159:18
159:21,25
160:5 162:19
**misrepresent...**
154:18 155:21
158:9 159:12
160:13 161:6
161:23 162:14
162:17,24
163:2,14,18
164:4,21
165:19 183:9
**misrepresent...**
154:24 161:5
165:17 205:7
**misreps**  154:3
**missed**  162:21
279:11,13
**misspoke**
139:21 162:23
234:25
**mistake**  13:25
240:2
**mix**  7:15
170:18,21
172:7
**mm**  9:13 58:21
120:21 148:12

148:20 149:9
150:2 152:16
152:18 154:4
154:10 155:2
167:13
**mode** 164:18
**model** 85:13
122:24 124:7
125:17,19,24
126:6 127:13
131:17 132:21
133:6 134:5,9
134:13,21,24
135:5,17,21,23
135:25 136:10
136:10,17
137:4,5,13,16
138:3,7,25
139:15,17,23
141:11,14
153:3 164:20
168:10 197:2,3
197:6,10 200:5
218:15 222:9
224:22,24
226:22 258:7
258:10
**model's** 226:6
**modeling**
136:25
**models** 84:6
89:25 139:24
**moment** 28:14
138:18 179:24

209:3 220:20
222:13 249:13
254:8
**money** 20:10
**monitor** 253:24
**month** 45:12,15
83:20
**months** 45:6
269:6,9,18
**morning** 7:6
**mou** 214:25
216:10
**mouth** 220:4
248:12
**mouthful**
163:24 165:12
**move** 18:11
118:14,16
123:19,21
129:12 130:22
131:23 133:25
169:10 177:22
177:24 203:18
229:24 261:17
**moved** 101:22
102:24 178:18
179:8
**movement** 99:8
100:6,8 119:10
175:25
**movements**
43:5 68:19
74:2 129:13

**moves** 175:15
**moving** 175:11
179:13 211:7
286:7
**multiple**
113:19 171:17
171:22 172:19
179:9 187:21
**municipality**
263:14
**murray** 2:5
6:12

**n**

**n** 2:1 3:1 4:1
133:13
**name** 5:7 7:7
8:2 62:18 67:6
67:16
**natural** 205:22
206:4
**naturally** 9:20
**nature** 47:14
218:13 225:23
232:9 245:13
**necessarily**
57:6 69:24
125:3 136:21
267:6
**necessary**
40:14 68:15
69:2,5 73:22
74:13,16 75:24
76:8 79:5

294:7
**need** 8:17 10:11
10:12 20:12
21:20 24:14
34:9,19 35:25
36:25 37:11
39:11,18 42:4
42:7 43:14
46:2 67:9 76:2
86:3,7 87:24
111:18 128:14
150:21 152:23
200:19 208:22
223:19 224:7
249:5 281:24
**needed** 19:17
21:19 40:2
53:8 54:13
**needing** 38:11
**needs** 67:8
69:25 75:12
**neither** 291:10
292:6
**never** 47:9
48:21 145:11
212:2 283:3
**new** 1:2 2:7,18
5:14 15:11
21:15 25:3
68:17 73:24
181:3,7 202:2
266:7,9 267:4
267:19 291:19

**news** 100:14 120:8 121:18 132:13,18,21 132:22 133:3,9 133:11,13,22 133:24 134:6,8 134:14,21,23 135:3,6,16,20 136:10,17 137:11 139:5 139:15,17 140:7,10,11,15 140:17 141:7 141:12,13,15 141:16 168:4,8 168:17,21 169:2,7,17,18 169:21,22,25 170:25 171:5 171:17 172:8 172:19 180:5 180:20 183:7 192:18 195:8 195:17 206:5 235:13 250:7,8 257:12 287:7

**nice** 145:7 279:24

**nine** 158:8 159:3 160:21 160:21 161:5,5 163:13,16,18 164:3,5,20 165:17,19

**nobody's** 103:23

**nod** 72:10

**non** 202:22 221:10 240:8

**nonresponsive** 18:12

**normal** 111:5

**notary** 5:12 291:18 294:13 294:19

**notch** 75:18

**note** 201:3 273:9

**noted** 70:5 139:2,9 294:7

**notes** 11:5

**notice** 4:8 13:2 14:3

**november** 63:17 64:10

**nuance** 266:12

**number** 5:5 24:9,10 33:22 33:25 34:4,7 35:16 37:23 38:18 40:9 54:15 55:20 57:17 104:21 112:6 146:10 146:14,16 152:15 156:15 167:3 180:2 222:24 231:20

280:10 283:2 284:25 285:13 286:18

**numbers** 53:16 54:12 161:3 282:18

**ny** 2:7,18

**o**

**o'clock** 166:18

**oath** 8:15 13:18

**oaths** 5:13

**object** 10:2 25:4 29:21 32:5 35:6 38:7 40:4,21 41:21 44:9 46:4,25 47:8 49:9,24 50:12,20 54:6 56:17 61:2,24 62:13 65:24 67:4 69:7 77:22 79:2 83:2 91:8 92:14 93:11 94:19 98:15 99:11 103:9 104:3 106:16 107:20 119:18 133:4,18 187:23 189:20 194:4 196:3 205:4 208:25 212:20 213:12

214:17 215:6 238:8,14 239:13,20 242:18 245:12 245:23 248:3 249:4,14 250:5 250:19 251:5 251:15 252:23 253:21 254:17 255:15 256:17 257:18 258:8 259:2,12 264:13 266:10 269:7 274:3 277:3,16 278:11 279:7

**objection** 5:16 6:16 25:13 37:19 42:13 52:18 69:22 70:5,24 71:3 196:18 206:9 213:18 261:9 261:13,16,17

**objectionable** 45:18

**objections** 261:11

**objective** 33:14 36:8,19,22 40:24

**objectively** 48:8 50:5,25 75:3 77:5

| | | | |
|---|---|---|---|
| **objectivity** 38:25 133:6,20 | **offered** 192:4 | 36:5 37:9,10 | 118:18,19,23 |
| **objects** 10:4 | **offering** 247:7 | 38:21 39:2 | 118:25 119:2 |
| **observable** 142:24 | **offerings** 191:24 | 42:2,20 43:7 | 120:12 121:7 |
| **observation** 35:11 | **officer** 291:1,2 | 43:22 44:4,20 | 123:12 125:9 |
| **observations** 33:23,25 34:4 35:16 | **offices** 227:17 | 45:3,11,23 | 125:22 127:9 |
| **observed** 90:3 | **officially** 14:16 | 47:17 50:6 | 128:10,12,21 |
| **obstruction** 260:8 | **offline** 229:4 | 51:3,11,13 | 130:16,22 |
| **obvious** 255:7 | **oh** 12:24 30:24 49:20 57:5 | 52:20 53:20 | 131:5,6,23 |
| **obviously** 32:12 224:3 273:16 278:18 279:16 | 86:10 96:23 145:3 149:14 150:11 158:19 158:22 162:22 167:18,20 171:24 185:22 191:7,10 213:21 231:5 269:11 280:19 286:20 290:6 | 54:17,23 55:15 55:17 56:9,10 56:18 57:12 59:7,11,16,24 60:7,12,20 61:4 62:6 64:3 64:19 66:6 67:11,23,24 70:4 78:19,21 79:17 80:20 82:9 83:19 84:3,23 85:4 | 132:3,5,19 135:13 136:15 137:14,20 138:17 140:4 141:19 142:5 142:16 144:6 145:12,20 146:5,7,22 147:7,10,10,13 147:22,24 148:10,21,25 |
| **occur** 263:10 | | 85:19 86:13,20 | 149:11 150:12 |
| **occurred** 154:12 276:3 | **okay** 7:23 8:5 10:22 11:13,18 12:12,22 13:13 13:17,20,24 15:4,23 16:2,3 16:7 17:10 18:11 19:5 22:12,22 23:6 23:13,17,25 24:2,11,16 25:17 26:17 28:6,12 29:3 30:19 31:8,19 33:19 34:18,25 | 86:24 87:3,7 87:20 88:2,2 88:25 90:5,8 94:2 96:2,4,8 96:23 98:2,7 101:11,13 102:6 103:10 103:21,25 106:7 110:14 112:10,18,21 113:7,16 114:21 117:2 117:15 118:13 | 150:18,19 151:7,8,10,20 152:15,17,19 152:22,24 153:25 155:17 155:25 157:8 157:12,22 158:18,25,25 159:14,24 160:10 161:22 162:2,10 166:7 167:15,20,22 169:3,8,9 170:10 173:15 |
| **occurrence** 142:20 | | | |
| **occurring** 133:8 134:2 137:9 142:23 265:23 | | | |
| **occurs** 175:18 197:7 | | | |
| **odds** 45:13 | | | |
| **offer** 97:18,19 115:5 192:6 209:9 | | | |

**[okay - opposite]**

176:24 179:16
179:21 180:9
181:15,15,21
182:10,12
184:8,9 186:14
187:14 189:5
190:12,25
191:18,25
192:11 196:21
197:13 198:3
200:2,24
202:15,16
205:13 206:15
207:3,18,21
208:2,16
209:11,19,22
210:14,15,19
211:2,25
213:21 217:21
219:23 220:4
223:2 224:12
226:25 227:6
227:22,24
228:18 230:2
230:15 231:18
232:20 233:24
234:4,6,11,12
237:22 238:10
241:24 246:6
246:10 249:18
250:2,25
251:19 256:10
262:3 264:16
267:17 268:11

275:9 276:19
276:20 280:12
280:21 281:3,7
281:10,12,15
282:6 284:9
285:7,17,18
286:2,12,20
287:4,14,25
289:14 290:9
**old**   25:2 45:2
**omissions**
    205:6
**omitted**   245:16
**once**   15:5 127:7
    145:8 193:20
    200:6 225:13
    225:25 238:15
    238:16 240:18
    241:10 250:10
**ones**   135:24
    151:25 284:5
**online**   271:24
    272:24
**open**   12:24
    23:22 64:3
    147:22 268:12
    281:16
**opened**   182:13
**opening**   23:24
    281:15
**operates**   97:9
**operating**
    90:14 186:23
    187:6 270:20

270:21,24
**operation**
    263:16,22
    267:18
**opine**   48:9
    49:11 50:3
    95:18 108:17
    108:19 127:8
    152:7 181:9
    212:25 213:2,4
    215:14 216:4
    216:25 217:2
    218:14 222:12
    238:25 246:24
    254:19 258:21
**opinion**   9:6
    18:9 20:19
    49:4 68:6
    69:17,19,20
    70:4,10,11
    71:6 72:14
    73:8,17,20
    74:7,12,12,15
    75:22 76:4,6
    79:7,7 80:2
    85:10 126:5,16
    176:21 192:15
    199:14 200:16
    203:10 204:4
    206:13 209:8
    211:13 213:21
    214:4,11 215:8
    215:11 217:5
    219:4,8,14,15

219:16 221:17
221:20 232:16
236:13,15
237:4 239:11
239:15,16,17
241:12 243:20
244:13 245:20
246:11,19,20
247:7,8,22
248:20 249:12
251:6,9,17,20
252:13 253:2,4
253:10,14
254:24 255:2,5
255:6 256:15
256:25 257:5
277:13
**opinions**   16:15
    16:16 17:23
    54:24 55:3,5,5
    55:7,8,10
    56:22 62:19
    70:16 71:22
    72:23 79:8,10
    85:8 124:17,24
    126:13 200:8
    220:20 233:23
    273:12
**opportunity**
    201:19 243:22
**opposite**   48:24
    92:7 193:7
    195:10,12,18
    196:11

**[optic - paragraph]**                                    Page 43

**optic** 280:22

**optimal** 34:6

**order** 85:22 126:20 200:16 223:18,22 230:14 232:20 234:18 263:15 286:6 287:23

**originally** 267:20 274:7

**oscillation** 31:24

**ought** 203:15 203:16

**outcome** 84:17 291:14 292:11

**output** 137:7 148:2,16 149:7

**outside** 9:9 31:18,20 44:18 85:17 130:10 145:3 221:23 243:15

**overall** 45:9,14 94:5 226:10 263:20

**overcome** 33:9 40:10

**overlapping** 27:25 28:5,6

**own** 55:5 91:20 97:23 165:3

**owned** 60:3

**p**

**p** 2:1,1 3:1,1 142:14,15,16 143:3,9,11,12 143:23,24 144:5,10,18,22 145:15 146:10 146:19,24 148:22 149:3 151:19 152:22 153:6,12,18 155:4 156:16 156:22 157:10 157:15,18,25 161:2 162:3 164:7 165:21

**p.m.** 112:2,5 166:22 167:2 222:20,23 280:6,10 290:11,12

**page** 4:2,7 15:9 15:19 16:4,20 16:21 22:23 24:6,7,9,10,15 24:19 25:25 26:7,12 28:20 51:3,4,12 54:19 63:22 64:5,7 67:25 68:3,4,5 79:9 85:22 86:4,8 86:10 96:17

113:4 118:16 118:18,23 119:21 120:16 120:17 127:11 127:13,22 128:4 137:12 140:24 166:14 180:2 182:6 186:11 190:18 190:20 191:2 191:14 209:16 210:23 293:4,7 293:10,13,16 293:19

**pages** 120:21 198:20

**paid** 178:21

**paper** 11:4,5,10 14:13,18,23,25 18:8 104:23 110:11

**papers** 146:4

**par** 50:22 72:7 76:22

**paragraph** 16:8,11,25 25:19,25 26:15 28:14,17,24 29:8 30:22 31:2,5,7 33:4 39:23 42:24 51:10 54:16 58:17,20 59:5 59:6,15 67:14

70:12 71:6,16 72:19 80:5 86:5,8 90:6,9 96:19 97:2 105:20,24 108:12,25 109:21 118:23 119:20 121:4 127:17 128:5,9 128:15,16 130:23 131:2 131:11,24 132:3 135:12 139:2 167:11 168:3,13,22 185:7,8 190:17 190:17,22 192:12 195:11 202:7,7,8,10,16 204:6,7 209:12 209:23 210:12 210:20,21 211:4,20 214:23 218:5 221:5 239:18 239:24,25 240:3,15 253:20 262:11 262:11 267:11 270:16 275:19 275:21,22 276:14,16 288:10,12 289:10,11

**[paragraphs - percent]**

**paragraphs**
30:21 65:3,11
65:13,20,22
66:2 80:18,23
86:19 109:20
**parameters**
85:16 93:8
**pardon** 284:10
**parentheses**
272:2
**parenthetical**
189:24
**park** 2:6
**parroting**
271:22
**parse** 193:18
196:2 226:11
**parsing** 172:16
**part** 38:3 42:21
42:22,23 68:25
70:3 107:15
109:22 116:16
118:2 147:16
192:3 195:6
223:21 228:10
247:12,13
249:5,8 264:22
270:4
**partial** 129:25
226:7
**partially**
262:19
**participants**
247:3 279:19

**particular**
35:23 41:25
46:12 51:24
52:6 53:18
54:15,15,16
62:15 72:11
76:15 79:21
82:16 84:2
88:8,21,23
92:20 94:6
95:15,15,21
98:5 108:20
118:5 129:22
130:4 144:23
149:7 152:7
153:23 154:17
170:13,14
172:13 174:8
177:10 181:5
183:8 187:15
190:10 195:9
205:9 216:15
217:13 241:2
253:10 266:2
267:21 277:5
**particularly**
124:7 283:14
**partida** 2:15
4:3 6:9,9 7:3,5
7:7 12:22 13:6
13:20 14:9
25:5 28:19,22
32:6 52:19
56:23 57:5,21

61:3 63:14
64:4 69:10,16
70:3,9 79:3
95:22 96:2,8
96:15 107:21
110:18,25
111:16 112:9
115:9,13
138:13,22
147:2,7,10,21
147:23 155:7,8
166:13 167:5,6
194:5 196:4
213:14,19
220:25 221:3
222:15 223:2,3
226:25 227:6
227:11,16,19
227:22 228:2
239:14,21
242:19 245:24
248:4 249:15
250:6,20
259:13,18,22
261:7,23 262:4
279:25 280:12
280:13,19,24
281:6,9 287:25
288:20 289:2
289:14,19,25
290:7
**parties** 5:14,18
291:11,13
292:7,10

**parts** 52:4
257:19
**party** 203:22
**paste** 17:16
18:3,17 20:2
21:20 22:5
**pasted** 18:22
20:22,23
**pasting** 20:21
**path** 47:10
**pattern** 140:20
142:24
**pause** 69:10
206:23
**peer** 46:22 47:4
**penalty** 17:5
**pending** 10:16
11:19 71:3
79:21
**pension** 60:13
64:15
**people** 12:8
48:22 154:8
156:5 196:9
200:7 224:5
278:16,20
**perceived**
203:14
**percent** 20:5
142:3 143:23
153:14 156:23
158:2 163:5
213:7

**[perfect - ph.d.]**                                    Page 45

| | | | |
|---|---|---|---|
| **perfect** 11:13 | 32:10,13,16,18 | **perjury** 17:6 | 63:1 64:1 65:1 |
| 26:3 42:20 | 32:19,20,24 | **permissible** | 66:1 67:1 68:1 |
| 55:11 114:6 | 33:5,11,15,17 | 11:8 | 69:1 70:1 71:1 |
| 120:12 123:24 | 35:15,17 37:14 | **permits** 272:14 | 72:1 73:1 74:1 |
| 125:9 141:15 | 37:23,24 38:5 | **permitted** 5:22 | 75:1 76:1 77:1 |
| 141:19 145:3 | 38:14,14,23 | **permutations** | 78:1 79:1 80:1 |
| 151:7 155:17 | 39:4,20,25 | 255:18 | 81:1 82:1 83:1 |
| 167:22 169:3 | 40:6,16 41:13 | **personal** 7:21 | 84:1 85:1 86:1 |
| 174:21 227:22 | 41:17 42:5,5,6 | **personally** | 87:1 88:1 89:1 |
| 233:24 255:3 | 42:17,17,18 | 22:18 75:23 | 90:1 91:1 92:1 |
| 262:10 280:2 | 43:7,12,13,18 | **perspective** | 93:1 94:1 95:1 |
| 289:25 | 43:20,21 44:2 | 79:16 177:19 | 96:1 97:1 98:1 |
| **perform** 51:23 | 44:5,7,11,12,13 | 178:5,14 | 99:1 100:1 |
| 52:2 55:23 | 44:16,16,18,19 | **ph.d.** 1:11 4:11 | 101:1 102:1 |
| 61:4,20 62:2 | 44:21,22 45:7 | 4:13,16 5:1 6:1 | 103:1 104:1 |
| 175:13 219:19 | 45:8,12,15,21 | 6:20 7:1 8:1 | 105:1 106:1 |
| **performance** | 45:25 46:2,6,6 | 9:1 10:1 11:1 | 107:1 108:1 |
| 90:13,15 | 46:7,11 48:17 | 12:1 13:1 14:1 | 109:1 110:1 |
| **performed** 49:6 | 48:18 58:14,15 | 15:1 16:1 17:1 | 111:1 112:1 |
| 64:21 66:7 | 58:23,25 59:2 | 18:1 19:1 20:1 | 113:1 114:1 |
| 223:17 | 59:18,19 68:23 | 21:1 22:1 23:1 | 115:1 116:1 |
| **performing** | 73:7 74:6 | 24:1 25:1 26:1 | 117:1 118:1 |
| 61:10 | 130:7 133:16 | 27:1 28:1 29:1 | 119:1 120:1 |
| **period** 25:23 | 141:4 154:13 | 30:1 31:1 32:1 | 121:1 122:1 |
| 26:5,7,20,21,24 | 154:25 168:6 | 33:1 34:1 35:1 | 123:1 124:1 |
| 27:3,4,6,8,9,10 | 168:18 183:21 | 36:1 37:1 38:1 | 125:1 126:1 |
| 27:13,18,19,21 | 288:11,12 | 39:1 40:1 41:1 | 127:1 128:1 |
| 27:22,23 28:9 | 289:13,13,17 | 42:1 43:1 44:1 | 129:1 130:1 |
| 28:10,11 29:6 | 289:18 | 45:1 46:1 47:1 | 131:1 132:1 |
| 29:9,10,17,18 | **periodicity** | 48:1 49:1 50:1 | 133:1 134:1 |
| 29:19 30:2,3,6 | 35:20 | 51:1 52:1 53:1 | 135:1 136:1 |
| 30:7 31:4,9,10 | **periods** 27:16 | 54:1 55:1 56:1 | 137:1 138:1 |
| 31:15,16,19,21 | 131:20,21 | 57:1 58:1 59:1 | 139:1 140:1 |
| 31:22,25 32:10 | | 60:1 61:1 62:1 | 141:1 142:1 |

**[ph.d. - please]** Page 46

| | | | |
|---|---|---|---|
| 143:1 144:1 | 211:1 212:1 | 279:1 280:1 | 218:24 232:17 |
| 145:1 146:1 | 213:1 214:1 | 281:1 282:1 | **pieces** 170:6 |
| 147:1 148:1 | 215:1 216:1 | 283:1 284:1 | 171:22 173:2 |
| 149:1 150:1 | 217:1 218:1 | 285:1 286:1 | 193:12 212:15 |
| 151:1 152:1 | 219:1 220:1 | 287:1 288:1 | 237:18 243:12 |
| 153:1 154:1 | 221:1 222:1 | 289:1 290:1 | **pivot** 191:21 |
| 155:1 156:1 | 223:1 224:1 | 293:2,24 294:2 | 195:14 198:5,8 |
| 157:1 158:1 | 225:1 226:1 | 294:4,12 | 198:10,11 |
| 159:1 160:1 | 227:1 228:1 | **phenomena** | 199:2,3,4,11,22 |
| 161:1 162:1 | 229:1 230:1 | 34:14 | 199:23 |
| 163:1 164:1 | 231:1 232:1 | **phenomenon** | **pivoting** 193:2 |
| 165:1 166:1 | 233:1 234:1 | 142:20 | **place** 190:15 |
| 167:1 168:1 | 235:1 236:1 | **phone** 11:15,15 | 272:13,14 |
| 169:1 170:1 | 237:1 238:1 | **phrase** 76:21 | **plaintiff** 15:13 |
| 171:1 172:1 | 239:1 240:1 | 100:7 134:17 | 263:5 |
| 173:1 174:1 | 241:1 242:1 | 219:22 | **plaintiff's** |
| 175:1 176:1 | 243:1 244:1 | **phrasing** | 112:20 204:25 |
| 177:1 178:1 | 245:1 246:1 | 115:20 | **plaintiffs** 1:5 |
| 179:1 180:1 | 247:1 248:1 | **pick** 34:16 35:5 | 2:2 6:12 10:2 |
| 181:1 182:1 | 249:1 250:1 | 40:16 | 64:16 79:21 |
| 183:1 184:1 | 251:1 252:1 | **picked** 31:8 | 192:20,22 |
| 185:1 186:1 | 253:1 254:1 | **picking** 36:24 | 203:23 |
| 187:1 188:1 | 255:1 256:1 | 48:10 | **plan** 270:12 |
| 189:1 190:1 | 257:1 258:1 | **pictures** 210:22 | **planning** |
| 191:1 192:1 | 259:1 260:1 | **piece** 134:23 | 186:21 188:22 |
| 193:1 194:1 | 261:1 262:1 | 135:3 164:18 | 270:18 |
| 195:1 196:1 | 263:1 264:1 | 164:19 171:5 | **plant** 205:23 |
| 197:1 198:1 | 265:1 266:1 | 172:13,14 | **play** 140:4 |
| 199:1 200:1 | 267:1 268:1 | 174:3 179:12 | 179:21 |
| 201:1 202:1 | 269:1 270:1 | 192:18 193:13 | **players** 99:19 |
| 203:1 204:1 | 271:1 272:1 | 196:10 197:8 | **please** 6:6,18 |
| 205:1 206:1 | 273:1 274:1 | 214:18 215:25 | 16:3 58:18 |
| 207:1 208:1 | 275:1 276:1 | 216:2,13 217:7 | 63:21 74:19 |
| 209:1 210:1 | 277:1 278:1 | 217:9,14,16,19 | 96:22 108:7,13 |

**[please - prepared]**

128:17 138:13
138:13 182:18
187:25 190:23
209:11 232:25
**plotting** 131:11
**plus** 26:23
**pocket** 79:22
**point** 36:16
39:6,10 42:24
44:4 59:4 61:6
100:16 106:14
106:20 107:8
107:13 108:10
111:10 117:19
122:2 123:5
126:15 129:5
132:25 135:12
137:14,24
149:9 154:20
164:15 174:17
176:17 178:7
194:12 197:10
198:7,16,24,25
199:10 201:22
204:21 220:4
221:4 222:8
223:25 237:20
242:3 245:4
247:5,19
251:18 255:8
256:2,2,16
258:22 259:22
266:12 271:17
273:14 275:9

275:13 285:15
**pointed** 26:4
**pointing** 66:2
186:16 231:6
259:20
**points** 109:6
173:23 174:5
235:20
**police** 60:13
64:15
**portfolio** 34:6
**portion** 202:19
221:8 240:6
**portrayal**
125:8
**posed** 92:16
**position** 245:9
**possession**
182:24 183:5
183:14 184:13
**possible** 20:9
50:5 51:2 75:3
77:5 82:4 93:7
104:15 140:15
140:17,18
220:9,10,16,17
240:19 244:14
244:21 246:12
247:23 251:4
251:10,11,13
252:8,10
255:14
**post** 39:12
137:3 139:11

140:21
**potential** 88:19
124:8 133:11
133:23 135:20
137:11 174:2
175:9 203:17
217:17 223:12
263:10 267:23
272:9,21 275:4
275:7
**potentiality**
275:6
**potentially**
40:8 54:11
56:21 100:25
126:21 181:7
197:21 203:14
205:8 206:4
212:19,21
214:19 217:20
217:21 232:18
233:19 272:25
**power** 30:2,8
30:10 32:14,15
33:10,12,18,20
34:11 35:18
36:9 37:3,12
37:13,15,17,20
38:4,12,22
39:3,8,11,19,25
40:8,10,13,15
40:18 41:2,13
41:18 42:7,15
42:19 46:11

82:6,12,23
83:3,20 187:21
188:5,16 192:8
193:15 205:3
263:13 271:8
**powered** 82:19
**practice** 224:5
**practices**
244:25
**preceded**
277:20
**precise** 130:19
140:9 165:11
**precisely** 43:13
197:4
**precision**
130:21 136:20
139:25
**precursor** 7:14
**predominance**
75:15
**predominant**
81:22
**prefer** 71:13
261:15 288:22
**premature**
124:11
**preparation**
51:16 53:10
**prepare** 23:15
**prepared** 22:17
23:14 24:4
52:16 106:23
292:3

**preparing** 38:3 66:9

**presence** 240:16 246:21 252:3

**present** 2:22 3:2 49:12 209:3 220:20 249:12 254:7

**presented** 238:15

**presenting** 75:8

**presently** 123:9 126:3

**presents** 254:18 255:10 256:5

**press** 278:18,18 278:19

**presume** 74:21

**presumption** 105:3 110:11 287:21

**presupposes** 256:7

**pretty** 8:23 46:17 75:18 135:25 162:6 208:6 279:5 280:15

**previous** 22:16 62:24 241:25 261:21

**previously** 98:2 187:17 269:19 271:12

**price** 43:5 68:19 74:2 89:23 97:13 98:14 100:6,8 101:22 102:24 119:10 120:8 121:17 122:3 123:19 129:4 169:7 171:14 172:10 175:11 175:15,25 176:4 177:22 177:24 178:10 178:18 179:7 185:6 197:16 201:21 202:24 203:18 204:10 219:11 221:12 223:13 230:6 240:10 247:8 257:6 267:5

**prices** 119:16 133:25 168:5 168:17 173:20

**pricing** 174:6

**primarily** 114:2 115:7

**primary** 204:25

**printed** 15:20

**prints** 285:11

**prior** 91:24 97:24 138:10 138:15 148:4 215:7 216:18 243:19 266:4 291:4

**privilege** 60:19 61:13

**privileged** 61:16 123:11

**privileges** 113:22 114:25

**privy** 266:3

**probably** 13:24 14:19 15:4 138:16 145:3 180:4 210:13 227:19 256:3

**problem** 9:19 12:6 34:19 35:4 37:15 39:18,25 41:18 43:15 150:8 197:9 207:25

**problems** 233:14 272:9

**procedural** 5:23

**procedurally** 243:16

**procedure** 22:9 22:12 244:24

**proceed** 7:2 33:15 70:22 252:6

**proceeding** 1:14 5:21 290:13 292:4

**proceedings** 291:3,4,5,8 292:5

**process** 90:23 193:23 235:12 236:11 237:12 244:24 245:5 248:13,17,17 248:24,25 249:17,18 250:3,3,9

**produce** 225:6

**produced** 5:20 98:13 121:24 122:21 182:22 183:4,13,13 229:21

**producing** 110:10 205:24

**product** 60:18 61:13

**profession** 76:19 78:3

**professional** 7:21,23 52:21 52:23

**profitability** 192:10 263:21

**[profits - question]**

**profits** 268:2 272:22

**project** 84:11 177:8 193:20 196:14 200:19 211:9 262:19 277:10,11

**projecting** 187:5 268:19 270:23 273:25

**projection** 189:16

**projections** 262:18

**projects** 273:22

**promised** 272:15 273:5

**prongay** 2:5 6:12

**pronouncing** 14:10

**proper** 260:6

**properly** 258:21

**propose** 158:12

**protected** 60:18,18 61:13 249:7

**provide** 36:7 90:14 97:8,12 104:10 114:4 114:23 116:15 117:18 201:7 245:2,3 283:19

285:15

**provided** 97:17 116:13 117:9 117:11 237:9 283:7

**provider** 116:16

**providers** 95:5

**provides** 106:12

**providing** 77:4 90:4 115:22 116:17

**public** 60:21 61:7 277:19 278:22 291:18 294:19

**publicly** 62:10 67:7 276:22 277:9 278:15

**publish** 90:10 106:4 114:21 114:23

**published** 97:16 265:9

**publisher's** 97:11

**pull** 56:7 101:20 282:15

**purchase** 202:20 221:9 240:7

**purchased** 117:17

**purchasing** 97:24

**purpose** 119:17 130:8,12 167:25

**purposes** 32:2 32:4,18 97:17 143:19 223:9 225:8 226:3

**push** 274:8 276:10

**pushed** 268:24 269:24

**put** 19:10 50:22 67:6 95:22 100:19 104:23 104:25 105:4 108:21 129:5 201:14 283:13

**puts** 15:6 92:24

**putting** 62:24 87:11 220:3 248:12

**q**

**q255** 149:13

**qualified** 291:7

**qualify** 224:13

**quality** 264:23

**quantified** 20:7

**quantify** 121:13 251:25

**quantifying** 19:17 20:25

126:11

**quarter** 35:10 35:21 189:13 189:13

**quarterly** 35:9 35:14 37:4 134:3

**quarters** 185:21 186:13 186:20 187:21 188:21,25 189:10,15 268:18 270:17

**queried** 283:24

**query** 284:18

**querying** 283:20,21

**question** 8:19 8:21,21 10:3,5 10:6,15,16 11:19,25 17:15 18:2,5,15,16,20 19:7,8,23,24 22:8,9 25:8,10 27:20 30:13 33:7 35:7 45:18 47:2,14 47:24 48:15,25 49:3 50:6,13 59:9 60:2 65:17 69:13 71:13,14 72:17 75:19,20,21 76:3,15 81:6

**[question - read]**

82:20 87:19
88:11,21 89:8
92:6 95:11
99:4,5,10,25
104:6 106:7
113:11 114:6
115:14,23
116:8,25 117:2
118:2 119:23
125:10 126:8
126:18,24
129:16,17
130:4 133:2
135:4 136:3,16
138:4 139:6,12
139:20 140:2
154:21 155:6
155:13 158:11
161:15 163:11
164:25 165:9
165:16,18
167:17 168:9
168:12,14
169:15 170:19
171:15 172:23
173:8 174:8,11
178:21 184:6
187:25 189:6
193:10 194:10
196:6,7,8,22
197:14 200:3,4
200:11 201:12
202:6 208:9
212:13 213:13

213:15 215:19
215:19 221:16
225:3 230:16
232:13 233:2
239:2 241:22
242:6,6,8,9,10
243:18 244:3
244:10 245:14
246:18 247:20
250:11 253:10
255:8 260:18
261:22,24
265:19 279:12
285:21 288:4
**questioning**
108:10 166:10
256:21 279:24
289:21
**questions** 7:14
8:22 10:8,24
27:16 63:5
67:19 76:13,14
81:14 105:15
112:25 118:22
150:9 165:5
182:20 184:3
206:18 210:13
220:24 221:2
236:14,18,23
260:3,4,9,10
284:12 288:2
289:23
**quick** 159:4
208:4

**quickly** 93:13
110:7,9 263:17
279:2
**quite** 25:9,14
29:3 41:9 91:9
100:8 106:8
108:2,3 115:23
126:18 134:4
136:9 139:13
163:25 190:8
236:9 242:10
**quote** 133:11

**r**

**r** 2:1 3:1 293:3
293:3
**raise** 6:18
**raised** 174:8
**ramifications**
70:2
**ran** 37:15
103:25 284:17
**random** 142:21
142:23 143:2
**rates** 263:19
265:4
**rather** 21:22
145:4 240:14
**ratings** 97:13
**rationale** 192:3
**reach** 49:16
187:6 196:11
265:25 268:19
270:24 278:25

**reached** 209:8
**reaches** 100:24
**reaching**
278:14
**reacted** 197:9
197:15 233:17
**reacting** 241:7
**reaction** 197:14
**read** 17:13
28:24 30:23,25
31:6 43:9
68:10,11,14
70:12,17,18
96:18,22,23,25
96:25 98:6
118:21,25
119:19 121:6
137:25 138:11
138:13 167:18
184:2,7 186:17
187:2,18,24
190:24 191:3
191:16,18,25
192:12 197:21
201:7,25 210:4
210:5,6,8,13,14
210:20,25
211:4,10,22,23
217:10 239:17
239:22,23,24
253:22,24
261:24 262:14
268:16 289:6
294:5

**readers** 97:15 97:21

**reading** 17:2,3 17:12 28:25 29:2 134:12 164:2 188:2 197:23 201:4 209:4 212:2,7 213:6 262:25 270:13

**ready** 96:22 128:12 131:3 132:2 167:16 279:22

**realistic** 250:15

**reality** 250:13

**realization** 272:21

**realized** 84:10 268:2

**really** 8:24 9:2 21:8,8 29:14 39:8,15 45:6 45:13 48:23 77:17 88:25 89:2 91:3,6 92:11 94:2 101:5 111:17 130:10 157:17 159:4 194:2 200:3 242:8 244:13 254:14 285:20 289:20

**reason** 13:13 13:15 29:25 101:24 125:14 163:24 164:10 172:18 223:16 254:21 271:3 284:18,22 289:2 293:6,9 293:12,15,18 293:21

**reasonable** 30:5 33:9,14 34:21,23 36:8 36:18,22 37:6 40:23 41:24 42:9 90:23 95:14 125:7 144:3 146:11 146:14 153:16

**reasons** 94:16 134:10 233:23

**recall** 62:23 181:13 183:20 211:18

**recant** 219:15

**receipt** 266:15

**receive** 63:20 93:18 94:25 252:5 271:15

**received** 12:20 12:21 23:18 91:14 96:6,7 147:15 181:20 181:24 195:22

207:7,15 208:13 227:9 227:11

**receives** 266:13

**receiving** 23:23 200:7

**recent** 90:11 191:8

**recognize** 208:11

**recollect** 207:14

**recollection** 64:20

**recommendat...** 90:16 97:13

**record** 5:3,17 6:7 57:11,13 57:15,18 70:6 110:15 111:24 111:25 112:3,5 123:14 138:20 166:22,23,25 183:3 187:14 201:15 222:20 222:21,23 259:21,23 261:14 280:6,7 280:9 288:19 289:24 290:2,5 290:8,10 291:9 292:5

**recorded** 5:6 5:25 8:13

291:6

**recording** 5:20 8:11 291:8 292:3

**recurring** 89:18

**recycle** 25:2,11 25:15

**red** 19:20

**redisclosed** 278:4

**reduce** 273:6

**reduced** 291:6

**refer** 14:13 60:20 84:4 86:21 138:9 201:17 215:7 216:18 231:13 231:16 235:4 275:20

**reference** 288:10

**references** 289:12

**referred** 117:8 127:13 141:10

**referring** 52:13 58:18 171:23 195:13 212:17 267:14

**refers** 127:17

**refinitiv** 104:14 282:7,22 283:7 283:25 284:2

284:17
**reflected**
163:22
**reflective** 267:5
267:7
**reflects** 17:23
**refresh** 59:11
64:19 80:9
267:10
**refusing** 260:5
**regard** 55:17
56:14 169:15
**regarding**
190:4 262:17
**regardless**
92:22
**regards** 21:23
22:8 25:20
30:3 32:11
46:9 51:18
55:3,7 100:16
104:20 114:3
118:3 131:10
133:6 137:3
173:9 206:11
223:13 235:6
235:23 236:2
247:8 263:7,25
264:23 267:13
267:18 285:4
**registered** 97:6
**regression**
26:19 130:15
131:8,13

167:24
**regular** 89:17
89:18
**regularity**
35:14
**regularly** 133:8
137:9
**reinvent** 20:11
20:12
**reject** 142:22
**relate** 205:2
**related** 202:22
221:11 240:9
291:10 292:7
**relating** 262:18
**relationship**
43:3 45:5,10
45:15,16 52:21
52:23 68:17
73:24 74:23
88:22 119:8,15
143:5
**relative** 189:4
288:23 291:12
292:9
**release** 132:20
139:5 141:6
148:16 171:3,8
172:22 181:5
181:12 195:17
231:24 232:3
235:18 236:3
237:16,25
241:2 242:12

242:17,21,22
243:7 277:5
278:19,25
279:4
**released** 173:3
195:7 235:14
235:16 241:17
**releases** 132:15
132:16 134:3,7
134:15 135:6
135:15,20
136:8 140:14
148:14,19
170:6 177:3
237:18
**relevant** 101:15
129:12 205:8
205:18,20
**reliable** 202:17
221:6 240:4
253:16
**reliance** 72:12
**relied** 177:24
178:13,24
**rely** 178:11
**relying** 41:15
93:15 264:21
**remains** 38:10
100:17 173:6
198:16 205:18
225:13
**remember**
61:10 93:15
242:2

**remote** 1:14
**remotely** 5:15
**removed**
250:12
**render** 217:5
218:18 253:2
254:23 255:2,5
256:15,24
257:5 268:10
**rendered**
150:23 253:4
**rendering**
97:20 150:14
209:17
**repeat** 47:2
66:17 67:5
77:21 104:4
113:11 243:19
**repeated** 18:13
138:19
**repeatedly**
20:23 21:24
79:14 217:25
**repeating**
220:8 254:7
**repetitive**
105:11
**rephrase**
194:10 196:6
**report** 4:10,12
4:15,18,19,20
4:21 9:7 11:8
14:6,14 15:5
15:24 16:4,10

**[report - reports]** Page 53

16:14 17:11,15 17:17,17 18:3 18:7,17,23 19:25 20:2,13 21:11,15,15,21 22:4,20,21 23:13,15 24:3 24:7,14,20 25:2,3,12,12 26:12 28:15,18 28:20 31:7 38:2,4,25 41:7 49:6,16 51:5 51:16,19 52:9 53:10,13,21,23 54:4,11,19,20 55:14 58:13,14 58:24 59:22 62:10,11,15,16 62:17,19,20,24 62:25 63:16 64:9 65:3,4,5 65:12,14,20 66:25 67:7,22 68:5 69:17 70:15 71:16 72:20,22 74:24 74:25 77:12,12 80:7,8,24 84:2 85:9,16,23 87:13 89:17,18 89:19 90:7,9 91:2,4,5,15,21 91:24,25 92:7

92:13,16,18,21 92:24 93:7,19 93:21 94:25 95:2,12,14,16 96:9,9,17 98:9 98:10,18,20 100:19 103:18 105:4 106:11 106:22 108:11 108:16,25 110:12 113:3 115:6 116:14 116:17,22,23 117:23 118:15 121:9,13 124:21,25 137:24 138:11 140:16,24 146:4 147:16 158:8 167:9 171:6,8 174:13 180:8 181:7,8 181:18 182:6 182:21 183:6 183:12,23 184:11 186:19 187:16 188:3 189:7 190:14 190:15,18 191:9,13,15 192:13,14,25 193:21 195:5,6 195:7,11,13 196:16 197:22

197:23 198:12 198:17,20,22 200:13 201:2,8 202:9 204:7,13 206:22 207:2 208:5 209:5,10 210:10 212:3 217:11 218:6 218:20 221:23 223:9 228:12 231:14,16 234:14 235:15 235:16,25 236:2 237:4 239:23 240:24 241:16,17,19 242:16,25 244:5,9 245:8 245:11 247:9 247:12,13 250:24 253:13 253:15 262:6,9 264:2,8,9,11,12 265:9,12,20,24 266:3,25 268:15 269:13 269:15 270:6,9 270:10,11 271:6,21,25 273:9,24 274:10,25 275:3,19 281:21,22 282:12 284:20

287:7 288:7,18 289:3
**reported**  1:17 116:5
**reporter**  5:8,11 6:15,25 8:10 9:11 95:24 138:17,19,21 147:9 227:3 261:25 262:3 280:25
**reporting**  75:2 144:18 146:3 148:6
**reports**  17:16 18:4,18 19:2,9 19:10,12,13,14 19:15,16 20:8 20:14,24 21:5 21:11,13,25 22:6,10,17 25:16 40:23 41:5,16 52:10 52:15 53:6 66:10 87:4,8 87:10,11,12,17 87:18,23 88:4 89:7,11 90:11 90:21,24 91:12 93:6,23 94:3,4 94:24 95:9 96:11 97:15,16 97:22 98:13,14 99:7 100:4,6,7

**[reports - retyping]** Page 54

100:11 102:23 103:17,20 104:7,9,11,12 104:16,17,21 104:21 106:4 106:18,20 107:3,12,17 108:14,20 109:23 110:9 113:2,8 114:8 114:11,20,21 114:24 115:8 115:23,25 116:3,20,21 117:3,5,9,11,12 117:14,17,20 118:11 179:18 180:5,10,13,19 181:6,11,17,20 182:21,23 183:4 184:12 195:2 196:16 198:2 200:25 228:20 234:7 234:16,21,23 238:2 240:22 240:25 241:9 242:13,14 249:2,3,24,25 250:9 257:12 283:15,18,21 283:22 284:5 284:19,25 287:8,9

**represent** 160:20 180:14 180:16 182:25 183:3 208:5
**representation** 15:24 128:25 129:18 184:17
**represented** 184:10
**representing** 105:25
**represents** 277:14
**request** 285:17
**requested** 54:8 106:21 138:20 236:20 285:16
**required** 66:18 124:10 294:13
**requirements** 66:13
**research** 3:4 4:18,21,22 6:14 87:13 88:3,12,18 96:10,17,21 97:5,16 100:3 101:12 114:11 246:16
**residual** 141:23 161:7
**resources** 83:10 102:2

**respect** 20:5,14 21:2 32:14 34:5 53:23 54:24 55:10 63:12 76:11 88:21 107:14 188:5 216:15 217:13 219:7 226:9
**respond** 71:17 74:18 107:25 108:5,6,7 136:13 241:21
**responded** 110:6 247:4
**responding** 93:13 206:2
**responds** 176:4
**response** 20:4 22:11 94:21 108:13,15 121:16 140:20 168:6,19 174:7 178:19 253:9
**responsible** 188:10 203:8 203:11,24
**responsive** 18:13 123:20
**rest** 16:10 103:7 188:3 254:8 279:24 287:15

**restate** 232:25 234:8 242:5
**restated** 76:16
**restating** 101:6
**restricted** 46:10
**restrictions** 115:2,3
**restroom** 166:12
**result** 179:7
**resulting** 43:4 68:18 73:25
**results** 4:22 228:13
**retained** 83:23 84:24 85:7 201:21 204:19 204:22 219:9 220:18 222:6 236:10 238:24
**retrieve** 56:2
**retrieved** 104:18
**retrieving** 284:25
**return** 142:8,12 144:12 161:8 173:19 175:14 197:13
**returns** 141:23 175:24
**retyping** 21:23

**reuters** 228:14 228:16 282:21
**revealed** 89:21 91:12 205:21 262:20
**revelation** 265:11
**revenue** 185:14 186:2,5 272:25
**revenues** 198:14 215:3 216:12
**reverse** 287:22
**review** 86:15 87:7,9,12 90:12 95:8 104:10 106:18 108:14,21 117:13 118:9 128:14,17 131:25 132:3 163:17 182:14 207:3 208:17 212:22 214:13 216:4,17 224:11 225:15 225:19 228:7 229:20 232:18 232:20 238:17 243:21 246:22 246:22 252:25 253:3 277:17
**reviewed** 17:18 17:20 18:7

24:2,15 46:22 47:4 56:20 62:16 80:18 86:18 87:23 104:7,16 128:19 163:12 176:21 203:13 203:15 208:14 216:20 241:3 241:10 254:22 255:21
**reviewing** 37:21 133:14 154:17 193:21 213:24
**revisit** 188:17
**right** 6:18 7:3 10:22 12:13,19 16:10,24 17:4 17:4 19:21 22:15 29:7,17 33:8 34:5,9 36:11,14 44:14 44:23 45:2,13 46:18 48:12 49:13,14 56:5 56:6 57:22 58:4,23 59:24 61:9 62:22 63:14 65:17,19 66:20 70:19 71:3 73:4 75:21 77:11 79:17 81:23

82:16,20 83:8 83:11 93:10,21 99:13 104:8,13 104:16,24 112:24 119:22 119:22 121:2,5 124:14 126:5,7 126:17 130:18 131:14,18 132:25 134:4 135:22 140:25 143:14,16 148:11 150:16 150:20 151:11 151:14,15 152:8,11,25 154:2,3,9,20 156:9,15,24 157:14 159:14 159:21 160:7 160:11 161:13 162:7,16,18 164:12 165:4 167:5 168:22 170:3,17 171:15,19 173:5,12,25 175:11,24 177:14 178:6 183:17 184:19 184:22 185:4 185:17 188:8 188:24,25 189:6,12,18

192:18 193:9 195:19 197:4 199:15,20,21 202:13,14 205:25 209:25 210:16,20 211:7,20 212:12 213:22 216:3 218:3 219:13 222:15 223:17 224:21 225:3,25 226:14 227:7 230:3 231:25 233:12 234:13 234:14 235:7 235:10,19 236:6 237:2,25 238:21 245:8 247:11 248:10 254:8 257:3 258:15 263:9 266:17 267:15 269:14 270:4,8 270:13 274:12 275:23 276:13 278:13 280:14 286:22,25 287:4 290:3
**rip** 48:3
**risk** 263:23 264:6,17 265:11,14,15 265:16 266:7,9

266:14 267:8 268:22 269:4 269:20,21,25 271:4,7,18 272:4 275:12 275:17,24,24 276:3,6 277:15 277:21 278:6,7 278:21

**riskiness** 84:16

**risks** 262:20 263:3 265:10

**road** 178:9 197:18

**rolling** 131:7

**room** 10:25 144:25

**routine** 133:8 137:10

**row** 149:12,16 149:25 151:9 152:19 153:2 153:23 159:9 159:17 161:17 161:23 162:12 162:16 163:22 165:24 286:17 286:17,25

**rows** 159:3 162:13 163:15 235:5 287:11

**rubber** 91:16

**rules** 5:24 8:6

**run** 38:22 39:3 133:22 137:4,6 142:6 186:11 188:6 263:17

**running** 267:25

**s**

**s** 2:1,14 3:1 4:6 113:15 186:24 187:7 270:20 270:22,25 293:3

**s&p** 129:6

**sake** 139:25

**sale** 202:21 221:9 240:7

**salience** 100:23

**salient** 89:16 95:2

**sample** 34:11 35:11

**san** 60:13 64:15

**satisfying** 46:24

**sausage** 29:24

**save** 20:10

**saw** 92:7 94:15 178:17 281:5

**saying** 13:25 27:20 30:17 36:12,25 38:2 38:15 39:13 42:2 44:4,15 52:14 76:10,21

92:9 94:3 109:17 124:16 124:22 134:19 137:9 139:21 154:16 155:9 172:12 174:3 175:12 194:7 195:5 198:2,6 198:12,19 199:13 201:24 213:6 218:8 234:20 236:21 238:19,20 248:12,24,25 249:22 250:14 254:12,20 255:4 256:21 270:9 271:23 274:6,11 276:2 276:4,9 277:18

**says** 8:12 12:18 15:9 16:12 23:7 31:2,8,21 43:2,17 56:12 63:22 68:14,25 70:12 72:20 77:12,12,15 79:5 81:10 90:10 93:5 99:17 102:18 102:19 108:25 109:2,9 121:9 121:12 134:13 135:7 154:2

156:17 157:15 184:20,25 185:5,13,15,21 186:2,3,7,10,12 186:19 188:18 188:21 189:25 191:12 195:13 195:18 209:12 211:20 214:23 219:16 229:25 230:5,9 237:4 240:3 244:5 253:20 260:18 260:20 262:15 262:16 268:16 270:13,16 272:2 276:12 282:7 284:2 286:23 287:2 289:16

**scaled** 184:21 185:9 188:19 189:23 270:15

**scan** 80:13

**scanned** 102:2 103:4

**scanning** 23:24

**scenario** 173:8 173:10,10 175:9 176:25 177:4,11,12 206:12 254:18

**scenarios** 254:13

schools  214:25
216:10
schultz  2:14
7:11
screen  12:7
98:16,18 99:14
100:10 149:15
149:19 150:6
150:13 182:11
scroll  15:22
230:12
scrolled  235:21
scrolling  90:7
230:11
se  4:14 8:4
23:10
search  4:22
228:12 229:10
searches
103:19,24
284:6
searching
284:17
sec  147:12
second  9:15
13:23 22:16,20
22:21 56:25
59:7 69:11
90:9 96:19
97:2 118:2
128:16 148:24
159:18 165:18
173:10 181:19
183:18 190:23

202:12 209:12
209:15,18,23
211:7 230:18
233:16 234:5
280:17 284:14
section  48:3
56:11 79:23
81:3 86:15,22
184:19
sections  56:15
66:24
secure  145:8
securities  7:25
23:11 66:8
79:24 97:20,25
202:21,24
203:7 221:10
221:13 240:8
240:11 247:24
251:2,21 257:7
260:19
security  25:22
see  11:3 13:7
15:15 16:4
22:23 23:6
31:7 58:21
64:9,12,13
76:16 78:9
79:8 86:21
87:3 89:11,13
92:2,3 93:23
98:17 100:10
101:12,21,23
116:19,20

137:12 142:2
145:5 148:8,14
149:16,24,25
150:3,9,13,22
151:7,11,14
154:2,5 156:9
156:16,19,23
159:11,13,17
159:21 160:5
162:5 175:25
176:4 178:12
181:16 183:16
184:18,21,23
185:7,9,11,12
185:14,18
186:3,6,9,14
188:20 189:24
190:3 191:16
191:17 194:7
195:2,3 198:20
199:6 203:3
209:19,22
212:14,16
214:20 220:13
222:7 230:7,8
231:19,19
234:16 238:19
253:24 267:14
275:24 276:8
281:6 282:6,8
284:24 285:24
286:14,15,21
287:3,5,7

seeing  149:6
213:9
seem  212:10,16
255:16 256:18
281:7
seems  188:3
190:8 211:6,15
212:7 269:5
seen  13:10,11
40:22 198:16
205:19 225:13
228:21 245:19
283:3 285:5
select  19:9
122:19 138:24
selected  135:19
135:24 137:13
138:3,7,23
140:7 230:5
selecting  48:10
selectively
136:7
sell  90:17 97:19
selling  97:25
semicolon
284:2
send  11:21,24
12:5,12,19
13:21,23 14:16
56:25 62:7
63:15 96:4
147:11 181:22
283:10 288:24
289:7

**[sending - simple]**

**sending** 14:14 181:19
**senior** 3:3
**sense** 92:5 94:14 133:12 193:10
**sent** 23:17 206:15 227:7 282:11 285:3
**sentence** 21:20 29:13 43:9 71:5,15 72:19 78:9,10 90:9 90:22 92:20 119:12 137:25 138:14 141:2 141:10 186:12 186:17 187:3 191:19 192:2 239:24 245:25
**sentences** 187:19,24 188:4 190:9 270:11
**sentiment** 169:24
**separate** 174:25 192:14
**series** 65:3,11
**service** 129:7
**services** 97:9
**serving** 230:22
**set** 77:3 134:20 285:20

**setting** 130:5 217:18
**setup** 133:5
**seven** 100:4 287:17,20
**seventh** 160:16
**several** 18:25 19:13,14 25:24 139:6 185:21 186:13,20 188:21,25 189:10,14 199:18 215:22 264:8 266:22 268:18 270:17
**shaking** 9:13
**share** 11:21 12:7 149:14,19 150:5,6,11,11 182:10
**shareholder** 82:3
**sharing** 12:6 199:18
**she'll** 8:11
**sheet** 104:23 149:22,24 154:16 287:6
**sheets** 110:11
**shoreline** 214:25 216:10
**short** 30:6 32:16 33:11 40:6 41:2,12

42:6 71:11 176:5,9,18
**shortened** 35:22
**shorter** 175:20
**shortly** 183:6
**show** 62:20 74:22 84:6 105:8 161:10 166:3 171:12 179:7 202:18 204:12 221:7 240:5 253:17
**showed** 163:17
**showing** 48:2 130:5 131:9,18 142:18
**shown** 141:2
**shows** 68:20 74:4 141:20 237:10
**side** 64:14 107:8,13 183:17 184:19 185:3,17 280:23
**sides** 144:19 145:17
**sign** 17:7
**signature** 291:16 292:13
**signed** 62:18 214:24 216:9 289:5

**significance** 39:7 142:18 143:4,18 144:21 145:18 146:12,15 155:11 200:22
**significant** 39:9 39:10 74:23 142:9,13 143:8 143:10,21,25 144:2,13 151:24 153:11 153:13,18,20 153:24 155:4 155:16 157:9 157:19 158:5 161:7 162:7,8 163:5,20 164:7 165:21 166:7 192:10 197:13 202:19 221:7 240:5
**silenced** 11:19
**similar** 19:3 20:24 38:9 52:15 285:4
**similarities** 52:9 63:11,13
**similarly** 211:21 214:23 216:8
**simple** 61:21 65:18 71:14 83:7 102:23

115:15 135:25
138:4 140:2
165:15 200:4
260:4,10
**simpler** 75:20
75:20
**simply** 41:9
47:18 88:11
98:13 106:8
115:23 125:11
126:19 134:4
136:9 139:14
145:25 163:25
194:11 200:4
242:10
**simultaneous**
243:11 247:2
**single** 52:7
171:16,21
172:22 210:12
241:16,17
**singling** 170:13
**sir** 57:20
280:11
**sirona** 4:17
60:14 64:16
**sit** 259:9
**site** 82:19
**sitting** 65:18
71:4 72:18
252:16
**situation** 30:8
237:15 249:17
249:18 250:15

250:16,25
251:3,12,14
254:13 255:10
255:12,13,14
256:14
**six** 45:5 182:6
**sixth** 160:15
**size** 34:11
156:18
**sketchy** 280:25
**skills** 291:9
292:6
**skim** 95:13
184:5 201:20
**skimmed** 98:4
184:8 210:11
**skipping** 30:16
**slated** 267:20
**sleuthing**
229:14
**slightly** 160:12
**slow** 90:7
150:22 227:15
280:16
**slowly** 21:8
**smaller** 171:7
**smart** 255:24
**snuff** 263:16
**software** 129:7
191:23
**solely** 97:17
**solicitation**
97:19

**solution** 34:21
34:23 35:5
245:17
**solutions** 192:6
**solve** 34:19
35:4 39:25
40:18 41:14
43:15 81:21,23
**solves** 41:18
176:25
**somebody**
282:11
**son** 45:2,5
**soon** 272:23,24
**sorry** 12:25
22:24 25:7
28:19 30:24
41:22 47:2
51:21,21 58:6
65:9 67:21
69:10 80:21
86:6,10,10
90:7 93:12
96:24 98:8
126:7 127:12
127:19 128:2
128:15 135:12
149:20 151:14
152:24 154:6
156:5 157:3
161:15 162:20
162:22 166:5
167:16,18,20
179:25 186:15

187:12,14
191:3 209:15
209:17 233:2
234:8 265:7
269:11,11,11
269:11 275:13
275:21 276:16
279:11,12
286:18 289:11
289:20 290:6
**sort** 11:4 82:8
83:24 84:24
89:5 126:25
193:22 200:9
238:11 260:5
273:6
**sorted** 158:18
158:19
**sorting** 158:12
**sorts** 87:15
115:3 159:8
**sounds** 222:18
246:3 280:4
**source** 282:7,14
282:25
**southern** 1:2
15:10
**speak** 9:13,17
9:23 57:23
58:9 85:12
110:15 197:6
197:10 236:24
246:4 258:11
258:14 259:4

**[speaking - statistically]**

**speaking** 9:21 30:9 33:13,23 84:20 85:12 118:6 142:25 238:23 257:21 261:10 276:5 278:22
**special** 89:19
**specific** 25:10 44:22 45:12 66:2 94:16 119:9 121:18 168:4,8,16,20 168:25 169:13 170:21 172:2,8 172:25 176:11 182:19 185:16 189:15 194:25 214:22 217:9 219:14 222:11 241:11 242:25 243:18 260:18 263:23 264:5 265:16 275:11
**specifically** 53:22 69:3 77:13,15 94:23 106:9 118:17 130:2,11 168:23
**specifics** 21:17 56:5 242:21
**specifying** 212:24

**speculate** 9:9
**speculated** 219:5
**speed** 167:21
**spent** 221:20
**sphere** 277:19
**spits** 99:21,22
**spoke** 223:15
**sports** 99:13
**spread** 279:5
**spreadsheet** 4:19 164:3
**sprung** 201:11
**staff** 51:14,23 51:25
**stage** 108:18 122:2 178:9 204:18
**stages** 233:18
**stamp** 15:7 91:16
**stamped** 15:3
**stand** 62:18 71:7,15,21 72:5,18,25 73:2,10,19 74:9 79:9 80:3 290:9
**standard** 79:20 87:13
**standing** 76:7
**stands** 96:20
**start** 31:25 43:19 122:23

127:20 132:5 173:21,24 175:15,24 178:11 218:14 233:19 234:15 238:18 246:24 263:7 268:3 272:24
**started** 45:3 63:6 108:9 171:17 193:2 233:20 267:22 272:5
**starting** 97:2 208:12 210:25 286:6
**starts** 86:11 127:11 183:21 185:20
**state** 78:7 202:17 204:8 291:19
**stated** 75:21 124:25 138:2 168:2 239:10 239:17,18 253:14 261:13 261:16 274:24 279:3 288:19
**statement** 25:8 69:5 70:20 71:21,23 72:24 74:15 79:12 81:6 155:13

164:24 216:8 237:9 259:9 263:2
**statements** 73:2 165:3 170:14
**states** 1:1 15:10 199:9
**statistic** 144:19 144:22 145:14 146:13,23
**statistical** 32:14,17 33:20 33:24 37:12,13 38:12 39:7 40:2 142:7,18 143:4,18 144:4 144:21 145:18 146:11,15 155:3,11 177:18 178:5 178:14 194:20 200:22
**statistically** 30:8 33:13,23 39:9,9 74:22 142:8,13,25 143:7,10,21,24 144:2,12 151:24 153:10 153:17,20,24 155:15 157:9 157:19 158:4 161:7 162:6,8

**[statistically - sure]**

163:4,20 164:6 165:21 166:6 194:14 197:12 257:21

**statistics** 146:20

**stats** 99:18

**stay** 48:4 159:16 160:10

**stenographic** 6:2

**step** 39:20,20

**stick** 176:8

**stipulation** 6:4

**stock** 29:16 43:5 55:19 68:18,21 73:5 73:15 74:2,4 75:17 90:18 95:21 98:14 99:7 100:6,8 119:7,16 120:7 121:17 123:19 129:4 130:3 168:5,7,17,19 171:14 172:9 173:20 175:11 177:22 185:4 219:11 273:3

**stop** 137:21 261:8,9

**stories** 240:23 241:5

**story** 241:7 270:5

**straightforward** 138:5 260:3

**strategy** 90:2

**strength** 143:4

**strike** 18:12,21

**struck** 205:23

**structure** 224:24

**struggling** 136:2

**studied** 140:14

**studies** 105:8 243:10

**study** 26:19 34:13,15 52:3 58:24 59:18 85:20 120:2,5 121:10,12 124:23 127:10 127:13 128:6 131:7,12 135:17 141:21 148:3,9 153:3 164:17,20 167:24 168:2 168:10,15 169:12,14 170:20,23,24 171:4,5,11 172:6,11,16,24 173:13 174:12 176:7 177:7

179:3,5,12 194:19 200:10 232:22,23,23 233:5,6,13 243:15 258:10

**studying** 35:13

**stuff** 31:21 210:2

**suarez** 3:3

**subject** 12:16 79:19 93:17

**subjectively** 36:17

**subjectivity** 36:12

**submit** 46:21 47:3 288:17,17

**submitted** 15:25 54:20 59:22

**subscribed** 294:14

**subscriber** 113:20,21,24

**subscription** 113:22

**subsequently** 229:21

**subtracted** 204:9

**successive** 177:2

**successively** 172:21

**sudden** 145:9

**sufficient** 58:22

**suggest** 166:15 204:23

**suitable** 197:16

**suite** 2:6 192:5

**summarize** 119:5

**summarized** 108:12

**summary** 175:14

**summer** 274:8 276:10

**support** 52:24 53:7 66:5,12 67:8 178:22 179:6 244:7

**supports** 29:4 29:15

**suppose** 211:14

**supposed** 106:23

**sure** 8:18 9:3 14:22 18:6 19:19 20:4 23:21 25:10,14 25:17 32:9 39:21 52:22 55:15 58:19 59:10 68:13 87:17 88:10 91:9 95:13 99:4,10 100:9

103:14 108:6
109:25 111:21
113:18 128:18
152:6 155:12
158:13,16
162:24 169:4
184:5,5,16
190:8 196:13
199:25 210:6
215:16,17
224:2,2 226:5
228:22 236:9
253:15 269:8
271:20 273:15
276:20 284:15
289:4
**surprise** 66:23
201:11 202:2
**surprising** 99:3
106:24
**suspect** 258:24
**suspects** 259:3
**swath** 278:20
278:25
**swear** 5:14
6:17
**switch** 150:10
**switching** 57:2
57:7
**swore** 8:10
**sworn** 5:17
6:22 291:5
294:14

**system** 15:6,7

**t**

**t** 4:6 144:19,22
145:14 146:13
146:20,23
293:3,3
**table** 54:19
118:5
**take** 5:9,12
9:16 10:18
21:10 24:12
50:23 57:3
62:9 86:2,7
95:12 106:19
110:21 111:20
118:20 128:8
130:24 135:8
154:7 160:23
170:4 183:24
208:4 211:22
220:22 222:15
228:18 234:17
235:2 255:24
261:3 263:18
264:18 274:16
278:22 287:19
**takeaways**
191:12,20
**taken** 223:14
241:4 291:3,11
292:8
**takes** 170:20

**talk** 30:15,20
33:2 43:24
48:14 85:19
109:21 112:11
131:3 169:11
177:3 190:16
229:4 241:23
**talked** 177:12
183:8 219:6
226:8 240:24
243:9 271:12
273:20
**talking** 22:13
31:14 39:22
43:18 78:14
89:22,24 93:8
132:6 140:22
144:4 148:17
152:20 165:14
168:23 187:20
189:9 193:14
195:2 206:12
212:17 223:5
242:3 243:8
247:11,13
268:21 275:4
276:15
**talks** 209:25
210:15
**tallahassee**
1:15
**tandem** 100:14
**target** 89:23
185:6

**targeted**
268:16 272:2
**targets** 97:13
**task** 54:8
114:13
**tasked** 126:15
**tax** 97:23
**taxonomy** 54:7
**teaching** 35:2
**technical** 98:14
100:5,7
**teleperforma...**
4:14 8:4 23:10
24:4 25:12
58:13 59:20,21
**tell** 6:22 12:20
16:22,25 23:3
23:18 25:17
28:24 51:9
54:8,10 63:20
68:9 78:19,21
85:23 89:9
96:5 109:13
113:7,16 131:2
131:8,25
145:23 147:13
147:14,24
148:21 149:3
150:21 151:22
161:3 171:4
172:7 179:12
181:23 182:15
190:19 202:10
208:6 217:6

225:4 227:8,8
228:9 229:13
240:2 252:17
252:20 254:2
256:6 257:9,9
257:10 259:10
260:21 262:7
282:3
**telling** 76:7
102:7 105:23
215:12 221:21
241:13,14
244:11 248:16
252:16 253:5
**tells** 102:15
**temporary**
181:8
**ten** 98:12 99:6
107:3 109:12
114:7 280:3
**tenants** 266:19
**tend** 212:9
**term** 142:3,3
**terms** 18:9
19:17 20:5,20
20:24 22:10
25:22 29:25
34:6,10 37:4
38:18 47:15
52:2,4,12
54:10 56:6,22
63:6,9 66:13
72:8,11 76:13
76:21 77:24,25

78:7 81:19
84:5,16 85:12
87:14 89:25
90:2 93:14,17
94:8 104:11
126:6 132:22
133:5,12,19,23
134:19 137:3
139:21 143:12
146:2,18 148:5
171:11 174:3
178:8 197:3,7
197:25 198:11
201:16 205:9
212:24 219:5
223:12,22
224:23,24
233:14,22
236:13 243:7
243:18 244:25
260:17 264:7
264:21 265:10
267:3,23
271:23 272:4
274:20,21
276:5 277:5,25
**test** 12:13
32:15 33:18
37:3,16 38:12
38:19 40:13
42:19 84:19
142:7
**testified** 6:24
29:9 41:11

43:14 66:20
194:13,13
200:21 214:10
215:21 217:25
238:3 256:4,9
**testify** 217:15
**testifying** 7:24
42:10 48:15
291:5
**testimony** 8:14
47:18,21 50:15
108:4 164:12
196:23 201:16
214:7 233:3
237:16 244:12
247:21,21
260:13 294:9
**testing** 176:15
**text** 19:9,25
21:10 22:5
24:7 62:23
121:2 185:16
**textbook** 76:4
**texts** 18:23
**textual** 52:12
**thank** 5:11 6:15
6:25 14:12
23:2 59:16
62:6 72:15
73:4 86:18
96:2 116:25
123:24 128:20
147:11 166:20
167:14,21

172:3 182:12
190:20,24
191:10,10
199:17 202:12
210:14 211:5
211:23,23
227:6,21 231:8
261:23 280:4
281:3 282:2,5
285:25
**theoretically**
244:13,21
246:11 247:23
**theory** 266:19
**thereof** 263:9
**thing** 9:15
10:14 17:10
52:6 92:12
99:16 118:13
138:12 156:2
157:13 187:10
230:13 236:22
277:20 278:15
278:16 285:19
**things** 8:17 9:9
9:14 38:19
91:5 102:8
115:17 125:16
144:8,10,13
265:22
**think** 8:22,23
13:24 16:20
17:12 51:4
67:2,18 69:24

90:22 94:20
105:17 111:21
125:7 136:2
147:5 150:14
151:22 156:17
162:5 172:19
174:10,22
186:19 188:14
194:21 196:21
198:4,10 203:7
205:11 207:16
215:20 220:3
230:13 234:19
237:7,8 256:2
271:11 278:12
279:21 280:14
281:8 284:23
285:2,5
**thinking** 111:5
111:12 256:8
**third** 23:6
159:21
**thompson**
114:22
**thomson**
228:14,15
282:21 283:8
**thoroughly**
208:17
**thought** 43:9
70:7 155:14
185:22 231:3
242:5 282:23
283:5

**three** 38:13,15
50:9,18 70:12
99:19 105:18
138:15 160:7
178:17,20
180:19 181:12
217:11
**thumb** 120:23
**thursday** 1:12
**time** 1:13 6:5
9:18,24,24
10:11 20:13
27:15 36:16
39:10 45:12
57:3 64:25
71:11 86:3,7
87:25 106:17
129:22 130:6
131:16,20,22
137:23 148:6
166:18 174:5
174:17 176:17
177:14 179:11
183:14 194:16
194:19 197:8
198:7,16,24,25
200:7 208:21
218:22 220:12
220:22 221:21
222:4,8 233:11
235:14 238:4
242:3 245:4
247:5 251:18
254:11 256:16

257:25 258:22
273:6 274:5
276:21 278:8
278:23 286:9
**timeline** 188:12
188:13,15
189:2,9 190:4
268:24 269:24
271:8 272:18
273:15,21
276:9
**times** 7:19
17:14 104:6
105:18 139:7
165:10 199:19
215:22 217:11
271:16
**timestamp**
175:19
**timing** 84:9
267:18 274:19
**tipped** 76:20
**title** 60:7,9,10
64:11 185:2
209:19 230:5
**toc** 230:5
**today** 7:12
11:21 13:14,16
13:18 17:24
71:5 72:18
73:10 75:14
78:9 209:8,9
213:22 215:9
217:15 219:8,9

236:12,16
239:9 247:7,9
247:10 252:14
252:16
**today's** 5:4
**together** 52:24
52:25 87:11
**told** 22:9 102:3
102:9 115:10
153:16 194:24
246:15 248:17
**tolerate** 261:10
261:12
**ton** 83:15
235:17 236:3,5
236:8
**tone** 76:12
**tons** 82:23
140:8
**top** 14:18,21
64:14 75:18
151:19 154:6
154:14 157:16
166:6 183:16
184:24 188:18
191:11,14
230:5
**topic** 211:16
220:24
**topics** 57:3,7
**total** 172:7
**totally** 192:13
**touting** 76:24
276:8

**toward** 195:14

**towards** 193:3

**tower** 4:18 88:3 88:12 96:21 97:5 101:12 114:11

**towers** 96:10

**tradable** 101:2

**traded** 29:5,16 68:21 73:15 74:5

**trading** 55:21 176:2

**traditional** 84:5

**train** 242:5

**training** 41:23 76:5

**transcriber** 292:1

**transcript** 5:19 292:3,4 294:5 294:9

**transcriptionist** 291:7

**trash** 209:13,20

**treat** 225:9

**trend** 130:5

**trick** 27:16 59:9 232:13

**trickier** 177:16

**tricky** 178:4 179:4 194:21 196:25 233:5

**trifecta** 160:6

**true** 17:6 45:24 45:24,25 132:22 259:14 268:5,7 291:8 292:4 294:8

**truly** 225:22

**truth** 6:22,23 6:23 138:8 205:20 256:24 260:20 262:17 272:5,5

**truthful** 259:8

**try** 9:22 102:16 165:7 178:3 194:14 218:13 226:5,7 248:14

**trying** 27:17 29:12 31:5,13 31:17,23 32:8 34:23 36:7 39:16 41:9 42:3,22,23 43:8,16 44:2,8 45:18 49:18,21 59:9,10 77:18 78:16,23 81:7 81:19 85:15 101:8,10,19 102:5,13,14,18 102:20 103:6,7 103:15,22,25 106:25 107:5 107:14 108:8

108:24 118:8 119:23 121:15 122:7,13 124:20 129:9 129:24 134:5 135:13 136:9 139:14 143:17 145:21 151:21 153:21 163:10 163:10 164:9 164:15 165:2,9 165:11 171:11 172:4 174:24 180:2 185:15 190:2 196:5 199:25 200:11 200:18,23 215:24 217:23 221:18,24 226:11,15 230:17 231:10 235:7,12 236:11 237:11 241:23 245:2 255:9 260:13 260:14 266:6 269:3 271:3,10 277:25 278:9 282:16 285:23

**tucked** 11:16

**turn** 16:3 86:25 133:21 167:8 259:4

**turned** 228:23

**turnover** 285:3

**turns** 17:13

**tweet** 264:2 265:21,22 266:2 273:20 275:3

**twice** 7:20 288:11

**two** 7:10 20:6 27:15 36:5,13 44:20 45:2,12 45:15 82:5,10 83:13 94:15,17 109:6,8 128:5 144:19 145:15 146:6 154:24 162:17,21,22 166:18 171:25 172:2 187:19 188:3 189:16 195:22 196:9 210:22 265:22 269:18 287:5 287:11 289:12

**type** 78:21,22 83:25 90:20 91:13 106:12 107:18 113:20 119:8 203:8,24 204:19,22

**types** 89:10 91:11 114:24 169:18,22

170:25
**typewriting**
291:6
**typical**   105:25
106:2,4,5
**typically**   12:8
34:8 89:22
90:10 113:25
116:18 146:10
180:25
**typos**   54:12

**u**

**u**   148:11 154:2
154:6 156:24
157:6 158:12
158:18,19
159:11,16
160:11 161:23
162:18
**u7**   148:15
**ubiquity**   98:21
**ultimately**
127:16 224:12
224:22 225:7
226:16
**unable**   250:16
**unavailable**
117:7
**unaware**   88:6
88:22
**uncertainty**
84:16 274:18

**unclear**   19:8,18
61:14 270:7
**under**   5:23
8:15 13:18
17:5 25:21
33:11,15 56:11
68:19 74:3
96:18 97:10
115:21 151:15
162:18 184:19
209:12,23
270:14
**underlying**
193:13,16
275:5
**undermine**
38:24 85:2
**undermines**
28:4
**understand**
5:18 8:19,24
9:3 13:17
27:17 31:6,13
31:17,24 32:8
34:24 39:16,17
39:21,23 41:9
41:10 42:3,11
42:21,24 43:8
43:12,16,22
44:3,8 45:22
47:10,14 49:22
61:21 67:6,11
69:22 75:10
76:23 77:18

78:16,24 80:20
81:8,14 83:18
84:23 85:17
92:10 93:4
94:12 101:10
101:19 102:5
102:14,16,18
102:21 103:6
103:16 107:2,8
107:14 108:8
108:24 109:25
110:2,17 119:4
119:5,11,24
121:16 122:7
122:13 123:14
124:2,3,20
125:13 127:17
132:7 134:5
135:3 136:3,9
139:10,12,14
140:5 143:18
144:6 146:5,8
151:23 153:21
155:22 156:16
156:22 162:6
162:13 163:10
164:2 165:8,13
167:25 169:8
169:11 171:25
172:4,6,10
174:11,22
176:24 177:6
194:9 196:5
197:24 200:11

200:24 215:16
217:24 218:5
218:13 219:21
221:19,24
225:23 226:15
230:17 233:3
235:8,8,10,12
237:11 238:12
243:7 244:12
246:2 255:23
256:20 257:3
260:22 265:7
266:6 268:23
269:3 271:4,6
271:10 278:2
278:10 282:17
283:12 284:9
285:8,18
**understanding**
26:18 32:22
50:7,15 66:11
69:9 72:2
76:18 77:20
78:8,11,18,20
78:24 80:24
81:11 82:14
89:3 105:23
107:17 109:7
109:17 124:21
128:22 132:9
141:22 167:23
169:21 174:22
180:23 187:15
203:5,11,22

**[understanding - vary]** Page 67

204:24 205:5
214:25 216:10
229:6 233:25
237:3 246:14
247:20 263:4
266:5 269:23
271:20 276:11
276:23,25
277:4
**understood**
32:9 44:10
78:13 92:5
95:6 118:7
120:13 143:8
169:4 171:15
194:23 223:16
256:4
**undertake**
114:14 243:3
**undertaken**
223:8
**undertaking**
119:13 120:2
**unfamiliar**
229:12
**unfortunately**
116:7
**unimportant**
48:23
**unique**   19:4
**unit**   5:5 112:6
167:2 222:24
280:10

**united**   1:1
15:10
**unlimited**   83:3
**unlock**   81:20
**unmarked**   11:7
**unquote**   133:11
**unreasonable**
272:18
**unsurprising**
66:4 98:21
**untangle**
254:16
**update**   124:17
125:17 181:6
**use**   11:23 12:6
21:11 44:24
62:11 98:25
99:14 110:20
136:20,21,23
136:24 145:17
145:22,22
165:3,4 173:24
176:6,10,19
219:22 233:5
240:15,16
250:9 288:18
**used**   19:16
21:21 28:8
40:25 79:23
82:17 94:22,23
98:17,20,22
100:11,13,18
114:18 130:17
144:4 173:20

175:23 176:14
194:22 220:8
**useful**   91:4,7
92:9 145:24
177:8
**user**   195:9
**users**   97:21
178:11 194:2
195:3,22
238:12
**uses**   5:22
**using**   41:14
44:25 48:6
144:21 174:16
175:14 203:2
221:14 232:21
247:17 248:9
**usually**   123:6
204:2,17
229:15
**utilized**   188:6

**v**

**v**   1:6 15:13
**vacuum**   22:13
**vague**   78:15
**validate**   192:5
**validea**   101:18
101:21
**valle**   211:8
**valuation**   84:22
85:11,17
**value**   81:16
82:2 84:7,12

84:14,18 85:14
101:15 130:21
142:14,15,16
143:3,9,11,12
143:23,24
144:10,18,22
145:15 146:10
146:19,21,22
146:24 148:22
149:3 151:19
152:22 153:6
153:12,18
155:4 156:16
156:22 157:10
157:15,18,25
162:3 164:7
165:21 195:23
204:8,14 268:3
273:7 275:7,8
**valueengine**
101:18
**values**   144:5
150:24 161:2
**variables**
130:13
**variety**   89:13
91:11 169:25
170:6 176:14
**various**   129:2
170:25 172:25
203:2 221:15
247:17
**vary**   91:15

**[vendor - way]** Page 68

**vendor** 93:20 93:25 104:13 104:19 229:11
**verbatim** 65:4 65:5,13,15,21 119:20 197:22 253:23,25
**versa** 53:7 66:5
**version** 15:22
**versions** 113:19
**versus** 66:12 67:16 72:12 91:24 137:5 171:20 177:20 177:21 178:23 225:10
**viable** 265:2
**vice** 53:7 66:5
**video** 5:5 8:14
**videoconfere...** 2:3,4,15,24 3:4
**videographer** 2:23 5:2,8 57:12,16 111:23 112:4 166:21,24 222:19,22 280:5,8 289:24 290:4,9
**videotaped** 1:10
**view** 50:3,21 72:6 92:15 178:22 191:21

193:7,8 198:7 266:23,24
**viewing** 72:8 76:21
**views** 76:19
**virtual** 209:5
**virtually** 79:23
**visibility** 92:25
**visual** 128:25 129:18
**volatility** 131:16
**volume** 55:22 107:11,12
**vs** 7:13 60:14 64:16 293:1 294:1

**w**

**wainwright** 4:20 101:17 182:20 191:9 193:5 269:13 269:15 271:6
**wait** 288:15
**waiting** 70:21 206:17 207:23
**walk** 19:21 21:8 33:3 39:14 81:9 159:4,7 164:14 273:10
**walking** 164:23 289:8

**want** 8:5,8 9:2 9:8 10:23 12:24 14:22 16:7,11,19 21:6 26:11 28:13,14 30:20 36:9 39:20,23 42:10,25 53:22 53:24 54:2,3 54:17 58:12 60:2,22 65:6 67:25,25 68:12 68:24 69:21 71:3 77:7,9 80:5 81:8 85:19,21 86:15 86:20 91:21 96:16,18 98:7 98:8,9 103:11 107:10 110:21 111:3,7 113:2 118:22 119:3 127:14,15,16 127:19 128:6,8 130:22,24 131:23 132:5 140:5,6 146:23 146:25 147:2 149:10 153:12 155:25 157:12 157:14,22,24 160:23 161:4 161:10 163:25 167:8,10,15,22

169:10 177:3 177:25 179:23 183:24 187:11 187:13 190:25 208:11 212:25 214:5 215:21 219:15 221:4 222:16 223:7 226:25 231:13 231:15 234:2 235:21 244:8 268:7 273:12 273:13 281:10 281:21 283:12 285:20 289:4,4
**wanted** 81:13 117:15,20 118:12 120:12 127:23 164:13 165:13 169:3 184:15 226:15 229:15 281:19 281:23 282:20
**waste** 137:23
**water** 4:18 10:12 88:3,12 96:9,21 97:5 101:12 114:11
**way** 11:20 31:12 33:2 49:4 53:10 63:23 100:2 102:21 107:23 107:24 111:9

114:10 115:19
117:19 125:19
126:16 127:25
135:14 142:11
145:21 154:8
158:11 163:11
163:25 172:5
173:7 186:16
194:21 201:3
206:13 213:22
214:4,11 215:9
216:4 220:20
232:16 245:6
251:7,17
252:14 258:5
**ways** 145:16
146:6 172:2,3
197:2
**we've** 57:8
110:19 147:5
163:7 165:16
183:7 193:20
196:16 197:19
220:21 232:15
233:9 240:23
243:9 257:12
258:11
**website** 198:21
199:7
**week** 287:20
**weekly** 55:21
**weigh** 72:2
224:17

**weighed** 75:12
**weighing** 75:7
77:3
**weight** 49:10
50:23 71:24
**welcome** 11:9
57:22 112:10
167:7 261:21
287:15
**went** 43:17
107:15 145:9
270:6,15
283:24 284:3
284:16
**whatever's**
47:11
**whatsoever**
258:18
**wheel** 20:11,12
**white** 104:23
**wholesale**
66:24
**wholly** 255:21
**wide** 56:13
79:19 202:25
221:14 247:17
247:25 249:20
251:22 253:19
257:8 278:14
278:19
**widely** 278:17
279:18
**wildly** 47:13

**wilk** 2:16
**wilkauslande...**
2:19 12:15
**window** 30:9
32:17 35:21
36:2 37:5,7
40:11 41:3
145:2 176:6,9
176:18
**windows**
176:14
**wise** 235:12
**wish** 12:10
138:11 236:24
**withdraw**
18:21 95:7
106:10 170:22
262:2,2
**witness** 5:15,17
5:18 6:17,21
23:8 28:21
53:5 63:25
96:7 110:23
111:4,21
147:19,22
166:8,19
222:18 227:10
227:13,18,21
227:23 260:5
261:12 279:21
280:3,16,21
281:3,8 289:11
289:15 290:2,6
291:4

**witnesses** 165:6
165:7 259:24
**wonderful**
128:19 150:17
166:20
**wondering**
88:16 89:8
103:3 148:5
164:24
**word** 17:19,20
18:8 20:21
94:22 136:24
140:5,18 184:2
184:3 194:21
198:5 210:8,8
220:7 234:17
235:2 240:15
240:16 248:6,7
248:8,11
274:16
**words** 25:18
119:21 136:21
185:5 220:3
248:9
**work** 52:23,25
60:16,18 61:4
61:10,12,17,20
62:2 64:21
66:7,14,19
85:13 111:13
165:10 203:6
249:17,18
250:3,4 285:8

**[worked - z]**

| | | | |
|---|---|---|---|
| **worked** 18:25 19:13 21:13 38:9 60:23 66:21 | **wtr** 96:20 97:2 97:6,8,9,11 | 189:5 190:21 194:12 208:8 208:13 209:15 | **z** |
| **working** 42:12 | **wtr's** 97:22 | 209:17 210:6,6 | **z** 5:1 6:1 7:1 |

**worked** 18:25 19:13 21:13 38:9 60:23 66:21
**working** 42:12
**works** 8:7 31:24 116:10 224:22 285:13
**world** 48:22 98:23 116:11 249:22,23,24 250:2 256:14 258:19
**worried** 61:22 88:14 136:6
**worry** 39:8
**worthwhile** 272:20
**wow** 17:12 199:15
**write** 20:13 21:25 22:2 88:4 244:9
**writing** 99:15
**written** 6:3 17:18 18:7 19:12,13 79:9 99:12 250:23
**wrong** 43:17 180:3 193:9 195:19 199:20
**wrote** 22:3 25:3 106:24 198:17

**wtr** 96:20 97:2 97:6,8,9,11
**wtr's** 97:22

**x**

**x** 4:1,6 101:22 102:24

**y**

**yeah** 16:21 30:24 51:6,7 55:4 58:22 59:14 67:11 80:11,17 81:7 81:7 82:9 83:11 105:12 105:16,19 109:17 124:19 127:25 128:18 128:18 129:20 130:20 132:18 147:7,21 149:20 150:8 150:14 151:4 151:18 152:21 152:24 158:14 158:21,24 159:7,9 160:7 163:9 165:2 166:5,5 168:22 169:8 170:10 170:16 182:15 183:19 185:24 185:24 186:9 187:13 188:17

189:5 190:21 194:12 208:8 208:13 209:15 209:17 210:6,6 210:18 211:3,6 211:19 227:24 228:3 230:4 239:10 262:11 269:12,12,12 269:17 274:4 276:18 279:8 279:20,25 280:21,24 284:8 286:10 287:9 289:2,11
**year** 26:23 27:5 27:5,10,11 29:11,11 31:9 31:9 34:17,17 35:18 36:13,13 36:23,23 37:5 44:20 189:3,11 189:14 190:7
**years** 36:6,13 45:2 189:16
**yep** 14:15 86:23 152:10 152:12,14 196:20 209:22
**yikes** 145:10
**york** 1:2 2:7,18 5:14 15:11 291:19

**z**

**z** 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1

**[z - zeros]**                                                    Page 71

| | | | |
|---|---|---|---|
| 100:1 101:1 | 168:1 169:1 | 236:1 237:1 | 293:2,24 294:2 |
| 102:1 103:1 | 170:1 171:1 | 238:1 239:1 | 294:4,12 |
| 104:1 105:1 | 172:1 173:1 | 240:1 241:1 | **zero**   143:15,17 |
| 106:1 107:1 | 174:1 175:1 | 242:1 243:1 | 151:23 |
| 108:1 109:1 | 176:1 177:1 | 244:1 245:1 | **zeros**   151:25 |
| 110:1 111:1 | 178:1 179:1 | 246:1 247:1 | |
| 112:1 113:1 | 180:1 181:1 | 248:1 249:1 | |
| 114:1 115:1 | 182:1 183:1 | 250:1 251:1 | |
| 116:1 117:1 | 184:1 185:1 | 252:1 253:1 | |
| 118:1 119:1 | 186:1 187:1 | 254:1 255:1 | |
| 120:1 121:1 | 188:1 189:1 | 256:1 257:1 | |
| 122:1 123:1 | 190:1 191:1 | 258:1 259:1 | |
| 124:1 125:1 | 192:1 193:1 | 260:1 261:1 | |
| 126:1 127:1 | 194:1 195:1 | 262:1 263:1 | |
| 128:1 129:1 | 196:1 197:1 | 264:1 265:1 | |
| 130:1 131:1 | 198:1 199:1 | 266:1 267:1 | |
| 132:1 133:1 | 200:1 201:1 | 268:1 269:1 | |
| 134:1 135:1 | 202:1 203:1 | 270:1 271:1 | |
| 136:1 137:1 | 204:1 205:1 | 272:1 273:1 | |
| 138:1 139:1 | 206:1 207:1 | 274:1 275:1 | |
| 140:1 141:1 | 208:1 209:1 | 276:1 277:1 | |
| 142:1 143:1 | 210:1 211:1 | 278:1 279:1 | |
| 144:1 145:1 | 212:1 213:1 | 280:1 281:1 | |
| 146:1 147:1 | 214:1 215:1 | 282:1 283:1 | |
| 148:1 149:1 | 216:1 217:1 | 284:1 285:1 | |
| 150:1 151:1 | 218:1 219:1 | 286:1 287:1 | |
| 152:1 153:1 | 220:1 221:1 | 288:1 289:1 | |
| 154:1 155:1 | 222:1 223:1 | 290:1 | |
| 156:1 157:1 | 224:1 225:1 | **zach**   277:8 | |
| 158:1 159:1 | 226:1 227:1 | **zachary**   2:13 | |
| 160:1 161:1 | 228:1 229:1 | 7:11 | |
| 162:1 163:1 | 230:1 231:1 | **zahn**   1:11 4:9 | |
| 164:1 165:1 | 232:1 233:1 | 4:10,12 5:6 6:8 | |
| 166:1 167:1 | 234:1 235:1 | 6:20 13:3 14:6 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.