# EXHIBIT C

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DARSHAN HASTHANTRA, *et al.*, <br><br> Plaintiff, <br><br> v. <br><br> CLEANSPARK, INC., *et al.*, <br><br> Defendants. | Case No. 1:21-cv-511 (LAP) <br><br> <u>CLASS ACTION</u> |

EXPERT REPLY REPORT OF ZAHN BOZANIC, PH.D.

May 2, 2025

# CONFIDENTIAL

**Table of Contents**

I.      Introduction ................................................................................................................... 1

II.     Summary of Opinions ..................................................................................................... 2

III.    Background on the Fraud-on-the-Market Theory and Stock Prices ........................... 5

IV.     The Out-of-Pocket Methodology is Widely Accepted by Courts at the Class
        Certification Stage and Defendants' Concerns Will be Addressed at the Damages
        Stage ................................................................................................................................ 7

    A.  Defendants Fail to Demonstrate that the Alleged Misrepresentations Had No Price
        Impact ........................................................................................................................... 8

    B.  The Out-of-Pocket Methodology is Capable of Addressing Confounding
        Information ................................................................................................................. 18

    C.  The Out-of-Pocket Methodology is Capable of Addressing Materializations of Risks
        ..................................................................................................................................... 19

V.      Conclusion .................................................................................................................... 21

## I.    Introduction

1.      On January 10, 2025, I submitted an expert report in this matter (my "Opening Report"), in which I concluded that the market for CleanSpark's Common Stock was efficient throughout the Class Period. I also concluded that damages can be calculated on a class-wide basis subject to a common methodology in this matter on Plaintiff's claims under §10(b) and §20(a).[1]

2.      Following the submission of my Opening Report, Counsel for Plaintiff provided me with Defendants' Opposition to Plaintiff's Motion for Class Certification, dated March 14, 2025 (Doc. 92) ("Defendants' Opp. Brief"). I have been asked to respond to certain characterizations of my Opening Report opinions contained within Defendants' Opp. Brief.

3.      My qualifications (including my CV) and rate of compensation for work in this matter were identified in my Opening Report and so I do not repeat them here.

4.      In formulating my opinions set forth in this Expert Reply Report, I have relied upon the analyses already described in my Opening Report, as well as my knowledge, experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts set forth in this matter. All of the materials I have considered in forming my opinions are identified in **Appendix A** to this Reply Report, in addition to those previously identified in Appendix B to my Opening Report.

5.      I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

---

[1] Opening Report, ¶¶ 3, 92, and Sections V and VI. I continue to hold the opinions expressed in my Opening Report and reiterate them here. Capitalized terms in this report have the same meaning as in my Opening Report.

## II.    Summary of Opinions

6.    Nothing in Defendants' Opp. Brief disturbs the opinions expressed in my Opening Report. There are a number of important opinions I express in my Opening Report that Defendants do not dispute. First, Defendants do not dispute my conclusion that CleanSpark's Common Stock traded in an efficient market throughout the entirety of the Class Period. In my Opening Report, I tested the market efficiency of CleanSpark's Common Stock by evaluating the *Cammer* and *Krogman* factors.[2] Defendants do not dispute my analyses of or my conclusions regarding *any* of these factors.

7.    Second, Defendants do not offer any criticism of the event study regression specified in my Opening Report. Defendants do not put forward their own event study, nor do they dispute that I performed a valid event study regression that controls for market and industry effects that accurately measures the abnormal returns exhibited by CleanSpark's Common Stock during the Class Period and on the alleged corrective disclosure dates. They also do not dispute that an event study regression, like the one I conducted in my Opening Report, is one of the economically valid methods for conducting a loss causation and damages analysis.

8.    Third, Defendants do not dispute that the damages methodology (*i.e.*, the out-of-pocket method) that I detail in my Opening Report is standard, reasonable, and relied upon in virtually all securities class action matters alleging fraud claims under Section 10(b) of the Exchange Act.[3] Nor do they articulate any alternative methodology that would be more suitable in this matter.

---

[2] Opening Report, Section V.

[3] Opening Report, Section VI.

9.      Defendants claim that the out-of-pocket damages methodology I have put forward is flawed for several reasons, because "individual causation, injury, and damages issues will predominate."[4] First, Defendants claim a lack of front-end price impact around the alleged misrepresentations.[5] Second, Defendants claim a lack of back-end price impact around several alleged corrective disclosures.[6] Third, Defendants claim I have failed to identify a method to determine the amount of confounding information that caused a portion of CleanSpark's Common Stock price declines around the corrective disclosures.[7] Fourth, Defendants claim I have failed to explain how the out-of-pocket damages methodology would address Plaintiff's allegations regarding materializations of the risk.[8]

10.      Defendants' concerns are unpersuasive. None of the purported issues they raise would lead to individualized questions about loss causation and damages. Rather, as explained in my Opening Report, the out-of-pocket damages methodology will reasonably address the calculation of artificial inflation and any disaggregation of confounding information at the loss causation and damages stage, based on a merits-based inquiry.[9] This methodology is common across all Class members. As noted in my Opening Report: "All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances."[10]

---

[4] Defendants Opp. Brief, at pp. 22-25.

[5] *Id*.

[6] *Id*.

[7] *Id*.

[8] *Id*.

[9] Opening Report, Section VI.

[10] Opening Report, ¶ 85.

3

11.     What Defendants claim regarding the amount of stock price changes and potential need for disaggregation have nothing to do with how the out-of-pocket damages framework fits Plaintiff's liability theory or its uniform applicability to all class members. Rather, their speculative concerns relate to circumstances that may later implicate the precise amount of artificial inflation that a jury or finder of fact attributes to Defendants' misconduct, and thus determines was present in CleanSpark's Common Stock throughout the Class Period. These are common concerns in securities litigation matters and are addressed in a loss causation and damages analysis, which I have not been asked to perform at this time. As I detail below, parsing out any confounding information will be conducted on a class-wide basis with common information at the loss causation and damages stage, and there are well-accepted valuation techniques to address these questions at that stage based on a detailed merits-based inquiry.[11]

12.     Moreover, I demonstrate evidence of the price impact of the alleged misrepresentations via the associated corrective disclosures in this case. This evidence includes: i) fundamental principles of finance and economic analysis, ii) internal case documents, iii) analyst coverage which explicitly references the economic information pertaining to the alleged misrepresentations, and iv) my event study analysis, which documents statistically significant evidence of price impact in CleanSpark's Common Stock price returns.

13.     As a result, Defendants' critiques do not address, much less alter, my opinion that damages in this case can be calculated using a common methodology that is consistent with Plaintiff's theory of liability.

---

[11] Opening Report, Section VI.

### III.     Background on the Fraud-on-the-Market Theory and Stock Prices

14.     In my Opening Report, I explained how the fraud-on-the-market theory relates directly to the price of a given security.[12] This theory posits that if a company's stock price reflects all public widely available information, then all purchasers of that company's stock implicitly rely on any misrepresentations or omissions because those statements or omissions have distorted the value of each investor's purchase price. I further explained how the fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to claims made under Section 10(b) of the Exchange Act and was adopted by the U.S. Supreme Court in *Basic* and reaffirmed in its *Halliburton II* decision.

15.     I analyzed the *Cammer* and *Krogman* factors relating to CleanSpark's Common Stock in my Opening Report, and I ultimately found that these factors support a conclusion of market efficiency.[13] Thus, it follows that purchasers of CleanSpark's Common Stock implicitly relied on Defendants' alleged misrepresentations and/or omissions because the value of that information was incorporated into the price of CleanSpark's Common Stock at the time those trades were made. Defendants do not dispute my analyses of any of the efficiency factors or my conclusion that CleanSpark's Common Stock traded in an efficient market during the entirety of the Class Period.

16.     As part of the analysis in my Opening Report, I performed an event study to analyze the stock price movements for CleanSpark's Common Stock throughout the Class Period. To perform the event study, I used a regression analysis to measure the relationship between CleanSpark's stock price returns and: (1) changes in market-wide factors that would be expected

---

[12] Opening Report, Section IV.

[13] Opening Report, Section V.

5

to impact all stocks, and (2) changes in industry-wide factors that would be expected to impact stocks in CleanSpark's industry. By modeling how CleanSpark's stock price returns moved relative to an overall market index and an industry index, I am able to measure its "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide effects.

17. Defendants offer no criticisms of my event study methodology. Nor do they dispute that it accurately measures the abnormal returns exhibited by CleanSpark's Common Stock during the Class Period and on the alleged misrepresentation and corrective disclosure dates. As explained further in **Section IV.A** below, my event study provides evidence of price impact – that is, the alleged misrepresentations impacted CleanSpark's Common Stock price during the Class Period.

18. Defendants claim my model "is unable to measure damages class-wide in a manner consistent with Plaintiff's liability theory."[14] While it is premature to opine on what a loss causation and damages analysis would demonstrate, I would identify, review, evaluate, and empirically analyze all of the events that are alleged as revealing corrective information (including by conducting an event study analysis). This, along with an analysis of the alleged misstatements and omissions in this matter, would allow me to determine the amount of artificial inflation impounded into the stock on each day of the class period that subsequently dissipated out of the price when the market began to learn of the truth. This amount of artificial inflation would apply to every member of the class who purchased on a given day during the Class Period.

19. In the following section, I explain how the out-of-pocket methodology, which routinely incorporates artificial inflation estimates derived from event study analyses, is widely accepted by courts at the Class certification stage.

---

[14] Defendants' Opp. Brief, at pp. 23-25.

**IV.   The Out-of-Pocket Methodology is Widely Accepted by Courts at the Class Certification Stage and Defendants' Concerns Will be Addressed at the Damages Stage**

20.    In addition to not challenging my opinions of market efficiency or my event study methodology or analysis, Defendants do not challenge the opinion in my Opening Report that the out-of-pocket method of calculating damages represents a standard and well-accepted methodology under Section 10(b) of the Exchange Act. As I explain in my Opening Report, the out-of-pocket methodology calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale.[15]

21.    At this point, it is important to draw a distinction between two concepts that are part of a damages methodology: the damages methodology itself and the *inputs* to the damages methodology. In my Opening Report, I presented the standard well-accepted damages methodology. Further, I make clear in my Opening Report that quantifying artificial inflation per share for each day in the Class Period and the dissipation of artificial inflation through corrective disclosures – the *inputs* to the damages methodology – are questions separate and apart from whether there is a common, class-wide method for computing damages. As discussed in my Opening Report, there are a number of valuation techniques that can be employed to conduct such an evaluation of inputs ultimately used in the damages methodology.[16] Rather than taking issue with the out-of-pocket methodology, Defendants express concerns over the specific calculation of inputs to this methodology. However, as explained in the following sections, none of their concerns raise individualized issues; if any such calculations are warranted at the damages stage, such calculations will be carried out on a class-wide basis using a common methodology.

---

[15] Opening Report, Section VI.A.

[16] Opening Report, Section VI.A.

**A.** **Defendants Fail to Demonstrate that the Alleged Misrepresentations Had No Price Impact**

22.     I understand that Plaintiff's allegations include the price maintenance theory of artificial inflation – that is, the alleged misrepresentations maintained artificial inflation in CleanSpark's Common Stock prices.[17] As a result, price impact can be demonstrated by looking at the alleged corrective disclosures and the resulting impacts on CleanSpark's stock prices. As I explain in this section, the alleged corrective disclosures caused declines in the Company's stock prices that are statistically significant on both an individual and collective basis. Moreover, CleanSpark's stock price increased at the front-end of the Class Period. I thus demonstrate evidence of both front-end and back-end price impact of the alleged misrepresentations and associated corrective disclosures in this case. This evidence includes: i) fundamental principles of finance and economic analysis, ii) internal case documents, iii) analyst coverage which explicitly references the economic information pertaining to the alleged misrepresentations and the associated alleged corrective disclosures, and iv) my event study analysis, which documents statistically significant evidence of price impact in CleanSpark's Common Stock price returns.

23.     I understand Defendants bear the burden of demonstrating there was no price impact by a preponderance of the evidence; that is, whether it is "more likely than not" that the alleged misrepresentations did not impact CleanSpark's stock prices.[18] As shown in this section, I document compelling evidence of price impact of the alleged misrepresentations in this matter.

---

[17] Complaint ¶ 170.

[18] "Defendants bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence at class certification." *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*

### i. Fundamental Principles of Finance and Economic Analysis

24. A fundamental principle of finance and economics holds that the value of a security is equal to the present value of the expected future cash flows to holders of that security.[19] In other words, a security's value is based on the amount, timing, and riskiness of future cash flows it can generate, discounted at a rate that reflects their riskiness.[20] All else being equal, a decrease in a company's future revenue or future earnings reflects a decrease in the cash flows to the common stockholders, and thus, causes a decrease in the value of the security. Similarly, a delay in the generation of cash flows causes a decrease in the value of the security because those future cash flows will be discounted over a greater length of time to the present value of the security.

25. The added power that the expansion of CleanSpark's ATL Facility would generate would allow the facility to produce more bitcoin and thus generate more revenue.[21] Therefore, there is an economic connection between: 1) the information conveyed by the alleged false and misleading statements about CleanSpark's ATL Facility, its expected costs and profitability, and the timeline of its expansion; and 2) the economic information provided by the alleged corrective disclosures – which included revelations of the relevant truth about the ATL acquisition, its potential costs and profitability, and timeline for completing the expansion project.[22]

26. As a result, fundamental principles of finance and economics support the conclusion that the alleged misrepresentations in this matter had an impact on CleanSpark's Common Stock prices.

---

[19] Tim Koller, Marc Goedhart, & David Wessels, *Measuring and Managing the Value of Companies*, John Wiley & Sons, Sixth Edition, 2015, p. 17.

[20] *Id.*, at p. 42.

[21] *See ¶ 30, infra.*

[22] Opening Report at ¶¶ 13-16.

### ii.    Internal Case Documents

27.    In addition to fundamental principles of finance and economics, internal case documents further support the conclusion that the alleged misrepresentations in this matter had an impact on CleanSpark's Common Stock prices. As discussed in the following paragraphs, CleanSpark received several inquiries from the financial media, as well as from CleanSpark investors, which demonstrate the value relevance of the allegedly misrepresented information to investors.

28.    First, internal documents reveal that CleanSpark received several requests for comment on January 14, 2021 from the financial media following the release of the Culper Report, including from *Seeking Alpha*, *Bloomberg*, and *TheFly.com*, thus indicating there was media interest and concern regarding the allegations contained in the report. For example, the following email inquiries were sent to CleanSpark's Investor Relations department:

- Seeking Alpha:  "Hi - Josh Fineman with Seeking Alpha news. Trying to get CleanSpark **comment on this new short report**. Thanks much. Josh  https://twitter.com/CulperResearch/status/1349797627018272773"[23]
- Bloomberg: "Bloomberg markets is wondering if Cleanspark would be able to **comment on the short-selling report issued by Culper Research**."[24]
- TheFly.com: "My name is Jessica de Sa-Mota and I'm a reporter with The Fly. **Culper Research has issued a short report on CleanSpark, calling the stock "uninvestible."** I just wanted to reach out and see if the company had any comments on this?"[25]

29.    Second, internal email communications between CleanSpark's investors and Defendant Schultz (Chairman) in the days and weeks following the release of Culper Report indicate there was substantial investor interest and concern regarding the allegations contained in

---

[23] Email inquiry from Seeking Alpha, January 14, 2021 (CSBish0002064)

[24] Email inquiry from Bloomberg, January 14, 2021 (CSBish0002071)

[25] Email inquiry from TheFly.com, January 14, 2021 (CSBish0002072)

the report. In addition to concerns regarding the allegations, as the price of CleanSpark's Common Stock declined, investors repeatedly asked why CleanSpark management failed to publicly respond to the allegations. Further, some investors expressed the view that CleanSpark's lack of public commentary disavowing the allegations further enabled CleanSpark's Common Stock price decline. See, for example, the following excerpts from emails between Defendant Schultz and CleanSpark's investors:[26]

- In reference to the allegations in the Culper Report: "What are your thoughts on the following.? **all clean spark investors are terrified**."[27]

- "However, I am **more than a little freaked out by the DOZENS of lawsuit/PR announcements** I see in my Yahoo finance app regarding CLSK."[28]

- "**if Culper allegations are fabricated or wrong, why not come out publicly with proof or a site visit in person** video recorded to give investors some good faith. I'd like to know where you stand with this."[29]

- "I am concerned with a report that was recently released, by Culper Research. I am interested to know **what you are going to do to combat this report. I lost thousands of dollars today over that report. My hope is that the report was mostly disinformation.** What can you tell me?"[30]

- "I'm reaching out because there's news about law firms' investigations about CleanSpark and its directors, which **impacted the stock price by almost 30% in just a few days**. I'm a firm believer and investor of CleanSpark but also a **bit concerned since there's no formal response to the lawsuit from CleanSpark**."[31]

- "I would please like to know a point of view or something you can tell me about the recent accusations that **has taken the stock 20% down in the past two sessions**. **I have being losing lots of money… Still, i would like to know if posible why has the company not said anything regarding the short.**"[32]

- "You guys wanna do your investors a little favor? **Give us an update on Lawsuit or anything? Were all just losing our money. You guys don't care about us** … I just feel like **did not initially comment on short seller reports that drove stock down for almost**

---

[26] Bold emphasis added to investor emails excerpts.

[27] Email inquiry from investor, January 15, 2021 (CSBish0002172)

[28] Email inquiry from investor, February 20, 2021 (CSBish0016542)

[29] Email inquiry from investor, January 21, 2021 (CSBish0002732)

[30] Email inquiry from investor, January 14, 2021 (CSBish0002087)

[31] Email inquiry from investor, January 20, 2021 (CSBish0002536)

[32] Email inquiry from investor, January 16, 2021 (CSBish0002175)

11

**a week straight** before management said a word and that scared alot of investors away ... **Ever since short sell report you have half the interest in your stock and it's driving prices down.**"[33]

- "Team- **At what point is a rebuttal going to come to the Culper Research report going to come? They are calling our millions of shares "worthless"** I expect 48 hours is ample time to draft something. Worth of value! … No Matt! **A simple PR response would be ideal here.** Something to the effect of Culpeper is a short seller and all of this is base claims. ... **putting out a PR statement defending your company and our shares would help a lot!** Being quite shows weakness! Just my opinion .... but if the stock keeps falling is selling shares on the open market will not help. **Defend our investment please!**" [34]

30.     The significant interest demonstrated by financial media outlets and CleanSpark's investors provides further evidence of the value relevance and thus price impact of the alleged misrepresentations at issue in this case.

### iii.     Analyst Coverage

31.     In addition to internal case documents, excerpts from analyst reports support the value relevance of the allegations from the Culper Report insofar as they support the conclusion that the alleged misrepresentations in this matter had an impact on CleanSpark's Common Stock prices and thus firm value. Quotes from analyst reports reveal that analysts updated their valuation models on the basis of the CleanSpark's statements regarding energy capacity increases and the ability to obtain and immediately deploy additional bitcoin mining equipment in order to improve computing speeds and thus the rate of bitcoin mining. Hence, on the basis of CleanSpark's disclosures, analysts raised their revenue and profit margin projections for CleanSpark and therefore CleanSpark's target share price. See, for example, the following excerpts from analyst reports covering CleanSpark:[35]

---

[33] Email inquiry from investor, February 2, 2021 (CSBish0003666)

[34] Email inquiry from investor, January 16, 2021 (CSBish0016106)

[35] Bold emphasis added to analyst report excerpts.

- December 11, 2020: "Our **price target increase** to $24.00 from $18.00 is **primarily driven by upward revisions to our future estimates to include new revenue and margin contribution from bitcoin mining activity**. We are now projecting FY2021 and FY2030 revenues of $28.7M. … **Bitcoin mining to be scaled immediately.** Management intends to scale its bitcoin mining operations immediately and has **contracted with the local municipality to expand the power to the facility** from 20MVV (of which 9.6MVV is being utilized) to 50MVV (targeted to be completed by April 2021). … **During the next several quarters, the company is planning to increase the capacity** from the current 9.6MVV, operating at approximately 190PH/s, to 50.0MVV, operating at approximately 900-1,400PH/s."[36]

- February 16, 2021: "We are **increasing our price target on CleanSpark to $50.00 from $24.00, driven by upward revisions to our expected contribution from the company's bitcoin mining operation**. … We believe **the company should see a full quarter of bitcoin contribution beginning in current March 2021 quarter**, with production ranging between 1.5 to 2.0 bitcoins per day (**going from approximately 200 PH/s in December to more than 315 PH/s in February 2021**). The company's bitcoin mining outlook is calling for an additional 800 to 880 PH/s of processing capacity that would **bring the total capacity to between 1.0 and 1.3 EH/s by early 2H21.**"[37]

- April 20, 2021: "…CleanSpark announced that it is purchasing over 20,000 Bitcoin miners with a total of approximately 1,600 miners expected to be **delivered between April 2021 and June 2021, and thereafter at a rate of approximately 1,600 miners per month from August 2021 to July 2022**. CleanSpark is spending approximately $18.8M for the first 1,600 miners and an aggregate of approximately $136.2M for the 19,200 miners over the subsequent 12 months. **As a result of this purchase, the company's capacity is set to reach more than 1.1EH/s by the summer of 2021**, capable of producing 6-7 Bitcoins per day at current difficulty rates, and to over 3.2EH/s by the summer of 2022, capable of producing 18-20 Bitcoins per day at current difficulty rates."[38]

- May 10, 2021: "**Gross margins were around 81.1% compared to 41.0% in F1021 and 39.8% in F4020, mainly supported by Bitcoin contribution**. … Key takeaways. **CleanSpark has revised its FY2021 outlook** with expectations for revenues to range between $47M and $60M. Energy, Digital Agency, and **Bitcoin Mining segment revenues for the fiscal year are now expected to range between** $16-20M, $1M, and **$30-40M**, respectively. … Management indicated that **the expected revenue range for Bitcoin-related contribution factors in some level of delays in receiving equipment.** Those results could vary depending on timeliness of the new equipment delivered and deployed." [39]

---

[36] H.C. Wainwright Analyst Report, December 11, 2020.

[37] H.C. Wainwright Analyst Report, February 16, 2021.

[38] H.C. Wainwright Analyst Report, April 20, 2021.

[39] H.C. Wainwright Analyst Report, May 11,2021.

- August 18, 2021: "**CleanSpark is in the process of adding mining capacity over the next 12-14 months**, for which it has already made advance deposits. Management expects a total of 11,700 miners to be deployed by September 30, 2021, 19,900 by December 31, 2021, 25,500 by March 31, 2022, 30,000 by June 30, 2022, and 34,000 by September 30, 2022. As a result, the total hashrate installed at the end of FY2022 is expected to be 3.2-3.4EH/s, enough to produce 26-28BTC/day. **We are taking a conservative stance and modeling the capacity to reach less than 10BTC/day by September 2022, mainly to hedge for: (1) any potential delays in deployment**…"[40]

32.     Further, some of the analyst reports include a "sensitivity analysis" of the analyst's valuation of the firm. The sensitivity analysis typically varies two essential inputs to the analysts' model: the discount rate and terminal growth rate.[41] As seen below in the figure excerpted from an analyst report by H.C. Wainright, as discount rates go up, firm value goes down.[42]

### Sensitivity Analysis

| Discount Rate | Terminal Growth Rate | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1.5% | 1.6% | 1.8% | 2.0% | 2.2% | 2.4% | 2.7% |
| 8.5% | 35.01 | 35.24 | 35.50 | 35.80 | 36.12 | 36.50 | 36.94 |
| 9.3% | 30.81 | 30.95 | 31.11 | 31.31 | 31.51 | 31.74 | 32.01 |
| 10.1% | 27.11 | 27.20 | 27.30 | 27.41 | 27.53 | 27.67 | 27.83 |
| 11.1% | 23.87 | 23.92 | 23.97 | 24.03 | 24.10 | 24.17 | 24.25 |
| 11.8% | 21.66 | 21.68 | 21.72 | 21.75 | 21.79 | 21.83 | 21.87 |
| 12.7% | 19.65 | 19.66 | 19.68 | 19.69 | 19.71 | 19.72 | 19.74 |
| 13.6% | 17.82 | 17.83 | 17.83 | 17.83 | 17.83 | 17.83 | 17.83 |

Source: H.C. Wainwright & Co. estimates.

As noted in **Section IV.A.i** above, this is because a security's value is based on the amount, timing, and riskiness of future cash flows it can generate, discounted at a rate that reflects their riskiness. That is, as risk regarding the realization of cash flows increases, the discount rate must also increase in order to compensate investors with a lower security price for taking on extra risk.

---

[40] H.C. Wainwright Analyst Report, August 18, 2021.

[41] The discount rate is the rate used to calculate the present value of a future stream of cash flows appropriate for the level of risk associated with the future realization (or lack thereof) of said cash flows. The terminal growth rate is the growth rate applied to a series of cash flow streams to estimate the expected future cash flows of the firm. *See, e.g.*, Joshua Rosenbaum and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, John Wiley & Sons, Inc. (Hoboken) (2009), Chapter 3.

[42] H.C. Wainwright Analyst Report, December 11, 2020.

14

Similarly, as the terminal growth rate goes down in the figure, firm value goes down. This is because a decrease in a company's future revenue or future earnings reflects a decrease in the cash flows to the common stockholders, and thus, causes a decrease in the value of the security. That is, as expected growth rates in future earnings or cash flows decrease, investors must be compensated with a lower security price given lower future expected growth.

### iv. Event Study Analysis

33. Defendants mischaracterize my testimony about my event study analysis to imply that it indicates a lack of price impact.[43] In addition to my testimony indicating there is more than one reasonable and conventional cutoff for assessing statistical significance, I testified that statistical significance is a continuum reflecting whether it is "more likely than not" that the alleged misrepresentations had price impact:

> "So this is a level of statistical significance. So *it's showing whether or not this is happening, this occurrence, this phenomenon that we're documenting is by random chance or not.* And so it's the ability to reject that this is occurring by random chance. That this is a pattern that's observable in the data statistically speaking that is different than random chance. *So the lower the p-value, the greater the statistical significance and the strength of the relationship.*"[44]

34. Moreover, as clearly explained in both my Opening Report and my testimony, my discussion of statistical significance pertained to my *Cammer* Factor Five test of market efficiency.[45] Defendants do not dispute that my event study analysis supports my conclusion that CleanSpark's Common Stock traded in an efficient market throughout the Class Period. As I explain below, my event study analysis also provides strong evidence that the alleged misrepresentations impacted the prices of CleanSpark's Common Stock.

---

[43] See, e.g., Defendants' Opp. Brief, at 23-24.

[44] See, e.g., Bozanic Deposition Transcript, pp. 142-144.

[45] Opening Report, Section V.E.

35.     My event study demonstrates that it is "more likely than not" that the alleged misrepresentations had price impact. For example, the alleged misrepresentations at the start of the Class Period on December 10, 2020 are associated with a positive stock price increase, with a *p*-value of 0.104 and statistical significance at the 89.6% level. Moreover, I understand Plaintiffs allege that Defendants' scheme and misrepresentations maintained artificial inflation in CleanSpark's Common Stock prices as of the start of the Class Period.[46] In cases alleging inflation maintenance, price impact can be assessed by evaluating the back-end impact of corrective disclosures on stock prices. As detailed in Table 1 and discussed further below, the alleged corrective disclosures resulted in significant declines in CleanSpark's stock prices. These events thus provide further evidence of price impact.

**Table 1. Event Study Results and Price Impact**

| Event Date | Event | Abnormal Return | T-Statistic | P-Value | Significance |
|---|---|---|---|---|---|
| 1/14/2021 | Culper Report | -13.5% | -1.58 | 0.116 | 88.4% |
| 1/15/2021 | Culper Tweet | -11.3% | -1.33 | 0.188 | 81.2% |
| *1/14 + 1/15* | *Cumulative* | *-23.2%* | *-1.93* | *0.056* | *94.4%* |
| | | | | | |
| 2/12/2021 | Press Release | -5.7% | -0.80 | 0.428 | 57.2% |
| 8/17/2021 | Press Release | -10.9% | -2.74 | 0.007 | 99.3% |
| *2/12 + 8/17* | *Cumulative* | *-16.0%* | *-1.94* | *0.055* | *94.5%* |

36.     Table 1 summarizes some of my Opening Report's event study findings and provides further calculations. First, on an individual basis, each alleged corrective disclosure listed

---

[46] Complaint ¶ 170: "Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to ***maintain*** artificially high market prices for CleanSpark's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5."

16

in the table is statistically significant at better than the 50% level. In other words, it is "more likely than not" that the declines were related to information released on these dates, as opposed to random price movements.

37. Second, the January 14, 2021 drop is related to the Culper Report, as is the drop on the following day since Culper tweeted out the report along with a list of questions regarding CleanSpark's business practices on January 15, 2021. Hence, these two days reflect the market's response to the same corrective event entering the market: first, the release of the report and then, second, the tweet which brought greater visibility to the report. Considering this, it is reasonable to combine returns across those days to assess the cumulative 2-day market response to both the release and the dissemination of the Culper Report. As shown in Table 1, the 2-day abnormal return for January 14 and 15, 2021 is -23.2%, with a $p$-value of 0.056 and significance of 94.4%. This provides strong evidence of price impact.

38. Third, the February 12, 2021 and August 17, 2021 drops are related to corrective disclosures regarding the delayed expansion timeline at the ATL facility from "mid-year 2021" to "this fall".[47] Hence, these two days reflect the market's response to the corrective information entering the market regarding expansion delays at the ATL facility. Considering this, it is reasonable to combine returns across those days to assess the cumulative 2-day market response to delaying the expansion timeline from the originally announced April 2021 date to "mid-year 2021" and again to "this fall." As shown in Table 1 above, the 2-day abnormal return for February

---

[47] "The capacity increase is underway and is expected to be complete by *mid-year 2021*." (https://www.sec.gov/Archives/edgar/data/827876/000166357721000068/ex99_1.htm) and "CleanSpark continues to work on expanding its total energy capacity to accelerate the growth of its bitcoin mining operations in Atlanta **this fall**." (https://www.sec.gov/Archives/edgar/data/827876/000166357721000436/ex99_1.htm). Emphasis added.

17

12, 2021 and August 17, 2021 is -16%, with a *p*-value of 0.055 and significance of 94.5%. This again provides strong evidence of price impact.

39.     As documented by my event study analysis, it is "more likely than not" that the alleged misrepresentations had price impact. This conclusion is corroborated by the other evidence I discuss above, including fundamental principles of finance and economic analysis, analyst coverage, and internal case documents.

### B.     The Out-of-Pocket Methodology is Capable of Addressing Confounding Information

40.     Addressing potential confounding information is a loss causation and damages issue that is standard practice in economic analysis. As explained in my Opening Report, there are many potential ways to disaggregate confounding information; to the extent any exists, one can utilize a variety of well-accepted valuation techniques including, but not limited to, event studies, valuation analysis, published academic research studies, analyst research, or other case-specific documents. This is an issue of fact that would need to be considered as part of any loss causation and damages analysis. However, Defendants, without support, suggest that disaggregation is not possible. If such a disaggregation analysis becomes necessary, the standard damages methodology readily incorporates such issues and will be dependent on the same analysis conducted on a class-wide basis.[48]

41.     Defendants have not conducted any analysis, nor put forward any evidence, that confounding information in fact impacted CleanSpark's Common Stock price movements on any of the alleged corrective disclosure dates. To the extent that any such changes ultimately require

---

[48] *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011) (holding that securities fraud plaintiffs need not prove loss causation in order to obtain class certification).

disaggregation, such analysis is appropriately conducted during the loss causation and damages stage of a case and will be carried out in a manner that is common across all Class members.

### C. The Out-of-Pocket Methodology is Capable of Addressing Materializations of Risks

42. As noted in my Opening Report, the "Complaint alleges that the truth regarding the ATL acquisition and CleanSpark's projections relating to the ATL expansion project was partially revealed, and/or the concealed risks materialized…" over several alleged corrective disclosure events.[49] Defendants' Opp. Brief criticizes the out-of-pocket damages methodology by claiming that I do "…not even purport to explain in [my Opening Report] what the materialized risk was, much less how that would be factored into [my] damages model."[50] As an initial matter, the Complaint explains Plaintiff's risk-based allegations as follows:

> "While the Culper Report revealed to the market certain key facts concerning CleanSpark's acquisition of ATL and thereby partially corrected the misleading impression created by Defendants' statements, the Culper Report failed to identify additional misleading aspects of Defendants' statements concerning ATL and additional undisclosed risks that materialized in the months that followed. As detailed below, Defendants failed to disclose conditions at the ATL facility and other facts that created material risks concerning CleanSpark's expansion plan. Those undisclosed facts and conditions prevented CleanSpark from completing the expansion plan (and obtaining the projected hash rates and power expansion benchmarks) within the contemplated timeframe. These failures had a devastating effect on CleanSpark's stock price and thereby damaged investors."[51]

43. The out-of-pocket methodology discussed in my Opening Report fits Plaintiff's theory of liability in this matter insofar as the market learned the truth about the ATL Facility through a series of corrective disclosures and/or materialization of risk events. This method is regularly relied upon by experts at the class certification stage (and beyond) as a method for

---

[49] Opening Report ¶ 15.

[50] Defendants' Opp. Brief, at p. 25.

[51] Complaint ¶ 54.

calculating class-wide damages in matters involving materialization of risk corrective disclosure events.[52]

44.     Generally speaking, corrective disclosure events can correct prior misstatements and/or omissions related to risks as well as those that are unrelated to risks. The out-of-pocket methodology described in my Opening Report capably handles both types of alleged misrepresentations. The attempt by Defendants to bifurcate Plaintiff's single theory of liability thus creates an artificial and unnecessary distinction for how such corrective disclosures would be treated in a damages methodology.

45.     To the extent that any portion of a stock price decline following a corrective disclosure event is unrelated to Plaintiff's allegations, including the materialization of concealed risk, this portion can be disaggregated using the same techniques described in my Opening Report. Under the out-of-pocket methodology, individual damages are calculated based on differences in artificial inflation in stock prices at the time of purchase versus the time of sale. As a result, calculation of the inputs to the out-of-pocket methodology is formulaic and common across class members. In summary, the fact that Plaintiff's theory of liability potentially includes materialization of risks that were disclosed to the market through a series of corrective disclosure events does not prevent me from quantifying artificial inflation throughout the Class Period and measuring damages on a class-wide basis at the damages stage.

---

[52] *See, e.g.,* Memorandum Opinion, Civil Action No. RDB-17-0388 filed September 29, 2022, *In Re Under Armour Securities Litigation*, p. 34; Consolidated Third Amended Complaint for Violations of the Federal Securities Laws, Civil Action No. RDB-17-0388 filed October 14, 2020, *In Re Under Armour Securities Litigation*, at ¶ 377: "The truth was not revealed to the market all at once, but, rather, the truth began to emerge, and the ***risk caused by Defendants' fraud materialized, through partial revelations of truthful information***," and at ¶ 404: "These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very ***risks they sought to warn of began to materialize***" (emphasis added); Memorandum Opinion and Order filed March 29, 2018, in *Washtenaw County Employees' Retirement System v. Walgreen Co., et al.*, No. 15-cv-3187 (N.D. Ill.).

## V.  Conclusion

46.  In summary, Defendants' concerns are flawed and unpersuasive.  I have provided a reasonable and concrete damages methodology, and I have also explained how the out-of-pocket damages methodology is widely employed in cases like this one precisely because it is capable of reliably calculating damages on a class-wide basis in a manner consistent with Plaintiff's theory of liability.

I declare under the penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

Zahn Bozanic, Ph.D.

**Appendix A**

**Documents Considered**

**Case Documents:**

- Amended Class Action Complaint for Violations of the Federal Securities Laws (Doc. 36).

- Expert Report of Dr. Zahn Bozanic, dated January 10, 2025.

- Deposition Transcript of Dr. Zahn Bozanic, dated February 27, 2025.

- Defendants' Opposition to Plaintiff's Motion for Class Certification, dated March 14, 2025 (Doc. 92).

- Declaration of David J. Partida, dated March 14, 2025 (Doc. 93).

- Email Inquiries from Financial Media referenced herein.

- Email Inquiries from Investors referenced herein.

**Court Decisions and Securities Law:**

- *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011).

- Memorandum Opinion, Civil Action No. RDB-17-0388 filed September 29, 2022, *In Re Under Armour Securities Litigation*.

- *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, 77 F.4th 74 (2023).

**CleanSpark SEC Filings**

- Press Release re 4Q 2020 Financial Results

- Press Release re 2Q 2021 Financial Results

**Analyst Reports:**

- H.C. Wainwright Analyst Report, dated December 11, 2020.

- H.C. Wainwright Analyst Report, dated February 16, 2021.

- H.C. Wainwright Analyst Report, dated April 20, 2021.

- H.C. Wainwright Analyst Report, dated May 11, 2021.

- H.C. Wainwright Analyst Report, dated August 18, 2021.

**Other:**

- Tim Koller, Marc Goedhart, & David Wessels, Measuring and Managing the Value of Companies, John Wiley & Sons, Sixth Edition, 2015.

- Joshua Rosenbaum and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, John Wiley & Sons, Inc. (Hoboken) (2009).

- All documents cited within this report and Opening Report.