# EXHIBIT F

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DARSHAN HASTHANTRA, *et al*., | Case No. 1:21-cv-511 (LAP) |
| Plaintiff, | CLASS ACTION |
| v. |  |
| CLEANSPARK, INC., *et al*., |  |
| Defendants. |  |

EXPERT MERITS REPLY REPORT OF ZAHN BOZANIC, PH.D.

October 9, 2025

# CONFIDENTIAL

**Table of Contents**

I.      Introduction..................................................................................................................1

II.     Summary of Opinions...................................................................................................3

III.    Interpreting Statistical Significance..........................................................................4

    A.  Conventional Levels of Statistical Significance.....................................................4

    B.  Academic Theory of Statistical Significance is Consistent with my Merits Report Analyses...................................................................................................................8

    C.  Cumulating Partial Corrective Disclosures..........................................................10

IV.     The Culper Report.....................................................................................................13

    A.  Forms of Market Efficiency..................................................................................13

    B.  Disclosure Processing Costs.................................................................................15

    C.  Disclosure Salience...............................................................................................16

    D.  My Analysis of the Culper Report and Related Tweets is Consistent with the Academic Literature on Disclosure Salience.........................................................20

    E.  The Literature Dr. Garmaise Claims I Fail to Consider is Irrelevant....................24

V.      The Corrective Disclosures........................................................................................27

    A.  Economic Materiality............................................................................................27

    B.  Consistency of Value Relevance Analyses............................................................28

    C.  The February 12, 2021 and August 17, 2021 Corrective Disclosures Provided New Information Regarding Expansion Delays..............................................................32

    a.  The February 12, 2021 Corrective Disclosure.......................................................32

    b.  The August 17, 2021 Corrective Disclosure..........................................................34

    D.  My Disaggregation Analysis of Confounding Information is Reasonable and Reliable..................................................................................................................39

VI.     Damages and Artificial Inflation...............................................................................49

    A.  The Constant Dollar Method is Appropriate in this Matter...................................51

    B.  My Artificial Inflation and Damages Methodology are Adaptable to Alternative Findings..................................................................................................................56

VII.    Conclusion..................................................................................................................58

## I.    Introduction

1.    I have previously filed expert reports in this matter (collectively, my "Prior Reports") and incorporate them here by reference in their entirety.[1] On January 10, 2025, I submitted an expert report in this matter (my "Efficiency Report") in which I concluded that: i) the market for shares of CleanSpark Common Stock was efficient throughout the Class Period; and ii) damages in this matter for CleanSpark Common Stock can be calculated on a class-wide basis subject to a common methodology.[2]

2.    On May 2, 2025, I submitted another expert report in this matter (my "Efficiency Reply Report") in response to Defendants' Opp. Brief. In my Efficiency Reply Report, I concluded that nothing in Defendants' Opp. Brief disturbed the opinions expressed in my Efficiency Report.[3] Further, in my Efficiency Reply Report, I provided compelling evidence of both front-end and back-end price impact of the alleged misrepresentations and associated corrective disclosures in this case.[4] This evidence includes fundamental principles of finance and economic analysis, internal case documents, analyst coverage, and my event study analysis.

3.    On July 18, 2025, I submitted another expert report in this matter (my "Merits Report"), in which I concluded that i) the alleged misstatements and omissions in this matter as set forth in the Complaint were economically material in that they conveyed information that altered the total mix of information available to investors, ii) the alleged corrective information regarding prior misstatements and/or omissions caused the price of CleanSpark Common Stock to decline on the Corrective Disclosure Events, and iii) based on my loss causation analysis, the total fraud-

---

[1] Unless otherwise noted, capitalized terms in this report have the same meaning as in my Prior Reports and all emphasis in this report is added.

[2] Bozanic Efficiency Report, ¶ 3.

[3] Bozanic Efficiency Reply Report, ¶ 6.

[4] Bozanic Efficiency Reply Report, **Section IV.A**.

related price decline associated with the Corrective Disclosure Events is estimated to be $11.69 per share.[5] This reflects $4.48 dissipated on January 14, 2021, $4.03 on January 15, 2021, $1.68 on February 12, 2021, and $1.50 on August 17, 2021. Nothing I have reviewed or analyzed as part of this report has caused me to change any of the opinions expressed in my Prior Reports and I continue to hold those opinions.

4.      Following the submission of my Merits Report, Plaintiff's Counsel provided me with Defendants' Expert Report of Dr. Mark Garmaise, dated September 12, 2025 ("Garmaise Report"). I have been asked by Plaintiff's Counsel to respond to certain characterizations of my Merits Report opinions contained within the Garmaise Report.

5.      In formulating my opinions set forth in this Merits Reply Report, I have relied upon the analyses already described in my Prior Reports (*i.e.*, Opening Report, Reply Report, and Merits Report) as well as my knowledge, experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts set forth in this matter. All of the materials I have considered in forming my opinions are identified in **Appendix A** to this Merits Reply Report, in addition to those previously identified in my Prior Reports.

6.      My qualifications (including my CV) and rate of compensation for work in this matter were identified in my Merits Report and so I do not repeat them here. I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

---

[5] Bozanic Merits Report, **Section III**. Due to a fractional penny rounding error, the last row in **Table B** of my Merits Report (¶ 159) should be $1.50 instead of $1.49.

**II.    Summary of Opinions**

7.    Nothing in the Garmaise Report disturbs the opinions expressed in my Prior Reports.  I continue to hold the opinions expressed in my Prior Reports and reiterate them herein. Additionally, there are a number of important opinions I express in my Merits Report that Dr. Garmaise does not dispute. First, Dr. Garmaise does not dispute that the event study methodology I employed in my Prior Reports is a reliable method for quantifying artificial inflation in this case, that I properly performed a reliable event study to determine the impact that each of the Corrective Disclosure Events had on the price of CleanSpark Common Stock, and that I properly calculated the abnormal declines in the market price of CleanSpark Common Stock on each of the Corrective Disclosure Events, after controlling for market and industry effects.[6] Second, Dr. Garmaise does not dispute that the damages methodology (*i.e.*, the out-of-pocket method) that I detail in my Prior Reports is standard, reasonable, and relied upon in virtually all securities class action matters alleging fraud claims under Section 10(b) of the Exchange Act.[7] Nor does Dr. Garmaise articulate any alternative methodology that would be more suitable in this matter.

8.    Dr. Garmaise puts forward two primary criticisms of my Merits Report in his report. First, Dr. Garmaise claims that I have failed to establish price impact of the alleged misrepresentations.[8] Specifically, Dr. Garmaise claims that I have failed to establish that the alleged misrepresentations caused investor losses on January 14–15, 2021, February 12, 2021, and

---

[6] Bozanic Efficiency Report, **Section V**.

[7] *See*, *e.g.*, Bozanic Merits Report, ¶ 30.

[8] Garmaise Report, ¶ 9.

August 17, 2021.[9] In addition, Dr. Garmaise claims that my assessment of statistical significance is inconsistent with academic research in finance and economics as well as my prior testimony."[10]

9.    Second, Dr. Garmaise claims that my artificial inflation and damages estimates are flawed and unreliable.[11] Specifically, Dr. Garmaise asserts that I provide no justification for the but-for valuation of CleanSpark implied by my artificial inflation estimate as of the start of the Class Period.[12] In addition, Dr. Garmaise asserts that my inflation estimates fail to account for changes in CleanSpark's economic environment during the Class Period.[13]

10.    Dr. Garmaise's concerns are unpersuasive. As discussed in the sections below, none of the purported issues he raises disturb the opinions set forth in my Merits Report regarding economic materiality, price impact, loss causation, artificial inflation, or damages.

## III.    Interpreting Statistical Significance

### A.    Conventional Levels of Statistical Significance

11.    Dr. Garmaise takes issue with how I interpret and rely on statistical significance in my Merits Report. In particular, he states that "…Dr. Bozanic's conclusions regarding the statistical significance of CleanSpark's stock price declines on the Alleged Corrective Disclosure Dates are inconsistent with academic practice and with his prior analysis and testimony."[14]

12.    Academic practice relies on conventions. It is conventional in accounting, economics, or finance research to assess statistical significance using conventional cutoffs for *levels* of statistical significance, such as the 90%, 95%, or 99% level. Indeed, in citing Rubinfeld's

---

[9] Garmaise Report, ¶ 11-13.

[10] Garmaise Report, ¶ 10.

[11] Garmaise Report, ¶ 14.

[12] Garmaise Report, ¶ 15.

[13] Garmaise Report, ¶ 16.

[14] Garmaise Report, ¶¶ 10, 35.

4

"Reference Guide on Multiple Regression," Dr. Garmaise himself[15] points out that this "standard practice" is a **convention**: "In most scientific work, the level of statistical significance required to reject the null hypothesis (*i.e.*, to obtain a statistically significant result) is set **conventionally** at 0.05, or 5%."[16]

13.    Further, Rubinfeld's view is consistent with my deposition where I stated in reference to a *p-value* of .05 that it represents a "conventionally used statistical cutoff"[17] as well as my prior testimony. For example, in reference to a discussion of price impact in my Reply Report I stated:

> "In addition to my testimony indicating there is more than one reasonable and **conventional cutoff** for assessing statistical significance, I testified that **statistical significance is a continuum** reflecting whether it is **'more likely than not'** that the alleged misrepresentations had price impact: 'So this is a level of statistical significance. So it's showing whether or not this is happening, this occurrence, this phenomenon that we're documenting is by random chance or not.'"[18]

14.    On the page that follows the discussion re conventional cutoffs, Rubinfeld discusses one- vs. two-tailed tests. He states: "Because using a one-tailed test produces *p*-values that are one-half the size of *p*-values using a two-tailed test, the choice of a one-tailed test makes it easier for the expert to reject a null hypothesis."[19] Stated differently, suppose a researcher begins with a *two-tailed test* with a *p*-value of 0.08, which would just fail Dr. Garmaise's threshold for statistical significance at conventional levels. All else equal, if instead the researcher chooses to proceed with a *one-tailed test* instead (*i.e.*, by changing the hypothesis to allow for a directional prediction), the

---

[15] Garmaise Report, ¶ 34.

[16] *See*, *e.g.*, Rubinfeld, D. "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence*, Third Edition (Federal Judicial Center, 2011), p. 320.

[17] Bozanic Deposition Transcript, pp. 142-144.

[18] Bozanic Reply Report, ¶ 33.

[19] *See*, *e.g.*, Rubinfeld, D. "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence*, Third Edition (Federal Judicial Center, 2011), p. 321.

*p*-value would become 0.04 and, according to Dr. Garmaise, would become statistically significant at conventional levels. Yet, as Rubinfeld points out: "Because there is some **arbitrariness** involved in the choice of an alternative hypothesis, <u>courts should avoid relying solely on sharply defined statistical tests</u>."[20]

15.    Dr. Garmaise repeatedly claims in his report that the 95% confidence interval is the standard used in academic research: "When determining statistical significance, a 95% confidence level (or a 5% significance level) is typically used."[21] and "…when determining statistical significance, a 95% confidence level is the typical threshold used for academic research."[22] and "A 95% confidence level is typically used in academic research"[23] However, according to Dr. Garmaise's deposition testimony:

> "But sometimes supporting, or secondary results, may be described as significant, weakly significant or marginally significant or significant at the 10 percent level [**confidence level of 90%**]. <u>And I have adopted that practice in my own work as well</u>."[24]

16.    Despite seemingly holding out the 95% confidence level as the academic standard, Dr. Garmaise himself regularly uses alternate statistical cutoffs in his own "standard practice" as an academic researcher. In addition to the "standard practice" of using a 99% or 95% confidence level, Dr. Garmaise's research has used, in numerous instances, an alternate statistical cutoff from which he has asserted inferences in his academic research. A review of his recent empirical work, *i.e.*, where he analyzed data and made statistical inferences, his "standard practice" commonly employs a 90% confidence level [10% significance level]. For example:

---

[20] *See*, *e.g.*, Rubinfeld, D. "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence*, Third Edition (Federal Judicial Center, 2011), p. 321.

[21] Garmaise Report, ¶ 10.

[22] Garmaise Report, ¶ 36.

[23] Garmaise Report, ¶ 43, 74.

[24] Garmaise Deposition Transcript, at p. 13.

- Garmaise and Natividad (2010):[25] "…we show that multi-province firm borrowing is also sensitive to local mining wind falls [**statistically significant at the 90% level**]."

- Garmaise and Natividad (2013):[26] "…MFIs that met the eligibility criteria just before the Rating Fund was announced are significantly [**at the 90% level**] more likely to be evaluated after its inception."

- Garmaise and Natividad (2021):[27] "The estimated coefficient of -0.268 is marginally significant [**at the 90% level**]."

I note that all of these examples from Dr. Garmaise's published papers assert statistical significance at the 90% confidence level, **but not the 95%** confidence level as espoused by Dr. Garmaise in his report.

17.    In addition, Dr. Garmaise claims in his report that "I understand that the 95% confidence level is also the threshold used in the context of litigation."[28] However, in his deposition testimony, Dr. Garmaise stated: "I am not a legal expert, and I have no legal opinions."[29] Nevertheless, in the same paragraph of his report, he cites to Kaye and Freedman's (2011) "Reference Guide on Statistics"[30] to support his claim regarding the use of the 95% confidence level [5% significance level] in litigation: "These levels of 5% and 1% have become icons of science and the legal process." However, Dr. Garmaise failed to cite the very next sentence – *i.e.*, the main point of the paragraph – which states: "In truth, however, such levels are **at best useful**

---

[25] Garmaise, M. and G. Natividad, 2010, "Information, the Cost of Credit, and Operational Efficiency: An Empirical Study of Microfinance," *Review of Financial Studies* 23, pp. 2582-2584.

[26] Garmaise, M. and G. Natividad, 2013, "The Attractions and Perils of Flexible Mortgage Lending," *Review of Financial Studies* 26, pp. 2562-2563.

[27] Garmaise, M. and G. Natividad, 2021, "Financial Flexibility: At What Cost?," *Journal of Financial and Quantitative Analysis* 56, pp. 260-261.

[28] Garmaise Report, ¶ 36.

[29] Garmaise Deposition Transcript, at p. 19.

[30] Kaye, D. and D. Freedman, 2011, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, Third Edition.

**conventions.**" During Dr. Garmaise's deposition testimony, when asked about this sentence, his response was: "I don't know precisely what they had in mind."[31] And when asked why he failed to cite this sentence in his report, he stated "I'm not sure what to say." further stating "I cited what I thought to be the most relevant sections…"[32]

### B. Academic Theory of Statistical Significance is Consistent with my Merits Report Analyses

18.    As explained in my Reply Report, statistical significance is a continuum that reflects whether is it "more likely than not" that a pattern observed in data is occurring by random chance.[33] For example, in looking at a series of stock returns data, one might observe large variation such that some returns appear abnormal or unusual but do not meet the conventional levels of statistical significance. Per Brav and Heaton (2015): "It is crucial to understand that statistical significance is simply describing a set of returns that would be unusual to observe if there was *no* price impact. Lack of statistical significance does *not* tell us that it is more probable than not that there was no price impact."[34] This view is affirmed by the courts: "…the existence of non-statistically-significant stock price declines does not prove the absence of price impact."[35]

19.    Closer to the facts and circumstances of this case, as noted in my Reply Report, the alleged misrepresentations at the start of the Class Period on December 10, 2020 were found to be associated with an abnormal stock price increase of 15%, with a *p*-value of 0.104 and statistical significance at the 89.6% level.[36] This implies that more than 89% of the returns analyzed in the

---

[31] Garmaise Deposition Transcript, at p. 16.

[32] Garmaise Deposition Transcript, at p. 17.

[33] Bozanic Reply Report, ¶ 33.

[34] Brav, A. and J. Heaton, 2015, "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," *Washington University Law Review* 93.

[35] *Monroe County Employees Retirement System v. Southern Co.*, 332 F.R.D. 370, 393 (N.D. Ga. 2019)

[36] Bozanic Reply Report, ¶ 35.

sample have smaller absolute magnitudes than the 15% abnormal return observed on this date. In other words, using the preponderance of evidence standard, it is "more likely than not" that the abnormal stock price increase is related to information released on this date, as opposed to random price movements. Academic research supports this view: "The effect best supported by the data from a given experiment is always the observed effect, regardless of its significance."[37]

20.    Under Dr. Garmaise's "standard practice" of using a 95% confidence level as asserted in his report, or even using the 90% confidence level regularly used in his academic research, this abnormal return of 15% would not be considered as any different from the other returns in the sample because it does not meet his cutoff – despite **more than 89%** of the returns in the sample reflecting values that are **smaller in absolute magnitude** than the positive 15% abnormal return observed.[38] Thus, Dr. Garmaise's criticisms about certain price impacts not achieving statistical significance at the 95% level ignores the fact that these events had meaningful economic impacts.[39] Stated differently, "…reliance on stringent standards of statistical significance, such as 95%, to identify price impact will result in the exclusion of price impacts that do not meet the high threshold yet are still economically meaningful."[40]

---

[37] Brav, A. and J. Heaton, 2015, "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," *Washington University Law Review* 93, at fn. 24, quoting Goodman, S., 2008, "A Dirty Dozen: Twelve P-Value Misconceptions," *Seminars in Hematology* 45.

[38] This view is commonly held among litigation experts, for example: "A confidence level of 92.12% with a p-level of 7.88% indicates that the return under study is among the top 7.88% of 'normal' returns in terms of absolute magnitude or, in this case, among the bottom 3.94% of the most negative returns." *See, Pirnik v. Fiat Chrysler Automobiles*, N.V., 327 F.R.D. 38 (2018).

[39] Garmaise Report, ¶¶ 10, 35.

[40] Axelson, P. and M. Cain, 2025, "What is Price Impact? How the Goldman Decisions are Reshaping Shareholder Class Actions," *Berkeley Business Law Journal* 22.

### C.    Cumulating Partial Corrective Disclosures

21.    Related to his arguments pertaining to statistical significance, Dr. Garmaise also takes issue with the use of cumulative returns in my Reply and Merits reports, stating that "Dr. Bozanic's use of a multi-day price decline over two dates that are more than six months apart is arbitrary and unsupported."[41] However, Dr. Garmaise is selective in his critique as he only takes issue with the cumulation of the corrective disclosures regarding the expansion dates, but not the cumulation of the corrective disclosures regarding Culper Report and related tweets.

22.    In my Prior Reports, I assessed the price impact of the Corrective Disclosure Events. I show that the two day abnormal return for January 14 and 15, 2021 of -23.2% is **statistically significant at the 94.4% confidence level**. In addition, I show that the two day cumulative abnormal return for February 12, 2021 and August 17, 2021 of -16% is **statistically significant at the 94.5% confidence level**. Thus, the cumulative impact of the Corrective Disclosure Events caused stock price movements that were statistically significant at greater than the 94% level, which demonstrates strong evidence of price impact.[42]

23.    As discussed in my Prior Reports, the January 14, 2021 drop is related to the Culper Report, as is the drop on the following day since Culper tweeted out the report along with a list of questions regarding CleanSpark's business practices on January 15, 2021.[43] Hence, these two days reflect the market's response to the same corrective event entering the market: first, the release of the report and then, second, the tweet which brought greater visibility to the report. Considering this, it is reasonable to combine returns across those days to assess the cumulative 2-day market

---

[41] Garmaise Report, ¶ 75.

[42] Bozanic Reply Report, ¶ 37; Bozanic Merits Report ¶ 88.

[43] See, *e.g.*, Bozanic Merits Report ¶¶ 118, 146.

response to both the release and the dissemination of the Culper Report, a view which is espoused by academic literature.

> "…when a single corrective disclosure is broken down into multiple disclosures, the statistical power to detect abnormal performance decreases further. For example, a 9% drop may be statistically significant at the 95% level, whereas three separate disclosures, each linked to a roughly 3% drop, may not be statistically significant individually."[44]

Following the logic of the preceding example, under Dr. Garmaise's view of statistical significance, cumulating three separate disclosures would imply that [3% + 3% + 3%] = 0%, because he interprets the lack of statistical significance of each disclosure as implying that the return for each partial disclosure is effectively zero. The issue with assessing each disclosure separately at conventional levels of statistical significance, such as 95% or 99%, is lack of statistical power,[45] which is overcome by cumulating returns to increase the power of the test and properly measure the total price impact of the corrective information.

24.     In light of the preceding discussion in this section, the statistical significance of the returns on these dates, whether assessed individually or cumulatively, demonstrate that the declines were related to information released on these dates, as opposed to random price movements. Dr. Garmaise makes no criticism of the returns on these dates other than the analysis "does not meet the 95% threshold"[46] he holds out as "standard practice," yet regularly uses lower thresholds in his own academic research.

25.     As noted above, Dr. Garmaise, however, does take issue with cumulating dates that are "six months apart" – with no apparent justification – as well as the choice of which dates to

---

[44] Axelson, P. and M. Cain, 2025, "What is Price Impact? How the Goldman Decisions are Reshaping Shareholder Class Actions," *Berkeley Business Law Journal* 22.

[45] "Another way to put this is that event studies used in securities litigation are likely to have very low power—very low probability of rejecting an actually false null hypothesis—when we insist on keeping the Type I error rate as low as 5%." *See, e.g.*, Fisch, J., J. Gelbach, and J. Klick, 2017, "The Logic and Limits of Event Studies in Securities Fraud Litigation," *Texas Law Review* 96.

[46] Garmaise Report, ¶ 43.

include in the calculation. On the first point, as discussed in my Prior Reports, the February 12, 2021 and August 17, 2021 drops are related to corrective disclosures regarding the delayed expansion timeline at the ATL facility from "mid-year 2021" to "this fall".[47] Hence, these two days reflect the market's response to the corrective information entering the market regarding expansion delays at the ATL facility. Considering this, it is reasonable to combine returns across those days to assess the cumulative 2-day market response to delaying the expansion timeline.[48] As noted above, the statistical significance of the returns on these dates, whether assessed individually or cumulatively, demonstrate that the declines were related to information released on these dates, as opposed to random price movements.

26.      On the second point, Dr. Garmaise alleges that the inclusion of other expansion dates – *i.e.*, January 5, 2021, March 2, 2021, July 14, 2021 – would affect the observed cumulative return.[49] As discussed in **Section V** below, none of the indicated dates revealed new information to the market and thus were not analyzed as corrective disclosures regarding expansion delays.[50] Thus, his argument to include these other dates, or his arguments pertaining to 26 random combinations of these dates, is irrelevant to the primary issue of the statistical significance of the returns on these dates, as Dr. Garmaise has not demonstrated that any of these alternative dates altered the total mix of fraud-related information in the market.

---

[47] Bozanic Reply Report, ¶ 38; Bozanic Merits Report, ¶ 118.

[48] Axelson, P. and M. Cain, 2025, "What is Price Impact? How the Goldman Decisions are Reshaping Shareholder Class Actions," *Berkeley Business Law Journal* 22.

[49] Garmaise Report, ¶ 76.

[50] Related to this point, Dr. Garmaise claims an inconsistency in my approach to assessing statistical significance for alleged misrepresentations versus alleged corrective disclosures (Garmaise Report, ¶ 38). As discussed in my Merits Report (¶ 78, footnote 78), the alleged February 18, 2021 misrepresentation repeated similar information relative to the prior February 12, 2021 alleged misrepresentation and thus did not introduce additional artificial inflation into CleanSpark's Common Stock price. Similarly, as discussed in **Section V** herein, the alleged misrepresentations on January 5, 2021 and March 2, 2021 also repeated similar information and thus could maintain inflation but did not introduce additional inflation. Therefore, his critique regarding the statistical significance of the returns on the dates in question is irrelevant.

## IV.    The Culper Report

27.    Dr. Garmaise claims[51] the information conveyed by the Culper Report and associated tweets was neither new nor value relevant because "Culper Research states on both its website and the first page of the Culper Report that 'all information' in the report 'has been obtained from public sources.'"[52] From this statement, I make four observations, which I discuss in kind in the paragraphs that follow. First, it is unclear which form of market efficiency Dr. Garmaise relies on when making this statement. Second, Dr. Garmaise fails to consider the literature on disclosure processing costs and its implications. Third, the publication of the report presupposes that the information is new to the market on the basis of the author bearing disclosure processing costs. Fourth, Dr. Garmaise takes issue with the use and implications of the disclosure salience literature in my assessment of the Culper Report and related tweets.

### A.    Forms of Market Efficiency

28.    First laid out in the seminal work of Professor Eugene Fama, the concept of market efficiency is typically separated into three categories[53]: "strong," "semi-strong" and "weak," as follows:

> "**Weak**" form efficiency suggests that historical stock prices do not predict future stock prices.
>
> "**Semi-strong**" form efficiency suggests that all public information is impounded into stock prices.

---

[51] Garmaise Report, ¶ 67.

[52] For example, Dr. Garmaise points to "evidence" from a YouTube stock influencer to claim "Dr. Bozanic fails to discuss evidence suggesting that it was publicly known that ATL was linked to Fastblock, that Fastblock had been a target of a failed acquisition by Marathon and that Marathon had decided to withdraw its offer citing the fact that Fastblock's subsidized power agreement was expiring in three years." (Garmaise Report, ¶ 68) While the video discusses CleanSpark's ATL Facility acquisition, with respect to Marathon, the influencer only focuses on CleanSpark's touted ability to lower its cost of energy below that of Marathon. When asked in his deposition about where in the video the reasons for Marathon's withdrawal were discussed, Dr. Garmaise concedes "I don't recall if that was discussed in this YouTube video." (Garmaise Deposition Transcript, p. 38)

[53] *See*, *e.g.*, Fama, E., 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25.

13

"**Strong**" form efficiency suggests that all public and private information is impounded into stock prices.

I believe it is reasonable to assume that Dr. Garmaise relies on the "semi-strong" version of market efficiency in his report.

29.    As discussed in my Efficiency Report[54], a market is considered *informationally* efficient when the market price of securities quickly responds to publicly available information:

> "For purposes of establishing the fraud-on-the-market presumption of reliance, we adopt the prevailing definition of market efficiency, which provides that an efficient market is one in which the market price of the stock fully reflects all publicly available information. By 'fully reflect,' we mean that **market price responds so quickly to new information that ordinary investors cannot make trading profits on the basis of such information**. This is known as 'informational efficiency.' We reject a second and much broader meaning of 'fully reflect,' known as 'fundamental value efficiency,' which requires that a market respond to information not only quickly but accurately, such that the market price of a stock reflects its fundamental value."[55]

30.    While I assume that Dr. Garmaise relies on semi-strong efficiency in his report, he conflates *fundamental* vs. *informational* efficiency and further ignores the literature on disclosure processing costs. If all public information is immediately impounded into price and is impounded accurately, then the repetition of that same information, *ceteris paribus*, should not affect market price. However, *informational* efficiency – which is what I rely on in my Efficiency Report – maintains that prices should react *quickly* to new information, but that reaction may or may not be *accurate* in terms of reflecting the firm's true fundamental value.

31.    Further, in a later work, Professor Fama stated that the "economically more sensible" definition of "semi-strong" efficiency hypothesis is that "…prices reflect information to the point where the marginal benefits of acting on the information (the profits to be made) do not

---

[54] Bozanic Efficiency Report, ¶ 21.

[55] *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005).

14

exceed the marginal cost."[56] Thus, even if all of the information conveyed by the Culper Report could have already existed in the public domain prior to the report's publication, the author had to bear disclosure processing costs in order to arrive at the claims and conclusions in the Culper Report.

### B.  Disclosure Processing Costs

32.    Disclosure processing costs are those costs related to the acquisition, analysis, and synthesis of information. Per Blankespoor, et al. (2020)[57]: "The literature identifies three steps to processing a disclosure for use in a trading decision, where 'disclosure' refers to a specific signal from a firm report or communication. An investor must: (i) learn that the disclosure exists; (ii) obtain the report and extract the disclosure; and (iii) analyze the implications of the disclosure for firm value. Each of these steps is costly, and we refer to those costs as: (i) awareness costs; (ii) acquisition costs; and (iii) integration costs." Integration costs in this instance refer to those related to the analysis and synthesis of information.

33.    On that point, most, if not all, of the information used in the generation of the Culper Report entail awareness, acquisition, and integration costs. Dr. Garmaise's "semi-strong" efficiency argument – absent informational efficiency and disclosure processing cost considerations – implies that the value of the Culper Report should *theoretically* be zero since all of the information contained within is already in the public domain. However, the author of the Culper Report clearly felt that there was value in becoming aware of and then acquiring information as well as analyzing and synthesizing information prior to making inferences and conclusions. To wit, consistent with Fama (1991), for the author of the Culper Report to bear

---

[56] Fama, E., 1991, "Efficient Capital Markets: II" *Journal of Finance* 46.

[57] Blankespoor, E., E. DeHaan, and I. Marinovic, 2020, "Disclosure Processing Costs, Investors' Information Choice, and Equity Market Outcomes: A Review," *Journal of Accounting and Economics* 70.

15

awareness, acquisition, and integration costs, **the expected marginal benefits of publishing the report** (*e.g.*, profiting from taking a short position against the stock in advance of the report) **had to exceed the marginal costs borne**.[58] Or, stated perhaps more simply, per Blankespoor, et al. (2020): "...if investors' costly information is immediately revealed in prices, then nobody would process the disclosure to begin with."

### C. Disclosure Salience

34.    In considering the value relevance of a disclosure, Dr. Garmaise takes issue in his report with my reliance on the disclosure salience literature, and specifically criticizes a representative paper I cite.[59] In my Merits Report, I cited the Cheng et al. (2020) paper as an example of the more general conclusions from the disclosure salience literature[60]:

> "For example, Cheng et al. (2021) study 'whether **earlier discussion** of earnings information, and earlier discussion of qualitatively positive or negative information, is associated with **stronger responses** to that information.' They find 'a **positive relation** between **investor response** to information and the **prioritization of that information** in the earnings announcement.'"

In my assessment of the value relevance of the Culper Report, I relied on the disclosure salience literature due to it establishing a strong and robust relation between the prominence of information in a given disclosure, and its relation to stock price movements.

---

[58] Dr. Garmaise states that I have not addressed "…the possibility that the very existence of a short-seller report targeting CleanSpark…could have negatively impacted CleanSpark's stock price… (Garmaise Report, ¶ 55)." However, the existence of a short seller report *presupposes adverse information within the report*, which is the basis upon which the market and investors negatively react. To my knowledge, the report was not alleged to exist independent of it being published on Culper Research's website, which implies that **investors could evaluate the content concurrently with knowledge of its existence**. When asked in his deposition as to whether the market knew of the Culper Report or Culper's short position ahead of the report's distribution via Culper's website and twitter, Dr. Garmaise stated he did not "have additional information" and further stated "I don't know," respectively (Garmaise Deposition Transcript, pp. 31-32.)

[59] Garmaise Report, ¶ 46.

[60] Bozanic Merits Report, ¶ 92.

35.    Unlike Dr. Garmaise's characterization in his report, the literature on disclosure salience is not contained to a single paper on the topic, as explained in the subsequent paragraphs. In his deposition testimony, Dr. Garmaise clarifies that his position in his report is not to criticize the entire body of disclosure salience literature but rather only the Cheng et al. (2020) paper to which I cite.[61] However, when asked whether he holds an opinion on how he would evaluate a disclosure's salience, he states: "I don't as I sit here today. I haven't developed a formal opinion on that. I'd have to think about that." Despite being unable to articulate his own approach, he offers "I do know that Dr. Bozanic's opinion in these two respects that we've been discussing is not supported by the literature that he cites." I disagree, as discussed in this and the following section.

36.    Hirshliefer and Teoh (2003) describe salience as "The salience of a stimulus is its 'prominence,' tendency to 'stand out', or its degree of contrast with other stimuli in the environment."[62] Research on disclosure salience has established that information can be considered more salient for investors when it is highlighted **more prominently, earlier, or in a press release headline**. Because investors have limited attention[63] and, as discussed in the preceding section, incur processing costs when acquiring and extracting information from disclosures, if firms can more quickly point investors to relevant information by highlighting its salience within a disclosure, investors' processing costs in assessing the value relevance of new information are reduced, which allows the information to be priced more quickly.

---

[61] Garmaise Deposition Transcript, pp. 43-44.

[62] Hirshleifer, D. and S.H. Teoh, 2003, "Limited Attention, Information Disclosure, And Financial Reporting," *Journal of Accounting and Economics* 36.

[63] Per Hirshleifer and Teoh (2003): "Limited attention is a necessary consequence of **the vast amount of information available in the environment**, and of limits to information processing power. **Attention must be selective** and requires effort…"

37.     For example, Huang, Nekrasov, and Teoh (2018) measure the number of quantitative items in an earnings press release headline as a proxy for headline salience.[64] They find that greater headline salience is associated with greater stock market reactions around the time of companies' earnings releases. In addition, Guillamon-Saorin, Osma, and Jones (2012) show that firms often disclose new positive information in press release headlines.[65] For example, they find that the disclosure of profits or sales figures in headlines is associated with firms' earnings performance.

38.     Bowen, Davis, and Matsumoto (2005) also study managerial emphasis in earnings press releases.[66] They find that a greater emphasis on earnings metrics in the press release is associated with a stronger stock market reaction. In general, they show that managers emphasize elements of disclosures that are more value relevant for investors, which leads to a greater market reaction. Files, Swanson, and Tse (2009) examine the market reaction to the prominence of the restatement announcement in the press release.[67] They find that greater prominence, such as a restatement being disclosed in the headline, is associated with a stronger market response.

39.     Finally, as noted in my Merits Report, Cheng, Roulstone, and Van Buskirk (2021) study "whether **earlier discussion** of earnings information, and earlier discussion of qualitatively positive or negative information, is associated with stronger responses to that information." [68] and

---

[64] Huang, X, A. Nekrasov, and S.H. Teoh, 2018, "Headline Salience, Managerial Opportunism, and Over- and Underreactions to Earnings," *The Accounting Review* 93.

[65] Guillamon-Saorin, E., B. Osma, and M. Jones, 2012, "Opportunistic Disclosure in Press Release Headlines," *Accounting and Business Research* 42.

[66] Bowen, R., A. Davis, and D. Matsumoto, 2005, "Emphasis on Pro Forma versus GAAP Earnings in Quarterly Press Releases: Determinants, SEC Intervention, and Market Reactions," *The Accounting Review* 80.

[67] Files, R., E. Swanson, and S. Tse, 2009, "Stealth Disclosure of Accounting Restatements," *The Accounting Review* 84.

[68] Cheng, L., D. Roulstone, and A. Van Buskirk, 2021, "Are Investors Influenced by the Order of Information in Earnings Press Releases?," *The Accounting Review* 96.

find "a positive relation between investor response to information and the **prioritization of that information** in the earnings announcement."

40.    Related to the prominent highlighting of information by way of ordering (*i.e.*, in a headline or early in a disclosure) is the repetition of information. Henry (2006) states: "In practice, emphasis can be achieved through **placement** in the text, through **repetition**, or **both**." Consistent with this view, Li (2019) finds that firms use more repetitive disclosures to highlight significant firm events, and that such disclosures are value relevant as evidenced by a positive relation between stock prices and repetitive disclosures.[69] Thus, consistent with the above-mentioned papers on disclosure ordering, disclosure repetition also influences the value relevance of information within a disclosure. Hence, the use of the disclosure salience literature in my assessment of the Culper Report's value relevance is reasonable, reliable, and consistent with the literature's findings.

41.    In addition to his criticism of the disclosure salience literature, Dr. Garmaise claims that the lack of analyst commentary surrounding the Culper Report undermines its value relevance.[70] Because analysts typically have a pro-management bias, analysts are typically reluctant to discuss short seller reports. That is, analysts must curry favor with management in order to gain access thereby potentially ignoring adverse information and especially information that may come from less credible sources. Per Axelson and Cain (2025): "**analysts tend to ignore short seller reports** that disagree with positive analyst recommendations and price forecasts." And per Stolowy et al. (2022): "analysts often engage in self-censorship in order not to develop a bad relationship with the companies they follow," analysts "often feel they have to maintain good

---

[69] Li, H., 2019, "Repetitive Disclosures in the MD&A," *Journal of Business Finance & Accounting* 46.

[70] Garmaise Report, ¶ 57.

19

relationships with the firms they follow – which implies avoiding overly critical public comments regarding these firms, even when the analysts agree with [activist short sellers'] allegations," "analysts cannot escape from (the more or less direct) pressure to be optimistic…in order not to compromise their firm's main source of revenue" and "even mentioning the short seller on a sell side report will be frowned upon by the management of the company."[71] Thus, analysts have clear incentives to avoid discussing short seller reports in order to maintain access to management.

### D. My Analysis of the Culper Report and Related Tweets is Consistent with the Academic Literature on Disclosure Salience

42.    In my Merits Report, I relied on the general findings from the disclosure salience literature to assess the value relevance of the information conveyed by the Culper Report and related tweets. As discuss therein, I stated that the Culper Report called into question the profitability of the ATL Facility acquisition on the basis of CleanSpark's alleged misrepresentations and omissions regarding i) projected costs to mine bitcoin in terms of energy usage (*i.e.*, understating expenses), ii) ability to "maximize energy savings" through its "software technologies and trade secrets," (*i.e.*, understating expenses), iii) ability to expand power (*i.e.*, overstating revenues), and iv) ability to expand  hashrate capacity (*i.e.*, overstating revenues).[72]

43.    I further discussed in my Merits Report that the tweet thread on January 14, 2021 was premised on the following two points: a statement that Culper Research had concluded to short CleanSpark (tweet #1 in the thread), and a statement supporting their inference that they were recommending a short position on the basis that CleanSpark "lied about its supposed customers and contracts" (tweet #2 in the thread).[73] The remaining enumerated points in the January 14 tweet

---

[71] Stolowy, H., L. Paugam, and Y. Gendron, 2022, "Competing for Narrative Authority in Capital Markets: Activist Short Sellers vs. Financial Analysts," *Accounting, Organizations, and Society* 100.

[72] Bozanic Merits Report, ¶ 82.

[73] Bozanic Merits Report, ¶¶ 91-93.

thread (#3-10), which reflected the discussions in the Culper Report, reflected evidence used by Culper to support its inference and conclusion.

44.     In the tweet that followed the next day on January 15, 2021, Culper Research indicated that it had emailed Defendant and Chairman Matthew Schultz several questions regarding the Culper Report. Of the eight enumerated points in the follow-up tweet on January 15, 2021, seven were points related to those in the original tweet thread. Following academic literature on disclosure salience, I focus my attention on two features of the tweets: order and repetition. This view is consistent and reasonable in light of the literature on disclosure salience.

45.     As discussed above, because investors have limited attention (*i.e.*, cannot process every stimuli received) and incur processing costs (*i.e.*, related to the acquisition, analysis, and synthesis of information), information that comes earlier (*e.g.*, in a headline) and/or is highlighted more prominently (*e.g.*, through repetition) in a disclosure reduces investors' processing costs and therefore allows information to be priced more quickly. Hence, by summarizing the Culper Report via Twitter, and repeated select points across tweets, Culper Research had chosen to emphasize the points from the report that substantiated the report's premise (*i.e.,* recommending a short position in CleanSpark) and conclusion (*i.e.,* CleanSpark "lied about its supposed customers and contracts") and therefore considered important for investors. Relying on this literature, I consider points that were not repeated across tweets as less emphasized and thus less value relevant for Culper Research and investors.

46.     Consistent with the disclosure salience literature, the tweets related to Shoreline Schools, p2k Labs' fake customers, and Defendant Bradford serving as an auditor of a cannabis penny stock would be less value relevant for investors because of their lack of repetition. Further, in my opinion, the rationale for the author to not repeat these points is because they conveyed little

to no value relevance for investors, as follows. First, with respect to Shoreline Schools, the memorandum of understanding was not a contract ('This agreement provides a path to contract directly…"), but rather an agreement to assess feasibility: "In accordance with the MOU, CleanSpark will evaluate two stages of grid resiliency for the District."[74] The fact that the Culper Report states "analysts claim could lead to $2 million to $3 million in revenues" re Shoreline Schools is irrelevant because no contract had been assigned. Second, re p2k Labs, a tweet from Culper in the initial tweet thread suggests that p2k Labs "appears to also fake its customers." While the focus on p2k Labs in both the Culper Report and related tweets is with respect to p2K being a related party transaction, the allegation regarding fake customers is irrelevant. This is because the substance upon which the Culper Report makes this claim is merely on the basis of some, but not all, customers listed on p2K's website as case studies had lacked "web presence." Third, regarding Bradford serving as an auditor of a cannabis penny stock, the Culper Report states that CleanSpark "…never disclose[d] that Bradford is currently moonlighting as an auditor of a penny stock cannabis company." The fact that the Culper Report alleges that Bradford is "moonlighting" is irrelevant because, per CleanSpark's disclosures: "Blue Chip is 50% beneficially owned by Mr. Bradford. Blue Chip performed all services at discounted rates and <u>none of the charges were associated with work performed by Mr. Bradford</u>."[75]

47.     Regarding related party transactions (RPTs), I note that p2k and p2k Labs were mentioned across tweets in this context, and the Culper Report alleged p2k's acquisition to be an "undisclosed related party transaction" that "funneled capital from the Company to the pockets of

---

[74] "CleanSpark Announces Execution of a Memorandum of Understanding with Shoreline Unified School District to Establish Grid Resiliency," *CleanSpark*, January, 9 2020.

[75] *See* SEC EDGAR, available at:
https://www.sec.gov/Archives/edgar/data/827876/000166357720000136/clsk10q.htm

insiders." As discussed in my Merits Report, investors are less likely to be concerned with RPTs as opposed to overstating revenues and/or understating expenses since the latter have a direct impact on company cash flows, profitability, and value.[76]

48.    Conversely, I consider points related to revenue overstatement and expense understatement – *i.e.*, the two primary components of earnings – as highly value relevant for investors, consistent with Dechow et al. (2011) who find that revenue and expense misstatements are the most common accounts shown to have been manipulated according to SEC enforcement actions.[77] This is because if CleanSpark overstated and/or fabricated revenues, or if CleanSpark understated expenses, the Company's anticipated future cash flows and profitability would be overstated. Therefore, the points that remain in the tweets related to revenue overstatement and expense understatement are those pertaining to the ATL Facility, Green Dragon, and Valle Divino.

49.    As discussed in my Merits Report, while the Green Dragon and Valle Divino points pertained to allegations of fictitious revenues, the ATL points questioned both the expected revenue generating ability of ATL's assets (which would reduce anticipated earnings and cash flows) as well as the lower-than-industry standard re expected energy expenses incurred to generate those revenues (which would also reduce anticipated earnings and cash flows).[78] My opinion is that the Green Dragon and Valle Divino points were meant to cast doubt on the financial viability of the ATL Facility in light of the claims made by CleanSpark regarding its expected capacity and profitability.

---

[76] Bozanic Merits Report, ¶ 95.

[77] Dechow, P., W. Ge, C. Larson, and R. Sloan, 2011, "Predicting material accounting misstatements," *Contemporary Accounting Research* 28.

[78] Bozanic Merits Report, ¶¶ 97-99.

50.     My assessment of the information conveyed by the January 14-15, 2021 tweets is reinforced by the structure of the Culper Report itself insofar as the report emphasized CleanSpark's claims regarding its customers and contracts, specifically with respect to its claims regarding the ATL Facility, Valle Divino site, and Green Dragon grow facility. Consistent with the disclosure salience literature, the order in which the points were made in the report are such that the most relevant (and thus salient) points can be quickly gleaned by an investor in order to influence investor judgement and decision making with respect to investing in CleanSpark. Similar to the second tweet in the original tweet thread, the first paragraph of the Culper Report was premised on the assertion that CleanSpark "lied about its supposed customers and contracts."

51.     The initial substantive paragraph (*i.e.*, the second paragraph on page 2) in the Culper Report in support of Culper's assertion was in regards to the acquisition of the ATL facility. In that paragraph, the Culper Report casts doubt on CleanSpark's claimed costs to mine bitcoin, pointing to a cost-advantaged power agreement that was set to expire in three years. To further undermine the credibility of the CleanSpark's claims regarding the ATL acquisition, the Culper Report quickly pointed investors (see the end of second paragraph on p. 2 of the report, as well as the two paragraphs which follow) to two other ventures where Culper alleged CleanSpark made similarly dubious claims: Green Dragon and Valle Divino, which are the focus of my disaggregation of confounds analysis in **Section V.D**. Further, in light of the discussion above, as well as the discussion in **Sections IV.B-C** above, my analysis of the Culper Report and related tweets is consistent with the disclosure salience literature.

### E.  The Literature Dr. Garmaise Claims I Fail to Consider is Irrelevant

52.     Dr. Garmaise contends that I ignore "academic literature on related party transactions and corporate governance quality" showing that i) "firms announcing related party transactions 'earn significant negative excess returns'" and ii) "certain related party transactions

24

'could signal firms' corporate governance quality, as investors substantially discount firms that undertake potentially expropriating transactions.'"[79]

53.     What Dr. Garmaise fails to represent in his report is that these papers[80] study Chinese affiliated companies listed on the Hong Kong Stock Exchange for the periods of 1998-2000 and 2002-2004. And as stated by Cheung et al. (2006), the setting studied is distinct from U.S. capital markets: "The different legal systems between Hong Kong and China create additional opportunities for expropriation by companies that can shift assets across the border, because rulings by courts in Hong Kong are not enforceable in the mainland." Further, Dr. Garmaise ignores the international literature that shows either no effect of minority shareholder expropriation[81] or the literature which differentiates between RPTs. Gordon et al. (2004) state that some RPT's represent "efficient transactions that fulfill rational economic demands of a firm such as the need for service providers with in-depth firm-specific knowledge."[82] Consistent with this view, Fooladi and Farhadi (2019) find that "Operating RPTs increase firm value and profitability." and further "They improve asset utilization and reduce discretionary expenses…"[83]

54.     Dr. Garmaise also contends that I ignore "the academic literature that suggests that executive compensation, and allegations of excessive executive compensation, may be value relevant to investors."[84] He points to Core et al. (1999) who state "CEOs at **firms with greater**

---

[79] Garmaise Report, ¶ 52.

[80] Cheung, Y., P. Rao, and A. Stouraitis, 2006, "Tunneling, Propping, and Expropriation: Evidence from Connected Party Transactions in Hong Kong," *Journal of Financial Economics* 82; Lei, A. and F. Song, 2011, "Connected Transactions and Firm Value: Evidence from China-Affiliated Companies," *Pacific-Basin Finance Journal* 19.

[81] Buysschaert, A., M. Deloof, M. Jegers, 2004, "Equity sales in Belgian corporate groups: expropriation of minority shareholders? A clinical study," *Journal of Corporate Finance* 10.

[82] Gordon, E., E, Henry, and D. Palia, 2004, "Related Party Transactions and Corporate Governance," *Advances in Financial Economics* 9.

[83] Fooladi, M. and M. Farhadi, 2019, "Corporate governance and detrimental related party transactions," *Asian Review of Accounting* 27.

[84] Garmaise Report, ¶ 53.

**agency problems** receive greater compensation; and that firms with greater agency problems perform worse."[85] and Carter et al. (2016) who state "**abnormally high CEO pay** predicts worse future firm performance."[86] First, Dr. Garmaise has failed to articulate the "agency problems" to which he refers as well as whether the compensation to which Culper refers should be considered "excessive." Second, Dr. Garmaise ignores the literature showing how executive compensation can align with shareholder interests. For example, Casavecchia and Suh (2016) find that a "greater sensitivity of managerial compensation to shareholder wealth…leads to greater risk taking through active capital allocation." and they further demonstrate that "risk-taking is positively associated with future stock returns."[87] These results are consistent with Guay (1999) whose findings suggest that "managers receiving incentives to invest in risky projects when the potential loss from underinvestment in valuable risk increasing projects is greatest."[88]

55. Dr. Garmaise claims that I failed to address that the "Culper Report had a negative effect on investors' perception of CleanSpark's corporate governance and internal controls, which the academic literature has found may be value-relevant to investors."[89] To this end, he points to papers on "reputational loss"[90] which generally calculate "reputational loss" as a firm's change in market value following announcements of financial misconduct less penalties and settlements.

---

[85] Core, J., R. Holthausen, and D. Larcker, 1999, "Corporate Governance, Chief Executive Officer Compensation, and Firm Performance," *Journal of Financial Economics* 51.

[86] Carter, M., L. Li, A. Marcus, and H. Tehranian, 2016, "Excess Pay and Deficient Performance," *Review of Financial Economics* 30.

[87] Casavecchia, L. and J. Suh, 2017, "Managerial incentives for risk-taking and internal capital allocation," *Australian Journal of Management* 42.

[88] Guay, W., 1999, "The sensitivity of CEO wealth to equity risk: an analysis of the magnitude and determinants," *Journal of Financial Economics* 53.

[89] Garmaise Report, ¶ 63.

[90] Karpoff, J. and J. Lott Jr., 1993, "The Reputational Penalty Firms Bear from Committing Criminal Fraud," *The Journal of Law and Economics* 36; Karpoff, J., D. Lee, and G. Martin, 2008, "The Cost to Firms of Cooking the Books," *Journal of Financial and Quantitative Analysis* 43; Armour, J., C. Mayer, and E. Polo, 2017, "Regulatory Sanctions and Reputational Damage in Financial Markets," *Journal of Financial and Quantitative Analysis* 52.

Effectively, any loss in market value beyond penalties and settlements is merely assumed to be a reputation loss. As the loss in market value can be attributed to many factors – such as a reduction in expectations regarding future cash flows – the approach of labeling a loss in market value as "reputation" is unpersuasive, as other information such as media coverage could contribute to the loss.[91] Further, Dr. Garmaise uses this critique to undermine my disaggregation analysis pertaining to Green Dragon. As discussed in **Section V.D** below, my disaggregation of this confound is reasonable and reliable.

## V.    The Corrective Disclosures

### A.  Economic Materiality

56.    In my Merits Report, I discussed how I consider economic materiality to relate to information, news, announcements, or other events that would impact the valuation of a company and its securities, and thus, investors' demand for those securities.[92] As such, my opinions herein regarding economic materiality are based upon my analysis of such information as it pertains to finance, economics, and valuation, and are not intended to represent legal analyses or conclusions. While I understand that materiality has a legal definition in matters such as this one, for the purposes of my report, the term "economic materiality" means the importance of information to the market (and thus, investors), such that it would affect the valuation of a security and investors' decisions to buy or sell the security, *i.e.*, the value relevance of the information to investors with respect to their investment choices.

---

[91] Haslem, B., I. Hutton, and A. Smith, 2017, "How Much Do Corporate Defendants Really Lose? A New Verdict on the Reputation Loss Induced by Corporate Litigation," *Financial Management*.

[92] Bozanic Merits Report, ¶ 37.

### B. Consistency of Value Relevance Analyses

57.     Dr. Garmaise claims in several instances in his report that I hold inconsistent opinions regarding evidence I point to in my Merits Report when discussing the value relevance of a disclosure.[93] Perhaps this is due in part to the fact that Dr. Garmaise neither defines value relevance nor articulates the "criteria" to which he refers in his report regarding my assessment of value relevance. My assessment of value relevance is not dependent on any one single source of information, as implied by Dr. Garmaise, e.g., "fails to reconcile", but rather includes consideration of the relevant information environment and principles of finance, economics, and valuation. Further, as discussed below, my analysis indicates that the information released on dates identified by Dr. Garmaise (i.e., January 5, 2021, March 2, 2021, July 14, 2021) did not alter the total mix of information related to the alleged fraud, and thus my analysis is reasonable and reliable. As a result, Dr. Garmaise's opinions do not disturb any of my opinions, analyses, or conclusions.

58.     To evaluate value relevance, I rely on a variety of sources – such as news articles, analyst reports, SEC filings, press releases, conference calls, and interviews – to understand a firm's information environment and whether a disclosure reflects new information that could influence an investor's decision to buy or sell a stock. Despite his criticisms of my approach, when asked in his deposition about where an investor would typically acquire value relevant information about a firm, he responded with "This information may come from **the firm itself**. It may come from **analysts**. It may come from the **media**."[94]

---

[93] Garmaise Report, ¶¶ 79, 86, 97.

[94] Garmaise Deposition Transcript, pp. 33-34.

59.     In the months leading up to the February 12, 2021 earnings report, investors would have found the lack of meaningful progress towards the ATL Facility expansion concerning as the inability to deploy miners would have a direct impact on revenue growth, cash flows, and firm value. This is because analysts increased their expectations – *e.g.,* "primarily driven by upward revisions to our future estimates to include new revenue and margin contribution from bitcoin mining activity"[95] – for CleanSpark following the ATL acquisition announcement. CleanSpark's post-acquisition quarterly earnings (actual loss of $0.32 per share vs. loss of $0.12 expected) and revenue (actual revenue of $2.26 million vs. $2.83 expected) reported on February 12, 2021 were below analyst expectations[96] – expectations that had increased consequent to the ATL acquisition.

60.     As noted by *Reuters News* on February 12, 2021, CleanSpark expected to "…reach more than 315 PH/s within the month of February."[97] This information is directly related to the expectations regarding capacity expansion and how the Company was not making meaningful progress ahead of the April 2021 capacity expectations, which prompted the firm to delay the timeframe from April 2021 to "mid-year" or "mid-summer" in their February 12, 2021 corrective disclosure. **This is because, upon acquisition, the hashrate stood at 190 PH/s and had only increased to 200 PH/s in December 2020**.[98]

61.     By February 12, 2021, with two months having passed since the ATL acquisition, CleanSpark added *less than* 115 PH/s (*i.e.*, the 315 PH/s expected in February 2021 less the 200 PH/s established in December 2020). Further, as of February 24, 2021, it was unclear what hashrate

---

[95] "Bitcoin Mining Acquisition Drives Estimates Higher; Raising Price Target to $24.00," *H.C. Wainwright*, December 11, 2020.

[96] Bozanic Merits Report, ¶ 116.

[97] "BRIEF-CleanSpark Says Quarterly Revenue Rose 130 Percent To $2.26 Million," *Reuters News*, February 12, 2021, 6:18 AM.

[98] "CleanSpark Provides Update on Bitcoin Mining Operations and Expansion," *CleanSpark*, December 18, 2020.

capacity beyond 200 PH/s the Company had in place[99], thus reducing investor confidence in the Company's disclosures and increasing investor skepticism regarding statements pertaining to the expansion plans, leaving investors to estimate the actual hashrate in the absence of a Company disclosure to the contrary.

62.     With approximately two and a half months remaining to deliver on the 0.9-1.4 EH/s hashrate expected by April 2021, in the absence of a material expansion in energy – as reflected by a 32 cent loss per share versus 12 cents expected[100] and widely reported by financial media[101] – investors would have to reassess and downward revise their revenue growth expectations, which would thus affect expected firm cash flows and expected firm value.

63.     Dr. Garmaise claims that my value relevance analysis of the February 12, 2021 expansion delay is inconsistent with my analysis of operating expenses for the reporting period.[102] As noted in my Merits Report, the increase in operating expenses was not value relevant in part due to the lack of subsequent discussion in the public press or analyst reports.[103] However, as noted in the preceding paragraphs, media discussion surrounding capacity shortfalls is directly related to the firm failing to meet investor expectations, which thus prompted the firm to delay the timeframe in the February 12, 2021 corrective disclosure. Dr. Garmaise further claims that my value relevance analysis of the February 12, 2021 expansion delay is inconsistent with my analysis of

---

[99] "CleanSpark Completes Strategic Acquisition of Solar Watt Solutions," *CleanSpark*, February 24, 2021.

[100] "Set Up for Continued Strength in FY2021; F4Q20 Results Update," *H.C. Wainwright*, dated December 21, 2020.

[101] "CleanSpark Inc: A loss of 12 cents per share anticipated for first quarter," *Reuters News*, February 12, 2021, 7:51AM.

[102] Garmaise Report, ¶ 86.

[103] Bozanic Merits Report, ¶ 123.

the January 5, 2021 TDA Network streaming interview.[104] I address the TDA Network streaming interview's lack of value relevance in **Section V** below.

64.    Regarding the alleged value relevance analysis inconsistency[105] pertaining to the August 17, 2021 disclosure, as discussed in the preceding paragraphs, investors would have found the lack of meaningful progress towards the expansion concerning as the inability to deploy miners would have a direct impact on revenue growth. Thus, another expansion delay would have a direct impact on the firm's expected cash flows and thus expected firm value, which is why analysts lowered their price targets consequent to revenues and earnings falling short of expectations and guidance being lowered. Further, contrary to Dr. Garmaise's assertion re "the lack of subsequent discussion…in…analyst reports"[106], as noted in my Merits Report, two analyst reports in the week following the August 17, 2021 press release mentioned increased expenses from executive compensation when summarizing quarterly results.[107] However, **both noted its non-recurring nature and <u>instead focused on revenue growth and outlook</u>**. For example, one analyst's "key takeaways" focused on revenue outlook (projections of $44.7M for FY2021) consequent to planned increases in miners deployed and hashrate expected to be achieved.

65.    Thus, following the ATL Acquisition whereby analysts' revenue growth estimates increased, the continued delay in meaningful progress towards energy and hashrate capacity forced analysts and investors to progressively ratchet down their revenue growth expectations as i) actual results continued to come in below consensus, ii) CleanSpark continued to lower guidance, and iii) CleanSpark continued to delay the expansion timeline.

---

[104] Garmaise Report, ¶ 79.

[105] Garmaise Report, ¶ 97.

[106] Garmaise Report, ¶ 79.

[107] Bozanic Merits Report, ¶ 152.

### C. The February 12, 2021 and August 17, 2021 Corrective Disclosures Provided New Information Regarding Expansion Delays

66.     Dr. Garmaise makes several claims in his report regarding whether information in the February 12, 2021 and August 17, 2021 corrective disclosures was new information. With respect to February 12, 2021, he claims that "…Dr. Bozanic fails to establish that the information regarding the ATL expansion project was new on February 12, 2021." [108] With respect to August 17, 2021, he claims that "Dr. Bozanic fails to establish what new information regarding the ATL capacity expansion timeline was conveyed by the August 17, 2021, press release, particularly given an earlier announcement by CleanSpark on July 14, 2021." In the sections below, I discuss how both corrective disclosures provided new information to the market regarding capacity expansion delays.

### a. The February 12, 2021 Corrective Disclosure

67.     Regarding the February 12, 2021 corrective disclosure[109], I discussed in my Merits Report how CleanSpark provided operational highlights in a press release as well as outlook regarding the energy and mining capacity at its ATL Facility.[110] With respect to the operational highlights, the Company stated that "The capacity increase is underway and is **expected to be complete by mid-year 2021**." With respect to energy and mining capacity outlook, the Company stated: "We expect this to **bring the total capacity under CleanSpark's subsidiaries to between 1.0 to 1.3 EH/s by mid-summer**."

---

[108] Garmaise Report, ¶ 78.

[109] "CleanSpark, Inc. Reports Quarterly Financial Results for the Three-Months Ended December 31, 2020," *CleanSpark*, February 12, 2021.

[110] Bozanic Merits Report, ¶ 113.

68.    I also considered whether the February 12, 2021 corrective disclosure provided investors with **new** information.[111] On January 5, 2021 CEO Bradford had an *after-market* interview with the TDA Network, which CleanSpark tweeted. In that interview, Bradford is quoted as saying: "We're **expanding the facility** from 20MW up to 50 MW. We expect that **that'll be done late spring / early July**."[112]

69.    In the *pre-market* press release[113] issued earlier that day, investors learned from the first substantive paragraph that "CleanSpark produced just over 31 Bitcoins from its mining activities." and "Bitcoin mining activities have resulted in roughly $873,000 of revenue since the closing of the transaction." Further, CEO Bradford stated: "**We anticipate completion of our near-term expansion within the coming weeks** adding 1,500 more ASICs miners in January." which was broadly disseminated via *Globe Newswire*[114], yet there was no mention of any expansion delays in the release. In contrast, the online, streaming-only TDA Network interview was not distributed via a press release over newswire, not posted on the Company's website, and was not filed with the SEC, nor did CleanSpark highlight expansion delays during the interview.

70.    As noted in my Merits Report, investors at this point in time would find the 31 bitcoins and $873K in revenue discussed in the widely disseminated January 5, 2021 pre-market press release highly value relevant.[115] This is because this incremental gain in bitcoin mining revenue from only 26 days of bitcoin mining was almost **90% of the quarterly revenues from all other segments combined** for the quarter ended December 31, 2019.[116]

---

[111] Bozanic Merits Report, ¶¶ 129-137.

[112] https://twitter.com/CleanSpark_Inc/status/1346599574639497217

[113] "CleanSpark Provides Bitcoin Mining Operation Update," *CleanSpark*, January 5, 2021.

[114] "CleanSpark Provides Bitcoin Mining Operation Update," *GlobeNewswire*, January 5, 2021, 9:25 AM.

[115] Bozanic Merits Report, ¶ 135.

[116] Bozanic Merits Report, ¶ 133.

71.     Further, with four months to go until the expected April 2021 completion date, "late spring" from the TDA Network interview could reasonably be interpreted as 'on schedule' by investors. Reinforcing this view, the TDA Network interviewer did not question "late spring / early July".[117] Also reinforcing this view is that a review of news articles and analyst reports[118] in the week following the January 5, 2021 event reveals no mention of an expansion delay but rather a **focus by the financial media on the <u>31 bitcoins produced to date</u> and the accompanying incremental revenue gain**.[119] Thus, in my opinion, the information provided by CleanSpark in the February 12, 2021 corrective disclosure regarding its revised timeline to "mid-summer" or "mid-year 2021" provided new information to the market regarding capacity expansion delays.

### b.   The August 17, 2021 Corrective Disclosure

72.     Regarding the August 17, 2021 corrective disclosure[120], I discussed in my Merits Report that CleanSpark provided operational highlights in a press release as well as outlook regarding the energy and mining capacity at its ATL Facility.[121] With respect to the operational highlights, the Company stated: "**Current hashrate capacity now exceeds <u>820 PH/s</u>**…The Company anticipates achieving 1.0 EH/s in production capacity **<u>within the coming month</u>** when the balance of the mining rigs scheduled to be hashing in August are installed." With respect to energy and mining capacity outlook, the Company stated that "CleanSpark **continues to work on expanding its total energy capacity** to accelerate the growth of its bitcoin mining operations in Atlanta <u>**this fall**</u>. **The expansion will bring this site's total capacity to 50 MW**." This information

---

[117] Bozanic Merits Report, ¶ 134.

[118] Bozanic Merits Report, ¶ 135.

[119] "CleanSpark produces just over 31 bitcoin from mining...," *TheFly.com*, January 5, 2021, 9:27 AM.

[120] *See* SEC EDGAR, available at:
https://www.sec.gov/ix?doc=/Archives/edgar/data/827876/000166357721000429/clsk10q.htm

[121] Bozanic Merits Report, ¶ 139.

provided by CleanSpark regarding its revised timeline to "this fall" for energy and hashrate capacity was new information to the market.

73.    My view is supported by an analyst report at BTIG on August 16, 2021 that indicates actual revenues for the period came in 22% below the analyst consensus estimate and management had lowered its revenue guidance expectations.[122] Analysts at BTIG further noted that CleanSpark's hashrate capacity as of August 16, 2021 is "**set to ramp** its hash capacity from 820 PH/s…" thus implying that CleanSpark once again **missed** the **0.9-1.4 EH/s hashrate expected** by April 2021. On this news, BTIG lowered its price target by 22%, from $45 to $35 per share. This price target reduction was also picked up by the financial media.[123]

74.    Dr. Garmaise claims that the information provided by the August 17, 2021 corrective disclosure was not new to the market.[124] He points to a CleanSpark press release[125] from July 14, 2021 that announced CleanSpark's agreement to send mining rigs to Coinmint since the ATL Facility did not have the additional power capacity needed to run the rigs. CEO Bradford is quoted in the announcement as saying:

> "We anticipate that this agreement will enable us to **expedite the time to reach 1.2 EH/s**. All of our recent shipments of mining rigs have arrived as agreed under our purchase agreements. **Over the course of the next three months, we plan to redirect our shipments to the Coinmint facilities** to maximize the contracted 25 MW of clean power. **Once we have reached full allocated capacity under the Coinmint agreement, we will then direct shipments of the new units to our Atlanta facilities**."

> and

> "The 30MW energy expansion of our wholly-owned facilities is progressing and will be **finalized in the coming months to bring our Atlanta facilities to 50MW of total capacity.** We intend to deploy miners to utilize the total available capacity in Atlanta with

---

[122] "Some Growing Pains, But Bitcoin Mining Ramp Underway Now and Later, Lowering PT to $35," *BTIG*, dated August 16, 2021.

[123] "CleanSpark price target lowered to $35 from $45 at BTIG analyst," *TheFly.com*, August 17, 2021, 6:45AM.

[124] Garmaise Report, ¶ 90.

[125] "CleanSpark Announces Agreement with ESG-Focused Crypto-Miner, Coinmint," *CleanSpark*, July 14, 2021.

the **units scheduled to arrive <u>between September 2021 and January 2022</u>**. Upon installation, CleanSpark's total deployed hashrate is expected to exceed to 2.1 EH/s."

75.    From the above statements, Dr. Garmaise suggests that the August 17, 2021 corrective disclosure re extending the expansion timeline – *i.e.*, "**continues to work on expanding its total energy capacity**…<u>**this fall**</u>" – is not new to the market because CleanSpark states in the Coinmint announcement that "**units scheduled to arrive between September 2021 <u>and January 2022</u>**."[126] I disagree, for the reasons outlined below.

76.    First, investors learned from the February 12, 2021 corrective disclosure that "The capacity increase is underway and is **expected to be complete by <u>mid-year 2021</u>**." With respect to energy and mining capacity outlook, the Company stated: "We expect this to **bring the total capacity under CleanSpark's subsidiaries to between 1.0 to 1.3 EH/s by <u>mid-summer</u>**." Mid-year 2021 can be considered as July 1. The dates for summer 2021 were June 20 – September 21 and fall were September 22 – December 20. Mid-summer 2021 would be roughly August 5. Therefore, the date range for "mid-year" to "mid-summer" is July 1 – August 5, 2021.

77.    Second, investors learned from the August 17, 2021 corrective disclosure that the firm had not met its goal 0.9-1.4 EH/s hashrate expected by April 2021 since CEO Bradford states that the Coinmint agreement would "expedite the time to reach 1.2 EH/s." In addition, as of July 14, 2021, investors learn that CleanSpark still did not have the requisite power capacity at the ATL Facility to run the rigs that would increase hashrate capacity to the 0.9-1.4 EH/s expected, but rather that it would be finalized "in the coming months" as additional rigs start to arrive in <u>**September 2021**</u>.

---

[126] Garmaise Report, ¶ 90.

78.     The Coinmint agreement was a separate and distinct initiative from the ATL Facility. First, this is evidenced by the shift in expectations by CleanSpark in light of the Coinmint agreement. As CEO Bradford noted in the July 14, 2021 Coinmint announcement – the same announcement where he stated that the Coinmint agreement would "expedite the time to reach 1.2 EH/s" – the **combined expected hashrate from <u>both initiatives</u>** would exceed 2.1 EH/s: "Upon installation, CleanSpark's total deployed hashrate is expected to **<u>exceed to 2.1 EH/s</u>**." Second, any capacity increase achieved at the Coinmint facility <u>does not fulfil investor expectations regarding the ATL facility</u> with respect to future revenues and cash flows and thus firm value. The ATL Facility announcement on December 10, 2020 is clear about the energy and hashrate capacity to be built <u>at the ATL Facility</u>[127], not other facilities such as those operated by Coinmint. **This is critically important as investor expectations regarding CleanSpark's future growth using a competitor's facility would <u>lower future cash flow expectations and thus firm value</u>**.

79.     According to a June 21, 2021 interview with Water Tower Research[128], this view is held by CEO Bradford himself when he states: "In addition, if you don't own your facility and **you're hosting all of your machines somewhere else, you're really <u>building somebody else's business</u>**. There are groups like Marathon that have made a choice to host everything elsewhere and again, **that makes the <u>other companies</u> more valuable…**"

80.     Lastly, since the date range for "mid-year" to "mid-summer" is July 1 – August 5, 2021, CEO Bradford's statements on July 14, 2021 that the expansion would be "finalized in the coming months" could reasonably be interpreted by investors as consistent with the expectations

---

[127] "We anticipate that upon completion of the equipment and energy expansion, **the [ATL] facility** is expected to produce between 0.9-1.4 EH/s…"

[128] "A Business Update with CleanSpark CEO Zach Bradford and Executive Chairman Matt Schultz," *Water Tower Research*, June 21, 2021.

set in the February 12, 2021 corrective disclosure of "mid-year" to "mid-summer." And, similarly, since the last day of summer in 2021 was technically September 21, 2021, the July 14, 2021 disclosure indicating that the units would start to arrive in September could reasonably be interpreted by investors as still within the timeframe promised in the February 12, 2021 disclosure. Lastly, since "this fall" (*i.e.*, September 22 – December 20, 2021) and "mid-year" to "mid-summer" (*i.e.*, July 1 – August 5, 2021) clearly reflect different time periods, the August 17, 2021 corrective disclosure re "this fall" provided new information to the market regarding capacity expansion delays.

81.    My view of the July 14, 2021 Coinmint announcement not providing new information is further reinforced in a Fireside Chat[129] held later the same day with Water Tower Research where CEO Bradford states: "We've talked a lot about our energy expansion in Georgia, and as I said is progressing well, and we're on track for **late summer** to bring that capacity online … by **this September** also we're going to be at 50 megawatts of total power at our current facilities." Despite the Coinmint announcement noting that units are scheduled to arrive "between September 2021 and January 2022," CEO Bradford is clear in the Fireside Chat that, consistent with the February 12, 2021 corrective disclosure, CleanSpark is on track for "late summer," which could reasonably be construed as late August through September 21, 2021 which he clarifies later in the Fireside chat as "this September," which is the same month the rigs are expected to arrive.[130] Thus, at this point in time, investors have reassurance that the February 12, 2021 timeframe could

---

[129] "Water Tower Research Virtual Conference," *Bloomberg*, July 14, 2021.

[130] In addition to alleging that the January 5, 2021 TDA Network streaming interview and July 14, 2021 Coinmint announcement provided new information regarding expansion delays, Dr. Garmaise also points to a March 2, 2021 press release to potentially insinuate it provided information regarding expansion delays. The relevant excerpt reveals that this information was not new relative to the February 12, 2021 corrective disclosure, *i.e.*, "We continue to aggressively pursue the growth of our hash rate capacity and expect to reach 1 to 1.3 EH/s in total production capacity **this summer**."

still reasonably be met – until the firm makes it clear in its August 17, 20221 corrective disclosure that the timeline has clearly been delayed to "this fall."

### D. My Disaggregation Analysis of Confounding Information is Reasonable and Reliable

82.     In analyzing the January 14-15, 2021 corrective disclosures, I stated in my Merits Report that it is possible to argue that Culper Research's claims regarding Green Dragon and Valle Divino are unrelated to the revelation of the relevant truth regarding the misrepresentations and omissions alleged by Plaintiffs in this case.[131] Further, assuming that news related to the Green Dragon and ILA / Valle Divino contracts as revealed by the Culper Report are unrelated to the alleged fraud, it is reasonable to consider the information regarding Green Dragon and Valle Divino contained in the Culper Report and associated tweets as potentially confounding information that should be disaggregated from CleanSpark's Common Stock price decline on January 14-15, 2021.

83.     In my Merits Report, I considered any non-fraud-related information disclosed on the corrective disclosure dates that could have contributed to the observed stock price declines, and I removed this confounding information from my artificial inflation estimates. I concluded in my Merits Report that there is no stock price component attributable to the potentially confounding information in the Culper Report regarding Green Dragon that would need to be disaggregated from the price decline on January 14-15, 2021 following the release of the Culper Report.[132] I further concluded it is reasonable to assume that investors weighed the importance of information regarding the Valle Divino development site at $0.81 per share. While Dr. Garmaise raises few criticisms in regards to my assessment of potentially confounding information regarding Valle

---

[131] Bozanic Merits Report, ¶¶ 102-103.

[132] Bozanic Merits Report, ¶¶ 108-109.

Divino, he raises several criticisms of my assessment of potentially confounding information regarding Green Dragon.

84.    Specifically, i) Dr. Garmaise disagrees with my opinion that "investors did not view the Green Dragon agreement as positively value relevant" because CleanSpark was traded OTC during this period; he thus questions market efficiency, ii) he criticizes the assertion that "CleanSpark's stock price 'declined by 18.84%' on October 3, 2017" on the basis that the 18.84% was not "a close-to-close price movement," and iii) he criticizes the "assertion that 'the stock price did not increase' on the other dates" on the basis that it "lacks crucial context."[133]

85.    I note that while Dr. Garmaise raises speculative questions about the exact amount of the price impact of confounding information contained within the corrective disclosures, he does not put forward any alternative calculations of the amount of confounding information or the level of artificial inflation dissipated on these dates. His critiques do not disturb any of my Merits Report calculations, opinions, or conclusions.

86.    Further, during Dr. Garmaise's deposition, when asked about other forms of analysis conducted in his report – *e.g.*, regarding price impact of fabricated customers and contracts, related party transactions, executive compensation, the existence of the Culper Report, and so forth – his repeated testimony was he **did not undertake or offer his own "affirmative analysis**."[134] That is, in criticizing my report and its methodology, he offers no alternative calculations or methodologies. However, what he does offer in its place are several academic studies which, as discussed in **Section IV.E** above, are not relevant.

---

[133] Garmaise Report, ¶¶ 58-61.

[134] Garmaise Deposition Transcript, pp. 25-32.

87.     As stated in my Merits Report, if investors had viewed CleanSpark's prior disclosures about the Green Dragon contract as positively value relevant, I would expect those disclosures to generate positive stock price reactions.[135] I identified four news events disclosed in the months prior to the Culper Report which discussed the Green Dragon agreement. On October 3, 2017, CleanSpark issued a press release announcing the agreement to provide a microgrid solution to Green Dragon and the stock *declined* by 18.84% on a raw return basis.[136] Additionally, I identified discussion regarding Green Dragon in three CleanSpark SEC filings (January 16, 2018, March 9, 2018, and April 5, 2018) and found that the stock price did not increase on those dates, which further suggests that investors did not view the Green Dragon agreement as positively value relevant.

88.     As an initial matter, I note that Defendants have not challenged my opinion that CleanSpark traded efficiently. While I agree that CleanSpark traded OTC in October 2017[137] and that the 18.84% decline is using the closing price on October 3, 2017 relative to the last available price which occurred on August 1, 2017, I disagree with Dr. Garmaise's conjecture that the Green Dragon announcement was not positively value relevant. I searched for press releases, SEC filings, analyst reports, and news articles between these dates (*i.e.*, August 1, 2017 - October 3, 2017) to determine whether the absence of disclosures contributes to the lack of price movement.

89.     During this period, CleanSpark issued two press releases, one announcing that an inside director would be replaced by the interim chairman of the board[138] and the other announcing

---

[135] Bozanic Merits Report, ¶ 108.

[136] "CleanSpark Provides a Best-in-Class Microgrid Solution to the Marijuana Industry," *CleanSpark*, October 3, 2017.

[137] CleanSpark was approved for listing on the NASDAQ on January 24, 2020. *See* SEC EDGAR, available at: https://www.sec.gov/Archives/edgar/data/827876/000166357720000021/clsk8-k.htm

[138] "CleanSpark Announces Appointment of New Chairman of the Board," *CleanSpark*, September 26, 2017.

CleanSpark's participation[139] in a cannabis conference. During this period, CleanSpark made three filings with the SEC: a filing that repeated the board change[140], a Notice of Exempt Offering of Securities[141], and a 10-Q filing.[142] News articles during this period similarly repeated information regarding the board change, conference participation, Notice filing, and 10-Q filing. No trades occurred on the basis of this information contained in these disclosures – until the October 3, 2017 Green Dragon announcement, which is associated with a raw *negative* return of 18.84%.

90.     Thus, relative to the prior disclosures made during this period, investors did not find the Green Dragon announcement positively value relevant. The last of these disclosures occurred on September 19, 2017 when the board change was announced, nearly two weeks ahead of the Green Dragon announcement.[143] To the extent the board change could be viewed as positively value relevant[144], the share price movement on the day of the Green Dragon announcement does not support this view.

91.     Of the other dates mentioned – January 16, 2018, March 9, 2018, and April 5, 2018 – they are associated with SEC comment letter correspondence and 10-K filings. Academic research has shown that the stock market generally does not react to either of these disclosures. With respect to the former, on average, there is very little value relevance[145], *i.e.*, "comment letters,

---

[139] "CleanSpark to Speak at 6th Annual CannaGrow Expo on October 28, 2017," *CleanSpark*, August 23, 2017.

[140] *See* SEC EDGAR, available at:
https://www.sec.gov/Archives/edgar/data/827876/000166357717000301/mainbody.htm

[141] *See* SEC EDGAR, available at:
https://www.sec.gov/Archives/edgar/data/827876/000166357717000267/xslFormDX01/primary_doc.xml

[142] *See* SEC EDGAR, available at:
https://www.sec.gov/Archives/edgar/data/827876/000166357717000260/mainbody.htm

[143] The board change was first announced in an SEC filing on September 19, 2017, *Supra* Footnote 141.

[144] *See*, *e.g.*, Lin, S., P. Pope, and S. Young, 2003, "Stock Market Reaction to the Appointment of Outside Directors," *Journal of Business Finance & Accounting*, 30.

[145] *See*, *e.g.*, Ryans, J., 2021, "Textual classification of SEC comment letters," *Review of Accounting Studies* 26.

on average, do not have a significant impact on directional stock returns." With respect to the latter, on average, research has shown that much of the information in the 10-K is already known from prior interim reports, which explains the muted market reaction.[146] Thus, academic research is consistent with the lack of price movement on these days, which is also consistent with the assertion that none of these dates conveyed positively value relevant information.

92.    Dr. Garmaise also criticizes my approach to analyzing potentially confounding information related to both Green Dragon and Valle Divino on the basis that I did not consider "whether there was confounding information on those dates" where 'those dates' ostensibly refer to the dates used in my confound analysis for disaggregation purposes, *i.e.*, October 3, 2017 for Green Dragon and September 15, 2021 and October 19, 2021 for Valle Divino.[147] I searched for press releases, SEC filings, analyst reports, and news articles on these dates to determine the possibility of other information unrelated to Green Dragon or Valle Divino that could influence CleanSpark's price movements on these dates. I found no CleanSpark press releases, no additional SEC filings, and no additional media articles on any of these days.

93.    Lastly, Dr. Garmaise contends that I have failed to rule out confounding information related to financial metrics in the February 12, 2021 and August 17, 2021 disclosures announcing quarterly financial results, as well revised revenue guidance for FY 2021 in the latter disclosure.[148]

94.    In regards to the February 12, 2021 corrective disclosure, I explained in my Merits Report that while the abnormal decline on February 12, 2021 is, in my opinion, attributable to the

---

[146] *See*, *e.g.*, Easton, P. and M. Zmijewski, 1993, "SEC form 10-K/10-Q reports and annual reports to shareholders: Reporting lags and squared market model prediction errors." *Journal of Accounting Research* 31.

[147] Garmaise Report, ¶¶ 60-62, 64, 66.

[148] Garmaise Report, ¶¶ 62, 66.

new information regarding expansion delays contained in the February 12, 2021 press release, I examined CleanSpark's financial statements for the period October 1, 2020 through December 31, 2020, released after market hours on February 11, 2021, to better understand other potential drivers of the observed stock price decline.[149] I found **no economic evidence of information unrelated to the Complaint's claims that needs to be disaggregated from the price decline** on February 12, 2021.[150]

95.     Despite a press release reporting seemingly positive news for investors (*e.g.*, period-over-period increases in revenue as well as gross margins, both of which are primarily attributable to the new bitcoin mining segment), the return on CleanSpark's common stock was negative that day on a loss of $0.32 per share.[151] While revenue growth was positive, it failed to meet market expectations; that is, CleanSpark's quarterly earnings (actual loss of $0.32 per share vs. loss of $0.12 expected) and revenue (actual revenue of $2.26 million vs. $2.83 expected) results were below analyst expectations.[152]

96.     In my opinion, the miss in revenue and earnings was relative to expectations set following the ATL Facility announcement. On the day after the announcement, analysts at H.C. Wainwright increased their target prices for CleanSpark by 33%, from $18 to $24.[153] Analysts attributed the increase in target price to the ATL Acquisition: "Our price **target increase to $24.00 from $18.00** is primarily driven by **upward revisions to our future estimates** to include **new revenue and margin contribution <u>from bitcoin mining activity</u>**." Further, in the same report,

---

[149] Bozanic Merits Report, ¶ 121.

[150] Bozanic Merits Report, ¶ 128.

[151] Bozanic Merits Report, ¶ 120.

[152] "Set Up for Continued Strength in FY2021; F4Q20 Results Update," *H.C. Wainwright*, dated December 21, 2020.

[153] "Bitcoin Mining Acquisition Drives Estimates Higher; Raising Price Target to $24.00," *H.C. Wainwright*, December 11, 2020.

44

analysts expected bitcoin mining to be scaled **immediately**. Aside from a modest increase of 10 PH/s in December 2020[154], bitcoin had not been scaled immediately, as demonstrated by CleanSpark's revised timeline from the April 2021 to "mid-year" or "mid-summer" disclosed in the February 12, 2021 press release.

97.    In addition, as discussed in my Merits Report[155], CleanSpark reported that total operating expense increased by 230% (from $3,085,564 to $7,094,778) period-over-period, or roughly $4 million. For example, some of the largest increases in expenses this period related to payroll ($3.3 million) and derivatives ($1 million). However, no analysts or media articles in the week following the February 12, 2021 press release connected the increases in expenses related to either payroll or derivative securities to the observed price decline.

98.    Thus, unlike revenue growth, the increase in operating expenses was not economically material to investor expectations regarding Company profitability and value, especially considering the nascent bitcoin segment earned more than twice the revenue per day than the legacy segments (*i.e.*, $34,924 revenue per day on average vs. $16,749)[156]. Given the relative earnings streams between the segments, investors would find updates regarding energy and hashrate capacity expansion at the nascent bitcoin segment material and value relevant. Hence, the information in the February 12, 2021 press release is corrective of the alleged misstatements and omissions because it revealed how CleanSpark had overstated its ability to increase energy and hash rate capacity at the ATL Facility in the timeline stated.

99.    In regards to August 17, 2021 corrective disclosure, while the abnormal decline on August 17, 2021 is, in my opinion, attributable to the new information regarding expansion delays

---

[154] *See* "CleanSpark Provides Update on Bitcoin Mining Operations and Expansion," *CleanSpark*, December 18, 2020.

[155] Bozanic Merits Report, ¶ 123.

[156] Bozanic Merits Report, ¶ 122.

contained in the August 17, 2021 press release, I examined CleanSpark's financial statements for the period April 1, 2021 through June 30, 2021, released after market hours on August 16, 2021, to better understand other potential drivers of the stock price decline. I concluded that I find **no economic evidence of information unrelated to the Complaint's claims that needs to be disaggregated from the price decline** on August 17, 2021.

100.    Despite a press release reporting seemingly positive news for investors (*e.g.*, period-over-period increases in revenue, primarily attributable to the new bitcoin mining segment), the return on CleanSpark's common stock was negative that day on a loss of $0.49 per share.[157] While revenue growth was positive year-over-year, and especially related to bitcoin mining, it failed to meet market expectations; that is, CleanSpark's quarterly earnings (adjusted *loss* of $0.38 per share vs. *profit* of $0.07 expected) and revenue (actual revenue of $11.9 million vs. approximately $15 million expected) results were below analyst expectations.[158] Analysts at BTIG also noted management had "narrowed" its revenue guidance expectations.[159]

101.    In my opinion, the miss in revenue and earnings was related to expectations set following the ATL Facility announcement and the updated timeline expectations set in the February 12, 2021 press release. As discussed in my Merits Report[160], as of February 24, 2021[161], it was unclear what hashrate capacity beyond 200 PH/s the Company had in place, thus reducing investor confidence in the Company's disclosures and increasing investor skepticism regarding

---

[157] Bozanic Merits Report, ¶ 148.

[158] "Some Growing Pains, But Bitcoin Mining Ramp Underway Now and Later, Lowering PT to $35," *BTIG*, dated August 16, 2021.

[159] "Management narrowed guidance with FY21 revenue now expected at $49M-$63M (previously $47M-$67M) with the mid-point at $56M (down from $57M) versus Consensus of ~$52M."

[160] Bozanic Merits Report, ¶ 127.

[161] "CleanSpark Completes Strategic Acquisition of Solar Watt Solutions," *CleanSpark*, February 24, 2021.

statements pertaining to the expansion plans, leaving investors to estimate the actual hashrate in the absence of a Company disclosure to the contrary. As of August 17, 2021, the hashrate capacity stated by CleanSpark in its press release was 820 PH/s – still short of the "0.9-1.4 EH/s" hashrate expected by April 2021 as stated in the December 10, 2021 ATL Acquisition announcement.

102.    According to the August 16, 2021 earnings report, total revenues grew by 247% (from $3,438,674 to $11,916,065) period-over-period, or roughly $8.47 million. Further, it is apparent from the Consolidated Statement of Operations that the non-mining segments (*i.e.*, Energy and Other) did not exhibit the same growth as the bitcoin mining segment (*i.e.*, Digital Currency Mining). Year-over-year growth in the period for non-mining segments was actually *negative* at 5.3%, from $3,438,674 to $3,266,625, or a decline in revenue of approximately $172K. In sharp contrast, bitcoin mining revenues were the lion's share of total revenues for the period, **from $0 the same period last year to $8.65 million the current period, or 72% of total current period revenues.**[162]

103.    CleanSpark reported that total operating expense increased by 375% (from $5,582,273 to $26,534,244) period-over-period, or roughly $21 million. Some of the largest increases in expenses this period relate to payroll ($11.8 million), bitcoin impairment ($3.7 million), and derivatives ($2.1 million). However, as discussed in my Merits Report, neither the Company nor analysts found the increases in payroll, bitcoin impairments, and derivatives to be economically material.[163]

---

[162] Bozanic Merits Report, ¶ 150.

[163] Bozanic Merits Report, ¶ 151.

104.    While two analyst reports[164] in the week following the August 17, 2021 press release mentioned increased expenses from executive compensation when summarizing quarterly results, both noted its non-recurring nature and instead focused on revenue growth and outlook. For example, one analyst's "key takeaways" focused on revenue outlook (projections of $44.7M for FY2021) consequent to planned increases in miners deployed and hashrate expected to be achieved. Further, no media articles in the week following the August 17, 2021 press release connected the increases in expenses related to payroll, impairments, or derivatives to the observed price decline. Thus, unlike bitcoin mining revenue growth, the increase in operating expenses was not economically material to investor expectations regarding Company profitability and value.

105.    During the earnings call, CleanSpark lowered its guidance projections from a midpoint of $57 million to $56 million for FY 2021.[165] This reflects an $8 million increase in bitcoin revenue expectations which are nearly offset by a $7.5 million decrease in the energy segment. A decrease of $1 million on $57 million reflects a *1.75% decline in overall revenue expected*. Given the offsetting nature of the segments, the small economic magnitude of the decline, that investors were more focused on the growth in bitcoin, and that the revised consensus was still $4 million or 7.7% above the consensus of approximately $52 million[166], in my opinion, the narrowed guidance was not economically material to investor expectations regarding Company profitability and value.

---

[164] "Poised for Significant Ramp in Hashrate During FY2022; F3Q21 Results Update," *H.C. Wainwright*, August 18, 2021; "3Q2I Results: +247% Revenue Growth Fueled by Bitcoin Mining; Management Raises FY2I Guidance," *Water Tower Research*, August 19, 2021.

[165] "CleanSpark, Inc. Q3 2021 Results Conference Call," *Bloomberg*, dated August 16, 2021.

[166] "Some Growing Pains, But Bitcoin Mining Ramp Underway Now and Later, Lowering PT to $35," *BTIG*, dated August 16, 2021.

106.    Thus, unlike revenue growth, the increase in operating expenses and slight decrease in FY 2021 guidance were not economically material to investor expectations regarding Company profitability and value. I conclude that CleanSpark's valuation and growth expectations following the ATL acquisition are predicated on investor expectations regarding CleanSpark's stated plans regarding energy and hashrate capacity and expansion at their bitcoin mining segment (*i.e.*, revenue growth), as opposed to the non-mining segments or operating expenses.

## VI.    Damages and Artificial Inflation

107.    In my Merits Report, I quantified the per share artificial inflation dissipated from the price of CleanSpark Common Stock on the Corrective Disclosure Events.[167] Dr. Garmaise does not dispute:

> a) that the event study methodology I employed in both my Efficiency Report and in my Merits Report is a reliable method for quantifying artificial inflation in this case.
>
> b) that I properly performed a reliable event study to determine the impact that each of the Corrective Disclosure Events had on the price of CleanSpark Common Stock (indeed Dr. Garmaise relies on the results of my event study in reaching certain conclusions).[168]
>
> c) that I properly calculated the abnormal declines in the market price of CleanSpark Common Stock on each of the Corrective Disclosure Events, after controlling for market and industry effects.

108.    Despite this, Dr. Garmaise criticizes my use of the constant dollar methodology in backcasting the level of artificial inflation dissipated by the Corrective Disclosure Events.[169] He provides the following critiques, which I address in the following sections: that a) I fail to "reliably establish that the alleged misrepresentations caused investor losses…"[170]; b) I provide no

---

[167] Bozanic Merits Report, **Section VIII**.

[168] *See,* for example, Garmaise Report, ¶¶ 37, 76.

[169] Garmaise Report ¶¶ 101-114.

[170] Garmaise Report ¶ 101.

justification for the but-for valuation of CleanSpark implied by my artificial inflation estimate as of the start of the Class Period[171]; and c) I fail to account for changes over the Class Period in the price of bitcoin, the bitcoin mining industry, CleanSpark's business model, and/or potential changes in the economic impact of the alleged misrepresentations on the value of CleanSpark.[172]

109.    Dr. Garmaise also claims that I do not provide adequate guidance: a) for a finder of fact to alter or adapt my measure of artificial inflation; b) to "the jury to decide what percentage of abnormal returns should be attributed to corrective versus confounding information"; or c) for the jury to assess "the evolution of artificial inflation over time, given the substantial variation in the economic environment and business composition of CleanSpark during the Proposed Class Period."[173] I reply to each critique in the following subsections, and I note that none of Dr. Garmaise's concerns disturb my Merits Report opinions.

110.    As an initial matter, I note that Dr. Garmaise's claim that I fail to "reliably establish that the alleged misrepresentations caused investor losses…"[174] is misguided. In my Merits Report, I explain that:

> My opinions regarding economic materiality, loss causation, and damages in this matter arising under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by the SEC, are premised upon Defendants being found to have knowingly or recklessly made material misrepresentations or omissions during the Class Period regarding CleanSpark's ability to expand their energy and hashrate capacity at the ATL Facility in the timeline stated and to operate the facility at low cost through advantageous contract terms with the local municipality.[175]

---

[171] Garmaise Report ¶¶ 102-103.

[172] Garmaise Report ¶¶ 104-114.

[173] Garmaise Report, ¶¶ 115-118.

[174] Garmaise Report, ¶ 101.

[175] Bozanic Merits Report, ¶ 13.

111.    It is not my burden to prove Plaintiffs' case. Rather, my opinions are premised upon Defendants being found to have knowingly or recklessly made material misrepresentations and/or omissions. Despite this, in my Merits Report,[176] and as discussed in the preceding sections, I provide ample support for my opinions regarding economic materiality, loss causation, and damages. As a result, Dr. Garmaise's opinions are unfounded and irrelevant.

112.    Moreover, I note that Dr. Garmaise does not put forward any alternative calculations of artificial inflation, approach to the backcasting of artificial inflation, or method for calculating damages in this matter. In his deposition testimony he asserted the same. In response to a question about whether he believes there should be zero damages associated with the price drops on the corrective disclosures dates, he testified that "I have offered the opinion that Dr. Bozanic has not shown, has not reliably shown that there are damages. I'm not offering an affirmative opinion…"[177] When asked if he could put forth alternate models to overcome the purported shortcomings on my model, he testified that "I don't have an affirmative opinion on a separate model for damages." yet he is able to opine that "a constant dollar model is unreliable and inappropriate…"[178] None of Dr. Garmaise's critiques alter my Merits Report opinions.

A.  The Constant Dollar Method is Appropriate in this Matter

113.    In my Merits Report, I concluded that the constant dollar methodology of measuring inflation is appropriate in this matter. Specifically, I stated:

> Based on my understanding of Plaintiffs' allegations, coupled with my review of the documents and information identified in Appendix A, I conclude that constant dollar inflation is appropriate in this matter. My opinion is based on the fact that the nature of the misrepresented and/or omitted information did not change during the Class Period. Specifically, I understand that Plaintiffs expect to prove that as

---

[176] Bozanic Merits Report, **Sections VI-IX**.

[177] Garmaise Deposition Transcript, p. 48.

[178] Garmaise Deposition Transcript, p. 48-49.

51

> of the start of the Class Period, Defendants knew, or recklessly disregarded that CleanSpark understated its mining costs, overstated its ability to further reduce energy costs through its "software technologies and trade secrets," and overstated its ability to increase energy and hash rate capacity – and concealed these issues from investors.
>
> As a result of the foregoing, I find no economic reason to believe that the financial impact of the misstatements and/or omissions would have been any different earlier in the Class Period and thus I find no economic reason to deviate from the standard constant dollar methodology. In my view, the most widely accepted and reliable proxy for evaluating how the market would have reacted to such a disclosure at the beginning of the Class Period is to rely upon the abnormal market price decline observed upon the later disclosure of such information.[179]

114.    In other words, Plaintiffs allege that Defendants knew about or recklessly disregarded that CleanSpark had understated its mining costs, overstated its ability to further reduce its energy costs, and overstated its ability to increase its energy and hash rate capacity as of the start of the Class Period, and that these issues persisted throughout the Class Period. Since these issues were allegedly known by Defendants from the beginning of the Class Period, and remained present throughout, there is no reason to believe that the financial impact of the alleged misrepresentations would have changed had the truth been disclosed any earlier in the Class Period prior to the alleged Corrective Disclosure Events. In my view, the same information, if revealed sooner, would have had a comparable negative impact on the price of CleanSpark Common Stock, meaning the per share artificial inflation would have been maintained throughout the Class Period.

115.    Dr. Garmaise argues that my use of the constant dollar approach is economically unreasonable. Importantly, in criticizing my use of the constant dollar methodology, Dr. Garmaise does not present any alternative methodology to measure per share artificial inflation. I note that the constant dollar methodology is a standard and well-accepted methodology.[180] Indeed, Dr.

---

[179] Bozanic Merits Report, ¶¶ 157-158.

[180] *See*, *e.g.*, *In re Under Armour Securities Litigation*, 730 F.Supp.3d 172 (2024).

Garmaise does not dispute this about the constant dollar methodology *in general*. Rather, he takes issue with its application to this matter specifically. He claims that I fail to account for changes over the Class Period in the price of bitcoin, the bitcoin mining industry, CleanSpark's business model, and/or potential changes in the economic impact of the alleged misrepresentations on the value of CleanSpark.[181] He further claims that I fail to justify the implied but-for valuation of CleanSpark as of the start of the Class Period.[182] As discussed below, his concerns are unfounded and flawed.

116.    First, as noted in my Merits Report, I considered all potential inflation creating events throughout the Class Period, which introduce artificial inflation into the Common Stock price during the Class Period.[183] This would allow for a smaller amount of artificial inflation to be backcast to the start of the Class Period. As noted in my Merits Report, the actionable alleged misrepresentations made after the start of the Class Period and with potential price impact repeated similar information from previous alleged misrepresentations.[184] Thus, while they could serve to *maintain* artificial inflation in CleanSpark's Common Stock price, they did not *introduce* any additional artificial inflation.

117.    Second, as explained in my Efficiency Report and Merits Report, my daily event study methodology explicitly controls for changes in the overall market, changes in CleanSpark's software-related industry, and changes in CleanSpark's bitcoin mining industry (including the price of bitcoin) throughout the Class Period.[185] This event study approach explicitly disaggregates

---

[181] Garmaise Report, ¶¶ 104-114.

[182] Garmaise Report, ¶¶ 102-103.

[183] Bozanic Merits Report, ¶ 78.

[184] *Id.*

[185] Bozanic Efficiency Report, **Section V.E**; Bozanic Merits Report, ¶ 68.

any market-based, industry-based, and Bitcoin pricing-based confounding information occurring during the alleged Corrective Disclosure Events. I further note that Dr. Garmaise's concerns relate to potential non-fraud-related aspects of CleanSpark's business. While it is possible that the market, the industry, the price of Bitcoin, and other elements of CleanSpark's business may have evolved over the course of the Class Period, my analysis pertains to the **alleged fraud-related artificial inflation** present in the Company's Common Stock price, as opposed to questions about issues that are not alleged to be connected to the fraud.

118.    Third, I note that CleanSpark's Common Stock price prior to the start of the Class Period was virtually identical to the Company's Common Stock price after the end of the Class Period – trading in the $11 to $12 range both before and after the Class Period.[186] This contradicts Dr. Garmaise's speculation that the constant dollar methodology is somehow inappropriate in this matter.[187] In other words, the business outlook and valuation for the Company was remarkably similar before versus after the Class Period.

119.    Fourth, I note that the constant percentage method represents an alternative approach to backcasting of artificial inflation. Dr. Garmaise's concerns about fluctuations in the value impact of the alleged misrepresentations throughout the Class Period due to fluctuations in CleanSpark's business outlook imply that a finder of fact could rely on this alternative backcasting method. Instead of backcasting a constant dollar value of inflation dissipated by the Corrective Disclosure Events, this approach would backcast a constant percentage value of inflation

---

[186] *Source*: Bloomberg. For example, CleanSpark's average daily closing stock price was $11.80 over December 1-9, 2020, and closed at $11.65 on August 17, 2021.

[187] I further note that Dr. Garmaise's implied speculation that artificial inflation must be capped at $26.3 million based on an implied valuation of the ATL transaction (Garmaise Report, ¶¶ 15, 103, 186), is contradicted by academic research. *See*, *e.g*., Moeller, S., F. Schlingemann, and R. Stulz, 2005, "Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," *Journal of Finance* 60.

dissipated by the Corrective Disclosure Events. These amounts would be calculated from the underlying data[188] and **Table A** in my Merits Report:

**Table 1:**
**CleanSpark Common Stock**
**Artificial Inflation per Share Dissipated**
**(Constant Percentage Approach)**

| Date | $ Artificial Inflation Dissipated | % Artificial Inflation Dissipated |
|---|---|---|
| January 14, 2021 | $4.48 | 11.39% |
| January 15, 2021 | $4.03 | 11.29% |
| February 12, 2021 | $1.68 | 5.74% |
| August 17, 2021 | $1.50 | 10.90% |

120.    Next, the percentage declines attributed to artificial inflation would be backcast on a constant basis, as done in **Table B** of my Merits Report:

**Table 2:**
**CleanSpark Common Stock**
**Artificial Inflation per Share During the Class Period**
**(Constant Percentage Approach)**

| Date Range | % Artificial Inflation per Share |
|---|---|
| December 10, 2020 – January 13, 2021 | 33.98% |
| January 14, 2021 | 25.50% |
| January 15, 2021 – February 11, 2021 | 16.01% |
| February 12, 2021 – August 16, 2021 | 10.90% |

121.    **Exhibit 1** provides a graph of the level of CleanSpark's Common Stock price artificial inflation over the Class Period calculated in my Merits Report, using constant dollar backcasting, versus the level calculated using this constant percentage approach. While I reaffirm

---

[188] *Sources*: Bozanic Merits Report, **Section VIII** and underlying event study; Bloomberg daily closing prices for CleanSpark Common Stock. The % Artificial Inflation Dissipated equals the negative of the abnormal return % from my event study (*See* Bozanic Merits Report, **Exhibit 3**) for January 15, February 12, and August 17, 2021. For January 14, 2021 to incorporate my confounding information calculations, the amount is calculated as: 13.45% * ($4.48 / $5.29).

the reasonableness of my Merits Report artificial inflation ribbon, I acknowledge that a finder of fact could also reasonably conclude that the constant percentage inflation ribbon is also appropriate in this matter. Regardless, this calculation represents an *input* to the out-of-pocket damages formula, which Dr. Garmaise does not dispute represents a reliable approach to calculating damages in this matter.

### B. My Artificial Inflation and Damages Methodology are Adaptable to Alternative Findings

122.    Finally, Dr. Garmaise opines that I do not provide adequate guidance: a) for a finder of fact to alter or adapt my measure of artificial inflation; b) to "the jury to decide what percentage of abnormal returns should be attributed to corrective versus confounding information"; or c) for the jury to assess "the evolution of artificial inflation over time, given the substantial variation in the economic environment and business composition of CleanSpark during the Proposed Class Period."[189] He is incorrect, as explained below.

123.    First, my Merits Report provides detailed calculations laying out the percentage of abnormal returns that are attributable to corrective versus confounding information.[190] Moreover, I explain in my Merits Report that, should a jury reach an alternative finding regarding this or other inputs to the artificial inflation and damages calculations, these can easily be plugged into the out-of-pocket damages formula:

> [I]rrespective of what the ultimate finder of fact, *i.e.*, the jury determines is the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information, this percentage can easily be inserted into the standard damages model that I have already described – the out-of-pocket formula.  For example, as described in Section VII.A., I estimate that $0.81 cents of the abnormal price movement in CleanSpark Common Stock on January 14-15, 2021 is attributable to confounding information. Assume, for purely illustrative purposes, that the jury determines that instead, $1.20 of the of the abnormal price

---

[189] Garmaise Report, ¶¶ 115-118.

[190] Bozanic Merits Report, **Section VIII**.

movement in CleanSpark Common Stock on January 14-15, 2021 is attributable to the confounding information. The daily inflation table could easily be updated for this alternative finding. Regardless of how the jury weighs evidence, whether they find that my disaggregation analysis is the most appropriate, or they determine that based upon the evidence, a different percentage is more appropriate, this finding can simply be incorporated into the damages calculation.

Similarly, if the jury determines that none of the abnormal return on a Corrective Disclosure Event is attributable to the corrective information, then it would be assumed that $0 of inflation was dissipated from CleanSpark Common Stock on that date, which could also easily be updated in the daily inflation table.[191]

124.    Second, as discussed above and in my Merits Report, I have properly considered changes in CleanSpark's business composition and the economic environment over the Class Period. Nonetheless, my Merits Report also explains how the out-of-pocket damages model can easily accommodate any alternative findings of fact:

[S]hould the jury determine that the true economic inflation evolved over the Class Period, the out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a class-wide basis. In a hypothetical example, assume the jury concludes that before December 15, 2020, inflation was only half of the value I have calculated. As shown above in Table B, I have estimated $11.69 of artificial inflation was present in CleanSpark Common Stock from the start of the Class Period through January 13, 2021. If the jury determines that inflation was only half that amount from December 10, 2020 through December 14, 2020, then the inflation table I presented above can be adjusted to $5.85 for that initial period (*i.e.*, 50% of $11.69).[192]

125.    Third, as discussed above, should the jury determine that a constant percentage approach to backcasting is more appropriate, such a finding can easily be accommodated within the out-of-pocket damages methodology. It is for this reason that I explain in my Merits Report how my damages methodology is flexible and able to easily incorporate alternative findings of fact to calculate damages on a common, Class-wide basis.[193]

---

[191] Bozanic Merits Report, ¶ 165.

[192] Bozanic Merits Report, ¶ 166.

[193] Bozanic Merits Report, ¶¶ 167-168.

## VII.    Conclusion

126.    First, my use of and interpretation of statistical significance is consistent with academic literature, my deposition, and my Prior Reports. Second, the Culper Report and related tweets provided new information to the market, consistent with my assessment of their value relevance, as supported by the disclosure salience literature. Third, the February 12, 2021 and August 17, 2021 corrective disclosures provided new information to the market regarding expansion delays. Finally, the constant dollar method is appropriate in this matter and is adaptable to alternate findings.

I declare under the penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

Zahn Bozanic, Ph.D.

**Appendix A**

**Documents Considered**

**Case Documents:**

- Amended Class Action Complaint for Violations of the Federal Securities Laws (Doc. 36).

- Efficiency Report of Dr. Zahn Bozanic, dated January 10, 2025.

- Deposition Transcript of Dr. Zahn Bozanic, dated February 27, 2025.

- Defendants' Opposition to Plaintiff's Motion for Class Certification, dated March 14, 2025 (Doc. 92).

- Expert Reply Report of Dr. Zahn Bozanic, dated May 2, 2025.

- Expert Merits Report of Dr. Zahn Bozanic, dated July 18, 2025.

- Expert Report of Mark Garmaise Ph.D., dated September 12, 2025.

- Deposition Transcript of Dr. Mark Garmaise, dated September 30, 2025.

**Court Decisions and Securities Law:**

- *PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005).

- *Pirnik v. Fiat Chrysler Automobiles*, N.V., 327 F.R.D. 38 (2018).

- *Monroe County Employees Retirement System v. Southern Co.*, 332 F.R.D. 370, 393 (N.D. Ga. 2019)

- *In re Under Armour Securities Litigation*, 730 F.Supp.3d 172 (2024).

**Academic Literature and Books:**

- Armour, J., C. Mayer, and E. Polo, 2017, "Regulatory Sanctions and Reputational Damage in Financial Markets," *Journal of Financial and Quantitative Analysis* 52.

- Axelson, P. and M. Cain, 2025, "What is Price Impact? How the Goldman Decisions are Reshaping Shareholder Class Actions," *Berkeley Business Law Journal* 22.

- Blankespoor, E., E. DeHaan, and I. Marinovic, 2020, "Disclosure Processing Costs, Investors' Information Choice, and Equity Market Outcomes: A Review," *Journal of Accounting and Economics* 70.

- Bowen, R., A. Davis, and D. Matsumoto, 2005, "Emphasis on Pro Forma versus GAAP Earnings in Quarterly Press Releases: Determinants, SEC Intervention, and Market Reactions," *The Accounting Review* 80.

- Brav, A. and J. Heaton, 2015, "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," *Washington University Law Review* 93.

- Buysschaert, A., M. Deloof, M. Jegers, 2004, "Equity sales in Belgian corporate groups: expropriation of minority shareholders? A clinical study," *Journal of Corporate Finance* 10.

- Carter, M., L. Li, A. Marcus, and H. Tehranian, 2016, "Excess Pay and Deficient Performance," *Review of Financial Economics* 30.

- Casavecchia, L. and J. Suh, 2017, "Managerial incentives for risk-taking and internal capital allocation," *Australian Journal of Management* 42.

- Cheng, L., D. Roulstone, and A. Van Buskirk, 2021, "Are Investors Influenced by the Order of Information in Earnings Press Releases?," *The Accounting Review* 96.

- Cheung, Y., P. Rao, and A. Stouraitis, 2006, "Tunneling, Propping, and Expropriation: Evidence from Connected Party Transactions in Hong Kong," *Journal of Financial Economics* 82.

- Core, J., R. Holthausen, and D. Larcker, 1999, "Corporate Governance, Chief Executive Officer Compensation, and Firm Performance," *Journal of Financial Economics* 51.

- Dechow, P., W. Ge, C. Larson, and R. Sloan, 2011, "Predicting material accounting misstatements," *Contemporary Accounting Research* 28.

- Easton, P. and M. Zmijewski, 1993, "SEC form 10-K/10-Q reports and annual reports to shareholders: Reporting lags and squared market model prediction errors," *Journal of Accounting Research* 31.

- Fama, E., 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25.

- Fama, E., 1991, "Efficient Capital Markets: II" *Journal of Finance* 46.

- Files, R., E. Swanson, and S. Tse, 2009, "Stealth Disclosure of Accounting Restatements," *The Accounting Review* 84.

- Fisch, J., J. Gelbach, and J. Klick, 2017, "The Logic and Limits of Event Studies in Securities Fraud Litigation," *Texas Law Review* 96.

- Fooladi, M. and M. Farhadi, 2019, "Corporate governance and detrimental related party transactions," *Asian Review of Accounting* 27.

- Garmaise, M. and G. Natividad, 2010, "Information, the Cost of Credit, and Operational Efficiency: An Empirical Study of Microfinance," *Review of Financial Studies* 23.

- Garmaise, M. and G. Natividad, 2013, "The Attractions and Perils of Flexible Mortgage Lending," *Review of Financial Studies* 26.

- Garmaise, M. and G. Natividad, 2021, "Financial Flexibility: At What Cost?," *Journal of Financial and Quantitative Analysis* 56.

- Gordon, E., E, Henry, and D. Palia, 2004, "Related Party Transactions and Corporate Governance," *Advances in Financial Economics* 9.

- Guay, W., 1999, "The sensitivity of CEO wealth to equity risk: an analysis of the magnitude and determinants," *Journal of Financial Economics* 53.

- Guillamon-Saorin, E., B. Osma, and M. Jones, 2012, "Opportunistic Disclosure in Press Release Headlines," *Accounting and Business Research* 42.

- Haslem, B., I. Hutton, and A. Smith, 2017, "How Much Do Corporate Defendants Really Lose? A New Verdict on the Reputation Loss Induced by Corporate Litigation," *Financial Management*.

- Hirshleifer, D. and S.H. Teoh, 2003, "Limited Attention, Information Disclosure, And Financial Reporting," *Journal of Accounting and Economics* 36.

- Huang, X, A. Nekrasov, and S.H. Teoh, 2018, "Headline Salience, Managerial Opportunism, and Over- and Underreactions to Earnings," *The Accounting Review* 93.

- Karpoff, J., D. Lee, and G. Martin, 2008, "The Cost to Firms of Cooking the Books," *Journal of Financial and Quantitative Analysis* 43.

- Karpoff, J. and J. Lott Jr., 1993, "The Reputational Penalty Firms Bear from Committing Criminal Fraud," *The Journal of Law and Economics* 36.

- Kaye, D. and D. Freedman, 2011, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, Third Edition.

- Lei, A. and F. Song, 2011, "Connected Transactions and Firm Value: Evidence from China-Affiliated Companies," *Pacific-Basin Finance Journal* 19.

- Li, H., 2019, "Repetitive Disclosures in the MD&A," *Journal of Business Finance & Accounting* 46.

- Lin, S., P. Pope, and S. Young, 2003, "Stock Market Reaction to the Appointment of Outside Directors," *Journal of Business Finance & Accounting*, 30.

- Moeller, S., F. Schlingemann, and R. Stulz, 2005, "Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," *Journal of Finance* 60.

- Rubinfeld, D. "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence*, Third Edition (Federal Judicial Center, 2011).

- Ryans, J., 2021, "Textual classification of SEC comment letters," *Review of Accounting Studies* 26.

- Stolowy, H., L. Paugam, and Y. Gendron, 2022, "Competing for Narrative Authority in Capital Markets: Activist Short Sellers vs. Financial Analysts," *Accounting, Organizations, and Society* 100.

**CleanSpark SEC Filings:**

- 10-Q, *CleanSpark*, August 14, 2017.
  https://www.sec.gov/Archives/edgar/data/827876/000166357717000260/mainbody.htm

- 8-K, *CleanSpark*, September 19, 2017.
  https://www.sec.gov/Archives/edgar/data/827876/000166357717000301/mainbody.htm

- 8-K, *CleanSpark*, January 29, 2020.

https://www.sec.gov/Archives/edgar/data/827876/000166357720000021/clsk8-k.htm

- 10-Q, *CleanSpark*, May 11, 2020.
  https://www.sec.gov/Archives/edgar/data/827876/000166357720000136/clsk10q.htm

- 10-Q, *CleanSpark*, August 17, 2021.
  https://www.sec.gov/ix?doc=/Archives/edgar/data/827876/000166357721000429/clsk10q.htm

- Form D, *CleanSpark*, August 17, 2021.
  https://www.sec.gov/Archives/edgar/data/827876/000166357717000267/xslFormDX01/primary_doc.xml

**Analyst Reports:**

- "Bitcoin Mining Acquisition Drives Estimates Higher; Raising Price Target to $24.00," *H.C. Wainwright*, December 11, 2020.

- "Set Up for Continued Strength in FY2021; F4Q20 Results Update," *H.C. Wainwright*, dated December 21, 2020.

- "A Business Update with CleanSpark CEO Zach Bradford and Executive Chairman Matt Schultz," *Water Tower Research*, June 21, 2021.

- "Some Growing Pains, But Bitcoin Mining Ramp Underway Now and Later, Lowering PT to $35," *BTIG*, dated August 16, 2021.

- "Poised for Significant Ramp in Hashrate During FY2022; F3Q21 Results Update," *H.C. Wainwright*, August 18, 2021.

- "3Q2I Results: +247% Revenue Growth Fueled by Bitcoin Mining; Management Raises FY2I Guidance," *Water Tower Research*, August 19, 2021.

**CleanSpark Press Releases:**

- "CleanSpark to Speak at 6th Annual CannaGrow Expo on October 28, 2017," *CleanSpark*, August 23, 2017.

- "CleanSpark Announces Appointment of New Chairman of the Board," *CleanSpark*, September 26, 2017.

- "CleanSpark Provides a Best-in-Class Microgrid Solution to the Marijuana Industry," *CleanSpark*, October 3, 2017.

- "CleanSpark Announces Execution of a Memorandum of Understanding with Shoreline Unified School District to Establish Grid Resiliency," *CleanSpark*, January, 9 2020.

- "CleanSpark Provides Update on Bitcoin Mining Operations and Expansion," *CleanSpark*, December 18, 2020.

- "CleanSpark Provides Bitcoin Mining Operation Update," *CleanSpark*, January 5, 2021.

- "CleanSpark, Inc. Reports Quarterly Financial Results for the Three-Months Ended December 31, 2020," *CleanSpark*, February 12, 2021.

A-4

- "CleanSpark Completes Strategic Acquisition of Solar Watt Solutions," *CleanSpark*, February 24, 2021.
- "CleanSpark Announces Agreement with ESG-Focused Crypto-Miner, Coinmint," *CleanSpark*, July 14, 2021.

**CleanSpark Conference Calls:**

- "Water Tower Research Virtual Conference," *Bloomberg*, July 14, 2021.

**News:**

- "CleanSpark Provides Bitcoin Mining Operation Update," *GlobeNewswire*, January 5, 2021, 9:25 AM.
- "CleanSpark produces just over 31 bitcoin from mining...," *TheFly.com*, January 5, 2021, 9:27 AM.
- "BRIEF-CleanSpark Says Quarterly Revenue Rose 130 Percent To $2.26 Million," *Reuters News*, February 12, 2021, 6:18 AM.
- "CleanSpark Inc: A loss of 12 cents per share anticipated for first quarter," *Reuters News*, February 12, 2021, 7:51AM.
- "CleanSpark, Inc. Q3 2021 Results Conference Call," *Bloomberg*, dated August 16, 2021.
- "CleanSpark price target lowered to $35 from $45 at BTIG analyst," *TheFly.com*, August 17, 2021, 6:45AM.

**Twitter:**

- January 5, 2021 @CleanSpark_Inc Tweet
  - twitter.com/CleanSpark_Inc/status/1346599574639497217, 6:28 PM.

**Data Sources:**

- Bloomberg

**Other:**

All documents cited within this report and Prior Reports.

**Exhibit 1. Constant Dollar and Constant Percentage Artificial Inflation**

