# EXHIBIT G

Page 295

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____

DARSHAN HASTHANTRA, et al.,

     Plaintiffs,

  v.                 Case No.

CLEANSPARK, INC., et al.,    1:21-cv-00511 (LAP)

     Defendants.

_____

VIDEOTAPED DEPOSITION OF ZAHN BOZANIC, PH.D.

VOLUME II

DATE:        Thursday, October 30, 2025

TIME:        10:20 a.m.

LOCATION:    Remote Proceeding

             Tallahassee, FL 32317

REPORTED BY:  Lindsey Diego

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF DARSHAN HASTHANTRA:

GREGORY LINKH, ESQUIRE (by videoconference)

Glancy Prongay & Murray LLP

230 Park Avenue, Suite 538

New York, NY 10169

glinkh@glancylaw.com

(212) 682-5340

ON BEHALF OF PLAINTIFF DARSHAN HASTHANTRA:

CHRIS FALLON, ESQUIRE (by videoconference)

Glancy Prongay & Murray LLP

1925 Century Park East, Suite 2100

Los Angeles, CA 90067

cfallon@glancylaw.com

(310) 201-9150

ON BEHALF OF DEFENDANTS CLEANSPARK, INC., MATTHEW

SCHULTZ, AND ZACHARY BRADFORD:

DAVID J. PARTIDA, ESQUIRE (by videoconference)

Wilk Auslander

825 Eighth Avenue, Suite 2900

New York, NY 10019

dpartida@wilkauslander.com

(212) 981-2300

A P P E A R A N C E S (Cont'd)

ALSO PRESENT:

Alejandro Hoyos, Ph.D., Cornerstone Research,

Defense Consultant (by videoconference)

Andrew Baker, Videographer (by videoconference)

Page 298

INDEX

EXAMINATION:                                        PAGE

By Mr. Partida                           303

EXHIBITS

NO.                  DESCRIPTION                    PAGE

Exhibit 94    Notice of Deposition          303

Exhibit 95    Dr. Zahn Bozanic's Expert

Reply Report, dated

October 9, 2025                 315

Exhibit 96    2013 Paper by Moeller,

Schlingemann, and Stulz -

Wealth Destruction on a

Massive Scale, a Study of

Acquiring-Firm Returns in the

Recent Merger Wave             363

Exhibit 97    Dr. Zahn Bozanic's Expert

Merits Report dated

July 18, 2025                  430

Exhibit 98    2010 Paper by Garmaise and

Natividad - Information, the

Cost of Credit, and

Operational Efficiency: An

Empirical Study of

Microfinance                   470

Page 299

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 99 | 2013 Paper by Garmaise - The Attractions and Perils of Flexible Mortgage Lending | 474 |
| Exhibit 100 | 2021 Paper by Garmaise and Natividad - Financial Flexibility: At What Cost | 477 |
| Exhibit 101 | 2017 Paper by Bozanic, Dietrich, and Johnson - SEC Comment Letters and Firm Disclosure | 484 |
| Exhibit 102 | 2020 Paper by Blankespoor, deHaan, and Marinovic - Disclosure Processing Costs, Investors' Information Choice, and Equity Market Outcomes | 520 |
| Exhibit 103 | Amended Complaint | 551 |

Page 300

Z. BOZANIC, PH.D.

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 10:20 a.m., Thursday, October 30, 2025.

This is media unit 1 of the video recorded deposition of Dr. Zahn Bozanic, as taken by Counsel for Defendants in the matter of Darshan Hasthantra vs. CleanSpark, Incorporated, et al., filed in the United States District Court, Southern District of New York.  Case Number 1:21-cv-00511-LAP.

My name is Andrew Baker, from the firm Veritext.  I'm the videographer.  The court reporter is Lindsey Diego, also from Veritext.

Will Counsel please state your appearance and affiliations for the record, beginning with the noticing attorney?

MR. PARTIDA:  Yes.  My name is David Partida.  I'm with the firm Wilk Auslander.  And I'm here appearing on behalf of the defendants, CleanSpark, Inc., Matthew Schultz, and

Page 301

Z. BOZANIC, PH.D.

Zachary Bradford.

MR. LINKH:  My name is Greg Linkh.  I represent Plaintiff Darshan Hasthantra. And I'm here with my partner, Chris Fallon.

THE REPORTER:  Thank you.  Hearing no objections, I will now swear in the witness.  Or actually --

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

Dr. Bozanic, please let me know where you are currently.

DR. BOZANIC:  Please let you know

Page 302

Z. BOZANIC, PH.D.

we're I'm located?

THE REPORTER:  Right now.  Yes, sir.

DR. BOZANIC:  Tallahassee, Florida.

THE REPORTER:  Would you happen to have a ZIP Code?  I'll put "private address."  But --

DR. BOZANIC:  32317.

THE REPORTER:  Please state your full name and affiliated address for the record.

DR. BOZANIC:  Zahn Bozanic. Tallahassee, Florida 32317.

THE REPORTER:  Please raise your right hand.

WHEREUPON,

ZAHN BOZANIC, PH.D., called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER:  And, Counsel Linkh, will you attest that the doctor is who he says he is?

MR. LINKH:  I do.  He is.

Page 303

Z. BOZANIC, PH.D.

THE REPORTER:  You may proceed.
Thank you.

MR. PARTIDA:  Okay.  Are we ready?

THE REPORTER:  Yes.

EXAMINATION

BY MR. PARTIDA:

Q    Okay.  Good morning,
Dr. Bozanic.  Thank you for being here.
Nice to see you again.

I'm David Partida, obviously.  I
represent CleanSpark and the defendants in
this lawsuit.  And the reason that we're
here today is that I issued you a
subpoena.  And I'm going to send this.
And this is going to be introduced as
Exhibit 94.

(Exhibit 94 was marked for
identification.)

I'll let you get a moment to get
that.  So it has been sent.  And you can
let me know when you receive it.

A    I have it.

Q    Okay.  Are you familiar with
this document?

Z. BOZANIC, PH.D.

A    I believe I received this notice.  Yes.

Q    Okay.  And this is a notice of -- for your deposition, commencing at 10:00 a.m., on October 30, 2025; that's correct?

A    That's correct.

Q    Okay.  And that's the reason you're here today?

A    I am, sir.

Q    Okay.  Obviously, you've been deposed before because I was at that deposition.  But I do want to cover just a couple of quick reminder rules, mostly for the benefit of our court reporter and all of us.

So the first and most important rule is that you let me know if you cannot hear me, if you can't understand anything I'm saying, if you have any questions about what I'm saying, or don't understand.

The second rule is that only one of us can be talking at a time.  I'll do

Page 305

Z. BOZANIC, PH.D.

my best to let you finish your answers if you'll do my -- your best to let me finish my questions.

With regard to the answers that you give, I want you to give me your best answer. I want you to give me the answer to the best of your actual knowledge.

I might ask you to clarify what certain opinions of yours are or aren't. And, obviously, in your capacity as an expert, I will want you to answer those questions.

When it comes to certain factual matters, questions like that, I don't want you to speculate. I don't want you to tell me anything you don't know.

If you do know the fact, that's fine. If you don't, I might try and refresh your recollection. But otherwise, I don't want you to speculate.

From time to time, Mr. Linkh or Mr. Fallon may object. If they object, I'm still entitled to an answer to my question unless they specifically instruct

Page 306

Z. BOZANIC, PH.D.

you not to answer.  Is all of that clear to you?

A    That is clear.  Thank you.

Q    Okay.  Do you have any other questions for me before we start?

A    I do not.

Q    Okay.  Is there anyone else in the room with you other than yourself?

A    There is not.

Q    Okay.  Aside from the clean copies of -- well, could you just identify any documents you have with you for the record?

A    Yes.  Sure.  I have a clean -- clean copy of my expert reply report, dated May 2, 2025.  I have a clean copy of my merits report -- expert report, dated July 18, 2025.

And then I also have a clean copy of my expert merits reply report, dated October 9, 2025.

Q    Okay.  From time to time, I might refer to those documents.  I'll be emailing those documents.  And to the

Page 307

Z. BOZANIC, PH.D.

extent they haven't been previously introduced, I'll introduce them as new exhibits.

But as we go through the deposition, do feel free to refer to the paper copies you have in front of you if that's easier.

If you have a cell phone with you, I would ask that you please turn it off now. And leave it so for the duration of the time that we're on the record. Obviously, you're welcome to use it when we take a break.

And that brings me to another really important rule. If at any time you need to take a break, a comfort break, you know, to stand up and stretch, whatever you need to do, you just let me know. And we will of course accommodate that.

And, you know, all I would ask in that regard is, if there is a question pending that I've asked, that you go ahead and give me a response to that question before we go off the record. Sound fair

Page 308

Z. BOZANIC, PH.D.

enough?

A    Fair enough.  Thank you.

Q    Okay.  So what I'd like to do is start from the top.  So do you understand that Plaintiff has the burden to establish loss causation and damages in this matter?  Yes or no?

A    I understand that I am attempting to establish loss causation and damages in my reports.  Yes.  That's true.

Q    So that's not the question I asked, although I appreciate the answer.  So I'll go ahead and re-ask my question.  And I'd appreciate a yes or no answer to it.

Do you understand that Plaintiff has the burden to establish loss causation and damages in this matter?

A    So I think you're calling for a legal opinion.  And so I don't have a legal opinion on this matter in terms of who has which burden of proof.

I've been instructed by counsel to create certain reports.  And so I have

Page 309

Z. BOZANIC, PH.D.

done so.

Q    Okay.  So let me try this again. I'm not asking for a legal opinion.  I'm asking for your understanding.

And my understanding -- or my question is, do you understand that the plaintiff has the burden in this case to establish loss causation and damages?  Do you understand that that's their burden? Yes or no?

A    That's my understanding.

Q    Okay.  Thank you.  Do you understand that it was not Professor Garmaise's burden to provide any alternative damages methodologies?  Yes or no?

A    Again, I'm not a legal expert. And so in terms of who has which burden of proof, this would be speculation on my part.

I do have some bare minimum understanding of where the burden of proof lies.  But you asked me to state the facts in terms of what I understand and not

Page 310

Z. BOZANIC, PH.D.

speculate.

And so I don't want to speculate in terms of these legal opinions where the burden of proof lies. I'm following what counsel has asked me to do in these reports.

Q   Okay. So let me try this again. Because we just did this with the first question. So we can do this with the second question.

We can keep doing this. Or we can get straight to the answer. My question is not asking for a legal opinion.

I am asking for your opinion or your understanding, as an expert in preparing a report for use in this case in connection with these legal proceedings, if you understand that it was not Professor Garmaise's burden to provide any alternative damages methodologies? Yes or no?

A   I have not formed an opinion.

Q   If you don't understand that,

Z. BOZANIC, PH.D.

you can say no.

A    I have not formed an opinion on that.

Q    Okay.  Do you understand that it was not Professor Garmaise's burden to provide alternative methodologies to disaggregate the price changes attributable to the alleged corrective information from confounding information? Yes or no?

A    My answer would be the same as the last.

Q    Which is no?

A    I didn't say no.

Q    You don't have an understanding?

A    I -- I said I don't have an opinion on that matter with regards to who has which burden of proof.

Q    So you don't know?  You don't understand what Professor Garmaise's burden to provide was?

A    I'll reiterate what I said.

Q    What I'm trying to understand -- sure.

Page 312

Z. BOZANIC, PH.D.

A   I -- I don't have an opinion.  I mean -- so, David, I'm being honest with you in terms of where my position is, consistent with you asking me not to speculate.

So I'm not speculating on where the burden of proof lies, as I'm not a legal expert.  And so this is -- the opinion that I have today is, I don't have an opinion on this.

I have a -- a bare minimum understanding in some contexts of legal principles and burdens.  But I'm not trying to hold myself out as a legal expert in terms of where the burden of proof lies.

Q   So to be clear, I didn't ask you who has the burden of proof.  I asked you if you understood that Professor Garmaise, as an expert providing an expert opinion as an economic expert, just like you; right?  If you understood that, in his capacity in providing and preparing an expert report for this case, what his

Page 313

Z. BOZANIC, PH.D.

burden was.

You see, because my difficulty -- what I'm having trouble understanding here is how you can reply to report if you don't understand what the burden of the report was.

If you don't understand what -- the intent of the report or what it was to do, it's kind of hard for me to follow how you're responding to it. So I'm not -- I don't think you're being dishonest. I'm just trying to get a straight answer.

And all I'm trying to understand is whether or not, quite simply, yes or no, you have an understanding of whether or not it was Professor Garmaise's burden to provide alternative methodologies and disaggregate the price changes attributable to the elective -- alleged corrective information or not?

It's a simple question. You either do or you don't. And it's okay. Either one is okay. I just want to understand whether you do, or you don't

Page 314

Z. BOZANIC, PH.D.

understand that.  That's all.

MR. LINKH:  Object to form.

THE WITNESS:  I appreciate that.
What -- What I --

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    Go ahead.  You can go ahead.

A    What I think you are alluding to is how my report -- my merits reply report discusses how he offered no alternative analysis in certain contexts.  No affirmative analyses, as he spoke of in his deposition.

But again, I have to revert back to my former answer.  These questions of burden of proof, this is outside my capacity as a financial economist.

And so what you have asked him to do and what the Court requires of him, that's up to you and the Court.  So I am replying to the claims that he's made with respect to my prior reports.  And so yes. I did note in my report that in some instances, he provided no alternatives.

Page 315

Z. BOZANIC, PH.D.

Now, where that burden of proof is, that's beyond my scope and capacity of my report.  And that's why I say to you again today --

And I'm not trying to be difficult with you here, David.  I'm just trying to tell you; I don't have an opinion on the matter because that's -- that's the truth.

Q    Okay.  So the answer is no. Okay.  Thank you.  All right.  Now, what I'm going to go ahead and introduce is going to be Exhibit 95.

(Exhibit 95 was marked for identification.)

And you probably have this document sitting right next to you.  So what I'm going to go ahead and do is send it right now.  Just bear with me a moment.

A    Was it sent, David?

Q    Not quite yet.  Sorry.

A    Oh.  Sorry.  Okay.  I'll wait then.

Q    I have to -- I have to retitle

Page 316

Z. BOZANIC, PH.D.

this.  But it's -- I just want to double-check that I have the right file really quick.  Sorry.  That's exactly why.  Because it's not.  Okay.  One moment.

All right.  So what I'm going to introduce here as Exhibit 95 is -- and I just sent -- is going to be your reply merits report dated October 9, 2025.

And once you get it, I -- just so we can confirm that the paper document you're looking at is the actual exhibit I'm introducing, you could take a look and confirm that they're the same document, and that this is your report.  Then you're free to refer to the paper version.

A     Thank you.  One second.

Q     Sure.

A     Yes.  It appears to be one and the same.  Thank you for letting me confirm.

Q     All right.  I appreciate that.

MR. PARTIDA:  So, Greg, do you have it?

Chris?

Page 317

Z. BOZANIC, PH.D.

You guys good?

MR. LINKH:  I do.

MR. PARTIDA:  Okay.  Perfect.

BY MR. PARTIDA:

Q    So this is your -- the expert reply report that you prepared in this matter, Dr. Bozanic?

A    It is.

Q    Okay.  Now, I want you to go to -- well, you can go there or not.  But in paragraphs 110 to 111 of this report, you state that Professor Garmaise criticizes you for failing to "Reliably establish that the alleged misrepresentations caused investor losses."

And then you respond that this is misguided.  Because your opinions are "Premised upon Defendants being found to have knowingly or recklessly made material misrepresentations or omissions."  Do you see that?

A    I do.  Let me know when I can read the relevant paragraphs.  But I see

Page 318

Z. BOZANIC, PH.D.

the point that you're making in 110.  Yes.

Thank you.

Q    Yeah.  You can take as much time
as you'd like to read them.  You can read
them now.

A    Oh.  Sorry.  Read paragraphs 110
and 111?  These are the points of focus
here?

Q    Yes.  In paragraphs 110 and 111,
what I'm asking for is, do you -- well,
let's do it this way.

So in paragraph 110, you state
that Professor Garmaise criticizes you for
failing to "Reliably establish that the
alleged misrepresentations caused investor
losses."  Do you see where you say that?

A    I do.

Q    Okay.  Now, the next thing that
you say is that -- your response to this
is that this is misguided.  Because your
opinions are "Premised upon Defendants
being found to have knowingly or
recklessly made material
misrepresentations or omissions."  Do you

Page 319

Z. BOZANIC, PH.D.

see that?

A    I do.

Q    Okay.  Did you also assume loss causation?  Yes or no?

A    May I read the relevant paragraphs?

Q    Sure.  I don't need you to read them aloud.  But sure.  You can absolutely read them.  Of course.

A    Okay.  I have read it.  Thank you for the benefit.

Q    Sure.  Now, do you have an answer to my question?

A    Can you repeat the question?

Q    Sure.  Just to be clear, you state that Professor Garmaise has criticized you for failing to "Reliably establish that the alleged misrepresentations caused investor losses."

And then you respond by saying this is misguided because your opinions are "Premised upon Defendants being found to have knowingly or recklessly made

Page 320

Z. BOZANIC, PH.D.
material misrepresentations or omissions."
Now, my question is, did you also assume
loss causation?

A     So here, what I'm trying to say
is that if the plaintiffs don't end up
proving their case with regards to
establishing these omissions and
misrepresentations, then there's not much
for me to go off here in terms of what I
am showing; right?  So if they don't prove
their case, then my analysis is
inconsequential.

And so what I'm saying here is
that all of my opinions are premised upon
taking the facts and circumstances of --
as outlined in the complaint, on their
face value; right?  And then proceeding to
do my analysis.  That's all this is saying
here.

In terms of this burden of proof
that we were discussing, I'm not here to
prove the plaintiff's case.  I am here to
provide supporting evidence for their
case, where I'm taking the opinions that

Page 321

Z. BOZANIC, PH.D.

were put forth in the complaint as true.

And I'm assuming that Plaintiffs will be able to prove those as true in court. And so, therefore, I conduct my analysis. Does that make sense?

Q    Okay.

A    That's all this paragraph is trying to convey.

Q    No. It doesn't because it doesn't address -- it does not address or answer my question.

So this is going to be a lot longer than an already long day is going to be if you continue to give me very long, nonresponsive answers to extremely simple yes-or-no questions.

So I can either ask you the question again or I can have the court reporter read it back to you again. But I would appreciate if I could get an answer to the question that I ask when I ask it; okay?

A    David, I apologize. And I'm --

Q    My question is, did you also

Page 322

Z. BOZANIC, PH.D.

assume loss causation?  Yes or no?  You should know what you assumed in your report.

Either you assumed there was loss causation, or you assumed there was not.  I want to know which is the answer. Yes or no?  That's my question.

A    So, again, I'm trying to understand your question.  So when you say I assumed loss causation, "Yes or no?" can you help me understand what you mean by "assuming loss causation"?  As if it's already occurred?

Q    Did you --

A    Ex ante?

Q    Yes.  Yes.  Did you assume that? Yes or no?

A    So this is what I'm trying to show in my reports, is this element of loss causation.  It's not assumption.  I take --

Q    So you did not assume it?  Okay.

A    So here -- here's what I'm taking as assumed.  If we read this

Page 323

Z. BOZANIC, PH.D.
paragraph more closely -- and this is why
I'm trying to unpack your question,
understand it.

This is not trying to belabor
the point.  You asked me not to answer
unless I understood your question.  So
simply stated, I'm trying to understand
your question and where you're focusing
your attention.

This paragraph assumes what's in
the complaint is true; right?  So my
opinions, as I say here, regarding
economic materiality, loss causation, and
damages, right, those are -- those are
premised upon --

This analysis is irrelevant, as
I said -- I think I answered your question
originally.  They're premised upon the
plaintiffs proving their case; right?
This analysis is irrelevant if they can't
prove their case.  And so I'm not assuming
that loss causation exists.

And this is what I'm trying to
understand.  Like, you're -- you're saying

Page 324

Z. BOZANIC, PH.D.
that, ex ante, before I approached the case, like I had some assumption about loss causation.  The report is trying to demonstrate loss causation.

Q    Okay.  So, again, these are not trick questions.  I mean, I guess we can let the record speak for itself.  I tend to believe that "Did you assume loss causation?" is a fair and very straightforward question for an expert who prepared an expert opinion.

But I do think you did give me an answer to the question, which is no. You didn't assume loss causation, ex ante, going into this.  And that's fine.  That's a simple answer.  I just --

A    David, that's correct.  But I want to reiterate so we don't rehash this --

Q    I appreciate that.  Well, I have an answer to my question.  I don't have another pending question.  So I'll go ahead and move on to my questions.  And I appreciate it.  You've already spent, I

Page 325

Z. BOZANIC, PH.D.

think, much more time than necessary answering a simple question.

A    But -- but if I may for the record, David --

Q    Okay.  So --

A    Can I speak?  Or no?

Q    Well, typically, you get to speak in response to questions I ask.  And I haven't asked a question.

A    Very well.

Q    But absolutely.  Speak to your heart's content.  Go ahead.

A    All I'm trying to reiterate to you is that I'm trying to understand the question.  And so I want to make sure that I fully understand the question.

You said a lot of words.  You repeated, verbatim, a lot of words from my report and asked several questions.  And so I'm trying to understand the heart of the question before I respond to it. That's it.

Q    Okay.  Fair enough.  If you don't understand the question of whether

Page 326

Z. BOZANIC, PH.D.

or not you assumed loss causation, I can't do much more to explain it than that. But I appreciate your attempt to answer and understand it.

Okay. What I'd like to do now is move on to --

MR. PARTIDA: And I think that this, Greg, is the exhibit that you said we had previously marked. Because what I want to introduce now is Professor Garmaise's expert report. So I don't know, Greg, if you want to respond with that.

MR. LINKH: I can send that off to everybody on this -- out on this chain.

MR. PARTIDA: Perfect. And if you will just remind us of what exhibit number that was so I can refer back to that?

MR. LINKH: It was Exhibit 90.

BY MR. PARTIDA:

Q   Okay. So what we're going to -- and I understand that you have a copy of this in front of you, Dr. Bozanic. So I guess --

A   Well, I apologize. Is this --

Page 327

Z. BOZANIC, PH.D.

this is the Garmaise report?

Q     Yes.

MR. LINKH:  Oh.  The Garmaise?

THE WITNESS:  This is the one I did not print.

MR. LINKH:  Yes.  Yes.  It --

MR. PARTIDA:  Oh.  You don't have a copy of that one?

THE WITNESS:  I do not.

MR. PARTIDA:  Oh.  Okay.  No problem. This is why I asked.

MR. LINKH:  Well, I just sent one on the -- I just sent one via email; so --

THE WITNESS:  Okay.

MR. PARTIDA:  Yeah.  Perfect.  I just wanted to make sure if I could tell Dr. Bozanic to refer to a paper copy or not.  Okay.

THE WITNESS:  Okay.  Here we go.

MR. PARTIDA:  For some reason, it still hasn't come through on my end; but --

THE WITNESS:  It just came through on mine.

Page 328

Z. BOZANIC, PH.D.

MR. PARTIDA:  Okay.

THE WITNESS:  Okay.

MR. PARTIDA:  Now, it just came.  So now, what we've all received is what was previously marked as Exhibit 90 in the deposition of Mark Garmaise.

BY MR. PARTIDA:

Q    And do you see this document?  That it's the expert report of Mark Garmaise, dated September 12, 2025?

A    I do.

Q    Okay.  And are you familiar with this report?

A    I am.

Q    And you read it through?

A    I have.

Q    Okay.

A    I mean, not in this moment.  But previously, yes.

Q    Of course.  Of course.

A    Yeah.

Q    Thank you.  Now, if I understand correctly, that -- based on your previous testimony, the object of your initial

Page 329

Z. BOZANIC, PH.D.
merits report was to demonstrate loss causation.  Do I have that correct?

A    Yes.

Q    Okay.  And I understand that an assumption that was made -- or that the loss causation that you would attempt to demonstrate with your work would be premised upon a finding that the defendants had knowingly or recklessly made material misrepresentations.

That you would have to assume that in terms of your analysis; is that accurate?

A    That's -- that's what I assumed at the paragraph that we indicated previously.

Q    Okay.

A    Yes.  Yes, sir.

Q    Yeah.  Perfect.  Okay.  I just want to make sure.  Because there was a lot of back and forth there.  And at the end of the day, I'm interested in clear expressed testimony.  So I appreciate getting that clear.

Page 330

Z. BOZANIC, PH.D.

Okay.  Now, do you understand that in this new expert report, what has been marked as Exhibit 90, that Professor Garmaise's critique of your report is that you failed to establish loss causation? And that he references all of those arguments in section 4 of this report -- or sorry -- section 6 of this report?

And feel free to go look through the report.  Feel free to look at the Table of Contents.  Feel free to look at section 6.

But just to put it simply, do you understand that Professor Garmaise's critique in section 6 is that you failed to establish loss causation?

A    So if I may, let me just look at the Table of Contents for -- with respect to section 6.  I haven't memorized his sections.  But let me just see what he's got in there.

Q    Right.  And I can ask the question again once you've taken a look. Because then --

Page 331

Z. BOZANIC, PH.D.

A    Yeah.  Sure.

Q    Hopefully.

A    That does seem to be the thrust of that section.  Yes.  Not having read this section.  But just looking at the Table of Contents.

Q    Okay.  Now, what I do -- you know, you do have a very specific opinion that we just talked about that this is misguided.  And what I'd like you to do is go ahead and turn to section 6.  And then I'd like you to go ahead and point me to the specific part of --

And maybe we could do this by first starting at the Table of Contents. And then moving to the section and looking a little bit deeper.  But could you tell me what specific part of Professor Garmaise's critique you think is misguided?

A    Well, I'll go back to my merits reply report, first.  I mean, 'cause you're quoting that in terms of the statements I made.

Page 332

Z. BOZANIC, PH.D.

Q    Whoa.  Whoa.  Wait.  Wait.  Wait a minute.  Wait a minute.  That's not my question.  And I appreciate that you want to talk about what you want to talk about.  But I want to talk about what I want talk about.

And what I want to talk about is Professor Garmaise's report.  And what I want you to do is point to me, in Professor Garmaise's report, where you find -- what specific portions.

And again, we can start with the Table of Contents.  We've got all day.  We can start with the Table of Contents.  And then we can dig a little deeper.

But what I want to do is understand what specific part of Professor Garmaise's critique you find misguided, so we can go look at that part of his report and talk about it.

A    Sure.  Let me have a moment to take a look at the relevant documents.

Q    Well, there's only one relevant document, which is Professor Garmaise's

Page 333

Z. BOZANIC, PH.D.

report.  So I would appreciate it if you would focus on that report.  Because that's the one we're going to be talking about.

A    David, while I'll get to your question and I'll focus on this report, I'm looking where my report is referencing his report.

You see, you -- the question is a legacy question going back to this notion of paragraph 110 of my merits reply report.  So where I quote him, I want to see exactly the paragraph that I've quoted.  Does that make sense?

Q    No.  It doesn't.  And you're reframing my question.  You're trying to ask the questions that you want to ask. And again --

MR. PARTIDA:  And, you know, if we need to take a break, and Greg, you and I need to have a discussion, I will not waste eight hours of this type of nonresponsive objectionable behavior. Frankly, I find this obstructionist.

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    So, at this point in time, I'm asking a very simple question.  I want you to look at Professor Garmaise's report.  And I want you to point to me which sections in that report you find objectionable.

I don't want you to rephrase my question and say, "You're asking me a legacy question about X, Y or Z.  Or this.  Or that."  I'm not doing any of that.

I'm asking you a very straightforward, specific question; right?  Which is look at Professor Garmaise's report.  And tell me which parts of this report you find to be misguided.

And I don't think that's a difficult question.  And I do think that's a fair question.  And I would like a straight answer to it.

A    So, David, your question is overly broad.  You're asking me to go through the entirety of his report and ask for where I feel each paragraph or each

Page 335

Z. BOZANIC, PH.D.

sentence is misguided.

And so what I am saying here is, I'm trying to triangulate the specific paragraph that I'm quoting in my report. And I think that's reasonable, given the overly broad question you just asked, to say where in the entirety of his report --

You said, "Look at the Table of Contents." Let's go line by line and look for every element where I fear it's misguided. And so this just -- the "misguided" term is to say, as I say in the next paragraph of my report, it's not my burden to prove Plaintiff's case; right?

So this just goes back to this assumption in regards to what I'm taking as assumed versus what evidence I'm trying to show; right? And so --

Q    Again, Dr. Bozanic, I'm going to stop you right there. Because you're doing the same thing. And frankly, you're wasting my time. I didn't ask you to do those things.

Page 336

Z. BOZANIC, PH.D.

And frankly, with all due respect, you provided the rebuttal and reply report to this. This is a report that you put in a specific report responding to you.

And frankly, for you to say it's not fair game for me to ask you what parts of this report you disagree with by looking at a report that you directly responded to, I -- frankly, I -- it's hard for me to square that hole.

And again, I didn't ask you to read every page of this report or piece of this report line by line, although we could do that in the next eight hours, if you would like.

What I asked you to do, to do exactly the same thing that you said is "triangulate," is to say, "Okay. I'm pointing you to a specific section of Dr. Garmaise's report, section 6.

"I'm asking you to look at a specific set of subsections and start identifying which ones. Which are the

Page 337

Z. BOZANIC, PH.D.

ones that you find misguided?"

And so as far as I understand it, you're telling me that either you're refusing or can't answer me as regards to a question as to whether or not you think certain points that you've stated in your report are misguided.

I -- so with all of that said, let's try and start again. Do you have Exhibit 90 in front of you?

A    I do.

Q    Okay. Can you please turn to page 2?

A    One moment. I'm there.

Q    Okay. Now, section 6 in that page --

A    Wait. Which page 2, David. I'm sorry. I'm on Summary of Opinions.

Q    Sorry. Table of Contents, the literal second page of the PDF. There's 99 pages.

A    PDF page 2?

Q    Yep. PDF page 2.

A    Okay. So if we're just looking,

Page 338

Z. BOZANIC, PH.D.

without having the benefit of reading the report --

Q    And we will get to the reading. Don't -- trust me.  We'll get to what's in the report.  I just want to know where to start.  That's it.  It -- really, that's it.

A    So if -- if we're focusing on section 6 and we're just focusing on the Table of Contents, I'm happy to opine.

So here it says, "Dr. Bozanic fails to reliably establish that the alleged misrepresentations caused investors loss -- caused investor losses." I disagree with that; right?  This is what I have -- I have shown in -- in my report in terms of loss causation.

And so then he goes through multiple subsections.  And we can look at each of those in turn if you would like. Do I opine on each?  A, B, C?

Q    Yes.  I'd like to know what specific points you think are misguided.

A    Okay.  Sure.  So let's go to A.

Z. BOZANIC, PH.D.

I disagree with his assessment of statistical significance and how we interpret statistical significance. I disagree that I failed to establish that the alleged misrepresentations caused investor losses.

And again, under the sub-bullets of section 6B, he makes several points with regards to statistical significance and value relevance. Which, I disagree with some of his points there, if not all. And this is what I discussed in my merits reply report.

Subpoint C, again, he's looking at a different date. But he's reiterating the same with regards to the alleged misreps causing investor losses. And so I have amply shown evidence that those misreps caused investor losses.

And then it goes on to other dates at issue in the case, August 17th. So I disagree with that I failed to establish that the alleged misreps caused investor losses on August 17th.

Page 340

Z. BOZANIC, PH.D.

And I think he makes some claims about what information was new. And so I disagree with his conclusions in regards to what he found to be new or redundant information with the dates referenced in that section.

So this is -- this is high level. And this is why, you know, I'm -- I'm actually not accustomed, David, to such a broad question. And so this is where I'm trying to figure out what the exact question is.

And so I can tell you that I disagree with the way that those bullets are phrased in the Table of Contents. But I was hoping you'd ask a more specific question. Because it seemed very broad.

So that's why I was trying to figure out what you were going for so I can respond appropriately. Again, it's not trying to be difficult. I'm trying to figure out what you're trying to ask.

Q    Okay. Thanks for all of that. I would say that -- okay. I want you to

Page 341

Z. BOZANIC, PH.D.

go look at -- back at Exhibit 95.

A    Exhibit 95?  I didn't mark mine.
This is my merits reply report, dated
October 9th?

Q    Should -- yes.

A    Sorry?

Q    Mm-hmm.

A    Yeah.  Okay.

Q    Yes.

A    Okay.  I'm back there.

Q    What do you mean by, "It's not
my burden to prove Plaintiff's case"?  The
first sentence of paragraph 111?

A    Back there?

Q    Mm-hmm.

A    So just as it says, this is --
this is not my burden.  So Plaintiff's
legal counsel has the burden to prove the
case in terms of the veracity of the
claims and the complaint.

I am taking those claims on
face.  And then I'm trying to provide
economic evidence consistent with what I'm
seeing, in terms of my professional

Page 342

Z. BOZANIC, PH.D.
experience and judgment, to see whether or not I can show some of these properties with respect to loss causation and damages and so forth.

Q    Okay.  And was your burden to establish, therefore, loss causation? That was your burden?

A    In a legal sense, no.  But in an economic sense, to show that it appears that there seems to be a connection with what were the facts of the case in terms of the misreps and the corrective disclosures.

Q    Okay.  Was it your job to quantify artificial inflation on each day of the class period caused by the alleged misstatements or omissions?

A    I did quantify it.  Yes.

Q    But was that your job?  Was it your job in this report?

A    This was what I was asked to do. Yes.

Q    Okay.  Now, can you go back to Exhibit 90?  And I want to direct your

Page 343

Z. BOZANIC, PH.D.

attention to paragraph 103.

A    Paragraph 103?

Q    That's correct.

A    Okay.  I'm there.

Q    Now, I want you to read the first sentence of that.  Do you see where it says, "As an initial matter, I note that Dr. Bozanic's measure of inflation implies that, absent the alleged misrepresentations, CleanSpark's stock price on December 10, 2020, would've been $3.70 rather than 15.39"?  Do you see that?

A    I do.

Q    Okay.  Do you dispute that statement?

A    I don't have an opinion on that statement.  So I don't dispute it.

Q    Okay.  Now, if you read the next sentence, it says, "It's shown in Exhibit 5 this corresponds to a price decline of $9.39 or 71.7 percent, relative to the closing price on December 9 (the prior trading day)."  Do you see that?

Page 344

Z. BOZANIC, PH.D.

A    I do.

Q    Do you dispute that statement?

A    Assuming the math is correct, no.

Q    Okay.  Now, do you think it's reasonable that, in a scenario where CleanSpark had adequately disclosed information about the ATL acquisition, in your view, for example, that it had not misrepresented or omitted the information that the plaintiff alleges --

Do you think it's reasonable in such a scenario that CleanSpark's stock price would've declined by 71.7 percent?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    Relative to the closing price?

MR. LINKH:  Object to form.

THE WITNESS:  I haven't formed an opinion on that today.  And so that opinion is also not expressed in my report.

I -- I do have some opinions on this matter in this report.  With -- with

Page 345

Z. BOZANIC, PH.D.

respect to that specific question, I don't have an opinion, as I sit here today.

BY MR. PARTIDA:

Q    Okay.  So you don't have an opinion on whether or not it's reasonable that, in a scenario where CleanSpark had adequately disclosed information about the ATL acquisition, that CleanSpark's stock price would've declined by 71.7 percent, relative to the closing price before the announcement of the ATL acquisition?

MR. LINKH:  Object to form.

THE WITNESS:  I -- I don't have an opinion.  But in -- in terms of the clause that you proceeded with, with respect to the disclosures, I think that's part of what's at issue here is what was disclosed upon acquisition versus what wasn't.

BY MR. PARTIDA:

Q    But -- okay.  So that's fine. You don't have an opinion.  Okay.  Now, do you agree that the value of the ATL facility implied by the December 10, 2020, transaction was 23 point -- 26.3 million?

Z. BOZANIC, PH.D.

A    I don't have an opinion.  I have not done those calculations.  Those are Dr. Garmaise's calculations and assumptions in terms of what he views the value of that acquisition to be.

Q    Okay.  So you don't have an opinion on what was the value of the ATL facility implied by the December 10, 2020, transaction?

A    I was not asked to create a valuation analysis of the acquisition upon acquisition announcement.  So therefore, unfortunately, I have no opinion today.

Q    Okay.  Now, do you dispute that your inflation measure implies that "Upon the announcement of the acquisition of the ATL facility, absent the alleged misrepresentations, CleanSpark's market capitalization would've declined by approximately 205 million"?

Do you see that sentence?  Do you disagree with that?

MR. LINKH: Object to form.

THE WITNESS:  I see that.  I do see

Z. BOZANIC, PH.D.

the sentence. And so I'll -- I'll answer the same. In terms of -- I've not run these calculations in terms of this decline. And so I don't have an opinion on that number that Dr. Garmaise puts forward.

BY MR. PARTIDA:

Q   Okay. Now, do you have an opinion --

THE REPORTER: I apologize. Before you get another question in, let me jump in here.

Doctor, I understand that you may anticipate some of the answers to these questions. But it's really important that I have a full and complete question, a possible objection from Mr. Linkh, and then your answer; all right? In that order.

So when you finish hearing the question, just wait one to two seconds before you develop your response so that he can get an objection in; okay?

THE WITNESS: That sounds great.

Page 348

Z. BOZANIC, PH.D.

Thanks, Lindsey. And always feel free to chime in. I apologize. Thank you for that.

THE REPORTER: You're welcome.

MR. PARTIDA: Okay. So I can re-ask the question if we need to, Ms. Court Reporter. Or was that sufficiently clear that we can move on?

THE REPORTER: No. No. I got the question and answer.

MR. PARTIDA: Okay.

THE REPORTER: I just, you know, wanted to prompt him so that way Mr. Linkh can make objections without getting crosstalk of the answer.

MR. PARTIDA: Perfect.

THE WITNESS: Absolutely.

THE REPORTER: Right?

THE WITNESS: Yeah.

MR. PARTIDA: Perfect. Just wanted to make sure. Thank you very much.

BY MR. PARTIDA:

Q   Okay. All right. Well, do you agree that 205 million is more than seven

Page 349

Z. BOZANIC, PH.D.

times 26.3 million?

A    Without having the benefit of a calculator, that seems approximately correct.

Q    Okay.  Now, I want to go back to -- let's see -- I think it's -- actually, I'm going to be introducing -- okay.

I want you to go back to what was previously marked as Exhibit 95, which is your reply merits report.  And I'd like to direct you to footnote 187 of that report.

A    I'm there.

Q    Okay.  Just tell me when you've had a chance to read it.

A    I have read it.

Q    Okay.  Now, I'd like you to go back to Exhibit 90.  And I'd like you to point me to where, in paragraph 186, Professor Garmaise makes that implication.

Well, let me do this, just to make sure the record is clear.  So footnote 187 says -- and you can correct

Page 350

Z. BOZANIC, PH.D.

me if I misread anything -- "I further note that Dr. Garmaise's implied speculation that artificial inflation must be capped at 26.3 million is based on an implied valuation of the ATL transaction."

And then you cite Garmaise's report, paragraphs 15, 103, and 186.  So then is that accurate?

A     That appears to be accurate. Yes.  Thank you.

Q     Okay.  And so then what I'd like you to do is point to me where, in paragraph 186 of his report, Professor Garmaise makes that implication.

A     I -- I'm not sure what you mean by -- well, I think I understand.  Hold on.  So the "implication," meaning the implied valuation?  Is that what you mean by "implication"?

Q     You stated it.

A     Yeah.  So --

Q     You stated -- I'm asking you. You cited three paragraphs in this report.

A     Right.

Z. BOZANIC, PH.D.

Q    I'd like you to point to me where, in paragraph 186 of Professor Garmaise's report, you -- why you're citing that paragraph.

A    Sure.  I know I stated --

Q    Let's put it that way.  So --

A    Sorry.

Q    So let's make this question clear.  187.  You say, "I further note that Dr. Garmaise's implied speculation that artificial inflation must be capped at 26.3 million is based on an implied valuation of the ATL transaction."

And then you cite three paragraphs in Professor Garmaise's report; is that accurate?

A    It is.

Q    Can you please turn me to paragraph 186 in Professor Garmaise's report and explain to me the reason for which you cited that paragraph in this footnote?

A    Ah.  I understand.  I was trying to understand what you meant by "implied,"

Page 352

Z. BOZANIC, PH.D.

if you were talking about his implication or my verbiage.  And so, in 103, I'm referring to -- this is where we started, the 26th point.

Q    This is a very simple question.

A    I'm not --

Q    I just want you to point me to where in 186 -- why you cited that paragraph.

MR. LINKH:  Object to form.

THE WITNESS:  I'm trying to pause to give each other times we're not talking over each other.

We were on 103.  And now, you said to jump to 186.  And so I'm happy to go to 186.  But we were first looking at 103, where they talked -- where Dr. Garmaise talked about the 26 million.  Let me go to 186 now.

BY MR. PARTIDA:

Q    Thanks.

A    Yeah.  That appears to be a typo.

Q    Doesn't exist.  Okay.

Z. BOZANIC, PH.D.

A    Doesn't exist.  That's a typo.
Yeah.

Q    Can you tell me what the typo
was?  Can you tell me -- well, let me ask
you this.  Do you cite check your reports?

A    I check my reports.  But it
doesn't mean that they're completely
100 percent immune from the occasional
typo.  And so there could be typos.  And
it appears we've -- we found a typo.

Q    So tell me which paragraph you
did mean to cite.

A    103.  The paragraph we were on.

Q    And so you just added an
additional phantom citation?

A    Again, it's a typo.  I am not
sure --

MR. LINKH:  Object to form --
BY MR. PARTIDA:

Q    What is the typo?  What is the
typo?  There's a paragraph cited here in
this report that doesn't exist.  That's
been -- that's --

So what I want to be very

Page 354

Z. BOZANIC, PH.D.

careful about is -- okay.  You're saying it's a typo.  That's great.  What's the typo?  Did you mean to type a different paragraph?  Did you just add a paragraph?  What's the typo?

MR. LINKH:  Object to form.

THE WITNESS:  As I sit here today, David, I don't recall what the typo was.

BY MR. PARTIDA:

Q     Okay.

A     Or what paragraph that I was intending to refer to.  Obviously, there's an error here.  So perhaps the 8 was transposed with something that else ended in 6.  But this would be speculation.

I'm not sure, in terms of when this was written, what I was thinking in terms of what paragraph.  So it was probably a keystroke typo.

And if you'd like, I can start to go through every other paragraph that seems to fit that "1X6."  Because obviously, there's not an -- there's not an 8 in terms of Dr. Garmaise's report.

Z. BOZANIC, PH.D.

But perhaps there's some other paragraph that starts with a 1 and ends in a 6. So let's see.

Q Oh. We don't need to do that exercise right now. I think it's clear that there's a mistake and that there's just non-existent paragraphs cited.

So we don't need to get into the why of it. It just seems like -- I don't know. Let's leave it at that.

A I apologize. That's what I thought you would ask.

Q Okay. Can you point me then -- so I guess paragraphs 15 and 103 do exist. So that's helpful. And so I would like you to point me to where first, in paragraph 15, Professor Garmaise suggests that artificial inflation must be capped at 26.3 million.

A So what I'm doing here is, I'm citing relevant paragraphs with this issue. So in paragraph 15, what I'm citing there is that 71 percent and the 205 million.

Page 356

Z. BOZANIC, PH.D.

But importantly, you see the parenthetical, which also is duplicated in paragraph 103, with regards to -- this is when I -- when we were discussing about "implied."  Were you talking about when I was saying "implied" or he was saying "implied?"

'Cause he says here, "The total value of ATL 'implied' by the December 10, 2020, transaction (estimated at up to 26.3 million)."  Which, I believe he has some footnotes that detail his calculations behind that estimate.  So this is what I'm referring to.  That 26.3.

Q    Okay.  So again, we'll do the same game.  Can you please go to paragraph 15 of Professor Garmaise's report?

A    I am there.

Q    Okay.  Can you read that for the record?

A    The entire paragraph?

Q    The entire paragraph.

A    Yes, sir.  I can.  "First,

Page 357

Z. BOZANIC, PH.D.

Dr. Bozanic's inflation measure implies that, absent the alleged misrepresentations, CleanSpark's stock price would have declined by 71.7 percent upon the announcement of the acquisition of the ATL facility.

"And the company's market capitalization would have declined by approximately 205 million, more than seven times the total value of ATL, implied by the December 10, 2020, transaction (estimated at up to 26.3 million).

"Dr. Bozanic provides no justification for this implication of his proposed measure of artificial inflation, including the implication that investors would've also substantially lowered their valuation of CleanSpark's other businesses (i.e., energy and digital agency, which I understand are unrelated to the allegations in this matter) by at least 179 million, absent the alleged misrepresentations."

End of paragraph, I believe.

Page 358

Z. BOZANIC, PH.D.

Yes.

Q    Okay.  Where in that paragraph does Professor Garmaise suggest that artificial inflation must be capped at 26.3 million?

A    I -- I'm assuming that he's making a claim with regards to artificial inflation and damages in terms of what a potential cap could be.

And so all I am -- all I am saying in -- in my footnote 187 of my merits reply report is that there's academic research that's inconsistent with his claim in regards to what the potential valuation of the ATL facility would be whereby they show losses upon acquisition. This is the point of the footnote.

Q    So again, my question -- my -- so that's fine; but --

MR. PARTIDA:  Sorry, Ms. Court Reporter.

BY MR. PARTIDA:

Q    That's fine.  But again, my question is, can you please point me

Page 359

Z. BOZANIC, PH.D.

where, in paragraph 15 of Professor Garmaise's report, Professor Garmaise suggests that artificial inflation must be capped at 26.3 million?

MR. LINKH:  Object to form.

THE WITNESS:  David.  He doesn't say those exact words.  We can agree to that.

What I'm assuming here is -- the implication here is, he's trying to put some sort of cap on a damages measure on the basis of a valuation of the ATL acquisition, upon acquisition.

BY MR. PARTIDA:

Q    Why is that the assumption you're making?  What language in this paragraph allows you to make that assumption?

MR. LINKH:  Object to form.

THE WITNESS:  I am inferring. Perhaps I'm incorrect with what he is trying to imply.  But this is what I'm assuming his implication to be.

Perhaps I'm incorrect.  But this is what I took at -- from -- from this

Page 360

Z. BOZANIC, PH.D.

particular paragraph, though his verbiage is not specifically the verbiage that I have used. Correct. But I'm trying to make an inference from his assertion.

BY MR. PARTIDA:

Q    That was a mercifully straightforward answer. Okay. Let's go to paragraph 103.

A    Paragraph 103? Same report?

Q    Mm-hmm. Same report.

A    Come on. Almost there. I am back there.

Q    Okay. Would it be fair to say that your view of Professor Garmaise's critique, in terms of as it was stated in 115, is similar to your view of it, as it's stated in 103? Does that then -- and maybe I'll just forget this as a question.

What I want to understand is, can you point to me where, in paragraph 103, Professor Garmaise suggests that artificial inflation must be capped at 26.3 million. And I guess my question to that is, would your answer be the same as

Page 361

Z. BOZANIC, PH.D.

your answer was with respect to paragraph 15?

MR. LINKH:  Object to form.

THE WITNESS:  As -- as the paragraphs are largely duplicative, yes.  My answer would be the same in terms of what I was reading from this paragraph and picking up on and -- and discussing in my report.

BY MR. PARTIDA:

Q    Okay.  Fair enough.  And that makes sense.  Okay.  Now, going back to --

THE WITNESS:  And David, I think that -- sorry.  If I may interject?  So for a comfort break, at some point when we're done with this topic of questioning, perhaps we can take a break for a few minutes?

MR. PARTIDA:  Sure.  We could do that now.  Or whatever's best for you.

THE WITNESS:  As you wish.  The -- the coffee has pulsed through me.  So yeah.

MR. PARTIDA:  Well, why don't -- we certainly don't want to make you

Page 362

Z. BOZANIC, PH.D.

uncomfortable.  Why don't we come back at -- does 11:30 work?

THE WITNESS:  That sounds fantastic.

MR. PARTIDA:  Do you want to come back sooner?  Okay.  Let's come back at 11:30.

MR. LINKH:  11:25?

THE WITNESS:  11:25 is fine too. Yeah.

MR. LINKH:  Okay.  All right.

MR. PARTIDA:  Sure.  11:25 works.

THE WITNESS:  Thank you.

MR. PARTIDA:  Thanks.

THE VIDEOGRAPHER:  This is the end of media unit number 1.  We are off the record at 11:17 a.m.

(Off the record.)

THE VIDEOGRAPHER:  This is the beginning of media unit number 2.  We are on the record at 11:28 a.m.

BY MR. PARTIDA:

Q   All right.  We're back.  So, Dr. Bozanic, I want to point you back to your 187 of your report.  Your reply

Z. BOZANIC, PH.D.

report, I should say, which is Exhibit 95.

MR. LINKH:  Is that footnote 187, David?

MR. PARTIDA:  That's correct. Footnote 187.  Yes.

THE WITNESS:  I'm there.

BY MR. PARTIDA:

Q    Okay.  What argument does the paper that you cite in footnote 187, the Moeller, et al. article, support?

A    So I'm referencing this article in regards to its analysis that pertains to losses upon acquisition and how the losses can exceed the value of the acquisition.

MR. PARTIDA:  Okay.  Now, I'm going to introduce, as Exhibit 96, that paper. And you all can tell me when you've received it.

(Exhibit 96 was marked for identification.)

MR. LINKH:  I just got mine.

THE WITNESS:  I have it.

//

Page 364

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    Okay.  Do you agree that the paper finds a loss of 12 cents a dollar -- 12 cents per dollar spent on acquisition?

A    So the paper says a lot of things.  But just looking at the abstract, yes.  It does say, "Acquiring firm shareholders lost 12 cents around acquisition announcements per dollar spent."

Q    Okay.  And does this mean that if you had invested $1, you were left with 88 cents?

A    Let me see what the implication would be.  So it's basically saying, "Yes. You're -- you have a discount.  You invest $1.  And what you invest is going to be worth less than that upon the investment." So I think that's accurate, what you said.

Q    And "what I said" meaning, "So that means if you invested $1, then you were left with 88 cents"?

A    I -- I think that's reasonable. I think that would be an implication for

Page 365

Z. BOZANIC, PH.D.

this.  I'm not sure if they -- they say that.  But that's -- that's the -- the implication, I believe.

Q    Okay.  Now, I'd like you to go down to page 759 of the paper; and --

A    This is numbered page 759.  Not PDF page.  Okay.

Q    That is correct.

A    I'm there.

Q    Okay.  Now, I want you to direct your attention to the very last full sentence on the bottom of that page, where it says, "Large loss deals have a negative average abnormal return of negative 10.6 percent."  Do you see that?

A    I do see it.

Q    Okay.  Now, is that saying that the deals in which there was a large loss, the average observed loss in the market value was 10.6 percent?

A    I would have to go back.  I haven't memorized this paper.  So it depends on what they meant by "large loss deals."

Page 366

Z. BOZANIC, PH.D.

So I don't know what they mean by "large loss deals."  But however those are defined, they're saying, "Yes.  They have a negative abnormal average return around negative 10.6 percent."  That seems to be true, what they're saying.

Q    And so the average observed loss in the market value would be 10.6 percent, if I'm understanding what this sentence means correctly?

A    Well, I mean, I -- I don't know what the average is in terms of which benchmark.  But they're saying for the -- for that subset; right?

Q    Right.  Right.

A    For that subset, it seems. They're bracketing it.  But they, on average -- so obviously, that's just an average.  That could be higher.  It could be lower.

Q    Okay.  All right.  Now, switching to a different topic, I want to talk -- so do you agree that the amount of revenue expected from an increase in a

Page 367

Z. BOZANIC, PH.D.
hash rate of 100 petahashes a second
depends on multiple factors?

     A     Repeat the question.  You said
that quickly.  And it was awfully
technical, David.  Go ahead, please.

     Q     Sure.  Do you agree that the
amount of revenue expected from an
increase in hash rate of 100 petahashes a
second depends on multiple factors?

     A     I -- I agree with the latter
part.  I don't -- I don't know the
consequences of the -- the former part
with the 100 petahashes.  I don't
understand the relevance of that.

          But I would agree that the
revenue that one can gain, there's a
multitude of factors that contribute to
any revenue stream.  And this is no
different in this case.

     Q     Okay.  I understand.  And
100 petahashes a second is tied to
allegations in the complaint.  But really,
the -- you could put, you know, an
increase in the hash rate of any sort of

Page 368

Z. BOZANIC, PH.D.

amount.  And so I think I understand your answer with that caveat.

Okay.  Now, would you agree that one of those factors would be the -- an increase in the hash rate?  Well, let me strike that.

Do you agree that the amount of revenue that you would expect from an increased hash rate depends on how difficult it actually is to mine the bitcoin?  Or what they refer to as "network difficulty"?

A    It's -- it's my understanding.  So I'm not a bitcoin expert.  But I have familiarity with bitcoin and its nuances through this case.

And so "network difficulty" does seem to be a contributing factor to the amount of revenue achieved.  This is just supply and demand, in terms of how the network difficulty is reset as -- as more miners start to enter the fray.  That's my understanding.

Q    Okay.  And would you also agree

Page 369

Z. BOZANIC, PH.D.

that the amount of revenue expected from an increase in a hash rate would also depend on the price of Bitcoin?

A    Absolutely.

Q    Okay.  Now, was the price of Bitcoin constant throughout the class period?

A    To my knowledge, it was not.  It did fluctuate throughout the class period.

Q    Okay.  And would you agree that the price of Bitcoin is volatile during the class period?

MR. LINKH:  Object to form.

THE WITNESS:  I'm not -- yeah.  I'm not sure what you mean by "volatile."  Did it go up?  Did it go down?  Likely, it did.  I -- I haven't looked at a trend; right?  You know, recently, in terms of the Bitcoin price throughout the class period.

What I can say, in looking at analysts' reports, it -- it did seem that there -- there was some variation.  Whether it's volatility, I don't -- I

Page 370

Z. BOZANIC, PH.D.

don't know.

But it did seem that the -- the price did change throughout the class period. That's true, to my knowledge.

BY MR. PARTIDA:

Q    Okay.  Do you have a sense of how you view what the meaning of "volatility" is?

A    When I think "volatility" versus "variation," volatility seems more extreme.  I mean, so you can talk about volatility in scales.

But when we talk about volatility, it's usually implying something that is extremely volatile, just like the -- the normal adjective, meaning it's going up and down.

Q    Mm-hmm.

A    We would put it in terms of means and standard deviations, where you'd have a large standard deviation.  So "volatile" just seems a little more loaded than "variation."

And so I'm aware of there --

Z. BOZANIC, PH.D.

there being variation. But whether there was volatility or excessive volatility, that I'm not. I'm not sure if I have a -- I have an opinion on that. I haven't looked at a graph in some time.

Q    Okay. I understand. And I will just note for the record, I agree with you about the meaning of volatility. And that's specifically why I was asking the question.

And it sounds like, for me, it's that -- what I'm understanding your testimony is to be that you do understand that there was a variation in the price of Bitcoin.

But you would have to look closer at a chart to determine whether or not you would say it was variation that, you know, reached the level of volatility. Is that an accurate understanding of your view?

A    Sort of. One -- one is more colloquial. One is more technical. And so I want a measure of the volatility to

Page 372

Z. BOZANIC, PH.D.

assess how volatile it is. And that's why -- why I referenced "standard deviation." Right?

So it's just a matter of degree; right? And so I -- I can't say whether it was volatile; right? But I can say I know there was variation. That -- that's all I'm saying.

Q    Okay. Now, was the network difficulty constant throughout the class period?

A    It's my understanding that network difficulty changed through the class period as well.

Q    Okay. And would you agree that there was a very sharp decline in network difficulty at the end of June 2021?

A    I -- I don't have an opinion on that. I have not looked specifically at that time period to look at this particular metric.

So as I sit here today, I don't have an opinion. I don't know that particular fact for that specific

Page 373

Z. BOZANIC, PH.D.

subperiod.  If we had a graph, then perhaps I could opine to further -- further speak to it.

Q    All right.  Is it your opinion that the constant dollar methodology is generally used in 10b-5 securities cases?

A    It's a widely used approach. Yes.

Q    In securities cases?

A    Oh.  Sorry.  Yes.

Q    Yes.  So yeah.  So my -- yeah. Just to be clear, is it -- so it is your opinion that the constant dollar methodology is generally used in 10b-5 securities cases?  Is that your opinion?

A    I -- I've seen that it's widely used.

Q    Would that be different from "generally used"?

A    Generally, in the sense that I haven't surveyed a -- a mass sample of cases.  So this is, you know, going back to, say, "averages."

And so I haven't taken all cases

Page 374

Z. BOZANIC, PH.D.

and -- and looked to see what approach was used.  But I'm -- I'm aware that this is a commonly used approach.

Q   Okay.  Now, is it your opinion that the constant dollar methodology is appropriate to use in all 10b-5 securities cases?

A   I -- I have not made that opinion.  And so what I'm saying is that, in this case, given the facts and circumstances and my review of this case, it would be appropriate in this matter.

Q   But my question is a little bit, intentionally so, broader than that.  And my question is whether or not, leaving aside this case, the constant dollar methodology would be appropriate for use in all 10b-5 securities cases?

A   I -- I can't speak to that.  I need to look to the facts and circumstances of the specific case.  So I don't -- I don't have an opinion on that other than I can't say without the benefit of assessing the individual specifics of

Page 375

Z. BOZANIC, PH.D.

the case.

Q    Okay.  Now, is it your opinion that CleanSpark's business outlook on December 9, 2020, was similar to its business outlook on August 17, 2021?

A    So in -- in terms of the outlook, with respect to its pivot and then the -- as the truth came out through the class period, we see that the share price and we see that the market cap kind of was deflated throughout that class period.  Going back to similar amounts that we had seen at the start of the class period.

Q    So I think maybe perhaps you misunderstood the question a little bit.  Because I'm asking something a little bit different, which is that, you know, its --

Was CleanSpark's business outlook, as a company, its business outlook at the beginning of the class period and/or right before, on December 9, 2020 --

If you were to look at

Page 376

Z. BOZANIC, PH.D.

CleanSpark's business outlook then, is it your opinion that its business outlook on that date, December 29, 2020, was similar to its business outlook on August 17, 2021?

A    If -- if I could back -- could you help me since I didn't understand the question per your words?

Q    Sure.

A    Can you help understand what you mean by "business outlook" since I -- I've clearly missed this question.  And you -- you referenced December 9th?  Or December 10th?

Q    December 9.  So just before the announcement.

A    Ah.

Q    So I'll give a little background, I guess, just so you can -- so I can explain what I'm saying.  And then I'll re-ask the question.

So in general layman's terms, if I was looking at a company -- you would look at a company.  And, say, you know, a

Page 377

Z. BOZANIC, PH.D.

business analyst gives out a report. And they would say, "The outlook of this firm is, you know, A to F." However they want to rank it; you know? And they did some analysis of it.

And then you would say -- you know, later on, on this date, you know, another, you know, person or somebody who is covering the stock or the company says, "Ah. This is the outlook. And it's, you know, this or that."

And so with that in mind, my understanding -- or what I'm trying to understand is, kind of in a general way, is it your -- do you have an opinion that what CleanSpark's business outlook was on December 9, 2020, was similar to its business outlook on August 17, 2021?

I guess another way of asking --

MR. LINKH: Object to form.

BY MR. PARTIDA:

Q    Another way of asking the question would be, did CleanSpark have similar business outlooks on December 9,

Page 378

Z. BOZANIC, PH.D.

2020, and August 17, 2021?

MR. LINKH:  Object to form.

THE WITNESS:  So I -- I have to admit, I'm a little confused by the grading of business outlook.

When I think of business outlook, I think about the prospects before the firm with respect to the activities that they're going to undertake to generate revenues.  That's kind of what I think of business --

BY MR. PARTIDA:

Q    Perfect.  Using that -- sure. So use that definition.  Great.  Do you think that was the same or similar for CleanSpark as it was on December 9, 2020, and August 17, 2021?

A    So "same" might be strong.  But "similar" might be better in terms of -- I think I make a point in my report.

And this is why I referred back to price of the -- the per share price and the market cap in regards to the expectations embedded at that time, i.e.,

Page 379

Z. BOZANIC, PH.D.

December 9th versus August 17th.  They seemed similar at the -- you know, just before the start of the class period versus just after the -- the class period.

So after this artificial inflation was dissipated through corrective disclosures towards the end of the class period, we see this dissipation in share price.  We see a drop in market value.

And so on the basis of future expectations and with respect to revenue-generating abilities, I would say they appear similar between those two dates.  Does that help?

Q    That answers my question.

A    Thank you, sir.

Q    All right.  Now, would you agree that CleanSpark made substantial investments in increasing its bitcoin mining capacity during the class period?

MR. LINKH:  Object to form.

THE WITNESS:  Substantial?  I don't know.  Did they make investments?  Yes.

Page 380

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    Okay.  Now, would you agree that those investments were beyond what was initially announced on December 10, 2020?

MR. LINKH:  Object to form.

THE WITNESS:  I do know that it would appear they attempted to place mining rigs at another facility, which is inconsistent with the ATL announcement.

And I don't recall with certainty. But I thought they might've acquired other facilities throughout the class period. But I'm not 100 percent sure if it was within the class or after the class.

But I -- but I do recall there being other investments being made in the bitcoin mining domain, beyond the ATL acquisition announcement commitments that they had promised.

BY MR. PARTIDA:

Q    All right.  And would you also agree that CleanSpark underwent a substantial transformation from energy management to bitcoin mining during the

Page 381

Z. BOZANIC, PH.D.

class period?

MR. LINKH:  Object to form.

THE WITNESS:  So adjectives aside, I -- I do understand that they were into providing hardware.  Providing energy management services.

And they were using bitcoin to demonstrate, like they tried to do with -- with other initiatives, the viability of their approach with respect to their ability to reduce energy consumption. Yeah.

BY MR. PARTIDA:

Q    So would you agree that CleanSpark underwent a transformation from an energy management to a bitcoin mining company during the class period?

A    I -- I would say the firm would -- would say -- say so; right?  They claim in -- in some of their documents that they've become a bitcoin miner.  And so they did shift from their traditional businesses to this new business.

Q    Okay.  So that's a yes?

Page 382

Z. BOZANIC, PH.D.

A    Well, a yes to what?  So like I said, you had a lot of adjectives.  I'd say there was a shift in their business with respect to their legacy services towards the nascent bitcoin mining initiative.

Q    So I guess we could have the question read back.  I think it was adjective-free.  But I'll just ask it again.

Would you agree that CleanSpark underwent a transformation from an energy management to a bitcoin mining company during the class period?

A    I -- I would say they shifted; right?  So they -- they didn't just -- they didn't abandon the -- the old legacy. They shifted in terms of -- technology.

Q    Did I use the word "abandon"?

MR. PARTIDA:  Sorry, Ms. Court Reporter.

BY MR. PARTIDA:

Q    So I think, if I'm understanding -- and correct me if I'm

Z. BOZANIC, PH.D.

wrong -- that CleanSpark transitioned from an energy management to bitcoin mining during the class period.  Could we agree on that basic statement?

MR. LINKH:  Object to form.

THE WITNESS:  What I'm -- what I'm having issue with is, I just want to make it clear they didn't abandon it.

BY MR. PARTIDA:

Q    Sure.

A    They were utilizing their technology.  And so they found an application where they could utilize that technology.  And so they did so.

And so when I say "transform," I'm just worried that there's some supposition or notion that they abandoned the legacy.  They did not abandon the legacy.

But there was a pivot; right? There was a shift, in terms of their initiatives, where they were putting some of the resources.  But they didn't abandon the legacy.  That's my only point in -- in

Page 384

Z. BOZANIC, PH.D.

mincing with this word, David.

Q    Okay.  Well, let's get into that for a minute.  So what I'm going to do is -- a new -- this is going to be 97.  Exhibit 97.  Bear with me for one minute.  You know what?  I'm actually going to go ahead and move on.

Okay.  Now, I want to actually go back to -- let me make sure the copy that I introduced -- okay.  I want you to go back to Exhibit 90, which is your reply merit's report.  And then I want to direct your attention to Exhibit 1.

THE REPORTER:  And then, I'm sorry.  Just before you get any questions in, two questions.  Exhibit 1 is contained within Exhibit 90?

MR. PARTIDA:  That is correct.  There is Exhibit 90, which is Dr. Bozanic's expert merits reply report.  And subsumed within that, as sort of an appendix, are a series of exhibits.

THE REPORTER:  Understood.

MR. PARTIDA:  And Exhibit 1 --

Page 385

Z. BOZANIC, PH.D.

yeah -- is on page 58 out of 99 of the PDF.

THE REPORTER:  Okay.

MR. LINKH:  David, are --

THE WITNESS:  I apologize.  I'm confused now.

MR. LINKH:  David, are you talking about Dr. Garmaise's report instead?

MR. PARTIDA:  Oh.  You know what? You're exactly right.  I'm sorry.  I'm not talking about Exhibit 90.  I want to talk about -- sorry -- Exhibit 95.  So my apologies.

What I'd like to direct your attention to is your reply merits report, which is Exhibit 95.  And that final page has document a titled Exhibit 1.

THE REPORTER:  And then I know the doctor is getting there.  But then did you mark 97.  Or it hasn't been sent out just yet?

MR. PARTIDA:  There is no 97.  I was going to introduce it.  And then I decided to move on to a different question.

Page 386

Z. BOZANIC, PH.D.

THE REPORTER:  Understood.

MR. PARTIDA:  My apologies for the confusion.

THE REPORTER:  It's okay.  I just -- I've got to make it clear.

MR. PARTIDA:  Yeah.  No, 100 percent. And I appreciate you doing your job; so --

All right.  If everyone can tell me when they're there?

THE WITNESS:  Been there.

MR. PARTIDA:  We're all there?  Okay.

BY MR. PARTIDA:

Q    The blue line in this exhibit --

A    Ooh.  The color.

Q    Which is the top line if you're looking at a black copy.  It's the top line.

A    The dash line?  Or the -- which line?

Q    No.  No.

A    The very top.

Q    The very top line that starts at like between 10 and 15, then spikes up to 40, and then goes down.  Like that line?

Page 387

Z. BOZANIC, PH.D.

A     Stock price.  Yes.  Stock price.

Q     Okay.  That's -- exactly.  So that's CleanSpark's stock price.  Okay.  And then the black dotted line.  The one that's like a dash line, not little dots.  So I shouldn't say dots.

The dash line, that shows the artificial inflation on each day during the class period, based on the constant dollar method; is that correct?

A     Yes.  That's correct.

Q     Okay.  And now, from this exhibit, can you tell me; approximately what was CleanSpark's stock price on the first day of the class period, December 10?

A     Around $15, it appears.

Q     Okay.  And also from this exhibit, could you tell me approximately what CleanSpark's stock price was on the -- on January 13, 2021?

A     Approximately, just looking at the one interval that's listed, which is 1/9/21, and going slowly to the right,

Page 388

Z. BOZANIC, PH.D.

it's tough to triangulate.  But it looks like maybe around high 30s.

Q    Okay.  So like -- it looks to me like -- and maybe you could tell me if this is fair or not -- like 39 to 40.  Something around there.

A    It -- it could be.  Without the benefit of additional interval markers or the underlying data, that sounds reasonable, David.

Q    Okay.  But high 30s.  Okay.  All right.  Now, do you agree that the price on December 10, 2020, was substantially lower than the price on January 13th?

MR. LINKH:  Object to form.

THE WITNESS:  I mean, ten to $15 is -- is lower than 35 to $40.  Yes.

BY MR. PARTIDA:

Q    Okay.  You would agree that it's lower?

A    Absolutely.

Q    And you'd agree it's halfway lower?  About half?

A    It would appear to be so.  Yeah.

Page 389

Z. BOZANIC, PH.D.

Q    Okay.  Now, do you agree that between December 10 and January 13, 2021, the artificial inflation is constant, based on your merits report?

A    Please repeat the question.  I'm sorry.

Q    Yep.  Do you agree that between December 10, 2021, and January 13, 2021, that artificial inflation is constant, based on your merits report?

A    Yes.

Q    Okay.  Now, from this exhibit, can you tell me approximately what was CleanSpark's stock price in February 12, 2021?  And I understand you're not going to be able to give me an exact number.  But just --

A    I'm trying,

Q    Just approximate.  Yeah.

A    Yeah.

Q    I, myself, am holding a letter opener up to the screen.

A    I'm doing the same, my friend.  Around $35.  Maybe under $35.

Page 390

Z. BOZANIC, PH.D.

Q    I have it as around like 28.

A    It's tough, David, with this.

Q    Yeah.

A    You said December -- or sorry -- February 12th; right?

Q    Yeah.  February 12th.  Yeah.

A    Ah.  That looks -- yeah.  It -- it could be what you said.  Sorry.  It's tough from this graphic here to ascertain. I apologize.

Q    No.  No apologies necessary.  I think I also have a little bit of an unfair advantage.  I actually know what the exact stock price was on these days; so --

But, you know, on this exhibit, you know, I think it's approximately -- we could see that there, it's approximately, you know, $28.

A    Okay.

Q    Okay.  And then also from this exhibit, same exercise, you know, when we get to August 16, 2021.  Can you tell me approximately what the stock price was?

Page 391

Z. BOZANIC, PH.D.

A    It would appear to be under $15. This one seems a little clearer to ascertain.

Q    Yeah.  It was like between 13 and 14.

A    Okay.

Q    Okay.  Now, would you agree then that the price on February 12, 2021, was higher than the price on August 16, 2021?

A    Yes.

Q    And again, by about half?  About double, I guess.  Yeah.

A    Assuming your metric with regards to the February 12th price is accurate, yes.  I would think that implies roughly half across that time interval.

Q    Roughly.  Yeah.  Okay.  Now, is it your opinion that the only two methodologies to measure artificial inflation are the constant dollar method and the constant percentage method?

A    These are inputs to the out-of-pocket methodology.  So these are different approaches to this particular

Page 392

Z. BOZANIC, PH.D.
methodology.

Q    And are they the only two methodologies that you would measure artificial inflation?

A    These are the methodologies that I've offered in my report today.

Q    Are they the only ones that could be used?  That's what I'm saying. Are they the only ones that would be available?  I get that you used two in your report.  Are there others outside of those?

A    I haven't considered others.  So I have no opinion today.

Q    Okay.  Now, you are aware, though, that there are other methods?

A    I -- I believe there's a lot of methodologies out there in regards to how experts go about their reports.  But in terms of what I've offered today, I'm looking at these two inputs to the out-of-pocket methodology.

Q    Right.  So did you consider specifically any other methodologies for

Page 393

Z. BOZANIC, PH.D.

measuring artificial inflation aside from the two you used?

A     I -- I considered the out-of-pocket method, that it would be appropriate in this matter with the constant dollar inflation.

And then consequent to Dr. Garmaise's report and some of his criticisms, this is why I looked into also the -- the constant percentage method, which is an alternate input.

Q     Okay.  And prior to preparing your merits report, had you considered applying any other methods other than the ones that you applied?

A     I did not.

Q     Okay.  Now, going back to Exhibit 90, Professor Garmaise's report, I want to direct your attention to paragraph 109, which is on page 49 of the internal pagination of the report or 52 of the PDF.

A     Which paragraph, David?  Sorry.

Q     I'm doing -- going to direct you

Page 394

Z. BOZANIC, PH.D.
to paragraphs 109 and 110.  So feel free
to make yourself familiar with those two.

    A    Thank you.  I've read those two
paragraphs.  Thank you for that
opportunity.

    Q    Yeah.  And do you dispute
Professor Garmaise's assertion in these
paragraphs that securities analysts'
projections of CleanSpark's bitcoin mining
revenues varied with changes in the
economic environment?

    A    Repeat the question, that last
part again?

    Q    Sure.  Would you dispute
Professor Garmaise's assertion in these
paragraphs that securities analysts'
projection of CleanSpark's bitcoin mining
revenues varied with changes in the
economic environment?

    A    So, as we discussed earlier,
there are a lot of different ways in -- in
which revenue is formed in terms of the
constraints and the opportunities.  And so
I agreed with you earlier that these are

Page 395

Z. BOZANIC, PH.D.

elements that analysts would've considered as well.

So the short answer is -- is, I don't disagree with his statement that analysts looked at Bitcoin prices in terms of revenue projections.  That's absolutely true.

Q    And also the part about that those projections varied in connection with changes in the economic environment?

A    I would say that the analysts' projections varied on the basis of a multitude of factors, including the promises made by CleanSpark with regards to the ATL facility.  But other inputs are those, as you've mentioned, such as Bitcoin price.  Absolutely.

Q    Understood.  Okay.  Now, do you also dispute -- or I shouldn't say "also." Do you dispute that, during the class period, H.C. Wainwright changed the projected number of bitcoins mined per day, per unit of hash rate?

A    Repeat that?  Sorry.  Slower.

Page 396

Z. BOZANIC, PH.D.

Q    No problem.  So I'll direct your attention -- maybe it'll help you if you're looking at it too.

But if you look at paragraph 110; right?  There's an H.C. Wainwright report.  A set of reports, right, that are stated there.  So I'll let you take a look at those and then I'll ask the question and see if that helps.

A    Thank you.  Just paragraph 110?

Q    Yeah.  You could read paragraph 111 again.  But the points I'm focusing on are the ones H.C. Wainwright made in its reports that are identified in 110.

A    Wonderful.  Thank you, sir.  One moment.

Q    Mm-hmm.

A    "Per -- prices -- would imply lower productivity at a higher Bitcoin price."  Understood.  So I've -- I've read this.  And I think I largely understand it.

There's -- there's one question

Z. BOZANIC, PH.D.

that I have that I'm not quite sure Dr. Garmaise explains, in terms of the implication of lower productivity.  But I see when -- when China's crackdown occurred, that would increase productivity because of -- the mining difficulty was reduced.

So I -- I largely understand the paragraph.  So we can proceed with your question.  I might have to refer back to it.  There's a lot of information there.

Q    There is indeed.  Okay.  So my question then is, would you dispute during the class period -- or dispute that, during the class period, H.C. Wainwright changed the projected number of bitcoins mined per day, per unit of hash rate?

A    On the basis of what Dr. Garmaise has here, without having the benefit of those reports in front of me to read them myself, and taking this on face value, it seems to be the case that their projections change.

And so, as I would expect,

Page 398

Z. BOZANIC, PH.D.

throughout the class period, as -- as things change, that projections would change. So this is -- as information comes out, analysts are always revising their projections and expectations.

Q Okay. And then if you look at the third to the bottom line on page 50, at the end of paragraph 110, it says, "On February 16, 2021, H.C. Wainwright & Co stated, 'We are now revising our Bitcoin price assumptions to assume -- to approximately 30,000 during F2Q21 from 17,500 previously.'" Do you see that?

A I do, sir.

Q Okay. And is it your understanding, based on the language quoted in this paragraph, that was that changing price which H.C. Wainwright had focused on in this quoted language, in changing its revenue projections?

A Well, I think there's a lot of reliance on what Dr. Garmaise has -- has chosen to selectively cite. So I can't answer the question without having a

Page 399

Z. BOZANIC, PH.D.

report.

You, yourself, I think, used the word "focus," perhaps. I don't recall. But in terms of what their focus was, I'd need to see the entirety of the report and to understand perhaps how their -- their focus shifted across reports.

But I don't disagree that this would be one element factoring into their projections. But there will be other elements, particularly with respect to -- maybe not with this individual report -- but whether or not the firm was producing the hash rate capacity that was anticipated at the acquisition of the ATL facility.

And so there are several reports that I referenced in my reports that talk about the expansion delays. And so that would be an element that's missing here. That's -- that's extremely salient with respect to the projections.

And so this would be one element, for sure. Whether it was the

Page 400

Z. BOZANIC, PH.D.

focus or not, I -- I can't speak to.  If we have the reports in front of us, I'm happy to read them and then ascertain what I believe the focus to be.

Q    Yeah.  Let's not get hung up on the word "focus."  I think you -- perhaps rightfully so, you're the deponent, injected that with far more meaning than I intended to have it.

I just meant the focus of the language.  That it -- you know, this sentence states, "We're revising our Bitcoin price assumptions to approximately 30,000 from 17,500."  And they talked about that in connection with changing the revenue.

So just to be clear, I think what I understood you say is that you don't dispute that H.C. Wainwright discussed the changing price of Bitcoin when discussing bitcoin mining revenue projections?  You don't dispute they discussed the two together?

A    I -- I don't.  I don't.

Page 401

Z. BOZANIC, PH.D.

Q    Okay.

A    Assuming that everything is accurate in the report.  Yeah.

Q    Okay.  Oh.  Yeah.  Of course. Assuming that this is the accurately quoted language.  Understood.

Okay.  Now, do you -- let me see.  Now -- and then do you -- so I want to draw your attention to -- up to paragraph 109.  Just right before it.

A    I am there.  Shall I read it?

Q    You could look.  Yeah.  You could certainly read through it.  I'm going to focus on the second part of that paragraph that's right before paragraph 110.  But feel free to familiarize yourself with that.

A    Wonderful.  Thank you.  One moment.  And this was 109; right?

Q    Yes.

A    Perfect.

Q    I'm focusing on the part of that paragraph on the second page that starts, "Analysts' commentary further" --

Page 402

Z. BOZANIC, PH.D.

A    Got it.

Q    But again, feel free to read everything.

A    Okay.  I've refreshed myself. Thank you.

Q    Okay.  Now, would you agree that BTIG commented on the following issues? First is changes in network difficulty?

A    Let me look to see where he quoted them directly.

Q    Yep.

A    You have Dr. Garmaise's words and then the quotations.

So they talk about -- the July 15, 2021, BTIG report,  It says, "The global hash rate has dropped.  The collapse has dropped the difficulty rate."

So they do talk about that.  He does talk about -- the report talks about the difficulty rate there.

Q    Okay.  And also the global hash rate, as you just mentioned.  And then if I'm looking at it, without pretending to myself know, you know, exactly how it all

Page 403

Z. BOZANIC, PH.D.

works --

But it does look like in the July 15, 2021, quoted language, BTIG comments on how these factors impacted how much bitcoin miners earned from mining bitcoin.  Is that how you read this paragraph?

A    It's my lay understanding, not being a Bitcoin expert, that all of these -- yeah -- factors would contribute to the price of Bitcoin in terms of difficulty and global hash rate.  In terms of supply and demand of who's doing the mining, and so forth.  Was that your question?

Q    Yes.

A    Okay.

MR. PARTIDA:  Okay.  Now, I'm about to jump into another topic.  I think we've been going -- I'm happy to keep going.  But I just wanted to give anyone the opportunity to take a break if they need it.

THE WITNESS:  I'm happy to keep going

Page 404

                    Z. BOZANIC, PH.D.
unless anyone else needs a break.  And
perhaps we can go until we decide it's
time for lunch?
        MR. PARTIDA:  Ms. Court Reporter?
        Anyone?
        THE REPORTER:  So I'll mention both;
right?  So I would appreciate five minutes
now.
        MR. PARTIDA:  Okay.
        THE REPORTER:  And then in terms of a
lunch break, what I do is normally
30 minutes after the third hour.  So that
would be 30 minutes after one.
        But because we're close to one, we
could take 30 minutes now.  Come back at
12:40.  Whatever you guys want to do.  I
don't want to, you know, pressure.
        MR. PARTIDA:  So I'm happy to do
whatever works best.  You need five
minutes now.  So there's no question we'll
take that.
        And I guess for you, Greg, and
Dr. Bozanic?  I really defer to you guys
as to if you would prefer to do 30 now.

Page 405

Z. BOZANIC, PH.D.

Or you'd prefer to do five now and then take 30 at, you know, sometime after one.

MR. LINKH:  Yeah.  Well, you know, we can go off the record; right?  And discuss this?

MR. PARTIDA:  Oh.  Yes.  I'm sorry. Yes.

MR. LINKH:  Yeah.

THE VIDEOGRAPHER:  We are off the record at 12:11 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the record at 12:48 p.m.

MR. PARTIDA:  All right.  Welcome back, everyone.  Hopefully, we all had a nice break.

BY MR. PARTIDA:

Q    What I'd like to turn you back to, Dr. Bozanic, is to Professor Garmaise's report, which is Exhibit 90. And where I'd like to direct you to is footnote 47 of this report.  And you can tell me when you've -- there.

A    I am there.

Z. BOZANIC, PH.D.

Q    So do you -- well, have you had a chance to read the footnote?

A    I have not.  One moment, please. Thank you.  I have read it.  Thank you.

Q    Okay.  So I'm just going to read it for the record.  I wanted to give you the opportunity to try and comprehend it.

But it says, "An alternative and equivalent way to determine statistical significance is to calculate the 'p-value,' which is the probability that an abnormal return of a certain magnitude or greater would occur by chance, assuming the abnormal return is actually zero (i.e., assuming that the 'null' hypothesis is true).

"Or under the standard 95 percent confidence level threshold or 5 percent significance, if the p-value is less than or equal to 0.05 or 5 percent, then one would reject the null hypothesis in favor of the 'alternative' hypothesis that the abnormal return was distinguishable from zero."

Page 407

Z. BOZANIC, PH.D.

So with that mouthful read, my question for you is, do you agree with Professor Garmaise's description of what "p-value" is?

A    One moment.  I have no issue with his description of a p-value here.

Q    Now, is the null hypothesis that you tested with your event study that the abnormal return on a given day is actually zero?

A    So this would be the implied null hypothesis.  So I'm not sure if I refer to a null hypothesis.

But in general, in terms of statistical testing, you're saying that, well, it -- it would appear as if the return is zero.

But if I can show that this return is different than zero, the "p-value" or the "t-statistic," which are two sides of the same coin, would indicate that this return seems to be different than those in the population.

Q    Okay.  So could you please state

Page 408

Z. BOZANIC, PH.D.

for me, keeping in mind I'm a lawyer, not an economist, in very simple terms, what is the null hypothesis that you tested in your event study model?

A     So I wouldn't say that I asserted a null hypothesis explicitly in the report.

But what we're trying to do in any statistical test is to say, "Does this look different?  Does it look like this is occurring by random chance?"  Where if we're -- if it's occurring by random chance, it could be the case that returns, on average, are zero.

But then we say -- if this return looks different than random chance, then we say that it has some statistical significance.  We're able to show through that p-value or through that t-stat the strength of the relationship and how different the returns are, relative to, say, a null hypothesis of zero.

So the expectation is to say that returns are zero and, you know, could

Page 409

Z. BOZANIC, PH.D.

be random chance.  Just we have a -- a different -- a whole distribution of returns.

And the mean could be, of those returns, zero in the aggregate.  But then you look for different returns on different days.  And you say, "Does this return seem different than the other returns?"

And so that's what we're going after.  So "null hypothesis/alternative hypothesis" can get confusing.  And so -- but the -- the basics of what we're trying to do, in terms of a simple explanation, is to say, "There's a series of returns."

And so if we look at those returns and we're looking at a return on a given day, does this return on a given day appear different than the others that we're analyzing?

That's -- that's the most basic description.  I think a lot of students that I teach, they too, David, get confused with respect to null hypotheses

Page 410

Z. BOZANIC, PH.D.

and alternative hypotheses as well.

But at the end of the day, we're trying to ascertain through statistical means, looking at distributions of data, whether a certain point in that distribution appears to be different than the other data points.  Does that make sense?

Q    Actually, that all makes perfect sense.  But I have a -- there is an implicit null hypothesis.  What was it?

A    So the implicit null hypothesis could be that the returns are zero or that they're not different than the other returns in the sample.  So they differ than the mean in the sample.  So, for example, does the return on a given day differ from the returns in the sample?

Q    And that's the implicit null hypothesis that was used in your event study model?

A    I -- I suppose so.

Q    Okay.

A    I mean, in terms of an implied

Z. BOZANIC, PH.D.

null hypothesis.  Like I said, I've not -- in terms of my event study, I don't think I ever said, "Here's the -- the null hypothesis that I'm -- that I'm testing," per se.

This is saying, again, I'm just looking at a distribution of returns and -- to say, "Does it appear as if this return looks different than the other returns in that distribution?"

Q   Okay.  Now, is the alternative hypothesis that you tested with your event study that the abnormal return on a given day is related to the information released on that day?

A   I'm sorry.  Repeat that question?

Q   Is the alternative hypothesis that you tested with your event study that the abnormal return on a given day is related to the information released on that day?

A   Right.  I understand the question.  So on a given day's return;

Z. BOZANIC, PH.D.

right?  And so what we're looking at is to say, "On a given day, the price movement could be zero."

And so here, now that I understand your question a little bit better, the null hypothesis on that particular event day could be zero.  And so yes.  It would be an implied zero, speaking specifically versus in more general terms.

But then the alternative would -- hypothesis would be, "Is this different than zero on this day?"  And then yes.  If we're looking at a particular event date, then we're trying to say, "Okay.  Does this return on this event date, in consideration of the information that arrived on that event date, seem to be different than zero?"  Right?

And so, again, this goes back to this notion of random chances.  To what we might expect for random movements versus movements that appear to be different than

Page 413

Z. BOZANIC, PH.D.

those in the distribution of the sample.

And so yes.  I am definitely -- going back to the -- the question, I'm trying to tie the information released to that return to say, "It appears as if this information is associated with the return that we observe on a given day."

Q    Okay.  Is the confidence level of a statistical test a measure between zero percent and 100 percent?

A    Yes.  So we can look at this as an interval.  This is a range, in terms of how confident we are that this return is different.

Q    Okay.  Now, is -- yes or no?  Is the confidence level of a statistical test for an abnormal return equivalent to the probability that there is a price impact?

A    Can you repeat the latter half?

Q    Sure.  I'll just repeat it in full.  Is confidence level of a statistical test for an abnormal return equivalent to the probability that there is a price impact?  Yes or no?

Z. BOZANIC, PH.D.

A    That last part, I'm confused by. "Equivalent to the probability that there is price impact"?

I would say this is a probabilistic assessment to say the likelihood that this return is different. And then we make the inference, given the presence of information, that this response, this price response that could be statistically different than -- than our expectations, is tied to the information on that day.

And so the way you phrased it was a little awkward. I had trouble understanding it. But I think what you're getting at is, we're trying to say that the test is -- is not necessarily saying that it's tied to that information; right?

There's another link to say that this movement seems to be in response to the information that has been released on that day.

Q    So I appreciate that. I think the question I'm trying to understand

Page 415

Z. BOZANIC, PH.D.
is -- maybe put it in layman's terms.

If you say that you have a specific confidence level of a statistical test, 90 percent -- you have a 90 percent confidence level -- is that the same thing as saying there's a 90 percent probability this happens?

Different example.  I have a 50 percent confidence level on this statistical test.  Is that the same thing as saying, "This is 50 percent likely to happen?"

Do you see what I'm saying?  That's what I'm trying to understand.  And it's for that reason that I say, is the confidence level of a statistical test the same thing or equivalent to the probability that there was a price impact?

MR. LINKH:  Object to form.

THE WITNESS:  That latter jump is where I got uncomfortable.  With the probability of there being price impact.  That's not the intent of the test.  The test is not trying to say, in terms of

Page 416

Z. BOZANIC, PH.D.

strictly interpreting statistical significance, that somehow it's the confidence that there's price impact.

What we're saying is, we need to be able to assert that this information is -- is novel that day, is new that day, that there's not the arrival of other information.

And so there is a link, in terms of getting to -- to price impact, to say that this statistical significance is indicative of price impact, in the absence of other information arriving, the absence of other compounds, and so forth.

So that -- that little jump is where I got a little uncomfortable, David, in terms of trying to strictly interpret what statistical significance means versus how we're using that to support the -- the -- with -- with evidence of price impact.

BY MR. PARTIDA:

Q    Okay.  Now, I want to talk a little bit about the standard for statistical significance.  And so is it

Page 417

Z. BOZANIC, PH.D.
standard practice in academic literature, particularly in finance and economics, to regard results with a confidence level of less than 90 percent as statistically significant?

A    So as I discussed in -- in my reports, there are conventions used.  And so in academic practice, when we're looking at academic research, whether it be accounting, finance, or economics, there are conventional cutoffs used.

And I think we've -- we've identified those before.  At the 1 percent level, the 10 percent level, the 5 percent level, and so forth.  And these are the standards that we see in economic research.  That's true with respect to statistical testing.

Q    Okay.  Sorry.  I don't know what happened.  My monitors just turned off.

A    Uh-oh.

Q    Okay.  And would you agree that a lack of statistical significance does not tell us that it is more probable than

Page 418

Z. BOZANIC, PH.D.

not that there was no price impact?

MR. LINKH:  Object to form.

THE WITNESS:  A -- a few double-negatives.  Please repeat?

BY MR. PARTIDA:

Q    Yeah.  Do you agree that lack of statistical significance does not tell us that it is more probable than not that there was no price impact?

MR. LINKH:  Same objection.

THE WITNESS:  Lack of statistical significance does not tell us that it's more probable than not?

What -- what I would say, without getting tripped up on all the double-negatives, is -- is we have to start to look at the preponderance of evidence with regards to the overall likelihood.  Going back to whether it's more likely than not that this return is different than others in the distribution.

But a lack of statistical significance depends at what convention.  What level; right?  So if we were to say,

Page 419

Z. BOZANIC, PH.D.

"Hey, this is statistically significant at the 90th percentile," right, "in terms of a standard convention," then we'd say, "Well, no.  Actually, I -- I found that the test shows that it's statistically significant at the 89.9 percent confidence interval."

From a materiality perspective, I don't view those to be terribly different; right?  In terms of the evidence that I am bringing forward when we use these bright-line cutoffs.  Because at the end of the day, it goes back to, as you said, what's that test telling us?

It's telling us that this return is a little bit different than the other returns in the sample.  And so if we say that it's statistically significant at the 89th percent level, right, that means that return is different than 89 -- 89 percent of the other returns in that sample.

And so when we get to that bright-line cutoff, at that 90 percent versus 89 percent, even though academics

Page 420

Z. BOZANIC, PH.D.
regularly use those cutoffs of 1, 5, and 10 percent, we have to start to look and think about, "What is this test telling us? What is it telling us in terms of materiality? In terms of the evidence that we're bringing?"

So that's kind of how I'd answer that. The double-negatives, I -- I apologize. It was rather confusing.

BY MR. PARTIDA:

Q    I appreciate all of that explanation, particularly since you explained a sentence that's in your report. And so I appreciate the clarity now.

And so why don't we go ahead and go to Exhibit 95, which is your report. And go ahead and look at paragraph -- your reply report, I should say. And go ahead and look at paragraph 18.

And you can feel welcome to read the whole paragraph. But I'd like to point you to the sentence beginning, "Per Brav and Heaton" --

Page 421

Z. BOZANIC, PH.D.

And that sentence says, "Per Brav and Heaton, 2015, it is crucial to understand that statistical significance is simply describing a set of returns that would be unusual to observe if there was no price impact."

And then this is the language I was quoting. "Lack of statistical significance does not tell us that it is more probable than not that there was no price impact." And so my question to you is, do you agree with that statement?

A    Sure.  Let me read the paragraph in full.  But I'll respond.  Thank you.

So I do agree with this statement.  So lack of statistical significance is not evidence of lack of price impact.

So you could have lack of statistical significance at these conventional levels.  But there still could be price impact when we go back to, say, using those bright-line thresholds versus going from the 90th percentile to

Page 422

Z. BOZANIC, PH.D.

the 89th percentile; right?

So you might have the absence of statistical significance, importantly, using the conventional cutoffs. But just because we fail, using those conventional cutoffs, to assess statistical -- or ascertain -- obtain statistical significance doesn't mean there's lack of price impact. That's how I'm interpreting that sentence.

Q   Okay. But that's not what that sentence actually says. So I guess I would just ask you to answer "yes" or "no."

Do you agree with the following quote: "Lack of statistical significance does not tell us that it is more probable than not that there was no price impact"?

MR. LINKH:  Object to form.

THE WITNESS:  The way that I'm interpreting that sentence out of context is saying the lack of statistical significance does not imply lack of price impact.

Page 423

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    And is that because statistical significance is simply describing a set of returns that would be unusual to observe if there was no price impact?

A    I -- I think that's what you were saying there.  Right.  You're just -- you're quoting from Brav and Heaton.  Again, yeah.

Q    All right.  Now, I just want to walk through a hypothetical so I can just kind of understand a little bit more about statistical significance.

Let's consider for a moment that you have a negative abnormal return on a given date with a confidence level of exactly 60 percent.  What would be the p-value for the abnormal return?

A    Repeat the question?

Q    Yep.  If there was a negative abnormal return on a given date that has a confidence level of exactly 40 -- or 60 percent; right?  What would be the p-value for that abnormal return?

Page 424

Z. BOZANIC, PH.D.

A    So I assume you want me to say 0.4.  You're just going for the simple math in terms of interpreting the other side?

Q    Correct.  Right.

A    Okay.

Q    Okay.  So I just -- yeah.  I just -- that's -- exactly.  I just wanted to confirm that I understand.

So what is the probability then that the decline on that date was related to information released on that day, as opposed to random price movements?

MR. LINKH:  Object to form.

THE WITNESS:  See, this is -- this is similar to the question you asked previously, where there was a disconnect. And I'm -- I'm uncomfortable.  Because you're taking a statistical test.  And then you're making an inference where you're saying the statistical test is -- is making an assumption about that information.

And so we have to say -- as I said

Page 425

Z. BOZANIC, PH.D.

before, we can't just simply interpret the test in isolation; right? We have to interpret the test with respect to the information environment, other information.

So to be able to assert that there is a price movement that's not only statistically significant, we have to look at the information that's arriving. Because we're saying that there's information that's arriving; right?

And then hopefully, there's not other information that's arriving that would confound this inference to say that this is the information that was in the market this day. And we saw that the return had a statistically significant return.

But this probability with respect to price impact, that next leap, is -- is -- I'm a little uncomfortable with. Because the -- that's not what the statistical test is meant to test in terms of pure statistical testing.

The inference that we're able to make

Page 426

Z. BOZANIC, PH.D.

from it, we're using this as evidence to make that inference that you just kind of leapt to.  Does that make sense?  This -- because it feels similar to the question you asked previously.  But maybe I'm misunderstanding.

BY MR. PARTIDA:

Q    No.  You're not misunderstanding, I don't think.  But I -- yeah.  I -- you're not misunderstanding what I'm saying.  And I appreciate your answers.  That they're -- your answer answering my questions.

A    Okay.  I'm really trying, David.  Thank you.

Q    So if -- going back to the issue about the cutoff levels for confidence levels and statistical significance, is it your opinion that 50 percent is the conventional confidence level threshold to assess statistical significance?

MR. LINKH:  Object to form.

THE WITNESS:  In -- in terms of academic literature, no.  That's not my

Z. BOZANIC, PH.D.

opinion. Nor do I believe that I stated as such in my reports.

BY MR. PARTIDA:

Q No. Okay. What -- so I guess then, is it your opinion that 50 percent is the conventional confidence level threshold to assess whether it's more likely or not that information released on a given date impacted the price?

A Again, same answer. You used the word "convention." I assume you're referring to convention in academia. And so no. That would not be my opinion that's the convention in academia.

Q Sorry. I want to make sure you -- I understand the answer. You're saying it's the conventional competence level in academic literature? That's not your opinion? I didn't understand your answer. I'm sorry.

A Sorry. Let me repeat. A 50 percent level is not the convention in academic literature.

Q Okay.

Z. BOZANIC, PH.D.

A    Nor have I offered that opinion in my report.

Q    Okay.  So can you then explain -- well, let me ask this little bit more basic question.

Is 50 percent confidence level the threshold to assess that it's more likely than not that there's a price impact?

A    This is "a" threshold in terms of more likely than not in terms of random chance; right?  So this is "a" threshold that that can be used.

But this goes back to the argument that I was making in terms of how one interprets these tests.  Are they different than the others?

And so if it's a 50 percent threshold, we would say this return is different than half of the returns in the distribution; right?  So this is all this is -- this is all this is saying.

But I haven't spoken to that particular threshold being a convention.

Page 429

Z. BOZANIC, PH.D.

By no means.  In fact, I speak of the academic conventions going back to the 10 percent, the 95 percent, and the 1 percent levels.

Q    Okay.  Can you take a look at paragraph 69 of your report?

A    This is my merits reply report? Exhibit 95; correct?

Q    Yes.  No.  No.  Not your -- sorry.  Not your merits.  Your -- not your reply report.  Your original merits report.

A    Oh.  Sorry.  Has this been introduced as an exhibit?

MR. LINKH:  Hey.

MR. PARTIDA:  Oh.  Did I not introduce that yet?

MR. LINKH:  Not yet.

MR. PARTIDA:  Okay.  So sure we can do that, unless it's been previously introduced as an exhibit, Greg, in this case?

MR. LINKH:  It was not at Garmaise's.

MR. PARTIDA:  Okay.  So then bear

Page 430

Z. BOZANIC, PH.D.

with me a moment.  All right.  I just circulated, as Exhibit 97, the merits expert report of Dr. Zahn Bozanic, dated July 18, 2025.

(Exhibit 97 was marked for identification.)

MR. PARTIDA:  If you can let me know when guys receive that?

BY MR. PARTIDA:

Q    I know, Dr. Bozanic, you have a paper copy with you.  I just want you to confirm we're looking at the same document.

A    Yes, sir.  Absolutely.  Yeah.  I have it.  It's one and the same.

Q    Okay.  You just want to take a -- let me find -- take a minute to look at this paragraph if you'd like.  Now --

A    I'm sorry.  Paragraph -- which?

Q    Paragraph 69.  So then I'd like to direct your attention to the second sentence.

And can you explain what you mean in your report when you say, "The

Page 431

Z. BOZANIC, PH.D.

corrective disclosure events caused stock price movements that were statistically significant at better than the 50 percent level, i.e., that it is 'more likely than not' that the declines were related to information released on these dates as opposed to random price movements"?

A    Mm-hmm.  So this is referring to my Exhibit 4 as well.  And so if we look at statistical significance, what I'm doing here is trying to support that the movement in price that we see is related to the information that is arriving in the market.

And with respect to that 50 percent, I'm summarizing the findings with respect to the individual drops that are outlined in Exhibit 4, with respect to the Culper Report and then the press releases in regards to the expansion delays.

And so if you see, statistical significance across the individual drops varies between -- in Exhibit 4 -- between

Z. BOZANIC, PH.D.

57 percent up to 99.3 percent.  And so this is summarizing that.  If we look at the individual drops over the four drops that I am analyzing, they are statistically significant at the 50 percent level or better; right?

And so this goes back to the idea of, as we talked about, how to generally interpret these tests.  Is this return different than the others?  Right?

And so if this return is different than 51 percent or 50 percent than -- than the other returns in the distribution, it would give us some evidence to say that perhaps this is not due to random chance.

And so, obviously, statistical significance is a continuum in terms of the strength of the relation.  But that sentence is merely summarizing what my findings were in Exhibit 4.

Q    Okay.  Fifty percent confidence level is not the same as 50 percent probability of a price impact; is that

Page 433

Z. BOZANIC, PH.D.

true?

MR. LINKH:  Object to form.

THE WITNESS:  Well, again, it goes back to what you were saying.  I'm saying that there's an association here.

And so absent the arrival of other information, we're trying to tie this association with respect to the level of, you know, statistical significance or confidence with the price movements on that day.

To say that the price seems to have moved with respect to the information that arrived.  And this is different than, say, a random price movement, the way that the event study regression is set up.

BY MR. PARTIDA:

Q    But I'm asking for a simple yes-or-no answer.  And yes or no?  Isn't it true that 50 percent confidence level doesn't say that the probability of price impact is more than 50 percent?  Yes or no?

A    Again, I'm uncomfortable.  I --

Page 434

Z. BOZANIC, PH.D.

I would agree 'cause that latter half --
this is the third time this question's
come up.  That's an -- an odd way to -- to
phrase, "The probability of price impact."

I'm looking back to interpreting
the test strictly in statistical terms.
And then we make other inferences and
assumptions to say that this appears to be
associated with the price on -- price
movement on that date.

Q    So that's a yes.

A    The information is tricky to
associate with the price movement on that
date.

Q    So that's a yes.  And I'm not
trying to ask a trick question.  I'm just
trying to make sure I understand that it
is true to say -- it's true that you
cannot say because you have a 50 percent
confidence level, the probability of the
price impact is more than 50 percent.
That's not something you can say?

MR. LINKH:  Object to form.

//

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    Is that true?

MR. LINKH:  Object to form.

THE WITNESS:  You kind of cut off there, David.  I apologize.  Like you went low.  Can you repeat your question?  I'm sorry.

BY MR. PARTIDA:

Q    Yes.  So the question I want to understand is that 50 -- is it true that 50 percent confidence doesn't say that the probability of price impact is more than 50 percent?

MR. LINKH:  Object to form.

THE WITNESS:  I -- I think we've covered this.  But I -- I'm uncomfortable with this.  The "probability of price impact" language; right?

I'm trying to interpret the test. And so that's -- at the end of the day, I'm trying to look at this as a statistical test that we can -- that is conventional, that we can interpret.

And so, at first, you're asking how

Page 436

Z. BOZANIC, PH.D.

I -- how I interpret these tests.  And so hopefully I've given responses that are satisfactory to you.  But that link that you keep trying to make, I'm a little uncomfortable with.  "The probability of price impact."

I'm interpreting the test on that date with regards to the returns.  And then I'm inferring, on the basis of what I observe from the test, that this is related to the information arriving that day.  This price movement is different; right?

And then later, we can start to establish whether or not there was other information arriving, whether there were compounds, and so forth.  So that's why I have to bracket this a little bit to say, "Yes, but" -- right?

And so -- but this "probability of price impact" language is -- is not something that we -- we would speak of when -- when we look at, you know, event study testing.  So this -- this language

Z. BOZANIC, PH.D.

is what I'm -- I'm struggling with, honestly.

BY MR. PARTIDA:

Q    Right.  So what I'm struggling with is, then why did you say that in paragraph 69 of your merits report?

You -- the link -- and what I'm trying to probe here is, I have the exact same discomfort you seem to have with making what you say is the leap I'm making.  I don't think there's the leap to be made.

But what you said in paragraph 69 of your report, "Overall, the corrective disclosure events caused stock price movements that were statistically significant at better than the 50 percent level, i.e., that it is more likely than not that the declines were related to information released on these dates, as opposed to random price movements."

And I -- so I'm trying to understand the basis for that opinion.  If it's not -- if you don't have the opinion,

Z. BOZANIC, PH.D.

what do you mean by that statement?  So let me just ask this again.  Because I asked this question earlier.

What do you mean, in paragraph 69 of this report, your merits report, where you say, "Overall, the corrective disclosure events caused stock price movements that were statistically significant at better than the 50 percent level, i.e., that it is 'more likely than not' that the declines were related to information released on these dates, as opposed to random price movements"?

A    Absolutely.  I can do so.  So two quick points.  One, I haven't had the full benefit of reading the entire paragraph.  I think we kind of bracketed that first part of the paragraph.

But then second, I'm happy to explain that sentence again.  But where I had discomfort was you kept referencing the "probability of price impact."

And so I don't think I see this in that paragraph, that specific language.

Page 439

Z. BOZANIC, PH.D.

I don't think I've made that statement. But let me take a moment to read the full paragraph to make sure I didn't miss anything here.

Yeah.  So here, the -- the punchline in the end of the paragraph is, "Whether or not the information on that date could have altered the total mix of information on the basis of the statistical test."  Right?

So I'm saying here, in that sentence at issue, the price movements were statistically significant, better than 50 percent level.  And we have some that are significant at the 99 percent level.

And so with any statistical test, as we discussed at length earlier, we're trying to say, "Is this return different than the others?"  Right?

And so if we can start to say that this return seems different than 99 percent of the others, or 95, or 90 percent, this is giving us some -- some

Page 440

Z. BOZANIC, PH.D.

evidence to make this inference that it appears that this return on this date is different.

And then the question is why? Sometimes we have returns on dates where there's not the arrival of information, where there's statistical significance. And here, we do have the arrival of information.

And so in interpreting the test, the inference is to say that this non-random price movement that has a high -- high threshold of statistical significance is associated with the information released on that day.

That's what I'm trying to make. But again, this -- this sentence is a summary sentence that is trying to explain the individual drops for the different dates in question, as outlined in Exhibit 4.

Q    Okay.  We're going to do this a different way.  Bear with me.

MR. LINKH:  Just checking, Andrew.

Page 441

Z. BOZANIC, PH.D.

Are you still okay with your time?

THE VIDEOGRAPHER:  Ten minutes max. Or right now, we could start a new one. And we could go for another hour and a half.

MR. LINKH:  David, what are your thoughts about just -- if we're going to get into a big back and forth, it may make more sense not to break it up.

MR. PARTIDA:  Totally fine.

MR. LINKH:  Okay.

MR. PARTIDA:  We can go off the record and switch the tapes.

MR. LINKH:  Great.

THE VIDEOGRAPHER:  Okay.  This is the end of media unit number 2.  We are off the record at 1:26 p.m.

(Off the record.)

THE VIDEOGRAPHER:  This is the beginning of media unit number 3.  We are on the record at 1:34 p.m.

MR. PARTIDA:  All right.  Welcome back.

//

Page 442

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    Dr. Bozanic, standing alone by itself, does a confidence level of greater than 50 percent mean that the probability of a price impact is greater than 50 percent?

MR. LINKH:  Object to form.

THE WITNESS:  So I think I've answered this a few times already at this point.  And I think you want me to say that it has some causal link here.  Or the statistical test somehow speaks in interpreting the convention to price impact, in particular.

I'm providing evidence, using the event study to support price impact by way -- by way of interpretation of the statistical significance.  And so what I'm going back to is what I've said before, which is in regards to what the statistical significance is trying to show us in terms of, "This return stands out to be as different from the other returns under analysis."

Page 443

Z. BOZANIC, PH.D.

And so this is the strength of the relationship in showing that it appears as if this return on this date is different than others in the sample distribution. And so on the basis of that threshold, whether it's 50 percent or higher, we're going to -- I can say that this is more likely than not that this return is -- is something that is substantive versus occurring from -- by -- by random chance.

And then I make the jump to say that this is evidence of price impact with respect to the information arriving that day and the results of the statistical test.

BY MR. PARTIDA:

Q     But, in and of itself then, a confidence level of 50 percent -- standing alone, a confidence level of 50 percent is not by itself enough to conclude that the probability of a price impact is more than 50 percent?

MR. LINKH:  Object to form.

THE WITNESS:  There -- there's the

Page 444

Z. BOZANIC, PH.D.

test and then the interpretation of the test. And so then we have the interpretation of the test.

You've asked in terms of how I interpret the test with respect to what statistical significance is and what it means. And so hopefully, I've answered that for you.

And then on the basis of this evidence, we make an inference. And that's what I'm saying.

BY MR. PARTIDA:

Q    Okay. What do you mean specifically when you say, in paragraph 69 of your merits report, "It is more likely than not"? What do you mean when you say, "It's more likely than not"?

"Probabilistically, it's more likely than not"? "I feel like it's more likely than not"? What does that mean? "More likely than not." What do those words mean?

A    So more likely that this return, in terms of its statistical significance,

Page 445

Z. BOZANIC, PH.D.

is different than the others in the distribution; right?  We're providing evidence.

I'm providing evidence that this return is somehow different, right, than others.  So if this return looked like every other return in the distribution, I -- I wouldn't have much to go off of.

But if we can say, "Hey, you know, there's -- there's ten different returns."  I'm just throwing it out there.  You know, one -- one is 1 percent.  One is 10 percent.  One is 20 percent.  All the way up to 100 percent.

And we say, you know -- and we can -- we can go up higher.  Say now, there's one at 1,000 percent return.  Is the 1,000 percent return different than the others?  That's all that we're after here.

And so if all the returns were, say, 10 percent; right?  And then there was another return that popped up on another day.  It's also 10 percent.  It's

Z. BOZANIC, PH.D.

tough to say that that 10 percent is different from all the other 10 percents in the sample distribution.

And so we're trying to assess, financial economists looking at event studies and understanding event studies and what they can imply, is that this return is -- is a bit different than those.  It's not occurring by random chance.

There's all sorts of reasons why prices move in the market.  It can be front information.  There can be price movements without information.

And so I'm trying to triangulate to say that information arrived.  The price moved.  This was not just by random chance that this price moved.  It's more likely than not that this price is moving on this date.  And it's different than others.

And then we make the inference that it has to do with the information that arrived.  And that's why it's

Page 447

Z. BOZANIC, PH.D.

special.  That's why it's different in terms of the rest of the returns in the distribution.

But I -- I thought I've -- I've answered this a few times, at least to the best of my ability.  I apologize if I missed the mark.  But I'm -- I'm trying my best, David.

Q    Is the probability that the return is different than the rest greater than 50 percent?

A    Say that again?

Q    Is the probability that the return is different than the rest of the abnormal returns greater than 50 percent?

A    What we're saying here, in -- in the report with this language here, is that this return is different than the others; right?  And so financial economists are interpreting this to say, "This return is different."

So when you keep saying "probability of, probability of, probability of," I'm not quite sure what

Page 448

Z. BOZANIC, PH.D.

you mean.  But what I can say today, in the opinion that I'm offering today, is that this return is different.

Q    Well, I keep going back to "probability" because of the words "more likely than not."  And at least in common vernacular in the English language, as I have encountered it, that is a description of probability of an event occurring.

So it's with that statement in mind that I'm trying to understand whether or not it's your opinion -- and it sounds very clearly like it's not -- that having a confidence level --

That by itself, having a confidence level of greater than 50 percent is not enough to be able to conclude that there's a probability of greater than 50 percent that there was a price impact.  So it seems to be very clearly that that's not your opinion.

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    Is that accurate?

Z. BOZANIC, PH.D.

A    I think you put a lot of words out there and a lot of words in my mouth. And I don't think that's exactly what I said.

I'm trying to explain this phrase to the best of my ability with respect to the distribution of properties of a sample to say, you know --

Let's assume that the significance level was at 40 percent; right?  So this return is only different than 40 percent of the returns in the distribution.

Then we can't say that this is more likely than not; right?  That this is different than the others.  Or is it just the "not" is occurring by random chance? So there is a probabilistic element to this phraseology; right?

But what it's saying is, did this return that we observed on this day -- does it appear as if it is different than the rest in the sample?

And if we say that this return

Page 450

Z. BOZANIC, PH.D.

is different than 89 percent of the returns in the sample -- right?  So this is more likely than not as well that this return is -- is different and is likely associated with the information that arrived on that day.

If we start to go below 50 percent, right, then that gets us away from this "more likely than not."  Right?  If it's 40 percent, well, then you've got, you know, far fewer returns that are -- that are different than the return that we're observing on that date.

Q    How does a 50 percent confidence level allow you to conclude that there is -- that it's more likely than not there was a price impact?

MR. LINKH:  Object to form.

THE WITNESS:  So again, this is evidence that I'm bringing to bear to show that this particular price on this day is different, right, than others in the sample.  It's not occurring by random chance.

Page 451

Z. BOZANIC, PH.D.

A lot of times, we can see returns in the market whereby there's some return. It is statistically significant. But it's unclear, the information that arrived to create that statistically significant return.

And so this is using probabilistic methodologies to say, again, "Does this return look different than the others?"

BY MR. PARTIDA:

Q    Right. But you're not saying and it's not your opinion that having, by itself, a confidence level of greater than 50 percent is the same as saying there's a 50 percent probability that this will happen? Or a greater than 50 percent probability?

So let me ask that question again so it's clear. Standing alone by itself, you cannot conclude that -- based solely on having a confidence level of greater than 50 percent, that there also is greater than 50 percent probability there was a price impact? You cannot?

Page 452

Z. BOZANIC, PH.D.

That's not your opinion?

MR. LINKH:  Object to form.

THE WITNESS:  I feel like you've asked the same question several times at this point.  Before the break.  After the break.  And I've answered it the same way each time.  And so I'm not quite sure what you're after here in terms of this "probability of price impact."

BY MR. PARTIDA:

Q    I'm trying to understand whether or not that's your opinion.  So it seems to me you should be able to say, "Yes. That is my opinion," or "No.  That's not my opinion."

So I'll ask it again.  And then I'll just have to ask the court reporter to keep reading it to you until I get a yes-or-no answer to it.

Because I'm trying to ask, is an opinion that you're offering -- is it your opinion that a greater than 50 percent confidence level, by itself, means that there is a greater than 50 percent

Z. BOZANIC, PH.D.

probability of a price impact?  Is that or is that not your opinion?

MR. LINKH:  Same objection.

THE WITNESS:  What I have said is the event study is bringing to light evidence that I can use to assess the probability of price impact; right?  So what -- "the probability of price impact," that -- that statement is difficult to understand the way you're phrasing it.

With regards to probability, all we're saying in the event study here is that this is different; right?  And so on the basis of this being different, I can say that this appears to be evidence in support of price impact because of this return.

Like, you're almost asking, "What is the probability of price impact?"  And I -- I don't -- I don't understand what that means when you say, "What is the probability of price impact?"  I -- I don't know.

But when we say, "Is there evidence

Page 454

Z. BOZANIC, PH.D.

showing that this return, on this date where information was released, is different than other returns in the sample distribution?" that gives me some comfort knowing that that return is related to that information on that day.

BY MR. PARTIDA:

Q    Okay.  Now, if the lack of statistical significance does not tell us that it's more probable than not that there was no price impact -- and that's what I understand from your hypothetical with the 40 percent.

So if that's true, if the lack of statistical significance does not tell us that it's more probable than not that there was no price impact, then is the opposite also true?  That a finding of statistical significance does not tell us that it's more probable than not that there was a price impact?

MR. LINKH:  Object to form.

THE WITNESS:  Well, I think I answered this already.  This goes back to

Z. BOZANIC, PH.D.

the materiality of the evidence I'm bringing to bear with respect to how a given return looks different than other returns in the sample distribution.  Thus, going back to that "more likely than not" language.

And the example that I gave previously was in regards to these bright-line thresholds that academics use. And then I say, well, it's fine if we -- you know, if we have statistical significance at the 90 percent level or greater, that's great.

But if we assume that statistical significance is at the 89 percent level, is that meaningless?  Does that mean that return is no different than other returns in the sample?  No.

We have to go back to how we interpret this test.  And this is saying that this return is different than 89 percent of the returns in the distribution.

So this return is greater in absolute

Page 456

Z. BOZANIC, PH.D.

magnitude than the other returns in the sample. So this gives me pretty strong evidence to say that this return, on this date, is not occurring by random checks.

And that's the only opinion here that I'm offering on this particular issue today, is to say that this is how I interpret statistical significance with regards to these bright-line thresholds. And perhaps where sometimes the statistical significance that I'm able to bring to bear might not exceed the standard conventional thresholds that we see in academic literature.

BY MR. PARTIDA:

Q   So is your opinion that because a confidence level of greater than 50 percent is evidence in support of price impact, more likely than not -- let me ask that question again.

On what basis do you form the opinion that because there is a confidence level of greater than 50 percent, which is evidence in support of price impact, allow

Page 457

Z. BOZANIC, PH.D.

you to conclude that it's more likely than not?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q     That there was a price impact?

MR. LINKH:  Same objection.

THE WITNESS:  So this is going back -- sorry --

MR. LINKH:  Same objection.

It was the same objection.  You may answer.

THE WITNESS:  So -- so this is going back to what statistical significance is telling us.  So I keep repeating myself.  The same thing.  That's the basis.

On the basis of interpreting what statistical significance is.  What it means when you have an 89th percentile.  If you have a 70th percentile, a 50th percentile, what this implies?

And -- and that's the basis, is the interpretation of the statistical test.  That's my basis.

//

Page 458

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    And how --

A    It's my understanding, as an economist, of how statistics work.  My training.  My experience.

Q    I don't think there was a question pending.

A    Oh.  I thought I heard, "How?"

Q    But I appreciate you volunteering information.  I was going to ask a question.  You're right.

A    Sorry.

Q    But sometimes you have to accept you're not going to get one.  So okay.  We'll go ahead and move on.

And what I want to -- I want to go to -- back to your reply merits report.  And it's Exhibit 95.  And I want to direct your attention to paragraph 16.

A    Which paragraph again?  Sorry.

Q    I want you to go to your expert reply report, the report that was introduced as Exhibit 95 and dated October 9, 2025.

Page 459

Z. BOZANIC, PH.D.

Now, in paragraph 16 -- do you want to take a look at it?  Familiarize yourself with it?

A    Please.  Thank you.  One moment. I have familiarized myself with the relevant paragraph.  Thank you.

Q    Okay.  And in paragraph 16 of that report, you cite three academic articles by Professor Garmaise; is that correct?

A    I do.

Q    Did you review all of Professor Garmaise's academic articles?

A    I reviewed a -- a sampling of his more recent articles.  He has a long career and many papers.  So I just looked for some more recent examples from the last ten or 15 years.

Q    How did you determine which articles to look at?  How did you select, search for, and identify them?

A    I went to his CV on his website to -- to see what -- his list of publications.  And then I looked for more

Page 460

Z. BOZANIC, PH.D.

recent papers.

Q    Approximately how many did you read?

A    In full?  I don't think I -- I read them all verbatim.  I was looking through them cursorily to understand his use of statistical tests and conventions in his papers.

I don't recall off the top of my head how many I looked at it.  And so he has ample papers.  So I -- I grabbed a few recent versions.

Q    Okay.  And so is that the only basis upon which you conclude that, "A review of his recent empirical work, i.e., where he analyzed data and made statistical inferences, his standard practice commonly employs a 90 percent confidence level"?

A    Sorry.  You're -- you're reading where from?

Q    I'm asking you, what is the basis for your conclusion that, "A review of his recent empirical work, i.e., where

Page 461

Z. BOZANIC, PH.D.

he analyzed data and made statistical inferences, his 'standard practice' commonplace -- commonly employs a 90 percent confidence level"?

A    So the basis is finding papers where he is using -- well, so finding papers where he uses alternate thresholds than the ones -- than the one he espouses in his report.

So his report seems to give the impression that all law and all finance seems to use some bright-line threshold at the 95 percent level.  And he -- he seems to hold it out as some gold standard.  And so it was interesting for me to see that, in terms of his academic work, he has a different convention that he also uses.

And so one would expect, given his position, that consistently throughout his work, if this were the standard in academia, if this were the standard, i.e., 95 percent level or greater, that he would also adhere to that.

And so, both in his research and

Page 462

Z. BOZANIC, PH.D.

his deposition testimony, I think he has shown by his research that he uses a lower threshold. And I think he admitted as such in his -- his deposition testimony as well.

Q   What do you mean with the words "standard practice"? What did you use those words to mean? You put it in a quote.

You say, "A review of his recent empirical work, i.e., where he analyzed data and made statistical inferences, his 'standard practice'" -- how did you determine it's his standard practice?

A   I -- I'm probably referring to language in his report that he uses a standard practice. So if I'm quoting it, it's likely this is verbiage used from his report where he refers to "standard practice."

Q   Well, you're not talking about that though. That's not what the sentence says. This sentence says, "A review of his recent empirical work" -- mentioned

Page 463

Z. BOZANIC, PH.D.

nothing about his report in this case.

"A review of his recent empirical work, i.e., where he analyzed data and made statistical inferences, his 'standard practice' commonly employs a 90 percent confidence level."  What do you mean when you say "his standard practice"?

A    I -- I think I answered it. If -- if I have this in quotations, what I believe I was thinking at the moment here is, I'm probably referring to his report, where he uses this terminology, "standard practice."

I can look at adjacent paragraphs to see if there's some other source of it.

Q    But you're referring to -- you're -- sorry.  You're referring to "his standard practice."  Not some standard practice he refers to.  You're saying, "His standard practice is" --

You say, "A review of his recent empirical work, i.e., where he analyzed data and made statistical inferences, his

Page 464

Z. BOZANIC, PH.D.

standard practice employs" --

My understanding -- and correct me if I'm wrong -- from this statement, you read his reports and came to a conclusion that, in his "standard practice," your words, "commonly employs a 90 percent confidence level."  What's the basis for that conclusion?

A    The basis is the evidence that I cited with respect to his published works.  And I'm sure there's other evidence out there as well.  But at least in terms of what I've given in this report, there are, at minimum, three examples of him using an alternate cutoff regularly.

Q    Okay.  Why did you only list these three papers?  Did you review only these three papers?  Or did you list -- look at additional papers?

A    I probably looked at additional papers.  Again, just looking at -- I -- I would say if you look at his CV and look at the --

Q    Probably?  Or did?

Page 465

Z. BOZANIC, PH.D.

A    I don't recall which -- all papers I looked at.  But what I said is, I looked at recent papers.  So any papers in the last ten or 15 years.

And so there are -- there are other papers I -- I looked at.  Which papers and, you know, how far back I went? I -- I think I went back ten or 15 years to look at how he was assessing statistical significance in his academic work.

Q    Are you aware that you're supposed to list all of the sources that you look at and identified and reviewed in connection with the preparing of your expert report?

A    So I --

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    List it so that I have a fair opportunity to be able to look at what you've seen and cited?

MR. LINKH:  Object to form.

//

Page 466

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    And so my question is, did you review articles, to the best of your recollection, other than these three that you cited?

A    There -- I -- I'm -- there could have been other articles that I cited that -- or that I reviewed that I did not cite.  Perhaps because they -- they were not on point.  Or perhaps because he didn't use the 10 percent statistical threshold.

And so I am just giving examples.  This isn't -- I never said this was an exhaustive search of all of his academic work, where I listed a table and gave the counts of the number of papers and the number of times in each paper where he uses it.

All I'm saying is that, despite his opinion -- very strong opinion with regards to this 95 percent threshold cutoff, he tends to use, in his -- in -- in his academic papers, alternate cutoffs.

Page 467

Z. BOZANIC, PH.D.

And that's the mere point here.

And so in terms of an exhaustive search, I don't claim to do an exhaustive search.  But when -- I looked at more recent papers.  And the evidence that I've used in this -- in -- in this report is cited in this report.

Q   Okay.  Well, why didn't you list them, all of the reports, in Appendix A?  If you considered them, why didn't you list them?  Even if you decided not to cite them, why didn't you list them?

MR. LINKH:  Object to form.

THE WITNESS:  Perhaps because it -- it wasn't on point.  It wasn't relevant in terms of what I was trying to look for in his -- in his papers.

There could be other papers where he uses other thresholds.  But again, I'm looking at more recent examples of his recent work to understand his more recent opinions with respect to academic work.

BY MR. PARTIDA:

Q   Okay.  Did you find any academic

Page 468

Z. BOZANIC, PH.D.
article by Professor Garmaise where he regarded results with a confidence level of less than 90 percent as statistically significant?

A    Repeat the question?  The first half?

Q    Did you find any academic article by Professor Garmaise where he regards results with a confidence level of less than 90 percent as statistically significant?

A    I -- I don't believe so.  But I didn't look.  So I don't recall if he -- if he had.

Q    Okay.  Did you find any academic article by Professor Garmaise where he regards results with a confidence level of 50 percent as statistically significant?

A    Again, I didn't look.  I don't recall.  So I don't have an opinion today.

Q    Okay.  Now, in paragraph 16 of your expert report -- since these are the articles you chose to rely on, we will look at them.

Page 469

Z. BOZANIC, PH.D.

So in paragraph 16, you have a quote here where you say, "With Garmaise and Natividad, 2010" -- that's the first bullet you cite with paragraph -- with footnote 25.

You cite a quote that -- you say, "We show that multi-province firm borrowing is also sensitive to local mining windfalls [statistically significant at the 90 percent level]." Correct?

A    That's correct.

Q    Okay.  Bear with me a moment. And while I'm doing this, you read these articles?  The -- you -- I just want to be clear on your testimony that, at least these three articles that were cited; you read?  Is that correct, Dr. Bozanic?

A    Not verbatim.

Q    Okay.  But you what?  How closely did you look at them?

A    So you can go through papers. And you can look at the tables to assess statistical significance.  So this -- this

Page 470

Z. BOZANIC, PH.D.

is the easiest way to look at the empirical analysis by way of the tables that are reported.

And then, usually, the tables have some notations that indicate levels of statistical significance. Usually, asterisks, for example.

MR. PARTIDA: Okay. I just circulated an exhibit. Exhibit 98. This is -- you can let me know when you get it.

(Exhibit 98 was marked for identification.)

THE WITNESS: Okay. I'm getting it.

BY MR. PARTIDA:

Q    Can you tell me what this document is?

A    Let's see here. This is one of Dr. Garmaise's papers with Natividad.

Q    And which paper is that, specifically?

A    I'm reading the title as, "Information, the Cost of Credit, and Operational Efficiency: An Empirical Study of Microfinance."

Page 471

Z. BOZANIC, PH.D.

Q    Okay.  And now, that's the very same article that was cited in paragraph 16 of your merits report that we were just looking at; right?

A    Yes.

Q    And the one that's footnoted 2025.  Now, I know that you said you didn't read the papers.  But I would assume that you read the quoted language?

A    Correct.  So what I'm trying to do is look at --

Q    Okay.  And put it here.  So just -- let's just -- just give me a chance to ask my question.

A    Sorry.

Q    And then we'll give you a chance to give your answers; okay?  What I want you to do is, I want you to look through the exhibit that I just sent.  And I want you to tell me where in this document that quote is from.

A    I apologize.  So I'm not seeing it.  I recall seeing this sentence.  The question is if the citation is incorrect

Page 472

Z. BOZANIC, PH.D.

or not.  But I recall this sentence.  I'm not seeing it in this citation.

Q    So I'll represent to you that the -- and Plaintiff's counsel can confirm for themselves.  But the sentence isn't in here.

A    Okay.

Q    So there's no need to beat your head against it.  I just --

A    Yeah.  I don't see it.

Q    It's interesting.  So that's why I asked if you cite checked earlier.

A    Mm-hmm.

Q    Because I've got a couple of phantom citations.  But that's okay.

Why don't we go to the next bullet point; okay?  In your report, 95; okay?  And let's go ahead and look at what you quote there; correct?  You quote, "MFIs that" --

A    I'm sorry.  Where are we going?

Q    Sure.  Paragraph 16.

A    Yes.

Q    Exhibit 95.  Paragraph 16 of

Page 473

Z. BOZANIC, PH.D.

your expert merits reply report.

A     Mm-hmm.

Q     Okay.  I want to go to the
second bullet.  The one right below the
one we were just looking at.

A     Got it.

Q     Where you cite a paper with
Garmaise and Natividad, 2013, with
footnote 26.

And there you quote, "MFIs that
met the eligibility criteria just before
the rating fund was announced are
significantly [at the 90 percent level],
more likely to be evaluated after its
inception."  Do you see that quote?

A     I do see it.

Q     Okay.  It looks like you're
doing something on your computer there.

A     Yeah.

Q     Are you listening to the
questions I'm asking?  Or are you doing
something else?

A     I am.

Q     Because I'd appreciate if you go

Page 474

Z. BOZANIC, PH.D.

ahead and listen to the questions I'm asking.

A    Look -- sure.  Sure.

Q    Thank you.  Okay.  Now, what I'm going to send you is -- and can you tell me what you have opened on your computer right now?

A    Exhibit 98 and Exhibit 90.

Q    Are there any background programs running on your computer?

A    Outlook and Zoom.

MR. PARTIDA:  All right.  I'm going to send another exhibit.  This is going to be Exhibit 99.  And --

(Exhibit 99 was marked for identification.)

MR. PARTIDA:  All right.  I've just sent Exhibit 99.  So you guys can let me know when you get it.  And you can let me know when you have it.

THE WITNESS:  Nothing yet.  Sorry.

MR. PARTIDA:  No problem.

THE WITNESS:  Okay.  Coming through.

//

Page 475

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    Okay.  So can you identify what this document is?

A    So Exhibit 99 is a paper by Dr. Garmaise entitled "The Attractions and Perils of Flexible Mortgage Lending."

Q    Okay.  Now, can you go back to paragraph 16 of your merits reply report?

A    Yes.

Q    Okay.  Now, one question is, can you -- the first question is, can you please direct me to the quote that you included from this paper?

A    So I think what I'm seeing here, David, is I may have inverted the citations.  And so I think, instead of a phantom cite, I think I just have the citations across papers inverted is what I'm seeing here.

Q    Okay.  Well, I asked a question.  And my question is, do you see that quote in this paper?

A    Let me see -- paper.  No.  This would be the quote in the other paper.

Page 476

                    Z. BOZANIC, PH.D.

Q    The quote in the other paper.  I appreciate the specificity.  Okay.  But we'll stick with my questions.  And that's fine.  So this paper is not the right citation either.

And we're going to go ahead and we're going to go to the next citation.  And that's to the third paper; correct?  And you -- let's go back to paragraph -- are you at -- do you have your merits reply -- merits report up?

A    I -- I have my merits report printed.  I don't have the third paper yet.  You're -- you're sending that?

Q    No.  No.  The reply paper.  I'm asking if you're looking at your reply report, paragraph 16?

A    I am.  Yeah.

Q    Okay.  Now, do you see where, on paragraph 16, you have a quote that you say, "The estimated coefficient of negative 0.268 is marginally significant at the 90 percent level"?  Do you see that?

Page 477

Z. BOZANIC, PH.D.

A    I do.

Q    Okay.  And you attribute that to a paper from Garmaise and Natividad of 2021; that's correct?

A    I'm sorry.  Repeat the question? I didn't understand -- hear the question.

Q    You attribute that quote to a title -- to a paper by Professor Garmaise? That's Garmaise and Natividad, 2021; correct?

A    Right.  I'm just looking at the footnote.  "Financial Flexibility: At What Cost?"

Q    Yes.  Okay.  I'm going to send -- you can let me know when you have it.

A    Oh.  Thank you.  Which exhibit is this?

Q    One hundred.

          (Exhibit 100 was marked for
          identification.)

A    Nothing yet.

Q    Okay.  And, of course, going back to the previous bullet point, I just

Z. BOZANIC, PH.D.

also wanted to ask.  Could you confirm that Natividad is not actually an author on that paper?  The 2013 paper? Exhibit 99?

A    In Exhibit 99, just Dr. Garmaise is coauthor if the -- is the author of the paper.

Q    Right.  Okay.  Let me know when you get 100.

A    Oh.  Here it comes.

Q    And I would like to just ask you to confirm, when you get that, that the quoted language cited in your report doesn't actually appear in this article.

A    Oh.  Let me see here.  Page number is two -- 261.  No, David.  I -- I think what I've done here is, I've inverted some citations.

I think that these quotes are from the papers that you have shared with me in terms of these exhibits.  But there seems to have been some inversion of the order of the citations.  And so this typo can easily be corrected.

Page 479

Z. BOZANIC, PH.D.

But this language does exist in certain papers of his.  But I think that, like I said, I -- like some of these quotes are in the papers you've already shared with me.

Q    Okay.  I would like to have you go to -- back to Exhibit 97.  And this is your July 18 merits report.

A    I have it.

Q    Okay.  Can you please go to footnote 78?

A    Okay.  I'm there.

Q    Okay.  Now, in footnote 78 of your merits report, you state that, "After the start of the class period, only the February 18, 2021, alleged misrepresentation was followed by a positive and statistically significant stock return."  Is that correct?

A    May I have a moment to read it?

Q    Please.

A    Thank you.  Okay.  I've -- I have read it.  Thank you.

Q    Okay.  So you see that

Page 480

Z. BOZANIC, PH.D.
statement; correct?  "After the start of the class period, only the February 18, 2021, alleged misrepresentation was followed by a positive and statistically significant stock return."  You see that?

A     I do.

Q     That's correct.  Okay.  What confidence threshold did you use to assess the statistical significance of the alleged misrepresentation dates?

A     So here, I'd have to go back to the event study.  But the statistical significance of this is irrelevant, given that there was a repetition of information.

However, I'd have to go back to the event study to look at the different thresholds.  But I would assume that this is using conventional thresholds.  But I don't have the benefit of those documents in front of me.

But regardless, the main thrust of this footnote is to state that there was a repetition of information.  And so

Page 481

Z. BOZANIC, PH.D.
statistical significance or not, this is redundant information.

Q   But my question is, what confidence threshold did you use to assess statistical significance of the alleged misrepresentation dates?

A   I would --

Q   And if I understand your testimony, you don't know, as you sit here?

A   What I don't have the benefit of is having the events study in front of me in terms of all of the dates and all of the levels of statistical significance. But I would imagine that I was doing so using conventional levels.

Q   Okay.  I would like to have you go to Exhibit 90.

A   Ninety?

Q   Which is -- yes.  That's the -- Professor Garmaise's report.

A   I'm there.

Q   Okay.  And I would like you to go down to Exhibit 1, which is on page 58

Page 482

Z. BOZANIC, PH.D.

of the PDF.

A    Fifty-eight.  I am there.

Q    Okay.  Do you agree that March 3, 2021, was another alleged misrepresentation date?

A    This, I believe, was another alleged misrepresentation date.  Yes.

Q    Okay.  And do you agree that the abnormal return for that date was positive?

A    Yes.

Q    Okay.  And do you agree that the confidence --

A    I mean, assuming that this is accurate, yes.

Q    Do you agree that the confidence level of the abnormal return for March 3, 2021, was 67.23?

A    As indicated by Dr. Garmaise's report, yes.

MR. LINKH:  Just to be clear here, David, are -- is it March 3rd or March 7th -- March 2nd?

MR. PARTIDA:  Second, I believe.

Page 483

Z. BOZANIC, PH.D.

Yes.

THE WITNESS:  Oh.  I think there was some confusion about the aftermarket, 3/1, 3/2.  So yeah.

BY MR. PARTIDA:

Q    Yes.  Yes.  That -- with footnote 3.  Okay.  Now, and that was not statistically significant or identified as statistically significant in your previous report; correct?

A    I believe that's correct.  So under conventional thresholds.

Q    Okay.  Now, in your 2017 paper co-authored with Dietrich and Johnson, which is titled "SEC Comment Letters and Firm Disclosure" --

MR. PARTIDA:  And let me actually go ahead and introduce that as an exhibit.  Okay.  And you can let me know whenever this goes through.

MR. LINKH:  David, this is 101? Exhibit?

MR. PARTIDA:  Yes.  That's correct.

MR. LINKH:  Okay.

Page 484

Z. BOZANIC, PH.D.

(Exhibit 101 was marked for identification.)

THE WITNESS:  I have it up and open now.

BY MR. PARTIDA:

Q    Okay.  And this is the two-seven -- 2017 paper, coauthored by yourself with Dietrich and Johnson titled "SEC Comment Letters and Firm Disclosure." Correct?

A    Correct.

Q    Okay.  And I'd like to direct your attention to page 353.

A    Okay.  I'm there.

Q    Okay.  Now, on page 353, you state there -- and sorry.  My computer's freezing.  So I'm going to have to look for a second.

"In Table 10" -- so this is right after footnote 35 in the above-the-line text.  It says, "In Table 10, consistent with H4, the positive coefficient on Post*QDF in column 1 suggests that disclosure improvements

Page 485

Z. BOZANIC, PH.D.

increase analyst following.

"However, the result from the matched pre-post design found in column 2, coefficient on CL by post by QDF, is not statistically significant at conventional levels."  Do you see that statement?

A    I -- I don't.  Let me catch -- 'cause you -- you focused me on a certain page.  Then you talked about Table 10. Where are you?  You're on page 353?

Q    Sorry.  Yeah.  Yes.  We are on page 353.

A    Okay.

Q    After footnote 35, there is a sentence where you say, "In Table 10, consistent with H4, the positive coefficient" -- that sentence I just read.

A    I see it now.  I'm sorry. Footnote 35 is at the bottom of page 353. That's where I got confused.  Okay.

Q    Oh.  I was looking at footnote 355, in the above-the-line text. I thought I had stated above-the-line text.

Page 486

Z. BOZANIC, PH.D.

A    I think I'm with you now on that sentence.  Yes.

Q    Okay.  Now, what are the conventional levels that you used to assess statistical significance in that case?

A    Sure.  Let -- it's been a while since I've looked at this paper.  If I could have the benefit of reading the paragraph and looking at the -- the respective table?

Q    Certainly.

A    Okay.  "Column 2 versus" -- so here, what I am asserting in this paper is that this particular result for this variable, as reflected by the coefficient estimate, is not statistically significant at conventional levels.

And conventional levels would be the ones that are denoted in the tables within academic research.  And so we see those asterisks that I referred to previously, where you have, "Denotes statistical significance at the 10, 5th,

Page 487

Z. BOZANIC, PH.D.

and 1 percentile, respectively --

1 percent level, I should say.

And so that's what I'm referring to.  Those conventions are beneath the table.  So the asterisk refers to the level of statistical significance.  That's what is meant there.

Q    I want you to go back to Exhibit 90, which is Professor Garmaise's report.

A    Yeah.

Q    Okay.  And then I want to go back to Exhibit 1.

A    I'm there.

Q    Okay.  Even before me.  Okay.  So based on your event study model, is the abnormal return on December 10, 2020, statistically significant?

A    So this goes back to what we mean by "statistical significance."  Right?  This goes back to this -- this notion of conventional levels per academia versus what one can interpret this to mean with respect to the evidence that I'm

Page 488

Z. BOZANIC, PH.D.

bringing to bear.

And so this -- this is the same discussion that we had earlier about statistical significance at the 10 percent level or a confidence interval of 90 percent.

And so the economic magnitude -- so even though that this cutoff -- this bright-line cutoffs would say, according to conventional levels used in academia, that -- at the start of the class period, that 15 percent positive abnormal return is not statistically significant at conventional levels.

But to me, 89.63 percent is not far off of 90.00 percent.  And so in terms of materiality, it seems as if this return is -- is quite an important one insofar as it's greater than 89 percent of the returns and absolute value in the distribution.

And so this goes back to this notion of, "Is this return happening by random chance or not?"  And so it would

Page 489

Z. BOZANIC, PH.D.
appear, on the basis of the strength of this confidence level, that this is not occurring by random chance.

Q    Is the abnormal return on December 10, 2020, statistically significant at the 95 percent level?

A    It is not.

Q    Is the abnormal return on December 10, 2020, statistically significant at the 90 percent level?

A    It also is not, using conventional thresholds.

Q    Based on your event study model, what was the abnormal price increase on December 10, 2020, in dollars?

A    In dollars?  I don't have that off the top of my head.  The abnormal return in a percent is 15 percent.

Q    I'm going to send a new exhibit. So I'll represent to you that -- rather than -- because we're going to end up running short on time.

But rather than showing you, I'll just represent to you that it was

Page 490

Z. BOZANIC, PH.D.

based on your event study model, as reflected in cell T255 of that, the abnormal price increase was assigned a value of $1.96.

And is it correct that you estimate artificial inflation at the start of the class period is $11.69?

A    That is my -- my estimate of artificial inflation at the start of the class period.  That's correct.  Yes.

Q    Okay.  And is $11.69 more than five times $1.96?

A    I'm sorry.  Repeat the question?

Q    Is 11.69 more than five times 1.96?  Five times as much?

A    I believe so.  Yes.  Yes.

Q    Okay.  Is it correct, in your merits report, that you state that March 2 and July 14, 2021, were dates when CleanSpark or then CEO, Mr. Bradford, provided updates on the ATL expansion timeline?

A    I would have to go back to the relevant paragraphs in my reports.  If you

Page 491

Z. BOZANIC, PH.D.

can point me to those, then I can look to see what I stated.

There's a lot of information in these reports. And I haven't memorized it all. So that would be helpful for me.

Q    Sure. Paragraph 44. Paragraph 44.

A    Sorry. Say again?

Q    Paragraph 44.

A    Which exhibit?

Q    Ninety-seven.

A    Ninety-seven. Thank you.

Q    So then my question is --

A    A moment, please?

Q    Okay. Yeah. No problem.

A    So here, I'm talking about that they did talk about the expansion and its estimate for completion. Whether or not this is new information on this date is the second question.

Q    Okay. You state that the tweet by Culper Research -- and this is -- if you want to look at it, you can go to your reply merits report.

Page 492

Z. BOZANIC, PH.D.

A     Which paragraph in Exhibit 95?

Q     It is paragraph 23.

THE WITNESS:  And I'm -- I wasn't sure if we were finishing the last line of questioning or if we're starting anew. But when we do finish whatever line of questioning, a comfort break would be appreciated.

MR. PARTIDA:  Let's just take five.

THE WITNESS:  And this is paragraph 29 in Exhibit 95?

MR. PARTIDA:  This is Exhibit 95. But why don't we just take five minutes? And then we'll come back.

THE WITNESS:  Okay.  Perfect. Thank you, gentlemen.

MR. PARTIDA:  So 2:37.

THE VIDEOGRAPHER:  This is the end of media unit number 3.  We are off the record at 2:32 p.m.

(Off the record.)

THE VIDEOGRAPHER:  This is the beginning of media unit number 4.  We are on the record at 2:39 p.m.

Page 493

Z. BOZANIC, PH.D.

MR. PARTIDA: All right. Welcome back.

BY MR. PARTIDA:

Q    Dr. Bozanic, I'd like to direct you to -- back to Exhibit 95, your expert merits reply. And paragraph 23 of that report. And you can tell me when you get there.

A    I am there.

Q    Okay. And when you -- in that paragraph, you state that the tweet by Culper Research on January 15th brought greater visibility to the Culper Report; isn't that correct?

A    May I have the benefit of reading the full paragraph?

Q    Sure.

A    Thank you, sir.

Q    And specifically, I'd direct you to the sense that says, "Hence, these two days reflect the market's response to the same corrective event entering the market.

"First, the release of the report. And then second, the tweet, which

Page 494

Z. BOZANIC, PH.D.

brought greater visibility to the report." Correct?

A    Pardon?

Q    You made that statement?  You see that sentence; correct?

A    I'm sorry.  I haven't finished reading the paragraph.  I've read it. Thank you.

Q    Do you see the sentence I directed you to?

A    I do.  Yes.

Q    Great.  Thanks.  Now, did you analyze the channels through which the Culper Report was disseminated?

A    I'm sorry.  I don't understand what you mean by, "Did I analyze the channels by which the Culper Report disseminated?"

Q    Sure.  Did you consider how the Culper Report might have been disseminated to the public?

A    So it's my understanding that the Culper Report was disseminated to the public by way of Culper Research's

Page 495

Z. BOZANIC, PH.D.

website.  And that it was further distributed by Twitter, at the time, X now.

And so those are the ways in which I was aware of which the Culper Report was distributed.

Q    Did you analyze how many people viewed, liked, or shared the January 15th tweet by Culper Research?

A    I -- I think in the tweets, at least with regards to the historical tweets that I had access to, I believe there are some other statistics in terms of maybe comments or -- or views.  But I did not analyze those.

Q    Okay.  And are you providing any expert opinion on the reach or visibility of channels through which Culper Research disseminated its report?

A    Only insofar as the -- the tweet would garner greater visibility of the report than just simply putting a report on a website.  It would bring more attention.  And there's academic research

Page 496

Z. BOZANIC, PH.D.

that -- that supports that.

Q     And where is that academic research cited in your report?

A     So the Blankespoor, et al., this is on disclosure processing costs.  And so this is about how information is -- is disseminated.

And so there's other research, whether I cited it or not.  But academic research does support that Twitter, for example, does help give more reach to information in the market.

Q     So are you providing an expert opinion on the reach and visibility of the channels through which Culper Research disseminated its report?

A     The only opinion I'm giving is that Twitter would've increased dissemination.  It would've increased visibility.  That's it.  To the extent?  I have not analyzed that.  No.  I have not.

Q     And so you are offering an expert opinion here today that publishing a tweet increases its exposure?

Page 497

Z. BOZANIC, PH.D.

MR. LINKH:  Object to form.

THE WITNESS:  I -- I think, yes. Academic research would support that as well.  But a tweet versus a single post on a website whereby others are able to see this information, i.e., the Culper Report and associated comments within the tweet, would allow for others to have access to that information.

Perhaps in the absence of that, it would be more difficult, is all I'm saying.  So it increased the visibility of the report.

BY MR. PARTIDA:

Q    And the basis for your expert opinion that the January 15th tweet increased the visibility is based on what?

MR. LINKH:  Object to form.

THE WITNESS:  So -- so one, there's academic research.  But two, just on the basis of one disclosure versus multiple disclosures.  So you have a disclosure. Then you have another disclosure.

So the tweet itself can be considered

Page 498

Z. BOZANIC, PH.D.

as a separate disclosure that could potentially increase the reach of that -- that report being published on a website.

BY MR. PARTIDA:

Q    What specific training and method, in your background and experience as an economist, qualifies you to state that basic logical conclusion that you've stated as an expert?

Why would we need an expert to say that?  Isn't that just a logical argument you're making?  What does that have to do with any expert analysis that you're offering?

MR. LINKH:  Object to form.

THE WITNESS:  It -- it's a logical statement that I'm making, which is predicated on my experience and expertise. And as I've said, there's academic research that supports this view that Twitter can increase the visibility of a given firm disclosure.

BY MR. PARTIDA:

Q    What new corrective information

Page 499

Z. BOZANIC, PH.D.

was disseminated by the January 15th tweet beyond what was conveyed in the January 14 Culper Report.

A       So can we bring up the tweet itself, so we can review it?

Q       Well, I'm asking you, as you sit here today, do you recall what if any new corrective information was disseminated by the January 15 tweet by Culper Research beyond what was obtained in the report?

A       So without having the benefit of reviewing the report in real time and the tweets in real time, the tweet repeated information that was contained within the report.

And as I said, the value relevance here is with respect to the broader dissemination of that report in the marketplace.

Q       Is it your opinion that the January 15, 2021, tweet by Culper Research had greater visibility than, for example, the December 12, 2020, video by RexFinance that Professor Garmaise referenced in his

Page 500

Z. BOZANIC, PH.D.

report?

MR. LINKH:  Object to form.

THE WITNESS:  Repeat the question once more?  Sorry, David.

BY MR. PARTIDA:

Q    Is it your opinion that the January 15, 2021, tweet by Culper Research had greater visibility than the December 12, 2020, video by RexFinance that Professor Garmaise referenced in his report?

MR. LINKH:  Same objection.

THE WITNESS:  I don't think I've offered an opinion on the relative reach of the relative information that you've quoted.

BY MR. PARTIDA:

Q    Okay.  Now, did you review the transcripts of the RexFinance YouTube video that were cited in the Garmaise report?

A    I am familiar with that video and the transcript.  Verbatim, from memory?  Not so much.  So if we have

Page 501

Z. BOZANIC, PH.D.

something to put in front of me, that would be very helpful.

Q    Sure.  But my question is, did you review those transcripts?

A    I -- I have seen a transcript of the -- the RexFinance video.  Yes.

Q    And you reviewed it?

A    Well, I listened to the video.  And I believe there might be like a subpanel or something where the transcript was generated.  And so I could hear it and see it.

Q    Okay.  So if we go to -- let me just -- okay.  Your -- just trying to remember the exhibit numbers of the different reports.  Oh.  Yeah.  So back on 95.  Mm-hmm.  I want to go down to footnote 52.

A    Footnote -- which?  Sorry.

Q    Five-two.

A    Five-two.  Okay.  I'm at the footnote.

Q    Okay.  So in that footnote -- and this is related to what I asked you

Page 502

Z. BOZANIC, PH.D.

about the transcripts.  I'm trying to understand.  What is the basis for your statement in footnote 52 that says -- and this is right after Garmaise's report.  Paragraph 68.  In that footnote.

But what is the basis for your statement that, "While the video discusses CleanSpark's ATL facility acquisition, with respect to Marathon, the influencer only focuses on CleanSpark's touted ability to lower its cost of energy below that of Marathon."

A    Thank you.  One moment.  Let me review the footnote in full.  So here, in reviewing the video and transcript, what I'm discussing is Dr. Garmaise's point about what was in the public at this time.

And he was pointing, I believe, to this video as evidence, at least as -- by way of an example, of information that was contained in the public.

So when he has this statement about ATL being linked to Fastblock -- Fastblock.  And Fastblock had been a

Page 503

Z. BOZANIC, PH.D.

target of a failed acquisition by Marathon and so forth.  And, you know, the -- the particular point about withdrawing it because of the expiration of the subsidized power agreement.

That was a lot of information. And so it was unclear if Dr. Garmaise was trying to tie all of that information perhaps to this YouTube video.

Upon my review of the YouTube video, what the influencer talks about is Marathon, a competitor; right?  A very large, established competitor.

With their energy costs.  And they could not achieve what CleanSpark stated it could achieve.  And so the -- the media influencer was excited about CleanSpark's touted claims to reduce the energy cost beyond that of a major competitor.

And so that was the takeaway that I saw with respect to the public information in the sphere, relative to what Dr. Garmaise was claiming in his

Page 504

Z. BOZANIC, PH.D.

report.

Q    So the basis -- to get back to my question, the basis for your sentence that I read in the report is your viewing of the video?

A    That's right.  I -- I viewed the video and looked at the transcript.

Q    Okay.

A    And that was my takeaway.  Yeah.

Q    Okay.  Thank you.  Now, that video also includes lots of other topics; isn't that true?

A    I -- I don't recall all the topics.

Q    Okay.

A    But I'm sure there were other topics discussed.  What they were, I don't recall off the top of my head.

Q    Understood.  So we're going to go ahead and help you with that.  I'm going to pull up the transcripts.

MR. PARTIDA:  And actually, Greg, I seem to recall that the transcripts were previously introduced in Professor

Page 505

Z. BOZANIC, PH.D.

Garmaise's deposition.  If that is the case --

MR. LINKH:  Do you want me to see if I can get it?  And I'll put it up on the -- on our email?

MR. PARTIDA:  You could circulate it.  Yeah.  You could do that if it's -- if you want to use that.  Either way.  Or I could throw up a new exhibit.

I just would prefer to keep, if we're going to use the previous exhibit number, that marked exhibit.  So we all know we're talking about the same thing.  And it was Exhibit 93.

MR. LINKH:  Okay.  Let me send that off.  Just give me a second.

MR. PARTIDA:  And it's because I actually don't have the actual marked copy of the exhibits.  Because I only saw them as we were --

MR. LINKH:  Okay.  I just sent off.

MR. PARTIDA:  Okay.  Thank you.

THE WITNESS:  It's coming through.

MR. PARTIDA:  Okay.  I haven't

Page 506

Z. BOZANIC, PH.D.

received it yet; but --

THE WITNESS:  I have it open, David.

MR. PARTIDA:  Okay.  No problem.  I'm just waiting for it to come through on my end.  And it has.

THE WITNESS:  Good.

MR. PARTIDA:  Thank you very much, Greg.

BY MR. PARTIDA:

Q    Okay.  So if you go and open Exhibit 93, which was previously marked in the deposition of Professor Garmaise?

I'll represent this to you as a transcript of the RexFinance video of December 12, 2020, that we were talking about.  Now, the video states that ATL was formerly known as Fastblock; correct?

A    I -- I haven't reviewed this transcript in some time.  So I'd have to go back --

Q    I'll direct you to 1:33, for example.

A    To -- to where?  I'm sorry.  One -- oh.  It's date -- time marked 1:33.

Page 507

Z. BOZANIC, PH.D.

Okay.

Q    Yes.  And do you see where it says, "And that's" -- starting at 1:31? "And that's all because ATL Data Centers, or formally known as Fastblock Mining, is such a huge player in the mining space." You see that?

A    I -- I see the same language.

Q    Okay.  Now, I would direct you down further to 2:57 through 3:02.  And do you see where it says, "So we're going to start off at ATL Data Centers' website, formerly known as Fastblock"?

A    I see that.

Q    Okay.  Fastblock Mining -- sorry.  I just -- this -- my computer skipped a -- something's weird with pagination.  So let me read it, just so we're clear.

On 2:57 through 3:04, it says, "So we're going to start off at ATL Data Centers' website, formerly known as Fastblock Mining, as I previously mentioned.  We'll get into why that's

Page 508

Z. BOZANIC, PH.D.

important."  Is that correct?  You see that language?

A    I do.

Q    And the video also states that Fastblock had been a target of a failed acquisition by Marathon; isn't that correct?  And I would direct your attention to 5:56 through 6:12.

And starting at 5:56, as soon as I can get there.  Do you see that it says, "All those companies that look up to ATL Data/Fastblock Mining, all of a sudden are going to want to install Fractalgrid for themselves.

"Back in August, they were actually set to be acquired by Marathon. Which, if you guys don't know, is one of the two biggest bitcoin mining publicly-traded companies."  Do you see that?

A    I do.

Q    Okay.  Then why did you state in footnote 52 that we were just looking at in your reply merits report that, "With

Page 509

Z. BOZANIC, PH.D.

respect to Marathon, the influencer only" -- your word -- "focuses on CleanSpark's touted ability to lower its energy costs below that of Marathon?"

A    Sure.  Happy to answer the question.  So if you keep going in the minute marks, he says further, "In the Nasdaq.  But the part I really want to pay attention to here is that Marathon said they could cut power costs to 2.85 cents per kilowatt hour, which would reduce the mining cost."

And so if you listen to the video, you can hear his intonation come out, especially in terms of what he's excited about, this particular influencer. And so what he's trying to underscore is that CleanSpark is touting that they can do better than a major competitor.

And so he was excited about the potential profitability of CleanSpark on the basis of those stated claims with respect to the power agreement and the potential to keep those costs low, beyond

Page 510

Z. BOZANIC, PH.D.

what the industry standard was, especially in regards to these major players.

So this is a pretty wild claim to say that the company can really reduce the cost of mining using its proprietary software or whatever the case may be, however they do so. But this is where the influencer gets really excited in terms of the main point that he wants to focus on.

Like he's not saying here that the reason -- to my knowledge, he's not saying that, "Hey, the reason this fell through is because of the lack of viability of the power agreement in terms of its intended expiration date."

And so this influencer is -- is touting the same, with respect to the ability to mine at a very low cost that's well below the industry standard.

Q    So I'm going to go ahead and cut through all of that, which is nonresponsive to my question.

My question is, why did you say in footnote 52 that, "With respect to

Page 511

Z. BOZANIC, PH.D.

Marathon, the influencer only" -- that's different than what you said.  You said, "Only."

Why did you use the word "only," when we've just read transcripts from this very video where he discusses something specific and completely different than that with regard to Marathon?  How is it that you can say that he "only" focused on that?

A    Well, again, I think the relevant point here -- and this goes back to Dr. -- Dr. Garmaise's quote.

Q    I didn't ask what you thought the relevant point was, with all due respect.  I asked why you stated in footnote 52 that the influencer only focuses on that, when from the transcript we've just read, that's not true?

A    It --

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    If you want to go ahead and say that maybe the word "only" --

Page 512

Z. BOZANIC, PH.D.

A    Let me know when I can answer.

Q    Maybe the word "only" is a -- quite a bit of an overstatement?

MR. LINKH:  Object --

BY MR. PARTIDA:

Q    I mean, didn't you just read these -- this previous transcript where we just saw, on 5:57 through 6:10, a discussion with respect to Marathon that focuses on something different than what you referenced in your footnote?  Isn't that true?

MR. LINKH:  Object to form.

THE WITNESS:  David, when you'll permit me, I'll answer the question.  You just said a lot there.

BY MR. PARTIDA:

Q    Isn't that true?  Isn't -- I'll say a little less.  Isn't it true that you just read 5:57 through 6:10 of this transcript?  Yes or no?

A    Let me --

Q    It's an easy question.

A    Let me go back.

Page 513

Z. BOZANIC, PH.D.

MR. PARTIDA:  Court --

THE WITNESS:  Dave --

MR. PARTIDA:  Can I --

THE WITNESS:  David, I'm -- I'm trying to express to you that I have been unable to answer the question because you speak -- keep speaking.  And so instead of rattling off a lot of points, if you can bracket it to a specific question, I'm happy to answer it.

BY MR. PARTIDA:

Q    I asked a very specific question.  Did you or did you not just read with me 5:57 through 6:10 of this transcript?

A    David, I'm going to go back to the transcript to affirm what you said.

MR. PARTIDA:  Can I ask the court reporter to read back the section of this deposition where we literally just read through 5:57 through 6:10 of this transcript?

THE REPORTER:  Absolutely.  Just a second.

Page 514

Z. BOZANIC, PH.D.

(The reporter repeated the record as requested.)

BY MR. PARTIDA:

Q    Does that refresh your recollection, Dr. Bozanic, as to whether or not we just read that part of the transcript at this deposition?

A    Dave, with all due respect, I -- I think you're getting a little animated. And it would be helpful if I had less tone in the questioning.

So with respect to your specific question, there is no 5:57 mark.  I simply wanted to go back to read the specific sections that you're quoting.  If you go back to the document, there is no 5:57, which is what you kept saying.

I simply just wanted to look back at the verbiage, that's all, to answer your question.  So you -- you rattled off a lot of words.  I could not ascertain where your question was.

And so when you simply wanted to say, "Hey, did we read this?"  Sure.  I

Page 515

Z. BOZANIC, PH.D.

want to go back to see the relevant excerpts that you're referring to before I can answer your question.

Q    So with all that said, do you now agree that we read that portion of the transcript?  Yes or no?

A    Yes.  We did read that portion of the transcript.

Q    Thank you.  Thank you.  Now, did Professor Garmaise claim anywhere in his report that the video discussed Marathon's reasons for withdrawing the offer to acquire Marathon?  Yes or no?

A    Let me look back at the sentence that I quoted.  I have not memorized his report.  So I quote a sentence about Fastblock.

And I think after, if I recall, in his report then he references this as video, as public evidence -- you know, information in the public in support of that statement.  And so that statement, I felt, was broader than what was made in the influencer's video.

Page 516

Z. BOZANIC, PH.D.

And for me, when I listened to the influencer's video and read the same as we just read, if you continue, which we haven't done and which I've tried to allude to, his point that he weaves through the video is, he starts to --

Where he -- where he really gets excited -- and we don't have the tone in the transcript that we do in the video. He gets excited by setting up, "Look at all these major competitors after this particular firm.  Didn't work out with those competitors for unspecified reasons."

But then he gets really excited about this claimed ability to mine bitcoin at such a low cost.  And those are the -- the several sentences that followed that discussion in terms of how he's teeing up his -- his video.

Q    Did Marathon issue a press release in September 2020 announcing that it was withdrawing its offer to acquire Fastblock and stating the reasons for its

Page 517

Z. BOZANIC, PH.D.

decision?

A    I believe there was a press release.  What the contents were, I would have to take it on faith.

In terms of what you said with regards to the date, I don't recollect the exact date.  But I do recall that there was some announcement in terms of the withdrawal from the agreement.

Q    Okay.  Do you agree that, prior to January 14th, the following items had been publicly discussed with respect to the issues in this case?  So do you agree that, prior to January 14, it had been publicly discussed that ATL was linked to Fastblock?

MR. LINKH:  Object to form.

THE WITNESS:  On -- on the basis of what we just saw, I mean, at minimum, it -- it seems as if this transcript, right, is alluding to the same.

BY MR. PARTIDA:

Q    Did it also -- was it also publicly disclosed that Fastblock had been

Page 518

Z. BOZANIC, PH.D.

a target of an acquisition by Marathon?

A    Again, I don't -- I don't have the benefit -- I think somewhere in my report, I might cite the same story that you're referring to in one of my reports. But I believe there was a press release by Marathon that talked about pulling out of the agreement.

Q    And that was also discussed in the transcript that we just looked through; correct?

A    Yes.

Q    Okay.  And now, I want to go to -- you're familiar with the Culper Report; correct?

A    I am indeed.

MR. PARTIDA:  Greg, I would have to dig deep here on this one.  In terms of asking you if there is a previously marked version of this, I would imagine there is. But if not, I will just circulate a new copy.

MR. LINKH:  Yeah.  I'm sure there is, David.  But I don't know if I can real

Page 519

Z. BOZANIC, PH.D.

easily find it.

MR. PARTIDA:  Yeah.  I know.  We --

MR. LINKH:  If we could just bump it up to the top, that would be fine.

MR. PARTIDA:  Yeah.  No problem.

Just bear with me one second.  Sorry. My computer.  I think I have too many PDFs open.  It's extremely slow.

THE REPORTER:  I was going to say -- I guess I could say it off the record -- that you were glitching earlier.  And I think it was because you had pulled up that exhibit with the video transcript.

MR. PARTIDA:  Ah.  Okay.

THE REPORTER:  So if you want to close everything before 90, that might help.

MR. PARTIDA:  Thank you very much.

All right.  Bear with me.  I apologize.  Going back to this.  Sorry. I'm having trouble pulling that up.

BY MR. PARTIDA:

Q    Okay.  So in moving to a different topic, there is a paper that you

Page 520

Z. BOZANIC, PH.D.

cite in your reply merits report by these authors:  Blankespoor, deHaan, and Marinovic.  Bear with me one moment.  And here's going to be Exhibit 102, which is this paper.

(Exhibit 102 was marked for identification.)

Did it happen to come through?  If not, I guess we can -- while we're waiting for that to come through, I'll just ask if you --

MR. LINKH:  Just came through for me.

MR. PARTIDA:  Okay.

THE WITNESS:  Just now.

MR. PARTIDA:  Okay.

THE WITNESS:  I -- I have it open.

BY MR. PARTIDA:

Q    Okay.  And this is -- you cite this paper in your reply merits report; correct?

A    That's correct.

Q    Okay.  Is it your opinion that because Culper Research incurred processing costs in acquiring, analyzing,

Page 521

Z. BOZANIC, PH.D.

and synthesizing the information contained in it, then that information must impact CleanSpark's stock price?

MR. LINKH:  Object to form.

THE WITNESS:  So what I'm arguing there in my report -- and I'm happy to go to those paragraphs as well -- is the author, despite the fact of the claims that all of this information, as Culper states and Dr. Garmaise states, was in the public sphere, the ability to acquire this information, analyze this information, synthesize this information, and make inferences on this information requires effort.  Requires costs.

And so there's costs that are borne by investors to acquire information.  And these are the disclosure processing costs that they refer to.  Information acquisition is not -- is not costless. You know, synthesis is not costless.

And so they discuss the ability to acquire it.  How to know of its existence, acquire it, analyze it, and then start to

Page 522

Z. BOZANIC, PH.D.

make inferences from it.  And so this is the context by which I discuss disclosure processing costs in my report.

BY MR. PARTIDA:

Q    But is it your opinion that because there are processing costs for information, the information process must impact the stock price?

MR. LINKH:  Object to form.

THE WITNESS:  This notion of "must." I'm not sure what -- what do you mean by "must"?  That seems awfully strong.

BY MR. PARTIDA:

Q    So I'm trying to understand what is -- what the point is you're trying to make with your opinion.  The point, to me, as I read the opinion, seems to be that, "Look, there are costs incurred in acquiring information."

And the opinion seems to be -- although you don't state one way or the other, which I'm trying to therefore ask what your opinion is and why you're citing this.

Page 523

Z. BOZANIC, PH.D.

But the opinion that seems to be getting inferred is that because there are information processing costs associated with it, or because there are processing costs associated with information, then that information impacts the stock price.

So I'll ask it in a specific different context.  Isn't it possible that, ex ante, Culper Report could have been wrong about the value of acquiring, analyzing, and synthesizing the information in it?

MR. LINKH:  Object to form.

THE WITNESS:  This would be pure speculation.  I -- I don't have any opinion on that.

BY MR. PARTIDA:

Q    I'm just asking if it's possible.

A    It -- it's possible for people to get things right.  It's possible to get things wrong.  I mean, it's a very general statement.

But my only point is -- and I'm

Page 524

Z. BOZANIC, PH.D.

happy to go back to the report, but you haven't referenced the specific paragraphs where you say I have an opinion -- is I'm trying to contextualize this -- this point with regards to the information being in the public sphere.

But the literature speaks pretty clearly about these costs that are borne. And on the basis of bearing those costs, the information can be valuable to use.

Q    Correct.  But isn't it also true that the person processing the information could make a mistake about its value, ex ante?

MR. LINKH:  Object to form.

THE WITNESS:  I -- I suppose anyone creating any report, such as an analyst, could make a mistake with the information he or she acquires and embeds in a report.

BY MR. PARTIDA:

Q    Okay.  And could they make a mistake about the relative value of the information?

A    Again, this would be

Page 525

Z. BOZANIC, PH.D.

speculative. I don't know what you mean. Who is "they?" And what's the relative value of what information?

Q I'm asking, could Culper -- let's put it this way. Let's put it on Culper. Could Culper; right? Could Culper have made a mistake, ex ante, about the value of acquiring, analyzing, and synthesizing the information that it did?

MR. LINKH: Object to form.

THE WITNESS: I don't have an opinion on that matter. But consistent with disclosure processing costs, it would say that, on the basis of acquiring costly information, if information has a price attached to it, then it is valuable.

BY MR. PARTIDA:

Q And so then is it your opinion that if information costs money to obtain that it has value in terms of the stock price?

MR. LINKH: Object to form.

THE WITNESS: In regards to specific information, I can't say. But in regards

Page 526

Z. BOZANIC, PH.D.

to what the literature says with -- with respect to disclosure and the acquisition of disclosures, the acquisition of information, there's a cost borne.

And for one to bear the cost, there's a presumption that there would be value in so doing. Whether there's an error, I -- I don't have an opinion on that.

BY MR. PARTIDA:

Q   Okay.  Is it your opinion that the ATL-related information in the Culper Report was already publicly available, but not incorporated into CleanSpark's stock price?

MR. LINKH:  Object to form.

THE WITNESS:  Repeat the question again?  Sorry.

BY MR. PARTIDA:

Q   Is it your opinion that the ATL-related information in the Culper Report was already publicly available, but that it was not incorporated into CleanSpark's stock price?

MR. LINKH:  Object to form.

Page 527

Z. BOZANIC, PH.D.

THE WITNESS:  It would appear that the information, as stated by Culper itself, was culled from public sources.

On the basis of bearing those disclosure processing costs and synthesizing all of those relative sources, it brought -- Culper brought to bear some allegations that the market could assess.

Whereas, previously, perhaps this was -- this was not as a -- as a whole; right?  We call this mosaic theory.  In terms of the overall amount of information, this was not interpretable by market participants.

Despite the fact that this -- these elements of this information were in the public domain, the -- the accumulation, the bringing together into one report to put all these allegations together, that's -- that's what's essential here in terms of the disclosure.

And so the -- to get to your question, that means that that information

Z. BOZANIC, PH.D.

that the Culper Report brought to bear was not embedded in the stock price of CleanSpark until the -- the publication and dissemination of that report.

BY MR. PARTIDA:

Q    So yes.  Okay.  In paragraph 31 of your reply merits report, which is Exhibit 95 -- so paragraph 31 of that report.

A    Exhibit 95?  Paragraph 31?

Q    Yes.  Exhibit 95, which is your expert reply merits report, paragraph 31.

A    I'm there.

Q    And in that paragraph, you cite to Professor Fama stating that -- is it "Fama"?  Is that how you pronounce it?

A    Yes.

Q    Okay.  "Professor Fama stated that the 'economically more sensible' definition of 'semi-strong' efficiency hypothesis is that 'prices reflect information to the point where the marginal benefits of acting on the information, the profits to be made did

Page 529

Z. BOZANIC, PH.D.

not exceed the marginal costs.'"  Correct?

A    That -- you read that verbatim. Yes.

Q    Okay.  Now, does this mean that, prior to the release of the Culper Report, the marginal benefit from acting on the information analyzed and disseminated by Culper Research in its January 14 report had to be equal to or less than the marginal cost of processing that information?

MR. LINKH:  Object to form.

THE WITNESS:  So what -- what this means is, information will not be embedded if the marginal benefit does not exceed the marginal cost.

So what -- what this implies is that for those to undertake costly information acquisition, they do so with the belief that they'll be able to gain.  They'll be able to profit; right?

And so on the basis of acquiring this information whereby they have a profit-motivated objective, that

Page 530

Z. BOZANIC, PH.D.

information could be impounded in price. And so to -- the -- the spoils go to the winners that can bring new information to the market and embed it into price.

BY MR. PARTIDA:

Q    Now, what if any analysis did you do to determine Culper Research's cost of acquiring, analyzing, and synthesizing the information contained in its January 14 report?

MR. LINKH:  Object to form.

THE WITNESS:  So I -- I did not quantify the explicit cost borne.  The theory would speak to, again, the knowledge of something's existence.

You have to search to find that something exists; right?  Then you have to acquire that something that exists.  Then you have to interpret it, synthesize it, and act upon it.

But in terms of quantifying the dollar amount of costs, I have not done so.  I have no opinion on that.

//

Page 531

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    Okay.  So you just assumed there were costs, but did not quantify them?

MR. LINKH:  Object to form.

THE WITNESS:  This is a theory as to why one would be motivated and why we might see price response post dissemination of information that might have existed in the public sphere in -- in very different areas.

But once brought together into one report, it brought to light a lot of allegations and claims that investors could evaluate and respond to.

BY MR. PARTIDA:

Q    But my question is, you did not quantify the cost to Culper Research of acquiring, analyzing, or synthesizing the information in its reports?

MR. LINKH:  Object to form.

THE WITNESS:  I believe I already answered that question.

MR. LINKH:  Object to form.

//

Page 532

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    Okay.  Thank you.  Well, so what is your answer?  You confirmed that you did not quantify --

A    As I stated previously --

MR. LINKH:  Same objection.

BY MR. PARTIDA:

Q    Culper Research's cost?

MR. LINKH:  Same objection.

THE WITNESS:  As I already stated, I did not quantify explicitly the costs borne by Culper Research with respect to the acquisition of this information.

BY MR. PARTIDA:

Q    Are you aware that the RexFinance YouTube channel is referenced in the Culper Report?

A    I don't recall.  I just don't -- I'd have to take a look.  Off the top of my head, I can't.

Q    I'll represent to you that it was.  And is it possible that, prior to disseminating its report, Culper Research knew that RexFinance had publicly

Page 533

Z. BOZANIC, PH.D.

discussed that ATL and Fastblock were linked?

MR. LINKH:  Object to form.

THE WITNESS:  One, it would -- it would benefit me to see the Culper Report. But two, ask the question once more.  I'm sorry.

BY MR. PARTIDA:

Q    Sure.  The Culper Report references the RexFinance YouTube channel, the same channel from the video -- RexFinance video transcript we were just looking at.

And I'm wondering if it's possible that, prior to releasing its report, Culper was aware that RexFinance had already discussed ATL and Fastblock publicly?

MR. LINKH:  Object to form.

THE WITNESS:  I -- I think that would be speculative.  I'm not quite sure what Culper was aware of.

I mean, we can look at the Culper Report to see what they say.  And then

Page 534

Z. BOZANIC, PH.D.

perhaps I can give more color to that question.

BY MR. PARTIDA:

Q    Okay.  But it's possible?

MR. LINKH:  Same objection.

THE WITNESS:  It would be pure speculation.  I -- I don't have -- I don't have an opinion.

BY MR. PARTIDA:

Q    Sure.  By nature of the question, I'm asking if it's possible. Speculate if it's possible.  But that's okay.

Now, is it -- why do you think -- let me start with this.  Is it -- give me a moment.  I want to turn to a different topic now, slightly.

The reply in your reply merits report -- well, let me ask it this way. Did you rely on the academic papers related to disclosure processing costs, which are cited in your reply merits report, when you were preparing your merits report?

Page 535

Z. BOZANIC, PH.D.

MR. LINKH:  Object to form.

THE WITNESS:  I -- I suppose by "reliance," you mean like explicitly in the report, did I cite this literature? I'd have to go back to see if I alluded to it.

But "rely." in the broader sense, that I'm well familiar with this literature and researched this literature? That sense, yes.

I mean, in terms of my education and experience.  This is a framework, as a disclosure expert, that -- I approach all academic research with disclosure.

So the -- the Blankespoor, et al. paper right now is the -- the state of the art, if you will.  There were other disclosure theory papers before this.

And -- but in terms of kind of understanding and sizing up disclosures, it did a good job of -- it's a literature review paper.  And it did a good job of talking about the different theories that are out there.

Page 536

Z. BOZANIC, PH.D.

So I -- I guess I'm -- "rely," in the strict sense of, "Is this in the report and cited in the report?"  I don't believe so.  Could there be threads?  Perhaps.  But this is, you know, consequent to my experience and expertise.

BY MR. PARTIDA:

Q    Okay.  Are you a disclosure expert?  Or are you a damages expert?

MR. LINKH:  Object to form.

THE WITNESS:  So in terms of my academic research?  So one of my -- one of my areas of expertise is corporate disclosure.

BY MR. PARTIDA:

Q    So you are a disclosure expert?  And that's at the -- that's the capacity in which you're opining in this report?

MR. LINKH:  Object to from.

THE WITNESS:  So I'm opining as a financial economist with a lot of expertise in different areas, disclosure being one of them.

But an area that I research quite a

Page 537

Z. BOZANIC, PH.D.

bit is corporate disclosure, regulation, enforcement, and so forth.  So in terms of my expertise, I --

BY MR. PARTIDA:

Q    What is your --

A    Go ahead.

Q    You can finish.

A    In terms of my academic expertise, with respect to the areas that I research, those are areas that I research.  And so that's why I say I'm familiar with these -- these theories of disclosure.

Q    Okay.  But you are a damages expert in this case; isn't that correct?

A    I am.

Q    You are not a disclosure expert in this case; isn't that correct?

MR. LINKH:  Object to form.

THE WITNESS:  I -- I think that's a distinction without a difference.  What I am saying is, with respect to my academic work, an area of expertise is disclosure.

//

Page 538

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    Not under the law.  Are you serving as a disclosure expert in this case?

MR. LINKH:  Object to form.

THE WITNESS:  I'm serving as a financial economist in this case.

BY MR. PARTIDA:

Q    Okay.  Thank you.  Did you talk to anyone about -- at Culper Research about the processes that they followed when they were writing the January 14, 2021, report on CleanSpark?

A    I don't know what you mean by "processes."  But I spoke to no one at Culper Research.

Q    Okay.  Do you have any actual knowledge about what Culper Research staff was thinking about in deciding what claims or topics to emphasize in the Culper Report?

A    I would not opine on what they're thinking about.

Q    And you also don't have an

Page 539

Z. BOZANIC, PH.D.

opinion about what they were thinking about with respect to subsequent tweets?

A    Again, with what's in their head, I -- I can't say.  With what I see on paper, with what is disclosed, then I can make some judgements and inferences.

Q    Is it your opinion that the claims in the Culper Report which were not repeated in subsequent Culper Research tweets were not value relevant?

MR. LINKH:  Object to form.

THE WITNESS:  I'm sorry.  Repeat the question?

BY MR. PARTIDA:

Q    Is it your opinion that the claims in the Culper Report which were not repeated in the subsequent tweets were not value relevant?

A    So the idea here is to assess the information brought to the attention, by way of the tweets, to the marketplace for information.  And so the report itself has the substantive claims.  The tweets reiterate some of those claims.

Page 540

Z. BOZANIC, PH.D.

Q    And so to the extent that the tweet reiterated or did not reiterate a claim, is the claim that was not repeated less value relevant?

MR. LINKH:  Object to form.

THE WITNESS:  So this was -- so I know we're not pointing to specific sections of my report.  But this also dovetails with the discussion about disclosure processing costs when we get into disclosure salience.

And so I'm relying on some theory with respect to disclosure salience to assess the value relevance of the information that was given, both in the Culper Report and the associated tweets.

And so the literature therein would say that repetition in placement would -- is -- is highly value relevant in terms of when these studies analyze information and the impact of that information.

And with respect to the placement, say, in a headline, or say, the repetition of the information, how it impacts market

Page 541

Z. BOZANIC, PH.D.

price.

And so the literature speaks to the value relevance of these features of disclosures.  That's all I'm saying here.

BY MR. PARTIDA:

Q    Okay.  But I guess the understanding I have from that is that then, if it's not repeated, it's less value relevant in the overall calculation.

MR. LINKH:  Object to form.

THE WITNESS:  So I don't know what you mean by "overall calculation."

MR. LINKH:  Yeah.  Yeah.

THE WITNESS:  But the disclosure salience literature would say that repetition and emphasis would be -- in the investor's eyes, would be viewed as more value relevant.

And they document this evidence by looking at how the market reacts when there are disclosures that are more repetitious or more emphasized.

BY MR. PARTIDA:

Q    So does more repetition equal

Page 542

Z. BOZANIC, PH.D.
more value relevance?

A    So the literature would speak. The repetition would increase the value relevance with respect to the market reaction.

Q    And less repetition would be less value relevance?

A    I -- I suppose the converse could hold.  But then we have to start to get into other issues with respect to the information environment.  And we have to get into what's relevant at that time period.

Q    Okay.  Well, I'm just going by what you say in paragraph 45 of your reply merits report, where you say exactly what I just asked you if it was true.

So I'll go ahead and point you to paragraph 45 of your report.  And in that paragraph -- and this is Exhibit 95; right?  You say exactly what I just asked you.  And you --

So here we go.  You say that "Relying on this literature" -- at the

Page 543

Z. BOZANIC, PH.D.

very last sentence of page --

paragraph 45.  "Relying on this

literature, I consider the points that

were not repeated across the tweets as

less emphasized.  And thus, less value

relevant for Culper Research and its

investors."

So I thought I was giving you a

layup.  Because I thought you would say,

"Yes.  I wrote that.  Of course, I agree

with it."  But --

So I'm trying to understand.  Do

you agree with this sentence?  "Relying on

this literature, I consider the points

that were not repeated across the tweets

as less emphasized.  And thus, less value

relevant for Culper Research and its

investors."  Is that your opinion?

MR. LINKH:  Object to form.

THE WITNESS:  Yes.  I see what -- I

see what I wrote.  And I stand by what I

wrote.  But I also augmented the

conversation.

//

```
                                              Page 544
```

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    Okay.  Thank you.  Thank you.  I appreciate that.  Okay.  Now, what is the basis -- well, strike that.

Is it correct that all the academic papers that you cited in paragraphs 36 to 40 of your reply merits reports are related to disclosures by the issuing firms?

MR. LINKH:  Object to form.

THE WITNESS:  I -- I'll need to review the paragraphs.  You said which again?

BY MR. PARTIDA:

Q    Yes.  Please review paragraphs 36 through 40.  And let me know if any of the papers you cite in those paragraphs are related -- well, I'll let you familiarize yourself with the paragraphs first.  And then --

A    Oh.  Thank you, sir.  Thirty-six to 43 you said; correct?

Q    Correct.

A    Thank you.

Page 545

Z. BOZANIC, PH.D.

Q    And just before you start reading, if it helps, I want to ask you a question generally about the literature that you have cited in those paragraphs. Not necessarily about the content of the paragraphs.

A    Understood.

Q    So however you want to read it. I just want you to more be familiar with the literature that you're citing in it because that's the thrust of my questions.

A    Okay.

Q    Okay. So is it true --

A    I have skimmed the relevant paragraphs.

Q    Oh. I'm sorry?

A    I have skimmed the relevant paragraphs. Thank you.

Q    Okay. Great. So is it correct -- and I think it is. But is it correct that all the academic papers that you cited in those paragraphs relate to disclosures by issuing firms?

MR. LINKH:  Object to form.

Page 546

Z. BOZANIC, PH.D.

THE WITNESS:  So yes.  If -- if I understand what you mean by "issuing firms."  So these are publicly traded firms that are providing disclosure to the marketplace.

And this is what the academics, at least in -- in most, if not all of those studies, are analyzing.

BY MR. PARTIDA:

Q    Okay.  So I understood that correctly.  Okay.  Did any of those papers, the papers that are cited in those paragraphs, discuss that information that isn't repeated in subsequent tweets is not value relevant?

A    I don't believe that these particular papers analyzed tweets.  I believe most of them would've analyzed earnings press releases.  That is true.

Q    Okay.  Now, in paragraph 40 of your reply merits report, you cite a paper.  You reference a paper by Henry, 2006?

A    I do.

Page 547

Z. BOZANIC, PH.D.

Q    Okay.  Sorry.  I was just checking.  I thought my headset had died. Tell me if I cut out.

Okay.  There's no paper listed with that citation in your documents considered list.  And I'm wondering why that is.  And then I'd also ask --

A    I believe you have it in the documents that I turned over.

Q    I'm just wondering why it wasn't on the list.

A    Perhaps a typo and an oversight. But I believe that's been turned over.

Q    Now, did you rely on -- and this is about -- I'm asking you questions about the merits report.  The first.  Not the reply.

Did you rely on the Hirshleifer and Teoh -- and I apologize if I butcher these academics' names, especially if they're friends of yours.  But I think it's Hirshleifer and Teoh, 2003.  Did you rely on that article in connection with your merits report?

Page 548

Z. BOZANIC, PH.D.

A    I -- I'd have to go back and look.  I don't -- I don't know if I cite it or if I used it in any capacity.  I'd have to look.

Q    So it's not cited, that I saw, or listed.  And I just -- that's why I asked if you relied on it in your original merits report.

Now, do you recall if this paper, the Hirshleifer and Teoh paper, discusses how short sellers organize information in their reports?

A    This paper -- which, as you said, I referred to it in my reply.  But not in my merits report, which I -- I think that's consistent with my memory.

I think this -- this paper is more theoretically oriented in terms of talking about limited attention.  Let's see here.  And prominence.  Yeah.  This is talking about limited attention.  Okay.  Sorry.  What's the question again?

Q    I wanted to know if that paper discusses how short sellers organize

Page 549

Z. BOZANIC, PH.D.

information in their report.  I didn't see that.  I just wanted to know if it --

A    I -- I don't believe so.  No.

Q    Okay.

A    Given -- given the timestamp of 2003, I -- I don't believe so.  No.  No.

Q    Okay.  Great.  Thanks.  So you also -- same question.  Did you rely on the academic article by Huang, Nekrasov, and Teoh from 2018 that you cite in your expert reply report?  Did you rely on that with respect to your merits report?

A    No.  I think the paper that I cite as a representative paper from the disclosure salience literature is a paper by Cheng, et al.

And so what I was bringing to bear in this report is that the disclosure salience literature is fairly sizable. There are several papers on this.

And so that one representative paper was an example.  And so I wanted to discuss more broadly this literature in this -- in this report.

Page 550

Z. BOZANIC, PH.D.

MR. PARTIDA:  Okay.  Do we mind if we take about a four-minute break until 3:45?

THE WITNESS:  Four might be too quick.  Can we do like five or six?  That's barely enough time to use the restroom.

MR. PARTIDA:  Oh.  Yeah.  I was just going to -- yeah.  Yeah.  I was going to try and find a paper.  So yes.  If you need more time, certainly.  Why don't we come back at 3:47?  Does that work?

THE WITNESS:  3:47?  Sure.  Thank you, sir.

MR. PARTIDA:  All right.  Yep.

THE VIDEOGRAPHER:  This is the end of media unit number 4.  We are off the record at 3:42 p.m.

(Off the record.)

THE VIDEOGRAPHER:  This is the beginning of media unit number 5.  We are on the record at 3:53 p.m.

MR. PARTIDA:  All right.  Welcome back, Dr. Bozanic.

And I believe everyone should now

Page 551

Z. BOZANIC, PH.D.

have what we have -- I have marked as Exhibit 103.

(Exhibit 103 was marked for identification.)

THE WITNESS:  David, I -- I have the same.  But I should note that when I opened it, there was an error message.  But it contains 126 pages on my end; is that correct?

MR. PARTIDA:  I got the same error message.

THE WITNESS:  Okay.  Thank you.

BY MR. PARTIDA:

Q    Okay.  Now -- okay.  So I want to direct you to the exhibit -- sorry.  Exhibit 2, which is on page 90.  Page 90 of the PDF, 90 out of 126.

A    We're looking at the Culper Report in the amended complaint?

Q    Yes.  Okay.  And the first thing I want you to look at is, there is this huge block of text; isn't that correct?  That you see under "Culper Research," that has the heading "Disclaimer"?

Page 552

Z. BOZANIC, PH.D.

A    I do see the disclaimer.

Q    Okay.  And I'm going to point you to a part in that specific block of text.  I'm just trying to find my notes so I can find the actual -- sorry -- quote.

If you look down, I would say -- oh, man -- one, two, three, eight lines down.  If you see on the left-hand side, there is a word, "Research," that begins with the capital R?

A    I see the start of the same sentence, David.

Q    Yeah.  Okay.  And then if you go to the sentence after that that begins, "To the best of our ability and belief, all information contained herein is accurate and reliable.

"And has been obtained from public sources we believe to be accurate and reliable.  And who are not insiders or connected persons of the securities covered in -- herein or who otherwise may owe any fiduciary duty or duty of confidentiality to the issuer."  Do you

Page 553

Z. BOZANIC, PH.D.

see that sentence?

A    I -- I see the same.

Q    Okay.  Now, what I then want you to turn to is the first paragraph.  So go to the next page; right?  And the first paragraph, can you tell me what the topic of this is?

A    Let me take a quick read, please.  So there's a lot in that paragraph.  So when you say "topic," I mean, they have --

Q    Okay.  Let me ask it this way.

A    Yeah.

Q    Yeah.  So I just wanted you to familiarize with yourself -- yourself with it so you know where I'm going.

So in the first paragraph here, it says, in the second sentence, "We also find that CleanSpark is rife with undisclosed related party transactions that we believe have effectively siphoned capital from shareholders to pockets of insiders."  Is that -- do you see that sentence?

Page 554

Z. BOZANIC, PH.D.

A    I do see the same.

Q    Okay.  Why do you think that Culper Research chose to highlight claims about related party transactions in the first paragraph of the report?

MR. LINKH:  Object to form.

THE WITNESS:  I -- I don't know what was in their mind.  But it seems as if they found some records on the web in terms of different corporations whereby some of these transactions were with those that had a relationship with CleanSpark.

And so they're alluding to, I think -- you know, going back to the prior sentence about purported customers and contracts.  And so I think part of the issue here is whether those were legitimate customers or whether those were customers party to a related party transaction.

And so trying to underscore and undermine this notion about, which customers does CleanSpark have?  Which contracts do they really have?  And so

Page 555

Z. BOZANIC, PH.D.

this is -- the thesis, you know, as you said, "the focus" before, is talking about those purported customers and contracts.

And then they're providing additional evidence to talk about and undermine whether or not these contracts exist and whether these customers exist.  Or is this just a related party transaction?

BY MR. PARTIDA:

Q    Okay.  Understood.  And so if I've understood your reports correctly and I've understood the literature you've cited, especially in your reply report --

Or only, I should say.  Is -- the fact that these related party transactions and purported customers and contracts are discussed first means that they're more value relevant than claims discussed later in the report?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    Is that accurate?

A    So the literature would say that, as the disclosures highlight in

Page 556

Z. BOZANIC, PH.D.

terms of the prominence or the placement, so early on, that that would be more value relevant.  That is correct.

Q    Okay.  Now, does -- I'm going to point you back up.  I'll scroll you to -- if you scroll up in this same exhibit and you go up to the actual complaint?

A    Okay.

Q    I would like to direct your attention to -- I think it's page 69 of the PDF.  But it's paragraph 147, I believe, of -- or 142.  Sorry.  One four -- excuse me.  Pardon me, 142.  And are you there?

A    I am there.

Q    Okay.  And the January 14 tweet -- or the January 15 tweet; correct? That discusses Green Dragon in contracts of 0.1; is that correct?

A    So this is the January 15th tweet, that tweet that's enumerated here. These bullets 1 through 8; correct?  We're on the same page there?

Q    Yes.

Page 557

Z. BOZANIC, PH.D.

A    Okay.  Perfect.

Q    Yes.  I'm sorry.

A    So yeah.  The first bullet discusses Green Dragon.

Q    Okay.  And it also discusses -- we also discuss Valle Divino, you know, in the next bullet point; isn't that correct?

A    Yes.  That's correct.

Q    And then we discuss P2K Labs; isn't that correct?

A    Yes.

Q    And then we also discuss Mr. Tadayon, the chief product officer at LawClerk, purported customer.  That's discussed; correct?

A    Yes.

Q    And it also lists a whole bunch of questions about Green Dragon, Valle Divino, P2K, LawClerk, and the miss in revenues in 2020 before we get to ATL; isn't that correct?

MR. LINKH:  Object to form.

THE WITNESS:  That -- that's what I was wondering.  So, I mean, we just went

Page 558

Z. BOZANIC, PH.D.

through this.  But prior to the ATL points, there's discussion about Green Dragon, Valle Divino, and so forth.  That's true.

BY MR. PARTIDA:

Q    Okay.  And it's not until all of those are mentioned, the first five points, that ATL Data Centers is mentioned; isn't that correct?

A    That's correct.

THE REPORTER:  And I'm sorry.  Just for clarity, this is still Exhibit 103; right?  That you're referring to?

MR. PARTIDA:  That is correct.  This is Exhibit 103.  And exhibit 103 is the amended complaint in the action.  And we're at paragraph 142.

Prior to that, the Exhibit 2 that we were referring to was the Exhibit 2 to that complaint, if that helps clarify.

BY MR. PARTIDA:

Q    Okay.  So now, in a hypothetical situation, say, where Culper Research would've announced that it's taking a

Page 559

Z. BOZANIC, PH.D.

short position in the stock and that it views as -- CleanSpark as worthless, without providing any additional support for their position, would you expect CleanSpark's stock price reacted negatively?

So let me ask that in a more clear way.

A    Thank you.

Q    If a short -- hypothetically, you have a short seller; right?  Such as Culper Research, who announces that it's taking a short position on the stock?  You with me so far?

A    Yes.

Q    Did I freeze?  Oh.  Okay. Sorry.  Your screen froze.  Okay.

A    Oh.  Sorry.

MR. PARTIDA:  Did he freeze for -- did anyone else freeze?

THE REPORTER:  No.  I think that may be on --

MR. PARTIDA:  I can hear you.  But your video froze up.

Page 560

Z. BOZANIC, PH.D.

THE REPORTER:  It may be on your end because I'm -- yeah.  I see myself.  I see everyone else.  It's on your end.

THE WITNESS:  I think it's on your end, David.  You've glitched a few times.

MR. PARTIDA:  Okay.  Well --

THE REPORTER:  If you want, we can stop here.

MR. PARTIDA:  Okay.  Well --

THE REPORTER:  And you can turn everything off and reboot it again.  Because that's usually a good fix.  It's your call --

MR. PARTIDA:  Yeah.  I'll just keep going as long as everyone else is okay with it.

THE REPORTER:  Okay.

BY MR. PARTIDA:

Q    Okay.  So if you have a short seller like Culper Research and that short seller announces, "I'm taking a short position in this stock.  And I think the company's worthless," but then provides absolutely no supporting evidence, would

Page 561

Z. BOZANIC, PH.D.

you expect the stock price to react negatively?

MR. LINKH:  Object to form.

THE WITNESS:  I -- I don't have an opinion on this hypothetical.  Because there is much that I need to understand in terms of the standing of this particular entity in the community; right?

So a random -- anyone can tweet out a random text.  Anyone can say, "I'm a short seller firm.  And here's my position."  Right?  But then should the investment community pay attention to that short seller, especially absent any evidence regarding those allegations?

And so I -- I don't have an opinion on which way the stock would go.  Because we have to look to the credibility of the source.  We have to look to the prominence of the source in the investment community to say, "Is this a particular entity whose investment advice we can rely upon?"

BY MR. PARTIDA:

Q    In your review of the analysts'

Page 562

Z. BOZANIC, PH.D.

reports for CleanSpark, did you identify any report issued in the weeks after the Culper Report that commented on claims about the Culper Report or the report itself?

MR. LINKH:  Object to form.

THE WITNESS:  I -- I think I heard the question.  But when you say, "Are there other reports?" do you mean analysts' reports?

BY MR. PARTIDA:

Q   I said -- and I apologize if I'm glitching.  And that's causing the problem.

But what -- in your review of analysts' reports for CleanSpark, did you identify any report that was issued in the weeks following the Culper Report, which commented on the claims in that report or the report itself?

A   Ah.  So no.  I didn't.  And I speak to this in my merits reply report in regards to how analysts are incentivized; right?  So analysts are incentivized to

Page 563

Z. BOZANIC, PH.D.

curry favor with management.

Q    So just because we're running short on time, all I needed --

A    I'm sorry, David.  David, you're glitching.

Q    Okay.  Let me --

A    I -- I might -- I might suggest you just reboot your connection.  Because I think you're the only one that's glitching.  And I think that's -- that delay is causing us issues with going back and forth a little bit.  So that might be helpful.

MR. PARTIDA:  Yeah.  I'll go ahead and try and jump out of the deposition, out of the Zoom, and jump back in.

THE VIDEOGRAPHER:  All right.  I'll take us off the video record.  We are off the record at 4:07 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the record at 4:31 p.m.

MR. PARTIDA:  Thank you.  Thanks, everyone, for being back.

Page 564

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    I am going to now go back to your reply merits report.  And that, I believe, was Exhibit 95.  Now, if you'd go to paragraph 41?

So just to recap where we left off, I believe right before we were interrupted, the question I wanted to ask was, in your review of analysts' reports for CleanSpark, did you identify any report issued in the weeks following the Culper Report commenting on the claims about the Culper Report or the report itself?

And I believe the answer that I heard back was no?

A    That's --

Q    Go ahead.

A    That correct.  That's no.  I explain why in paragraph 41 here that you've referenced.

Q    Okay.  Great.  So just because they were a little glitchy -- and tell me if I'm glitchy -- I just wanted to make

Page 565

Z. BOZANIC, PH.D.

sure that we're all on the same page.

Okay.  In paragraph 41 then of your reply merits report, you cite Axel [ph] and Kane [ph], stating that analysts tend to ignore short seller reports that disagree with positive analyst recommendations and price forecasts; correct?

A    That's correct.

Q    Now, did Axelson [ph] and Kane [ph] ever state that analysts never comment on short seller reports?

A    I -- I'm not sure if they use language so strong as "never."  The language that they're using there is "tend to ignore."

So I'd have to go back to the paper to see if that's language that they referenced.  But I'd be surprised if they would be so strong in their language.

Q    Okay.  That's -- okay.  Then I want to go to -- is it your opinion that analysts following CleanSpark chose to ignore the Culper Research because they

Page 566

Z. BOZANIC, PH.D.
had an incentive to maintain access to
management?

MR. LINKH:  Object to form.

THE WITNESS:  So -- so I can't opine
on what was in the minds of the analysts
that were following CleanSpark.  But I can
say, in general, what the literature shows
is that analysts have a pro-management
bias.

And so they're disincentivized, the
way the -- their compensation is
structured, to speak ill of the company.
And thus, legitimize short seller reports
and talk about the negative information
they're in.

BY MR. PARTIDA:

Q    But you don't have any specific
opinion about the analysts following
CleanSpark, you said, I think; correct?

A    A specific opinion in regards
to?

Q    Analysts following CleanSpark
and why they chose to ignore the Culper
Research?

Page 567

Z. BOZANIC, PH.D.

A    My opinion is outlined here, in paragraph 41, with regards to the compensation incentives that they have to not upset management.  They want -- analysts want access to management.

Q    And so --

A    And so if they start to speak ill of management or give opinions that are contrary to those beliefs, right, then they might lose that access to management. And that means they could lose business in regards to following that firm.

Q    And so there were a lot of "coulds" in that.  And my question is, is it your opinion -- or do you have an opinion as to whether or not that actually occurred here?

A    I don't have an opinion as to whether that actually occurred.

Q    Okay.

A    I'm relying on the incentive structures.

Q    Understood.  Okay.  That -- I just wanted to make that clear.  Okay.  Do

Page 568

Z. BOZANIC, PH.D.

you have any actual knowledge about what criteria was applied by analysts following CleanSpark when deciding whether or not to comment on Culper?

A    I -- I'm not opining on what criteria.  I'm not sure what would be in their heads.  But in terms of the criteria, it goes back to what I outlined in paragraph 41, with respect to compensation incentives.

And so if they feel that they're going to get locked out of access to management, well, that could be problematic for the creation of their reports and distribution of those reports with respect to the income that they intend to earn from those reports.

Q    And again, I -- you know, I -- and I think intentionally -- I heard a lot of "coulds."  But that's because you don't have actual knowledge about what they did; is that correct?

A    I -- I do not.

Q    Okay.

Page 569

Z. BOZANIC, PH.D.

A     I did not speak to these analysts in terms of whatever or supposed criteria you have in mind they might have used.

Q     I have no idea.  I wanted to know if you did.  Okay.  So have you done any analysis to establish that investors did not view the claims about related party transactions in the Culper Report as value relevant?

A     Have I done any -- any analysis in regards to the value relevance of the allegations regarding related party transactions?

Q     Let me re-ask my question.  And if that's the way you understood it, I'm just not quite sure it's the same.

A     Please.

Q     My question is, have you conducted any analysis to establish what investors -- that investors did not view the claims about related party transactions in the Culper Report as value relevant?

Page 570

Z. BOZANIC, PH.D.

A    So I -- I did a lot of analysis in between my merits report and merits reply report with respect to information that would drive the revenue of this firm; right?

In terms of what could drive those revenues, what could drive those expenses.  And then I looked at the claims of overstated revenues or understated expenses.

And so the analysis that I've done is -- is taken a close look at the report, taken a close look at the tweets to ascertain what investors could be reacting to with regards to what media said, what the analysts said, as it pertains to the information contained in those -- in -- in the report and the associated tweets.

And so this is -- this is, you know, outlined in -- in my merits and merits reply report with respect to the -- the "analysis" that I did.

Q    In your view, is there an

Page 571

Z. BOZANIC, PH.D.

agreement in academic literature that related party transactions are not value relevant to investors?

MR. LINKH:  Object to form.

THE WITNESS:  So I'm not sure about an overall established view in the literature.  But I -- I poked -- I point to some papers, as has Dr. Garmaise, that talk about related party transactions and their potential impact on firm value.  And whether that is value enhancing or value destroying.

BY MR. PARTIDA:

Q    And in your view, is there an agreement as to if it is value enhancing or value destroying?

A    I -- I think it depends upon the specific circumstances of the firm.  I think of the incentives for undertaking the related party transaction, what type of related party transaction it is.

And so when we say "consensus," I -- I think that there's some consensus that some have the potential to destroy

Page 572

Z. BOZANIC, PH.D.

value.  Some have the potential to create value if it optimizes efficiency with respect to the firm's operations.

I mean, so there are some papers that speak to this.  I think Dr. Garmaise points to some papers in regards to, say, family firms or -- or firms over in Asia, in terms of what this means from research from 20 years ago.

And so I -- I would say that there's countervailing evidence that -- that are dependent upon maybe the country, maybe the time period, maybe the type of related party transaction as well.

Q   Got it.  So in that sense, it's possible that certain types of related party transactions could be value relevant to investors?

A   It -- it could be the case; right?

Q   Okay.

A   And then -- then the question is -- is whether they are value enhancing or value destroying.

Page 573

Z. BOZANIC, PH.D.

And then, again, as I alluded to earlier, there's a lot of other information going on here at this time that needs to be sifted through to understand the claims in the Culper Report. And what would seem to have a material effect on undermining the claims in regards to ATL.

Q    Okay. Now, you state in your reply merits report, I think, at page -- at paragraph 47, that, "Investors are less likely to be concerned with RPTs as opposed to overstating revenues and/or understating expenses since the latter have a direct impact on company cash flows, profitability, and value." Correct?

A    Can I catch up to you? This is paragraph what?

Q    Sure. Sorry. Paragraph 47. And it's repeated again in your -- that -- so the same sentence is repeated both in paragraph 47 of your reply merits report and paragraph 95 of your original merits

Page 574

Z. BOZANIC, PH.D.

report.

A    Okay.

Q    So I had directed you to paragraph 47 of your reply merits report.

A    Wonderful.  Let me -- permit me to take a quick read, please.  Okay.  I've read it.

Q    So is it your opinion that investors never ascribe value to claims of fraud about undisclosed related party transactions?  Yes or no?

A    I -- I think, again, it goes back to the specific facts and circumstances of the firm and the type of related party transaction and the evidence being brought to bear.

Because the -- the value relevance can be positive.  The value relevance can be negative.  Or it could be nothing; right?  In terms of the basis of the allegations, whether they're founded or unfounded.

And so I think that there are larger claims at stake here in this case

Page 575

Z. BOZANIC, PH.D.

than the related party -- related party transaction claims, especially with regards to Green Dragon and Valle Divino.

Q    And so you would agree then that investors could be concerned with more than one type of information about the firm; correct?

A    That seemed very vague.  Can you repeat it again?

Q    You would agree that investors could be concerned with more than one type of information about a firm; correct?

A    I mean, investors are concerned about a variety of information that a firm releases.  And so I'm not quite sure without more specificity what we're going for here.

Q    Okay.  So yes.  That's it.  Yes. It's possible.  I think you've answered my question.

In your view, is it possible for different types of information to be value relevant, even if they're value relevant to different degrees?

Page 576

Z. BOZANIC, PH.D.

A    Repeat the question?

Q    Sure.  Is it possible for different types of value relevant information to be value relevant just to different degrees?

A    Without more context, David, I'm not sure I can answer this question. Because I don't fully understand it.  I mean, it's -- it's again, overly broad and vague.

Q    Okay.  Now, are you offering an opinion that if one piece of information, for example, like revenues, is value relevant for investors, that no other information, for example, related party transactions, is value relevant?

A    I -- I don't think that's the opinion I gave in my report.

Q    Okay.  And so it's possible that information about related party transactions is value relevant in this case; correct?

MR. LINKH:  Object to form.

THE WITNESS:  So what I'm opining on

Page 577

Z. BOZANIC, PH.D.

here today is looking at the main drivers of expected revenues for -- for this firm and how that translates to firm value.

And so there are a lot of claims in the Culper Report.  There are a lot of claims in the tweet in regards to old transactions that occurred years ago.  And trying to undermine.

At the -- at the end of the day, this report is about ATL.  And so this is about the recent acquisition and the recent share price runup between the acquisition announcement and the dissemination of the Culper Report.

And so when the Culper Report starts to bring in claims from years ago with respect to related party transactions or estimates that are old, I don't think an analyst or an investor is going to look at an estimate from several years ago and find that terribly value relevant.

But the items that have a direct translation into the firm's revenues and expense profile, these would be extremely

Page 578

Z. BOZANIC, PH.D.

important in terms of the underlying firm economics, as they translate into firm value.

And so there are a lot of claims here. And so when you sift through some of these older claims versus the newer claims, my position in my report is that all of this other evidence that the Culper Report brings to light, in addition to ATL and some of the issues with ATL, is meant to undermine the claims made with regards to ATL.

BY MR. PARTIDA:

Q How do you know that if you never talked with Culper? You have no idea, as you've testified previously, how they made their decisions on what to put in the report, what they were thinking when they put it in the report. How do you know that?

A I'm not saying as to what they decided. What I'm saying in terms of, as a financial economist, looking at what drives value, I'm looking for claims. And

Page 579

Z. BOZANIC, PH.D.

I'm looking for discussion pertaining to what could influence most heavily the overall valuation of the firm.

And so all I'm saying is, I'm drawing a contrast between perhaps a related party transaction that occurred several years prior to the acquisition of ATL versus ATL itself.

And this is why I referred earlier to looking at the firm's information environment. What was going on at this time; right? What was going on at this time that would be relevant for the underlying economics of the firm? And how that would translate into ultimately firm value?

Q    So correct. But it's all to degrees; right? So it's again -- I -- all possible. It's possible that information about related party transactions was value relevant.

Of course, you've just testified that perhaps it's not as value relevant as other things that you think are more value

Page 580

Z. BOZANIC, PH.D.

relevant.  But that's not the same as saying the related party transactions are not value relevant; isn't that true?

MR. LINKH:  Object to form.

THE WITNESS:  The -- the related party transactions could be value relevant; right?

BY MR. PARTIDA:

Q     Thank you.

A     They could be positively.

Q     Thank you.

A     They could be negatively value relevant.

Q     Okay.  Great.  I -- that's exactly -- so I understand.  And that's what I understood from your report.  So thank you.

Now, did you conduct any analysis to establish that CleanSpark's investors did not view the claims about excessive executive compensation in the Culper Report as value relevant?

A     Once more?  Sorry.

Q     Have you conducted any analysis

Page 581

Z. BOZANIC, PH.D.

to establish that investors didn't view the claims about executive compensation in the Culper Report as value relevant?

A    So what I did in my report is, I looked to see what investors.  So with this particular question, where -- I'm sorry.  Analysts.  Where analysts were focused; right?

And so we see in some analysts' reports, as I discussed in my report, that some might have mentioned compensation. But typically, this was referred to as one time in nature.  And then the -- in a lot of these reports, the focus was really on the bitcoin being produced.

And so while this is an expense, right, then the question becomes, how big of an expense is this relative to other prospects, especially revenue-generating prospects?

So the few reports that I recall -- and I -- I believe between the two reports, I -- I talk about these analysts' reports.  The emphasis was on

Page 582

Z. BOZANIC, PH.D.

prospects, was on bitcoin mining.

Q    So then I understand that you did not conduct any analysis to establish that investors don't view the claims about executive compensation in the Culper Report as value relevant?

MR. LINKH:  Object to form.

THE WITNESS:  So in terms of what investors thought, I'm looking at the marketplace and looking at overall what investors and analysts thought.  But I was pointing to evidence in regards to analysts there.  That's true.

BY MR. PARTIDA:

Q    Okay.  Is it possible that investors would've viewed the claims about excessive executive compensation in the Culper Report as value relevant?

MR. LINKH:  Object to form.

THE WITNESS:  I'm not sure exactly what -- what is considered "excessive." Because compensation can align interests with investors.  And so for some -- one could view it as excessive.  But then to

Page 583

Z. BOZANIC, PH.D.

what degree?

I guess this goes back to your question. So I'm not quite sure what is considered excessive here versus reasonable with respect to aligning the interest of investors with that of management.

BY MR. PARTIDA:

Q    But it's possible that, in certain circumstances, executive -- excessive executive compensation would be value relevant to investors?

MR. LINKH:  Object to form.

THE WITNESS:  In -- in certain circumstances.  If we establish what is "excessive" relative to some benchmark for the industry or the firm, perhaps some might bulk and say, "This is excessive," whereas others might say -- again, this is aligning interests.

BY MR. PARTIDA:

Q    So do you have a view as to whether or not the compensation stated in the Culper Report was excessive or not?

Page 584

Z. BOZANIC, PH.D.

A    I don't have a view on whether it's excessive.  But I can point to analysts who didn't seem to view it as excessive.

Q    So, in your view, investors didn't view the claims about excessive executive compensation in the Culper Report as value relevant?

MR. LINKH:  Object to form.

THE WITNESS:  Again, what I can point to are the analysts' reports that I used in the report with respect to the opinion that I formed here.

And I'll again point back to other allegations.  Other concerns, such as Green Dragon, where the Culper Report was basically saying how CleanSpark was touting ATL was very similar to Green Dragon in terms of these promises with respect to reducing energy.

I think, with Green Dragon, by 83 percent in terms of energy consumption for their grow facilities.  And so, you know, if true, right, this would be

Page 585

Z. BOZANIC, PH.D.

potentially damning for the ATL facility with respect to its promises.

BY MR. PARTIDA:

Q    Which analysts stated that the executive compensation detailed in the Culper Report was not excessive?

A    I -- I didn't say that an analyst expressly said it was not excessive.  What I said is, analysts did not seem to point to this as a big deal for them other than noting that expenses are higher.  In part, because of compensation.

However, the shift, the focus, in my view -- we'd have to go back to the report and see where I -- where I cite this -- was towards revenue prospects.

So, between one of the two reports.  I can find it if you permit me. But I don't think that verbiage -- I don't think an analyst said it was quote "not excessive."

Q    Well, the analysts, those same analysts, also didn't point to any of the

Page 586

Z. BOZANIC, PH.D.

ATL claims; did they?

A     From the Culper Report?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q     Correct.

A     That's correct.

Q     Okay.

A     But then the difference is -- is this goes back to my discussion in regards to what analysts have incentives to cite. But analysts need not cite this report to look at the financials to understand how expenses are shifting, and in part, shifting because of increased compensation.

Q     But you don't have any actual knowledge of that; correct?  You didn't talk personally to any of these analysts; did you?

A     I'm sorry.  Actual knowledge of what?

Q     Actual knowledge of why any information was or was not included in these analysts' reports that didn't

Page 587

Z. BOZANIC, PH.D.

mention ATL and also didn't mention or rely on the executive compensation?

A    Well, I think, in part, we discussed this at length before the break in terms of the incentives that analysts may or may not have.  But I did not speak to analysts.

Q    But you don't have --

A    That is true.

Q    Correct.

A    It's true.

Q    Correct.  That's it.  You don't have any actual knowledge.  Okay.  So now, do you have -- is it your opinion -- and I'm not saying it is.  I'm asking.

Is it your opinion that the claims around Mr. Bradford serving as an auditor of a cannabis company are not value relevant to investors?

MR. LINKH:  Object to form.

THE WITNESS:  So can we point to the specific paragraph where we talked about this in my merits reply report?

'Cause I'm going off of memory.  And

Page 588

Z. BOZANIC, PH.D.

I don't think that's a good thing.
Because I don't want to give you an answer
that is incorrect. So can you point to
this, in particular, with my merits reply
report, where I can try to find this in?

BY MR. PARTIDA:

Q   Paragraph 46, in which you state, "The fact that the Culper Report alleges that Bradford is moonlighting is irrelevant because per CleanSpark's disclosures, BlueChip is 50 percent beneficially owned by Mr. Bradford.

"BlueChip performed all services at discounted rates. And none of the charges were associated with work performed by Mr. Bradford."

So is that the basis for your conclusion that Mr. Bradford serving as an auditor of a cannabis company is not value relevant to investors?

MR. LINKH:  Object to form.

THE WITNESS:  So here you have to evaluate the claim. And so I'm evaluating the claim in terms of, "What does this

Page 589

Z. BOZANIC, PH.D.

mean to moonlight?"

So I -- I assume -- perhaps incorrectly so -- but that maybe Bradford is asleep at the wheel with respect to CleanSpark because of his multiple other ventures. And so he's not dedicating the time that he needs to dedicate.

And so here, this is just the -- the -- CleanSpark is transparent with Bradford's relationship with BlueChip; okay? They're not trying to -- he's not trying to hide anything. The firm is not trying to hide anything.

I don't think that there were, you know, excessive charges of -- of wrongdoing in terms of, you know, overcharging for this particular business and so forth.

And so this particular claim -- again, we go back to revenue generation. And we go back to building the valuation of CleanSpark. This didn't seem as important to me as some of the other claims.

Page 590

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    And is that your expert opinion, as an economist?

A    My opinion is this does not seem to be an issue for the value relevance of CleanSpark.  With respect to CEOs, CFOs, they're -- they're often appointed at different boards.  And they have other ventures.  And so I don't -- I don't believe that this is a concern for the value of this firm.

Q    And the basis for that conclusion is that CleanSpark disclosed the relationship?

MR. LINKH:  Object to form.

THE WITNESS:  The opinion that I'm giving here is that -- as it's said and underlined -- none of these charges were associated with work performance.

So I don't know if there's some discussion of, you know, some -- some sense or insinuation that there was some sort of wrongdoing here.  But given on the basis that there was disclosure, sunlight

Page 591

Z. BOZANIC, PH.D.

is the best medicine.  And there was sunlight brought to this.

BY MR. PARTIDA:

Q    Okay.  Is it possible that investors would be concerned if the CEO of a company has a second job that could distract him from the role?  His role as CEO?

MR. LINKH:  Object to form.

THE WITNESS:  The question becomes how relevant it is.  And so here, as it says here, none --

BY MR. PARTIDA:

Q    Well, sorry.  Sorry.  With all due respect, I don't want you to tell me what the question is.  I want you to answer my question.

My question is, is it possible that investors would be concerned if the CEO of a company has a second job that might distract him from that role?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    Is that possible?

Page 592

Z. BOZANIC, PH.D.

A    Yes.  I -- I was trying to answer.  Ownership of another entity does not preclude one's efforts in a separate entity.

This clearly states that none of the charges were associated with work -- work performed by Mr. Bradford.  So Mr. Bradford, apparently, if we take this disclosure as true, did not do this work.

Q    So with all due respect, my question is still, is it possible?  I'm not talking about Mr. Bradford.  I'm saying, is it possible that investors would be concerned if the CEO of their company had a second job that would distract him from his role as CEO?

MR. LINKH:  Object to form.

THE WITNESS:  I think your question's loaded.  You -- you're assuming that it's a distraction.  And that's what's questionable.  Is it a distraction?  In this particular instance, with the facts and circumstances of the case --

//

Page 593

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    I'm asking if it's possible. I'm asking if it's possible. If it's possible. If it's possible that that was the case. I'll give you an example. Are you familiar with Elon Musk?

A    I am.

Q    Are you familiar with the trillion dollar pay package that's been proposed for him?

A    I have very tangential knowledge. I have not followed all of this.

Q    Okay. Maybe if you were to go look, you would find out that the critical reason that Robyn Denholm, the chairman of Tesla, has been pushing for investors to sign that pay package is because, were Elon Musk not to receive that pay package, he would be distracted and turn his efforts to other businesses aside from Tesla.

And I say that by just way of an example, where I'm giving you a real-world

Page 594

Z. BOZANIC, PH.D.

possibility that actually exists now.  And I'm just asking you, is it possible?  Is it possible?  That's it.

Is it possible that investors could be concerned if the CEO of their company had another role that could distract him from his role as CEO?

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    Is that possible?

MR. LINKH:  Object to form.

THE WITNESS:  So, again, I don't have an opinion because the question is too vague.

BY MR. PARTIDA:

Q    Okay.

A    But the operative word that you keep using is "distracted."  And so that's the question is, do we agree on distraction?

And going back to the Elon Musk anecdote, part of my tangential knowledge of this particular case is he wants control over the firm, going forward, with

Page 595

Z. BOZANIC, PH.D.

the robots he wants to build.  And so there's a control element as well.

I don't think it's just the distraction.  He has certain vested interests in mind.  But this is neither here nor there with respect to the case.

BY MR. PARTIDA:

Q    My point is -- and I'm taking from this, it's possible; right?  Your view is that it's possible that investors could be concerned if the CEO of their company had a different -- had a second role that could distract from his role as CEO?

MR. LINKH:  Object to form.

THE WITNESS:  I have not formed an opinion on that today.  Nor does my report offer it.

BY MR. PARTIDA:

Q    Okay.  Perfect.  It would've been useful to get to that five minutes ago.

What do you understand by "moonlight" in Culper's statement, "CEO,

Page 596

Z. BOZANIC, PH.D.

Zachary Bradford, moonlights as the auditor of a microcap cannabis company"? What do you understand "moonlights" to mean?

A    Where are you reading from?  I'm sorry.

Q    I said, what do you understand --

A    Oh.  The same paragraph.  Okay. I see it.

Q    The one we were just going over before, in paragraph 46, where you in fact just dissembled for a couple of minutes about what moonlighting meant.  And how you didn't think he was moonlighting.  And there was disclosure.

So I'm talking about your use of that word "moonlighting," which was, I think, copied from Culper's Report.  And my question is, what did you understand the word "moonlight" to mean in Culper's Report?

MR. LINKH:  Object to form.

THE WITNESS:  I -- I don't know,

Page 597

Z. BOZANIC, PH.D.

other than working at night, in the moonlight.

BY MR. PARTIDA:

Q    Okay.  Got it.  Now, you pointed to the disclosure back earlier, in paragraph 46.  And did CleanSpark disclose in that disclosure that Mr. Bradford wasn't doing any work for BlueChip?

A    Can you point me to where in the report?  I'm sorry.  You went back a paragraph to 46?  Or no?  You're in the same paragraph?

Q    In paragraph 46.

A    Mm-hmm.

Q    I was just directing your attention back there.

A    Thank you.

Q    In paragraph 46; right?  That disclosure -- you cited disclosure.  Per CleanSpark's disclosures, "BlueChip is 50 percent beneficially owned by Mr. Bradford.

"BlueChip performed all services at discounted rates.  And none of the

Page 598

Z. BOZANIC, PH.D.

charges were associated with work performed by Mr. Bradford."  Do you see that?

A    I do.

Q    And so my question is, that disclosure says nothing about whether or not Mr. Bradford is working for BlueChip; isn't that correct?

MR. LINKH:  Object to form.

THE WITNESS:  I'm not sure that I agree.  It says, "None of" -- when you say "is working for," it seems he owns it. He -- it says right there that it's 50 percent beneficially owned.

But then further, CleanSpark goes on to say, "None of the charges were associated with work performed by Mr. Bradford."

BY MR. PARTIDA:

Q    That's correct.  And doesn't that mean that none of the charges that CleanSpark was paying BlueChip was for work performed by Mr. Bradford?  Isn't that correct?

Page 599

Z. BOZANIC, PH.D.

MR. LINKH:  Object to form.

THE WITNESS:  I -- I guess I'm not following, David.  'Cause we're reading this the same.  But I think we keep repeating the same phrase.  I'm misunderstanding something.

BY MR. PARTIDA:

Q    Yes.  Okay.  So we're reading it the same.  And I just wanted your simple agreement that that's what it says.  But my point is, that's not the same as disclosing he was not doing work for Mr. -- for BlueChip.

That says he wasn't performing work in his capacity as an owner of BlueChip for CleanSpark.  It says nothing about whether he could have been doing work for numerous other customers of BlueChip.

It doesn't say what he was doing.  It just says he wasn't doing the work that CleanSpark was paying for.  Do you see what I'm saying?

So my question is, doesn't this

Page 600

Z. BOZANIC, PH.D.

disclosure say he didn't do any of the work that CleanSpark was paying for? Correct?  It doesn't say he wasn't doing work for BlueChip.

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    Isn't that true?

MR. LINKH:  Same objection.

THE WITNESS:  I -- I suppose it could be true that he could be doing other work.

BY MR. PARTIDA:

Q    Okay.  Now, have you -- are you aware that Zach Bradford was serving as an auditor of BlueChip during this period?

A    I -- I am not aware of all of his service responsibilities to BlueChip throughout the class period.  No.

Q    Okay.  But you at least know it's possible that he was working there. And I'm representing to you that he was.

Now, have you conducted any analysis to establish that investors of CleanSpark didn't view the claims that Mr. Bradford was serving in capacities for

Page 601

Z. BOZANIC, PH.D.

BlueChip, in addition to his capacity as CEO of CleanSpark, as value relevant?

MR. LINKH:  Object to form.

THE WITNESS:  Repeat the question? There were several elements there.  If you don't mind.

BY MR. PARTIDA:

Q    Have you conducted any analysis to establish that investors did not view claims about Mr. Bradford serving as an auditor of BlueChip, in addition to his role as CEO of CleanSpark, as not value relevant?

MR. LINKH:  Same objection.

THE WITNESS:  So I -- I have not spoken to investors.  I'll point to the evidence that I have.  And so with respect to going through analysts' reports, I didn't --

BY MR. PARTIDA:

Q    That's okay.  That's okay.  I don't need an answer to a different question.  I just -- you've answered the question I asked, which was, have you

Page 602

Z. BOZANIC, PH.D.

conducted any analysis?  And I understand that answer is, you did not speak to investors.

Okay.  Now, is it possible that investors could be concerned -- sorry.  Is it possible -- strike that.  I'm going to move on to --

Did you conduct any analysis to establish that claims about fabricated customers and contracts in the Culper Report had no negative effect on investors' perceptions of CleanSpark's corporate governance and internal controls?

MR. LINKH:  Object to form.

THE WITNESS:  Repeat that last half?

BY MR. PARTIDA:

Q    Did you conduct any analysis to establish that claims about fabricated customers and contracts in the Culper Report did not have a negative effect on investors' perceptions of CleanSpark's corporate governance and internal controls?

Page 603

Z. BOZANIC, PH.D.

MR. LINKH:  Same objection.

THE WITNESS:  So is there a paragraph where you can reference me to in my reply report?

BY MR. PARTIDA:

Q    Well, I'm asking, did you conduct that analysis?

A    So the analysis that I've done is, with respect to fabricated customers and contracts, I evaluated the Culper Report.  I evaluated the associated tweets.

And so I am trying to assess and understand where there could be concerns, given the multiplicity of allegations that are made.  And especially with respect to the ATL facility.

And so what -- what I found, again, that was concerning to me are these claims with respect to -- to Valle Divino and Green Dragon.  Because the claims with Green Dragon, as I mentioned before, were very similar to ATL.

Q    And so based on that analysis,

Page 604

Z. BOZANIC, PH.D.

you concluded that fabricated customers and contracts would be value relevant to investors?

MR. LINKH:  Object to form.

THE WITNESS:  So on the basis that customers generate revenue and that contracts generate revenue, and if these are fictitious contracts and fictitious customers, yes.

This goes back to the conversation that we had earlier.  I'm looking at the direct drivers of revenue with regards to expectations of future revenues and whether they'll materialize for the firm, which has a direct relationship with firm value.

BY MR. PARTIDA:

Q    Now, were there claims about fake customers in connection with P2K?

A    I -- I would have to look to see what -- you'd have to provide me with the disclosure in my report.  But were there claims about fake customers with respect to P2K?

Page 605

Z. BOZANIC, PH.D.

Q    Yes.  In the Culper Report.

A    Can we go to the Culper Report then?

Q    That would be --

A    Again, I haven't memorized the entire report.  So I'd have to look through it.

Q    Okay.  In your view, is there agreement in the academic literature that claims about fraud do not lead to reputational loss?

A    Say that again?  I think we just switched questions; right?

Q    Yes.

A    Okay.

Q    Well, there was no question pending.

A    I'm trying to track with you, David.

Q    No question pending.  In your view, is there agreement in the academic literature that claims about fraud did not lead to reputational loss?

A    I think that's a broad

Page 606

Z. BOZANIC, PH.D.
statement.  But I think that if there is
fraud present, that could impact
reputation.

Q    Okay.  Now, did you conduct any
analysis to rule out that the Culper
Report didn't cause reputational harm for
CleanSpark?

MR. LINKH:  Object to form.

THE WITNESS:  So I did a lot of
analysis in terms of the impact of -- of
these statements.  But with respect to
reputational loss, I did not attempt to
quantify reputational loss.

BY MR. PARTIDA:

Q    Now, I want you to go to
paragraph 46 of your reply merits report.

A    Paragraph -- the same paragraph
we've been on; right?

Q    Mm-hmm.

A    Okay.

Q    And that's where -- because you
had asked about the P2K Labs.  So if you
go to -- this is page 22 of the report.  I
don't know the internal pagination now.

Page 607

Z. BOZANIC, PH.D.

But it's sentence that begins, "Second, re: P2K Labs, a tweet from Culper in the initial tweet thread, suggests that P2K Labs 'appears to also fake its customers.'" So if you want to familiarize yourself with the rest of that paragraph?

A     Yeah.  Please, let me.  Okay.  I have familiarized myself.  Thank you.

Q     Okay.  And so my question is, what analysis did you perform to quantify the impact of the claims with respect to P2K and the fake customers?

A     So for P2K Labs, the claim is that it appears to also fake its customers.  And I believe some of the allegations were in regard to web presence; right?  So whether or not the products had or did not have web presence.

And so this doesn't seem to be terribly relevant to me, in contrast to some of the other claims in the Culper Report.

Q     Okay.  And so what was the basis

Page 608

Z. BOZANIC, PH.D.

of your conclusion?  That conclusion?

A    I -- I say it here.  I said, "This is because the substance upon which the Culper Report makes this claim is merely on the basis of some, but not all, customers listed on P2K's website as case studies had lacked web presence."

Q    Anything else?

A    No.

Q    Now, in paragraph 88 of your reply merits report -- I'll give you a chance to get there if you would like.

A    I am there.  Shall I read it?

Q    Sure.  I'm scrolling.  So you can take a look.

A    Okay.  I've read it.

Q    Okay.  So in that paragraph, you state that "I note Defendants have not challenged my opinion that CleanSpark traded efficiently."  Is that correct?

A    I'm reading it as the same. Yes.

Q    Okay.  Now, forgive me.  Did I previously introduce as an exhibit today

Page 609

Z. BOZANIC, PH.D.

your class certification expert report?

MR. LINKH:  No.

THE WITNESS:  I don't think so.

THE REPORTER:  Not that I'm aware of.

BY MR. PARTIDA:

Q    Now, in that -- so rather than introducing it, I guess I'll just -- because we're going to get --

What I want to do is ask you, in the class cert report, which was dated January 10, 2025, your opinion was stated that "The market for CleanSpark's common stock was efficient throughout the class period."

Now, am I correct that your opinion regarding market efficiency is limited to the class period?

A    So that report speaks to the class period.  So it would be limited in that report to the class period.  That is correct.

Q    Is it correct that in the merits report, in paragraph 12 of that report, that you reiterate your opinion from your

Page 610

Z. BOZANIC, PH.D.

previous report, the class cert report we just discussed, that "The market for shares of CleanSpark common stock was efficient through the -- throughout the class period"?

A    I -- I believe so.  I need to take a look.

Q    Okay.  I'll represent to you that it does say that in paragraph 12. But it sounds like to me, if I'm understanding correctly, that that is your opinion still as we sit here today?

A    Yes.

Q    Okay.  And the reason I was asking these questions is the phrasing was different in the reports.  And I wanted to understand if it's the same position throughout.  Or there's some significance in the wording change.

Okay.  Now -- so it's correct that your opinion regarding market efficiency is limited to the class period?

A    So, again, I'd have to go back to the report.  So I'm not sure.  I -- I

Page 611

Z. BOZANIC, PH.D.

have not looked at this report today.  Nor do I have the benefit of having in front of me.

But I -- I don't recall if I used an analysis period as well in discussion of the class period.  That's one thing that is -- is concerning me right now.

Q    Okay.  Understood.  Understood with that clarification.  Now, is it your opinion that between August 1, 2017, and April 5, 2018, CleanSpark's stock price traded in an efficient market?

A    Say those dates again?

Q    April -- or sorry.  August 1, 2017, and April 5, 2018?

A    I -- I have not formed that opinion in this report.  Nor do I offer it.

Q    Okay.  Is it possible that, during that time period, CleanSpark's stock price did not react or react quickly to positive value relevant information?

MR. LINKH:  Object to form.

Page 612

Z. BOZANIC, PH.D.

THE WITNESS:  I -- I'm not sure why we're focused on positive value relevant information.  But what I'm trying to show here in these paragraphs is that, at this time period, when we see this raw negative return of 18.84 percent upon the announcement of the Green Dragon initiative, there -- there aren't other entries in terms of daily stock prices.

And so I was trying to explain the lack of movement to see if there were other salient events around this time whereby the -- the stock price hadn't moved.

And so I was finding that there weren't other events.  And the stock price didn't move until we see this Green Dragon announcement.  And then we had this large negative raw return of 18.84 percent.

BY MR. PARTIDA:

Q    Okay.  So is it possible then that between August 1, 2017, and April 5, 2018, CleanSpark's stock price didn't react at all?  Or at least didn't react

Page 613

Z. BOZANIC, PH.D.

quickly to positive value relevant information?

MR. LINKH:  Object to form.

THE WITNESS:  Again, this notion of positive versus negative.  I'm trying to show, in -- in my opening report, that information is -- is reacted to whether it's positive or negative in a timely basis.

And whether or not it's accurate is another question.  But at this point in time, there are not a lot of disclosures in regards to this firm until we see this Green Dragon disclosure.  And then we see this -- this negative return.

And I look for other events around this date that would potentially explain it.  And so I'm trying to triangulate the price movement with respect to this disclosure.  And -- and distinguish it between other disclosures that might have given a -- a price movement but did not.

And so I think I talked about this in -- in the surrounding paragraphs.

Page 614

Z. BOZANIC, PH.D.

BY MR. PARTIDA:

Q    But you don't have an opinion as to whether or not, between August 1, 2017, and April 5, 2018, CleanSpark's stock traded in an efficient market?

A    So I have not formed an overall opinion in regards to the efficiency with -- with this period.

Q    Okay.

A    Again, I'd have to go back and -- and double-check with that opening report with respect to the analysis period versus the class period.

But here, what I'm trying to do is, I -- I fully realize that the entries for share prices are sparse in this time period.  And this is why I wanted to go look at the different types of disclosures.

And so what I didn't see around this time is -- is some major material disclosure where there was lack of price movement.  In fact, what I found here, with respect to Green Dragon, is we had

Page 615

Z. BOZANIC, PH.D.

this large disclosure about this initiative.  And there was a negative price movement.

Q    Okay.  And so then can you explain to me how -- well, strike that.

In paragraph 104 of your initial merits report, if you want to go back to that, which was --

A    Yeah.  Please.  One -- one second.

Q    Which was exhibit -- what number was that again; 97, 98?

A    I think so.

MR. LINKH:  Yes, 97.

THE REPORTER:  The initial?

MR. LINKH:  The initial was 97.

MR. PARTIDA:  Okay.  Thank you very much.  When my computer decided to end its own life, it took away everything I had open; so --

BY MR. PARTIDA:

Q    Okay.  So if you'd go to paragraph 88 of that report?

A    I'm sorry.  Paragraph 88?

Page 616

Z. BOZANIC, PH.D.

Q    Sorry.  Sorry.  104.

A    There we go.  That's what I thought you said.  Shall I take a read?

Q    Yes.  And I'll point you to a specific sentence.

A    Okay.

Q    Just let me get --

A    I have read it.  Thank you.

Q    Okay.  And this is discussing the Valle Divino project; correct?

A    It is.

Q    Okay.  And when discussing the claims about that project, you state, "If investors initially reacted negatively to that specific allegation, I would expect subsequent disclosures affirming housing construction and microgrid development activity at the Valle Divino site to lead to a partial stock price reversal.

"Which would indicate that the Culper Report's claims regarding the Valle Divino site were value relevant for investors."  Correct?

A    That's correct.  I read the

Page 617

Z. BOZANIC, PH.D.

same.

Q    What is the basis for your expectation of a subsequent reversal?

A    Well, I -- I think I stated there pretty clearly, if -- if we believe that part of the negative reaction of the Culper Report is partially premised upon the activities at Valle Divino, then updates in the future regarding this initiative, right, could show that there is a positive reaction if there's initial negative reaction on the basis of reversal.

So this reversal on future dates could indicate the value relevance of this particular disclosure at the time of the Culper Report.  And so this is part of the approach that I've taken for disaggregation of compounds.

Q    And you state that subsequent disclosures affirming the Valle Divino project are expected to lead to a partial stock price reversal.  What do you mean by "partial" in this sentence?

Page 618

Z. BOZANIC, PH.D.

A    Well, so in -- in terms of assessing the -- I'm trying to quantify the differences in terms of the reaction. So first of all, attempting to quantify or allege that there could be a negative component to that return on the basis of the claims with respect to Valle Divino.

And then future development -- future disclosures about that development that are positive, talking about how this -- how this particular initiative is proceeding forward, if investors find this particular initiative value relevant, should partially reverse.

In terms of fully reverse, that's a different question. It's difficult to disentangle that.

But at least here, what I'm trying to show is that one, there's potentially this negative reaction. And two, if investors found this particular issue to be negative value -- negatively value relevant, that partial reversal would indicate that they found this --

Page 619

Z. BOZANIC, PH.D.

this partially value relevant.

In terms of full, that's -- that's difficult to quantify.  But in terms of showing that there is an element here that could be disaggregated is what I'm trying to do if we see this reversal.

Q    Okay.  Now, is it possible that the claims about Valle Divino in the Culper Report impacted CleanSpark's stock price on January 14th and 15th, 2021?

Not just because of the value that this project represented to CleanSpark.  But also due to the reputational impact of CleanSpark potentially lying about it?

MR. LINKH:  Object to form.

THE WITNESS:  Repeat the question once more?

BY MR. PARTIDA:

Q    Is it possible that the claims about Valle Divino in the Culper Report could have impacted CleanSpark's stock price on January 15th and 14th?

Not only because of the value

Page 620

Z. BOZANIC, PH.D.

that this project represented to CleanSpark. But also due to the reputational impact of CleanSpark potentially lying about it?

MR. LINKH: Object to form.

BY MR. PARTIDA:

Q   Couldn't both of those have impacted it?

MR. LINKH: Same objection.

THE WITNESS: They could have both potentially impacted, you're saying, the initial negative reaction on January 14th and 15th?

BY MR. PARTIDA:

Q   Correct. Correct. Isn't it possible that investors responded to the information in -- about Valle Divino in the Culper Report both because of the value of the project itself, but also because of the reputational impact of CleanSpark potentially lying about the project?

I'll put it in lay terms. Is it your opinion that an investor would have

Page 621

Z. BOZANIC, PH.D.

been concerned both about the potential loss of the Valle Divino project itself and also have reputational concerns about CleanSpark lying about that project?

MR. LINKH:  Object to form.

THE WITNESS:  So here, what I'm trying to quantify is this reversal in regards to the value relevance of updates on this initiative that could be positively value relevant.  This is all I'm trying to opine on here for disaggregation purposes.

BY MR. PARTIDA:

Q    Is it your opinion that investors do not -- price announcements about potential projects until they're fully confirmed or contract is fully executed?  Yes or no?

MR. LINKH:  Object to form.

THE WITNESS:  So I think that there are various levels of degrees of certainty with respect to projects that can be undertaken.

And so a plan to do something versus

Page 622

Z. BOZANIC, PH.D.

"We have signed a contract where we intend to do this.  And we're going to proceed with it," I think that it carries a bit more weight in the letter.

BY MR. PARTIDA:

Q    Okay.  In paragraph 71 of your reply merits report --

A    Mm-hmm.  We're jumping reports again?

Q    Yes.  We are.

A    And then, David, whenever we're done with this line of questioning, a quick break would be -- would be appreciated.

MR. PARTIDA:  Why don't we go ahead and -- since I haven't asked a question yet, why don't we go ahead and take that break now?

THE WITNESS:  Okay.

MR. PARTIDA:  Is five minutes sufficient?

THE WITNESS:  Yeah.  Five to seven minutes would be wonderful.

MR. PARTIDA:  Great.

Page 623

Z. BOZANIC, PH.D.

MR. LINKH:  Andrew or Lindsey, do you have a time thus far?

THE REPORTER:  Yes.  I've got five hours and 29 minutes until Baker takes us off.

MR. LINKH:  Great.  Thank you.

THE VIDEOGRAPHER:  This is the end of media unit number 5.  We are off the record at 5:28 p.m.

(Off the record.)

THE VIDEOGRAPHER:  This is the beginning of media unit number 6.  We are on the record at 5:40 p.m.

MR. PARTIDA:  Okay.  Thank you.

BY MR. PARTIDA:

Q    And thank you, Dr. Bozanic. What I'm going to try and do here in the last few minutes is cover -- I'm just trying to establish and understand clearly what your opinions are.  So hopefully, we can do that.  And then I have a couple of miscellaneous questions.

Is it your opinion that the miss in revenue and earnings on February 12th

Page 624

Z. BOZANIC, PH.D.
was attributable to the alleged
misrepresentations about ATL?

A    So I think I talk in my reports about how expectations were formed in December with regards to what was stated pertaining to ATL.  And so analysts ratcheted up their expectations.

And so, therefore, when the hash rate and -- the energy capacity expansion and the hash rate expansion didn't occur as planned, this would definitely affect how those expectations, right, were viewed in relation to the realizations of -- of, say, revenue.

Q    So it is your opinion that the miss in revenue and earnings on February 12th was attributable to the alleged misrepresentations about ATL; correct?

A    Yes.

MR. LINKH:  Object to form.

BY MR. PARTIDA:

Q    Okay.  And it's also your opinion -- well, let me ask it this way.

Page 625

Z. BOZANIC, PH.D.

Is it your opinion that the miss in revenue and earnings on August 17th was attributable to the alleged misrepresentations about ATL?  Same question.  Different date.

A    Again, I'd have the same answer in terms of expectations were formed on the basis of disclosures made with regards to the ATL facility.

Q    And is it your opinion that the lower revenue guidance CleanSpark announced on August 17th was attributable to the alleged misrepresentations about ATL?

A    Can you point me to a specific paragraph in my report?  I think I know the one you're referring to.  This is in my merits reply report?  I don't have everything memorized.  I apologize, David. So some basis would be helpful.

Q    No.  No.  I'm not -- I'm asking. I'm not thinking about a specific line in your report, to be frank.  I'm asking, you know, do I -- if you want to look to a

Page 626

Z. BOZANIC, PH.D.

paragraph, feel free to look. But truthfully, I don't have a specific paragraph.

I just want to know if it's your opinion that the lower revenue guidance announced on August 17th was attributable to the alleged misrepresentations about ATL?

A       The date again was what?

Q       August 17.

A       Yeah. Okay. So I think here, this is where there was some offsetting nature of the guidance in terms of guidance changing.

This is paragraph 105 of my merits reply report where there were some changes in expectations with regards to the Bitcoin segment and the legacy statement -- segment.

At the end of the day, it was a very negligible decline in guidance. With respect to overall revenue expected, less than 2 percent. And I think I state here that the revised consensus was -- was

Page 627

Z. BOZANIC, PH.D.

still 4 million or seven to 8 percent above the consensus of 52 million.

Q   Okay.  And was bitcoin guidance also increased?

A   I -- I'd have to go back and look.  My -- my memory's not serving me this -- so late in the day, unless I say something here.  Let me look.  One second.  Sorry.

So yeah.  So here, I say it.  "Eight million dollar increase in Bitcoin revenue expectations, which were nearly offset by a $7.5 million decrease in the energy segment."  So there were offsetting and color -- countervailing changes in projections.

Q   Okay.  And was guidance for any other segments lowered?

A   I mean --

MR. LINKH:  Object to form.

THE WITNESS:  I guess I'm a little confused when you say "other segments."  We've got the Bitcoin segment.  The energy segment.

Page 628

Z. BOZANIC, PH.D.

At this point in time, I was classifying these as -- as so-called legacy versus nascent, where Bitcoin would be the nascent. And legacy would -- would be what they had in place before the acquisition of ATL.

BY MR. PARTIDA:

Q    Okay.  Now, the increase in bitcoin guidance is good news; right?

A    I would say so.

Q    Okay.  Do you think that the date range corresponding to the late spring/early July that -- let me point you to a paragraph.

A    Thank you.  I appreciate that, David.

Q    And you're -- yeah.  Some of these, I don't actually have a specific paragraph.  I'm really honestly trying to --

A    Ah.  Okay.  I understand.

Q    I'm trying to literally understand, is this the opinion or not? It's not a trick.  I'm not trying to say

Z. BOZANIC, PH.D.

it should or shouldn't be your opinion.

I'm really just trying to -- so that I understand, "Okay.  This is my opinion."  And that's -- really, that's all it is.  But I think I can point you to --

A    Please.

Q    Paragraph 76 of your reply merits report.

A    I'm -- I am there.

Q    Okay.  And so this is, you know, just to help you orient yourself.  Some of the disclosures; right?

Critical in the language of the disclosures, at least as alleged in the complaint, are references to things like, "This fall.  "This summer."  "Early/late summer."  "Mid-year."  Are you familiar with what I'm referring to in terms of what the complaint is alleging?

A    I am, sir.

Q    Okay.  Now, in paragraph 76, right there, it says that -- my question with that, do you think that the date

Page 630

Z. BOZANIC, PH.D.

range is corresponding.

So if you think -- when you think "late spring/early July," do you think that that date range, when you think of that, overlaps with the date range corresponding to "mid-year" or "mid-summer"?  Which, in paragraph 76, you stated was July 1st through August 5th.

A    That was a lot, David.  Repeat that once more for me.  I'm sorry.

Q    Yeah.  Yeah.

A    I mean, that's --

Q    So what I'm trying to understand is, do you think that late spring/early July -- when somebody says "late spring/early July," do you think that date also overlaps with "mid-year" or "mid-summer"?

And the reason I'm asking that is because in paragraph 76 of your reply merits report, you state that July 1st through August 5th is mid-year or mid-summer.

And what I'm trying to

Page 631

Z. BOZANIC, PH.D.

understand is, so then would you say that there's overlap with late spring/early July?

MR. LINKH:  Object to form.

THE WITNESS:  So, again, I think I have all of this detailed, in terms of what the actual calendar says, somewhere else in the report.  This is -- this is part of it.

But when we start to say "late spring," I'd have to go back.  Let me just see here.  Summer '21.  Do I see the date for spring?

So late spring does not really align with this mid-year to mid-summer if that's what we're referring to.  I'm looking back at my page -- my paragraph 76 in this report.  And so, you know, if I say here, it says summer 2021, the date starts on June 20th; right?

And then furthermore, mid-year to mid-summer, if you agree with my logic in these paragraphs, starts at July 1.  So late spring does not seem to align with

Z. BOZANIC, PH.D.

that date range.  I think that's what you're going for.

BY MR. PARTIDA:

Q    So all of that makes sense, with one caveat.  It says "late spring/early July."  And so my thought is, I get -- I totally understand different time periods. I understand that you laid them out.  And I get that.

But one says "late spring/early July."  And I get that there's a difference.  But my understanding is that late spring/early July would overlap with mid-summer.

A    Yeah.  I would say -- so --

Q    Which begins July 1st and ends August 5th.

A    Yeah.  Mid-summer, though, is August 5th.  And so -- and this is -- this is nuanced, right, with regards to mid-year versus mid-summer.  And so here, I say mid-summer would roughly be August 5th.

So, again, now it goes back to

Z. BOZANIC, PH.D.

you asked if -- if July would be considered to be -- where'd it go -- mid-summer. And so if mid-summer is August 5th, that doesn't seem to align with July. Am I -- am I following you? I apologize if not.

Q You are. And I'm trying to find a way to clearly ask this question without me testifying. And I'm trying to find an easy way of asking it.

But one of the announcements, one of the guidances in terms of the timeline for completion of the project, said late spring/early July. A subsequent report said mid-year/mid-summer. And then a later report said a different date.

And all I was trying to clarify is that, you know, I understand what the calendars say and the dates say. But doesn't late spring/early July overlap with mid-year?

And I was literally thinking that because it says, "Early July." And as I've understood, laid out in

Page 634

Z. BOZANIC, PH.D.

paragraph 76 of your report, mid-year starts July 1st.

So in my simple mind, I'm thinking late spring/early July, that overlaps with mid-year, which starts July 1st.  Because obviously, early July is part of -- is -- July 1st is early July.

So with all of that said, my understanding and the question I have to you is that.  Do you agree that the date range late spring/early July has at least some overlap with the date range mid-year, which begins July 1st?

A    So given what I've outlined here -- I thought earlier -- I apologize. I thought you asked "mid-summer."  Right? And so I said, "Well, hey.  Mid-summer is August 5th.  So July does not align with that consistently."

Mid-year/early July; right? Here, we would say July 1st is mid-year.

Q    Yep.

A    Yeah.  So there, now, I'm with

Page 635

Z. BOZANIC, PH.D.

you.

Q    Understood.  And I appreciate that clarification because I did use both words.

A    Thank you.

Q    And so my understanding is that you would say there's late spring/early July, which has some overlap with mid-year.  But doesn't have overlap necessarily with mid-summer, which starts later than mid-year?

A    Correct.  Early July could align with mid-year.  But not mid-summer.

Q    Thank you.  I appreciate that answer.  I appreciate that we got through that.  So now, do you think --

Just a couple more questions from me.  And then I'll take a minute to see if there's anything else.  But in paragraph 60 of your reply report, you cite to a Reuters article.

A    Catching up.  I'm there.  Shall I read it, David?

Q    I just want you -- so I just --

Page 636

Z. BOZANIC, PH.D.

you're there?  And you're with me?

A    I -- I'm there.  I haven't read it.  But yes.  I'm there.

Q    Okay.  Yeah.  So yeah.  So go ahead.  Take a look at paragraph 60.

A    Thank you.

Q    But I'm actually going to ask you about the Reuters article; so --

A    I have read the -- the paragraph referenced.  Thank you.

Q    Do you remember if that article talks about expansion delays?

A    I -- I don't recall, off the top of my head, without having the benefit of the article in front of me.

Q    Okay.  I would like to turn you to paragraph 73 of your reply report.

A    I'm also there.  Shall I read it?

Q    Sure.  Take a look.  And I'm going to ask you the same question about this article.

A    I have read this paragraph 73.

Q    Okay.  So same question as

Page 637

Z. BOZANIC, PH.D.
before.  Does the BTIG report that you cite in paragraph 73 there -- does that report talk about expansion delays?

A    So, implicitly, I would say yes; right?  So it's set to ramp up.  So at this point in time, August 16th, the expectation was that the firm would be, by April 2021, at 0.9 to 1.4 EH; right?

And so when they say it's set to ramp up, this means that they have failed.  And the promise made by -- that was supposed to be made by April 2021.  Here, we're sitting at August 16th.

And so we don't know where they're at in actual hash rate capacity other than they're going to ramp up somewhere to 820, which is still falling short of what the promise was upon the ATL acquisition announcement.

Q    Okay.  And so that's implicitly.  But did they explicitly talk about it?  That's my question.  Do you recall if they explicitly discussed that?

A    Yeah.  I -- I apologize, Dave.

Page 638

Z. BOZANIC, PH.D.

Without the benefit of the report, I don't have that in front of me.  But this is the implication that I'm making from this particular utterance in this report.

Q    Okay.  But you don't recall, as you sit here today, whether they discussed that explicitly?

A    I apologize, sir.  I do not recall.

Q    Okay.  No problem.  Now, is it then your opinion that the reason for the price target reduction were the expansion delays?

A    I -- I would say that here, what I'm saying is that -- yeah.  This -- this missing of the hash rate could be contributing to that -- that price decline.

So that's quite a big change in terms of -- I think -- again, if my memory serves me, I think it was BTIG -- I'd have to go back and look at my report -- that reaffirmed one of their price targets. And then it was this report.

Page 639

Z. BOZANIC, PH.D.

So I think one of the previous -- one of the previous reports reaffirmed.  And then this one is the one that I think started to ratchet down the price target here.  But again, that's -- that's assuming my memory serves me correctly.

Q    It does.  And my -- so my question is, in this report that reduced it down, you know, did the BTIG report reduce its price target due to expansion delays?

But I take it, you don't remember the full content of the article, as you sit here today, which I understand.

A    Thank you.

Q    I guess maybe I'll ask a different thing that you might remember, which is that -- did you analyze -- when you did review that report, did you analyze the financial model that BTIG used to set the price target?

A    So I would say for several reports, I -- I look at some of the models

Page 640

Z. BOZANIC, PH.D.
and some of the assumptions to look at the estimates.  With respect to this particular report, I'd have to go back to this report and look closer at the model to see what I was thinking at this point in time.

Q    Let me think if I have much -- now, do you -- just as you sit here today, without having to point me to something specific, do you recall reviewing any analysts' reports?

Any reports setting price targets for CleanSpark, where they were discussing the delays?  The expansion delays in terms of setting their price targets?

A    Yeah.  Apologies.  Given how late it is in the day and how much information we've covered, my memory is not going to serve me well without having some additional documentation in front of me.

That said, what I will say is, I -- I do believe there were reports that

Page 641

Z. BOZANIC, PH.D. indicated that there could be delays in terms of acquisition of materials. And I think, implicitly, there's discussion of delays because the hash rate achieved at that point in time was not what was expected by April 2021.

So that's the best I can say, to my recollection at present, David.

Q    Okay. Now, I just have one -- last two questions. You're familiar with the Freshworks case?

A    I'm sorry. Say again?

Q    You're familiar with the Freshworks case?

A    I am familiar with Freshworks. Yes.

Q    You were an expert in that case?

A    I -- I was retained as an expert in that case. Yes.

Q    Are you aware that, in that case, summary judgment was granted against your client? And that your opinion was heavily criticized for being too speculative?

Page 642

Z. BOZANIC, PH.D.

MR. LINKH:  Object to form.

THE WITNESS:  I would disagree with that assessment.  I don't believe that it was heavily criticized.

I think that the judge had said that the analysis that counsel had requested of me, which was to look at the academic literature and take an academic perspective, and not -- I was explicitly not asked to do analysis.

The judge said that the report submitted did not have sufficient detail in terms of the analysis that -- I -- I don't know if it was a he or she -- would appreciate.  But I was following counsel's instructions in terms of what they requested of me.

BY MR. PARTIDA:

Q    But the opinion says, "Too speculative."  Those words; correct?

A    I don't recall the exact verbiage.

Q    That's what the judge in that case stated?

Page 643

Z. BOZANIC, PH.D.

A    Yeah.  I apologize.  I don't recall the exact verbiage.  I assume you're representing it as such.

But the fact of the matter is, I was not asked to do detailed analysis.  I was asked to provide an academic perspective in that case.

Q    Have you ever been excluded as an expert in any other case?

A    I have -- I have not.

Q    Did you form any opinions for this matter which are not included in your reports?

A    No.

MR. PARTIDA:  I have no further questions.

MR. LINKH:  I have no further questions.

MR. PARTIDA:  Thank you, everyone.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  Is there a read or waive?

THE REPORTER:  Oh.  I always include the read and sign.  I think with federal,

Page 644

Z. BOZANIC, PH.D.

it's defaulted.

THE VIDEOGRAPHER:  Oh.  Okay.

THE REPORTER:  The errata comes like automatically in New York.

MR. LINKH:  Right.

THE VIDEOGRAPHER:  I will take us off the video record then.

This is the end of media unit number 6.  We are off the record at 5:59 p.m.  And this concludes today's testimony, given by Dr. Zahn Bozanic.

(Off the record.)

THE REPORTER:  The time is now 6:00 p.m.  We are resuming the record.

All right.  So I'm sending the original to Counsel Partida.

Counsel Linkh, will you be ordering a copy of today's transcript?

MR. LINKH:  I will be.  Yes.

THE REPORTER:  Okay.  And you said you wanted a rush.  Is there an expected date you want it by?

MR. LINKH:  By Monday, if possible.

THE REPORTER:  Okay.  And, Counsel

Page 645

Z. BOZANIC, PH.D.

Partida, do you want yours rushed as well? Or do you want your normal delivery date?

MR. PARTIDA:  When would normal delivery be?

THE REPORTER:  Your normal delivery is November 13th; so --

MR. PARTIDA:  We'll go ahead and take rushed.

THE REPORTER:  So you want it on the 3rd as well?

MR. PARTIDA:  Yes.

THE REPORTER:  Okay.  The time is --

THE VIDEOGRAPHER:  Were there orders for the video at this time?

MR. LINKH:  At this time, I think we have a standard.  I forget exactly what the standard is.  But I would default to that.

THE VIDEOGRAPHER:  Okay.

THE REPORTER:  All right.  The time is now 6:01 p.m.  We are going off the record.

//

Page 646

Z. BOZANIC, PH.D.

(Whereupon, at 6:01 p.m., the proceeding was concluded.)

_____

ZAHN BOZANIC, PH.D.

Subscribed and sworn to before me

this ___ day of _____, 2025.

_____
Notary public

**Page 647**

CERTIFICATE OF DEPOSITION OFFICER

I, LINDSEY DIEGO, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

LINDSEY DIEGO

Notary Public in and for the

State of New York

Page 648

CERTIFICATE OF TRANSCRIBER

I, SHANNA NANCE, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Shanna Nance*

SHANNA NANCE

Page 649

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Hasthantra, Darshan v. Cleanspark, Inc. Et Al.
DATE OF DEPOSITION: 10/30/2025
WITNESSES' NAME: Zahn Bozanic , Ph.D.

PAGE    LINE (S)        CHANGE              REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

_____
                                    Zahn Bozanic , Ph.D.
SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.


_____          _____
(NOTARY PUBLIC)                 MY COMMISSION EXPIRES:

**[& - 15]**

**&**

**&** 296:4,12 398:10

**0**

**0.05** 406:21
**0.1** 556:20
**0.268** 476:23
**0.4.** 424:3
**0.9** 637:9
**00511** 295:7 300:12

**1**

**1** 300:5 355:3 362:16 364:13 364:18,22 384:14,17,25 385:18 417:14 420:2 429:5 445:13 481:25 484:24 487:2,3 487:14 556:23 611:12,16 612:23 614:4 631:24
**1,000** 445:18,19
**1.4** 637:9
**1.96** 490:13,16
**1.96.** 490:5
**1/9/21** 387:25
**10** 343:12 345:24 346:9 356:10 357:12

380:5 386:24 387:17 388:14 389:3,9 417:15 420:3 429:4 445:14,23,25 446:2,3 466:12 484:20,23 485:10,16 486:25 487:18 488:5 489:6,10 489:16 609:12
**10.6** 365:16,21 366:6,9
**10/30/2025** 649:3
**100** 299:6 353:9 367:2,9 367:14,22 380:14 386:7 413:11 445:15 477:21 478:10
**10019** 296:23
**101** 299:9 483:22 484:2
**10169** 296:6
**102** 299:13 520:5,7
**103** 299:19 343:2,3 350:8 352:3,15,17 353:14 355:15 356:4 360:9,10 360:18,22 551:3,4 558:13

558:16,16
**104** 615:7 616:2
**105** 626:16
**109** 393:21 394:2 401:11 401:20
**10:00** 304:6
**10:20** 295:13 300:3
**10b** 373:7,15 374:7,19
**10th** 376:15
**11.69** 490:8,12 490:15
**110** 317:12 318:2,7,10,13 333:12 394:2 396:6,11,16 398:9 401:17
**111** 317:12 318:8,10 341:14 396:13
**115** 360:17
**11:17** 362:17
**11:25** 362:8,9 362:12
**11:28** 362:21
**11:30** 362:3,7
**12** 328:11 364:4,5,9 389:15 391:9 499:24 500:10 506:16 609:24

610:10
**126** 551:9,18
**12:11** 405:11
**12:40** 404:17
**12:48** 405:14
**12th** 390:6,7 391:15 623:25 624:18
**13** 387:22 389:3,9 391:5
**13th** 388:15 645:7
**14** 391:6 490:20 499:3 517:15 529:9 530:11 538:13 556:17
**142** 556:13,14 558:18
**147** 556:12
**14th** 517:12 619:11,24 620:13
**15** 350:8 355:15,18,23 356:18 359:2 361:3 386:24 387:18 388:17 391:2 402:16 403:4 459:19 465:5,9 488:13 489:19 499:10 499:22 500:8 556:18

**[15.39 - 26.3.]**                                                    Page 2

**15.39** 343:13
**15th** 493:13
495:9 497:17
499:2 556:21
619:11,24
620:14
**16** 390:24
391:10 398:10
458:20 459:2,8
468:22 469:2
471:4 472:23
472:25 475:9
476:18,21
**16th** 637:7,14
**17** 375:6 376:5
377:19 378:2
378:18 626:11
**17,500** 398:14
400:15
**179** 357:23
**17th** 339:22,25
379:2 625:3,13
626:7
**18** 298:19
306:19 420:21
430:5 479:9,17
480:3
**18.84** 612:7,20
**186** 349:21
350:8,14 351:3
351:20 352:9
352:16,17,20
**187** 349:13,25
351:10 358:12

362:25 363:3,6
363:10
**1925** 296:13
**1:21** 295:7
300:12
**1:26** 441:18
**1:31** 507:4
**1:33** 506:22,25
**1:34** 441:22
**1st** 630:9,22
632:17 634:3,7
634:8,15,23
**1x6** 354:23

**2**

**2** 306:17
337:14,18,23
337:24 362:20
441:17 485:4
486:14 490:19
551:17 558:19
558:20 626:24
**2.85** 509:11
**20** 445:14
572:10 649:22
**2003** 547:23
549:7
**2006** 546:24
**201-9150**
296:16
**2010** 298:20
469:4
**2013** 298:11
299:3 473:9

478:4
**2015** 421:3
**2017** 299:9
483:14 484:8
611:12,17
612:23 614:4
**2018** 549:11
611:13,17
612:24 614:5
**2020** 299:13
343:12 345:24
346:9 356:11
357:12 375:5
375:24 376:4
377:18 378:2
378:17 380:5
388:14 487:18
489:6,10,16
499:24 500:10
506:16 516:23
557:21
**2021** 299:6
372:18 375:6
376:6 377:19
378:2,18
387:22 389:3,9
389:9,16
390:24 391:9
391:10 398:10
402:16 403:4
477:5,10
479:17 480:4
482:5,19
490:20 499:22

500:8 538:14
619:11 631:20
637:9,13 641:7
**2025** 295:12
298:10,19
300:4 304:6
306:17,19,22
316:9 328:11
430:5 458:25
471:8 609:12
646:10
**205** 346:21
348:25 355:25
357:10
**20th** 631:21
**21** 631:13
**2100** 296:13
**212** 296:8,25
**22** 606:24
**23** 345:25
492:3 493:7
**230** 296:5
**25** 469:6
**25538** 647:19
**26** 352:19
473:10
**26.3** 345:25
349:2 350:5
351:13 355:20
356:12 357:13
358:6 359:5
360:24
**26.3.** 356:15

**[261 - 5:56]** Page 3

**261** 478:17
**26th** 352:5
**28** 390:2,20
**29** 376:4
492:12 623:5
**2900** 296:22
**2:32** 492:21
**2:37** 492:18
**2:39** 492:25
**2:57** 507:11,21
**2nd** 482:24

**3**

**3** 441:21 482:5
482:18 483:8
492:20
**3.70** 343:13
**3/1** 483:4
**3/2** 483:5
**30** 295:12
300:4 304:6
404:13,14,16
404:25 405:3
**30,000** 398:13
400:15
**303** 298:3,7
**30s** 388:3,12
**31** 528:7,9,11
528:13
**310** 296:16
**315** 298:10
**32317** 295:15
302:8,13

**33723** 648:15
**35** 388:18
389:25,25
484:21 485:15
485:20
**353** 484:14,16
485:11,13,20
**355** 485:23
**36** 544:8,17
**363** 298:16
**39** 388:6
**3:02** 507:11
**3:04** 507:21
**3:42** 550:18
**3:45** 550:3
**3:47** 550:12,13
**3:53** 550:22
**3rd** 482:23
645:11

**4**

**4** 330:8 431:10
431:19,25
432:22 440:22
492:24 550:17
627:2
**40** 386:25
388:6,18
423:23 449:11
449:13 450:11
454:14 544:8
544:17 546:21
**41** 564:6,21
565:3 567:3

568:10
**43** 544:23
**430** 298:19
**44** 491:7,8,10
**45** 542:16,20
543:3
**46** 588:8
596:13 597:7
597:12,14,19
606:17
**47** 405:23
573:12,21,24
574:5
**470** 298:25
**474** 299:5
**477** 299:8
**484** 299:12
**49** 393:21
**4:07** 563:20
**4:31** 563:23

**5**

**5** 343:22 373:7
373:15 374:7
374:19 406:20
406:21 417:15
420:2 550:21
611:13,17
612:23 614:5
623:9
**50** 398:8
415:10,12
426:20 427:6
427:23 428:7

428:19 431:4
431:17 432:7
432:13,24
433:21,23
434:20,22
435:11,12,14
437:18 438:10
439:15 442:5,7
443:7,19,20,23
447:12,16
448:18,20
450:9,15
451:15,16,17
451:23,24
452:23,25
456:19,24
468:19 588:12
597:22 598:15
**50th** 457:21
**51** 432:13
**52** 393:22
501:19 502:4
508:24 510:25
511:18 627:3
**520** 299:18
**538** 296:5
**551** 299:19
**57** 432:2
**58** 385:2
481:25
**5:28** 623:10
**5:40** 623:14
**5:56** 508:9,10

**[5:57 - 99]**                                                    Page 4

**5:57**  512:9,21
  513:15,22
  514:14,17
**5:59**  644:11
**5th**  486:25
  630:9,23
  632:18,20,24
  633:5 634:20

**6**

**6**  330:9,13,16
  330:20 331:12
  336:22 337:16
  338:10 354:16
  355:3 623:13
  644:10
**60**  423:18,24
  635:21 636:6
**67.23**  482:19
**68**  502:6
**682-5340**  296:8
**69**  429:7
  430:21 437:7
  437:15 438:6
  444:15 556:11
**6:00**  644:15
**6:01**  645:22
  646:2
**6:10**  512:9,21
  513:15,22
**6:12**  508:9
**6b**  339:9

**7**

**7.5**  627:14
**70th**  457:20
**71**  355:24
  622:7
**71.7**  343:23
  344:15 345:10
  357:5
**73**  636:18,24
  637:3
**759**  365:6,7
**76**  629:9,23
  630:8,21
  631:18 634:2
**78**  479:12,14
**7th**  482:24

**8**

**8**  354:14,25
  556:23 627:2
**820**  637:18
**825**  296:22
**83**  584:23
**88**  364:14,23
  608:11 615:24
  615:25
**89**  419:21,21,25
  450:2 455:16
  455:23 488:20
**89.63**  488:16
**89.9**  419:7
**89th**  419:20
  422:2 457:19

**9**

**9**  298:10
  306:22 316:9
  343:24 375:5
  375:23 376:16
  377:18,25
  378:17 458:25
**9.39**  343:23
**90**  326:19
  328:6 330:4
  337:11 342:25
  349:20 384:12
  384:18,20
  385:12 393:19
  405:21 415:5,5
  415:7 417:5
  419:24 439:25
  455:13 460:19
  461:5 463:7
  464:8 468:4,11
  469:11 473:14
  474:9 476:24
  481:19 487:10
  488:7 489:11
  519:17 551:17
  551:17,18
**90.00**  488:17
**90067**  296:14
**90th**  419:3
  421:25
**93**  505:15
  506:12

**94**  298:7
  303:17,18
**95**  298:8
  315:14,15
  316:7 341:2,3
  349:11 363:2
  385:13,17
  406:19 420:18
  429:4,9 439:24
  458:19,24
  461:14,23
  466:23 472:18
  472:25 489:7
  492:2,12,13
  493:6 501:18
  528:9,11,12
  542:21 564:5
  573:25
**96**  298:11
  363:18,21
**97**  298:17
  384:5,6 385:21
  385:23 430:3,6
  479:8 615:13
  615:15,17
**98**  298:20
  470:10,12
  474:9 615:13
**981-2300**
  296:25
**99**  299:3
  337:22 385:2
  439:16,24
  474:15,16,19

**[99 - acquisition]** Page 5

475:5 478:5,6
**99.3** 432:2
**9th** 341:5
376:14 379:2

**a**

**a.m.** 295:13
300:3 304:6
362:17,21
**abandon**
382:18,20
383:9,19,24
**abandoned**
383:18
**abilities** 379:14
**ability** 381:12
447:7 449:7
502:12 509:4
510:19 516:17
521:12,23
552:16 647:9
648:6
**able** 321:4
389:17 408:19
416:6 425:7,25
448:18 452:14
456:12 465:22
497:6 529:21
529:22
**abnormal**
365:15 366:5
406:13,15,24
407:10 411:14
411:21 413:18

413:23 423:16
423:19,22,25
447:16 482:10
482:18 487:18
488:13 489:5,9
489:15,18
490:4
**above** 484:22
485:23,24
627:3
**absence** 416:13
416:14 422:3
497:11
**absent** 301:10
343:10 346:18
357:3,23 433:7
561:15
**absolute**
455:25 488:21
**absolutely**
319:9 325:12
348:18 369:5
388:22 395:7
395:18 430:15
438:15 513:24
560:25
**abstract** 364:7
**academia**
427:13,15
461:22 487:23
488:11
**academic**
358:14 417:2,9
417:10 426:25

427:19,24
429:3 456:15
459:9,14
461:17 465:11
466:17,25
467:23,25
468:8,16
486:22 495:25
496:3,10 497:4
497:21 498:20
534:21 535:15
536:13 537:9
537:23 544:7
545:22 549:10
571:2 605:10
605:22 642:8,9
643:7
**academics**
419:25 455:10
546:7 547:21
**accept** 458:14
**access** 495:13
497:9 566:2
567:6,11
568:13
**accommodate**
307:20
**accounting**
417:11
**accumulation**
527:19
**accurate**
329:14 350:9
350:10 351:17

364:20 371:21
391:16 401:4
448:25 482:16
552:18,20
555:23 613:11
647:8 648:5
**accurately**
401:6
**accustomed**
340:10
**achieve** 503:16
503:17
**achieved**
368:20 641:5
**acquire** 515:14
516:24 521:12
521:18,24,25
530:19
**acquired**
380:12 508:17
**acquires**
524:20
**acquiring**
298:15 364:8
520:25 522:20
523:11 525:9
525:15 529:23
530:9 531:19
**acquisition**
344:9 345:9,12
345:19 346:6
346:12,13,17
357:6 358:17
359:13,13

363:14,16
364:5,10
380:19 399:16
502:9 503:2
508:7 518:2
521:21 526:3,4
529:20 532:14
577:12,13
579:8 628:7
637:20 641:3
**act** 530:21
**acting** 528:24
529:7
**action** 558:17
647:11,15
648:8,11
**activities** 378:9
617:9
**activity** 616:19
**actual** 305:8
316:12 505:19
538:18 552:6
556:8 568:2,22
586:17,21,23
587:14 631:8
637:16
**actually** 301:9
340:10 349:8
368:11 384:7,9
390:14 406:15
407:10 410:10
419:5 422:13
478:3,15
483:18 504:23

505:19 508:17
567:17,20
594:2 628:19
636:8
**add** 354:5
**added** 353:15
**addition**
578:10 601:2
601:12
**additional**
353:16 388:9
464:20,21
555:5 559:4
640:22
**additionally**
301:10
**address** 302:7
302:10 321:11
321:11
**adequately**
344:8 345:8
**adhere** 461:24
**adjacent**
463:15
**adjective**
370:17 382:10
**adjectives**
381:4 382:3
**admit** 378:5
**admitted** 462:4
**advantage**
390:14
**advice** 561:23

**affect** 624:12
**affiliated**
302:10
**affiliations**
300:18
**affirm** 513:18
**affirmative**
314:13
**affirming**
616:17 617:22
**aftermarket**
483:4
**agency** 357:20
**aggregate**
409:6
**ago** 572:10
577:8,17,21
595:23
**agree** 301:13
345:23 348:25
359:8 364:3
366:24 367:7
367:11,16
368:4,8,25
369:11 371:8
372:16 379:19
380:3,23
381:15 382:12
383:4 388:13
388:20,23
389:2,8 391:8
402:7 407:3
417:23 418:7
421:13,16

422:16 434:2
482:4,9,13,17
515:6 517:11
517:14 543:11
543:14 575:5
575:11 594:20
598:12 631:23
634:12
**agreed** 394:25
**agreement**
503:6 509:24
510:15 517:10
518:9 571:2,16
599:11 605:10
605:22
**ah** 351:24
376:18 377:11
390:8 519:15
562:22 628:22
**ahead** 307:23
308:14 314:8,8
315:13,19
324:24 325:13
331:12,13
367:6 384:8
420:17,19,20
458:16 472:19
474:2 476:7
483:19 504:21
510:21 511:24
537:7 542:19
563:15 564:19
622:16,18
636:6 645:8

**al** 295:4,7 300:9 363:11 496:5 535:16 549:17 649:2

**alejandro** 297:3

**align** 582:23 631:15,25 633:5 634:20 635:13

**aligning** 583:6 583:21

**allegation** 616:16

**allegations** 357:22 367:23 527:9,21 531:14 561:16 569:14 574:22 584:16 603:16 607:18

**allege** 618:6

**alleged** 311:9 313:20 317:15 318:16 319:19 338:14 339:6 339:17,24 342:17 343:10 346:18 357:3 357:23 479:17 480:4,11 481:6 482:5,8 624:2 624:19 625:4 625:14 626:8

629:16

**alleges** 344:12 588:10

**alleging** 629:21

**allow** 450:16 456:25 497:9

**allows** 359:17

**allude** 516:6

**alluded** 535:6 573:2

**alluding** 314:9 517:22 554:14

**aloud** 319:9

**altered** 439:9

**alternate** 393:12 461:8 464:16 466:25

**alternative** 309:16 310:22 311:7 313:18 314:11 406:9 406:23 409:12 410:2 411:12 411:19 412:12

**alternatives** 314:25

**amended** 299:19 551:20 558:17

**amount** 366:24 367:8 368:2,8 368:20 369:2 527:14 530:23

**amounts** 375:13

**ample** 460:12

**amply** 339:19

**analyses** 314:13

**analysis** 314:12 320:12,19 321:6 323:17 323:21 329:13 346:12 363:13 377:6 442:25 470:3 498:14 530:7 569:8,12 569:21 570:2 570:12,24 580:20,25 582:4 600:23 601:9 602:2,9 602:19 603:8,9 603:25 606:6 606:11 607:12 611:6 614:13 642:7,11,14 643:6

**analyst** 377:2 485:2 524:18 565:8 577:20 585:9,22

**analysts** 369:23 394:9,17 395:2 395:6,12 398:5 401:25 561:25 562:11,17,24

562:25 564:10 565:6,12,24 566:6,9,19,23 567:6 568:3 569:3 570:17 581:8,8,10,25 582:12,14 584:4,12 585:5 585:10,24,25 586:11,12,19 586:25 587:6,8 601:19 624:7 640:12

**analyze** 494:14 494:17 495:8 495:16 521:13 521:25 540:21 639:20,22

**analyzed** 460:17 461:2 462:12 463:4 463:24 496:22 529:8 546:18 546:19

**analyzing** 409:21 432:5 520:25 523:12 525:9 530:9 531:19 546:9

**andrew** 297:5 300:13 440:25 623:2

**anecdote** 594:23

**[anew - appreciated]**

**anew** 492:6

**angeles** 296:14

**animated** 514:10

**announced** 380:5 473:13 558:25 625:13 626:7

**announcement** 345:12 346:13 346:17 357:6 376:17 380:10 380:19 517:9 577:14 612:8 612:19 637:20

**announcements** 364:10 621:16 633:12

**announces** 559:13 560:22

**announcing** 516:23

**answer** 305:7,7 305:12,24 306:2 308:13 308:15 310:13 311:12 313:13 314:16 315:11 319:14 321:12 321:21 322:7 323:6 324:14 324:17,22 326:4 334:21 337:5 347:2,19

348:11,16 360:8,25 361:2 361:6 368:3 395:4 398:25 420:8 422:14 426:13 427:11 427:17,21 433:20 452:20 457:12 509:6 512:2,16 513:7 513:11 514:21 515:4 532:4 564:16 576:8 588:3 591:18 592:3 601:23 602:3 625:7 635:16

**answered** 323:18 442:10 444:8 447:6 452:7 454:25 463:9 531:23 575:20 601:24

**answering** 325:3 426:14

**answers** 305:2 305:5 321:16 347:15 379:17 426:13 471:18

**ante** 322:16 324:2,15 523:10 524:15 525:8

**anticipate** 347:15

**anticipated** 399:16

**apologies** 385:14 386:3 390:12 640:18

**apologize** 321:24 326:25 347:11 348:3 355:12 385:6 390:11 420:10 435:6 447:7 471:23 519:21 547:20 562:13 625:20 633:7 634:17 637:25 638:9 643:2

**apparently** 592:9

**appear** 379:15 380:8 388:25 391:2 407:17 409:20 411:9 412:25 449:23 478:15 489:2 527:2

**appearance** 300:18

**appearing** 300:23

**appears** 316:19 342:10 350:10 352:23 353:11

387:18 410:7 413:6 434:9 440:3 443:3 453:16 607:5 607:16

**appendix** 384:22 467:10

**applicable** 301:17

**application** 383:14

**applied** 393:16 568:3

**applying** 393:15

**appointed** 590:8

**appreciate** 308:13,15 314:4 316:22 321:21 324:21 324:25 326:4 329:24 332:4 333:2 386:8 404:8 414:24 420:12,15 426:12 458:10 473:25 476:3 544:4 628:16 635:3,15,16 642:16

**appreciated** 492:9 622:15

**approach**
  373:8 374:2,4
  381:11 535:14
  617:19
**approached**
  324:2
**approaches**
  391:25
**appropriate**
  374:7,13,18
  393:6
**appropriately**
  340:21
**approximate**
  389:20
**approximately**
  346:21 349:4
  357:10 387:14
  387:20,23
  389:14 390:18
  390:19,25
  398:13 400:14
  460:3
**april**  611:13,16
  611:17 612:23
  614:5 637:9,13
  641:7
**area**  536:25
  537:24
**areas**  531:11
  536:14,23
  537:10,11
**arguing**  521:6

**argument**
  363:9 428:16
  498:13
**arguments**
  330:8
**arrival**  416:8
  433:7 440:7,9
**arrived**  412:19
  433:15 446:17
  446:25 450:7
  451:5
**arriving**  416:14
  425:10,12,14
  431:14 436:12
  436:17 443:14
**art**  535:18
**article**  363:11
  363:12 468:2,9
  468:17 471:3
  478:15 547:24
  549:10 635:22
  636:9,12,16,23
  639:15
**articles**  459:10
  459:14,16,21
  466:4,8 468:24
  469:16,18
**artificial**
  342:16 350:4
  351:12 355:19
  357:16 358:5,8
  359:4 360:23
  379:6 387:9
  389:4,10

  391:20 392:5
  393:2 490:7,10
**ascertain**
  390:10 391:4
  400:4 410:4
  422:8 514:23
  570:15
**ascribe**  574:10
**asia**  572:8
**aside**  306:11
  374:17 381:4
  393:2 593:22
**asked**  307:23
  308:13 309:24
  310:6 312:19
  314:19 323:6
  325:10,20
  327:12 335:7
  336:18 342:22
  346:11 424:17
  426:6 438:4
  444:5 452:5
  472:13 475:21
  501:25 511:17
  513:13 542:18
  542:22 548:8
  601:25 606:23
  622:17 633:2
  634:18 642:11
  643:6,7
**asking**  309:4,5
  310:14,16
  312:5 318:11
  334:4,10,13,23

  336:23 350:23
  371:10 375:18
  377:20,23
  433:19 435:25
  453:19 460:23
  473:22 474:3
  476:17 499:7
  518:20 523:19
  525:5 534:12
  547:16 587:16
  593:3,4 594:3
  603:7 610:16
  625:22,24
  630:20 633:11
**asleep**  589:5
**assert**  416:6
  425:7
**asserted**  408:7
**asserting**
  486:15
**assertion**  360:5
  394:8,16
**assess**  372:2
  422:7 426:22
  427:8 428:8
  446:5 453:7
  469:24 480:9
  481:5 486:6
  527:10 539:20
  540:15 603:14
**assessing**
  374:25 465:10
  618:3

**assessment**
  339:2 414:6
  642:4
**assigned**  490:4
**associate**
  434:14
**associated**
  413:7 434:10
  440:15 450:6
  497:8 523:4,6
  540:17 570:20
  588:16 590:20
  592:7 598:2,18
  603:12
**association**
  433:6,9
**assume**  319:4
  320:3 322:2,17
  322:23 324:9
  324:15 329:12
  398:12 424:2
  427:12 449:10
  455:15 471:10
  480:19 589:3
  643:3
**assumed**  322:3
  322:5,6,11,25
  326:2 329:15
  335:19 531:3
**assumes**  323:11
**assuming**  321:3
  322:13 323:22
  344:4 358:7
  359:9,23

391:14 401:3,6
  406:14,16
  482:15 592:20
  639:7
**assumption**
  322:21 324:3
  329:6 335:18
  359:15,18
  424:23
**assumptions**
  346:5 398:12
  400:14 434:9
  640:2
**asterisk**  487:6
**asterisks**  470:8
  486:23
**atl**  344:9 345:9
  345:12,23
  346:8,18 350:6
  351:14 356:10
  357:7,11
  358:16 359:12
  380:10,18
  395:16 399:16
  490:22 502:9
  502:24 506:17
  507:5,13,22
  508:13 517:16
  526:12,21
  533:2,18
  557:21 558:2,9
  573:9 577:11
  578:10,11,13
  579:9,9 584:19

585:2 586:2
  587:2 603:18
  603:24 624:3,7
  624:19 625:5
  625:10,15
  626:9 628:7
  637:19
**attached**
  525:17
**attempt**  326:4
  329:7 606:13
**attempted**
  380:8
**attempting**
  308:10 618:5
**attention**
  323:10 343:2
  365:12 384:14
  385:16 393:20
  396:3 401:10
  430:22 458:20
  484:14 495:25
  508:9 509:10
  539:21 548:20
  548:22 556:11
  561:14 597:17
**attest**  302:23
**attorney**
  300:20 647:13
  648:9
**attractions**
  299:4 475:6
**attributable**
  311:9 313:20

624:2,18 625:4
  625:13 626:7
**attribute**  477:3
  477:8
**audio**  647:7
  648:3
**auditor**  587:19
  588:20 596:3
  600:15 601:12
**augmented**
  543:23
**august**  339:22
  339:25 375:6
  376:5 377:19
  378:2,18 379:2
  390:24 391:10
  508:16 611:12
  611:16 612:23
  614:4 625:3,13
  626:7,11 630:9
  630:23 632:18
  632:20,24
  633:5 634:20
  637:7,14
**auslander**
  296:21 300:23
**author**  478:3,7
  521:9
**authored**
  483:15
**authors**  520:3
**automatically**
  644:5

**available**
392:11 526:13
526:22
**avenue** 296:5
296:22
**average** 365:15
365:20 366:5,8
366:13,19,20
408:15
**averages**
373:24
**aware** 370:25
374:3 392:16
465:13 495:6
532:16 533:17
533:23 600:14
600:16 609:5
641:21
**awfully** 367:5
522:13
**awkward**
414:15
**axel** 565:5
**axelson** 565:11

**b**

**b** 298:5 299:1
338:22
**back** 314:15
321:20 326:18
329:22 331:22
333:11 335:17
341:2,11,15
342:24 349:6

349:10,20
360:13 361:12
362:2,6,6,23,24
365:22 373:23
375:13 376:7
378:22 382:9
384:10,12
393:18 397:11
404:16 405:13
405:16,19
412:22 413:4
418:20 419:14
421:23 426:17
428:15 429:3
432:8 433:5
434:6 441:9,24
442:20 448:5
454:25 455:6
455:20 457:9
457:14 458:18
465:8,9 475:8
476:10 477:25
479:8 480:12
480:17 487:9
487:14,20,22
488:23 490:24
492:15 493:3,6
501:17 504:3
506:21 508:16
511:13 512:25
513:17,20
514:15,17,20
515:2,15
519:21 524:2

535:6 548:2
550:12,24
554:15 556:6
563:12,17,22
563:25 564:3
564:17 565:18
568:9 574:14
583:3 584:15
585:16 586:10
589:21,22
594:22 597:6
597:11,17
604:11 610:24
614:11 615:8
627:6 631:12
631:17 632:25
638:23 640:4
**background**
376:20 474:10
498:7
**baker** 297:5
300:13 623:5
**bare** 309:22
312:12
**barely** 550:6
**based** 328:24
350:5 351:13
387:10 389:5
389:11 398:17
451:21 487:17
489:14 490:2
497:18 603:25
**basic** 383:5
409:22 428:6

498:9
**basically**
364:16 584:18
**basics** 409:14
**basis** 359:12
379:12 395:13
397:19 436:10
437:24 439:10
443:6 444:10
453:15 456:22
457:16,17,22
457:24 460:15
460:24 461:6
464:9,10 489:2
497:16,22
502:3,7 504:3
504:4 509:23
517:19 524:10
525:15 527:5
529:23 544:5
574:21 588:18
590:13,25
604:6 607:25
608:6 613:10
617:3,13 618:7
625:9,21
**bear** 315:20
384:6 429:25
440:24 450:21
455:3 456:13
469:14 488:2
519:7,20 520:4
526:6 527:9
528:2 549:19

574:17
**bearing** 524:10
  527:5
**beat** 472:9
**beginning**
  300:19 362:20
  375:22 420:24
  441:21 492:24
  550:21 623:13
**begins** 552:10
  552:15 607:2
  632:17 634:15
**behalf** 296:2,10
  296:18 300:24
**behavior**
  333:24
**belabor** 323:5
**belief** 529:20
  552:16
**beliefs** 567:10
**believe** 304:2
  324:9 356:12
  357:25 365:4
  392:18 400:5
  427:2 463:11
  468:13 482:7
  482:25 483:12
  490:17 495:13
  501:10 502:19
  517:3 518:7
  531:22 536:4
  546:17,19
  547:9,14 549:4
  549:7 550:25

552:20 553:22
  556:13 564:5,8
  564:16 581:23
  590:11 607:17
  610:7 617:6
  640:25 642:4
**benchmark**
  366:14 583:17
**beneath** 487:5
**beneficially**
  588:13 597:22
  598:15
**benefit** 304:16
  319:12 338:2
  349:3 374:24
  388:9 397:21
  438:17 480:21
  481:12 486:10
  493:16 499:12
  518:4 529:7,16
  533:6 611:3
  636:15 638:2
**benefits** 528:24
**best** 305:2,3,6,8
  361:20 404:20
  447:7,9 449:7
  466:4 552:16
  591:2 641:8
  647:9 648:5
**better** 378:20
  412:7 431:4
  432:7 437:18
  438:10 439:14
  509:20

**beyond** 315:3
  380:4,18 499:3
  499:11 503:20
  509:25
**bias** 566:10
**big** 441:9
  581:18 585:11
  638:20
**biggest** 508:19
**bit** 331:18
  374:14 375:17
  375:18 390:13
  412:6 416:24
  419:17 423:13
  428:6 436:19
  446:9 512:4
  537:2 563:13
  622:4
**bitcoin** 368:12
  368:15,16
  369:4,7,12,20
  371:16 379:21
  380:18,25
  381:8,17,22
  382:6,14 383:3
  394:10,18
  395:6,18
  396:21 398:11
  400:14,21,22
  403:6,7,10,12
  508:19 516:17
  581:16 582:2
  626:19 627:4
  627:12,24

628:4,10
**bitcoins** 395:23
  397:17
**black** 386:17
  387:5
**blankespoor**
  299:13 496:5
  520:3 535:16
**block** 551:23
  552:4
**blue** 386:14
**bluechip**
  588:12,14
  589:11 597:9
  597:21,24
  598:8,23
  599:14,17,20
  600:5,15,17
  601:2,12
**boards** 590:9
**borne** 521:17
  524:9 526:5
  530:14 532:13
**borrowing**
  469:9
**bottom** 365:13
  398:8 485:20
**bozanic** 295:10
  299:9 300:1,6
  301:1,23,25
  302:1,4,8,12,12
  302:17 303:1,9
  304:1 305:1
  306:1 307:1

**[bozanic - bozanic]**                                          Page 13

| | | | |
|---|---|---|---|
| 308:1 309:1 | 375:1 376:1 | 442:1,3 443:1 | 510:1 511:1 |
| 310:1 311:1 | 377:1 378:1 | 444:1 445:1 | 512:1 513:1 |
| 312:1 313:1 | 379:1 380:1 | 446:1 447:1 | 514:1,6 515:1 |
| 314:1 315:1 | 381:1 382:1 | 448:1 449:1 | 516:1 517:1 |
| 316:1 317:1,8 | 383:1 384:1 | 450:1 451:1 | 518:1 519:1 |
| 318:1 319:1 | 385:1 386:1 | 452:1 453:1 | 520:1 521:1 |
| 320:1 321:1 | 387:1 388:1 | 454:1 455:1 | 522:1 523:1 |
| 322:1 323:1 | 389:1 390:1 | 456:1 457:1 | 524:1 525:1 |
| 324:1 325:1 | 391:1 392:1 | 458:1 459:1 | 526:1 527:1 |
| 326:1,23 327:1 | 393:1 394:1 | 460:1 461:1 | 528:1 529:1 |
| 327:18 328:1 | 395:1 396:1 | 462:1 463:1 | 530:1 531:1 |
| 329:1 330:1 | 397:1 398:1 | 464:1 465:1 | 532:1 533:1 |
| 331:1 332:1 | 399:1 400:1 | 466:1 467:1 | 534:1 535:1 |
| 333:1 334:1 | 401:1 402:1 | 468:1 469:1,19 | 536:1 537:1 |
| 335:1,21 336:1 | 403:1 404:1,24 | 470:1 471:1 | 538:1 539:1 |
| 337:1 338:1,12 | 405:1,20 406:1 | 472:1 473:1 | 540:1 541:1 |
| 339:1 340:1 | 407:1 408:1 | 474:1 475:1 | 542:1 543:1 |
| 341:1 342:1 | 409:1 410:1 | 476:1 477:1 | 544:1 545:1 |
| 343:1 344:1 | 411:1 412:1 | 478:1 479:1 | 546:1 547:1 |
| 345:1 346:1 | 413:1 414:1 | 480:1 481:1 | 548:1 549:1 |
| 347:1 348:1 | 415:1 416:1 | 482:1 483:1 | 550:1,24 551:1 |
| 349:1 350:1 | 417:1 418:1 | 484:1 485:1 | 552:1 553:1 |
| 351:1 352:1 | 419:1 420:1 | 486:1 487:1 | 554:1 555:1 |
| 353:1 354:1 | 421:1 422:1 | 488:1 489:1 | 556:1 557:1 |
| 355:1 356:1 | 423:1 424:1 | 490:1 491:1 | 558:1 559:1 |
| 357:1,14 358:1 | 425:1 426:1 | 492:1 493:1,5 | 560:1 561:1 |
| 359:1 360:1 | 427:1 428:1 | 494:1 495:1 | 562:1 563:1 |
| 361:1 362:1,24 | 429:1 430:1,4 | 496:1 497:1 | 564:1 565:1 |
| 363:1 364:1 | 430:11 431:1 | 498:1 499:1 | 566:1 567:1 |
| 365:1 366:1 | 432:1 433:1 | 500:1 501:1 | 568:1 569:1 |
| 367:1 368:1 | 434:1 435:1 | 502:1 503:1 | 570:1 571:1 |
| 369:1 370:1 | 436:1 437:1 | 504:1 505:1 | 572:1 573:1 |
| 371:1 372:1 | 438:1 439:1 | 506:1 507:1 | 574:1 575:1 |
| 373:1 374:1 | 440:1 441:1 | 508:1 509:1 | 576:1 577:1 |

578:1 579:1
580:1 581:1
582:1 583:1
584:1 585:1
586:1 587:1
588:1 589:1
590:1 591:1
592:1 593:1
594:1 595:1
596:1 597:1
598:1 599:1
600:1 601:1
602:1 603:1
604:1 605:1
606:1 607:1
608:1 609:1
610:1 611:1
612:1 613:1
614:1 615:1
616:1 617:1
618:1 619:1
620:1 621:1
622:1 623:1,17
624:1 625:1
626:1 627:1
628:1 629:1
630:1 631:1
632:1 633:1
634:1 635:1
636:1 637:1
638:1 639:1
640:1 641:1
642:1 643:1
644:1,12 645:1

646:1,5 649:3
649:21
**bozanic's** 298:8
298:17 343:9
357:2 384:20
**bracket** 436:19
513:10
**bracketed**
438:18
**bracketing**
366:18
**bradford**
296:19 301:2
490:21 587:18
588:10,13,17
588:19 589:4
592:8,9,13
596:2 597:8,23
598:3,8,19,24
600:14,25
601:11
**bradford's**
589:11
**brav** 420:25
421:3 423:9
**break** 307:14
307:17,17
333:21 361:15
361:17 403:23
404:2,12
405:17 441:10
452:6,7 492:8
550:3 587:5
622:14,19

**bright** 419:13
419:24 421:24
455:10 456:10
461:13 488:10
**bring** 456:13
495:24 499:5
530:4 577:17
**bringing**
419:12 420:7
450:21 453:6
455:3 488:2
527:20 549:18
**brings** 307:15
578:10
**broad** 334:23
335:7 340:11
340:18 576:10
605:25
**broader** 374:15
499:19 515:24
535:8
**broadly** 549:24
**brought** 493:13
494:2 527:8,8
528:2 531:12
531:13 539:21
574:17 591:3
**btig** 402:8,16
403:4 637:2
638:22 639:11
639:22
**build** 595:2
**building**
589:22

**bulk** 583:19
**bullet** 469:5
472:18 473:5
477:25 557:4,8
**bullets** 339:8
340:15 556:23
**bump** 519:4
**bunch** 557:18
**burden** 308:6
308:18,23
309:8,10,15,19
309:23 310:5
310:21 311:6
311:19,22
312:8,16,19
313:2,7,17
314:17 315:2
320:21 335:15
341:13,18,19
342:6,8
**burdens** 312:14
**business** 375:4
375:6,20,21
376:2,3,5,12
377:2,17,19,25
378:6,7,12
381:24 382:4
567:12 589:18
**businesses**
357:19 381:24
593:22
**butcher** 547:20

**c**

**c** 296:1 297:1 338:22 339:15
**ca** 296:14
**calculate** 406:11
**calculation** 541:10,13
**calculations** 346:3,4 347:4 356:14
**calculator** 349:4
**calendar** 631:8
**calendars** 633:20
**call** 527:13 560:14
**called** 302:18 628:3
**calling** 308:20
**cannabis** 587:19 588:20 596:3
**cap** 358:10 359:11 375:11 378:24
**capacities** 600:25
**capacity** 305:11 312:24 314:18 315:3 379:22 399:15

536:18 548:4 599:16 601:2 624:10 637:16
**capital** 552:11 553:23
**capitalization** 346:20 357:9
**capped** 350:5 351:12 355:19 358:5 359:5 360:23
**career** 459:17
**careful** 354:2
**carries** 622:4
**case** 295:6 300:11 309:8 310:18 312:25 320:7,12,23,25 323:20,22 324:3 335:15 339:22 341:13 341:20 342:12 367:20 368:17 374:11,12,17 374:22 375:2 397:23 408:14 429:23 463:2 486:7 505:3 510:7 517:14 537:16,19 538:5,8 572:20 574:25 576:23 592:24 593:6 594:24 595:7

608:7 641:12 641:15,18,20 641:22 642:25 643:8,10 649:2
**cases** 373:7,10 373:16,23,25 374:8,19
**cash** 573:16
**catch** 485:8 573:19
**catching** 635:23
**causal** 442:12
**causation** 308:7,10,18 309:9 319:5 320:4 322:2,6 322:11,13,21 323:14,23 324:4,5,10,15 326:2 329:3,7 330:6,17 338:18 342:4,7
**cause** 331:23 356:9 434:2 485:9 587:25 599:4 606:7
**caused** 317:16 318:16 319:20 338:14,15 339:6,20,24 342:17 431:2 437:16 438:8

**causing** 339:18 562:14 563:12
**caveat** 368:3 632:6
**cell** 307:9 490:3
**centers** 507:5 507:13,23 558:9
**cents** 364:4,5,9 364:14,23 509:11
**century** 296:13
**ceo** 490:21 591:6,9,21 592:15,17 594:6,8 595:12 595:15,25 601:3,13
**ceos** 590:7
**cert** 609:11 610:2
**certain** 305:10 305:14 308:25 314:12 337:7 406:13 410:6 479:3 485:9 572:17 583:11 583:15 595:5
**certainly** 361:25 401:14 486:13 550:11
**certainty** 380:11 621:22

**certificate**
647:1 648:1
**certification**
609:2
**certified**
301:13
**certify** 647:3
648:2
**cfallon** 296:15
**cfos** 590:7
**chain** 326:15
**chairman**
593:17
**challenged**
608:20
**chance** 349:17
406:3,14
408:12,14,17
409:2 428:13
432:17 443:11
446:11,19
449:18 450:25
471:15,17
488:25 489:4
608:13
**chances** 412:23
**change** 370:4
397:24 398:3,4
610:20 638:20
649:5
**changed**
372:14 395:22
397:17

**changes** 311:8
313:19 394:11
394:19 395:11
402:9 626:18
627:16
**changing**
398:19,21
400:16,21
626:15
**channel** 532:17
533:11,12
**channels**
494:14,18
495:19 496:16
**charges** 588:16
589:16 590:19
592:7 598:2,17
598:22
**chart** 371:18
**check** 316:3
353:6,7 614:12
**checked** 472:13
**checking**
440:25 547:3
**checks** 456:5
**cheng** 549:17
**chief** 557:14
**chime** 348:3
**china's** 397:5
**choice** 299:17
**chose** 468:24
554:4 565:24
566:24

**chosen** 398:24
**chris** 296:11
301:5 316:25
**circulate** 505:7
518:22
**circulated**
430:3 470:10
**circumstances**
320:16 374:12
374:22 571:19
574:15 583:11
583:16 592:24
**citation** 353:16
471:25 472:3
476:6,8 547:6
**citations**
472:16 475:17
475:19 478:19
478:24
**cite** 350:7
351:15 353:6
353:13 363:10
398:24 459:9
466:10 467:13
469:5,7 472:13
473:8 475:18
518:5 520:2,19
528:15 535:5
544:18 546:22
548:3 549:11
549:15 565:4
585:17 586:11
586:12 635:22
637:3

**cited** 350:24
351:22 352:9
353:22 355:8
464:11 465:23
466:6,8 467:8
469:18 471:3
478:14 496:4
496:10 500:21
534:23 536:4
544:7 545:5,23
546:13 548:6
555:14 597:20
**citing** 351:5
355:22,24
522:24 545:11
**cl** 485:5
**claim** 358:8,15
381:21 467:4
510:4 515:11
540:4,4 588:24
588:25 589:20
607:15 608:5
**claimed** 516:17
**claiming**
503:25
**claims** 314:22
340:2 341:21
341:22 503:19
509:23 521:9
531:14 538:20
539:9,17,24,25
554:4 555:19
562:4,20
564:13 569:9

569:23 570:9
573:6,8 574:10
574:25 575:3
577:5,7,17
578:5,7,8,12,25
580:21 581:3
582:5,17 584:7
586:2 587:18
589:25 600:24
601:11 602:10
602:20 603:21
603:22 604:19
604:24 605:11
605:23 607:13
607:23 616:14
616:22 618:8
619:9,21
**clarification**
611:11 635:4
**clarify** 305:9
558:21 633:18
**clarity** 420:15
558:13
**class** 342:17
369:7,10,13,20
370:4 372:11
372:15 375:10
375:12,14,22
379:4,5,9,22
380:13,15,15
381:2,18
382:15 383:4
387:10,16
395:21 397:15

397:16 398:2
479:16 480:3
488:12 490:8
490:11 600:18
609:2,11,14,18
609:20,21
610:2,6,23
611:7 614:14
**classifying**
628:3
**clause** 345:15
**clean** 306:11,15
306:16,17,20
**cleanspark**
295:7 296:18
300:9,25
303:12 344:8
345:7 377:24
378:17 379:20
380:23 381:16
382:12 383:2
395:15 490:21
503:16 509:19
509:22 528:4
538:14 553:20
554:13,24
559:3 562:2,17
564:11 565:24
566:7,20,23
568:4 584:18
589:6,10,23
590:7,14 597:7
598:16,23
599:17,23

600:3,24 601:3
601:13 606:8
608:20 610:4
619:14,15
620:3,4,22
621:5 625:12
640:14 649:2
**cleanspark's**
343:11 344:14
345:9 346:19
357:4,19 375:4
375:20 376:2
377:17 387:4
387:15,21
389:15 394:10
394:18 502:9
502:11 503:19
509:4 521:4
526:14,24
559:6 580:20
588:11 597:21
602:13,23
609:13 611:13
611:22 612:24
614:5 619:10
619:23
**clear** 306:2,4
312:18 319:16
329:23,25
348:8 349:24
351:10 355:6
373:13 383:9
386:6 400:18
451:20 469:17

482:22 507:20
559:9 567:25
**clearer** 391:3
**clearly** 376:13
448:14,22
524:9 592:6
617:6 623:20
633:9
**client** 641:23
**close** 404:15
519:17 570:13
570:14
**closely** 323:2
469:22
**closer** 371:18
640:5
**closing** 343:24
344:18 345:11
**coauthor** 478:7
**coauthored**
484:8
**code** 302:6
**coefficient**
476:22 484:24
485:5,18
486:17
**coffee** 361:22
**coin** 407:22
**collapse** 402:18
**colloquial**
371:24
**color** 386:15
534:2 627:16

**[column - conducted]**                                    Page 18

column  484:24
485:4 486:14
come  327:22
360:12 362:2,5
362:6 404:16
434:4 492:15
506:5 509:15
520:9,11
550:12
comes  305:14
398:5 478:11
644:4
comfort  307:17
361:15 454:5
492:8
coming  474:24
505:24
commencing
304:5
comment
299:11 483:16
484:10 565:13
568:5
commentary
401:25
commented
402:8 562:4,20
commenting
564:13
comments
403:5 495:15
497:8
commission
649:25

commitments
380:19
common  448:7
609:13 610:4
commonly
374:4 460:19
461:4 463:6
464:7
commonplace
461:4
community
561:9,14,21
companies
508:12,20
company
375:21 376:24
376:25 377:10
381:18 382:14
510:5 566:13
573:16 587:19
588:20 591:7
591:21 592:16
594:7 595:13
596:3
company's
357:8 560:24
compensation
566:12 567:4
568:11 580:22
581:3,12 582:6
582:18,23
583:12,24
584:8 585:6,14
586:16 587:3

competence
427:18
competitor
503:13,14,21
509:20
competitors
516:12,14
complaint
299:19 320:17
321:2 323:12
341:21 367:23
551:20 556:8
558:17,21
629:17,21
complete
347:17
completely
353:8 511:8
completion
491:19 633:14
component
618:7
compounds
416:15 436:18
617:20
comprehend
406:8
computer
473:19 474:7
474:11 507:17
519:8 615:19
computer's
484:17

concern  590:11
concerned
573:13 575:6
575:12,14
591:6,20
592:15 594:6
595:12 602:6
621:2
concerning
603:20 611:8
concerns
584:16 603:15
621:4
conclude
443:21 448:19
450:16 451:21
457:2 460:15
concluded
604:2 646:3
concludes
644:11
conclusion
460:24 464:6,9
498:9 588:19
590:14 608:2,2
conclusions
340:4
conduct  321:5
580:19 582:4
602:9,19 603:8
606:5
conducted
569:21 580:25
600:22 601:9

602:2
**confidence**
406:19 413:9
413:17,22
415:4,6,10,17
416:4 417:4
419:7 423:17
423:23 426:18
426:21 427:7
428:7 432:23
433:11,21
434:21 435:12
442:4 443:19
443:20 448:15
448:17 450:15
451:14,22
452:24 456:18
456:23 460:20
461:5 463:7
464:8 468:3,10
468:18 480:9
481:5 482:14
482:17 488:6
489:3
**confident**
413:14
**confidentiality**
552:25
**confirm** 316:11
316:14,21
424:10 430:13
472:5 478:2,13
**confirmed**
532:4 621:18

**confound**
425:15
**confounding**
311:10
**confused** 378:5
385:7 409:25
414:2 485:21
627:23
**confusing**
409:13 420:10
**confusion**
386:4 483:4
**connected**
552:22
**connection**
310:19 342:11
395:10 400:16
465:16 547:24
563:9 604:20
**consensus**
571:23,24
626:25 627:3
**consequences**
367:13
**consequent**
393:8 536:6
**consider**
392:24 423:15
494:20 543:4
543:15
**consideration**
412:18
**considered**
392:14 393:4

393:14 395:2
467:11 497:25
547:7 582:22
583:5 633:3
**consistent**
312:5 341:24
484:23 485:17
525:13 548:17
**consistently**
461:20 634:21
**constant** 369:7
372:11 373:6
373:14 374:6
374:17 387:10
389:4,10
391:21,22
393:7,11
**constitute**
301:21
**constraints**
394:24
**construction**
616:18
**consultant**
297:4
**consumption**
381:12 584:23
**cont'd** 297:1
299:1
**contained**
384:17 499:15
502:22 521:2
530:10 552:17
570:18

**contains** 551:9
**content** 325:13
545:6 639:15
**contents**
330:12,19
331:7,16
332:14,15
335:10 337:20
338:11 340:16
517:4
**context** 422:22
522:3 523:9
576:7
**contexts** 312:13
314:12
**contextualize**
524:5
**continue**
321:15 516:4
**continuum**
432:19
**contract**
621:18 622:2
**contracts**
554:17,25
555:4,7,17
556:19 602:11
602:21 603:11
604:3,8,9
**contrary**
567:10
**contrast** 579:6
607:22

**contribute**
367:18 403:11
**contributing**
368:19 638:18
**control** 594:25
595:3
**controls** 602:15
602:25
**convention**
418:24 419:4
427:12,13,15
427:23 428:25
442:14 461:18
**conventional**
417:12 421:22
422:5,6 426:21
427:7,18
435:24 456:14
480:20 481:17
483:13 485:6
486:5,19,20
487:23 488:11
488:15 489:13
**conventions**
417:8 429:3
460:8 487:5
**conversation**
543:24 604:11
**converse** 542:9
**convey** 321:9
**conveyed** 499:3
**copied** 596:20
**copies** 306:12
307:7

**copy** 306:16,17
306:21 326:22
327:9,18
384:10 386:17
430:12 505:19
518:23 644:19
**cornerstone**
297:3
**corporate**
536:14 537:2
602:14,24
**corporations**
554:11
**correct** 304:7,8
324:18 329:3
343:4 344:4
349:5,25 360:4
363:5 365:9
382:25 384:19
387:11,12
424:6 429:9
459:11 464:3
469:12,13,19
471:11 472:20
476:9 477:5,11
479:20 480:2,8
483:11,12,24
484:11,12
490:6,11,18
493:15 494:3,6
506:18 508:2,8
518:12,16
520:21,22
524:12 529:2

537:16,19
544:6,23,24
545:21,22
551:10,23
556:4,18,20,23
557:8,9,11,16
557:22 558:10
558:11,15
564:20 565:9
565:10 566:20
568:23 573:18
575:8,13
576:23 579:18
586:6,7,18
587:11,13
598:9,21,25
600:4 608:21
609:16,22,23
610:21 616:11
616:24,25
620:16,16
624:20 635:13
642:21
**corrected**
478:25
**corrective**
311:9 313:21
342:13 379:8
431:2 437:16
438:8 493:23
498:25 499:9
**correctly**
328:24 366:11
546:12 555:12

610:12 639:8
**corresponding**
628:13 630:2,7
**corresponds**
343:22
**cost** 298:22
299:8 470:23
477:14 502:12
503:20 509:13
510:6,19
516:18 526:5,6
529:11,17
530:8,14
531:18 532:9
**costless** 521:21
521:22
**costly** 525:15
529:19
**costs** 299:15
496:6 503:15
509:5,11,25
520:25 521:16
521:17,19
522:4,7,19
523:4,6 524:9
524:10 525:14
525:20 527:6
529:2 530:23
531:4 532:12
534:22 540:11
**coulds** 567:15
568:21
**counsel** 300:7
300:17 302:22

308:24 310:6 341:19 472:5 642:7 644:17 644:18,25 647:10,13 648:6,9

**counsel's** 642:16

**countervailing** 572:12 627:16

**country** 572:13

**counts** 466:18

**couple** 304:15 472:15 596:14 623:22 635:18

**course** 307:20 319:10 328:21 328:21 401:5 477:24 543:11 579:23

**court** 295:1 300:10,15 304:16 314:20 314:21 321:5 321:19 348:7 358:21 382:21 404:5 452:18 513:2,19

**cover** 304:14 623:19

**covered** 435:17 552:23 640:20

**covering** 377:10

**crackdown** 397:5

**create** 308:25 346:11 451:6 572:2

**creating** 524:18

**creation** 568:15

**credibility** 561:19

**credit** 298:22 470:23

**criteria** 473:12 568:3,7,9 569:4

**critical** 593:16 629:15

**criticisms** 393:10

**criticized** 319:18 641:24 642:5

**criticizes** 317:14 318:14

**critique** 330:5 330:16 331:20 332:19 360:16

**crosstalk** 348:16

**crucial** 421:3

**culled** 527:4

**culper** 431:20 491:23 493:13 493:14 494:15 494:18,21,24

494:25 495:6 495:10,19 496:16 497:7 499:4,10,22 500:8 518:15 520:24 521:10 523:10 525:5,7 525:7,8 526:12 526:21 527:3,8 528:2 529:6,9 530:8 531:18 532:9,13,18,24 533:6,10,17,23 533:24 538:11 538:17,19,21 539:9,10,17 540:17 543:7 543:18 551:19 551:24 554:4 558:24 559:13 560:21 562:4,5 562:19 564:13 564:14 565:25 566:24 568:5 569:10,24 573:6 577:6,15 577:16 578:9 578:16 580:23 581:4 582:6,19 583:25 584:8 584:17 585:7 586:3 588:9 602:11,21 603:11 605:2,3

606:6 607:3,23 608:5 616:22 617:8,18 619:10,22 620:19

**culper's** 595:25 596:20,22

**currently** 301:24

**curry** 563:2

**cursorily** 460:7

**customer** 557:15

**customers** 554:16,19,20 554:24 555:4,8 555:17 599:19 602:11,21 603:10 604:2,7 604:10,20,24 607:6,14,17 608:7

**cut** 435:5 509:11 510:21 547:4

**cutoff** 419:24 426:18 464:16 466:24 488:9

**cutoffs** 417:12 419:13 420:2 422:5,7 466:25 488:10

**cv** 295:7 300:12 459:23 464:23

**d**

**d** 298:1

**daily** 612:10

**damages** 308:7
308:11,19
309:9,16
310:22 323:15
342:4 358:9
359:11 536:10
537:15

**damning** 585:2

**darshan** 295:4
296:2,10 300:8
301:4 649:2

**dash** 386:19
387:6,8

**data** 388:10
410:5,8 460:17
461:2 462:13
463:5,25 507:5
507:13,22
508:13 558:9

**date** 295:12
339:16 376:4
377:8 412:16
412:18,20
423:17,22
424:12 427:10
434:11,15
436:9 439:9
440:3 443:4
446:21 450:14
454:2 456:5

482:6,8,10
491:20 506:25
510:16 517:7,8
613:18 625:6
626:10 628:13
629:25 630:5,6
630:17 631:13
631:20 632:2
633:17 634:12
634:14 644:23
645:3 649:3

**dated** 298:9,18
306:17,18,22
316:9 328:11
341:4 430:4
458:24 609:11

**dates** 339:22
340:6 379:16
431:7 437:21
438:13 440:6
440:21 480:11
481:7,14
490:20 611:15
617:15 633:20

**dave** 513:3
514:9 637:25

**david** 296:20
300:21 303:11
312:3 315:7,21
321:24 324:18
325:5 333:6
334:22 337:18
340:10 354:9
359:7 361:13

363:4 367:6
384:2 385:5,8
388:11 390:3
393:24 409:24
416:17 426:15
435:6 441:7
447:9 475:16
478:17 482:23
483:22 500:5
506:3 512:15
513:5,17
518:25 551:6
552:13 560:6
563:5,5 576:7
599:4 605:20
622:12 625:20
628:17 630:10
635:24 641:9

**day** 321:14
329:23 332:14
342:16 343:25
387:9,16
395:24 397:18
407:10 409:19
409:19 410:3
410:18 411:15
411:16,21,23
412:3,8,14
413:8 414:13
414:23 416:7,7
419:14 424:13
425:17 433:12
435:21 436:13
440:16 443:15

445:25 449:23
450:7,22 454:7
577:10 626:21
627:8 640:19
646:10 649:22

**day's** 411:25

**days** 390:15
409:8 493:22

**deal** 585:11

**deals** 365:14,19
365:25 366:3

**december**
343:12,24
345:24 346:9
356:10 357:12
375:5,23 376:4
376:14,15,16
377:18,25
378:17 379:2
380:5 387:17
388:14 389:3,9
390:5 487:18
489:6,10,16
499:24 500:10
506:16 624:6

**decide** 404:3

**decided** 385:24
467:12 578:23
615:19

**deciding**
538:20 568:4

**decision** 517:2

**decisions**
578:18

| | | | |
|---|---|---|---|
| **decline** 343:23 347:5 372:17 424:12 626:22 638:19 | **degree** 372:5 583:2 | **deposition** 295:10 298:7 300:6 301:19 304:5,14 307:6 314:14 328:7 462:2,5 505:2 506:13 513:21 514:8 563:16 647:1 649:3 | **development** 616:18 618:9 618:10 |
| **declined** 344:15 345:10 346:20 357:5,9 | **degrees** 575:25 576:6 579:19 621:22 | | **deviation** 370:22 372:4 |
| **declines** 431:6 437:20 438:12 | **dehaan** 299:14 520:3 | | **deviations** 370:21 |
| **decrease** 627:14 | **delay** 563:12 | **describing** 421:5 423:4 | **died** 547:3 |
| **dedicate** 589:8 | **delays** 399:20 431:22 636:13 637:4 638:14 639:13 640:15 640:16 641:2,5 | **description** 298:6 299:2 407:4,7 409:23 448:9 | **diego** 295:16 300:15 647:2 647:20 |
| **dedicating** 589:7 | | | **dietrich** 299:10 483:15 484:9 |
| **deep** 518:19 | **delivery** 645:3 645:5,6 | **design** 485:4 | **differ** 410:16 410:19 |
| **deeper** 331:18 332:16 | **demand** 368:21 403:14 | **despite** 466:21 521:9 527:17 | **difference** 537:22 586:9 632:13 |
| **default** 645:18 | **demonstrate** 324:5 329:2,8 381:9 | **destroy** 571:25 | **differences** 618:4 |
| **defaulted** 644:2 | | **destroying** 571:13,17 572:25 | **different** 339:16 354:4 366:23 367:20 373:19 375:19 385:25 391:25 394:22 407:20 407:23 408:11 408:17,22 409:3,7,8,9,20 410:7,15 411:10 412:14 412:20,25 413:15 414:7 414:11 415:9 |
| **defendants** 295:8 296:18 300:7,24 303:12 317:20 318:22 319:24 329:10 608:19 | **denholm** 593:17 | **destruction** 298:13 | |
| **defense** 297:4 | **denoted** 486:21 | **detail** 356:13 642:13 | |
| **defer** 404:24 | **denotes** 486:24 | | |
| **defined** 366:4 | **depend** 369:4 | **detailed** 585:6 631:7 643:6 | |
| **definitely** 413:3 624:12 | **dependent** 572:13 | **determine** 371:18 406:10 459:20 462:15 530:8 | |
| **definition** 378:15 528:21 | **depends** 365:24 367:3,10 368:10 418:24 571:18 | | |
| **deflated** 375:12 | **deponent** 400:8 | | |
| | **deposed** 304:13 | **develop** 347:23 | |

**[different - discuss]** Page 24

| | | | |
|---|---|---|---|
| 418:22 419:10 | 619:4 | **disaggregation** | 540:12,14 |
| 419:17,21 | **difficulty** 313:4 | 617:20 621:13 | 541:15 546:5 |
| 428:18,21 | 368:13,18,22 | **disagree** 336:9 | 549:16,19 |
| 432:11,13 | 372:11,14,18 | 338:16 339:2,5 | 590:25 592:10 |
| 433:15 436:13 | 397:7 402:9,18 | 339:11,23 | 596:17 597:6,8 |
| 439:21,23 | 402:21 403:13 | 340:4,15 | 597:20,20 |
| 440:4,20,24 | **dig** 332:16 | 346:23 395:5 | 598:7 600:2 |
| 442:24 443:4 | 518:19 | 399:9 565:7 | 604:23 613:15 |
| 445:2,6,11,19 | **digital** 357:20 | 642:3 | 613:21 614:23 |
| 446:3,9,21 | 647:7 648:3 | **disclaimer** | 615:2 617:17 |
| 447:2,11,15,19 | **direct** 342:25 | 551:25 552:2 | **disclosures** |
| 447:22 448:4 | 349:13 365:11 | **disclose** 597:7 | 342:14 345:17 |
| 449:12,17,24 | 384:13 385:15 | **disclosed** 344:8 | 379:8 497:23 |
| 450:2,5,13,23 | 393:20,25 | 345:8,18 | 526:4 535:21 |
| 451:10 453:14 | 396:2 405:22 | 517:25 539:6 | 541:5,22 544:9 |
| 453:15 454:4 | 430:22 458:19 | 590:14 | 545:24 555:25 |
| 455:4,18,22 | 475:13 484:13 | **disclosing** | 588:12 597:21 |
| 461:18 480:18 | 493:5,20 | 599:13 | 613:13,22 |
| 501:17 511:3,8 | 506:22 507:10 | **disclosure** | 614:20 616:17 |
| 512:11 519:25 | 508:8 551:16 | 299:12,15 | 617:22 618:10 |
| 523:9 531:11 | 556:10 573:16 | 431:2 437:16 | 625:9 629:14 |
| 534:18 535:24 | 577:23 604:13 | 438:8 483:17 | 629:16 |
| 536:23 554:11 | 604:16 | 484:10,25 | **discomfort** |
| 575:23,25 | **directed** 494:11 | 496:6 497:22 | 437:10 438:22 |
| 576:4,6 590:9 | 574:4 | 497:23,24 | **disconnect** |
| 595:13 601:23 | **directing** | 498:2,23 | 424:18 |
| 610:17 614:19 | 597:16 | 521:19 522:3 | **discount** |
| 618:17 625:6 | **directly** 336:10 | 525:14 526:3 | 364:17 |
| 632:8 633:17 | 402:11 | 527:6,23 | **discounted** |
| 639:19 | **disaggregate** | 534:22 535:14 | 588:15 597:25 |
| **difficult** 315:7 | 311:8 313:19 | 535:15,19 | **discuss** 405:5 |
| 334:19 340:22 | **disaggregated** | 536:9,15,17,23 | 521:23 522:3 |
| 368:11 453:10 | 619:6 | 537:2,14,18,24 | 546:14 549:24 |
| 497:12 618:18 | | 538:4 540:11 | 557:7,10,13 |

**[discussed - domain]** Page 25

| | | | |
|---|---|---|---|
| **discussed** | **disincentivized** | 594:8 595:14 | 385:18 430:14 |
| 339:13 394:21 | 566:11 | **distracted** | 470:17 471:21 |
| 400:21,24 | **dispute** 343:16 | 593:21 594:19 | 475:4 514:17 |
| 417:7 439:19 | 343:19 344:3 | **distraction** | 541:20 |
| 504:18 515:12 | 346:15 394:7 | 592:21,22 | **documentation** |
| 517:13,16 | 394:15 395:20 | 594:21 595:5 | 640:22 |
| 518:10 533:2 | 395:21 397:14 | **distributed** | **documents** |
| 533:18 555:18 | 397:15 400:20 | 495:3,7 | 306:13,24,25 |
| 555:19 557:16 | 400:23 | **distribution** | 332:23 381:21 |
| 581:11 587:5 | **dissembled** | 409:3 410:7 | 480:21 547:6 |
| 610:3 637:24 | 596:14 | 411:8,11 413:2 | 547:10 |
| 638:7 | **disseminated** | 418:22 428:22 | **doing** 310:12 |
| **discusses** | 494:15,19,21 | 432:15 443:5 | 334:12 335:23 |
| 314:11 502:8 | 494:24 495:20 | 445:3,8 446:4 | 355:21 386:8 |
| 511:7 548:12 | 496:8,17 499:2 | 447:4 449:8,14 | 389:24 393:25 |
| 548:25 556:19 | 499:9 529:8 | 454:5 455:5,24 | 403:14 431:12 |
| 557:5,6 | **disseminating** | 488:22 568:16 | 469:15 473:19 |
| **discussing** | 532:24 | **distributions** | 473:22 481:16 |
| 320:22 356:5 | **dissemination** | 410:5 | 526:8 597:9 |
| 361:9 400:22 | 496:20 499:19 | **district** 295:1,2 | 599:13,18,22 |
| 502:17 616:10 | 528:5 531:9 | 300:10,11 | 599:22 600:4 |
| 616:13 640:15 | 577:14 | **divino** 557:7,20 | 600:11 |
| **discussion** | **dissipated** | 558:4 575:4 | **dollar** 364:4,5 |
| 333:22 488:4 | 379:7 | 603:21 616:11 | 364:10 373:6 |
| 512:10 516:20 | **dissipation** | 616:19,23 | 373:14 374:6 |
| 540:10 558:3 | 379:9 | 617:9,22 618:8 | 374:17 387:11 |
| 579:2 586:10 | **distinction** | 619:9,22 | 391:21 393:7 |
| 590:22 611:7 | 537:22 | 620:18 621:3 | 530:23 593:10 |
| 641:4 | **distinguish** | **doctor** 302:23 | 627:12 |
| **disentangle** | 613:21 | 347:14 385:20 | **dollars** 489:16 |
| 618:18 | **distinguishable** | **document** | 489:17 |
| **dishonest** | 406:25 | 303:25 315:18 | **domain** 380:18 |
| 313:12 | **distract** 591:8 | 316:11,14 | 527:19 |
| | 591:22 592:17 | 328:9 332:25 | |

**dots** 387:6,7
**dotted** 387:5
**double** 316:3
  391:13 418:5
  418:17 420:9
  614:12
**dovetails**
  540:10
**dpartida**
  296:24
**dr** 298:8,17
  300:6 301:23
  301:25 302:4,8
  302:12 303:9
  317:8 326:23
  327:18 335:21
  336:22 338:12
  343:9 346:4
  347:6 350:3
  351:11 352:18
  354:25 357:2
  357:14 362:24
  384:20 385:9
  393:9 397:3,20
  398:23 402:13
  404:24 405:20
  430:4,11 442:3
  469:19 470:19
  475:6 478:6
  482:20 493:5
  502:17 503:8
  503:25 511:14
  511:14 514:6
  521:11 550:24

  571:9 572:6
  623:17 644:12
**dragon** 556:19
  557:5,19 558:4
  575:4 584:17
  584:20,22
  603:22,23
  612:8,18
  613:15 614:25
**draw** 401:10
**drawing** 579:6
**drive** 570:5,7,8
**drivers** 577:2
  604:13
**drives** 578:25
**drop** 379:10
**dropped**
  402:17,18
**drops** 431:18
  431:24 432:4,4
  440:20
**due** 336:2
  432:17 511:16
  514:9 591:16
  592:11 619:14
  620:3 639:12
**duly** 302:19
  647:5
**duplicated**
  356:3
**duplicative**
  361:6
**duration**
  307:11

**duty** 552:24,24

**e**

**e** 296:1,1 297:1
  297:1 298:1,5
  299:1
**earlier** 394:21
  394:25 438:4
  439:19 472:13
  488:4 519:12
  573:3 579:11
  597:6 604:12
  634:17
**early** 556:3
  628:14 629:18
  630:4,15,17
  631:3 632:6,11
  632:14 633:15
  633:21,24
  634:5,7,8,13,22
  635:8,13
**earn** 568:18
**earned** 403:6
**earnings**
  546:20 623:25
  624:17 625:3
**easier** 307:8
**easiest** 470:2
**easily** 478:25
  519:2
**east** 296:13
**easy** 512:24
  633:11

**economic**
  312:22 323:14
  341:24 342:10
  394:12,20
  395:11 417:17
  488:8
**economically**
  528:20
**economics**
  417:3,11 578:3
  579:15
**economist**
  314:18 408:3
  458:5 498:8
  536:22 538:8
  578:24 590:4
**economists**
  446:6 447:21
**education**
  535:12
**effect** 573:8
  602:12,22
**effectively**
  553:22
**efficiency**
  298:23 470:24
  528:21 572:3
  609:17 610:23
  614:8
**efficient** 609:14
  610:5 611:14
  614:6
**efficiently**
  608:21

**effort** 521:16
**efforts** 592:4
593:22
**eh** 637:9
**eight** 333:23
336:16 482:3
552:8 627:12
**eighth** 296:22
**either** 313:23
313:24 321:18
322:5 337:4
476:6 505:9
**elective** 313:20
**element** 322:20
335:11 399:10
399:21,25
449:19 595:3
619:5
**elements** 395:2
399:12 527:18
601:6
**eligibility**
473:12
**elon** 593:7,20
594:22
**email** 327:14
505:6
**emailing**
306:25
**embed** 530:5
**embedded**
378:25 528:3
529:15

**embeds** 524:20
**emphasis**
541:17 581:25
**emphasize**
538:21
**emphasized**
541:23 543:6
543:17
**empirical**
298:24 460:16
460:25 462:12
462:25 463:4
463:24 470:3
470:24
**employed**
647:10,13
648:7,9
**employee**
647:12 648:9
**employs** 460:19
461:4 463:6
464:2,7
**encountered**
448:9
**ended** 354:15
**ends** 355:3
632:17
**energy** 357:20
380:24 381:6
381:12,17
382:13 383:3
502:12 503:15
503:20 509:5
584:21,23

624:10 627:15
627:24
**enforcement**
537:3
**english** 448:8
**enhancing**
571:12,16
572:24
**enter** 368:23
**entering**
493:23
**entire** 356:23
356:24 438:17
605:7
**entirety** 334:24
335:8 399:6
**entitled** 305:24
475:6
**entity** 561:9,22
592:3,5
**entries** 612:10
614:16
**enumerated**
556:22
**environment**
394:12,20
395:11 425:5
542:12 579:12
**equal** 406:21
529:10 541:25
**equity** 299:17
**equivalent**
406:10 413:18
413:24 414:3

415:18
**errata** 644:4
649:1
**error** 354:14
526:8 551:8,11
**es** 647:4
**especially**
509:16 510:2
547:21 555:14
561:15 575:3
581:20 603:17
**espouses** 461:9
**esquire** 296:3
296:11,20
**essential**
527:22
**establish** 308:6
308:10,18
309:9 317:15
318:15 319:19
330:6,17
338:13 339:5
339:24 342:7
436:16 569:8
569:21 580:20
581:2 582:4
583:16 600:23
601:10 602:10
602:20 623:20
**established**
503:14 571:7
**establishing**
320:8

**estimate**
356:14 486:18
490:7,9 491:19
577:21
**estimated**
356:11 357:13
476:22
**estimates**
577:19 640:3
**et** 295:4,7
300:9 363:11
496:5 535:16
549:17 649:2
**evaluate**
531:15 588:24
**evaluated**
473:15 603:11
603:12
**evaluating**
588:24
**event** 407:9
408:5 410:21
411:3,13,20
412:8,16,18,19
433:17 436:24
442:17 446:6,7
448:10 453:6
453:13 480:13
480:18 487:17
489:14 490:2
493:23
**events** 431:2
437:16 438:8
481:13 612:13

612:17 613:17
**everybody**
326:15
**evidence**
320:24 335:19
339:19 341:24
416:21 418:19
419:11 420:6
421:18 426:2
432:16 440:2
442:16 443:13
444:11 445:4,5
450:21 453:6
453:16,25
455:2 456:4,19
456:25 464:10
464:12 467:6
487:25 502:20
515:21 541:20
555:6 560:25
561:15 572:12
574:16 578:9
582:13 601:18
**evidentiary**
301:18
**ex** 322:16 324:2
324:15 523:10
524:15 525:8
**exact** 340:13
359:8 389:17
390:15 437:9
517:8 642:22
643:3

**exactly** 316:4
333:14 336:19
385:11 387:3
402:25 423:18
423:23 424:9
449:4 542:17
542:22 580:16
582:21 645:17
**examination**
298:2 303:6
**examined**
302:21
**example**
344:10 410:18
415:9 455:8
470:8 496:12
499:23 502:21
506:23 549:23
576:14,16
593:6,25
**examples**
459:18 464:15
466:15 467:21
**exceed** 363:15
456:13 529:2
529:16
**excerpts** 515:3
**excessive** 371:3
580:22 582:18
582:22,25
583:5,12,17,19
583:25 584:3,5
584:7 585:7,10
585:23 589:16

**excited** 503:18
509:17,21
510:9 516:9,11
516:16
**excluded** 643:9
**excuse** 556:14
**executed**
621:19
**executive**
580:22 581:3
582:6,18
583:11,12
584:8 585:6
587:3
**exercise** 355:6
390:23
**exhaustive**
466:16 467:3,4
**exhibit** 298:7,8
298:11,17,20
299:3,6,9,13,19
303:17,18
315:14,15
316:7,12 326:9
326:17,19
328:6 330:4
337:11 341:2,3
342:25 343:22
349:11,20
363:2,18,21
384:6,12,14,17
384:18,20,25
385:12,13,17
385:18 386:14

387:14,20
389:13 390:17
390:23 393:19
405:21 420:18
429:9,15,22
430:3,6 431:10
431:19,25
432:22 440:22
458:19,24
470:10,10,12
471:20 472:25
474:9,9,14,15
474:16,19
475:5 477:18
477:21 478:5,6
479:8 481:19
481:25 483:19
483:23 484:2
487:10,14
489:20 491:11
492:2,12,13
493:6 501:16
505:10,12,13
505:15 506:12
519:14 520:5,7
528:9,11,12
542:21 551:3,4
551:16,17
556:7 558:13
558:16,16,19
558:20 564:5
608:25 615:12

**exhibits** 307:4
384:23 478:22

505:20

**exist** 352:25
353:2,23
355:15 479:2
555:7,8

**existed** 531:10

**existence**
521:24 530:16

**existent** 355:8

**exists** 323:23
530:18,19
594:2

**expansion**
399:20 431:21
490:22 491:18
624:10,11
636:13 637:4
638:13 639:12
640:15

**expect** 368:9
397:25 412:24
461:19 559:5
561:2 616:16

**expectation**
408:24 617:4
637:8

**expectations**
378:25 379:13
398:6 414:12
604:14 624:5,8
624:13 625:8
626:18 627:13

**expected**
366:25 367:8

369:2 577:3
617:23 626:23
641:7 644:22

**expense** 577:25
581:17,19

**expenses** 570:9
570:11 573:15
585:12 586:14

**experience**
342:2 458:6
498:7,19
535:13 536:7

**expert** 298:8,17
305:12 306:16
306:18,21
309:18 310:17
312:9,16,21,21
312:22,25
317:6 324:11
324:12 326:12
328:10 330:3
368:15 384:21
403:10 430:4
458:22 465:17
468:23 473:2
493:6 495:18
496:14,24
497:16 498:10
498:11,14
528:13 535:14
536:10,10,17
537:16,18
538:4 549:12
590:3 609:2

641:18,19
643:10

**expertise**
498:19 536:7
536:14,23
537:4,10,24

**experts** 392:20

**expiration**
503:5 510:16

**expires** 649:25

**explain** 326:3
351:21 376:21
428:5 430:24
438:21 440:19
449:6 564:21
612:11 613:18
615:6

**explained**
420:14

**explains** 397:3

**explanation**
409:15 420:13

**explicit** 530:14

**explicitly** 408:7
532:12 535:4
637:22,24
638:8 642:10

**exposure**
496:25

**express** 513:6

**expressed**
329:24 344:22

**expressly** 585:9

**extent** 307:2 496:21 540:2

**extreme** 370:12

**extremely** 321:16 370:16 399:22 519:9 577:25

**eyes** 541:18

**f**

**f** 377:4

**f2q21** 398:13

**fabricated** 602:10,20 603:10 604:2

**face** 320:18 341:23 397:22

**facilities** 380:13 584:24

**facility** 345:24 346:9,18 357:7 358:16 380:9 395:16 399:17 502:9 585:2 603:18 625:10

**fact** 305:18 372:25 429:2 521:9 527:17 555:16 588:9 596:13 614:24 643:5

**factor** 368:19

**factoring** 399:10

**factors** 367:3 367:10,18 368:5 395:14 403:5,11

**facts** 309:24 320:16 342:12 374:11,21 574:14 592:23

**factual** 305:14

**fail** 422:6

**failed** 330:6,16 339:5,23 503:2 508:6 637:11

**failing** 317:14 318:15 319:18

**fails** 338:13

**fair** 307:25 308:3 324:10 325:24 334:20 336:8 360:14 361:11 388:6 465:21

**fairly** 549:20

**faith** 517:5

**fake** 604:20,24 607:5,14,16

**fall** 629:18

**falling** 637:18

**fallon** 296:11 301:6 305:23

**fama** 528:16,17 528:19

**familiar** 303:24 328:13 394:3

500:23 518:15 535:9 537:13 545:10 593:7,9 629:19 641:11 641:14,16

**familiarity** 368:16

**familiarize** 401:18 459:3 544:20 553:16 607:7

**familiarized** 459:6 607:10

**family** 572:8

**fantastic** 362:4

**far** 337:3 400:9 450:12 465:8 488:17 559:15 623:3

**fastblock** 502:24,25,25 506:18 507:6 507:14,16,24 508:6,13 515:18 516:25 517:17,25 533:2,18

**favor** 406:23 563:2

**fear** 335:11

**features** 541:4

**february** 389:15 390:6,7 391:9,15

398:10 479:17 480:3 623:25 624:18

**federal** 643:25

**feel** 307:6 330:10,11,12 334:25 348:2 394:2 401:17 402:3 420:22 444:20 452:4 568:12 626:2

**feels** 426:5

**fell** 510:13

**felt** 515:24

**fewer** 450:12

**fictitious** 604:9 604:9

**fiduciary** 552:24

**fifty** 432:23 482:3

**figure** 340:12 340:20,23

**file** 316:3

**filed** 300:9

**final** 385:17

**finance** 417:3 417:11 461:12

**financial** 299:7 314:18 446:6 447:20 477:13 536:22 538:8 578:24 639:22

**financially** 647:14 648:10

**financials** 586:13

**find** 332:12,19 333:25 334:7 334:17 337:2 430:18 467:25 468:8,16 519:2 530:17 550:10 552:5,6 553:20 577:22 585:20 588:6 593:16 618:13 633:8 633:10

**finding** 329:9 454:19 461:6,7 612:16

**findings** 431:17 432:22

**finds** 364:4

**fine** 305:19 324:16 345:21 358:20,24 362:9 441:11 455:11 476:5 519:5

**finish** 305:2,3 347:21 492:7 537:8

**finished** 494:7

**finishing** 492:5

**firm** 298:15 299:12 300:14

300:22 364:8 377:3 378:8 381:19 399:14 469:8 483:17 484:10 498:23 516:13 561:12 567:13 570:5 571:11,19 574:15 575:8 575:13,15 577:3,4 578:2 578:3 579:4,15 579:17 583:18 589:13 590:12 594:25 604:15 604:16 613:14 637:8

**firm's** 572:4 577:24 579:11

**firms** 544:10 545:24 546:4,5 572:8,8

**first** 302:18 304:18 310:9 331:16,23 341:14 343:7 352:17 355:17 356:25 387:16 402:9 435:25 438:19 468:6 469:4 475:12 493:24 544:21 547:17 551:21 553:5,6,18

554:6 555:18 557:4 558:8 618:5

**fit** 354:23

**five** 404:8,20 405:2 490:13 490:15,16 492:10,14 501:21,22 550:5 558:8 595:22 622:21 622:23 623:5

**fix** 560:13

**fl** 295:15

**flexibility** 299:8 477:13

**flexible** 299:5 475:7

**florida** 302:4 302:13

**flows** 573:17

**fluctuate** 369:10

**focus** 318:8 333:3,7 399:4 399:5,8 400:2 400:5,7,11 401:15 510:10 555:3 581:15 585:15

**focused** 398:20 485:9 511:10 581:9 612:3

**focuses** 502:11 509:3 511:19 512:11

**focusing** 323:9 338:9,10 396:14 401:23

**follow** 313:10

**followed** 479:18 480:5 516:19 538:12 593:13

**following** 310:5 402:8 422:16 485:2 517:12 562:19 564:12 565:24 566:7 566:19,23 567:13 568:3 599:4 633:6 642:16

**follows** 302:21

**footnote** 349:13 349:25 351:23 358:12,18 363:3,6,10 405:23 406:3 469:6 473:10 477:13 479:12 479:14 480:24 483:8 484:21 485:15,20,23 501:19,20,23 501:24 502:4,6 502:15 508:24

**[footnote - full]**                                         Page 32

510:25 511:18 512:12

**footnoted** 471:7

**footnotes** 356:13

**forecasts** 565:9

**foregoing** 647:3,4 648:4

**forget** 360:19 645:17

**forgive** 608:24

**form** 314:3,6 344:16,19 345:13 346:24 352:11 353:19 354:7 359:6,19 361:4 369:14 377:21 378:3 379:23 380:6 381:3 383:6 388:16 415:20 418:3 422:20 424:15 426:23 433:3 434:24 435:4,15 442:8 443:24 448:23 450:19 452:3 454:23 456:22 457:4 465:19 465:24 467:14 497:2,19 498:16 500:3 511:22 512:14

517:18 521:5 522:10 523:14 524:16 525:11 525:23 526:16 526:25 529:13 530:12 531:5 531:21,24 533:4,20 535:2 536:11 537:20 538:6 539:12 540:6 541:11 543:20 544:11 545:25 554:7 555:21 557:23 561:4 562:7 566:4 571:5 576:24 580:5 582:8,20 583:14 584:10 586:4 587:21 588:22 590:16 591:10,23 592:18 594:9 594:12 595:16 596:24 598:10 599:2 600:6 601:4 602:16 604:5 606:9 611:25 613:4 619:17 620:6 621:6,20 624:22 627:21 631:5 642:2 643:12

**formally** 507:6

**formed** 310:24 311:3 344:20 394:23 584:14 595:17 611:18 614:7 624:5 625:8

**former** 314:16 367:13

**formerly** 506:18 507:14 507:23

**forth** 321:2 329:22 342:5 403:15 416:15 417:16 436:18 441:9 503:3 537:3 558:4 563:13 589:19

**forward** 347:7 419:12 594:25 618:13

**found** 317:20 318:23 319:24 340:5 353:11 383:13 419:5 485:4 554:10 603:19 614:24 618:22,25

**founded** 574:22

**four** 432:4 550:3,4 556:14

**fractalgrid** 508:14

**framework** 535:13

**frank** 625:24

**frankly** 333:25 335:23 336:2,7 336:11

**fraud** 574:11 605:11,23 606:3

**fray** 368:23

**free** 307:6 316:16 330:10 330:11,12 348:2 382:10 394:2 401:17 402:3 626:2

**freeze** 559:17 559:20,21

**freezing** 484:18

**freshworks** 641:12,15,16

**friend** 389:24

**friends** 547:22

**front** 307:7 326:23 337:11 397:21 400:3 446:14 480:22 481:13 501:2 611:3 636:16 638:3 640:22

**froze** 559:18,25

**full** 302:9 347:17 365:12 413:22 421:15

**[full - glitching]** Page 33

438:17 439:3
460:5 493:17
502:15 619:3
639:15
**fully** 325:17
576:9 614:16
618:16 621:18
621:18
**fund** 473:13
**further** 350:2
351:10 373:3,4
401:25 495:2
507:11 509:8
598:16 643:16
643:18 647:12
648:8
**furthermore**
631:22
**future** 379:12
604:14 617:10
617:15 618:9
618:10

**g**

**gain** 367:17
529:21
**game** 336:8
356:17
**garmaise**
298:20 299:3,6
312:20 317:13
318:14 319:17
327:2,4 328:7
328:11 347:6

349:22 350:15
352:18 355:18
358:4 359:3
360:22 397:3
397:20 398:23
459:10 468:2,9
468:17 469:3
473:9 475:6
477:4,9,10
478:6 499:25
500:11,21
503:8,25
506:13 515:11
521:11 571:9
572:6
**garmaise's**
309:15 310:21
311:6,21
313:17 326:11
330:5,15
331:20 332:9
332:11,19,25
334:5,15
336:22 346:4
350:3,7 351:4
351:11,16,20
354:25 356:18
359:3 360:15
385:9 393:9,19
394:8,16
402:13 405:21
407:4 429:24
459:14 470:19
481:22 482:20

487:10 502:5
502:17 505:2
511:14
**garner** 495:22
**general** 376:23
377:15 407:15
412:11 523:23
566:8
**generally** 373:7
373:15,20,21
432:10 545:4
**generate**
378:10 604:7,8
**generated**
501:12
**generating**
379:14 581:20
**generation**
589:21
**gentlemen**
492:17
**getting** 329:25
348:15 385:20
414:17 416:11
418:16 470:14
514:10 523:3
**give** 305:6,6,7
307:24 321:15
324:13 352:13
376:19 389:17
403:22 406:7
432:15 461:11
471:14,17,18
496:12 505:17

534:2,17 567:9
588:3 593:6
608:12
**given** 335:6
374:11 407:10
409:19,19
410:18 411:14
411:21,25
412:3 413:8
414:8 423:17
423:22 427:10
436:3 455:4
461:19 464:14
480:14 498:23
540:16 549:6,6
590:24 603:16
613:23 634:16
640:18 644:12
**gives** 377:2
454:5 456:3
**giving** 439:25
466:14 496:18
543:9 590:18
593:25
**glancy** 296:4
296:12
**glancylaw.com**
296:7,15
**glinkh** 296:7
**glitched** 560:6
**glitching**
519:12 562:14
563:6,11

**glitchy** 564:24 564:25
**global** 402:17 402:22 403:13
**go** 307:5,23,25 308:14 314:8,8 315:13,19 317:10,11 320:10 324:23 325:13 327:20 330:10 331:12 331:13,22 332:20 334:23 335:10 338:25 341:2 342:24 349:6,10,19 352:16,19 354:22 356:17 360:8 365:5,22 367:6 369:17 369:17 384:7 384:10,12 392:20 404:3 405:5 420:17 420:18,19,20 421:23 441:5 441:13 445:9 445:17 450:8 455:20 458:16 458:18,22 469:23 472:17 472:19 473:4 473:25 475:8 476:7,8,10

479:8,11 480:12,17 481:19,25 483:18 487:9 487:13 490:24 491:24 501:14 501:18 504:21 506:11,21 510:21 511:24 512:25 513:17 514:15,16 515:2 518:14 521:7 524:2 530:3 535:6 537:7 542:19 542:24 548:2 552:14 553:5 556:8 561:18 563:15 564:3,5 564:19 565:18 565:23 585:16 589:21,22 593:15 605:3 606:16,24 610:24 614:11 614:18 615:8 615:23 616:3 622:16,18 627:6 631:12 633:3 636:5 638:23 640:4 645:8
**goes** 335:17 338:19 339:21

386:25 412:22 419:14 428:15 432:8 433:4 454:25 483:21 487:20,22 488:23 511:13 568:9 574:13 583:3 586:10 598:16 604:11 632:25
**going** 300:3 303:15,16 315:13,14,19 316:6,8 321:13 321:14 324:16 326:21 333:4 333:11 335:21 340:20 349:8 361:12 363:17 364:18 370:18 373:23 375:13 378:10 384:4,5 384:7 385:24 387:25 389:16 393:18,25 401:15 403:21 403:21,25 406:6 409:11 413:4 418:20 421:25 424:3 426:17 429:3 440:23 441:8 442:20 443:8 448:5 455:6

457:8,13 458:11,15 472:22 474:6 474:13,14 476:7,8 477:15 477:24 484:18 489:20,22 504:20,22 505:12 507:12 507:22 508:14 509:7 510:21 513:17 519:10 519:21 520:5 542:15 550:9,9 552:3 553:17 554:15 556:5 560:16 563:12 564:3 568:13 573:4 575:17 577:20 579:12 579:13 587:25 594:22,25 596:12 601:19 602:7 609:9 622:3 623:18 632:3 636:8,22 637:17 640:21 645:22
**gold** 461:15
**good** 300:2 303:8 317:2 506:7 535:22 535:23 560:13 588:2 628:10

**[governance - heart]**

**governance** 602:14,24

**grabbed** 460:12

**grading** 378:6

**granted** 641:22

**graph** 371:6 373:2

**graphic** 390:10

**great** 347:25 354:3 378:15 441:15 455:14 494:13 545:20 549:8 564:23 580:15 622:25 623:7

**greater** 406:14 442:4,6 447:11 447:16 448:17 448:20 451:14 451:17,23,24 452:23,25 455:14,25 456:18,24 461:23 488:20 493:14 494:2 495:22 499:23 500:9

**green** 556:19 557:5,19 558:3 575:4 584:17 584:19,22 603:22,23 612:8,18

613:15 614:25

**greg** 301:3 316:23 326:9 326:12 333:21 404:23 429:22 504:23 506:9 518:18

**gregory** 296:3

**grow** 584:24

**guess** 324:7 326:24 355:15 360:24 376:20 377:20 382:8 391:13 404:23 422:13 427:5 519:11 520:10 536:2 541:7 583:3 599:3 609:8 627:22 639:18

**guidance** 625:12 626:6 626:14,15,22 627:4,18 628:10

**guidances** 633:13

**guys** 317:2 404:17,24 430:9 474:19 508:18

**h**

**h** 298:5 299:1

**h.c.** 395:22 396:6,14 397:16 398:10 398:19 400:20

**h4** 484:23 485:17

**half** 388:24 391:12,17 413:20 428:21 434:2 441:6 468:7 602:17

**halfway** 388:23

**hand** 302:15 552:9

**happen** 302:5 415:13 451:17 520:9

**happened** 417:21

**happening** 488:24

**happens** 415:8

**happy** 338:11 352:16 400:4 403:21,25 404:19 438:20 509:6 513:11 521:7 524:2

**hard** 313:10 336:11

**hardware** 381:6

**harm** 606:7

**hash** 367:2,9,25 368:6,10 369:3 395:24 397:18 399:15 402:17 402:22 403:13 624:9,11 637:16 638:17 641:5

**hasthantra** 295:4 296:2,10 300:8 301:4 649:2

**head** 460:11 472:10 489:18 504:19 532:21 539:5 636:15

**heading** 551:25

**headline** 540:24

**heads** 568:8

**headset** 547:3

**hear** 304:20 477:7 501:12 509:15 559:24

**heard** 458:9 562:8 564:17 568:20

**hearing** 301:7 347:21

**heart** 325:21

**[heart's - impact]**

**heart's** 325:13

**heaton** 420:25 421:3 423:9

**heavily** 579:3 641:24 642:5

**help** 322:12 376:8,11 379:16 396:3 496:12 504:21 519:18 629:13

**helpful** 355:16 491:6 501:3 514:11 563:14 625:21

**helps** 396:10 545:3 558:21

**henry** 546:23

**hereto** 647:13 648:10

**hey** 419:2 429:16 445:10 510:13 514:25 634:19

**hide** 589:13,14

**high** 340:8 388:3,12 440:14,14

**higher** 366:20 391:10 396:21 443:7 445:17 585:13

**highlight** 554:4 555:25

**highly** 540:20

**hirshleifer** 547:19,23 548:11

**historical** 495:12

**hmm** 341:8,16 360:11 370:19 396:19 431:9 472:14 473:3 501:18 597:15 606:20 622:9

**hold** 312:15 350:17 461:15 542:10

**holding** 389:22

**hole** 336:12

**honest** 312:3

**honestly** 437:3 628:20

**hopefully** 331:3 405:16 425:13 436:3 444:8 623:21

**hoping** 340:17

**hour** 404:13 441:5 509:12

**hours** 333:23 336:16 623:5

**housing** 616:17

**hoyos** 297:3

**huang** 549:10

**huge** 507:7 551:23

**hundred** 477:20

**hung** 400:6

**hypotheses** 409:25 410:2

**hypothesis** 406:16,22,23 407:8,13,14 408:4,7,23 409:12,13 410:12,13,21 411:2,5,13,19 412:7,13 528:22

**hypothetical** 423:12 454:13 558:23 561:6

**hypothetically** 559:11

**i**

**i.e.** 357:20 378:25 406:16 431:5 437:19 438:11 460:16 460:25 461:22 462:12 463:4 463:24 497:7

**idea** 432:9 539:20 569:6 578:17

**identification** 303:19 315:16 363:22 430:7

470:13 474:17 477:22 484:3 520:8 551:5

**identified** 396:15 417:14 465:15 483:9

**identify** 306:12 459:22 475:3 562:2,18 564:11

**identifying** 336:25

**ignore** 565:6,17 565:25 566:24

**ii** 295:11

**imagine** 481:16 518:21

**immune** 353:9

**impact** 413:19 413:25 414:4 415:19,23 416:4,11,13,21 418:2,10 421:7 421:12,19,23 422:10,19,25 423:6 425:20 428:10 432:25 433:23 434:5 434:22 435:13 435:19 436:7 436:22 438:23 442:6,15,17 443:13,22 448:21 450:18

451:25 452:10
453:2,8,9,17,20
453:23 454:12
454:18,22
456:20,25
457:6 521:3
522:9 540:22
571:11 573:16
606:3,11
607:13 619:15
620:4,21
**impacted** 403:5
427:10 619:10
619:23 620:9
620:12
**impacts** 523:7
540:25
**implication**
349:22 350:15
350:18,20
352:2 357:15
357:17 359:10
359:23 364:15
364:25 365:4
397:4 638:4
**implicit** 410:12
410:13,20
**implicitly**
637:5,21 641:4
**implied** 345:24
346:9 350:3,6
350:19 351:11
351:13,25
356:6,7,8,10

357:11 407:12
410:25 412:9
**implies** 343:10
346:16 357:2
391:16 457:21
529:18
**imply** 359:22
396:20 422:24
446:8
**implying**
370:15
**important**
304:18 307:16
347:16 488:19
508:2 578:2
589:24
**importantly**
356:2 422:4
**impounded**
530:2
**impression**
461:12
**improvements**
484:25
**incentive** 566:2
567:22
**incentives**
567:4 568:11
571:20 586:11
587:6
**incentivized**
562:24,25
**inception**
473:16

**include** 643:24
**included**
475:14 586:24
643:13
**includes** 504:12
**including**
357:17 395:14
**income** 568:17
**inconsequent...**
320:13
**inconsistent**
358:14 380:9
**incorporated**
300:9 526:14
526:23
**incorrect**
359:21,24
471:25 588:4
**incorrectly**
589:4
**increase** 366:25
367:9,25 368:6
369:3 397:6
485:2 489:15
490:4 498:3,22
542:4 627:12
628:9
**increased**
368:10 496:19
496:20 497:13
497:18 586:15
627:5
**increases**
496:25

**increasing**
379:21
**incurred**
520:24 522:19
**indicate** 407:22
470:6 616:21
617:16 618:25
**indicated**
329:16 482:20
641:2
**indicative**
416:13
**individual**
374:25 399:13
431:18,24
432:4 440:20
**industry** 510:2
510:20 583:18
**inference** 360:5
414:8 424:21
425:15,25
426:3 440:2,12
444:11 446:23
**inferences**
434:8 460:18
461:3 462:13
463:5,25
521:15 522:2
539:7
**inferred** 523:3
**inferring**
359:20 436:10
**inflation**
342:16 343:9

346:16 350:4
351:12 355:19
357:2,16 358:5
358:9 359:4
360:23 379:7
387:9 389:4,10
391:21 392:5
393:2,7 490:7
490:10

**influence** 579:3

**influencer**
502:10 503:12
503:18 509:2
509:17 510:9
510:17 511:2
511:18

**influencer's**
515:25 516:3

**information**
298:21 299:16
311:10,10
313:21 340:3,6
344:9,11 345:8
397:12 398:4
411:15,22
412:19 413:5,7
414:9,13,19,22
416:6,9,14
424:13,24
425:5,6,10,12
425:14,16
427:9 431:7,14
433:8,14
434:13 436:12

436:17 437:21
438:13 439:8
439:10 440:7
440:10,16
443:14 446:14
446:15,17,24
450:6 451:5
454:3,7 458:11
470:23 480:16
480:25 481:3
491:4,20 496:7
496:13 497:7
497:10 498:25
499:9,15
500:16 502:21
503:7,9,24
515:22 521:2,3
521:10,13,13
521:14,15,18
521:20 522:8,8
522:20 523:4,6
523:7,13 524:6
524:11,13,19
524:24 525:4
525:10,16,16
525:20,25
526:5,12,21
527:3,15,18,25
528:23,25
529:8,12,15,19
529:24 530:2,4
530:10 531:9
531:20 532:14
539:21,23

540:16,21,22
540:25 542:12
546:14 548:13
549:2 552:17
566:15 570:4
570:18 573:4
575:7,13,15,23
576:5,13,16,21
579:12,20
586:24 611:24
612:4 613:3,8
620:18 640:20

**initial** 328:25
343:8 607:4
615:7,16,17
617:12 620:13

**initially** 380:5
616:15

**initiative** 382:7
612:9 615:3
617:11 618:12
618:14 621:10

**initiatives**
381:10 383:23

**injected** 400:9

**input** 393:12

**inputs** 391:23
392:22 395:16

**insiders** 552:21
553:24

**insinuation**
590:23

**insofar** 488:19
495:21

**install** 508:14

**instance** 592:23

**instances**
314:25

**instruct** 305:25

**instructed**
308:24

**instructions**
642:17

**intend** 568:18
622:2

**intended**
301:16 400:10
510:16

**intending**
354:13

**intent** 313:9
415:24

**intentionally**
374:15 568:20

**interest** 583:7

**interested**
329:23 647:14
648:11

**interesting**
461:16 472:12

**interests**
582:23 583:21
595:6

**interject**
361:14

**internal** 393:22
602:14,24
606:25

**interpret** 339:4 416:18 425:2,4 432:10 435:20 435:24 436:2 444:6 455:21 456:9 487:24 530:20

**interpretable** 527:15

**interpretation** 442:18 444:2,4 457:23

**interpreting** 416:2 422:10 422:22 424:4 434:6 436:8 440:11 442:14 447:21 457:17

**interprets** 428:17

**interrupted** 564:9

**interval** 387:24 388:9 391:17 413:13 419:8 488:6

**intonation** 509:15

**introduce** 307:3 315:13 316:7 326:11 363:18 385:24 429:18 483:19 608:25

**introduced** 303:16 307:3 384:11 429:15 429:22 458:24 504:25

**introducing** 316:13 349:8 609:8

**inversion** 478:23

**inverted** 475:16,19 478:19

**invest** 364:17 364:18

**invested** 364:13 364:22

**investment** 364:19 561:13 561:21,23

**investments** 379:21,25 380:4,17

**investor** 317:16 318:16 319:20 338:15 339:7 339:18,20,25 577:20 620:25

**investor's** 541:18

**investors** 299:16 338:15 357:17 521:18 531:14 543:8

543:19 569:8 569:22,22 570:15 571:4 572:19 573:12 574:10 575:6 575:11,14 576:15 580:21 581:2,6 582:5 582:10,12,17 582:24 583:7 583:13 584:6 587:20 588:21 591:6,20 592:14 593:18 594:5 595:11 600:23 601:10 601:17 602:4,6 602:13,23 604:4 616:15 616:24 618:13 618:22 620:17 621:16

**irrelevant** 323:17,21 480:14 588:11

**isolation** 425:3

**issue** 339:22 345:18 355:23 383:8 407:6 426:17 439:13 456:7 516:22 554:18 590:6 618:23

**issued** 303:14 562:3,18 564:12

**issuer** 552:25

**issues** 402:8 517:14 542:11 563:12 578:11

**issuing** 544:10 545:24 546:3

**it'll** 396:3

**items** 517:12 577:23

**j**

**j** 296:20

**january** 387:22 388:15 389:3,9 493:13 495:9 497:17 499:2,3 499:10,22 500:8 517:12 517:15 529:9 530:11 538:13 556:17,18,21 609:12 619:11 619:24 620:13

**job** 342:15,20 342:21 386:8 535:22,23 591:7,21 592:16

**johnson** 299:10 483:15 484:9

**[judge - lack]** Page 40

**judge** 642:6,12
642:24
**judgements**
539:7
**judgment**
342:2 641:22
**july** 298:19
306:19 402:16
403:4 430:5
479:9 490:20
628:14 630:4,9
630:16,17,22
631:4,24 632:7
632:12,14,17
633:2,6,15,21
633:24 634:3,5
634:7,7,8,9,13
634:15,20,22
634:23 635:9
635:13
**jump** 347:12
352:16 403:20
415:21 416:16
443:12 563:16
563:17
**jumping** 622:9
**june** 372:18
631:21
**justification**
357:15

**k**

**kane** 565:5,12

**keep** 310:12
403:21,25
436:5 447:23
448:5 452:19
457:15 505:11
509:7,25 513:8
560:15 594:19
599:5
**keeping** 408:2
**kept** 438:22
514:18
**keystroke**
354:20
**kilowatt** 509:12
**kind** 313:10
375:11 377:15
378:11 420:8
423:13 426:3
435:5 438:18
535:20
**knew** 532:25
**know** 301:23
301:25 303:22
304:19 305:17
305:18 307:18
307:19,21
311:20 317:24
322:3,7 326:12
331:9 333:20
338:6,23 340:9
348:13 351:6
355:11 366:2
366:12 367:12
367:24 369:19

370:2 371:20
372:7,24
373:23 375:19
376:25 377:4,5
377:8,8,9,12
379:3,25 380:7
384:7 385:10
385:19 390:14
390:17,18,20
390:23 400:12
402:25,25
404:18 405:3,4
408:25 417:20
430:8,11
433:10 436:24
445:11,13,16
449:9 450:12
453:24 455:12
465:8 470:11
471:8 474:20
474:21 477:16
478:9 481:10
483:20 503:3
505:13 508:18
512:2 515:21
518:25 519:3
521:22,24
525:2 536:6
538:15 540:8
541:12 544:17
548:3,24 549:3
553:17 554:8
554:15 555:2
557:7 568:19

569:7 570:22
578:15,21
584:25 589:16
589:17 590:21
590:22 596:25
600:19 606:25
625:17,25
626:5 629:12
631:19 633:19
637:15 639:11
642:15
**knowing** 454:6
**knowingly**
317:21 318:23
319:25 329:10
**knowledge**
305:8 369:9
370:5 510:12
530:16 538:19
568:2,22
586:18,21,23
587:14 593:13
594:23 647:9
648:6
**known** 506:18
507:6,14,23

**l**

**labs** 557:10
606:23 607:3,5
607:15
**lack** 417:24
418:7,12,23
421:9,17,18,20

**[lack - likely]**

422:9,17,23,24
454:9,15
510:14 612:12
614:23
**lacked** 608:8
**laid** 632:9
633:25
**language**
359:16 398:17
398:20 400:12
401:7 403:4
421:8 435:19
436:22,25
438:25 447:18
448:8 455:7
462:17 471:10
478:14 479:2
507:9 508:3
565:15,16,19
565:21 629:15
**lap** 295:7
300:12
**large** 365:14,19
365:24 366:3
370:22 503:14
612:19 615:2
**largely** 361:6
396:23 397:9
**larger** 574:25
**late** 627:8
628:13 629:18
630:4,15,16
631:3,11,15,25
632:6,11,14

633:15,21
634:5,13 635:8
640:19
**law** 461:12
538:3
**lawclerk**
557:15,20
**laws** 301:18
**lawsuit** 303:13
**lawyer** 408:2
**lay** 403:9
620:24
**layman's**
376:23 415:2
**layup** 543:10
**lead** 605:11,24
616:19 617:23
**leap** 425:20
437:11,12
**leapt** 426:4
**leave** 307:11
355:11
**leaving** 374:16
**left** 364:13,23
552:9 564:7
**legacy** 333:11
334:11 382:5
382:18 383:19
383:20,25
626:19 628:4,5
**legal** 308:21,22
309:4,18 310:4
310:14,19
312:9,13,15

341:19 342:9
**legitimate**
554:19
**legitimize**
566:14
**lending** 299:5
475:7
**length** 439:19
587:5
**letter** 389:22
622:5
**letters** 299:11
483:16 484:10
**letting** 316:20
**level** 340:9
371:20 406:19
413:9,17,22
415:4,6,10,17
417:4,15,15,16
418:25 419:20
423:17,23
426:21 427:7
427:19,23
428:7 431:5
432:7,24 433:9
433:21 434:21
437:19 438:11
439:15,17
442:4 443:19
443:20 448:15
448:17 449:11
450:16 451:14
451:22 452:24
455:13,16

456:18,24
460:20 461:5
461:14,23
463:7 464:8
468:3,10,18
469:11 473:14
476:24 482:18
487:3,7 488:6
489:3,7,11
**levels** 421:22
426:18,19
429:5 470:6
481:15,17
485:7 486:5,19
486:20 487:23
488:11,15
621:22
**lies** 309:24
310:5 312:8,17
**life** 615:20
**light** 453:6
531:13 578:10
**liked** 495:9
**likelihood**
414:7 418:20
**likely** 369:17
415:12 418:21
427:9 428:9,12
431:5 437:19
438:11 443:9
444:16,18,20
444:21,22,24
446:20 448:7
449:16 450:4,5

**[likely - literature]**                                      Page 42

| | | | |
|---|---|---|---|
| 450:10,17 | 327:4,7,13 | 518:24 519:4 | 615:17 619:17 |
| 455:6 456:20 | 344:16,19 | 520:13 521:5 | 620:6,10 621:6 |
| 457:2 462:19 | 345:13 346:24 | 522:10 523:14 | 621:20 623:2,7 |
| 473:15 573:13 | 347:18 348:14 | 524:16 525:11 | 624:22 627:21 |
| **limited** 548:20 | 352:11 353:19 | 525:23 526:16 | 631:5 642:2 |
| 548:22 609:18 | 354:7 359:6,19 | 526:25 529:13 | 643:18 644:6 |
| 609:20 610:23 | 361:4 362:8,11 | 530:12 531:5 | 644:18,20,24 |
| **lindsey** 295:16 | 363:3,23 | 531:21,24 | 645:16 |
| 300:15 348:2 | 369:14 377:21 | 532:7,10 533:4 | **list** 459:24 |
| 623:2 647:2,20 | 378:3 379:23 | 533:20 534:6 | 464:17,19 |
| **line** 335:10,10 | 380:6 381:3 | 535:2 536:11 | 465:14,21 |
| 336:15,15 | 383:6 385:5,8 | 536:20 537:20 | 467:9,12,13 |
| 386:14,16,18 | 388:16 405:4,9 | 538:6 539:12 | 547:7,12 |
| 386:19,20,23 | 415:20 418:3 | 540:6 541:11 | **listed** 387:24 |
| 386:25 387:5,6 | 418:11 422:20 | 541:14 543:20 | 466:17 547:5 |
| 387:8 398:8 | 424:15 426:23 | 544:11 545:25 | 548:7 608:7 |
| 419:13,24 | 429:16,19,24 | 554:7 555:21 | **listen** 474:2 |
| 421:24 455:10 | 433:3 434:24 | 557:23 561:4 | 509:14 |
| 456:10 461:13 | 435:4,15 | 562:7 566:4 | **listened** 501:9 |
| 484:22 485:23 | 440:25 441:7 | 571:5 576:24 | 516:2 |
| 485:24 488:10 | 441:12,15 | 580:5 582:8,20 | **listening** |
| 492:5,7 622:13 | 442:8 443:24 | 583:14 584:10 | 473:21 |
| 625:23 649:5 | 448:23 450:19 | 586:4 587:21 | **lists** 557:18 |
| **lines** 552:8 | 452:3 453:4 | 588:22 590:16 | **literal** 337:21 |
| **link** 414:20 | 454:23 457:4,7 | 591:10,23 | **literally** 513:21 |
| 416:10 436:4 | 457:10 465:19 | 592:18 594:9 | 628:23 633:23 |
| 437:8 442:12 | 465:24 467:14 | 594:12 595:16 | **literature** |
| **linked** 502:24 | 482:22 483:22 | 596:24 598:10 | 417:2 426:25 |
| 517:16 533:3 | 483:25 497:2 | 599:2 600:6,9 | 427:19,24 |
| **linkh** 296:3 | 497:19 498:16 | 601:4,15 | 456:15 524:8 |
| 301:3,3 302:22 | 500:3,13 505:4 | 602:16 603:2 | 526:2 535:5,10 |
| 302:25 305:22 | 505:16,22 | 604:5 606:9 | 535:10,22 |
| 314:3,6 317:3 | 511:22 512:5 | 609:3 611:25 | 540:18 541:3 |
| 326:14,19 | 512:14 517:18 | 613:4 615:15 | 541:16 542:3 |

542:25 543:4
543:15 545:4
545:11 549:16
549:20,24
555:13,24
566:8 571:2,8
605:10,23
642:9
**little** 331:18
332:16 370:23
374:14 375:17
375:18 376:19
378:5 387:6
390:13 391:3
412:6 414:15
416:16,17,24
419:17 423:13
425:21 428:5
436:5,19
512:20 514:10
563:13 564:24
627:22
**llc** 649:1
**llp** 296:4,12
**loaded** 370:23
592:20
**local** 469:9
**located** 302:2
**location** 295:14
**locked** 568:13
**logic** 631:23
**logical** 498:9
498:12,17

**long** 321:14,16
459:16 560:16
**longer** 321:14
**look** 316:13
330:10,11,12
330:18,24
332:20,23
334:5,15 335:9
335:10 336:23
338:20 341:2
371:17 372:21
374:21 375:25
376:25 396:5,8
398:7 401:13
402:10 403:3
408:11,11
409:7,17
413:12 418:18
420:3,19,21
425:9 429:6
430:18 431:10
432:3 435:22
436:24 451:10
459:3,21
463:15 464:20
464:23,23
465:10,15,22
467:17 468:14
468:20,25
469:22,24
470:2 471:12
471:19 472:19
474:4 480:18
484:18 491:2

491:24 508:12
514:19 515:15
516:11 522:19
532:20 533:24
548:3,5 551:22
552:7 561:19
561:20 570:13
570:14 577:20
586:13 593:16
604:21 605:7
608:16 610:8
613:17 614:19
625:25 626:2
627:7,9 636:6
636:21 638:23
639:25 640:2,5
642:8
**looked** 369:18
371:6 372:20
374:2 393:10
395:6 445:7
459:17,25
460:11 464:21
465:3,4,7
467:5 486:9
504:8 518:11
570:9 581:6
611:2
**looking** 316:12
331:6,17 333:8
336:10 337:25
339:15 352:17
364:7 369:22
376:24 386:17

387:23 392:22
396:4 402:24
409:18 410:5
411:8 412:2,15
417:10 430:13
434:6 446:6
460:6 464:22
467:21 471:5
473:6 476:17
477:12 485:22
486:11 508:24
533:14 541:21
551:19 577:2
578:24,25
579:2,11
582:10,11
604:12 631:17
**looks** 388:2,4
390:8 408:17
411:10 455:4
473:18
**los** 296:14
**lose** 567:11,12
**loss** 308:7,10
308:18 309:9
319:4 320:4
322:2,6,11,13
322:21 323:14
323:23 324:4,5
324:9,15 326:2
329:2,7 330:6
330:17 338:15
338:18 342:4,7
364:4 365:14

**[loss - marked]**

365:19,20,24
366:3,8 605:12
605:24 606:13
606:14 621:3
**losses** 317:17
318:17 319:21
338:15 339:7
339:18,20,25
358:17 363:14
363:15
**lost** 364:9
**lot** 321:13
325:18,19
329:22 364:6
382:3 392:18
394:22 397:12
398:22 409:23
449:2,3 451:2
491:4 503:7
512:17 513:9
514:22 531:13
536:22 553:10
567:14 568:20
570:2 573:3
577:5,6 578:5
581:14 606:10
613:13 630:10
**lots** 504:12
**low** 435:7
509:25 510:19
516:18
**lower** 366:21
388:15,18,21
388:24 396:21

397:4 462:3
502:12 509:4
625:12 626:6
**lowered** 357:18
627:19
**lunch** 404:4,12
**lying** 619:16
620:5,22 621:5

**m**

**made** 314:22
317:21 318:24
319:25 329:6
329:11 331:25
374:9 379:20
380:17 395:15
396:15 437:13
439:2 460:17
461:2 462:13
463:5,25 494:5
515:24 525:8
528:25 578:12
578:18 603:17
625:9 637:12
637:13
**magnitude**
406:13 456:2
488:8
**main** 480:23
510:10 577:2
**maintain** 566:2
**major** 503:20
509:20 510:3
516:12 614:22

**make** 321:6
325:16 327:17
329:21 333:15
348:15,22
349:24 351:9
359:17 360:5
361:25 378:21
379:25 383:8
384:10 386:6
394:3 410:8
414:8 425:25
426:3,4 427:16
434:8,18 436:5
439:4 440:2,17
441:9 443:12
444:11 446:23
521:14 522:2
522:17 524:14
524:19,22
539:7 564:25
567:25
**makes** 339:9
340:2 349:22
350:15 361:12
410:10 608:5
632:5
**making** 318:2
358:8 359:16
424:21,23
428:16 437:11
437:12 498:13
498:18 638:4
**man** 552:8

**management**
380:25 381:7
381:17 382:14
383:3 563:2
566:3,9 567:5
567:6,9,11
568:14 583:8
**manner** 301:19
**marathon**
502:10,13
503:2,13 508:7
508:17 509:2,5
509:10 511:2,9
512:10 515:14
516:22 518:2,8
**marathon's**
515:12
**march** 482:5,18
482:23,24,24
490:19
**marginal**
528:24 529:2,7
529:11,16,17
**marginally**
476:23
**marinovic**
299:14 520:4
**mark** 328:7,10
341:3 385:21
447:8 514:14
**marked** 303:18
315:15 326:10
328:6 330:4
349:11 363:21

430:6 470:12
474:16 477:21
484:2 505:13
505:19 506:12
506:25 518:20
520:7 551:2,4
**markers** 388:9
**market** 299:17
346:19 357:8
365:20 366:9
375:11 378:24
379:10 425:16
431:15 446:13
451:3 493:23
496:13 527:9
527:16 530:5
540:25 541:21
542:5 609:13
609:17 610:3
610:22 611:14
614:6
**market's**
493:22
**marketplace**
499:20 539:22
546:6 582:11
**marks** 509:8
**mass** 373:22
**massive** 298:14
**matched** 485:4
**material**
317:21 318:24
320:2 329:11
573:8 614:22

**materiality**
323:14 419:9
420:6 455:2
488:18
**materialize**
604:15
**materials** 641:3
**math** 344:4
424:4
**matter** 300:8
308:7,19,22
311:18 315:9
317:8 343:8
344:25 357:22
372:5 374:13
393:6 525:13
643:5,13
**matters** 305:15
**matthew**
296:18 300:25
**max** 441:3
**mean** 312:3
322:12 324:7
328:19 331:23
341:12 350:16
350:19 353:8
353:13 354:4
364:12 366:2
366:12 369:16
370:12 376:12
388:17 409:5
410:17,25
422:9 430:25
438:2,5 442:5

444:14,17,21
444:23 448:2
455:17 462:7,9
463:8 482:15
487:21,24
494:17 512:7
517:20 522:12
523:23 525:2
529:5 533:24
535:4,12
538:15 541:13
546:3 553:12
557:25 562:10
572:5 575:14
576:10 589:2
596:5,22
598:22 617:24
627:20 630:13
**meaning**
350:18 364:21
370:8,17 371:9
400:9
**meaningless**
455:17
**means** 301:20
364:22 366:11
370:21 410:5
416:19 419:20
429:2 444:8
452:24 453:22
457:19 527:25
529:15 555:18
567:12 572:9
637:11

**meant** 351:25
365:24 400:11
425:23 487:8
578:11 596:15
**measure** 343:9
346:16 357:2
357:16 359:11
371:25 391:20
392:4 413:10
**measuring**
393:2
**media** 300:5
362:16,20
441:17,21
492:20,24
503:18 550:17
550:21 570:16
623:9,13 644:9
**medicine** 591:2
**memorized**
330:20 365:23
491:5 515:16
605:6 625:20
**memory** 500:25
548:17 587:25
638:21 639:7
640:20
**memory's**
627:7
**mention** 404:7
587:2,2
**mentioned**
395:17 402:23
462:25 507:25

**[mentioned - minutes]**

558:8,10
581:12 603:23
**mercifully**
360:7
**mere** 467:2
**merely** 432:21
608:6
**merger** 298:16
**merit's** 384:13
**merits** 298:18
306:18,21
314:10 316:9
329:2 331:22
333:12 339:13
341:4 349:12
358:13 384:21
385:16 389:5
389:11 393:14
429:8,11,12
430:3 437:7
438:6 444:16
458:18 471:4
473:2 475:9
476:11,12,13
479:9,15
490:19 491:25
493:7 508:25
520:2,20 528:8
528:13 534:19
534:23,25
542:17 544:8
546:22 547:17
547:25 548:9
548:16 549:13

562:23 564:4
565:4 570:3,3
570:22,23
573:11,24,25
574:5 587:24
588:5 606:17
608:12 609:23
615:8 622:8
625:19 626:17
629:10 630:22
**message** 551:8
551:12
**met** 473:12
**method** 387:11
391:21,22
393:5,11 498:7
**methodologies**
309:16 310:22
311:7 313:18
391:20 392:4,6
392:19,25
451:9
**methodology**
373:6,15 374:6
374:18 391:24
392:2,23
**methods**
392:17 393:15
**metric** 372:22
391:14
**mfis** 472:21
473:11
**microcap** 596:3

**microfinance**
298:25 470:25
**microgrid**
616:18
**mid** 629:19
630:7,8,18,19
630:23,24
631:16,16,22
631:23 632:15
632:19,22,22
632:23 633:4,4
633:16,16,22
634:2,6,14,18
634:19,22,23
635:10,11,12
635:14,14
**might've**
380:12
**million** 345:25
346:21 348:25
349:2 350:5
351:13 352:19
355:20,25
356:12 357:10
357:13,23
358:6 359:5
360:24 627:2,3
627:12,14
**mincing** 384:2
**mind** 377:13
408:2 448:12
550:2 554:9
569:4 595:6
601:7 634:4

**minds** 566:6
**mine** 327:25
341:3 363:23
368:11 510:19
516:17
**mined** 395:23
397:18
**miner** 381:22
**miners** 368:23
403:6
**minimum**
309:22 312:12
464:15 517:20
**mining** 379:22
380:8,18,25
381:17 382:6
382:14 383:3
394:10,18
397:7 400:22
403:6,15
469:10 507:6,7
507:16,24
508:13,19
509:13 510:6
582:2
**minute** 332:3,3
384:4,6 430:18
509:8 550:3
635:19
**minutes** 361:18
404:8,13,14,16
404:21 441:3
492:14 595:22
596:14 622:21

**[minutes - name]**                                    Page 47

622:24 623:5 623:19

**miscellaneous** 623:23

**misguided** 317:19 318:21 319:23 331:11 331:21 332:19 334:17 335:2 335:12,13 337:2,8 338:24

**misread** 350:2

**misrepresent...** 479:18 480:4 480:11 481:7 482:6,8

**misrepresent...** 317:16,22 318:16,25 319:20 320:2,9 329:11 338:14 339:6 343:11 346:19 357:4 357:24 624:3 624:19 625:5 625:14 626:8

**misrepresented** 344:11

**misreps** 339:18 339:20,24 342:13

**missed** 376:13 447:8

**missing** 399:21 638:17

**misstatements** 342:18

**mistake** 355:7 524:14,19,23 525:8

**misunderstan...** 426:7,10,11 599:7

**misunderstood** 375:17

**mix** 439:9

**mm** 341:8,16 360:11 370:19 396:19 431:9 472:14 473:3 501:18 597:15 606:20 622:9

**model** 408:5 410:22 487:17 489:14 490:2 639:22 640:5

**models** 639:25

**moeller** 298:11 363:11

**moment** 303:20 315:20 316:5 328:19 332:22 337:15 396:18 401:20 406:4 407:6 423:15 430:2 439:3 459:5 463:11

469:14 479:21 491:15 502:14 520:4 534:17

**monday** 644:24

**money** 525:20

**monitors** 417:21

**moonlight** 589:2 595:25 596:22 597:3

**moonlighting** 588:10 596:15 596:16,19

**moonlights** 596:2,4

**morning** 300:2 303:8

**mortgage** 299:5 475:7

**mosaic** 527:13

**motivated** 529:25 531:7

**mouth** 449:3

**mouthful** 407:2

**move** 324:24 326:7 348:9 384:8 385:25 446:13 458:16 602:8 612:18

**moved** 433:14 446:18,19 612:15

**movement** 412:3 414:21

425:8 431:13 433:16 434:11 434:14 436:13 440:13 612:12 613:20,23 614:24 615:4

**movements** 412:24,25 424:14 431:3,8 433:11 437:17 437:22 438:9 438:14 439:13 446:15

**moving** 331:17 446:20 519:24

**multi** 469:8

**multiple** 338:20 367:3 367:10 497:22 589:6

**multiplicity** 603:16

**multitude** 367:18 395:14

**murray** 296:4 296:12

**musk** 593:7,20 594:22

|  | **n** |  |
|---|---|---|

**n** 296:1 297:1 298:1

**name** 300:13 300:21 301:3

**[name - numbers]**

302:10 649:2,3
**names** 547:21
**nance** 648:2,15
**nascent** 382:6
628:4,5
**nasdaq** 509:9
**natividad**
298:21 299:7
469:4 470:19
473:9 477:4,10
478:3
**nature** 534:11
581:14 626:14
**nearly** 627:13
**necessarily**
414:18 545:6
635:11
**necessary**
325:2 390:12
**need** 307:17,19
319:8 333:21
333:22 348:7
355:5,9 374:21
399:6 403:23
404:20 416:5
472:9 498:11
544:12 550:11
561:7 586:12
601:23 610:7
**needed** 563:4
**needs** 404:2
573:5 589:8
**negative**
365:15,16

366:5,6 423:16
423:21 476:23
566:15 574:20
602:12,22
612:6,20 613:6
613:9,16 615:3
617:7,13 618:6
618:21,23
620:13
**negatively**
559:7 561:3
580:13 616:15
618:23
**negatives** 418:5
418:17 420:9
**negligible**
626:22
**neither** 595:6
647:10 648:6
**nekrasov**
549:10
**network**
368:13,18,22
372:10,14,17
402:9
**never** 466:15
565:12,15
574:10 578:16
**new** 295:2
296:6,23
300:11 307:3
330:3 340:3,5
381:24 384:5
416:7 441:4

489:20 491:20
498:25 499:8
505:10 518:22
530:4 644:5
647:21 649:1
**newer** 578:7
**news** 628:10
**nice** 303:10
405:17
**night** 597:2
**ninety** 481:20
491:12,13
**non** 355:8
440:13
**nonresponsive**
321:16 333:24
510:23
**normal** 370:17
645:3,4,6
**normally**
404:12
**notary** 646:13
647:20 649:25
**notations** 470:6
**note** 314:24
343:8 350:3
351:10 371:8
551:7 608:19
**notes** 552:5
**notice** 298:7
304:3,4
**noticing** 300:19
**noting** 585:12

**notion** 333:12
383:18 412:23
487:23 488:24
522:11 554:23
613:5
**novel** 416:7
**november**
645:7
**nuanced**
632:21
**nuances** 368:16
**null** 406:16,22
407:8,13,14
408:4,7,23
409:12,25
410:12,13,20
411:2,4 412:7
**number** 300:11
326:17 347:6
362:16,20
389:17 395:23
397:17 441:17
441:21 466:18
466:19 478:17
492:20,24
505:12 550:17
550:21 615:12
623:9,13
644:10
**numbered**
365:7
**numbers**
501:16

**numerous**
599:19

**ny** 296:6,23

**o**

**object** 305:23
305:23 314:3,6
328:25 344:16
344:19 345:13
346:24 352:11
353:19 354:7
359:6,19 361:4
369:14 377:21
378:3 379:23
380:6 381:3
383:6 388:16
415:20 418:3
422:20 424:15
426:23 433:3
434:24 435:4
435:15 442:8
443:24 448:23
450:19 452:3
454:23 457:4
465:19,24
467:14 497:2
497:19 498:16
500:3 511:22
512:5,14
517:18 521:5
522:10 523:14
524:16 525:11
525:23 526:16
526:25 529:13

530:12 531:5
531:21,24
533:4,20 535:2
536:11,20
537:20 538:6
539:12 540:6
541:11 543:20
544:11 545:25
554:7 555:21
557:23 561:4
562:7 566:4
571:5 576:24
580:5 582:8,20
583:14 584:10
586:4 587:21
588:22 590:16
591:10,23
592:18 594:9
594:12 595:16
596:24 598:10
599:2 600:6
601:4 602:16
604:5 606:9
611:25 613:4
619:17 620:6
621:6,20
624:22 627:21
631:5 642:2
**objection**
301:10 347:18
347:24 418:11
453:4 457:7,10
457:11 500:13
532:7,10 534:6

600:9 601:15
603:2 620:10
**objectionable**
333:24 334:8
**objections**
301:8 348:15
**objective**
529:25
**observe** 413:8
421:6 423:5
436:11
**observed**
365:20 366:8
449:22
**observing**
450:14
**obstructionist**
333:25
**obtain** 422:8
525:20
**obtained**
499:11 552:19
**obviously**
303:11 304:12
305:11 307:13
354:13,24
366:19 432:18
634:7
**occasional**
353:9
**occur** 406:14
624:11
**occurred**
322:14 397:6

567:18,20
577:8 579:7
**occurring**
408:12,13
443:11 446:10
448:10 449:18
450:24 456:5
489:4
**october** 295:12
298:10 300:4
304:6 306:22
316:9 341:5
458:25
**odd** 434:4
**offer** 515:13
516:24 595:19
611:19
**offered** 314:11
392:7,21 428:2
500:15
**offering** 448:3
452:22 456:7
496:23 498:15
576:12
**officer** 557:14
647:1,2
**offset** 627:14
**offsetting**
626:13 627:15
**oh** 315:23
318:7 327:4,8
327:11 355:5
373:11 385:10
401:5 405:7

**[oh - okay]** Page 50

| | | | |
|---|---|---|---|
| 417:22 429:14 | 342:15,24 | 397:13 398:7 | 481:18,24 |
| 429:17 458:9 | 343:5,16,20 | 398:16 401:2,5 | 482:4,9,13 |
| 477:18 478:11 | 344:6 345:5,21 | 401:8 402:5,7 | 483:8,14,20,25 |
| 478:16 483:3 | 345:22 346:7 | 402:22 403:18 | 484:7,13,15,16 |
| 485:22 501:17 | 346:15 347:9 | 403:19 404:10 | 485:14,21 |
| 506:25 544:22 | 347:24 348:6 | 406:6 407:25 | 486:4,14 |
| 545:17 550:8 | 348:12,24 | 410:24 411:12 | 487:13,16,16 |
| 552:8 559:17 | 349:6,9,16,19 | 412:17 413:9 | 490:12,18 |
| 559:19 596:10 | 350:12 352:25 | 413:16 416:23 | 491:16,22 |
| 643:24 644:3 | 354:2,11 | 417:20,23 | 492:16 493:11 |
| **okay** 303:4,8 | 355:14 356:16 | 422:12 424:7,8 | 495:17 500:19 |
| 303:24 304:4,9 | 356:21 358:3 | 426:15 427:5 | 501:14,15,22 |
| 304:12 306:5,8 | 360:8,14 | 427:25 428:4 | 501:24 504:9 |
| 306:11,23 | 361:11,12 | 429:6,20,25 | 504:11,16 |
| 308:4 309:3,13 | 362:6,11 363:9 | 430:17 432:23 | 505:16,22,23 |
| 310:8 311:5 | 363:17 364:3 | 440:23 441:2 | 505:25 506:4 |
| 313:23,24 | 364:12 365:5,8 | 441:12,16 | 506:11 507:2 |
| 315:11,12,23 | 365:11,18 | 444:14 454:9 | 507:10,16 |
| 316:5 317:4,10 | 366:22 367:21 | 458:15 459:8 | 508:23 517:11 |
| 318:19 319:4 | 368:4,25 369:6 | 460:14 464:17 | 518:14 519:15 |
| 319:11 321:7 | 369:11 370:7 | 467:9,25 | 519:24 520:14 |
| 321:23 322:23 | 371:7 372:10 | 468:16,22 | 520:16,19,23 |
| 324:6 325:6,24 | 372:16 374:5 | 469:14,21 | 524:22 526:11 |
| 326:6,21 | 375:3 380:3 | 470:9,14 471:2 | 528:7,19 529:5 |
| 327:11,15,19 | 381:25 384:3,9 | 471:13,18 | 531:3 532:3 |
| 327:20 328:2,3 | 384:11 385:4 | 472:8,16,18,19 | 534:5,14 536:9 |
| 328:13,18 | 386:5,12 387:3 | 473:4,18 474:5 | 537:15 538:10 |
| 329:5,18,20 | 387:4,13,19 | 474:24 475:3,8 | 538:18 541:7 |
| 330:2 331:8 | 388:4,12,12,20 | 475:11,21 | 542:15 544:3,4 |
| 336:20 337:13 | 389:2,13 | 476:3,20 477:3 | 545:13,14,20 |
| 337:16,25 | 390:21,22 | 477:15,24 | 546:11,12,21 |
| 338:25 340:24 | 391:7,8,18 | 478:9 479:7,11 | 547:2,5 548:22 |
| 340:25 341:9 | 392:16 393:13 | 479:13,14,23 | 549:5,8 550:2 |
| 341:11 342:6 | 393:18 395:19 | 479:25 480:8 | 551:13,15,15 |

**[okay - opinion]**                                                    Page 51

| | | | |
|---|---|---|---|
| 551:21 552:3 | 623:15 624:24 | **opener** 389:23 | 428:2 437:24 |
| 552:14 553:4 | 626:12 627:4 | **opening** 613:7 | 437:25 448:3 |
| 553:13 554:3 | 627:18 628:9 | 614:12 | 448:13,22 |
| 555:11 556:5,9 | 628:12,22 | **operational** | 451:13 452:2 |
| 556:17 557:2,6 | 629:4,12,23 | 298:23 470:24 | 452:13,15,16 |
| 558:7,23 | 636:5,17,25 | **operations** | 452:22,23 |
| 559:17,18 | 637:21 638:6 | 572:4 | 453:3 456:6,17 |
| 560:7,10,16,18 | 638:11 641:10 | **operative** | 456:23 466:22 |
| 560:20 563:7 | 644:3,21,25 | 594:18 | 466:22 468:21 |
| 564:23 565:3 | 645:13,20 | **opine** 338:11 | 495:18 496:15 |
| 565:22,22 | **old** 382:18 | 338:22 373:3 | 496:18,24 |
| 567:21,24,25 | 577:7,19 | 538:23 566:5 | 497:17 499:21 |
| 568:25 569:7 | **older** 578:7 | 621:12 | 500:7,15 |
| 572:22 573:10 | **omissions** | **opining** 536:19 | 520:23 522:6 |
| 574:3,7 575:19 | 317:22 318:25 | 536:21 568:6 | 522:17,18,21 |
| 576:12,20 | 320:2,8 342:18 | 576:25 | 522:24 523:2 |
| 580:15 582:16 | **omitted** 344:11 | **opinion** 308:21 | 523:17 524:4 |
| 586:8 587:14 | **once** 316:10 | 308:22 309:4 | 525:12,19 |
| 589:12 591:5 | 330:24 500:5 | 310:15,16,24 | 526:9,11,20 |
| 593:15 594:17 | 531:12 533:7 | 311:3,18 312:2 | 530:24 534:9 |
| 595:21 596:10 | 580:24 619:19 | 312:10,11,21 | 539:2,8,16 |
| 597:5 599:9 | 630:11 | 315:9 324:12 | 543:19 561:6 |
| 600:13,19 | **one's** 592:4 | 331:9 343:18 | 561:17 565:23 |
| 601:22,22 | **ones** 336:25 | 344:21,22 | 566:19,21 |
| 602:5 605:9,16 | 337:2 392:8,10 | 345:3,6,15,22 | 567:2,16,17,19 |
| 606:5,21 607:9 | 393:16 396:14 | 346:2,8,14 | 574:9 576:13 |
| 607:11,25 | 461:9 486:21 | 347:5,10 371:5 | 576:19 584:13 |
| 608:17,18,24 | **ooh** 386:15 | 372:19,24 | 587:15,17 |
| 610:9,15,21 | **open** 484:4 | 373:5,14,16 | 590:3,5,17 |
| 611:10,21 | 506:3,11 519:9 | 374:5,10,23 | 594:14 595:18 |
| 612:22 614:10 | 520:17 615:21 | 375:3 376:3 | 608:20 609:12 |
| 615:5,18,23 | **opened** 474:7 | 377:16 391:19 | 609:17,25 |
| 616:7,10,13 | 551:8 | 392:15 426:20 | 610:13,22 |
| 619:8 622:7,20 | | 427:2,6,14,20 | 611:12,19 |

**[opinion - pagination]** Page 52

614:3,8 620:25 621:15 623:24 624:16,25 625:2,11 626:6 628:24 629:2,5 638:12 641:23 642:20

**opinions** 305:10 310:4 317:19 318:22 319:23 320:15 320:25 323:13 337:19 344:24 467:23 567:9 623:21 643:12

**opportunities** 394:24

**opportunity** 394:6 403:23 406:8 465:22

**opposed** 424:14 431:8 437:22 438:14 573:14

**opposite** 454:19

**optimizes** 572:3

**order** 347:20 478:24

**ordering** 644:18

**orders** 645:14

**organize** 548:12,25

**orient** 629:13

**oriented** 548:19

**original** 429:12 548:8 573:25 644:17

**originally** 323:19

**outcome** 647:14 648:11

**outcomes** 299:18

**outlined** 320:17 431:19 440:21 567:2 568:9 570:22 634:16

**outlook** 375:4,6 375:8,21,22 376:2,3,5,12 377:3,11,17,19 378:6,7 474:12

**outlooks** 377:25

**outside** 314:17 392:12

**overall** 418:19 437:15 438:7 527:14 541:10 541:13 571:7 579:4 582:11 614:7 626:23

**overcharging** 589:18

**overlap** 631:3 632:14 633:21 634:14 635:9 635:10

**overlaps** 630:6 630:18 634:6

**overly** 334:23 335:7 576:10

**oversight** 547:13

**overstated** 570:10

**overstatement** 512:4

**overstating** 573:14

**owe** 552:24

**own** 615:20

**owned** 588:13 597:22 598:15

**owner** 599:16

**ownership** 592:3

**owns** 598:13

**p**

**p** 296:1,1 297:1 297:1 406:12 406:20 407:5,7 407:21 408:20 423:19,25

**p.m.** 405:11,14 441:18,22 492:21,25

550:18,22 563:20,23 623:10,14 644:11,15 645:22 646:2

**p2k** 557:10,20 604:20,25 606:23 607:3,5 607:14,15

**p2k's** 608:7

**package** 593:10 593:19,20

**page** 298:2,6 299:2 336:14 337:14,17,18 337:21,23,24 365:6,7,8,13 385:2,17 393:21 398:8 401:24 478:16 481:25 484:14 484:16 485:10 485:11,13,20 543:2 551:17 551:17 553:6 556:11,24 565:2 573:11 606:24 631:18 649:5

**pages** 337:22 551:9

**pagination** 393:22 507:19 606:25

**[paper - part]**                                                   Page 53

**paper**  298:11
298:20 299:3,6
299:9,13 307:7
316:11,16
327:18 363:10
363:18 364:4,6
365:6,23
430:12 466:19
470:20 473:8
475:5,14,23,24
475:25 476:2,5
476:9,14,16
477:4,9 478:4
478:4,8 483:14
484:8 486:9,15
519:25 520:6
520:20 535:17
535:23 539:6
546:23,23
547:5 548:11
548:11,14,18
548:24 549:14
549:15,16,23
550:10 565:19
**papers**  459:17
460:2,9,12
461:6,8 464:18
464:19,20,22
465:3,4,4,7,8
466:18,25
467:6,18,19
469:23 470:19
471:9 475:19
478:21 479:3,5

534:21 535:19
544:7,18
545:22 546:13
546:13,18
549:21 571:9
572:5,7
**paragraph**
318:13 321:8
323:2,11
329:16 333:12
333:14 334:25
335:5,14
341:14 343:2,3
349:21 350:14
351:3,5,20,22
352:10 353:12
353:14,22
354:5,5,12,19
354:22 355:2
355:18,23
356:4,18,23,24
357:25 358:3
359:2,17 360:2
360:9,10,21
361:3,8 393:21
393:24 396:5
396:11,13
397:10 398:9
398:18 401:11
401:16,17,24
403:8 420:19
420:21,23
421:14 429:7
430:19,20,21

437:7,15 438:6
438:18,19,25
439:4,7 444:15
458:20,21
459:2,7,8
468:22 469:2,5
471:4 472:23
472:25 475:9
476:10,18,21
486:11 491:7,8
491:10 492:2,3
492:12 493:7
493:12,17
494:8 502:6
528:7,9,11,13
528:15 542:16
542:20,21
543:3 546:21
553:5,7,11,18
554:6 556:12
558:18 564:6
564:21 565:3
567:3 568:10
573:12,20,21
573:24,25
574:5 587:23
588:8 596:10
596:13 597:7
597:12,13,14
597:19 603:3
606:17,18,18
607:8 608:11
608:18 609:24
610:10 615:7

615:24,25
622:7 625:17
626:2,4,16
628:15,20
629:9,23 630:8
630:21 631:18
634:2 635:21
636:6,10,18,24
637:3
**paragraphs**
317:12,25
318:7,10 319:7
350:8,24
351:16 355:8
355:15,22
361:5 394:2,5
394:9,17
463:16 490:25
521:8 524:3
544:8,13,17,19
544:21 545:5,7
545:16,19,23
546:14 612:5
613:25 631:24
**pardon**  494:4
556:14
**parenthetical**
356:3
**park**  296:5,13
**part**  309:21
331:14,19
332:18,20
345:17 367:12
367:13 394:14

**[part - partida]** Page 54

| | | | |
|---|---|---|---|
| 395:9 401:15 | **partida** 296:20 | 430:8,10 | 532:2,8,15 |
| 401:23 414:2 | 298:3 300:21 | 433:18 435:2,9 | 533:9 534:4,10 |
| 438:19 509:9 | 300:22 303:4,7 | 437:4 441:11 | 536:8,16 537:5 |
| 514:7 552:4 | 303:11 314:7 | 441:13,23 | 538:2,9 539:15 |
| 554:17 585:13 | 316:23 317:4,5 | 442:2 443:17 | 541:6,24 544:2 |
| 586:14 587:4 | 326:8,16,20 | 444:13 448:24 | 544:15 546:10 |
| 594:23 617:7 | 327:8,11,16,21 | 451:11 452:11 | 550:2,8,15,23 |
| 617:18 631:10 | 328:2,4,8 | 454:8 456:16 | 551:11,14 |
| 634:8 | 333:20 334:2 | 457:5 458:2 | 555:10,22 |
| **partial** 616:20 | 344:17 345:4 | 465:20 466:2 | 558:6,15,22 |
| 617:23,25 | 345:20 347:8 | 467:24 470:9 | 559:20,24 |
| 618:24 | 348:6,12,17,21 | 470:15 474:13 | 560:7,10,15,19 |
| **partially** 617:8 | 348:23 352:21 | 474:18,23 | 561:24 562:12 |
| 618:15 619:2 | 353:20 354:10 | 475:2 482:25 | 563:15,24 |
| **participants** | 358:21,23 | 483:6,18,24 | 564:2 566:17 |
| 527:16 | 359:14 360:6 | 484:6 492:10 | 571:14 578:14 |
| **particular** | 361:10,19,24 | 492:13,18 | 580:9 582:15 |
| 360:2 372:22 | 362:5,12,14,22 | 493:2,4 497:15 | 583:9,22 585:4 |
| 372:25 391:25 | 363:5,8,17 | 498:5,24 500:6 | 586:5 588:7 |
| 412:8,16 | 364:2 370:6 | 500:18 504:23 | 590:2 591:4,14 |
| 428:25 442:15 | 377:22 378:13 | 505:7,18,23,25 | 591:24 593:2 |
| 450:22 456:7 | 380:2,21 | 506:4,8,10 | 594:10,16 |
| 486:16 503:4 | 381:14 382:21 | 511:23 512:6 | 595:8,20 597:4 |
| 509:17 516:13 | 382:23 383:10 | 512:18 513:2,4 | 598:20 599:8 |
| 546:18 561:8 | 384:19,25 | 513:12,19 | 600:7,12 601:8 |
| 561:22 581:7 | 385:10,23 | 514:4 517:23 | 601:21 602:18 |
| 588:5 589:18 | 386:3,7,12,13 | 518:18 519:3,6 | 603:6 604:18 |
| 589:20 592:23 | 388:19 403:19 | 519:15,19,23 | 606:15 609:6 |
| 594:24 617:17 | 404:5,10,19 | 520:14,16,18 | 612:21 614:2 |
| 618:12,14,22 | 405:7,15,18 | 522:5,14 | 615:18,22 |
| 638:5 640:4 | 416:22 418:6 | 523:18 524:21 | 619:20 620:7 |
| **particularly** | 420:11 423:2 | 525:18 526:10 | 620:15 621:14 |
| 399:12 417:3 | 426:8 427:4 | 526:19 528:6 | 622:6,16,21,25 |
| 420:13 | 429:17,20,25 | 530:6 531:2,16 | 623:15,16 |

**[partida - period]** Page 55

624:23 628:8 632:4 642:19 643:16,20 644:17 645:2,4 645:8,12

**parties** 301:12 647:11,13 648:7,10

**partner** 301:5

**parts** 334:16 336:8

**party** 553:21 554:5,20,20 555:9,16 569:10,14,23 571:3,10,21,22 572:15,18 574:11,16 575:2,2 576:16 576:21 577:18 579:7,21 580:3 580:7

**pause** 352:12

**pay** 509:9 561:14 593:10 593:19,20

**paying** 598:23 599:23 600:3

**pdf** 337:21,23 337:24 365:8 385:3 393:23 482:2 551:18 556:12

**pdfs** 519:8

**pending** 307:23 324:23 458:8 605:18,21

**people** 495:8 523:21

**percent** 343:23 344:15 345:10 353:9 355:24 357:5 365:16 365:21 366:6,9 380:14 386:7 406:19,20,21 413:11,11 415:5,5,7,10,12 417:5,14,15,15 419:7,20,21,24 419:25 420:3 423:18,24 426:20 427:6 427:23 428:7 428:19 429:4,4 429:5 431:4,17 432:2,2,7,13,13 432:23,24 433:21,23 434:20,22 435:12,14 437:18 438:10 439:15,16,24 439:25 442:5,7 443:7,19,20,23 445:13,14,14 445:15,18,19

445:23,25 446:2 447:12 447:16 448:18 448:20 449:11 449:13 450:2,9 450:11,15 451:15,16,17 451:23,24 452:23,25 454:14 455:13 455:16,23 456:19,24 460:19 461:5 461:14,23 463:7 464:8 466:12,23 468:4,11,19 469:11 473:14 476:24 487:3 488:5,7,13,16 488:17,20 489:7,11,19,19 584:23 588:12 597:22 598:15 612:7,20 626:24 627:2

**percentage** 391:22 393:11

**percentile** 419:3 421:25 422:2 457:19 457:20,21 487:2

**percents** 446:3

**perceptions** 602:13,23

**perfect** 317:4 326:16 327:16 329:20 348:17 348:21 378:14 401:22 410:10 492:16 557:2 595:21

**perform** 607:12

**performance** 590:20

**performed** 588:14,17 592:8 597:24 598:3,18,24

**performing** 599:15

**perils** 299:4 475:7

**period** 342:17 369:8,10,13,21 370:4 372:12 372:15,21 375:10,13,15 375:23 379:4,5 379:9,22 380:13 381:2 381:18 382:15 383:4 387:10 387:16 395:22 397:15,16 398:2 479:16

**[period - ph.d.]** Page 56

| | | | |
|---|---|---|---|
| 480:3 488:12 | 305:1 306:1 | 373:1 374:1 | 441:1 442:1 |
| 490:8,11 | 307:1 308:1 | 375:1 376:1 | 443:1 444:1 |
| 542:14 572:14 | 309:1 310:1 | 377:1 378:1 | 445:1 446:1 |
| 600:15,18 | 311:1 312:1 | 379:1 380:1 | 447:1 448:1 |
| 609:15,18,20 | 313:1 314:1 | 381:1 382:1 | 449:1 450:1 |
| 609:21 610:6 | 315:1 316:1 | 383:1 384:1 | 451:1 452:1 |
| 610:23 611:6,7 | 317:1 318:1 | 385:1 386:1 | 453:1 454:1 |
| 611:22 612:6 | 319:1 320:1 | 387:1 388:1 | 455:1 456:1 |
| 614:9,13,14,18 | 321:1 322:1 | 389:1 390:1 | 457:1 458:1 |
| **periods** 632:8 | 323:1 324:1 | 391:1 392:1 | 459:1 460:1 |
| **permit** 512:16 | 325:1 326:1 | 393:1 394:1 | 461:1 462:1 |
| 574:6 585:20 | 327:1 328:1 | 395:1 396:1 | 463:1 464:1 |
| **permitted** | 329:1 330:1 | 397:1 398:1 | 465:1 466:1 |
| 301:16 | 331:1 332:1 | 399:1 400:1 | 467:1 468:1 |
| **person** 377:9 | 333:1 334:1 | 401:1 402:1 | 469:1 470:1 |
| 524:13 | 335:1 336:1 | 403:1 404:1 | 471:1 472:1 |
| **personally** | 337:1 338:1 | 405:1 406:1 | 473:1 474:1 |
| 586:19 | 339:1 340:1 | 407:1 408:1 | 475:1 476:1 |
| **persons** 552:22 | 341:1 342:1 | 409:1 410:1 | 477:1 478:1 |
| **perspective** | 343:1 344:1 | 411:1 412:1 | 479:1 480:1 |
| 419:9 642:10 | 345:1 346:1 | 413:1 414:1 | 481:1 482:1 |
| 643:8 | 347:1 348:1 | 415:1 416:1 | 483:1 484:1 |
| **pertaining** | 349:1 350:1 | 417:1 418:1 | 485:1 486:1 |
| 579:2 624:7 | 351:1 352:1 | 419:1 420:1 | 487:1 488:1 |
| **pertains** 363:13 | 353:1 354:1 | 421:1 422:1 | 489:1 490:1 |
| 570:18 | 355:1 356:1 | 423:1 424:1 | 491:1 492:1 |
| **petahashes** | 357:1 358:1 | 425:1 426:1 | 493:1 494:1 |
| 367:2,9,14,22 | 359:1 360:1 | 427:1 428:1 | 495:1 496:1 |
| **ph** 565:5,5,11 | 361:1 362:1 | 429:1 430:1 | 497:1 498:1 |
| 565:12 | 363:1 364:1 | 431:1 432:1 | 499:1 500:1 |
| **ph.d.** 295:10 | 365:1 366:1 | 433:1 434:1 | 501:1 502:1 |
| 297:3 300:1 | 367:1 368:1 | 435:1 436:1 | 503:1 504:1 |
| 301:1 302:1,17 | 369:1 370:1 | 437:1 438:1 | 505:1 506:1 |
| 303:1 304:1 | 371:1 372:1 | 439:1 440:1 | 507:1 508:1 |

**[ph.d. - point]**                                    Page 57

| | | | |
|---|---|---|---|
| 509:1 510:1 | 577:1 578:1 | 645:1 646:1,5 | 323:20 |
| 511:1 512:1 | 579:1 580:1 | 649:3,21 | **plan** 621:25 |
| 513:1 514:1 | 581:1 582:1 | **phantom** | **planned** 624:12 |
| 515:1 516:1 | 583:1 584:1 | 353:16 472:16 | **player** 507:7 |
| 517:1 518:1 | 585:1 586:1 | 475:18 | **players** 510:3 |
| 519:1 520:1 | 587:1 588:1 | **phone** 307:9 | **please** 300:17 |
| 521:1 522:1 | 589:1 590:1 | **phrase** 434:5 | 301:23,25 |
| 523:1 524:1 | 591:1 592:1 | 449:7 599:6 | 302:9,14 |
| 525:1 526:1 | 593:1 594:1 | **phrased** 340:16 | 307:10 337:13 |
| 527:1 528:1 | 595:1 596:1 | 414:14 | 351:19 356:17 |
| 529:1 530:1 | 597:1 598:1 | **phraseology** | 358:25 367:6 |
| 531:1 532:1 | 599:1 600:1 | 449:20 | 389:6 406:4 |
| 533:1 534:1 | 601:1 602:1 | **phrasing** | 407:25 418:5 |
| 535:1 536:1 | 603:1 604:1 | 453:11 610:16 | 459:5 475:13 |
| 537:1 538:1 | 605:1 606:1 | **picking** 361:8 | 479:11,22 |
| 539:1 540:1 | 607:1 608:1 | **piece** 336:14 | 491:15 544:16 |
| 541:1 542:1 | 609:1 610:1 | 576:13 | 553:10 569:19 |
| 543:1 544:1 | 611:1 612:1 | **pivot** 375:8 | 574:7 607:9 |
| 545:1 546:1 | 613:1 614:1 | 383:21 | 615:10 629:8 |
| 547:1 548:1 | 615:1 616:1 | **place** 380:8 | **pocket** 391:24 |
| 549:1 550:1 | 617:1 618:1 | 628:6 | 392:23 393:5 |
| 551:1 552:1 | 619:1 620:1 | **placement** | **pockets** 553:23 |
| 553:1 554:1 | 621:1 622:1 | 540:19,23 | **point** 318:2 |
| 555:1 556:1 | 623:1 624:1 | 556:2 | 323:6 331:13 |
| 557:1 558:1 | 625:1 626:1 | **plaintiff** 296:2 | 332:10 334:3,6 |
| 559:1 560:1 | 627:1 628:1 | 296:10 301:4 | 345:25 349:21 |
| 561:1 562:1 | 629:1 630:1 | 308:6,17 309:8 | 350:13 351:2 |
| 563:1 564:1 | 631:1 632:1 | 344:12 | 352:5,8 355:14 |
| 565:1 566:1 | 633:1 634:1 | **plaintiff's** | 355:17 358:18 |
| 567:1 568:1 | 635:1 636:1 | 320:23 335:15 | 358:25 360:21 |
| 569:1 570:1 | 637:1 638:1 | 341:13,18 | 361:15 362:24 |
| 571:1 572:1 | 639:1 640:1 | 472:5 | 378:21 383:25 |
| 573:1 574:1 | 641:1 642:1 | **plaintiffs** 295:5 | 410:6 420:24 |
| 575:1 576:1 | 643:1 644:1 | 320:6 321:3 | 442:11 452:6 |

**[point - previous]** Page 58

466:11 467:2
467:16 472:18
477:25 491:2
502:17 503:4
510:10 511:13
511:16 516:6
522:16,17
523:25 524:5
528:23 542:19
552:3 556:6
557:8 571:8
584:3,11,15
585:11,25
587:22 588:4
595:9 597:10
599:12 601:17
613:12 616:5
625:16 628:2
628:14 629:6
637:7 640:6,10
641:6
**pointed** 597:5
**pointing**
336:21 502:19
540:8 582:13
**points** 318:8
337:7 338:24
339:9,12
396:13 410:8
438:16 513:9
543:4,15 558:3
558:9 572:7
**poked** 571:8

**popped** 445:24
**population**
407:24
**portion** 515:6,8
**portions**
332:12
**position** 312:4
461:20 559:2,5
559:14 560:23
561:12 578:8
610:18
**positive** 479:19
480:5 482:11
484:23 485:17
488:13 565:7
574:19 611:24
612:3 613:2,6
613:9 617:12
618:11
**positively**
580:11 621:11
**possibility**
594:2
**possible** 347:18
523:9,20,21,22
532:23 533:16
534:5,12,13
572:17 575:20
575:22 576:3
576:20 579:20
579:20 582:16
583:10 591:5
591:19,25
592:12,14

593:3,4,5,5
594:3,4,5,11
595:10,11
600:20 602:5,7
611:21 612:22
619:8,21
620:17 644:24
**post** 484:24
485:4,5 497:5
531:8
**potential**
358:10,15
509:22,25
571:11,25
572:2 621:2,17
**potentially**
498:3 585:2
613:18 618:21
619:16 620:5
620:12,22
**power** 503:6
509:11,24
510:15
**practice** 417:2
417:9 460:19
461:3 462:8,14
462:15,18,21
463:6,8,14,20
463:21,22
464:2,7
**pre** 485:4
**preclude** 592:4
**predicated**
498:19

**prefer** 404:25
405:2 505:11
**premised**
317:20 318:22
319:24 320:15
323:16,19
329:9 617:8
**prepared** 317:7
324:12 648:3
**preparing**
310:18 312:24
393:13 465:16
534:24
**preponderance**
418:18
**presence** 414:9
607:19,20
608:8
**present** 297:2
606:3 641:9
**press** 431:20
516:22 517:3
518:7 546:20
**pressure**
404:18
**presumption**
526:7
**pretending**
402:24
**pretty** 456:3
510:4 524:8
617:6
**previous**
328:24 477:25

483:10 505:12
512:8 610:2
639:3,3
**previously**
307:2 326:10
328:6,20
329:17 349:11
398:14 424:18
426:6 429:21
455:9 486:24
504:25 506:12
507:24 518:20
527:11 532:6
578:17 608:25
**price** 311:8
313:19 343:12
343:22,24
344:15,18
345:10,11
357:5 369:4,6
369:12,20
370:3 371:15
375:11 378:23
378:23 379:10
387:2,2,4,15,21
388:13,15
389:15 390:15
390:25 391:9
391:10,15
395:18 396:22
398:12,19
400:14,21
403:12 412:3
413:19,25

414:4,10
415:19,23
416:4,11,13,21
418:2,10 421:7
421:12,19,23
422:10,19,24
423:6 424:14
425:8,20
427:10 428:9
431:3,8,13
432:25 433:11
433:13,16,22
434:5,10,10,14
434:22 435:13
435:18 436:7
436:13,22
437:17,22
438:9,14,23
439:13 440:13
442:6,14,17
443:13,22
446:14,18,19
446:20 448:21
450:18,22
451:25 452:10
453:2,8,9,17,20
453:23 454:12
454:18,22
456:19,25
457:6 489:15
490:4 521:4
522:9 523:7
525:16,22
526:15,24

528:3 530:2,5
531:8 541:2
559:6 561:2
565:8 577:13
611:13,23
612:14,17,24
613:20,23
614:23 615:4
616:20 617:24
619:11,24
621:16 638:13
638:18,24
639:6,12,23
640:13,16
**prices** 395:6
396:20 446:13
528:22 612:10
614:17
**principles**
312:14
**print** 327:6
**printed** 476:14
**prior** 314:23
343:25 393:13
517:11,15
529:6 532:23
533:16 554:15
558:2,19 579:8
647:4
**private** 302:6
**pro** 566:9
**probabilistic**
414:6 449:19
451:8

**probabilistica...**
444:19
**probability**
406:12 413:19
413:24 414:3
415:7,19,23
424:11 425:19
432:25 433:22
434:5,21
435:13,18
436:6,21
438:23 442:5
443:22 447:10
447:14,24,24
447:25 448:6
448:10,19
451:16,18,24
452:10 453:2,7
453:9,12,20,23
**probable**
417:25 418:9
418:14 421:11
422:18 454:11
454:17,21
**probably**
315:17 354:20
462:16 463:12
464:21,25
**probe** 437:9
**problem**
327:11 396:2
474:23 491:16
506:4 519:6
562:15 638:11

**problematic** 568:15

**procedural** 301:17

**proceed** 303:2 397:10 622:3

**proceeded** 345:16

**proceeding** 295:14 301:15 320:18 618:13 646:3 648:4

**proceedings** 310:19 647:3,4 647:5,8 648:5

**process** 522:8

**processes** 538:12,16

**processing** 299:15 496:6 520:25 521:19 522:4,7 523:4 523:5 524:13 525:14 527:6 529:11 534:22 540:11

**produced** 301:14 581:16

**producing** 399:14

**product** 557:14

**productivity** 396:21 397:4,6

**products** 607:20

**professional** 341:25

**professor** 309:14 310:21 311:6,21 312:20 313:17 317:13 318:14 319:17 326:11 330:4,15 331:19 332:9 332:11,18,25 334:5,15 349:22 350:14 351:3,16,20 355:18 356:18 358:4 359:2,3 360:15,22 393:19 394:8 394:16 405:20 407:4 459:10 459:13 468:2,9 468:17 477:9 481:22 487:10 499:25 500:11 504:25 506:13 515:11 528:16 528:19

**profile** 577:25

**profit** 529:22 529:25

**profitability** 509:22 573:17

**profits** 528:25

**programs** 474:11

**project** 616:11 616:14 617:23 619:13 620:2 620:20,23 621:3,5 633:14

**projected** 395:23 397:17

**projection** 394:18

**projections** 394:10 395:7 395:10,13 397:24 398:3,6 398:21 399:11 399:23 400:23 627:17

**projects** 621:17 621:23

**prominence** 548:21 556:2 561:20

**promise** 637:12 637:19

**promised** 380:20

**promises** 395:15 584:20 585:3

**prompt** 348:14

**prongay** 296:4 296:12

**pronounce** 528:17

**proof** 308:23 309:20,23 310:5 311:19 312:8,17,19 314:17 315:2 320:21

**properties** 342:3 449:8

**proposed** 357:16 593:11

**proprietary** 510:6

**prospects** 378:8 581:20 581:21 582:2 585:18

**prove** 320:11 320:23 321:4 323:22 335:15 341:13,19

**provide** 309:15 310:21 311:7 311:22 313:18 320:24 341:23 604:22 643:7

**provided** 314:25 336:3 490:22

**provides** 357:14 560:24

**providing** 312:21,24

381:6,6 442:16 445:3,5 495:17 496:14 546:5 555:5 559:4

**province** 469:8

**proving** 320:7 323:20

**public** 494:22 494:25 502:18 502:22 503:23 515:21,22 521:12 524:7 527:4,19 531:10 552:20 646:13 647:20 649:25

**publication** 528:4

**publications** 459:25

**publicly** 508:20 517:13,16,25 526:13,22 532:25 533:19 546:4

**published** 464:11 498:4

**publishing** 496:24

**pull** 504:22

**pulled** 519:13

**pulling** 518:8 519:22

**pulsed** 361:22

**punchline** 439:7

**pure** 425:23 523:15 534:7

**purported** 554:16 555:4 555:17 557:15

**purposes** 621:13

**pushing** 593:18

**put** 302:6 321:2 330:14 336:5 351:7 359:10 367:24 370:20 415:2 449:2 462:9 471:13 501:2 505:5 525:6,6 527:21 578:18,20 620:24

**puts** 347:6

**putting** 383:23 495:23

**q**

**qdf** 484:24 485:5

**qualified** 647:7

**qualifies** 498:8

**quantify** 342:16,19 530:14 531:4 531:18 532:5

532:12 606:14 607:12 618:3,5 619:4 621:8

**quantifying** 530:22

**question** 305:25 307:22 307:24 308:12 308:14 309:7 310:10,11,14 313:22 319:14 319:15 320:3 321:12,19,22 321:25 322:8 322:10 323:3,7 323:9,18 324:11,14,22 324:23 325:3 325:10,16,17 325:22,25 330:24 332:4 333:7,10,11,17 334:4,10,11,14 334:19,20,22 335:7 337:6 340:11,13,18 345:2 347:12 347:17,22 348:7,11 351:9 352:6 358:19 358:25 360:19 360:24 367:4 371:11 374:14 374:16 375:17

376:9,13,22 377:24 379:17 382:9 385:25 389:6 394:13 396:9,25 397:11,14 398:25 403:16 404:21 407:3 411:18,25 412:6 413:4 414:25 421:12 423:20 424:17 426:5 428:6 434:17 435:7 435:10 438:4 440:5,21 451:19 452:5 456:21 458:8 458:12 466:3 468:6 471:15 471:25 475:11 475:12,21,22 477:6,7 481:4 490:14 491:14 491:21 500:4 501:4 504:4 509:7 510:23 510:24 512:16 512:24 513:7 513:10,14 514:14,21,23 515:4 526:17 527:25 531:17 531:23 533:7

534:3,12
539:14 545:4
548:23 549:9
562:9 564:9
567:15 569:16
569:20 572:23
575:21 576:2,8
581:7,18 583:4
591:11,17,18
591:19 592:12
594:14,20
596:21 598:6
599:25 601:5
601:24,25
605:17,21
607:11 613:12
618:17 619:18
622:17 625:6
629:24 633:9
634:11 636:22
636:25 637:23
639:10
**question's**
434:3 592:19
**questionable**
592:22
**questioning**
361:16 492:6,8
514:12 622:13
**questions**
304:21 305:4
305:13,15
306:6 314:16
321:17 324:7

324:24 325:9
325:20 333:18
347:16 384:16
384:17 426:14
473:22 474:2
476:4 545:12
547:16 557:19
605:14 610:16
623:23 635:18
641:11 643:17
643:19
**quick** 304:15
316:4 438:16
550:5 553:9
574:7 622:14
**quickly** 367:5
611:23 613:2
**quite** 313:15
315:22 397:2
447:25 452:8
488:19 512:4
533:22 536:25
569:18 575:16
583:4 638:20
**quotations**
402:14 463:10
**quote** 333:13
422:17 462:10
469:3,7 471:22
472:20,20
473:11,16
475:13,22,25
476:2,21 477:8
511:14 515:17

552:6 585:22
**quoted** 333:15
398:18,20
401:7 402:11
403:4 471:10
478:14 500:17
515:16
**quotes** 478:20
479:5
**quoting** 331:24
335:5 421:9
423:9 462:18
514:16

**r**

**r** 296:1 297:1
552:11
**raise** 302:14
**ramp** 637:6,11
637:17
**random** 408:12
408:13,17
409:2 412:23
412:24 424:14
428:12 431:8
432:17 433:16
437:22 438:14
440:13 443:11
446:10,18
449:18 450:24
456:5 488:25
489:4 561:10
561:11

**range** 413:13
628:13 630:2,5
630:6 632:2
634:13,14
**rank** 377:5
**ratchet** 639:5
**ratcheted**
624:8
**rate** 367:2,9,25
368:6,10 369:3
395:24 397:18
399:15 402:17
402:18,21,23
403:13 624:10
624:11 637:16
638:17 641:5
**rates** 588:15
597:25
**rather** 343:13
420:10 489:21
489:24 609:7
**rating** 473:13
**rattled** 514:22
**rattling** 513:9
**raw** 612:6,20
**reach** 495:18
496:12,15
498:3 500:15
**reached** 371:20
**react** 561:2
611:23,23
612:25,25
**reacted** 559:6
613:8 616:15

**reacting** 570:16
**reaction** 542:6
  617:7,12,13
  618:4,21
  620:13
**reacts** 541:21
**read** 317:25
  318:5,5,7
  319:6,8,10,11
  321:20 322:25
  328:16 331:5
  336:14 343:6
  343:20 349:17
  349:18 356:21
  382:9 394:4
  396:12,22
  397:22 400:4
  401:12,14
  402:3 403:7
  406:3,5,6
  407:2 420:22
  421:14 439:3
  460:4,6 464:5
  469:15,19
  471:9,10
  479:21,24
  485:18 494:8
  504:5 507:19
  511:6,20 512:7
  512:21 513:15
  513:20,21
  514:7,15,25
  515:6,8 516:3
  516:4 522:18

529:3 545:9
553:9 574:7,8
608:14,17
616:4,9,25
635:24 636:3
636:10,19,24
643:22,25
**reading** 338:2,4
  361:8 438:17
  452:19 460:21
  470:22 486:10
  493:17 494:8
  545:3 596:6
  599:4,9 608:22
**ready** 303:4
**reaffirmed**
  638:24 639:4
**real** 499:13,14
  518:25 593:25
**realizations**
  624:14
**realize** 614:16
**really** 307:16
  316:4 338:7
  347:16 367:23
  404:24 426:15
  509:9 510:5,9
  516:8,16
  554:25 581:15
  628:20 629:3,5
  631:15
**reason** 303:13
  304:9 327:21
  351:21 415:16

510:12,13
593:17 610:15
630:20 638:12
649:5
**reasonable**
  335:6 344:7,13
  345:6 364:24
  388:11 583:6
**reasons** 446:12
  515:13 516:15
  516:25
**reboot** 560:12
  563:9
**rebuttal** 336:3
**recall** 354:9
  380:11,16
  399:4 460:10
  465:2 468:14
  468:21 471:24
  472:2 499:8
  504:14,19,24
  515:19 517:8
  532:19 548:10
  581:23 611:5
  636:14 637:23
  638:6,10
  640:11 642:22
  643:3
**recap** 564:7
**receive** 303:22
  430:9 593:20
**received** 304:2
  328:5 363:20
  506:2

**recent** 298:16
  459:16,18
  460:2,13,16,25
  462:11,25
  463:3,23 465:4
  467:6,21,22,22
  577:12,12
**recently** 369:19
**recklessly**
  317:21 318:24
  319:25 329:10
**recollect** 517:7
**recollection**
  305:20 466:5
  514:6 641:9
**recommendat...**
  565:8
**record** 300:3
  300:19 301:11
  302:11 306:14
  307:12,25
  324:8 325:5
  349:24 356:22
  362:17,18,21
  371:8 405:5,11
  405:12,14
  406:7 441:14
  441:18,19,22
  492:21,22,25
  514:3 519:11
  550:18,19,22
  563:19,20,21
  563:23 623:10
  623:11,14

644:8,10,13,15 645:23 647:9 648:5

**recorded** 300:6 301:19 647:6

**recording** 301:14 647:8 648:3

**records** 554:10

**reduce** 381:12 503:19 509:12 510:5 639:12

**reduced** 397:8 639:10 647:6

**reducing** 584:21

**reduction** 638:13

**redundant** 340:5 481:3

**refer** 306:24 307:6 316:16 326:18 327:18 354:13 368:12 397:11 407:14 521:20

**reference** 546:23 603:4

**referenced** 340:6 372:3 376:14 399:19 499:25 500:11 512:12 524:3 532:17 564:22

565:20 636:11

**references** 330:7 515:20 533:11 629:17

**referencing** 333:8 363:12 438:22

**referred** 378:22 486:23 548:15 579:10 581:13

**referring** 352:4 356:15 427:13 431:9 462:16 463:12,18,19 487:4 515:3 518:6 558:14 558:20 625:18 629:20 631:17

**refers** 462:20 463:21 487:6

**reflect** 493:22 528:22

**reflected** 486:17 490:3

**reframing** 333:17

**refresh** 305:20 514:5

**refreshed** 402:5

**refusing** 337:5

**regard** 305:5 307:22 417:4 511:9 607:18

**regarded** 468:3

**regarding** 323:13 561:16 569:14 609:17 610:22 616:22 617:10

**regardless** 480:23

**regards** 311:18 320:7 335:18 337:5 339:10 339:17 340:4 356:4 358:8,15 363:13 378:24 391:15 392:19 395:15 418:19 431:21 436:9 442:21 453:12 455:9 456:10 466:23 468:10 468:18 495:12 510:3 517:7 524:6 525:24 525:25 562:24 566:21 567:3 567:13 569:13 570:16 572:7 573:9 575:4 577:7 578:12 582:13 586:10 604:13 613:14 614:8 621:9 624:6 625:9 626:18 632:21

**regression** 433:17

**regularly** 420:2 464:16

**regulation** 537:2

**rehash** 324:19

**reiterate** 311:23 324:19 325:14 539:25 540:3 609:25

**reiterated** 540:3

**reiterating** 339:16

**reject** 406:22

**relate** 545:23

**related** 411:15 411:22 424:12 431:6,13 436:12 437:20 438:12 454:6 501:25 526:12 526:21 534:22 544:9,19 553:21 554:5 554:20 555:9 555:16 569:9 569:14,23 571:3,10,21,22 572:15,17 574:11,16 575:2,2 576:16 576:21 577:18

579:7,21 580:3
580:6 647:10
648:7
**relation** 432:20
624:14
**relationship**
408:21 443:3
554:13 589:11
590:15 604:16
**relative** 343:23
344:18 345:11
408:22 500:15
500:16 503:24
524:23 525:3
527:7 581:19
583:17 647:12
648:9
**release** 493:24
516:23 517:4
518:7 529:6
**released** 411:15
411:22 413:5
414:22 424:13
427:9 431:7
437:21 438:13
440:16 454:3
**releases** 431:21
546:20 575:16
**releasing**
533:16
**relevance**
339:11 367:15
499:18 540:15
541:4 542:2,5

542:8 569:13
574:19,20
590:6 617:16
621:9
**relevant** 317:25
319:6 332:23
332:24 355:22
459:7 467:16
490:25 511:13
511:16 515:2
539:11,19
540:5,20
541:10,19
542:13 543:7
543:18 545:15
545:18 546:16
555:19 556:4
569:11,25
571:4 572:18
575:24,24
576:4,5,15,17
576:22 577:22
579:14,22,24
580:2,4,8,14,23
581:4 582:7,19
583:13 584:9
587:20 588:21
591:12 601:3
601:14 604:3
607:22 611:24
612:3 613:2
616:23 618:14
618:24 619:2
621:11

**reliable** 552:18
552:21
**reliably** 317:14
318:15 319:18
338:13
**reliance** 398:23
535:4
**relied** 548:8
**rely** 468:24
534:21 535:8
536:2 547:15
547:19,24
549:9,12
561:23 587:3
**relying** 540:13
542:25 543:3
543:14 567:22
**remember**
501:16 636:12
639:15,19
**remind** 326:17
**reminder**
304:15
**remote** 295:14
**repeat** 319:15
367:4 389:6
394:13 395:25
411:17 413:20
413:21 418:5
423:20 427:22
435:7 468:6
477:6 490:14
500:4 526:17
539:13 575:10

576:2 601:5
602:17 619:18
630:10
**repeated**
325:19 499:14
514:2 539:10
539:18 540:4
541:9 543:5,16
546:15 573:22
573:23
**repeating**
457:15 599:6
**repetition**
480:15,25
540:19,24
541:17,25
542:4,7
**repetitious**
541:23
**rephrase** 334:9
**reply** 298:9
306:16,21
313:5 314:10
316:8 317:7
331:23 333:12
336:4 339:14
341:4 349:12
358:13 362:25
384:12,21
385:16 420:20
429:8,12
458:18,23
473:2 475:9
476:12,16,17

**[reply - report]**

| | | | |
|---|---|---|---|
| 491:25 493:7 | 331:23 332:9 | 430:4,25 | 524:2,18,20 |
| 508:25 520:2 | 332:11,20 | 431:20 437:7 | 526:13,22 |
| 520:20 528:8 | 333:2,3,7,8,9 | 437:15 438:6,7 | 527:20 528:2,5 |
| 528:13 534:19 | 333:13 334:5,7 | 444:16 447:18 | 528:8,10,13 |
| 534:19,23 | 334:16,17,24 | 458:18,23,23 | 529:6,9 530:11 |
| 542:16 544:8 | 335:5,8,14 | 459:9 461:10 | 531:13 532:18 |
| 546:22 547:18 | 336:4,4,5,9,10 | 461:11 462:17 | 532:24 533:6 |
| 548:15 549:12 | 336:14,15,22 | 462:20 463:2 | 533:10,17,25 |
| 555:14 562:23 | 337:8 338:3,6 | 463:12 464:14 | 534:20,24,25 |
| 564:4 565:4 | 338:17 339:14 | 465:17 467:7,8 | 535:5 536:3,4 |
| 570:4,23 | 341:4 342:21 | 468:23 471:4 | 536:19 538:14 |
| 573:11,24 | 344:23,25 | 472:18 473:2 | 538:22 539:9 |
| 574:5 587:24 | 349:12,14 | 475:9 476:12 | 539:17,23 |
| 588:5 603:4 | 350:8,14,24 | 476:13,18 | 540:9,17 |
| 606:17 608:12 | 351:4,16,21 | 478:14 479:9 | 542:17,20 |
| 622:8 625:19 | 353:23 354:25 | 479:15 481:22 | 546:22 547:17 |
| 626:17 629:9 | 356:19 358:13 | 482:21 483:11 | 547:25 548:9 |
| 630:21 635:21 | 359:3 360:10 | 487:11 490:19 | 548:16 549:2 |
| 636:18 | 360:11 361:9 | 491:25 493:8 | 549:12,13,19 |
| **replying** | 362:25 363:2 | 493:14,25 | 549:25 551:20 |
| 314:22 | 377:2 378:21 | 494:2,15,18,21 | 554:6 555:14 |
| **report**   298:9,18 | 384:13,21 | 494:24 495:7 | 555:20 562:3,4 |
| 306:16,18,18 | 385:9,16 389:5 | 495:20,23,23 | 562:5,5,18,19 |
| 306:21 310:18 | 389:11 392:7 | 496:4,17 497:7 | 562:20,21,23 |
| 312:25 313:6,7 | 392:12 393:9 | 497:14 498:4 | 564:4,12,13,14 |
| 313:9 314:10 | 393:14,19,22 | 499:4,11,13,16 | 564:14 565:4 |
| 314:10,24 | 396:7 399:2,6 | 499:19 500:2 | 569:10,24 |
| 315:4 316:9,15 | 399:13 401:4 | 500:12,22 | 570:3,4,14,19 |
| 317:7,12 322:4 | 402:16,20 | 502:5 504:2,5 | 570:23 573:7 |
| 324:4 325:20 | 405:21,23 | 508:25 515:12 | 573:11,24 |
| 326:12 327:2 | 408:8 420:15 | 515:17,20 | 574:2,5 576:19 |
| 328:10,14 | 420:18,20 | 518:5,16 520:2 | 577:6,11,15,16 |
| 329:2 330:3,5 | 428:3 429:7,8 | 520:20 521:7 | 578:8,10,19,20 |
| 330:8,9,11 | 429:12,13 | 522:4 523:10 | 580:17,23 |

| | | | |
|---|---|---|---|
| 581:4,5,11 | **report's** 616:22 | 467:10 490:25 | 620:21 621:4 |
| 582:7,19 | **reported** | 491:5 501:17 | **requested** |
| 583:25 584:9 | 295:16 470:4 | 518:6 531:20 | 514:3 642:7,18 |
| 584:13,17 | **reporter** | 544:9 548:13 | **requires** |
| 585:7,17 586:3 | 300:15 301:7 | 555:12 562:2 | 314:20 521:15 |
| 586:12 587:24 | 302:3,5,9,14,22 | 562:10,11,17 | 521:16 |
| 588:6,9 595:18 | 303:2,5 304:16 | 564:10 565:7 | **research** 297:3 |
| 596:20,23 | 321:20 347:11 | 565:13 566:14 | 358:14 417:10 |
| 597:11 602:12 | 348:5,8,10,13 | 568:16,16,18 | 417:18 461:25 |
| 602:22 603:5 | 348:19 358:22 | 581:11,15,22 | 462:3 486:22 |
| 603:12 604:23 | 382:22 384:15 | 581:24,25 | 491:23 493:13 |
| 605:2,3,7 | 384:24 385:4 | 584:12 585:20 | 495:10,19,25 |
| 606:7,17,24 | 385:19 386:2,5 | 586:25 601:19 | 496:4,9,11,16 |
| 607:24 608:5 | 404:5,7,11 | 610:17 622:9 | 497:4,21 |
| 608:12 609:2 | 452:18 513:20 | 624:4 639:3,25 | 498:21 499:10 |
| 609:11,19,21 | 513:24 514:2 | 640:12,13,25 | 499:22 500:8 |
| 609:24,24 | 519:10,16 | 643:14 | 520:24 529:9 |
| 610:2,2,25 | 558:12 559:22 | **represent** | 531:18 532:13 |
| 611:2,19 613:7 | 560:2,8,11,18 | 301:4 303:12 | 532:24 535:15 |
| 614:13 615:8 | 609:5 615:16 | 472:4 489:21 | 536:13,25 |
| 615:24 617:8 | 623:4 643:24 | 489:25 506:14 | 537:11,12 |
| 617:18 619:10 | 644:4,14,21,25 | 532:22 610:9 | 538:11,17,19 |
| 619:22 620:19 | 645:6,10,13,21 | **representative** | 539:10 543:7 |
| 622:8 625:17 | **reporting** | 549:15,22 | 543:18 551:24 |
| 625:19,24 | 649:1 | **represented** | 552:10 554:4 |
| 626:17 629:10 | **reports** 308:11 | 619:13 620:2 | 558:24 559:13 |
| 630:22 631:9 | 308:25 310:7 | **representing** | 560:21 565:25 |
| 631:19 633:16 | 314:23 322:20 | 600:21 643:4 | 566:25 572:9 |
| 633:17 634:2 | 353:6,7 369:23 | **reputation** | **research's** |
| 635:21 636:18 | 392:20 396:7 | 606:4 | 494:25 530:8 |
| 637:2,4 638:2 | 396:15 397:21 | **reputational** | 532:9 |
| 638:5,23,25 | 399:8,18,19 | 605:12,24 | **researched** |
| 639:10,11,21 | 400:3 417:8 | 606:7,13,14 | 535:10 |
| 640:4,5 642:12 | 427:3 464:5 | 619:15 620:4 | |

**[reset - revenue]**

**reset** 368:22

**resources** 383:24

**respect** 314:23 330:19 336:3 342:4 345:2,16 361:2 375:8 378:9 379:13 381:11 382:5 399:12,23 409:25 417:18 425:4,19 431:16,18,19 433:9,14 443:14 444:6 449:8 455:3 464:11 467:23 487:25 499:18 502:10 503:23 509:2,24 510:18,25 511:17 512:10 514:9,13 517:13 526:3 532:13 537:10 537:23 539:3 540:14,23 542:5,11 549:13 568:10 568:17 570:4 570:23 572:4 577:18 583:6 584:13,21 585:3 589:5

590:7 591:16 592:11 595:7 601:18 603:10 603:17,21 604:24 606:12 607:13 613:20 614:13,25 618:8 621:23 626:23 640:3

**respective** 486:12

**respectively** 487:2

**respond** 317:18 319:22 325:22 326:13 340:21 421:15 531:15

**responded** 336:11 620:17

**responding** 313:11 336:6

**response** 307:24 318:20 325:9 347:23 414:10,10,21 493:22 531:8

**responses** 436:3

**responsibilities** 600:17

**rest** 447:3,11 447:15 449:24 607:7

**restroom** 550:7

**result** 485:3 486:16

**results** 417:4 443:15 468:3 468:10,18

**resuming** 644:15

**retained** 641:19

**retitle** 315:25

**return** 365:15 366:5 406:13 406:15,24 407:10,18,20 407:23 408:17 409:9,18,19 410:18 411:10 411:14,21,25 412:17 413:6,7 413:14,18,23 414:7 418:21 419:16,21 423:16,19,22 423:25 425:17 425:18 428:20 432:11,12 439:20,23 440:3 442:23 443:4,9 444:24 445:6,7,8,18,19 445:24 446:9 447:11,15,19 447:22 448:4

449:12,22,25 450:5,13 451:3 451:7,10 453:18 454:2,6 455:4,18,22,25 456:4 479:20 480:6 482:10 482:18 487:18 488:13,18,24 489:5,9,19 612:7,20 613:16 618:7

**returns** 298:15 408:14,22,25 409:4,6,7,10,16 409:18 410:14 410:16,19 411:8,11 419:18,22 421:5 423:5 428:21 432:14 436:9 440:6 442:24 445:12 445:22 447:3 447:16 449:13 450:3,12 451:2 454:4 455:5,18 455:23 456:2 488:21

**reuters** 635:22 636:9

**revenue** 366:25 367:8,17,19 368:9,20 369:2

379:14 394:23
395:7 398:21
400:17,22
570:5 581:20
585:18 589:21
604:7,8,13
623:25 624:15
624:17 625:3
625:12 626:6
626:23 627:13

**revenues**
378:11 394:11
394:19 557:21
570:8,10
573:14 576:14
577:3,24
604:14

**reversal**  616:20
617:4,14,15,24
618:24 619:7
621:8

**reverse**  618:15
618:16

**revert**  314:15

**review**  374:12
459:13 460:16
460:24 462:11
462:24 463:3
463:23 464:18
466:4 499:6
500:19 501:5
502:15 503:11
535:23 544:13
544:16 561:25

562:16 564:10
639:21

**reviewed**
459:15 465:15
466:9 501:8
506:19

**reviewing**
499:13 502:16
640:11

**revised**  626:25

**revising**  398:5
398:11 400:13

**rexfinance**
499:24 500:10
500:20 501:7
506:15 532:17
532:25 533:11
533:13,17

**rife**  553:20

**right**  302:3,15
312:23 315:12
315:18,20
316:3,6,22
320:11,18
323:12,15,20
330:23 334:14
335:16,20,22
338:16 347:19
348:19,24
350:25 355:6
362:11,23
366:15,16,16
366:22 369:19
372:4,6,7

373:5 375:23
379:19 380:22
381:20 382:17
383:21 385:11
386:9 387:25
388:13 390:6
392:24 396:6,7
401:11,16,20
404:8 405:5,15
411:24 412:2
412:21 414:19
418:25 419:3
419:11,20
422:2 423:8,11
423:24 424:6
425:3,12
428:13,22
430:2 432:7,11
435:19 436:14
436:20 437:5
439:11,21
441:4,23 445:3
445:6,23
447:20 449:12
449:16,20
450:3,9,10,23
451:12 453:8
453:14 458:12
471:5 473:5
474:8,13,18
476:5 477:12
478:9 484:21
487:22 493:2
502:5 503:13

504:7 517:22
519:20 523:22
525:7 527:13
529:22 530:18
535:17 542:22
550:15,23
553:6 558:14
559:12 561:9
561:13 562:25
563:18 564:8
567:10 570:6
572:21 574:21
579:13,19
580:8 581:9,18
584:25 595:10
597:19 598:14
605:14 606:19
607:19 611:9
617:11 624:13
628:10 629:14
629:24 631:21
632:21 634:18
634:22 637:6,9
644:6,16
645:21

**rightfully**
400:8

**rigs**  380:8

**robots**  595:2

**robyn**  593:17

**role**  591:8,8,22
592:17 594:7,8
595:14,14
601:13

**[room - sections]**

**room** 306:9
**roughly** 391:17
391:18 632:23
**rpts** 573:13
**rule** 304:19,24
307:16 606:6
**rules** 301:18
304:15
**run** 347:3
**running** 474:11
489:23 563:3
**runup** 577:13
**rush** 644:22
**rushed** 645:2,9

**s**

**s** 296:1 297:1
298:5 299:1
649:5
**salience** 540:12
540:14 541:16
549:16,20
**salient** 399:22
612:13
**sample** 373:22
410:16,17,19
413:2 419:18
419:22 443:5
446:4 449:9,24
450:3,24 454:4
455:5,19 456:3
**sampling**
459:15

**satisfactory**
436:4
**saw** 425:17
503:23 505:20
512:9 517:20
548:6
**saying** 304:21
304:22 319:22
320:14,19
323:25 335:3
354:2 356:7,7
358:12 364:16
365:18 366:4,7
366:14 372:9
374:10 376:21
392:9 407:16
411:7 414:18
415:7,12,14
416:5 422:23
423:8 424:22
425:11 426:12
427:18 428:23
433:5,5 439:12
444:12 447:17
447:23 449:21
451:12,15
453:13 455:21
463:21 466:21
497:13 510:11
510:13 514:18
537:23 541:5
578:22,23
579:5 580:3
584:18 587:16

592:14 599:24
620:12 638:16
**says** 302:24
338:12 341:17
343:8,21
349:25 356:9
364:6 365:14
377:10 398:9
402:16 406:9
421:2 422:13
462:24,24
484:22 493:21
502:4 507:4,12
507:21 508:11
509:8 526:2
553:19 591:13
598:7,12,14
599:11,15,17
599:22 629:24
630:16 631:8
631:20 632:6
632:11 633:24
642:20
**scale** 298:14
**scales** 370:13
**scenario** 344:7
344:14 345:7
**schlingemann**
298:12
**schultz** 296:19
300:25
**scope** 315:3
**screen** 389:23
559:18

**scroll** 556:6,7
**scrolling**
608:15
**se** 411:6
**search** 459:22
466:16 467:4,5
530:17
**sec** 299:11
483:16 484:10
**second** 304:24
310:11 316:17
337:21 367:2
367:10,22
401:15,24
430:22 438:20
473:5 482:25
484:19 491:21
493:25 505:17
513:25 519:7
553:19 591:7
591:21 592:16
595:13 607:3
615:11 627:9
**seconds** 347:22
**section** 330:8,9
330:13,16,20
331:5,6,12,17
336:21,22
337:16 338:10
339:9 340:7
513:20
**sections** 330:21
334:7 514:16
540:9

**[securities - sentence]**

**securities** 373:7
373:10,16
374:7,19 394:9
394:17 552:22
**see** 303:10
313:3 317:23
317:25 318:17
319:2 328:9
330:21 333:10
333:14 342:2
343:7,13,25
346:22,25,25
349:7 355:4
356:2 364:15
365:16,17
374:2 375:10
375:11 379:9
379:10 390:19
396:10 397:5
398:14 399:6
401:9 402:10
415:14 417:17
424:16 431:13
431:23 438:24
451:2 456:15
459:24 461:16
463:16 470:18
472:11 473:16
473:17 475:22
475:24 476:20
476:24 478:16
479:25 480:6
485:7,19
486:22 491:3

494:6,10 497:6
501:13 505:4
507:3,8,9,12,15
508:2,11,20
515:2 531:8
533:6,25 535:6
539:5 543:21
543:22 548:21
549:2 551:24
552:2,9,12
553:2,3,24
554:2 560:3,3
565:19 581:6
581:10 585:17
596:11 598:3
599:24 604:21
612:6,12,18
613:14,15
614:21 619:7
631:13,13
635:20 640:6
**seeing** 341:25
471:23,24
472:3 475:15
475:20
**seem** 331:4
368:19 369:23
370:3 409:9
412:20 437:10
504:24 573:7
584:4 585:11
589:23 590:5
607:21 631:25
633:5

**seemed** 340:18
379:3 575:9
**seems** 342:11
349:4 354:23
355:10 366:6
366:17 370:11
370:23 391:3
397:23 407:23
414:21 433:13
439:23 448:21
452:13 461:11
461:13,14
478:23 488:18
517:21 522:13
522:18,21
523:2 554:9
598:13
**seen** 373:17
375:14 465:23
501:6
**segment** 626:19
626:20 627:15
627:24,25
**segments**
627:19,23
**select** 459:21
**selectively**
398:24
**seller** 559:12
560:21,22
561:12,15
565:6,13
566:14

**sellers** 548:12
548:25
**semi** 528:21
**send** 303:15
315:19 326:14
474:6,14
477:16 489:20
505:16
**sending** 476:15
644:16
**sense** 321:6
333:15 342:9
342:10 361:12
370:7 373:21
410:9,11 426:4
441:10 493:21
535:8,11 536:3
572:16 590:23
632:5
**sensible** 528:20
**sensitive** 469:9
**sent** 303:21
315:21 316:8
327:13,14
385:21 471:20
474:19 505:22
**sentence** 335:2
341:14 343:7
343:21 346:22
347:2 365:13
366:10 400:13
420:14,24
421:2 422:11
422:13,22

430:23 432:21 438:21 439:13 440:18,19 462:23,24 471:24 472:2,6 485:16,18 486:3 494:6,10 504:4 515:15 515:17 543:2 543:14 552:13 552:15 553:2 553:19,25 554:16 573:23 607:2 616:6 617:25

**sentences** 516:19

**separate** 498:2 592:4

**september** 328:11 516:23

**series** 384:23 409:16

**serve** 640:21

**serves** 638:22 639:7

**service** 600:17

**services** 381:7 382:5 588:14 597:24

**serving** 538:4,7 587:18 588:19 600:14,25 601:11 627:7

**set** 336:24 396:7 421:5 423:4 433:17 508:17 637:6 637:10 639:23

**setting** 516:11 640:13,16

**seven** 348:25 357:10 484:8 491:12,13 622:24 627:2

**several** 325:20 339:9 399:18 452:5 516:19 549:21 577:21 579:8 601:6 639:24

**shanna** 648:2 648:15

**share** 375:10 378:23 379:10 577:13 614:17

**shared** 478:21 479:6 495:9

**shareholders** 364:9 553:23

**shares** 610:4

**sharp** 372:17

**sheet** 649:1

**shift** 381:23 382:4 383:22 585:15

**shifted** 382:16 382:19 399:8

**shifting** 586:14 586:15

**short** 395:4 489:23 548:12 548:25 559:2 559:11,12,14 560:20,21,22 561:11,14 563:4 565:6,13 566:14 637:19

**show** 322:20 335:20 342:3 342:10 358:17 407:19 408:19 442:22 450:21 469:8 612:4 613:7 617:11 618:20

**showing** 320:11 443:3 454:2 489:24 619:5

**shown** 338:17 339:19 343:21 462:3

**shows** 387:8 419:6 566:8

**side** 424:5 552:9

**sides** 407:22

**sift** 578:6

**sifted** 573:5

**sign** 593:19 643:25

**signature** 647:19 648:15

**signed** 622:2

**significance** 339:3,4,10 406:11,20 408:19 416:3 416:12,19,25 417:24 418:8 418:13,24 421:4,10,18,21 422:4,9,17,24 423:4,14 426:19,22 431:11,24 432:19 433:10 440:8,15 442:19,22 444:7,25 449:11 454:10 454:16,20 455:13,16 456:9,12 457:14,18 465:11 469:25 470:7 480:10 480:14 481:2,6 481:15 486:6 486:25 487:7 487:21 488:5 610:19

**significant** 417:6 419:2,7 419:19 425:9

**[significant - speak]**

425:18 431:4 432:6 437:18 438:10 439:14 439:16 451:4,6 468:5,12,19 469:11 476:23 479:19 480:6 483:9,10 485:6 486:18 487:19 488:14 489:7 489:11

**significantly** 473:14

**similar** 360:17 375:5,13 376:4 377:18,25 378:16,20 379:3,15 424:17 426:5 584:19 603:24

**simple** 313:22 321:17 324:17 325:3 334:4 352:6 408:3 409:15 424:3 433:19 599:10 634:4

**simply** 313:15 323:8 330:14 421:5 423:4 425:2 495:23 514:14,19,24

**single** 497:5

**siphoned** 553:22

**sir** 302:3 304:11 329:19 356:25 379:18 396:17 398:15 430:15 493:19 544:22 550:14 629:22 638:9

**sit** 345:3 354:8 372:23 481:10 499:7 610:13 638:7 639:16 640:9

**site** 616:19,23

**sitting** 315:18 637:14

**situation** 558:24

**six** 544:22 550:5

**sizable** 549:20

**sizing** 535:21

**skills** 647:9 648:6

**skimmed** 545:15,18

**skipped** 507:18

**slightly** 534:18

**slow** 519:9

**slower** 395:25

**slowly** 387:25

**software** 510:7

**solely** 451:22

**somebody** 377:9 630:16

**something's** 507:18 530:16

**soon** 508:10

**sooner** 362:6

**sorry** 315:22,23 316:4 318:7 330:9 337:19 337:20 341:7 351:8 358:21 361:14 373:11 382:21 384:15 385:11,13 389:7 390:5,9 393:24 395:25 405:7 411:17 417:20 427:16 427:21,22 429:11,14 430:20 435:8 457:9 458:13 458:21 460:21 463:19 471:16 472:22 474:22 477:6 484:17 485:12,19 490:14 491:9 494:7,16 500:5 501:20 506:24 507:17 519:7 519:21 526:18 533:8 539:13

545:17 547:2 548:23 551:16 552:6 556:13 557:3 558:12 559:18,19 563:5 573:21 580:24 581:8 586:21 591:15 591:15 596:7 597:11 602:6 611:16 615:25 616:2,2 627:10 630:11 641:13

**sort** 359:11 367:25 371:23 384:22 590:24

**sorts** 446:12

**sound** 307:25

**sounds** 347:25 362:4 371:12 388:10 448:13 610:11

**source** 463:17 561:20,21

**sources** 465:14 527:4,8 552:20

**southern** 295:2 300:10

**space** 507:7

**sparse** 614:17

**speak** 324:8 325:7,9,12 373:4 374:20 400:2 429:2

436:23 513:8
530:15 542:3
562:23 566:13
567:8 569:2
572:6 587:7
602:3

**speaking**
412:10 513:8

**speaks** 442:13
524:8 541:3
609:19

**special** 447:2

**specific** 331:9
331:14,19
332:12,18
334:14 335:4
336:5,21,24
338:24 340:17
345:2 372:25
374:22 415:4
438:25 498:6
511:8 513:10
513:13 514:13
514:15 523:8
524:3 525:24
540:8 552:4
566:18,21
571:19 574:14
587:23 616:6
616:16 625:16
625:23 626:3
628:19 640:11

**specifically**
305:25 360:3

371:10 372:20
392:25 412:10
444:15 470:21
493:20

**specificity**
476:3 575:17

**specifics**
374:25

**speculate**
305:16,21
310:2,3 312:6
534:13

**speculating**
312:7

**speculation**
309:20 350:4
351:11 354:16
523:16 534:8

**speculative**
525:2 533:22
641:25 642:21

**spent** 324:25
364:5,11

**sphere** 503:24
521:12 524:7
531:10

**spikes** 386:24

**spoils** 530:3

**spoke** 314:13
538:16

**spoken** 428:24
601:17

**spring** 628:14
630:4,15,17

631:3,12,14,15
631:25 632:6
632:11,14
633:15,21
634:5,13 635:8

**square** 336:12

**staff** 538:19

**stake** 574:25

**stand** 307:18
543:22

**standard**
370:21,22
372:3 406:18
416:24 417:2
419:4 456:14
460:18 461:3
461:15,21,22
462:8,14,15,18
462:20 463:6,8
463:13,20,20
463:22 464:2,6
510:2,20
645:17,18

**standards**
417:17

**standing** 442:3
443:19 451:20
561:8

**stands** 442:23

**start** 306:6
308:5 332:13
332:15 336:24
337:10 338:7
354:21 368:23

375:14 379:4
418:18 420:3
436:15 439:22
441:4 450:8
479:16 480:2
488:12 490:7
490:10 507:13
507:22 521:25
534:16 542:10
545:2 552:12
567:8 631:11

**started** 352:4
639:5

**starting** 331:16
492:6 507:4
508:10

**starts** 355:3
386:23 401:24
516:7 577:16
631:20,24
634:3,6 635:11

**stat** 408:20

**state** 300:17
302:9 309:24
317:13 318:13
319:17 407:25
479:15 480:24
484:17 490:19
491:22 493:12
498:8 508:23
522:22 535:17
565:12 573:10
588:9 608:19
616:14 617:21

**[state - strike]**

626:24 630:22 647:21

**stated** 323:8 337:7 350:21 350:23 351:6 360:16,18 396:8 398:11 427:2 485:24 491:3 498:10 503:17 509:23 511:17 527:3 528:19 532:6 532:11 583:24 585:5 609:12 617:5 624:6 630:9 642:25

**statement** 343:17,19 344:3 383:5 395:5 421:13 421:17 438:2 439:2 448:11 453:10 464:4 480:2 485:7 494:5 498:18 502:4,8,23 515:23,23 523:24 595:25 606:2 626:20

**statements** 331:25 606:12

**states** 295:1 300:10 400:13 506:17 508:5

521:11,11 592:6

**stating** 516:25 528:16 565:5

**statistic** 407:21

**statistical** 339:3,4,10 406:10 407:16 408:10,18 410:4 413:10 413:17,23 415:4,11,17 416:2,12,19,25 417:19,24 418:8,12,23 421:4,9,17,21 422:4,7,8,17,23 423:3,14 424:20,22 425:22,24 426:19,22 431:11,23 432:18 433:10 434:7 435:23 439:11,18 440:8,14 442:13,19,22 443:15 444:7 444:25 454:10 454:16,20 455:12,15 456:9,12 457:14,18,23 460:8,18 461:2

462:13 463:5 463:25 465:11 466:12 469:25 470:7 480:10 480:13 481:2,6 481:15 486:6 486:25 487:7 487:21 488:5

**statistically** 414:11 417:5 419:2,6,19 425:9,18 431:3 432:6 437:17 438:9 439:14 451:4,6 468:4 468:11,19 469:10 479:19 480:5 483:9,10 485:6 486:18 487:19 488:14 489:6,10

**statistics** 458:5 495:14

**stenographic** 301:20

**stick** 476:4

**stipulation** 301:22

**stock** 343:11 344:14 345:9 357:4 377:10 387:2,2,4,15,21 389:15 390:15 390:25 431:2

437:16 438:8 479:20 480:6 521:4 522:9 523:7 525:21 526:14,24 528:3 559:2,6 559:14 560:23 561:2,18 609:14 610:4 611:13,23 612:10,14,17 612:24 614:5 616:20 617:24 619:10,23

**stop** 335:22 560:9

**story** 518:5

**straight** 310:13 313:13 334:21

**straightforward** 324:11 334:14 360:8

**stream** 367:19

**strength** 408:21 432:20 443:2 489:2

**stretch** 307:18

**strict** 536:3

**strictly** 416:2 416:18 434:7

**strike** 368:7 544:5 602:7 615:6

strong 378:19 456:3 466:22 522:13 528:21 565:15,21

structured 566:13

structures 567:23

struggling 437:2,5

students 409:23

studies 446:7,7 540:21 546:9 608:8

study 298:14 298:24 407:9 408:5 410:22 411:3,14,20 433:17 436:25 442:17 453:6 453:13 470:25 480:13,18 481:13 487:17 489:14 490:2

stulz 298:12

sub 339:8

submitted 642:13

subpanel 501:11

subperiod 373:2

subpoena 303:15

subpoint 339:15

subscribed 646:8 649:22

subsections 336:24 338:20

subsequent 539:3,10,18 546:15 616:17 617:4,21 633:15

subset 366:15 366:17

subsidized 503:6

substance 608:4

substantial 379:20,24 380:24

substantially 357:18 388:14

substantive 443:10 539:24

subsumed 384:21

sudden 508:13

sufficient 622:22 642:13

sufficiently 348:8

suggest 358:4 563:8

suggests 355:18 359:4 360:22 484:25 607:4

suite 296:5,13 296:22

summarizing 431:17 432:3 432:21

summary 337:19 440:19 641:22

summer 629:18 629:19 630:8 630:19,24 631:13,16,20 631:23 632:15 632:19,22,23 633:4,4,16 634:18,19 635:11,14

sunlight 590:25 591:3

supply 368:21 403:14

support 363:11 416:20 431:12 442:17 453:17 456:19,25 496:11 497:4 515:22 559:4

supporting 320:24 560:25

supports 496:2 498:21

suppose 410:23 524:17 535:3 542:9 600:10

supposed 465:14 569:3 637:13

supposition 383:18

sure 306:15 311:25 316:18 319:8,9,13,16 325:16 327:17 329:21 331:2 332:22 338:25 348:22 349:24 350:16 351:6 353:18 354:17 361:19 362:12 365:2 367:7 369:16 371:4 376:10 378:14 380:14 383:11 384:10 394:15 397:2 399:25 407:13 413:21 421:14 427:16 429:20 434:18 439:4 447:25 452:8 464:12 472:23 474:4,4 486:8 491:7 492:5 493:18

494:20 501:4
504:17 509:6
514:25 518:24
522:12 533:10
533:22 534:11
550:13 565:2
565:14 568:7
569:18 571:6
573:21 575:16
576:3,8 582:21
583:4 598:11
608:15 610:25
612:2 636:21
**surprised**
565:20
**surrounding**
613:25
**surveyed**
373:22
**swear** 301:8
**switch** 441:14
**switched**
605:14
**switching**
366:23
**sworn** 301:11
302:19 646:8
647:5 649:22
**synthesis**
521:22
**synthesize**
521:14 530:20
**synthesizing**
521:2 523:12

525:10 527:7
530:9 531:19

**t**

**t** 298:5 299:1
407:21 408:20
**t255** 490:3
**table** 330:12,19
331:7,16
332:14,15
335:9 337:20
338:11 340:16
466:17 484:20
484:23 485:10
485:16 486:12
487:6
**tables** 469:24
470:3,5 486:21
**tadayon** 557:14
**take** 307:14,17
316:13 318:4
322:22 332:23
333:21 361:17
396:8 403:23
404:16,22
405:3 429:6
430:17,18
439:3 459:3
492:10,14
517:5 532:20
550:3 553:9
563:19 574:7
592:9 608:16
610:8 616:4

622:18 635:19
636:6,21
639:14 642:9
644:7 645:8
**takeaway**
503:22 504:10
**taken** 300:7
330:24 373:25
570:13,14
617:19 647:3
647:11 648:8
**takes** 623:6
**talk** 332:5,5,6,6
332:8,21
366:24 370:12
370:14 385:12
399:19 402:15
402:19,20
416:23 491:18
538:10 555:6
566:15 571:10
581:24 586:19
624:4 637:4,22
**talked** 331:10
352:18,19
400:15 432:9
485:10 518:8
578:16 587:23
613:24
**talking** 304:25
333:4 352:2,13
356:6 385:8,12
462:22 491:17
505:14 506:16

535:24 548:20
548:22 555:3
592:13 596:18
618:11
**talks** 402:20
503:12 636:13
**tallahassee**
295:15 302:4
302:13
**tangential**
593:12 594:23
**tapes** 441:14
**target** 503:2
508:6 518:2
638:13 639:6
639:12,23
**targets** 638:24
640:14,17
**teach** 409:24
**technical** 367:6
371:24
**technology**
382:19 383:13
383:15
**teeing** 516:20
**tell** 302:19
305:17 315:8
327:17 331:18
334:16 340:14
349:16 353:4,5
353:12 363:19
386:9 387:14
387:20 388:5
389:14 390:24

405:24 417:25
418:8,13
421:10 422:18
454:10,16,20
470:16 471:21
474:6 493:8
547:4 553:7
564:24 591:16
**telling** 337:4
419:15,16
420:4,5 457:15
**ten** 388:17
441:3 445:11
459:19 465:5,9
**tend** 324:8
565:6,16
**tends** 466:24
**teoh** 547:20,23
548:11 549:11
**term** 335:13
**terminology**
463:13
**terms** 308:22
309:19,25
310:4 312:4,16
320:10,21
329:13 331:24
338:18 341:20
341:25 342:12
345:15 346:5
347:3,4 354:17
354:19,25
358:9 360:16
361:7 366:13

368:21 369:19
370:20 375:7
376:23 378:20
382:19 383:22
392:21 394:23
395:6 397:3
399:5 403:12
403:13 404:11
407:15 408:3
409:15 410:25
411:3 412:11
413:13 415:2
415:25 416:10
416:18 419:3
419:11 420:5,6
424:4 425:23
426:24 428:11
428:12,16
432:19 434:7
442:23 444:5
444:25 447:3
452:9 461:17
464:13 467:3
467:17 478:22
481:14 488:17
495:14 509:16
510:9,15
516:20 517:6,9
518:19 525:21
527:14,23
530:22 535:12
535:20 536:12
537:3,9 540:20
548:19 554:11

556:2 561:8
568:8 569:3
570:7 572:9
574:21 578:2
578:23 582:9
584:20,23
587:6 588:25
589:17 606:11
612:10 618:2,4
618:16 619:3,5
620:24 625:8
626:14 629:20
631:7 633:13
638:21 640:16
641:3 642:14
642:17
**terribly** 419:10
577:22 607:22
**tesla** 593:18,23
**test** 408:10
413:10,17,23
414:18 415:5
415:11,17,24
415:25 419:6
419:15 420:4
424:20,22
425:3,4,23,23
434:7 435:20
435:23 436:8
436:11 439:11
439:19 440:11
442:13 443:16
444:2,3,4,6
455:21 457:23

**tested** 407:9
408:4 411:13
411:20
**testified** 302:21
578:17 579:23
**testifying**
633:10 647:5
**testimony**
328:25 329:24
371:14 462:2,5
469:17 481:10
644:12
**testing** 407:16
411:5 417:19
425:24 436:25
**tests** 428:17
432:10 436:2
460:8
**text** 484:22
485:23,25
551:23 552:5
561:11
**thank** 301:7
303:3,9 306:4
308:3 309:13
315:12 316:17
316:20 318:3
319:11 328:23
348:3,22
350:11 362:13
379:18 394:4,5
396:11,17
401:19 402:6
406:5,5 421:15

**[thank - thought]**

426:16 459:5,7
474:5 477:18
479:23,24
491:13 492:17
493:19 494:9
502:14 504:11
505:23 506:8
515:10,10
519:19 532:3
538:10 544:3,3
544:22,25
545:19 550:13
551:13 559:10
563:24 580:10
580:12,18
597:18 607:10
615:18 616:9
623:7,15,17
628:16 635:6
635:15 636:7
636:11 639:17
643:20,21
**thanks**   340:24
348:2 352:22
362:14 494:13
549:8 563:24
**theoretically**
548:19
**theories**   535:24
537:13
**theory**   527:13
530:15 531:6
535:19 540:13

**thesis**   555:2
**thing**   318:19
335:23 336:19
415:6,11,18
457:16 505:14
551:21 588:2
611:8 639:19
**things**   335:25
364:7 398:3
523:22,23
579:25 629:17
**think**   308:20
313:12 314:9
323:18 324:13
325:2 326:8
331:20 334:18
334:19 335:6
337:6 338:24
340:2 344:6,13
345:17 349:7
350:17 355:6
361:13 364:20
364:24,25
368:2 370:10
375:16 378:7,8
378:11,16,21
382:9,24
390:13,18
391:16 396:23
398:22 399:3
400:7,18
403:20 409:23
411:3 414:16
414:24 417:13

420:4 423:7
426:10 435:16
437:12 438:18
438:24 439:2
442:9,11 449:2
449:4 454:24
458:7 460:5
462:2,4 463:9
465:9 475:15
475:17,18
478:18,20
479:3 483:3
486:2 495:11
497:3 500:14
511:12 514:10
515:19 518:4
519:8,13
533:21 534:16
537:21 545:21
547:22 548:17
548:18 549:14
554:3,15,17
556:11 559:22
560:5,23 562:8
563:10,11
566:20 568:20
571:18,20,24
572:6 573:11
574:13,24
575:20 576:18
577:19 579:25
584:22 585:21
585:22 587:4
588:2 589:15

592:19 595:4
596:16,20
599:5 605:13
605:25 606:2
609:4 613:24
615:14 617:5
621:21 622:4
624:4 625:17
626:12,24
628:12 629:6
629:25 630:3,4
630:5,5,15,17
631:6 632:2
635:17 638:21
638:22 639:2,5
640:8 641:4
642:6 643:25
645:16
**thinking**
354:18 463:11
538:20,24
539:2 578:19
625:23 633:23
634:5 640:6
**third**   398:8
404:13 434:3
476:9,14
**thirty**   544:22
**thought**   355:13
380:12 447:5
458:9 485:24
511:15 543:9
543:10 547:3
582:10,12

616:4 632:7 634:17,18
**thoughts** 441:8
**thread** 607:4
**threads** 536:5
**three** 350:24 351:15 459:9 464:15,18,19 466:5 469:18 552:8
**threshold** 406:19 426:21 427:8 428:8,11 428:13,20,25 440:14 443:6 461:13 462:4 466:13,23 480:9 481:5
**thresholds** 421:24 455:10 456:10,14 461:8 467:20 480:19,20 483:13 489:13
**throw** 505:10
**throwing** 445:12
**thrust** 331:4 480:23 545:12
**thursday** 295:12 300:4
**tie** 413:5 433:8 503:9

**tied** 367:22 414:12,19
**time** 295:13 304:25 305:22 305:22 306:23 306:23 307:12 307:16 318:4 325:2 334:3 335:24 371:6 372:21 378:25 391:17 404:4 434:3 441:2 452:8 489:23 495:3 499:13 499:14 502:18 506:20,25 542:13 550:6 550:11 563:4 572:14 573:4 579:13,14 581:14 589:8 611:22 612:6 612:13 613:13 614:17,22 617:17 623:3 628:2 632:8 637:7 640:7 641:6 644:14 645:13,15,16 645:21
**timeline** 490:23 633:14
**timely** 613:9

**times** 349:2 352:13 357:11 442:10 447:6 451:2 452:5 466:19 490:13 490:15,16 560:6
**timestamp** 549:6
**title** 470:22 477:9
**titled** 385:18 483:16 484:9
**today** 303:14 304:10 312:10 315:5 344:21 345:3 346:14 354:8 372:23 392:7,15,21 448:2,3 456:8 468:21 496:24 499:8 577:2 595:18 608:25 610:13 611:2 638:7 639:16 640:9
**today's** 644:11 644:19
**together** 400:24 527:20 527:21 531:12
**tone** 514:11 516:9

**took** 359:25 615:20
**top** 308:5 386:16,17,22 386:23 460:10 489:18 504:19 519:5 532:20 636:14
**topic** 361:16 366:23 403:20 519:25 534:18 553:7,11
**topics** 504:12 504:15,18 538:21
**total** 356:9 357:11 439:9
**totally** 441:11 632:8
**tough** 388:2 390:3,10 446:2
**touted** 502:11 503:19 509:4
**touting** 509:19 510:18 584:19
**towards** 379:8 382:6 585:18
**track** 605:19
**traded** 508:20 546:4 608:21 611:14 614:6
**trading** 343:25
**traditional** 381:23

**[training - trying]**

**training** 458:6 498:6

**transaction** 345:25 346:10 350:6 351:14 356:11 357:12 554:21 555:9 571:21,22 572:15 574:16 575:3 579:7

**transactions** 553:21 554:5 554:12 555:16 569:10,15,24 571:3,10 572:18 574:12 576:17,22 577:8,18 579:21 580:3,7

**transcriber** 648:1

**transcript** 301:13 500:24 501:6,11 502:16 504:8 506:15,20 511:19 512:8 512:22 513:16 513:18,23 514:8 515:7,9 516:10 517:21 518:11 519:14 533:13 644:19 648:3,4

**transcriptionist** 647:7

**transcripts** 500:20 501:5 502:2 504:22 504:24 511:6

**transform** 383:16

**transformation** 380:24 381:16 382:13

**transitioned** 383:2

**translate** 578:3 579:16

**translates** 577:4

**translation** 577:24

**transparent** 589:10

**transposed** 354:15

**trend** 369:18

**triangulate** 335:4 336:20 388:2 446:16 613:19

**trick** 324:7 434:17 628:25

**tricky** 434:13

**tried** 381:9 516:5

**trillion** 593:10

**tripped** 418:16

**trouble** 313:4 414:15 519:22

**true** 308:11 321:2,4 323:12 366:7 370:5 395:8 406:17 417:18 433:2 433:21 434:19 434:19 435:3 435:11 454:15 454:19 504:13 511:20 512:13 512:19,20 524:12 542:18 545:14 546:20 558:5 580:4 582:14 584:25 587:10,12 592:10 600:8 600:11 647:8 648:4

**trust** 338:5

**truth** 302:19,20 302:20 315:10 375:9

**truthfully** 626:3

**try** 305:19 309:3 310:8 337:10 406:8 550:10 563:16 588:6 623:18

**trying** 311:24 312:15 313:13 313:14 315:6,8 320:5 321:9 322:9,19 323:3 323:5,8,24 324:4 325:14 325:15,21 333:17 335:4 335:19 340:12 340:19,22,22 340:23 341:23 351:24 352:12 359:10,22 360:4 377:14 389:19 408:9 409:14 410:4 412:16 413:5 414:17,25 415:15,25 416:18 426:15 431:12 433:8 434:17,18 435:20,22 436:5 437:9,23 439:20 440:17 440:19 442:22 446:5,16 447:8 448:12 449:6 452:12,21 467:17 471:11 501:15 502:2 503:9 509:18 513:6 522:15

**[trying - understand]**

522:16,23
524:5 543:13
552:5 554:22
577:9 589:12
589:13,14
592:2 603:14
605:19 612:4
612:11 613:6
613:19 614:15
618:3,20 619:7
621:8,12
623:20 628:20
628:23,25
629:3 630:14
630:25 633:8
633:10,18
**turn** 307:10
331:12 337:13
338:21 351:19
405:19 534:17
553:5 560:11
593:21 636:17
**turned** 417:21
547:10,14
**tweet** 491:22
493:12,25
495:10,21
496:25 497:5,8
497:17,25
499:2,5,10,14
499:22 500:8
540:3 556:18
556:18,22,22
561:10 577:7

607:3,4
**tweets** 495:11
495:13 499:14
539:3,11,18,22
539:24 540:17
543:5,16
546:15,18
570:14,20
603:13
**twitter** 495:3
496:11,19
498:22
**two** 347:22
379:15 384:16
391:19 392:3
392:11,22
393:3 394:3,4
400:24 407:22
438:16 478:17
484:8 493:21
497:21 501:21
501:22 508:19
533:7 552:8
581:24 585:19
618:22 641:11
**type** 333:23
354:4 571:21
572:14 574:15
575:7,12
**types** 572:17
575:23 576:4
614:19
**typewriting**
647:6

**typically** 325:8
581:13
**typo** 352:24
353:2,4,10,11
353:17,21,22
354:3,4,6,9,20
478:24 547:13
**typos** 353:10

**u**

**uh** 417:22
**ultimately**
579:16
**unable** 513:7
**unclear** 451:5
503:8
**uncomfortable**
362:2 415:22
416:17 424:19
425:21 433:25
435:17 436:6
**under** 301:17
339:8 389:25
391:2 406:18
442:25 483:13
538:3 551:24
**underlined**
590:19
**underlying**
388:10 578:2
579:15
**undermine**
554:23 555:6
577:9 578:12

**undermining**
573:8
**underscore**
509:18 554:22
**understand**
301:12 304:20
304:23 308:5,9
308:17 309:7
309:10,14,25
310:20,25
311:5,21,24
313:6,8,14,25
314:2 322:10
322:12 323:4,8
323:25 325:15
325:17,21,25
326:5,22
328:23 329:5
330:2,15
332:18 337:3
347:14 350:17
351:24,25
357:21 360:20
367:15,21
368:2 371:7,14
376:8,11
377:15 381:5
389:16 396:23
397:9 399:7
411:24 412:6
414:25 415:15
421:4 423:13
424:10 427:17
427:20 434:18

**[understand - vague]** Page 83

435:11 437:24 448:12 452:12 453:10,21 454:13 460:7 467:22 477:7 481:9 494:16 502:3 522:15 543:13 546:3 561:7 573:6 576:9 580:16 582:3 586:13 595:24 596:4,9 596:21 602:2 603:15 610:18 623:20 628:22 628:24 629:4 630:14 631:2 632:8,9 633:19 639:16

**understanding** 309:5,6,12,23 310:17 311:16 312:13 313:5 313:16 366:10 368:14,24 371:13,21 372:13 377:14 382:25 398:17 403:9 414:16 446:7 458:4 464:3 494:23 535:21 541:8 610:12 632:13 634:11 635:7

**understated** 570:10
**understating** 573:15
**understood** 312:20,23 323:7 384:24 386:2 395:19 396:22 400:19 401:7 504:20 545:8 546:11 555:11,12,13 567:24 569:17 580:17 611:10 611:10 633:25 635:3
**undertake** 378:10 529:19
**undertaken** 621:24
**undertaking** 571:20
**underwent** 380:23 381:16 382:13
**undisclosed** 553:21 574:11
**unfair** 390:14
**unfortunately** 346:14
**unfounded** 574:23
**unit** 300:5 362:16,20

395:24 397:18 441:17,21 492:20,24 550:17,21 623:9,13 644:9
**united** 295:1 300:10
**unpack** 323:3
**unrelated** 357:21
**unspecified** 516:14
**unusual** 421:6 423:5
**updates** 490:22 617:10 621:9
**upset** 567:5
**use** 307:13 310:18 374:7 374:18 378:15 382:20 419:12 420:2 453:7 455:10 460:8 461:13 462:8 466:12,24 480:9 481:5 505:9,12 511:5 524:11 550:6 565:14 596:18 635:4
**used** 360:4 373:7,8,15,18 373:20 374:3,4 392:9,11 393:3

399:3 410:21 417:8,12 427:11 428:14 462:19 467:7 486:5 488:11 548:4 569:5 584:12 611:6 639:22
**useful** 595:22
**uses** 301:16 461:8,18 462:3 462:17 463:13 466:20 467:20
**using** 378:14 381:8 416:20 421:24 422:5,6 426:2 442:16 451:8 461:7 464:15 480:20 481:17 489:12 510:6 565:16 594:19
**usually** 370:15 470:5,7 560:13
**utilize** 383:14
**utilizing** 383:12
**utterance** 638:5

| v |
| --- |

**v** 295:6 649:2
**vague** 575:9 576:11 594:15

**valle** 557:7,19
558:4 575:4
603:21 616:11
616:19,22
617:9,22 618:8
619:9,22
620:18 621:3
**valuable**
524:11 525:17
**valuation**
346:12 350:6
350:19 351:14
357:19 358:16
359:12 579:4
589:22
**value** 320:18
339:11 345:23
346:6,8 356:10
357:11 363:15
365:21 366:9
379:11 397:23
406:12,20
407:5,7,21
408:20 423:19
423:25 488:21
490:5 499:17
523:11 524:14
524:23 525:4,9
525:21 526:7
539:11,19
540:5,15,20
541:4,10,19
542:2,4,8
543:6,17

546:16 555:19
556:3 569:11
569:13,24
571:3,11,12,12
571:16,17
572:2,3,18,24
572:25 573:17
574:10,18,19
575:23,24
576:4,5,14,17
576:22 577:4
577:22 578:4
578:25 579:17
579:21,24,25
580:4,7,13,23
581:4 582:7,19
583:13 584:9
587:20 588:20
590:6,12 601:3
601:13 604:3
604:17 611:24
612:3 613:2
616:23 617:16
618:14,23,24
619:2,12,25
620:20 621:9
621:11
**variable** 486:17
**variation**
369:24 370:11
370:24 371:2
371:15,19
372:8

**varied** 394:11
394:19 395:10
395:13
**varies** 431:25
**variety** 575:15
**various** 621:22
**ventures** 589:7
590:10
**veracity** 341:20
**verbatim**
325:19 460:6
469:20 500:24
529:3
**verbiage** 352:3
360:2,3 462:19
514:20 585:21
642:23 643:3
**veritext** 300:14
300:16 649:1
**vernacular**
448:8
**version** 316:16
518:21
**versions** 460:13
**versus** 335:19
345:19 370:10
379:2,5 412:10
412:24 416:19
419:25 421:25
443:10 486:14
487:24 497:5
497:22 578:7
579:9 583:5
613:6 614:14

621:25 628:4
632:22
**vested** 595:5
**viability** 381:10
510:15
**video** 300:5
499:24 500:10
500:21,23
501:7,9 502:8
502:16,20
503:10,12
504:6,8,12
506:15,17
508:5 509:15
511:7 515:12
515:21,25
516:3,7,10,21
519:14 533:12
533:13 559:25
563:19 644:8
645:15
**videoconfere...**
296:3,11,20
297:4,5
**videographer**
297:5 300:2,14
362:15,19
405:10,13
441:3,16,20
492:19,23
550:16,20
563:18,22
623:8,12
643:22 644:3,7

645:14,20
**videotaped**
  295:10
**view**  344:10
  360:15,17
  370:8 371:22
  419:10 498:21
  569:9,22
  570:25 571:7
  571:15 575:22
  580:21 581:2
  582:5,25
  583:23 584:2,4
  584:6,7 585:16
  595:11 600:24
  601:10 605:9
  605:22
**viewed**  495:9
  504:7 541:18
  582:17 624:13
**viewing**  504:5
**views**  346:5
  495:15 559:3
**visibility**
  493:14 494:2
  495:18,22
  496:15,21
  497:13,18
  498:22 499:23
  500:9
**volatile**  369:12
  369:16 370:16
  370:23 372:2,7

**volatility**
  369:25 370:9
  370:10,11,13
  370:15 371:3,3
  371:9,20,25
**volume**  295:11
**volunteering**
  458:11
**vs**  300:8

**w**

**wainwright**
  395:22 396:6
  396:14 397:16
  398:10,19
  400:20
**wait**  315:23
  332:2,2,2,3
  337:18 347:22
**waiting**  506:5
  520:11
**waive**  643:23
**walk**  423:12
**want**  304:14
  305:6,7,12,15
  305:16,21
  310:3 313:24
  316:2 317:10
  322:7 324:19
  325:16 326:10
  326:13 329:21
  332:4,5,6,6,8
  332:10,17
  333:13,18

334:4,6,9
338:6 340:25
342:25 343:6
349:6,10 352:8
353:25 360:20
361:25 362:5
362:24 365:11
366:23 371:25
377:4 383:8
384:9,11,13
385:12 393:20
401:9 404:17
404:18 416:23
423:11 424:2
427:16 430:12
430:17 435:10
442:11 458:17
458:17,19,22
459:3 469:16
471:18,19,20
473:4 487:9,13
491:24 501:18
505:4,9 508:14
509:9 511:24
515:2 518:14
519:16 534:17
545:3,9,10
551:15,22
553:4 560:8
565:23 567:5,6
588:3 591:16
591:17 606:16
607:6 609:10
615:8 625:25

626:5 635:25
644:23 645:2,3
645:10
**wanted**  327:17
  348:14,21
  403:22 406:7
  424:9 478:2
  514:15,19,24
  548:24 549:3
  549:23 553:15
  564:9,25
  567:25 569:6
  599:10 610:17
  614:18 644:22
**wants**  510:10
  594:24 595:2
**waste**  333:23
**wasting**  335:24
**wave**  298:16
**way**  318:12
  340:15 348:14
  351:7 377:15
  377:20,23
  406:10 414:14
  422:21 433:16
  434:4 440:24
  442:18,18
  445:15 452:7
  453:11 470:2,3
  494:25 502:21
  505:9 522:22
  525:6 534:20
  539:22 553:13
  559:9 561:18

566:12 569:17
593:24 624:25
633:9,11
**ways** 394:22
495:5
**we've** 328:5
332:14 353:11
403:20 417:13
417:13 435:16
511:6,20
606:19 627:24
640:20
**wealth** 298:13
**weaves** 516:6
**web** 554:10
607:18,20
608:8
**website** 459:23
495:2,24 497:6
498:4 507:13
507:23 608:7
**weeks** 562:3,19
564:12
**weight** 622:5
**weird** 507:18
**welcome**
307:13 348:5
405:15 420:22
441:23 493:2
550:23
**went** 435:6
459:23 465:8,9
557:25 597:11

**whatever's**
361:20
**wheel** 589:5
**where'd** 633:3
**whoa** 332:2,2
**widely** 373:8
373:17
**wild** 510:4
**wilk** 296:21
300:22
**wilkauslande...**
296:24
**windfalls**
469:10
**winners** 530:4
**wish** 361:21
**withdrawal**
517:10
**withdrawing**
503:4 515:13
516:24
**witness** 301:9
301:11,12
302:18 314:4
327:5,10,15,20
327:24 328:3
344:20 345:14
346:25 347:25
348:18,20
352:12 354:8
359:7,20 361:5
361:13,21
362:4,9,13
363:7,24

369:15 378:4
379:24 380:7
381:4 383:7
385:6 386:11
388:17 403:25
415:21 418:4
418:12 422:21
424:16 426:24
433:4 435:5,16
442:9 443:25
450:20 452:4
453:5 454:24
457:8,13
467:15 470:14
474:22,24
483:3 484:4
492:4,11,16
497:3,20
498:17 500:4
500:14 505:24
506:3,7 512:15
513:3,5 517:19
520:15,17
521:6 522:11
523:15 524:17
525:12,24
526:17 527:2
529:14 530:13
531:6,22
532:11 533:5
533:21 534:7
535:3 536:12
536:21 537:21
538:7 539:13

540:7 541:12
541:15 543:21
544:12 546:2
550:4,13 551:6
551:13 554:8
557:24 560:5
561:5 562:8
566:5 571:6
576:25 580:6
582:9,21
583:15 584:11
587:22 588:23
590:17 591:11
592:19 594:13
595:17 596:25
598:11 599:3
600:10 601:5
601:16 602:17
603:3 604:6
606:10 609:4
612:2 613:5
619:18 620:11
621:7,21
622:20,23
627:22 631:6
642:3 643:21
647:4
**witnesses'**
649:3
**wonderful**
396:17 401:19
574:6 622:24
**wondering**
533:15 547:7

**[wondering - youtube]**                                    Page 87

547:11 557:25
**word**  382:20
  384:2 399:4
  400:7 427:12
  509:3 511:5,25
  512:3 552:10
  594:18 596:19
  596:22
**wording**
  610:20
**words**  325:18
  325:19 359:8
  376:9 402:13
  444:23 448:6
  449:2,3 462:7
  462:9 464:7
  514:22 635:5
  642:21
**work**  329:8
  362:3 458:5
  460:16,25
  461:17,21
  462:12,25
  463:4,24
  465:12 466:17
  467:22,23
  516:13 537:24
  550:12 588:16
  590:20 592:7,8
  592:10 597:9
  598:2,18,24
  599:13,16,19
  599:23 600:3,5
  600:11

**working**  597:2
  598:8,13
  600:20
**works**  362:12
  403:2 404:20
  464:11
**world**  593:25
**worried**  383:17
**worth**  364:19
**worthless**
  559:3 560:24
**would've**
  343:12 344:15
  345:10 346:20
  357:18 395:2
  496:19,20
  546:19 558:25
  582:17 595:21
**writing**  538:13
**written**  301:21
  354:18
**wrong**  383:2
  464:4 523:11
  523:23
**wrongdoing**
  589:17 590:24
**wrote**  543:11
  543:22,23

**x**

**x**  298:1,5 299:1
  334:11 495:3

**y**

**y**  334:11
**yeah**  318:4
  327:16 328:22
  329:20 331:2
  341:9 348:20
  350:22 352:23
  353:3 361:23
  362:10 369:15
  373:12,12
  381:13 385:2
  386:7 388:25
  389:20,21
  390:4,7,7,8
  391:5,13,18
  394:7 396:12
  400:6 401:4,5
  401:13 403:11
  405:4,9 418:7
  423:10 424:8
  426:11 430:15
  439:6 472:11
  473:20 476:19
  483:5 485:12
  487:12 491:16
  501:17 504:10
  505:8 518:24
  519:3,6 541:14
  541:14 548:21
  550:8,9,9
  552:14 553:14
  553:15 557:4
  560:3,15

563:15 607:9
  615:10 622:23
  626:12 627:11
  628:18 630:12
  630:12 632:16
  632:19 634:25
  636:5,5 637:25
  638:16 640:18
  643:2
**year**  629:19
  630:7,18,23
  631:16,22
  632:22 633:16
  633:22 634:2,6
  634:14,22,23
  635:10,12,14
**years**  459:19
  465:5,9 572:10
  577:8,17,21
  579:8
**yep**  337:24
  389:8 402:12
  423:21 550:15
  634:24
**york**  295:2
  296:6,23
  300:11 644:5
  647:21 649:1
**youtube**  500:20
  503:10,11
  532:17 533:11

**[z - z]**

| z | | | |
|---|---|---|---|
| z   300:1 301:1 | 364:1 365:1 | 432:1 433:1 | 500:1 501:1 |
| 302:1 303:1 | 366:1 367:1 | 434:1 435:1 | 502:1 503:1 |
| 304:1 305:1 | 368:1 369:1 | 436:1 437:1 | 504:1 505:1 |
| 306:1 307:1 | 370:1 371:1 | 438:1 439:1 | 506:1 507:1 |
| 308:1 309:1 | 372:1 373:1 | 440:1 441:1 | 508:1 509:1 |
| 310:1 311:1 | 374:1 375:1 | 442:1 443:1 | 510:1 511:1 |
| 312:1 313:1 | 376:1 377:1 | 444:1 445:1 | 512:1 513:1 |
| 314:1 315:1 | 378:1 379:1 | 446:1 447:1 | 514:1 515:1 |
| 316:1 317:1 | 380:1 381:1 | 448:1 449:1 | 516:1 517:1 |
| 318:1 319:1 | 382:1 383:1 | 450:1 451:1 | 518:1 519:1 |
| 320:1 321:1 | 384:1 385:1 | 452:1 453:1 | 520:1 521:1 |
| 322:1 323:1 | 386:1 387:1 | 454:1 455:1 | 522:1 523:1 |
| 324:1 325:1 | 388:1 389:1 | 456:1 457:1 | 524:1 525:1 |
| 326:1 327:1 | 390:1 391:1 | 458:1 459:1 | 526:1 527:1 |
| 328:1 329:1 | 392:1 393:1 | 460:1 461:1 | 528:1 529:1 |
| 330:1 331:1 | 394:1 395:1 | 462:1 463:1 | 530:1 531:1 |
| 332:1 333:1 | 396:1 397:1 | 464:1 465:1 | 532:1 533:1 |
| 334:1,11 335:1 | 398:1 399:1 | 466:1 467:1 | 534:1 535:1 |
| 336:1 337:1 | 400:1 401:1 | 468:1 469:1 | 536:1 537:1 |
| 338:1 339:1 | 402:1 403:1 | 470:1 471:1 | 538:1 539:1 |
| 340:1 341:1 | 404:1 405:1 | 472:1 473:1 | 540:1 541:1 |
| 342:1 343:1 | 406:1 407:1 | 474:1 475:1 | 542:1 543:1 |
| 344:1 345:1 | 408:1 409:1 | 476:1 477:1 | 544:1 545:1 |
| 346:1 347:1 | 410:1 411:1 | 478:1 479:1 | 546:1 547:1 |
| 348:1 349:1 | 412:1 413:1 | 480:1 481:1 | 548:1 549:1 |
| 350:1 351:1 | 414:1 415:1 | 482:1 483:1 | 550:1 551:1 |
| 352:1 353:1 | 416:1 417:1 | 484:1 485:1 | 552:1 553:1 |
| 354:1 355:1 | 418:1 419:1 | 486:1 487:1 | 554:1 555:1 |
| 356:1 357:1 | 420:1 421:1 | 488:1 489:1 | 556:1 557:1 |
| 358:1 359:1 | 422:1 423:1 | 490:1 491:1 | 558:1 559:1 |
| 360:1 361:1 | 424:1 425:1 | 492:1 493:1 | 560:1 561:1 |
| 362:1 363:1 | 426:1 427:1 | 494:1 495:1 | 562:1 563:1 |
| | 428:1 429:1 | 496:1 497:1 | 564:1 565:1 |
| | 430:1 431:1 | 498:1 499:1 | 566:1 567:1 |

**[z - zoom]**

| | |
|---|---|
| 568:1 569:1 | 636:1 637:1 |
| 570:1 571:1 | 638:1 639:1 |
| 572:1 573:1 | 640:1 641:1 |
| 574:1 575:1 | 642:1 643:1 |
| 576:1 577:1 | 644:1 645:1 |
| 578:1 579:1 | 646:1 |
| 580:1 581:1 | **zach**   600:14 |
| 582:1 583:1 | **zachary**   296:19 |
| 584:1 585:1 | 301:2 596:2 |
| 586:1 587:1 | **zahn**   295:10 |
| 588:1 589:1 | 298:8,17 300:6 |
| 590:1 591:1 | 302:12,17 |
| 592:1 593:1 | 430:4 644:12 |
| 594:1 595:1 | 646:5 649:3,21 |
| 596:1 597:1 | **zero**   406:15,25 |
| 598:1 599:1 | 407:11,18,20 |
| 600:1 601:1 | 408:15,23,25 |
| 602:1 603:1 | 409:6 410:14 |
| 604:1 605:1 | 412:4,8,9,14,20 |
| 606:1 607:1 | 413:11 |
| 608:1 609:1 | **zip**   302:6 |
| 610:1 611:1 | **zoom**   474:12 |
| 612:1 613:1 | 563:17 |
| 614:1 615:1 | |
| 616:1 617:1 | |
| 618:1 619:1 | |
| 620:1 621:1 | |
| 622:1 623:1 | |
| 624:1 625:1 | |
| 626:1 627:1 | |
| 628:1 629:1 | |
| 630:1 631:1 | |
| 632:1 633:1 | |
| 634:1 635:1 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.