# EXHIBIT H

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK LEONE, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>ASP ISOTOPES INC., PAUL E. MANN, and HEATHER KIESSLING,<br><br>　　　　　　　　　Defendants. | Case No.  1:24-cv-09253-CM |

EXPERT REPORT OF ZAHN BOZANIC, PH.D.

JUNE 26, 2025

**Table of Contents**

I.      Scope of Report and Opinions ................................................................1

II.     Qualifications ..........................................................................................2

III.    Case Background ....................................................................................4

IV.     Bases for Opinions on Market Efficiency..............................................5

V.      Evaluation of Market Efficiency Factors for ASP Isotopes (ASPI) Common Stock ..........7

        A.    *Cammer* Factor 1: Average Weekly Trading Volume ................................. 9

        B.    *Cammer* Factor 2: Analyst Coverage .......................................................... 10

        C.    *Cammer* Factor 3: Market Makers ............................................................... 13

        D.    *Cammer* Factor 4: SEC Form S-3 Filing Eligibility .................................. 14

        E.    *Cammer* Factor 5: Cause-and-Effect Relationship Between
              Company Information and Stock Prices........................................................ 15

              i.     Event Study Methodology.................................................................. 16

              ii.    Cause and Effect Analysis Comparing ASP Isotopes
                     Common Stock Price Behavior on News Versus No News
                     Days ..................................................................................................... 19

        F.    *Krogman* Factor 1: Market Capitalization .................................................. 22

        G.    *Krogman* Factor 2: Bid-Ask Spread............................................................ 24

        H.    *Krogman* Factor 3: Public Float ................................................................. 25

        I.    Additional Factor: Institutional Ownership................................................. 26

VI.     Ability to Calculate Damages on a Class-Wide Basis.......................................27

        A.    Calculation of Damages for Violation of §§10(b) and 20(a) of the
              Exchange Act ................................................................................................ 27

        B.    Damages Methodology is Flexible and can Incorporate
              Alternative Findings ..................................................................................... 30

VII.     Conclusion ....................................................................................................31

Appendix A ......................................................................................................... A-1

Appendix B .........................................................................................................B-1

Exhibit 1 ..............................................................................................................E-1

Exhibit 2 ..............................................................................................................E-2

Exhibit 3 ..............................................................................................................E-3

Exhibit 4 ..............................................................................................................E-4

Exhibit 5 ..............................................................................................................E-5

Exhibit 6 ..............................................................................................................E-6

Exhibit 7 ..............................................................................................................E-9

Exhibit 8 ............................................................................................................E-10

Exhibit 9 ............................................................................................................E-11

Exhibit 10 ..........................................................................................................E-12

## I.  Scope of Report and Opinions

1.     Plaintiffs' attorneys have asked me to determine whether the market for ASP Isotopes Inc.'s ("ASP Isotopes", "ASPI", or the "Company") common stock ("Common Stock") was efficient during the period September 26, 2024 to November 26, 2024, inclusive (the "Class Period").

2.     Plaintiffs' attorneys have also asked me to opine on whether damages for investors trading in ASPI's Common Stock during the Class Period can be calculated using a common methodology for all Class members that is consistent with Plaintiffs' claims under: (i) §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, the "§10(b) claims"); and (ii) §20(a) of the Exchange Act.[1]

3.     Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the following opinions:

a.  The market for ASPI's Common Stock was efficient throughout the Class Period.

b.  The *Cammer* and *Krogman* factors accepted and applied by courts to assess market efficiency corroborate that ASPI's Common Stock traded in an efficient market.

c.  Though not necessary for a finding of market efficiency, the cause-and-effect relationship between new Company disclosures and resulting Common Stock price movements (which I analyze under the fifth *Cammer* factor) further shows that ASPI's Common Stock traded in an efficient market throughout the Class Period.

d.  Damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for Plaintiffs' pending claims. In particular, the out-of-pocket damages

---

[1] *See* Amended Class Action Complaint for Violations of the Federal Securities Laws, dated May 27, 2025. (Doc. 25) ("Complaint"). I understand Defendants to include ASP Isotopes and Paul Mann (ASP Isotopes' Chief Executive Officer ("CEO")).

methodology, which is used in virtually all §10(b) class action securities cases, is appropriate and applicable here.

4.      The remainder of my report is organized as follows: **Section II** describes my qualifications. **Section III** summarizes the case background. **Section IV** briefly explains the bases for the reliance requirement and the "fraud-on-the-market" theory relating to market efficiency. **Section V** presents my analyses of the market efficiency factors for ASPI's Common Stock during the Class Period. **Section VI** addresses how damages can be calculated on a class-wide basis subject to a common methodology under §10(b) and §20(a). **Section VII** summarizes my conclusions.

## II.  Qualifications

5.      I hold a Ph.D. in Business Administration from the Pennsylvania State University and am a tenured, full Professor of Accounting at Florida State University. I also hold the William Hillison Professorship of Accounting. I teach Ph.D. and Master's-level courses, present my research at universities and conferences both domestic and abroad, deliver guest lectures, participate in academic seminars, attend academic conferences, peer review academic work, organize academic conferences, and conduct research on areas related to accounting, finance, statistics, economics, and law.

6.      My research focuses on topics related to corporate disclosure, debt contracting, financial intermediaries, financial reporting misconduct, regulation, and enforcement. More specifically, my research has examined periodic corporate disclosures (e.g., 10-K's, earnings press releases), earnings guidance, earnings management, earnings manipulation, financial statement irregularities, debt contracts (e.g., private bank loans and public bonds), debt covenants, securitized debt, credit analysts, equity analysts, SEC comment letters, SEC requests for comment, and SEC investigations.

2

7.      I have been engaged in university-level teaching and academic research for over 15 years and continue to publish in peer-reviewed academic journals in accounting, economics, and finance. At the undergraduate level, I have taught courses on financial accounting, investments, valuation, and financial statement analysis. In addition, I have taught data analytics, valuation, and financial statement analysis at the Master's level as well as academic research seminars on empirical research methods in accounting at the doctoral level. I am an Editorial Board member of several peer-reviewed journals, and am an Editor at the International Journal of Accounting.

8.      Before my current roles, I was a tenured, Associate Professor of Accounting and the Director of the Ph.D. Program in Accounting at Florida State University. Prior to then, I was an Assistant Professor of Accounting at the Ohio State University as well as a Research Fellow at The National Center for the Middle Market.

9.      Prior to working for Ohio State, I received my Ph.D. in Business Administration from the Pennsylvania State University. Before my graduate work at Penn State, I was employed by Wells Fargo Bank as a Financial Consultant and Product Manager. I received an M.A. from the University of Michigan and a B.A. from the University of California at Berkeley.

10.      I have published research in leading peer-reviewed journals in the fields of finance, accounting, and economics, including: Journal of Accounting Research, Journal of Accounting and Economics, The Accounting Review, Journal of Business Finance & Accounting, Review of Quantitative Finance and Accounting, and Journal of Financial Reporting. My curriculum vitae, attached as **Appendix A**, further details my publication record. I have presented my academic research at over 50 academic institutions, as listed in my curriculum vitae. I have also received several awards and honors from my peers both nationally and globally related to my research, peer reviewing activities, and doctoral research supervision.

3

11.     The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $900 per hour for my work on this matter. I have been assisted in this matter by staff at Fideres USA Inc. working under my direction. My compensation is in no way contingent on the nature of my opinions or on the outcome of this case. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

12.     My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

### III. Case Background[2]

13.     ASP Isotopes is a small company with limited revenue, that is focused on developing isotope enrichment technologies acquired from a distressed private company based in South Africa.[3] During the Class Period, the Company incurred operating losses and negative cash flows, and did not generate any income from enriching isotopes.[4] Since its inception in 2021, and throughout the Class Period, ASP Isotopes was focused on acquiring and developing intellectual property from Klydon, a struggling isotope separation research and development company.[5] Throughout the Class Period, ASP Isotopes repeatedly touted its ability to commercialize and produce isotopes of various elements, in particular its ability to produce and sell uranium isotopes via its "quantum enrichment" technology.[6]

---

[2] The following overview section summarizes the allegations in the Complaint as context for Plaintiffs' claims. I make no findings or opinions as to these allegations, and the opinions I reach in other sections of this report regarding market efficiency and the calculation of damages are not dependent on any specific allegations summarized herein.

[3] Complaint, ¶¶ 2, 23-24.

[4] *Id*, ¶¶ 33-34.

[5] *Id.*, ¶ 23-24.

[6] *Id.*, ¶¶ 39-46.

4

14.     The Complaint alleges that the Company misled the market regarding its ability to produce and commercialize its uranium enrichment technology during the Class Period.[7] Specifically, the Complaint alleges that Defendants made materially false and/or misleading statements and failed to disclose that the company had never enriched uranium nor even tested its technology on uranium.[8]

15.     The Complaint alleges that the truth was partially revealed to the market on November 26, 2024, when Fuzzy Panda Research published a report revealing issues with ASPI's quantum enrichment technology.[9]

16.     The Complaint also alleges that the truth was fully revealed on November 27, 2024, when ASP Isotopes' CEO Paul Mann disclosed in an interview with a Canaccord Genuity stock analyst that the company had never enriched uranium, nor had it tested its underlying quantum enrichment technology on uranium.[10]

17.     **Exhibit 1** graphs the closing stock price and trading volume for ASPI's Common Stock shares throughout the Class Period.

## IV. Bases for Opinions on Market Efficiency

18.     I understand that, with respect to their claims under §10(b), Plaintiffs assert the "fraud-on-the-market" theory of class-wide reliance, i.e., that all ASP Isotopes shareholders relied on the alleged misrepresentations and omissions through their effect on stock prices in an informationally efficient market.[11]

---

[7] *Id.*, ¶ 3.

[8] *Id.*, ¶ 5.

[9] *Id.,* ¶ 5.

[10] *Id.*, ¶ 5.

[11] *Id.*, ¶ 127.

19.     As courts, including the Supreme Court, have explained, the "fraud-on-the-market" theory of class-wide reliance holds that investors trading securities in an informationally efficient market rely on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price. As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[12]

20.     The Supreme Court reaffirmed the availability of this theory to satisfy §10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[13]

21.     A market is considered informationally efficient when the market price of securities quickly responds to publicly available information.[14] In securities fraud cases, courts have

---

[12] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[13] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[14] *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005). "For purposes of establishing the fraud-on-the-market presumption of reliance, we adopt the prevailing definition of market efficiency, which provides that an efficient market is one in which the market price of the stock fully reflects all publicly available information. By 'fully reflect,' we mean that market price responds so quickly to new information that ordinary investors cannot make trading profits on the basis of such information. This is known as 'informational efficiency.' We reject a second and much broader meaning of 'fully reflect,' known as 'fundamental value efficiency,' which requires

6

endorsed the widely-cited five-factor test laid out in *Cammer v. Bloom* to evaluate whether a market is efficient for the purposes of establishing the presumption of reliance.[15] Courts also accept additional factors for evaluating market efficiency found in another widely cited opinion, *Krogman v. Sterritt*.[16]

22.    Research in accounting, economics, and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency.[17] However, as explained below, it is important to understand that an assessment of market efficiency does not hinge on any single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.[18]

## V.  Evaluation of Market Efficiency Factors for ASP Isotopes (ASPI) Common Stock

23.    I now turn to discuss the *Cammer* and *Krogman* factors and evaluate them in relation to ASPI's Common Stock.[19] To do so, I compare the factors' application to ASPI's Common Stock against: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed, published academic research.

---

that a market respond to information not only quickly but accurately, such that the market price of a stock reflects its fundamental value."

[15] *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989).

[16] *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[17] *See, e.g.*, Villanueva, M. and Feinstein, S., 2021. Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors. *Review of Quantitative Finance and Accounting* 57.

[18] *Id.* at 204-205.

[19] In addition to the *Cammer* and *Krogman* factors, I also note that the Company a) had call and put options traded on the Common Stock, and b) did not have a statistically significant autocorrelation coefficient on abnormal stock returns during the Class Period from my event study described in **Section V.E**. These findings further support my conclusion that ASPI Common Stock traded in an efficient market throughout the Class Period.

24.     As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that ASPI's Common Stock traded in an efficient market throughout the Class Period.

25.     One academic study that I use for comparison purposes was published by Mola, Rau, and Khorana, which I refer to as the "MRK Study."[20] In this study, the authors examined two samples of firms. The first sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[21]

26.     The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock. . . . Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[22]

27.      The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume,

---

[20] Mola, S., Rau, P., and Khorana, A., 2013. Is There Life After the Complete Loss of Analyst Coverage? *The Accounting Review* 88 at 667-705.

[21] MRK Study at 678, 681-682.

[22] MRK Study at 667.

bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[23] Therefore, I interpret the sample of MRK Covered firms as those eliciting high investor interest and reflecting factors common to firms operating in efficient markets.

28.     Below, I compare several of ASPI's market efficiency factors to the samples of firms in the MRK Study to assess whether the Company's characteristics are consistent with firms operating in efficient markets.

### A.  *Cammer* Factor 1: Average Weekly Trading Volume

29.     Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security.[24] Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.[25] The first *Cammer* factor, stock trading volume, has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[26]

---

[23] MRK Study at 681 (footnotes omitted).

[24] *See, e.g.*, Bhole, B., Surana, S. and Torchio, F., 2020. Benchmarking Market Efficiency Indicators for Securities Litigation. *University of Illinois Law Review* at 101-102. (the "Bhole Study"); Thomas, R. and Cotter, J., 2000. Measuring Securities Market Efficiency in the Regulatory Setting. *Law and Contemporary Problems* 63 at p. 108; MRK Study at 681.

[25] *Ibid.*

[26] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg, §8.6).

30.     **Exhibit 2** graphs ASPI's Common Stock weekly trading volume as a fraction of Common Stock outstanding throughout the Class Period.[27] The average weekly trading volume was 40.96% of ASPI's Common Stock outstanding over the Class Period. This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court which would justify a "strong presumption" of efficiency. As a result, ASPI's level of Common Stock trading volume throughout the Class Period supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

31.     Additionally, ASPI's Common Stock daily turnover rate of 8.03% during the Class Period placed it well above the 95th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018.[28] This further supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

### B. *Cammer* Factor 2: Analyst Coverage

32.     An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry. Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.

33.     Analyst coverage can be indicative of market efficiency since research analysts help to disseminate important new company-specific information to investors, thus impounding new information into stock prices quickly and efficiently. The *Cammer* court similarly stated:

---

[27] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[28] Bhole Study at 102. The 95th percentile of daily turnover for the 2016-2018 sample period is 2.95%. The 2016-2018 subsample time period is the most recent period reported in this study.

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[29]

34.     In **Exhibit 3** I reviewed the analyst coverage of ASPI over the Class Period. As the Class Period was only two months, I reviewed the analyst coverage for ASPI for the period spanning one year prior to the start of the Class Period (from September 26, 2023 until November 26, 2024, inclusive, the "Analysis Period").[30] In this period, I identified a total of at least 47 reports issued by analysts at seven separate firms.[31] The list of analyst reports that I was able to identify includes reports by firms that conducted thorough and detailed research on ASPI and the industry within which it operated, such as the reports prepared by analysts at Canaccord Genuity and H.C. Wainwright & Co., among others. Collectively, this degree of analyst coverage served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

35.     This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by Institutional Brokers' Estimate System ("I/B/E/S") received no analyst coverage in a given year.[32] Further, Lee and So documented that, on average, firms were covered by between 0.765 and 7.614

---

[29] *Cammer*, 711 F. Supp. at 1286.

[30] I identified a total of at least 13 reports issued by analysts at five separate firms during the Class Period.

[31] These statistics represent a lower bound of the analyst coverage of ASPI because many analyst reports are provided directly to investors but are not captured by third-party data vendors. *See*, for example, Amiram, D., Bozanic, Z., Bradshaw, M., and Rozenbaum, O., 2025. *Review of Accounting Studies*, forthcoming.

[32] MRK Study at 668.

11

analysts when ranking firms into deciles by the total number of analyst forecasts issued.[33] In other words, many firms within the category of the least amount of analyst coverage in their sample were covered by only one or two analysts. ASPI's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest.

36.     Moreover, ASPI's level of analyst coverage during the Analysis Period placed it between the 50th and 75th percentiles when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[34] This significant level of analyst coverage supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

37.     In addition to the analyst coverage documented above, investors could access information about ASPI from a variety of other sources. For example, I conducted a search of press and news articles about ASPI using Factiva, a well-known provider of access to business news across a comprehensive set of publications. This search produced approximately 61 (174) articles throughout the Class (Analysis) Period, including from prominent and widely distributed sources such as *Dow Jones Newswires*, *GlobeNewswire*, *Reuters*, *Business Wire*, and numerous other outlets.[35]

38.     As a result, the amount of analyst coverage, number of analyst research reports produced, and substantial public dissemination of news and information about ASPI support the

---

[33] Lee, C., and So, E., 2017. Uncovering Expected Returns: Information in Analyst Coverage Proxies. *Journal of Financial Economics* 124 at 336. (*see* Table 1, Panel B – "COV").

[34] Bhole Study at 104 (50th percentile defined as 6.2 analysts; 75th percentile defined as 12.2 analysts.).

[35] The articles were identified through a Factiva search of articles with ASP Isotopes' company tag from all available sources excluding SEC Filings.

conclusion that the Company's Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

### C. *Cammer* Factor 3: Market Makers

39.     The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate the buying and selling of shares among investors in a company's stock during trading hours.[36] Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[37]

40.     In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[38]

---

[36] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[37] Barber, B., Griffin, P., and Lev, B., 1994. The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporate Law* 19 at 291.

[38] *Cammer*, 711 F. Supp. at 1293; *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418 at *6 (N.D. Cal. Dec. 22, 2016) ("The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.").

41.     The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting.

42.     ASPI's Common Stock had at least 65 market makers and brokers providing similar activity over the Class Period, including well known financial firms such as Morgan Stanley, UBS, and JP Morgan.[39] The presence of more than 10 market makers supports the *Cammer* Court's "substantial presumption" of the efficiency of the market for the Company's Common Stock throughout the Class Period.

### D.  *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

43.     The fourth *Cammer* factor is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[40]

44.     Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant

---

[39] *See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact … RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow.").

[40] *Cammer*, 711 F. Supp. at 1287.

has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has a float of at least $75 million, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[41] The rationale behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have timely access to publicly available information about the issuer.

45.     ASPI made all required filings with the SEC in a timely manner during the Class Period and for the previous 12 months, and satisfied the other Form S-3 requirements.[42] During the Class Period, ASPI's float ranged in value from $129 million to $468 million, which was well above the minimum requirement for S-3 registration. Additionally, ASPI submitted a Form S-3 filing during the Class Period.[43] As a result, this factor supports the efficiency of the market for the Company's Common Stock throughout the Class Period.

### E.  *Cammer* Factor 5: Cause-and-Effect Relationship Between Company Information and Stock Prices

46.     The fifth *Cammer* factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information. The *Cammer* court held:

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect

---

[41] *See* SEC Form S-3, available at https://www.sec.gov/files/forms-3.pdf.

[42] *See* SEC EDGAR, ASP Isotopes Inc., *available at* https://www.sec.gov/edgar/search/#/ciks=0001921865&entityName=ASP%2520Isotopes%2520Inc.%2520(ASPI)%2520(CIK%25200001921865). Market capitalization of ASPI's float averaged $280.23 million during the Class Period.

[43] *See* SEC EDGAR, ASP Isotopes Inc., *available at* https://www.sec.gov/Archives/edgar/data/1921865/000147793224006805/aspi_s3mef.htm

15

relationship between company disclosures and resulting movements in stock price.[44]

47.      I summarize my empirical analysis below, which finds that ASPI's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*. I compare the behavior of ASPI's Common Stock on days when company-specific news is issued with its behavior on days when no such news is issued. This analysis demonstrates that ASPI's Common Stock price reacted rapidly to company-specific news and, thus, further supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

### i.      Event Study Methodology

48.      To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study. Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.[45] As Professor Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.
>
> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently

---

[44] *Cammer*, 711 F. Supp. at 1291.

[45] *See* MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature* 13.

16

to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[46]

49.    To determine whether ASPI's Common Stock price movements on any given date are statistically significant, I performed an event study using generally accepted economic methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security, and market and industry indices.

50.    Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily security price movement, which represents the component of the daily security price return that is not attributable to market-wide or industry-wide movements, but rather is attributable to company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (i.e., the "abnormal return") is "statistically significant," i.e., sufficiently large compared to the usual volatility in the company security price return such that simple random movement can be rejected as the cause.

51.    I applied these widely used and generally accepted econometric methodologies to perform my event study here. Specifically, in order to isolate the impact of company-specific news on ASPI's Common Stock price during the Class Period, I performed regression analyses to measure the relationship between the Company's Common Stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in industries similar to ASPI. By modeling how ASPI's Common Stock price returns moved relative to an overall market index and an industry

---

[46] Fama, E., 1991. Efficient Capital Markets: II. *Journal of Finance* 46 at 1607.

index, I was also able to measure the response of the Company's Common Stock to announcements of company-specific news.

52.     As the Class Period was only two months, I conducted my event study regression analysis for the Analysis Period. For each trading day within the Analysis Period, I constructed a regression model using data from the prior six months of trading days (the "Estimation Window").[47]

53.     To study the relationship between ASPI's Common Stock price returns and overall market factors, I used the S&P 1500 Composite Index (the "Market Index"). To study the relationship between ASPI's Common Stock price returns and industry-wide factors that would be expected to impact all stocks in ASPI's industry, I used the Range Nuclear Renaissance Index (the "Industry Index").

54.     I established the relationship between the daily returns of ASPI's Common Stock, the daily returns on the Market Index, and the daily returns on the Industry Index over each rolling Estimation Window.[48] As shown in **Exhibit 4**, the event study model reveals an evolving relationship between the daily returns of ASPI's Common Stock and those of the overall stock

---

[47] I utilized an Estimation Window of 120 trading days, which is approximately six calendar months. This allowed my regression approach to adapt to the changing volatility of stock returns over time. *See, e.g.*, Mitchell, M. and Netter, J., 1994. The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission. *Business Lawyer* 49; MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature* 35 at 15. ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[48] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature* 35; Braun, P., Nelson, D., and Sunier, A., 1995. Good News, Bad News, Volatility, and Betas. *Journal of Finance* 50 at 1597.

market and industry indices throughout the Analysis Period. In other words, movements of the Market and Industry Indices help explain movements in the Company's Common Stock prices.

55.     Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of the Company on any given date within the Analysis Period which control for that day's market and industry returns. Again, in accordance with standard event-study methodology, I then subtracted this predicted return from the actual return to obtain the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

56.     Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in ASPI's Common Stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the regression model. In other words, the standard deviation of errors provides a measure for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of ASPI's Common Stock after controlling for the Market and Industry Indices. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Analysis Period.

### ii.     Cause and Effect Analysis Comparing ASP Isotopes Common Stock Price Behavior on News Versus No News Days

57.     A generally-accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on days when a company releases value relevant news, or "news days", with the stock's behavior on days when relatively little or no news related to the company is released, or "no news days."[49] Showing that there is a statistically significant

---

[49] Ferrillo, P., Dunbar, F., and Tabak, D., 2004. The Less Than Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases, *St. John's Law*

difference in the volatility of a security's price on news days versus no news days indicates that the security responds promptly to news and, therefore, supports a finding of efficiency.

58.     Importantly, research has shown that in an efficient market, it is possible for a security to exhibit some large price movements despite the absence of news and, conversely, for one to observe news without large price movements.[50] For instance, a company may announce earnings that are in line with investor expectations and, while such an expected announcement is clearly important to investors, it will often not alter the total mix of information significantly enough to elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again would result in no statistically significant price movement. Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current level. Accordingly, a generally-accepted, peer-reviewed methodology accepted by numerous courts is to compare stock price behavior on a group of "news days" to stock price behavior on a group of "no news days."

59.     Here, I performed such an analysis comparing the behavior of ASPI's Common Stock on news versus no news days in the Analysis Period. My analysis demonstrates that the price of ASPI's stock was statistically significantly more volatile on news days than on no news days. This result supports the conclusion that there was a "cause and effect relationship between

---

*Review* 78 at 120-21; Miguel O. Villanueva and Steven Feinstein, 2021, Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors, *Review of Quantitative Finance and Accounting* 57.

[50] *See* Boudoukh, J., Feldman, R., Kogan, S. and Richardson, M., 2019. Information, Trading, and Volatility: Evidence from Firm-Specific News. *Review of Financial Studies* 32 at 1004; Fair, R., 2002. Events That Shook the Market. *Journal of Business* 75 at 713-714.

company disclosures and resulting movements in stock price" for ASPI's Common Stock during the Analysis Period and, thus, further supports a finding of market efficiency.

60.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed news related to the development of ASPI's business, such as announcements regarding new security offerings, announcements of strategic partnerships, milestones in plant construction, and milestones in isotope production (the "News Days"). As I explain in **Section III**, during the Class Period the Company made no revenue from isotope production. Consequently, these types of announcements represent a potential opportunity for the public release of new value-relevant Company information to investors.

61.    As shown in **Exhibit 6**, there were 21 News Days in the Analysis Period. I classified each day on which such an announcement was first issued as a "News Day."[51] I then compared the stock returns and trading volume of ASPI's Common Stock on these News Days versus those metrics on trading days that contained the least news during the Analysis Period (the "No News Days").[52] The No News Days provide a benchmark measurement of days in which relatively little or no new ASPI-specific information was provided to the market. If ASPI's stock prices tend to move more significantly on News Days than on No News Days, this would support a conclusion of market efficiency.

62.    **Exhibit 6** reports the results of the event study using ASPI's Common Stock returns on the News Days in the Analysis Period. The columns list the market impact dates, returns, and

---

[51] If the release were issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day.

[52] I identified "No News Days" as days on which there were no: a) updates related to the development of ASPI's business; b) alleged corrective disclosures; c) press releases issued by ASPI; d) news articles on Factiva tagged to ASPI; or e) filings submitted to the SEC by ASPI. I excluded from consideration news articles about trading halts due to volatility and announcements related to shareholder lawsuits.

abnormal returns from my event study, abnormal dollar change in stock price from my event study, the *t*-statistic, the *p*-value corresponding to statistical significance, and a description of the announcement on each date. Overall, 7 out of 21 News Days saw stock price movements that were statistically significant at the 95% level or better during the Analysis Period. I compare this rate with that on the No News Days in the following exhibit.

63.     **Exhibit 7** summarizes the statistical comparison of ASPI's Common Stock returns and trading volume following the 21 News Days versus these metrics as measured on the 189 No News Days. As shown in **Exhibit 7**, 33.33% of the News Days had stock movements that were statistically significant at the 95% level. This compares to 3.17% of the No News Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at the 99% level. In other words, the rate of statistically significant News Days is more than ten times greater than that of the No News Days. These results provide strong evidence of a cause-and-effect relationship between new information and ASPI's Common Stock price movements. Moreover, relative to the No News Days, the News Days had a higher average absolute abnormal returns and greater trading volume.

64.     In summary, relative to No News Days, News Days caused a greater proportion of statistically significant stock price movements at or above the 95% level. This finding establishes a clear cause-and-effect relationship between new company-specific information and ASPI's Common Stock price movements. As a result, this *Cammer* Factor 5 analysis supports the conclusion that the Company's Common Stock traded in an efficient market during the Class Period.

### F.  *Krogman* Factor 1: Market Capitalization

65.     Beyond the five *Cammer* factors, I have also considered several additional factors articulated by the *Krogman* court. The first of these is the total value of stock outstanding, or

22

market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[53] Similarly, the *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[54]

66. Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors – such as relatively small market capitalization – that indicate that their shares trade in less developed and efficient markets. The median market capitalization of the MRK Sample firms was $27.91 million.[55] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[56] This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

67. **Exhibit 8** reports the market capitalization of ASPI's Common Stock throughout the Class Period. This market capitalization averaged $377.2 million over the Class Period. The Company's Common Stock market capitalization places it between the 25th and 50th percentiles of all companies listed on either the NASDAQ and the NYSE from 2016-2018.[57] ASPI's Common Stock market capitalization also exceeded the MRK Sample firms on an inflation-adjusted basis.[58]

---

[53] *Cammer*, 711 F. Supp. at 1287.

[54] *Krogman*, 202 F.R.D. at 478.

[55] MRK Study at 678 (Table 3).

[56] MRK Study at 678 (Table 3).

[57] Bhole Study at 107 (25th percentile of market capitalization defined as $167 million; 50th percentile defined as $781 million).

[58] U.S. Bureau of Labor Statistics, CPI Inflation Calculator. *See* https://www.bls.gov/data/inflation_calculator.htm.

ASPI's number of shares outstanding averaged 68.8 million during the Class Period. ASPI's market capitalization, shares outstanding available for trading, and its float as discussed below, support the conclusion that the Company's Common Stock traded in an efficient market during the Class Period.

## G. *Krogman* Factor 2: Bid-Ask Spread

68.     The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[59]

69.     The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency or as a percentage relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally efficient market. A wider bid-ask spread indicates that investors will pay more to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

70.     I analyzed the bid-ask spread of ASPI's Common Stock during the Class Period. **Exhibit 9** reports the Company's bid-ask spread as a percentage of the bid-ask midpoint.[60] This spread averaged 0.24% over the Class Period.

71.     By way of comparison, the MRK Study found that MRK Sample firms had a median bid-ask spread of 4.55%, while MRK Covered firms had a median bid-ask spread of

---

[59] *Krogman*, 202 F.R.D. at 478.

[60] Calculated as the difference between Bloomberg daily bid and ask prices as a percentage of the bid-ask midpoint.

1.69%.[61] ASPI's daily average bid-ask spread was significantly smaller than both of these values, indicating that investors could trade the Company's Common Stock at very low relative cost. Additionally, ASPI's average bid-ask spread over the Class Period places it between the 50th and 75th percentiles of all companies listed on NASDAQ and the NYSE from 2016-2018 (lower percentile rankings correspond to smaller bid-ask spreads).[62]

72.     As a result, ASPI's bid-ask spread also supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

## H. *Krogman* Factor 3: Public Float

73.     The *Krogman* court also considered the public float of a company in weighing market efficiency.[63] The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

74.     As noted previously, ASPI's Common Stock had a market capitalization averaging $377.2 million and shares outstanding averaging 68.8 million during the Class Period. Furthermore, as can be seen in **Exhibit 10**, ASPI insiders held roughly 32.64% of ASPI's Common Stock during the Class Period.[64] As a result, approximately 67.36% of the Company's Common Stock was held and freely tradeable by outside investors during the Class Period. Hence, the large

---

[61] MRK Study at 678 (Table 3).

[62] Bhole Study at 105 (50th percentile of bid-ask spread defined as 0.14%; 75th percentile defined as 0.75%).

[63] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

[64] Data Source: Bloomberg.

degree of public float for the Company's Common Stock supports the conclusion that ASPI traded in an efficient market throughout the Class Period.

## I.   Additional Factor: Institutional Ownership

75.     I also analyze an additional indicator of market efficiency: the presence of institutional investors.[65] Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

76.     I report the total institutional ownership of ASPI in **Exhibit 10,** which shows that at least 89 institutions held the stock in a given quarter during the Class Period, and at least 128 different institutions held the stock at some point throughout the Class Period, including institutions such as Vanguard, Blackrock, and State Street. By comparison, the MRK Study found that the MRK Sample firms had a median of only 9 institutional investors while the MRK Covered firms had a median of 40 institutional investors.[66] ASPI's institutional ownership base greatly exceeds both of these levels. On average, institutional investors held 43.37% of ASPI's Common Stock outstanding during the Class Period. This level placed it between the 25th and 50th percentile

---

[65] *See*, *e.g.*, *In re Countrywide Fin.l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market."); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

[66] MRK Study at 678 (Table 3).

26

of NYSE and NASDAQ traded companies.[67] Thus, the significant institutional ownership base for ASPI's Common Stock supports the conclusion that ASPI traded in an efficient market throughout the Class Period.

## VI. Ability to Calculate Damages on a Class-Wide Basis

77.     I have also been asked to opine on whether per-share damages for traders of ASPI's Common Stock can be assessed for all Class members based upon a methodology common to all Class members and consistent with Plaintiffs' theories of liability. As discussed below, damages for each of Plaintiffs' claims can be calculated on a class-wide basis through a common methodology.

### A.     Calculation of Damages for Violation of §§10(b) and 20(a) of the Exchange Act

78.     For the §10(b) claims, Plaintiffs allege that the Defendants' materially false and/or misleading statements and/or failures to disclose artificially inflated the market price of ASPI's Common Stock, and caused Class members to purchase ASPI's Common Stock at artificially inflated prices.[68] Plaintiffs also claim Defendant Mann is liable as a control person of ASPI under §20(a).[69]

79.     The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act. This approach calculates investor damages formulaically as the artificial inflation in the stock price at the time of an investor purchase minus the artificial inflation in the stock price at the time of an investor sale. If shares

---

[67] Bhole Study at 106: 25th percentile defined as institutional ownership of 33.58% of shares outstanding; 50th percentile defined as 68.26%. I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[68] Complaint, ¶¶117, 131-133.

[69] *Id.*, ¶¶ 134-137. §20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. 15 U.S.C. §78t(a). Given §20(a)'s derivative nature, I understand that §20(a) damages can be calculated using the same methodology for assessing §10(b) damages.

27

are not sold prior to the full revelation of the fraud, then the difference is relative to the mean trading price during a 90-day lookback period under the Private Securities Litigation Reform Act of 1995 ("PSLRA").[70] This cap on damages is also applied class-wide.

80.     The claims process produces information necessary for the calculation of damages for each Class member as inputs to the formula above, including the purchase and sale information for the Class member's trades (including transaction dates, prices, and quantity of shares traded). This information is available from brokerage statements, trade blotters, and/or other documentation of securities transactions.

81.     Another input to the above formula, the quantification of artificial inflation per share, is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide as an input to the out-of-pocket formula. For example, event studies are widely employed to calculate artificial inflation. Event studies measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged fraudulent schemes and misrepresentations.[71]

82.     To the extent that reliable evidence is introduced to show that a significant portion of the difference in artificial inflation between the purchase and sale of securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of ASPI's

---

[70] The PSLRA states: "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S. Code §78u-4 (codifying language).

[71] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

securities can be determined on a common, class-wide basis using various accepted methodologies. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during discovery and will be based on the specific set of facts and circumstances in a given case.

83.     A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery.

84.     One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal dollar value of stock price decline from an event study around one or more corrective disclosures.

85.     Alternatively, one can measure "constant percentage inflation," which assumes that each share price was inflated by a constant percentage amount above the correct stock price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal percentage return in stock price from an event study around one or more corrective disclosures.

86.     In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculations of artificial inflation and any potential disaggregation of confounding information are based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.

29

87.     All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances.

## B. Damages Methodology is Flexible and can Incorporate Alternative Findings

88.     The damages methodology I have laid out above is flexible and able to incorporate alternative findings of fact regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period. The methodology can be modified based on alternative findings the finder of fact may determine, including, but not limited to any: (1) confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) the first actionable fraudulent conduct or misstatement.

89.     First, irrespective of what the ultimate finder of fact, i.e., the jury, determines is the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information, this percentage can easily be inserted into the standard damages model that I have already described – the out-of-pocket formula. Regardless of how the jury weighs evidence, whether they find that any such disaggregation analysis I may conduct is the most appropriate, or they determine that based upon the evidence, a different amount is more appropriate, this finding can simply be incorporated into the damages calculation.

90.     Second, should the jury determine that the true economic inflation evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a class-wide basis.

91.     Third, should the jury decide that the first actionable misstatement or otherwise actionable fraudulent conduct happened at a date later than September 26, 2024, then inflation could simply be set to zero prior to such date.

92.     If the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

93.     To summarize, I have not been asked to calculate damages in this matter. Such analysis would depend on information produced in discovery and development of the case record. Based on my experience, qualifications, and understanding of the nature of the claims in this matter, I conclude that Common Stock damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

**VII.     Conclusion**

94.     In conclusion, based on my analysis of the market efficiency factors considered by courts and in academia, it is my opinion that ASPI's Common Stock traded in an efficient market throughout the Class Period. Moreover, it is my opinion that damages in this matter under §§10(b) and 20(a) can be calculated on a class-wide basis utilizing a common methodology.

I declare under the penalty of perjury that the foregoing is true and correct.


Respectfully Submitted,


Zahn Bozanic, Ph.D.

31

**Appendix A**

# ZAHN BOZANIC

Florida State University
College of Business
821 Academic Way, RBA 522
Tallahassee, FL 32306

Telephone:  (850) 645-1521
E-mail:  zahn.bozanic@fsu.edu
URL:  business.fsu.edu/person/zahn-bozanic

---

## ACADEMIC INTERESTS

**Research**:  My primary research interests are in the areas of corporate disclosure, financial reporting misconduct, regulation, and enforcement.

**Teaching**:  I teach financial statement analysis (MAcc level) with an emphasis on data analytics and an accounting seminar (PhD level) which focuses on empirical research methods.

## EDUCATION

**Ph.D.**, The Pennsylvania State University

**M.A.**, The University of Michigan – Ann Arbor

**B.A.**, The University of California – Berkeley

## ACADEMIC EXPERIENCE

**Full Professor, Florida State University** (2023-present)
**William Hillison Professor of Accounting**
Introduction to Accounting Research Seminar – PhD Level
Financial Statement Analysis with Data Analytics – MAcc Level

**Director of the PhD Program in Accounting** (2019-2023)

**Associate Professor, Florida State University** (2019-2023)

**Assistant Professor, The Ohio State University** (2012-2019)
Financial Statement Analysis with Data Analytics – MAcc, MBA, and SMF Levels
Financial Statement Analysis – Undergraduate Level

**Research Fellow, The National Center for the Middle Market** (2012-2016)

**Instructor, The Pennsylvania State University** (2008-2009)
Intermediate Financial Accounting
Introduction to Financial and Managerial Accounting

## PUBLICATIONS

19. "**The Regulatory Observer Effect: Evidence from SEC Investigations**" with Terrence Blackburne, Bret Johnson, and Darren Roulstone. *Review of Accounting Studies*, forthcoming.

18. "**Selective Information Channels for Investment Research**" with Dan Amiram, Mark Bradshaw, and Oded Rozenbaum. *Review of Accounting Studies*, forthcoming.

17. "**Managing Expectations through Budgetary Slack: Evidence from Project Financing**" with Andrew Ferguson and Gabriel Pündrich. *European Accounting Review*, 2024, Vol. 33(4), 1603-1638.

16. "**Qualitative Disclosure and Credit Analysts' Soft Rating Adjustments**" with Pepa Kraft and Andrea Tillet. *European Accounting Review*, 2023, Vol. 32(4), 779-807. [Lead Article]

15. "**Have SFAS 166 and SFAS 167 Improved the Financial Reporting for Securitizations?**" with Minkwan Ahn, Sam Bonsall, Yiwei Dou, Gordon Richardson, and Dushyant Vyas. *Journal of Business Finance & Accounting*, 2020, Vol. 47(7-8), 821-857. [Lead Article]

14. "**Analyst Contrarianism**" with Jing Chen and Michael Jung. *Journal of Financial Reporting*, 2019, Vol. 4(2), 61-88.

13. "**Securities Law Expertise and Corporate Disclosure**" with Preeti Choudhary and Ken Merkley. *The Accounting Review*, 2019, Vol. 94(4), 141-172.

12. "**Financial Reporting Fraud and Other Forms of Misconduct: A Multidisciplinary Review of the Literature**" with Dan Amiram, James Cox, Quentin Dupont, Jon Karpoff, and Richard Sloan. *Review of Accounting Studies*, 2018, Vol. 23(2), 732-783.

*Ranked Top 10 by RAST for both downloads and citations*

11. "**Corporate Loan Securitization and the Standardization of Financial Covenants**" with Maria Loumioti and Florin Vasvari. *Journal of Accounting Research*, 2018, Vol. 56(1), 45-83.

10. "**Soft Information in Loan Agreements**" with Lin Cheng and Tzachi Zach. *Journal of Accounting, Auditing and Finance*, 2018, Vol. 33(1), 40-71.

9. "**Management Earnings Forecasts and Other Forward-Looking Statements**" with Darren Roulstone and Andy Van Buskirk. *Journal of Accounting and Economics*, 2018, Vol. 65(1), 1-20. [Lead Article]

8. "**SEC Comment Letters and Firm Disclosure**" with J. Richard Dietrich and Bret Johnson. *Journal of Accounting and Public Policy*, 2017, Vol. 36(5), 337-357.

7. "**IRS Attention**" with Jeff Hoopes, Jake Thornock, and Brady Williams. *Journal of Accounting Research*, 2017, Vol. 55(1), 79-114. [Data]

6. "**The *Ex-Ante* Monitoring Role of Accounting Covenants in Public Debt**" *Journal of Business Finance & Accounting*, 2016, Vol. 43(7), 803-829. [Lead Article]

5. "**Financial Statement Errors: Evidence from the Distributional Properties of Financial Statement Numbers**" with Dan Amiram and Ethan Rouen. *Review of Accounting Studies*, 2015, Vol. 20(4), 1540-1593. [Data]

*Winner of the Deloitte Foundation Wildman Medal Award and FARS Mid-Year Meeting Best Paper Award; Featured in Audit Analytics' Accounting Quality and Risk Matrix (AQRM) and Bloomberg Terminal's AQRM App*

A-2

4. "**Qualitative Disclosure and Changes in Sell-Side Financial Analysts' Information Environment**" with Maya Thevenot. *Contemporary Accounting Research*, 2015, Vol. 32(4), 1595-1616.

3. "**What Do Management Earnings Forecasts Convey About the Macroeconomy?**" with Sam Bonsall and Paul Fischer. *Journal of Accounting Research*, 2013, Vol. 51(2), 225-266. [Lead Article]

2. "**The Social Constitution of Regulation:  The Endogenization of Insider Trading Laws**" with Mark Dirsmith and Steve Huddart. *Accounting, Organizations, and Society*, 2012, Vol. 37(7), 461-481.

1. "**Managerial Motivation and Timing of Open Market Share Repurchases**" *Review of Quantitative Finance and Accounting*, 2010, Vol. 34(4), 517-531.

## WORKING PAPERS

6. "**(Unwanted) SEC Attention and Voluntary Disclosure**" with Andrea Down and Chris Williams

5. "**Processing Customer News: The Role of Media Coverage**" with Bruce Billings, Alyssa Moore, and Spencer Pierce (*TAR*, *Revise and Resubmit*)

4. "**Systemic Risk and Bank Disclosure**" with Christina Synn and Chris Williams

3. "**The Relative Persistence of Earnings Components**" with Paul Fischer and Gabriel Pündrich

2. "**Not All Critical Audit Matters (CAM) Are the Same: Anti-Herding Behavior in CAM Disclosures**" with Will Anding and Allen Blay (*JBFA*, *Revise and Resubmit*)

1. "**On the Role of *Jour-Analysts* in Capital Market Information Intermediation**" with Minkwan Ahn, Francine McKenna, and Maya Thevenot.

## PROFESSIONAL EXPERIENCE

**Wells Fargo Bank**                                                                                              2004-2005

*Financial Consultant* - Internal consultant to retail banking segment which focused on distribution planning.  Maintained financial models and databases; conducted ad-hoc research projects to measure the profitability of various strategies pre- and post-implementation.

*Product Manager* - Managed several retail products which generated annual fee revenues in excess of $80MM. Responsible for establishing strategic marketing programs for product enhancement and new products including identification of market segments, product positioning, pricing and profitability.

**Linsco / Private Ledger (LPL) Brokerage**                                                      2003-2004

*Investment Advisor* - Solidified relationships with client base through full-service financial planning; managed back office financial operations, including cultivation of broker/dealer and wholesaler relationships.

**The William Davidson Institute**                                                                     2001-2003

*Center Administrator* - Responsible for establishing, implementing, and streamlining the data center's operations. Collected, archived, and disseminated data on transition and emerging market economies.

**Tozzi Financial Research and Trading Center**                                    2002-2003

*Programmer Analyst* - Maintained the trading room's daily activities, assisted users with their financial data/modeling needs, and trained users on a variety of valuation and risk management software platforms.

## INVITED PRESENTATIONS

INSEAD (2024)
HEC Paris (2024)
University of Cyprus (2024)
Virginia Tech (2023)
University of Arizona (2023)
Tokyo Keizai University (2023)
Kobe University (2023)
University of Buffalo (2023)
University of Pittsburgh (2022)
University of Memphis (2022)
University of Florida (2022)
Iowa State University (2022)
Vanderbilt University (2021)
The Pennsylvania State University (2020)
The University of Rochester (2018)
London School of Economics (2018)
IESE Business School (2018)
Florida State University (2018)
West Virginia University (2018)
University of Louisville (2018)
William & Mary (2018)
Texas A&M University (2017)
Rice University (2017)
University of Missouri (2017)
University of Florida (2017)
University of Illinois (2017)
GWU Cherry Blossom Conference (2017)
University of Notre Dame (2016)
Columbia Business School (2016)

University of Toronto (2016)
Tilburg University (2016)
ESMT (2016)
FARS Mid-Year Meeting (2011-2015)
Georgetown University (2015)
Utah Winter Accounting Conference (2015)
The University of California - Berkeley (2014)
The Securities and Exchange Commission (2014)
Florida Atlantic University (2014)
Singapore Management University (2014)
Nanyang Technological University (2014)
Dartmouth College (2014)
Syracuse University (2014)
CFEA (2010-2011, 2013-2014)
HKUST Accounting Symposium (2013)
CUNY - Baruch (2013)
The University of Texas - Austin (2013)
The University of California - Irvine (2012)
The University of Miami (2012)
The University of Michigan (2012)
*Journal of Accounting Research* Conference (2012)
Carnegie Mellon University (2011)
Cornell University (2011)
The Ohio State University (2011)
Purdue University (2011)
The University of Utah (2011)
Washington University (2011)
Midwest Accounting Conference (2010)

## CONFERENCES

*Contemporary Accounting Research* Conference (2012-2013, 2015, 2020-2024)
*Review of Accounting Studies* Conference (2015, 2017-2018, 2020-2023)
Rotman Accounting Research Conference (2023)
FARS Mid-Year Meeting (2011-2018, 2023)
LBS Private Equity Symposium (2022)
USC Emerging Tech in Accounting Conference (2022)
Deloitte Foundation Faculty Consortium (2022)
FSU SunTrust Beach Conference (2022)

AAA Audit Mid-Year Meeting (2022)
Tilburg Accounting Winter Camp (2020-2021)
*European Accounting Review* Conference (2020-2021), discussant
Florida Accounting Symposium (2021)
CAFR Fundamental Analysis Symposium (2020)
KPMG Ph.D. Project ADSA Conference (2020), panelist
Accounting Horizons Data Analytics Conference (2019)
KPMG Faculty Symposium (2019)
LBS Accounting Symposium (2017, 2018)
Harvard Business School IMO Conference (2018)
Penn State Accounting Research Conference (2007-2011, 2014, 2018)
AAA Annual Meeting (2014, 2017)
*Accounting, Organizations, and Society* Conference (2017)
BYU Accounting Research Symposium (2017)
EAA Annual Congress (2017)
NYU Accounting Summer Camp (2014, 2016)
Minnesota Empirical Conference (2012, 2015-2016)
Utah Winter Accounting Conference (2013, 2014, 2016)
Colorado Summer Accounting Research Conference (2015)
CARE Conference (2010, 2012-2013)
FASB/IASB Financial Reporting Issues Conference (2012)
Conference on Financial Economics & Accounting (2012)
JAR – NY FED Conference (2012)
AAA New Faculty Consortium (2012)
AAA Annual Meeting (2010), moderator and discussant
FARS Mid-Year Meeting (2010), doctoral consortium
CFRM Conference on Financial Reporting (2009)
Conference on Empirical Legal Studies (2009)
AAA Annual Meeting (2009), discussant

## EXTERNAL SERVICE ACTIVITIES

Hawaii Accounting Research Conference (HARC), Editorial Committee and Track Chair (2023-2026)
Conference on Financial Economics and Accounting (CFEA), Program Committee (2024-2025)
Deloitte Foundation Wildman Medal Award Committee (2024)
Research Grants Council of Hong Kong, Advisory Committee Member (2020-2022)
EAA Annual Congress, Scientific Committee Member (2020-2021)
FARS Nominating Committee (2018-2019)
COSO/ACFE Fraud Risk Management Guide, Advisory Panel Member and Contributor (2016)
CARE Conference Co-Organizer (2016)
FARS Mid-Year Meeting, Editorial Committee and Track Chair (2015)

### Editorial Boards
*The Accounting Review*
*European Accounting Review*
*Journal of Business Finance & Accounting*
*Journal of Accounting & Public Policy*
*The International Journal of Accounting* (Editor)

**Ad-hoc Journal Referee**

*Journal of Accounting Research*

*Journal of Accounting and Economics*

*The Accounting Review*

*Review of Accounting Studies*

*Contemporary Accounting Research*

*Management Science*

*Accounting, Organizations and Society*

*Journal of Management Accounting Research*

*Journal of Financial Reporting*

*European Accounting Review*

*Accounting Horizons*

*Journal of Accounting Literature*

*Journal of Business Finance & Accounting*

*Journal of Economic Behavior & Organization*

*Journal of Accounting, Auditing and Finance*

*Journal of Accounting and Public Policy*

*The International Journal of Accounting*

*Journal of Corporate Finance*

*Journal of Empirical Finance*

*Regulation and Governance*

*Quarterly Journal of Finance and Accounting*

*Journal of International Business Studies*

*Pacific-Basin Finance Journal*

*Abacus*

**Ad-hoc Conference Referee**

Hawaii Accounting Research Conference (2022)

FARS Mid-Year Meeting (2011-2014, 2016-2017, 2019, 2021-2023)

AAA Annual Meeting (2013)

AAA Ohio Regional Meeting (2012)

## INTERNAL SERVICE ACTIVITIES

**Florida State**

Florida Accounting Symposium Committee

Strategic Planning Committee

Faculty Evaluation Committee

Accounting Doctoral Program Committee

Research Funding Committee

Professional Development Seminar Co-Coordinator (2020-2022)

Recruiting Committee (2019-2023)

Accounting PhD Program Director (2019-2023)

Doctoral Program Policy Committee (2019-2023)

PhD Student Dissertation Committees

    Will Anding, 2025 (Member, Initial Placement: University of Texas - San Antonio)

    Andrea Tillet, 2022 (Chair, Initial Placement: University of Wisconsin - Madison)

**Ohio State**

Faculty Senate

Recruiting Committee

PhD Program Committee

MAcc Program Committee

KPMG MAcc Data Analytics Initiative

MIS Program Committee

Accounting MBA Program Committee

PhD Student Dissertation Committees

    Danyang Jiang, 2019 (Member, Initial Placement: University of Intl. Business and Economics)

    Aaron Nelson, 2018 (Member, Initial Placement: University of Georgia)

    Bret Johnson, 2015 (Member, Initial Placement: George Mason University)

Burns Research Colloquium Coordinator

PhD Student Pre-Colloquium Coordinator
Summer Brown Bag Workshop Coordinator
Graduate Faculty Representative
Graduate Studies Committee

## ACADEMIC AWARDS & HONORS

FARS Best Dissertation Supervision Award
EAR Excellence in Reviewing Recognition
William Hillison Professorship
Faculty Leadership Development Program
Deloitte Foundation Wildman Medal Award
FARS Mid-Year Meeting Best Paper Award
The National Center for the Middle Market Research Fellowship
Ossian R. MacKenzie Doctoral Teaching Award
Smeal Competitive Dissertation Award
G. Kenneth Nelson Scholarship
Smeal Doctoral Research Grant
Jane O. Burns Graduate Scholarship
Center for the Study of Finance Graduate Fellowship

## MEDIA MENTIONS

"ExxonMobil, Impairments, and the SEC" – Audit Analytics, January 2021

"Corporate Loan Securitization and the Standardization of Financial Covenants" – Columbia Law
    School Blue Sky Blog, June 2018

"Using Benford's Law to Assess Financial Reporting Quality" – Columbia Law School Blue Sky Blog,
    February 2016

"The SEC Never Reads 74% of Filings, Putting Investors at Risk" – Marketwatch.com, October 2015

"On the Role of Companies' External Securities Law Advisors – Facilitators or Gatekeepers?"
    – Columbia Law School Blue Sky Blog, October 2015

"Accountants Increasingly Use Data Analysis to Catch Fraud" – Wall Street Journal, December 2014

"IRS Pays Attention to Corporate Filings, Study Shows" – Compliance Week, November 2014

"IRS Scanning 10-Ks for Tax Data, Report Finds" – CFO.com, November 2014

"A New Tool to Detect Financial Reporting Irregularities"
    – The Harvard Law School Forum on Corporate Governance and Financial Regulation, July 2014

"The Simple Mathematical Law That Financial Fraudsters Can't Beat" – Forbes, May 2014

"Financial Fraud Detection Now as Simple as 1, 2, 3" – PR Newswire, May 2014

"The Search for Suspect Accounting" – CFO.com, April 2014

"Earnings Bode Ill for Stocks" – Wall Street Journal, June 2012

## POLICY MENTIONS

U.S. Supreme Court Amicus Brief, *Goldman Sachs Group, Inc., et al., Petitioners v. Arksansas Teacher Retirement System, et al.*, March 2021

Comment to the SEC re Concept Release on Regulation S-K Disclosures by U.S. Senate Permanent Subcommittee on Investigations, July 2016

Capital Unbound: Remarks at the Cato Summit on Financial Regulation by SEC Commissioner Michael S. Piwowar, June 2015

## IMPACT METRICS

SSRN Downloads: ~**13,700** (**~1000** per downloadable paper)

Google Scholar (BYU) Citations: **2,374** (**2,169**)

h-index (i10-index): **16** (**18**)

## OUTSIDE ACTIVITIES

### Economic Litigation Consulting

I provide economic litigation consulting and support on cases related to financial reporting misconduct, including, but not limited to, misleading corporate disclosures, accounting fraud, and insider trading.

### Expert Witness Experience

*In re Verrica Pharmaceuticals Inc. Securities Litigation*, Case No. 2:22-cv-02226-MSG. Report June 2025.

*In re CleanSpark Inc. Securities Litigation*, Case No. 1:21-cv-511 (LAP). Report January 2025; Deposition February 2025; Report May 2025.

*In re Freshworks Inc. Securities Litigation*, Case No. 3:22-cv-06750-CRB. Report March 2025; Report April 2025.

*In re Teleperformance SE Securities Litigation*, Case No. 23-24580-CIV-ALTONAGA/REID (S.D. FL). Report November 2024; Deposition December 2024.

## PERSONAL INTERESTS

Running, Yoga, Swimming, Weightlifting, Tennis

## LINKS

BYU Rankings   Google Scholar   SSRN

## Appendix B

### Documents Considered

**Court Documents:**

- Amended Class Action Complaint for Violations of the Federal Securities Laws, dated May 27, 2025 (Doc. 25).

**Court Decisions and Securities Law:**

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

- *Cammer v. Bloom*, 711 F. Supp. 1264, 1286, 1287, 1291, 1292, 1293 (D.N.J. 1989).

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

- *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D. Cal. 2016).

- *In re Countrywide Fin.l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009).

- *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009).

- *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005).

- *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

- *Krogman v. Sterritt*, 202 F.R.D. 467, 477, 478 (N.D. Tex. 2001).

- Private Securities Litigation Reform Act of 1995, December 1995.

**Academic Literature:**

- Amiram, D., Bozanic, Z., Bradshaw, M., and Rozenbaum, O., 2025. *Review of Accounting Studies*, forthcoming.

- Barber, B., Griffin, P., and Lev, B., 1994. The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporate Law*

- Bhole, B., Surana, S. and Torchio, F., 2020. Benchmarking Market Efficiency Indicators for Securities Litigation. *University of Illinois Law Review*

- Boudoukh, J., Feldman, R., Kogan, S., and Richardson, M., 2019. Information, Trading, and Volatility: Evidence from Firm-Specific News. *Review of Financial Studies*

- Braun, P., Nelson, D., and Sunier, A., 1995. Good News, Bad News, Volatility, and Betas. *Journal of Finance*

- Fair, R., 2002. Events That Shook the Market. *Journal of Business*

- Fama, E., 1991. Efficient Capital Markets: II. *Journal of Finance*

- Ferrillo, P., Dunbar, F., and Tabak, D., 2004. The Less Than Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases, *St. John's Law Review*

- Lee, C. and So, E., 2017. Uncovering Expected Returns: Information in Analyst Coverage Proxies. *Journal of Financial Economics*

- MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature*

- Mitchell, M. and Netter, J., 1994. The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission. *The Business Lawyer*

- Mola, S., Rau. P., and Khorana, A., 2013. Is There Life After the Complete Loss of Analyst Coverage? *The Accounting Review*

- Thomas, R. and Cotter, J., 2000. Measuring Securities Market Efficiency in the Regulatory Setting. *Law and Contemporary Problems*

- Villanueva, M. and Feinstein, S., 2021. Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors. *Review of Quantitative Finance and Accounting*

**Data Sources:**

- Bloomberg Terminal

- Factiva

- Investext

- S&P Capital IQ

- SEC Edgar

**Other:**

- https://www.bls.gov

- https://www.investor.gov

- https://www.sec.gov

- All data and documents cited throughout this report

**Exhibit 1**



ASPI Common Stock Closing Price and Trading Volume
September 26, 2024 – November 26, 2024

*Data source*: Bloomberg.

E-1

**Exhibit 2**



ASPI Common Stock Weekly Trading Volume
September 26, 2024 - November 26, 2024

Average Weekly Trading Volume over the Class Period: 40.96%

— Weekly Volume as % of Shares Outstanding      - - Average Weekly Volume as % of Shares Outstanding

Note: Average weekly trading volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period. As the last week of the Class Period consists of only four trading days, the volume figure for this week is scaled by 5/4.

*Data sources*: Bloomberg, SEC Edgar.

**Exhibit 3**

**ASPI Analyst Coverage**
**September 26, 2023 – November 26, 2024**

| Analyst Name | Reports Issued During the Analysis Period |
|---|:---:|
| Canaccord Genuity | 5 |
| BuySellSignals Research | 23 |
| Sadif Analytics Prime | 8 |
| PriceTarget Research | 2 |
| ValuEngine, Inc | 4 |
| H.C. Wainwright & Co., LLC | 4 |
| Baptista Research | 1 |
| **Total** | **47** |

*Data Sources*: Investext

**Exhibit 4**



ASPI Coefficients from Rolling Event Study Regressions
September 26, 2023 - November 26, 2024

Sep 26, 2024:
Start of Class Period

S&P 1500 Composite Index — Range Nuclear Renaissance Index

Notes: Regression models described in notes below **Exhibit 7**.

*Data Sources*: Bloomberg, SEC Edgar, Factiva, S&P Capital IQ.

**Exhibit 5**



ASPI Root Mean Squared Error (RMSE) from Rolling Event Study Regression
September 26, 2023 - November 26, 2024

Case 1:24-cv-09215-LAP   Document 39-18   Filed 06/27/25   Page 51 of 58

Notes: Regression models described in notes below **Exhibit 7**.

*Data Sources*: Bloomberg, SEC Edgar, Factiva, S&P Capital IQ.

**Exhibit 6**

Case 1:24-cv-05213-LAP Document 39-18 Filed 06/27/25 Page 53 of 58

### ASPI News Days and Common Stock Abnormal Returns during the Analysis Period

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | t-Statistic | p-Value | Headline |
|---|---|---|---|---|---|---|---|
| [1] | Sep 28, 2023 | -0.97% | -0.56% | -$0.01 | -0.069 | 0.945 | ASP Isotopes Inc. Enters Into Memorandum of Understanding With a Small Modular Reactor Company To Supply High Assay Low Enriched Uranium (HALEU) |
| [2] | Oct 03, 2023 | -1.16% | -3.23% | -$0.03 | -0.400 | 0.690 | Asp Isotopes Inc Announces Plans To Use Cash Flow To Start Construction Of Additional Plants In 2024 For Other Isotopes |
| [3] | Oct 09, 2023 | 15.88% | 16.29% | $0.16 | 2.024 | 0.045 | ASP Isotopes Announces Private Placement of Approximately $8 Million Shares of Common Stock, Priced "At the Market" Under NASDAQ Rules |
| [4] | Oct 30, 2023 | 5.88% | 5.70% | $0.06 | 0.715 | 0.476 | ASP Isotopes Inc. Enters Strategic Relationship With PET Labs Pharmaceuticals for the Distribution of Medical Isotopes |
| [5] | Nov 27, 2023 | 8.56% | 7.25% | $0.14 | 0.979 | 0.329 | ASP Isotopes Inc. Enters Into Memorandum of Understanding (MOU) With Second US-based Small Modular Reactor (SMR) Company To Supply High Assay Low Enriched Uranium (HALEU) |
| [6] | Feb 20, 2024 | 3.17% | 2.79% | $0.08 | 0.515 | 0.607 | 1) ASP Isotopes Inc. Provides Update on Plans to Spin-Out its Wholly Owned Subsidiary, Quantum Leap Energy<br>2) ASP Isotopes Inc. Announces Proposed Offering of Convertible Notes by Quantum Leap Energy |
| [7] | Feb 22, 2024 | 29.03% | 27.70% | $0.86 | 5.215 | 0.000 | ASP Isotopes Inc. Announces Increase in Offering Size of Convertible Notes by Quantum Leap Energy |
| [8] | Feb 29, 2024 | 19.44% | 18.68% | $0.60 | 3.363 | 0.001 | ASP Isotopes Inc. Announces Signing of Purchase Agreement for Offering of Convertible Notes by Quantum Leap Energy |

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | t-Statistic | p-Value | Headline |
|---|---|---|---|---|---|---|---|
| [9] | Apr 01, 2024 | -2.91% | -3.60% | -$0.15 | -0.630 | 0.530 | ASP Isotopes Inc. Enters Into Purchase Agreement With a Leading Semiconductor Company for the Supply of Highly Enriched Electronic Gases |
| [10] | Apr 08, 2024 | 5.19% | 4.50% | $0.16 | 0.794 | 0.429 | ASP Isotopes Inc. Enters Into a Contract with U.S.-Based Small Modular Reactor (SMR) Company for Project Focused on Engineering Design and Planning for Enrichment Facility for the Production of Advanced Nuclear Fuels |
| [11] | Apr 09, 2024 | -7.79% | -7.79% | -$0.30 | -1.374 | 0.172 | ASP Isotopes Inc. Enters Into Warrant Inducement Transaction for Approximately $5.5 Million in Gross Proceeds |
| [12] | May 10, 2024 | -0.83% | -0.32% | -$0.01 | -0.056 | 0.956 | ASPI files S-3 Registration Statement with SEC |
| [13] | Jun 03, 2024 | -7.05% | -6.52% | -$0.33 | -1.199 | 0.233 | ASP Isotopes Inc. Receives Purchase Order from a Leading Global Industrial Gases Company for the Supply of Highly Enriched Electronic Gases |
| [14] | Jun 06, 2024 | -2.49% | -2.44% | -$0.11 | -0.449 | 0.654 | ASP Isotopes Files 8K - Unregistered Equity Sales |
| [15] | Jul 12, 2024 | -2.53% | -4.70% | -$0.17 | -0.831 | 0.408 | ASP Isotopes Announces Proposed Public Offering of Common Stock |
| [16] | Sep 03, 2024 | -2.53% | 4.23% | $0.10 | 0.745 | 0.458 | ASP Isotopes Inc. Completes Construction Phase of Ytterbium-176 Enrichment Facility |
| [17] | Oct 17, 2024 | 15.43% | 15.73% | $0.55 | 3.057 | 0.003 | ASP Isotopes Inc. Enriches Ytterbium-176 During Commissioning Phase of First Quantum Enrichment Facility and Expects to Offer Highly Enriched Ytterbium-176 for Commercial Sale in 2025 |
| [18] | Oct 30, 2024 | 19.79% | 22.11% | $1.27 | 4.041 | 0.000 | ASP Isotopes Inc. enters into Term Sheet with TerraPower, LLC for Construction of a HALEU Production Facility |
| [19] | Nov 01, 2024 | 11.44% | 11.40% | $0.80 | 2.101 | 0.038 | ASP Isotopes Announces Proposed Public Offering of Common Stock |
| [20] | Nov 14, 2024 | -10.20% | -9.37% | -$0.78 | -1.714 | 0.089 | ASP Isotopes Inc. enters into Memorandum of Understanding with the South African Nuclear |

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | t-Statistic | p-Value | Headline |
|---|---|---|---|---|---|---|---|
| | | | | | | | Energy Corporation (Necsa) to collaborate on the research, development and construction of an Advanced Nuclear Fuel Production Facility |
| [21] | Nov 26, 2024 | -23.53% | -23.64% | -$1.81 | -4.424 | 0.000 | Fuzzy Panda Research - ASP Isotopes (ASPI): Failed Tech + Paid Stock Promotion + "Microcap Fraudsters" (Honig & Stetson) = Nuclear Meltdown |

Notes: Regression models described in notes below **Exhibit 7**.

*Data sources*: Bloomberg, SEC Edgar, Factiva, Complaint, S&P Capital IQ.

# Exhibit 7

**Comparison of Statistical Significance on ASPI Common Stock**
**For News Days vs. No News Days During the Analysis Period**

|  | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 21 | 189 | |
| Significant Days at 95% Confidence Level | 7 | 6 | |
| % Significant Days at 95% Confidence Level | 33.33% | 3.17% | 0.000 |
| Average Absolute Abnormal Return | 9.46% | 3.83% | 0.005 |
| Average Volume (Millions) | 6.09 | 0.82 | 0.074 |

Notes: The event study estimations are based on rolling regressions of the 120 trading days preceding each date of analysis. The regression models control for the S&P 1500 Composite Index ("Market Index") as well as the Range Nuclear Renaissance Index ("Industry Index"). The estimation windows exclude the alleged corrective disclosures, earnings releases published by the Company, and the News Days identified in **Exhibit 6**. *P*-Value of difference for significant News Days and No News Days found using a Fisher's Exactness Test. *P*-Value of difference for average absolute abnormal return and trading volume found using a *t*-test.

*Data sources*: Bloomberg, SEC Edgar, Factiva.

**Exhibit 8**



ASPI Common Stock Market Capitalization
September 26, 2024 - November 26, 2024

Average Market Capitalization over
the Class Period: $377.2 million

Market Capitalization of Common Stock

Average Market Capitalization Over the Class Period

*Data Sources:* Bloomberg, SEC Edgar.

Case 1:24-cv-09233-LGRM Document 39-18 Filed 05/27/25 Page 56 of 58

**Exhibit 9**



ASPI Common Stock Daily Bid-Ask Spread
September 26, 2024 - November 26, 2024

Average Bid-Ask Spread Over the Class Period: 0.24%

Bid-Ask Spread as % of Bid-Ask Midpoint — — Average Bid-Ask Spread as % of Bid-Ask Midpoint

*Data Source*: Bloomberg.

Case 1:24-cv-09213-LAP   Document 39-18   Filed 06/27/25   Page 57 of 58

# Exhibit 10

| Quarter End | Shares Outstanding | Total Institutions Owning Stock | Insider Holdings | Short Interest | Public Float | Insider Holdings as % of Shares Outstanding | Institutional Holdings | Institutional Holdings as % of Shares Outstanding | Institutional Holdings as % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| Sep 30, 2024 | 66,686,940 | 89 | 23,328,255 | 9,574,903 | 52,933,588 | 34.98% | 24,986,401 | 37.47% | 47.20% |
| Dec 31, 2024 | 71,390,110 | 118 | 21,624,884 | 6,774,769 | 56,539,995 | 30.29% | 35,169,351 | 49.26% | 62.20% |
| Total Unique Institutions: | | 128 | | | Class Period Average: | 32.64% | | 43.37% | 54.70% |

*Data Source*: Bloomberg, SEC Edgar, S&P Capital IQ.

E-12