# EXHIBIT I

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KRANTHI GORLAMARI, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:22-cv-02226-MSG |
| Plaintiff, | |
| v. | |
| VERRICA PHARMACEUTICALS, INC., TED WHITE, and P. TERENCE KOHLER JR. | |
| Defendants. | |

EXPERT REPORT OF ZAHN BOZANIC, PH.D.

JUNE 12, 2025

**Table of Contents**

I.     **Scope of Report and Opinions** ....................................................................1

II.    **Qualifications**............................................................................................2

III.   **Case Background** ......................................................................................4

IV.   **Bases for Opinions on Market Efficiency** ..........................................6

V.    **Evaluation of Market Efficiency Factors for Verrica Common Stock** .........................7

      A.     *Cammer* Factor 1: Average Weekly Trading Volume .................................. 9

      B.     *Cammer* Factor 2: Analyst Coverage .......................................................... 10

      C.     *Cammer* Factor 3: Market Makers ............................................................... 13

      D.     *Cammer* Factor 4: SEC Form S-3 Filing Eligibility .................................. 15

      E.     *Cammer* Factor 5: Cause-and-Effect Relationship Between Company Information and Stock Prices......................................................... 16

            i.     Event Study Methodology.................................................... 16

            ii.    Cause and Effect Analysis Comparing Verrica Common Stock Price Behavior on News Versus No News Days ................... 20

      F.     *Krogman* Factor 1: Market Capitalization ................................................. 23

      G.     *Krogman* Factor 2: Bid-Ask Spread........................................................... 24

      H.     *Krogman* Factor 3: Public Float ................................................................. 25

      I.     Additional Factor: Institutional Ownership.................................................. 26

VI.   **Ability to Calculate Damages on a Class-Wide Basis**................................................27

      A.     Calculation of Damages for Violation of §§10(b) and 20(a) of the Exchange Act ............................................................................................. 27

      B.     Damages Methodology is Flexible and can Incorporate Alternative Findings ....................................................................................................... 30

**VII.    Conclusion** .........................................................................................................**31**

**Appendix A** ....................................................................................................... **A-1**

**Appendix B** .......................................................................................................**B-1**

**Exhibit 1** ...........................................................................................................**E-1**

**Exhibit 2** ...........................................................................................................**E-2**

**Exhibit 3** ...........................................................................................................**E-3**

**Exhibit 4** ...........................................................................................................**E-4**

**Exhibit 5** ...........................................................................................................**E-5**

**Exhibit 6** ...........................................................................................................**E-6**

**Exhibit 7** ...........................................................................................................**E-7**

**Exhibit 8** ...........................................................................................................**E-8**

**Exhibit 9** ...........................................................................................................**E-9**

**Exhibit 10** ........................................................................................................**E-10**

## I.  Scope of Report and Opinions

1.     Plaintiff's attorneys have asked me to determine whether the market for Verrica Pharmaceutical Inc.'s ("Verrica" or the "Company") common stock ("Common Stock") was efficient during the period May 19, 2021 to May 24, 2022, inclusive (the "Class Period").

2.     Plaintiff's attorneys have also asked me to opine on whether damages for investors trading in Verrica's Common Stock during the Class Period can be calculated using a common methodology for all Class members that is consistent with Plaintiff's claims under (i) §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, the "§10(b) claims"), and (ii) §20(a) of the Exchange Act.[1]

3.     Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the following opinions:

a.   The market for Verrica's Common Stock was efficient throughout the Class Period.

b.   The *Cammer* and *Krogman* factors accepted and applied by courts to assess market efficiency corroborate that Verrica's Common Stock traded in an efficient market.

c.   Though not necessary for a finding of market efficiency, the cause-and-effect relationship between new Company disclosures and resulting Common Stock price movements (which I analyze under the fifth *Cammer* factor) further shows that Verrica's Common Stock traded in an efficient market throughout the Class Period.

d.   Damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for Plaintiff's pending claims. In particular, the out-of-pocket damages

---

[1] *See* Second Amended Class Action Complaint for Violations of the Federal Securities Laws (Doc. 40) ("Complaint") and Memorandum Opinion (Doc 48). I understand Defendants to include Verrica and Ted White (Verrica's Chief Executive Officer ("CEO")).

methodology, which is used in virtually all §10(b) class action securities cases, is appropriate and applicable here.

4. The remainder of my report is organized as follows: **Section II** describes my qualifications. **Section III** summarizes the case background. **Section IV** briefly explains the bases for the reliance requirement and the "fraud-on-the-market" theory relating to market efficiency. **Section V** presents my analyses of the market efficiency factors for the Common Stock during the Class Period. **Section VI** addresses how damages can be calculated on a class-wide basis subject to a common methodology under §10(b) and §20(a). **Section VII** summarizes my conclusions.

## II. Qualifications

5. I hold a Ph.D. in Business Administration from the Pennsylvania State University and am a tenured, full Professor of Accounting at Florida State University. I also hold the William Hillison Professorship of Accounting. I teach Ph.D. and Master's-level courses, present my research at universities and conferences both domestic and abroad, deliver guest lectures, participate in academic seminars, attend academic conferences, peer review academic work, organize academic conferences, and conduct research on areas related to accounting, finance, statistics, economics, and law.

6. My research focuses on topics related to corporate disclosure, debt contracting, financial intermediaries, financial reporting misconduct, regulation, and enforcement. More specifically, my research has examined periodic corporate disclosures (e.g., 10-K's, earnings press releases), earnings guidance, earnings management, earnings manipulation, financial statement irregularities, debt contracts (e.g., private bank loans and public bonds), debt covenants, securitized debt, credit analysts, equity analysts, SEC comment letters, SEC requests for comment, and SEC investigations.

7.      I have been engaged in university-level teaching and academic research for over 15 years and continue to publish in peer-reviewed academic journals in accounting, economics, and finance. At the undergraduate level, I have taught courses on financial accounting, investments, valuation, and financial statement analysis. In addition, I have taught data analytics, valuation, and financial statement analysis at the Master's level as well as academic research seminars on empirical research methods in accounting at the doctoral level. I am an Editorial Board member of several peer-reviewed journals, and am an Editor at the International Journal of Accounting.

8.      Before my current roles, I was a tenured, Associate Professor of Accounting and the Director of the Ph.D. Program in Accounting at Florida State University. Prior to then, I was an Assistant Professor of Accounting at the Ohio State University as well as a Research Fellow at The National Center for the Middle Market.

9.      Prior to working for Ohio State, I received my Ph.D. in Business Administration from the Pennsylvania State University. Before my graduate work at Penn State, I was employed by Wells Fargo Bank as a Financial Consultant and Product Manager. I received an M.A. from the University of Michigan and a B.A. from the University of California at Berkeley.

10.      I have published research in leading peer-reviewed journals in the fields of finance, accounting, and economics, including: Journal of Accounting Research, Journal of Accounting and Economics, The Accounting Review, Journal of Business Finance & Accounting, Review of Quantitative Finance and Accounting, and Journal of Financial Reporting. My curriculum vitae, attached as **Appendix A**, further details my publication record. I have presented my academic research at over 50 academic institutions, as listed in my curriculum vitae. I have also received several awards and honors from my peers both nationally and globally related to my research, peer reviewing activities, and doctoral research supervision.

3

11. The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $900 per hour for my work on this matter. I have been assisted in this matter by staff at Fideres Partners LLP working under my direction. My compensation is in no way contingent on the outcome of this case. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

12. My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

### III. Case Background [2]

13. Verrica is a clinical-stage, dermatology therapeutics company that primarily focuses on developing medications for skin conditions. [3] During the Class Period, the Company had no products approved by the U.S. Food and Drug Administration ("FDA") for commercialization and had not yet generated revenues from product sales. [4] Since its inception in 2013, and throughout the Class Period, Verrica's operations have focused on its lead product, VP-102. [5] Throughout the Class Period, Verrica was focused on obtaining regulatory approval from the FDA to legally market VP-102 for the treatment of molluscum contagiosum, an infection caused by a pox-virus that is common in children. [6]

---

[2] The following overview section summarizes the allegations in the Complaint as context for Plaintiff's claims. I make no findings or opinions as to these allegations, and the opinions I reach in other sections of this report regarding market efficiency and the calculation of damages are not tied to any specific allegations summarized herein.

[3] Complaint, ¶¶ 2, 31.

[4] *Ibid*.

[5] *Id.*, ¶ 30.

[6] *Id.*, ¶¶ 2-3.

14.     The Complaint alleges that Verrica misled the market as to the risks relating to the FDA approval of VP-102 throughout the Class Period.[7] Specifically, the Complaint alleges that Defendants made materially false and/or misleading statements, and failed to disclose issues related to the FDA inspections of the facilities of Verrica's contract manufacturer Sterling Pharmaceuticals Services, LLC ("Sterling").[8] During its review of the new drug application ("NDA") for VP-102, the FDA inspected Sterling's manufacturing facilities to assess compliance with Current Good Manufacturing Practices ("cGMP"), regulations that contain minimum requirements for manufacturers and facilities concerning all aspects of production.[9]

15.     The Complaint alleges that the concealed risks partially materialized and/or the truth was partially revealed to the market after close of trade on September 20, 2021 when Verrica announced the receipt of a Complete Response Letter ("CRL") from the FDA due to deficiencies at Sterling's facility identified during the FDA's inspection between May 3 and 14, 2021.[10]

16.     The Complaint also alleges that the concealed risks materialized and/or the truth was fully revealed after close of trade on May 24, 2022, when Verrica announced the receipt of another CRL, which cited on-going deficiencies identified during the reinspection of Sterling's facility in February 2022.[11]

17.     Verrica's Common Stock was traded on the NASDAQ during the Class Period.[12] **Exhibit 1** graphs the closing stock price and trading volume for Verrica's Common Stock shares throughout the Class Period.

---

[7] *Id.,* ¶ 3.

[8] *Id.,* ¶ 16.

[9] *Id.,* ¶ 5.

[10] *Id.* ¶¶ 7-8.

[11] *Id.,* ¶¶ 11-12.

[12] *Id.,* ¶ 23.

### IV. Bases for Opinions on Market Efficiency

18. I understand that, with respect to their claims under §10(b), Plaintiff asserts the "fraud-on-the-market" theory of class-wide reliance, i.e., that all Verrica shareholders relied on the alleged misrepresentations (and the fraudulent schemes and acts underlying such misstatements and omissions) through their effect on stock prices in an informationally efficient market.[13]

19. As courts, including the Supreme Court, have explained, the "fraud-on-the-market" theory of class-wide reliance holds that investors trading securities in an informationally efficient market rely on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price. As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[14]

20. The Supreme Court reaffirmed the availability of this theory to satisfy §10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[15]

---

[13] *Id.*, ¶ 138.

[14] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[15] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

21.     A market is considered informationally efficient when the market price of securities quickly responds to publicly available information.[16] In securities fraud cases, courts have endorsed the widely-cited five-factor test laid out in *Cammer v. Bloom* to evaluate whether a market is efficient for the purposes of establishing the presumption of reliance.[17] Courts also accept additional factors for evaluating market efficiency found in another widely cited opinion, *Krogman v. Sterritt*.[18]

22.     Research in accounting, economics, and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency.[19] However, as explained below, it is important to understand that an assessment of market efficiency does not hinge on any single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.[20]

## V.  Evaluation of Market Efficiency Factors for Verrica Common Stock

23.     I now turn to discuss the *Cammer* and *Krogman* factors and evaluate them in relation to Verrica's Common Stock.[21] To do so, I compare the factors' application to Verrica's

---

[16] *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005). "For purposes of establishing the fraud-on-the-market presumption of reliance, we adopt the prevailing definition of market efficiency, which provides that an efficient market is one in which the market price of the stock fully reflects all publicly available information. By 'fully reflect,' we mean that market price responds so quickly to new information that ordinary investors cannot make trading profits on the basis of such information. This is known as 'informational efficiency.' We reject a second and much broader meaning of 'fully reflect,' known as 'fundamental value efficiency,' which requires that a market respond to information not only quickly but accurately, such that the market price of a stock reflects its fundamental value."

[17] *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989).

[18] *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[19] *See, e.g.*, Villanueva, M. and Feinstein, S., 2021. Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors. *Review of Quantitative Finance and Accounting* 57.

[20] *Id.* at 204-205.

[21] In addition to the *Cammer* and *Krogman* factors, I also note that the Company a) had call and put options traded on the Common Stock, and b) did not have a statistically significant autocorrelation coefficient on abnormal stock returns during the Class Period from my event study in **Section V.E**. These findings further

Common Stock against: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed, published academic research.

24.     As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that Verrica's Common Stock traded in an efficient market throughout the Class Period.

25.     One academic study that I use for comparison purposes was published by Mola, Rau, and Khorana, which I refer to as the "MRK Study."[22] In this study, the authors examined two samples of firms. The first sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[23]

26.     The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock. . . . Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading

---

support my conclusion that Verrica Common Stock traded in an efficient market throughout the Class Period.

[22] Mola, S., Rau, P., and Khorana, A., 2013. Is There Life After the Complete Loss of Analyst Coverage? *The Accounting Review* 88 at 667-705.

[23] MRK Study at 678, 681-682.

volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[24]

27.     The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[25] Therefore, I interpret the sample of MRK Covered firms as those eliciting high investor interest and reflect factors common to firms operating in efficient markets.

28.     Below, I compare several of Verrica's market efficiency factors to the samples of firms in the MRK Study to assess whether the Company's characteristics are consistent with firms operating in efficient markets.

### A. *Cammer* Factor 1: Average Weekly Trading Volume

29.     Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security.[26] Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.[27] The first *Cammer* factor, stock trading volume, has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the

---

[24] MRK Study at 667.

[25] MRK Study at 681 (footnotes omitted).

[26] *See, e.g.*, Bhole, B., Surana, S. and Torchio, F., 2020. Benchmarking Market Efficiency Indicators for Securities Litigation. *University of Illinois Law Review* at 101-102. (the "Bhole Study"); Thomas, R. and Cotter, J., 2000. Measuring Securities Market Efficiency in the Regulatory Setting. *Law and Contemporary Problems* 63 at p. 108; MRK Study at 681.

[27] *Ibid.*

market for the security is an efficient one; 1% would justify a substantial presumption.[28]

30.    **Exhibit 2** graphs Verrica's Common Stock's weekly trading volume as a fraction of Common Stock outstanding throughout the Class Period.[29] The average weekly trading volume was 1.92% of Verrica's Common Stock outstanding over the Class Period. This level of trading volume exceeds the 1% threshold established by the *Cammer* court which would justify a "substantial presumption" of efficiency. As a result, Verrica's level of Common Stock trading volume throughout the Class Period supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

31.    Additionally, Verrica's Common Stock daily turnover rate of 0.36% during the Class Period placed it above the 10th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018.[30] This further supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

### B. *Cammer* Factor 2: Analyst Coverage

32.    An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry. Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.

---

[28] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg, §8.6).

[29] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[30] Bhole Study at 102. The 10th percentile of daily turnover for the 2016-2018 sample period is 0.19%. The 2016-2018 subsample time period is the most recent period reported in this study.

10

33.     Analyst coverage can be indicative of market efficiency since research analysts help to disseminate important new company-specific information to investors, thus impounding new information into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[31]

34.     In **Exhibit 3** I reviewed the analyst coverage of Verrica over the Class Period. I identified a total of at least 80 reports issued by analysts at 14 separate firms during that period.[32] The list of analyst reports that I was able to identify includes reports by firms that conducted thorough and detailed research on Verrica and the industry within which it operated, such as the reports prepared by analysts at RBC Capital Markets, H.C. Wainwright & Co., and Cowen and Company, among others. Collectively, this is a significant degree of analyst coverage which served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

35.     This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received no analyst coverage in a given year.[33] Further, Lee and So documented that, on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the

---

[31] *Cammer*, 711 F. Supp. at 1286.

[32] These statistics represent a lower bound of the analyst coverage of Verrica because many analyst reports are provided directly to investors but are not captured by third-party data vendors. *See*, for example, Amiram, D., Bozanic, Z., Bradshaw, M., and Rozenbaum, O., 2025. *Review of Accounting Studies*, forthcoming.

[33] MRK Study at 668.

total number of analyst forecasts issued.[34] In other words, many firms within the category of the least amount of analyst coverage in their sample were covered by only one or two analysts. Verrica's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest.

36. Moreover, Verrica's high level of analyst coverage also placed it between the 75th and 90th percentiles when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[35] The significant analyst coverage of Verrica during the Class Period supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

37. In addition to the analyst coverage documented above, investors could access information about Verrica from a variety of other sources. For example, I conducted a search of press and news articles about Verrica using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes *Dow Jones Newswires*, *GlobeNewswire*, *PR Newswire*, *Reuters*, *Business Wire*, and numerous other outlets. This search produced approximately 171 articles throughout the Class Period.[36]

38. As a result, the amount of analyst coverage, number of analyst research reports produced, and substantial public dissemination of news and information about Verrica support the conclusion that the Company's Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

---

[34] Lee, C., and So, E., 2017. Uncovering Expected Returns: Information in Analyst Coverage Proxies. *Journal of Financial Economics* 124 at 336. (*see* Table 1, Panel B – "COV").

[35] Bhole Study at 104 (75th percentile defined as 12.2 analysts; 90th percentile defined as 20.1 analysts).

[36] The articles were identified through a Factiva search of articles with Verrica's company tag from all available sources.

### C. *Cammer* Factor 3: Market Makers

39.     The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate the buying and selling of shares among investors in a company's stock during trading hours.[37] Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[38]

40.     In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[39]

41.     The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting.

---

[37] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[38] Barber, B., Griffin, P., and Lev, B., 1994. The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporate Law* 19 at 291.

[39] *Cammer*, 711 F. Supp. at 1293; *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418 at *6 (N.D. Cal. Dec. 22, 2016) ("The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.").

42. Verrica's Common Stock had at least 47 market makers and brokers providing similar activity over the Class Period.[40] The presence of more than 10 market makers supports the *Cammer* Court's "substantial presumption" of the efficiency of the market for the Company's Common Stock throughout the Class Period.

43. In addition to the presence of market makers, the presence of institutional investors can be an indicator of market efficiency. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing new information to be quickly impounded into stock prices. During the Class Period, between 69 and 72 institutions held Verrica's Common Stock.[41] By comparison, the MRK Study found that the MRK Sample firms had a median of only nine institutional investors while the MRK Covered firms had a median of 40 institutional investors.[42] Verrica's institutional ownership base greatly exceeds both of these levels. Moreover, Verrica's institutional ownership as a percent of shares during the Class Period placed it between the 10th and 25th percentile of NYSE and NASDAQ traded companies.[43] Thus, the significant institutional ownership base for

---

[40] *See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact … RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow.").

[41] Data Source: S&P Capital IQ.

[42] MRK Study at 678 (Table 3).

[43] Bhole Study at 106: 10th percentile defined as institutional ownership of 13.48% of shares outstanding; 25th percentile defined as 33.58%. Verrica institutional ownership fluctuated between 20.56% and 24.18% of shares outstanding for quarters ending within the Class Period.

Verrica's Common Stock further supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### D. *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

44. The fourth *Cammer* factor is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[44]

45. Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has a float of at least $75 million, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[45] The rationale behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have timely access to publicly available information about the issuer.

46. Verrica made all required filings with the SEC in a timely manner during the Class Period and satisfied the other Form S-3 requirements.[46] Additionally, Verrica's submitted a Form

---

[44] *Cammer*, 711 F. Supp. at 1287.

[45] *See* SEC Form S-3, available at https://www.sec.gov/files/forms-3.pdf.

[46] *See* SEC EDGAR, Verrica Pharmaceuticals, Inc., *available at* https://www.sec.gov/edgar/search/#/ciks=0001660334&entityName=Verrica%2520Pharmaceuticals%2520Inc.%2520(VRCA)%2520(CIK%25200001660334). Market capitalization of Verrica's float averaged $150.22 million during the Class Period.

S-3 filing shortly after the Class Period.[47] As a result, this factor is consistent with the efficiency of the market for the Company's Common Stock throughout the Class Period.

### E. *Cammer* Factor 5: Cause-and-Effect Relationship Between Company Information and Stock Prices

47. The fifth *Cammer* factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information. The *Cammer* court held:

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[48]

48. I summarize my empirical analysis below, which finds that Verrica's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*. I compare the behavior of Verrica's Common Stock on days when company-specific news is issued with its behavior on days when no such news is issued. This analysis demonstrates that Verrica's Common Stock price reacted rapidly to company-specific news and, thus, further supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

### *i.* Event Study Methodology

49. To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study. Event studies are widely used by economists to measure the reaction of a security to

---

[47]*See* SEC EDGAR, Verrica Pharmaceuticals, Inc., *available at*
https://www.sec.gov/Archives/edgar/data/1660334/000119312522279251/d418490ds3.htm

[48] *Cammer*, 711 F. Supp. at 1291.

the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.[49] As Professor Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.

> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[50]

50.      To determine whether Verrica's Common Stock price movements on any given date are statistically significant, I performed an event study using generally accepted economic methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security, and market and industry indices.

51.      Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily security price movement, which represents the component of the daily security price return that is not attributable to market-wide or industry-wide movements, but rather is attributable to company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (i.e., the "abnormal return") is "statistically significant," i.e.,

---

[49] *See* MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature* 13.

[50] Fama, E., 1991. Efficient Capital Markets: II. *Journal of Finance* 46 at 1607.

sufficiently large compared to the usual volatility in the company security price return such that simple random movement can be rejected as the cause.

52. I applied these widely used and generally accepted econometric methodologies to perform my event study here. Specifically, in order to isolate the impact of company-specific news on Verrica's Common Stock price during the Class Period, I performed regression analyses to measure the relationship between the Company's Common Stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in industries similar to Verrica. By modeling how Verrica's Common Stock price returns moved relative to an overall market index and an industry index, I was also able to measure the response of the Company's Common Stock to announcements of company-specific news.

53. I conducted my event study regression analysis over an Analysis Period encompassing the Class Period (May 19, 2021 to May 24, 2022, inclusive), plus one trading day following the Class Period (Analysis Period = May 19, 2021 to May 25, 2022, inclusive). For each trading day, I constructed a regression model using data from the prior six months of trading days (the "Estimation Window").[51]

54. To study the relationship between Verrica's Common Stock price returns and overall market factors, I used the S&P 1500 Total Return Index (the "Market Index"). To study the relationship between Verrica's Common Stock price returns and industry-wide factors that

---

[51] I utilized an Estimation Window of 120 trading days, which is approximately six calendar months. This allowed my regression approach to adapt to the changing volatility of stock returns over time. *See, e.g.*, Mitchell, M. and Netter, J., 1994. The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission. *Business Lawyer* 49; MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature* 35 at 15. ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

would be expected to impact all stocks in Verrica's industry, I used the NASDAQ Biotechnology Index (the "Industry Index").

55.    I established the relationship between the daily return of Verrica's Common Stock, the daily return on the Market Index, and the daily returns on the Industry Index over each rolling Estimation Window.[52] As shown in **Exhibit 4**, the event study models revealed an evolving relationship between the daily returns of Verrica's Common Stock and those of the overall stock market and industry indices throughout the Analysis Period. In other words, movements of the Market and Industry Indices help explain movements in the Company's Common Stock prices.

56.    Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of the Company on any given date within the Analysis Period which controls for that day's market and industry returns. Again, in accordance with standard event-study methodology, I then subtracted this predicted return from the actual return to obtain the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

57.    Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in Verrica's Common Stock's price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the regression model. In other words, the standard deviation of errors provides a measure for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of Verrica's Common Stock after controlling for

---

[52] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature* 35; Braun, P., Nelson, D., and Sunier, A., 1995. Good News, Bad News, Volatility, and Betas. *Journal of Finance* 50 at 1597.

the Market and Industry Indices. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Analysis Period.

### ii. Cause and Effect Analysis Comparing Verrica Common Stock Price Behavior on News Versus No News Days

58.    A generally-accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on news days with its behavior on other days with relatively little or no news.[53] In showing that a security's price is more volatile on news days than on no news days to a statistically significant degree indicates that the security responds promptly to news and, therefore, supports a finding of efficiency.

59.    Importantly, research has shown that in an efficient market, it is possible for a security to exhibit some large price movements despite the absence of news and, conversely, for one to observe news without large price movements.[54] For instance, a company may announce earnings that are in line with investor expectations and, while such an expected announcement is clearly important to investors, it will often not alter the total mix of information significantly enough to elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again would result in no statistically significant price movement. Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current

---

[53] Ferrillo, P., Dunbar, F., and Tabak, D., 2004. The Less Than Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases, *St. John's Law Review* 78 at 120-21; Miguel O. Villanueva and Steven Feinstein, 2021, Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors, *Review of Quantitative Finance and Accounting* 57.

[54] *See* Boudoukh, J., Feldman, R., Kogan, S. and Richardson, M., 2019. Information, Trading, and Volatility: Evidence from Firm-Specific News. *Review of Financial Studies* 32 at 1004; Fair, R., 2002. Events That Shook the Market. *Journal of Business* 75 at 713-714.

level. Accordingly, a generally-accepted, peer-reviewed methodology accepted by numerous courts is to compare stock price behavior on a group of "news days" to stock price behavior on a group of "no news days."

60.     Here, I performed such an analysis comparing the behavior of Verrica's Common Stock on news versus no news days. My analysis demonstrates that the price of Verrica's stock was statistically significantly more volatile on news days than on no news days. This result supports the conclusion that there was a "cause and effect relationship between company disclosures and resulting movements in stock price" for Verrica's Common Stock during the Analysis Period and, thus, further supports a finding of market efficiency.

61.     To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed Verrica's announcements regarding the FDA's approval of VP-102. As I explain in **Section III**, during the Class Period the Company had no products approved by the FDA for commercialization and its operations focused on its lead product, VP-102. Consequently, these types of announcements represent a potential opportunity for the public release of new value-relevant Company information to investors.

62.     As shown in **Exhibit 6**, Verrica issued six updates regarding the FDA's approval of VP-102 during the Analysis Period. I classified each day on which such an announcement was first issued as a "News Day."[55] I then compared the stock returns and trading volume of Verrica's Common Stock on these News Days versus those metrics on trading days that contained the least news during the Analysis Period (the "No News Days").[56] The No News Days provide a

---

[55] If the release were issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day.

[56] I identified "No News Days" as days on which there were no: a) updates regarding the FDA's approval of VP-102; b) alleged corrective disclosures; c) press releases issued by Verrica; d) news articles on Factiva tagged to Verrica; or e) filings submitted to the SEC by Verrica. I ignore news articles about trading halts due to volatility and announcements related to shareholder lawsuits.

benchmark measurement of days in which relatively little or no new Verrica-specific information was provided to the market. If Verrica's stock prices tend to move more significantly on News Days than on No News Days, this would support a conclusion of market efficiency. As discussed below, there were 185 No News Days during the Analysis Period.

63. **Exhibit 6** reports the results of the event study using Verrica's Common Stock returns. The columns list the market impact dates, raw return, abnormal raw return from my event study, abnormal dollar change in stock price from my event study, the *t*-statistic, the *p*-value corresponding to statistical significance, and a description of the announcement on each date. Overall, two out of six Verrica's updates regarding FDA approval of VP-102 caused stock price movements that were statistically significant at the 95% level or better. I compare this rate with that on the No News Days in the following exhibit.

64. **Exhibit 7** summarizes the statistical comparison of Verrica's Common Stock returns and trading volume following the six News Days versus these metrics as measured on the 185 No News Days. As shown in the **Exhibit 7**, 33.33% of the announcements related to the FDA's approval of Verrica's drugs caused stock movements that were statistically significant at the 95% level. This compares to 3.78% of the No News Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at the 95% level. In other words, the rate of statistically significant News Days is more than eight times greater than that of the No News Days. These results provide strong evidence of a cause-and-effect relationship between new information and Verrica's Common Stock price movements. Moreover, relative to the No News Days, the News Days had a higher average absolute abnormal return and greater trading volume.

65. In summary, relative to other trading days contained in each event study's Estimation Window, News Days caused a greater proportion of statistically significant stock price

movements at the 95% level. This finding establishes a clear cause-and-effect relationship between new company-specific information and Verrica's Common Stock price movements. As a result, this *Cammer* Factor 5 analysis supports the conclusion that the Company's Common Stock traded in an efficient market during the Class Period.

### F. *Krogman* Factor 1: Market Capitalization

66.    Beyond the five *Cammer* factors, I have also considered several additional factors articulated by the *Krogman* court. The first of these is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[57] Similarly, the *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[58]

67.    Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors – such as relatively small market capitalization – that indicate that their shares trade in less developed and efficient markets. The median market capitalization of the MRK Sample firms was $27.91 million.[59] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[60] This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

---

[57] *Cammer*, 711 F. Supp. at 1287.

[58] *Krogman*, 202 F.R.D. at 478.

[59] MRK Study at 678 (Table 3).

[60] MRK Study at 678 (Table 3).

68.    **Exhibit 8** reports the market capitalization of Verrica's Common Stock throughout the Class Period. This market capitalization averaged $272.5 million over the Class Period. The Company's Common Stock market capitalization places it between the 25th and 50th percentiles of all companies listed on either the NASDAQ and the NYSE from 2016-2018.[61] Verrica's Common Stock market capitalization also exceeded the MRK Sample firms on an inflation-adjusted basis.[62] Verrica's number of shares outstanding were approximately 27.5 million during the Class Period. Verrica's market capitalization, shares outstanding available for trading, and its  float as discussed below, are consistent with the conclusion that the Company's Common Stock traded in an efficient market during the Class Period.

### G. *Krogman* Factor 2: Bid-Ask Spread

69.    The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[63]

70.    The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency or as a percentage relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally efficient market. A wider bid-ask spread indicates that investors will pay more to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

---

[61] Bhole Study at 107 (25th percentile of market capitalization defined as $167 million; 50th percentile defined as $781 million).

[62] U.S. Bureau of Labor Statistics, CPI Inflation Calculator. *See* https://www.bls.gov/data/inflation_calculator.htm.

[63] *Krogman*, 202 F.R.D. at 478.

71.     I analyzed the bid-ask spread of Verrica's Common Stock during the Class Period. **Exhibit 9** reports the Company's bid-ask spread as a percentage of the bid-ask midpoint.[64] This spread averaged 0.59% over the Class Period.

72.     By way of comparison, the MRK Study found that MRK Sample firms had a median bid-ask spread of 4.55%, while MRK Covered firms had a median bid-ask spread of 1.69%.[65] Verrica's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade the Company's Common Stock at very low relative cost. Additionally, Verrica's average bid-ask spread over the Class Period places it between the 50th and 75th percentiles of all companies listed on NASDAQ and the NYSE from 2016-2018 (lower percentile rankings correspond to smaller bid-ask spreads).[66]

73.     As a result, Verrica's bid-ask spread also supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period.

### H. *Krogman* Factor 3: Public Float

74.     The *Krogman* court also considered the public float of a company in weighing market efficiency.[67] The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

---

[64] Calculated as the difference between Bloomberg daily bid and ask prices as a percentage of the bid-ask midpoint.

[65] MRK Study at 678 (Table 3).

[66] Bhole Study at 105 (50th percentile of bid-ask spread defined as 0.14%; 75th percentile defined as 0.75%).

[67] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

75.     Verrica's Common Stock had a market capitalization averaging $272.5 million and between 27.4 and 27.5 million shares outstanding during the Class Period. Furthermore, as can be seen in **Exhibit 10**, Verrica insiders held roughly 53.4% to 58.9% of Verrica's Common Stock during the Class Period.[68] As a result, approximately 41.1% to 46.6% of the Company's Common Stock was held and freely tradeable by outside investors during the Class Period. Hence, the large degree of public float for the Company's Common Stock supports the conclusion that Verrica traded in an efficient market throughout the Class Period.

## I.  Additional Factor: Institutional Ownership

76.     I also analyze an additional indicator of market efficiency: the presence of institutional investors.[69] Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

77.     I report the total institutional ownership of Verrica in **Exhibit 10,** which shows that at least 69-72 institutions held the stock in a given quarter during the Class Period, and at least 124 different institutions held the stock at some point throughout the Class Period. By comparison, the MRK Study found that the MRK Sample firms had a median of only nine institutional investors while the MRK Covered firms had a median of 40 institutional investors.[70] Verrica's institutional

---

[68] Data Source: Bloomberg.

[69] *See*, *e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market."); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

[70] MRK Study at 678 (Table 3).

ownership base greatly exceeds both of these levels. On average, institutional investors held 22.2% of Verrica's Common Stock outstanding during the Class Period. This level placed it between the 10th and 25th percentile of NYSE and NASDAQ traded companies.[71] Thus, the significant institutional ownership base for Verrica's Common Stock supports the conclusion that Verrica traded in an efficient market throughout the Class Period.

## VI. Ability to Calculate Damages on a Class-Wide Basis

78. I have also been asked to opine on whether per-share damages for traders of Verrica's Common Stock can be assessed for all Class members based upon a methodology common to all Class members and consistent with Plaintiff's theories of liability. As discussed below, damages for each of Plaintiff's claims can be calculated on a class-wide basis through a common methodology.

### A. Calculation of Damages for Violation of §§10(b) and 20(a) of the Exchange Act

79. For the §10(b) claims, Plaintiff alleges that the Defendants' materially false and/or misleading statements and/or failures to disclose artificially inflated the market price of Verrica's Common Stock, and caused Class members to purchase Verrica's Common Stock at artificially inflated prices.[72] Plaintiff also claims certain Defendants are liable as control persons under §20(a).[73]

80. The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act. This approach calculates investor

---

[71] Bhole Study at 106: 10th percentile defined as institutional ownership of 13.48% of shares outstanding; 25th percentile defined as 33.58%. I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[72] Complaint, ¶¶138-139, 153-155.

[73] *Id.*, ¶¶ 157-160. §20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. 15 U.S.C. §78t(a). Given §20(a)'s derivative nature, I understand that §20(a) damages can be calculated using the same methodology for assessing §10(b) damages.

damages formulaically as the artificial inflation in the stock price at the time of an investor purchase minus the artificial inflation in the stock price at the time of an investor sale. If shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Private Securities Litigation Reform Act of 1995 ("PSLRA").[74] This cap on damages is also applied class-wide.

81.     The claims process produces information necessary for the calculation of damages for each Class member as inputs to the formula above, including the purchase and sale information for the Class member's trades (including transaction dates and quantity of shares traded). This information is available from brokerage statements, trade blotters, and/or other documentation of securities transactions.

82.     Another input to the above formula, the quantification of artificial inflation per share, is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide as an input to the out-of-pocket formula. For example, event studies are widely employed to calculate artificial inflation. Event studies measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged fraudulent schemes and misrepresentations.[75]

---

[74] The PSLRA states: "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S. Code §78u-4 (codifying language).

[75] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

83.     To the extent that reliable evidence is introduced to show that a significant portion of the difference in artificial inflation between the purchase and sale of securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of Verrica's securities can be determined on a common, class-wide basis using various accepted methodologies. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during discovery and will be based on the specific set of facts and circumstances in a given case.

84.     A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery.

85.     One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal dollar value of stock price decline from an event study around one or more corrective disclosures.

86.     Alternatively, one can measure "constant percentage inflation," which assumes that each share price was inflated by a constant percentage amount above the correct stock price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal percentage return in stock price from an event study around one or more corrective disclosures.

87.     In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculations of artificial inflation and any potential disaggregation of confounding

29

information are based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.

88.     All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances.

**B. Damages Methodology is Flexible and can Incorporate Alternative Findings**

89.     The damages methodology I have laid out above is flexible and able to incorporate alternative findings of fact regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period. The methodology can be modified based on alternative findings the finder of fact may determine, including, but not limited to any: (1) confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) the first actionable fraudulent conduct or misstatement.

90.     First, irrespective of what the ultimate finder of fact, i.e., the jury, determines is the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information, this percentage can easily be inserted into the standard damages model that I have already described – the out-of-pocket formula. Regardless of how the jury weighs evidence, whether they find that any such disaggregation analysis I may conduct is the most appropriate, or they determine that based upon the evidence, a different amount is more appropriate, this finding can simply be incorporated into the damages calculation.

91.     Second, should the jury determine that the true economic inflation evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a class-wide basis.

30

92. Third, should the jury decide that the first actionable misstatement or otherwise actionable fraudulent conduct happened at a date later than May 19, 2021, prior to such date, inflation could simply be set to zero.

93. If the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

94. To summarize, I have not been asked to calculate damages in this matter. Such analysis would depend on information produced in discovery and development of the case record. Based on my experience, qualifications, and understanding of the nature of the claims in this matter, I conclude that Common Stock damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

## VII. Conclusion

95. In conclusion, based on my analysis of the market efficiency factors considered by courts and in academia, it is my opinion that Verrica's Common Stock traded in an efficient market throughout the Class Period. Moreover, it is my opinion that damages in this matter under §§10(b) and 20(a) can be calculated on a class-wide basis utilizing a common methodology.

I declare under the penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

Zahn Bozanic, Ph.D.

31

## Appendix A

# ZAHN BOZANIC

Florida State University
College of Business
821 Academic Way, RBA 522
Tallahassee, FL 32306

Telephone:  (850) 645-1521
E-mail:  zahn.bozanic@fsu.edu
URL:  business.fsu.edu/person/zahn-bozanic

---

## ACADEMIC INTERESTS

**Research**:  My primary research interests are in the areas of corporate disclosure, financial reporting misconduct, regulation, and enforcement.

**Teaching**:  I teach financial statement analysis (MAcc level) with an emphasis on data analytics and an accounting seminar (PhD level) which focuses on empirical research methods.

## EDUCATION

**Ph.D.**, The Pennsylvania State University

**M.A.**, The University of Michigan – Ann Arbor

**B.A.**, The University of California – Berkeley

## ACADEMIC EXPERIENCE

**Full Professor, Florida State University** (2023-present)
**William Hillison Professor of Accounting**
    Introduction to Accounting Research Seminar – PhD Level
    Financial Statement Analysis with Data Analytics – MAcc Level

**Director of the PhD Program in Accounting** (2019-2023)

**Associate Professor, Florida State University** (2019-2023)

**Assistant Professor, The Ohio State University** (2012-2019)
    Financial Statement Analysis with Data Analytics – MAcc, MBA, and SMF Levels
    Financial Statement Analysis – Undergraduate Level

**Research Fellow, The National Center for the Middle Market** (2012-2016)

**Instructor, The Pennsylvania State University** (2008-2009)
    Intermediate Financial Accounting
    Introduction to Financial and Managerial Accounting

## PUBLICATIONS

18. "**Selective Information Channels for Investment Research**" with Dan Amiram, Mark Bradshaw, and Oded Rozenbaum. *Review of Accounting Studies*, forthcoming.

17. "**Managing Expectations through Budgetary Slack: Evidence from Project Financing**" with Andrew Ferguson and Gabriel Pündrich. *European Accounting Review*, 2024, Vol33(4), 1603-1638.

16. "**Qualitative Disclosure and Credit Analysts' Soft Rating Adjustments**" with Pepa Kraft and Andrea Tillet. *European Accounting Review*, 2023, Vol. 32(4), 779-807. [Lead Article]

15. "**Have SFAS 166 and SFAS 167 Improved the Financial Reporting for Securitizations?**" with Minkwan Ahn, Sam Bonsall, Yiwei Dou, Gordon Richardson, and Dushyant Vyas. *Journal of Business Finance & Accounting*, 2020, Vol. 47(7-8), 821-857. [Lead Article]

14. "**Analyst Contrarianism**" with Jing Chen and Michael Jung. *Journal of Financial Reporting*, 2019, Vol. 4(2), 61-88.

13. "**Securities Law Expertise and Corporate Disclosure**" with Preeti Choudhary and Ken Merkley. *The Accounting Review*, 2019, Vol. 94(4), 141-172.

12. "**Financial Reporting Fraud and Other Forms of Misconduct: A Multidisciplinary Review of the Literature**" with Dan Amiram, James Cox, Quentin Dupont, Jon Karpoff, and Richard Sloan. *Review of Accounting Studies*, 2018, Vol. 23(2), 732-783.

*Ranked Top 10 by RAST for both downloads and citations*

11. "**Corporate Loan Securitization and the Standardization of Financial Covenants**" with Maria Loumioti and Florin Vasvari. *Journal of Accounting Research*, 2018, Vol. 56(1), 45-83.

10. "**Soft Information in Loan Agreements**" with Lin Cheng and Tzachi Zach. *Journal of Accounting, Auditing and Finance*, 2018, Vol. 33(1), 40-71.

9. "**Management Earnings Forecasts and Other Forward-Looking Statements**" with Darren Roulstone and Andy Van Buskirk. *Journal of Accounting and Economics*, 2018, Vol. 65(1), 1-20. [Lead Article]

8. "**SEC Comment Letters and Firm Disclosure**" with J. Richard Dietrich and Bret Johnson. *Journal of Accounting and Public Policy*, 2017, Vol. 36(5), 337-357.

7. "**IRS Attention**" with Jeff Hoopes, Jake Thornock, and Brady Williams. *Journal of Accounting Research*, 2017, Vol. 55(1), 79-114. [Data]

6. "**The *Ex-Ante* Monitoring Role of Accounting Covenants in Public Debt**" *Journal of Business Finance & Accounting*, 2016, Vol. 43(7), 803-829. [Lead Article]

5. "**Financial Statement Errors:  Evidence from the Distributional Properties of Financial Statement Numbers**" with Dan Amiram and Ethan Rouen. *Review of Accounting Studies*, 2015, Vol. 20(4), 1540-1593. [Data]

*Winner of the Deloitte Foundation Wildman Medal Award and FARS Mid-Year Meeting Best Paper Award;*
*Featured in Audit Analytics' Accounting Quality and Risk Matrix (AQRM) and Bloomberg Terminal's AQRM App*

4. "**Qualitative Disclosure and Changes in Sell-Side Financial Analysts' Information Environment**" with Maya Thevenot. *Contemporary Accounting Research*, 2015, Vol. 32(4), 1595-1616.

3. "**What Do Management Earnings Forecasts Convey About the Macroeconomy?**" with Sam Bonsall and Paul Fischer. *Journal of Accounting Research*, 2013, Vol. 51(2), 225-266. [Lead Article]

A-2

2. "**The Social Constitution of Regulation:  The Endogenization of Insider Trading Laws**" with Mark Dirsmith and Steve Huddart.  *Accounting, Organizations, and Society*, 2012, Vol. 37(7), 461-481.

1. "**Managerial Motivation and Timing of Open Market Share Repurchases**" *Review of Quantitative Finance and Accounting*, 2010, Vol. 34(4), 517-531.

## WORKING PAPERS

7. "**(Unwanted) SEC Attention and Voluntary Disclosure**" with Andrea Down and Chris Williams

6. "**Processing Customer News: The Role of Media Coverage**" with Bruce Billings, Alyssa Moore, and Spencer Pierce (*TAR*, *Revise and Resubmit*)

5. "**Systemic Risk and Bank Disclosure**" with Christina Synn and Chris Williams

4. "**The Relative Persistence of Earnings Components**" with Paul Fischer and Gabriel Pündrich

3. "**Not All Critical Audit Matters (CAM) Are the Same: Anti-Herding Behavior in CAM Disclosures**" with Will Anding and Allen Blay (*JBFA*, *Revise and Resubmit*)

2. "**The Regulatory Observer Effect: Evidence from SEC Investigations**" with Terrence Blackburne, Bret Johnson, and Darren Roulstone (*RAST, Revise and Resubmit*)

1. "**On the Role of *Jour-Analysts* in Capital Market Information Intermediation**" with Minkwan Ahn, Francine McKenna, and Maya Thevenot.

## PROFESSIONAL EXPERIENCE

### Wells Fargo Bank                                                                                              2004-2005

*Financial Consultant* - Internal consultant to retail banking segment which focused on distribution planning.  Maintained financial models and databases; conducted ad-hoc research projects to measure the profitability of various strategies pre- and post-implementation.

*Product Manager* - Managed several retail products which generated annual fee revenues in excess of $80MM. Responsible for establishing strategic marketing programs for product enhancement and new products including identification of market segments, product positioning, pricing and profitability.

### Linsco / Private Ledger (LPL) Brokerage                                                        2003-2004

*Investment Advisor* - Solidified relationships with client base through full-service financial planning; managed back office financial operations, including cultivation of broker/dealer and wholesaler relationships.

### The William Davidson Institute                                                                     2001-2003

*Center Administrator* - Responsible for establishing, implementing, and streamlining the data center's operations. Collected, archived, and disseminated data on transition and emerging market economies.

**Tozzi Financial Research and Trading Center**                                    2002-2003

*Programmer Analyst* - Maintained the trading room's daily activities, assisted users with their financial data/modeling needs, and trained users on a variety of valuation and risk management software platforms.

## INVITED PRESENTATIONS

INSEAD (2024)
HEC Paris (2024)
University of Cyprus (2024)
Virginia Tech (2023)
University of Arizona (2023)
Tokyo Keizai University (2023)
Kobe University (2023)
University of Buffalo (2023)
University of Pittsburgh (2022)
University of Memphis (2022)
University of Florida (2022)
Iowa State University (2022)
Vanderbilt University (2021)
The Pennsylvania State University (2020)
The University of Rochester (2018)
London School of Economics (2018)
IESE Business School (2018)
Florida State University (2018)
West Virginia University (2018)
University of Louisville (2018)
William & Mary (2018)
Texas A&M University (2017)
Rice University (2017)
University of Missouri (2017)
University of Florida (2017)
University of Illinois (2017)
GWU Cherry Blossom Conference (2017)
University of Notre Dame (2016)
Columbia Business School (2016)

University of Toronto (2016)
Tilburg University (2016)
ESMT (2016)
FARS Mid-Year Meeting (2011-2015)
Georgetown University (2015)
Utah Winter Accounting Conference (2015)
The University of California - Berkeley (2014)
The Securities and Exchange Commission (2014)
Florida Atlantic University (2014)
Singapore Management University (2014)
Nanyang Technological University (2014)
Dartmouth College (2014)
Syracuse University (2014)
CFEA (2010-2011, 2013-2014)
HKUST Accounting Symposium (2013)
CUNY - Baruch (2013)
The University of Texas - Austin (2013)
The University of California - Irvine (2012)
The University of Miami (2012)
The University of Michigan (2012)
*Journal of Accounting Research* Conference (2012)
Carnegie Mellon University (2011)
Cornell University (2011)
The Ohio State University (2011)
Purdue University (2011)
The University of Utah (2011)
Washington University (2011)
Midwest Accounting Conference (2010)

## CONFERENCES

*Contemporary Accounting Research* Conference (2012-2013, 2015, 2020-2024)
*Review of Accounting Studies* Conference (2015, 2017-2018, 2020-2023)
Rotman Accounting Research Conference (2023)
FARS Mid-Year Meeting (2011-2018, 2023)
LBS Private Equity Symposium (2022)
USC Emerging Tech in Accounting Conference (2022)
Deloitte Foundation Faculty Consortium (2022)
FSU SunTrust Beach Conference (2022)
AAA Audit Mid-Year Meeting (2022)

Tilburg Accounting Winter Camp (2020-2021)
*European Accounting Review* Conference (2020-2021), discussant
Florida Accounting Symposium (2021)
CAFR Fundamental Analysis Symposium (2020)
KPMG Ph.D. Project ADSA Conference (2020), panelist
Accounting Horizons Data Analytics Conference (2019)
KPMG Faculty Symposium (2019)
LBS Accounting Symposium (2017, 2018)
Harvard Business School IMO Conference (2018)
Penn State Accounting Research Conference (2007-2011, 2014, 2018)
AAA Annual Meeting (2014, 2017)
*Accounting, Organizations, and Society* Conference (2017)
BYU Accounting Research Symposium (2017)
EAA Annual Congress (2017)
NYU Accounting Summer Camp (2014, 2016)
Minnesota Empirical Conference (2012, 2015-2016)
Utah Winter Accounting Conference (2013, 2014, 2016)
Colorado Summer Accounting Research Conference (2015)
CARE Conference (2010, 2012-2013)
FASB/IASB Financial Reporting Issues Conference (2012)
Conference on Financial Economics & Accounting (2012)
JAR – NY FED Conference (2012)
AAA New Faculty Consortium (2012)
AAA Annual Meeting (2010), moderator and discussant
FARS Mid-Year Meeting (2010), doctoral consortium
CFRM Conference on Financial Reporting (2009)
Conference on Empirical Legal Studies (2009)
AAA Annual Meeting (2009), discussant

## EXTERNAL SERVICE ACTIVITIES

Hawaii Accounting Research Conference, Editorial Committee and Track Chair (2023-2025)
Deloitte Foundation Wildman Medal Award Committee (2024)
Research Grants Council of Hong Kong, Advisory Committee Member (2020-2022)
EAA Annual Congress, Scientific Committee Member (2020-2021)
FARS Nominating Committee (2018-2019)
COSO/ACFE Fraud Risk Management Guide, Advisory Panel Member and Contributor (2016)
CARE Conference Co-Organizer (2016)
FARS Mid-Year Meeting, Editorial Committee and Track Chair (2015)

### Editorial Boards
*The Accounting Review*
*European Accounting Review*
*Journal of Business Finance & Accounting*
*Journal of Accounting & Public Policy*
*The International Journal of Accounting* (Editor)

**Ad-hoc Journal Referee**

| | |
|---|---|
| *Journal of Accounting Research* | *Journal of Business Finance & Accounting* |
| *Journal of Accounting and Economics* | *Journal of Economic Behavior & Organization* |
| *The Accounting Review* | *Journal of Accounting, Auditing and Finance* |
| *Review of Accounting Studies* | *Journal of Accounting and Public Policy* |
| *Contemporary Accounting Research* | *The International Journal of Accounting* |
| *Management Science* | *Journal of Corporate Finance* |
| *Accounting, Organizations and Society* | *Journal of Empirical Finance* |
| *Journal of Management Accounting Research* | *Regulation and Governance* |
| *Journal of Financial Reporting* | *Quarterly Journal of Finance and Accounting* |
| *European Accounting Review* | *Journal of International Business Studies* |
| *Accounting Horizons* | *Pacific-Basin Finance Journal* |
| *Journal of Accounting Literature* | *Abacus* |

**Ad-hoc Conference Referee**

Hawaii Accounting Research Conference (2022)
FARS Mid-Year Meeting (2011-2014, 2016-2017, 2019, 2021-2023)
AAA Annual Meeting (2013)
AAA Ohio Regional Meeting (2012)

## INTERNAL SERVICE ACTIVITIES

**Florida State**

Florida Accounting Symposium Committee
Strategic Planning Committee
Faculty Evaluation Committee
Accounting Doctoral Program Committee
Research Funding Committee
Professional Development Seminar Co-Coordinator (2020-2022)
Recruiting Committee (2019-2023)
Accounting PhD Program Director (2019-2023)
Doctoral Program Policy Committee (2019-2023)
PhD Student Dissertation Committees
    Will Anding, 2025 (Member, Initial Placement: University of Texas - San Antonio)
    Andrea Tillet, 2022 (Chair, Initial Placement: University of Wisconsin - Madison)

**Ohio State**

Faculty Senate
Recruiting Committee
PhD Program Committee
MAcc Program Committee
KPMG MAcc Data Analytics Initiative
MIS Program Committee
Accounting MBA Program Committee
PhD Student Dissertation Committees
    Danyang Jiang, 2019 (Member, Initial Placement: University of Intl. Business and Economics)
    Aaron Nelson, 2018 (Member, Initial Placement: University of Georgia)
    Bret Johnson, 2015 (Member, Initial Placement: George Mason University)
Burns Research Colloquium Coordinator
PhD Student Pre-Colloquium Coordinator

Summer Brown Bag Workshop Coordinator
Graduate Faculty Representative
Graduate Studies Committee

## OUTSIDE ACTIVITIES

### Economic Litigation Consulting

I provide economic litigation consulting and support on cases related to financial reporting misconduct, including, but not limited to, misleading corporate disclosures, accounting fraud, and insider trading.

### Expert Witness Experience

*In re CleanSpark Inc. Securities Litigation*, Case No. 1:21-cv-511 (LAP). Report January 2025; Deposition February 2025; Report May 2025.

*In re Freshworks Inc. Securities Litigation*, Case No. 3:22-cv-06750-CRB. Report March 2025; Report April 2025.

*In re Teleperformance SE Securities Litigation*, Case No. 23-24580-CIV-ALTONAGA/REID (S.D. FL). Report November 2024; Deposition December 2024.

## ACADEMIC AWARDS & HONORS

FARS Best Dissertation Supervision Award
EAR Excellence in Reviewing Recognition
William Hillison Professorship
Faculty Leadership Development Program
Deloitte Foundation Wildman Medal Award
FARS Mid-Year Meeting Best Paper Award
The National Center for the Middle Market Research Fellowship
Ossian R. MacKenzie Doctoral Teaching Award
Smeal Competitive Dissertation Award
G. Kenneth Nelson Scholarship
Smeal Doctoral Research Grant
Jane O. Burns Graduate Scholarship
Center for the Study of Finance Graduate Fellowship

## MEDIA MENTIONS

"ExxonMobil, Impairments, and the SEC" – Audit Analytics, January 2021

"Corporate Loan Securitization and the Standardization of Financial Covenants" – Columbia Law School Blue Sky Blog, June 2018

"Using Benford's Law to Assess Financial Reporting Quality" – Columbia Law School Blue Sky Blog, February 2016

"The SEC Never Reads 74% of Filings, Putting Investors at Risk" – Marketwatch.com, October 2015

"On the Role of Companies' External Securities Law Advisors – Facilitators or Gatekeepers?" – Columbia Law School Blue Sky Blog, October 2015

"Accountants Increasingly Use Data Analysis to Catch Fraud" – Wall Street Journal, December 2014

"IRS Pays Attention to Corporate Filings, Study Shows" – Compliance Week, November 2014

"IRS Scanning 10-Ks for Tax Data, Report Finds" – CFO.com, November 2014

"A New Tool to Detect Financial Reporting Irregularities"

    – The Harvard Law School Forum on Corporate Governance and Financial Regulation, July 2014

"The Simple Mathematical Law That Financial Fraudsters Can't Beat" – Forbes, May 2014

"Financial Fraud Detection Now as Simple as 1, 2, 3" – PR Newswire, May 2014

"The Search for Suspect Accounting" – CFO.com, April 2014

"Earnings Bode Ill for Stocks" – Wall Street Journal, June 2012

## POLICY MENTIONS

U.S. Supreme Court Amicus Brief, *Goldman Sachs Group, Inc., et al., Petitioners v. Arksansas Teacher Retirement System, et al.*, March 2021

Comment to the SEC re Concept Release on Regulation S-K Disclosures by U.S. Senate Permanent Subcommittee on Investigations, July 2016

Capital Unbound: Remarks at the Cato Summit on Financial Regulation by SEC Commissioner Michael S. Piwowar, June 2015

## IMPACT METRICS

SSRN Downloads: ~**13,700** (**~1000** per downloadable paper)

Google Scholar (BYU) Citations: **2,374** (**2,169**)

h-index (i10-index): **16** (**18**)

## PERSONAL INTERESTS

Running, Yoga, Swimming, Weightlifting, Tennis

## LINKS

BYU Rankings   Google Scholar   SSRN

## Appendix B

### Documents Considered

**Court Documents:**

- Second Amended Class Action Complaint for Violations of the Federal Securities Laws, dated January 26, 2024 (Doc. 40).

- Memorandum Opinion, dated September 3, 2024 (Doc 48).

**Court Decisions and Securities Law:**

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

- *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D. Cal. 2016).

- *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009).

- *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009).

- *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005).

- *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

- Private Securities Litigation Reform Act of 1995, December 1995.

**Academic Literature:**

- Amiram, D., Bozanic, Z., Bradshaw, M., and Rozenbaum, O., 2025. *Review of Accounting Studies*, forthcoming.

- Barber, B., Griffin, P., and Lev, B., 1994. The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporate Law*

- Bhole, B., Surana, S. and Torchio, F., 2020. Benchmarking Market Efficiency Indicators for Securities Litigation. *University of Illinois Law Review*

- Boudoukh, J., Feldman, R., Kogan, S., and Richardson, M., 2019. Information, Trading, and Volatility: Evidence from Firm-Specific News. *Review of Financial Studies*

- Braun, P., Nelson, D., and Sunier, A., 1995. Good News, Bad News, Volatility, and Betas. *Journal of Finance*

- Fair, R., 2002. Events That Shook the Market. *Journal of Business*

- Fama, E., 1991. Efficient Capital Markets: II. *Journal of Finance*

- Ferrillo, P., Dunbar, F., and Tabak, D., 2004. The Less Than Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases, *St. John's Law Review*

- Lee, C. and So, E., 2017. Uncovering Expected Returns: Information in Analyst Coverage Proxies. *Journal of Financial Economics*

- MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature*

- Mitchell, M. and Netter, J., 1994. The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission. *The Business Lawyer*

- Mola, S., Rau. P., and Khorana, A., 2013. Is There Life After the Complete Loss of Analyst Coverage? *The Accounting Review*

- Thomas, R. and Cotter, J., 2000. Measuring Securities Market Efficiency in the Regulatory Setting. *Law and Contemporary Problems*

- Villanueva, M. and Feinstein, S., 2021. Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors. *Review of Quantitative Finance and Accounting*

**Data Sources:**

- Bloomberg

- Factiva

- Investext

- S&P Capital IQ

- SEC Edgar

- Verrica Press Releases

**Other:**

- https://www.bls.gov

- https://www.investor.gov

- https://www.sec.gov

- Analyst reports from Counsel.

- All data and documents cited throughout this report.

**Exhibit 1**



VRCA Common Stock Closing Price and Trading Volume
May 19, 2021 - May 24, 2022

*Data source*: Bloomberg.

**Exhibit 2**



VRCA Common Stock Weekly Trading Volume
May 19, 2021 - May 24, 2022

Average Weekly Trading Volume
Over the Class Period: 1.92%

Weekly Volume as % of Shares Outstanding        — — Average Weekly Volume as % of Shares Outstanding

Notes: Average weekly trading volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period. As the last week of the Class Period consists of only two trading days, the volume figure for this week is scaled by 5/2.

*Data sources*: Bloomberg, SEC Edgar.

**Exhibit 3**

### Verrica Analyst Coverage
### May 19, 2021 – May 24, 2022

| Analyst Name | Reports Issued During the Class Period |
|---|---|
| RBC Capital Markets | 14 |
| H.C. Wainwright & Co., LLC | 11 |
| Needham & Company Inc. | 11 |
| BuySellSignals Research | 8 |
| Northland Securities | 7 |
| Cowen and Company | 6 |
| Sadif Analytics Prime | 5 |
| GlobalData | 4 |
| Jefferies | 4 |
| ValuEngine, Inc | 4 |
| Wright Reports | 3 |
| PriceTarget Research | 1 |
| Sadif Analytics | 1 |
| The Insight Partners | 1 |
| **Total** | **80** |

*Data Sources*: Counsel, Investext.

**Exhibit 4**



Coefficients from Rolling Event Study Regressions
May 19, 2021 - May 25, 2022

<u>Notes</u>: Regression models described in notes below Exhibit 7.

*Data Sources*: Bloomberg, SEC Edgar, Factiva, Verrica Press Releases, Complaint.

E-4

**Exhibit 5**



Root Mean Squared Error (RMSE) from Rolling Event Study Regressions
May 19, 2021 - May 25, 2022

<u>Notes</u>: Regression models described in notes below Exhibit 7.

*Data sources*: Bloomberg, SEC Edgar, Factiva, Verrica Press Releases, Complaint.

**Exhibit 6**

**Verrica News Days and Common Stock Abnormal Returns**

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | t-Statistic | p-Value | News Day Description |
|---|---|---|---|---|---|---|---|
| [1] | May 28, 2021 | -4.41% | -5.01% | -$0.59 | -1.144 | 0.255 | Verrica Pharmaceuticals Announces Extension of FDA Review Period of its NDA for VP-102 |
| [2] | Sep 21, 2021 | -8.31% | -9.44% | -$1.14 | -2.362 | 0.020 | Verrica Pharmaceuticals Receives CRL From FDA On New Drug Application For VP-102 |
| [3] | Nov 12, 2021 | -1.91% | -2.60% | -$0.33 | -0.647 | 0.519 | Verrica Pharmaceuticals provides update on FDA approval of VP-102 in Q3 2021 earnings release |
| [4] | Nov 29, 2021 | 0.76% | -0.80% | -$0.08 | -0.207 | 0.836 | Verrica Pharmaceuticals Announces Resubmission of New Drug Application for VP-102 |
| [5] | Dec 16, 2021 | -1.70% | 0.39% | $0.04 | 0.108 | 0.914 | Verrica Pharmaceuticals Announces Acceptance by FDA of NDA Resubmission for VP-102 |
| [6] | May 25, 2022 | -63.85% | -64.58% | -$3.59 | -23.759 | 0.000 | Verrica Receives Complete Response Letter from the FDA for its NDA for VP-102 |

Notes: Regression models described in notes below Exhibit 7.

*Data sources*: Bloomberg, SEC Edgar, Factiva, Verrica Press Releases, Complaint.

**Exhibit 7**

**Comparison of Statistical Significance on Verrica Common Stock
for News Days vs. No News Days During the Analysis Period**

|  | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 6 | 185 |  |
| Significant Days at 95% Confidence Level | 2 | 7 |  |
| % Significant Days at 95% Confidence Level | 33.3% | 3.78% | 0.027 |
| Average Absolute Abnormal Return | 13.8% | 2.36% | 0.315 |
| Average Volume (Millions) | 1.51 | 0.08 | 0.241 |

Notes: The event study estimations are based on rolling regressions of the 120 trading days preceding each date of analysis. The regression models control for the S&P 1500 Total Return Index ("Market Index") as well as the NASDAQ Biotechnology Index ("Industry Index"). The estimation windows exclude the alleged corrective disclosures, earnings and press releases published by the Company, and the News Days identified in Exhibit 6. *P*-Value of difference for significant News Days and No News Days found using a Fisher's Exactness Test. *P*-Value of difference for average absolute abnormal return and trading volume found using a *t*-test.

*Data sources*: Bloomberg, SEC Edgar, Factiva, Verrica Press Releases.

**Exhibit 8**



### VRCA Common Stock Market Capitalization
### May 19, 2021 - May 24, 2022

*Data Sources*: Bloomberg, SEC Edgar.

**Exhibit 9**



### VRCA Common Stock Daily Bid-Ask Spread
### May 19, 2021 - May 24, 2022

*Data Source*: Bloomberg.

**Exhibit 10**

| Quarter End | Shares Outstanding | Total Institutions Owning Stock | Insider Holdings | Short Interest | Public Float | Insider Holdings as % of Shares Outstanding | Institutional Holdings | Institutional Holdings as % of Shares Outstanding | Institutional Holdings as % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| Jun 30, 2021 | 27,409,576 | 70 | 16,145,631 | 2,068,708 | 13,332,653 | 58.91% | 6,626,437 | 24.18% | 49.70% |
| Sep 30, 2021 | 27,514,720 | 69 | 14,701,012 | 1,475,179 | 14,288,887 | 53.43% | 5,851,514 | 21.27% | 40.95% |
| Dec 31, 2021 | 27,519,053 | 69 | 15,302,769 | 1,434,503 | 13,650,787 | 55.61% | 5,751,807 | 20.90% | 42.14% |
| Mar 31, 2022 | 27,519,053 | 71 | 14,742,138 | 1,538,784 | 14,315,699 | 53.57% | 5,656,983 | 20.56% | 39.52% |
| Jun 30, 2022 | 27,519,053 | 72 | 16,170,709 | 1,195,458 | 12,543,802 | 58.76% | 6,592,647 | 23.96% | 52.56% |
| **Total Unique Institutions:** | | 124 | | | **Class Period Average:** | 56.06% | | 22.17% | 44.97% |