# EXHIBIT J

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| CITY OF WARREN GENERAL EMPLOYEES' RETIREMENT SYSTEM, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>TELEPERFORMANCE SE, *et al.*,<br><br>Defendants. | Case No. 23-24580-CIV-ALTONAGA/REID<br><br>CLASS ACTION |

EXPERT REPORT OF ZAHN BOZANIC, PH.D.

November 5, 2024

**Table of Contents**

I.      **Scope of Report and Opinions** ...................................................................2

II.     **Qualifications**.............................................................................................3

III.    **Case Background and Alleged Fraudulent Scheme** ........................................5

IV.    **Bases for Opinions on Market Efficiency** ...................................................7

V.     **Background and Overview of Teleperformance ADRs**....................................8

       A.     Background on ADRs and OTC Market.............................................8

       B.     Overview of Teleperformance ADRs ...............................................15

VI.    **Evaluation of Market Efficiency Factors for Teleperformance ADRs** .......17

       C.     *Cammer* Factor 1: Average Weekly Trading Volume...........................18

       D.     *Cammer* Factor 2: Analyst Coverage..................................................20

       E.     *Cammer* Factor 3: Market Makers.....................................................22

       F.     *Cammer* Factor 4: SEC Form S-3 Filing Eligibility .............................23

       G.     *Cammer* Factor 5: Cause and Effect Relationship Between Company
            Information and Stock Prices...........................................................25

       H.     *Krogman* Factor 1: Market Capitalization ............................................30

       I.      *Krogman* Factor 2: Bid-Ask Spread ...................................................32

       J.      *Krogman* Factor 3: Public Float..........................................................33

VII.   **Teleperformance's Common Stock Supports Market Efficiency of its ADRs**..........34

VIII.  **Ability to Calculate Damages on a Class-Wide Basis**.....................................35

       A.     Calculation of Damages for Violation of Sections 10(b) and 20(a) of
            the Exchange Act ..........................................................................36

       B.     Damages Methodology is Flexible and can Incorporate Alternative
            Findings.......................................................................................38

IX.    **Conclusion** ..............................................................................................40

## I.     Scope of Report and Opinions

1.     Plaintiffs' attorneys have asked me to determine whether the market for Teleperformance SE's ("Teleperformance" or the "Company") American Depositary Receipts ("ADRs") was efficient during the period February 20, 2020 to August 3, 2022, inclusive (the "Class Period").

2.     Plaintiffs have also asked me to opine on whether damages for investors trading in Teleperformance's ADRs during the Class Period can be calculated using a common methodology for all Class members that is consistent with Plaintiffs' claims under (i) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, the "§10(b) claims"), and (ii) Section 20(a) of the Exchange Act.[1]

3.     Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the following opinions:

a.     The market for Teleperformance's ADRs was efficient throughout the Class Period.

b.     The *Cammer* and *Krogman* factors accepted and applied by courts to assess market efficiency corroborate that Teleperformance's ADRs traded in an efficient market.

c.     Though not necessary for a finding of market efficiency, the cause-and-effect relationship between new Company disclosures and resulting ADR price movements (which I analyze under the fifth *Cammer* factor) further shows that Teleperformance's ADRs traded in an efficient market throughout the Class Period.

d.     Damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for Plaintiffs' pending claims. In particular, the out-of-pocket damages methodology, which is used in

---

[1] *See* Second Amended Class Action Complaint for Violations of the Federal Securities Laws (Doc. 71) ("Complaint"); Order, dated Aug. 28, 2024 (Doc. 75) (the "MTD Order"). I understand Defendants to include Teleperformance, Daniel Julien (Chairman and CEO of Teleperformance), Olivier Rigaudy (Deputy CEO and Chief Financial Officer of Teleperformance), and Akash Pugalia (Global President of Trust & Safety at Teleperformance).

virtually all Section 10(b) class action securities cases, is appropriate and applicable here.

4. The remainder of my report is organized as follows: **Section II** describes my qualifications. **Section III** summarizes the case background. **Section IV** briefly explains the bases for the reliance requirement and the "fraud-on-the-market" theory relating to market efficiency. **Section V** provides background on ADRs and the OTC market as well as an overview of Teleperformance's ADRs. **Section VI** presents my analyses of the market efficiency factors for the ADRs during the Class Period. **Section VII** discusses how Teleperformance's common stock also supports the market efficiency of the ADRs. **Section VIII** addresses how damages can be calculated on a class-wide basis subject to a common methodology under Section 10(b). **Section IX** summarizes my conclusions.

## II. Qualifications

5. I hold a Ph.D. in Business Administration from the Pennsylvania State University and am a tenured, full Professor of Accounting at Florida State University. I also hold the William Hillison Professorship of Accounting. I teach Ph.D. and Master's-level courses, present my research at universities and conferences both domestic and abroad, deliver guest lectures, participate in academic seminars, attend academic conferences, peer review academic work, organize academic conferences, and conduct research on areas related to accounting, finance, statistics, economics, and law.

6. My research focuses on topics related to corporate disclosure, debt contracting, financial intermediaries, financial reporting misconduct, regulation, and enforcement. More specifically, my research has examined periodic corporate disclosures (*e.g.*, 10-K's, earnings press releases, etc.), earnings guidance, earnings management, earnings manipulation, financial statement irregularities, debt contracts (*e.g.*, private bank loans and public bonds), debt covenants,

securitized debt, credit analysts, equity analysts, SEC comment letters, SEC requests for comment, and SEC investigations.

7. I have been engaged in university-level teaching and academic research for over 15 years and continue to publish in peer-reviewed academic journals in accounting, economics, and finance. At the undergraduate level, I have taught courses on financial accounting, investments, valuation, and financial statement analysis. In addition, I have taught data analytics, valuation, and financial statement analysis at the Master's level as well as academic research seminars on empirical research methods in accounting at the doctoral level. I am an Editorial Board member of several peer-reviewed journals, and am an Editor at the *International Journal of Accounting*.

8. Before my current roles, I was a tenured, Associate Professor of Accounting and the Director of the Ph.D. Program in Accounting at Florida State University. Prior to then, I was an Assistant Professor of Accounting at the Ohio State University as well as a Research Fellow at The National Center for the Middle Market.

9. Prior to working for Ohio State, I received my Ph.D. in Business Administration from the Pennsylvania State University. Before my graduate work at Penn State, I was employed by Wells Fargo Bank as a Financial Consultant and Product Manager. I received an M.A. from the University of Michigan and a B.A. from the University of California at Berkeley.

10. I have published research in leading peer-reviewed journals in the fields of finance, accounting, and economics, including: *Journal of Accounting Research, Journal of Accounting and Economics*, *The Accounting Review*, *Journal of Business Finance & Accounting*, *Review of Quantitative Finance and Accounting*, and *Journal of Financial Reporting*, *inter alia*. My curriculum vitae, attached as **Appendix A**, further details my publication record. I have presented my academic research at over 50 academic institutions, as listed in my curriculum vitae. I have

also received several awards and honors from my peers both nationally and globally related to my research, peer reviewing activities, and doctoral research supervision.

11.     The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $900 per hour for my work on this matter. I have been assisted in this matter by staff at Cleveland Analytics, LLC working under my direction. My compensation is in no way contingent on the outcome of this case.

12.     My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

### III.     Case Background and Alleged Fraudulent Scheme

13.     Teleperformance is headquartered in Paris, France and has offices throughout the world, including the United States.[2] The Company's common shares trade on the Paris Stock Exchange (ticker: TEP.PA) and the Company's ADRs trade on the Over-the-Counter (OTC) market in the United States (ticker: TLPFY).[3] The Company provides customer experience management services tailored to specific client needs, including, for example, call center operations, employee recruitment, payment collection, and content moderation.[4] The Complaint alleges that, during the Class Period, Defendants claimed to provide a work environment that fostered employee well-being to include appropriate screening, training, safeguards, and support for its content moderators.[5] The Complaint further alleges that content moderators were instead

---

[2] Complaint, ¶ 7. The following overview section summarizes the allegations in the Complaint as context for Plaintiffs' claims. I make no findings or opinions as to these allegations, and the opinions I reach in other sections of this report regarding market efficiency and the calculation of damages are not tied to any specific allegations summarized herein.

[3] *Id.*, ¶ 7.

[4] *Id.*, ¶ 13.

[5] *Id.*, ¶ 14.

subjected to "grotesque and horrifying working conditions," from the exposure to training materials regarding the sexual abuse of children to inadequate psychological care.[6]

14. The Complaint alleges that throughout the Class Period, Defendants engaged in a fraudulent scheme and course of business, misled investors, and made materially false and misleading statements and omissions relating to the screening and hiring of its content moderators, their training and safeguards, as well as on-going support for moderators.[7]

15. The Complaint alleges that the relevant truth was revealed to investors on August 4-5, 2022 following the publication of a *Forbes* article.[8] Based on accounts from current and former Teleperformance content moderators, the article revealed that moderators were allegedly exposed to "sexually exploitative" images of children as part of their training and were "under-trained and overworked." [9] The article further revealed that Teleperformance's practices allegedly had adverse effects on moderators to the point where some were "struggling to just function properly" and had "feelings of suicide."[10]

16. The Complaint alleges that, as a result of Defendants' fraudulent scheme and course of business, misstatements, and omissions, investors traded Teleperformance's Common Stock at artificially inflated prices during the Class Period.[11] **Exhibit 1** graphs the closing stock price and trading volume for Teleperformance's Common Stock shares throughout the Class Period.

---

[6] *Id.*, ¶ 14.

[7] *Id.*, ¶ 42-46.

[8] *Id.*, ¶ 47.

[9] *Id.*, ¶ 47-48.

[10] *Id.*, ¶ 49.

[11] *Id.*, ¶ 12, 109.

## IV.     Bases for Opinions on Market Efficiency

17.     I understand that, with respect to their claims under §10(b), Plaintiffs assert the "fraud-on-the-market" theory of class-wide reliance, *i.e.*, that all Teleperformance shareholders relied on the alleged misrepresentations (and the fraudulent schemes and acts underlying such misstatements and omissions) through their effect on stock prices in an informationally efficient market.[12]

18.     As courts, including the Supreme Court, have explained, the "fraud-on-the-market" theory of class-wide reliance holds that investors trading securities in an informationally efficient market rely on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price. As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[13]

19.     The Supreme Court reaffirmed the availability of this theory to satisfy Section 10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that

---

[12] *Id.*

[13] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

decision and decline to modify the prerequisites for invoking the presumption of reliance.[14]

20.     A market is considered informationally efficient when the market price of securities quickly responds to publicly available information.[15] In securities fraud cases, courts have endorsed the widely-cited five-factor test laid out in *Cammer v. Bloom* to evaluate whether a market is efficient for the purposes of establishing the presumption of reliance.[16] Courts also accept additional factors for evaluating market efficiency found in another widely cited opinion, *Krogman v. Sterritt*.[17]

21.     Research in accounting, economics, and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency.[18] However, as explained below, it is important to understand that an assessment of market efficiency does not hinge on any single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.[19]

## V.     Background and Overview of Teleperformance ADRs

### A.     Background on ADRs and OTC Market

22.     An American Depositary Receipt (ADR) is a "negotiable certificate that evidences an ownership interest in American Depositary Shares (ADSs) which, in turn, represent an interest

---

[14] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[15] Academics often consider more stringent forms of market efficiency, *e.g.*, defining an efficient market as one in which prices reflect all material, widely available public information up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs. *See* Fama, E.F., 1991. Efficient Capital Markets: II. *Journal of Finance* 46, at 1575.

[16] *Cammer*, 711 F. Supp. at 1292.

[17] *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[18] *See, e.g.*, Villanueva, M. and Feinstein, S., 2021. Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors. *Review of Quantitative Finance and Accounting* 57.

[19] *Id.*, at 204-205.

8

in the shares of a non-U.S. company that have been deposited with a U.S. bank."[20] ADRs allow a domestic investor to invest in the shares of a foreign issuer and allow the foreign issuer to access U.S. capital markets either to establish a trading presence or raise capital. An ADR is a dollar-denominated security and may trade on either a 1-1 share basis with a foreign issuer's shares or on a fractional or multiple share basis.[21]

23.     To issue an ADR, a U.S. depository institution first acquires or receives shares of a foreign issuer. Because these shares are typically held at a foreign branch of the U.S. depository institution, they are termed American Depositary Shares. The depository institution then creates a receipt (*i.e.*, an ADR) for a potential investor to trade his or her interest in the share in U.S. markets. A foreign issuer can work with a U.S. depository institution to issue ADRs on the foreign issuer's stock (*i.e.*, "sponsored" ADR) or a U.S. depository institution can issue ADRs without the cooperation of the foreign issuer (*i.e.*, "unsponsored" ADR). While both sponsored and unsponsored ADRs are registered with the SEC via Form F-6, sponsored ADRs also require the foreign issuer to file an annual report with the SEC via Form 20-F. Furthermore, sponsored ADRs trade on major exchanges (*e.g.*, NYSE, NASDAQ) whereas unsponsored ADRs trade in the OTC market.[22]

24.     The OTC market is regulated by the SEC and Financial Industry Regulatory Authority (FINRA) yet most stocks trading in this market are largely exempt from SEC registration

---

[20] Investor Bulletin: American Depositary Receipts, *U.S. Securities & Exchange Commission*, August 2012.

[21] *Id.*

[22] *Id.* There are 3 levels of ADRs depending on the intent of foreign issuer and/or depository institution. While all 3 levels establish a trading presence, Level 1 are unsponsored and trade OTC, Level 2 trade on major exchanges, and Level 3 allows the foreign issuer to raise capital.

and filing requirements.[23] Further, OTC stocks are traded outside of traditional exchanges, such as the NYSE or NASDAQ, and instead trading is facilitated by OTC Markets Group.[24] OTC Markets Group offers electronic trading on three exchanges (OTCQX, OTCQB, and Pink) tiered by the "quantity and quality" of information provided.[25] While stocks trading in the OTC market are sometimes characterized as "penny stocks" of companies that offer very little information, low liquidity, and high volatility, the OTC market is intended to serve a variety of investor needs.[26] For example, the OTC market allows investors to trade large blocks of shares normally traded on a traditional exchanges to provide anonymity.[27] In addition, the OTC market may be used to trade corporate bonds, government securities, or derivatives.[28]

25.     Alternatively, some foreign issuers may have their shares traded in the U.S. OTC market to allow domestic investors' exposure to the foreign issuer's stock without the need for the foreign issuer to comply with domestic SEC registration and filing requirements:

> "The U.S. capital markets offer greater liquidity and deeper pool of sophisticated investors, skilled investment professionals and financial news and media outlets than any other market in the world. However, because of the fear of the registration with the U.S. Securities and Exchange Commission (the "SEC"), the cost of compliance with the U.S. federal securities laws, and the burden of meeting stock exchange cross-trading requirements, many

---

[23] *See* https://www.otcmarkets.com/learn/market-101/market-structure; White, J., 2016, Outcomes of Investing in OTC Stocks, *U.S. Securities & Exchange Commission*, Division of Economic and Risk Analysis (DERA) White Paper, at pp. 1-2.

[24] *See* https://www.otcmarkets.com/learn/market-101/trading.

[25] *See* https://www.otcmarkets.com/learn/faqs.

[26] Low-Priced Stocks Can Spell Big Problems, *Financial Industry Regulatory Authority* (FINRA), January 2024. (https://www.finra.org/investors/insights/low-priced-stocks-big-problems); Ang, A., Shtauber, A., and Tetlock, P., 2013. Asset Pricing in the Dark: The Cross-Section of OTC Stocks. *The Review of Financial Studies* 26, at p. 2986.

[27] Can You Swim in a Dark Pool?, FINRA, November 2023. (https://www.finra.org/investors/insights/can-you-swim-dark-pool).

[28] *See* https://www.sec.gov/about/divisions-offices/division-trading-markets/over-counter-market.

international companies elect not to have their securities traded in the United States. OTCQX International provides a cost-effective way for smaller foreign private issuers with securities cross-traded on a qualified foreign exchange to test the U.S. capital market waters and have their securities traded in the United States without SEC registration under the U.S. Securities and Exchange Act of 1934."[29]

Further, in addition to having their common shares traded in their domestic market, some large foreign issuers may have ADRs, whether sponsored by the issuer or a U.S. depository institution, traded OTC on their foreign-issued shares. As a result, many large and well-known international stocks trade their ADRs in the U.S. OTC market, such as Mitsubishi (ticker: MTSUY), Airbus (ticker: EADSY), and LVMH-Moet Hennessy Louis Vuitton (ticker: LVMUY), among others, without having to comply with SEC registration and filing requirements.[30]

26.    None of the above-mentioned stocks or ADRs could be characterized as a "penny stock" since these shares traded at a range of $19.25 (MSBHF) to $657.133 (LVMHF) as of 10/17/2024 per OTC Markets Group.[31] Furthermore, none of these stocks or ADRs carry OTC Markets Group's "Caveat Emptor" designation, which is intended to warn investors of stocks that could be characterized as "penny stocks" insofar as they might be subject to misleading/manipulative promotion, investigation of fraud, or other concerns.[32] Hence, even though the above-mentioned shares or ADRs are traded in the OTC market, they are not comparable to a typical "penny stock" but rather are more comparable to a dual- or cross-stock listing from a well-established company trading on a major exchange that is widely-followed by

---

[29] Testing the Waters: Tapping U.S. Capital Markets without SEC Registration by Cross-Trading on OTCQX International, *Seward & Kissel LLP*, July 2021, at p. 1.

[30] *See* https://www.otcmarkets.com.

[31] *Id.*

[32] *See* https://www.otcmarkets.com/learn/caveat-emptor.

11

investors and analysts. This is further evidenced by the fact that instead of holding the ADR, an investor can choose to convert the ADR to its underlying security.[33]

27.     Because ADRs represent the foreign issuer's underlying common stock, ADR prices derive their value from the foreign issuer's underlying common stock. Academic research has documented that the movement of the ADR's underlying shares, *i.e.*, the foreign issuer's shares trading in the foreign issuer's country, is the factor that most influences ADR price movements. For example, Kim et al. (2000) document that "…innovations from each country's underlying shares explain substantial portion of innovations in the corresponding ADRs…"; similarly, Ely and Salehizadeh (2001) document that "…foreign markets are the more important source of information on the values of the equity values."; and Aquino and Poshakwale (2006) document that "…movements in the underlying shares are the most influential factor affecting ADR prices."[34]

28.     While an ADR's price is derived from the foreign issuer's underlying shares, there may be temporary impediments to price transmission which could give rise to possible arbitrage opportunities. However, as Gagnon and Karolyi (2010) state: "Arbitrage is one of the central tenets of financial economics, enforcing the law of one price and keeping markets efficient. It is defined as the 'simultaneous purchase and sale of equivalent securities in two different markets in order to profit from discrepancies in their price relationship' (Bodie, Kane, and Marcus, 2009, p. 319)."[35]

---

[33] Investor Bulletin: American Depositary Receipts, *U.S. Securities & Exchange Commission*, August 2012.

[34] Kim, M., Szakmary, A., and Mathur, I, 2000. Price Transmission Dynamics Between ADRs and Their Underlying Foreign Securities, *Journal of Banking & Finance* 24, at p. 1368; Ely, D. and Salehizadeh, M., 2001. American Depositary Receipts An Analysis of International Stock Price Movements, *International Review of Financial Analysis* 10, at p. 359; and Aquino, K., and Poshakwale, S., 2006. Price Determinants of American Depositary Receipts (ADR): A Cross-sectional Analysis of Panel Data, *Applied Financial Economics* 16, at p. 1225.

[35] Gagnon, L. and Karolyi, G., 2010. Multi-Market Trading and Arbitrage, *Journal of Financial Economics* 97, at p. 53.

For example, because the underlying is priced in the currency of the foreign issuer while ADRs are dollar-denominated, foreign currency fluctuations could also affect ADR pricing.[36] In addition, because of differences in the timing of trading hours between the U.S. and foreign exchanges, there may be a temporary delay in the impounding of information from the underlying to its ADR.[37]

29.    Gagnon and Karolyi (2010) find that "…daily deviations from price parity among cross-listed pairs are, on average, economically small averaging around 4.9 basis points (as a percent of the home share price) and with a daily standard deviation of 1.4% for a typical stock pair."[38] Similarly, Alsayed and McGroarty (2012) document that "…stock–ADR arbitrage is characterized by a high incidence of small, short-lived, exploitable mispricings."[39] Furthermore, they state that "Arbitrage is an important element in enforcing stock–ADR parity, and is demonstrably successful at doing so. Our analysis constitutes evidence in support of Grossman and Stiglitz (1976, 1980) in that *pricing anomalies incentivize arbitrageurs to restore price efficiency*."[40] Similarly, Kim et al. (2000) find that "The resulting mismatches between ADR and underlying security values are eventually eliminated by arbitrageurs, but the arbitrage activity is impeded by nonsynchronous trading times and transactions costs."[41]

30.    Depending on the time of year (*i.e.*, eastern standard or daylight time), there are up to two trading hours in a given calendar day where the open trading hours overlap between U.S.

---

[36] Kim, M., Szakmary, A., and Mathur, I, 2000. "Price Transmission Dynamics Between ADRs and Their Underlying Foreign Securities." *Journal of Banking & Finance* 24, at p. 1380.

[37] *Id*., at p. 1359.

[38] Gagnon, L. and Karolyi, G., 2010. Multi-Market Trading and Arbitrage, *Journal of Financial Economics* 97, at p. 54.

[39] Alsayed, H. and McGroarty, F., 2012. Arbitrage and the Law of One Price in the Market for American Depository Receipts. *Journal of International Financial Markets, Institutions and Money* 22, at p. 1274.

[40] *Id.* (emphasis added).

[41] Kim, M., Szakmary, A., and Mathur, I, 2000. "Price Transmission Dynamics Between ADRs and Their Underlying Foreign Securities." *Journal of Banking & Finance* 24, at p. 1378.

and French markets. That is, the Paris Stock Exchange may be open for up to two hours at the end of their trading day while east coast traders in the U.S. begin their trading day. In the window of synchronous trading, Howe and Ragan (2002) find that "…the opening volatility of American depositary receipts (ADRs) is lower when the trading of the underlying asset overlaps trading of the ADR on the New York Stock Exchange (NYSE). This lower volatility is consistent with the notion that price discovery on the NYSE is enhanced by concurrent trading in the underlying market."[42] Similarly, Figueiredo and Parhizgari (2018) find that "Regarding market efficiency, based on the results obtained, we conclude that when the local market and the US market are simultaneously open for trading, ADR prices and their equivalent underlying local share prices trade within a tight band. This band is mostly within a 5-cent range on a minute-by-minute basis, making it difficult to find profitable arbitrage opportunities to exploit…"[43]

31.      Hence, due to asynchronous trading, it often takes an extra calendar trading day for prices in the U.S. ADR market to reflect information from the foreign issuer's market, as evidenced in Mehanaoui (2017), who states: "This suggests that the prices of the French firms listed on the EURONEXT market lead the prices of their cross-listed shares on the NYSE market. Stated alternatively, lagged changes in the prices of French firms on the EURONEXT market lead to subsequent changes in the prices of ADRs on the NYSE. … Hence, markets are integrated, since differences in prices are temporary."[44] These temporary differences in prices do not indicate inefficiency, but rather reflect price discovery consistent with Kim et al. (2000), Gagnon and Karolyi (2010), and Alsayed and McGroarty (2012). This is further consistent with informational

---

[42] Howe, J. and Ragan, K., 2002. Price Discovery and the International Flow of Information. *Journal of International Financial Markets, Institutions and Money* 12, at p. 201.

[43] Figueiredo, A. and Parhizgari, A., 2018. Contemporaneous ADR pricing: intraday dynamics during overlapping trading hours. *The European Journal of Finance* 24, at p. 204.

[44] Mehanaoui, M., 2017. Financial Market Integration: Evidence from Cross-Listed French Firms. *Journal of Risk and Financial Management* 10, at p. 10.

14

efficiency insofar as prices are responding to information, albeit with delay given the asynchronous nature of trading across these markets.[45]

### B. Overview of Teleperformance ADRs

32. Teleperformance's ADRs are considered as Level 1 ADRs which trade OTC in the U.S. via OTC Markets Group on their Pink Exchange.[46] Teleperformance's ADRs are registered with the SEC via Form F-6.[47] Teleperformance's ADRs establish a trading presence in the U.S. to allow U.S. investors to indirectly invest in the underlying shares of Teleperformance trading in France. Alternatively, U.S. investors could directly invest in shares of Teleperformance trading in France. Several depository institutions facilitate the trading of Teleperformance's ADRs, including JPMorgan Chase Bank, Citibank, Deutsche Bank, The Bank of New York Mellon, along with other depository institutions.[48]

33. As discussed above, some foreign issuers and depository institutions choose to trade on certain exchanges, such as OTC, in order to be exempt from SEC registration and filing requirements. Many foreign issuers are exempt from SEC registration and filing requirements by

---

[45] *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005). "For purposes of establishing the fraud-on-the-market presumption of reliance, we adopt the prevailing definition of market efficiency, which provides that an efficient market is one in which the market price of the stock fully reflects all publicly available information. By 'fully reflect,' we mean that market price responds so quickly to new information that *ordinary investors cannot make trading profits on the basis of such information*. This is known as 'informational efficiency.' We reject a second and much broader meaning of 'fully reflect,' known as 'fundamental value efficiency,' which requires that a market respond to information not only quickly but accurately, such that the market price of a stock reflects its fundamental value." (emphasis added).

[46] *See* https://www.otcmarkets.com/stock/TLPFY/overview.

[47] "Disclosure under Form F-6 relates only to the contractual terms of deposit under the deposit agreement and includes copies of the agreement, a form of ADR certificate, and legal opinions. A Form F-6 registration statement contains no information about the foreign private issuer. If a foreign private issuer with ADRs wishes to raise capital in the United States, it would separately file a registration statement on Form F-1, F-3 or F-4, as described earlier." *See* https://www.sec.gov/divisions/corpfin/internatl/foreign-private-issuers-overview.shtml.

[48] *See* https://www.sec.gov/edgar/browse/?CIK=1450682.

15

demonstrating SEC Rule 12g3-2b compliance.[49] In the absence of SEC Rule 12g3-2b compliance, foreign issuers may still trade OTC under SEC Rule 15c2-11[50] using the Large Company Exemption.[51] My understanding is that Teleperformance is exempt from SEC registration and filing requirements yet trades OTC because, per OTC Markets Group, Teleperformance is considered to be a large, well-capitalized issuer with highly liquid securities "…that meet trading volume, asset and shareholder equity metrics, without complying with the information review requirement." [52] Furthermore, Teleperformance does not carry OTC Markets Group's "Caveat Emptor" designation, which, as mentioned above, is intended to warn investors of stocks that could be characterized as "penny stocks."

34.     Hence, similar to other large and well-known international issuers traded in the U.S. OTC market on the Pink Exchange, Teleperformance's ADRs are not comparable to a typical "penny stock"; rather, they are more comparable to a dual- or cross-stock listing from a well-established company trading on a major exchange that is widely-followed by investors and analysts. This is further evidenced by the fact that instead of holding Teleperformance's ADRs, an investor can choose to convert the ADR to its underlying security.

---

[49] "The exemption allows a foreign private issuer to have its equity securities traded in the U.S. over-the-counter market without registration under Section 12(g). The adopted rule amendments will eliminate the current written application and paper submission requirements under Rule 12g3-2(b) by automatically exempting from Exchange Act Section 12(g) a foreign private issuer that meets specified conditions. Those conditions will require an issuer to maintain a listing of its equity securities in its primary trading market located outside the United States, and require it to publish electronically in English specified non-United States disclosure documents." Exemption from Registration Under Section 12(g) of the Securities Exchange Act of 1934 for Foreign Private Issuers, *U.S. Securities & Exchange Commission*, September 2008, at p. 1.

[50] Publication or Submission of Quotations Without Specified Information, *U.S. Securities & Exchange Commission*, September 2020, at p. 121.

[51] International Reporting Standard: Pink Basic Disclosure Guidelines, *OTC Markets Group*, March 2023, at p. 2.

[52] *See* https://www.otcmarkets.com/glossary#large-company-exemption.

## VI.  Evaluation of Market Efficiency Factors for Teleperformance ADRs

35.  I now turn to discuss the *Cammer* and *Krogman* factors and evaluate them in relation to Teleperformance's ADRs. To do so, I compare the factors' application to Teleperformance's ADRs against: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed, published academic research.

36.  As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that Teleperformance's ADRs traded in an efficient market throughout the Class Period.

37.  One academic study that I use for comparison purposes was published by Mola, Rau, and Khorana, which I refer to as the "MRK Study."[53] In this study, the authors examined two samples of firms. The first sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[54]

38.  The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock. . . . Firms that lose all analyst coverage continue

---

[53] Mola, S., Rau, P., and Khorana, A., 2013. Is There Life After the Complete Loss of Analyst Coverage? *The Accounting Review* 88, at pp. 667-705.

[54] MRK Study at 678, 681-682.

to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[55]

39.     The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[56] Therefore, I interpret the sample of MRK Covered firms as those eliciting high investor interest and reflect factors common to firms operating in efficient markets.

40.     Below, I compare several of Teleperformance market efficiency factors to the samples of firms in the MRK Study to assess whether Teleperformance's characteristics are consistent with firms operating in efficient markets.

### C.     *Cammer* Factor 1: Average Weekly Trading Volume

41.     Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security.[57] Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.[58] The first *Cammer* factor, stock trading volume, has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the

---

[55] MRK Study at 667.

[56] MRK Study at 681 (footnotes omitted).

[57] *See, e.g.*, Bhole, B., Surana, S. and Torchio, F., 2020. Benchmarking Market Efficiency Indicators for Securities Litigation. *University of Illinois Law Review*, at pp. 101-102. (the "Bhole Study"); Thomas, R. and Cotter, J., 2000. Measuring Securities Market Efficiency in the Regulatory Setting. *Law and Contemporary Problems* 63, at p. 108; MRK Study at p. 681.

[58] *Id.*

18

market for the security is an efficient one; 1% would justify a substantial presumption.[59]

42.    **Exhibit 2** graphs Teleperformance's ADRs' weekly trading volume as a fraction of ADRs outstanding throughout the Class Period.[60] The average weekly trading volume was 2.1% of Teleperformance's ADRs outstanding over the Class Period.[61] This level of trading volume exceeds the 1% and 2% thresholds established by the *Cammer* court. I also note that investors could trade Teleperformance Common Stock on the Paris Stock Exchange (ticker: TEP.PA), with over 84 million shares traded during the Class Period.[62] This indicates that the ADR trading volume represents only a small subset of the total trading opportunities for investors. As a result, Teleperformance's level of ADR trading volume throughout the Class Period supports the conclusion that Teleperformance's ADRs traded in an efficient market throughout the Class Period.

43.    Additionally, Teleperformance's ADRs' daily turnover rate of 0.4% during the Class Period placed it above the 25th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018.[63] (This represents a lower-bound comparison because it excludes the

---

[59] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg, §8.6).

[60] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[61] Throughout this report, I reasonably estimate the number of ADRs outstanding as the proportion of ADR dollar trading volume relative to the sum of ADR dollar trading volume and Common Stock dollar trading volume over the Class Period, which was 3.69%, multiplied by the number of Common Shares outstanding. Academic literature frequently measures the relative dollar trading volume of U.S. ADRs and foreign common stock. *See*, *e.g.*, Chakravarty, S., Chiyachantana, C., and Jiang, C., 2011. The Choice of Trading Venue and Relative Price Impact of Institutional Trading: ADRs vs. the Underlying Securities in their Local Markets. *The Journal of Financial Research*, at p. 541.  I reserve the right to amend this report and my calculations if additional data becomes available regarding the number of ADRs outstanding throughout the Class Period.

[62] Data Source: Bloomberg.

[63] Bhole Study at 102. The 25th percentile of daily turnover for the 2016-2018 sample period is 0.39%. The 2016-2018 subsample time period is the most recent period reported in this study.

significant trading volume of the Common Stock relative to the common stock trading measured in the Bhole Study). This further supports the conclusion that Teleperformance's ADRs traded in an efficient market throughout the Class Period.

### D. *Cammer* Factor 2: Analyst Coverage

44. An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry. Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.

45. Analyst coverage can be indicative of market efficiency since research analysts help to disseminate new important company-specific information to investors, thus impounding new information into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[64]

46. In **Exhibit 3** I reviewed the analyst coverage of Teleperformance over the Class Period. I identified a total of at least 278 reports issued by analysts at 22 separate firms during that period.[65] The list of analyst reports that I was able to identify includes reports by firms that conducted thorough and detailed research on Teleperformance and the industry within which it

---

[64] *Cammer*, 711 F. Supp. at 1286.

[65] These statistics represent a lower bound of the analyst coverage of Teleperformance because many analyst reports are provided directly to investors but are not captured by third-party data vendors.

operated, such as the reports prepared by analysts at Morgan Stanley, Societe Generale, and Credit Suisse, among others. Collectively, this is a significant degree of analyst coverage which served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

47.     This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received no analyst coverage in a given year.[66] Further, Lee and So documented that, on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[67] In other words, many firms within the category of the least amount of analyst coverage in their sample were covered by only one or two analysts. Teleperformance's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest.

48.     Moreover, Teleperformance's high level of analyst coverage also placed it above the 90th percentile when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[68] The significant analyst coverage of Teleperformance during the Class Period supports the conclusion that Teleperformance's ADRs traded in an efficient market throughout the Class Period.

49.     In addition to the analyst coverage documented above, investors could access information about Teleperformance from a variety of other sources. For example, I conducted a search of press and news articles about Teleperformance using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes

---

[66] MRK Study at 668.

[67] Lee, C., and So, E., 2017. Uncovering Expected Returns: Information in Analyst Coverage Proxies. *Journal of Financial Economics* 124, at 336. (*see* Table 1, Panel B – "COV").

[68] Bhole Study at 104 (90th percentile defined as 20.1 analysts).

*Dow Jones Newswires*, *Reuters News*, *PR Newswire*, *Associated Press Newswires*, *Business Wire*, and numerous other outlets. This search produced over 1,300 articles throughout the Class Period.[69]

50. As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news and information about Teleperformance supports the conclusion that its ADRs traded in a well-developed and informationally efficient market throughout the Class Period.

### E. *Cammer* Factor 3: Market Makers

51. The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate the buying and selling of shares among investors in a company's stock during trading hours.[70] Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[71]

52. In evaluating market efficiency by looking at market makers, the *Cammer* court held:

---

[69] The articles were identified through a Factiva search of articles with Teleperformance's company tag from all available sources. After excluding potential duplicates, 912 unique news articles were identified by the search (which was limited to English language articles).

[70] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[71] Barber, B., Griffin, P., and Lev, B., 1994. The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporate Law* 19, at p. 291.

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[72]

The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting.

53.     Teleperformance's ADRs had at least 32 market makers and brokers providing similar activity over the Class Period.[73] The presence of more than 10 market makers thus supports the *Cammer* Court's "substantial presumption" of the efficiency of the market for Teleperformance's ADRs throughout the Class Period.

### F.     *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

54.     The fourth *Cammer* factor is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[74]

---

[72] *Cammer*, 711 F. Supp. at 1293; *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Cal. Dec. 22, 2016) ("The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.").

[73] *See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact . . . RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow.").

[74] *Cammer*, 711 F. Supp. at 1287.

55.     Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has a float of at least $75 million, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[75] The rationale behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have timely access to publicly available information about the issuer.

56.     My understanding is that Teleperformance did not have a class of securities subject to the Exchange Act's filings requirements during the Class Period, and thus was not eligible to file SEC Form S-3. However, as discussed in **Section V** above, Teleperformance is considered to be a large, well-capitalized issuer with highly liquid securities "…that meet trading volume, asset and shareholder equity metrics, without complying with the information review requirement."[76] To the extent that S-3 registration eligibility reflects company characteristics that are correlated with market efficiency, based on my review of Teleperformance's financial reports, Teleperformance clearly possessed those characteristics throughout the Class Period.[77] Thus, while this *Cammer* factor does not weigh in favor of market efficiency, Teleperformance's characteristics do not weigh against market efficiency in the context of S-3 eligibility characteristics.

---

[75] *See* SEC Form 3, available at https://www.sec.gov/files/forms-3.pdf.

[76] *See* https://www.otcmarkets.com/glossary#large-company-exemption.

[77] *See* https://www.teleperformance.com/en-us/investors/investors-homepage/.

**G.** ***Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices**

57. The fifth *Cammer* factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information. The *Cammer* court held:

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[78]

58. I summarize my empirical analysis below, which finds that Teleperformance's ADRs exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*.

### i. Event Study Methodology

59. To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study. Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.[79] As Professor Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.
>
> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This

---

[78] *Cammer*, 711 F. Supp. at 1291.

[79] *See* MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature* 13.

> evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[80]

60. To determine whether Teleperformance's ADR price movements on any given date are statistically significant, I performed an event study using generally accepted economic methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices.

61. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily security price movement, which represents the component of the daily security price return that is not attributable to market-wide or industry-wide movements, but rather is attributable to company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (*i.e.*, the "abnormal return") is "statistically significant," *i.e.*, sufficiently large compared to the usual volatility in the company security price return such that simple random movement can be rejected as the cause.

62. I applied these widely used and generally accepted econometric methodologies to perform my event study here. Specifically, in order to isolate the impact of company-specific news on Teleperformance's ADR price during the Class Period, I performed regression analyses to measure the relationship between Teleperformance's ADRs' price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in Teleperformance's industry. By modeling how Teleperformance's ADRs' price returns moved relative to an overall market index and an industry

---

[80] Fama, E., 1991. Efficient Capital Markets: II. *Journal of Finance* 46, at p. 1607.

index, I was also able to measure the response of Teleperformance's ADRs to announcements of company-specific news.

63. I conducted my regression analysis over the Class Period (February 20, 2020 through August 3, 2022, inclusive). For each trading day, I constructed a regression model using data from the prior six months of trading days (the "Estimation Window").[81]

64. To study the relationship between Teleperformance's ADR price returns and overall market factors, I used the S&P 500 Total Return Index (the "Market Index"). To study the relationship between Teleperformance's ADR price returns and changes in industry-wide factors that would be expected to impact all stocks in Teleperformance's particular industry, I used the S&P 500 Information Technology Index (the "Industry Index").

65. I established the relationship between the daily return of Teleperformance's ADRs, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[82] As shown in **Exhibit 4**, the event study models revealed an evolving relation between the daily returns of Teleperformance's ADRs and those of the overall stock market and industry

---

[81] I utilized an Estimation Window of 120 trading days, which is approximately six calendar months. This allowed my regression approach to adapt to the changing volatility of stock returns over time. *See, e.g.*, Mitchell, M. and Netter, J., 1994. The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission. *Business Lawyer* 49; MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature* 35, at p. 15. ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[82] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature* 35; Braun, P., Nelson, D., and Sunier, A., 1995. Good News, Bad News, Volatility, and Betas. *Journal of Finance* 50, at p. 1597.

indices throughout the Class Period. In other words, movements of the Market Index and the Industry Index help explain movements in Teleperformance's ADRs' prices.

66. Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of the Company on any given date within the Class Period which controls for that day's market and industry returns. Again, in accordance with standard event-study methodology, I then subtracted this predicted return from the actual return to obtain the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

67. Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in Teleperformance's ADRs' price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the regression model. In other words, the standard deviation of errors provides a measure for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of Teleperformance's ADRs after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period.

ii. *Cause and Effect Analysis of Teleperformance Earnings Announcements*

68. A generally-accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to evaluate earnings announcements over time.[83] A showing that a security's price tends to respond to new, potentially value-relevant disclosures of earnings-related

---

[83] Bozanic, Z., Roulstone, D., and Van Buskirk, A., 2018. Management Earnings Forecasts and Other Forward-Looking Statements. *Journal of Accounting and Economics*, 65; Villanueva, M.O. and Feinstein, S., 2021. Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors. *Review of Quantitative Finance and Accounting* 57.

information is considered powerful evidence that the security responds promptly to news and, therefore, strongly supports a finding of efficiency.[84]

69.     Importantly, research has shown that in an efficient market, it is possible for a security to exhibit some large price movements despite the absence of news and, conversely, for one to observe news without large price movements.[85] For instance, a company may announce earnings (or a lack thereof) that are in line with investor expectations – and while such an expected announcement is clearly important to investors, it will often not alter the total mix of information significantly enough to elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again would result in no statistically significant price movement. Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current level.

70.     To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I identified Teleperformance earnings releases posted on the Company's website during the Class Period. These types of announcements represent a potential opportunity for the public release of new, value-relevant Company information to investors. As shown in **Exhibit 6**, Teleperformance issued 11 earnings releases during the Class Period.

71.     I then calculated the abnormal returns of Teleperformance's ADRs around the earnings release disclosure windows. As noted in **Section V** above, research has shown that price

---

[84] *Id.*

[85] *See* Boudoukh, J., Feldman, R., Kogan, S. and Richardson, M., 2019. Information, Trading, and Volatility: Evidence from Firm-Specific News. *Review of Financial Studies* 32, at p. 1004; Fair, R., 2002. Events That Shook the Market. *Journal of Business* 75, at pp. 713-714.

discovery initially occurs in the foreign issuer's domestic market and that ADRs trading in the U.S. frequently reflect information the trading day following price movements in the foreign issuer's domestic market. I therefore evaluate whether Teleperformance's ADRs demonstrated a statistically significant price movement on either the day of the earnings announcement ("Day 0") or the next trading day ("Day 1").[86]

72.     **Exhibit 6** reports the list of 11 earnings releases and corresponding disclosure windows. It also reports the results of my event study using Teleperformance's ADRs' returns. The columns list abnormal returns and the $p$-value corresponding to statistical significance for each relevant trading day. Overall, 9 out of 11 (81.8%) of Teleperformance earnings releases caused stock price movements that were statistically significant at the 90% level or better. This proportion of significant price movements is itself statistically significant at the 1% level or better based on a test of proportions.[87]

73.     These results provide strong evidence of a cause-and-effect relationship between new information and Teleperformance's ADRs' price movements. These results establish a clear cause-and-effect relationship between the release of new company-specific information and Teleperformance's ADRs' price movements. As a result, this *Cammer* factor five analysis supports the conclusion that Teleperformance's ADRs traded in an efficient market during the Class Period.

## H.     *Krogman* Factor 1: Market Capitalization

74.     Beyond the five *Cammer* factors, I have also considered several additional factors articulated by the *Krogman* court. The first of these is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market

---

[86] Teleperformance held analyst and investor calls after the 5:30pm local Paris time market close (*see* Teleperformance Investor Relations Website, earnings releases). For example, Teleperformance announced 1Q2020 earnings on April 28, 2020 and held a conference call starting at 6:15pm CET. In **Exhibit 6**, I include April 28 as Day 0 and April 29 as Day 1.

[87] Using Stata's *bitesti* command with a null hypothesis of 0.1 yields a $p$-value of less than 0.001.

efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[88] Similarly, the *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[89]

75.     Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors – such as relatively small market capitalization – that indicate that their shares trade in less developed and efficient markets. The median market capitalization of the MRK Sample firms was $27.91 million.[90] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[91] This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

76.     **Exhibit 7** reports the market capitalization of Teleperformance's ADRs throughout the Class Period.[92] This market capitalization averaged $347.2 million over the Class Period. Teleperformance's total ADR market capitalization places it between the 25th and 50th percentiles of all companies listed on either the NASDAQ and the NYSE from 2016-2018.[93] Teleperformance's ADR market capitalization also exceeded the MRK Sample firms on an

---

[88] *Cammer*, 711 F. Supp. at 1287.

[89] *Krogman*, 202 F.R.D. at 478.

[90] MRK Study at 678 (Table 3).

[91] MRK Study at 678 (Table 3).

[92] Calculated as ADR closing price multiplied by estimated number of ADRs outstanding each day.

[93] Bhole Study at 107 (25th percentile of market capitalization defined as $167 million; 50th percentile defined as $781 million).

inflation-adjusted basis.[94] It also greatly exceeds the $75 million minimum float requirement under the SEC's S-3 eligibility requirements. I further note that this measurement of ADR market cap represents a lower bound of size, given that the Company's market capitalization of Common Stock was several billion dollars throughout the Class Period.

77.     Teleperformance's market capitalization is thus consistent with the conclusion that Teleperformance's ADRs traded in an efficient market during the Class Period.

**I.     *Krogman* Factor 2: Bid-Ask Spread**

78.     The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[95]

79.     The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency or as a percentage relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally efficient market. A wider bid-ask spread indicates that investors will pay more to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

80.     I analyzed the bid-ask spread of Teleperformance's ADRs during the Class Period. **Exhibit 8** reports Teleperformance's bid-ask spread as a percentage of the bid-ask midpoint.[96] This spread averaged 0.41% over the Class Period.

---

[94] U.S. Bureau of Labor Statistics, CPI Inflation Calculator. *See* https://www.bls.gov/data/inflation_calculator.htm.

[95] *Krogman*, 202 F.R.D. at 478.

[96] Bloomberg daily reported "AVERAGE_BID_ASK_SPREAD_%" variable.

81.     By way of comparison, the MRK Study found that MRK Sample firms had a median bid-ask spread of 4.55%, while MRK Covered firms had a median bid-ask spread of 1.69%.[97] Teleperformance's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade Teleperformance's ADRs at very low relative cost. Additionally, Teleperformance's average bid-ask spread over the Class Period places it between the 50th and 75th percentiles of all companies listed on NASDAQ and the NYSE from 2016-2018 (lower percentile rankings correspond to smaller bid-ask spreads).[98]

82.     As a result, Teleperformance's bid-ask spread also supports the conclusion that Teleperformance's ADRs traded in an efficient market throughout the Class Period.

### J.     *Krogman* Factor 3: Public Float

83.     The *Krogman* court also considered the public float of a company in weighing market efficiency.[99] The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

84.     Teleperformance insiders did not report any ADR holdings during the Class Period.[100] As a result, 100% of the ADRs were held and freely tradeable by outside investors.

---

[97] MRK Study at 678 (Table 3).

[98] Bhole Study at 105 (50th percentile of bid-ask spread defined as 0.14%; 75th percentile defined as 0.75%).

[99] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

[100] Data Sources: Bloomberg, Teleperformance's Investor Relations Website.

Hence, Teleperformance's float also supports the conclusion that Teleperformance's ADRs traded in an efficient market throughout the Class Period.

**VII.    Teleperformance's Common Stock Supports Market Efficiency of its ADRs**

85.    I also note that my analyses regarding Teleperformance's ADRs are conservative because investors were not limited to trading only Teleperformance's ADRs. For example, when new information was disclosed, investors could trade either the ADRs or the underlying common stock. As discussed in **Section V**, academic research has shown that this type of dual listing improves price efficiency. In this section, I briefly summarize the Cammer and Krogman factors of market efficiency for Teleperformance's Common Stock listing on the Paris Stock Exchange during the Class Period. I conclude that market for Teleperformance Common Stock was efficient throughout the Class Period, and this efficiency further enhances the efficiency of the ADRs.

- ***Cammer* Factor 1**: The average weekly trading volume was 1.2% of Teleperformance's Common Stock shares outstanding over the Class Period. This level of trading volume exceeds the 1% threshold established by the *Cammer* court, as discussed in **Section VI.A**.

- ***Cammer* Factor 2**: The sizeable analyst coverage was the same for all of Teleperformance's securities (at least 278 reports issued by analysts at 22 separate firms), as discussed in **Section VI.B**.

- ***Cammer* Factor 3**: Teleperformance's Common Stock had at least 86 market makers and brokers providing similar activity over the Class Period.[101] This level exceeds the *Cammer* court's benchmark of five or ten market makers (for OTC stocks), as discussed in **Section VI.C**.

- ***Cammer* Factor 4**: This factor is the same as explained for the ADRs in **Section VI.D** above.

- ***Cammer* Factor 5**: I conducted the same test of a cause-and-effect relationship between disclosures of information and resulting price movements as in **Section VI.E** above, but using the Common Stock price

---

[101] Source: Bloomberg RANK function.

34

movements instead of the ADR price movements.[102] As shown in **Exhibit 9**, 8 out of 11 earnings announcements produced Common Stock price reactions that were statistically significant at the 90% level or better. This proportion itself is statistically significant at the 99% level or better.[103]

- _**Krogman** Factor 1_: The Common Stock market capitalization averaged $17.5 billion during the Class Period, greatly exceeding the benchmarks described in **Section VI.F**.

- _**Krogman** Factor 2_: The Common Stock had a bid-ask spread of 0.06% during the Class Period, below the benchmarks described in **Section VI.G**.

- _**Krogman** Factor 3_: Teleperformance Common Stock had a market capitalization averaging $17.5 billion and between 58.72 million and 59.12 million shares outstanding during the Class Period. Furthermore, insiders held less than 2.01% of outstanding shares during the Class Period,[104] indicating that Teleperformance Common Stock had a sizeable float available for public trading throughout the Class Period.

86. Based on the foregoing, I conclude that market for Teleperformance Common Stock was efficient throughout the Class Period, and this efficiency further enhances the efficiency of Teleperformance's ADRs.

## VIII. Ability to Calculate Damages on a Class-Wide Basis

87. I have also been asked to opine on whether per-share damages for traders of Teleperformance's ADRs can be assessed for all Class members based upon a methodology common to all Class members and consistent with Plaintiffs' theories of liability. As discussed

---

[102] The event study parameters remain the same (same Estimation Window, market and industry indices, and sample of 11 Class Period earnings announcements). As noted in **Section VI.G**, Teleperformance held analyst and investor calls after the 5:30pm local Paris time market close (*see* Teleperformance Investor Relations Website, earnings releases). For example, Teleperformance announced 1Q2020 earnings on April 28, 2020 and held a conference call starting at 6:15pm CET. In **Exhibit 9**, I include April 28 as Day -1 and April 29 as Day 0.

[103] Using Stata's *bitesti* command with a null hypothesis of 0.1 yields a *p*-value of less than 0.001.

[104] Source: Bloomberg. Minimum insider ownership = 1.68%; Average = 1.96%.

below, damages for each of Plaintiffs' claims can be calculated on a class-wide basis through a common methodology.

**A.    Calculation of Damages for Violation of Sections 10(b) and 20(a) of the Exchange Act**

88.    For the §10(b) claims, Plaintiffs allege that the Defendants' fraudulent scheme, misstatements, and omissions artificially inflated the market price of Teleperformance's ADRs, and caused Class members to purchase Teleperformance's ADRs at artificially inflated prices.[105] Plaintiffs also claim certain Defendants are liable as control persons under section 20(a).[106]

89.    The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act. This approach calculates investor damages formulaically as the artificial inflation in the stock price at the time of an investor purchase minus the artificial inflation in the stock price at the time of an investor sale. If shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Private Securities Litigation Reform Act of 1995 ("PSLRA").[107] This cap on damages is also applied class-wide.

90.    The claims process produces information necessary for the calculation of damages for each Class member as inputs to the formula above, including the purchase and sale information

---

[105] Complaint, ¶¶ 12, 109.

[106] *Id.*, ¶¶ 133-134. Section 20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. 15 U.S.C. §78t(a). Given §20(a)'s derivative nature, I understand that §20(a) damages can be calculated using the same methodology for assessing §10(b) damages.

[107] The PSLRA states: "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S. Code §78u-4 (codifying language).

for the security (including transaction dates and quantity of shares traded). This information is available from brokerage statements, trade blotters, and/or other documentation of securities transactions. This information can also be used to identify eligible Class members meeting the relevant domesticity requirements (*i.e.*, trades of U.S.-based CUSIP 87946F100 and ISIN US87946F1003).

91.     Another input to the above formula, the quantification of artificial inflation per share, is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide as an input to the out-of-pocket formula. For example, event studies are widely employed to calculate artificial inflation. Event studies measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged fraudulent schemes and misrepresentations.[108]

92.     To the extent that reliable evidence is introduced to show that a significant portion of the difference in artificial inflation between the purchase and sale of securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of Teleperformance's securities can be determined on a common, class-wide basis using various accepted methodologies. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during discovery and will be based on the specific set of facts and circumstances in a given case.

---

[108] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

93.     A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery.

94.     One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal dollar value of stock price decline from an event study around one or more corrective disclosures.

95.     Alternatively, one can measure "constant percentage inflation," which assumes that each share price was inflated by a constant percentage amount above the correct stock price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal percentage return in stock price from an event study around one or more corrective disclosures.

96.     In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculations of artificial inflation and any potential disaggregation of confounding information are based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.

97.     All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances.

**B.     Damages Methodology is Flexible and can Incorporate Alternative Findings**

98.     The damages methodology I have laid out above is flexible and able to incorporate alternative findings of fact regarding the quantification, as well as the timing, of artificial inflation

38

and how it evolves over the Class Period. The methodology can be modified based on alternative findings the finder of fact may determine, including, but not limited to any: (1) confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) the first actionable fraudulent conduct or misstatement.

99. First, irrespective of what the ultimate finder of fact, *i.e.*, the jury, determines is the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information, this percentage can easily be inserted into the standard damages model that I have already described – the out-of-pocket formula. Regardless of how the jury weighs evidence, whether they find that any such disaggregation analysis I may conduct is the most appropriate, or they determine that based upon the evidence, a different amount is more appropriate, this finding can simply be incorporated into the damages calculation.

100. Second, should the jury determine that the true economic inflation evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a class-wide basis.

101. Third, should the jury decide that the first actionable misstatement or otherwise actionable fraudulent conduct happened at a date later than February 20, 2020, prior to such date, inflation could simply be set to zero.

102. If the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

103. To summarize, I have not been asked to calculate damages in this matter. Such analysis would depend on information produced in discovery and development of the case record. Based on my experience, qualifications, and understanding of the nature of the claims in this matter, I conclude that ADR damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

## IX. Conclusion

104. In conclusion, based on my analysis of the market efficiency factors considered by courts and in academia, it is my opinion that Teleperformance's ADRs traded in an efficient market throughout the Class Period. Moreover, it is my opinion that damages in this matter under Sections 10(b) and 20(a) can be calculated on a class-wide basis utilizing a common methodology.

I declare under the penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

Zahn Bozanic, Ph.D.

## Appendix A

## ZAHN BOZANIC

Florida State University
College of Business
821 Academic Way, RBA 522
Tallahassee, FL 32306

Telephone:  (850) 645-1521
E-mail:  zahn.bozanic@fsu.edu
URL:  business.fsu.edu/person/zahn-bozanic

---

## ACADEMIC INTERESTS

**Research**:  My primary research interests are in the areas of corporate disclosure, financial reporting misconduct, regulation, and enforcement.

**Teaching**:  I teach financial statement analysis (MAcc level) with an emphasis on data analytics and an accounting seminar (PhD level) which focuses on empirical research methods.

## EDUCATION

**Ph.D.**, The Pennsylvania State University

**M.A.**, The University of Michigan – Ann Arbor

**B.A.**, The University of California – Berkeley

## ACADEMIC EXPERIENCE

**Full Professor, Florida State University** (2023-present)
**William Hillison Professor of Accounting**
    Introduction to Accounting Research Seminar – PhD Level
    Financial Statement Analysis with Data Analytics – MAcc Level

**Director of the PhD Program in Accounting** (2019-2023)

**Associate Professor, Florida State University** (2019-2023)

**Assistant Professor, The Ohio State University** (2012-2019)
    Financial Statement Analysis with Data Analytics – MAcc, MBA, and SMF Levels
    Financial Statement Analysis – Undergraduate Level

**Research Fellow, The National Center for the Middle Market** (2012-2016)

**Instructor, The Pennsylvania State University** (2008-2009)
    Intermediate Financial Accounting
    Introduction to Financial and Managerial Accounting

## PUBLICATIONS

17. "**Managing Expectations through Budgetary Slack: Evidence from Project Financing**" with Andrew Ferguson and Gabriel Pündrich. *European Accounting Review*, 2024, in-press.

16. "**Qualitative Disclosure and Credit Analysts' Soft Rating Adjustments**" with Pepa Kraft and Andrea Tillet. *European Accounting Review*, 2023, Vol. 32(4), 779-807. [Lead Article]

15. "**Have SFAS 166 and SFAS 167 Improved the Financial Reporting for Securitizations?**" with Minkwan Ahn, Sam Bonsall, Yiwei Dou, Gordon Richardson, and Dushyant Vyas. *d*, 2020, Vol. 47(7-8), 821-857. [Lead Article]

14. "**Analyst Contrarianism**" with Jing Chen and Michael Jung. *Journal of Financial Reporting*, 2019, Vol. 4(2), 61-88.

13. "**Securities Law Expertise and Corporate Disclosure**" with Preeti Choudhary and Ken Merkley. *The Accounting Review*, 2019, Vol. 94(4), 141-172.

12. "**Financial Reporting Fraud and Other Forms of Misconduct: A Multidisciplinary Review of the Literature**" with Dan Amiram, James Cox, Quentin Dupont, Jon Karpoff, and Richard Sloan. *Review of Accounting Studies*, 2018, Vol. 23(2), 732-783.

   *Ranked Top 10 by RAST for both downloads and citations*

11. "**Corporate Loan Securitization and the Standardization of Financial Covenants**" with Maria Loumioti and Florin Vasvari. *Journal of Accounting Research*, 2018, Vol. 56(1), 45-83.

10. "**Soft Information in Loan Agreements**" with Lin Cheng and Tzachi Zach. *Journal of Accounting, Auditing and Finance*, 2018, Vol. 33(1), 40-71.

9. "**Management Earnings Forecasts and Other Forward-Looking Statements**" with Darren Roulstone and Andy Van Buskirk. *Journal of Accounting and Economics*, 2018, Vol. 65(1), 1-20. [Lead Article]

8. "**SEC Comment Letters and Firm Disclosure**" with J. Richard Dietrich and Bret Johnson. *Journal of Accounting and Public Policy*, 2017, Vol. 36(5), 337-357.

7. "**IRS Attention**" with Jeff Hoopes, Jake Thornock, and Brady Williams. *Journal of Accounting Research*, 2017, Vol. 55(1), 79-114. [Data]

6. "**The *Ex-Ante* Monitoring Role of Accounting Covenants in Public Debt**" *Journal of Business Finance & Accounting*, 2016, Vol. 43(7), 803-829. [Lead Article]

5. "**Financial Statement Errors:  Evidence from the Distributional Properties of Financial Statement Numbers**" with Dan Amiram and Ethan Rouen. *Review of Accounting Studies*, 2015, Vol. 20(4), 1540-1593. [Data]

   *Winner of the Deloitte Foundation Wildman Medal Award and FARS Mid-Year Meeting Best Paper Award;*
   *Featured in Audit Analytics' Accounting Quality and Risk Matrix (AQRM) and Bloomberg Terminal's AQRM App*

4. "**Qualitative Disclosure and Changes in Sell-Side Financial Analysts' Information Environment**" with Maya Thevenot. *Contemporary Accounting Research*, 2015, Vol. 32(4), 1595-1616.

3. "**What Do Management Earnings Forecasts Convey About the Macroeconomy?**" with Sam Bonsall and Paul Fischer. *Journal of Accounting Research*, 2013, Vol. 51(2), 225-266. [Lead Article]

2. "**The Social Constitution of Regulation:  The Endogenization of Insider Trading Laws**" with Mark Dirsmith and Steve Huddart. *Accounting, Organizations, and Society*, 2012, Vol. 37(7), 461-481.

1. "**Managerial Motivation and Timing of Open Market Share Repurchases**" *Review of Quantitative Finance and Accounting*, 2010, Vol. 34(4), 517-531.

## WORKING PAPERS

7. "**(Unwanted) SEC Attention and Voluntary Disclosure**" with Andrea Down and Chris Williams

6. "**Negative Externalities of Media Coverage for Economically Linked Firms**" with Bruce Billings, Alyssa Moore, and Spencer Pierce

5. "**Systemic Risk and Bank Disclosure**" with Christina Synn and Chris Williams

4. "**The Relative Persistence of Earnings Components**" with Paul Fischer and Gabriel Pündrich

3. "**Not All Critical Audit Matters (CAM) Are the Same: Anti-Herding Behavior in CAM Disclosures**" with Will Anding and Allen Blay (*JBFA*, *Revise and Resubmit*)

2. "**The Regulatory Observer Effect: Evidence from SEC Investigations**" with Terrence Blackburne, Bret Johnson, and Darren Roulstone (*RAST, Revise and Resubmit*)

1. "**Selective Information Channels for Investment Research**" with Dan Amiram, Mark Bradshaw, and Oded Rozenbaum (*RAST, Revise and Resubmit*)

## PROFESSIONAL EXPERIENCE

### Wells Fargo Bank                                                                                2004-2005

*Financial Consultant* - Internal consultant to retail banking segment which focused on distribution planning.  Maintained financial models and databases; conducted ad-hoc research projects to measure the profitability of various strategies pre- and post-implementation.

*Product Manager* - Managed several retail products which generated annual fee revenues in excess of $80MM. Responsible for establishing strategic marketing programs for product enhancement and new products including identification of market segments, product positioning, pricing and profitability.

### Linsco / Private Ledger (LPL) Brokerage                                                         2003-2004

*Investment Advisor* - Solidified relationships with client base through full-service financial planning; managed back office financial operations, including cultivation of broker/dealer and wholesaler relationships.

### The William Davidson Institute                                                                  2001-2003

*Center Administrator* - Responsible for establishing, implementing, and streamlining the data center's operations. Collected, archived, and disseminated data on transition and emerging market economies.

A-3

**Tozzi Financial Research and Trading Center**                    2002-2003

*Programmer Analyst* - Maintained the trading room's daily activities, assisted users with their financial data/modeling needs, and trained users on a variety of valuation and risk management software platforms.

## INVITED PRESENTATIONS

INSEAD (2024, Scheduled)
HEC (2024, Scheduled)
University of Cyprus (2024, Scheduled)
Virginia Tech (2023)
University of Arizona (2023)
Tokyo Keizai University (2023)
Kobe University (2023)
University of Buffalo (2023)
University of Pittsburgh (2022)
University of Memphis (2022)
University of Florida (2022)
Iowa State University (2022)
Vanderbilt University (2021)
The Pennsylvania State University (2020)
The University of Rochester (2018)
London School of Economics (2018)
IESE Business School (2018)
Florida State University (2018)
West Virginia University (2018)
University of Louisville (2018)
William & Mary (2018)
Texas A&M University (2017)
Rice University (2017)
University of Missouri (2017)
University of Florida (2017)
University of Illinois (2017)
GWU Cherry Blossom Conference (2017)
University of Notre Dame (2016)
Columbia Business School (2016)

University of Toronto (2016)
Tilburg University (2016)
ESMT (2016)
FARS Mid-Year Meeting (2011-2015)
Georgetown University (2015)
Utah Winter Accounting Conference (2015)
The University of California - Berkeley (2014)
The Securities and Exchange Commission (2014)
Florida Atlantic University (2014)
Singapore Management University (2014)
Nanyang Technological University (2014)
Dartmouth College (2014)
Syracuse University (2014)
CFEA (2010-2011, 2013-2014)
HKUST Accounting Symposium (2013)
CUNY - Baruch (2013)
The University of Texas - Austin (2013)
The University of California - Irvine (2012)
The University of Miami (2012)
The University of Michigan (2012)
*Journal of Accounting Research* Conference (2012)
Carnegie Mellon University (2011)
Cornell University (2011)
The Ohio State University (2011)
Purdue University (2011)
The University of Utah (2011)
Washington University (2011)
Midwest Accounting Conference (2010)

## CONFERENCES

*Contemporary Accounting Research* Conference (2012-2013, 2015, 2020-2024, Scheduled)
*Review of Accounting Studies* Conference (2015, 2017-2018, 2020-2023)
Rotman Accounting Research Conference (2023)
FARS Mid-Year Meeting (2011-2018, 2023)
LBS Private Equity Symposium (2022)
USC Emerging Tech in Accounting Conference (2022)
Deloitte Foundation Faculty Consortium (2022)
FSU SunTrust Beach Conference (2022)
AAA Audit Mid-Year Meeting (2022)

Tilburg Accounting Winter Camp (2020-2021)
*European Accounting Review* Conference (2020-2021), discussant
Florida Accounting Symposium (2021)
CAFR Fundamental Analysis Symposium (2020)
KPMG Ph.D. Project ADSA Conference (2020), panelist
Accounting Horizons Data Analytics Conference (2019)
KPMG Faculty Symposium (2019)
LBS Accounting Symposium (2017, 2018)
Harvard Business School IMO Conference (2018)
Penn State Accounting Research Conference (2007-2011, 2014, 2018)
AAA Annual Meeting (2014, 2017)
*Accounting, Organizations, and Society* Conference (2017)
BYU Accounting Research Symposium (2017)
EAA Annual Congress (2017)
NYU Accounting Summer Camp (2014, 2016)
Minnesota Empirical Conference (2012, 2015-2016)
Utah Winter Accounting Conference (2013, 2014, 2016)
Colorado Summer Accounting Research Conference (2015)
CARE Conference (2010, 2012-2013)
FASB/IASB Financial Reporting Issues Conference (2012)
Conference on Financial Economics & Accounting (2012)
JAR – NY FED Conference (2012)
AAA New Faculty Consortium (2012)
AAA Annual Meeting (2010), moderator and discussant
FARS Mid-Year Meeting (2010), doctoral consortium
CFRM Conference on Financial Reporting (2009)
Conference on Empirical Legal Studies (2009)
AAA Annual Meeting (2009), discussant

## EXTERNAL SERVICE ACTIVITIES

Deloitte Foundation Wildman Medal Award Committee (2024)
Hawaii Accounting Research Conference, Editorial Committee and Track Chair (2023-2024)
Research Grants Council of Hong Kong, Advisory Committee Member (2020-2022)
EAA Annual Congress, Scientific Committee Member (2020-2021)
FARS Nominating Committee (2018-2019)
COSO/ACFE Fraud Risk Management Guide, Advisory Panel Member and Contributor (2016)
CARE Conference Co-Organizer (2016)
FARS Mid-Year Meeting, Editorial Committee and Track Chair (2015)

### Editorial Boards
*The Accounting Review*
*European Accounting Review*
*Journal of Business Finance & Accounting*
*Journal of Accounting & Public Policy*
*The International Journal of Accounting* (Editor)

**Ad-hoc Journal Referee**

| | |
|---|---|
| *Journal of Accounting Research* | *Journal of Business Finance & Accounting* |
| *Journal of Accounting and Economics* | *Journal of Economic Behavior & Organization* |
| | |
| *The Accounting Review* | *Journal of Accounting, Auditing and Finance* |
| *Review of Accounting Studies* | *Journal of Accounting and Public Policy* |
| *Contemporary Accounting Research* | *The International Journal of Accounting* |
| *Management Science* | *Journal of Corporate Finance* |
| *Accounting, Organizations and Society* | *Journal of Empirical Finance* |
| *Journal of Management Accounting Research* | *Regulation and Governance* |
| *Journal of Financial Reporting* | *Quarterly Journal of Finance and Accounting* |
| *European Accounting Review* | *Journal of International Business Studies* |
| *Accounting Horizons* | *Pacific-Basin Finance Journal* |
| *Journal of Accounting Literature* | |

**Ad-hoc Conference Referee**

Hawaii Accounting Research Conference (2022)
FARS Mid-Year Meeting (2011-2014, 2016-2017, 2019, 2021-2023)
AAA Annual Meeting (2013)
AAA Ohio Regional Meeting (2012)


## INTERNAL SERVICE ACTIVITIES

**Florida State**

Strategic Planning Committee
Promotion and Tenure Committee
Recruiting Committee
Accounting Doctoral Program Committee
Professional Development Seminar Co-Coordinator (2020-2022)
Accounting PhD Program Director (2019-2023)
Doctoral Program Policy Committee (2019-2023)
PhD Student Dissertation Committees
    Andrea Tillet, 2022 (Chair, Initial Placement: University of Wisconsin - Madison)
    Will Anding, 2024, Expected (Committee Member)

**Ohio State**

Faculty Senate
Recruiting Committee
PhD Program Committee
MAcc Program Committee
KPMG MAcc Data Analytics Initiative
MIS Program Committee
Accounting MBA Program Committee
PhD Student Dissertation Committees
    Danyang Jiang, 2019 (Member, Initial Placement: University of Intl. Business and Economics)
    Aaron Nelson, 2018 (Member, Initial Placement: University of Georgia)
    Bret Johnson, 2015 (Member, Initial Placement: George Mason University)
Burns Research Colloquium Coordinator
PhD Student Pre-Colloquium Coordinator
Summer Brown Bag Workshop Coordinator
Graduate Faculty Representative
Graduate Studies Committee

## OUTSIDE ACTIVITIES

### Economic Litigation Consulting
I provide economic litigation consulting and support on cases related to financial reporting misconduct, including, but not limited to, misleading corporate disclosures, accounting fraud, and insider trading.

## ACADEMIC AWARDS & HONORS

FARS Best Dissertation Supervision Award
EAR Excellence in Reviewing Recognition
William Hillison Professorship
Faculty Leadership Development Program
Deloitte Foundation Wildman Medal Award
FARS Mid-Year Meeting Best Paper Award
The National Center for the Middle Market Research Fellowship
Ossian R. MacKenzie Doctoral Teaching Award
Smeal Competitive Dissertation Award
G. Kenneth Nelson Scholarship
Smeal Doctoral Research Grant
Jane O. Burns Graduate Scholarship
Center for the Study of Finance Graduate Fellowship

## MEDIA MENTIONS

"ExxonMobil, Impairments, and the SEC" – Audit Analytics, January 2021

"Corporate Loan Securitization and the Standardization of Financial Covenants" – Columbia Law School Blue Sky Blog, June 2018

"Using Benford's Law to Assess Financial Reporting Quality" – Columbia Law School Blue Sky Blog, February 2016

"The SEC Never Reads 74% of Filings, Putting Investors at Risk" – Marketwatch.com, October 2015

"On the Role of Companies' External Securities Law Advisors – Facilitators or Gatekeepers?" – Columbia Law School Blue Sky Blog, October 2015

"Accountants Increasingly Use Data Analysis to Catch Fraud" – Wall Street Journal, December 2014

"IRS Pays Attention to Corporate Filings, Study Shows" – Compliance Week, November 2014

"IRS Scanning 10-Ks for Tax Data, Report Finds" – CFO.com, November 2014

"A New Tool to Detect Financial Reporting Irregularities" – The Harvard Law School Forum on Corporate Governance and Financial Regulation, July 2014

"The Simple Mathematical Law That Financial Fraudsters Can't Beat" – Forbes, May 2014

"Financial Fraud Detection Now as Simple as 1, 2, 3" – PR Newswire, May 2014

"The Search for Suspect Accounting" – CFO.com, April 2014

"Earnings Bode Ill for Stocks" – Wall Street Journal, June 2012

**POLICY MENTIONS**

U.S. Supreme Court Amicus Brief, *Goldman Sachs Group, Inc., et al., Petitioners v. Arksansas Teacher Retirement System, et al.*, March 2021

Comment to the SEC re Concept Release on Regulation S-K Disclosures by U.S. Senate Permanent Subcommittee on Investigations, July 2016

Capital Unbound: Remarks at the Cato Summit on Financial Regulation by SEC Commissioner Michael S. Piwowar, June 2015

**IMPACT METRICS**

SSRN Downloads:  ~**12,500** (**~900** per downloadable paper)

Google Scholar (BYU) Citations:  **2,161** (**2,004**)

h-index (i10-index): **15** (**18**)

**PERSONAL INTERESTS**

Running, Yoga, Swimming, Weightlifting, Tennis

**LINKS**

BYU Rankings   Google Scholar   SSRN

**Appendix B**

**Documents Considered**

**Court Documents:**

- Second Amended Class Action Complaint for Violations of the Federal Securities Laws (Doc. 71)

- Order, dated Aug. 28, 2024 (Doc. 75)

**Court Decisions and Securities Law:**

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

- *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D. Cal. 2016).

- *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005).

- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

- Private Securities Litigation Reform Act of 1995, December 1995.

- Exemption from Registration Under Section 12(g) of the Securities Exchange Act of 1934 for Foreign Private Issuers, *U.S. Securities & Exchange Commission*, September 2008

- Publication or Submission of Quotations Without Specified Information, *U.S. Securities & Exchange Commission*, September 2020

**Academic Literature:**

- Alsayed, H. and McGroarty, F., 2012. Arbitrage and the Law of One Price in the Market for American Depository Receipts. *Journal of International Financial Markets, Institutions and Money*

- Ang, A., Shtauber, A., and Tetlock, P., 2013. Asset Pricing in the Dark: The Cross-Section of OTC Stocks. *The Review of Financial Studies*

- Aquino, K., and Poshakwale, S., 2006. Price Determinants of American Depositary Receipts (ADR): A Cross-sectional Analysis of Panel Data. *Applied Financial Economics*

- Barber, B., Griffin, P., and Lev, B., 1994. The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporate Law*

- Bhole, B., Surana, S. and Torchio, F., 2020. Benchmarking Market Efficiency Indicators for Securities Litigation. *University of Illinois Law Review*

- Boudoukh, J., Feldman, R., Kogan, S., and Richardson, M., 2019. Information, Trading, and Volatility: Evidence from Firm-Specific News. *Review of Financial Studies*

B-1

- Bozanic, Z., Roulstone, D., and Van Buskirk, A., 2018. Management Earnings Forecasts and Other Forward-Looking Statements. *Journal of Accounting and Economics*

- Braun, P., Nelson, D., and Sunier, A., 1995. Good News, Bad News, Volatility, and Betas. *Journal of Finance*

- Chakravarty, S., Chiyachantana, C., and Jiang, C., 2011. The Choice of Trading Venue and Relative Price Impact of Institutional Trading: ADRs vs. the Underlying Securities in their Local Markets. *The Journal of Financial Research*

- Ely, D. and Salehizadeh, M., 2001. American Depositary Receipts An Analysis of International Stock Price Movements. *International Review of Financial Analysis*

- Fair, R., 2002. Events That Shook the Market. *Journal of Business*

- Fama, E., 1991. Efficient Capital Markets: II. *Journal of Finance*

- Figueiredo, A. and Parhizgari, A., 2018. Contemporaneous ADR pricing: intraday dynamics during overlapping trading hours. *The European Journal of Finance*

- Gagnon, L. and Karolyi, G., 2010. Multi-Market Trading and Arbitrage. *Journal of Financial Economics*

- Howe, J. and Ragan, K., 2002. Price Discovery and the International Flow of Information. *Journal of International Financial Markets, Institutions and Money*

- Kim, M., Szakmary, A., and Mathur, I, 2000. Price Transmission Dynamics Between ADRs and Their Underlying Foreign Securities. *Journal of Banking & Finance*

- Lee, C. and So, E., 2017. Uncovering Expected Returns: Information in Analyst Coverage Proxies. *Journal of Financial Economics*

- MacKinlay, A., 1997. Event Studies in Economics and Finance. *Journal of Economic Literature*

- Mitchell, M. and Netter, J., 1994. The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission. *The Business Lawyer*

- Mehanaoui, M., 2017. Financial Market Integration: Evidence from Cross-Listed French Firms. *Journal of Risk and Financial Management*

- Mola, S., Rau. P., and Khorana, A., 2013. Is There Life After the Complete Loss of Analyst Coverage? *The Accounting Review*

- Thomas, R. and Cotter, J., 2000. Measuring Securities Market Efficiency in the Regulatory Setting. *Law and Contemporary Problems*

- Villanueva, M. and Feinstein, S., 2021. Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors. *Review of Quantitative Finance and Accounting*

- White, J., 2016, Outcomes of Investing in OTC Stocks, *U.S. Securities & Exchange Commission*, Division of Economic and Risk Analysis (DERA) White Paper

**Data Sources:**

- Bloomberg Terminal
- Factiva News
- Teleperformance Earnings Releases

**Other:**

- International Reporting Standard: Pink Basic Disclosure Guidelines, *OTC Markets Group*, March 2023.
- Investor Bulletin: American Depositary Receipts, *U.S. Securities & Exchange Commission*, August 2012.
- Testing the Waters: Tapping U.S. Capital Markets without SEC Registration by Cross-Trading on OTCQX International, *Seward & Kissel LLP*, July 2021.
- Low-Priced Stocks Can Spell Big Problems, *Financial Industry Regulatory Authority* (FINRA), January 2024.
- Can You Swim in a Dark Pool?, FINRA, November 2023.
- https://www.teleperformance.com
- https://www.bls.gov
- https://www.investor.gov
- https://www.sec.gov
- https://www.otcmarkets.com
- All data and documents cited throughout this report

**Exhibit 1**

**Teleperformance ADRs Closing Stock Price and Daily Volume**
**February 20, 2020 – August 3, 2022**



Data source: Bloomberg.

E-1

**Exhibit 2**

### Teleperformance Weekly Trading Volume
### February 20, 2020 – August 3, 2022



Data source: Bloomberg. Note: Average weekly trading volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period.

E-2

**Exhibit 3**

### Analyst Coverage
### Class Period: February 20, 2020 - August 3, 2022

|      | Contributor Name | Reports Issued |
|------|------------------|----------------|
| [1]  | Morgan Stanley | 52 |
| [2]  | Societe Generale | 37 |
| [3]  | Credit Suisse | 28 |
| [4]  | Kepler | 23 |
| [5]  | Gilbert Dupont | 19 |
| [6]  | HSBC | 17 |
| [7]  | Deutsche Bank | 16 |
| [8]  | Bank of America | 15 |
| [9]  | JP Morgan | 14 |
| [10] | UBS | 14 |
| [11] | Market Grader | 10 |
| [12] | Exane | 7 |
| [13] | Sadif | 6 |
| [14] | Portzamparc | 5 |
| [15] | BNP Paribas | 4 |
| [16] | CIC ESN | 3 |
| [17] | finnCap/Cavendish[109] | 2 |
| [18] | RBS | 2 |
| [19] | Berenberg | 1 |
| [20] | Business Research Co. | 1 |
| [21] | theScreener | 1 |
| [22] | William O'Neil | 1 |
| **Total** | | **278** |

Source: Counsel.

---

[109] Per https://www.finncap.com, "finnCap Group plc has successfully merged with Cenkos Securities plc, to form a new group known as Cavendish."

**Exhibit 4**

**Coefficients from Rolling Event Study Regressions**
**February 20, 2020 – August 3, 2022**

Data Sources: Bloomberg, Teleperformance Investor Relations Website, Complaint.
Note: Regression models described in notes below Exhibit 6.

E-4

**Exhibit 5**



**Root Mean Squared Error (RMSE) from Rolling Event Study Regressions**
**February 20, 2020 – August 3, 2022**

Data sources: Bloomberg, Teleperformance Investor Relations Website, Complaint.
Note: Regression models described in notes below Exhibit 6.

E-5

**Exhibit 6**

### Teleperformance Earnings Announcements and ADRs Abnormal Returns

| | Disclosure Event | Disclosure Window | Day 0 | | Day 1 | | Statistically Significant |
|---|---|---|---|---|---|---|---|
| | | | Abnormal Return | *p*-value | Abnormal Return | *p*-value | |
| [1] | 4Q 2019 Earnings Release | Feb. 20-21, 2020 | -0.8% | 0.599 | 0.5% | 0.763 | No |
| [2] | 1Q 2020 Earnings Release | Apr. 28-29, 2020 | 1.1% | 0.636 | 7.1% | 0.002 | Yes |
| [3] | 2Q 2020 Earnings Release | Jul. 29-30, 2020 | -0.3% | 0.907 | 7.9% | 0.005 | Yes |
| [4] | 3Q 2020 Earnings Release | Nov. 3-4, 2020 | 1.7% | 0.336 | 3.2% | 0.076 | Yes |
| [5] | 4Q 2020 Earnings Release | Feb. 25-26, 2021 | 2.2% | 0.139 | 3.9% | 0.010 | Yes |
| [6] | 1Q 2021 Earnings Release | Apr. 12-13, 2021 | 2.6% | 0.070 | 1.3% | 0.361 | Yes |
| [7] | 2Q 2021 Earnings Release | Jul. 28-29, 2021 | 0.3% | 0.792 | 0.9% | 0.365 | No |
| [8] | 3Q 2021 Earnings Release | Nov. 3-4, 2021 | -0.8% | 0.447 | -2.5% | 0.020 | Yes |
| [9] | 4Q 2021 Earnings Release | Feb. 17-18, 2022 | 0.2% | 0.886 | 5.9% | 0.000 | Yes |
| [10] | 1Q 2022 Earnings Release | Apr. 19-20, 2022 | -1.5% | 0.351 | 4.5% | 0.005 | Yes |
| [11] | 2Q 2022 Earnings Release | Jul. 27-28, 2022 | -2.2% | 0.120 | -5.2% | 0.000 | Yes |

Data Sources: Bloomberg, Teleperformance Investor Relations Website, Complaint. The event study estimations are based on rolling regressions of the 120 trading days preceding each date of analysis. The regression models control for the S&P 500 Total Return Index ("Market Index") and the S&P Information Technology Index ("Industry Index"). The estimations exclude the alleged corrective disclosure window and the earnings announcement disclosure windows.

**Exhibit 7**

### Teleperformance ADR Market Capitalization
### February 20, 2020 – August 3, 2022



Data Source: Bloomberg.

**Exhibit 8**



**Teleperformance ADRs Average Bid-Ask Spread**
**February 20, 2020 – August 3, 2022**

Data Source: Bloomberg.

**Exhibit 9**

### Teleperformance Earnings Announcements and Common Stock Abnormal Returns

| | Disclosure Event | Disclosure Window | Day -1 | | Day 0 | | Statistically Significant |
|---|---|---|---|---|---|---|---|
| | | | Abnormal Return | p-value | Abnormal Return | p-value | |
| [1] | 4Q 2019 Earnings Release | Feb. 20-21, 2020 | -1.1% | 0.375 | 0.2% | 0.877 | No |
| [2] | 1Q 2020 Earnings Release | Apr. 28-29, 2020 | -0.8% | 0.757 | 8.5% | 0.001 | Yes |
| [3] | 2Q 2020 Earnings Release | Jul. 29-30, 2020 | -1.3% | 0.658 | 6.4% | 0.036 | Yes |
| [4] | 3Q 2020 Earnings Release | Nov. 3-4, 2020 | 0.7% | 0.664 | 5.4% | 0.002 | Yes |
| [5] | 4Q 2020 Earnings Release | Feb. 25-26, 2021 | 1.2% | 0.395 | 6.0% | 0.000 | Yes |
| [6] | 1Q 2021 Earnings Release | Apr. 12-13, 2021 | 1.9% | 0.161 | 1.4% | 0.296 | No |
| [7] | 2Q 2021 Earnings Release | Jul. 28-29, 2021 | -0.6% | 0.545 | 1.1% | 0.235 | No |
| [8] | 3Q 2021 Earnings Release | Nov. 3-4, 2021 | -0.8% | 0.407 | -2.6% | 0.006 | Yes |
| [9] | 4Q 2021 Earnings Release | Feb. 17-18, 2022 | 0.9% | 0.529 | 5.5% | 0.000 | Yes |
| [10] | 1Q 2022 Earnings Release | Apr. 19-20, 2022 | -3.8% | 0.039 | 5.9% | 0.001 | Yes |
| [11] | 2Q 2022 Earnings Release | Jul. 27-28, 2022 | -0.1% | 0.939 | -4.9% | 0.005 | Yes |

Data Sources: Bloomberg, Teleperformance Investor Relations Website, Complaint. The event study estimations are based on rolling regressions of the 120 trading days preceding each date of analysis. The regression models control for the S&P 500 Total Return Index ("Market Index") and the S&P Information Technology Index ("Industry Index"). The estimations exclude the alleged corrective disclosure window and the earnings announcement disclosure windows.