**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARSHAN HASTHANTRA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CLEANSPARK, INC., ZACHARY BRADFORD, and S. MATTHEW SCHULTZ,<br><br>Defendants. | Civil Action No. 1:21-cv-00511-LAP |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION TO EXCLUDE THE REPORTS AND TESTIMONY OF PLAINTIFF'S**
**PROPOSED EXPERT DR. ZAHN BOZANIC**

# TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY ..................................3

ARGUMENT .............................................................................................................4

   I.     PLAINTIFF MUST ESTABLISH ADMISSIBILITY ...................................................4

       A.  Expert Testimony Must Be Reliable At Every Step.......................................5

          1.  Methods and Principles Must Be Reliable and Reliably Applied.....................5

          2.  Non-Exclusive Reliability Factors........................................................6

       B.  Expert Opinions Must Be Relevant ........................................................7

   II.    BOZANIC'S MERITS OPINIONS ARE UNRELIABLE ............................................7

       A.  Bozanic Fundamentally Misapplies and Misconstrues Statistical Significance......8

          1.  50% Threshold Is Invalid ...................................................................8

          2.  Bozanic Misconstrues Statistically Insignificant Results ...........................12

       B.  Bozanic's Approach Contradicts His Own Opinion on Market Efficiency ..........13

          1.  "Informational" Efficiency Theory Is Unreliable .............................................13

          2.  "Disclosure Processing Costs" Theory Is Unreliable ...................................15

          3.  Combination of Returns More Than Six Months Apart Is Unreliable.............16

             a.  Combination Of Distant Dates Is Unsupported .......................................16

             b.  Dates Were Cherry-Picked.............................................................17

             c.  Bozanic Arbitrarily Characterizes Old Information As New ....................18

          4.  Bozanic's Disaggregation Methodology Is Unsupported and Speculative......18

             a.  Use of "Disclosure Salience".........................................................18

             b.  Bozanic Ignores Other Factors That Should Be Disaggregated ...............21

  III.   MERITS OPINIONS ARE IRRELEVANT, UNHELPFUL,
        OR FAIL TO TAKE INTO ACCOUNT RELEVANT FACTS AND DATA ..............22

  IV.   EFFICIENCY REPORTS ARE IRRELEVANT ........................................................23

CONCLUSION.........................................................................................................23

## TABLE OF AUTHORITIES

**Cases**                                                           **Pages**

*Abreu Bautista v. Pagan-Rodriguez*,
  No. 24-CV-631 (JMF), 2025 WL 1730213 (S.D.N.Y. June 23, 2025) ............................ *passim*
*Amorgianos v. Natl. R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir 2002) ............................................................................ 5, 6, 22
*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
  477 F. Supp. 3d 88, (S.D.N.Y. 2020) .................................................................... 18
*Bank of Am., N.A. v. Bear Stearns Asset Mgt.*,
  969 F. Supp. 2d 339 (S.D.N.Y. 2013) ..................................................................... 4
*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988). ........................................................................................ 13
*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) .................................................................................... 6
*Bricklayers and Trowel Trades Intern. Pension Fund v. Credit Suisse Sec. (USA) LLC*,
  752 F.3d 82 (1st Cir 2014) .......................................................................... 9, 13, 14
*Bustamante v. Kind, LLC*,
  100 F.4th 419 (2d Cir. 2024) ............................................................................... 5
*Cammer v. Bloom*,
  711 F. Supp 1264 (D.N.J. 1989) .......................................................................... 13
*City of Warren General Employees' Retirement Sys. v. Teleperformance SE*,
  746 F.Supp.3d 1395 (S.D. Fla. 2024) .................................................................... 10
*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579, 113 S. Ct. 2786 (1993) ................................................................. 5, 7
*ECD Inv. Group v. Credit Suisse*,
  2017 WL 3841872, Fed. Sec. L. Rep. P 99864 (S.D.N.Y. Sept. 1, 2017) ................... 17
*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804, 131 S. Ct. 2179 (2011) .................................................................... 8
*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
  2:20-CV-00368-JNP-DBP, 2025 WL 690466 (D. Utah Mar. 4, 2025) ................... 6, 9, 21
*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ........................................................................................... 6
*Gorlamari v. Verrica Pharmaceuticals, Inc. et al.*,
  No. 22-cv-02226-KNS, (E.D. Pa. June 13, 2025) .................................................... 10
*In re Acetaminophen - ASD-ADHD Products Liab. Litig.*,
  22MC3043 (DLC), 2024 WL 3357608 (S.D.N.Y. July 10, 2024) ................................. 5
*In re Acetaminophen - ASD-ADHD Products Liab. Litig.*,
  707 F. Supp. 3d 309 (S.D.N.Y. 2023) ................................................................ 6, 10
*In re Apache Corp. Sec. Litig.*,
  4:21-CV-00575, 2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ..................................... 10
*In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*,
  263 F. Supp. 3d 446 (S.D.N.Y. 2017) .................................................................... 20
*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  11 MDL 2262 (NRB), 2025 WL 2733020 (S.D.N.Y. Sept. 25, 2025) ..................... 6, 7, 22

*In re Mylan N.V. Sec. Litig.*,
    666 F. Supp. 3d 266 (S.D.N.Y. 2023) ................................................................ 18
*In re Mirena Ius Levonorgestrel-Related Products Liab. Litig. (No. II)*,
    341 F. Supp. 3d 213 (S.D.N.Y. 2018) ...........................................................*passim*
*In re Mirena IUS Levonorgestrel-Related Products Liab. Litig. (No. II)*,
    982 F.3d 113 (2d Cir. 2020)) ........................................................................... 6
*In re Omnicom Group, Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008) .............................................................. 14
*In re Platinum-Beechwood Litig.*,
    469 F. Supp. 3d 105 (S.D.N.Y. 2020) .............................................................. 15
*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ............................................................ 21
*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137, 119 S. Ct. 1167 (1999) .............................................................. 6
*Leone v. ASP Isotopes Inc. et al.*,
    No. 24-cv-09253-CM, (S.D.N.Y. June 27, 2025) ............................................. 10
*Ottaviani v. State Univ. of N.Y. at New Paltz*,
    875 F.2d 365 (2d Cir. 1989) ............................................................................. 12
*PharmacyChecker.com v N.A. of Boards of Pharm.*,
    19-CV-7577 (KMK), 2023 WL 2973038 (S.D.N.Y. Mar. 28, 2023) ................... 13
*Pirnik v. Fiat Chrysler Autos, N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018) ........................................................................ 11
*Scentsational Tech., LLC v. Pepsi, Inc.*, 13-CV-8645 (KBF),
    2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) ................................................... 12
*Shapiro v. TG Therapeutics, Inc.*,
    652 F. Supp. 3d 416 (S.D.N.Y. 2023) .............................................................. 13
*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
    18-CV-12084 (VSB) (KHP), 2025 WL 2554474 (S.D.N.Y. Sept. 4, 2025) ......... 9, 10, 11
*Sundaram v. Freshworks Inc.*,
    No. 22-cv-07750-CRB, 2025 WL 1083168 (N.D Cal. April 10, 2025) ............... 16
*Town & Country Linen Corp. v. Ingenious Designs LLC*,
    18-CV-5075 (LJL), 2022 WL 2757643 (S.D.N.Y. July 14, 2022) ...................... 7, 23
*U.S. Sec. and Exch. Commn. v. Mudd*,
    11-CV-9202 (PAC), 2016 WL 2593980 (S.D.N.Y. May 4, 2016) ...................... 11, 12
*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) ............................................................................ 4

**Rules**

Federal Rule of Evidence 401 ................................................................................. 5
Federal Rule of Evidence 403 ................................................................................. 5
Federal Rule of Evidence 702 .........................................................................*passim*
Securities and Exchange Act §10(b) .................................................................*passim*

**Other Authorities**

Federal Judicial Center, *Reference Manual on Scientific Evidence* 381 (3d ed. 2011) ............... 10

Michael D. Green, D. Michael Freedman, and Leon Gordis,
   *Ann. Reference Manual on Sci. Evid.* 333 (2d ed. 2004) ........................................................... 9

Michael J. Saks, David L. Faigman, David H. Kaye, and Joseph Sanders,
   *Annotated Reference Manual on Scientific Evidence*, 83 Reference Guide on Statistics,
   2004 WL 48151 ..................................................................................................................... 12

## PRELIMINARY STATEMENT

The opinions of Plaintiff's[1] proposed economic expert suffer from a glaring and overarching defect: They are indisputably the product of reverse-engineering designed to achieve Plaintiff's desired result. Repeatedly, Dr. Zahn Bozanic ("Bozanic") disregards established principles and precedent in favor of some theory – *any* theory – that might create the appearance of statistically significant results to support Plaintiff's allegations of loss causation and damages. The result is an incurably unreliable set of conclusions based on unsupported conjecture and outlandish theories that contradicts standard economic practice – and even Bozanic's own.

For example, Bozanic takes the extraordinary step of claiming that statistically *insignificant* stock price changes are statistically *significant* by proclaiming that any "confidence level" over 50% is good enough – even though this extreme view dramatically defies prevailing standards*, including those Bozanic, himself, has employed*.

And in a transparent effort to circumvent the basic principle that an efficient market quicky absorbs all public information – on which Plaintiff eagerly relied to obtain class certification, but now waves away because the supposed corrective disclosures contain information that was *not* new to the market and therefore *could not be corrective* – Bozanic seems to pull theories from thin air. Among other things, he argues without authority that unidentified costs short seller Culper Research might have borne when it "published" its self-serving report denigrating CleanSpark[2] somehow prove that certain information in the Culper Report (and related Tweets) impacted CleanSpark's stock price, even though that same information was already public. This attempt to evade market efficiency is particularly striking given *Bozanic, himself*, previously submitted

---

[1] "Plaintiff" refers to plaintiff Darshan Hasthantra.
[2] "CleanSpark" refers to defendant CleanSpark, Inc. CleanSpark, Zachary Bradford, and S. Matthew Schultz, collectively, are "Defendants."

reports concluding that CleanSpark common stock traded in an efficient market throughout the class period.

"Disclosure salience" as a disaggregation tool is another, similarly off-the-wall concept that Bozanic unveils for this litigation. To establish loss causation, Section 10(b) plaintiffs must disaggregate losses that are unrelated to the alleged fraud from those caused by the allegedly fraudulent statements. Here, however, Bozanic attempts to avoid disaggregating certain subjects unrelated to Plaintiff's fraud allegations because he supposedly can tell - *just by looking at the order of the paragraphs of the Culper Report and related Tweets* - that such information had no price impact. Unsurprisingly, there is no support for this wild theory, which is contrary to a long line of case law and massively speculative to boot.

In short, virtually every factor courts consider in assessing reliability of an expert witness cries out for exclusion here: The "merits" opinions reverse-engineer theories to fit Plaintiff-friendly conclusions, and those theories are speculative, untested, nowhere near being generally accepted or subjected to peer review, and arbitrarily applied.

In addition to overall unreliability, portions of Bozanic's "merits" opinions are plagued by irrelevance, including his earlier opinions on market efficiency, which is not an open question at this stage: It is undisputed that CleanSpark common stock traded in an efficient market throughout the class period, and a class has been certified partially on that basis.

In short, Bozanic's opinions fall far short of the rigorous requirements of Federal Rule of Evidence 702, which requires parties proffering experts to demonstrate that those experts' opinions are reliable and relevant. Defendants therefore respectfully request that the Court exclude them in their entirety and preclude any related testimony by Bozanic.

**STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY**

Plaintiff's amended complaint ("Complaint" or "AC") (ECF 36) asserts two claims: (i) under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (together, "Section 10(b)"); and (ii) under Section 20(a) of the Exchange Act. (AC ¶15)). Plaintiff asserts these claims on behalf of himself and the class that this Court certified on September 24, 2025. (ECF 101 at 24).

The Complaint alleges that Defendants made material misrepresentations or omissions on various dates between December 10, 2020 and May 7, 2021, relating to CleanSpark's acquisition of ATL Data Centers LLC ("ATL") and expansion of ATL's data center and bitcoin mining facility. (*E.g.*, AC¶¶14, 139-40, 151). Plaintiff has now abandoned all but four alleged corrective disclosures:[3] (i) the "Culper Report" "published" by short-seller Culper Research on January 14, 2021 (AC ¶¶6, 45); (ii) Culper's related Tweet on January 15, 2021 (the "Culper Tweet")[4] (AC ¶51); (iii) a February 12, 2021 CleanSpark press release ("2/12/21 PR"), announcing financial results for the fiscal quarter ending on December 31, 2020 (AC ¶88); and (iv) an August 17, 2021 CleanSpark press release ("8/17/21 PR"), which announced financial results for the fiscal quarter ending on June 30, 2021 (AC ¶110) (collectively, the "Alleged Corrective Disclosures").

On January 10, 2025, Plaintiff provided a report by his proposed economic expert, Bozanic ("Efficiency Report" or "ER") (Exhibit A to the accompanying Affirmation of David J. Partida ("Aff.")), in support of Plaintiff's motion for class certification (ECF 91-1). In that report, Bozanic opines that the market for CleanSpark's common stock was efficient throughout the class period, *i.e.*, December 10, 2020 through August 16, 2021. (*E.g.*, ER ¶1, 3(a). Defendants deposed Bozanic

---

[3] Merits Report ("MR") at 8, 5, n.19; Plaintiff's Motion For Class Certification (ECF 89) at 4-5.
[4] Together, the Culper Report and the Culper Tweet are the "Culper Statements."

on February 27, 2025. *See* Aff. Exh. B. Plaintiff provided Bozanic's reply report ("RER") (Aff. Exh. C) on May 2, 2025. (Together, this reply report and the Efficiency Report are the "Efficiency Reports").

On July 18, 2025, Plaintiff provided Bozanic's Merits Report (Aff. Exh. D) opining on "economic materiality, loss causation, and damages." (MR ¶6). Among other things, Bozanic concludes that the Alleged Corrective Disclosures caused "stock price movements that were statistically significant at better than the 50% level," (MR ¶69), and that their "*cumulative* impact…caused stock price movements that were statistically significant at" at least a 94% level. (MR ¶69) (emphasis added).

Defendants provided a rebuttal to the Merits Report on September 12, 2025, by Dr. Mark J. Garmaise ("Garmaise Report" or "GR") (Aff. Exh. E). Plaintiff provided Bozanic's reply report on or about October 9, 2025 ("Reply Merits Report" or "RMR") (Aff. Exh. F). (Together, the MR and the RMR are the "Merits Reports" and related opinions are the "Merits Opinions"). Defendants deposed Bozanic for a second time on October 30, 2025. *See* Aff. Exh. G.

## ARGUMENT

### I.  PLAINTIFF MUST ESTABLISH ADMISSIBILITY

Expert testimony that does not satisfy Federal Rules of Evidence Rule ("FRE") 702 is inadmissible. *See, e.g., Abreu Bautista v. Pagan-Rodriguez*, No. 24-CV-631 (JMF), 2025 WL 1730213, at *1 (S.D.N.Y. June 23, 2025). And the party proffering an expert bears the burden of establishing admissibility by a preponderance of the evidence. *See*, *e.g.*, *Bank of Am., N.A. v. Bear Stearns Asset Mgt.*, 969 F. Supp. 2d 339, 346-47 (S.D.N.Y. 2013) (citing *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)). As "gatekeeper," the Court is obligated to ensure that only

reliable, relevant expert testimony is admitted. *Bustamante v. Kind, LLC*, 100 F.4th 419, 427 (2d Cir. 2024).

Qualifications are not enough: the expert's proponent must also "demonstrate[] to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." FRE 702.[5]

A. **Expert Testimony Must Be Reliable At Every Step**

1. **Methods and Principles Must Be Reliable and Reliably Applied**

"To warrant admissibility…it is critical that an expert's analysis be reliable at every step." *Amorgianos v. Natl. R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir 2002). And "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *Id.* (emphasis in original; internal quotation marks omitted). Courts, therefore, "should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* "Ultimately, a court must 'make certain that an expert…employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *In re Acetaminophen - ASD-ADHD Products Liab. Litig.*, 22MC3043 (DLC),

---

[5] Judges analyzing FRE 702 "'should also be mindful of other applicable rules,'" including FRE 401 ("Test for Relevant Evidence") and FRE 403 ("Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons"). *Bustamante*, 100 F.4th at 427 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786 (1993)).

2024 WL 3357608, at *14-15 (S.D.N.Y. July 10, 2024) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999)).

Accordingly, courts exclude expert opinions that are: "'speculative or conjectural,'" *Abreu*, 2025 WL 1730213, at *2 (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); "'based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison,'" *id.*; "connected to existing data only by the *ipse dixit* of the expert,'" *id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); or "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached." *Amorgianos*, 303 F.3d at 266.

Moreover, "results-driven" analyses are unacceptable. *In re Acetaminophen - ASD-ADHD Products Liab. Litig.*, 707 F. Supp. 3d 309, 364 (S.D.N.Y. 2023). *See also Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, 2:20-CV-00368-JNP-DBP, 2025 WL 690466, at *8 (D. Utah Mar. 4, 2025) (n.5) ("flaw in [economic expert's] report is so serious that it renders his expert opinion results-driven"). Similarly, "[c]herry-picking" warrants exclusion. *Acetaminophen*, 707 F. Supp. 3d at 336. In fact, any "'[o]pinions that assume a conclusion and reverse-engineer[] a theory to fit that conclusion are…inadmissible.'" *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 11 MDL 2262 (NRB), 2025 WL 2733020, at *29 (S.D.N.Y. Sept. 25, 2025) (quoting *In re Mirena Ius Levonorgestrel-Related Products Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 251 (S.D.N.Y. 2018), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Products Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020)).

### 2. Non-Exclusive Reliability Factors

Courts also consider several "non-exclusive factors" in evaluating reliability, including: "(1) whether the expert's technique or theory can be or has been tested; (2) whether it has been

subjected to peer review and publication; (3) whether there is a high error rate for the expert's technique, and whether there are 'standards controlling the technique's operation;'…(4) whether the expert's technique or theory is generally accepted by the relevant scientific community,"[6] (5) "whether the proffered expert opinions were developed for the purposes of litigation" *id.*, and (6) "[w]hether the expert has adequately accounted for obvious alternative explanations." Committee Comments, 2000 Amendments to FRE 702.

## B. **Expert Opinions Must Be Relevant**

Further, "[e]xpert testimony that seeks to address lay matters, which a jury is capable of understanding without expert help, is not relevant and therefore not admissible." *Abreu*, 2025 WL 1730213, at *4 (internal quotation marks omitted). Neither are expert opinions addressed to points that are not at issue in the action. *See LIBOR-Based Fin. Instruments*, 2025 WL 2733020, at *26 (excluding expert testimony "as irrelevant, misleading, and unhelpful to the fact finder" where it generated conclusions about a subject not at issue); *Town & Country Linen Corp. v. Ingenious Designs LLC*, 18-CV-5075 (LJL), 2022 WL 2757643, at *3 (S.D.N.Y. July 14, 2022) (excluding expert testimony on "issues that are no longer in the case").

## II. BOZANIC'S MERITS OPINIONS ARE UNRELIABLE

Unreliable principles and methodologies form the foundation of Bozanic's Merits Opinions, as we explain below. And "[e]ach of [Bozanic's] departures from settled and rigorous methodology favors the same outcome": a pro-Plaintiff result on loss causation, damages, and/or materiality. *Mirena*, 341 F. Supp. 3d at 251. Such "unidirectional misapplication…is a red flag. Rather than suggesting a scholar's considered neutral engagement…it suggests motivated, result-

---

[6] *Mirena*, 341 F. Supp. 3d at 239-42 (citing *Daubert,* 509 U.S. at 592-4).

driven, reasoning."[7] *Id.*

A. **Bozanic Fundamentally Misapplies and Misconstrues Statistical Significance**

Bozanic concludes in his Merits Reports that alleged misstatements by Defendants artificially inflated CleanSpark's stock and the Alleged Corrective Disclosures caused statistically significant price declines. (*E.g.*, MR ¶¶ 19, 69, 78). These are crucial issues for Plaintiff, given his obligation to prove loss causation and damages under Section 10(b). *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809, 131 S. Ct. 2179 (2011) (listing elements).

Yet, Bozanic's opinions hinge on a drastic departure from generally accepted statistical standards: He claims that any statistical result with a confidence level greater than 50% is statistically significant,[8] meaning it is likely that the event being measured did not occur by chance. *See* MR ¶¶69 (the Alleged Corrective Disclosures "caused stock price movements that were statistically significant at better than the 50% [confidence] level; *i.e.,* it is 'more likely than not' that the declines were related to information released on these dates, as opposed to random price movements"), 78 (Exhibit 3 "demonstrate[s] that each alleged corrective disclosure listed in the table exhibits a negative price reaction, and is statistically significant at the 50% level or better. In other words, it is 'more likely than not' that the declines were related to information released on these dates, as opposed to random price movements.").

1. **50% Threshold Is Invalid**

Bozanic purports to derive his opinions from his event study (*e.g.*, MR ¶16), which "is a statistical regression analysis that examines the effect of an event on a dependent variable, such as

---

[7] This motion addresses issues pertaining to admissibility and should not be construed as a comprehensive exploration of every flaw in Bozanic's opinions. Defendants reserve all of their rights.

[8] References to a "50% Threshold" are to the 50% confidence level threshold for statistical significance that Bozanic advocates in his Merits Reports, *e.g.*, ¶78.

a corporation's stock price." *Gelt*, 2025 WL 690466, at *7 (internal quotation marks omitted). Ideally, an event study in a Section 10(b) case "determines the extent to which the changes in the price of a security result from events such as disclosure of negative information about a company, and the extent to which those changes result from other factors." *Bricklayers and Trowel Trades Intern. Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 86-87 (1st Cir 2014).

As set forth above, Bozanic opines that each of the Alleged Corrective Disclosures caused CleanSpark's stock to experience a price decline that is statistically significant – even though three of the four fall below even a 90% confidence level,[9] with the lowest at 57.2% (MR ¶¶86, 87, 117) – because the confidence level[10] for each decline exceeds 50%. MR ¶¶69, 78. But Bozanic's view that any confidence level above 50% yields a statistically significant result is wildly at odds with that of his field. *See* GR ¶36 ("50% confidence level as the threshold for statistical significance is inconsistent with the standard practice in academic research in finance and economics…."). Indeed, Bozanic, himself, has repeatedly admitted – *even in this very case* – that his field does *not* accept a 50% Threshold. *See*, *e.g.*, Aff. Exh. G at 427:22-24 ("A 50 percent level is not the convention in academic literature."); Aff. Exh. B at 144:3-5 (admitting that p-value of 0.05 [*i.e.*, 95% confidence level] was "a reasonable and conventionally used statistical cutoff"); RMR ¶12

---

[9] Similarly, Bozanic claims that "an abnormal stock price increase" at the start of the class period was statistically significant "at the 89.6% level." (RMR ¶19).

[10] The "confidence level" represents the probability of observing a result less extreme than the one observed, assuming that the null hypothesis (i.e., the assumption that there is no relationship between the variables being measured) is true. *See* Michael D. Green, D. Michael Freedman, and Leon Gordis, *Ann. Reference Manual on Sci. Evid.* 333 (2d ed. 2004), 333 Reference Guide on Epidemiology, 2004 WL 48155, at *27. Alternatively, "confidence level" can be expressed as a "p-value," which "represents the probability that the observed data … would occur assuming that the 'null hypothesis' is true…." *Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*, 18-CV-12084 (VSB) (KHP), 2025 WL 2554474, at *33 (S.D.N.Y. Sept. 4, 2025). For example, a confidence level of 95% is equivalent to a p-value of 0.05. *See id.* at 34. *See generally* GR ¶33 n.47.

(stating that "conventional cutoffs for levels of statistical significance" include "the 90%, 95%, or 99% level").

Also, Bozanic's work in other expert engagements applies conventional statistical standards, not the 50% Threshold he urges here. *See* Expert Report of Zahn Bozanic, Ph.D*., Leone v. ASP Isotopes Inc. et al.*, No. 24-cv-09253-CM, (S.D.N.Y. June 27, 2025), Dkt. No. 39-1 (Bozanic applies 95% and 99% confidence levels in June 26, 2025 report) (Aff. Exh H ¶¶63-4); Expert Report of Zahn Bozanic, Ph.D, *Gorlamari v. Verrica Pharmaceuticals, Inc. et al.*, No. 22-cv-02226-KNS, (E.D. Pa. June 13, 2025), Dkt. No. 69-3 (Bozanic applies 95% level in June 12, 2025 report) (Aff. Exh. I ¶¶63-4). In fact, the *lowest* confidence level Bozanic has employed in other expert reports apparently is 90%. *See City of Warren General Employees' Retirement Sys. v. Teleperformance SE*, 746 F.Supp.3d 1395 (S.D. Fla. 2024) (November 5, 2024 report by Bozanic) (Aff. Exh. J ¶72).

Moreover, a 50% Threshold – little better than flipping a coin – is inherently unreliable due to its "high error rate." *Mirena*, 341 F. Supp. 3d at 239-42. *See also* GR ¶37 ("To use a confidence level of 50% to determine statistical significance would imply that, across many statistical tests…on average there is a 50% probability of incorrectly rejecting a true 'null' hypothesis….").

Further, the 50% Threshold is worlds away from the oft-accepted standard of 95%. *See, e.g., Sjunde AP-Fonden v Goldman Sachs Group, Inc.,* 18-CV-12084 (VSB) (KHP), 2025 WL 2554474, at *11 (S.D.N.Y. Sept. 4, 2025) ("95% confidence level is the 'gold standard' in research"); *Acetaminophen*, 707 F. Supp. 3d at 322 ("statistical significance…is usually reported using a range of values referred to as the '95% confidence interval'"); *In re Apache Corp. Sec. Litig.*, 4:21-CV-00575, 2024 WL 532315, at *11-12 (S.D. Tex. Feb. 9, 2024) ("Plaintiffs do not

seriously contest that a 95% confidence level is the scientific and legal standard.") (citing (Federal Judicial Center, *Reference Manual on Scientific Evidence* 381 (3d ed. 2011)).

In his Reply Merits Report, Bozanic protests that a 50% Threshold is nevertheless appropriate here because the 95% confidence level threshold is merely a "convention." (RMR ¶17). Yet Defendants have not located any Section 10(b) case within the Second Circuit permitting anything near a 50% Threshold, or even anything below a 90% threshold. *See, e.g., Sjunde*, 2025 WL 2554474, at *11 (S.D.N.Y. Sept. 4, 2025) (rejecting defendants' argument that report improperly "attribut[ed] statistical significance to a 91% confidence interval" where defendants bore burden of disproving price impact at class certification); *Pirnik v. Fiat Chrysler Autos, N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018) (granting class certification where 92.12% confidence level "is obviously less comfort than a result that is at a confidence level of 95%" but did not disprove price impact). Moreover, those are procedurally distinguishable class certification decisions, where the plaintiffs did not bear the burden of demonstrating loss causation. *See* above at 11.

Worse yet, Bozanic does not even apply his own 50% Threshold consistently or reliably. *See* FRE 702(d). Instead, where it suits Plaintiff, he opines that a result with a confidence level of 67.23% – despite satisfying his own 50% Threshold – is *not* statistically significant. *See* MR n.78 (concluding that "the confidence levels for the abnormal returns on…seven dates," including one with a confidence level of 67.23%, were not statistically significant); GR ¶38.

Given the wide chasm between the 50% Threshold and materially higher confidence levels used in standard economic practice, prevailing case law, and Bozanic's own work, it is evident that applying the 50% Threshold to analyze price impact "is novel, untested, and not peer reviewed…and it has not been generally accepted by the relevant scientific community." *U.S. Sec. and Exch. Commn. v. Mudd*, 11-CV-9202 (PAC), 2016 WL 2593980, at *3 (S.D.N.Y. May 4,

2016).  As a result, Bozanic's opinions "are not based on reliable principles and methods and are…inadmissible." *Id.*

### 2.  Bozanic Misconstrues Statistically Insignificant Results

In addition, Bozanic's analysis is unreliable because it is based on a fundamental misinterpretation: that any confidence level above 50% means it is more likely than not that a price decline was related to information released on a particular date, as opposed to random price movements. (*E.g.*, MR ¶78).

A result with a confidence level hovering above 50% is not statistically significant, as set forth above. And a statistically insignificant result is too weak to demonstrate a likelihood that it was not random. *See Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365 (2d Cir. 1989) ("Because random deviations from the norm can always occur, statisticians do not consider slight disparities between predicted and actual results to be statistically significant…."). Moreover, even where a "model is undisputed, a *p*-value less than 50% [*i.e.*, a confidence level greater than 50%] does not necessarily demonstrate a 'preponderance of the evidence' against the null hypothesis. Indeed, a *p*-value less than 5% or 1% might not meet the preponderance standard." Michael J. Saks, David L. Faigman, David H. Kaye, and Joseph Sanders, *Annotated Reference Manual on Scientific Evidence*, 83 Reference Guide on Statistics, 2004 WL 48151, at *47.

Bozanic's unsupported suggestion that any confidence level over 50% means it is "more likely than not" that the result was related to particular information and not random stands in stark contrast to a foundational tenet of statistical analysis and is, therefore, unreliable. *See*, *e.g.*, *Scentsational Tech., LLC v. Pepsi, Inc.*, 13-CV-8645 (KBF), 2018 WL 1889763, at *6 (S.D.N.Y. Apr. 18, 2018) (expert's opinions were inadmissible without "methodology or analysis to support her assertion" regarding whether a project "was 'more likely than not' to be successful"), *aff'd sub*

*nom. ScentSational Tech. LLC v. PepsiCo, Inc.*, 773 Fed. Appx. 607 (Fed Cir. 2019).

Further, to the extent Bozanic is implying that exceeding a 50% confidence level constitutes "preponderance of the evidence" (RMR ¶19),[11] that is an inadmissible legal conclusion. *See PharmacyChecker.com v N.A. of Boards of Pharm.*, 19-CV-7577 (KMK), 2023 WL 2973038, at *15 (S.D.N.Y. Mar. 28, 2023) (Second Circuit mandates "exclusion of expert testimony that expresses a legal conclusion") (internal quotation marks omitted).

## B. **Bozanic's Approach Contradicts His Own Opinion on Market Efficiency**

### 1. **"Informational" Efficiency Theory Is Unreliable**

Dr. Bozanic's loss causation and damages conclusions are also inherently unreliable because they ignore the efficient market theory[12] in that context, *despite having relied on the theory to obtain class certification*. (AC ¶¶138, 159; ER ¶3; ECF 101). Indeed, quick incorporation of public information in stock price is the foundational principle of the "fraud on the market" reliance presumption that Plaintiff invokes. *See, e.g., Cammer v. Bloom*, 711 F. Supp 1264, 1287 (D.N.J. 1989) (whose factors the Efficiency Reports discuss at length).

Courts unsurprisingly reject such a have-your-cake-and-eat-it-too approach, holding that:

> *Having established that AOL stocks traded in an efficient market in order to obtain class certification, the shareholders could not abandon that factual premise when proving loss causation.* Yet several of the relevant events in [the expert's] study are based on published references to information *previously disclosed* that, under

---

[11] In discussing a stock price increase purportedly associated with alleged misrepresentations, Bozanic states: "[U]sing the preponderance of evidence standard, it is 'more likely than not' that the abnormal stock price increase [with a confidence level of 89.6%] is related to information on this date, as opposed to random price movements." RMR ¶¶ 8-9.

[12] *See, e.g., Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 422 (S.D.N.Y. 2023) ("Securities law presumes that the 'market price of shares…reflects all publicly available information.'") (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)); *see also Bricklayers*, 752 F.3d at 89 ("[O]nce a misstatement or corrective disclosure is publicly known in an efficient market, courts will assume that the stock price reacts immediately, and any claim that an event moved the stock price when the event was not actually a new disclosure will necessarily fail.").

> an efficient market theory, would have already been incorporated
> into AOL's share price…."

*Bricklayers and Trowel Trades Intern. Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 94 (1st Cir 2014) (emphasis added).

Yet, Bozanic argues that the Culper Statements are statistically significant corrective disclosures despite the Culper Report *admitting* that it is based *solely* on public information and the Culper Tweet merely regurgitating public information from the report.  (Aff. Exhs K at 1 and L); *see* GR ¶¶67-69.

Bozanic attempts to whitewash this irreconcilable conflict by arguing that because the market for CleanSpark stock purportedly was "informationally" but not "fundamentally" efficient – itself an assumption for which he provides no basis – it was legitimate for him to consider old information as corrective, because price incorporation in an informationally efficient market does not necessarily accurately reflect "the firm's true fundamental value." (RMR ¶28).

In addition to failing to explain why such potentially "inaccurate" prices would override prevailing law requiring corrective disclosures to be new, *see*, *e.g.*, *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) ("recharacterization of previously disclosed facts cannot qualify as a corrective disclosure"), Bozanic fails to cite any source providing that a Section 10(b) plaintiff may demonstrate loss causation through the use of information previously disclosed to the market as long as the market is "informationally" efficient. Indeed, *Bricklayers* directly contradicts Bozanic's novel view, rejecting plaintiff's reliance on an "informationally" efficient market when it had previously relied on the efficient market to obtain class certification.  752 F.3d at 94 (emphasis added).

14

## 2.  "Disclosure Processing Costs" Theory Is Unreliable

Recognizing this glaring inconsistency, the Reply Merits Report also introduces the outlandish concept of "disclosure processing costs." (RMR ¶32). Bozanic vaguely suggests that the Culper Statements could have caused statistically significant loss despite all of the relevant information having existed in the public domain *because Culper Research may have spent money on the Report and Tweet*: "for the author of the Culper Report to bear awareness, acquisition, and integration costs," Bozanic opines, "**the expected marginal benefits of publishing the report** (*e.g.*, profiting from taking a short position against the stock in advance of the report) **had to exceed the marginal costs borne**." (RMR ¶33) (Emphasis in original).

This murky position is unreliable for several reasons. First, it is rooted in inadmissible conjecture – about Culper's "feelings" ("Culper Report clearly felt that there was value….")) and motives; costs it may or may not have borne in "publishing" the Culper Report; and the purported "value" of the Culper Report itself. (RMR ¶33). *See Abreu*, 2025 WL 1730213, at *2*. Similarly, "[i]nferences about the intent or motive of" third parties (MR ¶¶33, 97), "lie outside the bounds of expert testimony." *In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 115 (S.D.N.Y. 2020) (internal quotation marks omitted).

Second, there is no authority whatsoever – and Bozanic cites to none[13] – for considering "disclosure processing costs" when analyzing the impact of alleged corrective disclosures in Section 10(b) cases for purposes of determining loss causation, materiality, or damages. And a

---

[13] Bozanic instead cites (RMR ¶32) to academic articles such as Blankespoor, E. et al., "Disclosure Processing Costs, Investors' Information Choice, and Equity Market Outcomes: A Review," *Journal of Accounting and Economic* 70 (2020), which reviews literature concerning cost relating to a *firm*'s disclosures – not a short-seller's report – so as to "provide a primer for thinking about how disclosure processing costs affect equity markets, organize and critique existing empirical work, highlight links in seemingly disparate literatures, and provide guidance for future research."

court hearing claims under Sections 11 and 15 of the Securities Act of 1933 recently rejected a "drift" theory that Bozanic, as the plaintiff's expert, based in part on discussion of "disclosure processing costs." *See Sundaram v. Freshworks Inc.*, No. 22-cv-07750-CRB, 2025 WL 1083168, at *5 n.6 (N.D Cal. April 10, 2025) (in decision granting summary judgment to defendants, finding Bozanic's opinion on "drift" speculative and noting that court was unaware of any case applying it to the question at hand); Aff. Exh. L ¶¶17-18, 21 (discussion of "disclosure processing costs" in Bozanic's March 13, 2025 *Freshworks* report).

Third, Bozanic's theory directly contradicts established case law holding that efficient markets quickly absorb public information, as set forth above.

### 3. Combination of Returns More Than Six Months Apart Is Unreliable

Another obvious example of "reverse-engineering" is Bozanic's combination of abnormal returns on alleged corrective disclosure dates that are *more than six months apart* to create the appearance of statistical significance where there is none.

#### a. Combination Of Distant Dates Is Unsupported

Here, Bozanic combines returns from the 2/12/21 PR (which by itself has a confidence level of only 57.2%) and the 8/17/21 PR, to find a "cumulative abnormal return" that "is statistically significant at the 94.5%[14] confidence level." Combining results from these two distant dates is reasonable, says Bozanic, because statements by Defendants on both dates "related to the delayed expansion timeline at the ATL facility from 'mid-year 2021' to 'this fall.'" (MR ¶118).

But there is nothing reasonable or reliable about this given that it assumes that information in the 2/12/21 PR was not fully absorbed by the market *until six months later* – which the market's

---

[14] Even this combined result falls below the standard 95% threshold. *See* GR ¶ 76.

quick incorporation of all public information precludes and as Bozanic, himself, previously acknowledged. (*E.g.*, ER ¶47 (market for CleanSpark stock "reacted rapidly to company-specific news")). Bozanic's suggestion that only "*widely available* public information is quickly incorporated into stock prices" (MR ¶12) is wrong, and he cites no authority for it.

Finally, Bozanic's assumption that old information could have price impact long into the future is unreliable given that he blithely rejects it whenever it suits Plaintiff's position: In the Merits Report, for example, he argues that unrelated news could not have caused the January 14 and 15, 2021 price decreases (which he attributes to the Culper Statements) because that news was reported on January 13, 2021 and thus had "*already been incorporated into market price before the release of the Culper report*" on January 14, 2021. (MR ¶90) (emphasis added). *See ECD Inv. Group v. Credit Suisse*, 2017 WL 3841872, at *14, Fed. Sec. L. Rep. P 99864 (S.D.N.Y. Sept. 1, 2017) (expert "cannot rely on the same…records when it suits his analysis and ignore them when it does not"). According to Bozanic, therefore, news *one day* old is incorporated into the market price, but news *six months* old isn't: an indisputably absurd and unreliable result.

### b.  Dates Were Cherry-Picked

Bozanic's analysis is also unreliable given that he cherry-picks Plaintiff-friendly dates by combining returns allegedly stemming from the 2/12/21 PR and 8/17/21 PR while simultaneously ignoring disclosures from other dates concerning the same ATL expansion timeline at issue in those press releases. Bozanic's exclusion of those other dates is particularly suspect because including all of them would have yielded "a *positive* cumulative abnormal return," thus decapitating Bozanic's conclusion of negative abnormal returns reflecting price declines. *See* GR ¶¶76, 136; *see also* GR Exh. 4.

### c. Bozanic Arbitrarily Characterizes Old Information As New

Also, Bozanic treats as new an estimate in the 2/12/21 PR that the ATL expansion would be completed in "mid-year 2021," claiming that this purportedly "made it *exceedingly clear to investors for the first time that CleanSpark would miss the April 2021 timeframe*…." MR ¶137. But a January 5, 2021 public interview had already disclosed that same fact, estimating completion in "late spring/early July." MR ¶130; GR ¶77. Similarly, Bozanic treats the 8/17/21 PR's (MR ¶129) estimate of expansion completion "within the coming weeks" as new information despite it having been disclosed more than a month before, on July 14, 2021, estimating completion by "late summer." (GR ¶76 n.136; Aff. Exh. E). Both interpretations are contrary to the well-settled principle that an efficient market quickly incorporates all public information and are thus inadmissible.

### 4. Bozanic's Disaggregation Methodology Is Unsupported and Speculative

To demonstrate loss causation, Section 10(b) ""[p]laintiffs must disaggregate losses caused by disclosures of the truth behind the alleged misstatements from losses caused by other factors, including changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, [and] other events." *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 110 (S.D.N.Y. 2020). In support of this "threshold evidentiary showing," *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 325 (S.D.N.Y. 2023), Bozanic, again, relies on speculative, unsupported, and unreliable methodology that the Court should exclude.

### a. Use of "Disclosure Salience"

Bozanic acknowledges that the Culper Statements contain allegations about CleanSpark that are unrelated to Plaintiff's fraud allegations here. (*E.g.*, MR ¶93). To say that his methodology

for disaggregating these statements – "disclosure salience" – is speculative, unsupported, and unreliable, however, is to say the least:  It is outright quackery.

Indeed, Bozanic concludes that the allegations in the Culper Report and Tweet unrelated to Plaintiff's fraud allegations *need not be disaggregated altogether* because they lacked "value relevance" to investors and therefore could not have caused the price drops that he proclaims – without a scintilla of support – are conveniently due *only* to the statements at issue in this action. (*E.g.*, RMR ¶45). Voila!

> Astoundingly – and among other fantastical claims – Bozanic states:
>
>> Following academic literature on disclosure salience, I focus my attention on two features of the tweets: order and repetition. First, Culper Research, by virtue of summarizing the Culper Report via Twitter, had chosen to emphasize the points from the report that substantiated the report's premise…and conclusion…and thus considered important for investors. Second, the points that repeated across tweets were also points of emphasis for investors. Therefore, I consider points that were not repeated across tweets as less emphasized and thus less relevant for Culper Research and investors.

MR ¶¶ 92-3.  Bozanic similarly concludes that "the order in which the points were made in the report are such that the most relevant (and thus salient) points can be quickly gleaned by an investor in order to influence investor judgement [sic] and decision making with respect to investing in CleanSpark."  RMR  ¶50.  And he supports this rigorous analysis *of a short seller report and Twitter posts* by referring to purported "[r]esearch on disclosure salience" that "has established that information can be considered more salient for investors when it is highlighted **more prominently, earlier, or in a press release headline**…."  RMR ¶36 (emphasis in original).

Said differently, Bozanic's "scientific" disaggregation methodology determines value relevance from (i) the order in which Culper referenced particular topics and (ii) whether Culper repeated them in its subsequent Tweets.

This is hogwash and pseudo-science, at best. And it is inadmissible under FRE 702 for four reasons.

First, it is plainly inadmissible *ipse dixit*[15] and "not supported by the academic literature." GR ¶46. Bozanic does not identify an iota of evidence suggesting that *any* other expert in *any* other Section 10(b) case has ever applied the concept of "disclosure salience" to analyzing loss causation or damages, let alone that such a methodology is "generally accepted" or has been "subjected to peer review." *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 263 F. Supp. 3d 446, 448-9 (S.D.N.Y. 2017).

Notably, the supposed "disclosure salience literature" that Bozanic cites has nothing to do with Section 10(b) loss causation or establishing that certain information need not be disaggregated due to lack of value relevance, but instead largely addresses the unremarkable theory that corporations making earning disclosures may choose to emphasize particular information by placing it earlier or more prominently, such as in headlines.[16] And the literature has nothing to do with how short-sellers choose to organize their "reports" or Tweets, as even Bozanic readily admitted. *See* Aff. Exh. G at 545-6.

Second, Bozanic evidently developed the theory of "disclosure salience" as a disaggregation technique solely for this litigation, which is another reason it is unreliable, *see* above at *Abreu*, 2025 WL 1730213 at *2. Bozanic makes no mention of "disclosure salience" in

---

[15] *See Abreu*, 2025 WL 1730213, at *2.

[16] *See, e.g.,* Xuan Huang et al., *"Headline Salience, Managerial Opportunism, and Over- and Underreactions to Earnings," The Accounting Review*, Vol 93, No. 6 (Nov. 2018) (analyzing whether headline salience "causes stronger market reactions" and positing that "more salient earning announcements may cause greater incorporation of earning news into price"); RMR 36-40 (discussing cited articles).

any of his other available expert reports in Section 10(b) cases. Nor have Defendants identified even a single case applying "disclosure salience" to a Section 10(b) claim.

Third, applying "disclosure salience" to bypass disaggregation requirements is directly contrary to the well-established principle that an efficient market quickly incorporates *all* public information, not just information that appears towards the top of a document or is repeated.

Fourth, Bozanic's approach is improperly infused with unsupported speculation about what kinds of subjects investors might find concerning. *See* MR ¶95 (claiming without any of support that "investors are less likely to be concerned with [related party transactions] as opposed to overstating revenues and/or understating expenses").

### b. Bozanic Ignores Other Factors That Should Be Disaggregated

Bozanic chooses a more conventionally unreliable approach for disaggregating major factors that affected stock price during the Class Period, such as significant bitcoin mining industry developments, "substantial variation in bitcoin prices and network difficulty," and CleanSpark's own "changing business model." (GR ¶¶15, 17). He essentially ignores them. *See Gelt Trading*, 2025 WL 690466, at *8 (expert's "failure to test for the effects of the quarterly earnings statement renders his testimony on loss causation unreliable"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273-75 (S.D. Cal. 2010) (finding analysis unreliable when expert analyzing corrective disclosures made "no attempt to account for other possible [non-company-specific] causes, i.e., industry-specific news…, market-specific news…,or other measurable macroeconomic variables."). Indeed, although Bozanic admitted that such matters are important to value relevance and that they varied substantially during the class period, he does not even attempt to disaggregate them. (MR ¶ 58, GR ¶¶ 16, 105, 109).

## III. MERITS OPINIONS ARE IRRELEVANT, UNHELPFUL, OR FAIL TO TAKE INTO ACCOUNT RELEVANT FACTS AND DATA

The overarching unreliability of Bozanic's Merits Opinions warrants excluding them in their entirety. *See Amorgianos* 303 F.3d at 267. Portions are also inadmissible for other reasons, as set forth below.

First, Bozanic's circular assertion that certain statements are material simply because they were made (MR ¶¶39(1), 40-48) is irrelevant given that a layperson on the jury is capable of viewing the relevant documents. *See Abreu,* 2025 WL 1730213 at *4 (S.D.N.Y. June 23, 2025) ("The jury…is capable of observing the video evidence and drawing conclusions therefrom for itself.").

Second, Bozanic's damages analysis is unhelpful and thus inadmissible, *see LIBOR-Based Fin. Instruments*, 2025 WL 2733020, at *2, given that he essentially leaves it to the jury to identify confounding factors and quantify price effects. (MR ¶¶ 34, 165-6; GR ¶ 117).

Third, there "is simply too great an analytical gap between the data" and Bozanic's damages analysis. *Mirena*, 341 F. Supp. 3d at 239-42. As Professor Garmaise explains, "Bozanic's inflation measure implies that, absent the alleged misrepresentations, CleanSpark's stock price would have declined by 71.7% upon the announcement of the acquisition of the ATL facility, and the Company's market capitalization would have declined by approximately $205 million – *more than seven times* the total value of ATL implied by the December 10, 2020, transaction." (GR ¶ 15) (emphasis added). Such an inflation measure is not only absurd in comparison to the price increase of $11.69 but also would mean that investors utterly devalued parts of CleanSpark's business that are unrelated to the allegations. (GR ¶ 15, Exhibit 5, MR ¶ 165). Unsurprisingly, Bozanic refused to meaningfully defend this preposterous position at his deposition. (GR ¶ 103,

MR ¶ 158).

## IV.    EFFICIENCY REPORTS ARE IRRELEVANT

Unlike the Merits Reports, the Efficiency Reports opine on market efficiency and the ability of damages in this matter to be calculated "on a class-wide basis subject to a common methodology." *E.g.*, BMR ¶ 1; (ECF 101). Plaintiff submitted them in support of his motion for class certification, which this Court granted. (ECF 101).

There is no dispute concerning market efficiency, as set forth above. Nor is class certification at issue given that a class has been certified. The Efficiency Reports are therefore irrelevant, and the Court should exclude them and any related testimony. *See Town & Country Linen Corp. v. Ingenious Designs LLC*, 18-CV-5075 (LJL), 2022 WL 2757643, at *3 (S.D.N.Y. July 14, 2022) (expert "testimony that relates only to issues that are no longer in the case…will be excluded as no longer relevant to any issue in the case").

Moreover, to the extent that the Efficiency Reports contain opinions relating to loss causation, damages, and/or materiality (*see* MR ¶ 33 (incorporating statements from Efficiency Reports)), those are inadmissible for all of the reasons set forth above.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court exclude all opinions and testimony by Dr. Bozanic.

Dated: December 12, 2025
   New York, New York

Respectfully submitted,

WILK AUSLANDER LLP

By: _____
  Jay Auslander
  Aari Itzkowitz
  David J. Partida
Worldwide Plaza
825 Eighth Avenue, Suite 2900
New York, NY 10019
Tel: (212) 981-2300
jauslander@wilkauslander.com
aitzkowitz@wilkauslander.com
dpartida@wilkauslander.com

*Attorneys for Defendants CleanSpark, Inc.,*
*Zachary Bradford, and S. Matthew Schultz*