# EXHIBIT A



# EXPERT REPORT IN THE MATTER OF:

DARSHAN HASTHANTRA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

V.

CLEANSPARK, INC., ZACHARY BRADFORD, AND S. MATTHEW SCHULTZ

PREPARED FOR:

**GLANCY PRONGAY & MURRAY LLP**
1925 CENTURY PARK EAST
SUITE 2100
LOS ANGELES, CALIFORNIA 90067

JULY 18, 2025

| HOME OFFICE | ATLANTA | ALABAMA | CALIFORNIA | TEXAS |
|---|---|---|---|---|
| 124 Follins Lane | 1100 Peachtree Street NE | 420 North 20th Street | 405 East Branch Street | 352 North St. Paul Street |
| St. Simons Island, GA 21522 | Suite 200 | Suite 2200 | Suite 106 | Suite 3100 |
| 912.268.4144 | Atlanta, GA 30309 | Birmingham, AL 35203 | Arroyo Grande, CA 93420 | Dallas, TX 75201 |
| | 404.781.0771 | 205.379.1128 | 805.222.3262 | 469.455.1167 |

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 3 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York

# TABLE OF CONTENTS

I.    Introduction ................................................................................................................... 1

    A.    Statement of Purpose ............................................................................................. 1

    B.    Qualifications of David M. Ponte, P.E., CCM, CFCC ......................................... 1

    C.    Documents Reviewed and Relied Upon ................................................................ 1

II.    Opinion and Findings ..................................................................................................... 3

    A.    Key Findings: ......................................................................................................... 3

        1.    Unrealistic Project Timelines ........................................................................ 3

        2.    Early-Stage and Incomplete Planning ........................................................... 3

        3.    Lack of Engineering and Construction Experience ....................................... 3

        4.    Power Agreement Limitations ....................................................................... 4

        5.    Delayed Contractor Engagement and Permitting .......................................... 4

        6.    Known Risks: Supply Chain, Weather, and Municipal Coordination ........... 4

        7.    Noise Mitigation Issues ................................................................................. 4

        8.    Incomplete Work as of Q3 2021 .................................................................... 4

        9.    Microgrid Delayed to 2022 ............................................................................ 4

        10.    Material Disconnect Between Public Statements and Internal Status ......... 5

    B.    Expert Opinions: .................................................................................................... 5

III.    Project overview ........................................................................................................... 6

    A.    Key Individuals and Entities in the CleanSpark Litigation ................................... 6

    B.    Key Background: .................................................................................................... 7

    C.    Basis of the Litigation: .......................................................................................... 8

IV.    Discussion ..................................................................................................................... 9

    A.    Project Management of a Data Center Expansion Project ..................................... 9

        1.    Introduction ................................................................................................... 9

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 4 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



2. Project Controls – Gantt Chart Use ............................................................... 10

3. Risk Variables and 2021-Specific Impacts .................................................... 11

4. Conclusion ..................................................................................................... 11

B. Review of Power Supply Documentation and Coordination Efforts............................. 12

1. Power Sales Agreement – September 1, 2020 ................................................ 12

2. Coordination Meeting with City of College Park – January 7, 2021............................ 12

3. Preliminary Site Planning – January 29, 2021................................................ 14

4. March 3, 2021, Email and Preliminary Project Plan ..................................... 15

C. Other Relevant Dates and Milestones........................................................................ 18

D. Additional Risk Factors and Indicators of Delay........................................................ 18

E. Supply Chain Disruptions in Electrical Equipment Procurement................................. 22

1. References...................................................................................................... 22

F. Bradford's Qualifications and Limitations ................................................................. 23

G. Timeline Comparison of Public Statements vs. Internal Project Status ......................... 25

Late 2020: .................................................................................................................... 25

January 29, 2021: ........................................................................................................ 25

February 2021: ............................................................................................................ 25

March 3, 2021: ............................................................................................................ 25

March 26, 2021: .......................................................................................................... 26

April 2021: .................................................................................................................. 26

July 2021:.................................................................................................................... 26

August 2021:............................................................................................................... 26

Fall 2021: .................................................................................................................... 26

December 2021:........................................................................................................... 26

Summary ..................................................................................................................... 26

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 5 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



V.    Conclusion ............................................................................................................... 28

VI.    Reservation of Rights............................................................................................. 30

VII.    Appendices............................................................................................................. 31



Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 6 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



## I.    INTRODUCTION

### A.    Statement of Purpose

Blueprint Construction Counsel, LLC ("Blueprint") was retained by Lead Counsel Glancy Prongay & Murray LLP ("Lead Counsel") on behalf of Lead Plaintiff, Darshan Hasthantra ("Lead Plaintiff") and the putative class to provide an overview of construction project management principles, including the use of tools such as Critical Path Method (CPM) scheduling, and to offer an opinion on the reasonableness of the Defendants' various assertions regarding project completion in light of the project's own estimated completion dates.

### B.    Qualifications of David M. Ponte, P.E., CCM, CFCC

I am a Senior Claims Manager at Blueprint, based in Boston, with forty years of experience in the design, construction, and management of large, complex construction projects. I am a licensed Professional Engineer and Construction Supervisor in the Commonwealth of Massachusetts, as well as a Certified Construction Manager and Certified Forensic Claims Consultant.

My expertise includes preparing detailed construction cost estimates and project budgets, developing large, complex CPM schedules, and preparing and analyzing construction claims. Throughout my career, I have provided strategic risk management and dispute resolution services to a diverse range of clients, including owners, contractors, design professionals, insurance carriers, and attorneys.

Additionally, I have contributed to several construction claim-related publications, authored articles on construction cost estimates, and presented on numerous topics related to construction claims. My areas of expertise include the forensic analysis of complex design and construction issues, the development and analysis of multifaceted CPM schedules, and the preparation of detailed expert opinions and reports covering both technical and quantum construction issues, as well as the development and analysis of construction costs and budgets.

### C.    Documents Reviewed and Relied Upon

In forming the opinions herein, I have examined documents relating to the pertinent subject matter and within the relevant time periods from the contemporaneous records including but not



Case 1:21-cv-00511-LAP   Document 111-1   Filed 12/12/25   Page 7 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York

limited to the Amended Complaint, Plaintiffs' Mediation Statement, deposition transcripts

(including exhibits), email correspondence and other documents as noted in Appendix B



Case 1:21-cv-00511-LAP   Document 111-1   Filed 12/12/25   Page 8 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



## II.   OPINION AND FINDINGS

### A.   Key Findings:

### 1.   *Unrealistic Project Timelines*

CleanSpark publicly claimed that a 30 MW power expansion would be completed on a very aggressive timeline: first by April 2021, and later by the summer of 2021. However, internal emails, testimony, and project records show that there was no factual basis for the April 2021 projected completion date. In February 2021, Defendants revised the expansion completion date to mid-summer; however, the Company still had not completed a project timeline or engaged key stakeholders at that time. The construction timeline was not completed until March 2021 and indicated the expansion would not be completed until at least October 2021. Moreover, Defendants were told at that time that the timeline was "incredibly fast and probably unrealistic". Nevertheless, in late March 2021, Defendants told investors the expansion project would be completed by the end of the summer. These public representations did not reflect actual project conditions that existed when they were made, which is further corroborated by the fact that the expansion was not completed until 2022.

### 2.   *Early-Stage and Incomplete Planning*

- As of January 2021, CleanSpark had not finalized a construction timeline or coordinated critical milestones with the City of College Park ("CoCP").
- Planning documents and site layouts from January 29, 2021, indicated that basic design feasibility had not been resolved, and spatial constraints rendered the proposed build-out "ludicrous," according to the lead electrician.
- Critical project stakeholders, including the engineer/project manager (ForeSite), were engaged only in March 2021, well after public schedule commitments had been made.

### 3.   *Lack of Engineering and Construction Experience*

CEO Zach Bradford had no engineering, construction, or critical path scheduling background. While he testified to relying on project personnel and third-party consultants, contemporaneous records do not substantiate that such reliance was meaningfully or effectively implemented. Bradford's lack of technical expertise left him unable to evaluate the realism of the proposed

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 9 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



schedule or to challenge optimistic projections, contributing to public statements that were not grounded in credible technical analysis.

## 4.    *Power Agreement Limitations*

The Power Sales Agreement made no commitments on the feasibility or timing of power delivery beyond 15 MW and was set to expire in 2023.

## 5.    *Delayed Contractor Engagement and Permitting*

- Engineer/project manager (ForeSite) was not formally engaged until March 5, 2021.
- Final site plan was not submitted to the CoCP until April 9, 2021.
- CoCP permit was not issued until June 17, 2021.
- General contractor (Young Contracting) was not hired until June 2021.

## 6.    *Known Risks: Supply Chain, Weather, and Municipal Coordination*

Significant project delays arose from transformer and conduit delivery issues, Georgia's rainy climate, and slow municipal coordination. These were known and foreseeable risks as of early 2021, particularly given the global supply chain disruptions from COVID-19 widely reported by fall 2020.

## 7.    *Noise Mitigation Issues*

CoCP required noise abatement issues to be resolved before granting full occupancy or allowing full power use, adding further delays not adequately anticipated in the project plan.

## 8.    *Incomplete Work as of Q3 2021*

Invoices from July–August 2021 showed that construction administration and program management remained significantly incomplete, with only ~18% of construction administration billed, reflecting substantial lag behind the April 2021 and summer of 2021 public completion projections.

## 9.    *Microgrid Delayed to 2022*

Power-related construction delays, including permitting and utility coordination setbacks, pushed back CleanSpark's highly publicized expansion into 2022.



### *10.      Material Disconnect Between Public Statements and Internal Status*

At multiple points from late 2020 through late 2021, public statements by Bradford and CleanSpark leadership regarding project completion were inconsistent with the internal state of planning and execution. Critical engineering, permitting, and construction decisions were made months after public completion commitments were announced, and predictable delays were not incorporated into external representations.

### B.      Expert Opinions:

1.      The project lacked fundamental project management discipline, including realistic scheduling, milestone planning, stakeholder coordination, and contemporaneous schedule updates.

2.      There was inadequate due diligence performed in assessing ATL's capabilities, project readiness, and the technical feasibility of the expansion timeline.

3.      Public representations of project readiness and completion timelines were not aligned with the internal state of planning, progress, and risk.

4.      Senior leadership, including the CEO, lacked the technical background necessary to evaluate project feasibility, which contributed to the advancement of overly optimistic and unsupported expectations.

5.      The project failed to incorporate widely known supply chain disruptions, including those stemming from COVID-19, and did not account for their foreseeable impacts on delivery timelines.

6.      Risk management practices were materially insufficient to address known and foreseeable uncertainties, including those related to permitting delays, adverse weather, noise mitigation requirements, and resource constraints.

7.      The cumulative effect of these deficiencies reflects a profound breakdown in project governance, falling well below the standard of care expected in the planning and execution of projects of this scale and complexity.

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 11 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



## III.    PROJECT OVERVIEW

Lead Plaintiff, acting on behalf of a proposed class of investors, has brought this action to recover substantial losses resulting from material misrepresentations and omissions by CleanSpark, Inc., and its senior executives. The allegations focus on three primary issues: (1) unrealistic and unsupported projections concerning the timeline for completing the expansion of the Godby Road bitcoin mining facility; (2) the failure to disclose that a favorable power supply agreement with CoCP was set to expire at the end of 2023; and (3) the omission of material facts related to ATL Data Centers, Inc., a company acquired by CleanSpark, which had previously operated under the name Virtual Citadel and had filed for bankruptcy less than a year prior to the acquisition.

### A.    Key Individuals and Entities in the CleanSpark Litigation

**Zach Bradford** – Chief Executive Officer of CleanSpark and a named defendant. Bradford made several of the alleged misrepresentations regarding the Godby Road Facility expansion timeline, the Power Agreement with CoCP, and ATL's background.

**S. Matthew Schultz** – Co-Founder and Executive Chairman of the Board of CleanSpark and a named defendant. Schultz was the Company's Chief Executive Officer from 2014 through October 2019, served as a Director since March 2014 and Executive Chairman since October 2020.

**Lisa DeKalb** – General Manager of the Godby Road Facility during the relevant period. She was a key third-party witness deposed in the case and provided firsthand insights into the facility's operational conditions and delays.

**Kent Shelley** – Lead electrician at the Godby Road Facility. He would likely be relevant for understanding actual construction timelines and feasibility of electrical infrastructure upgrades.

**Bernardo Schucman** – Investor in CleanSpark and former owner of Block Data, which acquired the assets of Virtual Citadel through bankruptcy proceedings before those assets were transferred to ATL. Schucman had a personal relationship with Zach Bradford and was involved in organizing multiple entities including ATL and Fastblock.

**Patrick Stanton** – Employee at ForeSite, the engineering firm hired to assist with the Expansion Project. His role would be integral in assessing the project planning and permitting timeline.

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 12 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



**CleanSpark, Inc.** – Defendant company that acquired ATL and became the operator of the Godby Road Facility.

**ATL Data Centers, Inc.** – A Bitcoin mining entity acquired by CleanSpark in December 2020. ATL was the successor to Virtual Citadel, a bankrupt company, and held the lease and operations at the Godby Road Facility.

**Godby Road Facility** – The data center in College Park, GA, at the heart of the litigation. The subject of the planned expansion to increase electrical capacity from 15MW to 45MW, which Lead Plaintiff claims was misrepresented in terms of feasibility and timeline.

**City of College Park ("CoCP")** – The municipal power provider for the Godby Road Facility. CoCP entered into a Power Agreement with ATL in September 2020 to provide up to 45MW at a favorable rate, set to expire in 2023. Lead Plaintiff alleges this expiration risk was material and was omitted from investor disclosures.

## B.    Key Background:

CleanSpark, Inc. ("CleanSpark" or "the Company") is a publicly traded entity that, prior to late 2020, primarily identified itself as a provider of advanced energy software and microgrid solutions. On December 10, 2020, CleanSpark publicly announced its strategic acquisition of ATL Data Centers, Inc. ("ATL") for consideration valued at approximately $19.4 million. At the time of acquisition, ATL operated a data center in College Park, Georgia, which included a nascent bitcoin mining operation. The stated purpose of the acquisition was to transform ATL into a profitable facility that would showcase CleanSpark's proprietary microgrid technologies and allow for cost-efficient bitcoin mining through reduced energy consumption.

CleanSpark emphasized that a core component of this strategy would involve expanding ATL's power capacity from 20 megawatts (MW) to 50 MW, which would enable significant increases in bitcoin production. The Company publicly represented that this power expansion would begin promptly and be completed by April 2021. CleanSpark also stated that its decision to acquire ATL was based on rigorous due diligence, including analysis purportedly beginning in February 2020, and asserted that ATL presented an ideal platform for the integration of its energy management solutions.

However, shortly after the acquisition, concerns were raised regarding the veracity of CleanSpark's public representations. A January 2021 report published by short-seller Culper

Case 1:21-cv-00511-LAP   Document 111-1   Filed 12/12/25   Page 13 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



Research alleged that another bitcoin mining company, Marathon Patent Group, had previously explored acquiring the same assets under the name "Fastblock Mining" but withdrew after identifying material risks, including the limited duration of a critical power agreement with CoCP. The report further revealed that ATL was, in fact, a rebranded successor to Virtual Citadel—a bitcoin mining enterprise that had filed for bankruptcy in early 2020.

CleanSpark's stock price declined following these revelations and the subsequent delays in the completion of the power expansion project, which ultimately led to this securities class action. Lead Plaintiff alleges that Defendants failed to disclose material adverse facts regarding ATL's corporate history, the feasibility of the expansion timeline, and the economic viability of the acquisition. Discovery has revealed that CleanSpark's original estimates lacked a reasonable factual basis and that throughout the Class Period that management's projections and subsequent revisions to those projections to complete the expansion were unrealistic.

## C.      Basis of the Litigation:

The basis of the litigation is that CleanSpark, Inc. and certain senior executives allegedly violated federal securities laws by making materially false and misleading statements and omitting critical information in connection with the Company's December 2020 acquisition of ATL Data Centers, Inc. ("ATL"). The claims are brought under Sections **10(b)** and **20(a)** of the **Securities Exchange Act of 1934**, and **Rule 10b-5** promulgated by the SEC.[1]

This is a securities fraud class action based on the theory that CleanSpark misled investors regarding the viability and timeline of its expansion strategy, the stability of its power supply, and the corporate pedigree of ATL, thereby inflating the stock price and causing significant losses when the truth emerged.

---

[1] I offer no opinion and possess no specialized expertise with respect to securities law, accounting standards, or the financial reporting obligations of public companies. My opinions are limited solely to issues relating to the construction project management process, including the feasibility, planning, scheduling, and execution of the expansion of the Godby Road facility, as informed by my professional experience in construction project delivery.

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 14 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



## IV.    DISCUSSION

### A.    Project Management of a Data Center Expansion Project

#### *1.    Introduction*

This narrative provides a professional opinion regarding the project management processes and practices typically required for the successful execution of a data center expansion. The discussion below is structured around standard project phases: initiation, planning, execution, testing, and commissioning. The narrative also incorporates the functional use of Gantt Charts as a project control tool and addresses relevant risk factors specific to early 2021, including supply chain disruptions and COVID-19-related impacts.

#### i.    Initiation Phase

The initiation phase of a data center expansion is focused on establishing project viability, scope, and high-level stakeholder alignment. This phase typically involves establishing the business case for expansion (e.g., increased computing capacity, power efficiency), engaging stakeholders such as CleanSpark, CoCP, design engineers, and contractors, and conducting preliminary risk and feasibility assessments, including zoning reviews and utility availability.

#### ii.    Planning Phase

The planning phase formalizes the project delivery strategy and establishes control documents and procedures. Key tasks include hiring engineers and contractors, securing permits, preparing the site, and planning procurement. CleanSpark handles the acquisition of owner-furnished equipment while CoCP manages public utility infrastructure. A Gantt Chart is developed to reflect key milestones and dependencies across all phases.

#### iii.    Execution Phase

This phase involves managing on-site construction, coordinating trades, and ensuring timely delivery of equipment. Project controls involve monitoring schedule performance[2] including the status of Project Milestones as well as identify risks requiring corrective actions.

---

[2] Monitoring of schedule performance typically involves updating project schedules (timelines) on a periodic basis such as weekly or monthly to reflect completed and ongoing tasks.

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 15 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



**iv.     Testing and Commissioning Phase**

This phase ensures all systems function as intended. Commissioning includes load testing, system verification, and turnover of O&M documentation. It culminates with occupancy approval and beneficial use.

**v.      Post-Construction Phase**

The post-construction phase focuses on closing out the project and ensuring a smooth transition to operations. Typical activities include completing punch list items, providing final O&M documentation, training operations personnel, delivering warranties, and ensuring compliance with final permits and inspections. Final acceptance, occupancy, and any outstanding claims or contract disputes are resolved in this phase.

*2.      Project Controls – Gantt Chart Use*

The Critical Path Method (CPM) is a widely recognized project management technique used to plan, schedule, and monitor complex projects. Through CPM, the project's critical path — the longest sequence of dependent activities that determines the minimum project duration — is identified, allowing stakeholders to understand which tasks are critical, which have flexibility, and where delays may jeopardize the overall schedule. CPM scheduling enables proactive management by helping project teams visualize task relationships, allocate resources efficiently, assess the impacts of changes or delays, and implement corrective actions to maintain project objectives. Importantly, CPM is not a static tool; it requires regular updating to reflect actual project progress, incorporate newly identified risks or delays, and provide an accurate basis for forecasting and decision-making. Without timely updates, the schedule quickly loses its value as a management and communication tool, undermining the ability to respond effectively to emerging challenges.

Complementing CPM schedules, Gantt charts are an important and effective communication tool used in conjunction with CPM Scheduling. A Gantt chart provides a visual, time-phased representation of project activities, typically displayed as horizontal bars across a timeline calendar. This graphical format helps stakeholders — including those without technical scheduling backgrounds — to easily understand the sequence, duration, and overlap of activities, as well as key milestones and deadlines. Together, CPM schedules and Gantt charts serve as indispensable tools in the effective management of construction and other complex projects,

Case 1:21-cv-00511-LAP   Document 111-1   Filed 12/12/25   Page 16 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York

supporting informed decision-making, early identification of potential issues, and successful project delivery within established timeframes and budgets.



*Figure 1 Sample of Gannt Chart*

### 3.      *Risk Variables and 2021-Specific Impacts*

Key risks in early 2021 included adverse weather, material shortages due to global supply chain disruptions, and COVID-19-related impacts on labor and permitting. These challenges required adaptive planning and mitigation strategies.

### 4.      *Conclusion*

Effective project management for data center expansions requires integrated planning, robust schedule control using Gantt Charts, and proactive risk management. Adherence to these principles ensures timely and cost-effective project delivery.

Case 1:21-cv-00511-LAP   Document 111-1   Filed 12/12/25   Page 17 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York

**B.      Review of Power Supply Documentation and Coordination Efforts**

As part of my analysis, I reviewed the Power Sales Agreement dated September 1, 2020[3] and contemporaneous communications and meeting notes related to project coordination with CoCP, including documents dated January 7, 2021[4].

*1.      Power Sales Agreement – September 1, 2020*

The Power Sales Agreement outlines the pricing terms for electrical service; however, it does not address several key issues critical to project planning and execution. Notably, the agreement is silent on:

- The feasibility of delivering additional power beyond initial allocations,
- The timing for such delivery, and
- The responsibilities, infrastructure requirements, or constraints necessary to support expanded electrical capacity.[5]

These omissions are significant because without clear commitments on feasibility, timing, and infrastructure responsibilities, project stakeholders cannot reliably coordinate design, permitting, construction sequencing, or commissioning activities. The absence of these details increases the risk of misaligned expectations, unforeseen delays, and unallocated costs, all of which can materially impact the project's schedule, budget, and successful delivery.

*2.      Coordination Meeting with City of College Park – January 7, 2021*

On January 7, 2021, representatives from CleanSpark, and CoCP met to discuss the 30 MW power build-out. The purpose of this meeting, as stated in both internal communications and the meeting notes, was to obtain a high-level understanding of CoCP's major milestones and to determine what actions CleanSpark would need to undertake to align with those milestones. At the time of the meeting, CleanSpark had not yet developed a project timeline, though CleanSpark representatives committed to producing a draft project schedule within the following week.[6,7]

Key points from this meeting include:

---

[3] CSBish0024123 – Med. Ex. F
[4] CSBish0001576–1577 – Med. Exs. H–I
[5] *CSBish0024123 – Med. Exhibit F: Power Sales Agreement dated 9/1/2020.*
[6] *CSBish0001576 – Med. Exhibit H: Email from Lisa DeKalb re: CoCP 30 MW build-out project review.*
[7] *CSBish0001577 – Med. Exhibit I: Meeting Notes – 30 MW Build-Out with City of College Park.*

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 18 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



- Transformer Procurement Timeline: A CoCP representative stated that the Required Design Package (RDP) for the transformers was due in January 2021, with the intent to place orders in the first week of February. While transformers were typically received within approximately eight weeks, the timeline was subject to delay due to pandemic-related disruptions[8]. CoCP already had four transformers in stock and would need to procure twelve additional units, with the goal of delivering all transformers and completing related infrastructure by July 2021.[9]

- Construction Prerequisites: Both parties acknowledged that critical site preparation—including installation of underground utilities and concrete foundations—would need to be completed prior to CoCP delivering transformers and associated circuitry. CleanSpark representatives noted the aggressive nature of CoCP's schedule and acknowledged the difficulty of maintaining pace. Additionally, it was confirmed that CoCP would begin billing as soon as the system was energized, further underscoring the need for timely execution of CleanSpark's responsibilities.

- Status of Project Planning: At the time of the meeting, CleanSpark had not yet finalized a construction timeline. The notes reflect that "Kent and Lisa will work on getting the timeline" indicating that internal planning was still in early stages. The meeting notes also identify a number of follow-up actions, including obtaining engineering design approvals, site-specific planning for transformer placement, budgeting approvals, and legal entity setup, all of which were still pending.

These documents indicate that, as of early January 2021, the ability of CleanSpark to meet CoCP's target delivery milestones was contingent upon numerous tasks that were still in progress or had not yet been initiated. Moreover, the absence of clear commitments in the Power Sales Agreement regarding the timing or feasibility of expanded power delivery introduces ambiguity regarding the parties' respective expectations and obligations.

---

[8] See Paragraph F for more discussion on this issue.

[9] This statement refers only to the delivery of transformers and associated main infrastructure work and does not include the separate scope of work required to connect power to each individual container. According to the Gantt chart, project activities related to final power connections and system integration extended through at least until October 4, 2022.

Case 1:21-cv-00511-LAP   Document 111-1   Filed 12/12/25   Page 19 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



### 3.  *Preliminary Site Planning – January 29, 2021*

I reviewed internal planning documents dated January 29, 2021[10] which reflect CleanSpark's preliminary efforts to evaluate options for accommodating the planned 30 MW electrical deployment.

These materials demonstrate that, as of late January 2021, CleanSpark remained in an early-stage planning phase. The documents describe conceptual site layouts and acknowledge that multiple design alternatives were under consideration. The planning notes explicitly state that "[t]here are some **significant challenges** to attempt the 30 MW deployment on the existing Annex property."[11] **[Emphasis Added]**

These concerns were further elaborated on during the deposition of Kent Shelley, who explained the infeasibility of such a dense configuration:

> *Q. Can you tell me what those -- what the significant challenges were?*
> *A. This was -- Bernardo Schucman had asked me to see if I thought it was possible to add the additional 30 million watts under this one-acre plot that already had 15 million watts of power on it. With the dimensions and footprints, it showed stacking containers three high, transformers at every little place you could possibly get, and I basically – I basically deemed this impossible, or if we went, I'd said it would be ludicrous, like it would be the worst idea you could have in history. So, I just -- I tried to draw it in there to show them how condensed, you know, how unappropriate [sic] it would be to do that."*

Additionally, the plan notes that: "Kent proposes that while we build out the front property and depending on the timing of available new mining devices and the delivery of all of the 30 MW power (CoCP has noted that it will be delivered in two phases, with 15MW coming first and the remaining coming later)." This further illustrates the tentative and undeveloped nature of the project scope and delivery strategy as of January 2021.

---

[10] CSBish0003513 and CSBish0003514 – Med. Exs. J–K
[11] *CSBish0003513–3514 – Med. Exs. J–K: Internal planning documents dated January 29, 2021.*

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 20 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York

This testimony, together with the internal planning documents, supports the conclusion that as of January 29, 2021, there was **no finalized or feasible plan in place** to accommodate the full 30 MW build-out on the proposed site. Instead, ATL was still grappling with significant logistical and spatial constraints that directly impacted its ability to execute the project within the anticipated timeframe.

### 4.    *March 3, 2021, Email and Preliminary Project Plan*

The internal email dated March 3, 2021, transmitting a preliminary Gantt chart and project plan[12], explicitly cautioned that the proposed schedule was "an incredibly fast and probably unrealistic schedule." This disclaimer from the individual responsible (Lisa DeKalb) for creating the plan indicates an early acknowledgment that the timeline was likely unattainable.

In my professional opinion, when a project planner or technical lead flags a proposed schedule as unrealistic, management bears a responsibility to investigate those concerns, determine which assumptions are driving the risk, and revise the schedule to reflect a more achievable execution strategy. Failure to do so increases the risk of downstream delays, coordination failures, and unmet expectations.

In deposition, Lisa DeKalb, the project manager responsible for preparing the plan, reiterated that the schedule was premised on ideal conditions, assuming "we don't have any problems with weather or contractors able to start right away," and that it was "an incredibly fast and probably unrealistic schedule for completing the various surveys and reports that have to be completed before the plan can get in front of the City of College Park."[13] She further testified that the schedule included "too many variables over which none of us had any control."[14]

Ms. DeKalb also testified that her past experience with CoCP led her to anticipate extended timelines: "my experience with College Park [including 'getting a prior permit' and 'getting other things accomplished'] led me to believe that everything was going to take a lot longer than we would hope."[15] Although the permitting process itself was not unusually delayed, her

---

[12] CSBish0007230, 7235 – Med. Exs. L–M
[13] DeKalb Tr. at 112:3–10.
[14] DeKalb Tr. at 113:3–5.
[15] DeKalb Tr. at 113:10–13.

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 21 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



statement reflects a commonly understood industry reality: municipal coordination is often subject to uncertain timeframes.

In explaining the intent behind the email language, DeKalb testified that her warning "was to try to help Zach [Bradford] understand that we couldn't commit to this timeline." She further stated, "Based on my experience project messaging [sic] the many decades that I had been working in my life, I did not think that timeline was going to be met."[16] Dekalb also testified that when she delivered the first draft of the Gantt chart to Zachary Bradford (around March 2021), he was upset because it showed the project would not be completed by the time he had publicly announced to investors. Specifically, DeKalb stated[17]:

> *"He stated that he had made a public announcement that it was going to be completed before that".*

The Gantt chart assumed CleanSpark's in-house team, including Kent Shelley, would perform certain electrical work following power delivery, land clearance, slab installation, and equipment placement. DeKalb testified that Shelley provided rough estimates for the electrical work based on the number of amp boxes and their complexity, which she incorporated into the schedule.[18] However, she acknowledged that the Gantt chart was not updated after initial delivery.[19]

Shelley himself confirmed the unrealistic nature of the assumptions, stating in deposition that he gave DeKalb simplified estimates to appease her request for a specific timeline, despite his belief that the task required a more nuanced evaluation: "She just demanded an answer, so I gave her a point-to-point-to-point answer. That's what she submitted."[20] He elaborated that he would not be performing the work himself and that the actual electricians might work at a much slower pace.[21]

Moreover, the project manager, ForeSite Group, had limited to no involvement in the preparation of the initial plan. According to a March 3, 2021 email, a meeting was held with Patrick Stanton of ForeSite only that day, during which the team "spent several hours going over the logistics of the project as well as several potential design layouts." ForeSite was not formally engaged until

---

[16] DeKalb Tr. at 115:2–5; 116:10–13.
[17] DeKalb Tr. at 98:2-9
[18] DeKalb Tr. at 136:4–137:16.
[19] DeKalb Tr. at 197:15–198:4.
[20] Shelley Tr. at 52:4–17.
[21] Shelley Tr. at 55:7–19.

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 22 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



March 5, 2021. Shelley confirmed this sequence in deposition, noting that the March 3 meeting was essentially an exploratory discussion to frame ForeSite's eventual proposal.[22]

The limited involvement of the project manager, ForeSite Group, in the preparation of the initial project plan represents a significant deficiency in standard project management practice. In typical construction and data center development projects, the preparation of the initial project schedule is a collaborative effort involving key stakeholders, including the owner (or client), the owner's representative, the project manager, design professionals, and the contractor (or construction manager, depending on project delivery method). Each party provides critical input:

- **The project manager** or owner's representative is responsible for overseeing overall project coordination, ensuring alignment between design, construction, and client goals, and developing (or at minimum, validating) the master project schedule.
- **The contractor or construction manager** typically provides detailed input on construction sequencing, durations, resource availability, and logistical constraints, based on field expertise.
- **The client (Bradford/CleanSpark in this case)** is expected to review, approve, and sign off on key project documents, particularly the baseline schedule as well as any major revisions and/or delays, as it sets expectations for delivery timelines and milestone achievements.

The March 3, 2021 meeting—described as an exploratory discussion—occurred only two days before ForeSite was formally engaged. As such, ForeSite could not have meaningfully participated in the preparation, validation, or approval of the initial schedule. This is problematic because it suggests the project moved forward without the benefit of a fully coordinated and endorsed project plan. Notably:

- There appears to be **no formal, signed baseline schedule or project timeline approved by the client**, which is a critical control document in any professionally managed project.
- Without such a document, there is no shared reference point to measure progress, evaluate changes, assess delays, or allocate responsibility.

---

[22] Shelley Tr. at 42:6–13.

Case 1:21-cv-00511-LAP  Document 111-1  Filed 12/12/25  Page 23 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York

- It also raises concerns about **internal communication and governance**, as Bradford appears to have communicated public completion dates to investors without reference to a formally validated schedule.

In a well-managed project, the timeline would have been developed jointly by the project manager and contractor, reviewed in detail with the client, and formally approved (typically through signoff or written acceptance). This baseline schedule would then serve as the foundation for subsequent project controls, including tracking, reporting, change management, and delay analysis. The absence of such a document not only undermines effective project execution, but also exposes the project to heightened risk of misalignment, misunderstanding, and ultimately, misrepresentation of project status to external stakeholders.

## C.      Other Relevant Dates and Milestones

- ForeSite, the engineer/project manager, was formally hired on March 5, 2021.[23]
- The Final Site Plan was submitted to CoCP on April 9, 2021.[24]
- Young Contracting, the general contractor, was not retained until June 2021.
- CoCP issued the permit approving the Final Plan on June 17, 2021.[25]

## D.      Additional Risk Factors and Indicators of Delay

Noise abatement concerns raised by CoCP introduced further uncertainty into the project timeline. Deposition testimony confirmed that CoCP initially flagged the potential for excessive noise due to exhaust fans used to cool the containers. Although CleanSpark considered mitigation options—including construction of a sound wall and relocation of structures—there was uncertainty over whether the noise concerns had to be resolved prior to full power use. By May 2021, CoCP made clear that resolution of the noise issues was a prerequisite for full operational approval.[26] While a temporary certificate of occupancy could potentially be issued, its discretionary nature further underscores the risk.

In deposition, Zach Bradford identified several contributing causes to the delay in power delivery from July to October 2021, including persistent supply chain disruptions, adverse weather

---

[23] CSBish0007343
[24] CSBish0018627 – Med. Ex. P
[25] CSBish0012601 – Med. Ex. Q; CSBish0012603
[26] Bradford Tr. at 146:18–147:24.



Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 24 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York

conditions (such as heavy Georgia rainfall and clay soil challenges), and prolonged underground conduit installation. Bradford attributed the underground conduit delays to contractors working on behalf of CoCP, whose pace of work was slower than anticipated[27].

Importantly, these were not wholly unforeseen risks. Supply chain disruptions, weather impacts, permitting delays, and underground utility coordination are **well-recognized risks in large-scale infrastructure and data center projects**. Notably, the effects of the COVID-19 pandemic on global and domestic supply chains were widely recognized across the construction and electrical sectors by the fall of 2020[28]. Project teams were expected to account for longer lead times, limited equipment availability, labor constraints, and delivery delays for critical components — including conduit, transformers, switchgear, and other electrical equipment — when developing and updating the project timeline.

Other project-specific risk factors — such as the construction of the required stormwater retention pond[29] and the installation of environmental containment systems for existing facility transformers[30] — similarly represented known engineering, permitting, and logistical challenges. These were critical-path-sensitive items that required proactive management.

When delays in power delivery began to materialize, best practice would have been to **update the project schedule contemporaneously** to reflect revised milestone dates and assess downstream impacts. For example, the delay in power delivery had a foreseeable effect on the commissioning of the microgrid (i.e. the delivery of the additional power), which was ultimately pushed into 2022[31]. Failure to promptly adjust the project timeline in response to these emerging conditions left the project team without an accurate schedule basis and undermined both internal planning and external reporting.

---

[27] Bradford Tr. at 107:24–110:3.

[28] By late 2020, the construction and electrical sectors were widely reporting significant impacts from COVID-19 on material supply chains, labor availability, and delivery timelines. Industry groups such as the Associated General Contractors of America (AGC) and the National Electrical Contractors Association (NECA), as well as trade publications like *Engineering News-Record* (ENR), published multiple bulletins and articles warning of extended lead times for electrical gear, transformers, conduit, switchgear, steel, HVAC equipment, and other key construction materials. See, e.g., AGC, *The Construction Industry's Response to COVID-19: November 2020 Update*; NECA, *COVID-19 Impact on Supply Chains* (October 2020); ENR, *Supply Chain Disruptions Likely to Extend Into 2021* (December 2020). These conditions were broadly known within the industry and should have been proactively incorporated into project risk assessments and schedule planning.

[29] CSBish13607

[30] CSBish13084

[31] CSBish13342.



Contemporaneous progress invoices reinforce the assessment that major construction activities remained significantly incomplete well into Q3 2021. An invoice from ForeSite dated July 13, 2021[32], and another dated August 9, 2021[33], both show that ForeSite had not completed the construction administration or program management scopes of work. Likewise, a July invoice from Young Contracting[34] shows that their scope was still in progress and nowhere near final completion.

Based on the reviewed Foresite invoices dated July 13, 2021, and August 9, 2021, the Godby Road Expansion project had progressed through key preconstruction milestones by mid-summer 2021. Specifically, the design development, construction drawings, and permitting phases were substantially complete, and construction administration services had commenced but were only approximately 18% billed by August 2021.

Under normal circumstances, with construction administration and major construction activities beginning around August or September 2021, the anticipated duration for a project of this scale — including sitework, equipment installation, microgrid integration, and environmental systems — would typically extend over a minimum period of four to six months. This would place expected substantial completion or operational turnover in the range of March to May 2022.

However, given the documented delays attributable to known risk factors, including COVID-19-related supply chain disruptions, underground conduit installation challenges, and delayed power delivery, the commissioning of the microgrid (i.e. the delivery of the additional power) and full operational completion extended into mid to late 2022. This indicates that, while a reasonable baseline completion date might have been Q1 or early Q2 2022, the actual completion was likely deferred to Q2 or Q3 2022.

Importantly, the absence of an updated and formally approved project timeline reflecting these emerging delays further complicates retrospective assessment and underscores deficiencies in project controls.

---

[32] CSBish13390
[33] CSBish13919
[34] CSBish26059

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 26 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



The following presents an approximate reconstruction of the project schedule, developed from the ForeSite invoices and related project records, along with an updated Gantt chart reflecting the timeline of key activities and milestones

| Phase | Start | End (Estimate) |
|---|---|---|
| Pre-Planning, Concept, Design | Late 2020 | July 2021 (complete) |
| Permitting & Environmental | Early 2021 | July–August 2021 (complete) |
| Construction Mobilization | August 2021 | September 2021 |
| Major Construction Phase | September 2021 | March–May 2022 (baseline) |
| Adjusted with Known Delays | September 2021 | June–July 2022 (realistic adjusted) |
| Microgrid Commissioning | Post–Power Delivery (originally late 2021, delayed) | Mid to late 2022 |

**Key Notes**

- Baseline schedule (without delays): completion by ~May 2022

- Adjusted schedule (with delays): completion by ~July 2022 or later

- Risk factors extending timeline: COVID-19 supply chain impacts, conduit and utility delays, power delivery dependencies, microgrid commissioning



*Figure 2 Updated Gantt Chart*

Case 1:21-cv-00511-LAP Document 111-1 Filed 12/12/25 Page 27 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



### E. Supply Chain Disruptions in Electrical Equipment Procurement

It was widely known by early 2021 that global supply chain disruptions were critically impacting the procurement of electrical equipment—particularly switchgear, transformers, and circuit breakers. According to Wood Mackenzie, transformer lead times in 2021 averaged around 50 weeks—a dramatic increase compared to pre-pandemic norms[35]—while larger units sometimes spanned into 80–210 weeks (Wood Mackenzie, 2023). Utility providers nationwide reported acute shortages in transformers, cables, switchgear, meters, and substation equipment, hampering their ability to fulfill existing orders (APPA, 2021). Market intelligence reports highlighted that delivery delays caused by the pandemic had pushed lead times from six weeks in early 2020 to three to nine months by mid-2021 (IEEE Spectrum, 2021). Additionally, logistical bottlenecks—including container shortages and port congestion—exacerbated delays. As of early 2021, inbound logistics delays averaged over 16%, translating into 15– to 40-day window shipments extending significantly (McKinsey & Company, 2021). Given these well-documented industry conditions, project stakeholders, including CleanSpark's team, should have reasonably anticipated lengthy procurement timelines for electrical equipment and adjusted the schedule and contingencies accordingly during project planning and execution.

### 1. References

- American Public Power Association (APPA). (2021). Transformer supply chain constraints. https://www.publicpower.org
- IEEE Spectrum. (2021). Why global supply chains may never be the same. https://spectrum.ieee.org
- McKinsey & Company. (2021). The state of global supply chains in 2021. https://www.mckinsey.com

---

[35] Prior to the COVID-19 pandemic, the procurement of electrical equipment operated within well-established and predictable timeframes. Standard distribution transformers and medium-voltage switchgear typically carried lead times of 6 to 12 weeks, depending on the size, configuration, and manufacturer. For larger or specialized equipment, such as custom-designed power transformers or advanced switchgear assemblies, lead times generally ranged from 12 to 20 weeks, with particularly complex orders extending up to 24 weeks. These timelines reflected an industry accustomed to just-in-time (JIT) production strategies, supported by stable global manufacturing networks, reliable raw material supplies, and consistent international logistics. Contractors and developers were able to integrate these standard procurement durations into project schedules with routine planning, and significant deviations from these norms were rare outside of specialized or niche equipment categories. This pre-pandemic baseline stands in sharp contrast to the extended lead times observed during and after 2020, where global supply chain disruptions severely strained the availability of critical electrical components.

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 28 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



- Wood Mackenzie. (2023). Global transformer supply and demand outlook. https://www.woodmac.com

## F.    Bradford's Qualifications and Limitations

Zach Bradford, the Chief Executive Officer of CleanSpark, holds a degree in accounting from the University of Nevada, Las Vegas (UNLV) and is a certified public accountant (CPA) licensed in Nevada. His professional background is rooted in financial accounting, corporate finance, and business operations, with particular emphasis on capital markets, mergers and acquisitions, and strategic oversight. Importantly, Bradford has no formal education, training, or certification in engineering, electrical systems, construction management, project management, or critical path scheduling methodologies.

Bradford's early career in public accounting and his subsequent executive roles provided him with experience in financial management and corporate strategy, but did not equip him with the technical knowledge or field experience necessary to understand the intricacies of planning and delivering complex construction or energy infrastructure projects. Notably, he has no documented background managing construction teams, overseeing design-build processes, coordinating with utility providers, or managing the permitting, logistical, and scheduling challenges inherent to large-scale construction or microgrid deployment projects.

In his deposition, Bradford confirmed that he was not personally involved in engineering or construction planning decisions for the Godby Road facility. He testified that he relied on project personnel and third-party consultants for technical matters, including scheduling, design feasibility, and permitting logistics. However, contemporaneous project records do not substantiate this claimed reliance. The available documents do not reflect substantive engagement by qualified third-party consultants in the development, review, or validation of the project schedule.

Moreover, when Bradford was informed internally that the proposed timeline was likely unrealistic, he failed to investigate these warnings or to take corrective action. A fundamental responsibility of a project executive — particularly one without technical expertise — is to ensure that key stakeholders with relevant technical knowledge are actively involved in creating and validating the project timeline. This typically includes the project manager, design engineers, contractors, utility representatives, and permitting authorities. Yet there is no evidence that

Case 1:21-cv-00511-LAP   Document 111-1   Filed 12/12/25   Page 29 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



Bradford convened or coordinated these stakeholders to develop a realistic schedule or to reassess project feasibility in light of identified risks.

Bradford's failure to probe, challenge, or adjust the schedule when faced with concerns — coupled with the absence of any formally approved baseline schedule or documented stakeholder buy-in — reflects a significant breakdown in project governance and oversight. While reliance on technical experts is standard and expected for an executive without construction background, such reliance must be verified, deliberate, and well-documented. In this case, Bradford's lack of relevant technical experience left him unable to critically assess whether the aggressive project timelines were achievable and whether the necessary controls were in place to manage project risks.

Bradford's lack of formal education and experience in construction management, critical path scheduling, and infrastructure delivery significantly undermines the reliability of his public statements regarding the project's anticipated completion. As an executive without technical expertise, Bradford was dependent on the input, analysis, and validation provided by qualified project personnel and consultants. However, contemporaneous records show no evidence that these key stakeholders were substantively engaged in developing or approving the project timeline.

Critically, when internal concerns were raised that the timeline was unrealistic — due to factors such as design complexity, permitting constraints, supply chain risks, and utility coordination challenges — Bradford failed to investigate these warnings or adjust the public messaging accordingly. Without personally understanding the technical drivers of the schedule or ensuring that qualified experts had validated its feasibility, Bradford lacked a reasonable basis for making confident public representations about project completion dates.

In effect, Bradford's public statements were not grounded in a rigorously developed and technically supported project plan. Instead, they were based on unverified assumptions and unchallenged optimism, absent the essential due diligence typically required in large-scale construction projects. This disconnect significantly diminishes the reliability and credibility of those statements, as they did not reflect a realistic or professionally vetted assessment of project risks, timelines, or deliverability.

Case 1:21-cv-00511-LAP   Document 111-1   Filed 12/12/25   Page 30 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



### G.     Timeline Comparison of Public Statements vs. Internal Project Status

Based on my review of the available documents, deposition testimony, and project records, I have prepared a timeline comparing public statements made by CleanSpark CEO Zach Bradford regarding the Godby Road expansion project with the actual internal status of the project at the time those statements were made. This analysis reveals a consistent and material disconnect between the public representations advanced by company leadership and the internal realities known to project personnel and documented contemporaneously.

*Late 2020:*

Bradford publicly represented to investors that the 30 MW Godby Road expansion would be completed by April 2021. At this time, there was no formal engineering schedule, no validated critical path, and key project consultants and contractors had not yet been engaged. Internal project records show that fundamental design, permitting, and logistical planning were still in early development stages.

*January 7, 2021:*

Representatives from CleanSpark and CoCP met to obtain a high-level understanding of CoCP's major milestones and to determine what actions CleanSpark would need to undertake to align with those milestones to achieve the 30 MW power build-out.

*January 29, 2021:*

Planning documents and site layouts indicated that basic design feasibility had not been resolved, and spatial constraints rendered the proposed build-out "ludicrous," according to the lead electrician.

*February 2021:*

CleanSpark revised the projected completion date to mid-year/mid-summer 2021.

*March 3, 2021:*

An initial meeting was held with Patrick Stanton of ForeSite, which Bradford referenced as part of ongoing planning activities. However, contemporaneous documentation confirms this was an exploratory discussion, and ForeSite was not formally engaged until March 5, 2021. At this point, the project still lacked finalized design documents, a formal site plan, or approved

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 31 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



construction schedule. Despite this, Bradford continued promoting a mid-summer 2021 completion timeline to external stakeholders.

*March 26, 2021:*

CleanSpark revised the project completion timeline to "end-of-summer" 2021.

*April 2021:*

Bradford maintained public projections for imminent project completion. Internally, however, essential milestones such as final site plan submission, permit issuance, and general contractor engagement had not yet been achieved. There was no evidence of substantial fieldwork, and construction administration activities had not meaningfully commenced.

*July 2021:*

Public communications continued to frame the project as nearing completion. Meanwhile, internal invoices and project reports show that construction administration was only approximately 18% billed. Known delays from permitting, underground conduit installation, utility coordination, adverse weather, and COVID-19-related supply chain disruptions were materially affecting project progress.

*August 2021:*

CleanSpark announced that the expected completion of the expansion project was "this Fall" (2021).

*Fall 2021:*

Internal project records reflect delays from permitting, weather, infrastructure constraints, and supply chain challenges, which were foreseeable and had been raised by project personnel well in advance. Notably, microgrid commissioning was pushed into 2022, reflecting the cascading effect of earlier management and planning failures.

*December 2021:*

CleanSpark announces that the expansion project is still not completed.

*Summary*

The timeline comparison demonstrates that while CleanSpark's CEO made repeated public representations of aggressive and imminent project completion, these claims were not grounded



Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 32 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York

in a credible or validated technical basis. The project suffered from a lack of disciplined project management practices, including inadequate scheduling, deficient risk mitigation, and insufficient progress tracking. Senior decision-makers, including Bradford, lacked the technical expertise necessary to evaluate the realism of the proposed schedule and failed to adequately respond to early warnings raised by project staff and consultants.

Further evidence shows that critical engineering and construction decisions were made late in the project timeline, with key contractors and designers engaged only months after initial schedule commitments had already been publicly announced. Essential milestones — such as submission of the final site plan, issuance of permits, and hiring of the general contractor — did not occur until the second quarter of 2021. Predictable external risks, including adverse weather, noise abatement requirements, and infrastructure constraints, were not adequately accounted for in the original planning.

In sum, it is my professional opinion that the project completion timelines were not merely unrealistic but were fundamentally unsupported by any credible schedule, technical analysis, or executable strategy. The delays and disruptions that followed were foreseeable and should have been anticipated and disclosed by competent project management personnel. These shortcomings reflect a profound breakdown in project governance and fall well below the standard of care expected in the planning and execution of projects of this complexity and scale.

Case 1:21-cv-00511-LAP   Document 111-1   Filed 12/12/25   Page 33 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



## V.   CONCLUSION

Based on my review of the available documents, deposition testimony, project records, and planning materials, it is my professional opinion that CleanSpark and its project leadership not only failed to exercise appropriate planning, oversight, and due diligence in executing the 30 MW power expansion at the Godby Road facility but exhibited a complete disregard for known risks, constraints, and feasibility limitations.

The challenges inherent to the project — including permitting requirements, utility coordination, design feasibility, supply chain disruptions, contractor delays, and environmental compliance — were not merely underestimated. Internal documents make clear that project leadership was aware of these substantial and foreseeable obstacles well before the publicly promoted completion dates. Despite these known risks, CleanSpark continued to make public representations about the project timeline that were inconsistent with the internal state of planning and execution.

A detailed timeline comparison shows that while CEO Zach Bradford repeatedly assured external stakeholders of aggressive and imminent project completion — beginning with an April 2021 target — there was no underlying credible schedule, technical plan, or execution framework to support these claims. From late 2020 through mid-2021, essential project milestones such as submission of the final site plan, issuance of permits, and engagement of the general contractor had not yet been achieved. Critical engineering and construction decisions were made late in the project timeline, and by July 2021, internal records showed construction administration was only approximately 18% billed, with known delays compounding across permitting, utility, weather, and supply chain dimensions.

Despite early warnings from project staff and consultants, senior decision-makers — including Bradford, who lacked the technical expertise to evaluate the realism of the proposed schedule — failed to reassess or recalibrate the project plan. Predictable external risks, including adverse weather, noise abatement requirements, and infrastructure constraints, were not adequately accounted for in the original schedule. By August 2021, when delays became undeniable, CleanSpark framed them as unforeseen, despite internal records showing they were foreseeable and should have been anticipated.



Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 34 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York

In sum, it is my opinion that the project completion timelines were not merely unrealistic but were fundamentally unsupported by any credible schedule, technical analysis, or executable strategy. The delays and disruptions that followed were not unforeseen anomalies but foreseeable consequences of critical management failures. Competent project management personnel, applying generally accepted industry standards, would have anticipated these challenges, incorporated them into the planning process, and communicated realistic timelines to stakeholders. CleanSpark's failure to do so reflects a profound breakdown in project governance, planning discipline, and risk management, and falls well below the standard of care expected in the planning and execution of projects of this complexity and scale.

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 35 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



## VI.    RESERVATION OF RIGHTS

The opinions and findings presented in this report will continue to be developed and evaluated as new information is made available. I reserve the right to modify these opinions as facts and circumstances warrant.

By:

David M. Ponte, P.E., CCM, CFCC

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 36 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



## VII.    APPENDICES

Appendix A    Curricula Vitae – David M. Ponte, P.E., CCM, CFCC........................................ 32

Appendix B    Documents and Data Received ................................................................. 34



Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 37 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



## Appendix A   Curricula Vitae – David M. Ponte, P.E., CCM, CFCC



# DAVID M. PONTE

## Senior Claims Analyst

Office:   912.268.4144
Mobile:   617.777.3034
dponte@blueprintlaw.com

### EDUCATION

**Suffolk University,**
Sawyer Business School
*Master of Business Administration*

**Marquette University,**
*Bachelor of Science, Civil Engineering*

### CERTIFICATIONS & TRAINING

➢ Professional Engineer
*CO, MA, MD, NY, TX, VA*
➢ Construction Supervisor
*MA*
➢ Certified Construction Manager (CMAA)
➢ Certified Forensic Claims Consultant (AACEi)

### PROFESSIONAL ASSOCIATIONS

➢ American Society of Civil Engineers – Committee on Claims Reduction and Management
➢ ASCE Structural Engineering Institute
➢ ASCE Construction Institute - Claims Avoidance and Resolution Committee
➢ Boston Society of Civil Engineers Section
➢ The American Bar Association – Forum on Construction Law
➢ Society of Construction Law – North America
➢ The Construction Management Association of America
➢ CMAA New England Chapter
➢ AACE International
➢ AACEi Boston Chapter

## ABOUT

David Ponte has more than 35 years of experience in the design, construction and management of large, complex construction projects. His extensive field experience includes the preparation of detailed construction cost estimates and project budgets; development of large, complex CPM schedules; preparation of contractor construction claims; and development of engineering calculations and plans. He has provided strategic risk management and dispute resolution expertise to owners, contractors, design professionals, insurance carriers, and counsel.

Mr. Ponte is a contributing author in several construction claim related publications and have published several articles relating to construction cost estimates. Mr. Ponte has also presented on numerous construction claim topics. His areas of expertise include analysis and resolution of complex design and construction issues; development and analysis of multi-faceted CPM schedules; preparation of detailed expert opinions/reports encompassing both technical and quantum construction issues; and development and analysis of construction cost budgets, including job cost accounts for project cost control.

## PUBLICATIONS & PRESENTATIONS

➢ **Amendments to Federal Rule of Evidence 702 and the Implications for Expert Witnesses** | February 7, 2024 | Arbitration & Dispute Resolution - United States | *Author*
➢ **Death by a Thousand Cuts: Cumulative Impact Claims** | 2024 | Cost Engineering, 66(1), 30-38 | *Co-Author*
  • Presented at the 2023 CI Summit in St. Louis, MO and the 2023 AACEi Conference and Expo in Chicago, IL
➢ **Navigating the Five Phases in the Lifecycle of a Construction Project** | October 12, 2023 | Construction & Planning – United States | *Author*
➢ ~~Good~~ **Any Help is Hard to Find: A Crisis in the Construction and Design Labor Markets** | August 10, 2022 | American Bar Association | *Co-Author*
➢ **Construction Law: Construction Checklists, Second Edition** | 2021 | American Bar Association | *Contributing Author*
➢ **COVID-19 Pandemic Impacts on Construction Projects** | 2021 | American Society of Civil Engineers | *Contributing Author*
➢ **ASCE/CI 71-21 Identifying, Quantifying, and Proving Loss of Productivity** | 2021 | American Society of Civil Engineers | *Contributing Author*
➢ **2018 Global Construction Disputes Report – Do We Learn from Our Mistakes?** | March 2019 | Boston Society of Civil Engineers Section Newsletter | *Author*
➢ **Claims Management Guidelines** | 2018 | Construction Management Association of America | *Contributing Author*



124 Follins Lane
St. Simon Island, GA 31522
www.blueprintlaw.com

Case 1:21-cv-00511-LAP    Document 111-1    Filed 12/12/25    Page 38 of 39
Scot Bishins et al. v. CleanSpark, inc. et al.
United States District Court, Southern District of New York



# DAVID M. PONTE
## Senior Claims Analyst

# SELECT PROJECT EXPERIENCE

### CONSTRUCTION, PROJECT MANAGEMENT & DESIGN

- Harvard, Smith Campus Center | Cambridge, MA | Resident Engineer
- Removal of the Old Jamestown Bridge | Rhode Island Department of Transportation | North Kingstown/Jamestown, RI | Chief Engineer/Estimator
- Rio Puerto Nuevo Project | U.S. Army Corps of Engineers | San Juan, Puerto Rico | Chief Engineer
- Central Artery/Third Harbor Tunnel Project | Massachusetts Highway Department | Boston, MA

### DISPUTE AND FORENSIC EXPERIENCE

**Commercial Buildings**
- Inland Western Coram | Plaza Coram, NY
- North Hills Mall | Raleigh, NC
- West County Center | Des Plaines, MO
- INX International Ink Co. | Homewood, IL
- OMJ Cold Storage Facility | Ayer, MA
- Dallas Cowboys Stadium | Arlington, TX
- Connecticut Science Center | Hartford, CT
- Norwood Theatre | Norwood, MA
- McCormick Place West Expansion | Chicago, IL
- 341 Newbury Street Garage | Boston, MA
- Loring Arena | Framingham, MA
- Lindt & Sprüngli USA Facility | Stratham, NH
- 3345 Stop Eight Road | Vandalia, Ohio
- 10 Technology Park | Billerica, MA
- Party Depot | Danbury, CT
- Boston Advanced Medicine, Inc., v. Cresa Partners Boston, Inc., et al. | Waltham, MA

**Medical Facilities**
- St. Francis Hospital & Medical Center | Hartford, CT
- Sarasota Memorial Hospital | Sarasota, FL
- Underwood Memorial Hospital | Woodbury, NJ
- Maine Medical Center | Portland, ME
- Carrollton West Pet Hospital | Carrollton, TX

**Education & Institutional Facilities**
- Princeton Regional High School | Princeton, NJ
- University of Connecticut School of Law Library | Hartford, CT
- Dartmouth College | Dartmouth, NH
- Northeastern University Residence Hall | Boston, MA
- David J. Quinn Middle School | Hudson, MA
- Northeast High School | Oakland Park, FL
- J. Michael Runne Judicial Center | Salem, MA
- Saint Ann's School | Brooklyn, NY
- SNHU Penmen Stadium | Hooksett, NH

**Infrastructure Projects**
- Midland Valley Trail Extension | Tulsa, OK
- Tacoma Narrows Bridge | Tacoma, WA
- NJ Oak PV Solar Project | Bridgeton, NJ
- Airport Terminal Building | Cold Bay, AK
- BP Noel Major Project | British Columbia, CN
- Wastewater Treatment Facility | Clinton, MA
- Central Link Operations & Maintenance Facility | Seattle, WA
- Water Filtration Improvements | Groton, CT
- New Hampshire Air National Guard Bldg 252 | Pease Air National Guard Base, NH
- Repair/Rehabilitation of Merrimack River and Washington Street Bridges | Haverhill, MA
-

**Residential & Hospitality**
- Fox Hills at Rockaway | Rockaway, NJ
- Harvard University Residence Facility | Cambridge, MA
- Park City Grand | Union City, NJ
- Stoneledge @ Lake Keowee | Seneca, SC
- Terraces on Lake Coeur d'Alene | Coeur d'Alene, ID
- Svenningsen Pool Villa | Thimble Islands, Branford, CT
- 225 Centre Street | Jamaica Plans, MA
- 75 Clinton Street | Brooklyn, NY
- Longyear at Fisher | Hill Brookline, MA
- The Distillery | Boston, MA
- Maison Vernon/Residence II | Boston, MA
- La Quinta Inn & Suites | Clifford Park, NY
- The Tremont Apartments | Boston, MA
- 244 Adams Street | Newton, MA
- Nova Residences of Quincy | Quincy, MA
- Hobson's Landing | Portland, ME
- Hewitts Landing | Hingham, MA
- The Chevron | Boston, MA
- The Hendries Building | Milton, MA
- 455 Harvard Street | Brookline, MA
- 1760 Revere Beach Parkway | Revere, MA
- Cresa Partners Boston, Inc. | Waltham, MA

### DEPOSITION, ARBITRATION, & TRIAL TESTIMONY

- **Kevin D. Wagner, et al., vs. Sramowicz Development, LLC, et al. vs. Goldsmith, Prest & Ringwall, Inc.** Commonwealth of Massachusetts, Middlesex Superior Court. Testified on behalf of Defendants, May 2024.
- **Revoli Construction Co., Inc. v. City of Worcester**, Commonwealth of Massachusetts, Worcester Superior Court. Testified on behalf of Plaintiff, November 2023.
- **Mammoet USA North, Inc., et al. v. New York Wheel Owner LLC, et al.** New York Wheel Project. Deposed on behalf of Mammoet USA North, Inc., Mammoet Americas Holding, Inc., and Mammoet Holding B.V, November 2023.
- **Meehn Su Gim, et al. v. Young Construction Corp., Inc., et al.,** Commonwealth of Massachusetts, Middlesex Superior Court. Testified on behalf of defendants, September, 2022.
- **Shawmut Woodworking & Supply Inc. d/b/a Shawmut Design and Construction v. Starbucks Corporation d/b/a Starbucks Coffee Company,** Starbucks Reserve New York Roastery. Deposed on behalf of Shawmut Design and Construction, August 2021.
- **Sejin Global Co. Ltd. v. Young Construction Corp., Inc., et al., Porter Square Hotel,** Cambridge, Massachusetts. Testified on behalf of Young Construction Corp., Inc., et al in Arbitration proceedings, March 2021.
- **Norman Traverse and Nassrine Traverse, Individually and Derivatively on behalf of Technology Park X Limited Partnership v. The Gutierrez Company, et al.,** Technology Park X Limited Partnership, Nominal Defendant, United States District Court for the District of Massachusetts, Deposed on behalf of Gutierrez Construction Company, Inc., August 2020 & October 2020
- **Maverick Construction Management Services, Inc. v. Liberty Mutual Insurance Company and R.H. White Construction Co., Inc.,** State of Connecticut Superior Court Judicial District of New London at New London, Deposed on behalf of R.H. White Construction Co., Inc., March 2020.
- **Palumbo Family Trust v. Young Construction Company, LLC, 244 Adams Street,** Newton, Massachusetts. Testified on behalf of Young Construction Company, LLC in Arbitration proceedings, February 2020.



124 Follins Lane
St. Simon Island, GA 31522
www.blueprintlaw.com



## Appendix B   Documents and Data Received

The following documents, data, and reports were provided to Blueprint Construction Counsel, LLP for use in the preparation of this report and the findings herein.

1. 2022.02.28-CLEANSPARK10B-Amended Complaint [ESTAMPED].pdf
2. Cleanspark Plaintiff Mediation Statement (FINAL).pdf
3. CSBish0007343.pdf
4. CSBish0009185.pdf
5. CSBish0012603.pdf
6. CSBish0012780.pdf
7. CSBish0012781 (1).pdf
8. CSBish0013084.pdf
9. CSBish0013243.pdf
10. CSBish0013244.pdf
11. CSBish0013342.pdf
12. CSBish0013347.pdf
13. CSBish0013348.pdf
14. CSBish0013390.pdf
15. CSBish0013607.pdf
16. CSBish0013919.pdf
17. CSBish0019608.pdf
18. CSBish0022093.pdf
19. CSBish0022343.pdf
20. CSBish0026059.pdf
21. CSBish0050732.pdf
22. ex 15.pdf
23. ex 16.pdf
24. ex 21.pdf
25. ex 23.pdf
26. ex 26.pdf
27. ex 28.pdf
28. ex 29.pdf
29. Exhibit A (CAC).pdf
30. Exhibit B (MTD Order).pdf
31. Exhibit C (Bradford Transcript).pdf
32. Exhibit D (DeKalb Transcript).pdf
33. Exhibit E (Culper Report).pdf
34. Exhibit F (CSBish0024123).pdf
35. Exhibit G (CSBish0053487).pdf
36. Exhibit H (CSBish0001576).pdf
37. Exhibit I (CSBish0001577).pdf
38. Exhibit J (CSBish0003513).pdf
39. Exhibit K (CSBish0003514).pdf
40. Exhibit L (CSBish0007230).pdf
41. Exhibit M (CSBish0007235).pdf
42. Exhibit N (CSBish0041787).pdf
43. Exhibit O (CSBish0007367).pdf
44. Exhibit P (CSBish0018627).pdf
45. Exhibit Q (CSBish0012601).pdf
46. Shelley Kent 01.09.25.pdf