**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DARSHAN HASTHANTRA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CLEANSPARK, INC., ZACHARY BRADFORD, and S. MATTHEW SCHULTZ,<br><br>Defendants. | Civil Action No. 1:21-cv-00511-LAP |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION TO EXCLUDE THE REPORTS AND TESTIMONY OF**
**PLAINTIFF'S EXPERT DR. ZAHN BOZANIC**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    APPLICABLE LEGAL STANDARDS DO NOT FAVOR DEFENDANTS' MOTION... 2

III.   DEFENDANTS DO NOT CHALLENGE DR. BOZANIC'S QUALIFICATIONS.......... 3

IV.   DR. BOZANIC'S EVENT STUDY AND CONSTANT DOLLAR METHODOLOGIES ARE WIDELY ACCEPTED, RELIABLE, AND WILL ASSIST THE JURY ................... 4

V.     DEFENDANTS' CHALLENGES TO THE CONCLUSIONS OF DR. BOZANIC'S LOSS CAUSATION AND DAMAGES ANALYSIS ARE NOT A BASIS TO EXCLUDE HIS TESTIMONY ........................................................................ 6

      A.     Dr. Bozanic's Analysis of Statistical Significance Is Consistent With Academic Theory.................................................................................. 6

      B.     The Corrective Disclosure Events Provided New Information To The Market...... 8

      C.     The Combination of Dates Is Supported By Academic Theory And Is Regularly Accepted By Courts ....................................................... 10

      D.     The Dates Chosen By Dr. Bozanic Revealed New Information To The Market And Were Not Cherry-Picked ........................................ 12

VI.   DR. BOZANIC'S OPINIONS ARE HIGHLY RELEVANT AND WILL BE HELPFUL TO A JURY.......................................................................... 15

      A.     Dr. Bozanic's Analysis Of Economically Materiality Is Highly Relevant............ 15

      B.     The Constant Dollar Inflationary Ribbon is Regularly Accepted by Courts and Defendants May Test its Merits Before the Jury.................................................... 16

      C.     Disclosure Salience Is Supported By Academic Literature ................................ 17

      D.     The Event Study Disaggregated Market-Based, Industry-Based and Bitcoin Pricing-Based Confounding Information.............................................................. 19

      E.     Dr. Bozanic's Market Efficiency Reports A Are Relevant And Will Be Useful To The Jury.................................................... 20

CONCLUSION............................................................................................................... 22

## TABLE OF AUTHORITIES

**Page**

**Statutes and Rules**

Federal Rules of Civil Procedure 23(c)(1)(C) .............................................................. 21

Federal Rules of Evidence 702 ...................................................................... passim

**Cases**

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*,
568 U.S. 455, 133 S. Ct. 1184, 185 L.Ed.2d 308 (2013) .......................................... 12

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) .................................................................................. 8

*Aranaz Catalyst Pharm. Partners Inc.*,
302 F.R.D. 657 (S.D. Fla. Sept. 29, 2014) ............................................................ 12

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ............................................................................................. 10

*Bishins v. CleanSpark, Inc.*,
2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ......................................................... 9, 11

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ...................................................................................... 3

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ......................................................................... 5, 7

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ............................................................................... 19

*Daubert v. Merrell Dow Pharm, Inc.*,
509 U.S. 579 (1993) .................................................................................... 2, 3, 18

*DoubleLine Capital LP v. Odebrecht Finance, Ltd.*,
2024 WL 1115944 (S.D.N.Y. Mar. 14, 2024) ........................................................ 3

*Fogarazzo v. Lehman Bros.*,
263 F.R.D. 90 (S.D.N.Y. 2009) ........................................................................... 12

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ................................................................................. 16

*Gruber v. Gilbertson*,
628 F. Supp. 3d 472 (S.D.N.Y. 2022) .................................................................... 20

*Guild v. Gen. Motors Corp.*,
53 F.Supp.2d 363 (W.D.N.Y. 1999) ......................................................................... 3

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ................................................................................................ 10

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ........................................................... 9

*In re Credit Suisse Securities Fraud Class Actions*,
2025 WL 3172143 (S.D.N.Y. Nov. 13, 2025) ........................................................... 6

*In re Diamond Foods, Inc.*,
295 F.R.D. 240 (N.D. Cal. 2013) ........................................................................... 12

*In re DVI, Inc. Sec. Litig.*,
639 F.3d 623 (3d Cir. 2011) ................................................................................... 12

*In re Fosamax Prods. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009) ...................................................................... 3

*In re Mirena IUD Products Liability Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016) ...................................................................... 2

*In re Omnicom Group, Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008) ...................................................................... 9

*In re Take-Two Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y Apr. 16, 2008) ........................................................ 9

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
No. 3:15-cv-07658-MAS-LHG, 2023 WL 9748644 (D.N.J. May 22, 2023) ........... 18

*In re Vivendi Universal, S.A., Sec. Litig.*,
634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) ........................................................... 12

*In re Vivendi, S.A. Secs. Litig.*,
838 F.3d 223 (2d Cir. 2016) ................................................................................... 20

*In re Winstar Commc'ns*,
2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ................................................................. 9

*In re Xcelera.com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005) ................................................................................ 12

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ....................................................................................... 2, 3

*Leone v. ASP Isotopes Inc.*,
2025 WL 3484821 (S.D.N.Y. Dec. 4, 2025) ........................................................ 4, 19

*Mazzei v. The Money Store*,
656 Fed. App'x. 558 (2d Cir. 2016) ......................................................................... 21

*Monroe County Employees Retirement System v. Southern Co.*,
332 F.R.D. 370\ (N.D. Ga. 2019) ............................................................................. 7

*Moonbug Entertainment Limited v. BabyBus (Fujian) Network Technology Co., Ltd.*,
2024 WL 2193323 (N.D. Cal. May 15, 2024) ......................................................... 20

*Pirnik v. Fiat Chrysler Autos., N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018) ................................................................................ 7

*Republic of Turkey v. Christie's Inc.*,
425 F. Supp. 3d 204  (S.D.N.Y. Dec. 2, 2019) .......................................................... 3

*Rooney v. EZCORP, Inc.*,
330 F.R.D. 439 (W.D. Tex. 2019) ............................................................................. 8

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
2023 WL 6314939 (S.D.N.Y. Sept. 28, 2023) ........................................................... 8

*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
798 F. Supp. 3d 416 (S.D.N.Y. 2025) ....................................................................... 1

*Smilovits v. First Solar, Inc.*,
2019 WL 7282026 (D. Ariz. Dec 27, 2019) ............................................................. 16

*Sundaram v. Freshworks Inc.*,
2025 WL 1083168 (N.D Cal. Apr. 10, 2025) ........................................................... 10

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
2022 WL 2757643 (S.D.N.Y. July 14, 2022) ........................................................... 21

*United States v. Hatfield*,
2014 WL 7271616 (E.D.N.Y. Dec. 18, 2014) ......................................................................... 12

*Vizirgianakis v. Aeterna Zentaris, Inc.*,
775 Fed.App'x. 51 (3d Cir. May 30, 2019) ............................................................................ 7

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017) ..................................................................................................... 2

*Washington v. Kellwood Co.*,
105 F. Supp. 3d 293 (S.D.N.Y. 2015) ..................................................................................... 2

*Williams v. Gaye,*
895 F.3d 1106 (9th Cir. 2018) .............................................................................................. 20

*WM High Yield Fund v. O'Hanlon*,
2013 WL 3230667 (E.D. Pa. June 27, 2013) ........................................................................ 20

## **Misscelaneous**

Axelson, P. and M. Cain, 2025, "What is Price Impact? How the Goldman Decisions are
Reshaping Shareholder Class Actions,"
*Berkeley Business Law Journal* 22 ..................................................................................... 7, 11

Blankespoor, E., E. DeHaan, and I. Marinovic, 2020, "Disclosure Processing Costs, Investors'
Information Choice, and Equity Market Outcomes: A Review,"
*Journal of Accounting and Economics* 70 ................................................................................ 9

Brav, A. and J. Heaton, 2015, "Event Studies in Securities Litigation: Low Power, Confounding
Effects, and Bias,"
Washington University Law Review 93 ............................................................................... 6, 7

Fama, E., 1991, "Efficient Capital Markets: II"
*Journal of Finance* 46 ............................................................................................................. 9

Goodman, S., 2008, "A Dirty Dozen: Twelve P-Value Misconceptions,"
*Seminars in Hematology* 45 ................................................................................................... 7

Kaye, D. and D. Freedman, 2011, "Reference Guide on Statistics,"
*Reference Manual on Scientific Evidence*, Third Edition .......................................................... 7

Michael J. Kaufman & John M. Wunderlich, *Regressing: The Troubling Dispositive Role of
Event Studies in Securities Fraud Litigation*,
15 Stan. J.L. Bus. & Fin. 183, 190 (2009) ............................................................................. 5

Moeller, S., F. Schlingemann, and R. Stulz, 2005, "Wealth Destruction on a Massive Scale? A
    Study of Acquiring-Firm Returns in the Recent Merger Wave,"
    Journal of Finance 60 .................................................................................................. 17

Rubinfeld, D. "Reference Guide on Multiple Regression,"
    *Reference Manual on Scientific Evidence*, Third Edition (Federal Judicial Center, 2011), p. 321
    ................................................................................................................................ 7

Lead Plaintiff and Class Representative Darshan Hasthantra ("Class Representative"), individually and on behalf of all members of the certified Class (defined below), respectfully submits this opposition to Defendants' Motion to Exclude the Reports and Testimony of Plaintiff's Expert Dr. Zahn Bozanic (ECF No. 109, the "Motion" or "Mot.").

## I.      INTRODUCTION

Dr. Bozanic's expert reports and opinions establish market efficiency, economic materiality, and loss causation, and provide a model to calculate damages on a class-wide basis. Defendants' motion seeks to exclude Dr. Bozanic's reports and testimony, including his market efficiency report, which the Court already found relevant and that supported class certification. *See* Mot. at 2, 23; Order (ECF No. 101) at 2, 22-23. Dr. Bozanic meets the requirements of Federal Rules of Evidence ("FRE") 702. He applies his technical expertise to the facts using widely accepted economic principles to reach his conclusions and does not offer legal opinions. His analysis will assist the jury in determining the damages incurred by the Class.

Dr. Bozanic presented a proposed damages methodology amenable to the calculation of per-share out-of-pocket damages on a class-wide basis. *See* ECF No. 108-1, ("Ex. A"), ¶¶3, 85, 92; ECF No. 108-4, ("Ex. D") ¶¶12, 30, 33, 166-68. Defendants' Daubert motion largely reiterates flawed arguments from Defendants' Opposition to Class Certification. ECF No. 92. Dr. Bozanic's methodology used an event study which measured the amount of inflation dissipation following each corrective disclosure date(s) and worked chronologically backward to construct the inflation ribbon for each day during the Class Period. Ex. D, ¶¶65-69, 155-68. This is a widely accepted technique for computing class-wide damages in securities class actions. Courts in this circuit have repeatedly endorsed this method to establish loss causation and damages. *See, e.g., Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*, 798 F. Supp. 3d 416, 478-79 (S.D.N.Y. 2025); *Waggoner*

*v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017). Dr. Bozanic's testimony is admissible and will assist the trier of fact.

## II.     APPLICABLE LEGAL STANDARDS DO NOT FAVOR DEFENDANTS' MOTION

In *Daubert v. Merrell Dow Pharm, Inc.*, 509 U.S. 579 (1993), the Supreme Court explained that FRE 702 requires district courts to act as gatekeepers, ensuring that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id*. at 597. As such, the Court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592–93. In short, the Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Courts in the Second Circuit liberally construe expert-qualification requirements. *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 305 (S.D.N.Y. 2015). At best, Defendants' speculative attacks, even if accurate (which they are not), present a battle of the experts. "Under *Daubert* and its progeny, it is the role of the district court to analyze the qualifications of experts, the reliability of the methods used by an expert, and whether expert testimony will assist the trier of fact, not to weigh conflicting evidence..." *In re Mirena IUD Products Liability Litig.*, 169 F. Supp. 3d 396, 427 (S.D.N.Y. 2016); *see also Daubert,* 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.") "[T]he mere fact that a difference of opinion exists does not make plaintiff's experts' conclusions inherently unreliable. Such differences of opinion and alleged weaknesses in the experts' methodologies will go to the weight to be given the expert testimony, not its admissibility." *Guild v. Gen. Motors*

*Corp.,* 53 F.Supp.2d 363, 368-369 (W.D.N.Y. 1999). "[U]nless the disputed evidence is wholly irrelevant or so speculative as to have no probative value, it is appropriate for the Court to "take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology." *Republic of Turkey v. Christie's Inc.*, 425 F. Supp. 3d 204, 220 (S.D.N.Y. Dec. 2, 2019) (internal citations omitted).

"[I]t is not the role of the court to determine whether the expert's conclusions are right or wrong." *DoubleLine Capital LP v. Odebrecht Finance, Ltd.*, 2024 WL 1115944, at *6 (S.D.N.Y. Mar. 14, 2024). Exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009). If an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. *Kumho Tire*, 526 U.S. at 153. "[E]xpert testimony should be excluded if it is speculative or conjectural ... or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means" of challenging expert testimony. *Daubert,* 509 U.S. at 596. Dr. Bozanic's expert reports and testimony readily meet the liberal admissibility requirements of FRE 702. Defendants' motion to exclude them should be denied.

## III.    DEFENDANTS DO NOT CHALLENGE DR. BOZANIC'S QUALIFICATIONS

FRE 702(a) permits expert testimony when the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact

in issue. Dr. Bozanic's qualifications are unassailable. He holds a Ph.D. in Business Administration from the Pennsylvania State University and is a tenured, full professor of accounting at Florida State University, where he teaches courses and conducts research on corporate disclosure, debt contracting, financial intermediaries, financial reporting misconduct, regulation, and enforcement. Ex. D, ¶¶4-5. Before joining Florida State University, Dr. Bozanic served as an Assistant Professor of Accounting at the Ohio State University as well as a research fellow at The National Center for the Middle Market. *Id.*, ¶7. Dr. Bozanic is also an Editorial Board member of several peer-reviewed journals, and is an Editor at the *International Journal of Accounting*. *Id.*, ¶6.

This Court has already found that Dr. Bozanic's report submitted in connection with Plaintiff's motion for class certification supported market efficiency. Order at 22-23; *see also Leone v. ASP Isotopes Inc.*, 2025 WL 3484821, at *36 (S.D.N.Y. Dec. 4, 2025) (finding Dr. Bozanic's event study provided "strong evidence" of the corrective disclosures' price impact).

## IV. DR. BOZANIC'S EVENT STUDY AND CONSTANT DOLLAR METHODOLOGIES ARE WIDELY ACCEPTED, RELIABLE, AND WILL ASSIST THE JURY

Defendants do not dispute that the out-of-pocket methodology is standard, reasonable, and relied upon in virtually all securities class action matters alleging fraud claims under Section 10(b) of the Exchange Act, nor do they offer an alternative methodology. Defendants also do not contest that Dr. Bozanic's use of the event study methodology is a reliable method for quantifying artificial inflation in this case, that Dr. Bozanic properly performed a reliable event study to determine the impact that each of the Corrective Disclosure Events had on the price of CleanSpark common stock, and that Dr. Bozanic properly calculated the abnormal declines in the market price of CleanSpark common stock on each of the Corrective Disclosure Events, after controlling for market and industry effects. *See* Mot. at 8-9; *see also* Ex. A, Section V; Merits Reply (ECF No.

4

108-6, "Ex. F"), ¶7. As noted above, event studies are routinely used and accepted by courts in securities-fraud cases.

An event study is "a statistical regression analysis that examines the effect of an event ... on a dependent variable, such as a company's stock price." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 80 (S.D.N.Y. 2015) (quoting Michael J. Kaufman & John M. Wunderlich, *Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation*, 15 Stan. J.L. Bus. & Fin. 183, 190 (2009)). "An event study has four parts: defining the event (e.g., an earnings announcement), establishing the announcement window (i.e., the period over which stock price changes are calculated), measuring the expected return of the stock, and computing the abnormal return (which is the actual return minus the expected return)." *Id.*; *see also* Ex. D, ¶66. A regression analysis is also used to determine whether the abnormal return is statistically significant. *Id.*, ¶66.

Dr. Bozanic conducted a classic event study, reviewing day-to-day information releases from sources including press releases, conference calls, news reports, securities analysts' reports, and SEC filings. Ex. A, Section V.E; Ex. D, ¶¶68, 77. Dr. Bozanic's event study: (i) identified statistically significant movements in CleanSpark's stock price; (ii) identified the Company-specific news that caused CleanSpark's stock price to change; (iii) quantified the amount of movement in CleanSpark's stock price caused by the Company-specific news by controlling for general market and industry factors; and (iv) analyzed the news that caused the stock price movements to determine whether, and if so, how it related to the alleged fraudulent misstatements and omissions. Ex. D, ¶¶64-69.

Based on that analysis, Dr. Bozanic opined on estimated per share damages caused by the disclosure of the relevant truth. The difference between CleanSpark's actual trading price and its

value, i.e., the price at which CleanSpark shares would have traded absent the alleged fraud, represents the inflation per share, commonly referred to as "per share" or "out-of-pocket" damages. *Id*., ¶¶160-68; *In re Credit Suisse Securities Fraud Class Actions*, 2025 WL 3172143, at *17 (S.D.N.Y. Nov. 13, 2025) (the out-of-pocket "model can mechanically compute individual class members' damages across the Class based on the proposed common 'out-of-pocket' methodology, which courts have repeatedly held to be consistent with the securities laws and capable of being applied on a class-wide basis"). Dr. Bozanic applied widely accepted reliable methodologies and thus his testimony is admissible and will assist the trier of fact. Defendants' challenges to Dr. Bozanic's conclusions are not grounds for exclusion.

## V. DEFENDANTS' CHALLENGES TO THE CONCLUSIONS OF DR. BOZANIC'S LOSS CAUSATION AND DAMAGES ANALYSIS ARE NOT A BASIS TO EXCLUDE HIS TESTIMONY

### A. Dr. Bozanic's Analysis of Statistical Significance Is Consistent With Academic Theory

Defendants argue that Dr. Bozanic's conclusion that the "Corrective Disclosure Events caused stock price movements that were statistically significant at better than the 50% level, *i.e.*, it is 'more likely than not' that the stock price declines were related to information released on these dates, as opposed to random price movements" is invalid. Mot. at 8; Ex. D, ¶69. Dr. Bozanic detailed the relevant academic research supporting his statement that "statistical significance is a continuum reflecting whether it is 'more likely than not' that the alleged misrepresentations had price impact."[1] Ex. D, ¶¶13, 18. Notably, Dr. Rubinfeld's "Reference Guide on Multiple Regression" states that "courts should avoid relying solely on sharply defined statistical tests." *Id*.,

---

[1] Brav, A. and J. Heaton, 2015, "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," Washington University Law Review 93 ("[S]tatistical significance is simply describing a set of returns that would be unusual to observe if there was *no* price impact. Lack of statistical significance does not tell us that it is more probable than not that there was no price impact.").

¶14.[2] Indeed, the literature relied on by Defendants' expert, Dr. Garmaise[3], similarly describes the 95% and 90% statistical significance levels as "at best useful conventions." *Id.*, ¶17. As Dr. Bozanic noted in his Reply, academic literature states that "The effect best supported by the data from a given experiment is always the observed effect, regardless of its significance." *Id.*, ¶19.[4] In fact, academic literature states that Defendants' argument that courts rely on stringent standards of statistical significance would "result in the exclusion of price impacts that do not meet the high threshold yet are still economically meaningful." *Id.*, ¶20.[5]

Courts have similarly found that failure to find statistical significance at the 95% confidence level "does not prove that information had no role in the observed stock price adjustment." *Monroe County Employees Retirement System v. Southern Co.*, 332 F.R.D. 370, 393 (N.D. Ga. 2019); *see also Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 Fed.App'x. 51, 53 (3d Cir. May 30, 2019) (failure to prove price impact to a 95% confidence level is not "necessarily proof of the opposite."); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018) (holding that a statistically significant stock price decline below the 95% confidence level following corrective disclosure "does not prove the *absence* of price impact") (emphasis in original); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 89-90 (S.D.N.Y. 2015) (rejecting defendants' argument that plaintiffs' expert abandoned statistical significance where the

---

[2] *See*, *e.g.*, Rubinfeld, D. "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence*, Third Edition (Federal Judicial Center, 2011), p. 321.

[3] Garmaise, ¶36; Kaye, D. and D. Freedman, 2011, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, Third Edition.

[4] Brav, A. and J. Heaton, 2015, "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," *Washington University Law Review* 93, at n.24, quoting Goodman, S., 2008, "A Dirty Dozen: Twelve P-Value Misconceptions," *Seminars in Hematology* 45.

[5] Axelson, P. and M. Cain, 2025, "What is Price Impact? How the Goldman Decisions are Reshaping Shareholder Class Actions," *Berkeley Business Law Journal* 22.

expert found information that "doesn't rise to the level of statistical significance at the 5 percent level" was "significant enough that a reasonable investor would say that would affect his or her investment decision" and holding that "defendants' objections go to the weight, not the sufficiency of the evidence, and are therefore not a basis to exclude[.]"); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019) (p values of 0.234 and 0.233 "suggest there is a 77 percent chance the corrective disclosures identified by Plaintiff negatively impacted EZCORP's stock price on these dates. [] What they do not suggest is that the misrepresentation 'did not affect the stock price'").

Dr. Bozanic's methodology is consistent with academic literature and Defendants' disagreement with his conclusions is not grounds for exclusion. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 2023 WL 6314939, at \*16 (S.D.N.Y. Sept. 28, 2023) (constant dollar inflation "an accepted methodology" and plaintiffs' expert's application of an accepted methodology a jury question. "To the extent that Defendants contend that there is evidence in the record to the contrary, [] the remedy is not exclusion, but '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" (citation omitted)); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ("the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions").[6]

**B.    The Corrective Disclosure Events Provided New Information To The Market**

Defendants argue that certain information regarding the corrective disclosures in the Culper Report was already public and that the informational efficiency theory Dr. Bozanic applied is unreliable. Mot. at 13-14. Defendants similarly argued in their motion to dismiss that the

---

[6] Defendants point out that Dr. Bozanic applied 95% and 90% confidence levels in the *ASP Isotopes*, *Verrica*, and *Teleperformance* cases. (Mot. at 10) The application of those levels in other cases does not imply that lower confidence thresholds are inappropriate or unreliable.

information in the Culper Report and related tweet regurgitated public information (ECF No. 45 at 26) and the Court noted several cases, including *Chicago Bridge*, which stated that "any third party's analysis of a company's already-public financial information cannot contribute new information to the marketplace …. is incorrect." *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *12-13 (S.D.N.Y. Jan. 5, 2023); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7-8 (S.D.N.Y. Mar. 23, 2020) (collecting cases); *see also In re Winstar Commc'ns*, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006) (loss causation may be based on stock drop following short seller report, even when its findings are "not attributed to any non-public information" and "derived from an analysis of" published financials); *In re Take-Two Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y Apr. 16, 2008) (loss causation may be based on "third-party analyses of a company's financials, which contradict representations made by defendants"). Unlike *Omnicom* where the underlying accounting issue had been widely reported in the press (*In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008)), "the information in the first Culper Report had been buried in the bankruptcy filings of an unrelated company." *CleanSpark,* 2023 WL 112558, at *12.

Defendants also contend that Dr. Bozanic's disclosure processing costs theory is unreliable. Disclosure processing costs are costs related to the acquisition, analysis, and synthesis of information. Ex. F, ¶32. Relying on academic literature,[7] Dr. Bozanic opined that the author of the Culper Report would not have incurred such costs if investors were already aware of the information revealed in the Culper Report. *Id*., ¶¶32-33. Dr. Bozanic's analysis is reliable and

---

[7] *See* Fama, E., 1991, "Efficient Capital Markets: II" *Journal of Finance* 46; Blankespoor, E., E. DeHaan, and I. Marinovic, 2020, "Disclosure Processing Costs, Investors' Information Choice, and Equity Market Outcomes: A Review," *Journal of Accounting and Economics* 70.

helpful to the jury to understand why the corrective disclosures in the Culper Report and related tweet were new to the market and caused CleanSpark's stock price to drop.

Defendants also incorrectly claim that a court rejected Dr. Bozanic's "drift" theory based in part on a discussion of disclosure processing costs in *Sundaram v. Freshworks Inc.*, 2025 WL 1083168, at *5 n.6 (N.D Cal. Apr. 10, 2025). Mot. at 16. However, that court made no reference to disclosure processing costs in its opinion. *See Freshworks*, 2025 WL 1083168. Moreover, Dr. Bozanic's opinions in this matter do not rely on the "drift" theory, so *Freshworks* is not substantively relevant. In addition, the court in *Freshworks* noted "drift is supported in the academic literature" yet found that Dr. Bozanic never applied "drift" theory to the facts of that case and thus it was "too speculative to create a genuine dispute of material fact" (*id*. at *5); however, Dr. Bozanic was never asked to conduct such an analysis. *Freshworks* provides no basis to exclude Dr. Bozanic's opinions in this matter.

### C. The Combination of Dates Is Supported By Academic Theory And Is Regularly Accepted By Courts

The Supreme Court has declined to "adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic Inc. v. Levinson*, 485 U.S. 224, 249 n.28 (1988). In *Halliburton II*, the Supreme Court again stated that it would not "enter the fray" of academic debates about the speed at which information is impounded into a stock price. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 271-72 (2014) ("*Halliburton II*").

Dr. Bozanic combined dates because the market was responding to the same corrective events. Dr. Bozanic found that the two-day abnormal return for January 14 and 15, 2021 of -23.2% and for February 12, 2021 and August 17, 2021 of -16% were each statistically significant at greater than the 94% level. Ex. D, ¶88. Dr. Bozanic explained that combining the January 14th and

10

15th drops was reasonable because the market was responding to the same corrective event, specifically the release of the Culper Report and the tweet bringing greater visibility to its contents. Ex. F, ¶23.

Defendants take issue with Dr. Bozanic's cumulation of the February 12, 2021 and August 17, 2021 drops, yet cite nothing, including any academic literature, to suggest this is inappropriate. *See* Garmaise Report (ECF No. 108-5, "Ex. E"), ¶75. However, even when assessed individually the statistical significance of the returns on these dates still demonstrates that the declines were related to the corrective disclosures. Ex. F, ¶25. Dr. Bozanic explained that it was reasonable to combine the February 12, 2021 and August 17, 2021 drops because both corrective disclosures concern the delayed expansion timeline and they "reflect the market's response to the corrective information entering the market regarding expansion delays at the ATL facility." *Id*., ¶25. As the Court acknowledged in its opinion on the motion to dismiss, the misstatements regarding the timeline were based on materialization of the concealed risk that the longer expansion project timeline posed to investors. *CleanSpark*, 2023 WL 112558, at *13.

Dr. Bozanic's analysis relies on academic literature stating that "when a single corrective disclosure is broken down into multiple disclosures, the statistical power to detect abnormal performance decreases." Ex. F, ¶23.[8] As explained in the literature cited by Dr. Bozanic, "event studies used in securities litigation are likely to have very low power—very low probability of rejecting an actually false null hypothesis—when we insist on keeping the Type I error rate as low as 5%." *Id*., ¶23 n.45.

---

[8] Citing Axelson, P. and M. Cain, 2025, "What is Price Impact? How the Goldman Decisions are Reshaping Shareholder Class Actions," *Berkeley Business Law Journal* 22.

"The selection of an appropriate event window is an inexact science," and the question of whether a multi-day window is appropriate is fact dependent. *United States v. Hatfield*, 2014 WL 7271616, at *12 (E.D.N.Y. Dec. 18, 2014). Multi-day event windows have frequently been found appropriate for event study analysis in securities fraud class actions. *See, e.g.*, *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) (rejecting argument that a two-day event window is inconsistent with an efficient market); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3d Cir. 2011) ("That some information took two days to affect the price does not undermine a finding of efficiency."), abrogated on other grounds by *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 133 S. Ct. 1184, 185 L.Ed.2d 308 (2013); *In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) (using a three-day window for analysis); *In re Diamond Foods, Inc.*, 295 F.R.D. 240, 249 (N.D. Cal. 2013) (citing defense expert's assertion that a "proper test of market efficiency" required analyzing whether the market price reacted to new information over more than one trading day in order to "assess[ ] whether there are delayed price responses to the events of interest"); *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 104 (S.D.N.Y. 2009) (accepting event study with three-day event window and rejecting argument that this rule only applied "where the timing of discrete events was [not] ascertainable"); *Aranaz Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 669 (S.D. Fla. Sept. 29, 2014) (citing significant two-day stock decline as "strong empirical evidence of market efficiency"). Defendants' disagreement with cumulating related returns across days is not a basis for exclusion.

D.    **The Dates Chosen By Dr. Bozanic Revealed New Information To The Market And Were Not Cherry-Picked**

Defendants claim Dr. Bozanic characterized old information as new and cherry-picked Plaintiff-friendly dates and excluded dates that would have yielded "a *positive* cumulative abnormal return." Mot. at 17-18. Dr. Garmaise opined that January 5, 2021, March 2, 2021, and

12

July 14, 2021 should have been included. Ex. E, ¶76. However, none of these dates revealed new information to the market and thus were not corrective disclosures regarding expansion delays. Dr. Bozanic explained that because these alternative dates did not alter the total mix of fraud-related information in the market, Dr. Garmaise's argument that these dates should be included is irrelevant to the primary issue of whether these dates conveyed new, fraud-related information to the market. Ex. F, ¶26.

On January 5, 2021, Bradford had an after-market interview with the TDA Network, which CleanSpark tweeted. In that interview, Bradford stated: "We're expanding the facility from 20 MW up to 50 MW. We expect that that'll be done late spring / early July."[9] However, a press release issued that same day which was broadly released via *GlobeNewswire* made no mention of any expansion delays and stated that "[w]e anticipate completion of our near-term expansion ***within the coming weeks***" (emphasis added), and that the Company had mined 31 bitcoins resulting in $873,000 in revenue. Ex. F, ¶69. Dr. Bozanic concluded that the news of the 31 bitcoins and $873,000 was highly relevant given that in only 26 days of bitcoin mining it comprised almost 90% of the quarterly revenues from all other segments combined for the quarter ended December 31, 2019. *Id.*, ¶70; Ex. D, ¶¶133, 135. He further noted that this was the focus of news articles and analyst reports, which made no mention of the expansion delays. Ex. F, ¶71. In addition, Dr. Bozanic noted that with four months to go until the expected April 2021 completion date, "late spring" could reasonably be interpreted as 'on schedule'. *Id.*; Ex. D, ¶134.

With respect to the Company's March 2, 2021 statement that "We continue to aggressively pursue the growth of our hash rate capacity and expect to reach 1 to 1.3 EH/s in total production capacity this summer," Dr. Bozanic explained that this information was not new relative to the

---

[9] https://twitter.com/CleanSpark_Inc/status/1346599574639497217

February 12, 2021 corrective disclosure and "thus could maintain but not introduce additional inflation." Ex. F, ¶26 n.50.

On July 14, 2021, CleanSpark announced an agreement to send mining rigs to Coinmint since the ATL Facility lacked power capacity. Bradford stated in that announcement that the ATL expansion would be "finalized in the coming months." Dr. Bozanic concluded that statement could reasonably be interpreted by investors as consistent with the expectations set in the February 12, 2021 corrective disclosure of "mid-year" to "mid-summer" since the date range for "mid-year" to "mid-summer" is July 1 – August 5, 2021. And, similarly, since the last day of summer in 2021 was September 21, 2021, the July 14, 2021 disclosure indicating that the units would start to arrive in September could reasonably be interpreted as consistent with the February 12, 2021 disclosure. *Id.*, ¶80. Dr. Bozanic also noted that this conclusion is consistent with Bradford's statement on a Fireside Chat later the same day with Water Tower Research that "we're on track for late summer to bring that capacity online … by this September also we're going to be at 50 megawatts of total power at our current facilities." *Id.*, ¶81. On the other hand, Dr. Bozanic concluded that "this fall" (*i.e.*, September 22 – December 20, 2021) was a different time period than "mid-year" to "mid-summer" (*i.e.*, July 1 – August 5, 2021), and thus the August 17, 2021 corrective disclosure re "this fall" provided new information to the market. *Id.*, ¶80.

For these reasons, the dates were not cherry-picked, but rather, were a product of Dr. Bozanic's analysis of reliable academic principles. Defendants' disagreement with that analysis is not a basis for exclusion.

## VI.    DR. BOZANIC'S OPINIONS ARE HIGHLY RELEVANT AND WILL BE HELPFUL TO A JURY

### A.    Dr. Bozanic's Analysis Of Economically Materiality Is Highly Relevant

Defendants incorrectly claim that Dr. Bozanic asserted that certain statements were "material simply because they were made" and that this opinion is irrelevant given that a layperson on the jury is capable of viewing the relevant documents. As stated in Dr. Bozanic's Merits Report his finding of economic materiality was based on:

> (1) Defendants' own public statements portraying the ATL Facility's potential to rapidly increase expected profitability on the basis of increased operational capacity and lower energy costs; (2) analyst commentary demonstrating that the market relied upon Defendants' statements concerning the ability to increase operational capacity, the ability to secure power at low cost, and the anticipated timeline to rapidly increase expected profitability through scale; (3) the application of basic valuation principles to CleanSpark's business; and (4) my event study analysis that establishes statistically significant declines in the price of CleanSpark Common Stock on the Corrective Disclosure Events.

Ex. D, ¶39.

Dr. Bozanic found that Defendants' public statements reflect that "CleanSpark considered information about expected operational capacity, expected energy costs, and the anticipated timeline to rapidly increase expected profitability through scale as important drivers of CleanSpark's value and the valuation of its stock." *Id.*, ¶40. His analysis of these statements describes why the information therein was important to investors. *See id.*, ¶¶40-48. Dr. Bozanic noted that CleanSpark regularly updated investors on the expansion timeline throughout the Class Period, which demonstrated that the Company understood the importance of this information. *Id.*, ¶¶44-45, 47-48. He also detailed how the statements reflect that Defendants recognized the importance of obtaining power at a low cost. *Id.*, ¶¶46, 48. As such, Dr. Bozanic's analysis of Defendants' public statements is highly relevant to his conclusion that these statements were economically material and will assist the trier of fact.

15

### B.   The Constant Dollar Inflationary Ribbon is Regularly Accepted by Courts and Defendants May Test its Merits Before the Jury

Defendants argue that Dr. Bozanic's inflation measure is "absurd" and suggests that "investors utterly devalued parts of CleanSpark's business that are unrelated to the allegations" (Mot. at 22). Defendants, however, offer no alternative methodology. Dr. Bozanic used the constant dollar methodology to measure inflation. This approach measures the inflation in the stock price attributable to the fraud on each day of the Class Period, and is calculated by working chronologically backward from the disclosures of the relevant truth, cumulating the artificial inflation in the stock price on each day. Ex. D, ¶¶156-59. This is widely recognized as the traditional measure of damages in Rule 10b-5 cases, and is amply supported by academic literature and case law. *Sjunde*, 2023 WL 6314939, at *16 ("constant-dollar inflation methodology is sufficiently reliable" and "courts commonly accept the constant-dollar inflation"); *see Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 908 (S.D. Cal. 2019) ("the constant dollar inflation method is commonly used to calculate 10b-5 damages"); *Smilovits v. First Solar, Inc.*, 2019 WL 7282026, at *6-8 (D. Ariz. Dec 27, 2019) (constant dollar inflation "an accepted methodology"); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) ("The best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect."). Thus, Dr. Bozanic's opinions about loss causation and damages are reliable under applicable law.

While Dr. Bozanic chose the "constant dollar" approach, he noted in his Reply that "the constant percentage method represents an alternative approach to backcasting of artificial inflation." Ex. F, ¶119. Further, he stated in his Reply that these approaches are *inputs* to the out-of-pocket damages model that could easily be modified if the jury were to find the "constant

16

percentage" approach more appropriate. *Id*., ¶¶121-25. Defendants' contention that there "is simply too great an analytical gap between the data" in Dr. Bozanic's constant dollar approach (Mot. at 22) is unavailing, as Dr. Bozanic's theory can be supported through empirical price analysis. As Dr. Bozanic demonstrates, CleanSpark's stock traded at virtually identical levels before and after the Class Period, averaging $11.80 in early December 2020 and closed at $11.65 on August 17, 2021. Ex. F, ¶118, n.186. This price symmetry directly contradicts Dr. Garmaise's speculation that constant dollar inflation is inappropriate, demonstrating "the business outlook and valuation for the Company was remarkably similar before versus after the Class Period." *Id*., ¶118.

Moreover, Dr. Garmaise's implicit cap of artificial inflation at the $26.3 million ATL transaction value ignores established academic literature. As Dr. Bozanic notes, acquirer wealth destruction routinely exceeds acquisition costs when transactions signal deeper management failures. *Id*., ¶118 n.187 (*citing* Moeller, S., F. Schlingemann, and R. Stulz, 2005, "Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," Journal of Finance 60.).

### C.    Disclosure Salience Is Supported By Academic Literature

Disclosure salience is the theory that information can be considered more salient for investors when it is highlighted more prominently, earlier, or in a press release headline. Disclosure salience is supported by academic literature on which Dr. Bozanic relies. Ex. F, ¶¶34-41. Thus, Dr. Bozanic's assessment of the Culper Report's value relevance is reasonable, reliable, and consistent with the literature's findings. In fact, Dr. Garmaise did not disavow the legitimacy of disclosure salience, nor did he opine on how he would evaluate a disclosure's salience at his deposition. Garmaise Depo. Tr., at 43-44, attached as Exhibit 1 to the Declaration of Christopher Fallon, submitted herewith. While Defendants attempt to distinguish this case on the grounds that it

17

concerns short seller statements, as opposed to corporate headlines discussed in the academic literature, there is no reason to assert that the latter type of news would impact the stock price in a way that the former would not.

Dr. Bozanic applied disclosure salience theory from published academic research "to assess the value relevance of the information conveyed by the Culper Report and related tweets." Then, relying on that theory, he considered "points that were not repeated across tweets as less emphasized and thus less value relevant". Ex. F, ¶¶42, 45-46. Defendants claim that Dr. Bozanic's use of disclosure salience is "speculative, unsupported, and unreliable" and was applied "to bypass disaggregation requirements." Mot. at 19, 21.

Defendants fail to acknowledge that Dr. Bozanic did not simply claim that the points that were not repeated were less value relevant. Rather, Dr. Bozanic analyzed each point that was not repeated and explained why they lacked value relevance. Ex. F, ¶¶45-46. He explained that (i) the Shoreline Schools announcement concerning a MOU was not relevant because a contract was not awarded; (ii) the tweet suggesting p2k Labs "appears to also fake its customers" was not relevant because it was based on some, but not all customers listed on p2K's website as case studies lacking "web presence"; and (iii) the fact that the Culper Report alleges that Bradford is "moonlighting" was not relevant because CleanSpark disclosed that Blue Chip was 50% beneficially owned by Bradford and performed all services at discounted rates and none of the charges were associated with work performed by Bradford. Ex. F, ¶46.

While Defendants may disagree with Dr. Bozanic's conclusions, that is not a basis to exclude them. *See Daubert*, 509 U.S. at 595; *see also In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 3:15-cv-07658-MAS-LHG, 2023 WL 9748644, at *24 (D.N.J. May 22, 2023) ("While Defendants assert that [plaintiff's expert's] analysis is flawed, those flaws can be addressed if and

18

when Plaintiffs' expert gives testimony at the time of trial. Defendants here have failed to establish that [plaintiff's expert's] analysis and opinions are based on either invalid reasoning or unreliable methodology.").

### D.    The Event Study Disaggregated Market-Based, Industry-Based and Bitcoin Pricing-Based Confounding Information

Dr. Bozanic examined the corrective disclosure dates (1/14-1/15, 2/12, and 8/17) and examined the corrective disclosures, along with other non-fraud related news on those days. He used standard disaggregation methods to separate what portion of the price drops were due to the fraud, versus other non-fraud related factors. Disaggregation is an issue in many securities cases, and it's an issue of fact. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014) (disaggregation "involve[s] questions of fact").

Defendants argue that Dr. Bozanic's analysis is unreliable because he did not disaggregate "significant bitcoin mining industry developments, 'substantial variation in bitcoin prices and network difficulty,' and CleanSpark's own 'changing business model.'" Mot. at 21. However, Dr. Bozanic's event study methodology explicitly controls for changes in the overall market, changes in CleanSpark's software-related industry, and changes in CleanSpark's bitcoin mining industry (including the price of bitcoin) throughout the Class Period. *See* Ex. A, Section V.E; Ex. D, ¶68. The event study controlled for market-based, industry-based, and Bitcoin pricing-based confounding information occurring during the alleged Corrective Disclosure Events. While Defendants claim these were "major factors that affected stock price during the Class Period" (Mot. at 21), Dr. Garmaise never offered his own empirical quantification of what portions of the price drops were due to non-fraud related factors. *See Leone v. ASP Isotopes Inc.*, 2025 WL 3484821, at *33 (S.D.N.Y. Dec. 4, 2025) ("rebuttal typically requires empirical evidence, often in the form of an event study, demonstrating that other factors explain the entire price movement");

*WM High Yield Fund v. O'Hanlon*, 2013 WL 3230667, at \*11–12 (E.D. Pa. June 27, 2013) (requiring an event study or other evidence to demonstrate a causal connection between a misrepresentation and subsequent price decline).

It is "up to the jury to determine how much, if any, of the artificial inflation identified by [the damage expert] was caused by [defendants'] alleged fraud (and thus by the various statements [they] released in the relevant period), by assessing the alleged misstatements and their connection to the misconception in question." *In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 256 (2d Cir. 2016) (upholding jury finding where damages expert presented the "maximum amount" of artificial inflation). The law is clear that the jury may adjust a damages expert's model to account for their liability findings. *See, e.g., Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 489 (S.D.N.Y. 2022) (upholding jury finding of 57% inflation where "the jury accepted some but not all" of expert's "testimony regarding disaggregation" because "this only shows how carefully they parsed the evidence"); *Williams v. Gaye,* 895 F.3d 1106, 1129 (9th Cir. 2018) (upholding jury damages awards based on expert testimony about a "range" of potential recoveries and upholding "jury's choice" to apportion profits of "approximately 40%" though no party argued for that percentage); *Moonbug Entertainment Limited v. BabyBus (Fujian) Network Technology Co., Ltd.*, 2024 WL 2193323, at \*16 (N.D. Cal. May 15, 2024) ("it is within the province of the jury to award less than all of what the plaintiff seeks," and "'the jury may make a just and reasonable estimate of the damage based on relevant data'" and is "'allowed to act on probable and inferential as well as (upon) direct and positive proof'") (quotation omitted).

### E.    Dr. Bozanic's Market Efficiency Reports Are Relevant And Will Be Useful To The Jury

Defendants argue that since the Court has certified the Class, Dr. Bozanic's Market Efficiency Reports (Ex. A, ECF No. 108-3, "Ex. C"), submitted in connection with Plaintiffs'

Motion for Class Certification, are not relevant and should be excluded. Mot. at 23. Defendants also argue that "to the extent that the Efficiency Reports contain opinions relating to loss causation, damages, and/or materiality" they are "inadmissible", apparently because they argue Dr. Bozanic's Merits Reports should be excluded. *Id*.

The Market Efficiency Reports are cited extensively throughout Dr. Bozanic's Merits Reports and contain evidence that is relevant to loss causation and damages and will be helpful to the jury. Ex. D, Section V., ¶68. *Town & Country Linen Corp. v. Ingenious Designs LLC*, which Defendants cite in support of their argument, denied Daubert motions pertaining to Plaintiffs' damages expert because they "present several questions related to damages that raise legal questions that may shape the way the parties present their cases". 2022 WL 2757643, at *3 (S.D.N.Y. July 14, 2022). Even if the Court were to exclude Dr. Bozanic's Merits Reports and testimony, the Market Efficiency Reports remain relevant because district courts have the power to decertify a class at any time before the entry of final judgment, and Plaintiff would rely on those reports to challenge any decertification. *See Mazzei v. The Money Store*, 656 Fed. App'x. 558 (2d Cir. 2016); *see also* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). Defendants have not foreclosed the possibility that they will move to decertify the class, and the Court has the authority to do so on its own. Thus, Dr. Bozanic's Market Efficiency Reports remain relevant.

21

**CONCLUSION**

For the foregoing reasons, Defendants' motion to exclude the reports and testimony of Dr. Zahn Bozanic should be denied in its entirety.

Dated: January 26, 2026        By: */s/Gregory B. Linkh*
                      **GLANCY PRONGAY & MURRAY LLP**
                      Gregory B. Linkh (GL-0477)
                      230 Park Ave., Suite 358
                      New York, NY 10169
                      Telephone:(212) 682-5340
                      Facsimile: (212) 884-0988
                      glinkh@glancylaw.com

                      Christopher Fallon (*admitted pro hac vice*)
                      1925 Century Park East, Suite 2100
                      Los Angeles, CA 90067
                      Telephone: (310) 201-9150
                      Facsimile: (310) 201-9160


                      **LAW OFFICES OF FRANK CRUZ**
                      Frank Cruz (*admitted pro hac vice*)
                      1999 Avenue of the Stars, Suite 1100
                      Los Angeles, CA 90067
                      Telephone: (310) 914-5007

                      *Lead Attorneys for Lead Plaintiff Darshan*
                      *Hasthantra and the putative Class*

22

## CERTIFICATE OF COMPLIANCE

I, Gregory B. Linkh, that this brief contains 6,706 words, which complies with the word limit of L.R. 7.1(c).

/s/ Gregory B. Linkh
Gregory B. Linkh

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On January 26, 2026, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 26, 2026.

*s/s Gregory B. Linkh*
Gregory B. Linkh

24