**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARSHAN HASTHANTRA, Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     v.<br><br>CLEANSPARK, INC., ZACHARY BRADFORD, and S. MATTHEW SCHULTZ,<br><br>          Defendants. | Civil Action No. 1:21-cv-00511-LAP |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION TO EXCLUDE PORTIONS**
**OF DAVID M. PONTE'S EXPERT REPORT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT........................................................................................................................... 2

I.    THE PONTE REPORT SATISFIES
      ALL REQUIREMENTS OF FRE 702 ........................................................................ 3

      A.  The Ponte Report Provides Specialized Knowledge That Will
          Help the Trier of Fact Understand the Evidence (FRE 702(a)) ................................... 3

      B.  The Ponte Report Is Based on Sufficient Facts and Data (FRE 702(b)) ..................... 4

      C.  The Ponte Report Is the Product of Reliable
          Principles and Methods (FRE 702(c)) ........................................................................ 5

      D.  The Ponte Report Reflects a Reliable Application of the Principles and Methods to
          the Facts of the Case (FRE 702(d))............................................................................ 7

II.   DEFENDANTS' SPECIFIC OBJECTIONS TO THE
      PONTE REPORT ARE WITHOUT MERIT ................................................................ 8

      A.  Mr. Ponte's Recitation of Facts Is Necessary for
          His Analysis and Is Not Improper Factual Narrative..................................................... 8

      B.  Mr. Ponte Does Not Opine on Defendants'
          Knowledge, Intent, or Credibility ............................................................................. 12

      C.  Mr. Ponte Does Not Offer Improper Legal Opinions ................................................ 14

      D.  Mr. Ponte Does Not Improperly Rely on Hearsay...................................................... 15

III.  DEFENDANTS' REMAINING OBJECTIONS
      GO TO WEIGHT, NOT ADMISSIBILITY .................................................................. 17

CONCLUSION........................................................................................................................ 18

i

# TABLE OF AUTHORITIES

**Page**

**Statutes and Rules**

Federal Rule of Evidence 702 ................................................................................................ *passim*

Federal Rules of Evidence 703 ................................................................................................ 2, 15

Securities Exchange Act of 1934, Section 10(b) ............................................................................ 3

**Cases**

*Accent Delight Int'l., Ltd., v. Sotheby's et al.*,
2023 WL 2307179 (S.D.N.Y. Mar 1, 2023) ........................................................................ 9, 10

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) .................................................................................................... 3

*Coco Rico LLC v. Universal Ins. Co.*,
2024 WL 3737063 (D.P.R. May 30, 2023) ............................................................................ 6

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ............................................................................................................ 2, 3

*GLF Constr. Corp. v. FEDCON Joint Venture, Inc.*,
2019 WL 7423552 (M.D. Fla. Oct. 15, 2019) ........................................................................ 6

*In re Fosamax Prods. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009) ...................................................................................... 9

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) ...................................................................................................... 9

*Kasuba v. Costco Wholesale Corp.*,
710 F. Supp. 3d 122 (D. Conn. 2024) .................................................................................... 14

*LCC-MZT Team IV. v. U.S.*,
155 Fed. Cl. 387 (2021) ............................................................................................................ 6

*Polk Co., IA, v. Populous, Inc.*,
2013 WL 12284713 (S.D. Iowa Jul. 12, 2013) ........................................................................ 6

*Santopietro v. City of New Haven*,
   239 Conn. 207, 682 A.2d 106 (1996) .......................................................................... 14

*Scentsational Techs. Inc. v. Pespi, Inc.*,
   2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018)......................................................... 9, 10

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) ...................................................................................... 9

*U.S. v. Duncan,*
   42 F.3d 97 (2d Cir. 1994)................................................................................................ 9

*U.S. v. Locascio*,
   6 F.3d 924 (2d Cir. 1993)............................................................................................. 16

*Wilner v. U.S.*,
   Cl. Ct. 241 (1991) ........................................................................................................... 6

iii

**PRELIMINARY STATEMENT**

Defendants ask this Court to strike core portions of the Expert Report of David Ponte, dated July 18, 2025 ("Ponte Report", attached as Exhibit A to the Affirmation of David J. Partida (ECF No. 111)). This case turns on a practical question where specialized project management analysis will help the jury: when Defendants told investors the Godby Road data center expansion was expected to be completed by specific dates, did the project actually have the planning and controls that make those dates achievable?

Mr. Ponte meets the requirements of Federal Rule of Evidence ("FRE") 702. He brings forty years of experience in construction scheduling and forensic project controls to this matter. He applies the same methods routinely used by owners, contractors, and construction managers to evaluate schedule feasibility. His opinions are grounded in an adequate factual record and rely on principles long accepted in the industry. He applies those principles directly to the facts of this project. He does not speculate, advocate, or address Defendants' intent or credibility; instead, he evaluates objective indicators, and explains what they reveal about whether the stated completion dates were achievable.

This is exactly the kind of specialized, technical assistance contemplated by FRE 702. Mr. Ponte's analysis aligns with the facts of the case and will assist the jury in determining whether the timelines Defendants presented reflected ordinary project management practice. By characterizing this applied analysis as mere "narrative" or "rehashing," Defendants ignore how schedule feasibility is evaluated in practice and improperly conflate admissibility with weight.

Mr. Ponte offers no legal opinions or conclusions. He merely applies technical project management principles to the facts. Defendants argue to the contrary, taking certain words in the report out of context and improperly ascribing them a "legal" meaning, as opposed to their obvious technical meaning.

1

Mr. Ponte's testimony does not improperly rely on hearsay. In accordance with FRE 703, he relies on project records and communications in the customary way that similar experts would, and then uses the evidence to inform his analysis. Further, much of the evidence he cites is not hearsay, because it would not be offered for the truth of the matter asserted.

Defendants chose not to submit a competing expert report[1] identifying why Mr. Ponte's analysis is methodologically incorrect. As a result, their criticisms rest entirely on attorney advocacy, rather than contrary technical evidence from a qualified professional. They also elected not to depose Mr. Ponte, forgoing the most basic opportunity to examine his methods, assumptions, or conclusions.

The Court should deny Defendants' motion, and allow the jury to hear the technical evidence it needs to decide whether Defendants' completion timelines had a practical foundation.

## **ARGUMENT**

The Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993) explained that "[t]he inquiry envisioned by Rule 702, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability— of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."

The Court has a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. However, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those

---

[1] On September 2, 2025, the parties jointly requested an extension to file a rebuttal report to Mr. Ponte, citing the Defendants' rebuttal expert's preexisting schedule. [ECF No. 99]. In light of that request, Plaintiffs were taken by surprise when Defendants abruptly changed course and opted not to submit a rebuttal report at all.

conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). Disputes about the strength of an expert's conclusions go to weight, not admissibility, and are resolved through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

As demonstrated below, the Ponte Report satisfies all four requirements of FRE 702, and Mr. Ponte's testimony should not otherwise be excluded or restricted.

## I.      THE PONTE REPORT SATISFIES ALL REQUIREMENTS OF FRE 702

FRE 702 permits expert testimony when: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Ponte Report satisfies each of these requirements.

### A.      The Ponte Report Provides Specialized Knowledge That Will Help the Trier of Fact Understand the Evidence (FRE 702(a))

Mr. Ponte's opinions are directly relevant to the core issues in this case. To establish a violation of Section 10(b) of the Exchange Act of 1934, Plaintiff must prove that Defendants made materially false or misleading statements. Whether project completion forecasts had a reasonable technical basis at the time they were made is central to that inquiry. Ponte's testimony will assist the jury in understanding whether, from a project management perspective, the announced dates were supportable given the documented planning record. This is precisely the type of "specialized knowledge" contemplated by FRE 702(a)

The Ponte Report is explicitly proffered to provide this specialized knowledge. As stated in his report's Statement of Purpose, he was retained "to provide an overview of construction project management principles, including the use of tools such as Critical Path

3

Method (CPM) scheduling, and to offer an opinion on the reasonableness of the Defendants' various assertions regarding project completion in light of the project's own estimated completion dates." Ponte Report at 1. His opinions are "limited solely to issues relating to the construction project management process, including the feasibility, planning, scheduling, and execution of the expansion of the Godby Road facility." *Id*. at 8 n.1.

These opinions rest on principles specific to project management that are not within common knowledge. The Critical Path Method ("CPM"), for example, is "a widely recognized project management technique used to plan, schedule, and monitor complex projects" that identifies "the longest sequence of dependent activities that determines the minimum project duration." Ponte Report at 10. Understanding what constitutes a validated CPM schedule, how procurement lead times integrate into project planning, or what risk factors competent project managers should account for requires training and experience that lay juror should not be expected to possess. Defendants do not criticize the validity or applicability of CPM.

Mr. Ponte's qualifications to provide this specialized knowledge are amply supported by the record. He is a licensed Professional Engineer with forty years of experience in the design, construction, and management of large, complex construction projects. He holds certifications as a Certified Construction Manager and Certified Forensic Claims Consultant. His expertise includes "preparing detailed construction cost estimates and project budgets, developing large, complex CPM schedules, and preparing and analyzing construction claims." Ponte Report at 1. Defendants do not challenge these qualifications, which are set forth in detail at Appendix A of his Report.

**B.    The Ponte Report Is Based on Sufficient Facts and Data (FRE 702(b))**

Mr. Ponte's conclusions are based, among other things, on a comprehensive review of "available documents, deposition testimony, and project records." Ponte Report at 25. Specifically, he examined, among other things, the Power Sales Agreement dated September

1, 2020; meeting notes from the January 7, 2021 coordination meeting with the City of College Park; internal planning documents from January 29, 2021; the March 3, 2021 email transmitting the preliminary Gantt chart; deposition transcripts of Zach Bradford, Lisa DeKalb, and Kent Shelley; ForeSite invoices; and contemporaneous project records.

When evaluating whether projected completion dates were supportable, a construction expert would be expected to review the project schedule (or absence thereof), planning documents, communications, and progress records. Mr. Ponte applied standard project management analytics to these materials, reconstructing the timeline from documents and comparing publicly announced milestones to documented internal project status.

Defendants have not challenged the sufficiency of the evidence Mr. Ponte examined. Defendants have not proffered a competing expert, and they do not argue that he failed to review relevant documents or that his data set was incomplete or unrepresentative. Defendants' did not even seek to depose Mr. Ponte. This further underscores that Defendants' objections go to the weight of Mr. Ponte's opinions, not the admissibility.

**C.      The Ponte Report Is the Product of Reliable Principles and Methods (FRE 702(c))**

Mr. Ponte's methodology is grounded in well-established construction project management principles. The Ponte Report provides a detailed overview of "the project management processes and practices typically required for the successful execution of a data center expansion," structured around "standard project phases: initiation, planning, execution, testing, and commissioning." Ponte Report at 9. He discusses the functional use of Gantt charts and CPM. These are techniques that are not merely accepted, but foundational to the construction industry.

CPM, as Mr. Ponte explains, is a "widely recognized project management technique" that enables "stakeholders to understand which tasks are critical, which have flexibility, and where delays may jeopardize the overall schedule." Ponte Report at 10. *See also LCC-MZT*

5

*Team IV. v. U.S.*, 155 Fed. Cl. 387, 457 (2021) (detailing use of CPM in litigation); *Wilner v. U.S.*, Cl. Ct. 241, 244-45 (1991) (same). This is not a novel or untested methodology. CPM scheduling has been the industry standard for complex project management for decades. Courts routinely admit expert testimony applying CPM analysis to evaluate project delays, schedule feasibility, and the reasonableness of project completion forecasts. *See, e.g., Coco Rico LLC v. Universal Ins. Co.*, 2024 WL 3737063, at *2 (D.P.R. May 30, 2023) (court noting opposing party didn't challenge the reliability of CPM); *GLF Constr. Corp. v. FEDCON Joint Venture, Inc.*, 2019 WL 7423552, at *5 (M.D. Fla. Oct. 15, 2019) (CPM was not disputed by parties and "appears generally accepted in the industry and subject to peer review"); *Polk Co., IA, v. Populous, Inc.*, 2013 WL 12284713, at *2 (S.D. Iowa Jul. 12, 2013) (qualifying expert on CPM scheduling, among other things).

Mr. Ponte also applies standard risk analysis principles, noting that "CPM is not a static tool; it requires regular updating to reflect actual project progress, incorporate newly identified risks or delays, and provide an accurate basis for forecasting and decision-making." Ponte Report at 10. His methodology incorporates assessment of known risk factors specific to early 2021, including supply chain disruptions and COVID-19-related impacts, that were "widely recognized across the construction and electrical sectors by the fall of 2020." Ponte Report at 19. This contextual risk analysis reflects standard practice in forensic schedule analysis.

Defendants have not challenged these principles and methods. They do not argue that CPM scheduling is unreliable, that Gantt chart analysis is improper, or that construction experts should not consider documented risk factors when evaluating schedule feasibility. Defendants' silence on methodology is telling. They attack the conclusions without engaging the analytical framework that produced them.

**D.**     **The Ponte Report Reflects a Reliable Application of the Principles and Methods to the Facts of the Case (FRE 702(d))**

Mr. Ponte consistently applies his methodology throughout the Report, to compare standard project management processes and practices to the evidence regarding what was, or was not, done on the Godby Road expansion. His analysis is systematic and grounded in the project record.

**First,** Mr. Ponte uses his professional opinion to evaluate the realism of the proposed schedule. As one example, when the project planner flagged the schedule as "incredibly fast and probably unrealistic," Mr. Ponte explains that "management bears a responsibility to investigate those concerns, determine which assumptions are driving the risk, and revise the schedule to reflect a more achievable execution strategy. Failure to do so increases the risk of downstream delays, coordination failures, and unmet expectations." Ponte Report at 15. This opinion applies standard project management principles to the specific conduct documented in the record.

**Second,** Mr. Ponte reconstructs the timeline based on invoice data, noting that by August 2021, "construction administration services had commenced but were only approximately 18% billed." Ponte Report at 20. From this, he calculates that "the anticipated duration for a project of this scale . . . would typically extend over a minimum period of four to six months," placing "expected substantial completion or operational turnover in the range of March to May 2022." *Id*. This is precisely the type of forensic schedule reconstruction that construction experts routinely perform.

**Third,** Mr. Ponte compares publicly announced timelines to internal project status at each relevant point in time. For instance, as one example, he notes that in "late 2020, Bradford publicly represented to investors that the 30 MW Godby Road expansion would be completed by April 2021. At this time, there was no formal engineering schedule, no validated critical path, and key project consultants and contractors had not yet been engaged." Ponte Report at

25. This comparative analysis applies project management standards to assess whether project completion forecasts had technical support.

**Fourth,** Mr. Ponte addresses the foreseeability of risks, noting that "[s]upply chain disruptions, weather impacts, permitting delays, and underground utility coordination are well-recognized risks in large-scale infrastructure and data center projects." Ponte Report at 19. His opinion that competent project managers should have accounted for these risks reflects standard practice, and not speculation or hindsight bias.

**Fifth,** Mr. Ponte addresses the Power Agreement's limitations from a project planning perspective, explaining that without "clear commitments on feasibility, timing, and infrastructure responsibilities, project stakeholders cannot reliably coordinate design, permitting, construction sequencing, or commissioning activities." Ponte Report at 12. He is not providing any "legal" interpretation of this agreement. Rather, this analysis reflects standard construction practice, where contracts are reviewed, not to determine liability or other legal issues, but to identify the inputs available for schedule development and risk planning.

## II.    DEFENDANTS' SPECIFIC OBJECTIONS TO THE PONTE REPORT ARE WITHOUT MERIT

### A.    Mr. Ponte's Recitation of Facts Is Necessary for His Analysis and Is Not Improper Factual Narrative

Defendants' primary objection, that the Report constitutes "improper factual narrative" (Def. Br. at 5-9), fundamentally misunderstands the nature of Mr. Ponte's expert testimony. An expert evaluating the feasibility of projected completion dates must identify the forecasts being tested and the contemporaneous project context against which accepted project management standards are applied. Otherwise, the analysis cannot be performed reliably.[2] Mr.

---

[2] Under Defendants' theory, any construction expert who references project documents when explaining schedule deficiencies would be providing "improper factual narrative." But that is precisely what such experts should do, and must do, to assist the jury. The alternative would be an abstract lecture on CPM scheduling divorced from the actual project, which would be far less helpful to the trier of fact.

Ponte identifies when estimated completion dates were communicated publicly, and then applies specialized project management standards and methodologies to assess whether those dates had a technical foundation at the time they were made.

A lay jury can read emails announcing purported completion dates, but it is more difficult to determine without expert assistance whether the absence of a validated critical path schedule, unresolved permitting, inadequate long-lead procurement planning, or undefined sequencing renders a project completion forecast unreliable from a project management standpoint. The timeline section in the Ponte Report that Defendants criticize exemplifies this applied analysis: Mr. Ponte explains the industry requirements for a credible forecast and evaluates whether those requirements were met as of the relevant dates, including whether known constraints were reflected in the schedule. Because one cannot opine on the feasibility of a timeline without identifying what the timeline is, Mr. Ponte's factual references are necessary to, and inseparable from, his expert methodology. "An expert [] may offer commentary on documents in evidence if the expert's testimony relates to the context in which documents were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) (*quoting In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009)). Mr. Ponte's opinions "provide the groundwork . . . to enable the jury to make its own informed determination." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 725 F.3d 65, 114 (2d Cir. 2013) (*quoting U.S. v. Duncan,* 42 F.3d 97, 101 (2d Cir. 1994)).

This is not a case where an expert is merely reciting documents because they are interesting, without applying specialized expertise.[3] Four examples of Mr. Ponte's application

---

[3] Defendants' reliance on *Accent Delight Int'l., Ltd., v. Sotheby's et al.*, 2023 WL 2307179 (S.D.N.Y. Mar 1, 2023) and *Scentsational Techs. Inc. v. Pespi, Inc.*, 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) is misplaced. In fact, in both cases, the respective courts indeed let

of his expertise are set forth below.

### 1.    January 7, 2021 CoCP coordination meeting (Ponte Report at 12-13)

Defendants characterize Ponte's discussion of the January 7, 2021 coordination meeting with the City of College Park ("CoCP") as mere "narrative." Mr. Ponte, however, cites the meeting notes and related communications to apply standard project management principles for scheduling with CoCP. Ponte uses this evidence to conclude that "as of early January 2021, the ability of CleanSpark to meet CoCP's target delivery milestones was contingent upon numerous tasks that were still in progress or had not yet been initiated. Moreover, the absence of clear commitments in the Power Sales Agreement regarding the timing or feasibility of expanded power delivery introduces ambiguity regarding the parties' respective expectations and obligations." Ponte Report at 13.

### 2.    March 3, 2021 preliminary Gantt chart flagged "unrealistic" (Ponte Report at 14-17)

Mr. Ponte's discussion of the March 3, 2021 email transmitting a preliminary Gantt chart likewise is not improper storytelling; it is CPM-based analysis of baseline schedule validity. The contemporaneous record reflects that the schedule was expressly flagged as "incredibly fast and probably unrealistic," and that its assumptions depended on ideal conditions and variables outside the project team's control, while the schedule was not updated as realities emerged. Mr. Ponte uses this evidence to opine that:

---

the experts in question testify on several topics. In *Accent Delight*, 2023 WL 2307179, at *28, however, the court excluded certain other expert testimony where the experts interpreted emails for the jury, and opined on what defendants "knew" or believed, and other ipse dixit testimony not grounded in specific expertise. Likewise, in *Scentsational*, 2018 WL 1889763, at **7-8, the court barred an expert from providing certain select testimony, finding that in that instance the expert had certain opinions that improperly ventured into legal testimony, and drew conclusions outside the experts field of expertise. By contrast, Mr. Ponte does not merely recite documents, supply a theory of culpability, or opine on state of mind. His limited reference to the project record serves only as the necessary predicate for applying specialized construction project-management principles to evaluate the technical feasibility of projected completion dates.

> In a well-managed project, the timeline would have been developed jointly by the project manager and contractor, reviewed in detail with the client, and formally approved (typically through signoff or written acceptance). This baseline schedule would then serve as the foundation for subsequent project controls, including tracking, reporting, change management, and delay analysis. The absence of such a document not only undermines effective project execution, but also exposes the project to heightened risk of misalignment, misunderstanding, and ultimately, misrepresentation of project status to external stakeholders.

Ponte Report at 18. That is a technical opinion about schedule feasibility, not a comment on credibility, intent, or the legal elements of the case.

### 3. Lack of Effective Scheduling (Ponte Report at 17-20)

Defendants' "narrative" objection to Ponte's discussion of ForeSite's engagement timing ignores the purpose of that discussion: explaining why the project lacked the stakeholder-integrated controls required for reliable schedule forecasting. Ponte reviews record evidence showing that the engineering/project management firm (ForeSite) had limited involvement in the initial schedule development, and was not formally engaged until after key public timeline estimations were already made.

From a project management perspective, the inference is technical but straightforward. Schedules for complex expansions are typically developed and validated through collaboration among the owner or client, project manager, design professionals, and contractor or construction manager, with formal approval creating a common reference for tracking progress, managing changes, and addressing delays. The absence of such collaborative validation and sign-off is not a mere factual summary. It is the foundation of Ponte's expert opinion that CleanSpark lacked a professionally managed baseline schedule and, consequently, a technically sound basis for the aggressive completion timelines it communicated.

4.    **Analysis of Invoices**
      **(Ponte Report at 20-21)**

Mr. Ponte's reliance on contemporaneous invoices and progress billing is also a standard forensic project controls technique, not improper advocacy. The invoices reflect that construction administration and program management scopes were only approximately 18% billed by August 2021, corroborating that major execution activities were still underway well after the April 2021 and "summer 2021" completion targets.

Mr. Ponte relies on objective progress indicators to make a technical feasibility inference common in construction management. When project administration and major construction scopes remain at an early stage while a project is publicly portrayed to be at a later stage, the claimed schedule conflicts with normal sequencing and the time required for remaining tasks, such as equipment installation, utility coordination, and commissioning. This type of specialized assessment helps the jury under FRE 702 without drawing legal conclusions or supplanting the jury's function.

B.    **Mr. Ponte Does Not Opine on Defendants'**
      **Knowledge, Intent, or Credibility**

Defendants contend that Mr. Ponte "improperly opines on Defendants' knowledge and credibility" (Def. Br. at 10-11), but this mischaracterizes both the substance and methodology of his testimony. Mr. Ponte does not purport to assess what Defendants subjectively believed, intended, or why they acted. He does not offer opinions about credibility or state of mind. Instead, he applies construction project management principles to an question of objective feasibility: whether, at the time projected completion dates were communicated, the project had the planning maturity and controls that a reasonable construction manager would require.

Where Defendants fault Mr. Ponte's use of phrases like "known risks, constraints, and feasibility limitations" or "internal realities known" (Def. Br. at 10), those terms refer to risks and constraints reflected in the project record or inherent in projects at that stage (such as

12

approvals, procurement, and sequencing), and not to Defendants' subjective awareness or intent. Construction experts routinely evaluate whether such documented or typical constraints were incorporated into schedules. That analysis assesses process and planning adequacy, not mental state.[4]

For example, when Mr. Ponte states that the March 3, 2021 email "indicates an early acknowledgment that the timeline was likely unattainable" (Ponte Report at 15) he is not opining on Bradford's subjective beliefs. He is observing that project personnel flagged the schedule as "incredibly fast and probably unrealistic" and applying his expert judgment that, under standard project management practice, "management bears a responsibility to investigate those concerns, determine which assumptions are driving the risk, and revise the schedule." *Id*.

Similarly, Mr. Ponte's discussion of Bradford's qualifications addresses whether Bradford had the "technical background necessary to evaluate project feasibility." Ponte Report at 5. This is a question relevant to whether the company's planning processes met industry standards. He does not opine on what Bradford actually "knew" or intended. His opinion that Bradford "was dependent on the input, analysis, and validation provided by qualified project personnel and consultants" but that "contemporaneous records show no evidence that these key stakeholders were substantively engaged" (Ponte Report at 24) is an observation about the project record, not a credibility determination.

Mr. Ponte's opinions are anchored to contemporaneous project materials and explain why, under accepted project management practice, the absence of standard controls undermines the technical support for project completion forecasts, regardless of motive, optimism, or good faith. Any disagreement with his conclusions is properly addressed through cross-examination

---

[4] To the extent any phrasing could be misconstrued as an opinion on state of mind, Plaintiff will cabin Mr. Ponte's trial testimony to project management issues and will not ask him to opine on what Defendants believed, intended, or whether any witness was credible.

and contrary evidence. This is particularly true where Defendants not only offered no competing expert to challenge his opinions, but declined to depose Mr. Ponte.

### C.      Mr. Ponte Does Not Offer Improper Legal Opinions

Defendants criticize Mr. Ponte's use of terms such as "standard of care," "reasonable basis," and "foreseeable" (Def. Br. at 11-12), but the context of his opinions makes clear that these terms are used in their ordinary project management sense, not as legal conclusions. Mr. Ponte employs this language to describe professional norms governing construction project planning: the level of CPM rigor typically required to support a project completion forecast, the integration of procurement lead times and permitting status into a schedule, and the identification of risks that competent project managers routinely account for when sequencing work. In fact, "[i]f the determination of the standard of care requires knowledge that is beyond the experience of an ordinary fact finder, expert testimony will be required." *Kasuba v. Costco Wholesale Corp.,* 710 F. Supp. 3d 122, 127 (D. Conn. 2024) (*quoting Santopietro v. City of New Haven*, 239 Conn. 207, 682 A.2d 106, 115 (1996)).

Defendants similarly fault Mr. Ponte's use of the phrase "material disconnect," but that criticism ignores context. Mr. Ponte uses this term in its ordinary project management sense to describe a substantial technical gap between projected completion dates and the planning inputs required to support those projections. He does not invoke, apply, or opine on the securities law concept of materiality, nor does he address investor expectations or disclosure obligations. His opinion reflects a project management gap analysis explaining why the absence of standard planning controls created a significant disconnect that undermined the technical reliability of the asserted completion timelines. For example, the phrase "material disconnect" is analogous to "substantial," "significant," or "meaningful disconnect" in project management terms. Relatedly, when Ponte uses terms like "reasonable basis," he employs them in their project management sense: whether the project completion forecast was grounded in a validated

14

schedule, integrated known constraints, and reflected standard risk analysis. He does not opine on legal reasonableness under securities law. Ultimately, the jury will determine issues of material falsity or scienter.

To be clear, Mr. Ponte has specifically qualified that his opinions are "limited solely to issues relating to the construction project management process, including the feasibility, planning, scheduling, and execution of the expansion of the Godby Road facility." Ponte Report at 8 n.1. Mr. Ponte does not opine on securities law, disclosure obligations, or what Defendants were required to say to investors. His opinions are confined to whether projected completion dates were supported by the types of planning controls and risk analyses that constitute accepted practice in construction project management. The use of industry terminology to explain technical adequacy does not transform his analysis into an impermissible legal opinion.

Defendants' challenge to Mr. Ponte's discussion of the Power Agreement fails to recognize that Mr. Ponte does not opine on the agreement's legal interpretation or offer opinions regarding the parties' contractual rights or obligations. Rather, he evaluates the agreement exclusively as an input to project planning and explains, from a project management standpoint, that the absence of defined milestones, sequencing provisions, or risk allocation mechanisms complicates the preparation of a reliable CPM schedule and increases uncertainty in projected completion dates. His testimony is directed to technical feasibility and planning discipline, not contract interpretation.

### D.    Mr. Ponte Does Not Improperly Rely on Hearsay

Defendants' hearsay objection fails because Mr. Ponte is not a "conduit" for hearsay. As FRE 703 explicitly provides, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Technical experts like Mr. Ponte should be expected to rely on

15

relevant testimony, project communications, and other records when conducting their analysis. *See U.S. v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993) ("An expert who meets the test of Rule 702 . . . is assumed 'to have the skill to properly evaluate the hearsay, giving it probative force appropriate to the circumstances.'") (quotation omitted).

Furthermore, many pieces of evidence considered by Mr. Ponte are not hearsay, because he does not rely on them for the truth of the matter asserted. Instead, he applies project management expertise to assess whether the project record reflects the scheduling rigor, risk integration, and planning controls required to support projected completion dates. When he discusses deposition testimony from Lisa DeKalb, for example, he does not testify to prove the truth of her statements. Rather, he analyzes whether the concerns she documented, such as that the schedule was "incredibly fast and probably unrealistic" and included "too many variables over which none of us had any control," are the type that, under standard project management principles, would ordinarily be incorporated into schedule risk analysis. Whether or not her concerns ultimately proved accurate, standard project management practice would require Defendants to follow up on her warning. Mr. Ponte's opinion that management failed to adequately respond to these documented concerns is an application of expertise, not mere repetition of hearsay.

Similarly, when Mr. Ponte reviews the Power Agreement or meeting notes from the January 7, 2021 coordination meeting with the City of College Park (Ponte Report at 12-13), he does so not to opine on their legal meaning or to establish the truth of statements therein, but to assess whether they provided the inputs typically necessary to develop a reliable construction schedule. His conclusions flow from his application of specialized project management expertise to the presence, *or absence*, of standard project controls in the record, not from parroting the statements of any third party.

16

Critically, Mr. Ponte's opinions do not depend on presenting the specific wording of any email or specific testimony from a witness. The relevance of many of these materials lies in their technical implications (or omissions), not their truth. Whether ForeSite was engaged in March 2021, whether a formal site plan was submitted in April 2021, or whether the City issued a permit in June 2021, are historical facts that form the framework for Mr. Ponte's schedule analysis. His expert opinion concerns what those facts mean from a project management standpoint: whether the sequence and timing of these activities could support the publicly announced completion dates. His synthesis and interpretation, through the lens of specialized expertise, is not improper hearsay transmission.

## III.    DEFENDANTS' REMAINING OBJECTIONS GO TO WEIGHT, NOT ADMISSIBILITY

To the extent Defendants disagree with Mr. Ponte's conclusions, those disagreements go to the weight of his testimony, not its admissibility. Vigorous cross-examination, presentation of contrary evidence, and careful jury instruction are the appropriate means of attacking evidence.

Defendants had ample opportunity to challenge Mr. Ponte's analysis. They could have deposed him to probe the basis for his opinions. They could have retained their own construction expert to offer competing opinions on whether the project planning met industry standards or whether the projected timelines were supportable. They did neither. Instead, they filed this motion attacking methodology they do not dispute, facts they do not challenge, and conclusions they have not rebutted with expert testimony of their own. These are precisely the issues that should be tested through the adversarial process at trial, not resolved through exclusion.

Mr. Ponte's forty years of experience in construction project management, his professional certifications, his detailed review of project documents, and his application of

17

standard industry methods all support the reliability of his opinions. Whether those opinions ultimately persuade the jury is a question for trial.

## **CONCLUSION**

The Ponte Report satisfies every requirement of FRE 702, and should not be otherwise excluded or limited. Defendants' motion should be denied in its entirety.

Dated: January 26, 2026

By: */s/ Gregory B. Linkh*
**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone:(212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

Christopher Fallon (*admitted pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**LAW OFFICES OF FRANK CRUZ**
Frank Cruz (*admitted pro hac vice*)
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Lead Attorneys for Lead Plaintiff Darshan Hasthantra and the putative Class*

## CERTIFICATE OF COMPLIANCE

I, Gregory B. Linkh, that this brief contains 5,339 words, which complies with the word limit of L.R. 7.1(c).

*/s/ Gregory B. Linkh*
Gregory B. Linkh

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On January 26, 2026, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 26, 2026.

*s/s Gregory B. Linkh*
Gregory B. Linkh

20